1  Kent A. Gardiner *(pro hac vice)*
   Kathryn D. Kirmayer *(pro hac vice)*
2  Jerome A. Murphy (*pro hac vice*)
   CROWELL & MORING LLP
3  1001 Pennsylvania Avenue, N.W.
   Washington, D.C.  20004
4  Telephone:  202-624-2500
   Facsimile:  202-628-5116
5  E-mail:  kgardiner@crowell.com
            kkirmayer@crowell.com
6            jmurphy@crowell.com

7  Daniel A. Sasse (CA Bar No. 236234)
   Christine E. Cwiertny (CA Bar No. 222098)
8  CROWELL & MORING LLP
   3 Park Plaza, 20th Floor
9  Irvine, California  92614
   Telephone:  949-263-8400
10 Facsimile:  949-263-8414
   E-mail:  dsasse@crowell.com
11           ccwiertny@crowell.com

12 Counsel for Plaintiffs
   Sun Microsystems, Inc. and
13 Unisys Corporation

14                 UNITED STATES DISTRICT COURT

15      NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

16 SUN MICROSYSTEMS, INC., a California       Case No. C 06-01665 PJH
   corporation, and UNISYS CORPORATION,       (Consolidated)
17 a Delaware corporation,
                        Plaintiffs,           **AMENDED CONSOLIDATED**
18                                            **COMPLAINT FOR DAMAGES AND**
             v.                               **INJUNCTIVE RELIEF FOR**
19
   HYNIX SEMICONDUCTOR, INC., a              **(1)     VIOLATION OF THE**
20 Korean corporation, HYNIX                 **SHERMAN ACT PURSUANT TO**
   SEMICONDUCTOR AMERICA INC., a             **15 U.S.C. § 1**
21 California corporation, MOSEL VITELIC
   INC., a Taiwanese corporation, MOSEL      **(2)     VIOLATION OF**
22 VITELIC CORPORATION, a California          **CALIFORNIA'S CARTWRIGHT**
   corporation, NANYA TECHNOLOGY             **ACT PURSUANT TO §§  16700**
23 CORPORATION, a Taiwanese corporation,      **ET SEQ. OF CAL. BUS. & PROF.**
   NANYA TECHNOLOGY CORPORATION,             **CODE**
24 USA, a California corporation, WINBOND
   ELECTRONICS CORPORATION, a                **(3)     VIOLATION OF**
25 Taiwanese corporation, WINBOND             **CALIFORNIA'S UNFAIR**
   ELECTRONICS CORPORATION                   **COMPETITION ACT PURSUANT**
26 AMERICA, a Delaware corporation, ELPIDA    **TO §§ 17200 ET SEQ. OF CAL. BUS.**
   MEMORY, INC., a Japanese corporation,     **& PROF. CODE**
27 ELPIDA MEMORY (USA) INC., a
   Delaware corporation, MITSUBISHI          **DEMAND FOR JURY TRIAL**
28 ELECTRIC CORPORATION, a Japanese
   corporation, MITSUBISHI ELECTRIC AND

AMENDED CONSOLIDATED COMPLAINT OF SUN & UNISYS (C06-01665 PJH)

1   ELECTRONICS USA, INC., a Delaware
    corporation, and MITSUBISHI ELECTRIC
2   EUROPE B.V., a Netherlands corporation,
    INFINEON TECHNOLOGIES AG, a
3   German corporation, INFINEON
    TECHNOLOGIES NORTH AMERICA
4   CORPORATION, a Delaware corporation,
    and DOES 1 through 5,
5                           Defendants.

6

7          Plaintiffs Sun Microsystems, Inc. ("Sun") and Unisys Corporation ("Unisys")

8   (collectively, "Plaintiffs"), for their Amended Complaint against Hynix Semiconductor,

9   Inc.; Hynix Semiconductor America, Inc.; Mosel Vitelic Inc.; Mosel Vitelic Corporation;

10  Nanya Technology Corporation; Nanya Technology Corporation (USA); Winbond

11  Electronics Corporation; Winbond Electronics Corporation America; Elpida Memory,

12  Inc.; Elpida Memory (USA), Inc.; Mitsubishi Electric Corporation; Mitsubishi Electric

13  and Electronics USA, Inc.; Mitsubishi Electric Europe B.V.; Infineon Technologies AG;

14  Infineon Technologies North America Corporation; and Doe defendants 1 through 5

15  (collectively, "Defendants"), allege as follows:

16  **A.    Nature of Action**

17         1.     Plaintiffs bring this action to recover damages caused by long-standing

18  collusion by suppliers of dynamic random access memory computer chips ("DRAM").

19  As described in more detail below, in June 2002 the United States Department of Justice

20  (the "DOJ") announced that it had begun to investigate a conspiracy among the world's

21  DRAM suppliers.  During the conspiracy, the DRAM suppliers conspired to control

22  production capacity, raise prices or slow their decline, allocate customers, and otherwise

23  unlawfully overcharge their DRAM customers.  During that same period, Plaintiffs, both

24  American companies, purchased several billion dollars worth of DRAM from the

25  conspirators and were substantially injured in U.S. commerce.

26         2.     As a result of the DOJ's investigation, five of the world's largest DRAM

27  suppliers have now admitted their involvement in the conspiracy, including Hynix

28  Semiconductor, Inc.; Infineon Technologies AG; Elpida Memory, Inc.; Micron

2

1   Technology, Inc.; and Samsung Electronics Co., Ltd.  Two of these companies – Micron

2   Technology, Inc. and Samsung Electronics Co., Ltd. –  are not named as Defendants in

3   this action, but, along with various other individuals, partnerships, corporations, and

4   associations (collectively, "Co-conspirators"), nevertheless participated in the DRAM

5   conspiracy.  Micron Technology, Inc. obtained amnesty from criminal prosecution by

6   being the first to admit its participation in the illegal cartel.  Infineon Technologies AG,

7   Hynix Semiconductor, Inc., Elpida Memory, Inc., and Samsung Electronics Co., Ltd.

8   have agreed to enter guilty pleas and pay fines based on their involvement in the

9   conspiracy.  In doing so, Elpida Memory, Inc. admitted that it conspired with an unnamed

10  DRAM manufacturer to rig a bid for a DRAM lot sold to Sun.  A senior official at Elpida

11  Memory (USA), Inc. also admitted to conspiring with respect to the same bid, as well as

12  another bid submitted to Sun.  Furthermore, senior officials at Micron, Hynix, Samsung,

13  and Infineon have pled guilty to colluding with their competitors to fix and raise DRAM

14  prices.  The DOJ investigation is ongoing, and additional guilty pleas are expected.

15          3.      Plaintiffs now seek treble damages and injunctive relief to remedy the

16  injuries they sustained as a result of the cartel's illegal activities beginning in or about

17  January 1997, the exact date being unknown to Plaintiffs, and continuing thereafter at

18  least through 2002 (the "Cartel Period").

19  **B.      Jurisdiction and Venue**

20          4.      Plaintiffs bring this action pursuant to Sections 4, 12, and 16 of the Clayton

21  Act, 15 U.S.C. §§ 15, 22, and 26 (2000 suppl. 2), for treble damages and injunctive relief,

22  as well as reasonable attorneys' fees and costs, with respect to the injuries they have

23  sustained arising from Defendants' and their Co-conspirators' violations of Section 1 of

24  the Sherman Act, 15 U.S.C. § 1 (2000 suppl. 2).

25          5.      Plaintiffs also bring this action pursuant to Section 16750(a) of the

26  California Business and Professions Code, for injunctive relief and treble damages that

27  Plaintiffs sustained due to Defendants' and their Co-conspirators' violations of Section

28  16700 *et seq.* of the California Business and Professions Code (the "Cartwright Act").

3

1 Plaintiffs' claims also are brought pursuant to Sections 17203 and 17204 of the California
2 Business and Professions Code, to obtain restitution from and an injunction against
3 Defendants due to their violations of Section 17200 *et seq.* of the California Business and
4 Professions Code (the "Unfair Competition Act").

5       6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331
6 and 1337(a). This Court has supplemental jurisdiction over Plaintiffs' state law claims
7 pursuant to 28 U.S.C. § 1367(a). In addition, this Court has jurisdiction over Plaintiffs'
8 claims pursuant to the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a (2000
9 suppl. 2) (the "FTAIA"), in that Defendants' and their Co-Conspirators' conduct had a
10 direct, substantial, and reasonably foreseeable effect on U.S. domestic commerce, and
11 such effect gave rise to Plaintiffs' antitrust claims.

12       7.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22,
13 and 28 U.S.C. § 1391(b), (c), and (d), in that at least one Defendant resides in this judicial
14 district or is licensed to do business or is doing business in this judicial district. Venue as
15 to each Defendant is also proper in this judicial district pursuant to the provisions of
16 Sections 16750(a) and 17203 of the California Business and Professions Code. The
17 unlawful conduct undertaken pursuant to the combination and conspiracy alleged herein
18 had and has a direct effect on business within the State of California, and the trade and
19 commerce described below is carried on to a significant degree within the State of
20 California.

21       8.    This Court has *in personam* jurisdiction over each Defendant, because,
22 *inter alia*, each Defendant: (a) transacted business throughout the United States,
23 including this district; (b) manufactured, sold, shipped, and delivered substantial
24 quantities of DRAM throughout the United States, including this district; (c) had
25 substantial contacts with the United States; and (d) was engaged in an illegal scheme and
26 price-fixing conspiracy that was directed at and had the intended effect of causing injury
27 to persons and entities residing in, located in, or doing business throughout the United
28 States.

