**United States District Court**
For the Northern District of California

1

2

3                    UNITED STATES DISTRICT COURT

4                    NORTHERN DISTRICT OF CALIFORNIA

5

6

7    SUN MICROSYSTEMS INC.,

8            Plaintiff,                      No. C 06-1665 PJH

9        v.                                  **ORDER DENYING TWO MOTIONS TO
                                             DISMISS AND DEFERRING RULING
10                                           ON ONE MOTION TO DISMISS**
     HYNIX SEMICONDUCTOR INC., et al.,
11
             Defendants.
12   _____/

13
     This Document Also Relates to:
14
     Unisys Corp. v. Hynix et al.
15   (C06-2915 PJH); and

16   DRAM Claims Liquidation Trust
     v. Hynix, et al. (C 07-1381)
17   _____/

18          Three separate motions came on for hearing before this court on September 12,

19   2007:  (1) defendants' joint motion to dismiss the claims of Sun Microsystems, Inc. ("Sun")

20   and Unisys Corporation ("Unisys") based on foreign purchases asserted in case numbers

21   06-1665 and 06-2915; (2) defendants' joint motion to dismiss the claims of DRAM Claims

22   Liquidation Trust by its Trustee, Wells Fargo Bank, N.A. ("the trust") based on foreign

23   purchases asserted in case number 07-1381; and (3) joining defendants' motion to dismiss

24   certain claims of the trust asserted in case number 07-1381 on the basis that such claims

25   were not assigned to the trust.  Plaintiffs Sun and Unisys appeared through their counsel,

26   Kathryn Kirmayer, Jerome A. Murphy, and Matthew J. McBurney.  The trust appeared

27   through its attorneys James M. Lockhart and James Ficenec.  Defendants appeared

28   through their counsel, Julian Brew, Steven Morrissett, Wendy A. Herby, Harrison Frahn,

United States District Court

For the Northern District of California

1   Jason Bussey, David Brownstein, Howard Ullman, Daniel E. Alberti, Paul Salvaty, Steven

2   H. Bergman, Kenneth O'Rourke, Mona Solouki, Tuler Cunningham, Joshua Hess,

3   Jonathan E. Swartz, and Samuel J. Maselli.  Having read the papers filed in conjunction

4   with the motion and carefully considered the arguments and the relevant legal authority, the

5   court hereby **DENIES WITHOUT PREJUDICE** defendants' first two motions listed above,

6   and **DEFERS** ruling on the third motion, for the reasons stated at the hearing and as

7   follows.

8                                     **BACKGROUND**

9   **A.     Sun/Unisys**

10         The first motion to dismiss pertains to two actions: <u>Sun Microsystems, Inc. v. Hynix</u>

11  <u>et al.</u>, C 06-1665 PJH, and <u>Unisys Corporation v. Hynix et al.</u>, C 06-2915 PJH.  Sun and

12  Unisys are the only named plaintiffs in their respective actions which have been

13  consolidated for pretrial purposes.  On September 1, 2006, both plaintiffs filed a single

14  consolidated complaint against fifteen defendants:  Hynix Semiconductor Inc., and Hynix

15  Semiconductor America Inc. ("Hynix"); Mosel-Vitelic Inc., and Mosel-Vitelic Corporation

16  ("Mosel-Vitelic"); Nanya Technology Corporation, and Nanya Technology Corporation USA

17  ("Nanya"); Winbond Electronics Corporation, and Winbond Electronics Corporation America

18  ("Winbond"); Elpida Memory, Inc., and Elpida Memory (USA) Inc. ("Elpida"); Mitsubishi

19  Electric Corporation,  Mitsubishi Electric and Electronics USA, Inc., and Mitsubishi Electric

20  Europe B.V. ("Mitsubishi"); Infineon Technologies AG, and Infineon Technologies North

21  America Corporation ("Infineon") (collectively "defendants").

22         Sun and Unisys are original equipment manufacturers ("OEM"s) involved in the

23  technology field.  Sun is a leading maker of computer servers, workstations, and storage

24  systems.  Unisys is a global technology services and solutions company.  Both entities

25  purchased dynamic random access memory ("DRAM") from defendants.

26         In their original consolidated complaint, Sun and Unisys allege that from 1997

27  through 2002 defendants engaged in a conspiracy to control DRAM production capacity,

28

                                          2

United States District Court

For the Northern District of California

1    raise DRAM prices, allocate customers, and otherwise unlawfully overcharge their DRAM

2    customers.   As a result, plaintiffs allege that they suffered injury in that they paid more for

3    DRAM than they otherwise would have in the absence of defendants' conspiracy.

4        Defendants subsequently filed a motion to dismiss the initial complaint.  Defendants

5    categorized plaintiffs' claims as based on either foreign or domestic injury, and they sought

6    (a) dismissal of plaintiffs' claims based on foreign injury, both for lack of subject matter

7    jurisdiction and for failure to state a claim; and (b) dismissal of plaintiffs' claims based on

8    both foreign and domestic injury, for failure to satisfy notice pleading requirements.

9        On April 5, 2007, this court granted that motion and dismissed plaintiffs' consolidated

10   complaint for failure to comply with notice pleading requirements.  The court granted

11   plaintiffs leave to amend in order to set forth allegations that provide greater clarity and

12   specificity with respect to that portion of plaintiffs' claims which is based on foreign harm,

13   and that portion which is based on domestic harm.  Specifically, plaintiffs were ordered to

14   amend their complaint to include:  where the price for DRAM purchases upon which

15   plaintiffs base their claims was negotiated; where the DRAM purchases upon which

16   plaintiffs base their claims were actually made; whether plaintiffs themselves, subsidiaries,

17   or third parties made the actual purchases of DRAM; where these entities making DRAM

18   purchases on plaintiffs' behalf were located; where the DRAM was ultimately delivered or

19   distributed; and which particular claims are being alleged by plaintiffs as indirect

20   purchasers, rather than as direct purchasers.  See April 5, 2007 Order ("April 5 Order") at

21   8-9.

22       On May 4, 2007, plaintiffs Sun and Unisys filed an amended consolidated complaint

23   ("ACC") for damages and injunctive relief, asserting the same three causes of action

24   asserted in their original complaint: (1) violation of the Sherman Act pursuant to 15 U.S.C. §

25   1; (2) violation of California's Cartwright Act pursuant to §§ 16700 et seq. of the Cal. Bus. &

26   Prof. Code; and (3) violation of California's Unfair Competition Act pursuant to §§ 17200 et

27   seq. of the Cal. Bus. & Prof. Code.  See ACC, ¶¶ 79-106.  Plaintiffs allege that their claims

28

are based on a global conspiracy that involved foreign conduct.  See, e.g., ACC ¶¶ 21, 23,

25, 27, 29, 31, & 34 (alleging that foreign defendants "manipulated the price of DRAM

charged around the globe").  Sun and Unisys seek damages as a result of the artificially

inflated prices they allege they paid for DRAM as a consequence of defendants' alleged

price-fixing activity.

Defendants seek to dismiss only plaintiffs' claims based on purchases of DRAM by

plaintiffs' foreign operations and subsidiaries and by foreign external manufacturers and

module makers.  Briefly, plaintiffs' allegations relating to foreign purchases are as follows.

