KAYE SCHOLER LLP
Aton Arbisser, Bar Number 150496
Julian Brew, Bar Number 150615
Joshua Stambaugh, Bar Number 233834
1999 Avenue of the Stars, Suite 1700
Los Angeles, California  90067
Telephone:  (310) 788-1000
Facsimile:  (310) 788-1200

Attorneys for Defendants Infineon Technologies
North America Corp. and Infineon Technologies AG
*[on behalf of all Defendants listed on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SUN MICROSYSTEMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HYNIX SEMICONDUCTOR, INC., ET AL.,<br><br>Defendants. | Case No. C 06-01665 PJH<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT WITNESS HALBERT WHITE PURSUANT TO FED. R. EVID. 702; MEMORANDUM OF POINTS AND AUTHORITIES** |
| This document also filed in **related cases**:<br><br>*Unisys Corporation v. Hynix Semiconductor, Inc., et al.,* Case No. C-06-02915 PJH<br><br>*All American Semiconductor, Inc. v. Hynix Semiconductor, Inc., et al.,* Case No. C-07-01200 PJH<br><br>*Edge Electronics, Inc. v. Hynix Semiconductor, Inc., et al.,* Case No. C-07-01207 PJH<br><br>*Jaco Electronics, Inc. v. Hynix Semiconductor, Inc., et al.,* Case No., C-07-01212 PJH<br><br>*DRAM Claims Liquidation Trust, by its Trustee Wells Fargo Bank, NA v. Hynix Semiconductor, Inc., et al.,* Case No. C-07-01381 PJH | Hearing Date:  December 10, 2008<br>Time:  9:00 a.m.<br>Courtroom:  3, 17th Floor<br>Judge:  Hon. Phyllis J. Hamilton |

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ............................................................................................ 1

II.    STATEMENT OF FACTS ............................................................................. 4

       A.     Industry Background............................................................................ 4

       B.     DOJ Investigation ............................................................................... 6

       C.     Professor White's Methodology ......................................................... 6

III.   ARGUMENT .................................................................................................. 8

       A.     Legal Standards................................................................................... 8

       B.     White Fails To Demonstrate That Similar Competitive Conditions Existed
              In His Benchmark Periods Used To Predict Prices In The Conduct Period. ........ 10

       C.     This Court Should Exclude White's Damages Opinions Because He Fails
              To Exclude The Impact Of Defendants' Lawful Conduct.................................... 15

       D.     White's Second Step, In Which He Predicts Plaintiffs' Prices Using Target
              OEM Prices, Is Unreliable And Inadmissible........................................................ 20

              1.     Plaintiffs Have Not Shown That White's Two-Step Approach Is
                    Accepted In The Scientific Community. ................................................... 20

              2.     White's Two Step Approach And Its Results Conflict With What He
                    Contends Is The Generally Accepted Approach......................................... 22

              3.     White Has Not Accurately Determined The "Relationship" Between
                    Plaintiffs' Prices And The Target OEMs' Prices...................................... 23

IV.    CONCLUSION............................................................................................. 25

**TABLE OF AUTHORITIES**

**CASES**

Page(s)

*Blue Dane Simmental Corp. v. American Simmental Association,*
    178 F.3d 1035 (8th Cir. 1999) ............................................................................9

*Cagle v. Cooper Cos. (In re Silicone Gel Breasts Implants Products Liability Litigation),*
    318 F. Supp. 2d 879 (C.D. Cal. 2004) ...........................................................20, 23

*Carnegie Mellon University v. Hoffmann-LaRoche, Inc.,*
    55 F. Supp. 2d 1024 (N.D. Cal. 1999) ...............................................................21

*Claar v. Burlington R.R.,*
    29 F.3d 499 (9th Cir. 1994) ..........................................................................8, 9

*Crystal Semiconductor Corp. v. Tritech Microelectronics International,*
    246 F.3d 1336 (Fed. Cir. 2001) .......................................................................18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    43 F.3d 1311 (9th Cir. 1995) ...................................................................9, 21, 22

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993) .........................................................................1, 4, 9, 20

*Domingo v. T.K.,*
    289 F.3d 600 (9th Cir. 2002) ............................................................................9

*El Aguila Food Products v. Gruma Corp.,*
    301 F. Supp. 2d 612 (S.D. Tex. 2003),
    *aff'd,* U.S. App. LEXIS 8944 (5th Cir. 2005) ......................................................16

*Farley Transportation Co., Inc. v. Santa Fe Trail Transportation Co.,*
    786 F.2d 1342 (9th Cir. 1985) .........................................................................16

*General Electric Co. v. Joiner,*
    522 U.S. 136 (1997)...................................................................................9, 19

*Hall v. Baxter Healthcare Corp.,*
    947 F. Supp. 1387 (D. Or. 1996) ......................................................................22

*ILC Peripherals Leasing Corp. v. IBM,*
    458 F. Supp. 423 (N.D. Cal. 1978) ...................................................................16

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999)...........................................................................9, 20, 23,

*In re Linerboard Antitrust Litigation,*
    497 F. Supp. 2d 666 (E.D. Pa. 2007) .............................................................18, 21

*Litton Systems, Inc. v. Honeywell, Inc.,*
    1996 U.S. Dist. LEXIS 14662 (C.D. Cal. 1996)...................................................16

KAYE SCHOLER LLP

Page(s)

*MCI Communications Corp. v. American Telegraph & Telegraph Co.,*
    708 F.2d 1081 (7th Cir. 1983) ....................................................................16

*Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir. 1980) ..........................16

*Monolithic Power System v. O2 Micro International Ltd.,*
    476 F. Supp. 2d 1143 (N.D. Cal. 2007) ....................................................18

*In re Paoli R.R. Yard PCB Litig.,*
    35 F.3d 717 (3d Cir. 1994)........................................................................20

*Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc.,*
    526 F.2d 1196 (9th Cir. 1975) ...........................................................10, 15

*Rebel Oil Co. v. Atlantic Richfield Co.,*
    146 F.3d 1088 (9th Cir. 1998) *cert denied*, 525 U.S. 1017 (1998).....................9

*Southland Sod Farms v. Stover Seed Co.,*
    108 F.3d 1134 (9th Cir. 1997) ....................................................................9

*United States v. Downing,*
    753 F.2d 1224 (3d Cir. 1985)....................................................................20

*United States v. Ford,*
    481 F.3d 215 (3d Cir. 2007) .......................................................................9

*Vernon v. Southern California Edison Co.,*
    955 F.2d 1361 (9th Cir. 1992) ..................................................................16

*William Inglis & Sons Baking Co. v. Continental Baking Company, Inc.,*
    942 F.2d 1332 (9th Cir. 1991), *vacated in part on unrelated grounds)*
    *by, remanded by,* 970 F.2d 639 (9th Cir. 1992)..............................................10, 11

## STATUTES

Fed. R. Evid. 702 ....................................................................................................9

Fed. R. Evid. 702 (2) & (3)....................................................................................9

## MISCELLANEOUS

Areeda P., Hovenkamp H.,
    *Antitrust Law* (3d 2007), IIA ....................................................................10

KAYE SCHOLER LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT, on December 10, 2008, or as soon thereafter as the matter may be heard by the above entitled court, in Courtroom 3 of the United States Courthouse located at 450 Golden Gate Avenue, San Francisco, California 94102, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendants Micron Technology, Inc., Micron Semiconductor Products, Inc., Infineon Technologies AG, Infineon Technologies North America Corporation, Nanya Technology Corporation, Nanya Technology Corporation USA, Elpida Memory, Inc., Elpida Memory (USA) Inc., Hynix Semiconductor Inc., Hynix Semiconductor America Inc., Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc.,[1] and NEC Electronics America, Inc. ("Defendants") will and hereby do move to exclude the testimony of expert witness Professor Halbert White ("Professor White") in the above-entitled actions on the ground that Professor White' methodologies do not meet the standards of Fed. R. Evid. 702. This motion is based upon this Notice of Motion and accompanying Memorandum of Points and Authorities, the complete files and records in this action, oral arguments, and such other and further matters as this Court may consider. If Defendants are successful in this Motion, Plaintiffs' will not be able to present any evidence of damages for any of their claims.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

These civil cases are the latest in a series of antitrust actions that have been filed over the last several years, arising out of a federal grand jury investigation into potential antitrust violations in the sale of Dynamic Random Access Memory ("DRAM"). As this Court is aware, that investigation resulted in pleas by four DRAM suppliers and certain of their employees, each of whom admitted to violations only during "certain periods of time" between April (or July in the case of Infineon) 1999 and June 2002, in sales of DRAM to six specific computer manufacturers: IBM, Compaq, HP, Dell, Gateway, and Apple (the "Target OEMs").

---

[1] Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc. join this Motion only for purposes of *Edge Electronics, Inc. v. Hynix Semiconductor, Inc., et al.*, Case No. C-07-01207 PJH.

