KENNETH R. O'ROURKE (S.B.#120144)
korourke@omm.com
PAUL B. SALVATY (S.B. #171507)
psalvaty@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:     (213) 430-6000
Facsimile:     (213) 430-6407

MICHAEL TUBACH (S.B. #145955)
mtubach@omm.com
THOMAS BROWN (S.B. # 182916)
tbrown@omm.com
O'MELVENY & MYERS LLP
Embarcadero Center West, 275 Battery Street
San Francisco, CA  94111-3305
Telephone:     (415) 984-8700
Facsimile:     (415) 984-8701

IAN SIMMONS (admitted *pro hac vice*)
isimmons@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C.  20006-4001
Telephone:     (202) 383-5300
Facsimile:     (202) 383-5414

Attorneys for Defendants
HYNIX SEMICONDUCTOR INC. and
HYNIX SEMICONDUCTOR AMERICA INC.
(except in the *DRAM Claims Liquidation Trust*)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *Sun Microsystems, Inc., et al. v. Hynix Semiconductor, Inc., et al.* | Case No.   C-06-01665 PJH (Consolidated) |
| *Unisys Corporation v. Hynix Semiconductor, Inc., et al.* | C-06-02915 PJH<br>C-07-01200 PJH<br>C-07-01207 PJH |
| *All American Semiconductor, Inc. v. Hynix Semiconductor, Inc., et al* | C-07-01212 PJH<br>C-07-01381 PJH |
| *Edge Electronics, Inc. v. Hynix Semiconductor, Inc., et al.* | **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND, IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MEMORANDUM IN SUPPORT THEREOF** |
| *Jaco Electronics, Inc. v. Hynix Semiconductor, Inc., et al.* | |
| *DRAM Claims Liquidation Trust, by its Trustee, Wells Fargo Bank, N.A. v. Hynix Semiconductor, Inc., et al.* | Hearing Date:     December 10, 2008<br>Time:                 9:00 a.m.<br>Place:               Courtroom 3, 17th Floor<br>Judge:             Hon. Phyllis J. Hamilton |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS .................................................................................... 4

      A.    Overview Of DRAM Products .................................................................. 4

      B.    DRAM Industry During Relevant Period ................................................. 4

      C.    The Parties ................................................................................................. 5

      D.    The DOJ Investigation And Pleas ............................................................. 6

      E.    Plaintiffs' Claims Differ From Those Of Prior Plaintiffs ........................ 7

III.  ARGUMENT ........................................................................................................ 8

      A.    Plaintiffs Cannot Establish That Defendants' Conduct Caused The Injury
            That Plaintiffs Claim ................................................................................. 8

            1.    The Pleas Do Not Admit That These Plaintiffs Suffered Any Injury
                  Nor Do They Admit The Type Of Conspiracy That Plaintiffs
                  Assume Existed ............................................................................... 11

            2.    Neither Plaintiffs Nor Their Experts Establish That Defendants
                  Restrained Supply. .......................................................................... 13

            3.    Neither Plaintiffs Nor Their Experts Establish That Defendants
                  Fixed Benchmark Prices ................................................................. 16

            4.    Plaintiffs' Only Evidence Of Injury Is An Expert Opinion,
                  Unsupported By Market Facts That Cannot As A Matter Of Law
                  Sustain Their Burden Of Proof On Causation................................. 19

      B.    Summary Judgment Is Appropriate For Plaintiffs' California Law Claims ......... 27

      C.    Plaintiffs' Theory Of Causation Is Too Attenuated To Allow The
            Incredible Recovery Sought .................................................................... 28

      D.    In The Alternative, Defendants Are Entitled To Summary Adjudication
            That Certain Material Facts Are Not Genuinely At Issue........................ 32

IV.   CONCLUSION ................................................................................................... 32

# TABLE OF AUTHORITIES

Page

## CASES

*Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*,
116 F. Supp. 2d 1159 (C.D. Cal. 2000) ................................................ 30

*Ass'n of Washington Pub. Hosp. Dists. v. Philip Morris, Inc.*,
241 F.3d 696 (9th Cir. 2001)......................................................... 29

*Associated Gen. Contractors v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)................................................................ 29, 31

*Blue Shield of Va., Inc. v. McCready*,
457 U.S. 465 (1982)................................................................ 29

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ...................................................... 8, 13, 20, 25

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................ 8

*Clayworth v. Pfizer, Inc.*,
No. A116798 (Cal. Ct. App. Jul. 25, 2008) .......................................... 28

*Cook v. United States*,
545 F. Supp. 306 (N.D. Cal. 1982) ................................................. 26

*Dealers Wholesale Supply, Inc. v. Pacific Steel and Supply Co.*,
No. C-81-3038-MHP, 1984 U.S. Dist. LEXIS 15145 (N.D. Cal. 1984) ................. 9

*Flintkote Co. v. Lysfjord*,
246 F.2d 368 (9th Cir. 1957)........................................................ 9

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
744 F.2d 588 (7th Cir. 1984)........................................................ 13

*Global Minerals & Metals Corp. v. Superior Court of San Diego County*,
7 Cal. Rptr. 3d 28 (Cal. Ct. App. 2003) ............................................ 28

*Hall v. Time Inc.*,
70 Cal. Rptr. 3d 466 (Cal. Ct. App. 2008) .......................................... 28

*Holmes v. Sec. Investor Prot. Corp.*,
503 U.S. 258 (1992)................................................................ 31

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
691 F.2d 1335 (9th Cir. 1982)..................................................... 9, 30

*In re Industrial Diamonds Antitrust Litigation* is instructive,
167 F.R.D. 374 (S.D.N.Y. 1996) .................................................... 23

*In re Vitamins Antitrust Litig.*,
Misc No. 99-197, 2001 WL 855463 (D.D.C. Jul. 2, 2001) ........................... 30

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
864 F.2d 1409 (7th Cir. 1989)...................................................... 8

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981)................................................................ 8

*Janich Bros., Inc. v. Am. Distilling Co.*,
570 F.2d 848 (9th Cir. 1977)....................................................... 14

# TABLE OF AUTHORITIES
## (Continued)

Page

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000).................................................................................... 28

*Kolling v. Dow Jones & Co.*,
  187 Cal. Rptr. 797 (Cal. Ct. App. 1982) .................................................................... 28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)...................................................................................................... 8

*McGlinchy v. Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988)...................................................................................... 27

*McKay v. Hageseth,*
  No. C-06-1377, 2007 WL 2669934 (N.D. Cal. Sept. 7, 2007) ................................. 28

*Morrison v. Viacom, Inc.*,
  78 Cal. Rptr. 2d 133 (Cal. Ct. App. 1998) ................................................................ 28

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*,
  468 U.S. 85 (1984)...................................................................................................... 13

*Norfolk & Western Ry. v. Ayers*,
  538 U.S. 135 ( 2003).................................................................................................... 26

*Northwest Publ'ns, Inc. v. Crumb*,
  752 F.2d 473 (9th Cir. 1985)........................................................................................ 9

*Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*,
  185 F.3d  (9th Cir. 1999)............................................................................... 29, 31, 32

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995)................................................................................. 8, 20

*Stationary Eng'rs Local 39 Health & Welfare Trust Fund v. Philip Morris, Inc.*,
  No. C-97-1519 DLJ, 1998 WL 476265 (N.D. Cal. Apr. 30, 1998) ......................... 28

*Sybersound Records, Inc. v. UAV Corp.*,
  517 F.3d 1137 (9th Cir. 2008)................................................................................... 32

*U.S. Gypsum Co. v. Ind. Gas Co.*,
  350 F.3d 623 (7th Cir. 2003)...................................................................................... 31

*United States v. W.R. Grace*,
  455 F. Supp. 2d 1181 (D. Mont. 2006) ..................................................................... 26

*United States v. W.R. Grace*,
  504 F.3d 745 (9th Cir. 2007)...................................................................................... 26

## STATUTES

15 U.S.C. § 1 ........................................................................................................... 8, 11

15 U.S.C. § 15 ............................................................................................................... 8

Cal. Bus. & Prof. Code § 16700 ............................................................................... 27

Cal. Bus. & Prof. Code § 17200 ............................................................................... 28

**TABLE OF AUTHORITIES**
(Continued)

**Page**

**TREATISES**

3 L. Sand *et al.,*
  *Modern Federal Jury Instructions-Criminal* (2008)................................................................ 11

ABA Section of Antitrust Law,
  CRIMINAL ANTITRUST LITIGATION HANDBOOK (2d ed. 2006) ................................................ 11

Areeda, Philip E., Herbert Hovenkamp & Roger D. Blair,
  *Antitrust Law,* (3d ed. 2007) ...................................................................................... 14

Richard A. Posner,
  *Antitrust Law* 66 (2d ed. 2001) ...................................................................... 14, 16

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on December 10, 2008 at 9:00 a.m. in Courtroom 3 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, or as soon thereafter as the matter may be heard by the above entitled Court, Defendants Micron Technology, Inc., Micron Semiconductor Products, Inc., Infineon Technologies AG, Infineon Technologies North America Corporation, Nanya Technology Corporation, Nanya Technology Corporation USA, Elpida Memory, Inc., Elpida Memory (USA), Inc., Hynix Semiconductor Inc., Hynix Semiconductor America Inc., Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc.[1] and NEC Electronics America, Inc. ("Defendants") will and hereby do move this Court pursuant to Rule 56(b) of the Federal Rules of Civil Procedure for an Order for summary judgment in their favor on Plaintiffs' Sherman Act, Cartwright Act and California Unfair Competition Law claims.  In the alternative, Defendants also will and hereby do move this Court pursuant to Rule 56(d) of the Federal Rules of Civil Procedure for an Order for summary adjudication as to certain facts as indicated in the accompanying Memorandum of Points and Authorities.

The motion is made pursuant to the grounds that there are no genuine issues of material fact that Plaintiffs were injured by reason of Defendants' conduct.  This motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the Declaration of Paul B. Salvaty and the exhibits attached thereto, all pleadings and papers on file with the Court in this action, and any other or further admissible evidence and arguments as may be presented at the hearing on this motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This motion poses a single question: whether Plaintiffs can create a triable issue of fact on their claims that they suffered billions of dollars in damages attributable to Defendants' conduct

---

[1] Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc. join this motion only for purposes of *Edge Electronics, Inc. v. Hynix Semiconductor, Inc., et al.*, Case No. C-07-01207 PJH.

1   without conducting any analysis of the conduct itself or making any meaningful attempt to link

2   the conduct to any impact on the prices they paid.  The answer, Defendants submit, is no.  Absent

3   proof of injury caused by reason of a violation of the antitrust laws, all of Plaintiffs' claims for

4   damages in all of these opt-out cases must be rejected as a matter of law.

5           Some Defendants have admitted in their respective pleas to conspiring to raise the contract

6   prices of certain types of Dynamic Random Access Memory ("DRAM") sold to six specific

7   Original Equipment Manufacturers ("Target OEMs") -- Apple, Dell, Gateway, HP, Compaq and

8   IBM -- during "certain periods of time" between April 1, 1999 and June 15, 2002 and with

9   "varying levels of effectiveness."[2]  Plaintiffs in this case are ***not*** among those Target OEMs.  But

10  in the first three numbered paragraphs of each of their amended complaints, Plaintiffs claim that

11  they paid an inflated price for DRAM because of the conduct admitted in the pleas.  They claim,

12  in other words, that Defendants' conduct affected ***not*** just the six Target OEMs, but instead

13  ***affected everyone who purchased DRAM between 1997 and at least through 2002***.  They claim

14  that Defendants' conduct raised the prices that they paid for DRAM by approximately 50% over

15  this six year period, and they seek more than $5 billion in damages after trebling.

16          Plaintiffs must establish the facts that support their claim of injury.  To do so, they must

17  factually link the Defendants' conduct to an elevation of the prices they paid for DRAM.  Given

18  the breadth of their claims, they must either establish that Defendants fixed Plaintiffs' contract

19  prices for the entire period of claimed injury or that Defendants fixed market-wide prices for the

20  entire period of claimed injury.  However, Plaintiffs do not assert that Defendants entered into a

21  separate conspiracy to raise the prices Plaintiffs paid for DRAM (the first alternative above).

