# EXHIBIT 3 TO
# DECLARATION OF
# JOSHUA S. STAMBAUGH

# PART ONE OF THREE

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re Dynamic Random Access Memory (DRAM)
Antitrust Litigation

THIS DOCUMENT RELATES TO:

| | |
|---|---|
| Sun Microsystems, Inc. and Unisys Corporation, ) <br> v. ) <br> Hynix Semiconductor, Inc., et al. ) | Docket No. 06-cv-1665 |
| ) <br> All American Semiconductor, Inc., ) <br> v. ) <br> Hynix Semiconductor, Inc. et al. ) | Docket No. 07-cv-1200 |
| ) <br> Edge Electronics, Inc., ) <br> v. ) <br> Hynix Semiconductor, Inc. et al. ) | Docket No. 07-cv-1207 |
| ) <br> Jaco Electronics, Inc. ) <br> v. ) <br> Hynix Semiconductor, Inc. et al. ) | Docket No. 07-cv-1212 |
| ) <br> Dram Claims Liquidation Trust, by Its Trustee, ) <br> Wells Fargo Bank, N.A., ) <br> v. ) <br> Hynix Semiconductor, Inc., et al. ) | Docket No. 07-cv-1381 |

## EXPERT REPORT OF JOSEPH P. KALT, Ph.D.
### March 7, 2008

## HIGHLY CONFIDENTIAL

**Expert Report of Joseph P. Kalt**

I.    **Introduction and Summary of Conclusions**

A.    **Background and Qualifications**

1.    My name is Joseph P. Kalt. I am the Ford Foundation Professor of International Political Economy at the John F. Kennedy School of Government, Harvard University. I also work as a senior economist with Compass Lexecon, an economic consulting company.

2.    I hold B.A., M.A., and Ph.D. degrees in economics and am a specialist in the economics of competition, antitrust, and regulation. Throughout my professional career I have conducted research, published, taught, and testified extensively on the economics of industrial organization, market structure, contracting, regulation, pricing, and strategic performance.

3.    At Harvard, I served as an Instructor, Assistant Professor, and Associate Professor in the Department of Economics from 1978-1986. In the Department of Economics, I had primary responsibility for teaching the graduate and undergraduate courses in the economics of regulation and antitrust. In 1986, I joined the faculty of the Kennedy School of Government at Harvard as a Professor with tenure. The Kennedy School of Government is Harvard's graduate school for public policy and public administration.

4.    At the Kennedy School, my teaching responsibilities have included the economics of industrial organization, regulation, and antitrust; economics for public policy, natural resource, and environmental policy; and economic development. At the Kennedy School, I have also served as Chair of the Economics and Quantitative Methods Program, Faculty Chair and Academic Dean for Research, Chair of Teaching Programs, and Chair of Ph.D. Programs. I have also served as the faculty chair of the Harvard University Native American Program.

5.    I am also a Visiting Professor at the Eller College of Management at the University of Arizona, where I taught both an undergraduate and a graduate course in the economics of regulation and antitrust in the spring 2007 semester. In spring 2008, I am teaching a course in the law, economics, and policy of economic development on American Indian reservations, jointly offered by the Eller College of Management and the Rogers College of Law.

6.    Over my career, I have testified as an expert economist in numerous legal, regulatory, and policy proceedings. My expert testimony and consulting over the last 30 years have encompassed issues of competition, antitrust, market valuation, exclusionary conduct, industry structure, standard setting,

taxation, contracting, and regulation. For a more complete listing of my prior professional training, academic research, teaching, and consulting experience, see my *curriculum vitae* attached hereto (Appendix A).

## B. Assignment and Materials Considered

7. I have been asked by attorneys for Infineon Technologies AG ("Infineon") to examine the conduct and performance of the marketplace for Dynamic Random Access Memory ("DRAM") during the period encompassed by Plaintiffs' claims in this proceeding.[1] Specifically, I have been asked to (1) assess whether the economic conduct described in Infineon's plea agreement and shown by the evidence cited by Plaintiffs would have led to higher prices to Plaintiffs; (2) assess whether the applicable economics support an inference that Infineon entered agreements beyond those described in the pleas and that would have had an adverse impact on DRAM prices paid by Plaintiffs; and (3) review and assess the reports submitted on behalf of Plaintiffs by Professors Halbert White and Robert Marshall.[2]

8. To address these questions, I have examined and considered a variety of materials, including documents and data produced through the discovery process in this matter, interrogatory responses, depositions, expert reports and workpapers, and public materials on the DRAM marketplace. A complete list of the materials considered by me and my staff working under my direction is attached to this report (Appendix B).[3]

---

[1] I understand that Sun Microsystems has not sued Infineon and address my analysis to the facts surrounding the other Plaintiffs in this matter. Five parties other than Sun have opted out of the direct class and filed complaints individually. These parties are: DRAM Claims Liquidated Trust; Jaco Electronics, Inc.; Unisys Corporation; All American Semiconductor, Inc.; and Edge Electronics, Inc. In most material respects, the parties' claims are identical. For the purposes of this report, I refer to the five parties collectively as "Plaintiffs."

