# EXHIBIT 5 TO
# DECLARATION OF
# JOSHUA S. STAMBAUGH

# PART ONE OF TWO

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DRAM CLAIMS LIQUIDATION TRUST,<br>By its Trustee, Wells Fargo Bank, N.A.,<br>Plaintiff,<br>v.<br>HYNIX SEMICONDUCTOR, INC., et. al.<br>Defendants<br><br>And<br><br><br>EDGE ELECTRONICS, INC.,<br>a New York corporation,<br>Plaintiff,<br>v.<br>HYNIX SEMICONDUCTOR, INC., et. al.<br>Defendants | [Case No. C 07-1381 PJH]<br><br><br><br><br><br><br><br>[Case No. C 07-01207 PJH] |

# EXPERT REPORT OF

# <u>DANIEL L. RUBINFELD</u>

## March 7, 2008

**Highly Confidential**
**Subject to Protective Order**

Highly Confidential
Subject to Protective Order

## I. INTRODUCTION

### A.    Qualifications

1.      I am the Robert L. Bridges Professor of Law and Professor of Economics at the University of California, Berkeley.  I served as Deputy Assistant Attorney General at the Antitrust Division of the U.S. Department of Justice from June 1997 through December 1998.  In that position I was responsible for supervising a staff of approximately 70 Ph.D. economists, financial analysts, and research assistants in regard to a wide range of civil matters.  My responsibilities at the Antitrust Division included economic issues related to intellectual property and antitrust, and included a range of issues flowing from mergers and acquisitions relating to computers and computer software.  I have also been involved in a variety of investigations involving allegations of price fixing.

2.      I received my A.B. degree in mathematics from Princeton in 1967 and my Ph.D. in economics from M.I.T. in 1972.  I have previously taught at the University of Michigan and have been a visiting professor at the law schools of Stanford University, the University of Geneva, the University of Virginia, the University of Hamburg, the University of Bergen, and most recently, N.Y.U.  I am the author of two textbooks, *Microeconomics*, and *Econometric Models and Economic Forecasts* (both with Robert Pindyck).  I have received fellowships from the National Bureau of Economic Research, the John M. Guggenheim Foundation, and the Center for Advanced Studies in the Behavioral Sciences, and am a member of the American Academy of Arts and Sciences. I have served as Associate Dean of the School of Law (as Chair of the U.C. Berkeley Program in Jurisprudence and Social Policy) and as Chair of the Law School's Program in Law and Economics.  In the summer of 2003, I gave a short course on antitrust economics to attorneys at the Federal Trade Commission.  I am a former President of the American Law and Economics Association.

3.      My research interests span a broad range of subject matters, including the economics of legal rules and institutions, law and statistics, industrial organization and competition policy, and public economics.  I have published or edited seven books and over 100 articles.  I have consulted and testified extensively in cases involving intellectual property, antitrust, public regulation, and damages, for private parties, and for the U.S. Department of Justice, the Federal Trade Commission, the U.S. Treasury, and a number of State Attorneys General.

4.      I have substantial experience (as a consultant and while at the Department of Justice) in cases involved computer software and hardware.

5.      My teaching interests include antitrust, the economics of legal rules and institutions, economics and public policy, and law and statistics.  I have served on numerous occasions as a lecturer for the Federal Judicial Center concerning the use of statistical methods by the courts.  I have given lectures to a number of antitrust authorities throughout the world.

Highly Confidential
Subject to Protective Order

6.    A copy of my curriculum vitae is in Attachment 1. A list of my prior testifying experience appears in Attachment 2.

7.    I am currently being compensated at the rate of $900 per hour for my work in this matter. My fee is not contingent on the outcome of this case.

## B.    Assignment

8.  Plaintiffs claim that the defendant DRAM manufacturers engaged in a conspiracy to fix the price of Dynamic Random Access Memory. Plaintiffs seek damages in the form of overcharges during two time periods – April 1, 1999 through June 15, 2002 (the "plea period") and August 1, 1998 through June 15, 2002 (the "conspiracy period").

9.  I have been asked by counsel for defendant Samsung to evaluate allegations with respect to antitrust impact and damages associated with claims by SGI and Edge.[1]  Since Edge made no purchases from Samsung during the alleged injury period, my report will focus almost entirely on SGI (hereinafter "Plaintiff").

10. In preparation for my work on injury and damages, I have carefully reviewed Plaintiff's allegations with respect to liability. I have also been asked to comment on the liability allegations to the extent that they relate to my analysis of antitrust injury and damages.

11. A list of materials that I have reviewed appears in Attachment 3. I reserve the right to update this report in response to additional information that is made available to me after the submission of this report.

