# EXHIBIT 6 TO
# DECLARATION OF
# JOSHUA S. STAMBAUGH

# PART ONE OF THREE

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re DYNAMIC RANDOM ACCESS MEMORY (DRAM) ANTITRUST LITIGATION | |
| This Document Relates To: | |
| All American Semiconductor, Inc. v. Hynix Semiconductor, et al. | Docket No. 07-cv-1200 |
| Jaco Electronics v. Hynix Semiconductor, et al. | Docket No. 07-cv-1212 |
| DRAM Claims Liquidation Trust, By Its Trustee, Wells Fargo Bank, N.A. v. Hynix Semiconductor, et al. | Docket No. 07-cv-1381 |

## EXPERT REPORT OF CARL SHAPIRO

### March 7, 2008

THIS DOCUMENT CONTAINS HIGHLY CONFIDENTIAL MATERIAL

Contains Highly Confidential Information

## 1. Qualifications and Assignment

I am Carl Shapiro, the Transamerica Professor of Business Strategy at the Haas School of Business at the University of California at Berkeley, where I have taught since 1990. I also am Director of the Institute of Business and Economic Research at U.C. Berkeley. I have served as the Editor of the *Journal of Economic Perspectives*, a leading economics journal published by the American Economic Association. I also am a Senior Consultant with CRA International, an economics consulting firm.

I am an industrial organization economist who has been studying antitrust and competitive strategy for roughly twenty-five years. My curriculum vitae is attached as Appendix A. I have considerable experience in the application of economics for the purposes of enforcing the antitrust laws. I served during 1995 and 1996 as the Deputy Assistant Attorney General for Economics in the Antitrust Division of the Department of Justice. I have served on several occasions as an expert witness or consultant to the Antitrust Division or the Federal Trade Commission. Over the years I have also consulted or served as an expert witness on numerous antitrust matters for private companies in a range of industries. A list of the testimony I have given during the past four years is provided in Appendix B.

Counsel for Micron has asked me to study two main questions: (1) Did communications among defendants lead to an effective price fixing conspiracy that caused DRAM prices to be higher than they otherwise would have been? (2) If DRAM prices were elevated by an effective price fixing conspiracy among the defendants, how much were they elevated, to whom, and over what period of time? As part of studying these questions, I have also been asked to evaluate and critique the work done by Professor Halbert White and Professor Robert Marshall on behalf of the plaintiffs. Counsel for Micron have also advised me that plaintiffs Sun Microsystems, Unisys Corporation, and Edge Electronics have not filed a complaint against Micron.

In forming my opinion, I have carefully studied the DRAM industry and obtained a variety of data about the industry, and I have relied upon the expert report of Mr. Victor De Dios submitted on October 2, 2006 ("2006 De Dios Report"). I also have reviewed a variety of evidence that has been produced in this case. Appendix C contains a list of materials on which I relied in forming my opinion. My review of the evidence in this litigation is on-going, and I may supplement my views as additional information becomes available.

## 2. Summary of Opinion

My primary conclusions are the following:

- Basic DRAM industry data on prices and quantities do not support the hypothesis that there was an effective price fixing conspiracy during the periods claimed by the plaintiffs. Most notably, average DRAM prices fell more rapidly during the alleged conspiracy period than before or after that time period.

Contains Highly Confidential Information

- The conditions in the DRAM industry, including the opaque and complex pricing that prevails in the industry, are not conducive to an effective price fixing conspiracy. We observe sharp price drops, combined with large shifts in the shares of the leading firms, during the period when plaintiffs claim there was an effective price fixing conspiracy, contrary to standard cartel theory.

- The price peaks observed in Fall 1999, Spring 2000, and Spring 2002, and the deep trough in prices observed in Fall 2001, can generally be explained based on changes in underlying supply and demand conditions in the industry.

- A reliable, well-specified model that explains the movement of DRAM prices, incorporating industry dynamics, does not reveal an elevation of prices during the August 1998 through June 2002 time period, when the plaintiffs allege price elevation.

- An effective price fixing conspiracy requires that suppliers coordinate to reduce output below the competitive level. An examination of the record suggests an absence of evidence that any such output reductions took place prior to December 2001. The output reductions that took place during 2001 appear to be unilateral decisions in the face of sharply declining prices. I estimate that these output reductions elevated DRAM prices by about 3% during the December 2001 to March 2002 time period.

- The damage estimates sponsored by Professor White are inaccurate and unreliable. His methodology is deeply flawed, yielding damages estimates that cannot reliably be distinguished from forecast error. Moreover, his results are inconsistent with the Law of Demand, a fundamental economic principle, and do not pass a basic reality check.

## 3. Industry Context

### A.  Continual Investment in Technological Change

Technological progress is the primary driver of prices and product performance in the DRAM industry. Technological progress has greatly increased the amount of memory contained in DRAM products over time. From 1996 to 2004, the capacity of DRAM chips increased by a factor of 64, from 16 megabits to as much as one gigabit.[1] At the same time, the price per megabit has fallen dramatically. Technological progress also has increased the speed at which memory can be accessed. Micron, for example, sold products with external bus speeds ranging from 16 MHz to 667 MHz during 1996 to 2004.[2]

These huge improvements in product performance have been made possible by advances in the methods used to manufacture DRAMs. Over time, wafer sizes have grown and feature size has shrunk. Holding wafer size constant, output per wafer, measured in megabits, increased 44 times

---

[1]  "DRAM Trends" available at http://www.icknowledge.com/trends/dram.html, accessed on September 27, 2006.

[2]  Micron DRAM Transactions data, 1996 – 2004.

Contains Highly Confidential Information

from 1996 to 2004.[3]  Wafer size also grew by 2.4 times during this period.[4]  Declining feature size also causes die size to decline, so a chip of a given density requires less area on a wafer.  For example, the average die size of the 128Mb chip, a high-volume part during much of 1996 to 2002, decreased from 178 mm$^2$ to 39 mm$^2$.[5]  Die size is an important factor in the variable cost to produce a DRAM chip: as die size declines, variable cost per bit also declines.

Naturally, these improvements in manufacturing technology are costly to DRAM firms.  Chip fabrication facilities are tooled for a fixed wafer size and feature size; changing either of these parameters requires expensive retooling.[6]  In addition, the impressive technological progress in the DRAM industry is the result of extensive research and development (R&D) efforts by DRAM manufacturers.[7]

DRAM firms must obtain a reasonable financial return from their DRAM sales in order to attract the capital necessary to finance their R&D activities.  If prices are below average cost, including R&D costs, for a sustained period of time, investments will not occur and product improvements will slow or cease.

## B.  DRAM Manufacturing and Short-Run Supply Elasticity

DRAM fabrication facilities, or "fabs," are very expensive to build.  The cost to build a new fab has also been increasing over time, both in absolute terms and as a percentage of total industry revenue.  In 1990, for example, a fab cost about $400 million; by 1995, fabs cost about $1 billion, and in 2000 fabs cost about $1.6 billion.[8]  In 1995, a typical fab cost represented about 1.9% of total industry revenue; by 2000, fabs cost about 3.3% of total industry revenue.[9]

Once a fab is built and running, marginal cost (up to capacity) is very low, and it is significantly less than average cost, which includes the cost of capital associated with building the fab.

---

[3]  Expert Report of Victor De Dios, October 2, 2006, p. 8.

[4]  Expert Report of Victor De Dios, October 2, 2006, p. 8.

[5]  "DRAM Trends" available at http://www.icknowledge.com/trends/dram.html, accessed on September 27, 2006.

[6]  John Stokes, "Understanding Moore's Law," February 20, 2003, available at http://arstechnica.com/articles/paedia/cpu/moore.ars/2, accessed January 25, 2008.

