# EXHIBIT 9 TO
# DECLARATION OF
# JOSHUA S. STAMBAUGH

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA -
# SAN FRANCISCO DIVISION

| | |
|---|---|
| *Sun Microsystems, Inc. v. Hynix Semiconductor, Inc., et al.* | C-06-cv-1665 PJH |
| *Unisys Corporation. v. Hynix Semiconductor, Inc., et al.* | C-06-cv-2915 PJH |
| *All American Semiconductor, Inc., v. Hynix Semiconductor, Inc., et al.* | C-07-cv-1200 PJH |
| *Edge Electronics, Inc., v. Hynix Semiconductor, Inc., et al.* | C-07-cv-1207 PJH |
| *Jaco Electronics, Inc., v. Hynix Semiconductor, Inc., et al.* | C-07-cv-1212 PJH |
| *Dram Claims Liquidation Trust, By Its Trustee, Wells Fargo Bank, N.A., v. Hynix Semiconductor, Inc., et al.* | C-07-cv-1381 PJH |

## REBUTTAL EXPERT REPORT OF MICHAEL D. WHINSTON, PH.D
## May 2, 2008
## HIGHLY CONFIDENTIAL

# EXHIBIT 10 TO
# DECLARATION OF
# JOSHUA S. STAMBAUGH

0001

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

IN RE: Dynamic Random Access Memory (DRAM)
Antitrust Litigation

SUN MICROSYSTEMS, INC.     : Case No.:
vs. HYNIX SEMICONDUCTOR     : C 06-01665 PJH
INC., et al.,                      :

                                   :
UNISYS CORPORATION vs.      : Case No.:
HYNIX SEMICONDUCTOR, INC., : C 06-02915 PJH
et al.,                            :

                                   :
ALL AMERICAN SEMICONDUCTOR,: Case No.:
INC. vs. HYNIX             : C 07-01200 PJH
SEMICONDUCTOR INC., et al.,:

                                   :
EDGE ELECTRONICS, INC. vs. : Case No.:
HYNIX SEMICONDUCTOR, INC., : C 07-01207 PJH
et al.                            :

                                   :
JACO ELECTRONICS, INC. vs. : Case No.:
HYNIX SEMICONDUCTOR, INC., : C 07-01212 PJH
et al.,                            :

                                   :
DRAM CLAIMS LIQUIDATION    : Case No.:
TRUST, by its Trustee,     : C 07-01381 PJH
WELLS FARGO BANK, N.A., vs.:
HYNIX SEMICONDUCTOR, INC.  :
et al.,                            :
                  - - -

         Philadelphia, Pennsylvania
          Thursday, May 29, 2008


                  - - -

     VIDEOTAPED DEPOSITION OF FRANCIS X. DIEBOLD
                  - - -

Francis X. Diebold

Q. There was a further stage in Professor White's analysis which involved using those OEM but-for prices to statistically relate them to but-for prices for the named plaintiffs in these cases, correct?

MR. HOWARD: Object to form.

BY MR. BREW:

Q. Is that correct?

MR. HOWARD: Same objection.

You can answer, if you can.

THE WITNESS: Yes.

BY MR. BREW:

Q. Okay. And in the course of your work, am I correct that you are not offering opinions on that second stage? I'll refer to it as a second stage.

A. Well, I suppose I would say that these stages are hardly independent. So, to the extent that I'm offering opinions on the crucial first stage, that filters into aspects of the second and third stages.

Q. Okay. Can you tell me what the second and third stages -- first of all, can

31

5/29/2008  Diebold, Francis X.

Francis X. Diebold

you tell me where in your report you discuss the second and third stages of Professor White's analysis?

A.  I think I do not.

Q.  You do not what?

A.  There is no explicit discussion of the second and third stages in this report that I can recall right now.

Q.  You're not offering an opinion on the second and third stages either, are you?

A.  Well, again, I would say that I may offer opinions on the centerpiece of his analysis.  Without those three pillars one couldn't do the second or couldn't do the third stage of the analysis.

So I don't view the analysis as decomposable into three independent parts. The second part relies on the first crucially. The third part relies on the first and second crucially.

Q.  Whether or not the second and third rely on the first, are you offering opinions on the methodology used by Professor White in his second and third stages?

32

Francis X. Diebold

A. I don't offer direct opinions on that.

Q. Okay. And in his second and third stages, am I correct that he does not use a predictive assessment of treatment effects?

