Jerome A. Murphy (*pro hac vice*)
David D. Cross (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W
Washington, DC  20004-2595
Telephone:      202-624-2500
Facsimile:      202-628-5116
E-mail: jmurphy@crowell.com
        dcross@crowell.com

Daniel A. Sasse (CA Bar No. 236234)
Theresa C. Lopez (CA Bar No. 205338)
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA  92614-8505
Telephone:    949-263-8400
Facsimile:    949-263-8414
E-mail:        dsasse@crowell.com
        tlopez@crowell.com

*Counsel for Plaintiff Sun*
*Microsystems, Inc., Unisys Corporation,*
*Edge Electronics, Inc., All American*
*Semiconductor, Inc., and Jaco Electronics, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| *Sun Microsystems, Inc., et al. v. Hynix Semiconductor, Inc., et al.*<br><br>*Unisys Corporation v. Hynix Semiconductor, Inc., et al.*<br><br>*All American Semiconductor, Inc. v. Hynix Semiconductor, Inc., et al*<br><br>*Edge Electronics, Inc. v. Hynix Semiconductor, Inc., et al.*<br><br>*Jaco Electronics, Inc. v. Hynix Semiconductor, Inc., et al.*<br><br>*DRAM Claims Liquidation Trust, by its Trustee, Wells Fargo Bank, N.A. v. Hynix Semiconductor, Inc., et al.* | Case Nos.:  C-06-01665 PJH<br>C-06-02915 PJH<br>C-07-01200 PJH<br>C-07-01207 PJH<br>C-07-01212 PJH<br>C-07-01382 PJH<br><br>Assigned for all purposes to the Hon. Phyllis J. Hamilton<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT WITNESS HALBERT WHITE PURSUANT TO FED. R. EVID. 702** |

# TABLE OF CONTENTS

**Page**

I.     SUMMARY .......................................................................................................... 1

II.    STATEMENT OF FACTS.................................................................................... 8

III.   ARGUMENT ........................................................................................................ 9

    A.   DR. WHITE'S METHODOLOGY IS VALID AND SCIENTIFICALLY
        ACCEPTED. ................................................................................................ 9

        1.   Defendants' Criticism Of Dr. White's Before-And-After Approach Is
            Mistaken. ..................................................................................... 9

        2.   Defendants' Criticisms Of Dr. White's Exclusion Of Factors Under The
            Conspirators' Control Do Not Affect The Admissibility Of His Testimony.
            .................................................................................................... 11

        3.   Dr. White's Two Step Methodology Is Scientifically Valid And Generally
            Accepted. ..................................................................................... 13

    B.   THE RELIABILITY OF DR. WHITE'S ANALYSIS IS VERIFIED BY THE TEN
        ADDITIONAL ECONOMIC STUDIES THAT CORROBORATE ITS
        RESULTS.................................................................................................. 17

    C.   DEFENDANTS' CRITICISMS OF DR. WHITE'S METHODOLOGY SHOULD
        NOT AFFECT THE ADMISSIBILITY OF HIS TESTIMONY. ........................ 18

IV.    CONCLUSION ................................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

## CASES

*Assoc. of Irritated Residents v. C&R Vanderham Dairy*,
    435 F. Supp. 2d 1078 (E.D. Cal. 2006) ................................................................. 6

*Bazemore v. Friday*,
    478 U.S. 385 (1986) ..................................................................................... 18

*Bazuaye v. INS*,
    79 F.3d 118 (9th Cir. 1996) ............................................................................ 6

*Bigelow v. RKP Radio Pictures*,
    327 U.S. 251 (1946) ..................................................................................... 2

*City of Vernon v. S. Cal. Edison Co.*,
    1990 WL 278569 (C.D. Cal. 1990) ................................................................. 12

*City of Vernon v. Southern California Edison Co.*,
    955 F.2d 1361 (9th Cir. 1992) ................................................................. 12, 13

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ..................................................................................... 9

*Dukes v. Wal-Mart, Inc.*,
    509 F.3d 1168 (9th Cir. 2007) ........................................................................ 2

*Eberle v. City of Anaheim*,
    901 F.2d 814 (9th Cir. 1990) ......................................................................... 6

*EEOC v. Gen. Tel. Co. of Nw., Inc.*,
    885 F.2d 575 (9th Cir. 1989) ........................................................................ 18

*Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*,
    786 F.2d 1342 (9th Cir. 1985) ...................................................................... 13

*Hall v. Baxter Healthcare Corp.*,
    947 F. Supp. 1387 (D. Or. 1996) ................................................................... 16

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174 (9th Cir. 2002) ...................................................................... 19

*ILC Peripherals Leasing Corp. v. IBM Corp.*,
    458 F. Supp. 423 (N.D. Cal. 1978) ................................................................ 13

*In Re Indus. Silicon Antitrust Litig.*,
    1998 WL 1031507 (W.D. Pa. 1998) ................................................................. 3

*In Re Linerboard Antitrust Litig.*,
    497 F. Supp. 2d 666 (E.D. Pa. 2007) ................................................. 3, 4, 12, 16

*In Re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) ............................................................................ 7

*In Re Vitamins Antitrust Litig.*,
    Docket No. Misc. 99-197 (D.D.C. 2003) .......................................... 7, 15, 16, 18

*J. Truett Payne Co. v. Chrysler Motor Corp.*,
    451 U.S. 557 (1981) ..................................................................................... 2

*Jones v. Balt. Life Ins. Co.*,
    2007 WL 1713250 (E.D. Cal. 2007) ................................................................. 6

-ii-

PLS.' OPP. TO DEFS.' MOT. TO EXCLUDE THE TEST. OF PLS.' EXPERT WIT. HALBERT WHITE
CASE NOS. C06-01665; C06-02915; C07-01200; C07-01207; C07-01212; C07-01382

*Litton Sys., Inc. v. Honeywell, Inc.*,
 1996 WL 634213 (C.D. Cal. 1996).................................................................13

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
 211 F.R.D. 562 (D. Minn. 2001)....................................................................2

*Obrey v. Johnson*,
 400 F.3d 691 (9th Cir. 2005).........................................................................19

*Ohio Pub. Interest Campaign v. Fisher Foods, Inc.*,
 546 F. Supp. 1 (N.D. Ohio 1982)..................................................................18

*One Beacon Ins. Co. v. Prometheus Real Estate Group, Inc.*,
 2007 WL 2318925 (N.D. Cal. 2007).............................................................6

*Pacific Coast Agric. Export Ass'n v. Sunkist Growers, Inc.*,
 526 F.2d 1196 (9th Cir. 1975)................................................................10, 11

*Redfoot v. B.F. Ascher & Co.*,
 2007 WL 1593239 (N.D. Cal. 2007).............................................................9

*Southwire Co. v. J.P. Morgan Chase & Co.*,
 528 F. Supp. 2d 908 (W.D. Wis. 2007) ........................................................18

*United States v. Romm*,
 455 F.3d 990 (9th Cir. 2006).........................................................................6

*United States v. Williams*,
 235 F. App'x 925 (3d Cir. 2007) ...................................................................7

*William Inglis & Sons Baking Co. v. Cont'l Baking Co.*,
 461 F. Supp. 410 (N.D. Cal. 1978) ...............................................................10

*William Inglis & Sons Baking Co. v. Cont'l Baking Co.*,
 942 F.2d 1332 (9th Cir. 1991) ......................................................................10

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
 395 U.S. 100 (1969) ......................................................................................2

## REGULATIONS

Fed. R. Evid. 702 ..............................................................................................8