AMENDED CONSOLIDATED COMPLAINT OF SUN & UNISYS (C06-01665 PJH)

## C.   Intradistrict Assignment

9.   Because Sun and a large number of Defendants maintain their principal places of business within Santa Clara County, this action arises in Santa Clara County for the purposes of Civil Local Rule 3-2(c), and should be assigned to the San Jose Division. However, Plaintiffs' actions have been ordered related to the *In re DRAM Antitrust Litigation action,* Case No. C 02-01486 PJH, and therefore are assigned to the San Francisco Division, Judge Hamilton presiding.

## D.   Parties

10.   Sun is a California corporation with its principal place of business in Santa Clara, California.  Sun is a leading maker of computer servers, workstations, and storage systems, with net sales in 2006 of $13.1 billion.  Throughout the Cartel Period, Sun procured its worldwide DRAM needs directly from DRAM suppliers, including Defendants and their Co-conspirators, as part of a global procurement strategy formulated and directed by a central purchasing organization based at its headquarters in California. This California-based central purchasing organization negotiated the price of and entered into contracts for Sun's global DRAM needs using three procurement mechanisms managed and run in California:  (1) face-to-face negotiations; (2) live electronic auctions, called Dynamic Bidding Events ("DBEs"); and (3) sealed bidding events.  The DRAM acquired pursuant to these three procurement mechanisms managed and run in California were incorporated into Sun products containing DRAM (i.e., servers, workstations, and storage systems) by either:  (1) Sun's facilities in the United States; (2) Sun's facilities outside the United States; or (3) one of the third-party external manufacturers used by Sun to manufacture some of its products containing DRAM:  (a) MiTAC International Corporation (a Taiwanese company with operations throughout the world, including the United States); (b) Celestica Inc. (a Canadian company with operations throughout the world, including the United States); (c) Benchmark Electronics, Inc. (a U.S. company with operations throughout the world); (d) Smart Modular Technologies, Inc. (a U.S. company with operations throughout the world); (e) Solectron Corporation (a U.S.

AMENDED CONSOLIDATED COMPLAINT OF SUN & UNISYS (C06-01665 PJH)

1    company with operations throughout the world); and (f) Expansion Electronics Inc. (a

2    U.K. company with operations throughout the world, including the United States)

3    (collectively, the "External Manufacturers").

4         11.    The procurement mechanisms used by Sun's California-based central

5    purchasing organization to effectuate the company's global DRAM procurement strategy

6    worked in the following manner:

7              a.  Prior to approximately 2001, Sun's central purchasing organization based

8                  in California acquired the company's global DRAM needs through face-to-

9                  face negotiations with DRAM suppliers, including Defendants and their

10                 Co-conspirators.  The DRAM suppliers would negotiate for a share of

11                 Sun's DRAM business at a certain price, without prior notice of where the

12                 DRAM would be delivered (whether it be to a Sun facility in the United

13                 States, a Sun facility outside the United States, or to one of the External

14                 Manufacturers used by Sun).  Upon agreement with a DRAM supplier,

15                 Sun's central purchasing organization based in California would forward

16                 notice to Sun's facilities in the United States, facilities outside the United

17                 States, and/or External Manufacturers telling them from which DRAM

18                 supplier and at which price (as negotiated by Sun in California) they should

19                 request a delivery of DRAM.  The various Sun facilities and External

20                 Manufacturers would then release purchase orders against the prices and

21                 volumes established by Sun's central purchasing organization based in

22                 California.  In turn, the identical product would often be shipped at the

23                 same price to the various sites around the world where Sun products

24                 containing DRAM were manufactured.

25             b.  Beginning in approximately 2001, Sun began procuring the vast majority of

26                 its worldwide DRAM needs primarily though DBEs.  These DBEs were

27                 organized and run in California at the direction of Sun's central purchasing

28                 organization based there.  Pursuant to the DBEs, DRAM suppliers would

6

1   submit electronic bids for a specific portion of Sun's worldwide DRAM

2   needs.  They did so without notice of where the delivery of DRAM would

3   occur (whether it be to a Sun facility in the United States, a Sun facility

4   outside the United States, or to one of the External Manufacturers used by

5   Sun).  Through its central purchasing organization based in California, Sun

6   would determine the winning DRAM suppliers, their share of Sun's

7   business, and the price to be paid for DRAM.  Sun's central purchasing

8   organization would then notify the DRAM suppliers of their allotted share

9   of business and forward notice to Sun's facilities in the United States,

10   facilities outside the United States, and/or External Manufacturers telling

11   them from which DRAM supplier and at which price (as negotiated by Sun

12   in California) they should request a delivery of DRAM.  The various Sun

13   facilities and External Manufacturers would then release purchase orders

14   against the prices and volumes established by Sun's central purchasing

15   organization based in California.  In turn, the identical product would often

16   be shipped at the same price to the various sites around the world where

17   Sun products containing DRAM were manufactured.

18   c.   Beginning in approximately 2001, in conjunction with the DBEs, Sun's

19   central purchasing organization based in California acquired a portion of

20   the company's worldwide DRAM needs through sealed bidding events

21   managed and run in California.  Like DBEs, sealed bidding events involved

22   DRAM suppliers submitting a bid for a portion of Sun's worldwide DRAM

23   needs directly to Sun's central purchasing organization based in California,

24   without prior notice of where the DRAM would be delivered (whether it be

25   to a Sun facility in the United States, a Sun facility outside the United

26   States, or to one of the External Manufacturers used by Sun).  Through its

27   central purchasing organization based in California, Sun would determine

28   the winning suppliers, their share of Sun's business, and the price to be paid

7

for DRAM.  Sun's central purchasing organization would then notify the winning DRAM suppliers and forward notice to Sun's facilities in the United States, facilities outside the United States, and/or External Manufacturers telling them from which DRAM supplier and at which price (as negotiated by Sun in California) they should request a delivery of DRAM.  The various Sun facilities and External Manufacturers would then release purchase orders against the prices and volumes established by Sun's central purchasing organization based in California.  In turn, the identical product would often be shipped at the same price to the various sites around the world that manufactured Sun products containing DRAM.  The sealed bid process was virtually identical to the DBE process, except that it was not electronic and only one bid per DRAM supplier was accepted by Sun's central purchasing organization based in California.

12.    The prices offered by Defendants and their Co-conspirators in connection with the above procurement mechanisms managed and run in California by Sun's central purchasing organization based there were centrally coordinated by global sales teams at each Defendant and Co-conspirator (usually based at the Defendant's or Co-conspirator's worldwide headquarters) that were specifically assigned to manage the company's account with Sun.  These global sales teams used pricing information – including competitive pricing information illegally obtained from other cartel members – to set a single, artificially-inflated price that would apply to all deliveries of DRAM to Sun throughout the world (whether it be to a Sun facility in the United States, a Sun facility outside the United States, or to one of the External Manufacturers used by Sun).  Thus, global sales teams at each Defendant and Co-conspirator specifically targeted their illegal activities at Sun in California, causing substantial injury to Sun in U.S. commerce.  For example, Defendant Hynix treated Sun as a strategic account (along with personal computer manufacturers such as Hewlett Packard Company, Dell Inc., and International Business Machines Corp.), whereby all DRAM pricing to Sun was centrally coordinated

8

1   through Hynix's headquarters in Korea.  Likewise, the prices offered to Sun by Elpida

2   were centrally coordinated through Elpida's headquarters in Japan.  Other Defendants

3   similarly centralized pricing on a global basis to Sun.

4          13.     The DRAM acquired by Sun's California-based central purchasing

5   organization using the above procurement mechanisms managed and run in California

6   was delivered to and used at the following consumption points:

7                  a.   During the Cartel Period, approximately 66% of Sun's worldwide DRAM

8                       needs were consumed at the company's manufacturing facilities located in

9                       the United States and abroad.  These facilities incorporated the DRAM

10                      acquired by Sun's California-based central purchasing organization into

11                      finished Sun products (e.g., servers, workstations, and storage systems).

12                      Approximately 75% of the DRAM delivered for use at Sun facilities was

13                      consumed at Sun's manufacturing facilities located in the United States,

14                      primarily those located in Beaverton, Oregon and Newark, California.  The

15                      remaining 25% of the DRAM delivered for use at Sun facilities was

16                      consumed in Europe, primarily at Sun's manufacturing facility located in

17                      Linlithgow, Scotland, with a small amount being used at Sun's facility in

18                      Amersfoort, Netherlands.  The individuals at the Beaverton, Newark,

19                      Linlithgow, and Amersfoort facilities responsible for placing purchase

20                      orders for DRAM against the prices and volumes established by Sun's

21                      central purchasing organization based in California reported directly to the

22                      California-based manager of the central purchasing organization.  At times

23                      during the Cartel Period, Sun's facilities in the United States would place

24                      orders for the delivery of DRAM to the company's European facilities, and

25                      likewise, the European facilities would place orders for the delivery of

26                      DRAM to the company's U.S. facilities.  Sun's operations in the United

27                      States (Beaverton and Newark) and Europe (Linlithgow and Amersfoort)

28

9

1              acted as a single enterprise and shared a complete unity of interests

2              throughout the Cartel Period.