**Sun.**  Sun is a California corporation with its principal place of business in Santa

Clara, California.  Sun procured its DRAM from DRAM suppliers, including defendants, as

part of a global procurement strategy formulated and directed by a central purchasing

organization based in California.  This organization negotiated the price of and entered into

contracts for Sun's global DRAM needs via face-to-face negotiations, live electronic

auctions, and sealed bidding events.  All three of these procurement methods were

managed and run in California, and the negotiations between Sun and defendants took

place in the United States.  The DRAM acquired pursuant to these methods was

incorporated into Sun products containing DRAM by Sun's foreign and domestic facilities,

and by foreign and domestic third party external manufacturers.[1]  ACC ¶ 10.  Upon

reaching an agreement with a DRAM supplier (or upon conclusion of the bid process after

submitting bids), Sun's central purchasing organization would forward notice to Sun's

facilities (both domestic and foreign) telling them from which DRAM supplier and at which

price they should request a delivery of DRAM.  ACC ¶ 11.  At the hearing, Sun's counsel

referred to such agreements as "master agreements" which define the price that Sun

agrees to pay and the quantity that it can purchase from each defendant.  This is a single

agreement on price that applies globally, as the terms do not depend on the place of

---

[1]   These manufacturers include a Taiwanese company with worldwide operations, a Canadian company with worldwide operations, three US companies with worldwide operations, and a UK company with worldwide operations.  ACC ¶ 10.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   delivery, and Sun has an absolute right to make purchases against the master agreement.

2       The various Sun facilities and external manufacturers then release purchase orders

3   against the prices established by Sun's California based central purchasing organization in

4   the master agreements.  These purchase orders are issued both domestically and abroad.

5   The identical products are then shipped at the "same price" to the foreign and domestic

6   facilities.  This procedure, according to Sun, leads to the conclusion that each defendant

7   ultimately targeted their illegal activities at Sun in California.  ACC ¶ 12.

8       Sun directly purchased DRAM in the United States for about 49.5% of the purchases

9   for which it is seeking recovery in this action.  Approximately 16.5% of the DRAM

10  purchases for which it seeks recovery are for direct purchases of DRAM for use by its

11  foreign facilities.  See Mot. to Dismiss at 5:5-15 (citing ACC ¶ 13a).  At times, Sun's

12  facilities in the United States would place orders for delivery of DRAM to its European

13  facilities (in Linlithgow, Scotland and Amersfoort, Netherlands), and the European facilities

14  would place orders for delivery to the US.  Sun also alleges that 34% of its claims are

15  based on purchases by domestic and foreign facilities of the external manufacturers used

16  by Sun to manufacture its products containing DRAM, although Sun does not indicate what

17  portion of that 34% consists of purchases by or deliveries to foreign external

18  manufacturers.  Sun alleges that third party discovery is required to ascertain this

19  percentage.  Sun's contracts with its external manufacturers permitted them to charge Sun

20  100% of the cost of DRAM plus an assembly fee.  ACC ¶ 13b.  While defendants

21  characterize the purchases by the external manufacturers as indirect purchases, plaintiffs

22  do not concede this point.

23      In sum, between 49.5% and 83.5% of Sun's total DRAM purchases were for DRAM

24  delivered to and consumed in the United States.  See Mot. to Dismiss at 6:15-16 (citing

25  ACC ¶ 13a, 13b).  With respect to all transactions, defendants and their co-conspirators

26  offered a single, artificially-inflated price that they knew would apply to all deliveries of

27  DRAM to Sun around the globe, regardless of where the DRAM was shipped.  ACC ¶ 14.

28

**United States District Court**

For the Northern District of California

1    **Unisys.**  Unisys is a Delaware corporation with its principal place of business in

2    Pennsylvania.  It is a direct purchaser of DRAM from defendants at artificially inflated

3    prices.  ACC ¶ 16.  Unisys' story is somewhat different than Sun's.  Unisys has a server

4    business and a personal computer business.  The purchasing process for Unisys' personal

5    computer business was similar to Sun's, but its server business operated somewhat

6    differently.

7    Unisys purchased DRAM directly for use in its personal computer manufacturing

8    operations.  Of this category of DRAM, approximately 20% of Unisys' claim is for direct

9    purchases of DRAM used in the United States, and another 14% is for direct purchases of

10   DRAM used in Villers, France.  See Mot. to Dismiss at 5:9-15 (citing ACC ¶ 18).  For these

11   purchases, a global procurement team in San Jose, California negotiated the price and

12   volume of and entered into contracts for DRAM used in both San Jose and Villers.  The

13   facility in Villers was closely controlled by San Jose and requested its deliveries of DRAM in

14   accordance with prices set by the California procurement team.  Again, Unisys' counsel

15   refers to this type of contract as a master agreement.  Thus, the same price applied to

16   DRAM delivered to San Jose and to Villers.  ACC ¶ 18.  Of all the DRAM purchased by

17   Unisys, including DRAM contained in memory modules, 86% was used at one of Unisys'

18   facilities in the United States.  ACC ¶ 19.  Unisys claims to have been a direct purchaser of

19   all its DRAM, whether or not that DRAM was contained in memory modules.  It claims to

20   have been an indirect purchaser of DRAM to the extent that it purchased DRAM

21   incorporated into personal computers sold to Unisys by third parties, namely the US

22   companies HP and Dell.  ACC ¶ 20.

23   Unisys also purchased DRAM for use in its California-based server manufacturing

24   operations, which consumed DRAM sold at artificially inflated prices.  Approximately 66% of

25   DRAM purchased by Unisys was delivered to and used in California by Unisys' server

26   manufacturing operations.  Unisys purchased DRAM manufactured and sold by

27   defendants, as well as memory modules (Unisys-specific configurations of DRAM) from

28

United States District Court

For the Northern District of California

1  US-based third party module makers.  ACC ¶ 17.  All prices and contracts for DRAM and

2  for memory modules were negotiated and entered into by a procurement team based in

3  California.[2]  Moreover, all DRAM and memory modules were delivered to and used in

4  California.  The cost of DRAM was passed down from the module makers to Unisys, as

5  their agreements allowed the module makers to charge Unisys 100% of their cost of

6  DRAM.  ACC ¶ 17.  Unisys' server operations, therefore, differ from its personal computer

7  operations and Sun's operations in that there was no master agreement negotiated by

8  Unisys (at least, as to module makers), and Unisys took delivery of and consumed all of its

9  server DRAM in the United States.

10      Defendants now move to dismiss Sun's and Unisys' claims for damages based on

11  foreign purchases of DRAM described in paragraphs 13 and 18 of the ACC for lack of

12  subject matter jurisdiction and for failure to state a claim.  They also move to dismiss the

13  indirect purchaser claims in the ACC based on foreign purchases for failing to satisfy the

14  requirements of notice pleading and the requirements set forth in this court's April 5 Order.

15  **B.     The Trust**

16      The second and third motions to dismiss described above involve the trust's

17  complaint.  The trust was created as part of Silicon Graphics, Inc.'s ("SGI") Chapter 11

18  reorganization and claims to hold by assignment the DRAM price-fixing claims of SGI and

19  its subsidiaries.  First Amended Complaint ("FAC") ¶ 1.  SGI is a Delaware corporation with

20  its principal place of business in Sunnyvale, California.  It provides products, services and

21  solutions for use in high performance computing and storage.  It has manufacturing

22  facilities in the US, and previously had one in Switzerland that was operated by a subsidiary

23  ───────────────

24      [2] At the hearing, counsel for Unisys indicated that for its server operations, Unisys'
module makers independently negotiated with defendants to establish DRAM prices that varied

25  from module maker to module maker; the module makers ordered the DRAM directly from
defendants; defendants shipped the DRAM to the module makers; and the module makers

26  then shipped the DRAM-containing modules to Unisys in the United States.  Accordingly, there
was no master agreement negotiating DRAM prices between Unisys and  the module makers.