The plaintiffs in these cases ("Plaintiffs") are not among the six Target OEMs and, except for one plea by one Defendant based on a single sale of DRAM to Sun Microsystems, no Defendant has been charged with or admitted to reaching any agreement on prices to any of the Plaintiffs. Nor has any Defendant been charged with or admitted to fixing market wide prices, or to restraining output of DRAM. Moreover, there is no evidence in the voluminous discovery record in these cases of any such conspiracy. Despite these undisputed facts, Plaintiffs' purported damages expert Professor White opines that a market wide conspiracy resulted in massive overcharges as high as 50% between August 1998 and June 2002 to Plaintiffs, who were not named in the pleas and, in most cases, did not even buy DRAM from the Defendants they sued. Professor White's damages estimates are implausible for a number of reasons. In an industry where manufacturers lost billions of dollars during the relevant period, White claims a market wide conspiracy caused overcharges to Plaintiffs as high as 50%. White also claims the DRAM industry imposed these enormous overcharges over 4 or 5 years, during which time many of the largest electronics companies in the world exited the industry and stopped manufacturing DRAM. White purports to find these overcharges during a period when prices fell at their fastest pace ever and output grew faster than in the years immediately before or after.

Plaintiffs go even further by claiming that the impact on the prices paid by the Plaintiffs, that were either very rarely or never the subject of discussion among the Defendants, were raised *more* than the prices to the Target OEMs, as to which numerous pricing discussions took place. These counter-intuitive conclusions are the product of fundamental flaws in the methodology and assumptions adopted by Professor White. His methodology defies common sense and violates basic principles of economics. For instance, Professor White asserts total damages for the Plaintiffs ($1.7 billion dollars) that are nearly as great as all of the Plaintiffs' total purchases from all Defendants combined during the entire relevant period.

To generate his claimed overcharges, White uses two steps: First, he develops a formula based on prices during selected periods of time outside the alleged conspiracy period ("benchmark periods"), and he uses that formula to predict what he contends the prices to the six Target OEMs should have been during the alleged conspiracy period. Second, White determines a purported

1   relationship between Target OEMs' prices and Plaintiffs' prices, by which he uses the Target OEM

2   "but for" prices to predict the Plaintiffs' "but-for" prices.  Neither step meets the applicable

3   standards for reliability.

4           ***First***, White fails to justify his selection of the benchmark periods he uses to predict Target

5   OEM prices in his alleged "conduct" periods.  The Ninth Circuit and other courts have held that an

6   expert who predicts prices for one period based on another time period must affirmatively

7   demonstrate that market conditions were similar during the two periods.  Yet, White admits he did

8   ***nothing*** to determine whether conditions in the DRAM market were the same during his conduct

9   and benchmark periods, despite (i) his admission that lawful competitive conditions in the DRAM

10  market change over time, and these changes materially affect prices, (ii) another Plaintiffs' expert's

11  admission that, in cyclical markets such as the DRAM market, it is necessary to include multiple

12  cycles in the benchmark period in order to obtain accurate predictions outside that period, and (iii) a

13  third Plaintiffs' expert's admission that competitive conditions in the DRAM market changed

14  materially from the beginning of White's benchmark period through the end of the conduct period.

15  Defendants' experts also identified numerous important but unaccounted for differences in DRAM

16  market conditions between the two periods that make White's benchmark period selection

17  inappropriate and unjustified.  White's opinions should be excluded for this reason alone.

18          ***Second***, despite admitting he had been asked to assume only the conspiracy admitted by

19  certain Defendants in their pleas, White erroneously built a model for predicting Target OEM prices

20  that depends on the existence of a broader conspiracy, encompassing any changes in pricing or

21  output made by every Defendant during the conduct period.  White erroneously assumes that all

22  conduct by all DRAM suppliers throughout the period at issue was "tainted," and thus excludes from

23  consideration in his formula anything within the control of or even influenced by the Defendants,

24  including all changes in output by any Defendant.  However, White makes no effort to determine

25  whether this conduct was in fact conspiratorial, as opposed to unilateral.

26          White assumed that any change in Defendants' responses to market conditions during the

27  conspiracy period was due to the conspiracy, even though he admits there is a range of competitive

28  behavior in the DRAM market ***and that "less competitive" – but not conspiratorial – behavior***

3

*during the conspiracy period would also generate "damages"* in his model. As a result, White has not distinguished between the effects of legal conduct by Defendants that raised prices – such as unilateral decisions to shut down plants or stop fighting as aggressively for market share – and the impact, if any, of the alleged conspiracy. The Ninth Circuit repeatedly has held that a damage study that fails to disaggregate the effects of lawful and unlawful conduct is not admissible.

*Third,* instead of using his prediction equation to directly predict the prices Plaintiffs would have paid but for the alleged conspiracy, White uses the "but for" prices he predicts for the Target OEMs to indirectly calculate Plaintiffs' "but for" prices. There are enormous flaws in this two-step approach. Indeed, the model, which should generate overcharges to Plaintiffs only when the actual Target OEM prices were higher than "but for" Target OEM prices, instead generates massive overcharges to Plaintiffs when there is *no difference* between actual and "but for" Target OEM prices. Moreover, applying what Plaintiffs' own experts contend is the most appropriate and widely accepted methodology (*i.e.*, predicting Plaintiffs' prices directly) generates no damages instead of the massive damages that White's two-step approach generates. This two-step approach lacks any precedent, conflicts with what Plaintiffs' own experts claim is the most appropriate method for predicting prices, and is demonstrably flawed. It therefore fails to meet the standards for reliability and admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## II. STATEMENT OF FACTS

### A. Industry Background

Defendants are major manufacturers and distributors of DRAM.[2] (*See* 12/14/07 Expert Report of Halbert White ("White Report"), Ex. 7 at ¶ 82.)[3] DRAM is produced in large fabrication facilities ("fabs"), which require billion dollar investments to build and equip, as well as multiple years to plan and construct. (March 7, 2008 Expert Report of Joseph Kalt ("Kalt Report"), Ex. 3 at ¶ 41; March 7, 2008 Expert Report of Carl Shapiro ("Shapiro Report"), Ex. 6 at pp. 3-4; Harter Tr.,

---

[2] The Mitsubishi, Mosel, and Winbond Defendants were named as parties in one or more of the Amended Complaints, but have been voluntarily dismissed from all cases. *See, e.g.,* Docket Entries Nos. 232, 286 & 297 in *Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*, Case No. C-06-01665 PJH.

[3] Unless otherwise noted, all references to Exhibits correspond to documents attached to the Declaration of Joshua Stambaugh, filed concurrently herewith.

KAYE SCHOLER LLP

1   Ex. 11 at 127:22-128:5; Pai Tr., Ex. 17 at 39:5-25; I.U. Kim Tr., Ex. 15 at 50:9-51:2.)  Once fully

2   equipped, the incremental cost of additional production is very small until the plant is operating

3   seven days a week, 24 hours a day.  (Kalt Report, Ex. 3 at ¶54-55; Shapiro Report, Ex. 6 at pp. 3-4.)

4   This leads to a boom and bust cycle in the DRAM industry.  During "booms," shortages lead to

5   rapidly rising prices, attracting new capital investment.  (*See* Kalt Report, Ex. 3 at ¶ 170, Figure 4;

6   March 7, 2008 Expert Report of Victor DeDios ('DeDios Report"), Ex. 1 at ¶ 41.)  Eventually, all of

7   those new fabs come "on line" at around the same time, resulting in excess supply that forces

8   suppliers to fight for customers by cutting prices ("busts") until the prices are driven so low that

9   producers must shut down fabs and even exit the market, leading to a shortage of capacity, and

10  starting the cycle all over again.  (Kalt Report, Ex. 3 at ¶¶ 169-70, Figures 3 & 4; DeDios Report,

11  Ex. 1 at ¶ 40.)  Thus, in contrast to the consistent decline in prices (with no increases) predicted by

12  White during the alleged conduct periods, the long-term price trends for DRAM are cyclical,

13  alternating between periods of price increases and declines.  (*Id*; Shapiro Report, Ex. 6 at pp. 9-13.)

14      Defendants sell to several different types of customers.  Defendants' largest customers were

15  the Target OEMs, who made personal computers, workstations and computer servers.  (White

16  Report, Ex. 7 at ¶ 95.)  The Target OEMs primarily purchased their DRAM under contracts, with

17  prices determined through separate bi-weekly negotiations directly with each of their approved

18  DRAM suppliers, typically dealing with each supplier's designated account manager.  (*Id.* at ¶ 104-

19  110.)  Defendants also sold via the "spot market," where terms were "negotiated in isolation . . .

20  After a spot sale, neither the buyer nor the seller has any obligation to the other.  Because there is no

21  centralized market, many spot market sales are arranged using brokers as intermediaries . . . and

22  buyers need not identify for whom they are attempting to procure DRAM."  (*Id.* at ¶ 99.)  "The exact

23  percentage of DRAM sales that take place in the spot market varies over time and fluctuates with . . .