22  Instead, Plaintiffs claim that there was a market-wide conspiracy that injured them because they

23  purchased DRAM when this supposed market-wide conspiracy was in effect.  To create a genuine

24  issue of material fact that would allow a jury to determine that Defendants' conduct increased

25  prices to the entire DRAM industry for years, Plaintiffs must establish that Defendants' conduct

26

27  _____

    [2] Not all of the Defendants pleaded to violating Section 1 of the Sherman Act, and the pleas by
    those that did are not admissible against the other Defendants.  The non-pleading Defendants do
28  not admit to knowledge of or participation in any conspiracy.

DEFTS' NOTICE OF MOTION + MOTION FOR
SUMMARY JUDGMENT AND ADJUDICATION;
MEMO ISO THEREOF

involved the following:

- Defendants significantly restrained DRAM production and output to the market and this caused all DRAM prices, including Plaintiffs' prices, to be higher than they would otherwise have been;

- Defendants fixed benchmark DRAM prices that were actually relied upon by Plaintiffs and that actually dictated, throughout the entire period of purported injury, Plaintiffs' DRAM prices.

Plaintiffs and their experts, Professors Robert C. Marshall and Halbert L. White, acknowledge these necessary factors. In fact, White and Marshall assume that the nature of the conspiracy was market-wide, but their assumptions -- like the opinions based on them -- are not a substitute for facts and do not come close to creating a genuine dispute.

*First*, Plaintiffs rely solely on the conduct admitted in the pleas. But the pleas do not establish that Defendants targeted or impacted the Plaintiffs' contract prices or participated in a market-wide conspiracy to restrain output or fix benchmark prices.

*Second*, even though Plaintiffs' amended complaints allege that Defendants restrained production to raise their prices, neither of Plaintiffs' experts conducted an analysis of industry output to determine whether there was, in fact, a restraint that would cause the injury that Plaintiffs claim to have suffered.

*Third*, Plaintiffs and their experts have not proffered an analysis that Defendants' conduct involved fixing market-wide prices by fixing a benchmark price. A "benchmark" price is a price that is used as a basis for the negotiation of all other prices. Plaintiffs' experts have not established that any benchmark price was fixed and they have not linked Defendants' conduct to any supposed harm suffered by Plaintiffs as a result.

*Fourth*, Plaintiffs' experts offer conjecture about what "had to have" happened in this industry in order for Defendants to have raised the price that the Plaintiffs paid for DRAM. As a matter of law, this conjecture, which is unsupported by analysis or market facts, cannot create a genuine dispute.

*Finally*, Plaintiffs' claims fail because their purported injury is too remote to allow a jury

1   to determine that Defendants' conduct proximately caused the harm they claim to have suffered.

2        Simply put, Plaintiffs' and Plaintiffs' experts' failure to analyze the underlying conduct

3   and to make any real attempt to connect that conduct to any injury to Plaintiffs is fatal to their

4   claims.  Plaintiffs do not create a genuine issue of material fact that Defendants' conduct had the

5   market-wide impact they claim and that, as a result of that supposed market-wide impact, they

6   suffered a cognizable injury.  Accordingly, summary judgment is proper.

7   **II.**    **STATEMENT OF FACTS**

8        **A.**    **Overview Of DRAM Products**

9        DRAM is a type of electronic memory semiconductor used to store digital information

10   and provide high-speed storage and retrieval of data.  Ex. 1, Order Granting Summary Judgment

11   in Part and Denying Summary Judgment in Part, *In re Dynamic Random Access Memory (DRAM)*

12   *Antitrust Litig.*, No. M 02-1486 PJH at 2 (N.D. Cal., Feb. 20, 2007) ("February 20, 2007 Order").

13   DRAM is sold in two main forms: chips and modules.  Ex. 2, Expert Report of Halbert White

14   ("White Rep.") at ¶ 5.  DRAM also comes in a variety of different "technologies."  Ex. 2, White

15   Rep. at ¶ 61.

16        **B.**    **DRAM Industry During Relevant Period**

17        Plaintiffs' amended complaints focus on the years 1997 through 2002.  *See, e.g.*, Sun and

18   Unisys Con. Am. Compl. at ¶ 80.  This was a period of significant change for DRAM

19   manufacturers and the DRAM industry as a whole.  During this time, DRAM manufacturers

20   introduced several new DRAM technologies.  Prior to 1996, there was only "asynchronous"

21   DRAM:  Fast Page Mode (FPM) DRAM and its upgraded form, Extended Data Out (EDO)

22   DRAM.  Ex. 2, White Rep. at Fig. 22.  Beginning in 1996 and continuing until late 2002, DRAM

23   manufacturers introduced new "synchronous" DRAM technologies.  Ex. 2, White Rep. at ¶ 63.

24   Product-mix issues caused by the widespread introduction of synchronous DRAM (SDRAM) in

25   1996, Rambus DRAM (RDRAM) in 1999 and Double Data Rate SDRAM (DDR) in 1999 were

26   unprecedented in the industry's history.  *See* Ex. 3, Wilson at 160:15-161:7.  Product mix and

27   technology standards issues largely were resolved by the end of 2002, as DDR (and its successor

28   DDR2) began to dominate the DRAM market. Ex. 2, White Rep. at Fig. 22.  While each DRAM

DEFTS' NOTICE OF MOTION + MOTION FOR
SUMMARY JUDGMENT AND ADJUDICATION;
MEMO ISO THEREOF

1   technology performed a similar function in that each stored data, each technology operated

2   differently and each technology often was not interchangeable in end-use products.  *See, e.g.*, Ex.

3   5, Duncan at 106:6-108:11 (stating that no other system could interchange Sun's NG DIMM

4   module); Ex. 6, Raposa at 67:7-69:15 (Sun could not determine a way to substitute FPM/EDO

5   DRAM with SDRAM).

6       Even as new DRAM technologies were phased in, some customers, Sun Microsystems for

7   example, continued to rely heavily on older "legacy" technologies that the Target OEMs were not

8   buying in mass quantities.[3]  As a result, Sun had greater difficulty than the Target OEMs

9   maintaining its DRAM supply.  *See, e.g.,* Ex. 9, SUN0337198-200 at 199; *see also* Ex. 3, Wilson

10  at 142:11-144:7.  Sun's reliance on legacy products not being purchased by the Target OEMs also

11  meant that it was forced to pay more -- referred to by Sun as a "cost penalty" -- for the legacy

12  DRAM that it needed.  Ex. 7, Carroll at 137:3-12.

13      **C.    The Parties**

14      Defendants in these six opt-out actions were engaged in the manufacture and/or sale of

15  DRAM and/or DRAM modules.  Ex. 1, February 20, 2007 Order at 2.  Plaintiffs are not among

16  the six Target OEMs -- Apple, Dell, Gateway, HP, Compaq and IBM -- which are among the

17  largest PC manufacturers in the world.  *See* Ex. 2, White Rep. at ¶¶ 12, 73.  By contrast, Plaintiffs

18  (except for Sun and SGI) are relatively small companies that purchased much smaller amounts of

19  DRAM from some Defendants.[4]  *See id*. at Fig. 41.

20      Plaintiffs' DRAM procurement practices and DRAM product needs also differed in many

21  respects from those of the Target OEMs.  For example, Sun purchased large volumes of DRAM

22  but, as noted, it primarily purchased legacy DRAM products that were one or two generations

23  ─────────────

[3] "Sun didn't move away from Fast Page and EDO parts sooner" because Sun had a "system
technology that[] [was] designed to use a specific memory technology, and it…couldn't be
changed."  Ex. 3, Wilson at 145:7-13.  During the relevant time period, Sun used about 80% of
the world's supply of FPM/EDO DRAM.  Ex. 7, Carroll at 139:25-141:11.  As Sun's corporate
designee explained during his deposition:  "Sun always has and still remains a large consumer of
older technologies that would not be considered sweet spot."  Ex. 4, Wilson at 593:3-594:25; *see
also* Ex. 8, Ellis at 113:8-23 ("You are buying devices that are no longer center line and you are
going to pay a premium to get them.").

[4] Unlike the Target OEMs, Jaco, Edge and All American were DRAM re-sellers.  Ex. 13, Donza
at 14:3-20; Ex. 14, Pollina at 24:13-21; Ex. 15, Elsbihi at 15:10-16:1.

DEFTS' NOTICE OF MOTION + MOTION FOR
SUMMARY JUDGMENT AND ADJUDICATION;
MEMO ISO THEREOF

1   behind the leading technologies purchased by the OEMs. *See, e.g.,* Ex. 6, Raposa at 66:14-67:6.

2   *See also* Ex. 10, Expert Report of Kevin Murphy at Ex. 27. The Target OEMs purchased

3   SDRAM and DDR products during the relevant period, but Sun continued to buy almost

4   exclusively FPM and EDO products. Ex. 10, Expert Report of Kevin Murphy at Ex. 27. SGI

5   represented the opposite end of the spectrum. It purchased primarily cutting-edge DRAM

6   technologies -- particularly DDR -- before they had been adopted by the OEMs. *See, e.g.,* Ex. 11,

7   Ishiguro at 71:10-23. *See also* Ex. 12, Expert Report of Benjamin Klein at ¶ 20 (stating that SGI

8   began purchasing DDR in late 1999, while the Target OEMs did not buy it in significant

9   quantities until December 2001).

10       Plaintiffs and the Target OEMs differed in other ways as well. The Target OEMs

11   procured most of their DRAM through contract sales made pursuant to long-term agreements

12   ("LTAs"). Ex. 2, White Rep. at ¶¶ 104-105. The Target OEMs also negotiated prices for DRAM

13   frequently (often twice a month), Ex. 2, White Rep. ¶ 108, whereas Sun primarily relied on

14   quarterly negotiations. *See* Ex. 3, Wilson at 93:7-94:11. In 2001, Sun stopped relying on

15   quarterly negotiations and began procuring DRAM through quarterly online auctions called

16   "Dynamic Bidding Events" or "DBEs". Ex. 8, Ellis at 47:5-48:17.

17       **D.    The DOJ Investigation And Pleas**

18       Certain Defendants -- Infineon, Hynix, Samsung and Elpida (and certain of their

19   employees) -- pleaded to participation in a price-fixing conspiracy in violation of federal antitrust

20   law. Ex. 1, February 20, 2007 Order at 2. Defendants Mitsubishi, Nanya, Mosel, Winbond and

21   NEC did not plead or otherwise acknowledge wrongdoing of any kind.[5] The pleas state that

22   certain of the Defendants entered into "agreements" to fix the prices of DRAM products sold to

23   "certain OEMs" during "at least certain periods of time" with "varying levels of effectiveness."

24   Ex. 16, Hynix Plea Agreement at ¶ 4, Ex. 17, Elpida Plea Agreement at ¶ 4, Ex. 18, Infineon Plea

25   Agreement at ¶ 4, Ex. 19, Samsung Plea Agreement at ¶ 4.

26

27   _____

28   [5] Mitsubishi was one of Plaintiff Sun Microsystems' largest suppliers during the relevant time period, with sales of over $420 million. Ex. 2, White Rep. at Fig. 17.

### E.      Plaintiffs' Claims Differ From Those Of Prior Plaintiffs

Although based on many of the same basic facts, Plaintiffs' claims are fundamentally different from those asserted either by the DOJ or by the Class Plaintiffs in the MDL.

- **Longer duration.** Plaintiffs claim that there was an alleged global conspiracy which began in or about January 1997 and operated continuously through at least 2002 (six years). *See, e.g.,* Sun and Unisys Con. Am. Compl. at ¶¶ 80-85. Most pleas state that the relevant time period is limited to April 1999 to June 2002 (three years), and several pleas reference an even shorter period of time. Ex. 18, Infineon Plea Agreement at ¶ 4. *Cf., e.g.,* Ex. 20, Plea Agreement of Dae Soo Kim at ¶ 4; Ex. 21, Plea Agreement of D. James Sogas at ¶ 4; Ex. 22, Plea Agreement of Heinrich Florian at ¶ 4.