[2] Expert Report of Halbert L. White, Jr., Ph.D., December 14, 2007 (hereinafter White); Expert Report of Robert C. Marshall, Ph.D., December 14, 2007 (hereinafter Marshall).

[3] My analysis in this matter is on-going. I intend to review the other expert reports file din this matter, and I reserve the right to update my opinions as additional information becomes available.

13. Exchanges of information on price, production, and product road maps do not, themselves, cause the withholding of supply that is needed to drive prices upward. Even where market participants attempt to reach cooperative agreement to jointly withhold supply, the attempt may be ineffective. Cartels generate the benefit of excess profits to cartel members as a joint, collective outcome. Such collective benefit is notoriously subject to problems of "free-riding" and "cheating." While withholding of supply is in the joint interest of the members of a cartel, it is not in the unilateral interests of the cartel members. In particular, individually, each would-be cartel participant has the strong incentive to let others bear the burden of withholding their supply and then "cheat" on a cartel agreement by expanding its output to take advantage of the business left on the table by others in the cartel.

## B.    Investment and Technological Change

41.    The DRAM industry is characterized by high up-front costs in production facilities, and relatively low variable or marginal costs. For example, in 2002, the cost of a modern fab using 300 mm silicon wafers is estimated to be in the range of $2.5 billion, while a fab using older 200 mm wafer technology would cost approximately $1.5 billion.[29] Moreover, it takes upwards of two years for a fab to be fully operational. The primary driver of declining costs in the industry is the continued reduction in the geometry or size of DRAM chips. To achieve these reductions in geometry, fabs must be repeatedly upgraded to maintain productivity (and cost) at competitive levels. Of course all of these efforts require ongoing investment.

[29] UBS Warburg, "Global DRAM Update," April 17, 2002, at 10.

## E.    Elasticities of Supply and Demand

54.    While DRAM producers have shown that they can greatly increase output over the long term, they have much less ability to increase output in the short term. This is because the supply available to the market at any point in time depends on production and capacity decisions made earlier. These decisions include investment in constructing and equipping fabs and making process improvements.

55.    Given the high cost of building and equipping fabs, the marginal cost of operating a fab is relatively low, and is generally below average unit cost, which includes the fixed costs of constructing and equipping the fab. As a result, reductions in output save relatively little in cost. As long as price is above marginal cost, DRAM manufacturers will not tend to reduce output. Similarly, to the extent DRAM manufacturers run their fabs at high output levels, an increase in demand cannot readily be met with increased output without increased investment in capacity. The process of building a fab can take up to two years and billions of dollars.[44]    Other means of increasing supply, such as process improvements and increasing capacity at existing fabs, can be undertaken somewhat more rapidly. Nevertheless, the supply of DRAM cannot be rapidly increased in the face of unexpected demand.

## IV.    The Economics of Cartel Conduct

### A.    The Basic Economics of Cartels

60.    There is an extensive body of literature on the economics of cartels with which I am familiar and about which I have taught. We often refer to cartels as engaging in "price fixing." At the same time, economics teaches that cartels do not violate the laws of supply and demand; they turn those laws in their favor. By this we mean that, to be effective in elevating prices, cartels must be able to withhold overall supply from the marketplace. It is the

_____

withholding of supply relative to demand that puts prices under upward pressure and can allow "fixed" prices to stick in the marketplace.[48]

61. Restrictions in supply by a cartel require effective *coordination* among cartel members. Mechanisms must be found such that cartel members share in the burden (in terms of forgone sales) of withholding supply. Indeed, cartels are inherently unstable because each member of the cartel has an incentive to cheat on the cartel agreement by letting others perform the task of withholding supply and, itself, expanding output to capture the sales thereby left on the table by those others. Such expansions of output, a rational temptation to all cartel members, thwart effective cartelization by preventing "fixed" prices from sticking in the marketplace.