## C.    Summary of Conclusions

### *The dynamics of the DRAM industry*

12. Market prices of DRAM fell substantially during the 1996-2003 period due to the effects of competition, production economies of scale (increased wafer diameters, geometric shrinks, and increased density), and learning economies (greater experience).

13. During the same period, DRAM technology evolved substantially.. Asynchronous DRAM (EDO, Fastpage) was replaced by synchronous DRAM (SDRAM) and later by double data rate synchronous DRAM (DDR). In addition, Rambus memory (RDRAM) came into production, driven in part by the encouragement of Intel. However, at a later

---

[1] Here I use "SGI" to denote Silicon Graphics Inc. SGI entered Chapter 11 bankruptcy, and the party in-suit is the "DRAM Claims Liquidation Trust" (trustee: Wells Fargo Bank), which holds by assignment the price fixing claims of SGI. See "United States District Court, Northern District of California, *DRAM Claims Liquidation Trust, through its Trustee, Wells Fargo Bank,* vs. *Hynix et. al.*" (hereinafter, "SGI Complaint"), p. 1. See also, "United States District Court, Northern District of California – San Francisco Division, *Edge Electronics, Inc., a New York corporation, Plaintiff, v. Hynix Semiconductor, Inc.,* et. al." (hereinafter, "Edge Complaint"), p. 1.

Highly Confidential
Subject to Protective Order

point in time, Intel changed its view, announcing that it would no longer exclusively support RDRAM.

14. The life cycle of memory technologies is such that it takes some time before the newer technologies completely replace the older. Furthermore, the largest OEMs shift their demands to the newer technologies gradually over time. As a result, during any given portion of the period of alleged collusion several of these memory technologies (DDR, SDRAM, RDRAM, and Async) coexisted in the marketplace, with a continuing series of transitions – "crossovers." The *crossover* phenomenon – the gradual replacement of one technology by another – is standard in the DRAM industry. However, crossovers were particularly complicated during the alleged conspiracy period (as compared to the before or after period) because of the significant changes in technology.

15. Crossovers tend to result in disruption in the preexisting patterns of supply and demand, as suppliers convert capacity to new memory technologies, and as buyers redesign and rollout new computer systems that can take advantage of the newer technologies.

16. As a general rule, changes in supply (including production technologies and costs) and demand (for PCs and other hardware and software products that utilize DRAM) can have immediate and direct implications for market prices.

17. There was substantial consolidation in the DRAM industry prior to and during the period of the alleged conspiracy. IBM, Toshiba, and Texas Instruments exited the industry, while other major manufacturers combined to form consolidated units (Hyundai and LG became Hynix; Siemens' and Philips' DRAM business became Infineon, and Elpida was formed from the relevant parts of Hitachi and NEC).

Highly Confidential
Subject to Protective Order

73. While multiple technologies did coexist before and after the alleged conspiracy periods, there was a substantially greater variety of DRAM technologies in the marketplace in the alleged "during" period than in either the "before" or the "after" period. Exhibit 2 illustrates this point. In the pre-conspiracy period, the industry was dominated by a few technologies (primarily Async) – hence the high concentration as measured by the HHI. During the conspiracy period, multiple technologies were utilized by the industry participants (Async, SDRAM, DDR, and Rambus), and the HHI was quite low. Finally, in the post-conspiracy period, DDR was the dominant technology as evidenced by the high HHI.

*Crossovers lead to life-cycle dynamics in demand, supply, and prices.*

77. As a general matter, crossovers tend to result in disruption in the preexisting patterns of supply and demand, as suppliers convert capacity to new memory technologies, and buyers redesign and rollout new computer systems that can take advantage of the new technologies and higher densities.

78. There are easily understandable economic explanations for the "life-cycle" pricing pattern. On the supply side, suppliers must often invest in new equipment in order to produce new, higher performance memory types or take advantage of geometry shrinks by producing higher density products. However, these newer products typically have lower yields than the older products, at least early in their life-cycle. This means that the supply of current high-yield (commodity) products can be reduced as DRAM producers convert capacity from current products to newer lower-yield products. In addition, suppliers that are further down their learning curves may prefer to focus their productive capacity on the newer higher-priced products, which will reduce their willingness to supply the older products. Over time, manufacturers ramp up their volumes of new products and move down the associated learning curves, with the result that prices

Highly Confidential
Subject to Protective Order

decline. However, prices of older products typically increase as they move to "legacy" status and are produced by fewer manufacturers.[27]

---

[27] Legacy products require "significant price premiums to justify support from a DRAM company. These products had larger die sizes, due either to the use of older processes or circuit complexity." (De Dios Report, p. 15.)

Respectfully submitted this 7th day of March, 2008,

Daniel Rubinfeld