[8]  See Daw Ma and John Mark, "The DRAM Market Structure: The Rise and Fall in Concentration," in The Proceedings of the 8th Annual Cambridge International Manufacturing Symposium. (Cambridge, September 2003) available at http://www.ifm.eng.cam.ac.uk/cim/imnet/symposium2003/papers/ citing data from IC Insights. See also, Peter Van Zant, Microchip Fabrication, (New York: McGraw-Hill, 2004), p. 21 ("Wafer fab facilities are in the gigabuck ($2 to 3 billion and increasing) level, and equipment and process development are equally expensive.").

I note that the cost to build a fab varies with its — larger fabs cost more to build.  The figures I report here are representative of the cost to build a fab at an efficient scale of operation.  However, I understand that fab costs per wafer are typically decreasing in size, so some firms may choose to build larger fabs and spend more on the total facility than is indicated here.

[9]  Calculations based on total industry revenue reported in the World Semiconductor Trade Statistics (WSTS) Blue Book data.

Contains Highly Confidential Information

Therefore, a company that reduces its output saves relatively little in production costs. Furthermore, since it is costly to restart a fab after it has been shut down, DRAM manufacturers typically do not find it cost effective to close a fab for a short period of time, even in the face of declining prices. Together, these aspects of DRAM manufacturing imply that industry production levels show little short-term downward adjustment in the face of declining prices.[10]

On the other hand, when prices rise, DRAM manufacturers who are running their fabs at or near capacity cannot quickly increase output, and building a new fab takes about 18 to 24 months.[11] Elpida, for example, started stage-one construction of its 300mm wafer facility in Hiroshima, Japan in February 2001.[12] The project was completed in January 2003.[13] Planning for fab construction and calibrating the process equipment add to the total cycle time required to bring a new facility into commercial production. It can take less time to add a new line to an existing fab, adding to wafer starts, or to introduce a new process that expands output capacity by increasing the number of usable die produced per wafer. Elpida, for example, announced plans to add a new line to its Hiroshima fab. The upgrade was expected to require about 10 months.[14]

In terms of basic economics, these observations together imply that the short-run elasticity of supply in the DRAM industry is low. A basic principle of economics tells us that prices are more sensitive to shifts in demand, the lower is the elasticity of supply. Therefore, the short-run supply conditions in the DRAM industry lead to the prediction that prices in the industry, in the absence of an effective conspiracy, will be relatively sensitive to short-run shifts in the demand for DRAMs.

In practice, for goods like DRAMs that can be stored, price changes caused by shifts in demand are buffered through inventories. When demand is unexpectedly high, the immediate effect is for sales to increase at prevailing prices, causing inventories to decline. Falling inventories in turn put upward pressure on prices. Likewise, when demand is unexpectedly low, the immediate effect is for sales to decline at prevailing prices, causing inventories to build. Rising inventories in turn put downward pressure on prices. As a result, shifts in supply or demand can have a

---

[10] See Daw Ma and John Mark, "The DRAM Market Structure: The Rise and Fall in Concentration," in The Proceedings of the 8th Annual Cambridge International Manufacturing Symposium. (Cambridge, September 2003) available at http://www.ifm.eng.cam.ac.uk/cim/imnet/symposium2003/papers/. See also Deposition of Pai Pei Lin, Nanya, July 14, 2006, p. 23.

[11] James Carbone, "Downturn Shakes Up Semiconductor Rankings," Purchasing Magazine Online, June 20, 2002, available at http://www.purchasing.com/article/CA221946.html?text=downturn+and+semiconductor. See also, Deposition of Charles Byrd, Exhibit 8 HSA 3002899-2902; and See, Daw Ma and John Mark, "The DRAM Market Structure: The Rise and Fall in Concentration," in The Proceedings of the 8th Annual Cambridge International Manufacturing Symposium. (Cambridge, September 2003) available at http://www.ifm.eng.cam.ac.uk/cim/imnet/symposium2003/papers/.

[12] "Elpida Memory Announces Capital Expenditure Plan at Hiroshima Elpida Memory," Elpida News Release, June 27, 2006, available at www.elpida.com.

[13] "Elpida Memory Announces Capital Expenditure Plan at Hiroshima Elpida Memory," Elpida News Release, June 27, 2006, available at www.elpida.com.

[14] "Elpida Memory Announces Capital Expenditure Plan at Hiroshima Elpida Memory," Elpida News Release, June 27, 2006, available at www.elpida.com.

Contains Highly Confidential Information

smaller impact on prices in the very short term, where inventory adjustments are available to respond to changed market conditions, than over longer periods, when production levels must match consumption levels.

Exhibit 1 shows DRAM industry inventory over time, measured in weeks on hand.[15] Over the 1996 – 2004 time period, DRAM industry inventories averaged about five weeks worth of sales. Exhibit 2 shows Micron's inventory over time, measured in weeks on hand. Over the 1996 – 2004 time period, Micron's DRAM inventories averaged about five weeks worth of sales.

---

[15] The gap in the line plotted in the chart arises because the inventory information for the second and third quarters of 1997 were missing in the source data.

Contains Highly Confidential Information

accommodated through inventory adjustments will cause considerable fluctuations in the price of DRAMs.

Professor White defines the "Plea Period" as April 1, 1999 through June 15, 2002 and the "Conspiracy Period" as August 1998 through June 15, 2002 (hereafter "Alleged Conspiracy Period"). Professor White does not offer any explanation for why these are relevant periods to study. Neither Professor White nor Professor Marshall provide any information on the nature of the price fixing agreement that was allegedly reached among the defendants during these periods. Professor White ( ¶ 47) simply states that he was asked to assume that defendants engaged in a conspiracy to fix the price of DRAM to certain OEMs, and to undertake an analysis to determine the extent to which plaintiffs were overcharged during these two periods.[21]

Exhibit 4A displays the rate of decline of DRAM prices before, during, and after the Alleged Conspiracy Period. DRAM prices fell by an average of 3.2% per month before the Alleged Conspiracy Period, by 4.9% per month during the Alleged Conspiracy Period, and rose 0.5% per month after the Alleged Conspiracy Period. We can repeat the calculations just provided using the Plea Period, which is April 1, 1999 through June 15, 2002. Exhibit 4B shows that DRAM prices fell by an average of 3.6% per month before the Plea Period, by 5.8% per month during the Plea Period, and rose 0.5% per month after the Plea Period.

An effective price fixing conspiracy raises price above competitive levels. In the DRAM industry, where prices fall significantly over time, one would expect prices to fall *less rapidly* during the period of an effective price fixing conspiracy than during other periods. That is the opposite of what is reported in Exhibits 4A and 4B. Therefore, the direct observations on price just reported call into question whether there was in fact an effective conspiracy operating during the time periods claimed by the plaintiffs.

## B.  DRAM Quantities Sold

Exhibit 5 displays industry DRAM sales over time along with a simple trend line. The vertical axis measures the number of terabits sold, on a logarithmic scale, so the trend line represents the average percentage increase in terabits sold per month. As shown in the exhibit, the quantity of DRAM sales grew an average of about 4.5% per month from 1991 through 2004.

Exhibit 6A displays the rate of increase of DRAM output before, during, and after the Alleged Conspiracy Period. DRAM output rose by an average of 4.8% per month before the Conspiracy Period, 3.9% per month during the Alleged Conspiracy Period, and 2.5% per month after the Alleged Conspiracy Period. Again, we can repeat these calculations using the Plea Period. Exhibit 6B shows that DRAM output rose by an average of 4.9% per month before the Plea Period, 3.7% per month during the Plea Period, and 2.5% per month after the Plea Period.

---

[21]   Professor White's model includes a "lingering period" that extends beyond the Plea Period and Conspiracy Period. He therefore estimates damages over a longer time periods than just the Plea Period and Conspiracy Period.