A. Well, again --

Q. As you have used that term?

A. Again, let's take his third stage, which is the calculation of the damages. That's relying crucially and directly, again, on these three pillars, the predictive assessment of treatment effects, the co-integration models with variables selected by cross validation.

Without those things, he couldn't do his assessment in Stage 3. They are the entirety of what let's him do it.

Q. Okay. In his Stage 3, does Professor White use in that stage a predictive assessment of treatment effects?

A. I would say absolutely. His damage assessment is basically the difference between actual price charged and a prediction of what price would have been in the absence of a

33

Francis X. Diebold

Q. His first step was to determine OEM —

A. That's the first step, yes. I'm sorry, yes. So he did exactly that.

Q. And the OEM prices are the prices to the six named OEMs in the pleas, as I'll refer to them.

A. Yes.

Q. And you understand what we're talking about, correct?

A. I do.

Q. Apple, IBM, Compaq.

A. Yes. If you had asked me to name each of them, I could not have, but I understand.

Q. And that does not include the plaintiffs in this lawsuit?

A. That's right.

Q. And it's your opinion that it was appropriate and followed generally accepted methodologies to use predictive assessment of treatment effects to determine those OEM but-for prices, correct?

A. Yes. In my view the determination

5/29/2008  Diebold, Francis X.

Francis X. Diebold

of but-for prices is fundamentally a predictive exercise. We have to ask what would prices have been in the absence of a conspiracy, and that is a predictive exercise.

Q. And the appropriate methodology that you believe Professor White used is the one that he describes in his report, and the one that you describe in your section on predictive assessment of treatment effects, right?

A. Yes.

Q. And that includes using the OEM prices in a benchmark period to develop a model to predict prices in other periods, correct?

A. Yes. The idea is to use -- just almost to repeat what you said. The idea is to use data from outside the conspiracy period to understand the relationships governing prices, and then use that to project what prices would have been during the conspiracy period in the absence of a conspiracy.

Q. Is it your opinion that that is the most appropriate method for determining

Francis X. Diebold

but-for prices as to the OEMs?

A.  It is, and the reason is because what else could you do?  I don't know of any other methods really that I would view as credible.

If a method is not somehow or another projecting what price would have been in the absence of the event, then it can't be doing what we want, which is determining but-for price.  I mean, I see that as the definition of a but-for price:  What would price have been in absence of the conspiracy?

Q.  And the method of projecting that you believe is the most appropriate is the one that Professor White actually used to determine OEM but-for prices, correct?

A.  Yes.

Q.  But Professor White's charge actually was to determine the plaintiffs' but-for prices, correct?

A.  My understanding is that Professor White's charge was to determine the plaintiffs' but-for prices.  Yeah.

Q.  And it's your opinion that it would

Francis X. Diebold

quality, quantity, and availability as reason why you would not use predictive assessment of treatment effects directly on the plaintiffs, right?

MR. HOWARD:  Object to form.

BY MR. BREW:

Q.  Did I misunderstand your answer?

MR. HOWARD:  Same objection.

THE WITNESS:  It would help me if you could just repeat the question so I know that I answered the right question.

BY MR. BREW:

Q.  Let's get back to where we were.

A.  Okay.

Q.  So appropriate methodology, in effect the best methodology, to determine but-for prices for the OEMs to apply predictive assessment of treatment effects directly to OEM prices, right?

A.  Yeah.

MR. HOWARD:  Same objection.

BY MR. BREW:

Q.  Is that not also true with respect

69

Francis X. Diebold

to plaintiff prices?

MR. HOWARD:  Same objection..

THE WITNESS:  What I tried to say is that I have no way to know whether it would be superior or not to go and directly apply this model to plaintiff prices.

BY MR. BREW:

Q.  What do you know about the OEM prices that you don't know about plaintiff prices that allows you to opine as to OEM prices and not as to the plaintiff prices?

MR. HOWARD:  Same objection.

THE WITNESS:  What I can say is that it would certainly be interesting, and in my opinion legitimate, to try doing this directly in plaintiff prices and to compare results.

My understanding, although I haven't seen Professor White's rebuttal report, is that that was done, and that the results are robust.

BY MR. BREW:

Q.  So --

Francis X. Diebold

A. I can't say to you that -- again, to repeat -- that the way he did it is undeniably, indisputably the right way. Reasonable people can disagree on this.