## OTHER AUTHORITIES

Abadie, A., and Imbens, G., "Large Sample Properties of Matching Estimators for
 Average Treatment Effects," 74 *Econometrica* 235 (2006)..............................12

Abadie, A., and Imbens, G., "Simple and Bias-Corrected Matching Estimators for
 Average Treatment Effects," *NBER Technical Working Paper* 283 (2002).........12

Abadie, A., Drukker, D., Herr, J. L., Imbens, G., "Implementing Matching
 Estimators for Average Treatment Effects in Stata," 4 *The Stata Journal* 290
 (2004) .........................................................................................................12

Areeda P., Hovenkamp H., *Antitrust Law* (3d ed. 2007) ...................................passim

Becker, S. and Ichino, A., "Estimation of Average Treatment Effects Based on
 Propensity Scores," 2 *The Stata Journal* 358 (2002).......................................12

Collins, D., "Predicting Earnings with Sub-Entity Data: Some Further Evidence,"
 14 *Journal of Accounting Research* 163 (1976) ..............................................15

Dangerfield, B., Morris, J., "Top-Down or Bottom-Up: Aggregate Versus
  Disaggregate Extrapolations," 8 *International Journal of Forecasting* 233
  (1992) ............................................................................................................... 15

Dangerfield, B., Morris, J., "An Empirical Evaluation of Top-Down
  and Bottom-up Forecasting Strategies," *Proceedings of the*
  *1988 Annual Meeting of the Western Region Decision Sciences Institute*, 322
  (1988) ............................................................................................................... 15

Dunn, D., Williams, W., Spivey, W. A., "Analysis and Prediction
  of Telephone Demand in Local Geographical Areas,"
  2 *The Bell Journal of Economics and Management Science* 561 (1971) ........... 15

Frölich, M., "Programme Evaluation with Multiple Treatments," 18 *Journal of*
  *Economic Surveys* 181 (2004) ....................................................................... 12

Gu, X. and Rosenbaum, P., "Comparison of Multivariate Matching Methods:
  Structures, Distances and Algorithms," 2 *Journal of Computational and*
  *Graphical Statistics* 405 (1993) ...................................................................... 12

Heckman, J., Ichimura, H., and Todd, P., "Matching as an Econometric Evaluation
  Estimator: Evidence from Evaluating a Job Training Programme," 64 *Review*
  *of Economic Studies* 605 (1997) .................................................................... 12

Imbens, G., "Nonparametric Estimation of Average Treatment Effects under
  Exogeneity: A Review," 86 *The Review of Economics and Statistics* 4 (2004) ........ 12

Kang, H., "Univariate ARIMA Forecasts of Defined Variables,"
  4 *Journal of Business & Economic Statistics* 81 (1986) .................................... 15

Kinney, W., "Predicting Earnings: Entity Versus Subentity Data,"
  9 *Journal of Accounting Research* 127 (1971) .................................................. 15

Min, C.K., Zellner, A., "Bayesian and Non-Bayesian Methods for Combining
  Models and Forecasts with Applications to Forecasting International Growth
  Rates," 56 *Journal of Econometrics* 89 (1993) .................................................. 14

Pesaran, M., Pierse, R., Kumar, M., "Econometric Analysis of Aggregation
  in the Context of Linear Prediction Models," 57 *Econometrica* 861 (1989) ........ 15

*Reference Manual on Scientific Evidence* (2d ed. 2000) ........................................ 3

Rosenbaum, P., "Optimal Matching for Observational Studies," 84 *Journal of the*
  *American Statistical Association* 1024 (1989) ................................................. 12

Rosenbaum, P., *Observational Studies*, Springer Verlag, New York (1995) ............ 12

Rubin, D., "Estimating causal effects of treatments in randomized and non-
  randomized studies," 66 *Journal of Educational Psychology* 688 (1974) ............ 12

Rubin, D., "Matching to Remove Bias in Observational Studies," 29 *Biometrics*
  159 (1973) ...................................................................................................... 12

U.S. Antitrust Modernization Commission, Report and Recommendations
  (April 2007) 301 ................................................................................................. 1

Zellner, A., Hong, C., Min, C.K., "Forecasting Turning Points in International
  Output Growth Rates Using Bayesian Exponentially Weighted Autoregression,
  Time-Varying Parameter, and Pooling Techniques," 49 *Journal of*
  *Econometrics* 275 (1991) ............................................................................... 14

Zellner, A., Hong, C., "Forecasting International Growth Rates Using Bayesian
  Shrinkage and Other Procedures," 40 *Journal of Econometrics* 183 (1989) ........ 14

-iv-

1

Zellner, A., Min, C.K., "Forecasting Turning Points in Countries' Output Growth
    Rates: A Response to Milton Friedman," 88 *Journal of Econometrics* 203
    (1999) ...........................................................................................................................14

2

3

Zellner, A., Tobias, J.,
    "A Note on Aggregation, Disaggregation and Forecasting Performance," 19
    *Journal of Forecasting* 457 (2000) ....................................................................................14

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **I.   SUMMARY**

2          Defendants move to exclude the testimony of plaintiffs' damages expert, Dr. Halbert L.

3  White, Jr.  Dr. White conducted an empirical analysis using multiple regression techniques to

4  determine the relationship between (1) DRAM prices and (2) DRAM cost, demand and other

5  relevant market factors *outside the period of the DRAM cartel*.  Using this relationship, he was

6  able to predict what prices would have been during the cartel period, but for the cartel.  By

7  accounting for the relevant market factors that affect price, the differences between the predicted

8  prices and actual prices charged during the cartel can be reliably attributed to the cartel.[1]

9  Dr. White then estimates that the weighted average overcharge for all plaintiffs was 39% during

10  the period to which many defendants pled guilty ("Plea Period"), and 49% during a slightly

11  expanded time period ("Conspiracy Period").  On a simple average basis, without taking into

12  account purchase volumes over time, the overcharges are 28.7% and 36.8%, respectively.[2]

13          Defendants argue that "Professor White's damages estimates are implausible" because

14  they are too high.  Br. 2:9-10.[3]  But they ignore the fact that his estimated overcharges are well

15  within the range of the "average overcharge in recent cartel cases [of] 40 percent" as reported by

16  the 2007 United States Antitrust Modernization Commission.[4]

17  [1] White 5-2-08 Rebuttal Report ("Reb. Rep.") ¶¶ 62-66 (Ex. 1) (All references to exhibits are to
18  the Declaration of David D. Cross, filed herewith.); Areeda P., Hovenkamp H., *Antitrust Law* (3d
    ed. 2007), IIA, ¶ 395, at 386.

19  [2] White 12-14-07 Report ("Rep.") ¶¶ 37-39 (Ex. 2).  Dr. White did not apply a single overcharge
20  percentage to the entire period, but rather computed overcharges on a monthly basis and found
    the percentage of overcharge varied by month.  The weighted average takes into account the
21  quantity purchased each month and reflects the fact that some plaintiffs, such as Sun, purchased
    more DRAM during periods of higher estimated overcharges and is the appropriate measure of
22  damages.  *Id.* ¶ 38.

23  [3] They assert that Dr. White finds damages of $1.7 billion, which are nearly as great as all
    purchases from all defendants.  Br. 2:22-23.  But in fact, for the Plea Period, he finds damages of
24  nearly $1.3 billion on total purchases of $3.24 billion, or 39.4%.  Rep. Figure 15, p. 20 (Ex. 2).

25  [4] Report and Recommendations, at 301 (April 2007) (Ex. 3).  Defendants assert that Dr. White's
    estimates are unreliable because he always finds "massive damages."  Br. 4:14.  In fact, his
26  estimates show that the actual prices dip below the predicted but for prices during the so-called
    "Kill Hynix" time period.  This provides even greater confidence in their reliability.  White 2-27-
27  08 Dep. 230:19-231:16 (Ex. 4); Rep. Figs. 81-92 (Ex. 2).