3       b.  During the Cartel Period, approximately 34% of Sun's worldwide DRAM

4              needs were consumed at the domestic and foreign facilities of the External

5              Manufacturers used by Sun to manufacture its products containing DRAM.

6              Some of the External Manufacturers were headquartered in the United

7              States and all had operations in the United States.  Discovery is required to

8              identify the precise percentage of deliveries of DRAM to each of the

9              External Manufacturer's various facilities.  In approximately 1997, Sun

10            began outsourcing a portion of its server, workstation, and storage systems

11            manufacturing to the External Manufacturers.  The DRAM consumed by

12            the External Manufacturers and incorporated into Sun products was

13            requested at a price and share of business established by Sun through the

14            procurement mechanisms organized and run by Sun's California-based

15            central purchasing organization.  Thus, though an External Manufacturer

16            may have placed a purchase order directly with a selected DRAM supplier

17            on behalf of Sun for a shipment of DRAM to either its domestic or foreign

18            facilities, the price and share of business were determined by Sun in

19            California.  In addition, all technical and performance issues associated

20            with the DRAM delivered to the External Manufacturers were managed and

21            communicated to the DRAM suppliers by Sun.  To this extent, the External

22            Manufacturers acted as limited agents of Sun with respect to acquisitions of

23            DRAM pursuant to contracts negotiated by Sun for use in the company's

24            server, workstation, and storage systems manufacturing operations.

25            Further, the amounts paid for DRAM by the External Manufacturers were

26            passed through to Sun in their entirety pursuant to Sun's agreements with

27            the External Manufacturers, which were negotiated and entered into by

28            Sun's headquarters in California, and which permitted the External

10

Manufacturers to charge Sun 100% of the cost of DRAM plus an additional assembly fee.  As a result, Sun in the United States suffered the ultimate financial injury caused by overpriced DRAM being consumed by the External Manufacturers.

14.  Thus, regardless of the procurement mechanism used, with respect to all transactions in which Sun's California-based central purchasing organization sought to establish the price and quantity of DRAM, Defendants and their Co-conspirators offered a single, artificially-inflated price that they knew would apply to all deliveries of DRAM to Sun around the globe, whether such DRAM was shipped, as necessary to manufacture Sun products containing DRAM, to:  (1) one of Sun's U.S. manufacturing facilities (Beaverton, Oregon or Newark, California); (2) one of Sun's foreign manufacturing facilities (Linlithgow, Scotland or Amersfoort, Netherlands); or (3) one of the domestic or foreign facilities of Sun's External Manufacturers (MiTAC, Celestica, Benchmark, Smart Modular, Solectron, or Expansion).  Because of Sun's relationship with its foreign manufacturing facilities (closely controlled extensions of the company's U.S. operations) and External Manufacturers (limited agents of Sun who, pursuant to their agreements with Sun, completely passed the cost of DRAM through to Sun), the inflated DRAM prices charged in connection with deliveries to these entities were directly borne by Sun in the United States.  As a result, the ultimate financial injury caused by Defendants' and their Co-conspirators' illegal conduct was sustained in American commerce by an American company and significantly affected the financial status of that American company.

15.  Sun is a direct purchaser with respect to all of the DRAM used in the manners set forth above.  Defendants' and their Co-conspirators' illegal activities were specifically directed at the procurement mechanisms used by Sun's California-based central purchasing organization to establish the price of DRAM shipped to Sun around the world.  Thus, during the Cartel Period, the anticompetitive effects directed at Sun in California were the proximate cause of the artificially-inflated prices paid for all DRAM

11

1    used by Sun around the globe.  To the extent that Sun may be determined to be an

2    indirect purchaser of DRAM, the prices paid for such DRAM were artificially inflated,

3    thereby causing Sun to pay higher prices.

4         16.    Unisys is a Delaware corporation with its principal place of business in

5    Blue Bell, Pennsylvania and significant DRAM consuming operations in Mission Viejo,

6    California.  Unisys is a worldwide technology services and solutions company, with

7    expertise in consulting, systems integration, outsourcing, infrastructure, and server

8    technology aimed at achieving secure business operations for its clients.  In 2006, Unisys

9    had revenues of over $5.7 billion.  During the Cartel Period, Unisys procured DRAM

10   directly from Defendants and their Co-conspirators at artificially-inflated prices for use in

11   its server and personal computer manufacturing operations.

12        17.    During the Cartel Period, Unisys purchased DRAM directly for use in its

13   California-based server manufacturing operations.  These operations consumed both:  (1)

14   DRAM manufactured and sold at artificially-inflated prices by Defendants and their Co-

15   conspirators; and (2) memory modules (Unisys-specific configurations of DRAM)

16   assembled by U.S.-based third-party module makers – (a) Simple Technology, Inc.; (b)

17   Viking Interworks, Inc.; (c) Smart Modular Technologies, Inc.; and (d) White Electronic

18   Design Corp. (collectively, the "Module Makers") – using DRAM sold at artificially-

19   inflated prices by Defendants and their Co-conspirators.  All prices and contracts for the

20   DRAM and memory modules were negotiated and entered into by a procurement team

21   based at the headquarters of Unisys Corporation's server manufacturing operations

22   located in Mission Viejo, California (formerly in Rancho Bernardo, California).

23   Moreover, all such DRAM and memory modules were delivered to and used in Mission

24   Viejo, California (or previously in Rancho Bernardo, California).  Approximately 66% of

25   all DRAM purchased by Unisys from Defendants and their Co-conspirators during the

26   Cartel Period (including DRAM contained in memory modules) was delivered to and

27   used by the company's server manufacturing operations based in California.  Discovery

28   is required to identify the precise percentage of deliveries of DRAM to each of the

AMENDED CONSOLIDATED COMPLAINT OF SUN & UNISYS (C06-01665 PJH)

1   Module Makers' various facilities.  Further, the amounts paid for DRAM by the Module

2   Makers were passed through to Unisys in their entirety pursuant to Unisys Corporations'

3   agreements with the Module Makers, which permitted the Module Makers to charge

4   Unisys 100% of the cost of DRAM plus an additional module assembly fee.  As a result,

5   Unisys assumed the position of direct purchaser with respect to all such DRAM

6   purchases, suffering the ultimate and complete financial injury caused by overpriced

7   DRAM being consumed by the Module Makers.  Thus, with respect to all of the DRAM

8   (including DRAM contained in memory modules) consumed by its California-based

9   server manufacturing operations, Unisys, an American company, was substantially

10  injured in American commerce.

11          18.     Unisys also purchased DRAM directly for use in its personal computer

12  manufacturing operations.  Up until approximately 1998, Unisys manufactured personal

13  computers at its facilities located in San Jose, California and Villers, France.  The

14  company's worldwide personal computer manufacturing operations were based in and

15  coordinated from the San Jose facility, and a global procurement team located in San Jose

16  negotiated the price and volume of and entered into contracts for all of the DRAM used at

17  both the San Jose and Villers facilities pursuant to a global procurement strategy.  The

18  sister facility in Villers was closely controlled by San Jose and requested all of its

19  deliveries of DRAM in accordance with the volumes and prices set by the global

20  procurement team located in San Jose.  Thus, the same artificially-inflated price charged

21  by Defendants and their Co-conspirators for DRAM delivered to Unisys in San Jose also

22  applied to DRAM delivered to Unisys in Villers.  Throughout the Cartel Period, the

23  operations in San Jose and Villers acted as a single enterprise and shared a complete

24  unity of interests.  As a result, with respect to all DRAM delivered to Unisys

25  Corporation's personal computer manufacturing operations around the world, the

26  ultimate financial injury caused by Defendants' and their Co-conspirators' illegal conduct

27  was sustained in American commerce by an American company and directly affected the

28  financial status of that American company.  During the Cartel Period, approximately 20%

13

1    of all DRAM purchased by Unisys from Defendants and their Co-Conspirators was used

2    at the company's facility located in San Jose, California, and another 14% was used at the

3    company's facility located in Villers, France.

4         19.    With respect to all DRAM consumed in connection with its server and

5    personal computer manufacturing operations based in California, Unisys was a direct

6    purchaser of DRAM.  Of all the DRAM (including DRAM contained in memory

7    modules) purchased by Unisys from Defendants and their Co-Conspirators in connection

8    with its server and personal computer manufacturing operations, approximately 86% was

9    used at one of Unisys Corporation's facilities in the United States.  As a result, the

10   anticompetitive effects of Defendants' and their Co-conspirators' illegal conduct directed

11   at Unisys in the United States proximately caused the artificially-inflated prices paid for

12   DRAM by Unisys around the world.  To the extent that Unisys may be determined to be

13   an indirect purchaser with respect to any of the DRAM used by either its server or

14   personal computer manufacturing operations, the prices paid for such DRAM were

15   artificially inflated, thereby causing Unisys to pay higher prices.