27  It is unclear, however, whether any such master agreements were in place with respect to any
direct purchases of DRAM made by Unisys from defendants, in connection with Unisys' server

28  manufacturing operations.

United States District Court

For the Northern District of California

1   until 2001.  FAC ¶¶ 10-11.

2          The trust filed its original complaint on March 8, 2007, which included allegations

3   similar to those made by Unisys and Sun, discussed above.  The trust filed its first

4   amended complaint ("FAC") on May 4, 2007 in order to comply with the court's April 5

5   Order in the Sun and Unisys consolidated case.[3]

6          The trust seeks recovery for direct purchases of DRAM delivered to SGI's

7   manufacturing facilities in the United States.  Given the assignment, the trust stands in the

8   shoes of SGI and the court uses the terms "the trust", "SGI," and "plaintiff" interchangeably.

9   SGI purchased many millions of dollars of DRAM directly from defendants.  This represents

10  approximately 80% of the DRAM purchases for which it seeks recovery.  Less than 20% of

11  the DRAM was delivered to a Swiss manufacturing facility operated by a Swiss subsidiary

12  owned and controlled by SGI.  Plaintiff claims it is primarily a direct purchaser of DRAM, but

13  asserts that to the extent it is determined to be an indirect purchaser, the prices paid for

14  that DRAM were artificially inflated and caused SGI to pay higher prices.  SAC ¶ 11.

15         The trust alleges that defendants treated it as a unitary business entity and delivered

16  DRAM to SGI in the United States and in Switzerland pursuant to the SGI company-wide

17  price negotiated and implemented in the United States.  All payments were in US dollars at

18  US dollar prices.  Delivery of DRAM was made upon communication of purchase orders

19  issued by SGI's facilities in the US and in Switzerland.  Defendants' and their co-

20  conspirators' illegal price-fixing was the proximate cause of artificially elevated prices paid

21  by SGI for DRAM, whether delivered in the US or in Switzerland.  The trust also alleges

22  that the market and conspiracy at issue were global.  SAC ¶¶ 36-39.  They allege that

23  defendants manufactured DRAM throughout the world and held a price-fixing meeting in

24

25
_____
26       [3] While plaintiff subsequently filed a second amended complaint ("SAC") on June 29,
    2007, it is identical to the FAC, but adds certain Hitachi defendants.  Accordingly, the parties
27  have stipulated that the pending motion to dismiss the FAC shall be applied equally and in full
    to the allegations in the SAC, and that the motion shall be deemed a response to both the SAC
28  and the FAC.  The court cites to the SAC, as that is the operative complaint.

United States District Court

For the Northern District of California

Japan.  SAC ¶¶ 38-39, 53.  Defendants[4] now move to dismiss the claims in the complaint based on foreign purchases pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 8.

Samsung, Elpida, Micron, Infineon, NEC, Nanya, Winbond, and Mosel-Vitelic also move to dismiss claims that were not properly assigned to the trust.  While the trust seeks damages for price-fixing beginning in January 1997, defendants argue that the trust lacks standing to bring claims based on SGI's DRAM purchases prior to April 1999 and after June 2002.  SAC ¶¶ 74, 81, 88.  Defendants maintain that the trust lacks standing because its authority to prosecute claims derives from the debtor's confirmed reorganization plan, which assigns to the trust the authority to prosecute only the claims of debtors "arising out of the purchase of dynamic random access memory between April 1999 and June 2002."  See RJN, Ex. A § 1.82 (plan).  In the alternative, joining defendants move to strike such claims.  This is the final motion discussed below and involves different issues than those in the other two motions to dismiss the claims based on foreign purchases.

**DISCUSSION**

A.    Legal Standards

1.    Rule 12(b)(1)

On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing subject matter jurisdiction (even though it is defendants' motion).  See Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375 (1994); Stock West, Inc. v. Confederated Tribes of the Colville Reservation, 873 F.2d 1221, 1225 (9th Cir. 1989).  A Rule 12(b)(1) jurisdictional attack may be facial or factual.  In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.  See Safe Air v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004).  In

---

[4] The moving defendants are Samsung Electronics Co. and Samsung Semiconductor ("Samsung"), Elpida, Micron Technology Inc. and Micron Semiconductor Products Inc. ("Micron"), Infineon, NEC Electronics America, Nanya, Winbond, Mosel-Vitelic, and Mitsubishi. NEC Corporation and Hynix have filed a joinder in the motion to dismiss.

United States District Court
For the Northern District of California

resolving a facial attack, a motion will be granted if the complaint, when considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction. See, e.g., Savage v. Glendale Union High School, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).

2.      Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint.  Ileto v. Glock, Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Review is limited to the contents of the complaint.  Allarcom Pay Television, Ltd. v. Gen. Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995).  To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure ("FRCP") 8. Rule 8(a)(2) requires only that the complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief."  FRCP 8(a)(2).

Specific facts are unnecessary – the statement need only give the defendant "fair notice of the claim and the grounds upon which it rests."  Erickson v. Pardus, 127 S.Ct. 2197, 2200 (2007) (citing Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007)). All allegations of material fact are taken as true.  Erickson, 127 S.Ct. at 2200.  However, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic, 127 S.Ct. at 1964-65 (citations and quotations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id. at 1965.  A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face.  See id. at 1966-67.

3.      Rule 8

Rule 8 requires that a complaint set forth all claims in short and plain terms, and in a manner that is simple, concise and direct.  See FRCP 8(a).  The complaint need not, however, allege every fact constituting the claim for relief or detailed evidentiary facts – it need only give fair notice of the plaintiff's claim so that the opposing party can respond,

**United States District Court**

For the Northern District of California

1  undertake discovery and prepare for trial.  See, e.g., Conley v. Gibson, 355 U.S. 41, 47-48

2  (1957); see also Bautista v. Los Angeles County, 216 F.3d 837, 843 (9th Cir. 2000).

3      4.    Rule 12(f)

4      As for Rule 12(f), a court may strike from "any pleading any insufficient defense or

5  any redundant, immaterial, impertinent, or scandalous matter."  FRCP 12(f).  "Immaterial"

6  matters are those which have no essential or important relationship to the claim for relief;

7  "impertinent" matters are statements that do not pertain and are not necessary to the

8  issues in question.  See Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993),

9  overruled on other grounds, 510 U.S. 517 (1994).

10
11  B.    Defendants' Motions to Dismiss Claims of Sun, Unisys, and the Trust Based on
        Foreign Purchases

12      1.    Subject Matter Jurisdiction

13      Section 1 of the Sherman Act prohibits all unlawful restraints of trade, including

14  price-fixing agreements.  See 15 U.S.C. § 1.  Since the language of Section 1 is broad, and

15  could conceivably limit all restraints of trade, Congress and the courts have limited the

16  reach of Section 1.  In 1982, Congress enacted the Foreign Trade Antitrust Improvements

17  Act of 1982 ("FTAIA"), which amended the Sherman Act to preclude its application to

18  conduct involving export trade or wholly foreign conduct unless two jurisdictional

19  prerequisites are met.  First, the conduct must have a "direct, substantial, and reasonably

20  foreseeable" effect on US domestic commerce or US import trade, or on the export

21  commerce of a person engaged in such commerce in the US.  See 15 U.S.C. § 6a.