24  varying demand for DRAM."  (*Id.* at ¶ 102.)

25      Some Plaintiffs purchased DRAM from certain Defendants at various times.  (White Report,

26  Ex. 7 at pg. 9, Figures 7 & 8; ¶¶ 125-29.)  However, most of the Defendants did not sell any DRAM

27  to the Plaintiffs who have sued them in these cases.  (*See id*).  Plaintiffs All American

28  Semiconductor, Edge Electronics, and Jaco Electronics are distributors of electronic components.

KAYE SCHOLER LLP

1    (*Id.* at ¶¶ 112-114.)  Plaintiffs Silicon Graphics, Inc. (by DRAM Claims Liquidation Trust), Sun

2    Microsystems, Inc., and Unisys Corporation are electronics manufacturers.  (*Id.* at ¶¶ 116-119.)

3    **B.   DOJ Investigation**

4           Beginning in 2002, the Department of Justice ("DOJ") conducted a thorough investigation of

5    allegations of anticompetitive activity in the DRAM industry.  They reviewed millions of pages of

6    documents and interviewed dozens of cooperating witnesses.  The investigation led to pleas by

7    certain Defendants to charges of conspiring to fix prices of DRAM "sold to certain OEMs," --

8    namely, Dell, Hewlett-Packard, Compaq, IBM, Apple and Gateway --"during certain periods of

9    time" between April 1, 1999 through June 15, 2002, "with varying levels of effectiveness." (*See*

10   Infineon Plea Agreement, Ex. 26 at ¶¶ 4(c)-(d); Hynix Plea Agreement, Ex. 25 at ¶¶ 4(c)-(d);

11   Samsung Plea Agreement, Ex. 27 at ¶¶ 4(c)-(d); Elpida Plea Agreement, Ex. 24 at ¶¶ 4(c)-(d).)[4]

12   Significantly, the DOJ's extensive investigation resulted in no charges or admissions of agreements

13   to restrain output or to fix prices to the "spot market." (*See id.*)  In fact, one plea states that the

14   named Defendants "substantially added DRAM capacity and expanded output during the relevant

15   period." (Samsung Plea Agreement, Ex. 27 at ¶ 4(d).)

16   **C.   Professor White's Methodology**

17          Despite the limited nature of the Plea Agreements, the named Plaintiffs in these actions have

18   brought claims against Defendants alleging that Plaintiffs also were injured by Defendants' "illegal

19   activities." (*See* Sun/Unisys Amended Complaint, Docket No. 127, at ¶ 3.)  Plaintiffs retained

20   Professor White to "determine the extent to which Plaintiffs were overcharged as a result of

21   Defendants' conspiracy . . . ." (White Report, Ex. 7 at ¶ 2).  In calculating damages, White claims he

22   assumed only the conspiracy *set forth in the Plea Agreements*, except that White also explicitly

23   assumed the start of the conspiracy was either April 1, 1999 or August 1, 1998. (*Id.* at ¶ 47; May 2,

24   2008 Rebuttal Report of Halbert White ("White Rebuttal Report"), Ex. 8 at ¶ 2; May 22, 2008

25   Deposition of Halbert White ("White Rebuttal Tr."), Ex. 21 at 20:5-25.)  Professor White offers no

26   [4]   The Elpida Plea Agreement also discusses one instance of anticompetitive conduct regarding
27   a single bid proposal for a single DRAM module to Plaintiff Sun on a single occasion during the relevant time period. (Elpida Plea Agreement, Ex. 24 at ¶ 4(e)).  This is the only mention of any of
28   the Plaintiffs in any of the corporate Plea Agreements.

DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF HALBERT WHITE - Case No. 06-01665 PJH and *related cases*

KAYE SCHOLER LLP

1    opinion, and has done no analysis, regarding the existence of any conspiracy or agreements to fix

2    prices to Plaintiffs, or **any** customers other than the six Target OEMs named in the Plea Agreements.

3    (White Rebuttal Tr., Ex. 21 at 20:5-25; 23:1-8; 66.)  His report cites no evidence of any such

4    agreements, and he performed no analysis of which customers were the subject of Defendants' price

5    communications.  (*Id.* at 66:19-67:3; 02/27/08-02/28/08 Deposition of Halbert White ("White Tr."),

6    Ex. 20 at 35:18-21 ("[I]n arriving at my opinion, it's not necessary for me to understand who was

7    talking to whom, or which companies were specifically involved . . . .").)  Similarly, Professor White

8    offers no opinion regarding the existence of any output restraint by Defendants.  (White Rebuttal Tr.,

9    Ex. 21 at 23:1-8; 91:9-24.)  His report does not cite evidence of any actual agreements to restrict

10   output by Defendants, and he has not offered any admissible evidence of any coordinated activity by

11   Defendants' employees responsible for the operation of the Defendants' DRAM manufacturing fabs.

12   (*Id.* at 67:5-16; 68:3-13.)  White could not even recall if he reviewed any of Defendants' production

13   data.  (White Tr., Ex. 20 at 244:12-23.)

14           To calculate "overcharges" to Plaintiffs, Professor White uses a two-step process.  First, he

15   purports to measure the impact of the alleged conspiracy on the Target OEMs by comparing an

16   index of the actual prices paid by the OEMs with his predicted "but for" price index.  (White Report,

17   Ex. 7 at ¶¶ 120-22; 135-137).  To create his "but for" prices for the conduct period, White uses a

18   formula he developed based on the relationship between prices and various "predictive variables"

19   during a selected "benchmark" period before and after the assumed conduct period.  (*Id.* at ¶¶ 122,

20   142.)  White asserts his prediction equation "captures the statistical relationship between the price

21   index and these predictors [variables], **outside** the conduct period," and is used to predict prices in

22   the conduct period that "would have prevailed for the [Target] OEMs in the absence of the conduct."

23   (*Id.* at ¶¶ 137 & 135 (emphasis added).)  White attributes **all of the difference** between his actual

24   and "but for" price lines to the alleged conspiracy.  (*See* White Tr., Ex. 20 at 33:7-34:4.)

25           In his second step, White predicts "but for" prices for the Plaintiffs using the predicted Target

26   OEM "but for" prices.  Thus, instead of applying his prediction equation directly to the actual prices

27   for each Plaintiff, he estimates "the statistical relationship between the DRAM prices paid by each

28   plaintiff and those paid by the [Target] OEMs."  (White Report, Ex. 7 at ¶ 154).  He then applies

these estimated relationships to the Target OEMs' "but for" price index in order to obtain Plaintiff-specific "but for" price indexes. (*Id.* at ¶ 156.) As in his first step relating to the Target OEMs price indexes, Professor White attributes "*any difference*" between the [Plaintiffs'] actual and but-for price indexes to the effects of [Defendants'] conduct." (*Id.* at ¶ 157 (emphasis added)).

White excludes from his prediction equation *any* predictive variables that are "subject to the control of the Defendants" or even "*whose values would be affected by the Defendants' conduct.*" (White Report at ¶ 26 (emphasis added)). In his view, these variables are "tainted" because they could be influenced by the "conspiracy" he was asked to assume (*i.e.*, the conspiracy limited to pricing communications relating to the Target OEMs). (White Tr., Ex. 20 at 76:23-77:7). Thus, White excluded any factors or variables that would capture (or were affected by) the Defendants' ability to produce additional DRAM, including "capacity," "capacity utilization," "wafer starts," and "inventory levels." (*Id.* at 148:3-149:13; 240:4-14; 244:17-23; White Rebuttal Tr., Ex. 21 at 61:11-62:11; White Report, Ex. 7 at ¶ 26.) If a Defendant or non-defendant DRAM supplier unilaterally chose to close or sell a fab, exit the industry, switch production to a more profitable product than DRAM, or even if a fab had yield or production problems reducing its output, none of White's predictive variables would capture the effect of that competitive conduct on DRAM prices.

White also assumes that Defendants' ability to produce DRAM and their ability to respond to market conditions was the same in the benchmark period as in the alleged conduct period. (*See* White Tr., Ex. 20 at 147:3-16 ("The analysis that I undertake takes into account the ability to produce outside of the conspiracy period based upon all of the different supply and demand factors. *So whatever that ability was outside the conduct period is the ability that is built into my but-for price line* or price index estimates . . . .") (emphasis added).)

## III.   ARGUMENT

### A.   Legal Standards

Under the Federal Rules, district courts are "both authorized and obligated to scrutinize carefully the reasoning and methodology underlying" expert testimony. *Claar v. Burlington R.R.*, 29 F.3d 499, 501 (9th Cir. 1994). Courts must perform a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that

8

KAYE SCHOLER LLP

1   reasoning or methodology properly can be applied to the facts in issue." *Id.* at 501 (citing *Daubert v.*

2   *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-932 (1993)). "This gate-keeping function is

3   applicable to 'technical' and other 'specialized' expert testimony, in addition to the testimony of

4   scientific experts." *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1040

5   (8th Cir. 1999) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)); *see also Southland Sod*

6   *Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997) (applying *Daubert* standards to

7   economic expert testimony).