- **Continuous and industry-wide.** Plaintiffs claim DRAM manufacturers entered into a single industry-wide agreement that was "continuous" for at least six years. *See, e.g.*, Sun and Unisys Con. Am. Compl. at ¶¶ 80-85. In contrast, the pleas refer to "agreements" among different companies relating to particular transactions during "certain periods of time." DOJ (unlike Plaintiffs) acknowledged in the pleas that only "certain DRAM producers" agreed to fix the prices of DRAM sold to "certain OEMs" with "varying levels of effectiveness" for "certain periods of time."

- **Higher overcharges.** Plaintiffs claim that as a result of Defendants' conduct they suffered overcharges that averaged approximately 50% over a multi-year period. Ex. 2, White Rep. at Fig. 41. But in the Direct Purchaser Class Action, this Court approved class settlements based on overcharges ranging from 5% to 18% -- which the Court described as "exceptionally good." *See* Ex. 23, Tr. of Proceeding, *In re: Dynamic Access Memory Antitrust Litig.*, No. 02-1486 PJH at 10:16-10:17 (N.D. Cal. Aug. 15, 2007). The overcharges in the Direct Purchaser Class Settlement were applied to each defendants' individual sales, not to any plaintiff's total DRAM purchases from all DRAM suppliers as Plaintiffs assert against Defendants here.

Plaintiffs' claims in these opt-out matters do not differ because they uncovered evidence materially different in kind from the evidence that the DOJ and Class Plaintiffs obtained through

their own investigations.  To the contrary, Plaintiffs rely heavily upon evidence obtained by the DOJ in its criminal investigation and by Class Plaintiffs during their years of discovery.

## III.   ARGUMENT

Summary judgment is appropriate when there exists no genuine issue of material fact. FED. R. CIV. P. 56(b).  The non-moving party can only create a "genuine" dispute on a material issue by adducing admissible evidence on the issue which is sufficient for a reasonable jury to find for the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Significantly, "[e]xpert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them."  *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

### A.   PLAINTIFFS CANNOT ESTABLISH THAT DEFENDANTS' CONDUCT CAUSED THE INJURY THAT PLAINTIFFS CLAIM.

As the Supreme Court held in *J. Truett Payne Co. v. Chrysler Motors Corp.*, proof of an antitrust violation does not establish that anyone, let alone the plaintiff, "has been actually 'injured' within the meaning of § 4" but rather "establishes only that injury *may* result."  451 U.S. 557, 562 (1981).  Accordingly, Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that "any person *who shall be injured* in his business or property *by reason of* anything forbidden in the antitrust laws may sue . . . and shall recover threefold the damages by him sustained."[6]  The statute's language and well established precedent confirm that proof of a violation of an antitrust law alone does not entitle Plaintiffs to recover damages.  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1444 (9th Cir. 1995) ("The 'mere presence' of a *per se* violation under Sherman Act § 1 'does not by itself bestow on any plaintiff a private right of action for damages.'"), *cert denied*, 516 U.S. 987 (1995).

To survive summary judgment, Plaintiffs must present proof of a *cognizable injury* that was *caused* by the antitrust violation about which they complain.  In other words, Plaintiffs

---

[6] Plaintiffs bring their private causes of action under Section 4 of the Clayton Act, 15 U.S.C. § 15, for alleged violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, because there is no right to bring a private cause of action under Section 1 of the Sherman Act.  *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1418-19 (7th Cir. 1989).

1  cannot prevail on an antitrust claim for damages by pointing to a violation of the antitrust laws

2  and presenting evidence of purported harm.  The private plaintiff must factually link the two with

3  admissible evidence to survive summary judgment.  *See, e.g.*, *Dealers Wholesale Supply, Inc. v.*

4  *Pacific Steel and Supply Co.,* No. C-81-3038-MHP, 1984 U.S. Dist. LEXIS 15145, at *9-10

5  (N.D. Cal. Jul. 6, 1984).  As the Ninth Circuit has specifically held, "[c]ausal antitrust injury is an

6  essential element of any remedy under the Sherman Act."  *Northwest Publ'ns, Inc. v. Crumb*, 752

7  F.2d 473, 476 (9th Cir. 1985).  *See also In re Coordinated Pretrial Proceedings in Petroleum*

8  *Prods. Antitrust Litig.*, 691 F.2d 1335, 1341 (9th Cir. 1982) ("To recover treble damages,

9  plaintiffs must prove actual causation - 'injury in fact'"), *cert. denied*, 464 U.S. 1068 (1984).

10  And causal injury must be proven with a reasonable degree of probability.  *Flintkote Co. v.*

11  *Lysfjord*, 246 F.2d 368, 392 (9th Cir. 1957) ("[P]laintiff is required to establish with reasonable

12  probability the existence of some causal connection between defendant's wrongful act and some

13  loss of anticipated revenue."), *cert. denied*, 355 U.S. 835 (1957).  The burden to prove causal

14  injury rests squarely on Plaintiffs.  *See Northwest Publ'ns,* 752 F.2d at 473.

15    Plaintiffs claim that Defendants raised the prices they paid for DRAM continuously for a

16  multi-year period[7] by almost 50%.  Ex. 2, White Rep. at Fig. 41.  They claim that they were the

17  victims of the price fixing conspiracy admitted by some of the Defendants in the pleas, that is, the

18  conspiracy as to the six Target OEMs.  *See, e.g.*, Sun and Unisys Con. Am. Compl. at ¶¶ 1-3.

19  And Plaintiffs' expert insists "that defendants' *conspiracy* to increase the prices paid to the named

20  OEMs caused an increase to plaintiffs' prices."  Ex. 24, Rebuttal Expert Report of Robert

21  Marshall ("Marshall Reb. Rep.") at ¶ 28 (emphasis in original).  In other words, Marshall's claim

22  is that certain Defendants' Target OEM conspiracy had to have increased prices market-wide.

23  Ex. 25, Expert Report of Robert Marshall ("Marshall Rep.") at ¶ 30 ("[T]he conspiratorial

24  behavior of the defendants that elevated prices to the named OEMs resulted in elevated market-

25  wide pricing and elevated pricing to the plaintiffs.").

26   [7] In their amended complaints, Plaintiffs alleged that Defendants' conduct began in January 1997 and continued "at least" through 2002 (six years).  *See, e.g.*, Sun and Unisys Am. Compl. at ¶ 80.

27  Through their experts Plaintiffs claim two periods of conduct which are different than that alleged by them in their complaints -- August 1, 1998 to June 15, 2002 (almost four years), and April 1,

28  1999 to June 15, 2002 (three years, two and half months).  Ex. 2, White Rep. at ¶ 2.

DEFTS' NOTICE OF MOTION + MOTION FOR
SUMMARY JUDGMENT AND ADJUDICATION;
MEMO ISO THEREOF

Plaintiffs have chosen to present a theory of causation that depends solely upon the pleas. *See, e.g.*, Sun and Unisys Con. Am. Compl. at ¶¶ 1-3. *See also*, Ex. 2, White Rep. at ¶ 2; Ex. 25, Marshall Rep. at ¶ 2; Ex. 24, Marshall Reb. Rep. ¶ 28; Ex. 26, Marshall 2/29 at 192:25-193:8. Plaintiffs may try to oppose this motion by identifying various emails or other evidence of communications between Defendants regarding certain Plaintiffs.  The Court need not consider that evidence in deciding this motion because Plaintiffs have not linked (or even attempted to link) that evidence to the prices they paid.  That evidence does not go to whether Plaintiffs were injured.  Instead, it relates, at most, to the presence or absence of a conspiratorial agreement. Rather, on the issue here, causal injury, Plaintiffs have expressly limited themselves to the theories advanced by White and Marshall.  In fact, when asked to identify "each transaction that caused an injury" and provide "all facts that support your damages claimed," Plaintiffs responded solely by identifying the reports of White and Marshall, along with their transactional purchase data. *See* Ex. 27, Plaintiff Sun Microsystems, Inc.'s Second Supplemental Response to Hynix Semiconductor Inc.'s and Hynix Semiconductor America Inc.'s First Set of Interrogatories at 10-12 (Response to Interrogatories 7, 9 and 10).[8]

Having chosen to eschew an analysis of particular communications or agreements directly affecting particular Plaintiffs' prices, Plaintiffs instead put forth a theory that is wholly – and exclusively – founded on the pleas.  Having taken this approach, Plaintiffs must actually establish the purported facts that support their claim -- namely, that the conduct admitted in the pleas affected the market-wide price for DRAM.  Ex. 25, Marshall Rep. ¶ 30.  To establish a conspiracy with a market-wide impact, Plaintiffs must show: (1) that Defendants restrained output to the

---

[8] *See also* Ex. 28, Plaintiff Unisys Corporation's Second Supplemental Response to Hynix Semiconductor Inc.'s and Hynix Semiconductor America Inc.'s First Set of Interrogatories at 8-10 (Responses to Interrogatories 6, 8, and 9); Ex. 29, Plaintiff All American Semiconductor, Inc.'s Supplemental Responses To Hynix Semiconductor, Inc.'s and Hynix Semiconductor America, Inc.'s First Set of Interrogatories, at 9-11 (Responses to Interrogatories 5, 7 and 8); Ex. 30, Plaintiff Edge Electronics, Inc.'s Supplemental Response To Hynix Semiconductor Inc.'s and Hynix Semiconductor America Inc.'s First Set of Interrogatories at 10-11 (Response to Interrogatory 9); Ex. 31, Plaintiff Jaco Electronic, Inc.'s Supplemental Responses to Hynix Semiconductor Inc.'s and Hynix Semiconductor America Inc.'s First Set of Interrogatories at 8-9, 10-11 (Responses to Interrogatories 6 and 9); Ex. 32, Plaintiff's [SGI] Supplemental Answer to Defendants Hynix Semiconductor Inc. and Hynix Semiconductor America Inc.'s First Set of Interrogatories at 8-12 (Responses to Interrogatories 6, 8, and 9).

DRAM market and caused all DRAM prices to rise, and/or (2) that Defendants fixed benchmark DRAM prices that were actually relied upon and that actually dictated, throughout the entire period of purported injury, Plaintiffs' DRAM prices.  Here, Plaintiffs' claims collapse.  The pleas do not establish any of the facts on which their theory of injury necessarily rests.  And beyond the pleas, Plaintiffs have only their experts, Marshall and White.  Yet, neither of their experts analyzes the underlying conduct, and neither predicates his opinions on the underlying conduct.  Both, in fact, rely on the pleas to establish the nature of the conspiracy.  Ex. 33, White 2/27 at 35:8-36:7; 37:12-20; Ex. 34, White 2/28 at 365:15-366:8; Ex. 26, Marshall 2/29 at 191:3-22; 199:4-199:17.  Although both experts can imagine facts that would link Plaintiffs' alleged injury to the conduct admitted in the pleas, this conjecture does not sustain Plaintiffs' burden of proof in an antitrust case as *Brooke Group.*, 509 U.S. at 209, specifically holds.

> 1.   **The Pleas Do Not Admit That These Plaintiffs Suffered Any Injury Nor Do They Admit The Type Of Conspiracy That Plaintiffs Assume Existed.**

Four DRAM suppliers pleaded guilty to violating Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by conspiring to fix prices for DRAM.[9]  But the pleas are limited in several respects.  ***First***, several of the Defendants did not enter pleas at all and were not targets of the DOJ investigation.  Defendants Mitusbishi, Nanya, Mosel, Winbond and NEC did not plead or otherwise acknowledge wrongdoing of any kind.[10]

***Second***, although the pleas state that DRAM is the product at issue, the pleas explicitly define DRAM as including various types of "synchronous" DRAM, without mentioning asynchronous FPM/EDO.  *See, e.g.,* Ex. 16, Hynix Plea Agreement at ¶ 4 (stating that "DRAM"

---

[9] The essential elements of a violation are:  (1) the existence of a price-fixing conspiracy at or about the time alleged in the accusatory instrument; (2) defendant knowingly became a member of that conspiracy; (3) defendant joined the conspiracy with the intent to unreasonably restrain trade; and (4) the conspiracy concerned goods or services in interstate or foreign commerce.  Ex. 35, 3 L. Sand *et al., Modern Federal Jury Instructions-Criminal,* ¶ 58.04, Instruction 58-44 (2008).  *See also* Ex. 36, ABA Section of Antitrust Law, CRIMINAL ANTITRUST LITIGATION HANDBOOK 415-16 (2d ed. 2006) (including only elements (1), (2) and (4) from the above set in its list of the elements of a Sherman Act offense).  Defendants here do not contest these elements for purposes of this motion.