---

[48] Carlton, Dennis W., and Jeffrey M. Perloff, *Modern Industrial Organization*, 3rd Ed., Addison-Wesley, 2000, Chapter 5, Cartels: Oligopoly Joint Decision Making, at 121-124.

112. Industry reports show that there were some reductions in capacity during 2001. The question is whether these output reductions were unilateral or were the result of effective agreement among DRAM manufacturers, including Infineon. Certain of the reductions in output are unambiguously unilateral. For example, IBM exited the DRAM industry in 2001.[80] IBM is a competent semiconductor manufacturer. Thus, its exit must be the result of a decision to invest its resources elsewhere. There is no basis to assert that a firm exiting the industry would be part of a conspiracy to withhold output because it does not stand to benefit from the increased prices its exit might foster. Moreover, IBM is a DRAM buyer and would be injured by supporting and/or participating in a conspiracy to increase DRAM prices.

---

[80] "DRAMS and DRAM Modules From Korea," Staff Report to the Commission, United States International Trade Commission, Investigation No 701-TA-431 (Final), at Table III-1.

**A.    Rising Prices from July 1998 to January 1999**

124.    Between July 1998 and January 1999, DRAM prices rose from approximately $35 per 256 Mb equivalent to nearly $41 per 256 Mb equivalent. This increase followed a sustained downward trend in DRAM prices that began at the end of 1995. Prices during 1996 and 1997 had fallen over 90 percent. (See Figure 15.) As described above, this resulted in DRAM prices that were too low to cover various DRAM producers' variable costs. By mid-1998, a number of DRAM manufacturers reported losses in the billions of dollars and,

not surprisingly, various manufacturers closed fabs and restructured their DRAM businesses.[88] The associated reductions in supply, of course, would naturally tend to firm prices. In addition, PC sales were stronger in the second half of 1998 than had been expected in the industry[89]; and demand was further supported by Microsoft's release of Windows 98 in June 1998.[90] Rising prices from mid-1998 into 1999 were consistent with these supply and demand forces.

---

[88] ITAG-00061276-77. See also "DRAM Chip Maker Vanguard To Post Net Loss of NT$5 billion in 1998," 9 July 1998, Taiwan Electronic News; "Acer Semicon Expects NT$4.7b Loss This Year," Laurence Eyton, 20 July 1998, Business Times Singapore; and "Squeeze on Profits Margins Forces Many Memory Chip Makers to Consider Pulling Out," 19 August 1998, The Scotsman. WDR, "Global DRAM Update," December 1998, at 12.

[89] WDR, "Global DRAM Update," December 1998, at 8 and 10.

[90] See UBS Warburg, "Global DRAM Update," 4 May 2001, at Table 18; www.microsoft.com.
..

## G.    Rising Prices from October 2001 to March 2002

142. In November 2001, DRAM prices began to rise from a low of $3.70 per 256 Mb equivalent, and reached a high of almost $10 per 256 Mb equivalent in March 2002. As would be expected on the basis of producers' unilateral self-interest, the falling and even below-cost prices leading up to November 2001 spurred production cutbacks. Market observers and course-of-business records indicate that Micron's production of DRAM fell by 30 percent over the first quarter of 2002.[117] Other smaller DRAM makers, such as Toshiba and Hitachi, also cut production, changed product mix, and ceased commodity DRAM production.[118]

---

[117] UBS Warburg, "Global DRAM Update," April 17, 2002, at 4.

[118] See, e.g., "Japan's Hitachi to cut chip production, jobs in Singapore," 29 November 2001, Agence France-Presse; and "Toshiba's DRAM Retreat to Result in 2,000-Job Cut," 18 December 2001, Jiji Press English News Service; "Toshiba Sells U.S. Plant to Micron, Snubs Infineon," Edmund Klamann, 18 December 2001, Reuters News; "Toshiba to Stop Making Low-end Memory Chips – Decision Comes After Failure of Infineon Talks," Peter Landers, 19 December 2001, The Wall Street Journal Europe.

### 2.    DRAM Price Movements over the Long Term

169.    Figure 3 shows DRAM prices from 1991 through 2007. The figure shows a pricing pattern that is driven by the recognized cyclicality of the industry.[142] As we have seen above, in the DRAM industry, there is a pattern where supply grows tight, prices are stable, and investment in new capacity grows. When the new capacity comes on line, prices often fall rather dramatically. With reduced income and the prospect of poor returns on additional capacity, DRAM manufacturers rationally and unilaterally cut back on investment as prices fall. The result of this pattern is that the DRAM industry has moved from relatively stable prices to falling prices a number of times.