Contains Highly Confidential Information

An effective price fixing conspiracy must involve a reduction in output below the competitive level. In the DRAM industry, where output grows significantly over time, one would expect output to grow *less rapidly* during the period of an effective price fixing conspiracy than during other periods. That is not what in fact happened, as shown in Exhibits 6A and 6B. Rather, these data indicate that the growth rate of DRAM sales has gradually declined over time, which is not surprising given that total DRAM output grew by a factor of one thousand from 1991 to 2004. Exponential growth of this magnitude is very difficult to sustain over long periods of time, Moore's Law notwithstanding. These direct observations on output call into question whether there was in fact an effective conspiracy operating during the time periods claimed by the plaintiffs.

## C. DRAM Supplier Shares

Exhibit 7 shows worldwide supplier shares in the DRAM industry from 1996 to 2004, using annual data from Gartner. The exhibit shows variation in the shares of the suppliers over time, and the changes in shares do not appear different during the Alleged Conspiracy Period as compared to the periods before and after. Exhibit 7 shows that Samsung gained share during 1996 to 2004. Samsung's share in 1996 was about 17%, and its share had increased in 2004 to about 28%. Much of the growth in Samsung's share occurred during the Alleged Conspiracy Period. From 1999 to 2002, Samsung's share grew from 23% to 32%. Infineon also gained share from 1996 to 2004, growing from about 3% in 1996 to 14% in 2004. During the period from 1999 to 2002, Infineon's share grew from 6% to 13%.

Exhibit 8 also shows supplier shares in the DRAM industry during 1996 to 2004. Exhibit 8 differs from Exhibit 7 in that it reports monthly shares using Professor White's OEM transactions data. The exhibit shows that the shares of the major suppliers shifted significantly from month to month during the Alleged Conspiracy Period. Again, there does not appear to be an appreciable difference in the month-to-month variation in shares during the Alleged Conspiracy Period as compared to the periods before and after.

Shifts in supplier shares naturally arise in competitive markets as firms vary in their relative ability to serve the needs of customers and in the aggressiveness of their pricing. An effective cartel will generally lead to more stable shares, since the members of the cartel have agreed to restrain competition. Furthermore, shifting supplier shares tend to undermine the effectiveness of any price fixing agreement, since firms that are losing share will suspect or infer that the other firms are not adhering to the agreement. Therefore, the direct observation that supplier shares shifted significantly from month to month during the Alleged Conspiracy Period further calls into question whether there was in fact an effective conspiracy operating during the time periods claimed by the plaintiffs.

## D. Micron Price/Cost Margins

Most economists would agree that prices in a competitive industry are usually around average cost. Therefore, in a competitive industry we would expect to see an average margin (measured as the percentage difference between price and average cost) near to zero. Micron's average margin is in fact quite close to zero. In a competitive industry, the margin between price and

Contains Highly Confidential Information

average cost will tend to be positive during times when demand is high (relative to trend or expectations) and negative during times when demand is low.

Exhibit 9 displays the percentage margin between Micron's average selling price for DRAMs and Micron's average cost of producing DRAMs from 1996 to 2004. Micron's average margin over the entire period was –0.07%. Exhibit 9 also shows that Micron's average margin was highly variable during 1996 to 2004, precisely what one would expect in an industry with a low elasticity of supply in the short term and substantial variation in demand over a period of weeks or months.

## 5. Industry Peaks and Troughs During Alleged Conspiracy Period

DRAM prices and quantities are influenced by a variety of factors that influence DRAM demand and supply. In this section of the report I review the contemporaneous industry press reports on these factors. In addition, the expert report of Victor De Dios contains a wealth of information about the factors that influenced DRAM demand and supply during the time period relevant in this case. Understanding the forces that were influencing DRAM demand and supply before, during, and after the Alleged Conspiracy Period is an important part of assessing the impact on prices of the communications among the defendants. In this regard, it is worth remembering that 1999 was an exceptional year in the technology sector, with technology markets in general growing rapidly as part of the dot-com boom.

As shown in Exhibit 3, three peaks in DRAM prices were experienced during the Alleged Conspiracy Period: in November 1999, in August 2000, and in March 2002. In addition, a deep trough in DRAM prices was experienced in November 2001. I now comment on industry conditions around the times of these three peaks and one trough to identify underlying industry conditions that may have caused or significantly contributed to them. My discussion focuses on movements in demand, supply, and inventories since these are key to understanding observed movements in price.

An important factor affecting demand for DRAM is shipments of the various types of microprocessors and other devices that are used with DRAM. Exhibit 10 reports shipments of microprocessors (MPU) and digital signal processors (DSP). As noted above, PCs and servers comprise the largest usage category for DRAM, and these uses are reflected in the MPU data. Digital signal processors are devices used in communications equipment. These devices are also used with DRAM.

The primary supply-side driver of DRAM prices is the cost of manufacturing DRAMs. Exhibit 11 shows Micron's total cost per megabit for the 1996 to 2004 period.

### A.  Summer and Fall 1999 Peak

Exhibit 3 shows that DRAM prices began increasing in July 1999 and peaked in November of that year. Two factors appear largely to account for the increase. First, demand for DRAM increased in the fall of 1999. Second, an earthquake in Taiwan disrupted DRAM manufacturing at a number of fabs. Prices declined after November for the next several months.

·Contains Highly Confidential Information

## 1.  Increase in DRAM Demand

Mr. De Dios reports an 18% increase in the demand for DRAM in the third quarter of 1999, as compared to the prior quarter, and a 43% increase in the demand for DRAM in the fourth quarter as compared to the third quarter.[22]  Increased PC shipments were an important factor in the increase, which industry analysts at the time attributed to Y2K concerns.[23]

A trade press report from the period remarked on the unusually high demand in the fall of 1999. "After three bleak years, demand exploded in the fall of 1999" and "a three-month order surge … temporarily drove up memory prices in the fall."[24]

Exhibit 1 shows that industry inventories were low during the third and fourth quarters of 1999, consistent with the strong demand reported by the trade press.  Inventories began to increase again in the first quarter of 2000 while prices fell in the face of weak demand.[25]

## 2.  Earthquake in Taiwan

A 7.6 Richter scale earthquake occurred in Taiwan on September 21, 1999, affecting output at the 28 DRAM fabs there.  A survey of the fabs indicated that 10-20% of the wafers in process were destroyed during the earthquake and additional wafers were damaged.[26]  Spot prices rose following the earthquake, and damage to the fabs led to reduced supply that likely affected prices over the next two months as the fabs gradually returned to normal production.[27]  Even after the fabs returned to normal levels of wafer starts, wafer output remained low because wafers take 45 to 60 days to cycle through the manufacturing process.[28]  Industry analysts at the time concluded that "Taiwan's major earthquake in late September added momentum to the rising ASPs."[29]

## B.  Summer 2000 Peak

Exhibit 3 shows that prices declined from the peak in Fall 1999 until March 2000 before climbing again toward a peak in August 2000.  The August 2000 peak was followed by a sustained period of decline that ended in October 2001.

---

[22]  Expert Report of Victor De Dios, October 2, 2006, pp. 21-22.

[23]  Expert Report of Victor De Dios, October 2, 2006, pp. 21-22.

[24]  J. Robert Lineback, "Two Good Years May Move Up DRAM Sales To Peak '95 Level," *Silicon Strategies*, January 3, 2000, available at http://www.eetimes.com/news/semi/showArticle.jhtml?articleID=10810926.

[25]  Expert Report of Victor De Dios, October 2, 2006, p. 22.

[26]  The DRAM Market Advisor, De Dios & Associates, October 8, 1999, p. 4..

[27]  See, for example, Sean Flemin and Linda Harrison, "Taiwan Quake Sees DRAM Prices Rise," The Register, September 21, 1999, available at http://www.theregister.co.uk/1999/09/21/taiwan_quake_sees_dram_prices/ and Linda Harrison, "DRAM Prices Go Through Roof," The Register, September 24, 1999, available at http://www.theregister.co.uk/1999/09/24/dram_prices_go_through_roof/.

[28]  The DRAM Market Advisor, De Dios & Associates, October 8, 1999, p. 4.