What I was trying to say is that I don't also -- I also don't think anyone can say it's indisputably the wrong way. Ultimately it's an empirical issue, and my understanding is that when one does it the other way, the results corroborate.

Q. So there is nothing that you know about the plaintiffs' prices that would cause you to believe that using this predictive assessment of treatment effects methodology directly on their prices would not be an appropriate way to go?

MR. HOWARD: Object to form.

THE WITNESS: Correct.

BY MR. BREW:

Q. Okay. In doing that predictive assessment of treatment effects methodology on the plaintiffs' prices directly, would it be appropriate to use as one of the variables OEM prices?

Francis X. Diebold

A. It seems to me -- what I am prepared to opine on is what was done, and that's not what was done. So I really don't know. I need time to think about that. I don't know off the top of my head. It's a hypothetical.

Q. Would it be appropriate to use something within the control of the defendants?

MR. HOWARD: Same objection.

BY MR. BREW:

Q. As a variable?

MR. HOWARD: Same objection.

THE WITNESS: This is just things that I have not studied. These are things that were not done by Professor White, as far as I know, and, therefore, things that I am not prepared to offer opinions on.

BY MR. BREW:

Q. So you're not saying that it is never appropriate to use a variable that's within the control of the defendants in a predictive assessment of treatment effects; is that right?

5/29/2008 Diebold, Francis X.

Francis X. Diebold

A. I'm really not saying anything on this. This is not anything that Professor White did. It's not anything that I have prepared myself to speak on.

Q. Well, what Professor White did do is express the opinion in his report that it's inappropriate to use as a variable something that's within the control of the defendants; isn't that right?

A. He did.

Q. Okay. Do you agree with that?

A. I do agree with that.

Q. Okay. And in doing a predictive assessment of treatment effects directly on the plaintiff prices, would that also apply?

MR. HOWARD: Object to form.

BY MR. BREW:

Q. It's that same rule?

MR. HOWARD: Same objection.

THE WITNESS: I would need to see the complete analysis directly done to plaintiff prices, but it may apply.

BY MR. BREW:

Q. Okay.

73

Francis X. Diebold

A. I mean, this isn't what he did. I haven't seen anything like this, and I don't know what other parts of the analysis might look like.

I'm saying it's exactly what he did in what I have seen, except that something is put in —

Q. That's because —

A. — under control of plaintiffs or — I mean, in his report that I have seen, it — if I recall correctly, and I think I do, he was quite careful not to do that, and he did say, as you just said, that one would not want to do that.

Q. And you would agree with that?

A. I would agree with that.

Q. And there is no reason you wouldn't agree with that as to the plaintiff prices either, right?

MR. HOWARD: Same objection.

BY MR. BREW:

Q. If you're doing the same methodology that you said is the way to go as to the plaintiff prices, you should do the same

Francis X. Diebold

thing, right?

MR. HOWARD: Same objection.

THE WITNESS: I can't think of any objections right now, but, again, it's something that I haven't thought about. It's a hypothetical that's just different from what was done.

BY MR. BREW:

Q. Okay. In doing a predictive assessment of treatment effects directly on the plaintiff prices, you would expect the model to be built using variables that are not within the control of defendants, right?

MR. HOWARD: Same objection.

THE WITNESS: That would be my first expectation.

BY MR. BREW:

Q. And you certainly would expect they would not use defendants' prices as one of the variables, right?

MR. HOWARD: Same objection.

THE WITNESS: If those prices were directly controllable, probably not.

BY MR. BREW:

Francis X. Diebold

So, if I counted correctly, that's five.

Q. I had six, but --

A. I might not have counted correctly.

Q. And you were predicting how far forward from 1984?

A. Well, the way the model worked is generating probability of assessment -- probability of recession in the next six months.

So, every time we ran the model, it would give a recession probability with the relevant horizon being six months. So you could say six months.

Q. And in determining that 24-year period as your control period, did that have something to do with the fact that you wanted to have multiple recessions included in your control period in order to be sure that you had a reliable picture?

MR. HOWARD: Object to form.

THE WITNESS: In terms of recession forecasting, other things the same, it's good to have the data set with

Francis X. Diebold

more recessions in it rather than less.