28                                                    -1-

1   They also argue that the estimates are implausible because with one exception the

2   defendants did not plead guilty to fixing prices for anyone but the so-called named OEMs.  Br.

3   2:1-3.  But they ignore the well recognized reality that negotiated plea agreements, like consent

4   decrees, cannot be expected to reflect the actual scope of the conspiracy "because one would

5   rarely expect the defendant to agree to all of the provisions that might possibly result from a trial

6   resolving all liability and relief against it."[5]  In addition, the evidence here is that the prices to the

7   OEMs and to plaintiffs "are closely interrelated."[6]  Defendants simply ignore the fact that the

8   prices charged to plaintiffs closely tracked the admittedly fixed prices charged to OEMs.  As a

9   result, a conspiracy to raise the prices to OEMs would likely have affected plaintiffs' prices

10  whether or not they were overtly targeted.

11  Defendants also ignore the substantive antitrust law which makes clear that "[t]he vagaries

12  of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been

13  in the absence of the defendant's antitrust violation," *J. Truett Payne Co. v. Chrysler Motors*

14  *Corp.*, 451 U.S. 557, 566 (1981), and "'[t]he constant tendency of the courts is to find some way

15  in which damages can be awarded where a wrong has been done.  Difficulty of ascertainment is

16  no longer confused with right of recovery for a proven invasion of the plaintiff's rights." *Bigelow*

17  *v. RKP Radio Pictures*, 327 U.S. 251, 265-66 (1946).  The amount of damages can be determined

18  using "a just and reasonable estimate . . . based on relevant data," including the "probable and

19  inferential."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124 (1969).

20  Defendants do not question the reliability of regression analyses generally, which the

21  courts have recognized as "a common statistical tool . . . designed to isolate the influence of one

22  particular factor . . . on a dependent variable.'" *Dukes v. Wal-Mart, Inc*., 509 F.3d 1168, 1180 n.6

23  (9th Cir. 2007) (internal citation omitted); *Midwestern Machinery Co. v. Nw. Airlines, Inc*., 211

24  F.R.D. 562, 567 (D. Minn. 2001) ("widely recognized within the field of economics and have

25  been accepted by the courts."); *In Re Indus. Silicon Antitrust Litig.*, 1998 WL 1031507 at * 2

26  [5] Areeda P., Hovenkamp H., *Antitrust Law* (3d ed. 2007) , IIA, ¶ 327, at 26.

27  [6] White 2-27-08 Dep. 47:11-48:24 (Ex. 4).

28

1    (W.D. Pa. 1998) ("an accepted method of determining damages in antitrust litigation."); Federal

2    Judicial Center, *Reference Manual on Scientific Evidence* (2d ed. 2000), at 181-82 (Ex. 5).

3    　　　Moreover, such techniques are widely relied upon by business and government in a

4    variety of contexts.  Both Dr. White and Dr. Diebold, another expert economist who testified for

5    plaintiffs,[7] pointed out that the type of multiple regression method used by Dr. White here is

6    widely relied upon in the field of medicine, for example, to predict the effectiveness of new

7    cancer drugs, and by the Federal Reserve System to predict future recessions.  Diebold Rep.

8    ¶¶ 9, 26-27 (Ex. 6); Reb. Rep. ¶¶ 44-61 (Ex. 1).

9    　　　Instead, defendants urge Dr. White's exclusion because:  (1) he allegedly does not show

10   that market conditions were the same in the benchmark and cartel periods; (2) he excludes from

11   consideration any factors, *e.g.*, capacity utilization, which were under defendants' control; and (3)

12   his two step analysis using both OEM and plaintiff prices is allegedly unreliable.  Br. 3-4.  As we

13   demonstrate below, each of these contentions is without merit.

14   　　　Defendants do not challenge Dr. White's qualifications.  This is not surprising.  As one

15   District Court recently found:  "Professor White is well qualified to testify on damages in antitrust

16   cases."  *In Re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 668 (E.D. Pa. 2007).  He has his

17   Ph.D. in economics from MIT; serves as a Professor of Economics at the University of California,

18   San Diego; he is widely published in peer reviewed literature on economics and statistics; his

19   book – *Asymptotic Theory for Econometricians* – is a standard graduate level text in

20   econometrics; and he has testified as an expert on the economic analysis of damages in antitrust

21   cases in several courts.  *Id.*

22   　　　Here, Dr. White testified that:  "The approach that I take in this matter is inherently

23   consistent with the approach that I took in the [*Linerboard*] matter."  White 5-22-08 Dep. 69:23-

24   25 (Ex. 7).  In *Linerboard*, the Court denied a motion to exclude Dr. White's regression analysis

25   _____

26   [7] Dr. Diebold has his Ph.D. in economics from the University of Pennsylvania; is currently a
     Professor at the University of Pennsylvania's Wharton Business School; served as a visiting
27   professor at Princeton University, the University of Chicago, and several other leading
     institutions; and served as an economist with the Federal Reserve System, Board of Governors.

28

and in so doing rejected defendants' argument that it was improper not to include "any variables that reflected Defendants' . . . conduct affecting the amount of DRAM produced."  Br. 19:19-20. The Court there held that "it was appropriate for Professor White to remove all variables that could be affected by defendants' conduct, lawful or unlawful."  *Linerboard*, 497 F. Supp. 2d at 681.

Defendants' remaining arguments are also without merit for three reasons.

**First**, the reliability of Dr. White's predicted but for prices is corroborated by the fact that they accurately predict the actual prices after the cartel ended.  His prediction equation does not in any way guarantee that the predicted prices will match the actual prices. Rep. ¶ 31 (Ex. 2).  The fact that they do provides strong support for the reliability of the method.  As the District Court in *Linerboard* concluded:  "What matters is that the selected variables resulted in a predicted price during the benchmark period that was almost identical to the actual price in the benchmark period."  *Linerboard*, 497 F. Supp. 2d at 682.

**Second**, in response to criticisms lodged by defendants' seven economists (Shapiro, Kalt, O'Brien, Murphy, Topel, Cox, and Rubinfeld), Dr. White conducted ten alternative empirical studies which are reflected in his Rebuttal Report.  Defendants do not mention, much less contest, the reliability of these ten corroborating studies.  As it turns out, all ten alternative studies corroborate the reliability of Dr. White's damage estimates.

**1.**     **Profit Margin Study**:  Dr. White examined defendants' profit margins during the benchmark and conduct periods and found a substantial increase during the conduct period,[8] which indicates an overcharge of approximately 48%.  Reb. Rep. ¶¶ 11-12; 69-71 (Ex. 1).

**2.**     **Simplified Regression Study**:  In response to criticism that his initial method was too complex in that it considered 24 cost and demand variables, he undertook a different regression analysis using only three key cost and demand variables, which also predicts overcharges of approximately 32%.  Reb. Rep. ¶¶ 13-15; 72-83 (Ex. 1).

---

[8] The results in the text are for the "Plea Period."  Figures 115 and 116 in his Rebuttal Report report similar results for the "Conspiracy Period."  Reb. Rep. ¶ 26 (Ex. 1).

**3.** **Plaintiff Direct Study**: Several of defendants' experts (and Br. 4) criticize his initial two-step method as improper and argue that he should have predicted plaintiffs' but for prices directly. In response, Dr. White undertook such a direct study which also predicts overcharges of approximately 41%. Reb. Rep. ¶¶ 16-17; 88-92 (Ex. 1).