16        20.    Unisys also purchased DRAM indirectly from Defendants and their Co-

17   conspirators that was incorporated into personal computers sold to Unisys by third-

18   parties.  After closing its personal computer manufacturing operations in approximately

19   1998, Unisys began rebranding and reselling personal computers manufactured by two

20   U.S.-based companies, Hewlett-Packard Company ("HP") and Dell Inc. ("Dell").  The

21   arrangement with HP lasted from approximately 1998 through 2001, and the arrangement

22   with Dell began in approximately 2001 and continues to the present.  The prices set and

23   contracts entered into with HP and Dell were negotiated by a Unisys team based in the

24   United States, and all orders for personal computers under the contracts were routed

25   through Unisys Corporation's facilities in California.  A number of Defendants and their

26   Co-conspirators have already admitted to price-fixing with respect to the DRAM sold to

27   HP and Dell.  Thus, to the extent that Unisys was an indirect purchaser of DRAM, the

28

AMENDED CONSOLIDATED COMPLAINT OF SUN & UNISYS (C06-01665 PJH)

1   price of that DRAM was artificially inflated, thereby causing Unisys to pay a higher price

2   for the personal computers it later resold.

3       21.     Defendant Hynix Semiconductor, Inc., a Korean corporation, maintains its

4   head offices at San 136-1, Ami-Ri, Bubal-eub, Ichon-si, Kyongki-do, Korea.  During the

5   time covered in this Amended Complaint, Hynix Semiconductor, Inc., a manufacturer of

6   DRAM, sold and distributed DRAM throughout the world, including the United States.

7   On information and belief, as a Korea-based manufacturer of DRAM with facilities

8   throughout the world, Hynix Semiconductor, Inc. manipulated the price of DRAM

9   charged around the globe, including in the United States, by intentionally restricting the

10  production capacity of its manufacturing plants located throughout the world and

11  directing its international affiliates, including those located in the United States, to charge

12  collusively-established prices for DRAM.  As a result of Hynix Semiconductor, Inc.'s

13  illegal activities directed at the United States and elsewhere, Plaintiffs paid artificially-

14  inflated prices for DRAM.

15      22.     Defendant Hynix Semiconductor America, Inc. is a California corporation

16  located at 3101 North First Street, San Jose, California 95134.  Hynix Semiconductor

17  America Inc., on information and belief, is a wholly-owned and controlled subsidiary of

18  Defendant Hynix Semiconductor, Inc. (collectively referred to as "Hynix").  During the

19  time period covered in this Amended Complaint, Hynix Semiconductor America, Inc.

20  sold and distributed DRAM throughout the United States.

21      23.     Defendant Mosel Vitelic Inc. is a Taiwanese corporation which maintains

22  its headquarters at No. 1 Creation Rd. 1, Hsinchu Science Park, Hsinchu, Taiwan, 30077,

23  R.O.C.  During the time period covered in this Amended Complaint, Mosel Vitelic Inc., a

24  manufacturer of DRAM, sold and distributed DRAM throughout the world, including the

25  United States.  On information and belief, as a Taiwan-based manufacturer of DRAM

26  with facilities throughout the world, Mosel Vitelic Inc. manipulated the price of DRAM

27  charged around the globe, including in the United States, by intentionally restricting the

28  production capacity of its manufacturing plants located throughout the world and

1    directing its international affiliates, including those located in the United States, to charge

2    collusively-established prices for DRAM.  As a result of Mosel Vitelic Inc.'s illegal

3    activities directed at the United States and elsewhere, Plaintiffs paid artificially-inflated

4    prices for DRAM.

5              24.    Defendant Mosel Vitelic Corporation is a California corporation located at

6    3910 North First Street, San Jose, California 95314.  Mosel Vitelic Corporation, on

7    information and belief, is a wholly-owned and controlled subsidiary of Defendant Mosel

8    Vitelic Inc. (collectively referred to as "Mosel Vitelic").  During the time period covered

9    in this Amended Complaint, Mosel Vitelic Corporation sold and distributed DRAM

10   throughout the United States.

11             25.    Defendant Nanya Technology Corporation is a Taiwanese corporation

12   which maintains its headquarters at Hwa Ya Technology Park, 669 Fu Hsing 3rd Rd.

13   Keuishan, Taoyuan, Taiwan, R.O.C.  During the time period covered in this Amended

14   Complaint, Nanya Technology Corporation, a manufacturer of DRAM, sold and

15   distributed DRAM throughout the world, including the United States.  On information

16   and belief, as a Taiwan-based manufacturer of DRAM with facilities throughout the

17   world, Nanya Technology Corporation manipulated the price of DRAM charged around

18   the globe, including in the United States, by intentionally restricting the production

19   capacity of its manufacturing plants located throughout the world and directing its

20   international affiliates, including those located in the United States, to charge collusively-

21   established prices for DRAM.  As a result of Nanya Technology Corporation's illegal

22   activities directed at the United States and elsewhere, Plaintiffs paid artificially-inflated

23   prices for DRAM.

24             26.    Defendant Nanya Technology Corporation, USA, a California corporation,

25   is located at 675 E. Brokaw Road, San Jose, California 95112.  On information and

26   belief, Nanya Technology Corporation USA is a wholly-owned and controlled subsidiary

27   of Defendant Nanya Technology Corporation (collectively referred to as "Nanya").  In

28   addition to its main U.S. office in San Jose, Nanya Technology Corporation operates

1   sales and technical support offices in San Jose, California, Raleigh, North Carolina, and

2   Austin, Texas and operates a memory design center in Houston, Texas.  During the time

3   period covered in this Amended Complaint, Nanya Technology Corporation USA sold

4   and distributed DRAM throughout the United States.

5          27.     Defendant Winbond Electronics Corporation is headquartered at No. 4,

6   Creation Road 3 and No. 9, Li-Shin Road, Science-Based Industrial Park, Hsinchu,

7   Taiwan, 300, R.O.C.  During the time period covered in this Amended Complaint,

8   Winbond Electronics Corporation, a manufacturer of DRAM, sold and distributed

9   DRAM throughout the world, including the United States.  On information and belief, as

10  a Taiwan-based manufacturer of DRAM with facilities throughout the world, Winbond

11  Electronics Corporation manipulated the price of DRAM charged around the globe,

12  including in the United States, by intentionally restricting the production capacity of its

13  manufacturing plants located throughout the world and directing its international

14  affiliates, including those located in the United States, to charge collusively-established

15  prices for DRAM.  As a result of Winbond Electronics Corporation's illegal activities

16  directed at the United States and elsewhere, Plaintiffs paid artificially-inflated prices for

17  DRAM.

18         28.     Defendant Winbond Electronics Corporation America, a Delaware

19  corporation, is located at 2727 North First Street, San Jose, California 95134 and is a

20  wholly-owned subsidiary of Winbond Electronics Corporation (collectively referred to as

21  "Winbond").  During the time period covered in this Amended Complaint, Winbond

22  Electronics Corporation America sold and distributed DRAM throughout the United

23  States.

24         29.     Defendant Elpida Memory, Inc., a Japanese corporation, maintains its

25  executive offices at Sumitomo Seimei Yaesu Building, 3F, 2-1 Yaesu 2-chome, Chuo-ku,

26  Tokyo, Japan.  During the time period covered in this Amended Complaint, Elpida

27  Memory Inc., a manufacturer of DRAM, sold and distributed DRAM throughout the

28  world, including the United States.  On information and belief, as a Japan-based

AMENDED CONSOLIDATED COMPLAINT OF SUN & UNISYS (C06-01665 PJH)

1  manufacturer of DRAM with facilities throughout the world, Elpida Memory, Inc.

2  manipulated the price of DRAM charged around the globe, including in the United

3  States, by intentionally restricting the production capacity of its manufacturing plants

4  located throughout the world and directing its international affiliates, including those

5  located in the United States, to charge collusively-established prices for DRAM.  As a

6  result of Elpida Memory, Inc.'s illegal activities directed at the United States and

7  elsewhere, Plaintiffs paid artificially-inflated prices for DRAM.

8         30.    Defendant Elpida Memory (USA) Inc., a Delaware corporation, is located

9  at 2001 Walsh Ave, Santa Clara, California, 95050 and is a wholly-owned subsidiary of

10 Elpida Memory, Inc. (collectively referred to as "Elpida").  During the time period

11 covered in this Amended Complaint, Elpida Memory (USA) Inc. sold and distributed

12 DRAM throughout the United States.

13        31.    Defendant Mitsubishi Electric Corporation, a Japanese corporation, is

14 headquartered at Tokyo Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310,

15 Japan.  During the time period covered in this Amended Complaint, Mitsubishi Electric

16 Corporation, a manufacturer of DRAM,  sold and distributed DRAM throughout the

17 world, including the United States.  On information and belief, as a Japan-based

18 manufacturer of DRAM with facilities throughout the world, Mitsubishi Electric

19 Corporation manipulated the price of DRAM charged around the globe, including in the

20 United States, by intentionally restricting the production capacity of its manufacturing

21 plants located throughout the world and directing its international affiliates, including

22 those located in the United States, to charge collusively-established prices for DRAM.

23 As a result of Mitsubishi Electric Corporation's illegal activities directed at the United

24 States and elsewhere, Plaintiffs paid artificially-inflated prices for DRAM.

25        32.    Defendant Mitsubishi Electric & Electronics USA, Inc., a Delaware

26 corporation, is headquartered at 5665 Plaza Drive, Cypress, CA 90630 and is a wholly-

27 owned subsidiary of Mitsubishi Electric Corporation.  During the time period covered in

28

1  this Amended Complaint, Mitsubishi Electric & Electronics USA, Inc. sold and

2  distributed DRAM throughout the United States.