22  Second, the "direct, substantial, and reasonably foreseeable" effect must "give rise to" a

23  Sherman Act claim.  Id.

24      In the Supreme Court's most recent pronouncement regarding the FTAIA, the court

25  affirmed specifically that where a plaintiff alleges anticompetitive price-fixing activity that is

26  in significant part foreign and results in foreign injury, the FTAIA's "general rule" excluding

27  the Sherman Act's application applies.  See F. Hoffman-La Roche Ltd. v. Empagran S.A.,

28

United States District Court

For the Northern District of California

1   542 U.S. 155, 158 (2004) (Empagran I).  This is the case here.  Plaintiffs have alleged

2   price-fixing activity by defendants that is in significant part foreign.  Plaintiffs allege a global

3   conspiracy based on significant foreign conduct by defendants.  See, e.g., ACC ¶¶ 21, 23,

4   25, 27, 29, 31, & 34 (alleging that foreign defendants "manipulated the price of DRAM

5   charged around the globe"); 53 (price-fixing meeting in Japan); SAC ¶¶ 36-39.  And they

6   allege that they paid higher prices both domestically and abroad.  In their opposition to

7   defendants' motion, plaintiffs concede that their allegations include foreign conduct by

8   defendants.  See Opp. at 4:16-18 (if the first sentence of the FTAIA stood alone, there

9   would be no issue before this Court; Defendants' foreign 'conduct' would be wholly beyond

10  the reach of the US antitrust laws.").  Accordingly, the FTAIA's general rule precluding

11  application of the Sherman Act to defendants' foreign price-fixing conduct applies.

12      As the Supreme Court noted in Empagran I, however, the relevant question is

13  frequently not whether the general rule excluding the Sherman Act's reach over wholly

14  foreign conduct applies, but whether the foreign conduct in question falls within the

15  domestic injury *exception* to the general rule.  As noted above, this exception applies where

16  the foreign conduct in question (1) has a direct, substantial, and reasonably foreseeable

17  effect on domestic commerce; and (2) the effect gives rise to a Sherman Act claim.  See

18  Empagran I, 542 U.S. at 159.  Accordingly, since plaintiffs bear the burden of proof in

19  demonstrating subject matter jurisdiction, the question is whether they can satisfy these two

20  prongs with respect to those portions of their claims based on DRAM purchased abroad.

21      First, plaintiffs must sufficiently allege that defendants' price-fixing conduct had a

22  "direct, substantial, and reasonably foreseeable" effect on US domestic commerce.  A

23  domestic effect is "direct" if it "follows as an immediate consequence of the defendant's

24  activity."  See United States v. LSL Biotechnologies, 379 F.3d 672, 680 (9th Cir. 2004)

25  (requiring the effect under the FTAIA to follow "as an immediate consequence of the

26  defendant's activity").  A domestic effect may be "substantial" if it involves a sufficient

27  volume of US commerce and is not a mere "spillover effect."  See, e.g., United

28

12

1   Phosphorous Ltd. v. Angus Chem Co., 131 F. Supp. 2d 1003, 1011-12 (N.D. Ill. 2001).

2       The second element requires that plaintiffs plead plausible facts showing that the

3   "effect" in question also "gives rise to" a Sherman Act claim.  Specifically, this means that

4   plaintiffs must show that the domestic effects in the United States, give rise to their claims

5   based on the DRAM purchased abroad.  Again, the Empagran litigation operates as

6   controlling precedent on this point.[5]

7               a)      Direct, Substantial, and Foreseeable Domestic Effect

8       The first step is to define the domestic effect in this case.  Not surprisingly, the

9   parties define domestic effect in a way that suits their own interests.  Plaintiffs argued that

10  the domestic effect was that they entered into contractual agreements to pay too much for

11  DRAM.  Regardless of where the injury occurred (the actual payment of higher prices), it

12  was the result of the agreement to pay inflated prices.  Whether the inflated prices were

13  paid by plaintiffs or their foreign affiliates, the prices were not simply based on the US-

14  negotiated price, but were the exact same price.  Thus, plaintiffs argued that their pleadings

15  appropriately asserted that the domestic effect of defendants' foreign price-fixing conduct

16  was their contractual agreement entered into in the US to pay higher prices to defendants

17  for DRAM.  Defendants on the other hand argued that an agreement to pay higher prices

18  could not be a domestic effect, rather it is the actual payment of higher prices in the US that

19  qualifies as a domestic effect of the alleged foreign price-fixing conduct.  That is because

20  there can be no injury from the negotiated agreement as injury occurs only when inflated

21  prices are paid.

22  _____

23      [5] Defendants also argue that plaintiffs do not meet the "export" exception of the FTAIA.
    The FTAIA provides that if the Sherman Act applies to conduct involving foreign trade or
24  commerce *only because* such conduct has a direct, substantial and reasonably foreseeable
    effect on export trade or export commerce with foreign nations or a person engaged in such
25  commerce in the United States, then the Sherman Act shall apply to such conduct "only for
    injury to export business in the United States."  15 U.S.C. § 6a.  Plaintiffs, however, do not
26  allege that the FTAIA exceptions apply *only because* of injury to export commerce – they
    allege that the foreign conduct had direct, substantial and reasonably foreseeable effects on
27  US commerce.  The "domestic injury" exception, therefore, is at the center of the parties'
    dispute.
28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Although the parties have advanced these seemingly irreconcilable positions, both sides appeared to blur the distinctions between "agreeing to higher prices" vs. "paying of higher prices" during the hearing.  For instance, although defendants generally maintained that it is the *payment* of higher prices in the US that is the domestic effect, rather than the setting of higher prices, they sometimes referred to the domestic effect simply as "higher prices" in the US and "sales of DRAM at artificially inflated prices in the US."  Similarly, Sun and Unisys while claiming that the execution of the master agreement negotiated and agreed to in the US is the domestic effect, also characterized the domestic effect as "paying defendants too much for DRAM." [6]

If defendants are correct in arguing that the price *paid* for DRAM is all that can satisfy the domestic effect element here, there can be no domestic effect – and therefore, no jurisdiction.  For it is undisputed that plaintiffs do not allege that they actually paid domestically for the DRAM ultimately delivered abroad to their foreign affiliates and external manufacturers.  If plaintiffs are correct in their argument that it is the mere agreement to pay (or the setting of) higher prices in the US that is the domestic effect, and that this setting of higher prices itself proximately caused the payment of higher prices abroad, there likely would be jurisdiction.

While the court finds these conflicting positions interesting, the court is not persuaded that either side is entirely correct.

First, the court notes that this is the first time that defendants have advanced this position, by defining domestic effect so narrowly.  These cases are related to antitrust litigation that has been pending on this court's docket for five years, See  In re DRAM Antitrust Litig., MDL No. 1486 (PJH), and which involves most of the same defendants.  Indeed, these plaintiffs have opted out of the class litigation in order to pursue their

---

[6] Although a certified copy of the transcript of the hearing on these motions was neither requested by the parties nor prepared by the court reporter, the court has referred to the court reporter's rough draft of the hearing to assist its recollection of the oral arguments made by the parties.

United States District Court

For the Northern District of California

1   individual claims.  An identical issue of FTAIA jurisdiction was raised by many of these

2   same defendants who obtained a dismissal of a foreign plaintiff, Centerprise International

3   ("Centerprise") based upon the court's finding that the domestic effect did not give rise to a

4   Sherman Act claim.  The court's ruling on the domestic effect prong of the FTAIA is,

5   however, noteworthy.  The court found without much analysis that the domestic effect of

6   the same price-fixing conduct at issue in these cases, was simply that the prices for DRAM

7   in the US rose.  See In re DRAM Antitrust Litig., 2006 U.S. Dist. LEXIS 8977 (N.D. Cal.

8   Mar. 1, 2006).  Specifically, the court found allegations that the prices for DRAM in the

9   United States went up because of defendants' conspiracy constituted a "direct, substantial,

10  and reasonably foreseeable" effect on domestic commerce.  See id. at *9.