8        As the Supreme Court explained in *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997):

9   "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

10  opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court

11  may conclude that there is simply too great an analytical gap between the data and the opinion

12  proffered." The Ninth Circuit has recognized the principles of *Joiner* are applicable to economic

13  testimony. *See, e.g., Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002); *Rebel Oil Co. v. Atlantic*

14  *Richfield Co.*, 146 F.3d 1088, 1097 (9th Cir. 1998) *cert denied*, 525 U.S. 1017 (1998) (citing quote

15  from *Joiner* above in reviewing economic testimony ).

16        Under Fed. R. Evid. 702, expert testimony may not be admitted unless "the testimony is the

17  product of reliable principles and methods, and . . . the witness has applied the principles and

18  methods reliably to the facts of the case." Fed. R. Evid. 702 (2) & (3). As the proponents of

19  Professor White's testimony, Plaintiffs have the burden to establish its admissibility "by a

20  preponderance of proof." *Daubert*, 509 U.S. at 592, n10. The Ninth Circuit has held that "Federal

21  judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are

22  convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not

23  mislead the jury." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1321 (9th Cir.

24  1995). This is referred to as a "presumption of exclusion." *United States v. Ford*, 481 F.3d 215, 220

25  n.6 (3d Cir. 2007). This Court has broad discretion in determining admissibility, including the

26  selection of criteria for determining reliability, and application of those criteria to the opinions in this

27  case. *See Kumho* 526 U.S. at 158; *General Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997).

28

KAYE SCHOLER LLP

**B.** **White Fails To Demonstrate That Similar Competitive Conditions Existed In His Benchmark Periods Used To Predict Prices In The Conduct Period.**

To generate his "but for" Target OEM prices, White creates a predictive equation that is based on the relationship between certain "predictive variables" and DRAM prices paid by the Target OEMs in a benchmark period of January 1996 to July 1998 and July 2002 to December 2004. (White Report, Ex. 7 at ¶ 142; White Tr., Ex. 20 at 87:1-16.) None of White's chosen variables are DRAM-specific, and most of them bear no discernible relationship to the DRAM market, such as currency exchange rates with certain foreign countries. He then uses this equation to predict "but for" prices for the Target OEMs during two alleged "conduct" periods, August 1998 through June 2002, and April 1999 through June 2002. (White Report, Ex. 7 at ¶ 142.)

The Ninth Circuit has repeatedly held that use of such a "before and after" approach to determining damages requires "some showing that the market conditions in the two periods were similar but for the impact of the violation." *See Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975) ("Plaintiffs' method of measuring damages, known as the 'before and after' theory, may be used only where there has been some showing that the market conditions in the two periods were similar but for the impact of the violation."); *William Inglis & Sons Baking Co. v. Continental Baking Company, Inc.*, 942 F.2d 1332, 1340 (9th Cir. 1991), *vacated in part (on unrelated grounds) by, remanded by*, 970 F.2d 639 (9th Cir. 1992). Likewise, "[t]his [before and after] methodology presumes that whatever conditions were present during the [benchmark period] continued to prevail during the conspiracy period . . . If something has changed - in addition to the fact of collusion - this must be taken into account in estimating the 'but for' prices during the conspiracy period." Areeda P., Hovenkamp H., *Antitrust Law* (3d 2007), IIA, at ¶ 395b, pp. 384-85.

In *Inglis*, for example, the plaintiff bread-making company alleged predatory pricing by a competitor during a certain period of time, which resulted in lost profits to the plaintiff. Plaintiff calculated its profit margin (or the spread of its selling price over its costs) in the calendar quarter immediately prior to the onset of predatory pricing. *Id.* at 1340. The expert calculated what its selling price would have been had it maintained that profit margin throughout the period of below-

1    cost pricing, and projected the profit plaintiff would have made at that price. The court ruled that

2    this calculation was insufficient because there was no evidence that the "base period" utilized by the

3    expert was comparable to the liability period but for the impact of the violation. *Id.* at 1341. The

4    expert simply used the base period because it was immediately prior to the alleged below-cost

5    pricing, but "[n]either he nor anyone else, however, offered evidence that market conditions existing

6    during the base period remained the same (or even comparable after appropriate adjustments) during

7    the liability period . . . ." *Id.* The defendant, however, "offered considerable evidence that

8    conditions differed." In light of the lack of any evidence to the contrary, the plaintiff's calculation of

9    lost profits was "wholly speculative." *Id.*

10       White similarly fails to move beyond mere speculation. Instead of demonstrating that market

11   conditions were comparable in the two periods, White simply ***assumed*** they were comparable, and

12   also assumed that the relationship between DRAM prices and the set of "predictive variables" that

13   he used to predict prices in the benchmark period would remain the same in the conduct period.

14   (*See* White Report, Ex. 7 at ¶ 16; White Tr., Ex. 20 at 177:8-12 ("The purpose of using the data

15   outside the conduct period is in order to let my prediction equation represent whatever the

16   competitive interaction would have been during the benchmark period'); 177:24-178:3 ("[T]he but-

17   for price represents the prices that would have been observed ***had that same conduct prevailed***

18   through the months of the conspiracy period or the plea period.") (emphasis added).)

19       White, however, concedes that the DRAM industry was "more competitive" and "less

20   competitive" at various times. (White Rebuttal Report, Ex. 8 ¶¶ 272-73; White Rebuttal Tr., Ex. 21

21   at pp. 78:10-79:8 ("Sometimes the competition is more aggressive. Sometimes it's more

22   cooperative. Sometimes it's conspiratorial. *It can change, and it does change*.").) The "less

23   competitive" periods, although not necessarily conspiratorial, can exhibit higher prices than "more

24   competitive" periods. White admits a "more competitive benchmark" generates "but for" prices that

25   are too low and generates overcharges not attributable to the conspiracy. (White Rebuttal Tr., Ex. 21

26   at 78:10-79:8; 83:17-84:1 ("Q. But the mere fact that an application of your methodology results in

27   but-for prices that are less than actual prices doesn't say that that period of time was conspiratorial,

28   correct? A. That's right. Q. It could simply be a less competitive period, right? A. Yes.").)

Despite acknowledging that lawful competitive behavior varies over time in this industry, White contends that his model predicts only prices that **would have** existed **if** competitive conditions in the conduct period were the same as in the benchmark period:

> Instead, my but-for prices represent the prices one would expect to prevail under the market conditions historically observed during the conduct period (as measured by historical supply and demand factors) **and under whatever average blend of more or less competitive conduct prevailed during the corresponding benchmark period. . . .** Because my but-for prices reflect the average blend of **benchmark period** competitive behavior, they properly account for whatever variations in competitive conduct occur **in the benchmark period**."

(White Rebuttal Report, Ex. 8 at ¶¶ 272-273 (emphasis added)).  Indeed, White pointed to these very types of variations in lawful competition to explain why his model generates apparent "overcharges" when applied to earlier periods where there was no conspiratorial behavior.  (*Id.* at ¶ 273; *See also* Kalt Report, Ex. 3 at ¶¶ 201-209 & Fig. 25; Shapiro Report, Ex. 6 at pg. 35 (identifying other earlier periods when White's methodology would erroneously generate "overcharges" despite the absence of any conspiracy).)  The fact that different levels of lawful competition can result in massive purported overcharges in earlier periods is compelling proof that it may also cause inflated overcharges during the periods at issue here.  Not only have Plaintiffs failed to submit any expert report that analyzes similarities in market conditions and competition between the benchmark and conduct periods, the evidence overwhelmingly demonstrates that the benchmark periods White chose are, in fact, not representative or similar to conditions in the conduct period.