[10] The pleas by the Defendants that did plead are not admissible against the non-pleading Defendants. *See* Ex. 1, February 20, 2007 Order at 25. The non-pleading Defendants do not admit to knowledge of or participation in any conspiracy.  *See*, *supra*, Footnote 2.

DEFTS' NOTICE OF MOTION + MOTION FOR
SUMMARY JUDGMENT AND ADJUDICATION;
MEMO ISO THEREOF

1  includes SDRAM and DDR); Ex. 19, Samsung Plea Agreement at ¶ 4 ("DRAM" includes

2  SDRAM, DDR and Rambus DRAM).  One Plaintiff -- Sun -- did not begin purchasing

3  synchronous DRAM in significant quantities until the middle of 2001.  *See* Ex. 12, Expert Report

4  of Benjamin Klein at ¶¶ 17-19 and related figures; Ex. 10, Expert Report of Kevin Murphy at Ex.

5  27.  Before then, Sun's purchases were almost exclusively limited to an ***asynchronous*** type of

6  DRAM called FPM/EDO.  Ex. 5, Duncan at 92:23-94:3.  By contrast, the Target OEMs were

7  purchasing almost exclusively SDRAM.  *See* Ex. 12, Expert Report of Benjamin Klein at ¶¶ 17-

8  19 and related figures; Ex. 10, Expert Report of Kevin Murphy at Ex. 27.

9      ***Third***, the pleas do not support Plaintiffs' claims that Plaintiffs were targets of a price-

10  fixing conspiracy.  The pleas list only the six Target OEMs as the targets of the conspiracy.  With

11  one exception, none of the corporate pleas mentions any of the Plaintiffs.  There is no mention in

12  *any* plea by any Defendant of Unisys, Jaco, Edge, All American or DRAM Liquidation Trust

13  (Silicon Graphics).  Similarly, there is no mention of Sun Microsystems in any of the corporate

14  pleas by Defendants Infineon, Hynix, or Samsung.

15      Elpida's plea admits that it cooperated with a competitor to submit complementary bids on

16  a single lot of custom DRAM modules comprised of "1GB NG DIMMs" during a single Sun

17  DBE auction on or about March 26, 2002.[11]  Ex. 17, Elpida Plea Agreement at ¶¶ 2, 4.  Only one

18  other Defendant participated in that auction.  Most of the Defendants never even made or sold this

19  custom NG DIMM product.  Moreover, this one instance did not result in any injury to Sun as a

20  matter of law.  Sun rejected Elpida's price as too high, choosing instead to enter into separate

21  negotiations to purchase the custom DIMM product that it wanted for a different, lower price than

22  that which was the basis for the Elpida plea.  Ex. 4, Wilson at 541:12-548:18.

23      ***Fourth***, even as to the Defendants who entered pleas, the pleas do not establish that all of

24  them were conspiring throughout the entirety of the relevant period.  Instead, the pleas only admit

25  that during "*certain periods of time*" during the relevant time period, "*agreements* were reached

26

---

27  [11] The individual pleas of Tom Quinn (Samsung), Ex. 37, and James Sogas (Elpida), Ex. 21, also acknowledge reaching an agreement to coordinate a single bid to Sun for the same 1GB NG DIMM custom modules in December, 2001.

28

DEFTS' NOTICE OF MOTION + MOTION FOR
SUMMARY JUDGMENT AND ADJUDICATION;
MEMO ISO THEREOF

to fix the price of DRAM to…*certain OEMs* [Dell, HP, Compaq, IBM, Apple, Gateway]" and

that these agreements were "among certain DRAM producers."  Ex. 16, Hynix Plea Agreement at

¶ 4 (emphasis added).  For example, the Hynix plea agreement states in relevant part:

> For purposes of this Plea Agreement, the "relevant period" is that period from on
> or about April 1, 1999 to on or about June 15, 2002.  …  During…certain periods
> of time during the relevant time period…[there was] a conspiracy…among certain
> DRAM producers, the primary purpose of which was to fix the price of DRAM
> sold to certain OEMs.  The conspiracy directly affected these OEMs in the United
> States:  Dell Inc., Hewlett-Packard Company, Compaq Computer Corporation,
> Internal Business Machines Corporation, Apple Computer Inc., and Gateway, Inc.
> …  During [] discussions and meetings, agreements were reached to fix the price
> of DRAM to be sold to certain OEMs.

Ex. 16, Hynix Plea Agreement at ¶ 4.  Other pleas apply to even shorter time periods.  *See, e.g.,*

Ex. 18, Infineon Plea Agreement at ¶ 4.  All of this goes to one very important point:  the pleas do

not establish that all DRAM producers -- or even just the Defendants that entered pleas -- were

effectively conspiring to raise the prices of all of the various types of DRAM products being sold

into the market continuously and simultaneously between April 1, 1999 and June 15, 2002, much

less the far longer periods of time claimed by Plaintiffs.

**Finally**, none of the pleas supports Plaintiffs' claim that Defendants restricted DRAM

supply.  The only plea that mentions DRAM output is Samsung's (the world's largest DRAM

producer), and that plea refutes any notion of an output restraint because it confirms that

Defendants "substantially added to DRAM capacity and expanded output during the relevant time

period."  Ex. 19, Samsung Plea at ¶ 4.

　　　　　　2.　　**Neither Plaintiffs Nor Their Experts Establish That Defendants
　　　　　　　　　Restrained Supply.**

Courts recognize that a continuous, long-term market-wide conspiracy to raise prices

cannot be successful without restricting output.  Price and quantity are inextricably linked under

all but the most unusual market settings.  Even if a product has few substitutes, buyers will

consume less as price rises.  For this reason, as the Supreme Court has observed, any successful

effort to raise prices above the competitive level "entails a restriction in output."  *Brooke Group*,

509 U.S. at 233.  *See also Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594

(7th Cir. 1984); *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 105 (1984); *Janich*

*Bros., Inc. v. Am. Distilling Co.*, 570 F.2d 848, 857 n.9 (9th Cir. 1977) *cert. denied* 439 U.S. 829

(1978).  Thus, in order to get a market-wide cartel started, the participants must generally agree to

cut output.  Absent a cut in output, "the goods will pile up and eventually exert irresistible

pressure to reduce price."  Ex. 38, Richard A. Posner, *Antitrust Law* 66 (2d ed. 2001).  *See also*

Ex. 39, Philip E. Areeda, Herbert Hovenkamp & Roger D. Blair, *Antitrust Law*, ¶ 395a, p.377 (3d

ed. 2007) ("Following the formation of a price-fixing cartel, each firm will restrict output to the

point where its marginal revenue (*mr*) equals its marginal cost (*MC*),—that is, *each firm will*

*reduce output* from *Q1* to *Q2*.") (emphasis added).

Plaintiffs' experts do not dispute that a reduction of output would have been necessary to

support the effects that they claim to have observed.  Marshall admits that "an effective elevation

in prices . . . implies . . . a supply restriction in the marketplace."  Ex. 26, Marshall 2/29 at

201:18-201:21.  White does not contest this point.  Ex. 33, White 2/27 at 237:24-238:21 ("Q:  It is

a fact that it's your view that if the prices were as you say they should have been during the

conspiracy and the plea period, the but-for prices, there would have had to have been additional

supply of DRAM sold on the market; is that correct?  Some amount of additional supply?  A:  I

would expect there to be some.  Might be a lot, might be a little; I don't know.").[12]

Even though output and price cannot be disentangled, Plaintiffs and their experts do not

analyze whether Defendants restrained output during the period of the alleged conspiracy.  In

fact, White claimed that he had not even "been asked to answer" how much less DRAM the

industry would have had to produce, relative to the competitive level, in order to yield the

overcharges that he claims to have measured.  *See* Ex. 33, White 2/27 at 146:16-147:1 ("What the

quantities would have been is a different question that I haven't been asked to answer, nor is it

directly of -- nor is it something that is directly related to my -- addressing my charge").  Marshall

also disclaims having any "opinion regarding the existence of an output restraint in the

marketplace."  *See* Ex. 26, Marshall 2/29 at 200:7-21.[13]  Hence, their testimony does not establish

---

[12] Whinston, hired by Plaintiffs only to respond to Hynix's experts, testified that the quantity demanded will be reduced if price is increased.  Ex. 40, Whinston at 32:4-37:2; 39:18-40:22.

[13] With regard to an analysis of supply restrictions, Marshall does almost nothing.  Two (of 404) paragraphs of his report are devoted to this subject.  Ex. 25, Marshall Rep. at ¶¶ 123-124.  In

DEFTS' NOTICE OF MOTION + MOTION FOR
SUMMARY JUDGMENT AND ADJUDICATION;
MEMO ISO THEREOF

1  the restraint on output that is necessary to cause the multi-year, continuous, and significant injury

2  Plaintiffs claim to have suffered or any restraint at all.  They have not performed that analysis.

3         On the contrary, undisputed evidence shows that there was no restraint on output.

4  Production witnesses for Hynix, Infineon, Samsung, Mosel, Nanya and Micron have all testified

5  that production at the DRAM fabs continued at full capacity twenty four hours a day, 365 days a

6  year, aside from brief maintenance periods and unplanned stoppages.  *See*, *e.g.*, Exs.42-43, Kim

7  (Hynix) at 146:13-147:9; 36:2-19; 62:8-20; Ex. 44, Huang (Mosel) at 96:10-17; 139:2-141:2; Ex.

8  45, Nicosin (Samsung) at 72:16-22; 131:16-22; 138:17-139:5; Ex. 46, Harter (Infineon) at 136:5-

9  137:7; 338:2-7; 317:2-318:14; Ex. 47, Pai (Nanya) at 15:4-17; 114:9-115:1; Ex. 48, Hawkins

10  (Micron) at 73:21-74:13.

11         The record also shows that any attempts to collude on output utterly failed.  Mike Sadler

12  of Micron testified that agreements to reduce production were never reached.  Ex. 49, Sadler 5/21

13  at 49:5-66:6.  Even the Department of Justice Criminal Antitrust Division -- a body that

14  investigated this industry for six years and worked with numerous cooperating witnesses --

15  concluded that attempts to reduce output were made but were simply not successful.  Ex. 50, Gary

16  Swanson Trial Tr., Day 10 at 2083-84 ("the production output never - it never transpired.  There

17  was no conspiracy.  It was an attempt, but it never happened.").  Nor can Plaintiffs rely on the

18  pleas for indirect proof of an output restraint as a predicate for an effective price-fixing

19

---

20  these paragraphs he cites to about a dozen emails and newspaper articles and one deposition and
   concludes that these materials "indicate that defendants engaged in a variety of supply

21  restrictions."  *Id.* at ¶ 123.  The documents Marshall cites are news articles reporting on potential
   output reductions or communications between competitors about the state of supply more

22  generally - not evincing any effective market-wide agreement to reduce production.  *Id.* at ¶¶ 123-
   124.  Moreover, some of the documents Marshall cites are from June 1998, before the start of the

23  periods for which White purported to calculate overcharges.  *Id.*  Interestingly, Marshall ignores
   all of the production reports that Defendants produced in these cases and all of the depositions

24  that Plaintiffs took of Defendants' production witnesses.  He also ignores all of the other evidence
   that establishes that a supply restriction did not exist in the DRAM market as whole.  As to some

25  of the same documents cited by Marshall in paragraphs 123 to 124, White states that it's not
   possible for him to conclude that agreements to restrict output were reached.  Ex. 41, White 5/22

26  at 66:19-67:15 ("Q:  And the same would be true as to whether there was an agreement on supply
   amongst defendants in August 1998?  You have not found any communication or evidence of

27  such an agreement on supply at that time?  A:  These are communications indicating information
   exchange among the participants, but it's not possible for me to conclude from this whether or not

28  they are in support of an agreement or not.").

DEFTS' NOTICE OF MOTION + MOTION FOR
SUMMARY JUDGMENT AND ADJUDICATION;
MEMO ISO THEREOF

conspiracy.  Criminal antitrust liability requires no demonstration of impact, *see* Footnote 9,

*supra*, and in fact the pleas note that any agreements had only "varying levels of effectiveness."