170.    Figure 4 shows DRAM investment and DRAM industry revenue. The figure shows that investment in the DRAM industry is a large share of revenue in most years. When considered in conjunction with the prices presented in Figure 3, it also shows that significant periods of investment have commonly preceded dramatic falls in prices. In particular, high investment in 1995 and 1996 corresponds to the price drop beginning in 1996 and increasing investment in 2004 and 2005 precede the large drop in price in 2007. The large price drop in 2001 was preceded by three years of stable investment.

### 3.    Professor White's Methodology Leads Him to Ignore Significant Drivers of DRAM Prices

171.    As described above, Professor White's methodology does not permit him to incorporate the effects of events that occurred only within, or with differential effect during, the damages period. Analysis of the asserted conduct period shows that, in terms of underlying supply and demand factors, it is not like the asserted pre- and post-conduct periods Professor White uses to fit his model.

172. DRAM prices fell dramatically during 1996 and 1997, stabilizing in 1998. As described above, DRAM prices are frequently relatively stable following the sharp falls in DRAM prices sometimes observed in the industry. DRAM prices were volatile, but with a relatively flat trend during 1998-2000. At the end of 2000, DRAM prices began another period of steep decline. After recovering from this decline, prices entered another relatively flat period.

173. The asserted conduct period clearly witnessed a number of significant events that would tend to stop DRAM prices from declining that are not accounted for in Professor White's modeling. For example, there were a number of introductions of operating systems during the asserted conspiracy period that preceded a number of the periods of increasing DRAM prices. The timing of these introductions is shown on Figure 20. Professor White's model does not account for new operating system introductions before, during, or after the asserted conduct period.

174. Operating system introductions are important to DRAM prices because new operating systems often require higher-end processors and more DRAM to work well. For example Windows 98, introduced in June 1998 just before a DRAM price increase, had a minimum system requirement of 16 MB of DRAM relative to 4 MB for Windows 95, the earlier version of Windows. Similarly, Windows 2000 required 32 MB of DRAM, but 64 MB was recommended. The recommended memory was four times the requirement of the previous version, Windows NT. Windows XP, with yet again significantly increased DRAM requirements, was launched in October 2001 and was quickly adopted,[143] shortly before DRAM prices increased later that year. Contemporaneous industry reports, in fact, recognized that operating system introductions spurred DRAM demand and put upward pressure on DRAM prices.[144]

175. It is notable that during the asserted conduct period, the major operating system introductions were followed by DRAM price increases, with the exception of the introduction of Windows Me (Millennium Edition). Windows Me is the exception that proves the rule. Introduced in September 2000,[145]

---

[143] See UBS Warburg, "Global DRAM Update," 4 May 2001, at Table 18; www.microsoft.com. Windows XP had a minimum system requirement of 64 MB. Microsoft recommended 128 MB, and many users found 256 MB were required to obtain good performance. See "When the Chips Are Down," Thomas W. Smith, CFA, Business Week Online, June 28, 2002.

[144] See "A Relative Recovery for Chips Stocks," Business Week, January 8, 2002. ("The October launch of Microsoft's Windows XP has been a boon to the semiconductor industry, believes Manoj Nadkami, founder and editor of chipinvestor.com, because it has boosted PC demand and almost doubled the DRAM content in new PCs.") See also DeDios & Associates, "The DRAM Market Advisor," February 20. 2002; "Global DRAM Update," UBS Investment Research, 9 July 2003, at 8.

[145] UBS Warburg, "Global DRAM Update," May 4, 2001, at Table 18.

Windows Me was notable for its lack of success in the marketplace. It had a life of just over a year and was replaced by the much more successful Windows XP. In 2006, the trade press named Windows Me one of "The 25 Worst Tech Products of All Time," products that "are so bad, they belong in the high-tech hall of shame."[146]   Windows Me did not stem a significant downturn in DRAM prices through to the third quarter of 2001.

176.    Professor White did not include explanatory variables that would capture the introductions of operating systems that would lead to discrete shifts in the DRAM demand curve and exogenously driven increase in DRAM per computer. Indeed, his methodology is not capable of doing so in so far, for example, as his "before-and-after v. during" methodology would operate on the *assumption* that introductions before and after the conduct period have the same effects on demand as introductions during the conduct period. But as the case of Windows Me so clearly illustrates, factors such as the introduction of new operating systems are *sui generis* and can hardly be assumed to be uniform or even substantially similar in their effects on demand and/or prices.