[29]  J. Robert Lineback, "Two Good Years May Move Up DRAM Sales To Peak '95 Level," Silicon Strategies, January 3, 2000, available at http://www.ectimes.com/news/semi/showArticle.jhtml?articleID=10810926.

Contains Highly Confidential Information

Mr. De Dios reports that demand for DRAM was weak early in the first quarter of 2000 because of a shortage of Intel microprocessors.[30] The microprocessor shortage was resolved by March 2000, and prices began to rise around that time.[31]

Industry analysts at the time predicted that growing demand for DRAM would produce a shortage that would begin in the second half of 2000 and last through 2002.[32] The concern over a potential shortage of DRAM was widely shared, and a number of companies purchased ahead of demand to insure an adequate supply. Inventory levels at DRAM customers increased in April and May in preparation for a supply shortage.[33] As a consequence, vendor inventories were relatively low in the second quarter of 2000, which put upward pressure on prices during July and August.[34]

Demand from the PC sector was up 22% in the third quarter of 2000 as compared to the second quarter.[35] In addition, demand from the network infrastructure and communications sector of the market was unusually strong during this period. Cisco Systems, a leading manufacturer of routers and switches used in communications networks, became one of the largest customers of DRAM during this period.[36]

Exhibit 10 shows that demand for DRAM peaked in late summer 2000 and began decreasing thereafter. Exhibit 1 shows that inventories at DRAM suppliers began increasing around this time and continued to rise for the next several quarters.

---

[30]  Expert Report of Victor De Dios, October 2, 2006, p. 23.

[31]  Expert Report of Victor De Dios, October 2, 2006, p. 24..

[32]  See for example, Bob Merritt, "Semico Industry Review 2000," March 3, 2000, available at http://www.sematech.org/meetings/archives/GES/20000331/docs/semico.pdf; Jack Robertson, "DRAM Demand Exhausting Second Quarter Supplies," Electronic Business News, May 5, 2000, available at http://www.my-esm.com/story/OEG20000505S0063; and Anthony Cataldo, "Researcher Warns DRAM Shortage is Imminent, Could Last Two Years," EE Times, May 23, 2000, available at http://www.eetimes.com/news/semi/showArticle.jhtml;jsessionid=1WSXEVGJYSUFAQSNDLRSKH0CJUNN 2JVN?articleID=10812282; Carol Haber, "Memory Prices Rock Micron," Electronic News, March 27, 2000, available at http://findarticles.com/p/articles/mi_m0EKF/is_13_46/ai_61209434 and "Chip Stocks Rise on Call from Lehman Analyst Niles," HPC Wire, June 2, 2000, available at http://www.hpcwire.com/hpc-bin/artread.pl?direction=Current&articlenumber=17829.

[33]  The DRAM Market Advisor, De Dios & Associates, September 15, 2000, p. 7. See also, "DRAM Market Seeks Balance in 2001," Simmtester.com, November 30, 2000, available at http://www.simmtester.com/page/news/showpubnews.asp?title=DRAM+Market+Seeks+Balance+In+2001+&n um=49.

[34]  The DRAM Market Advisor, De Dios & Associates, August 7, 2000; The DRAM Market Advisor, De Dios & Associates, September 15, 2000; The DRAM Market Advisor, De Dios & Associates, October 30, 2000, p. 5.

[35]  Expert Report of Victor De Dios, October 2, 2006, p. 2.

[36]  Expert Report of Victor De Dios, October 2, 2006, p. 27.

Contains Highly Confidential Information

## C.  Summer and Fall 2001 Trough

As shown in Exhibit 3, DRAM prices began to decline in September 2000 and continued to fall much faster than trend throughout most of 2001.  Prices rebounded after October 2001, increasing almost back to the long-run trend by March 2002, before declining again.

Industry inventory data for 2001 are highly informative in understanding the steep price drop during this period.  As shown in Exhibit 1, industry inventories began increasing in the third quarter of 2000 and were well above normal levels by the first quarter of 2001.  They peaked in the second quarter of 2001 at 12.3 weeks worth of sales, far above typical levels.

DRAM production, measured in megabits, grew 18% during the first quarter of 2001, contributing to the rapid growth of inventory during that period.[37]  Bit growth slowed during the second, third and fourth quarters of 2001, allowing industry inventories to return to normal levels.

Not surprisingly, this very large buildup of inventories put substantial downward pressure on prices.  At the nadir, in October 2001, prices were $0.015 per megabit, far below the price on the trend line of $0.053.

## D.  March 2002 Peak

Two factors contributed to the rise in DRAM prices that began in December 2001 and continued through March 2002:  recovery from the deep trough in Fall 2001, and an increase in DRAM demand.

### 1.  Recovery from Fall 2001 Trough

As just discussed, the trough in prices in Fall 2001 was unusually deep.  By October 2001, prices were well below their long-run trend line.  Furthermore, by Fall 2001, industry inventory levels had returned to the range they usually occupy, namely 3-6 weeks worth of sales.

> "When PC sales dropped off last year, vendors required less memory.  However, memory makers continued to pump out chips. Soon, the supply of memory was out of balance with what the industry actually needed.  To dump the excess, memory sellers dropped prices dramatically.  This trend is now in reverse, says Steve Cullen, director of semiconductor research at Cahners In-Stat Group. Vendors have sold off their excess DRAM inventories, and new DRAM orders are being met with higher prices."[38]

---

[37]  Expert Report of Victor De Dios, October 2, 2006, p. 32.

[38]  Tom Spring, "Memory Prices Double," PC World.com, January 15, 2002, available at http://www.pcworld.com/article/id,79704/article.html/.

Contains Highly Confidential Information

## 2. Increase in DRAM Demand

The base memory in PC systems began to increase in August 2001 in anticipation of the launch of Windows XP, causing demand for DRAM to increase.[39] Demand from the PC sector was up 43% in the fourth quarter of 2001 as compared to the third quarter.[40] Along with PC sales generally, industry analysts cite the introduction of Intel's 845x chipset, which uses lower-priced DDR SDRAM (as opposed to RDRAM), a reduction in the price of Pentium 4's, and the introduction of Windows XP as important contributors to the increased demand for DRAM.[41]

The increase in demand was largely unexpected.

> "We're seeing significantly stronger growth in consumer PC sales than what we originally anticipated."[42]

Had the increase in demand been expected, it would likely have pulled up DRAM prices earlier, leading to a less severe price trough in Fall 2001. Since much of the increase in demand was unexpected, prices continued to drop faster than trend until October 2001, and the industry did not build inventories in anticipation of higher demand. When the higher demand materialized, prices quickly rebounded.

I discuss below another factor that also contributed to the rise in prices observed from December 2001 through March 2002: production cutbacks that took place in Fall 2001, at the depth of the price trough.

---

[39] The DRAM Market Advisor, De Dios & Associates, September 12, 2001. Expert Report of Victor De Dios, October 2, 2006, p. 35.

[40] Expert Report of Victor De Dios, October 2, 2006, p. 2.

[41] Expert Report of Victor De Dios, October 2, 2006, p. 39. See also, Martyn Williams and Sumner Lemon, "Signs Show DRAM Price Surge," PC World.com, November 15, 2001, available at http://www.pcworld.com/article/id,71244/article.html/.

[42] Alan Promisel, PC analyst with IDC, quoted in Tom Spring, "Memory Prices Double," PC World.com, January 15, 2002, available at http://www.pcworld.com/article/id,79704/article.html/.

Contains Highly Confidential Information

DRAM price index constructed by Professor White. The correlation coefficient between the two indices is 0.998, the correlation coefficient between the first differences of the two series is 0.940 and the series are cointegrated.

As Exhibits 18 and 19 indicate, DRAM prices during the period January 1991 to July 1998 share much in common with DRAM prices during the period studied by Professor White (January 1996 to December 2004). In both cases, an early period of rapid price decline was followed by a period of less rapid decline, which was in turn followed by a period or more rapid decline.