BY MR. BREW:

Q. Is that because it's -- you're looking at sort of business cycles there?

A. Yes.

Q. And I noticed in your book -- in your book on forecasting you talked about -- maybe not in that chapter, but you talked about forecasting housing starts?

A. I'm sorry? Somewhere else in the book I talked about --

Q. Forecasting housing starts?

A. Yes, that is true, I believe.

Q. Does that ring a bell?

A. Yeah.

Q. And that was the forecast that you also had done, right, forecasting housing starts?

A. Yes.

Q. And that was another cyclical industry?

A. Housing starts are cyclical, yes.

Q. And what period of time did you use for your control period there?

Francis X. Diebold

A.  To the best of my ability to recall there, it was kind of post-World War II.  So going back, you know, quite far.

Q.  Forty, fifty years?

A.  Yeah.  I would caution you though that the exercise, for example, of the Federal Reserve was very much real, you know, to be used by real people in real decision making.

The examples in the book are just examples.  I wouldn't put too much weight on the fact that I went back post-war as opposed to, say, starting in 1960, as we did with the Fed, but at any rate, if you're analyzing business cycles, I do agree that it's better to have a data set with more rather than less.

Q.  And why is that?

A.  Well, if you're — to take an example that's absurd, but illuminating I hope, suppose you had three months of data, and they were all in recession.  Then it's hard to say much about times other than recession, based on that data.

Q.  Okay.  I think I get that.  Not

Francis X. Diebold

terribly absurd, but.

If -- and is it enough to have just one recession in order to predict future recessions or do you want to have more than one?

MR. HOWARD: Object to form.

THE WITNESS: The way I approach that question is, again, through this tension that I mentioned before, and this tension comes up constantly in modeling, in forecasting.

Other things the same, I would like to go back to 1855 and have, you know, every recession on record, but at the same time I know that there is a lot of changes in the economy and so on that have happened since then that make me not want to go back to 1865.

So you wind up somewhere in between, and where exactly, you know, it's a situation specific and highly judgmental thing. So you just have to have an expert who considers the situation and makes a hopefully

Francis X. Diebold

persuasive and credible decision.

BY MR. BREW:

Q. As a forecaster, you certainly wouldn't want to predict future recessions using only data from a single recession, right?

A. Other things the same, I would want more data.

Q. And the reason for that is because it's not predicted -- it doesn't give you a cycle that you can then project to future cycles, right?

MR. HOWARD: Object to form.

THE WITNESS: Right.

BY MR. BREW:

Q. And having only one cycle also gives you limited ability to predict future cycles because that's like having one patient -- one placebo and one treater, right?

MR. HOWARD: Object to form.

THE WITNESS: As I said, I think it's situation specific. If the pattern of that one cycle were very informative and typical, it might convey

149

Francis X. Diebold

a reasonable amount of information.

BY MR. BREW:

Q.  How do you know it's typical if you haven't looked at the earlier ones?

A.  Well, I am saying if, you know, hypothetically.  If it was abhorrent in one way or another sort of unlike history, then it could potentially lead you astray.

Q.  But you would want to do that assessment to determine if it's like history in terms of cycles?

MR. HOWARD:  Object to form.

THE WITNESS:  If I could get the data and it were of sufficient quantity and quality and reliability, yeah.

BY MR. BREW:

Q.  Well, If you couldn't get the data, then that doesn't make your model good.  It just makes it something you can't assess, right?

MR. HOWARD:  Same objection.

THE WITNESS:  That's right, and it doesn't necessarily make it bad

Francis X. Diebold

either, but, other things the same, I want more data rather than less.

BY MR. BREW:

Q. Especially when you have cycles like that because you want to capture the dynamics of cycles, right?

MR. HOWARD: Object form.

THE WITNESS: Yeah. Yeah. The way I would phrase it is it's not so much the number of observations that I have, but how much of a cycle do I have.

So, in principal I would agree with that. Other things the same, I want more cycles.

BY MR. BREW:

Q. In the treatment effects -- just thinking about the sort of base example you use of one group getting treated and one getting placebo.

A. Right.

Q. When you do that type of study, in selecting your two groups, you typically would want to do that by random selection, right? That's the idea, right?