**4.** **Enhanced Data Set Study**: In response to criticism that he did not include all of the defendants' data in his initial regression analysis, he undertook a new study using virtually all of the available data which also predicts overcharges of approximately 44%. Reb. Rep. ¶¶ 18-20; 93-96 (Ex. 1).

**5-7.** **Defendants' Experts Analysis**: In response to alternative multiple regression analyses offered by three of defendants' experts, Dr. White corrected defects in their methodology and, using their methods, predicted overcharges of approximately 54% (Rubinfeld), 19% (Shapiro),[9] and 58% (Topel), respectively. Reb. Rep. ¶¶ 21-24; 113-213 (Ex. 1).

**8.** **Common Variables Study**: Several of the defendants' experts criticized Dr. White's regression analysis because it drew on different variables for the Plea and Conspiracy Periods. In response, Dr. White re-ran the regressions using the same variables for each period and still predicted overcharges of 36% and 45%, respectively. Reb. Rep. ¶¶ 246-53 (Ex. 1).

**9.** **Netting Negative Overcharges Study**: Defendants' experts also criticized Dr. White's regression analysis because it did not net out any predicted negative overcharges. Dr. White believes – as does Areeda and Hovenkamp – that negative overcharges "should not be netted out against the overcharges."[10] Nonetheless, in response, Dr. White re-ran his analysis and found the negative amounts have a negligible impact (2 to 3%), so the predicted overcharge remains at 36% to 37%. Reb. Rep. ¶¶ 265-68 (Ex. 1).

**10.** **Exogenous Event Study**: Several of defendants' experts (and Br. 14:12-21)

---

[9] Dr. White's corrected version of Dr. Shapiro's plea period analysis renders an overcharge of 19%; however, Dr. White identified additional serious issues with Dr. Shapiro's model that he could not correct, including unsupported assumptions. Reb. Rep. ¶¶ 169-201 (Ex. 1).

[10] Reb. Rep. ¶¶ 267-68 (Ex. 1); Areeda P., Hovenkamp H., *Antitrust Law* (3d ed. 2007) , IIA, ¶ 395, at 388.

1    criticized Dr. White's regression analysis because it did not separately account for earthquakes,

2    the alleged boom-or-bust cycle of DRAM, new PC operating systems, Y2K and the like.  In

3    response, Dr. White studied each of these events separately and determined that "these events

4    either had no impact on DRAM prices or I have already accounted for their impact."  Reb. Rep.

5    ¶ 218-19; App. G, ¶¶ 355-81 (Ex. 1).

6        Defendants have not contested any of these ten alternative studies in their opening brief

7    and, accordingly, any objection they may have had to them is waived.  "It is well established in

8    this circuit that 'the general rule is that appellants cannot raise a new issue for the first time in

9    their reply briefs.'"  *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990); *United States*

10    *v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006) ("[A]rguments not raised by a party in its opening

11    brief are deemed waived."); *Bazuaye v. INS*, 79 F.3d 118, 120 (9th Cir. 1996) ("Issues raised for

12    the first time in the reply brief are waived."); *One Beacon Ins. Co. v. Prometheus Real Estate*

13    *Group, Inc.,* 2007 WL 2318925 at *2 (N.D. Cal. 2007) (striking "new arguments and evidence

14    presented in its reply brief"); *Jones v. Balt. Life Ins. Co.,* 2007 WL 1713250, at *9 (E.D. Cal.

15    2007) ("It is improper for a moving party to introduce new facts or different legal arguments in

16    the reply brief."); *Assoc. of Irritated Residents v. C&R Vanderham Dairy*, 435 F. Supp. 2d 1078,

17    1089 (E.D. Cal. 2006) ("It is inappropriate to consider arguments raised for the first time in a

18    reply brief.").

19        As a result, Dr. White's damage estimate cannot be "unreliable" when it is verified by so

20    many uncontested, alternative methods.

21        **Third**, it is simply incorrect to assert that Dr. White's method does not establish that

22    market conditions were the same in the benchmark and conduct periods or that his two step

23    method is unreliable.  By using reliable predictor factors, Dr. White insures that *any changes in*

24    *market conditions across benchmark and conduct periods that might impact price have been*

25    *adequately taken into account*.  As a result, "any differences between actual and but-for prices

26    can be directly interpreted as overcharges caused by the conspiracy."  Reb. Rep. ¶ 62 (Ex. 1);

27    White 5-22-08 Dep. 23:20-24:3 (Ex. 7).  As Areeda and Hovenkamp explain:  "The resulting

28    prediction on price during the conspiracy period takes into account influences other than the

conspiracy that could serve to increase the . . . prices."[11]  Further, as his initial Report (¶¶ 186-190; Ex. 2) and Appendix G (¶¶ 355-81; Ex. 1) show, White considered all of these other factors, and even separately studied all of the events defendants have asserted – from earthquakes in Taiwan to DRAM boom-and-bust cycles – and found they either had no effect on price or are properly accounted for in his initial study.  Defendants never even mention this Exogenous Event Study, much less contest the validity of this separate analysis.

Finally, the two step method Dr. White used is entirely sound.  As Dr. White explained, it allows him to use the richer OEM data and is completely appropriate because the OEM and plaintiff prices tend to move together and are explained by common demand and supply factors. Reb. Rep. ¶ 6 (Ex. 1); White 2-27-08 Dep. 62:2-11 (Ex. 4).  Indeed, the two step method is "the most reliable way to obtain the but-for price estimates."  White 2-27-08 Dep. 64:7-8 (Ex. 4).  It does not in any way attribute OEM overcharges to plaintiffs.  And, contrary to defendants' unsupported assertion, it is fully consistent with the peer reviewed economic literature.[12]  Indeed, a two step method was used both by Dr. White in *Linerboard* and by Dr. B. Douglas Bernheim in the *In Re Vitamins Antitrust Litigation* proceeding and was found to be reliable by both Courts.[13]

If there were any remaining doubt about Dr. White's damage estimate – either concerning the two step method or the defendants' other quarrels – the ten alternative, uncontested studies fully substantiate its reliability.  How can his damage estimate be unreliable as a matter of law, when it is verified by so many uncontested, alternative methods?

As set forth above, the core *Daubert* test is whether Dr. White's testimony is scientifically valid and hence trustworthy.  Plaintiffs need not prove that it is correct or even persuasive, only that it is sufficiently reliable that it may assist the jury.  *In Re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).  "The requirement of reliability is lower than the standard of correctness."  *United States v. Williams*, 235 F. App'x. 925, 928 (3d Cir. 2007) (unpublished);

---

[11] Areeda P., Hovenkamp H., *Antitrust Law* (3d ed. 2007) , IIA, ¶ 395, at 386.

[12] See, *infra*, pp. 13-15.

[13] Reb. Rep.¶¶ 86-87 (Ex. 1); see also, *infra*, pp.15-16.

1    Fed. R. Evid. 702 advisory committee's note (2000), at 3.

2          Plaintiffs respectfully submit that based on (1) his acknowledged expertise, (2) his

3    acceptance as an expert in other antitrust cases, (3) the acceptance of his method in the peer

4    reviewed literature, (4) the ability of his estimate to so closely predict actual prices after the cartel

5    ended, and (5) the ten uncontested, alternative studies that verify his damage estimates,

6    Dr. White's testimony easily passes the reliability test.

7    **II.    STATEMENT OF FACTS**

8          On December 14, 2007, Dr. White submitted an initial report in which he presented an

9    estimation of overcharges to plaintiffs based on a two step regression analysis.  Rep. ¶ 17 (Ex. 2).