3        33.    Defendant Mitsubishi Electric Europe B.V., a Netherlands corporation and

4  a wholly-owned subsidiary of Mitsubishi Electric Corporation (collectively referred to as

5  "Mitsubishi"), is headquartered at The Atrium, Uxbridge One, 1 Harefield Road,

6  Uxbridge, Middlesex, UB8 1PH, England, with its United Kingdom branch at Travellers

7  Lane, Hatfield, Hertfordshire, AL 10 8XB.  During the time period covered in this

8  Amended Complaint, Mitsubishi Electric Europe B.V. sold and distributed DRAM

9  throughout the world, including the United States and the European Union.

10        34.    Defendant Infineon Technologies AG, a German corporation, has its

11  principal place of business at Am Campeon 1-12, Munich, 85779, Germany.  During the

12  time period covered in this Amended Complaint, Infineon Technologies AG, a

13  manufacturer of DRAM, sold and distributed DRAM throughout the world, including the

14  United States.  On information and belief, as a Germany-based manufacturer of DRAM

15  with facilities throughout the world, Infineon Technologies AG manipulated the price of

16  DRAM charged around the globe, including in the United States, by intentionally

17  restricting the production capacity of its manufacturing plants located throughout the

18  world and directing its international affiliates, including those located in the United

19  States, to charge collusively-established prices for DRAM.  As a result of Infineon

20  Technology AG's illegal activities directed at the United States and elsewhere, Plaintiffs

21  paid artificially-inflated prices for DRAM.

22        35.    Defendant Infineon Technologies North America Corporation, a Delaware

23  corporation and a wholly-owned subsidiary of Infineon Technologies AG (collectively,

24  "Infineon"), has its principal place of business at 640 N. McCarthy Boulevard, Milipitas,

25  California 95035.  During the time period covered in this Amended Complaint, Infineon

26  Technologies North America Corporation sold and distributed DRAM throughout the

27  United States.  Recently, Infineon spun-off its DRAM business, which is now operating

28  as Qimonda, a wholly-owned subsidiary of Infineon Technologies AG.

36. Doe defendants 1 through 5 are persons and/or entities whose identities are as yet unknown to Plaintiffs and who have participated in the violations of the federal and state antitrust laws for which Plaintiffs seek relief, and have performed acts and made statements in furtherance thereof.

37. For purposes of this Amended Complaint, Sun brings its causes of action solely against the following Defendants:  Hynix Semiconductor, Inc.; Hynix Semiconductor America, Inc.; Mosel Vitelic Inc.; Mosel Vitelic Corporation; Nanya Technology Corporation; Nanya Technology Corporation, USA; Winbond Electronics Corporation; Winbond Electronics Corporation America; Elpida Memory, Inc.; Elpida Memory (USA) Inc.; Mitsubishi Electric Corporation; Mitsubishi Electric and Electronics USA, Inc.; Mitsubishi Electric Europe B.V.; and Doe defendants 1 through 5.

38. For purposes of this Amended Complaint, Unisys brings its causes of action solely against the following Defendants:  Hynix Semiconductor, Inc.; Hynix Semiconductor America, Inc.; Mosel Vitelic Inc.; Mosel Vitelic Corporation; Nanya Technology Corporation; Nanya Technology Corporation, USA; Winbond Electronics Corporation; Winbond Electronics Corporation America; Mitsubishi Electric Corporation; Mitsubishi Electric and Electronics USA, Inc.; Mitsubishi Electric Europe B.V.; Infineon Technologies AG; Infineon Technologies North America Corporation; and Doe defendants 1 through 5.

39. Various individuals, partnerships, corporations, and associations other than Defendants named in this Amended Complaint – the Co-conspirators – have participated in the violations of the federal and state antitrust laws for which Plaintiffs seek relief, and have performed acts and made statements in furtherance thereof.

40. Whenever in this Amended Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

1       41.    Co-conspirators Micron Technology Inc. and Micron Semiconductor

2   Products, Inc. (collectively known as "Micron") and Co-conspirators Samsung

3   Electronics Co., Ltd. and Samsung Semiconductor, Inc. (collectively known as

4   "Samsung") also participated in the violations alleged herein and performed acts and

5   made statements in furtherance thereof.

6   **E.    Trade and Commerce**

7       42.    During the Cartel Period, Defendants and their Co-conspirators sold and

8   shipped substantial quantities of DRAM in a continuous and uninterrupted flow of

9   interstate and international commerce to customers located in countries and states other

10   than the countries and states in which Defendants and their Co-conspirators manufacture

11   DRAM.

12       43.    The business activities of Defendants and their Co-conspirators that are the

13   subject of this Amended Complaint were within the flow of, and substantially affected,

14   interstate and international trade and commerce.  The global conspiracy, in which

15   Defendants and their Co-conspirators participated, had a direct, substantial, and

16   reasonably foreseeable effect on United States commerce.

17       44.    During the Cartel Period, Defendants and their Co-conspirators made most

18   of the DRAM sales in the global marketplace.

19   **F.    Statement of Facts**

20       45.    Defendants and their Co-conspirators manufacture, sell, and distribute

21   memory chips throughout the world.  Memory chips store data in a wide variety of

22   computing and electronic devices.  Memory chips are used in the manufacture of, and are

23   critical to the functioning of, such devices as personal computers, workstations, servers,

24   printers, fax machines, digital cameras and video recorders, video game equipment,

25   personal digital assistants, and cellular and wireless telephones.

26       46.    DRAM is the dominant, most common form of memory chip.  "Random

27   Access Memory" means that the data, stored in the form of 0s and 1s, can be accessed

28   directly from any part of the memory, rather than having to proceed sequentially from

1 some starting place. DRAM is called "dynamic" because it must have its storage cells

2 refreshed or given a new electronic charge every few milliseconds.

3      47. A DRAM chip is a large-scale integrated circuit with simple structures, and

4 is fairly easy to manufacture. Accordingly, DRAM is a commodity, with each of

5 Defendants' and their Co-conspirators' products being freely interchangeable with the

6 products of another company.

7      48. DRAM is sold in individual chips, or in modules with several chips

8 attached to each module.

9      49. DRAM sales exceed $20 billion a year. The world's top six manufacturers

10 of DRAM, all of which are named as either a Defendant or Co-conspirator here, control

11 roughly 96% of the market.

12      50. The DRAM industry enjoyed an extended period of prosperity in the mid-

13 1990s as the personal computer industry boomed. During this time, DRAM

14 manufacturers could not meet the demand for their products. Revenues from DRAM

15 sales nearly tripled between 1993 and 1995. DRAM manufacturers responded by

16 building substantial new chip-making capacity. Factories for the manufacture of DRAM

17 chips are referred to as fabrication plants, or "fabs."

18      51. In 1996, this new capacity, coupled with demand decline, led to pressure on

19 Defendants and their Co-conspirators to cut their prices. Defendants and their Co-

20 conspirators responded by illegally conspiring to limit capacity and artificially fix and

21 raise prices.

22      52. Specifically, in December 1996, DRAM manufacturers attended a

23 SyncLink Consortium. SyncLink was a DRAM industry organization whose members

24 consisted of DRAM suppliers. During this December 1996 meeting, DRAM suppliers

25 resolved to establish unified strategies to address market concerns. Although the

26 organization initially appears to have been created to address technology concerns, the

27 industry reorganized the consortium in January 1999, causing the new president of the

28

AMENDED CONSOLIDATED COMPLAINT OF SUN & UNISYS (C06-01665 PJH)

organization to acknowledge publicly that the focus of the group would be to "co-ordinate instead of develop new technology."

53.   Executives from DRAM suppliers met again in Japan in January 1997. During this meeting the participants agreed that they would need to continue communicating with each other.  The participants also agreed to use an e-mail distribution software program, then known as a reflector e-mail, which permitted industry executives to exchange information via e-mail quickly and confidentially.

54.   Shortly after this meeting, in February 1997, DRAM suppliers curtailed production at their DRAM manufacturing facilities, as part of a collusive effort to maintain and raise prices.

55.   This coordinated drop in production had an immediate, but temporary, effect on prices, which rose during the second quarter of 1997.  Prices then began to fall again in the second half of 1997.

56.   As DRAM prices continued to fall into early 1998, DRAM manufacturers held at least two meetings to discuss the problem in April and June.  The second meeting, held on June 25, was called an "Executive Summit" and was attended by industry executives.  One of the topics at the Executive Summit was how to "Manage Price Competition, Profitability."  Upon information and belief, during these meetings, and in communications before and after these meetings, Defendants and their Co-conspirators discussed supply and pricing issues, and agreed that they would limit their capacity to artificially decrease the supply of, and increase, maintain, or control the price of, DRAM chips.

57.   Between June and September of 1998, every major DRAM manufacturer announced that it was curtailing or shutting down DRAM production facilities, because of a lack of demand for the product.  Defendant Hynix's corporate predecessor,

AMENDED CONSOLIDATED COMPLAINT OF SUN & UNISYS (C06-01665 PJH)

Hyundai,[1] and Co-conspirator Samsung each shut down its facilities for approximately one to two weeks in the summer of 1998.  Other suppliers communicated their intentions to slash production.

58.     This coordinated withdrawal of production capacity had an immediate effect on prices, which began to rise in June 1998, and increased steadily throughout the rest of the year.

59.     In August 1998, an email circulated among DRAM suppliers warned that during the ramp-up in production of a new DRAM standard being implemented by Rambus, DRAM vendors "will need a constant flow of information to help make wise decisions and to walk the fine line between a pleasant shortage and a disastrous over-supply."  A Hyundai executive noted that a shortage would please DRAM manufacturers because "prices go up."