11      Similar to the Centerprise plaintiffs, plaintiffs here have alleged that defendants were

12  engaged in a large volume of DRAM commerce, and that prices of DRAM in the US went

13  up as a result of that conspiracy.[7]  See, e.g., ACC ¶¶ 1-2, 49.  In the prior DRAM litigation,

14  the court did not draw a distinction between the setting of and the payment of higher prices

15  and it would be inconsistent with prior decisions to find that the "domestic effect" language

16  of the FTAIA requires more – i.e., that it requires actual payment of those prices.

17      Second, the relevant case law does not support defendants' argument that payment

18  of higher prices rather than the existence of such prices, is the required domestic effect of

19  foreign price-fixing conduct.  Defendants have cited no case which holds as much.  In fact,

20  the language used in the Empagran cases indicates that the court should not draw a

21  distinction between prices paid and prices established.  The Supreme Court referred to

22  "higher prices in the United States" – not payment of those higher prices – as an example

23

24      [7]  Briefly, the mechanism by which the high prices were set in the US are that all of
    Sun's purchases of DRAM from defendants were negotiated at a fixed quantity and price, here

25  in California pursuant to one master agreement.  The alleged artificially high price for DRAM
    negotiated to finality here in the US was the same price that was used for "deliveries of DRAM

26  to Sun around the globe."  For Unisys' personal computer manufacturing operations, a US
    team negotiated the price and volume of DRAM, and its French facility ordered DRAM at those

27  same prices set by the California procurement team.  Similarly, defendants delivered DRAM
    to SGI in Switzerland pursuant to the SGI company-wide price negotiated and implemented

28  in the US.

United States District Court

For the Northern District of California

1    of an adverse domestic effect in <u>Empagran I</u>.  In <u>Empagran II</u>, the court noted that

2    "maintaining super-competitive prices in the United States" – not payment of those higher

3    prices – was the domestic effect at issue.  <u>See Empagran S.A. v. F. Hoffman-La Roche</u>

4    <u>Ltd.</u>, 417 F.3d 1267, 1269, 1271 (D.C. Cir. 2005)("<u>Empagran II</u>").  Furthermore, because

5    the same price agreement governs domestic and foreign purchases here, the "adverse

6    foreign effect" is not "independent of any adverse domestic effect," as was the case in

7    <u>Empagran I</u>.  <u>See also MSG</u>, 477 F.3d at 540 ("domestic effects of the price fixing scheme

8    (increased U.S. prices) were not the direct cause of the appellants' injuries.  Rather, it was

9    the foreign effects of the price-fixing scheme (increased prices abroad).").[8]

10        Finally, the FTAIA uses the term domestic *effect*, not domestic *injury*.  To limit this

11   term to the *payment* of higher prices would be in the court's view an improper interpretation

12   of the statutory language.  While *payment* of artificially high prices by a victim of price-fixing

13   is one way to establish a domestic effect, the court is not persuaded that it is the only way

14   to establish a domestic effect.  The court thus rejects defendants' argument on this issue,

15   and concludes that, as plaintiffs posit, a domestic effect is established here by virtue of

16   plaintiffs' allegations that defendants' conduct led to higher prices for DRAM in the United

17   States, which in turn formed the predicate for plaintiffs' domestic agreements to pay higher

18   prices for DRAM.

19        Notwithstanding this finding, however, and as will be seen in the following section,

20   the court is similarly unpersuaded by plaintiffs' argument on the second prong of the FTAIA

21   test.

22            b)        Whether Effect "Gives Rise To" a Sherman Act Claim

23        The second prong requires plaintiffs to allege plausible facts showing that the

24

---

25        [8] <u>In re Intel Corp. Microprocessor Antitrust Litig.</u>, 452 F. Supp. 2d 555 (D. Del. 2006),

26   a case relied upon by defendants, also addressed the FTAIA.  That court concluded that
     plaintiff could not show domestic effects because its allegations that Intel excluded it from the

27   foreign market, which in turn weakened plaintiff domestically involved a chain of events too
     attenuated to constitute direct domestic effects.  This case is distinguishable in light of the

28   different type of domestic effects alleged here.

16

United States District Court

For the Northern District of California

1    domestic "effect" in question also "gives rise to" a Sherman Act claim.

2         Courts that have had occasion to consider this aspect of the FTAIA have generally

3    concluded that jurisdiction under the FTAIA exists only when the injury for which the plaintiff

4    seeks redress arises from the direct, substantial, and reasonably foreseeable US effect.

5    See, e.g., Den Norske Stats Oljeselskap As v. HeereMac Vof, 241 F.3d 420, 429 n.13 (5th

6    Cir. 2001) (affirming decision that no subject matter jurisdiction existed under FTAIA

7    because foreign plaintiff's injury (paying higher prices in the North Sea) did not arise from

8    domestic effect (higher prices in the domestic market)).  The controlling precedent on this

9    issue, as acknowledged by the parties, is the Supreme Court's opinion in Empagran I.

10        In Empagran I, vitamin sellers around the world conspired to fix prices, leading to

11   higher vitamin prices in the United States, and independently leading to higher vitamin

12   prices in other countries, like Ecuador.  See 542 U.S. 155 (2004).  In passing on whether

13   subject matter jurisdiction existed over the foreign plaintiffs' claims based on their foreign

14   purchases under the FTAIA, the Supreme Court held that "a purchaser in the United States

15   could bring a Sherman Act claim under the FTAIA based on domestic injury, but a

16   purchaser in Ecuador could not bring a Sherman Act claim based on foreign harm."  See

17   542 U.S. 155, 159 (2004).  The Court noted that since the wholly foreign harm suffered by

18   plaintiffs was *independent* of any adverse domestic effect (i.e., the higher prices in the US),

19   there was no jurisdiction.  The Court held that the FTAIA bars foreign purchasers from

20   bringing suit under the Sherman Act when the foreign effects of the foreign conduct at issue

21   are independent of any domestic anticompetitive effects.  However, the Empagran I Court

22   expressly left open the question whether the Sherman Act may apply to foreign claims

23   linked to domestic effects (i.e., claims in which the foreign injury is *not* independent of the

24   domestic effect).

25        The Supreme Court remanded the case back to the district court, and the case on

26   remand was eventually decided by the D.C. Circuit in Empagran II, which found that a

27   plaintiff must allege proximate cause to establish the requisite nexus between domestic

28

17

**United States District Court**
For the Northern District of California

effect and foreign injury.  See 417 F.3d at 1271.  The court then found that plaintiffs had

failed to do so.  Plaintiffs argued that because vitamins are fungible and readily

transportable, the sellers could not have maintained their international price-fixing

arrangement and injured plaintiffs without maintaining higher prices in the US.  Id. at 1269.

Plaintiffs argued that the conspirators accomplished their objective by "fixing a single global

price for the vitamins" and by creating barriers to international vitamin commerce in the

form of agreements that prevented vitamins from being traded between North America and

other regions.  Id. at 1270 n.5.  The court found that "while maintaining super-competitive

prices in the United States may have facilitated the appellees' scheme to charge

comparable prices abroad, this fact demonstrates at most but-for causation. . . ."  Id. at

1271.  In other words, proximate causation requires more than allegations that higher

prices abroad were triggered as a result of higher prices in the US.  Id. (distinguishing

Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC, 148 F.3d 1080 (D.C. Cir. 1998)

(American companies overpaying for radio advertising proximately caused those same

companies to have less to spend on advertising on the foreign plaintiff's station); Industria

Siciliana Asfalti, Bitumi, S.P.A. v. Exxon Research & Eng'g Co., No. 75-CSH, 1977 WL

1353 (S.D.N.Y. Jan. 18 1977) (defendant's tying arrangement precluded American

companies from bidding on design services, and the claim arose from its inability to seek

competitive bids from American companies)).