*First*, it is uncontroverted by White that his first benchmark period was an unprecedented period of rapidly falling prices due to massive oversupply of DRAM following a sustained period of manufacturing plant construction.  (*See* DeDios Report, Ex. 1 at ¶¶ 10-15; Kalt Report, Ex. 3 at ¶¶ 124, 170, & Figure 4; Shapiro Report, Ex. 6 at pp. 7-8.)  As explained above, this period was part of a cyclical pattern in the DRAM industry that results in periods of dropping prices, followed by stable or increasing prices and capital investment, leading in turn to prices dropping as new and abundant capacity comes on line.  (Kalt Report, Ex. 3 at ¶¶ 169-173, 201 & Fig. 3.)  This, in turn, leads to reduced capital expenditures and plant shutdowns when prices get too low to be profitable.  (Kalt Report, Ex. 3 at ¶¶ 13, 201, and Figures 3 & 4.)  Thus, the long term DRAM price trend reveals

12

1    alternating periods of stable or increasing prices ("booms") and steep declines ("busts"). White's

2    initial benchmark period, from January 1996 through July 1998 (for the alleged "conspiracy period")

3    was a "bust" period, which resulted in billions of dollars of losses by Defendants as prices dropped

4    rapidly. (Kalt Report, Ex. 3 at ¶ 124; Fig. 15.) In fact, during this "bust" period, prices plummeted

5    by 95%. (March 7, 2008 Report of Benjamin Klein, Ex. 4 at ¶ 89.) At the end of this "bust" period

6    (*the beginning of White's alleged conspiracy period*), Defendants began to operate below costs at

7    certain plants and would naturally take unilateral and competitive action in responding to these

8    market conditions by reducing capital expenditures or shutting down fabs. (Kalt Report, Ex. 3 at

9    Fig. 4.) These conditions led to rapidly rising prices (a "boom") at the outset of White's conduct

10   periods, which White's model (eschewing consideration of supply data) is incapable of predicting.

11   A similar condition arose in 2001, when prices again dropped precipitously, forcing certain

12   manufacturers to stop production, laying the foundation for another "boom" in late 2001 and early

13   2002. (Kalt Report, Ex. 3 at ¶ 142, Fig. 15; Shapiro Report, Ex. 6 at pg. 12.)

14          Yet, White can show no comparable booms *captured by his benchmark period.* And, by

15   excluding as predictive variables anything that could be affected by actual output decisions, White's

16   model cannot *capture the very events that lead to the onset of a boom period*. Therefore, White's

17   benchmark period does not allow him to opine what prices should have been during booms "but for"

18   the conspiracy. Not surprisingly, therefore, while the long-term trend in DRAM prices alternates

19   between periods of increase and decrease, White's model predicts only steadily decreasing prices

20   during virtually the entire conduct period.

21          Plaintiffs' own expert Frances Diebold, admitted that, when dealing with a cyclical industry,

22   it is important to include multiple "cycles" in the benchmark period. (May 29, 2008 Deposition of

23   Francis X. Diebold ("Diebold Tr."), Ex. 10 at 147:14-17; 145:16-151:15.) But despite the

24   undisputed cyclical nature of DRAM prices, Professor White included only the "bust" portion of one

25   cycle in his initial "benchmark" period. In other words, he used only a period of time when prices

26   were in steep decline because of over construction of new fabs. White captured in his benchmark

27   period only competitive conditions that would exist in a depressed market, and not those that would

28   exist in a boom market after supplies had been cut. Far from being representative, this benchmark is

KAYE SCHOLER LLP

13

1    "an aberration when compared with the behavior of DRAM price changes in an extended period

2    . . . ." (DeDios Report, Ex. 1 at ¶ 6.)  When competitive conditions changed at the beginning of

3    White's "conspiracy" period, through the unilateral and competitive reduction of capital

4    expenditures and fab closings, *which would have the effect of stabilizing or increasing prices*,

5    White simply attributed these changes to the alleged conspiracy because his benchmark period failed

6    to account for them.

7       *Second*, another Plaintiffs' expert admitted that significant changes in the number and

8    concentration of competitors took place between the benchmark and conduct periods.  (May 2, 2008

9    Report of Michael D. Whinston, Ex. 9 at ¶ 61; June 17, 2008 Deposition of Michael Whinston, Ex.

10    19 at 42:9-45:14.)  A reduced number of competitors would affect the degree of competition, and is

11    further evidence that White has failed to account for important differences between the two periods.

12       *Third*, Professor White has wholly failed to take account of numerous significant market

13    transitions between his benchmark and conspiracy periods that affected the supply and demand of

14    DRAM.  These include the introduction of computer operating systems (Kalt Report, Ex. 3 at ¶¶

15    173-76; Fig. 20; DeDios Report, Ex. 1 at ¶ 44 & Exhibit K); unprecedented product mix issues

16    (White Report, Ex. 7 at pp. 38 & 40, Figures 22 & 23); the introduction of (and greater shift

17    towards) new revolutionary technologies (March 7, 2008 Expert Report of Daniel Rubinfeld

18    ("Rubinfeld Report"), Ex. 5 at ¶ 73; Kalt Report, Ex. 3 at ¶ 179-180); decreased yield as a result of

19    shifts to new technologies (Kalt Report, Ex. 3 at ¶ 180; Rubinfeld Report, Ex. 5 at ¶ 77-78; DeDios

20    Report, Ex. 1 at ¶ 40); and even short term supply shocks such as earthquakes (Kalt Report, Ex. 3 at

21    ¶ 178).  White's mere assumption that market conditions and the competitive interaction among

22    DRAM suppliers were the same in the benchmark and conduct periods is even more tenuous given

23    the impact of these events in the conduct period that he fails to consider in his methodology.

24       White attempts to shrug off these events by remarking that things such as technological

25    innovations or supply shocks happened "before, during and after the conduct period." (White Tr.,

26    Ex. 20 at 178:23-179:13; 205:6-9.)  However, this claim is vacuous because White excludes any

27    variables that would be affected by supply decisions or supply shocks, and admits he has done *no*

28    *analysis* of whether the dynamic relationships between his predictive variables and the Defendants'

KAYE SCHOLER LLP

1    behavior were generally different in the benchmark and conduct periods. (White Rebuttal Tr., Ex.

2    21 at 141:14-23). He also has done **no analysis** of whether many key events affecting the price or

3    supply of DRAM were present in the conduct period, but not his benchmark period, or how they

4    affected the supply or demand of DRAM. (White Tr., Ex. 20 at 180:16-185:22 (new operating

5    systems); 190:17-191:1 (new DRAM technologies introduced); 204:19-205:14 (earthquakes).

6           Thus, Professor White has failed to meet the burden in demonstrating that "market conditions

7    in the two periods were similar but for the impact of the violation." *See Pacific Coast Agricultural*

8    *Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1207 (9th Cir. 1975).

9    **C.**    **This Court Should Exclude White's Damages Opinions Because He Fails To**

10          **Exclude The Impact Of Defendants' Lawful Conduct.**[5]

11          The first step of White's damages model is to compare the actual prices paid by the Target

12   OEMs to his "predicted" prices for those OEMs. White purports to predict those "but for" prices

13   based solely on the specific conspiracy admitted in the guilty pleas of certain Defendants. (White

14   Report, Ex. 7 at ¶ 2; White Rebuttal Tr., Ex. 21 at 20:5-25) But, in fact, White leaps from the

15   limited conspiracy admitted by certain Defendants (to discuss pricing involving six specific

16   customers at certain times with varying levels of effectiveness) to a model in which *all* of

17   Defendants' conduct – including any unilateral decisions about DRAM production in the conduct

18   period – are presumed to be potentially "tainted" by the conspiracy. (White Tr., Ex. 20 at 76:23-

19   77:7) Thus, White excludes any variables from his equation "*whose values would be affected by the*

20   *Defendants' conduct.*" (White Report, Ex. 7 at ¶ 26 (emphasis added).) By treating all of

21   Defendants' (and even non-Defendant DRAM suppliers') conduct as potentially "tainted" -- even

22   unilateral decisions which affect output and prices -- White erroneously lumps together legal and

23   illegal conduct, and counts as "damages" even price increases resulting from lawful and unilateral

24   conduct by Defendants and other DRAM suppliers.

25

26   ─────────────────────
     [5]     Defendants show in their joint summary judgment motion that, as a matter of law, there was
27   no injury to the Plaintiffs as a result of the conspiracy outlined in the pleas. The argument here
     presumes that there was some injury, but White's methodology doesn't separate it from "injury"
28   caused by Defendants' lawful conduct.

─────────────────────
                                              15

1    Courts routinely exclude damages studies that fail to distinguish between legal and illegal

2    conduct. *Vernon v. Southern California Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992); *MCI*

3    *Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983) (court rejected

4    plaintiff's damages estimates because they did not establish any variation in the outcome depending

5    on which acts of [the Defendant] were held to be legal)). In *Vernon*, the Ninth Circuit rejected a

6    damages study offered by Plaintiffs which "failed to segregate the losses, if any, caused by acts

7    which were not antitrust violations from those that were." *Id.* at 1372. *See also Farley*

8    *Transportation Co., Inc. v. Santa Fe Trail Transportation Co.*, 786 F.2d 1342, 1352 (9th Cir. 1985)

9    (Plaintiff's "failure to make any segregation between damages attributable to lawful competition and

10   that attributable to the unlawful scheme . . . requires reversal of the verdict "); *Litton Systems, Inc. v.*

11   *Honeywell, Inc.*, 1996 U.S. Dist. LEXIS 14662 (C.D. Cal. 1996) (The jury must be able "at a

12   minimum, to distinguish between losses attributable to lawful competition and those attributable to

13   unlawful anticompetitive conduct."); *ILC Peripherals Leasing Corp. v. IBM*, 458 F. Supp. 423, 434

14   (N.D. Cal. 1978), *aff'd per curiam sub nom, Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir.