Defendants' experts analyzed various Defendants' production decisions and concluded

that industry output was not restrained and that Defendants' production decisions were not the

result of any agreements to restrict output.  Dr. Kalt explained in his report that Infineon's

production growth and all Defendants' output decisions were inconsistent with a conspiratorial

output restraint.  *See* Ex. 51, Expert Report of Joseph Kalt at ¶¶ 99-101.  Dr. Murphy reached a

similar conclusion about Hynix.  Ex. 10, Expert Report of Kevin Murphy at ¶¶ 69-74.  Drs. Klein

and Shapiro show that there was no output restriction across the entire industry.  *See* Ex. 12,

Expert Report of Benjamin Klein at ¶ 94 (industry data from the conspiracy period shows that

there was no industry output restriction); Ex. 52, Expert Report of Carl Shapiro at 23-26 (no

evidence of output reductions until 2001, and these cuts were consistent with the sharp recession

which followed the dot-com boom).[14]  These showings stand un-refuted.[15]

### 3. Neither Plaintiffs Nor Their Experts Establish That Defendants Fixed Benchmark Prices.

Plaintiffs have not shown the existence of a price fix as to some industry-wide benchmark

price.[16]  As noted above, Plaintiffs rely on their experts to establish that Defendants' conduct

---

[14] *See also* Ex. 1, February 20, 2007 Order at 18-20 (granting summary judgment of Nanya parent company because, *inter alia*, any reduction in its output was motivated by competition, not collusion).

[15] The majority of Defendants' experts' analysis of industry output stands uncontested by Plaintiffs' experts, even after Plaintiffs' filing of five separate rebuttal reports.  White criticizes the methodology of one of Defendants' experts (Topel), but does nothing to show that his predicted overcharges would have been possible given the actual levels of DRAM produced.  Ex. 53, Rebuttal Expert Report of Halbert White ("White Reb. Rep.") at ¶ 288-294.  Similarly, Whinston contests the analysis of supply by one of Defendants' experts (Murphy) without disputing the point that White's but-for prices would have entailed significant output restraints or establishing that output restraints did in fact exist.  Ex. 54, Rebuttal Expert Report of Michael Whinston at ¶¶ 56-62.  The remainder of Plaintiffs' rebuttal expert reports make no attempt to demonstrate that an output restraint occurred, or that one would not have been necessary to justify their finding of the continuous and significant market-wide overcharge they claim.

[16] Notably, even if Plaintiffs' claim is that Defendants fixed an industry-wide benchmark price, they still need to establish that industry-wide output was reduced because, absent a cut in output, "the goods will pile up and eventually exert irresistible pressure to reduce price."  Ex. 38, Richard A. Posner, *Antitrust Law* 66 (2d ed. 2001).  This is especially true because Plaintiffs claim that they were injured continuously for a multi-year period.

1   caused them harm.  Neither of their experts, however, does any real analysis of the underlying

2   conduct in this case; their opinions are not predicated upon an analysis of the conduct.  *See* Ex.

3   34, White 2/28 at 365:15-366:10; Ex. 26, Marshall 2/29 at 190:10-191:22.  Instead, they rely on

4   the conduct admitted by some Defendants in the pleas.  But as noted, the pleas do not provide

5   evidence of an industry-wide benchmark price fix.

6         Plaintiffs cannot reasonably dispute this point.  Marshall agrees that Plaintiffs' attempt to

7   prove that they were affected by Defendants' conduct turns on the existence of a conspiracy to fix

8   an industry-wide price.  Marshall opines "that defendants' *conspiracy* to increase the prices to the

9   Target OEMs caused an increase to plaintiffs' prices" and not that "*increases to named OEM*

10  *prices* caused increases to plaintiffs' prices."  Ex. 24, Marshall Reb. Rep. at ¶ 28 (emphasis in

11  original).  *See also*, Ex. 25, Marshall Rep. ¶ 30 ("[T]he conspiratorial behavior of the defendants

12  that elevated prices to the named OEMs resulted in elevated market-wide pricing . . . .").  He does

13  not claim that Defendants' conduct was directed only at the Target OEMs and that the increase to

14  the Target OEMs were somehow transmitted to the rest of the market.  Ex. 24, Marshall Reb.

15  Rep. ¶ 28, 127.  He admits that Plaintiffs' prices would only be affected by a conspiracy to set

16  Target OEM prices if that conspiracy impacted either the price in the DRAM spot market or some

17  reference price that these Plaintiffs used in their DRAM contracts.  His deposition testimony

18  explicitly concedes this point:  "If spot prices are not above – have not been elevated by a

19  conspiracy…and plaintiffs are referencing prices that have not been elevated, then their prices

20  will not be elevated."  Ex. 55, Marshall 5/22 at 73:11-15.

21        Although Marshall agrees that Plaintiffs' theory of injury turns on the existence of a

22  successful conspiracy as to an industry-wide benchmark price, he admits that he conducted no

23  real analysis to determine whether that conspiracy existed.  Ex. 26,  Marshall 2/29 at 190:10-

24  191:22.  Marshall contends that the only potential industry-wide benchmark price in the DRAM

25  industry is the spot market price.  *See* Ex. 55, Marshall 5/22 at 90:18-93:7.  *See also* Ex. 24,

26  Marshall Reb. Rep. at ¶¶ 9, 54-58.  Marshall cites no evidence that any Plaintiff could have

27  considered the Target OEMs' prices in any useful way that would have actually dictated the

28  prices that they ultimately paid.  Ex. 26, Marshall 2/29 at 207:18-211:24; 216:4-216:21.

Marshall's reports identify three documents in support of his conclusion that Defendants' conduct involved the spot market. *See* Ex. 25, Marshall Rep. at ¶ 121, n. 150; Ex. 24, Marshall Reb. Rep. at ¶ 58 n. 43. But Marshall admitted that he did no analysis to determine what impact, if any, these specific communications or the purported conduct referenced therein had on the spot market. Ex. 55, Marshall 5/22 at 34:15-35:4.[17]  In fact, Marshall admits that these three emails, dated between November 2001 and January 2002, do not establish that Defendants actually communicated about the spot market even on these three isolated occasions, let alone the entire period of purported injury. Ex. 55, Marshall 5/22 at 75:25-80:13.

White cannot sustain Plaintiffs' burden on this critical point either. Like Marshall, White conducts no analysis of Defendants' conduct to see how it would have affected any set of DRAM prices. Ex. 41, White 5/22 at 27:1-28:15 ("Q: . . . Have you done any analysis showing a connection between any specific agreement between competitors in the DRAM industry and an increase in any DRAM price? A: I'm not looking at specific agreements, no, sir. Q: You cite a lot of e-mails and other documents in your rebuttal report as well as in your initial report. It's true, sir, that you have not conducted any analysis demonstrating a connection between any of these pieces of evidence and any increase in a DRAM price? A: No. I consider all of that to be corroborative."). White does not even determine whether the conduct in the pleas involved one long term agreement, multiple long term agreements, or multiple short term agreements; instead, he assumes the start and end dates based entirely on the direction of Plaintiffs' counsel. Ex. 53, White Reb. Rep. at ¶ 2; Ex. 33, White 2/27 at 116:19-117:6 ("Q:  How did you determine the

---

[17] Those documents themselves provide no support for the existence of a fix of the spot market price:  (1) Ex. 56, ITAG00019709 is an internal Infineon document from November 2001 that, although noting that "we must drive the spot market up," does not indicate any type of conspiratorial conduct; (2) Ex. 57, EMUS155224 is an internal Elpida document from December 2001 allegedly spreading "information" that Hynix, Samsung and Infineon are cooperating "to raise spot price" but it contains no probative evidence of actual coordination because there is no indication of where this information was received (e.g., contract customer, spot market customer, or other supplier, etc.) or whether the word "cooperation" means conspiratorial cooperation; and (3) Ex. 58, SSI0005096760 is an internal Samsung document from January 2002 regarding Micron's spot market pricing but does not suggest that Samsung had agreed with Micron on this pricing. By discussing these documents, Defendants do not concede the admissibility of the documents. On the contrary, Defendants would likely object to any attempt to introduce these documents into evidence based on the hearsay rule and other appropriate grounds.

1    timing of the conspiracy period?  A:  That was given to me as an instruction by the attorneys.").

2          Not only does White fail to analyze the conduct supposedly leading to the damages he

3    computes, he also admits that he has no opinion as to causation.  Ex. 34, White 2/28 at 323:16-

4    324:10.  Although he stands on the results of his prediction equation, White concedes that the

5    variables he uses in his prediction equation are not expressions of causal relationships.  Ex. 33,

6    White 2/27 at 104:1-105:11.  To the extent that White claims to offer an opinion on injury

7    separate from causation,[18] it rests on a critical and unsupported assumption that the periods on

8    which he bases his estimate of Plaintiffs' "but-for" prices serve as good proxies for the period

9    allegedly affected by the conspiracy in all ways except the conspiracy.  *See* Ex. 33, White 2/27 at

10   176:11-178:6.  But, as White admits, he was not even told why he should assume that August 1,

11   1998 was the date on which the effects of the conspiracy that he purportedly examines began, nor

12   did he attempt to explain this choice to his staff.  Ex. 34, White 2/28 at 446:13-447:15.  In fact,

13   White admits that his analysis *assumes* that the prices set by the Defendants and paid by the

14   Plaintiffs during the alleged conspiracy period were affected by the conspiracy.  *See* Ex. 34,

15   White 2/28 at 370:25-373:3 ("So I know that the relationship between the supply and demand

16   factors is affected because of that admitted conduct.").

17          4.    **Plaintiffs' Only Evidence Of Injury Is An Expert Opinion,
                  Unsupported By Market Facts That Cannot As A Matter Of Law
18                Sustain Their Burden Of Proof On Causation.**

19          Plaintiffs claim to have suffered injury by virtue of a conspiracy orchestrated by the

20   Defendants against the Target OEMs.  Having chosen to rely on the conduct reflected in the

21   pleas, rather than analyzing the causal connection between any particular communication or

22   agreement and a resulting price to a particular Plaintiff, they need to prove how conduct directed

23   at the Target OEMs caused them harm.  But Plaintiffs have not analyzed any evidence of either a

24   supposed industry-wide output restraint or industry-wide benchmark price fix that would have

25

26   _____
     [18] White claims that his prediction equation establishes that the Target OEMs and Plaintiffs were
     impacted by the conspiracy.  According to White, "[t]he difference between the actual and the
27   but-for is a measure of the impact of the conspiracy."  Ex. 33, White 2/27 at 41:2-3.  *See also* Ex.
     33, White 2/27 at 24:3-4 ("The presence of the overcharge is an indication of impact."); 33:3-6;
28   Ex. 41, White 5/22 at 17:19-21.

1   been necessary to produce their claimed injury.  Nor have Plaintiffs' experts done so.

2          While denying that increased Target OEM prices somehow caused Plaintiffs' prices to

3   increase, Ex. 24, Marshall Reb. Rep. at ¶¶ 28, 127, Marshall claims to have reached the

4   conclusion that Plaintiffs were injured by virtue of the conduct to which some of the Defendants

5   pleaded based on an analysis of two things:  (1) DRAM market characteristics and (2) DRAM

6   price movements over time.  Ex. 25, Marshall Rep. at ¶¶ 52-58.  In brief, Marshall claims that

7   given the nature of the DRAM industry, a price fix as to the Target OEMs could only have been

8   effective if Defendants also fixed prices as to the entire industry.  Ex. 25, Marshall Rep. ¶¶ 30,

9   176.  Marshall observes that the Target OEMs' prices and Plaintiffs' prices "moved together"

10  over the relevant period.  *See, e.g.*, Ex. 25, Marshall Rep. at ¶ 184.  Because some Defendants

11  admitted fixing certain prices as to the certain Target OEMs at certain times, Marshall concludes

12  that Defendants fixed prices as to the whole market and all of the Plaintiffs all of the time.  *See,*

13  *e.g.,* Ex. 25, Marshall Rep. at ¶¶ 30, 176-177.  Basically, Marshall seizes upon the word

14  "effectiveness" in the pleas, *see, e.g.*, Ex. 16, Hynix Plea Agreement at ¶ 4, and offers conjecture

15  as to what "must" have happened in the DRAM industry.