178.    There are other significant events and factors during the asserted conspiracy period that Professor White's model does not take into account. For example, during the conduct period, an earthquake in Taiwan damaged a number of DRAM fabs and destroyed some DRAM production. Such a reduction in supply would be expected to put upward pressure on DRAM prices, but Professor White's model is incapable of addressing the impact of such a non-conspiratorial decrease in the supply of DRAM and its attendant upward pressure on prices. Within Professor White's damages framework, the upward pressure on DRAM prices attributable to the Taiwanese earthquake was unexplained upward pressure and, hence, by assumption treated as a source of asserted overcharges. Professor White's methodology confuses earthquakes with conspiracy.

---

[146] "The 25 Worst Tech Products of All Time," May 26, 2006, at http://www.pcworld.com/article/id,125772-page.2/article.html, accessed March 6, 2008.

179.    Still further market supply and demand developments are not accounted for by Professor White's methodology. For example, over time, the DRAM market has seen an increase in the rate at which new densities of chips are introduced.[147] In addition, the DRAM industry has shifted from having predominantly one "interface" technology, asynchronous, to SDRAM and subsequently DDR. In addition, Rambus memory was introduced in the 1990s, but was not well received by the marketplace. Both DDR and Rambus components are larger than standard SDRAM components per unit of useable memory. Thus, shifting from SDRAM to these other interface technologies is effectively an exogenously driven decrease in DRAM fab capacity to produce bits.

180.    The DRAM industry has also accelerated the rate at which it upgrades chip densities.[148] This means that the industry is bringing new products to market more frequently. The variety of DRAM products has increased not only with multiple interfaces, as described above, but also with specialty DRAM for mobile, video, and other applications.[149] The result of the more varied product mix is that DRAM fabs must spend more time changing equipment and ramping new products with lower yields than if the product slate were less complicated and less changing. All of these factors tend to reduce the number of bits that a fab can produce.[150] Professor White does not account for these competitive and unilateral factors that would lead to reduced DRAM output growth.

---

[147] DeDios Report at 12-13.

[148] DeDios Report at 12-13.

[149] IC Insights, Inc., "Section 8: DRAM and SRAMS," 2003, at 8-11 and 8-21.

[150] Harter Interview, Harter Deposition at 137-139; DeDios Report at 9 and 20.

### E.    Professor White's Analysis Is Flawed Because It Identifies Overcharges Where None Are Asserted

201.    As described above, DRAM prices have a history of falling and then staying flat for some period of time and then falling again. This is part of the boombust cycle of the industry. Figure 3 shows the worldwide price of one megabit of DRAM based on statistics from WSTS. The figure shows that between 1993 and 1995, the price of DRAM was flat and somewhat volatile.

202.    Research on the DRAM industry during this time period did not show evidence of asserted conspiracy. In fact, press reports described complaints of dumping of DRAM in the United States. Thus, this appears to be a period of stable DRAM prices where there were not assertions of conspiratorial conduct. Plaintiffs also assert that this was a period of excess demand where DRAM manufacturers could not meet the demands of the marketplace.[163]

203.    To test Professor White's damages method and the variables that he uses to estimate a model of DRAM prices, I have used his methodology and candidate explanatory variables to estimate whether there were overcharges in the period from December 1992 through October 1995. Specifically, I have used his methodology to fit the model of DRAM prices for the period 1991 through November 2002 and November 1995 through 1998. Figure 25 shows the results.

204.    As the figure shows, Professor White's model cannot explain the period of stable prices during 1993-1995, and Professor White would find that the difference between the actual price line and the "but for" price line is overcharges. However, Plaintiffs themselves recognize that this period of stable DRAM prices was driven by high demand and do not assert

coordinated conduct. Thus, Professor White's methodology generates a "false positive" when asked to explain this period of relatively flat DRAM prices. This result is consistent with Professor White's model generating price forecasts that simply connect the dots between the point where he starts them and the data at the end of the series that is used to fit the model.

205. The fact that Professor White's analysis identifies damages during periods of flat DRAM prices or prices above the trend in Professor White's data shows that it is unreliable. Of course any product with declining prices like DRAM or other electronics will have periods where prices are both above and below some trend line. Figure 3 shows that DRAM prices have had a number of periods where they were flat or above trend and then fell rapidly. In fact, the period following the asserted conduct period is one where prices were quite stable for a time, rising above trend without assertions of a conspiracy.