If Professor White's approach reliably estimates overcharges, it should find none when applied to a false, "pseudo conspiracy" period within the January 1991 to July 1998 interval.[98] I tested Professor White's method on two such pseudo conspiracies. In scenario #1, I assumed a pseudo conspiracy extending from January 1993 to January 1996. I then implemented Professor White's method in its entirety, with an initial model specification determined by LARS, followed by the backward and forward variable selection process described in his report, estimation, and but-for forecast.[99] In scenario #2, I assumed a pseudo conspiracy extending from July 1993 to July 1995, and again implemented Professor White's complete estimation and forecast method.

The results of these two exercises are depicted in Exhibits 18 and 19. In each scenario, the approach endorsed by Professor White predicts massive DRAM overcharges during the pseudo conspiracy period, rather than forecasting values close to the actual price levels as it should. Furthermore, in both cases the forecast price levels eventually return to match closely with actual prices in the post "conduct" period, an attribute that Professor White claims shows the predicted, but-for prices are reliable.[100] In fact, these pseudo overcharges are nothing of the sort. They simply reflect the inability of the underlying model to forecast prices accurately and reliably, especially in the short and medium term, when prices may temporarily deviate from the long run trend. This exercise makes plain the inability of Professor White's approach to distinguish overcharges from inaccurate predictions.

## B.   Professor White's Predicted But-For Prices Are Inaccurate and Unreliable

Professor White offers little in his report to support the accuracy and reliability of the but-for predicted values he uses to calculate overcharges. For example, he does not provide any of the standard statistical measures of accuracy, such as the confidence intervals for his but-for prices.[101] Instead, he opines that "the estimated but-for price indexes themselves provide significant evidence that they are accurate and reliable" because they "match up closely with the

---

[98]   Professor White claims that his method will find no damages when there was no effective conspiracy. Deposition of Halbert White, February 27, 2008, pp. 36, 41, 230 and February 28, 2008, pp. 365-366.

[99]   See, for example, Expert Report of Halbert L. White, Jr., Ph.D., Appendix E, p. 242-248.

[100]   Expert Report of Halbert L. White, Jr., Ph.D., ¶ 31. I explain below why this inference is unfounded.

[101]   Professor White states that he "examined standard diagnostics for evaluating the performance of my prediction equation, including the R-squared, the cross-validated root mean squared error (CVRMSE), and the residual autocorrelation," but he does not report these statistics. Expert Report of Halbert L. White, Jr., Ph.D., ¶ 30.

Contains Highly Confidential Information

prediction equation, I would expect the selected variables to be the same. In fact, different variables are selected when estimating the model on the pre-conduct period alone.

In his testimony, Professor White refers to these same criteria when discussing the reliability of his Plea Period price forecast.[108] I agree with Professor White that stable predictors, and stable coefficient estimates, are useful indicia of the reliability of a statistical model. In this case, these indicia show that Professor White's model is unreliable.

When a model estimated on different intervals of the data produces very different predictors or very different coefficient estimates for the predictors, it indicates that the model estimated using data from one interval is unlikely to forecast well into another. These "out-of-sample" tests that I have conducted show that Professor White's model exhibits this defect.

One reason that Professor White's model performs poorly is that his predictors—variables such as electricity costs, wages, interest rates, and silicon wafer costs—cannot possibly measure technological change effectively because they are unrelated to the underlying improvements in DRAM production technology. These variables clearly do not adequately capture the effect of technological change (and therefore declining average costs) over time. This is far inferior to using actual data on costs, as I do in my regression analysis.

These analyses demonstrate that the "close match" that Professor White touts in the post-conduct period does *not* show that his model is able to accurately and reliably predict but-for plaintiff prices during the conduct period. Indeed, these analyses show that the "close match" occurs only because Professor White used post-conduct data to estimate his model. Without these post-conduct data, the "close match" disappears. As Professor White did not use data from within the conduct period to estimate his model, the model's ability to accurately and reliably predict but-for prices within the conduct period is suspect. In the next section, I demonstrate that Professor White's but-for predictions within the conduct period are in fact highly inaccurate and unreliable.

### 2. Second Stage Forecasts of Plaintiff Prices are Inaccurate and Unreliable

Professor White has suggested that a close match between predicted but-for prices and actual prices is a useful indicator of the accuracy and reliability of his model.[109] Here, I test whether his model produces a close match between predicted and actual prices within the Alleged Conspiracy Period. To do so, I have used Professor White's model to forecast the *actual* plaintiff price indexes during the conduct period, and I compare those forecast indexes to the actual price indexes. This analysis involved using the actual named OEM price index in Professor White's second stage prediction equation (equation 0.13, ¶ 299).[110]

---

[108]    Deposition of Halbert White, February 28, 2008, pp. 371-372.

[109]    Expert Report of Halbert L. White, Jr., Ph.D., ¶ 31.

[110]    A small number of actual plaintiff price index values were also used to fill in initial lagged values in the prediction equation.

Contains Highly Confidential Information

Exhibits 24, 25, 26, 27, 28, and 29 plot actual plaintiff price indexes against forecast values for those indexes from August 1998 forward, where the forecasts were derived from Professor White's second stage prediction equation. If Professor White's model is able to generate accurate and reliable predictions, the forecast indexes should closely match the actual index values. In fact, there are substantial differences between the forecast and actual indexes in each exhibit. For example, in Exhibit 28, which plots actual and forecast indexes for SGI, the forecast index lies well below the actual index from January 1999 through September 2001. In April 2000, Professor White's model forecasts an SGI index value of 56.7, nearly one-half the actual value of 111.5. Similarly, in Exhibit 24, which plots actual and forecast indexes for Sun, the actual index value in September 2000 is 149.7, and the predicted value is 96.2, a difference of 36%.

These significant forecast errors for Plaintiff price indexes are of comparable magnitude to Professor White's damage estimates. Further, Professor White's approach is unable to distinguish between forecast error and any effect of the alleged conspiracy as sources for differences between actual and but-for prices. These results indicate that a sizable share of Professor White's damage estimates may be due to forecast errors.

### 3. No Stable Relationship Between the OEM Price Index and the Plaintiff Price Indices

One reason why Professor White's model is unable to accurately and reliably predict the plaintiff price indexes during the conduct period is that his model, and in particular his second stage prediction equation,[111] relies on an assumption that there is a stable, long-run relationship between the named OEM price index and the plaintiff price indexes. However, neither Professor White nor Professor Marshall have offered any reason to expect such a stable relationship between these price indexes. Professor Marshall examines specific DRAM products purchased by both the named OEMs and certain plaintiffs and concludes that these prices exhibit a type of stable statistical relationship.[112] However, neither he nor Professor White consider whether such a relationship holds between the named OEM price index and the plaintiff price indexes. Indeed, there is little reason to believe that a price index—which is composed of a basket of DRAM products—for the named OEMs would exhibit any regular relationship with price indexes for the plaintiffs unless the two groups of firms purchased similar types of DRAM over time.

In fact, Exhibit 30 shows that the named OEMs purchased very different DRAM products than did the plaintiffs. The exhibit lists the top ten products, as measured by share of total purchases, included in the price index for the named OEMs. The exhibit shows that these top ten products accounted for 64.9% of the purchases included in the named OEM price index. These same ten products accounted for only 1.4% of the Sun price index, 31.4% of the Unisys price index, and 37.5% of the SGI price index. Moreover, these shares for the top ten products in the named OEM index obscure further important differences at the level of individual DRAM products. For

---

[111] "In the second stage of my analysis, I estimated the statistical relationship between the DRAM prices paid by each plaintiff and those paid by the named OEMs." Expert Report of Halbert L. White, Jr., Ph.D., ¶ 33.

[112] Expert Report of Robert Marshall, Figures 21 to 30, pp. 85-93, and Table 3, p. 94.