NAME OF CASE: Sun Microsystems v. Hynix

DATE OF DEPOSITION: May 29, 2008

NAME OF WITNESS: Francis X. Diebold

Reason Codes:

1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

Page __8__ Line __22__ Reason __3__

From __"plaintiff"__ to __"plaintiffs"__

Page __14__ Line __22__ Reason __3__

From __"flush"__ to __"flesh"__

Page __21__ Line __10__ Reason __3__

From __"Ellena"__ to __"Elena"__

Page __41__ Line __16__ Reason __1 or 3__

From __"article, but."__ to __"article"__

Page __50__ Line __23__ Reason __3__

From __"imagine"__ to __"I imagine"__

Page __59__ Line __17__ Reason __3__

From __"Amd"__ to __"And"__

Page __64__ Line __6__ Reason __3__

From __"principal"__ to __"principle"__

Page __80__ Line __3__ Reason __3__

From __"principal"__ to __"principle"__

Page __80__ Line __4__ Reason __3__

From __"principal"__ to __"principle"__

Page __83__ Line __7__ Reason __1 or 3__

From __"in a but-for"__ to __"of a but-for"__

Page __87__ Line __8__ Reason __3__

From __"lag dependant"__ to __"lagged dependant"__

Page __87__ Line __8__ Reason __3__

From __"lag price"__ to __"lagged price"__

Page __87__ Line __8-9__ Reason __3__

From __"lag change"__ to __"lagged change"__

Page __87__ Line __16__ Reason __3__

From __"lag"__ to __"lagged"__

Page __90__ Line __10__ Reason __1 or 3__

From __"thing"__ to __"things"__

Page __90__ Line __16__ Reason __1 or 3__

From __"rate"__ to __"rates"__

Page __92__ Line __7__ Reason __1 or 3__

From __"times"__ to __"time"__

Page __97__ Line __4__ Reason __1 or 3__

From __"and"__ to __"of"__

Page __99__ Line __13__ Reason __3__

From __"reduction demand"__ to __"reduction of demand"__

Page __100__ Line __17__ Reason __3__

From __"supplier demand"__ to __"supply or demand"__

Page __111__ Line __2__ Reason __3__

From __"flushed"__ to __"fleshed"__

Page 130 Line 13 Reason 1 or 3

From "produces or" to "produces is"

Page 130 Line 13 Reason 1 or 3

From "variable" to "variables"

Page 133 Line 6 Reason 3

From "such as" to "such that"

Page 133 Line 7 Reason 3

From "forecasts. In this" to "forecasts, in that"

Page 143 Line 12 Reason 3

From "pre-imposed" to "plea"

Page 150 Line 7 Reason 3

From "abhorrent" to "aberrant"

Page 153 Line 2 Reason 1 or 3

From "group" to "groups"

Page 170 Line 25 Reason 3

From "they" to "there"

Page 177 Line 16 Reason 3

From "futures" to "features"

Page 181 Line 12 Reason 3

From "I" to "I've"

Page 185 Line 20 Reason 3

From "principal" to "principle"

Page 189 Line 3 Reason 3

From "universal" to "universe of"

Page 201   Line 2   Reason 1 or 3

From "in a" to "in the"

Page 201   Line 25   Reason 3

From "and" to "in"

Page 203   Line 35   Reason 3

From "and" to "in"

Page 205   Line 11   Reason 3

From "rema (pb.)" to "mean"

Page 206   Line 14   Reason 3

From "light" to "might"

Page 207   Line 13   Reason 3

From "ration" to "ratio"

Page 209   Line 35   Reason 3

From "group" to "root"

Page 210   Line 9   Reason 3

From "Dicky" to "Dickey"

Page 210   Line 15   Reason 3

From "Dicky" to "Dickey"

Page 210   Line 15   Reason 1 or 3

From "is" to "are"

Page 210   Line 23   Reason 3

From "knoll" to "null"

Page 211   Line 18   Reason 3

From "principal" to "principle"

Page 212 Line 14 Reason 3

From "Dicky" to "Dickey"

Page 213 Line 13-14 Reason 3

From "that's of integrated" to "that's integrated"

Page 216 Line 17 Reason 3

From "lag" to "lagged"

Page 318 Line 21 Reason 3

From "not" to "known"

Page 219 Line 3 Reason 3

From "Dicky" to "Dickey"

Page 221 Line 18 Reason 3

From "principal" to "principle"

Page 225 Line 2-3 Reason 3

From "Unit 5" to "unity"    [BOTH INSTANCES]

Page 240 Line 27 Reason 3

From "principal" to "principle"

Page 241 Line 6 Reason 3

From "word" to "world"

Page 241 Line 9 Reason 3

From "principal" to "principle"

Page 241 Line 11 Reason 3

From "principal" to "principle"

Page 250 Line 13 Reason 3

From "principal" to "principle"

Page 268    Line 13-14    Reason 1 or 3

From "or is relying"    to "or relying"

Page 272    Line 4    Reason 3

From "journalist"    to "journal"

Page 272    Line 18    Reason 3

From "that's; one"    to "that's the one"

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Francis X. Diebold

5/29/2008 Diebold, Francis X.