10   Dr. White first estimated the impact of the conspiracy on the prices paid for DRAM products by

11   the named OEMs, and further calculated the prices the named OEMs would have paid but for the

12   conspiracy.  *Id.* ¶ 20.  This regression analysis incorporated 24 cost and demand variables that

13   were verified through a cross-validation process.  *Id.* ¶¶ 27-28; App. E.  Dr. White then

14   performed a second regression analysis to relate the prices paid by the named OEMs to those paid

15   by the plaintiffs and to predict the prices plaintiffs would have paid but for the conspiracy.  *Id.*

16   ¶¶ 33-34.  Dr. White concluded that the total weighted average overcharge percentage for the

17   Plaintiffs was 39% during the Plea Period and 49% during the Conspiracy Period.  The simple

18   average was 28.7% and 36.8%, respectively.  *Id.* ¶ 159.

19         On May 2, 2008, Dr. White submitted his rebuttal report presenting an additional ten

20   separate economic studies, each of which corroborates the results of his initial damage estimate.

21   Reb. Rep. ¶¶ 7-26, 69-83, 88-96, 113-213, 246-53, 265-68, and 355-81 (Ex. 1).[14]  These ten

22   separate studies looked at the question of whether there was an overcharge and its estimated

23   amount in significantly different ways.  Yet, it is uncontested that they confirmed that there were

24   overcharges and that they ranged from 32% to 58%.[15]

25   _____

     [14] At Reb. Rep ¶ 9 (Ex. 1), Dr. White refers to seven additional studies.  The other three are
26   identified at Reb. Rep. ¶¶ 246-53 (common variables); ¶¶ 265-68 (netting negative overcharges);
     ¶¶ 218, 355-81 (exogenous events).

27   [15] As discussed above, this does not include Dr. White's corrected version of Dr. Shapiro's
     analysis which contained other serious issues as well.  *See*, *supra*, p. 5.
28

-8-

PLS.' OPP. TO DEFS.' MOT. TO EXCLUDE THE TEST. OF PLS.' EXPERT WIT. HALBERT WHITE
CASE NOS. C06-01665; C06-02915; C07-01200; C07-01207; C07-01212; C07-01382

1    **III.    ARGUMENT**

2         Defendants have presented no valid reason to exclude the testimony of Dr. White.  First,

3    their quarrel about the comparability of market forces in the benchmark and conduct periods, the

4    exclusion of factors under defendants' control, and the two step regression analyses, fails on the

5    merits as we show below.

6         Second, they have not contested the ten alternative studies that Dr. White presented in his

7    Rebuttal Report.  How can these quarrels with the study constitute material defects when his

8    damage estimate is corroborated by so many alternative methods?

9         Courts should preliminarily assess whether the methodology underlying an expert's

10   testimony is "scientifically valid," and thus reliable, and can be applied to the facts in issue.

11   *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993).  However, under *Daubert*,

12   "there is a presumption of admissibility."  *Redfoot v. B.F. Ascher & Co.*, 2007 WL 1593239 at * 3

13   (N.D. Cal. 2007) (Hamilton, J.).

14        **A.    DR. WHITE'S METHODOLOGY IS VALID AND**
          **SCIENTIFICALLY ACCEPTED.**

15             **1.    Defendants' Criticism Of Dr. White's Before-And-After**
                       **Approach Is Mistaken.**

16

17        Defendants contend that in order for Dr. White's regression analysis to be valid, he must

18   show that market conditions in the benchmark and cartel periods were the same but for the illegal

19   conduct.  Br. 10:11-17; 11:10-18.

20        In making this argument, defendants rely (Br. 10:20-22) on a highly selective quote from

21   a well-known antitrust treatise:  "If something has changed – in addition to the fact of collusion –

22   this must be taken into account in estimating the 'but for' prices during the conspiracy period."

23   Areeda P., Hovenkamp H., *Antitrust Law* (3d ed. 2007), IIA, ¶ 395, at 384-85.  In fact, this

24   commentary relates to a "simple model of damages [which] presumes that whatever conditions

25   were present" in benchmark period "continued to prevail during the conspiracy period."  *Id.* at

26   384.

27        Defendants do not inform the Court, however, that the very same treatise goes on to

28   explain precisely why this criticism does not apply to the more complex "reduced form price

-9-

equation" where "price is expressed as a function of supply and demand variables." *Id.* at 386.

This regression method accounts for any variation in market conditions in the benchmark and

conspiracy periods.  As Areeda and Hovenkamp explain:

> In order to estimate the prices during the conspiracy period but for
> the cartel behavior, one substitutes the actual values of the
> explanatory variables . . . for the conspiracy period in the estimated
> price equation.  ***In this way, the plaintiff has controlled for
> changes in demand and supply determinants of price.  The
> resulting prediction on price during the conspiracy period takes
> into account influences other than the conspiracy that could
> serve to increase the . . . prices***.  The differences between the
> predicted prices and the actual prices charged during the
> conspiracy period are inferred to be the overcharges due to the
> conspiracy.

*Id.* (emphasis added).[16]

Dr. White did not simply assume that the two periods were comparable.  Instead, by

accounting for the relevant market factors during the both periods, Dr. White – just as Areeda and

Hovenkamp – has properly taken into account the influences on price due to market conditions.

Like Areeda and Hovenkamp, he is thus able to reliably attribute any difference between the

actual and but for prices in the cartel period to the conduct itself.  Rep. ¶¶ 154-58 (Ex. 2).

Defendants assert that Ninth Circuit law (*Pacific Coast Agric. Export Ass'n v. Sunkist

Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975) and *William Inglis & Sons Baking Co. v. Cont'l

Baking Co.*, 942 F.2d 1332 (9th Cir. 1991)) requires some separate and independent showing that

the market conditions in the two periods were the same.  Br. 10:12-13.  But, the two cases they

rely upon do not apparently even involve a multiple regression analysis where "price is expressed

as a function of supply and demand variables."  *Antitrust Law* (3d ed. 2007), IIA, ¶ 395, at 386.

In *Inglis*, the witness was a "cost expert" who compared costs in two periods (942 F.2d at 1340;

*William Inglis & Sons Baking Co. v. Cont'l Baking Co.*, 461 F. Supp. 410, 418 (N.D. Cal. 1978)

---

[16] Defendants assert that Dr. White did no analysis of which customers were the subject of price
communications or of the existence of any output restriction.  Br. 7.  But, the methodology
approved by Areeda does not require such an analysis in order to predict reliable but for prices.

("an accounting expert")) and *Pacific* involved a market share projection based on two time

periods. *Pacific*, 526 F.2d at 1206-07. Neither case apparently involved a multiple regression

analysis of the type used here which "***controlled for changes in demand and supply***

***determinants of price.***" Areeda P., Hovenkamp H., *Antitrust Law* (3d ed. 2007) , IIA, ¶ 395, at

386 (emphasis added). As a result, the cases relied upon are irrelevant; there is no need to

separately prove comparability when the regression analysis itself controls for changes in factors

that may affect price across both periods.

Defendants also argue that Dr. White's analysis fails to account for various changes in

supply and demand, such as "booms" and "busts" in productions as well as changes in the

numbers and concentration of competitors. Br. 12:20-22; 14:7-11. Defendants ignore the fact

that Dr. White's analysis uses several production indices related to end products for DRAM. In

addition, Dr. White's analysis includes several variables related to the underlying costs of

manufacturing DRAM, including the effects of learning by doing. By including these variables,

Dr. White can accurately account for DRAM supply and demand without having to resort to the

use of variables tainted by defendants' conduct. Reb. Rep. ¶¶ 216-17 (Ex. 1); Rep. App. E (Ex.

2).