60.     A former Samsung employee, Devin Cole, has admitted that before he left Samsung in July 1998, he spoke with competitors regarding price issues.  Cole informed federal authorities that these conversations led to agreements on a "range pact" that included "the ranges of prices, where each competitor felt that others would price in the range, and whether each competitor would move prices 'a little' or 'a lot'."  Upon information and belief, this evidence is corroborated by Cole's own notes and other documents.

61.     DRAM prices continued to climb steadily in 1999.  During this time, Defendants and their Co-conspirators continued their illegal communications with each other about prices, market share, and supply.  In July 1999, a Hyundai executive sent an e-mail to Farhad Tabrizi, the vice president of marketing for Hyundai and head of the DRAM industry group SLDRAM Inc. (the successor organization to SyncLink).  The e-mail states that "[w]ith Samsung building significant amounts of product, we need to

---

[1]     Hyundai's semiconductor subsidiary was named Hyundai Electronics.  In March 2001 Hyundai renamed this subsidiary Hynix Semiconductor.  In August 2001, Hyundai spun off the company.

1   work with them to limit the supply in the market, otherwise we both will be competing

2   for market share which will result in an oversupply.  We have to meet with Samsung and

3   discuss our and their production plan, TAM analysis and targeted market share."   In

4   response, another Hyundai employee stated that he had "a connection in samsung" [sic]

5   and offered to set up a meeting.

6   62.   A short time later, Samsung and Hyundai both began raising prices at an

7   accelerated rate.  Indeed, in September 1999, industry sources noted that South Korea's

8   DRAM suppliers (Samsung and Hyundai) were raising prices in one-to-two week

9   intervals.

10   63.   Despite their unlawful and secret cooperation to reduce DRAM production

11   and increase price, Defendants and their Co-conspirators publicly misrepresented that

12   DRAM prices escalated due to increased demand resulting from strong sales of low-

13   priced PCs incorporating large quantities of DRAM.  In a September 13, 1999, Electronic

14   News article, Avo Kanadjian, vice president of marketing at Samsung said:  "Because we

15   see the value PC and free PCs entering the market at extraordinary numbers, DRAM

16   oversupply has silently gone into a shortage."  Chee-Wai Ho, director of product

17   marketing for memory products at Infineon, agreed.

18   64.   Because of Defendants' and their Co-conspirators' collusive activities,

19   DRAM prices remained artificially inflated from the middle of 1998 through the fall of

20   2000.

21   65.   In August 2000 prices began to drop once again.  By mid-2001, every

22   major DRAM supplier was reporting losses.  Their stock prices fell.  Once again,

23   Defendants and their Co-conspirators responded by conspiring with each other to control

24   production and raise prices.  Their collusive activities included, but were not limited to,

25   the following:

26   • In July 2001, Hynix announced plans to cut production to boost prices.

27   A spokeswoman for Hynix stated:  "We understand other companies are

28   also considering cuts."

- In August 2001, a Mosel Vitelic executive admitted that Taiwan DRAM manufacturers had discussed curtailing production in an effort to raise prices.

- Also in August, Thomas Chang at Mosel Vitelic acknowledged talking to other Taiwanese DRAM manufacturers about reducing supply:  "Our preliminary agreement is to trim some production starting September."

- In November, Micron manager Kathy Radford acknowledged efforts by Infineon and Samsung to raise prices of DRAM, and stated that Micron intended to raise prices for all of its OEM customers:  "The consensus from all suppliers is that if Micron makes the move, all of them will do the same and make it stick."

- In late 2001 and early 2002, representatives of Samsung and Infineon communicated with one another specifically about bidding on DRAM to be purchased by Sun.  During one contact, the Samsung employee told the Infineon employee that Samsung's goal in the bidding was to "come [in] second."

- Alfred Censullo, a former Micron sales manager, also confirmed that Micron spoke with competitors about pricing.  Censullo pleaded guilty in January 2004 to federal charges of obstruction of justice for altering and withholding documents responsive to a grand jury subpoena issued to Micron.  At his sentencing hearing, Censullo acknowledged that these documents consisted of notes that he took during weekly conference calls with other regional sales managers at Micron, who, like Censullo, were responsible for major OEM customers.  During these calls, the managers would discuss price recommendations for major OEM customers and the prices at which competitors would sell their products to these OEM customers.  Censullo's notes reflected this pricing

1         information and identified communications between Micron and its

2         competitors about sales and pricing.

3      66.    These collusive activities perpetrated by Defendants and their Co-

4 conspirators worked – by the end of 2001, the price for 128 MB DRAM had increased by

5 95% over the November 6, 2001, spot price.

6      67.    Nevertheless, Defendants and their Co-conspirators again publicly, and

7 falsely, attributed the increase in DRAM price to legitimate market forces.  In a

8 December 4, 2001, interview published on Simmtester.com, Steve Appleton, chief

9 executive officer of Micron, was asked why prices had recently increased sharply and

10 suddenly.  He answered:

11      "I have no idea.  There clearly was a belated increase in demand as the seasonal

12      rebound we had expected two-and-a-half months earlier finally kicked in.  And,

13      clearly the Japanese are cutting back their DRAM production.  Even Hynix, which

14      is so unpredictable, cut some production by temporarily closing its Eugene, Ore.,

15      fab.  When it was running at 40K wafer capacity a month, that fab alone probably

16      had about 2.5% of the world's DRAM production."

17      68.    DRAM price increases, as well as Defendants' and their Co-conspirators'

18 illegal activities, continued into 2002.  From November 2001 to April 2002, DRAM

19 prices tripled.  In a press release issued on April 15, 2002, Hynix represented that its

20 increased revenues resulted from increased demand in the DRAM market.  However, in

21 May 2002, Thomas Chang of Mosel Vitelic contradicted other cartel members' assertions

22 that legitimate market forces were driving DRAM prices when he stated: "We're trying

23 to encourage a price of US $3.  That's the consensus…You don't need to have a meeting.

24 You just need to have a phone call.  Everybody knows each other.  We just said 'try not

25 to sell below US $3.'"

26      69.    Defendants and their Co-conspirators also specifically targeted Sun's DBE

27 auction process, exchanging pricing information, discussing whether to bid on certain lots

28 of DRAM, and coordinating which place (which percentage of Sun's business) each

1   supplier would seek during a particular auction.  As just one example, Elpida, Infineon,

2   Mitsubishi, and others coordinated bids and the share of Sun's business each would seek

3   during a DBE conducted in 2002.

4          70.     In furtherance of the conspiracy, Defendants established internal rewards

5   for employees who participated in the cartel.  For example, the compensation of an

6   Elpida employee responsible for managing Sun's account was specifically tied to his

7   ability to coordinate Sun pricing with Elpida's competitors.  In other words, the better

8   that employee was at conspiring against Sun, the more he was paid by Elpida.  Likewise,

9   the management at Hynix promoted a business culture whereby collaboration with

10  competitors was encouraged and rewarded.  Other Defendants similarly rewarded such

11  illegal behavior toward customers by their employees.

12  **G.     The Department of Justice Investigation**

13         71.     On June 18, 2002, Co-conspirator Micron announced it had been

14  cooperating with a DOJ investigation of the DRAM industry.

15         72.     By June 20, 2002, Defendants Hynix and Infineon and Co-conspirator

16  Samsung confirmed that they had received subpoenas from a grand jury investigating

17  DRAM collusion.

18         73.     On September 12, 2003, Defendant Elpida announced that it had received

19  subpoenas from the DRAM grand jury.

20         74.     On or about September 4, 2004, Defendant Infineon entered into a plea

21  agreement with the U.S. government pursuant to which it agreed to plead guilty to

22  conspiring to fix prices in the DRAM market between July 1999 and June 2002.

23         75.     On April 21, 2005, the DOJ announced that it had entered into a plea

24  agreement with Defendant Hynix pursuant to which Hynix agreed to plead guilty to

25  conspiring to fix prices in the DRAM market between April 1999 and June 2002.

26         76.     On or about October 13, 2005, the DOJ announced that it had entered into a

27  plea agreement with Co-conspirator Samsung pursuant to which Samsung agreed to plead

28

AMENDED CONSOLIDATED COMPLAINT OF SUN & UNISYS (C06-01665 PJH)

1  guilty to conspiring to fix prices in the DRAM market between April 1999 and June
2  2002.

3        77.    Three months later, on January 30, 2006, the DOJ announced that it had
4  entered into a plea agreement with Defendant Elpida pursuant to which Elpida agreed to
5  plead guilty to conspiring to fix prices in the DRAM market between April 1999 and
6  June 2002.  In addition, Elpida admitted that it conspired with an unnamed DRAM
7  manufacturer to rig a bid for a DRAM lot sold to Sun.

8        78.    The DOJ's investigation has also resulted in former and current Samsung,
9  Hynix, Infineon, and Elpida executives being fined and imprisoned.

10 **H.    Violations Alleged**

11              **FIRST CAUSE OF ACTION**

12        **(Violation of Sherman Act Against All Defendants)**

13        79.    Plaintiffs incorporate by reference, as if fully set forth, the allegations of
14  paragraphs 1 through 78 of this Amended Complaint.