        A few recent district court decisions involving factual scenarios similar to the present

case have also addressed the proximate cause requirement.  The parties have relied

heavily on two cases in particular.  In re Rubber Chemicals Antitrust Litigation, MDL No. 04-

1647, 2007 U.S. Dist. LEXIS 62734 (N.D. Cal. Aug. 15, 2007) ("Rubber Chemicals")

involved allegations that defendants conspired to fix prices for rubber chemicals in both

domestic and foreign markets.  Plaintiffs alleged that the prices paid for rubber chemicals in

the global market were "inextricably linked" and correlated with the prices paid in the US,

and that defendants conspired to bring about a "single worldwide price increase."  Plaintiffs

1    also alleged an arbitrage theory, contending that defendants fixed prices in the US to allow

2    the cartel to be effective anywhere in the world.  The court found that without more, these

3    facts did not allege the requisite proximate causation.  Plaintiffs' arguments that the

4    domestic and foreign impacts were the product of a single economic relationship and the

5    price paid for deliveries abroad was actually linked to the collusively established price set

6    and paid in the United States "gloss over the FTAIA's requirement that it must be the

7    domestic effects of the Defendants' anticompetitive conduct, rather than the anticompetitive

8    conduct itself, which gives rise to Plaintiffs' foreign injuries." Id. at *27.  The court

9    dismissed the claims based on foreign injury.  This case is similar to the present in that it

10   involved allegations of both domestic and foreign injury.  It did not, however, deal with the

11   allegations made here of a single domestically negotiated price.

12        In Emerson Elec. Co. v. Le Carbone Lorraine, 2007 U.S. Dist. LEXIS 57809 (D.N.J.

13   Aug. 9, 2007) ("Emerson"), plaintiffs included foreign and domestic companies that bought

14   electrical carbon products in the US and abroad.  Defendants moved to dismiss for lack of

15   subject matter jurisdiction plaintiffs' claims based on injury incurred abroad.  Those

16   plaintiffs, similar to plaintiffs here, alleged that they claimed more than the global arbitrage

17   theory.  They argued (but did not allege in their complaint) that they had "unitary purchasing

18   organizations" and headquarters in the US, and that negotiations were generally made at a

19   global level by a single purchasing unit, and that each plaintiff essentially paid a single price

20   for the carbon products worldwide. Id. at *17.  The court considered all of plaintiffs'

21   allegations and arguments, and found that it lacked jurisdiction "because there is no claim

22   that the foreign purchases directly affected domestic commerce or American import or

23   export commerce, as the statute requires." Id. at *20 (citing 15 U.S.C. § 6a).  Again, while

24   this case involved allegations of both domestic and foreign injury, it did not discuss whether

25   a single domestically negotiated price was itself a domestic effect.  Additionally, it is not

26   clear from the court's reasoning why it considered  whether the foreign purchases directly

27   affected domestic commerce rather than whether the domestic effects gave rise to

28

19

**United States District Court**

For the Northern District of California

1   (proximately caused) the foreign injury.

2       On the record before the court, it is difficult to determine whether the higher prices

3   set and established in the US proximately caused the foreign entities associated with

4   plaintiffs to pay higher prices abroad.  This is in large part because there are different types

5   of foreign entities involved here, which will likely affect whether proximate cause can be

6   satisfied.  Plaintiffs argue that because only one global price was negotiated and

7   established, all purchases wherever made were pursuant to that single global price, which

8   amounts to proximate not but for causation.  Alternatively plaintiffs argue that the foreign

9   purchases were not really foreign purchases at all because those purchases were in

10  essence purchases by plaintiffs themselves.

11      As to the former argument, defendants make a good point by when they argue that

12  even if the price set in the master agreement is the required domestic effect, there is still no

13  injury that is proximately caused by the negotiation of the contract.  This is because there

14  are a number of significant intervening steps between the negotiation of the purchase price

15  and plaintiffs' injuries.  First, plaintiffs must direct their foreign affiliates to buy at that price.

16  Second, those entities have to issue purchase orders.  Third, the purchase orders must

17  issue to one or more of the defendants.  Fourth, that defendant must deliver that DRAM to

18  the foreign affiliate.  Fifth, an invoice must issue to that foreign affiliate.  And finally, that

19  invoice must be paid for by the foreign affiliate.  It is upon this payment that any antitrust

20  injury occurs.  The court agrees that the injury is far too attenuated to conclude that it is the

21  proximate result of merely the setting of one global price.

22      Plaintiffs' alternative argument, however, warrants further development and

23  consideration.  As previously noted, defendants move to dismiss only those portions of

24  plaintiffs' claims that are based on foreign purchases.  Foreign purchases were made by 1)

25  the foreign facilities, subsidiaries and affiliates of Sun, Unisys and Silicon Graphics, 2)

26  Sun's foreign external manufacturers, and 3) Unisys' foreign module makers.  Sun, Unisys,

27  and the trust therefore all allege that some of their *own* foreign facilities or subsidiaries paid

28

United States District Court

For the Northern District of California

1  higher prices abroad.  As to this first category of foreign entities, it is certainly possible that

2  plaintiffs may stand in their shoes, so to speak.  At the hearing, for example, Sun

3  articulated a legal theory that these entities are its agents and that their purchases are

4  tantamount to Sun's own purchases.  The amended consolidated complaint similarly

5  alleges that Sun's foreign manufacturing facilities located in Europe acted "as a single

6  enterprise" with Sun's domestic facilities and that the two "share[] a complete unity of

7  interests" (although plaintiffs' counsel did not focus on this "single enterprise" theory at the

8  hearing).  See ACC ¶ 13a.  The same "single enterprise" allegations are made with respect

9  to Unisys' domestic and foreign facilities.  Id. at ¶ 18.  Accordingly, there is a basis upon

10  which plaintiffs might, with discovery, establish their entitlement to recover for their own

11  foreign affiliates' DRAM purchases.

12         Although Sun advanced this theory with respect to its external manufacturers as

13  well, however – in that its external manufacturers purchased DRAM abroad, before passing

14  on that same price to Sun – it is likely a tougher case to make in light of the independent

15  and multiple dealings between foreign defendants and Sun's foreign external

16  manufacturers.  Significantly, the complaint is devoid of any "single enterprise" references

17  with respect to Sun and its external manufacturers.  As for Unisys' foreign module makers,

18  Unisys alleges that the module makers independently negotiated a price for DRAM with

19  defendants, ordered DRAM directly from defendants who shipped the DRAM to the module

20  makers, who then shipped the DRAM-containing modules to Unisys in the United States for

21  its server operations.  And as with Sun's external manufacturers, the complaint once again

22  fails to allege any "single enterprise" between Unisys and the module makers.  Thus, it is

23  even less likely that Unisys will be able to establish proximate cause for purchases made

24  by its foreign module makers given the independent negotiations and decisions made by

25  them.

26         Simply put, however, if plaintiffs can articulate and prove a legal theory that would

27  permit the court to find that they stand in the shoes of or are the alter ego of their foreign

28

21

United States District Court

For the Northern District of California

affiliates as well as a factual basis for such a claim, the court would be permitted to find that proximate cause under the FTAIA is necessarily satisfied, and that jurisdiction exists. Accordingly, the court DENIES WITHOUT PREJUDICE, defendants' motions to dismiss the foreign injury portion of plaintiffs' claims for lack of jurisdiction.  Defendants may move on this basis again after an appropriate amount of discovery has been taken to enable both sides to fully develop their arguments.