15   1980) (damages study rejected because of "no reasonable basis in fact for the jury to determine what

16   the effect on damages would be if it found one or more of the challenged acts lawful.")[6]

17   White's failure to disaggregate the effects of Defendants' lawful conduct from the effects of

18   their unlawful conduct flows directly from his mistaken assumption that all of Defendants' conduct

19   that could affect DRAM prices was potentially "tainted." This includes conduct related to *output,*

20   (White Tr., Ex. 20 at 147:3-16; 149:14-153:2), despite the complete lack of evidence that

21   Defendants' output decisions were tainted. Defendants' experts and witnesses have pointed to

22   numerous changes in capacity, yield and output in response to new market conditions arising during

23   the conduct period that were not present in the benchmark period, and that ***are not attributable to the***

24   ***conspiracy*** (*e.g.*, closing plants, exiting the industry, lost yield due to changes in technology). (*See*

25   Kalt Report, Ex. 3 at ¶¶ 112, 142.) Hynix closed its Eugene, Oregon fab for a few months in 2001

26

---

27   [6]    Expert opinions have been excluded in a *Daubert* context based upon failure to disaggregate
     damages. *El Aguila Food Prods. v. Gruma Corp.*, 301 F. Supp. 2d 612, 624-26 (S.D. Tex. 2003),

28   *aff'd,* 2005 U.S. App. LEXIS 8944, (5th Cir. 2005).

DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF HALBERT WHITE - Case No. 06-01665 PJH and *related cases*

KAYE SCHOLER LLP

1   for a complex two-stage technology upgrade.  (J.S. Kim Tr., Ex. 16 at 146:19-149:4; 205:25-206:19;

2   295:21-296:8.)  Hynix also closed other fabs during the relevant period because they were utilizing

3   outdated technology.  (*See id.*)  IBM exited the business.  Other DRAM makers, such as Toshiba and

4   Hitachi, also cut production or ceased commodity DRAM production.  (Kalt Report, Ex. 3 at ¶¶ 112,

5   142.)  Micron experienced difficulties in wafer output due to transitions to the next generation of

6   process geometry.  (J. Hawkins Tr., Ex. 12 at 76:8-80:6, 131:13-134:13, 148:24-150:5.)  Infineon

7   decided not to ramp up new manufacturing plants in mid-2001 due to the worst losses the company

8   had ever seen.  (Harter Tr., Ex. 11 at 258:6-259:5; 333:5-336:4.)  (*See also* O'Brien Decl., Ex. 22 at

9   ¶¶ 5-9; M. Sadler Tr., Ex. 18 at 119:15-121:9; S. Huang Tr., Ex. 13 at 96:10-98:25; C. Kau Tr., Ex.

10   14 at 117:19-119:2; Order Granting Summary Judgment in Part and Denying Summary Judgment in

11   Part (February 20, 2007), Ex. 23 at 19-20 (granting summary judgment of Nanya parent company in

12   part because any reduction in its output was motivated by competition, not collusion).)

13        White concedes that he attributes to the alleged conspiracy any impact or changes in

14   Defendants' output decisions during the alleged conspiracy.  (White Tr., Ex. 20 at 146:16-148:2;

15   White Rebuttal Tr., Ex. 21 at 66:19-67:15, 86:14-87:4).  However, he has no opinion that all of

16   Defendants' conduct related to output which could impact DRAM prices was actually conspiratorial.

17   (*See id.*)  No authority permits White to assume that all of Defendants' activities were conspiratorial

18   just because they occurred during the period of the alleged conspiracy.

19        Basic economics teaches that changes in output will impact prices.  In the simplest terms, the

20   more Defendants produce, the lower prices must be to clear the market.  Conversely, decisions to

21   reduce output or cut back on production will tend to drive prices up.  White concedes that both

22   supply and demand determine prices.  (White Tr., Ex. 20 at 27:8-14 ("[E]conomic theory tells us that

23   there are a number of important factors that determine prices.  There are supply factors, there are

24   demand factors.  It's only been recently in the history of economics that people have understood that

25   you need both supply and demand to understand how prices arise.").)  Yet, White ***makes no***

26   ***allowance for unilateral decisions affecting supply of DRAM, and therefore affecting DRAM***

27   ***prices.***  Instead, White assumes the entire difference between his predicted prices and actual prices is

28   caused by the conspiracy.  Economic opinion testimony that fails to account for the laws of supply

17

KAYE SCHOLER LLP

1   and demand is flawed and inadmissible. *See Crystal Semiconductor Corp. v. Tritech*

2   *Microelectronics Int'l*, 246 F.3d 1336, 1359 (Fed. Cir. 2001); *Monolithic Power Sys. v. O2 Micro*

3   *Int'l Ltd.*, 476 F. Supp. 2d 1143, 1155-1156 (N.D. Cal. 2007).

4          Plaintiffs rely on the decision in *In re Linerboard Antitrust Litigation,* 497 F. Supp.2d 666

5   (E.D. Pa. 2007), as purportedly accepting White's methodology. *Linerboard* is not instructive here

6   for a fundamental reason.  The first sentence of the decision makes clear that *Linerboard* involved

7   claims of an industry-wide restraint on output.  *See id.* at 669 (Plaintiffs allege Defendants

8   "conspired to raise the price of corrugated containers and corrugated sheets throughout the United

9   States *by restricting production*") (emphasis added).  Where Plaintiffs undertake to prove an

10  industry-wide output restraint, it may be reasonable to use a damages model that assumes output

11  decisions were conspiratorial.  It is not reasonable in this case, where White assumes only the limited

12  conspiracy in certain Defendants' pleas, and does not even attempt to demonstrate a conspiracy on

13  output.  There is no evidence that all (or any) of Defendants' output decisions were conspiratorial

14  and tainted, much less all non-defendants' output decisions.

15         *Linerboard* is also distinguishable because in that case Professor White claimed to have

16  successfully identified a benchmark period where Defendants operated as they should have during

17  the conspiracy period.  *Id.* at 682 ("So the cost and demand factors operating in the benchmark

18  period then drive whatever those Defendant decisions are as to inventories, downtime, et cetera, the

19  aspects of those that are not contaminated by the alleged conspiracy because it's the benchmark

20  period, as well as driving prices and quantities directly".)  Here, as explained above, Professor White

21  concedes the level of competition may well have changed between the benchmark period and the

22  alleged conspiracy period, and non-conspiratorial changes in competitive behavior could account for

23  at least part of the difference observed between actual and but for prices.[7]

---

24         [7] The *Vitamins* case cited by Professor White provides even less guidance because there is no
    formal opinion and no clear articulation of the specifications of the model, the challenges by the
25  Defendants, and the Courts reaction to those challenges.  White even admitted that he had not
    reviewed the five-year-old expert report from another expert in that case in preparing his report, and
26  could not describe any details of the analysis at issue.  (White Rebuttal Tr., Ex. 21 72:15-73:15).
    Most importantly, there is no reason to believe that the court permitted the model to go to the jury
27  despite its failure to disaggregate between the impact of lawful and unlawful conduct by the
    Defendants.

28

KAYE SCHOLER LLP

1   As explained above, there is substantial evidence that the benchmark selected by White was

2   "more competitive" – because it was skewed to include *only* the bust part of a cycle in which prices

3   declined 95% -- so at least a portion of his measured damages would be attributable to his selection

4   of this skewed benchmark period rather than the impact of any alleged conspiracy on actual prices.

5   (*See* DeDios Report, Ex. 1 at ¶¶ 10-15; Kalt Report, Ex. 3 ¶¶ 124, 170, & Figure 4; Shapiro Report,

6   Ex. 6 at ¶¶ 7-8). Yet, White does nothing to disaggregate the affect of a more competitive

7   benchmark period from the damages he attributes to the alleged conspiracy.

8       White creates "too great an analytical gap between the data and the opinion proffered," *see*

9   *Joiner*, 522 U.S. at 146, when he assumes that all of Defendants' conduct during the conspiracy

10  period is attributable to the conspiracy. White purported to assume only the admitted conduct

11  directed at six specific OEMs, which is limited to coordination on certain bid prices during certain

12  periods of time to six specific customers. (*See* White Rebuttal Report, Ex. 8 at ¶ 2; Rebuttal Tr., Ex.

13  21 at 16:22-18:13.) White predicted his "but-for" prices by excluding *any* predictive variables or

14  market factors that were subject to the Defendants' control or influenced by Defendants' conduct, or

15  even that could have been affected by Defendants' conduct. (White Tr., Ex. 20 at 76:23-77:7; 121:2-

16  4.) White's "leap" from the narrow conspiracy reflected in the pleas to an all-encompassing,

17  industry-wide cartel (*i.e.*, one which presumes that all values subject to the Defendants' control were

18  potentially "tainted" by the conspiracy) leaves too large a gap between the facts and his opinions.