16         The Supreme Court cautions against relying on exactly this type of expert opinion to

17  sustain a burden of proof in an antitrust case:  "When an expert opinion is not supported by

18  sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or

19  otherwise render the opinion unreasonable, it cannot support a jury's verdict.  Expert testimony is

20  useful as a guide to interpreting market facts, but it is not a substitute for them."  *Brooke Group*,

21  509 U.S. at 242 (1993) (internal citations omitted) (affirming judgment as a matter of law in

22  defendant's favor).  Because Marshall's opinion is not supported by the facts, it does not establish

23  by a reasonable probability that Defendants' conduct caused injury to Plaintiffs sufficient to

24  create a genuine issue of material fact.  *Rebel Oil*, 51 F.3d at 1440 (affirming summary judgment

25  and rejecting expert's unsupported conclusions about market definition:  "[a]ssertions in expert

26  affidavits do not automatically create a genuine issue of material fact. . . we are obligated to look

27  at the record to determine whether, in light of any undisputed facts, the inferences to be drawn

28  from the expert's affidavits are reasonable").

1       Marshall's analysis suffers from two principal problems.  First, Marshall does not

2  establish that the market characteristics he identifies actually functioned as he claims.  His

3  opinion is pure speculation.  Second, even assuming that the industry operated as he imagines, his

4  theory explains, at most, why prices of DRAM sold to the Target OEMs and prices of DRAM

5  sold to Plaintiffs moved together.  It does not establish that the conduct admitted by some of the

6  Defendants actually caused an increase in the prices that any of the Plaintiffs paid for DRAM.

7  Marshall offers only conjecture about how this industry might have functioned without analyzing

8  the "market facts" needed to support such conjecture.

9              a.      **Marshall's Discussion Of "Market Characteristics" Denotes**
                       **Conjecture About How The DRAM Industry Might Have**
10                     **Worked And Is Not Supported By The Evidence.**

11      Marshall bases his theory of a market-wide conspiracy on four supposed "market

12  characteristics:"  (1) the standardized nature of DRAM products; (2) the existence of sales

13  channels outside of purchases from the Defendants, like the spot market; (3) transparency of

14  prices and the use of other buyers' prices as references in negotiations; and (4) the existence of

15  most favored customer (MFC) clauses.  Ex. 25, Marshall Rep. at ¶ 53.  Based on these "market

16  characteristics," Marshall claims that any conspiracy that was effective as to the Target OEMs

17  must also have affected Plaintiffs.  Ex. 25, Marshall Rep. at ¶ 170.  But there is no evidence that

18  the market worked as Marshall claims or that the conduct Marshall imagines—for example, the

19  fixing of industry-wide benchmark prices or an output restraint—actually took place.

20      Marshall opines that DRAM is a standardized product sold through well-established sales

21  channels, like the spot market.  Ex. 25, Marshall Rep. at ¶¶ 146; 151.  He argues that if the

22  Defendants had conspired to raise Target OEM contract prices and not raised spot market prices,

23  the Target OEMs would have purchased DRAM from the spot market instead of the Defendants.

24  Ex. 25, Marshall Rep. at ¶¶ 150-151.  Marshall thus surmises that the Defendants and other

25  DRAM producers necessarily must have fixed spot market prices as well as Target OEM contract

26  prices, Ex. 25, Marshall Rep. at ¶¶ 150-151, and that Plaintiffs, whom he claims used spot market

27  prices as a benchmark for the prices they should pay, must have paid higher prices for DRAM as

28  well.  Ex. 25, Marshall Rep. at ¶¶ 9, 152.  He also claims that if the Defendants had effectively

21

1  raised the OEM contract prices, they would have had to raise prices to all other contract

2  customers as well because the Target OEMs had MFC clauses in their contracts which required

3  that they receive the lowest prices given to any customer. Ex. 25, Marshall Rep. at ¶¶ 157, 165.

4  In essence, Marshall claims that these "market characteristics" would have forced the Defendants

5  to fix market-wide prices and prices to Plaintiffs in addition to the Target OEMs because they

6  would not have been able to "effectively" conspire as to the OEMs otherwise. *See, e.g.*, Ex. 25,

7  Marshall Rep. at ¶¶ 150, 172-177.

8      Yet, Marshall does not establish that the market actually functioned in the way he

9  postulates:

10      <u>DRAM Is Not Always A Standard Product</u>: Although Marshall claims DRAM is

11  "standardized," the undisputed evidence obtained during discovery proves that there are many

12  situations in which DRAM varies considerably in function and quality. For instance, certain

13  DRAM suppliers could not even qualify to sell DRAM products to Sun during much of the

14  relevant period due to Sun's quality concerns. *See, e.g.,* Ex. 4, Wilson at 716:13-717:5. And

15  Sun's witnesses testified that the type of DRAM products they purchased could not be

16  interchanged with other types of DRAM being sold in the market. *See, e.g*., Ex. 5, Duncan at

17  106:6-108:11 (stating that no other technology could interchange Sun's NG DIMM module); Ex.

18  6, Raposa at 67:7-69:15 (Sun could not determine a way to substitute FPM/EDO DRAM with

19  SDRAM). Moreover, both Sun and SGI were buying different types of DRAM than the Target

20  OEMs. *See, e.g.,* Ex. 6, Raposa at 66:14-67:6; Ex. 11, Ishiguro at 71:10-23.

21      <u>Other Sales Channels (Spot Market)</u>: Professor Marshall states that "defendants could not

22  raise the named OEMs' prices without also raising spot market prices." Ex. 25, Marshall Rep. at

23  ¶ 150. In support of his theory, Marshall cites to some documents and claims that these

24  documents establish that the Target OEMs used the spot market to control their contract prices.

25  Ex. 25, Marshall Rep. at ¶ 150. But Marshall makes no substantive effort to analyze the facts or

26  determine whether his hypothesis about how the Target OEMs would have behaved is true. He

27  says ***nothing*** about whether the named OEMs could have met their supply and quality of product

28  needs by purchasing from the spot market instead of through contracts. In addition, Marshall

1   offers no explanation as to why some Defendants would have bothered communicating about

2   prices to the Target OEMs for years if they could have simply fixed spot market prices and raised

3   industry-wide prices as a result.  *See* Ex. 55, Marshall 5/22 at 82:17-83:8.  As the Court knows,

4   some Defendants exchanged information related to DRAM sales to particular OEMs.  Had

5   Defendants been able to fix prices in the spot market and, by doing so, raise market-wide prices,

6   including the Target OEMs' contract prices, the Target OEM specific communications would

7   have been unnecessary.  Asked to explain this apparent contradiction, Marshall has no answer

8   because, as he admits, he has "not done an explicit analysis of the mechanisms the cartel used."

9   Ex. 55, Marshall 5/22 at 82:17-83:16.  Moreover, he admits that the spot market is not

10  centralized, that sales are arranged through numerous brokers, that the purchasers are anonymous

11  as a result and that spot market prices are negotiated through intermediaries.  Ex. 25, Marshall

12  Rep. at ¶ 106.  He does not claim that the Defendants controlled the spot market.  Ex. 55,

13  Marshall 5/22 at 16:5-13.  So he does not determine whether Defendants would have been able to

14  raise spot market prices even if this was their aim, let alone their accomplishment.

15      Transparency of DRAM Prices: To establish that Plaintiffs' access to information about

16  DRAM prices would have actually worked to dictate the prices they paid for the DRAM products

17  they purchased, Marshall must not only show that all of the benchmark prices to which he refers

18  were actually fixed, he must also establish that the benchmark prices he claims were fixed

19  actually served as the basis for Plaintiffs' prices and impacted those prices.[19]  Marshall does not

20  establish how spot market prices (which changed frequently) and the aggregate reports of contract

21  prices (which reflected aggregate prices paid by OEMs and other buyers weeks before they were

22  published) supposedly were used as a basis for any of the Plaintiffs' negotiations with

23  Defendants, much less all negotiations for over four years.  *See, e.g.*, Ex. 26, Marshall 2/29 at

---

[19] In this regard, *In re Industrial Diamonds Antitrust Litigation*, 167 F.R.D. 374 (S.D.N.Y. 1996), is instructive.  There, the plaintiffs claimed that defendants fixed a list price and that those list prices were the basis upon which individual negotiations with customers were actually based.  *Id.* at 381.  In other words, the list prices actually dictated the plaintiffs' final contract price.  To establish that this was so, the plaintiffs' expert compared the prices that over 100 customers paid prior to a specific list price increase with those paid after that same increase and determined that a great majority of customers' individually negotiated prices increased after the list price was increased.  *Id.* at 383-84.

DEFTS' NOTICE OF MOTION + MOTION FOR
SUMMARY JUDGMENT AND ADJUDICATION;
MEMO ISO THEREOF

1   213:17-216:21.  Rather, he speaks in generalities about Plaintiffs referencing prices of DRAM

2   products, *see* Ex. 25, Marshall Rep. at ¶¶ 152-156, but he says nothing about which prices of

3   which DRAM products were fixed at what point and how the price of that DRAM product at that

4   point influenced any specific Sun, Unisys, SGI, All American, Edge or Jaco contract negotiation.

5   *See, e.g.,* Ex. 24, Marshall Reb. Rep. at ¶ 56.  This point is especially significant because before

6   the period of purported injury (pre-1998), purchasers were all buying one type of DRAM product

7   (FPM/EDO), but during the period of purported injury (1998-2002), purchasers had to decide

8   between FPM/EDO, RDRAM, SDRAM, and DDR.  The pleas explicitly define DRAM as

9   including various types of synchronous DRAM, without mentioning asynchronous FPM/EDO.

10  *See, e.g.,* Ex. 16, Hynix Plea Agreement at ¶ 4 (stating that "DRAM" includes SDRAM and

11  DDR); Ex. 19, Samsung Plea Agreement at ¶ 4 ("DRAM" includes SDRAM, DDR and Rambus

12  DRAM).  The only type of DRAM that Sun purchased in significant quantities until 2001 was

13  asynchronous FPM/EDO.  Ex. 5, Duncan at 92:23-94:3; *see also* Ex. 10, Expert Report of Kevin

14  Murphy at Ex. 27.  Moreover, witnesses who worked for Sun during the period at issue have

15  testified that Sun's general reference to DRAM market prices bore no relation to the prices that

16  Sun actually paid after auctions and negotiations were conducted.  Ex. 6, Raposa at 261:5-265:8

17  ("[W]e felt that the ceiling and reserve price [derived from publicly available DRAM pricing

18  information] was important, but it was not important in terms of -- or it was not necessarily

19  important or relevant in terms of where the final pricing would end up.  It was important to the

20  event, but it wasn't necessarily in any way tied to where final -- the final price would land.").

21      "Most Favored Customer" Clauses:  Marshall assumes that Defendants must have raised

22  prices for every product across the entire market because the "named OEMs frequently negotiated

23  clauses in their contracts to ensure that they do not receive disadvantageous prices relative to

24  other purchasers."  Ex. 25, Marshall Rep. at ¶ 157.  But Marshall offers no analysis of which

25  MFC clauses, if any, in which contracts with which OEMs, if any, would have been triggered by

26  which sales, if any, to the Plaintiffs.  *See, e.g.,* Ex. 25, Marshall Rep. at ¶ 161.  He admits that the

27  MFC clauses he analyzed only require matching of lower prices for purchases of "like quantities

28  of substantially comparable products."  But he refused to answer whether he had actually

DEFTS' NOTICE OF MOTION + MOTION FOR
SUMMARY JUDGMENT AND ADJUDICATION;
MEMO ISO THEREOF

1   analyzed if the MFC clauses of the Target OEMs could have been triggered by any of the

2   purchases made by Plaintiffs given these differences.  Ex. 26, Marshall 2/29 at 221:5-224:22.