206. The identification of damages where none are asserted should be expected to be a problem for a methodology like the one Professor White has created because his methodology is critically dependent on the trends that it is built up from. Moreover, the methodology is highly predisposed to find prices reflecting positive shocks to be "overcharges" because the methodology does not permit sufficient analysis of the factors during the asserted conduct period that might also cause prices to be above trend. Thus, it cannot distinguish coordinated conduct by Defendants from other factors that could lead to flat prices.

207. The problem of falsely identifying overcharges where there is not conduct that would generate overcharges can be addressed by an analysis of the conduct that Plaintiffs assert. If Plaintiffs do not assert conduct that is consistent with the withholding of supply, for example, there is no basis to identify damages consistent only with a theory of withholding.

208. Professor White's testimony, however, illustrates that he has not analyzed Defendant conduct and does not believe that he needs to evaluate Defendant conduct to assess whether his overcharge analysis has falsely identified overcharges:

> "But in arriving at my opinion, it's not necessary for me to understand who was talking to whom, or which companies were specifically involved, because my calculation of the but for price is one that could have perfectly reproduced what the actual prices are, and therefore found no impact. When I do this analysis, it's not with a goal of coming up with one conclusion or another. It's with a goal of coming up with the best prediction of prices outside the conduct period that I'm able to arrive at. That doesn't require a specific....Knowledge of who was

doing what to whom. It's something for the data to tell me whether the actual prices diverged from the but for prices."[164]

209.    Thus, Professor White asserts that if his model finds damages in the presence of just the assertion of illegitimate conduct, then the overcharges he finds are attributable to the asserted conduct. Professor White's failure to address even the basic question of Defendant conduct will lead to his falsely identifying periods of above-trend prices as damages with his methodology.

---

[164] White Deposition at 35-36.

### G.   Professor White's Model Does Finds Undercharges and Overcharges When Applied Directly to Plaintiff Prices

214.   Professor White's damages model is built upon the flawed foundation laid by Professor Marshall.   Professor Marshall asserts that the pled conspiracy affected Plaintiffs.   Following this logic, Professor White estimates overcharges to OEMs and then estimates overcharges to Plaintiffs based on the OEM "but for" prices he estimates.   Professor White asserts that by breaking his damages estimation into two stages where he estimates "but for" OEM prices first and uses those "but for" prices as part of the estimation of Plaintiff "but for" prices he is able to more reliably estimate Plaintiff damages.[165]   However, as shown above, this methodology is faulty because the second stage identifies overcharges to Plaintiffs even it there are no overcharges to OEMs.   Thus Professor White's two-stage procedure is not reliable; it is biased.

215.   Of course, if Professor White's candidate explanatory variables allow his model of OEM prices to "capture the dynamics of the DRAM industry," then that model with the same variables ought to be able to capture the individual dynamics of the Plaintiff prices as well.   This is particularly the case where Professor Marshall has opined that Plaintiff and OEM prices "move together."

216.   Figures 27A through 27E show the results of inserting Plaintiff prices into the first stage of Professor White's damages calculation where he estimates "but for" prices based on the candidate explanatory variables.   The figures show the results for those Plaintiffs with sufficient transaction data to run the model.   As shown in the figures, Professor White's model, which he asserts captures the dynamics of the DRAM industry, finds that during much of the asserted conduct period, the "but for" prices that his model produces are above the actual prices charged to Plaintiffs.   Thus, Professor White's model shows prices should have been higher for substantial periods, or that overcharges are *negative*.

217.   Calculation of damages using these but for prices for these Plaintiffs shows that damages are greatly reduced or negative.[166]   These results demonstrate

---

[165] White Deposition at 62-63.

[166] Professor White calculates overcharges improperly.  He sets overcharges of less than zero equal to zero in his calculation of damages.  Both positive and negative overcharges must be taken into account because the "but for" price is a statistical estimate, with both positive and negative errors.  Setting negative overcharges to zero effectively biases the results toward finding damages.

that Professor White's model is highly sensitive to the data that are used as inputs.[167] The variability of results also shows that his model's results will be highly dependent on data-processing. As shown here Professor White's model generates radically different results depending on the DRAM prices used as inputs. This should not occur in a well-specified model that "captures the dynamics of the DRAM industry" and where Professor Marshall has asserted that Plaintiff and OEM prices move together.

---

[167] When Infineon's own prices from Professor White's transaction database are inserted in the OEM model, the model similarly generates long periods of negative overcharges.

conduct period.  These contradictory results are further confirmation of the infirmity of Professor White's methodology and calculations.

Joseph P. Kalt

March 7, 2008