Contains Highly Confidential Information

In addition, Professor White's overcharges are inconsistent with established industry facts and economic theory. His estimated overcharges implausibly require that but-for industry output during the conduct period would have exceeded actual output by approximately 60%. And Professor White implausibly finds plaintiff overcharges that are sometimes 5 and 10 times more than those at the named OEMs, while at other times plaintiffs paid only a fraction of the OEM overcharge. These far-fetched results show that Professor White's analysis is unreliable.

Carl Shapiro

March 7, 2008

## Shapiro Appendix C

# Documents Relied Upon or Cited
### *Pleadings and Testimony*

| Title of Document |
| --- |
| All American Semiconductor, Inc., Amended Complaint for Damages and Injunctive Relief for Violation of the Sherman Act Pursuant to 15 U.S.C. § 1, Case No. C 07-01200 PJH, May 4, 2007. |
| DRAM Claims Liquidation Trust, Amended Complaint for Damages and Injunctive Relief, (1) Violation of the Sherman Act Pursuant to 15 U.S.C. § 1 (2) Violation of California's Cartwright Act Pursuant to §§ 16700 Et Seq. of Cal. Bus. & Prof. Code (3) Violation of California's Unfair Competition Act Pursuant to §§ 17200 Et Seq. of Cal. Bus. & Prof. Code, Case No. C-07-1381 PJH, May 4, 2007. |
| DRAM Claims Liquidation Trust, Second Amended Complaint for Damages and Injunctive Relief, (1) Violation of the Sherman Act Pursuant to 15 U.S.C. § 1 (2) Violation of California's Cartwright Act Pursuant to §§ 16700 Et Seq. of Cal. Bus. & Prof. Code (3) Violation of California's Unfair Competition Act Pursuant to §§ 17200 Et Seq. of Cal. Bus. & Prof. Code, Case No. C-07-1381 PJH, June 29, 2007. |
| Jaco Electronics, Inc., Amended Complaint for Damages and Injunctive Relief (1) Violation of the Sherman Act Pursuant to 15 U.S.C. § 1 (2) Violation of California's Cartwright Act Pursuant to §§ 16700 Et Seq. Cal. Bus. & Prof. Code (3) Violation of California's Unfair Competition Act Pursuant to §§ 17200 Et Seq. of Cal. Bus. & Prof. Code, Case No. C 07-01212 PJH, May 4, 2007. |
| Sun Microsystems, Inc. and Unisys Corporation, Amended Consolidated Complaint for Damages and Injunctive Relief for (1) Violation of the Sherman Act Pursuant to 15 U.S.C. § 1 (2) Violation of California's Cartwright Act Pursuant to §§ 16700 Et Seq. of Cal. Bus. & Prof. Code (3) Violation of California's Unfair Competition Act Pursuant to §§ 17200 Et Seq. of Cal. Bus. & Prof. Code, Case No. C06-01665 PJH, May 4, 2007. |
| Department of Justice, Japanese Company Agrees to Plead Guilty to Participating in DRAM Price-Fixing Conspiracy, January 30, 2006. |
| U.S. v. Elpida, U.S.D.C. Northern District of California, Information, January 30, 2006. |
| U.S. Sentencing Commission, Federal Sentencing Guidelines, October 27, 2005. |
| U.S. v. Hynix, U.S.D.C. Northern District of California, Information, April 21, 2005. |
| U.S. v. Hynix, Plea Agreement, May 11, 2005. |

Shapiro Appendix C

# Documents Relied Upon or Cited
## *Pleadings and Testimony*

| Title of Document |
| --- |

U.S. v. Infineon, U.S.D.C. Northern District of California, Information, September 15, 2004.

U.S. v. Infineon, Plea Agreement, October 20, 2004.

U.S. v. Samsung, U.S.D.C. Northern District of California, United States and Samsung's Joint Sentencing Memorandum and Request for Expedited Sentencing under LR 32-1(b), November 30, 2005.

U.S. v. Samsung, Plea Agreement, November 30, 2005.

Declaration of Michael Bokan, May 17, 2006, Master File No. M-02-1486PJH, MDL No. 1486.

Declaration of Anthony Shapiro, May 17, 2006, Master File No. M-02-1486PJH, MDL No. 1486.

Exhibits to Declaration of Anthony Shapiro, May 17, 2006, Master File No. M-02-1486PJH, MDL No. 1486.

Expert Report of Margaret E. Guerin-Calvert, March 10, 2006, Master File No. M-02-1486PJH, MDL No. 1486.

Attachments to the Expert Report of Margaret E. Guerin-Calvert.

Expert Report of Victor De Dios, Case No. M-02-1486 (PJH), October 2, 2006.

## Shapiro Appendix C

# Documents Relied Upon or Cited
### *Pleadings and Testimony*

| Title of Document |
| --- |
| Expert Report of Halbert L. White, Jr., Ph.D., December 14, 2007. |
| Expert Report of Robert C. Marshall, Ph.D., December 14, 2007. |
| Expert Report of Victor De Dios, March 7, 2008. |
| Jerry Hausman, "The Effect of Korean Government Subsidies on the U.S. DRAM Industry," Exhibit 19 to Pre-Hearing Brief of Petitioner Micron Technology, Inc. in U.S. International Trade Commission, DRAMs and DRAM Modules from Korea, Inv. No. 701-TA-431, June 17, 2003. |
| Testimony of Jerry Hausman, in U.S. International Trade Commission, DRAMs and DRAM Modules from Korea, Inv. No. 701-TA-431, June 24, 2003. |
| Jerry Hausman, "Appendix: Econometric Analysis of DRAM Prices Submitted to the U.S. International Trade Commission," June 25, 2003, in U.S. International Trade Commission, DRAMs and DRAM Modules from Korea, Inv. No. 701-TA-431. |
| "DRAMS and DRAM Modules from Korea," Investigation No. 701-TA-431 (Final), USITC Publication 3616, August 2003. |
| Testimony of Michael Sadler, in *U.S. v. Gary Swanson,* No. CR 06-0692 PJH. |
| Testimony of Steven Appleton, in *U.S. v. Gary Swanson,* No. CR 06-0692 PJH. |
| Testimony of Jerry Hausman, in *U.S. v. Gary Swanson,* No. CR 06-0692 PJH. |

## Shapiro Appendix C

# Documents Relied Upon or Cited
## *Depositions*

| Company | Witness | Date |
|---------|---------|------|
| Dell | Brown, Kevin | 9/12/2006 |
| Dell | Seshu, Anne | 9/14/2006 |
| Elpida | Aggarwal, Arun | 3/20/2006 |
| Elpida | Anderson, Curt | 3/21/2006 |
| Elpida | Buse, Karen | 3/22/2006 |
| Elpida | Despotes, Mike | 5/22/2006 |
| Elpida | Donabedian, Dan | 4/25/2006 |
| Elpida | Farahbod, Ali | 5/9/2006 |
| Elpida | Furusawa, Akihiko | 8/1/2006 |
| Elpida | Hassett, Bill | 5/12/2006 |
| Elpida | Iida, Tatsuya | 7/14/2006 |
| Elpida | Inoue, Yasukazu | 6/22/2006 |
| Elpida | Lin, David | 7/20/2006 |
| Elpida | Pannacci, Tom | 4/25/2006 |
| Elpida | Sogas, Jim | 4/25/2006 |
| Elpida | Takayasu, Akifumi | 6/14/2006 |
| Expert | Marshall, Robert | 2/29/2008 |
| Expert | White, Halbert | 2/27/2008 |
| Expert | White, Halbert | 2/28/2008 |
| HP | Gross, Jackie | 8/29/2006 |
| Hynix | Boro, Al | 2/10/2006 |