CERTIFICATE

I HEREBY CERTIFY that the proceedings, evidence and objections are contained fully and accurately in the stenographic notes taken by me upon the deposition of FRANCIS X. DIEBOLD, taken on May 29, 2008, and that this is a true and correct transcript of same.

_____
Jessica Haddix, Registered
Professional Reporter and
Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

282

# EXHIBIT 11 TO
# DECLARATION OF
# JOSHUA S. STAMBAUGH

0001

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

UNISYS CORPORATION V. HYNIX )
SEMICONDUCTOR, INC., ET AL.   ) No. C 06-02915
PJH

                                )
JACO ELECTRONICS, INC. V.    )
HYNIX SEMICONDUCTOR, INC., ET ) No. C-07-01200
PJH
al. (Case No. C06-01212 PHJ)  )
                                )
EDGE ELECTRONICS, INC., V.   )
HYNIX SEMICONDUCTOR, INC.,   )
ET AL., (Case No. C06-01207 PJH) No. C-07-01207
PJH
                                )
ALL AMERICAN SEMICONDUCTOR,   ) No. C-07-01212
PJH
INC., V. HYNIX SEMICONDUCTOR, )
INC., ET AL.,             ) No. C-07-01381
PJH
(Case No. C06-01207 PJH)      )
                                )
DRAM CLAIMS LIQUIDATION TRUST )
BY ITS TRUSTEE WELLS FARGO    )
BANK, NA V. HYNIX SEMICONDUCTOR)
INC., ET AL.             )
(Case No. C07-01381 PJH)      )
                                )

CONFIDENTIAL
DEPOSITION OF DR. JOHANN HARTER
TUESDAY, NOVEMBER 20, 2007
LOS ANGELES, CALIFORNIA

REPORTED BY: JEANINE CURCIONE
CSR NO. 10223, RPR

FILE NO.: 1-1030

1

A. Similar time frame like Richmond. Also 1995, 1996.

Q. If I can turn back to the Regensburg plant, when you converted to logic, how long did that process take? Do you know?

A. I don't know that anymore. It was not in my responsibility anymore.

Q. Was it part of your responsibility to open the second Dresden plant, the Dresden 300 plant?

A. Yes.

Q. And how long did it take to built that plant?

MR. BREW: I'm going to object as vague.

THE WITNESS: I don't recall the exact time frame. I can only talk in what it took us typically for the fabs to be built in Dresden. Normally you had a year's time for building, constructing the fab, and then another three-quarter year to ramp it.

BY MR. SASSE:

Q. Do you know how much it cost to build the Dresden plant?

A. I don't know the exact numbers. The numbers we typically used were about 200,

127

$250 million for building the fab, the construction, and then another 1.5 to $2 billion to equip it and ramp it. Again, these are generic numbers which were valid at the time. The actual numbers I don't know.

Q. When that plant was built, was it designed specifically to make DRAM products?

A. The fab was designed to make DRAMs. I wouldn't call it specifically for DRAM, because as we discussed earlier about the flexibility you have in those tools. But yes, the first tool set was tailored to run the next-generation technology in DRAM.

Q. What other products can you run at the Dresden 300 plant?

MR. BREW: You mean currently?

MR. SASSE: Yes.

THE WITNESS: Sorry. I didn't get that.

MR. BREW: I asked if he meant currently, and I will object as beyond the scope.

Go ahead.

THE WITNESS: Currently the fab is only running DRAMs. I cannot speculate for logics. You have to ask me which logics.

board previously. Is there a distinction between the memory products top workshop and the memory products board?