Defendants also ignore the fact that in response to their experts' criticisms, Dr. White

undertook a separate study of these so-called exogenous factors, *e.g.,* earthquakes and boom-and-

bust cycles, and found them to have no significant effect on price or to be already accounted for

in his analysis. Reb. Rep. ¶ 218, App. G, ¶¶ 355-81 (Ex. 1). In addition, Dr. White conducted

sensitivity analyses with the additional variables proposed by defendants' own experts. Dr. White

found that these variables, which accounted for product life cycles, and additional cost and

demand factors, did not affect his results in any meaningful way. *Id.* ¶ 220.

> **2.  Defendants' Criticisms Of Dr. White's Exclusion Of Factors
> Under The Conspirators' Control Do Not Affect The
> Admissibility Of His Testimony.**

Defendants complain that Dr. White should be excluded because he did not consider

factors under the conspirators' control. Br. 15-20. As noted above, the court in *Linerboard*

1   rejected this very argument, holding that "it was appropriate for Professor White to remove all

2   variables that could be affected by defendants' conduct, lawful or unlawful."  497 F. Supp. 2d at

3   680-81.

4          Beyond that, however, it is well recognized in the economic literature that to generate a

5   reliable set of plaintiff but for prices, one should not include any factors that were themselves

6   tainted by the conspiracy.  This concept has played a central role within a large body of statistics

7   and economic literature that deal with the problem of constructing multiple regression analyses to

8   measure the effect of an action or event.[17]

9          Furthermore, the Ninth Circuit cases relied upon by defendants (Br. 16) are completely

10  irrelevant to the damage studies conducted here.  For example, *City of Vernon v. Southern*

11  *California Edison Co*., 955 F.2d 1361 (9th Cir. 1992), involved only engineering studies, not

12  economic studies or regression analyses.  *City of Vernon v. S. Cal. Edison Co.,* 1990 WL 278569

13  (C.D. Cal. 1990).  Thus, the Court's ruling is irrelevant here.  Dr. White's regression analysis—

14  unlike an engineering comparison between two time periods—controlled for the demand and

15  _____

16  [17] This literature dates back to the seminal work of Rubin (1973, 1974). *See* Rubin, D., "Matching to Remove Bias in Observational Studies," 29 *Biometrics* 159-83 (1973) (Ex. 8); and Rubin, D.,

17  "Estimating causal effects of treatments in randomized and non-randomized studies," 66 *Journal of Educational Psychology* 688-701 (1974) (Ex. 9). Other examples include Rosenbaum, P.,

18  "Optimal Matching for Observational Studies," 84 *Journal of the American Statistical Association* 1024-32 (1989) (Ex. 10); Rosenbaum, P., *Observational Studies*, Springer Verlag,

19  New York (1995) (Ex. 11); Gu, X. and Rosenbaum, P., "Comparison of Multivariate Matching Methods: Structures, Distances and Algorithms," 2 *Journal of Computational and Graphical*

20  *Statistics* 405-20 (1993) (Ex. 12); Heckman, J., Ichimura, H., and Todd, P., "Matching as an Econometric Evaluation Estimator: Evidence from Evaluating a Job Training Programme," 64

21  *Review of Economic Surveys* 605-54 (1997) (Ex. 13); Abadie, A., Drukker, D., Herr, J. L., Imbens, G., "Implementing Matching Estimators for Average Treatment Effects in Stata," 4 *The*

22  *Stata Journal*  290-311 (2004) (Ex. 14); Frölich, M., "Programme Evaluation with Multiple Treatments," 18 *Journal of Economic Surveys* 181-224 (2004) (Ex. 15); Abadie, A., and Imbens,

23  G., "Simple and Bias-Corrected Matching Estimators for Average Treatment Effects," *NBER Technical Working Paper* 283 (2002) (Ex. 16); Abadie, A., and Imbens, G., "Large Sample

24  Properties of Matching Estimators for Average Treatment Effects," 74 *Econometrica* 235-67 (2006) (Ex. 17); Imbens, G., "Nonparametric Estimation of Average Treatment Effects under

25  Exogeneity: A Review," 86 *The Review of Economics and Statistics* 4-29 (2004) (Ex. 18); Becker, S. and Ichino, A., "Estimation of Average Treatment Effects Based on Propensity

26  Scores," 2 *The Stata Journal* 358-377 (2002) (Ex. 19).

27

28

-12-

PLS.' OPP. TO DEFS.' MOT. TO EXCLUDE THE TEST. OF PLS.' EXPERT WIT. HALBERT WHITE
CASE NOS. C06-01665; C06-02915; C07-01200; C07-01207; C07-01212; C07-01382

1  supply factors that may impact price and accordingly, as Areeda and Hovenkamp explain, "[t]he

2  differences between the predicted prices and the actual prices charged during the conspiracy

3  period are inferred to be the overcharges due to the conspiracy." *Antitrust Law* (3d ed. 2007), IIA,

4  ¶ 395, at 386.  This is one of the well-recognized improvements in estimating damages through a

5  multiple regression analysis; by controlling for the factors that may impact price, there is no need

6  to further disaggregate illegal conduct.

7       *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342 (9th Cir. 1985) (Br.

8  16) involved a damage estimate by plaintiffs' officers of $150 lost net profit per trailer, but it

9  merely assumed that all of the shipping business was infected by the unlawful activity.  There was

10  also a projection of "growth rates and profit margins" by an economist who assumed that all

11  projected lost profits were attributable to the unlawful conduct.  *Id.* at 1351.  Neither method

12  apparently controlled for the demand and supply factors that could impact price, as Dr. White did.

13  Rather, Dr. White used the period outside the cartel to establish the relationship between demand

14  and supply factors and price.  He was then able to predict what prices during the cartel would have

15  been but for the conduct.  Unlike in *City of Vernon* and *Farley,* by controlling for the demand and

16  supply factors that affect price, he is able to reliably attribute the difference between predicted and

17  actual prices to the cartel.[18]

18              **3.      Dr. White's Two Step Methodology Is Scientifically Valid And
                          Generally Accepted.**
19

20       Defendants argue that Dr. White's two step approach is unreliable because it is not accepted

21  in economic literature.  Contrary to their assertion, two step forecasting approaches have been

22  used in many other situations in which a single step approach was available but ended up being

23  inferior.  In a series of influential papers, a group of economists from the University of Chicago

24  implement two step forecasting procedures to predict international countries' growth rates.  In the

---

[18] The two district court cases, *Litton Sys., Inc. v. Honeywell, Inc*., 1996 WL 634213 (C.D. Cal. 1996) and *ILC Peripherals Leasing Corp. v. IBM Corp*., 458 F. Supp. 423 (N.D. Cal. 1978), involved monopolization claims seeking to prove lost profits without distinguishing between lawful and unlawful conduct.  Dr. White, in contrast, controls for the factors that effect price and thus can reliably attribute the difference between but for and actual prices.

first step of their analyses, they develop a predictive equation for the aggregated growth rates.  In their second step, they build a separate predictive equation for each country's growth rates, using as one of the predictors the previously forecasted aggregated growth rates.  They find that the two step predictive approach is consistently more accurate than a single step predictive approach for the individual countries' growth rates.[19]

Two step forecasting approaches have been shown to provide superior results in many other contexts. Pesaran, Pierse, and Kumar (1989) forecast the employment demand for the UK economy, and find that a two step procedure at the industry level works better than a single step procedure.

Kang (1986) finds that two step forecasting methods for real interest rates, real gross domestic product (GDP), money multiplier, and money velocity are superior to single step forecasting procedures:

- Dangerfield and Morris (1992), in a forecasting study of product demand, find that a two step forecasting approach provided superior results to a single step approach when forecasting the demand for the product class.