15        80.    Beginning in or about January 1997, the exact date being unknown to
16  Plaintiffs, and continuing thereafter at least through 2002, Defendants and their Co-
17  conspirators, by and through their officers, directors, employees, agents, or other
18  representatives, entered into a continuing contract, combination and/or conspiracy to
19  unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act,
20  15 U.S.C. § 1 (2000 suppl. 2).

21        81.    Defendants and their Co-conspirators, by their unlawful conspiracy,
22  artificially raised, inflated, and maintained the market price of DRAM as herein alleged.

23        82.    The contract, combination, and/or conspiracy consisted of a continuing
24  agreement, understanding, and concert of action among Defendants and their Co-
25  conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the
26  prices of, and/or allocate the market for, DRAM sold throughout the world, including the
27  United States.

28

83.    Upon information and belief, for the purposes of formulating and effectuating their contract, combination, and/or conspiracy, Defendants and their Co-conspirators did those things they contracted, combined or conspired to do, including:

    a.   participating in meetings and conversations to discuss the prices of and/or allocate the global market for DRAM;

    b.   agreeing to manipulate capacity, production, and prices so as to boost sagging DRAM prices in a manner that deprived direct purchasers of free and open competition;

    c.   issuing price announcements and price quotations in accordance with the agreements they reached; and

    d.   selling DRAM to customers throughout the world, including the United States, at artificially inflated and non-competitive prices.

84.    The above contract, combination and/or conspiracy has had the following effects, among others:

    a.   price competition in the sale of DRAM by Defendants and their Co-conspirators has been restrained, suppressed, and eliminated throughout the world, including the United States;

    b.   prices for DRAM sold by Defendants and their Co-conspirators have been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the world, including the United States; and

    c.   purchasers of DRAM from Defendants and their Co-conspirators have been deprived of the benefit of free and open competition in the purchase of DRAM.

85.    As a direct and proximate result of the unlawful conduct of Defendants and their Co-conspirators in furtherance of their continuing contract, combination, and/or conspiracy, Plaintiffs have been injured in their business and property in that they have

1   paid more for DRAM than they otherwise would have paid in the absence of Defendants'

2   and their Co-conspirators unlawful price fixing.

3   **SECOND CAUSE OF ACTION**

4   **(Violation of California's Cartwright Act Under §§ 16700 Et Seq. Of The California**

5   **Business & Professions Code Against All Defendants)**

6           86.     Plaintiffs incorporate by reference, as if fully set forth, paragraphs 1

7   through 85 of this Amended Complaint.

8           87.     Beginning in or about January 1997, the exact date being unknown to

9   Plaintiffs, and continuing thereafter at least through 2002, Defendants and their Co-

10  conspirators, by and through their officers, directors, employees, agents, or other

11  representatives, violated Section 16700 *et seq*. of the California Business and Professions

12  Code ("Section 16700" or "Cartwright Act") by entering into and engaging in a

13  continuing unlawful trust in restraint of trade and commerce, as described above.  During

14  the Cartel Period, Defendants and their Co-conspirators effected this unlawful trust, and

15  violated Section 16700, by combining, conspiring, and/or agreeing to fix, raise, stabilize,

16  and maintain the prices of, and/or allocate the market for, DRAM at supra-competitive

17  levels.  Section 16720 of the Cartwright Act expressly forbids the creation of such

18  unlawful trusts.

19          88.     The purpose of Defendants' and their Co-conspirators' unlawful

20  combination, conspiracy, and/or agreement was to create artificially-inflated DRAM

21  prices in the marketplace, thereby providing Defendants and their Co-conspirators with

22  substantially higher revenues and profits than would otherwise have been the case in a

23  truly competitive market.

24          89.     In forming, and in furtherance of, this unlawful combination, conspiracy,

25  and/or agreement, Defendants and their Co-conspirators engaged in acts, practices, and

26  courses of conduct, which included, but are not limited to, the following:

27                  a.   participating in meetings and/or discussions amongst themselves, as

28                       discussed more fully above, for the purpose of coordinating DRAM

31

1              production reductions to limit supply and fix, raise, stabilize, and

2              maintain the prices of, and/or allocate the market for, DRAM;

3       b.  participating in meetings, discussions, and/or communications

4              amongst themselves, as discussed more fully above, for the purpose

5              of exchanging information about DRAM prices and setting price

6              ranges for DRAM to fix, raise, stabilize, and maintain the prices of,

7              and/or allocate the market for, DRAM;

8       c.  participating in meetings, discussions, and/or communications

9              amongst themselves, as discussed more fully above, for the purpose

10             of setting DRAM contract prices for OEM customers to fix, raise,

11             stabilize, and maintain the prices of, and/or allocate the market for,

12             DRAM; and

13       d.  using their best efforts to ensure that the prices each charged its

14             customers for DRAM were within the price range, or at the same

15             price, agreed to during the meetings, discussions, and/or

16             communications held amongst themselves.

17       90.    As a direct consequence of Defendants' and their Co-conspirators' acts,

18 practices, and course of conduct in implementing the unlawful trust, the following have

19 occurred:

20       a.  DRAM price competition has been restrained, suppressed, and/or

21             eliminated, including, but not limited to, within and throughout the

22             State of California;

23       b.  DRAM price has been fixed, raised, maintained, and stabilized at a

24             high and artificial level, including, but not limited to, within and

25             throughout the State of California;

26       c.  Plaintiffs have been deprived of the benefit of free and openly

27             competitive negotiations for DRAM in the marketplace; and

28

AMENDED CONSOLIDATED COMPLAINT OF SUN & UNISYS (C06-01665 PJH)

      d.  Plaintiffs have been forced to pay artificially high prices for DRAM for use in their computer systems and network products.

91.    As a direct and proximate result of Defendants' and their Co-conspirators' unlawful combination, conspiracy and/or agreement, Plaintiffs have been injured in their business and property in that they had to pay more for DRAM than they would have paid in an otherwise free and open marketplace.  Plaintiffs are unable to state their damages with precision at this time, because that determination will require discovery and accounting analysis of Defendants' and their Co-conspirators' books and records. Nevertheless, under Section 16750(a) of the Business and Professions Code, Plaintiffs are entitled to interest on the aforementioned sum from the dates of service of this Amended Complaint until entry of judgment thereon, to its costs of suit, including reasonable attorneys' fees and treble damages.

## THIRD CAUSE OF ACTION

### (Unfair Competition Under § § 17200 Et Seq. Of

### The California Business & Professions Code Against All Defendants)

92.    Plaintiffs incorporate by reference, as if fully set forth, paragraphs 1 through 91 of this Amended Complaint.

93.    Plaintiffs bring this action pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that violate Section 17200 *et seq*. of the California Business and Professions Code, commonly known as the Unfair Competition Act.

94.    Beginning in or about January 1997, the exact date being unknown to Plaintiffs, and continuing thereafter at least through 2002, Defendants and their Co-conspirators, by and through their officers, directors, employees, agents, or other representatives committed, and continue to commit, acts of unfair competition, as defined by Sections 17200 *et seq*. of the California Business and Professions Code.  Defendants' and their Co-conspirators' acts of unfair competition, more fully alleged in paragraphs 1 through 91 above, included participating in an unlawful combination, conspiracy, and/or

33

1   agreement to fix, raise, stabilize, and maintain the prices of, and/or allocate the market

2   for, DRAM prices and making misrepresentations, or fraudulently concealing relevant

3   information, concerning the reason for increased DRAM prices.

4        95.    Plaintiffs have standing to bring this action, because they purchased DRAM

5   from Defendants and their Co-conspirators during the period January 1997 to the present.

6   In doing so, Plaintiffs were injured by Defendants' and their Co-conspirators' unlawful

7   actions, because they paid more for DRAM than they otherwise would have, as described

8   more fully above.  These higher prices caused Plaintiffs to lose money and customers,

9   who could not afford to purchase Plaintiffs' products containing artificially high-priced

10   DRAM.

11        96.    Defendants' and their Co-conspirators' conduct as alleged herein violates

12   Section 17200 *et seq.*  The unlawful combination, conspiracy, and/or agreement effected

13   by Defendants and their Co-conspirators, as well as their acts, omissions,

14   misrepresentations, practices, and non-disclosures in furtherance thereof, as alleged

15   herein, constitute a common continuous and continuing course of conduct of unfair

16   competition by means of unfair, unlawful, and/or fraudulent business acts or practices

17   within the meaning of California Business and Professions Code, Section 17200 *et seq.*

18   including, but in no way limited to, the following:

19             a.   Defendants' and their Co-conspirators violations of 15 U.S.C. § 1 and

20                  Section 16700 *et seq.,* of the California Business and Professions

21                  Code, as set forth in Paragraphs 1 through 91, above;

22             b.   Defendants' and their Co-conspirators' acts, omissions,

23                  misrepresentations, practices, and non-disclosures regarding how they

24                  set DRAM prices, as described in Paragraphs 1 through 91 above –

25                  whether or not in violation of 15 U.S.C. § 1 and Section 16700 *et seq.*

26                  of the California Business and Professions Code, and whether or not

27                  concerted or independent acts – are otherwise unfair, unlawful, or

28                  fraudulent;

c.   Defendants' and their Co-conspirators' act and practices, as alleged in
paragraphs 1 through 91, are unfair to consumers of DRAM in the
State of California and throughout the United States, within the
meaning of Section 17200 *et seq.*, California Business and Professions
Code; and

d.   Defendants' and their Co-conspirators' acts and practices, as alleged
in paragraphs 1 through 91, are fraudulent or deceptive within the
meaning of Section 17200 *et seq.* of the California Business and
Professions Code.