Finally, as to whether plaintiffs' claims based on foreign injury are severable from their claims based on domestic injury (which defendants have not moved to dismiss), the court agrees with a number of courts who have employed sound analysis in determining that such claims are severable.  See, e.g., Rubber Chemicals, 2007 U.S. Dist. LEXIS 62734 at *13-22.  However, in view of the ruling, the court need not decide the issue definitively.

2.      Standing

Defendants also move to dismiss plaintiffs' claims based on foreign injury for lack of standing.  Whether or not plaintiffs have standing to bring claims on behalf of their subsidiaries and affiliates is related to the proximate cause inquiry.

Preliminarily, plaintiffs argue that the FTAIA preempts the traditional judicial standing analysis.  But plaintiffs present no affirmative authority for this argument.  This court itself has noted that "antitrust standing is an issue separate from the jurisdictional question [addressed by the FTAIA]."  In re DRAM Antitrust Litig., 2006 U.S. Dist. LEXIS 8977 at *16. While the standing analysis may overlap with the FTAIA issues, it is still required here. See, e.g., In re Intel Microprocessor Antitrust Litig., 452 F. Supp. 2d 555, 563 (D. Del. 2006) (in addition to concluding it lacked subject matter jurisdiction over some claims under the FTAIA, the court also concluded plaintiff lacked standing).  Thus, the court finds that plaintiffs must also establish antitrust standing.

The traditional antitrust standing analysis requires that the court evaluate five factors when determining whether a plaintiff has sufficiently alleged antitrust standing: (1) the

22

United States District Court

For the Northern District of California

1  nature of plaintiff's alleged injury and whether it is an antitrust injury; (2) the directness of

2  the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and

3  (5) the complexity in apportioning damages.  American Ad Mgmt. v. Gen. Tel. Co., 190

4  F.3d 1051, 1054 (9th Cir. 1999).  To find standing, a court need not find in favor of the

5  plaintiff as to each element.  Id. at 1055.

6      Here, defendants contend that plaintiffs lack standing to assert their foreign injury

7  claims because they suffered injuries outside of the relevant US domestic DRAM market,

8  thereby tipping the first factor against standing.  However, because plaintiffs' claims based

9  on foreign injury may be cognizable under US antitrust law as discussed above, plaintiffs

10  may have standing to pursue those claims.

11      Defendants also claim that plaintiffs' vague allegations regarding causation fail to

12  establish the directness of the injuries suffered by plaintiffs, and that any claim of damages

13  from overcharges in the foreign market will be speculative and complex.  Plaintiffs,

14  however, allege that they are direct purchasers of DRAM from defendants.  To the extent

15  that Sun and Unisys are indirect purchasers, they allege that their external manufacturers

16  and module makers charged them 100% of the cost of DRAM plus an assembly fee, See

17  ACC ¶¶ 13b, 17, and that this allegation of a direct injury is capable of a straightforward

18  calculation with respect to damages.

19      The court finds that the directness of the injury and the remaining factors will be

20  better addressed in conjunction with the discussion of proximate cause referred to above.

21  Additionally, the court is of the view that discovery is necessary to completely evaluate this

22  argument.  See, e.g., American Ad Mgmt. v. Gen. Tel. Co., at 1055 n.4 (allowing antitrust

23  standing to be raised at any stage of litigation).  Dismissal on this basis is therefore not

24  proper at this time.  Accordingly, the motions to dismiss the foreign injury portion of

25  plaintiffs' claims for lack of standing are DENIED WITHOUT PREJUDICE.

26      3.    Notice Pleading

27  Defendants also argue that the claims of Sun and Unisys based on foreign

28

United States District Court

For the Northern District of California

1  purchases by their external manufacturers and module makers should be dismissed

2  pursuant to Rule 8 for failure to satisfy notice pleading requirements, and for failure to

3  comply with this court's April 5, 2007 Order.  Specifically, defendants claim that Sun and

4  Unisys have failed to allege:  where their external manufacturers or module makers actually

5  purchased and used DRAM; who sold DRAM to their external manufacturers and module

6  makers; who paid for DRAM and DRAM containing products delivered to plaintiffs'

7  overseas operations; and the nature of the contracts with external manufacturers and

8  module makers pursuant to which Sun and Unisys claim to be direct purchasers.

9       When granting defendants' motion to dismiss the first consolidated complaint, the

10  court ordered plaintiffs to amend their complaint to include: where the price for DRAM

11  purchases upon which plaintiffs base their claims was negotiated; where the DRAM

12  purchases upon which plaintiffs base their claims were actually made; whether plaintiffs

13  themselves, subsidiaries, or third parties made the actual purchases of DRAM; where these

14  entities making DRAM purchases on plaintiffs' behalf were located; where the DRAM was

15  ultimately delivered or distributed; and which particular claims are being alleged by plaintiffs

16  as indirect purchasers, rather than as direct purchasers.  See April 5, 2007 Order at 8-9.

17       Although the ACC leaves much to be desired, Sun and Unisys have complied with

18  that order.  As for where the price of DRAM was set, they make clear that all prices paid for

19  DRAM were determined in the US.  ACC ¶¶ 10-12, 17-18.  As for where the purchases

20  were made and who made them, plaintiffs make clear that the various foreign operations

21  and manufacturers would release purchase orders against prices established by Sun's

22  central purchasing organization in California.  Id. ¶¶ 10-12.  Unisys' foreign Villers facility

23  requested DRAM at the prices negotiated in California.  Id. ¶ 18.  As for the locations of

24  subsidiaries and third parties, it lists the locations of the subsidiaries.  As for the external

25  manufacturers and module makers, it lists the names of those companies and how they

26  interacted with plaintiffs.  Id. ¶¶ 10, 17.  While the complaint does not list all delivery

27  locations of these third parties, such information is not essential at this stage of the

28

24

United States District Court

For the Northern District of California

1  litigation, and plaintiffs are engaged in third party discovery to uncover these facts.  The

2  ACC also describes where the DRAM was delivered, and provides percentage ranges or

3  approximated percentages for domestic versus foreign deliveries.  Id. ¶¶ 13-20.  Finally,

4  Sun and Unisys define which purchases they allege to be direct and indirect.  Id.

5       As for the sufficiency of the trust's allegations, defendants argue that the trust's

6  claims for foreign indirect purchases must be dismissed because plaintiff did not allege

7  where and from whom it purchased DRAM delivered to the Swiss subsidiary and has not

8  alleged which purchases are indirect purchases.  The trust, however, has alleged that it

9  issued purchase orders from Switzerland, and that DRAM was delivered to Switzerland

10  pursuant to the company-wide price negotiated in the United States.  SAC ¶ 11.  It also

11  alleges that it is not an indirect purchaser at all, but preserves its claim that to the extent it

12  may be determined to be an indirect purchaser, it paid artificially inflated prices as such a

13  purchaser.

14       Defendants, therefore, have enough information to undertake discovery and prepare

15  for trial in the actions by Sun, Unisys, and the trust.  The additional information defendants

16  seek is required neither by Rule 8 nor this court's prior order.  And, as should be clear by

17  now, the court is of the view that many of the interrelated issues involving jurisdiction,

18  standing and direct/indirect purchaser status cannot be resolved on the pleadings, but

19  instead require a factual record.  It may be that these issues are better suited for summary

20  judgment motions.  The motions to dismiss the foreign injury claims for failure to comply

21  with this court's order and with Rule 8 are DENIED WITH PREJUDICE.