19      Most importantly, White excluded any variables that reflected Defendants' -- and other non-

20  Defendant DRAM manufacturers' -- conduct affecting the **amount** of DRAM produced. (White Tr.,

21  Ex. 20 at 147:3-16; 149:14-153:2). By excluding any variables affect by Defendants' output

22  decisions from his predictive model, White assumed that any changes in Defendants' conduct during

23  the conduct period in relation to the specific predictive variables he chose for his model were

24  attributable to that conspiracy. Thus, he predicted prices without considering lawful and unilateral

25  changes in supply decisions, violating the most fundamental laws of economics. Yet, the only thing

26  linking Defendants' output decisions to the admitted conspiracy is White's unsupported

27  assumptions. White's "but for" model forces Defendants (and other DRAM manufacturers) to

28  continue to react to market conditions as they have during the benchmark period. Although White

19

1   acknowledges that Defendants did change their behavior relative to market conditions in ways

2   unrelated to the conspiracy (*See* discussion, *supra*, at Section III-B), his model mistakenly lumps the

3   effects of both legal and illegal conduct.

4   **D.      White's Second Step, In Which He Predicts Plaintiffs' Prices Using Target**

5   **OEM Prices, Is Unreliable And Inadmissible.**

6           Even if the Court were to accept White's first step, in which he claims to have predicted what

7   the Target OEMs' prices would have been absent the conspiracy, White must also demonstrate that

8   his decision not to use that process to predict plaintiffs' prices directly is sound and reliable.  *See*

9   *Cagle v. Cooper Cos. (In re Silicone Gel Breasts Implants Prods. Liab. Litig.)*, 318 F. Supp. 2d 879,

10  890 (C.D. Cal. 2004) (holding that "any step that renders [the expert's] analysis unreliable . . .

11  renders the expert's testimony inadmissible. This is true whether the step completely changes a

12  reliable methodology or merely misapplies that methodology") (quoting *In re Paoli R.R. Yard PCB*

13  *Litig.*, 35 F.3d 717, 7454 (3d Cir. 1994)).  In *Daubert*, the Supreme Court identified certain criteria

14  for courts to use in exercising their discretion to exclude an expert's testimony, including peer

15  review, testing, the rates of error, and whether the expert's approach had been accepted in the

16  scientific community.  *Daubert*, 509 U.S. at 593-594.  This list of criteria is not exclusive, and

17  district courts have wide discretion to apply additional or different factors in evaluating reliability.

18  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

19  **1.      Plaintiffs Have Not Shown That White's Two-Step Approach Is Accepted**

20  **In The Scientific Community.**

21          In *Daubert*, the Supreme Court held that "[w]idespread acceptance can be an important factor

22  in ruling particular evidence admissible, and 'a known technique which has been able to attract only

23  minimal support within the community' may properly be viewed with skepticism.'"  509 U.S. at 594

24  (quoting *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir.1985).)  Thus, courts have excluded

25  expert testimony when the expert fails to present some objective source that shows that his

26  methodology is accepted in the field.

27              The Ninth Circuit has repeatedly stated that where evidence of pre-
                litigation research or peer review is not available, the experts must (1)
28              "explain precisely how they went about reaching their conclusions"

KAYE SCHOLER LLP

and (2) "point to some objective source -- a learned treatise, the policy
statement of a professional association, a published article in a
reputable scientific journal or the like -- to show that they have
followed the scientific method as it is practiced by (at least) a
recognized minority of the scientists in their field."

*Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1035 (N.D. Cal. 1999)

(quoting *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311 (9th Cir. 1995)).  There, the court

excluded an expert's testimony where he failed to show that his particular method "is practiced by

even a minority of scientists in this field."  *Id.* at 1034.  Further, the court stated that "the absence of

peer-reviewed publication is another factor in favor of excluding the testimony."  *Id.* at 1033.

White cites no scientific literature, nor any court decision, which upheld or advocated use of

this two-step approach to determine prices.  White's rebuttal report contains a section arguing that

the methodology used in his *first step*, in which he uses a set of "predictive variables" to predict the

Target OEM prices, is "well accepted in the academic literature," and includes a list of "relevant

papers."  (White Rebuttal Report, Ex. 8 at ¶¶ 52-61 & Appendix B.)  But White provides *no similar*

*showing of support for his second step*, in which he predicts Plaintiffs' prices not using that

methodology, but using only the Target OEMs' predicted prices, and the purported "relationship"

with Plaintiffs' prices.  White does not cite a single piece of scientific literature -- peer reviewed or

otherwise -- supporting that approach.  (White Rebuttal Report, Ex. 8 at ¶¶ 86-87).

The only precedents White cited were a single Court decision in *In re Linerboard,* and the

transcript of a hearing in *In re Vitamins.*  However, White admitted that in the *Linerboard* case, he

did not use a two-step approach, but used his "predictive assessment of treatment effects" directly to

determine Plaintiffs' prices.  (White Tr., Ex. 20 at 312:18-313:21.)  As for *Vitamins*, the transcript he

cites makes no reference to a two-step approach, and White admits he did not review the report in

that case, and did nothing to confirm that it included a two-step process.  (White Rebuttal Tr., Ex. 20

at 72:15-73:15).  Despite Defendants' request, Plaintiffs have not produced the report from that case.

Plaintiffs submitted the Rebuttal Report of Professor Diebold to demonstrate that White's

technique enjoys widespread acceptance.  However, Professor Diebold opines only that White's use

of his "predictive assessment of treatment effects" (*i.e.*, his first step) to predict prices is generally

accepted and reliable and has been the subject of peer reviewed literature.  (Diebold Report, Ex. 2 at

21

¶¶ 22-25).  Diebold does not offer any opinion that White's decision to depart from that approach, and use two steps, has been generally accepted, instead of simply directly applying the "generally accepted" methodology to determine Plaintiffs' prices.  (Diebold Tr., Ex. 10 at 31:2-33:3; 69:17-70:8.)  Indeed, Professor Diebold testified that the most appropriate way to predict prices is through White's first step, and he was unaware of any reason why it would have been inappropriate or unreliable to apply that directly to determine Plaintiffs' prices.  (*Id.* at 59:20-61:18; 70:10-71:19.)[8] Thus, plaintiffs have failed to demonstrate that White's decision to depart from a single-step approach is generally accepted or peer-reviewed.

## 2.   White's Two Step Approach And Its Results Conflict With What He Contends Is The Generally Accepted Approach.

When an approach used by an expert conflicts with the generally accepted approach, the expert's opinions should be excluded.  In *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1391 (D. Or. 1996), the court granted defendant's motion to exclude the testimony of plaintiff's expert, noting that "[m]any courts have recognized that an unexplained conflict with the generally accepted methodology or theories in a given scientific field can be a basis for excluding proffered expert testimony."  *Id.* at 1406.  The court noted that "[i]n addition to not being peer-reviewed and to being untestable" the expert's proffered testimony "inexplicably conflicts with the general consensus of the epidemiological community."  *Id.* at 1406-07.  As demonstrated above, both White and Diebold opine that the accepted and most appropriate method for predicting prices is White's first step, "predictive assessment of treatment effects."  (*See* Diebold Tr., Ex. 10 at 59:20-61:18).  The two-step method White uses conflicts with what he has testified is the most generally accepted approach.

Moreover, the results generated by White's two-step approach also conflict with the results from the single step approach that Diebold and White both agree is widely accepted and reliable. Diebold agreed that it would "certainly be interesting" and indeed "legitimate" to apply White's

---

[8]   Neither White nor Diebold contends that the data available for Plaintiffs' prices is somehow inadequate for his predictive model; nor could they because Professor White relies heavily on that very price data to determine Plaintiffs' prices in his second stage.  To the contrary, Diebold testified that he was aware of nothing about Plaintiffs' prices that would prevent White from using his first stage to predict those prices directly.  (Diebold Tr., Ex. 10 at pg. 71:12-19.)

KAYE SCHOLER LLP

1    model directly to predict Plaintiffs' prices and to compare those results to those generated by

2    White's two-step approach. (Diebold Tr., Ex. 10 at 70:10-71:19.)  But applying this test finds

3    substantial **negative** damages for most Plaintiffs, and dramatically lower overcharges for the other

4    two, instead of the significant overcharges found by White's untested two-step approach. (Kalt

5    Report, Ex. 3 at ¶¶ 214-217).  White's decision to depart from his standard approach demands

6    explanation when we learn that his standard approach finds no damages when applied directly to

7    predict plaintiffs' prices.  The absence of damages under the standard approach is a significant

8    indication that White's modified two-step approach is unreliable.