3   Most Plaintiffs purchased small amounts of DRAM as compared to the Target OEMs.  Ex. 2,

4   White Rep. at Fig. 41.  Sun did purchase large volumes of DRAM but it primarily purchased

5   legacy DRAM products that were one or two generations behind the leading technologies

6   purchased by the OEMs.  *See, e.g.,* Ex. 6, Raposa at 66:14-67:6.  In fact, until 2001, Sun was

7   purchasing primarily asynchronous DRAM (FPM/EDO) while the Target OEMs were purchasing

8   synchronous DRAM (SDRAM).  Ex. 10, Expert Report of Kevin Murphy at Ex. 27.  And SGI

9   purchased primarily cutting-edge DRAM; buying technologies -- particularly DDR -- before they

10  had been adopted by the OEMs.  *See, e.g.,* Ex. 11, Ishiguro at 71:10-23.  *See also* Ex. 12,

11  Benjamin Klein at ¶ 20.  Marshall simply does not establish that MFC clauses were applied or

12  even would have applied under these circumstances.[20]

13         Thus, Marshall's conjecture does not bridge the gap between the conduct admitted in the

14  pleas and the injury asserted by the Plaintiffs.  There should be evidence that Defendants fixed the

15  price of DRAM on the spot market or that a price paid by an OEM for a particular DRAM

16  product at a particular point in time was transmitted to a Plaintiff by virtue of particular contract

17  language if this actually occurred continuously for over four years.  But Marshall analyzes no

18  such evidence and points to no such evidence to support this sweeping conclusion.  Under *Brooke*

19  *Group*, Marshall's conjecture cannot substitute for the requisite "market facts."  509 U.S. at 242.

20                    b.       **Marshall's Analysis Of Price Movements Over Time Does Not**
                              **Establish Causation.**

21

22         Marshall's analysis of price movements over time does not sustain Plaintiffs' burden

23  either.  As with his views of market characteristics, Marshall offers an explanation of what may

24  have happened in the industry.  But he fails to provide the facts of what actually happened that

25  would ground his explanation in market realities.

26         Marshall concludes that because the Target OEMs' and Plaintiffs' prices for DRAM

27  ─────────────────────
[20] Nor did he opine as to basic aspects of the MFC clauses, like what the effective dates of the
28  existing clauses were.

                                        DEFTS' NOTICE OF MOTION + MOTION FOR
                                        SUMMARY JUDGMENT AND ADJUDICATION;
                                        MEMO ISO THEREOF

"moved together" through time, Plaintiffs in this case were impacted by Defendants' conspiracy. Ex. 25, Marshall Rep. at ¶¶ 129-130.  One of the bases for his conclusion is that the Target OEMs' and Plaintiffs' prices are "correlated."  Ex. 25, Marshall Rep. at ¶ 20.  But it is well established that "correlation is not causation."  *Norfolk & W. Ry. v. Ayers*, 538 U.S. 135, 173 (2003).[21]  In fact, Marshall admits that his correlation analysis does not establish causation.  Ex. 24, Marshall Reb. Rep. at ¶ 127.

Marshall's empirical work, moreover, demonstrates that the Target OEMs' and Plaintiffs' prices are subject to fluctuations that have no counterpart in the other set.  Ex. 26, Marshall 2/29 at 124:16-125:13, 139:3-139:21.  Marshall concedes that his analysis shows that the Target OEMs' prices and the Plaintiffs' prices can diverge from each other, but come back to "moving together" ***more than*** three to four months later: "[m]y analysis shows that approximately half of any disturbance to the fundamental relationship between the Target OEM and Plaintiff price typically disappears within three months, absent any additional disturbance."  Ex. 24, Marshall Reb. Rep. at ¶ 93.  *See also* Ex. 55, Marshall 5/22 at 46:5-9.

Marshall admits that he cannot determine whether this convergence of the Target OEM price and Plaintiff price after a separation is a result of the Target OEM prices being raised ***and then going back down*** to market-wide levels or a result of all prices, including the OEM prices, being raised.  Ex. 55, Marshall 5/22 at 53:4-53:22 ("The impulse response analysis that I have done doesn't speak to whether one price is going to go up or another price is going to go down.").  It follows that to the extent Marshall expresses any degree of confidence that the conspiracy admitted by some in the pleas ***may*** have impacted Plaintiffs' DRAM prices, it flows entirely from his ***assumption*** that Defendants' conduct had a continual impact on the Target OEM prices over a prolonged period of time.  His empirical analysis does not allow him to conclude that particular

---

[21] *See also United States v. W.R. Grace*, 455 F. Supp. 2d 1181, 1193 (D. Mont. 2006) ("An opinion on causation assists the jury, because the jury must decide whether the charged releases placed another person in imminent danger. . . . The ATSDR Report and the Peipins Study do not contain opinions as to causation, but instead identify a correlation or association. . . . Evidence of this correlation does not assist the trier of fact.") (*aff'd by United States v. W.R. Grace*, 504 F.3d 745, 765 (9th Cir. 2007)); *Cook v. United States*, 545 F. Supp. 306, 314 (N.D. Cal. 1982) (holding plaintiffs had not adequately shown causation when they presented evidence of correlation without accounting for alternative explanations).

1   impacts affected both series with any degree of probability, much less a reasonable degree.  And

2   his empirical analysis does not allow him to conclude that the price series moved together

3   because one set followed the other one up -- according to him, the opposite could have occurred.

4        In the end, Marshall's entire analysis depends on the word "effectiveness" in the pleas.

5   Again, the pleas state that certain of the Defendants entered into "agreements" to fix the prices of

6   certain DRAM products sold to "certain OEMs" during "at least certain periods of time" with

7   "varying levels of effectiveness."  Marshall reads "effectiveness" to mean that Defendants

8   affected the price that all Target OEMs paid for all DRAM products continuously for a prolonged

9   period of time.  But he has no facts to corroborate his reading of the word or his conclusion that

10  the Defendants had the effect on the prices paid by the Target OEMs that his analysis assumes.  In

11  fact, Marshall states that "it was not necessary to reach my opinion to do any additional work in

12  regard of determining anything about the nature of the conspiracy."  Ex. 26, Marshall 2/29 at

13  190:24-191:22.  *See also id.* at 192:15-192:18 ("I did not investigate anything about the specific

14  time periods for the conspiracy.  I took as given what was said in the plea agreements and

15  sentencing statements.").  This is precisely the kind of expert opinion against which *Brooke*

16  *Group* warns.  Marshall does not meet Plaintiffs' burden to link Defendants' conduct to Plaintiffs'

17  claimed injury.

18      **B.**    **SUMMARY JUDGMENT IS APPROPRIATE FOR PLAINTIFFS'**
     **CALIFORNIA LAW CLAIMS.**
19

20       Having not established an admissible factual link between Defendants' conduct and

21  Plaintiffs' purported injury, Plaintiffs' Sherman Act claims fail.  Plaintiffs also claim relief under

22  California's Cartwright Act.  Cal. Bus. & Prof. Code §§ 16700 et. seq. (2008).  Plaintiffs'

23  Cartwright Act claims are based upon the same set of facts and analysis as their Sherman Act

24  claims.  *See, e.g.*, Sun and Unisys Con. Am. Compl. at ¶ 86.  Cartwright Act claims raise the

25  same issues as do Sherman Act claims, making summary judgment on Cartwright Act claims

26  appropriate when a court grants summary judgment on Sherman Act claims.  *See, e.g., McGlinchy*

27  *v. Shell Chem. Co.*, 845 F.2d 802, 812 n.4 (9th Cir. 1988) (applying analysis of Sherman Act

28  claim to Cartwright Act claim and affirming judgment on the pleadings for both claims).

DEFTS' NOTICE OF MOTION + MOTION FOR
SUMMARY JUDGMENT AND ADJUDICATION;
MEMO ISO THEREOF

1  Moreover, courts have made clear that the requirement of injury-in-fact is embodied in the

2  Cartwright Act.  *See, e.g., Global Minerals & Metals Corp. v. Superior Court of San Diego*

3  *County*, 7 Cal. Rptr. 3d 28, 42-47 (Cal. Ct. App. 2003).  Proximate cause is also required under

4  the Cartwright Act, and the same analysis, set forth below, should be applied to Plaintiffs'

5  Cartwright Act claims.  *See Stationary Eng'rs Local 39 Health & Welfare Trust Fund v. Philip*

6  *Morris, Inc.*, No. C-97-1519 DLJ, 1998 WL 476265, at *9 (N.D. Cal. Apr. 30, 1998) (dismissing

7  Cartwright Act claims because, *inter alia,* proximate cause was not established); *Morrison v.*

8  *Viacom, Inc.*, 78 Cal. Rptr. 2d 133, 141 (Cal. Ct. App. 1998) ("The plaintiff in a Cartwright Act

9  proceeding must show that an antitrust violation was the proximate cause of his injuries.")

10  (quoting *Kolling v. Dow Jones & Co.*, 187 Cal. Rptr. 797, 806 (Cal. Ct. App. 1982)).  *See also*

11  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987-92 (9th Cir. 2000) (applying *AGC*

12  factors, including those used to determine proximate cause, to Cartwright Act claim).

13       Plaintiffs also claim monetary and injunctive relief pursuant to California's Unfair

14  Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL"), which also requires proof of

15  injury-in-fact and causation.  *See Hall v. Time Inc.*, 70 Cal. Rptr. 3d 466, 467 (Cal. Ct. App.

16  2008) ("A plaintiff must have suffered an 'injury in fact' and 'lost money or property as a result

17  of such unfair competition' to have standing to pursue either an individual or a representative

18  claim under [§§ 17200 et seq.]."); *McKay v. Hageseth,* No. C-06-1377, 2007 WL 2669934, at *8

19  (N.D. Cal. Sept. 7, 2007) (granting summary judgment on a Section 17200 claim where plaintiffs

20  could not establish causation).  *See also Clayworth v. Pfizer, Inc.*, No. A116798, at 41 (Cal. Ct.

21  App. Jul. 25, 2008).  Plaintiffs fail to establish a genuine issue of material fact as to injury and

22  causation under the UCL for the same reasons they fail to establish the same under the Sherman

23  Act and Cartwright Act.

24      **C.**     **PLAINTIFFS' THEORY OF CAUSATION IS TOO ATTENUATED TO**
            **ALLOW THE INCREDIBLE RECOVERY SOUGHT.**

25

26       Even if Plaintiffs could establish a causal connection between the alleged conduct and

27  their purported injury, which they do not, their claims still fail because the causal connection is

28  too remote to allow recovery.  It is well established that "Congress did not intend to allow every

DEFTS' NOTICE OF MOTION + MOTION FOR
SUMMARY JUDGMENT AND ADJUDICATION;
MEMO ISO THEREOF

1    person tangentially affected by an antitrust violation to maintain an action to recover threefold

2    damages for the injury to his business or property." *Associated Gen. Contractors v. Cal. State*

3    *Council of Carpenters,* 459 U.S. 519, 534-35 (1983) (quoting *Blue Shield of Va., Inc. v.*

4    *McCready*, 457 U.S. 465, 476-77 (1982)).  Instead, the principles enunciated by the Supreme

5    Court establish that antitrust damages are recoverable only upon a showing of proximate cause.

6    *See, e.g., Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d

7    957, 963 (9th Cir. 1999), *cert. denied*, 528 U.S. 1075 (2000).

8          In analyzing this requirement, the Ninth Circuit has emphasized that "[a] direct

9    relationship between the injury and the alleged wrongdoing has been one of the 'central elements'

10   of the proximate causation determination."  *Ass'n of Washington Pub. Hosp. Dists. v. Philip*

11   *Morris, Inc.*, 241 F.3d 696, 701 (9th Cir. 2001), *cert. denied*, 534 U.S. 891 (2001).  In addition,

12   the Ninth Circuit looks to three factors:  (1) whether there are more direct victims of the alleged

13   wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2)

14   whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to

15   defendants' wrongful conduct, and (3) whether the courts will have to adopt complicated rules

16   apportioning damages to obviate the risk of multiple recoveries.  *Oregon Laborers*, 185 F.3d at

17   963.  Applying these factors militates strongly against a finding of proximate cause here.