## Shapiro Appendix C

# Documents Relied Upon or Cited

*Depositions*

| Company | Witness | Date |
|---------|---------|------|
| Hynix | Byrd, Charles | 4/19/2006 |
| Hynix | Chung, C.K. | 7/27/2006 |
| Hynix | Earl, Martha | 2/6/2006 |
| Hynix | Kassak, Al | 4/21/2006 |
| Hynix | Kim, H.J. | 7/11/2006 |
| Hynix | Lee, Lin | 2/9/2006 |
| Hynix | Lee, M.R. | 2/8/2006 |
| Hynix | McBroom, Jerome | 3/29/2006 |
| Hynix | Nam, J.G | 5/11/2006 |
| Hynix | Palonsky, Paul | 5/9/2006 |
| Hynix | Peterson, Mike | 4/5/2006 |
| Hynix | Shin, Duk IL | 2/9/2006 |
| Hynix | Suh, K.C. | 7/25/2006 |
| Hynix | Swanson, Gary | 4/27/2006 |
| Hynix | Tabrizi, Farhad | 4/7/2006 |
| Hynix | Woo, Sung | 2/6/2006 |
| Infineon | Bugee, John | 4/6/2006 |
| Infineon | Corwin, Rudd | 4/13/2006 |
| Infineon | Florian, Heinrich | 5/2/2006 |
| Infineon | Hefner, Guenter | 5/10/2006 |

## Shapiro Appendix C

# Documents Relied Upon or Cited
### *Depositions*

| Company | Witness | Date |
|---------|---------|------|
| Infineon | Pitzer, Mike | 3/30/2006 |
| Infineon | Schaefer, Peter | 5/8/2006 |
| Infineon | Wahl, Steve | 4/25/2006 |
| Micron | Addie, Thomas | 5/24/2006 |
| Micron | Appleton, Steve | 5/6/2006 |
| Micron | Arave, Bryce | 2/14/2006 |
| Micron | Censullo, Al | 4/11/2006 |
| Micron | Hawkins, Roger | 2/28/2006 |
| Micron | Landreth, John | 3/3/2006 |
| Micron | Lauer, Bill | 3/21/2006 |
| Micron | Lim, Lionel | 5/8/2006 |
| Micron | Morrissey, Steve | 4/25/2006 |
| Micron | Ostberg, Jon | 3/14/2006 |
| Micron | Radford, Kathy | 4/5/2006 |
| Micron | Sadler, Mike | 7/7/2006 |
| Micron | Smith, Julie | 2/14/2006 |
| Micron | Thorsen, Steve | 3/24/2006 |
| Micron | Turner, Linda | 4/14/2006 |
| Micron | Waddel, Fred | 3/10/2006 |
| Micron | Weinstock, Keith | 5/12/2006 |

## Shapiro Appendix C

## Documents Relied Upon or Cited
### *Depositions*

| Company | Witness | Date |
|---------|---------|------|
| Mosel | Chen, Kevin | 8/15/2006 |
| Mosel | Farrell, Ron | 5/9/2006 |
| Mosel | Handelsman, Nathan | 5/1/2006 |
| Mosel | Iqbal, Mohammed | 4/27/2006 |
| Mosel | Liu, AK | 8/16/2006 |
| Mosel | Ramirez, Michael | 5/5/2006 |
| Mosel | Seto, John | 4/18/2006 |
| Mosel | Shah, Rajit | 5/11/2006 |
| Mosel | Sheng Li, Yu | 5/3/2006 |
| Mosel | Smith, Fred | 5/3/2006 |
| Mosel | Smith, Fred | 5/2/2006 |
| Nanya | Chen, Pamela | 3/29/2006 |
| Nanya | Donahue, Brian | 6/12/2006 |
| Nanya | Dwyer, Dave | 6/14/2006 |
| Nanya | Hsu, Steve | 6/29/2006 |
| Nanya | Hurley, Ken | 6/16/2006 |
| Nanya | Kau, Charles | 7/12/2006 |
| Nanya | Lin, Pai Pei | 7/14/2006 |
| Nanya | Walsh, Mike | 6/28/2006 |
| Nanya | Wang, Steve | 4/17/2006 |

## Shapiro Appendix C

# Documents Relied Upon or Cited
### *Depositions*

| Company | Witness | Date |
|---------|---------|------|
| NEC | Brents, Roy | 7/6/2006 |
| NEC | Cripps, Richard Russell | 5/5/2006 |
| NEC | Hatcher, Donna | 3/2/2006 |
| NEC | Ladd, Bart | 5/2/2006 |
| NEC | Scott, Dennis | 3/1/2006 |
| Winbond | Abruzzese, Ronald | 6/27/2006 |
| Winbond | Chen, Joe KC | 7/14/2006 |
| Winbond | Chu, Weh | 6/14/2006 |
| Winbond | Eideh, John | 6/28/2006 |
| Winbond | Gaddy, Larry | 6/30/2006 |
| Winbond | Schauss, Stefan | 7/25/2006 |
| Winbond | Wu, Jeng-Yi | 7/11/2006 |

## Shapiro Appendix C

# Documents Relied Upon or Cited
## *Bates Numbered*

| Bates Begin | Bates End |
|---|---|
| ADT 0064 | ADT 0065 |
| ADT 0212 | ADT 0213 |
| ADT 0212 | ADT 0213 |
| DEDR 001-001297 | DEDR 001-001297 |
| DEDR-001-001297 | DEDR-001-001297 |
| DEDR-001-000833 | DEDR-001-000833 |
| DEDR-001-000834 | DEDR-001-000834 |
| DEDR-001-000836 | DEDR-001-000836 |
| DEDR-001-000838 | DEDR-001-000838 |
| DEDR-001-000839 | DEDR-001-000839 |
| DEDR-001-000843 | DEDR-001-000843 |
| DEDR-001-0001290 | DEDR-001-0001290 |
| DEDR-001-0001292 | DEDR-001-0001292 |
| DEDR-001-0001294 | DEDR-001-0001294 |
| DEDR-001-0001300 | DEDR-001-0001300 |
| DEDR-001-0001323 | DEDR-001-0001323 |
| DEDR-001-0001325 | DEDR-001-0001325 |
| DEDR-001-0001327 | DEDR-001-0001327 |
| DEDR-001-0001330 | DEDR-001-0001330 |
| DEDR-001-0001332 | DEDR-001-0001332 |
| DEDR-001-0001334 | DEDR-001-0001334 |
| DEDR-001-0001336 | DEDR-001-0001336 |
| DEDR-001-0001338 | DEDR-001-0001338 |
| EMUS 109760 | EMUS 109761 |
| EMUS 155223 | EMUS 155224 |
| EMUS 191285 | EMUS 191286 |
| EMUS 100170 | EMUS 100172 |
| EMUS 1003008 | EMUS 1003008 |
| EMUS 100567 | EMUS 100570 |
| EMUS 100574 | EMUS 100576 |
| EMUS 1011273 | EMUS 1011277 |
| EMUS 103214 | EMUS 103216 |
| EMUS 103233 | EMUS 103235 |
| EMUS 104279 | EMUS 104280 |
| EMUS 104653 | EMUS 104657 |
| EMUS 105053 | EMUS 105054 |
| EMUS 105120 | EMUS 105125 |
| EMUS 107856 | EMUS 107856 |
| EMUS 107856 | EMUS 107856 |
| EMUS 107875 | EMUS 107876 |
| EMUS 109760 | EMUS 109761 |
| EMUS 109760 | EMUS 109761 |
| EMUS 110661 | EMUS 110661 |
| EMUS 111022 | EMUS 111023 |
| EMUS 111128 | EMUS 111130 |
| EMUS 111128 | EMUS 111130 |
| EMUS 111459 | EMUS 111459 |
| EMUS 115884 | EMUS 115886 |
| EMUS 116565 | EMUS 116567 |
| EMUS 116787 | EMUS 116788 |
| EMUS 127715 | EMUS 127716 |