A. The top workshop contained much more people, typically 70 to 90 people.

Q. If you could turn to page 12, going with the Bates number 912, what was this slide trying to convey to the workshop?

A. Give it a couple of minutes to read again.

If I read it through, then what it shows here is the various problems we had been encountering in the time frame starting 15th of July, 2001, to 8th of February, 2002, in the process of etching the deep trench that we had discussed earlier, this tiny hole where we folded the capacitor into, and it was referring to several times of problem.

Like, deep trench mask open, that's the one I explained when we etched the first two layers we deposited on the wafer. And "ASH" stands for "ashing problem." That's when we took away the resist again. Mask erosion again means that the layers on the wafer were kind of damaged by the etching process and did no longer act

258

properly as a masking layer. So all of this --
for example, they had a bad etch printing at the
far right was where we had a problem at the other
side of the wafer, killing chips which were more
inside of the wafer, causing defects, for example.

Q. Did this only refer to the Dresden 300
plant?

A. Yes.

Q. And the learning curve was, as you've
discussed earlier, lessons learned or getting more
efficient at that plant? Is that what that's --

A. Give me a second, please.

Q. -- referring to?

A. There must be something on the yield.

Normally this would refer to showing
improvements needed to get higher yield, meaning
more working chips on a wafer compared to printed
chips on a wafer.

Q. Did the learning curve also refer to
achieving the 30 percent cost reduction goal that
you had discussed earlier?

MR. BREW: Object as vague.

You mean the learning curve as referred to
in this document?

259

A. No.

Q. And this ramp-up plan includes, as counsel noted earlier, a flat line in the middle. Do you see that?

A. Yes.

Q. Can you tell me why the decision was made in June of 2001 to not buy additional equipment to increase that ramp-up line?

MR. SASSE: Objection. Foundation.

THE WITNESS: In the Fiscal Year 0001, which we're talking about in May of 2001, we made the worst losses the memory group ever did, and I think the numbers were mounting up to 1.2 billion Euro, so we just could not afford to buy, actually, any equipment. So this was already a stretch to do that.

BY MR. BREW:

Q. How much money would that equipment have cost to fully operate that plant?

A. If I recall the numbers, as I stated earlier, somewhere in the order of 1.5 to 2 billion Euro.

Q. And were you actually involved in that decision-making process?

A. Yes.

333

11/20/2007 Harter, Johann

Q. Were there discussions at the time about the wisdom of even opening up this plant, of building this plant?

A. Yes, we discussed very hard whether we should go ahead with that, and we decided at least to go ahead because we felt we had a competitive advantage in going to 300-millimeter.

Q. So even with $1.2 billion in losses, you were still spending money on this plant?

A. Yes.

Q. Were any other steps taken at that time to reduce costs?

A. We did very drastic steps. I already mentioned one. We decided in July of 2001 to not complete the shell under construction at Richmond, to build another 300-millimeter fab.

Q. By the way, how much would it have cost to have completed that plant?

A. The shell was targeted to cost in the order of 250 million, and I think we already spent 220 or something.

Q. And to complete the rest of the plant?

A. Would be in the order of 20 to 30 million.

Q. How about to build -- to fully equip

334

the plant?

A. And to fully equip would have called for another 1.5 to 2 billion to be spent for buying the equipment.

Q. And did Infineon have the money to do that?

A. By no means.

And also, you asked me for other measures. The other measures —

Q. Yeah, were there any other measures?

A. We had to lay off 5,000 people worldwide.

Q. Was all of this pursuant to any agreement with your competitors?

A. We did not talk with competitors on that.

Q. Was this based on anything that your competitors had told you or asked you?

A. No.

Q. Would it have been profitable -- based on how the market was at that point, would it have been profitable to invest that extra money in the ramp-up of Dresden 300?

A. We were looking at the prices. The prices were going down much faster than the

335

11/20/2007 Harter, Johann

30 percent per bid per year that we discussed earlier, so projecting from the actual trend of the prices, this investment would not have been profitable.

Q. And you were also involved in that decision?

A. I was a part of that decision too, yes.

MR. KASHA: Objection. Leading.

336

REPORTER'S CERTIFICATE

I, JEANINE CURCIONE. C.S.R. NO. 10223, RPR, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth.

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced to typewriting under my direction, and the same is a true, correct and complete transcript of said proceedings.

I further certify that I am not interested in the event of the action.

Witness my hand this _____ day of _____, 20007.

_____

Certified Shorthand Reporter for the State of California

350