- Dunn, William, and Spinney (1971) find that in forecasting demand for telephones, a two step procedure worked better than a single step approach.

- Dangerfield and Morris (1988) examine the relative performance of single step and two step approaches in forecasting the total run of anadromous fish in the Columbia River drainage, and find that two step forecasting approaches are more accurate than the single step approach.

---

[19] *See* Zellner, A., Hong, C., "Forecasting International Growth Rates Using Bayesian Shrinkage and Other Procedures," 40 *Journal of Econometrics* 183-202 (1989) (Ex. 20); Zellner, A., Hong, C., Min, C.K., "Forecasting Turning Points in International Output Growth Rates Using Bayesian Exponentially Weighted Autoregression, Time-Varying Parameter, and Pooling Techniques," 49 *Journal of Econometrics* 275-304 (1991) (Ex. 21); Min, C.K., Zellner, A., "Bayesian and Non-Bayesian Methods for Combining Models and Forecasts with Applications to Forecasting International Growth Rates," 56 *Journal of Econometrics* 89-118 (1993) (Ex. 22); Zellner, A., Min, C.K., "Forecasting Turning Points in Countries' Output Growth Rates: A Response to Milton Friedman," 88 *Journal of Econometrics* 203-06 (1999) (Ex. 23); Zellner, A., Tobias, J., "A Note on Aggregation, Disaggregation and Forecasting Performance," 19 *Journal of Forecasting* 457-65 (2000) (Ex. 24).

-14-

PLS.' OPP. TO DEFS.' MOT. TO EXCLUDE THE TEST. OF PLS.' EXPERT WIT. HALBERT WHITE
CASE NOS. C06-01665; C06-02915; C07-01200; C07-01207; C07-01212; C07-01382

- Kinney (1971) finds that a two step approach generates more accurate forecasts than a single-step approach when forecasting firm-wide earnings for a set of companies.

- Collins (1976) compares two step and one step forecasting methods for forecasting sales and profit data, and finds that two step procedures are superior to single-step procedures. [20]

A two step prediction method has also been recognized in antitrust litigation as a methodology acceptable under *Daubert*.  For example, in the *Vitamins* case, the plaintiffs' damages expert, Dr. B. Douglas Bernheim, used a two step approach to predict the "but for" prices in the vitamins market, thereby calculating the claimed overcharges.  As Dr. Bernheim pointed out:

> I used the Roche ROVIS data [First Step] to identify the dynamic processes that determine prices for a collection of benchmark products (excluding only those that were thinly-traded or sold over relatively short time frames).  I call this the 'benchmark price model.' I then used the customer-specific transactions data [Second Step] to relate prices charged on every transaction (regardless of customer, vendor, or product) to the prices of the benchmark products (the 'transaction model').[21]

The district court denied the *Vitamins* defendants' *Daubert* motion, finding that this approach was "a product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case."  *In re Vitamins Antitrust Litig.*, Docket No. Misc. 99-

---

[20] Pesaran, M., Pierse, R., Kumar, M. "Econometric Analysis of Aggregation in the Context of Linear Prediction Models," 57 *Econometrica* 861-88 (1989) (Ex. 26); Kang, H., "Univariate ARIMA Forecasts of Defined Variables," 4 *Journal of Business & Economic Statistics* 81-86 (1986) (Ex. 27); Dangerfield, B., Morris, J., "Top-Down or Bottom-Up: Aggregate Versus Disaggregate Extrapolations," 8 *International Journal of Forecasting* 233-41 (1992) (Ex. 28); Dunn, D. , Williams, W., Spivey, W. A., "Analysis and Prediction of Telephone Demand in Local Geographical Areas," 2 *The Bell Journal of Economics and Management Science* 561-76 (1971) (Ex. 29); Dangerfield, B., Morris, J., "An Empirical Evaluation of Top-Down and Bottom-up Forecasting Strategies," *Proceedings of the 1988 Annual Meeting of the Western Region Decision Sciences Institute*, 322-24 (1988) (Ex. 30); Kinney, W. R., "Predicting Earnings: Entity Versus Subentity Data," 9 *Journal of Accounting Research* 127-36 (1971) (Ex. 31); Collins, D. W., "Predicting Earnings with Sub-Entity Data: Some Further Evidence," 14 *Journal of Accounting Research* 163-77 (1976) (Ex. 32).

[21] Expert report of Professor B. Douglas Bernheim, submitted on May 24, 2002, at 169, in *In Re Vitamins Antitrust Litig.*, Docket No. Misc. 99-197 (D.D.C. 2003) (Ex. 33).

---

197, Transcript of *Daubert* Hearing, at 43 (D.D.C. March 21, 2003) (Ex. 25).[22]  Dr. Bernheim

testified at trial using the two step method and the jury awarded the full damages determined by

that analysis.

In addition, a two step method was employed by Dr. White to estimate damages in the

*Linerboard* case where the District Court denied the *Daubert* motion.  As Dr. White's counsel

explained to the Court in *Linerboard*:

> Professor White did a two-stage analysis.  Stage one was what was
> the impact of the conspiracy on the market price for corrugated and
> that's what we're talking about here today . . . the second part of his
> analysis was to derive for each plaintiff the impact that results from
> the but-for price, the change in the market price.

*In Re Linerboard Antitrust Litig.*, Transcript of *Daubert* Hearing, at 104:1-19 (E.D. Pa. June 14,

2007) (Ex. 34).  The Court found that:  "Professor White's damages model fits the facts of this

case and is a reliable method of establishing causation of damages in price-fixing cases."

*Linerboard*, 497 F. Supp. 2d at 668.[23]

Defendants also erroneously contend that *Hall v. Baxter Healthcare Corp.*, 947 F. Supp.

1387, 1406 (D. Or. 1996), stands for the premise that an "unexplained conflict" with the generally

accepted methodology could be a basis for excluding expert testimony.  Br. 22:11-18.  But,

Dr. White's approach has been generally accepted, making the *Hall* case irrelevant.  *Hall* is also

wholly distinguishable.  There, for example, the testimony of the plaintiffs' epidemiology expert

was comprised solely of "her opinions and criticisms of others' work."  947 F. Supp. at 1406.

By contrast, here, Dr. White's opinion is based on multiple and extensive empirical

analyses.  Further, the defendants have made no showing that Dr. White's opinion conflicts with

general consensus in the field of economics.  Defendants cite to Dr. Diebold's testimony and his

supposed statement that the most appropriate methodology here would have been only to use one

---

[22] Defendants argue that Dr. White did not review the Bernheim report in preparation for his
deposition, but overlook the fact that he testified that he was "involved in the preparation of
Dr. Bernheim's report in the vitamins action."  White 5-22-08 Dep. 72: 6-8 (Ex. 7).

[23] Contrary to defendants' assertion, Dr. White testified that in *Linerboard* he "calculated a but-
for price for a market index of liner board.  In the first step and in the second step I computed
plaintiff-specific but-for prices."  White 2-28-08 Dep. 312:18-24 (Ex. 35).

step and not two.  Br. 22:18-21.  On the contrary, Dr. Diebold actually testified that Dr. White's

two step methodology could be just as reliable if not more so than a one step analysis:

> [I]t's certainly conceivable that a more statistically efficient, and
> hence **appropriate and reliable approach,** would first start with an
> analysis of the OEMs, and then bridge that to the plaintiffs, and that
> is what was done here.

Diebold 5-29-08 Dep. 62:8-17 (Ex. 36) (emphasis added).  This is hardly evidence against

Dr. White's methods.