97.   The aforementioned unlawful and unfair business practices of Defendants
and their Co-conspirators have injured and present a continuing threat of injury to
Plaintiffs.  Defendants' and their Co-conspirators' conduct has restrained competition in
the DRAM market, has caused Plaintiffs to pay supra-competitive and artificially-inflated
prices for DRAM, and has deceived, and may continue to deceive, Plaintiffs with respect
to the manner in which the prices charged for DRAM have been and will be set.  Thus,
Plaintiffs are informed and believe that Defendants and their Co-conspirators may
continue to persist in this conduct and commit the aforementioned acts unless and until
the Court orders Defendants to cease and desist.

98.   Defendants and their Co-conspirators have been unjustly enriched as a
result of their wrongful conduct and unfair competition.  Plaintiffs are accordingly
entitled to equitable relief, including restitution and/or disgorgement of all revenues,
earnings, profits, compensation, and benefits in order to restore money lost by Plaintiffs
and that may have been obtained by Defendants and their Co-conspirators as a result of
such unfair business acts and practices, pursuant to the California Business and
Professions Code, Sections 17203 and 17204.  In addition, Plaintiffs seek a permanent
injunction enjoining Defendants, and their officers, directors, employees, agents, or other
representatives, and all others acting in concert with Defendants to cease and desist from
colluding together to fix, raise, stabilize, and maintain the prices of, and/or allocate the

AMENDED CONSOLIDATED COMPLAINT OF SUN & UNISYS (C06-01665 PJH)

1  market for, DRAM prices and making misrepresentations, or fraudulently concealing

2  relevant information, concerning the reason for increased DRAM prices.

3  **I.    Tolling of the Applicable Statute of Limitations due to Fraudulent**

4        **Concealment**

5        99.    Plaintiffs incorporate by reference, as if fully set forth, the allegations of

6  paragraphs 1 through 78 of this Amended Complaint.

7        100.    Plaintiffs had no knowledge of the combination and conspiracy alleged

8  herein, or of any facts that might have led to the discovery thereof in the exercise of

9  reasonable diligence, prior to June 2002 when Defendants Hynix and Infineon and Co-

10  conspirators Micron and Samsung first disclosed publicly that the DOJ was investigating

11  the DRAM industry.

12        101.    Defendants and their Co-conspirators engaged in a successful price-fixing

13  conspiracy concerning DRAM computer chips, which they affirmatively concealed, at

14  least in the following respects:

15            a.   By meeting secretly to discuss prices, and customers and markets, of

16                DRAM computer chips sold in the U.S. and elsewhere; and

17            b.   By agreeing among themselves at meetings and in communications not to

18                discuss publicly, or otherwise reveal, the nature and substance of the acts

19                and communication in furtherance of the illegal scheme.

20        102.    Price increases for DRAM before and during the Cartel Period were not

21  unusual.  Plaintiffs were therefore conditioned, by experience in dealing with Defendants

22  and their Co-conspirators in what they believed to be a competitive industry, to expect

23  price increases from time to time.

24        103.    Plaintiffs could not have discovered the existence of the combination and

25  conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence,

26  because of the deceptive practices and techniques of secrecy employed by Defendants

27  and their Co-conspirators to avoid detection and affirmatively conceal such violations.

28  Defendants and their Co-conspirators consistently ascribed their price increases to

1   ordinary market forces and consideration including, without limitation, falsely attributing

2   price increases to increased demand, shortages in supply, increased manufacturing costs,

3   increased prices of labor and of raw materials, and/or insufficient production capacity.

4   Such false statements included, without limitation:

5       a.   The statement of Samsung's vice president of marketing, Avo Kanadjian, in

6            a September 13, 1999, article, alleged more fully above in paragraph 63,

7            that higher prices were attributable to a DRAM shortage, which was

8            concurred upon by Chee-Wai Ho, director of product marketing for

9            memory products at Infineon; and,

10      b.   Hynix's April 15, 2002, representation, alleged in paragraph 68, that its

11           increased revenues resulted from increased demand in the DRAM market.

12      104.   Defendants and their Co-conspirators also falsely informed their customers

13  that they were unable to sell their products at a lower price due to increased

14  manufacturing costs, increased prices of labor and of raw materials, and insufficient

15  production capacity.

16      105.   Plaintiffs had no reason to disbelieve these statements.  Furthermore, most

17  of the explanations provided by Defendants and their Co-conspirators involved non-

18  public and/or proprietary information completely in Defendants' and their Co-

19  conspirators' control such that Plaintiffs could not verify their accuracy.  Defendants' and

20  their Co-conspirators' purported reasons for their price increases of DRAM were

21  materially false and misleading and were made for the purpose of concealing Defendants'

22  and their Co-conspirators' anti-competitive scheme, as alleged herein.  In truth, at all

23  relevant times, the price of DRAM was artificially inflated and maintained as a direct

24  result of Defendants' and their Co-conspirators' anticompetitive scheme, the operation of

25  which was a substantial (but undisclosed) factor in the pricing of DRAM during the

26  Cartel Period.

27      106.   As a result of the fraudulent concealment of the conspiracy, Plaintiffs assert

28  the tolling of the applicable statute of limitations affecting Plaintiffs' claims.

AMENDED CONSOLIDATED COMPLAINT OF SUN & UNISYS (C06-01665 PJH)

1    **J.     Damages/Restitution**

2        107.    During the Cartel Period, Plaintiffs purchased DRAM from Defendants and

3    their Co-conspirators, or their subsidiaries, agents, and/or affiliates, and, by reason of the

4    antitrust violations herein alleged, paid more for such products than they would have paid

5    in the absence of such antitrust violations.  As a result, Plaintiffs have sustained damages

6    to their business and property, and Defendants and their Co-conspirators wrongfully

7    acquired money from Plaintiffs in an amount to be determined at trial.

8    **K.     Prayer for Relief**

9        WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them,

10   as follows:

11       108.    A declaration that the unlawful contract, combination and/or conspiracy

12   alleged herein is an unreasonable restraint of trade of commerce in violation of Section 1

13   of the Sherman Act, 15 U.S.C. § 1 (2000 suppl. 2), and in violation of Sections 16700 *et*

14   *seq.* and 17200 *et seq.* of the California Business and Professions Code;

15       109.    An injunction enjoining, preliminarily and permanently, Defendants and all

16   those acting in concert or in active participation with Defendants from continuing the

17   unlawful combination and conspiracy alleged herein;

18       110.    An award to Plaintiffs of damages, as provided by law, and joint and

19   several judgments in favor of Plaintiffs against Defendants, and each of them, in an

20   amount to be trebled in accordance with the federal and California antitrust laws;

21       111.    For restitution and disgorgement of revenues, earnings, profits,

22   compensation, and benefits that have been wrongfully taken by Defendants and their Co-

23   conspirators from Plaintiffs as provided by 17200 *et seq.* of the California Business &

24   Professions Code;

25       112.    An award to Plaintiffs for the costs of this suit (including expert fees), and

26   reasonable attorneys' fees, as provided by law; and

27

28

AMENDED CONSOLIDATED COMPLAINT OF SUN & UNISYS (C06-01665 PJH)

1    113.    An award to Plaintiffs for such other and further relief as the nature of this

2  case may require or as this Court deems just, equitable and proper.

3  DATED:  May 4, 2007                    CROWELL & MORING LLP

4

5                                         By:   /s/ Daniel A. Sasse
                                               Kent A. Gardiner
6                                              Kathryn D. Kirmayer
                                               Jerome A. Murphy
7                                              1001 Pennsylvania Avenue, N.W.
                                               Washington, D.C.   20004
8                                              Phone:  202-624-2578
                                               Fax:     202-628-5116
9
                                               Daniel A. Sasse
10                                             Christine E. Cwiertny
                                               3 Park Plaza, 20th Floor
11                                             Irvine, CA  92614-8505
                                               Phone:  949-263-8400
12                                             Fax:     949-263-8414

13                                             Counsel for Plaintiffs
                                               Sun Microsystems, Inc. and Unisys Corporation
14

15                          **DEMAND FOR JURY TRIAL**

16    114.    Sun and Unisys demand a trial by jury, pursuant to Federal Rules of Civil

17  Procedure, Rule 38(b), of all triable issues.

18  DATED:  May 4, 2007                    CROWELL & MORING LLP

19

20                                         By:   /s/ Daniel A. Sasse
                                               Kent A. Gardiner
21                                             Kathryn D. Kirmayer
                                               Jerome A. Murphy
22                                             1001 Pennsylvania Avenue, N.W.
                                               Washington, D.C.   20004
23                                             Phone:  202-624-2578
                                               Fax:     202-628-5116

24                                             Daniel A. Sasse
                                               Christine E. Cwiertny
25                                             3 Park Plaza, 20th Floor
                                               Irvine, CA  92614-8505
26                                             Phone:  949-263-8400
                                               Fax:     949-263-8414

27

28                                             Counsel for Plaintiffs
    DCACTIVE 3052733 2                        Sun Microsystems, Inc. and Unisys Corporation
                                               39

AMENDED CONSOLIDATED COMPLAINT OF SUN & UNISYS (C06-01665 PJH)