22  C.    Defendants' Motion to Dismiss the Trust's Claims for Lack of Standing

23       There are two threshold issues plaintiff raises that the court must consider before

24  turning to the merits of whether the trust has standing to bring claims for SGI's purchases

25  outside the April 1999 through June 2002 time period:  the timeliness of the motion and the

26  submission of extra-pleading materials.

27       Briefly, as for the timeliness of the motion, the Ninth Circuit allows a motion under

28

25

United States District Court

For the Northern District of California

1    Rule 12(b) to be filed any time before the responsive pleading is filed.  Aetna Life Ins. Co.

2    v. Alla Medical Services, Inc., 855 F.2d 1470, 1474 (9th Cir. 1988).  In addition, the court

3    may consider the defense of failure to state a claim at any time before trial.  Albachten v.

4    Corbett, 156 F. Supp. 863, 864 (S.D. Cal. 1957).  Rule 12(h)(2) provides that a defense of

5    failure to state a claim may be made in any Rule 7(a) pleading permitted or on motion for

6    judgment on the pleadings or at trial on the merits.  See also Aldabe v. Aldabe, 616 F.2d

7    1089, 1093 (9th Cir. 1980).  Defendant noticed this motion for hearing concurrently with its

8    other motion to dismiss, and Rule 12(h) "does not in any way prevent a judge in his

9    discretion from permitting a party to expand the grounds of motion well in advance of a

10   hearing." Bechtel v. Liberty Nat'l Bank, 534 F.2d 1335, 1341 n.8 (9th Cir. 1976) (citation

11   omitted).  For these reasons, plaintiff's objection that the motion is not timely is

12   OVERRULED.

13        As for the extraneous documents and materials, courts may consider facts alleged in

14   the pleadings, documents attached as exhibits or incorporated by reference in the

15   pleadings, and matters subject to judicial notice.  See, e.g., Parrino v. FHP, Inc., 146 F.3d

16   699, 705 (9th Cir. 1998) ("A district court ruling on a motion to dismiss may consider

17   documents 'whose contents are alleged in a complaint and whose authenticity no party

18   questions, but which are not physically attached to the [plaintiff's] pleading.'" ) (citation

19   omitted).  Thus, the court may consider the reorganization plan and bankruptcy court order

20   without converting the motion to one for summary judgment.  Additionally, the court has

21   also considered plaintiff's rebuttal exhibits, and the evidentiary objections thereto are

22   OVERRULED.

23        Turning to the merits, in interpreting a Chapter 11 reorganization plan, the court

24   construes the plan as a contract and interprets the plan to give effect to the parties' mutual

25   intent at the time of contracting.  See In re Captain Blythers, Inc., 311 B.R. 530, 536 (9th

26   Cir. BAP 2004).  The plan is essentially a contract between a debtor and its creditors, and

27   its purpose is to pay back creditors.  Id.  The plan is the single most relevant document in

28

United States District Court

For the Northern District of California

1  determining the intent of the parties in bankruptcy, and the next most important document

2  is the disclosure statement.  Id.

3       Turning to these documents, SGI's reorganization plan clearly defines liquidating

4  trust assets as claims "arising out of the purchase of DRAM between April 1999 and June

5  2002 [plus $250,000 to litigate the claims]."  Def. Ex. A at 10 § 1.82 (reorganization plan).[9]

6  The liquidating trust consists of the liquidating trust assets.  Id. at 33 § 5.11(c).  The plan

7  also provides that the bankruptcy court has exclusive jurisdiction of matters arising out of or

8  related to the reorganization plan, including to "consider any amendments to or

9  modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency,

10  in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order."

11  Id. at 56.  As for the disclosure statement, nothing in it defines or discusses DRAM claims

12  outside of that April 1999 through June 2002 time period.  In fact, it specifically notes that

13  SGI would qualify as a member of the DRAM class because it purchased more than $100

14  million of DRAM during the April 1999 through June 2002 time period.  Id. at 24.

15       In light of the clear language of the plan and disclosure statement, the plaintiff trust

16  does not have standing to pursue claims outside the designated time period, as those

17  claims were not transferred to it.  See In re Almac's Inc., 202 B.R. 648 (D.R.I. 1996) (where

18  breach of fiduciary duty claims had been assigned to purchaser, and trust had only been

19  assigned avoidance claims, it could not pursue breach of fiduciary duty claims); Rahl v.

20  Bande, 328 B.R. 387 (S.D.N.Y. 2005) (trustee assigned the right to bring suit against

21  directors and officers could not sue other third parties).

22       The trust, however, argues that even if it was not assigned the claims outside of the

23  designated time period, during reorganization SGI subsequently assigned those claims to it

24  via a March 2007 assignment.  The trust attaches evidence of this assignment to its

25  opposition.  It is true that claims not assigned to the trust have vested in the reorganized

26  _____

27       [9] According to the plan, the Liquidating Trust Agreement terms trump those of the plan.
The October 17, 2006 Liquidating Trust Agreement, however, limits the transfer of assets to

28  the liquidating trust assets defined in the plan.

debtor, who is free to assign such claims.  <u>See</u> Def. Ex. B  at 37 ¶ 31 (confirmation order).

But it is far from clear that the trust has authority to accept that assignment.  The

bankruptcy court has retained jurisdiction over matters arising out of the plan, including

amendment or modification of the plan.  Because the trust was expressly created by that

plan, permission for the assignment or to modify the plan should have been sought from

the bankruptcy court in order to enlarge the scope of that express trust.  Accordingly, as

ordered at the hearing, the trust may make an emergency request of the bankruptcy court

to modify the plan.  If the bankruptcy court allows such modification, or orders that such

modification is not necessary, the trust may prosecute all of the DRAM claims at issue, and

the court will deny the motion.  Otherwise, the court will grant the motion.  At the hearing,

final decision on this motion was deferred several weeks pending action by the trust and

decision by the bankruptcy court. [10]

### CONCLUSION

Accordingly, the court hereby **DENIES WITHOUT PREJUDICE** defendants' joint

motion to dismiss the claims of Sun and Unisys based on foreign purchases in case

numbers 06-1665 and 06-2915 and defendants' joint motion to dismiss the claims of the

trust based on foreign purchases asserted in case number 07-1381, for lack of jurisdiction

and antitrust standing.

The court **DENIES WITH PREJUDICE** the motion to dismiss based on failure to

comply with this court's order and with Rule 8.

The court **DEFERS** ruling on joining defendants' motion to dismiss certain claims of

the trust asserted in case number 07-1381 on the basis that such claims were not assigned

to the trust.  The parties shall notify the court as soon as the bankruptcy court acts on this

matter.  In any event a status statement must be filed no later than December 5, 2007 by

the trust.

---

[10] By letter dated September 28, 2007, counsel for the trust advised that he had made
the requisite request, that certain defendants had filed objections, and that the bankruptcy
court was expected to place the motion on its calendar.

United States District Court

For the Northern District of California

1       Additionally, the parties shall meet and confer to determine how best to proceed with

2   discovery on jurisdiction and standing and to determine whether these issues should be

3   revisited in limited early summary motions after a period of jurisdictional discovery, or at a

4   later time when dispositive motions would normally be heard.  A joint case management

5   statement addressing these matters shall be filed within 30 days along with a proposed

6   revised scheduling order.

7       **IT IS SO ORDERED.**

8   Dated: October 15, 2007

9

10                                          _____

                                            PHYLLIS J. HAMILTON
11                                          United States District Judge