9         In his rebuttal report, White does not dispute the results Defendants obtained using his

10   methodology to directly predict Plaintiffs' prices, and specifically that applying that methodology

11   finds substantial undercharges, not overcharges. (White Rebuttal Report, Ex. 8 at ¶¶ 88-92.)

12   Instead, he claims that, by modifying his first step to include OEM prices as one of the predictive

13   variables, he can still generate substantial overcharges.  (*Id.*)  White, however, does not advocate this

14   approach or contend that it is reliable.  This is not surprising, because it would violate one of the

15   fundamental requirements White and Diebold identify for this methodology.  Both White and

16   Diebold agree it is inappropriate to use as a predictive variable anything within Defendants' control,

17   which certainly would include the prices charged to the target OEMs. (White Report, Ex. 7 at ¶ 26;

18   Diebold Tr., Ex. 10 at 73:6-13.)   In fact, Professor Diebold specifically testified it would be

19   inappropriate to use OEM prices as a variable to predict Plaintiffs' prices.  (*Id.* at 70-75.)

20              **3.    White Has Not Accurately Determined The "Relationship" Between**

21                   **Plaintiffs' Prices And The Target OEMs' Prices.**

22        Even if Plaintiffs had shown that the use of a second step to predict Plaintiffs' prices from the

23   Target OEMs' prices is a generally accepted methodology, they would have to show that it was

24   properly applied in this case. *See Cagle, supra,* 318 F. Supp. 2d at 890 (C.D. Cal. 2004) (opinion

25   should be excluded where expert uses a reliable methodology, but "merely misapplies that

26   methodology.")  Under *Daubert*, the Court may consider "testing" and "error rates," as well as other

27   criteria the court finds relevant in assessing reliability. *See Kumho Tire Co.*, 526 U.S. at 158.

28

KAYE SCHOLER LLP

23

1    To generate "but for" prices for the Plaintiffs, White claims to have "estimated the statistical

2    relationship between the DRAM prices paid by each plaintiff and those paid by the named OEMs."

3    (White Report, Ex. 7 at ¶ 75). White then "applied these estimated relationships to the named OEM

4    but-for price index . . . to obtain plaintiff-specific but-for price indexes." (*Id.* at ¶ 76.) White does

5    not explain how he determined this "relationship," but the key premise of this approach is that this

6    statistical relationship enables White to accurately predict Plaintiffs' prices. White provides no

7    estimates of error rates, and no objective tests for accuracy for his second step. He claims only to

8    have developed a statistical relationship, and then applied it. It is, however, possible to directly test

9    whether White in fact has accurately captured in his formula the relationship between Plaintiff and

10   Target OEM prices, by testing whether it accurately predicts actual plaintiff prices when applied to

11   actual Target OEM prices. White conceded at his deposition there should be a "match to a degree"

12   between predicted plaintiff prices and actual plaintiff prices when applying his "relationship" to

13   actual Target OEM prices, and that the accuracy of the predictions would be an important test for the

14   reliability of his purported "relationship." (White Tr., Ex. 20 at 258:12-259:10.)

15   White's second step fails even the most basic test of its accuracy and reliability, because it

16   finds very substantial overcharges to the Plaintiffs even when it assumes there are ***no overcharges*** to

17   the Target OEMs. If properly constructed, it should yield zero overcharge to the Plaintiffs when

18   there is no overcharge to the Target OEMs. But exactly the opposite happens. Applying White's

19   statistical relationship to actual Target OEM prices predicts Plaintiffs' prices that are wildly

20   divergent from -- and substantially below -- actual Plaintiffs' prices. While White claims the

21   prediction will never be "perfect," the predictions in fact are not even close; they severely under-

22   predict actual prices. This error generates overcharges of as much as 48% of the damages Plaintiffs

23   claim in the case of SGI, when there is no assumed overcharge to the Target OEMs. (Kalt Report,

24   Ex. 3 at ¶¶ 60-61 and Figures 26A-26F; Shapiro Report, Ex. 6 at pp. 38 & 39, Exhs. 24-29.) White

25   simply has not accurately determined the relationship between Target OEM prices and Plaintiff

26   prices, and the result is to find substantial damages when there should be none.

27   In his rebuttal report, White does not challenge these results or deny that the rate of error

28   shown is significant. Instead, he concedes the results by arguing that the mismatch in prices results

KAYE SCHOLER LLP

24

1    from his decision to use a combination of pricing data from inside and outside the conduct period to

2    determine the "relationship" between plaintiff and Target OEM prices.  White then claims that, if he

3    instead uses only data from the conduct period, or only data from the non-conduct period to come up

4    with his statistical relationship, this generates even higher overcharges.  (White Rebuttal Report, Ex.

5    8 at ¶¶ 119-122).  These arguments do not dispute, and essentially concede, that the statistical

6    relationship White uses in his initial report does not accurately predict Plaintiffs' prices.

7        White cannot rely on either of his two alternative approaches that generate higher damages

8    because he admits that each is unreliable and fails to account for important factors.  Using only

9    conduct period data is not reliable because the data is tainted by the conspiracy, and using only non-

10   conduct data is not reliable because it fails to account for changes in the composition of products

11   bought by each plaintiff and the OEMs.  (*Id.* at 279.)  In other words, White is left with (i) an initial

12   methodology that demonstrably fails to accurately predict Plaintiffs' actual prices, and (ii) two

13   alternative methodologies that White concedes are flawed.  The fact that White's methodology

14   generates lower damages than the other two alternatives does not make any of them reliable.

15   **IV.   CONCLUSION**

16       Defendants respectfully request that this Court exclude any and all testimony, references to

17   testimony or argument based upon the testimony of Professor White regarding Plaintiffs' alleged

18   damages in the above-entitled actions.

19
     DATED:  July 30, 2008                       Respectfully Submitted,
20                                               KAYE SCHOLER LLP

21
                                                 By:_____/s/_____
22                                                          Julian Brew
                                                 Attorneys for Defendants
23                                               INFINEON TECHNOLOGIES NORTH
                                                 AMERICA CORP. AND INFINEON
24                                               TECHNOLOGIES AG
                                                 *[On behalf of all Defendants listed below]*
25

26

27

28

KAYE SCHOLER LLP

1

2   Dated:  July 30, 2008                    KENNETH R. O'ROURKE
                                             O'MELVENY & MYERS LLP
3

4                                            By:_____/s/_____
                                                    Kenneth O'Rourke
5
                                             Attorneys for Defendants
6                                            HYNIX SEMICONDUCTOR INC. and
                                             HYNIX SEMICONDUCTOR AMERICA INC.
7

8   Dated:  July 30, 2008                    ORRICK, HERRINGTON & SUTCLIFFE LLP

9
                                             By:_____/s/_____
10                                                  Howard M. Ullman

11                                           Attorneys for Defendants
                                             NANYA TECHNOLOGY CORPORATION
12                                           and NANYA TECHNOLOGY
                                             CORPORATION USA
13

14  Dated:  July 30, 2008                    SIMPSON THACHER & BARTLETT LLP

15

16                                           By:_____/s/_____
                                                    Harrison J. Frahn IV
17
                                             Attorneys for Defendants
18                                           ELPIDA MEMORY, INC. and
                                             ELPIDA MEMORY (USA) INC.
19

20  Dated:  July 30, 2008                    THELEN REID BROWN RAYSMAN &
                                             STEINER LLP
21

22                                           By:_____/s/_____
                                                    Robert Pringle
23

24                                           Attorneys for Defendants
                                             NEC ELECTRONICS AMERICA, INC.
25

26

27

28

DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF HALBERT WHITE - Case No. 06-01665 PJH and *related cases*

Dated:  July 30, 2008          SHEPPARD MULLIN RICHTER &
                               HAMPTON LLP


                               By:_____/s/_____
                                         David Garcia

                               Attorneys for Defendants
                               SAMSUNG ELECTRONICS CO., LTD. and
                               SAMSUNG SEMICONDUCTOR, INC.

Dated:  July 30, 2008          GIBSON DUNN & CRUTCHER LLP


                               By:_____/s/_____
                                         Joel Sanders

                               Attorneys for Defendants
                               MICRON TECHNOLOGY, INC. and
                               MICRON SEMICONDUCTOR PRODUCTS,
                               INC.

Dated:  July 30, 2008          THELEN REID BROWN RAYSMAN
                               & STEINER LLP


                               By: _____/s/_____
                                         Samuel J. Maselli

                               Attorneys for Defendants
                               HYNIX SEMICONDUCTOR INC. and
                               HYNIX SEMICONDUCTOR AMERICA INC.
                               in the DRAM Claims Liquidation Trust matter
                               only

## ATTESTATION OF FILING

Pursuant to General Order No. 45 § X (B), I hereby attest that I have obtained concurrence in the service and filing of this Motion with electronic signatures from all of the Defendants listed in the signature blocks above.

                               _/s/ Joshua Stambaugh_
                               Joshua Stambaugh