18          The basic problem with Plaintiffs' claims is that causation is based not on any price-fixing

19   aimed at Plaintiffs, but rather that "defendants' *conspiracy* to increase the prices to the Target

20   OEMs caused an increase to [P]laintiffs' prices because of the market forces affecting prices and

21   the characteristics of the DRAM market."  Ex. 24, Marshall Reb. Rep. at ¶ 28 (emphasis in

22   original).  Not only does Plaintiffs' assertion of causation apparently rest on the operation of

23   generic market forces not under Defendants' control and not specific to Plaintiffs, but Plaintiffs

24   never actually articulate or analyze any chain of causation between the alleged conspiracy and

25   their injury vis-à-vis these market features.  Instead, their expert simply points to these market

26   features as reasons why "one would think" that Defendants could not raise prices to the Target

27   OEMs without affecting prices market-wide.  *See* Ex. 26, Marshall 2/29 at 126:7-9.

28          Defendants stand in much the same position as third-party sellers or re-sellers who are not

DEFTS' NOTICE OF MOTION + MOTION FOR
SUMMARY JUDGMENT AND ADJUDICATION;
MEMO ISO THEREOF

1    even alleged to have been participants in any Target OEM conspiracy. That is, accepting the

2    Target OEM conspiracy as laid out in the pleas, and accepting Marshall's opinions, the same

3    general market factors would have led both Defendants – who did not conspire as to Plaintiffs'

4    prices – and third-party sellers or re-sellers to price higher to Plaintiffs under the Target OEM

5    price "umbrella." *See*, *e.g.*, Ex. 55, Marshall 5/22 at 28:14-29:11 ("I'm envisioning here a non-

6    collusive fringe player with a small market share that's selling to both the Target OEMs and the

7    plaintiffs. The question is whether or not their – if their pricing is moving together with all other

8    pricing in the marketplace, including what the members of the cartel are selling at? . . . . And

9    given the market mechanisms that exist here, the answer to your question would be yes . . . . The

10   four [market] characteristics . . . are leading to the connection of the prices in the marketplace.").

11          The umbrella theory of antitrust liability, however, has been rejected by the Ninth Circuit.

12   *See In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335,

13   1341 (9th Cir. 1982) ("Under an umbrella theory, the result of any attempt to ascertain with

14   reasonable probability whether the non-conspirators' prices resulted from the defendants'

15   purported price-fixing conspiracy or from numerous other pricing considerations would be

16   speculative to some degree.") (footnote omitted), *cert. denied*, 464 U.S. 1068 (1984); *see also*

17   *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1168-69

18   (C.D. Cal. 2000) (rejecting umbrella standing in context of a merger of two firms, where plaintiffs

19   bought product from a different firm and argued that they paid supra-competitive prices: "the

20   weight of *recent* authority using the nuanced antitrust analysis outlined in *Associated General*

21   *Contractors*, has found against allowing 'umbrella' standing to plaintiffs") (emphasis in original);

22   *In re Vitamins Antitrust Litig.*, Misc No. 99-197, 2001 WL 855463, at *4 (D.D.C. Jul. 2, 2001)

23   (The "overwhelming majority" of recent court decisions that have addressed the issue after

24   *Associated General Contractors* have rejected umbrella claims.).

25          The rationale for this rule is that it is simply too speculative and complex to attempt to

26   trace non-collusive pricing behavior back to an alleged conspiracy's pricing. Because under

27   Marshall's theory Defendants stand vis-à-vis the Plaintiffs in the same position as parties not

28   alleged to have conspired against the Target OEMs, *Petroleum Products* applies with equal force

1    here.  To conclude otherwise would introduce market-wide liability in virtually every price-fixing

2    case, no matter how targeted or limited the defendants' price-fixing behavior may have been.[22]

3    Put slightly differently, these are precisely the types of "vaguely defined links" that make a

4    purported injury too attenuated to allow recovery.  *See Associated General Contractors*, 459 U.S.

5    at 540.

6            The indirectness is borne out by the application of the other proximate cause factors.  The

7    supposed link between the alleged conduct and the alleged injury, reliant on various market

8    forces, is attenuated and renders any effort to calculate damages with reasonable certainty

9    impossible.[23]  The myriad of intervening steps between the alleged conspiracy directed to the

10   Target OEMs and the proffered injury to Plaintiffs (*e.g.*, buyers' reference to other buyers' prices

11   in negotiating with suppliers, the effectiveness and applicability of MFC clauses, the decision to

12   increase Plaintiffs' prices as an acknowledgement of those market features) renders an acceptably

13   accurate calculation of damages impossible here.  *See, e.g., Holmes v. Sec. Investor Prot. Corp.*,

14   503 U.S. 258, 269 (1992) ("the less direct an injury is, the more difficult it becomes to ascertain

15   the amount of a plaintiff's damages attributable to the violation, as distinct from other,

16   independent factors").  This indirect causal connection coupled with the inability to ascertain

17   damages weighs heavily, if not decisively, against a finding of proximate cause.  *See Oregon*

18   *Laborers*, 185 F.3d at 965.

19           In addition, it is obvious from Marshall's testimony that more direct victims exist.

20

21   [22] Although a small number of post-*AGC* cases have allowed umbrella standing, at least at the
     pleading stage, they have typically done so where there is an alleged collusive output reduction,
22   which necessarily would have a market-wide effect and so eliminates some of the *AGC* concerns.
     *See, e.g., U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623 (7th Cir. 2003).  *Petroleum Products*,
23   however, does not recognize that exception, and in any event Plaintiffs' experts do not opine that
     there was a collusive output reduction here and the cases are obviously well beyond the pleading
24   stage.

     [23] The speculative nature of Plaintiffs' damages is highlighted by a comparison of the overcharge
25   they claim, ranging roughly from 40% to 50%, to the settlements entered into by the direct
     purchaser class members, ranging from roughly 5% to 18% and estimated at more than 85% of
26   the overcharge incurred.  *See* Ex. 59, Memo. ISO Mot. for an Award of Attys.' Fees, *In re:
     Dynamic Access Memory Antitrust Litig.*, No. 02-1486 PJH at 6 (N.D. Cal. July 26, 2007).  This
27   Court described the recovery in the class settlements as "exceptionally good."  *See* Ex. 23, Tr. of
     Proceeding, *In re: Dynamic Access Memory Antitrust Litig.*, No. 02-1486 PJH at 9-10 (N.D. Cal.
28   Aug. 15, 2007).

1   Plaintiffs' claims are predicated not on a conspiracy to fix the prices of DRAM sold to Plaintiffs,

2   but rather on a conspiracy to fix the prices at which Defendants sold DRAM to Apple, Compaq,

3   Dell, Gateway, IBM and Hewlett-Packard.  Ex. 24, Marshall Reb. Rep. at ¶¶ 2-3.  Those OEMs

4   are the more direct victims here, making this factor also weigh against proximate cause.[24]

5          Given the attenuated nature of the claimed injury, coupled with the difficulty in

6   ascertaining damages and the existence of more direct victims, proximate cause is lacking here

7   and summary judgment should be granted.

8          **D.      IN THE ALTERNATIVE, DEFENDANTS ARE ENTITLED TO
            SUMMARY ADJUDICATION THAT CERTAIN MATERIAL FACTS ARE
9          NOT GENUINELY AT ISSUE.**

10         Rule 56(d) of the Federal Rules of Civil Procedure states that "[i]f summary judgment is

11  not rendered on the whole action, the court should . . . determine what material facts are not

12  genuinely at issue. . . .  It should then issue an order specifying what facts . . . are not genuinely at

13  issue."  Defendants respectfully request that this Court enter an Order pursuant to Rule 56(d) if

14  this Court does not find for Defendants on summary judgment.  Defendants request that the Court

15  specify that the following material facts are not genuinely at issue: (i) Plaintiffs suffered no injury

16  from a fix of their specific contract prices during the entire period of claimed injury; (ii) Plaintiffs

17  suffered no injury from a restraint on DRAM output, or (iii) Plaintiffs suffered no injury from a

18  fix of DRAM benchmark prices.

19  **IV.    CONCLUSION**

20         Defendants respectfully request that this Court, pursuant to Rule 56(b) of the Federal

21  Rules of Civil Procedure, grant summary judgment in their favor on Plaintiffs' Sherman Act,

22  Cartwright Act and California Unfair Competition Law claims.  In the alternative, Defendants

23  request that this Court, pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, enter an

24

25  _____

26  [24] When the other factors weigh against a finding of proximate cause, the fact that there is not an
    appreciable risk of duplicative recovery will not suffice to establish proximate cause.  *See Oregon
    Laborers*, 185 F.3d at 965 (difficulty in ascertaining and calculating damages can be dispositive);

27  *see also Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1149 (9th Cir. 2008) (affirming
    dismissal for lack of proximate cause despite no risk of duplicative recoveries because that risk

28  "is not a necessary condition for concluding that proximate cause is lacking").

DEFTS' NOTICE OF MOTION + MOTION FOR
SUMMARY JUDGMENT AND ADJUDICATION;
MEMO ISO THEREOF

Order for summary adjudication which states that certain facts are not genuinely at issue as set forth above.

Dated:  July 30, 2008              Respectfully Submitted,

                                   O'MELVENY & MYERS LLP


                                   By: _____ /S/ Kenneth R. O'Rourke _____
                                                Kenneth R. O'Rourke
                                   Attorneys for Defendants
                                   HYNIX SEMICONDUCTOR INC. and
                                   HYNIX SEMICONDUCTOR AMERICA INC.
                                   (except in the *DRAM Claims Liquidation Trust*
                                   matter)

Dated:  July 30, 2008              ORRICK, HERRINGTON & SUTCLIFFE LLP


                                   By: _____ /S/ Howard M. Ullman _____
                                                Howard M. Ullman
                                   Attorneys for Defendants
                                   NANYA TECHNOLOGY CORPORATION and
                                   NANYA TECHNOLOGY CORPORATION USA

Dated:  July 30, 2008              SIMPSON THACHER & BARTLETT LLP


                                   By: _____ /S/ Harrison J. Frahn IV _____
                                                Harrison J. Frahn IV
                                   Attorneys for Defendants
                                   ELPIDA MEMORY, INC. and
                                   ELPIDA MEMORY (USA) INC.

Dated:  July 30, 2008              THELEN REID BROWN RAYSMAN & STEINER
                                   LLP


                                   By: _____ /S/ Robert Pringle _____
                                                Robert Pringle
                                   Attorneys for Defendant
                                   NEC ELECTRONICS AMERICA, INC.

Dated:  July 30, 2008              KAYE SCHOLER LLP


                                   By: _____ /S/ Julian Brew _____
                                                Julian Brew
                                   Attorneys for Defendants
                                   INFINEON TECHNOLOGIES AG and
                                   INFINEON TECHNOLOGIES NORTH AMERICA
                                   CORP.

1   Dated:  July 30, 2008          SHEPPARD MULLIN RICHTER & HAMPTON
                                   LLP
2

3
                                   By:  _____/S/ David Garcia_____
4                                                David Garcia
                                   Attorneys for Defendants
5                                  SAMSUNG ELECTRONICS CO., LTD. and
                                   SAMSUNG SEMICONDUCTOR, INC.
6
    Dated:  July 30, 2008          GIBSON DUNN & CRUTCHER LLP
7

8
                                   By:  _____/S/ Joel Sanders_____
9                                                Joel Sanders
                                   Attorneys for Defendants
10                                 MICRON TECHNOLOGY, INC. and
                                   MICRON SEMICONDUCTOR PRODUCTS, INC.
11
    Dated:  July 30, 2008          THELEN REID BROWN RAYSMAN
12                                 & STEINER LLP

13

14                                 By:  _____/S/ Samuel J. Maselli_____
                                               Samuel J. Maselli
15                                 Attorneys for Defendants
                                   HYNIX SEMICONDUCTOR INC. and
16                                 HYNIX SEMICONDUCTOR AMERICA INC.
                                   in the *DRAM Claims Liquidation Trust* matter only
17

18                      **ATTESTATION OF FILING**

19          Pursuant to General Order No. 45 § X(B), I hereby attest that I have obtained concurrence

20   in the service and filing of this Motion with electronic signatures from all the Defendants listed in

     the signature blocks above.
21

22                                 _____/S/ Kenneth R. O'Rourke_____
                                               Kenneth R. O'Rourke
23                                 Attorneys for Defendants Hynix Semiconductor
                                   Inc. and Hynix Semiconductor America Inc.
24

25

26

27

28

DEFTS' NOTICE OF MOTION + MOTION FOR
                                              SUMMARY JUDGMENT AND ADJUDICATION;
                                              MEMO ISO THEREOF