## Shapiro Appendix C

# Documents Relied Upon or Cited
### *Bates Numbered*

| Bates Begin | Bates End |
|---|---|
| EMUS 127715 | EMUS 127716 |
| EMUS 128927 | EMUS 128928 |
| EMUS 128927 | EMUS 128928 |
| EMUS 129051 | EMUS 129052 |
| EMUS 133852 | EMUS 133853 |
| EMUS 133916 | EMUS 133920 |
| EMUS 139919 | EMUS 139920 |
| EMUS 143044 | EMUS 143045 |
| EMUS 143044 | EMUS 143045 |
| EMUS 143311 | EMUS 143311 |
| EMUS 143311 | EMUS 143311 |
| EMUS 146058 | EMUS 146061 |
| EMUS 146906 | EMUS 146906 |
| EMUS 149379 | EMUS 149380 |
| EMUS 149428 | EMUS 149429 |
| EMUS 149428 | EMUS 149429 |
| EMUS 149428 | EMUS 149429 |
| EMUS 150062 | EMUS 150063 |
| EMUS 150210 | EMUS 150211 |
| EMUS 151303 | EMUS 151304 |
| EMUS 151390 | EMUS 151391 |
| EMUS 151491 | EMUS 151491 |
| EMUS 153398 | EMUS 153399 |
| EMUS 154261 | EMUS 154264 |
| EMUS 154261 | EMUS 154264 |
| EMUS 154785 | EMUS 154786 |
| EMUS 155007 | EMUS 155007 |
| EMUS 155007 | EMUS 155007 |
| EMUS 155007 | EMUS 155007 |
| EMUS 155700 | EMUS 155700 |
| EMUS 155722 | EMUS 155723 |
| EMUS 156362 | EMUS 156363 |
| EMUS 156374 | EMUS 156375 |
| EMUS 156376 | EMUS 156378 |
| EMUS 158427 | EMUS 158429 |
| EMUS 158641 | EMUS 158641 |
| EMUS 160531 | EMUS 160533 |
| EMUS 168244 | EMUS 168248 |
| EMUS 168725 | EMUS 168727 |
| EMUS 168725 | EMUS 168727 |
| EMUS 168751 | EMUS 168756 |
| EMUS 169688 | EMUS 169720 |
| EMUS 175772 | EMUS 175775 |
| EMUS 191285 | EMUS 191286 |
| EMUS 192795 | EMUS 192795 |
| EMUS 192795 | EMUS 192795 |
| EMUS 203363 | EMUS 203363 |
| EMUS 203363 | EMUS 203363 |
| EMUS 203366 | EMUS 203367 |
| EMUS 203366 | EMUS 203367 |
| EMUS 203490 | EMUS 203496 |

## Shapiro Appendix C

# Documents Relied Upon or Cited
## *Bates Numbered*

| Bates Begin | Bates End |
| --- | --- |
| EMUS 203490 | EMUS 203496 |
| EMUS 205028 | EMUS 205029 |
| EMUS 205028 | EMUS 205029 |
| EMUS 205200 | EMUS 205202 |
| EMUS 205200 | EMUS 205202 |
| EMUS 205663 | EMUS 205666 |
| EMUS 205867 | EMUS 205867 |
| EMUS 205867 | EMUS 205867 |
| EMUS 205895 | EMUS 205896 |
| EMUS 205895 | EMUS 205896 |
| EMUS 208853 | EMUS 208859 |
| EMUS 208860 | EMUS 208862 |
| EMUS 212320 | EMUS 212321 |
| EMUS 212320 | EMUS 212321 |
| EMUS 212376 | EMUS 212379 |
| EMUS 212384 | EMUS 212384 |
| EMUS 215568 | EMUS 215568 |
| EMUS 221427 | EMUS 221430 |
| EMUS 222405 | EMUS 222406 |
| EMUS 222405 | EMUS 222406 |
| EMUS 223605 | EMUS 223606 |
| EMUS 227570 | EMUS 227571 |
| EMUS 227881 | EMUS 227886 |
| EMUS 227887 | EMUS 227887 |
| EMUS 228203 | EMUS 228203 |
| EMUS 228203 | EMUS 228203 |
| EMUS 228203 | EMUS 228203 |
| EMUS 230129 | EMUS 230129 |
| EMUS 230129 | EMUS 230129 |
| EMUS 230453 | EMUS 230455 |
| EMUS 232713 | EMUS 232713 |
| EMUS 232713 | EMUS 232722 |
| EMUS 232713 | EMUS 232722 |
| EMUS 238965 | EMUS 238972 |
| EMUS 247006 | EMUS 247008 |
| EMUS 247006 | EMUS 247008 |
| EMUS 262510 | EMUS 262510 |
| EMUS 264841 | EMUS 264842 |
| EMUS 283522 | EMUS 283524 |
| EMUS 310637 | EMUS 310638 |
| EMUS 317716 | EMUS 317716 |
| EMUS 317716 | EMUS 317716 |
| EMUS 318725 | EMUS 318725 |
| EMUS 321924 | EMUS 321924 |
| EMUS 329214 | EMUS 329214 |
| EMUS 333262 | EMUS 333262 |
| EMUS 336685 | EMUS 336687 |
| EMUS 383116 | EMUS 383117 |
| EMUS 383116 | EMUS 383116 |
| EMUS 383442 | EMUS 383443 |
| EMUS 383899 | EMUS 383899 |

## Shapiro Appendix C

# Documents Relied Upon or Cited
## *Bates Numbered*

| Bates Begin | Bates End |
|---|---|
| EMUS 383899 | EMUS 383899 |
| EMUS 383899 | EMUS 383901 |
| EMUS 386678 | EMUS 386678 |
| EMUS 388073 | EMUS 388073 |
| EMUS 389094 | EMUS 389094 |
| EMUS 391907 | EMUS 391909 |
| EMUS 393328 | EMUS 393328 |
| EMUS 393345 | EMUS 393349 |
| EMUS 400120 | EMUS 400120 |
| EMUS 400913 | EMUS 400915 |
| EMUS 402327 | EMUS 402327 |
| EMUS 465364 | EMUS 465365 |
| EMUS 465674 | EMUS 465675 |
| EMUS 466043 | EMUS 466044 |
| EMUS 467357 | EMUS 467360 |
| EMUS 467357 | EMUS 467360 |
| EMUS 469399 | EMUS 469402 |
| EMUS 469637 | EMUS 469638 |
| EMUS 469637 | EMUS 469638 |
| EMUS 471404 | EMUS 471408 |
| EMUS 49471 | EMUS 49471 |
| EMUS 49569 | EMUS 49570 |
| EMUS 497530 | EMUS 497530 |
| EMUS 49910 | EMUS 49911 |
| EMUS 49977 | EMUS 49978 |
| EMUS 500641 | EMUS 500649 |
| EMUS 50197 | EMUS 50200 |
| EMUS 50203 | EMUS 50205 |
| EMUS 50770 | EMUS 50771 |
| EMUS 525130 | EMUS 525139 |
| EMUS 525130 | EMUS 525139 |
| EMUS 60011 | EMUS 60015 |
| EMUS 60106 | EMUS 60107 |
| EMUS 602756 | EMUS 602766 |
| EMUS 604363 | EMUS 604364 |
| EMUS 606118 | EMUS 606119 |
| EMUS 606967 | EMUS 606967 |
| EMUS 61723 | EMUS 61723 |
| EMUS 61723 | EMUS 61723 |
| EMUS 617656 | EMUS 617657 |
| EMUS 617673 | EMUS 617674 |
| EMUS 617954 | EMUS 617955 |
| EMUS 630586 | EMUS 630587 |
| EMUS 631387 | EMUS 631390 |
| EMUS 63257 | EMUS 63257 |
| EMUS 63257 | EMUS 63257 |
| EMUS 63257 | EMUS 63257 |
| EMUS 63421 | EMUS 63421 |
| EMUS 63421 | EMUS 63421 |
| EMUS 63544 | EMUS 63545 |
| EMUS 63544 | EMUS 63545 |