Further, defendants assert that Dr. White provides "no objective tests for the accuracy for

his second step."  Br. 24:7.  Yet, they again ignore the objective test reflected in the close match

between predicted prices and the actual prices after the cartel ended.  This provides clear and

understandable objective evidence of the reliability of the method.  If it were not reliable, the post

cartel predicted and actual prices would not line up so well.[24]

He also conducted ten alternative studies, which provide an "objective test" of the

reliability of his method.  How could he replicate the results of his method so closely with all the

alternative studies if it was inherently inaccurate as defendants assert?  One of these tests was to

directly predict plaintiffs' prices through a single step analysis (see discussion of "Plaintiff Direct

Study," pp. 4-5, *supra*) that predicted damages of approximately 41%.  Reb. Rep. ¶¶ 16-17; 88-92

(Ex. 1).  This is also a powerful "objective test" of the reliability of his damage estimates.

**B.      THE RELIABILITY OF DR. WHITE'S ANALYSIS IS VERIFIED
BY THE TEN ADDITIONAL ECONOMIC STUDIES THAT
CORROBORATE ITS RESULTS.**

The introductory Summary describes the ten additional studies Dr. White performed that

verify his results.  One of these was a profit margin study.  This type of analysis has itself been

---

[24] Defendants argue that Dr. White performed no objective test to verify the relationship between
OEM and plaintiff prices and that even when he predicts no overcharge to the OEMs, his model
generates a 48% overcharge to plaintiffs.  Br. 24.  However, Dr. White's Rebuttal Report shows
that in fact this is a inaccurate characterization of what he did.  His second step analysis is not
biased and when he runs two alternative analyses to test its reliability, he confirms that he was
correct and conservative in estimating damages using a middle ground approach.  Reb. Rep. ¶¶
276-83 (Ex. 1).

-17-

PLS.' OPP. TO DEFS.' MOT. TO EXCLUDE THE TEST. OF PLS.' EXPERT WIT. HALBERT WHITE
CASE NOS. C06-01665; C06-02915; C07-01200; C07-01207; C07-01212; C07-01382

accepted by the courts in other cases.  *E.g.*, *Ohio Pub. Interest Campaign v. Fisher Foods, Inc.*, 546 F. Supp. 1, 10 (N.D. Ohio 1982) (considering profit margin analysis conducted by defendants' expert in approving settlement of price-fixing case against food retailers).

It was also accepted by the Court in the *Vitamins* case.  There, Dr. Bernheim undertook an alternative damages analysis based on changes in defendants' profit margins within and outside the conspiracy period.  He concluded that "this result is consistent with the average overcharge obtained using the preferred statistical methodology."[25]  The District Court in *Vitamins* denied the *Daubert* motion relating to Bernheim's opinions.

Defendants' failure to address, much less show, the unreliability of these corroborating, alternative analyses undercuts their entire argument.

## C.   DEFENDANTS' CRITICISMS OF DR. WHITE'S METHODOLOGY SHOULD NOT AFFECT THE ADMISSIBILITY OF HIS TESTIMONY.

Following the lead of the Supreme Court's decision in *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("normally, failure to include variables will affect the analyses' probativeness, not its admissibility"), courts in multiple circuits have found that to exclude testimony, an opponent must do more than simply point out possible flaws in the proponent's analyses.  The opponent must produce "credible evidence that curing the alleged flaws would also cure the statistical disparity."  *EEOC v. Gen. Tel. Co. of Nw., Inc.*, 885 F.2d 575, 582-83 (9th Cir. 1989).

This is an impossible burden for the defendants to satisfy here in view of the multiple alternative studies which verify the reliability of Dr. White's damage estimates.

In addition, many of defendants' critiques on Dr. White's analyses center on the variables he chose.  Br. 8:5-16; 10:6-10; 11:10-18.  However, the case law clearly provides that the decision of which variables to use is a professional judgment call subject to cross examination, and is not grounds for excluding testimony altogether.  *E.g., Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 928 (W.D. Wis. 2007).  The Ninth Circuit concurs:

---

[25] Expert report of Professor B. Douglas Bernheim, submitted on May 24, 2002, page xvii, in *In Re Vitamins Antitrust Litigation*, Docket No. Misc. 99-197 (D.D.C. 2003) (Ex. 33).

> [A] regression analysis does not become inadmissible because it does not include every variable that is quantifiable and may be relevant to the question presented . . . . It is for the finder of fact to consider the variables that have been left out of an analysis, and the reasons given for the omissions and then determine the weight to accord study's results.

*Obrey v. Johnson*, 400 F.3d 691, 695-96 (9th Cir. 2005) (internal citation omitted).

Although it is clear from Dr. White's reports and testimony that he included or accounted for the appropriate variables in his analyses (Reb. Rep. ¶¶ 215-20; Ex. 1), that determination should ultimately be left to the fact finder, after hearing Dr. White's testimony and his cross-examination by the defendants. As the Ninth Circuit has held, "vigorous cross-examination" of an expert will allow a jury to appropriately weigh any claimed defects, and thereby reduce the possibility of prejudice. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002).

## IV.   CONCLUSION

Dr. White's damage estimate is strongly corroborated by its ability to accurately predict the actual prices after the cartel. If his estimate were not providing reliable predictions, then the predicted and actual prices would not match up so well. Defendants do not even contest this point.

Further, in response to their seven experts' criticisms of his estimate, Dr. White undertook ten alternative studies. Remarkably, all ten verify his initial estimate by predicting overcharges in similar amounts. Defendants do not contest the reliability of any of these alternative studies.

Finally, their three critiques – about the similar market conditions, the exclusion of factors under their control and the two step methodology – are all erroneous on the merits and fully rebutted both by the accuracy of the predictions after the cartel and by the ten alternative studies. For these reasons, plaintiffs respectfully urge the Court to deny the motion to exclude.

1

2   DATED:  October 2, 2008                CROWELL & MORING LLP

3                                           //s//_____
                                            Jerome A. Murphy
4                                           David D. Cross
                                            1001 Pennsylvania Avenue, N.W.
5                                           Washington, D.C. 20004-2595
                                            Phone: 202-624-2500
6                                           Fax: 202-628-5116

7
                                            Daniel A. Sasse
8                                           Theresa C. Lopez
                                            3 Park Plaza, 20th Floor
9                                           Irvine, CA 92614-8505
                                            Phone: 949-263-8400
10                                          Fax: 949-263-8414

11
                                            *Counsel for Plaintiff Sun*
12                                          *Microsystems, Inc., Unisys Corporation,*
                                            *Edge Electronics, Inc., All American*
13                                          *Semiconductor, Inc., and Jaco Electronics, Inc.*

14
                                            Michael Olafson *(pro hac vice)*
15                                          James M. Lockhart *(pro hac vice)*
                                            DeAnne M. Hilgers *(pro hac vice)*
16                                          John C. Ekman *(pro hac vice)*
                                            LINDQUIST & VENNUM PLLP.
17                                          4200 IDS Center
                                            80 South Eighth Street
18                                          Minneapolis, MN 55402-2274
                                            Telephone:      612-371-3211
19                                          Facsimile:      612-371-3207

20
                                            James J. Ficenec (CA Bar No. 152172)
21                                          SELLAR HAZARD MANNING
                                            FICENEC & LAI
22                                          1800 Sutter Street, Ste. 460
                                            Concord, CA 94520
23                                          Telephone: (925) 938-1430
                                            Facsimile: (925) 926-7508
24                                          Email: jficenec@sellarlaw.com

25
                                            *Counsel for Plaintiff DRAM Claims*
26                                          *Liquidation Trust*

27   DC6339734.6

28

---