Jerome A. Murphy (*pro hac vice*)
David D. Cross (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
Telephone:     202-624-2500
Facsimile:     202-628-5116
E-mail:        jmurphy@crowell.com
               dcross@crowell.com

Daniel A. Sasse (CA Bar No. 236234)
Theresa C. Lopez (CA Bar No. 205338)
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
Telephone:  949-263-8400
Facsimile:  949-263-8414
E-mail:     dsasse@crowell.com
            tlopez@crowell.com

*Counsel for Plaintiffs Sun Microsystems, Inc.,*
*Unisys Corporation, Jaco Electronics, Inc.,*
*Edge Electronics, Inc., and All American*
*Semiconductor, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| SUN MICROSYSTEMS, INC., ET AL. v. HYNIX SEMICONDUCTOR, INC., *et al.* <br><br> UNISYS CORPORATION v. HYNIX SEMICONDUCTOR, INC., *et al.* <br><br> ALL AMERICAN SEMICONDUCTOR, INC. v. HYNIX SEMICONDUCTOR, INC., *et al.* <br><br> EDGE ELECTRONICS, INC. v. HYNIX SEMICONDUCTOR, INC., *et al.* <br><br> JACO ELECTRONICS, INC. v. HYNIX SEMICONDUCTOR, INC., *et al.* <br><br> DRAM CLAIMS LIQUIDATION TRUST, BY ITS TRUSTEE, WELLS FARGO BANK, N.A. v. HYNIX SEMICONDUCTOR, INC., *et al.* | CASE NOS.   C-06-01665 PJH <br> C-06-02915 PJH <br> C-07-01200 PJH <br> C-07-01207 PJH <br> C-07-01212 PJH <br> C-07-01381 PJH <br><br> **Assigned for all purposes to the Honorable Phyllis J. Hamilton** <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND, IN THE ALTERNATIVE, SUMMARY ADJUDICATION** <br><br> Hearing Date:  December 10, 2008 <br> Time:          9:00 a.m. <br> Place:         Courtroom 3, 17th Floor |

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................................1

STATEMENT OF FACTS ....................................................................................................5

ARGUMENT ........................................................................................................................7

I.   Legal Standard ...........................................................................................................7

II.  A Reasonable Jury Could—And Should—Conclude That Defendants' Price-Fixing
     Conspiracy More Likely Than Not Affected DRAM Prices Paid By Plaintiffs. ..................8

     A.   The Evidence Shows That Defendants' Conspiracy Targeted And More
          Likely Than Not Affected Plaintiffs' DRAM Prices. ...........................................8

          1.   Defendants Exchanged Competitively Sensitive Pricing Information
               Regarding Sales To Plaintiffs Specifically. ...................................................9

          2.   Defendants Understood That Increases In Named OEM Prices
               Would Cause Increases In Prices To Other Customers, Including
               Plaintiffs. ...........................................................................................12

          3.   Dr. Marshall's Expert Opinion Corroborates The Evidence Showing
               That Defendants' Conspiracy More Likely Than Not Affected
               Plaintiffs' Prices. ................................................................................17

               (a)   Plaintiffs' Prices Moved Together With The Named OEMs'
                     Prices Before, During And After the Conspiracy Period ...............17

               (b)   Dr. Marshall's Opinion Is Amply Supported By The Facts............19

               (c)   Dr. Marshall's Opinion Is Supported By Accepted Methods..........21

     B.   Dr. White's Analyses and Opinions Show That Plaintiffs And The Named
          OEMs Paid Inflated Prices For DRAM Due To Defendants' Conspiracy..............23

     C.   Plaintiffs Are Not Required To Prove The Mechanism By Which
          Defendants Fixed Prices, Only That They Did......................................................25

          1.   Plaintiffs Need Not Prove Collusive Output Controls................................25

          2.   A Reasonable Jury Could Conclude That Defendants Restrained
               DRAM Supply........................................................................................26

     D.   Defendants' Conspiracy Was the Proximate Cause of Plaintiffs' Injuries .............33

i

PLAINTIFFS' MEMORANDUM I/S/O THEIR OPPOSITION TO DEFENDANTS' M/S/J AND, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION  CASE NOS. C06-01665; C06-02915; C07-01200; C07-01207; C07-01212; C07-01381

III.    Summary Judgment Is Inappropriate On Plaintiffs' California Law Claims.....................35

IV.    Defendants Are Not Entitled To Summary Adjudication...................................................35

V.    Conclusion........................................................................................................................35

# TABLE OF AUTHORITIES

**Page**

Cases

*Amarel v. Connell,*
   102 F.3d 1494 (9th Cir. 1996) ............................................................34

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
   459 U.S. 519 (1983) ....................................................................34

*Bieghler v. Kleppe,*
   633 F.2d 531 (9th Cir. 1980) ............................................................19

*Blue Shield of Virginia v. McCready,*
   457 U.S. 465 (1982) ..............................................................17, 34

*Callahan v. A.E.V., Inc.,*
   182 F.3d 237 (3d Cir. 1999) ............................................................25

*Emich Motors Corp. v. General Motors Corp.,*
   340 U.S. 558 (1951) ....................................................................2

*Fox West Coast Theatres Corp. v. Paradise Theatre Building,*
   264 F.2d 602 (9th Cir. 1958) ............................................................8

*Hall v. Time Inc.,*
   70 Cal. Rptr. 3d 466 (Cal. Ct. App. 2008) ............................................35

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
   392 U.S. 481 (1968) ....................................................................7

*In re Aluminum Phosphide Antitrust Litig.,*
   905 F. Supp. 1457 (D. Kan. 1995) ..................................................7, 25

*In re Catfish Antitrust Litig.,*
   908 F. Supp. 400 (N.D. Miss. 1995) ................................................7, 8

*In re Coordinated Pretrial Proceedings In Petroleum Products Antitrust Litig.,*
   906 F.2d 432 (9th Cir. 1990) ..............................................6, 30, 32, 33

*In re DRAM Antitrust Litig.,*
   No. M 02-1486 PJH, MDL No. 1486 PJH, 2006 WL 1530166
   (N.D. Cal. June 5, 2006) ................................................................22

*In re Folding Carton Antitrust Litig.,*
   75 F.R.D. 727 (N.D. Ill. 1977) ..........................................................8

*In re Indus. Diamonds Antitrust Litig.,*
   167 F.R.D. 374 (S.D.N.Y. 1996) ......................................................14

*In re Indus. Silicon Antitrust Litig.,*
   1998 WL 1031507 (W.D. Pa. Oct. 13, 1998) ........................................25

iii

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d. Cir. 2002) ...........................................................................................22

*In re Linerboard Antitrust Litig.*,
  497 F. Supp. 2d 666 (E.D. Pa. 2007)...............................................................................25

*In re Petroleum Products*,
  691 F.2d 1335 (9th Cir. 1982) .........................................................................................34

*In re Polyester Staple Antitrust Litig.*,
  MDL No. 3:03CV1516, 2007 WL 2111380 (W.D.N.C. July 19, 2007)........................ passim

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
  No. 3:03-MDL-1556, 2007 WL 4150666 (M.D. Pa. Nov. 19, 2007)...................................23

*In re Rubber Chemicals Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005) ...............................................................................14, 22

*In re Vitamins Antitrust Litig.*,
  320 F. Supp. 2d 1 (D.D.C. 2004) .....................................................................................18

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) .......................................................................................passim

*Or. Laborers-Employers Health & Welfare Trust Fund v. Phillip Morris Inc.*,
  185 F.3d 957 (9th Cir. 1999) ...........................................................................................33

*Rebel Oil Co. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ...........................................................................................19

*Southwire Co. v. J.P. Morgan Chase & Co.*,
  528 F. Supp. 2d 908 (W.D. Wis. 2007)........................................................................19, 24

*United States Gypsum Co. v. Indiana Gas Co., Inc.*,
  350 F.3d 623 (7th Cir. 2003) ...........................................................................................26

*United States v. Broce*,
  488 U.S. 563 (1989) ..........................................................................................................2

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940) ......................................................................................................1, 25

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969) ...............................................................................................1, 2, 7, 8

Statutes

15 U.S.C. § 15 (2000).............................................................................................................1

15 U.S.C. § 16 (2000).............................................................................................................2

Cal. Bus. & Prof. Code §§ 16700 et seq. (2008) ..................................................................35

Cal. Bus. & Prof. Code §§ 17200 et seq. (2008) ..................................................................35

iv

### Rules

Federal Rule of Evidence 805(d) ................................................................. 6

### Other Authorities

ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases, 2005
    Edition F-3 ................................................................................................. 2

Areeda P., Hovenkamp H., Antitrust Law (3d ed. 2007), IIA, ..................................... 17

3 Park Plaza, 20ᵗʰ Floor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

**INTRODUCTION**

Defendants move for summary judgment only on the ground that there is no genuine issue of fact as to plaintiffs' injury. Defendants' motion does not contest plaintiffs' allegation that *each defendant* participated in an unlawful conspiracy to fix DRAM prices. The Court, thus, should assume for the sake of this motion that plaintiffs have established all other elements of their claims. The only issue raised by defendants' motion is whether a jury reasonably could conclude that *any* of the prices plaintiffs paid for DRAM between August 1998 and June 2002 (the "conspiracy period") were affected by defendants' unlawful conspiracy to fix prices. The evidence here is more than enough for a jury to draw this conclusion. The evidence and plaintiffs' experts' opinions show that plaintiffs were targeted by defendants' conspiracy and could not escape its effects, and thus purchased DRAM from defendants at an artificially-inflated price.

In order for plaintiffs to recover treble damages under the Clayton Act, plaintiffs must show that they were "injured in [their] business or property." *See* 15 U.S.C. § 15 (2000). To establish injury, plaintiffs must prove two things: (1) that they suffered "*some* damage flowing from the unlawful conspiracy"; and (2) that a defendant's Sherman Act violation "is a material cause of the [injury]; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) (emphasis in original).

Defendants wrongly argue that plaintiffs must prove the actual mechanism by which their successful cartel fixed DRAM prices, including that it "restrained DRAM production and output" and that they relied upon "fixed benchmark DRAM prices." Br. 3. Not only do defendants cite no authority for this contention, but the Ninth Circuit has rejected it, holding that "'the machinery employed by a combination for price-fixing is immaterial.'" *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 990 n.8 (9th Cir. 2000) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)).[1] Indeed, plaintiffs need not show that defendants "were in [a] position

---

[1] Although plaintiffs are not required to prove an output restriction, there is ample evidence here of such a restriction. *See infra* at 25-32.

1  to control the markets" or even that they agreed to fix "the ultimate price" paid by plaintiffs.  *Id.* at

2  990 n.8.  Nor are plaintiffs required to eliminate all other possible causes of their injuries.  *Zenith*

3  *Radio*, 395 U.S. at 114; *In re Polyester Staple Antitrust Litig.*, MDL No. 3:03CV1516, 2007 WL

4  2111380, at *18 (W.D.N.C. July 19, 2007); ABA Section of Antitrust Law, *Model Jury*

5  *Instructions in Civil Antitrust Cases*, F-3 (April 2005).

6  　　Defendants do not dispute that at least five DRAM suppliers, which together controlled the

7  lion's share of the market, conspired to fix DRAM prices during at least April 1999 to June 2002

8  (the "plea period") and affected over $2.5 billion in DRAM "commerce."  Nor do defendants

9  dispute that this conspiracy successfully increased DRAM prices to *at least* the largest, most

10  sophisticated customers in the market—nineteen plea agreements recite this impact.[2][3]  Plaintiffs

11  have ample evidence from which a jury reasonably could conclude that they too suffered "some

12  damage flowing from" this admitted conspiracy.

13  　　First, although plaintiffs need not prove that defendants' cartel specifically targeted

14  plaintiffs' prices, the evidence shows that it did—this eliminates any doubt about whether

15  plaintiffs were injured.  For example, Samsung's account manager for Plaintiff Sun Microsystems,

16  Inc. ("Sun") testified that he communicated pricing with rival Sun account managers at Elpida,

17  Hynix and Infineon.  T. Trill Dep. 70:17-72:21; 74:1-9; 78:5-84:14; 86:21-88:18; 90:1-92:13 (Ex.

18  20).  Hynix received price information from Samsung concerning pricing for Plaintiff All

19

---

20  [2] Elpida Plea ¶ 4(d) (Ex. 1); Hynix Plea ¶ 4(d) (Ex. 2); Infineon Plea ¶ 4(d) (Ex. 3); Samsung Plea

21  ¶ 4(d) (Ex. 4) (collectively, the "Corporate Pleas"). C.Y. Choi Plea ¶ 4(d) (Ex. 5); C.K. Chung
Plea ¶ 4(d) (Ex. 6); T.R. Corwin Plea ¶ 4(c) (Ex. 7); H. Florian Plea ¶ 4(d) (Ex. 8); G. Hefner Plea

22  ¶ 4(d) (Ex. 9); Y. Kang Plea ¶ 4(d) (Ex. 10); D.S. Kim Plea ¶ 4(d) (Ex. 11); I.U. Kim Plea ¶ 4(d)
(Ex. 12); S.W. Lee Plea ¶ 4(d) (Ex. 13); Y.W. Lee Plea ¶ 4(d) (Ex. 14); Y.H. Park Plea ¶ 4(d) (Ex.

23  15); T. Quinn Plea ¶ 4(d) (Ex. 16); P. Schaefer Plea ¶ 4(c) (Ex. 17); J. Sogas Plea ¶ 4(d) (Ex. 18);
K.C. Suh Plea ¶ 4(d) (Ex. 19) (collectively, the "Individual Pleas").  Defendants' guilty pleas are

24  admissions of all facts contained within each plea agreement.  *United States v. Broce*, 488 U.S.
563, 570 (1989).  Under section 5 of the Clayton Act, these pleas constitute prima facie evidence

25  that each defendant entering a plea participated in a conspiracy to fix the price of DRAM.  15
U.S.C. § 16; *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 567-71 (1951).  The

26  purpose of section 5 of the Clayton Act is to "minimize the burdens of litigation for injured private
suitors," like plaintiffs, "by making available to them all matters previously established by the

27  Government in antitrust actions."  *Emich Motors*, 340 U.S. at 568.

[3] All references to exhibits are to the Declaration of David D. Cross, filed herewith.

28

crowell moring

3 Park Plaza, 20ᵗʰ Floor
Irvine, CA  92614-8505
(949) 263-8400

American Semiconductor, Inc. ("All American").  HSA00133914 (Ex. 21).  In March 2002, Elpida's Nagamori Tatsuomi wrote regarding pricing for Silicon Graphics, Inc. ("SGI"):  "We need to get competitor's input, as usual, if we need to go below following price."  EMUS744085-86 (Ex. 22).  Additionally, three plea agreements expressly admit a conspiracy among at least three DRAM suppliers to raise prices to Sun:  "[Elpida] and its *coconspirators* submitted bid proposals to Sun . . . to achieve that result."  Elpida Plea ¶ 4(e) (Ex. 1) (emphasis added);  T. Quinn Plea ¶ 4(d) (Ex. 16); J. Sogas Plea ¶ 4(d) (Ex. 18).

Further, the very same employees who pleaded guilty to fixing DRAM prices had pricing responsibility for plaintiffs.  At Samsung, for example, prices for Global Accounts (the Named OEMs[4] and Sun) and regional accounts (including SGI and other plaintiffs) were set by Il Ung Kim (who pleaded guilty) at the parent company in South Korea.  Y. Kang Dep. 32:9-18, 36:7-12, 54:25-55:3, 56:7-10, 57:17-24, 60:14-17 (Ex. 23).  Under Kim's direction, regional prices were transmitted to Yeongho Kang (who also pleaded guilty) in the United States.  Kang's "primary focus was to stabilize the market for the regional accounts."  Y. Kang Depo. 240:18-19 (Ex. 23).

Additionally, a comparison of the Named OEMs' prices—which defendants do not dispute were artificially increased by the cartel—and plaintiffs' prices confirms that plaintiffs were injured.  Dr. Robert Marshall did this comparison for plaintiffs using ten alternative methods—and defendants have not moved to exclude any of his testimony.  Dr. Marshall plotted the Named OEMs' and plaintiffs' prices for eight common DRAM products and discovered that they line up very closely—a fact defendants do not dispute.  Marshall Reb. Rep. ¶ 6, Figure 49 (Ex. 24).  Accepted statistical tests confirmed that the prices match (*i.e.*, a correlation as high as 99, almost a perfect correlation), *id*. ¶ 7, and track very closely, *id*. ¶¶ 10-13, Figures 50 and 51.  Defendants' own documents and testimony concede that "there should not be a material difference" in the Named OEMs' and others' prices.  *Id.* ¶ 8.  When asked why they had to wait for IBM and Dell

---

[4] Dell, Inc. ("Dell"), Hewlett-Packard Company ("HP"), Compaq Computer Corporation ("Compaq"), International Business Machines Corporation ("IBM"), Apple Computer Inc. ("Apple"), and Gateway, Inc. (Gateway").

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

pricing "before we decide on Sun's price???," Elpida's Jim Sogas (who pleaded guilty) replied: "The reason we need to see IBM/Dell prices is that they are representative of the open market OEM price."  EMUS 391848-50 (Ex. 25).

But, in response to defendants' meritless criticisms, Dr. Marshall did even more.  Using more data, he re-ran his analysis and confirmed that the alignment in the Named OEMs' and plaintiffs' prices he initially observed is reflected throughout the majority of DRAM products and that the prices still tracked very closely.  Marshall Reb. Rep. ¶¶ 14-18, Figure 52 (Ex. 24).  He also re-ran his method accounting for product life cycles and again confirmed that the Named OEMs' and plaintiffs' prices match very closely.  *Id.* ¶¶ 19-22, Figure 53.

Dr. Marshall's findings are strongly reinforced by undisputed facts about the DRAM market: DRAM chips are all standardized by JEDEC industry standards; there are well-established sales channels, publicly available pricing information, widespread most-favored-customer ("MFC") clauses;[5] and everybody (defendants, Named OEMs and plaintiffs) looks to the publicly available prices in negotiating their own prices.  Marshall Reb. Rep. ¶ 9 (Ex. 24).  These market characteristics explain why the cartel "primarily" directed at the Named OEMs did injure plaintiffs as well – as shown by the close tracking of OEM and plaintiff prices.

Plaintiffs also offer the testimony of Dr. Halbert White that the plaintiffs were injured by the cartel.  He used another 11 widely-accepted alternative methods to probe this question (*only one* of which has been challenged by defendants).  White Reb. Rep. ¶¶ 1-26 (Ex. 26).  They all confirm that plaintiffs were overcharged by about 39% during the plea period.

Plaintiffs respectfully submit that this evidence presents a compelling case of injury and causation, but note that they are not required at this juncture to make such a case.  All that is necessary now is that there is a genuine issue of material fact for the jury to decide regarding the injury to plaintiffs.  And indeed are many.  Therefore, defendants' motion should be denied.

---

[5] E. Piesch from Infineon testified as follows about its Dell MFC:  "Q.  So if, during the period, Infineon had sold DRAM chips or DRAM modules to Sun at a price lower than it sold to Dell, this clause could have applied; right?  . . . A. Yes."  Piesch Dep. 88:21–89:1 (Ex. 27).

3 Park Plaza, 20th Floor
Irvine, CA  92614-8505
(949) 263-8400

crowell moring

4

**STATEMENT OF FACTS**[6]

The evidence shows that between at least August 1998 and June 2002, defendants Hynix

Semiconductor Inc., Hynix Semiconductor America Inc. (collectively "Hynix"), Micron

Technology, Inc., Micron Semiconductor Products, Inc. (collectively "Micron"), Infineon

Technologies AG, Infineon Technologies North America Corporation (collectively "Infineon"),

Nanya Technology Corporation, Nanya Technology Corporation USA (collectively "Nanya"),

Elpida Memory, Inc., Elpida Memory (USA), Inc. (collectively "Elpida"), Samsung Electronics

Co., Ltd., Samsung Semiconductor, Inc. (collectively "Samsung") and NEC Electronics America,

Inc. ("NEC") successfully conspired to fix DRAM prices.  This conspiracy was prompted by the

decline of DRAM prices in the late 1990s and defendants' desire to maximize revenues through

any means possible.  Because DRAM was a commodity product, no DRAM supplier could raise

DRAM prices without losing business, unless it had the cooperation of other DRAM suppliers.

D.S. Kim Dep. 128:23-129:23 (Ex. 38); M. Ellsberry Dep. 110:20-111:19 (Ex. 39).  Thus, when

defendants sought to increase prices, or to slow the rate of their decline, they would communicate

with one another to ensure that their pricing strategy would be successful.  D.S. Kim Dep. 128:23-

129:23 (Ex. 38); SSI-0020038689-90 (Ex. 40); EMUS 783126-31 (Ex. 41); ITAG-00231422-23

(Ex. 42); MU00773494 (Ex. 43); NECELAM 086703 (Ex. 44); NTC-73 00033103 (Ex. 45).

Between at least August 1998 and June 2002, defendants communicated and exchanged

competitive pricing information for many of their customers.  Defendants already have admitted

that they exchanged pricing information for the Named OEMs.  But throughout the conspiracy

period, defendants also communicated and exchanged competitive price information specifically

for plaintiffs, including Sun, Unisys Corporation ("Unisys"), SGI and All American, as well as

other customers, such as Fujitsu, Cisco, Microsoft, Thomson, and Maxtor.  *E.g.,* T. Trill Dep.

70:17-72:21; 91:21-92:13, 141:9-17 (Ex. 20) (Sun); EMUS 750806-08 (Ex. 46) (Sun); ITAG-

00231422-23 (Ex. 42) (pricing for regional customers, which included Unisys); HSA00133914

---

[6] A fuller description of defendants' anticompetitive conduct is contained in plaintiffs' responses
to defendants' contention interrogatories.  Exs. 28-37.

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

(Ex. 21) (All American); MU00773494 (Ex. 43) (Fujitsu); ITNA01011886-92 (Ex. 47) (Cisco); HSA00137390-92 (Ex. 48) (Microsoft); HSA:Swanson, G. 0424965-66 (Ex. 49) (Thomson); MU00193220-21 (Ex. 50) (Maxtor).  In addition, many of the individuals who pleaded guilty to fixing prices for the Named OEMs and instructing their subordinates to obtain competitive pricing information also were responsible for setting prices for plaintiffs and other customers, including Hynix's D.S. Kim and C.K. Chung, Elpida's James Sogas, Infineon's Guenther Hefner and Rudd Corwin, and Samsung's Yeongho Kang and Thomas Quinn.  D.S. Kim Dep. 34:16 – 36:6, 52:4 – 53:25 (Ex. 38); C. K. Chung Dep. 26:24-27:23; 32:15-34:9 (Ex. 51); H. Ueno Dep. 52:23-53:4 (Ex. 52); G. Hefner Dep. 21:14-24:13 (Ex. 53); H. Florian Dep. 198:15-18 (Ex. 54); Y. Kang Dep. 46:12-49:10 (Ex. 23); T. Quinn Dep. 24:23-26:11 (Ex. 55).[7]

Although defendants may have communicated with each other most frequently regarding the Named OEMs' pricing, this was because the Named OEMs negotiated pricing more frequently than other customers and because defendants recognized that the Named OEMs' prices had a material effect on the market and, to many other customers, constitute market prices (or benchmark prices).  In response to the question, "Do we always need to wait for IBM/DELL pricing before we decide on Sun's price???," Elpida's Jim Sogas replied "The reason we need to see IBM/Dell prices is that they are representative of the open market OEM price.  EMUS 391848-50 (Ex. 25); M. Ellsberry Dep. 99:8-100:10 (Ex. 39) (testifying that the prices Hynix charged to IBM and other large customers were used as benchmarks for setting prices to Hynix's other customers); N. LaHerran Dep. 169:23-170:1 (Ex. 56) ("Apple was a benchmark price for [pricing] information for Sun").  As a result, throughout the conspiracy period, defendants used

---

[7] Guilty pleas by defendants Hynix, Elpida, Infineon and Samsung, which admit to price-fixing "primarily aimed at," but not limited to, the Named OEMs, constitute sufficient independent evidence of a conspiracy to support the admissibility of statements made by employees or representatives of these defendants against any other defendant under Federal Rule of Evidence 805(d).  *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 906 F.2d 432, 458-59 (9th Cir. 1990).  Independent evidence of participation in a conspiracy sufficient to trigger the coconspirator exception likewise exists for defendant NEC, because Elpida's plea includes the admission that its joint venture members, including NEC, also participated in the conspiracy and NEC's plea period U.S. sales were "affected commerce" for purposes of Elpida's criminal fine. Elpida Plea ¶ 4 (Ex. 1).

3 Park Plaza, 20ᵗʰFloor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

PLAINTIFFS' MEMORANDUM I/S/O THEIR OPPOSITION TO DEFENDANTS' M/S/J AND, IN THE ALTERNATIVE, SUMMARY ADJUDICATION  CASE NOS. C06-01665; C06-02915; C07-01200; C07-01207; C07-01212; C07-01381

1   Named OEMs' pricing to justify price increases, or resist price declines, to plaintiffs and other

2   customers.  EMUS 391848-50 (Ex. 25) ("Let's make every effort to make Sun price to be in line

3   with the current price for other MNA customers"); D. Mackowiak Dep. 153:6-154:10 (Ex. 57).

4           During the conspiracy period, defendants also engaged in coordinated supply controls to

5   increase and stabilize DRAM prices that affected all defendants' customers.  Defendants met and

6   discussed reducing output in order to reduce the supply of DRAM in the market.  D.S. Kim Dep.

7   93:10-99:5 (Ex. 38); M. Sadler 5-21-2008 Dep. 49:11-66:6 (Ex. 58B).  Defendants also reduced

8   their DRAM inventories at shared hub facilities in advance of price increases to create the

9   perception of supply shortages.  M. Sadler 5-20-2008 Dep. 106:24-110:14, 113:10-115:3 (Ex.

10  58A); M. Sadler 5-21-2008 Dep. 95:5-98:8, 101:22-109:6, 149:19-150:7 (Ex. 58B); MU00131927

11  (Ex. 59); MU00187896-97 (Ex. 60).  In addition, defendants regularly exchanged specific

12  production information, including overall capacity, current production levels, and product mix,

13  and shared this information in the context of pricing discussions.  ITAG-00242971-72 (Ex. 61).

14  <u>**ARGUMENT**</u>

15  **I.      <u>Legal Standard</u>**

16          In order to establish a cognizable injury, plaintiffs need only show "*some* damage flowing

17  from the unlawful conspiracy."  *Zenith Radio Corp.*, 395 U.S. at 114 n.9.  For a section 4 claim

18  predicated on a horizontal price-fixing conspiracy, this standard is satisfied by any showing that

19  the conspiracy had an effect on the prices paid by the plaintiff.  *In re Aluminum Phosphide*

20  *Antitrust Litig.*, 905 F. Supp. 1457, 1465 (D. Kan. 1995); *In re Polyester Staple*, at * 18

21  (W.D.N.C. July 19, 2007) (citing *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481,

22  489 (1968)); *In re Catfish Antitrust Litig.*, 908 F. Supp. 400, 409-410 (N.D. Miss. 1995) (stating

23  that any evidence in record showing some effect on price is sufficient proof of injury under

24  Clayton Act).  "[I]nquiry beyond this minimum point goes only to the amount and not the fact of

25  damage."  *Zenith Radio Corp.*, 395 U.S. at 114 n.9.

26          Plaintiffs need only show that the unlawful conduct was "a material cause of the injury."

27  *Id.*  While defendants may attempt to identify alternative causes for plaintiffs' injury, defendants'

28  efforts are irrelevant because plaintiffs "need not exhaust all possible alternative sources of injury

3 Park Plaza, 20ᵗʰFloor
Irvine, CA  92614-8505
(949) 263-8400

crowell moring

7

in fulfilling [their] burden of proving compensable injury" under section 4 of the Clayton Act.  *Id.*
Plaintiffs also need not establish for this motion that defendants' conspiracy affected each specific
transaction for which plaintiffs claim damages.  *In re Polyester Staple*, 2007 WL 2111380 at *24
(citing *In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727, 734 (N.D. Ill. 1977)); *Fox West Coast
Theatres Corp. v. Paradise Theatre Bldg.*, 264 F.2d 602, 608 (9th Cir. 1958) (stating that proof of
antitrust injury "need not be made patent item by item as on a balance sheet").  So long as there is
a disputed issue of material fact on whether any price paid by plaintiffs was affected by
defendants' conspiracy, plaintiffs are entitled to a jury trial on their claims.  *In re Catfish*, 908 F.
Supp. at 410.  Under this standard, defendants' motion should be denied.

**II.     A Reasonable Jury Could—And Should—Conclude That Defendants' Price-Fixing
Conspiracy More Likely Than Not Affected DRAM Prices Paid By Plaintiffs.**

   **A.     The Evidence Shows That Defendants' Conspiracy Targeted And More Likely
   Than Not Affected Plaintiffs' DRAM Prices.**

   During at least the years 1998 to 2002, defendants conspired to fix DRAM prices
throughout the market by sharing competitively sensitive pricing information and by basing their
pricing decisions on this information.  D.S. Kim Dep. 121:15-123:7; 128:23-129:23 (Ex. 38)
(admitting that Hynix communicated with its competitors when it wanted to increase prices so as
not to lose business or to avoid selling DRAM at too low a price); D. Mackowiak Dep. 162:24-
164:12 (Ex. 57) (admitting that Samsung communicated with its competitors for the purpose of
driving up prices); Y. Kang Dep. 237:3-240:21 (Ex. 23) (admitting that the purpose of
communications with competitors was to formulate marketing strategies for the entire DRAM
market, including both global accounts, such as the Named OEMs and Sun, *and* regional accounts,
such as SGI); Corporate Pleas ¶ 4 (Exs. 1-4); Individual Pleas ¶ 4 (Exs. 5-19).  Defendants do not
dispute that their conspiracy successfully stabilized and increased DRAM prices, Corporate Pleas
¶ 4 (Exs. 1-4); Individual Pleas ¶ 4 (Exs. 5-19), but disingenuously contend that these effects were
limited to the Named OEMs.  This contention is belied by the evidence wholly ignored—much
less rebutted—in their motion, which is more than sufficient for a reasonable jury to conclude that
defendants' conduct injured plaintiffs.

crowell  moring

3 Park Plaza, 20th Floor
Irvine, CA  92614-8505
(949) 263-8400

3 Park Plaza, 20<sup>th</sup>Floor
Irvine, CA  92614-8505
(949) 263-8400

crowell moring

1.     **Defendants Exchanged Competitively Sensitive Pricing Information Regarding Sales To Plaintiffs Specifically.**

Contrary to defendants' claims, their collusive exchanges of pricing information concerned more than just the Named OEMs.  In fact, in 2001 Samsung identified *Sun*—not any of the Named OEMs—as "Public Enemy Number 1."  ITNA01146016-20 (Ex. 62); R. Costa Dep. 196:1-17 (Ex. 63).  This evidently was prompted by Sun's newly-instituted quarterly DBEs (online reverse auctions) in 2001, which defendants worried threatened the success of their conspiracy to fix Sun's prices.  *Id.*  Prior to the DBEs, Sun negotiated prices with each of its DRAM suppliers on a quarterly basis, Declaration of Peter Wilson ¶ 11 ("Wilson Declaration") (Ex. 120), and defendants had successfully fixed DRAM prices to Sun and others for at least three years by focusing their communications primarily, but not only, on the Named OEMs, which raised the market price for plaintiffs and others. *See infra* at 11-22.  Samsung's account manager for Sun testified that between 2000 and 2002 he communicated about pricing and price strategy with the Sun account managers for Elpida, Hynix and Infineon *at least once quarterly*, and often more frequently, and passed the information up the chain of command at Samsung for consideration in setting Sun's prices.  T. Trill Dep. 70:17-72:22, 73:22-74:9; 76:9-77:2; 78:5-84:14; 86:21-88:18; 90:1-92:13 (Ex. 20).  In June 2001, Infineon, Samsung and Micron exchanged their price targets to Sun for the upcoming quarter in a concerted effort to achieve higher prices to Sun than they would acting alone and without knowledge of each other's intended prices.  ITAG-00136319 (Ex. 64).  In September 2001, Elpida resisted a price decrease proposed by Sun by coordinating with Infineon and Samsung regarding the prices they were giving to Sun.  EMUS 783126-31(Ex. 41).

Concerned that Sun's DBEs could potentially derail their effective price-fixing conspiracy, in December 2001, the same month in which defendants were instituting price increases to the Named OEMs, EMUS381472 (Ex. 65), ITNA01133127-30 (Ex. 66), Sun account managers at Elpida, Infineon and Samsung discussed plans to boycott the next Sun DBE.  ITNA01021494-96 (Ex. 67); EMUS383170 (Ex. 68).  They ultimately decided to fix the bidding rather than boycott it (perhaps because a boycott risked revealing their collusion).  Jim Sogas of Elpida met with Tom Quinn and Tom Trill of Samsung before the December DBE, and they exchanged information on

the prices they planned to bid.  T. Trill Dep. 145:2-14 (Ex. 20).  Elpida, Infineon, and Samsung

again coordinated their bids in advance of the Sun DBE in March 2002.  EMUS402327-29 (Ex.

69); SSI-0010024010-11 (Ex. 70); ITNA01136141-44 (Ex. 71).  In addition, Infineon, Samsung

and Elpida exchanged information relating to the DRAM modules they sold to Sun, including the

markup of these modules over cost, for purposes of resisting Sun's attempt to drive down the price

of these modules.  T. Trill Dep. 108:10-19 (Ex. 20); SSI0010024353-54 (Ex. 72).  And lest there

remain any doubt about Sun being a targeted victim of the conspiracy, the Court need look no

further than the guilty pleas of Elpida, Jim Sogas (Elpida) and Tom Quinn (Samsung) expressly

identifying Sun as a target of the conspiracy.  Elpida Plea ¶¶ 2, 4(e) (Ex. 1); T. Quinn Plea ¶¶ 2,

4(d) (Ex. 16); J. Sogas Plea ¶¶ 2, 4(d) (Ex. 18).

Defendants similarly coordinated pricing for other plaintiffs.  In August 2000, Infineon

raised prices for its regional account customers, which included plaintiff Unisys (and Unisys'

third-party module makers), after discussing these price increases with Micron and Hynix.  ITAG-

00231422-23 (Ex. 42).  Infineon increased prices for its regional accounts in December 2001,

instructing its sales personnel "[p]lease be not too cautious with price raise since our competitors

(Samsung, Hynix) also intend to raise prices."  ITNA01280107-10 (Ex. 75); ITNA01132918-19

(Ex. 74).  Jim Elliott testified that, in communications with competitors, he would provide pricing

information from the bottom selling price ("BSP") guidelines for regional accounts.  J. Elliott Dep.

48:12-16; 72:15-21 (Ex. 76).  In May 2001, Hynix received price information from Samsung with

respect to pricing for plaintiff All American.  HSA00133914 (Ex. 21).  In March 2002, Elpida's

Nagamori Tatsuomi stated with respect to pricing for SGI:  "We need to get competitor's input, as

usual, if we need to go below following price."  EMUS744085-86 (Ex. 22).[8]  *See also* SSI-

0005059547-48 (Ex. 77); J. Elliott Dep. 114:10-115:4 (Ex. 76) (acknowledging that Kang Exhibit

_____

[8] Throughout the conspiracy period, defendants coordinated price increases for other non-Named
OEM customers as well.  *E.g.,* ITNA01011886-92 (Ex. 47) (discussing price increases to Cisco
based on the rise in spot market pricies and Named OEM prices as well as discussions among
Elpida, Infineon and Samsung); MU0773494 (Ex. 43) (March 27, 2000 email in which Micron
regional account manager instructs her subordinates to "please talk to Hyundai, Fujitsu, Samsung
and Infineon today and let them know that Micron is raising prices this week [to Fujitsu]").

3 Park Plaza, 20ᵗʰFloor
Irvine, CA  92614-8505
(949) 263-8400

crowell moring

18 (1/7/02 email) reflected pricing to regional accounts); SSI-0005059437-38 (Ex. 78) (BSP guidelines reflect competitive inputs from Elpida, Mitsubishi, and Micron for OEMs and regional accounts EMC and Lucent used in setting regional BSP guidelines); J. Elliott Depo. 45:23-46:7 (Ex. 76); SSI-0005060541 (Ex. 79) (reflecting communications with Nanya regarding regional accounts Ma Labs, Dane Electric, and Wintec); SSI-0005059380-84 (Ex. 80) (BSP price guidelines for regional accounts tying increase in SDRAM price to regional accounts to price "changes in PC OEM customers."). Distributor customer prices were also determined by regional price guidelines. Y. Kang Dep. 46:8-18 (Ex. 23).

It comes as no surprise that defendants exchanged pricing information concerning plaintiffs and the Named OEMs at the same time given defendants' decision-making structure for setting DRAM prices. The *same* sales representatives and managers responsible for one or more of the Named OEMs often were responsible for one or more of plaintiffs. N. LaHerran Dep., 20:19-21:2 (Ex. 56); J. Bugee Dep., 39:1-11 (Ex. 81); C. K. Chung Dep. 26:24-27:23; 32:15-34:9 (Ex. 51); H. Ueno Dep. 24:1-23; 28:5-15 (Ex. 52); M. Bocian Dep. 23:13-24:5 (Ex. 82); T. Quinn Dep. 24:23-26:11 (Ex. 55); R. Corwin Dep. 54:7-55:8; 66:8-68:7 (Ex. 83). And the employees ultimately responsible for setting or approving DRAM prices for the Named OEMs had the same ultimate authority for plaintiffs' prices, if not *all* DRAM customers. D.S. Kim Dep. 52:19-54:2 (Ex. 38); H. Ueno Dep. 44:17-45:25 (Ex. 52); Y. Kang Dep. 32:9-18, 36:7-12, 54:25-55:3, 56:7-10, 57:17-24, 60:14-17 (Ex. 23); M. Sadler 5-20-2008 Dep. 36:24-37:5 (Ex. 58A); H. Florian Dep. 198:15-18 (Ex. 54). A former Strategic Account Manager for Hynix, who was responsible for quoting prices to Sun and Apple, admitted that he exchanged DRAM pricing information with competitors on numerous occasions and that these exchanges made him "uncomfortable." N. LaHerran Dep. 20:19-21:13, 53:8-11; 89:24-90:23 (Ex. 56) Further, many of those with ultimate authority for setting plaintiffs' prices are the same individuals who pleaded guilty to fixing DRAM prices. *E.g.,* D.S. Kim Dep. 52:4-54:2 (Ex. 38); G. Hefner Dep. 30:18-33:13 (Ex. 53); Y. Kang Dep 36:7-12 (Ex. 23); A. Furusawa Dep. *passim* (Ex. 84) (asserting Fifth Amendment right against self-incrimination).

Contrary to the evidence, defendants would have this Court conclude that these employees,

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

who admittedly fixed prices to the Named OEMs and frequently exchanged pricing information with competitors' employees responsible for the same customers, did so to the *complete exclusion* of the other customers for whom they also were responsible. Not only is this belied by the evidence, it is wholly unreasonable. Even if the Court were to assume that these employees did not exchange pricing information for plaintiffs specifically (contrary to the evidence), it is unreasonable to conclude that these individuals' price determinations for plaintiffs were wholly unaffected by their conduct and knowledge concerning the fixing of Named OEMs' prices.

**2. Defendants Understood That Increases In Named OEM Prices Would Cause Increases In Prices To Other Customers, Including Plaintiffs.**

Defendants understood that, due to market conditions, the Named OEMs' prices rose and fell together with prices paid by plaintiffs and others. By fixing and stabilizing prices for the Named OEMs, defendants knew they could affect plaintiffs' prices as well, and would need to in order to sustain increases to the Named OEMs. D.S. Kim Dep. 53:11-25; 151:5-151:22 (Ex. 38) ("Q. Strategic accounts at least up through 2002 included … Sun Microsystems? A. Yes."; "Q. And so the thinking was that if you could raise the price at IBM, you could raise the price at other strategic accounts; is that right? A. Yes."). For example, when Samsung raised prices for Global Accounts, it also intended to raise prices for regional accounts, including SGI and other plaintiffs—and it was not uncommon for prices to rise for both kinds of accounts at the same time. D. Mackowiak Dep. 151:5-15:16 (Ex. 57); SSI-0005059604-06 (Ex. 85); SSI-0005064276-78 (Ex. 86); SSI-0005130496-509 (Ex. 87); SSI-0005059517-46 (Ex. 88); SSI-0005130574-85 (Ex. 89).

In the second half of 1998, defendants exchanged price information before negotiating prices for the Named OEMs and were able to increase Named OEM pricing each month. HSA00643663-64 (Ex. 90); HSA3036551 (Ex. 91); HSA3017813-14 (Ex. 92); NECELAM 086726 (Ex. 93); NECELAM018242-62 at 018256 (Ex. 94). For example, Hynix used the upward pressure imposed upon market prices by the collusive increases to the Named OEMs' prices to increase prices for both Named OEMs and other "OEM" customers, including Unisys and SGI: "[R]aise the prices upto [sic] as mentioned as best you can. Since situation in the current market is coming up with great chance to higher price, may we expect to get your best endeavor."

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

HSA00665304-05 at 665605 (Ex. 95).  Similarly, Samsung used the increased pricing defendants collusively achieved for the Named OEMs to justify higher prices for Sun, as Tom Dempsey told Peter Wilson in November 1998:  "There is still considerable upward pressures on 64M 5V Async product, which is now over $10 *at the other corp. accounts* and as high as $12-13 in the secondary/spot markets.  I would like to propose that we increase 8Mx144 to $179.75 ($177.50 currently) and hold other modules flat."  SUN0033807-08 at 33807.

This practice continued through 2002.  For example, Hynix and Samsung executives D.S. Kim and Y.B. Rha agreed to raise prices in late 2001.  D.S. Kim Dep. 116:12-119:4 (Ex. 38). Around the same time, Micron and Samsung informed Elpida and Infineon that they were committed to increasing prices.  EMUS381472 (Ex. 65); ITNA01133127-30 (Ex. 66); ITAG-00092387 (Ex. 97); SSI-0020038689-90 (Ex. 40).  Defendants then were able to successfully coordinate price increases in December 2001, EMUS825818-20 (Ex. 98); HSA00079678 (Ex. 99); ITNA01008587 (Ex. 100); EMUS387426 (Ex. 101), and successive months.  *E.g.*, SSI0005060554 (Ex. 102); SSI-0005238353-55 (Ex. 103); HSA Swanson, G. 0073106 (Ex. 104); NTC-73 00033103 (Ex. 45) *together with* NTC-73-00002172-74 (Ex. 105) (Nanya matching Samsung price to Dell after communications between Samsung's Russell Grifo and Nanya's Mike Walsh).[9]  Again using the upward pressure imposed upon market prices by the coordinated Named OEM price increases, Samsung's Vice President of Memory Marketing Strategy and Intelligence announced in February 2002 a price increase for all regional accounts:  "We are raising Sync DRAM price *per the changes in [price to] PC OEM customers*."  SSI-0005059380-84 at 5059380 (Ex. 80) (emphasis added).  Around the same time, Samsung's Il Ung Kim likewise stated:  "We will try to shuffle around our volume from RA [regional accounts] to GA [global accounts] or vice versa as we need to keep our price upward."  SSI-0005238446-49 at 5238446 (Ex. 111).

In March 2002, as in most months, defendants had successfully coordinated increased prices to the Named OEMs, SSI-0010027437 (Ex. 112), but defendants were still obligated to sell

---

[9] ITNA01090722-24 (Ex. 106); HSA00398392-94 (Ex. 107); HSA Swanson, G. 0401983 (Ex. 108); HSA00097152-56 (Ex. 109); SSI0010006836-37 (Ex. 110).

crowell moring

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400

DRAM to Sun at the prices set in the December 2001 DBE, except for any DRAM supplied to Sun in excess of the amounts allocated in the DBE. Defendants sought to bring Sun prices for these additional sales in line with Named OEM prices that had been increasing month over month since December 2001; Elpida's Hirohiso Ueno told Elpida's account manager for Sun: "Let's make every effort to make Sun price *to be in line with the current price for other MNA customers*." EMUS391848-50 at 391848 (Ex. 25) (emphasis added); EMUS391764-65 (Ex. 73). For example, Elpida priced the 512MB NGDIMM for Sun by marking up the then-current price IBM and Dell were paying for 512MB standard modules. EMUS751105-07 (Ex. 113). Infineon similarly priced the same module by adding a fixed mark-up to the average contract price of a 512 MB module reported on the DRAMeXchange website, per agreement with Sun. ITNA01136115-17 (Ex. 114). In addition, the Sun account managers at Elpida, Infineon, Samsung and Mitsubishi also communicated among each other in advance of their quotations to ensure that they would be able to achieve the price increases they sought. T. Trill Dep. 91:21-92:23; 108:10-19 (Ex. 20); EMUS400786 (Ex. 115); EMUS750806-08 (Ex. 46); MITSSUN00121438 (Ex. 116).

As already shown above, even Sun's DBEs could not shield it from defendants' conspiracy. The baseline from which the DBE bidding began was determined on the basis of Named OEM prices.[10] For example, for the March 2002 DBE, Sun asked its suppliers to provide Sun with the average price charged to the top three to five customers for the second half of March. MU00116315-16 (Ex. 117); Wilson Decl. ¶ 12 (Ex. 120). Little did Sun know then that this average price would be based on collusively-established prices offered to the Named OEMs, which, along with Sun, were defendants' largest customers. HSA: Swanson, G. 0073154 (Ex. 118). Hynix's Nick LaHerran submitted the "highest one out of the price of Strategic Accounts" and "assume[d] that April pricing will be increased 15%" in submitting Hynix's input into the March 2002 DBE ceiling price. HSA00031168-71 (Ex. 119). Similarly, Elpida's Hirohiso Ueno

---

[10] A plaintiff suffers antitrust injury where the plaintiff has alleged "that the defendants conspired to set an artificially inflated base price from which negotiations for discounts began." *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 353 (N.D. Cal. 2005) (quoting *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 383 (S.D.N.Y. 1996)).

14

PLAINTIFFS' MEMORANDUM I/S/O THEIR OPPOSITION TO DEFENDANTS' M/S/J AND, IN THE ALTERNATIVE, SUMMARY ADJUDICATION  CASE NOS. C06-01665; C06-02915; C07-01200; C07-01207; C07-01212; C07-01381

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

told Bill Hassett in January 2002 with respect to the March 2002 Sun DBE: "Whenever you will be asked to provide 'Budgetary Price', please make the official request to Tokyo side. Since market price is keep going up, we need be careful." EMUS980982 (Ex. 121). The next month, Ueno wrote Hassett and others, stating: "This month is going to be the exciting month for us to propose price increase to Sun," EMUS751105-08 (Ex. 113); Hiroyuki Tsuda, who was responsible for communicating DRAM price quotes to Sun (H. Ueno Dep. 21:4-23:7 (Ex. 52)), responded with a price quote for Sun that was a 30% mark-up on the prices to IBM and Dell for the same DRAM. *Id.*

Defendants were not the only ones who used Named OEM prices as a benchmark or reference for determining plaintiffs' prices. Plaintiffs themselves did too. In assessing whether a price was "competitive" in negotiations with defendants and in calculating the "target price" at which negotiations would begin, each plaintiff relied on publicly available pricing information, such as DRAMeXchange and the De Dios Market Advisor trade reports, which included contract prices paid by the Named OEMs. Wilson Dec. ¶ 4 (Ex. 120); P. Wilson 11-5-2007 Dep. 100:6-17, 218:15-219:12 (Ex. 122); R. Ellis Dep. 263:23-264:16 (Ex. 123); N. Edelbaum Dep. 34:20-36:23 (Ex. 124); J. Donza Dep. 89:21-90:19, 91:14-21 (Ex. 125); A. Ishiguro Dep. 189-190 (Ex. 126); Marshall Rep. ¶ 153 (Ex. 127). Sun considered many of the Named OEMs to be its competitors and thus compared Named OEM prices to its own when determining whether the prices it was paying were competitive. M. Raposa Dep. 116:7-18; 132:23-133:22 (Ex. 128). The incorporation, by both defendants and plaintiffs, of artificially inflated Named OEM prices into plaintiffs' prices ensured that plaintiffs would suffer the effects of defendants' price-fixing conspiracy. *Knevelbaard Dairies*, 232 F.3d at 979, 982, 989-990 (finding that conspiracy to depress the price of bulk cheese injured plaintiff milk producers where bulk cheese price was one input into a formula used by a state agency to set prices at which the defendants bought milk from the plaintiffs).

Defendants also employed policies and practices that ensured that plaintiffs' prices would stay in line with the Named OEMs' prices, and thus suffer the effect of defendants' conspiracy. For example, defendants created customer classifications and maintained consistent pricing within

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

3 Park Plaza, 20ᵗʰFloor
Irvine, CA  92614-8505
(949) 263-8400

crowell moring

1   (and across, as shown above) these classifications.  Sun was grouped with the Named OEMs as a

2   "Strategic Account" by Hynix (D.S. Kim 53:11-54:2 (Ex. 38)), "Multi National Account" by

3   Elpida (H. Ueno Dep. 63:6-64:22 (Ex. 52)), "Corporate Account" by Infineon (R. Costa Dep.

4   12:24-13:9 (Ex. 63)) and "Global Account" by Samsung (T. Quinn Dep. 25:4-17 (Ex. 55)).  Sun's

5   pricing was based upon pricing for the other customers in its classification—namely, the Named

6   OEMs' prices.  D.S. Kim Dep. 72:12-72:25 (Ex. 38); N. LaHerran Dep. 169:23-170:1 (admitting

7   that Apple was a benchmark price for pricing information for Sun); 61:20-24 (admitting that

8   Hynix used same criteria to set prices for Sun and Apple and that one of those criteria were prices

9   Hynix was offering other Named OEMs) (Ex. 56) ; M. Ellsberry Dep. 99:8-100:10 (Ex. 39)

10  (stating that the prices Hynix charged to IBM were used as benchmarks for prices to other

11  customers).  Defendants refused to offer prices to smaller volume distributors such as plaintiffs All

12  American, Edge and Jaco lower than Named OEM prices:  "We must adhere to our policy of not

13  giving future or any other disti a cost that is below our strategic customer price… for any volume.

14  HSA00071336-38 (Ex. 129).  Finally, defendants' contracts with the Named OEMs typically

15  included MFC clauses guaranteeing them the best price available.  *E.g.* NECELAM 021016-32 at

16  021020 (Ex. 130); ITAG-00299701-722 at 00299701 (Ex. 131).  These MFCs precluded plaintiffs

17  from obtaining better pricing than the Named OEMs.  E. Piesch Dep. 87:6-89:10 (Ex. 27)

18  (admitting that selling DRAM to Sun at a price lower than Dell's price would violate Infineon's

19  MFC clause with Dell).

20       Finally, the guilty pleas admit that fixing the Named OEMs' prices was not the only

21  purpose of defendants' conspiracy.[11]  Rather, the pleas identify this as the "*primary* purpose."

22  Corporate Pleas ¶ 4(c) (Exs. 1-4).  This is entirely consistent with the evidence here—that

23  defendants (i) "primarily," but not exclusively, focused their price-fixing efforts on the Named

24  OEMs' prices because market conditions meant a market-wide impact on prices from these efforts,

25

26  [11] *See* additional discussion in section II.A in Sun's Memorandum of Points and Authorities in
    Opposition to Defendant's Motion for Summary Adjudication on Sun's Claims Based on
27  Purchases From Mitsubishi Entities, filed concurrently herewith, which is incorporated as if set
    forth fully herein.

28

and (ii) secondarily directed their price-fixing efforts at plaintiffs and others in order to sustain price increases to the Named OEMs and to maximize the return on their collusion. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 478-81 (1982) (allowing plaintiff to recover treble damages for Sherman Act violation where injury to plaintiff was reasonably foreseeable consequence of the defendants' anticompetitive scheme). Moreover, defendants' clever, yet disingenuous, attempts to use the pleas as a shield ignores the well recognized reality that negotiated plea agreements, like consent decrees, cannot be expected to reflect the actual scope of the conspiracy "because one would rarely expect the defendant to agree to all of the provisions that might possibly result from a trial resolving all liability and relief against it." Areeda P., Hovenkamp H., Antitrust Law (3d ed. 2007), IIA, ¶ 327a, p. 26. To the extent the pleas reasonably could be read as describing a narrower conspiracy than that alleged by plaintiffs (when in fact they are consistent with plaintiffs' allegations), this would in no way undermine plaintiffs' claims, as this would be indicative only of the negotiated deals behind these agreements. The pleas are simply the tip of the iceberg.

### 3. Dr. Marshall's Expert Opinion Corroborates The Evidence Showing That Defendants' Conspiracy More Likely Than Not Affected Plaintiffs' Prices.

#### (a) Plaintiffs' Prices Moved Together With The Named OEMs' Prices Before, During And After the Conspiracy Period

Plaintiffs' expert, Dr. Robert Marshall, Head of the Department of Economics at Pennsylvania State University, conducted extensive analyses of market conditions and pricing trends in the DRAM market. Marshall Rep. (Ex. 127); Marshall Reb. Rep. (Ex. 24) His analyses and opinions corroborate the evidence that defendants' conspiracy targeted and affected both plaintiffs and the Named OEMs. In short, Dr. Marshall's econometric analysis revealed that market conditions cause plaintiffs' prices to move together with the Named OEMs' prices and that this parallel movement occurred before, during and after the conspiracy period. Marshall Reb. Rep. ¶¶ 1-26 (Ex. 24). This economic relationship between plaintiffs' and Named OEMs' prices is undisputed. Benjamin Klein, Elpida's expert, agrees that "OEM and plaintiff prices are cointegrated *because of competitive market forces* and the significant downward trend in prices." Klein Rep. ¶ 62 (Ex. 132) (emphasis added). This relationship means that conditions affecting

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

17

Named OEMs' prices—including price-fixing by defendants—also affected plaintiffs' prices. Because the pleas admit that the cartel stabilized and increased at least the Named OEMs' prices, a jury reasonably could conclude, based upon Dr. Marshall's opinion, that plaintiffs also were injured by the cartel.

Dr. Marshall found that four key features of the DRAM market—the standardized nature and subsequent interchangeability of DRAM, significant price transparency, well-established sales channels such as the spot market, and the use of MFCs—heavily contributed to the market pressures that caused plaintiffs' prices and Named OEMs' prices to move together.  Marshall Rep. ¶¶ 134-36 (Ex. 127).  The significant price transparency in the market, through the third-party sources discussed above and other resources, provided all DRAM purchasers with substantial visibility into each others' prices.  Marshall Reb. Rep. ¶¶ 44-64 (Ex. 24).  As a result, it would have been economically impossible for defendants to fix prices for only one set of customers—the victims of such a limited conspiracy quickly would have learned that their prices were out of line with prevailing market prices and would have been able to resist the artificially-inflated prices defendants were attempting to impose.  Marshall Rep. ¶¶ 134-65 (Ex. 127).  This is especially true for the Named OEMs, which were among the most sophisticated and demanding customers in the market; the sheer volume of their purchases alone would have provided them with more than sufficient leverage to resist artificial price increases directed *only* at them.  Thus, it would have been contrary to defendants' economic incentives to conspire only with respect to the Named OEMs.  Marshall Rep. ¶ 17 (Ex. 127); Marshall Reb. Rep. ¶ 96 (Ex. 24).  Focusing "primarily" on the Named OEMs' prices, however, would have been entirely consistent with defendants' economic incentives and the market conditions, and indeed the evidence shows that defendants did just that.  Evidence that defendants exchanged pricing information and based pricing decisions on non-public competitor information, combined with evidence that defendants needed to fix prices for a broader set of customers in order to realize any benefit from their conspiracy, is sufficient to establish the existence of a broader conspiracy that affected plaintiffs.  *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 16-22 (D.D.C. 2004).

Defendants have not challenged the admissibility of Dr. Marshall's opinion.  Rather, they

3 Park Plaza, 20ᵗʰ Floor
Irvine, CA  92614-8505
(949) 263-8400

crowell moring

18

1    merely have argued that his analysis and the facts underlying his opinion do not adequately

2    support his conclusions, but this issue must be reserved for the jury. *Bieghler v. Kleppe*, 633 F.2d

3    531, 534 (9th Cir. 1980). In *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Suppl. 2d 908,

4    935-36 (W.D. Wis. 2007), plaintiffs relied on econometric analysis to establish injury and

5    causation. Once the court deemed the expert opinion admissible, it concluded that sufficient

6    evidence of injury existed to require a jury trial so long as plaintiffs made some direct purchases

7    from the defendants. *Id*. Here, Dr. Marshall's opinion is presumed admissible, and each plaintiff

8    purchased DRAM directly from defendants. Thus, defendants' motion should be denied.

9         Defendants' reliance upon the Ninth Circuit's decision in *Rebel Oil Co., Inc. v. Atlantic

10   Richfield Co.*, 51 F.3d 1421, 1435-36 (9th Cir. 1995), is misplaced. There, the court held that an

11   expert's opinion is insufficient evidence to survive summary judgment *only* if there are

12   "undisputed facts" that render Dr. Marshall's opinion "economically unreasonable." But here,

13   none of the facts that defendants claim undermines Dr. Marshall's analysis is "undisputed;" thus,

14   there are no "undisputed facts" that render Dr. Marshall's opinion "economically unreasonable."

15              **(b)      Dr. Marshall's Opinion Is Amply Supported By The Facts.**

16        Although defendants do not contest that the pricing data analyzed by Dr. Marshall shows

17   that plaintiffs' prices did closely track the admittedly fixed OEM prices, defendants make a

18   number of factual allegations about the DRAM market that they contend undermine Dr.

19   Marshall's report, but these allegations are belied by the evidence and, in some cases, are

20   irrelevant as a matter of law. ***First***, defendants contend that DRAM is not always standard. Br.

21   22. But this is simply false. DRAM is *always* standard, and can be identified by certain well-

22   defined characteristics, such as density (number of megabits per chip), technology (EDO, SDRAM

23   or DDR), and speed. Marshall Rep. ¶¶ 139-44 (Ex. 127). In fact there is an organization devoted

24   to establishing industry standards for semiconductor products, including DRAM, called JEDEC.

25   Marshall Rep. 72-74 (Ex. 127). All DRAM chips sold by defendants were JEDEC standard, *e.g.*

26   M. Despotes Dep. 188:25-189:18 (Ex. 133), and all DRAM chips purchased by plaintiffs were

27   standard, too. Wilson Decl. ¶ 6 (Ex. 120); C. Fang Dep. 50:11-51:10 (Ex. 134); C. Dewar Dep.

28   228:10-229:14 (Ex. 135); A. Ishiguro Dep. 53:23-54:19 (Ex. 126); N. Edelbaum Dep. 185:21-

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

19

186:10 (Ex. 124).

Defendants attempt to mislead the Court by conflating standard DRAM chips with customized modules that house these chips. Although plaintiffs Sun and SGI did purchase some customized modules, the methods of pricing of such modules makes this fact irrelevant. Customized modules sometimes were priced by marking up the price the Named OEMs were paying for a standard module with the same basic features—namely, density, speed and sometimes technology. *E.g.*, EMUS751105-08 (Ex. 113) More often, the DRAM chips were priced separately from the module, and a fixed amount (called a "module adder") was added to the cost of the chips to reflect the cost of customization. Wilson Decl. ¶¶ 7-8 (Ex. 120); SSI-0010024353 (Ex. 72); SUN0007284-85 (Ex. 136). Because, as shown above, the prices Sun and SGI paid for these chips were based on Named OEM prices for the same DRAM, and because defendants' conspiracy admittedly affected the Named OEMs' prices, defendants' conspiracy likewise affected the prices of plaintiffs' customized modules. Peter Wilson of Sun testified:

> [A]ll of the DRAM we bought was standard product. It was bought on standard modules and/or in the case of the NG DIMM, it was a standard DRAM assembled onto a custom module… We would be buying, say a by-eight configured DRAM. We would expect it to be priced similar to a by-four configured DRAM, which may or may not be what the PC industry was using in higher volumes.

P. Wilson Dep. 237:1-9 (Ex. 122); *see also* A. Ishiguro Dep. 182:17-187:25 (Ex. 126). This was the approach defendants themselves took to pricing during the conspiracy period, and they cannot now genuinely dispute it.[12]

***Second***, defendants mischaracterize the significance of the spot market to Dr. Marshall's

---

[12] Defendants claim that Dr. Marshall failed to account for differences in the types of DRAM bought by plaintiffs and the Named OEMs and that the guilty pleas do not expressly mention a specific type of DRAM (FPM/EDO). Br. 24. Dr. Marshall did account for the various types of DRAM in his analyses, Marshall Rep. ¶¶ 202-221 (Ex. 127), but regardless, defendants' point is moot because it is undisputed that Sun also purchased SDRAM and DDR (expressly identified in the pleas) during the conspiracy period and it need only show that a single sale was affected by defendants' conspiracy to establish injury. In addition, like Sun's "custom" modules, the price of "legacy" FPM/EDO DRAM was determined by adding a fixed premium to the price of non-legacy SDRAM. SUN0029067-68 (Ex. 137); MIC000233-35 (Ex. 138); Wilson Decl. ¶¶ 9-10 (Ex. 120).

3 Park Plaza, 20th Floor
Irvine, CA  92614-8505
(949) 263-8400

crowell moring

1    opinion.  Br. 22-23.  He did not opine that defendants could fix prices market-wide simply by

2    fixing spot market prices; rather, he merely concluded that the Named OEM prices, which were

3    fixed by defendants, could not deviate substantially from spot market prices, because the spot

4    market gives the Named OEMs an indication of prevailing market prices and an alternative source

5    of supply, regardless of whether the Named OEMs actually purchased DRAM from the spot

6    market.  Marshall Rep. ¶¶ 150-55 (Ex. 127); EMUS 155224 (Ex. 139) ("Hynix, Samsung and

7    Infineon are cooperating to raise spot price for Dec. contract negotiation."); MU00026836 (Ex.

8    140) ("[U]se the spot market pricing as part of the discussion in how suppliers need to narrow the

9    gap between [S]pot and OEM pricing."); HSA00656276 (Ex. 141); M. Ellsberry Dep. 68:22 –

10   69:9 (Ex. 39) (testifying that Hynix's customers used spot prices to negotiate contract prices); E.

11   Piesch Dep. 25:5-29:9 (Ex. 27) (stating that spot market prices were relevant to how Infineon

12   would set prices for Sun and other customers); SUN0029973-30043 (Ex. 142) (listing "spot

13   market analysis" as one of Sun's memory cost control measures); Wilson Decl. ¶ 5 (Ex. 120).  As

14   Infineon's own expert admits: "[C]ontract customers would reasonably take note of movements in

15   the spot market and expect similar reductions in their prices."  Kalt Rep. ¶ 127 (Ex. 143); K.

16   Brown Dep. 152:1-20 (Ex. 144) (testifying that Dell used publicly available spot and contract

17   price information to determine the target price it would seek from Defendants).

18                    **(c)      Dr. Marshall's Opinion Is Supported By Accepted Methods.**

19          Defendants' experts do not dispute that the methods used by Dr. Marshall were appropriate

20   here; they only dispute his results.  *E.g.*, Kalt Dep. 51:4-12 (Ex. 145).  Dr. Marshall used

21   numerous accepted methods in his analyses, and each shows that the Named OEMs' and

22   plaintiffs' prices moved together.  Dr. Marshall calculated the coefficient of correlation between

23   plaintiffs' and the Named OEMs' prices for over eighty different DRAM products, finding

24   correlations ranging from .96 to .99 for the products most commonly purchased by plaintiffs'

25   during the conspiracy period.  Marshall Rep. ¶¶ 189-195 (Ex. 127); Marshall Reb. Rep. ¶¶ 80-85

26   (Ex. 24).  Dr. Marshall also performed two regression analyses to compare the Named OEMs' and

27   plaintiffs' prices while controlling for different characteristics of the products purchased by each.

28   Dr. Marshall determined the statistical relationship between the actual prices paid by the Named

3 Park Plaza, 20th Floor
Irvine, CA  92614-8505
(949) 263-8400

crowell moring

21

3 Park Plaza, 20ᵗʰFloor
Irvine, CA  92614-8505
(949) 263-8400

crowell moring

1    OEMs and the characteristics of the DRAM products they purchased, and applied these

2    relationships to the DRAM products purchased by plaintiffs to determine what plaintiffs would

3    have paid if they received the same pricing as the Named OEMs.  Dr. Marshall also calculated the

4    statistical relationship between the actual prices paid by plaintiffs and the Named OEMs and the

5    characteristics of the DRAM products purchased by each, and then applied both sets of

6    relationships to a single set of DRAM product characteristics.  In both analyses, the Named

7    OEMs' and plaintiffs' prices had a correlation of .99, just below the theoretical maximum of 1,

8    and were cointegrated, meaning that they were tied together by a fundamental economic

9    relationship and did not and could not diverge (for more than short periods of time).  Marshall

10   Rep. ¶¶ 211-22 (Ex. 127). [13]

11         As this Court recently recognized in the related MDL proceedings, an econometric

12   analysis, such as correlation analysis, showing that prices for two sets of customers move together

13   over time can support the inference that a price-fixing conspiracy affected both sets of customers.

14   *In re DRAM Antitrust Litig.*, No. M 02-1486 PJH, MDL No. 1486 PJH, 2006 WL 1530166 at *9

15   (N.D. Cal. June 5, 2006) (citing *In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. at 346, 353 (N.D.

16   Cal. 2005)); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153-55 (3d. Cir. 2002) (holding that

17   movement together of prices for various types of corrugated containers sold to different customers

18   could be evidence that price-fixing conspiracy impacted all purchasers of corrugated containers).

19   In *In re Polyester Staple Antitrust Litigation*, 2007 WL 2111380, the defendant made the same

20   claim as defendants do here—that the conspiracy in which it participated was limited only to the

21   specific polyester staple products and customers identified in the defendant's guilty plea.  *Id.* at

22   *7-8.  The district court concluded that expert testimony showing that the prices of different

─────────────────────

24   [13] Contrary to defendants' claim, Dr. Marshall neither assumes nor concludes that defendants'
     conspiracy had a constant and continuous effect on prices for the entire conspiracy period.  Dr.
25   Marshall's analysis is not intended show that every specific change in the Named OEMs' prices
     was "transmitted" to plaintiffs' prices, Marshall 5-22-2008 Dep. 45:11-50:2 (Ex. 146), but rather
26   to evaluate the strength of the economic relationship between both sets of prices and whether any
     factor could affect one without affecting the other.  *Id.* 46:11-25.  Moreover, the question of when
27   and for how long the conspiracy affected prices is a disputed question of fact that is not—and
     could not be on summary judgment—before this Court.

28

1    polyester staple products sold to different customers moved together over time could be used to

2    establish that the conspiracy had market-wide impact on all purchasers.  *Id.* at \*25-26.

### B.    Dr. White's Analyses and Opinions Show That Plaintiffs And The Named OEMs Paid Inflated Prices For DRAM Due To Defendants' Conspiracy.

5         Plaintiffs' expert, Dr. Halbert White, used regression analysis to determine the prices

6    plaintiffs would have paid for DRAM between August 1998 and June 2002 in a purely

7    competitive market—these are referred to as "but-for prices" (meaning, but for defendants'

8    conspiracy).  White Rep. ¶¶ 135-36 (Ex. 147).  Dr. White used defendants' sales data to the

9    Named OEMs from the time period before and after defendants' conspiracy to ensure that the

10   findings derived by his regression analysis reflected only market forces and not defendants'

11   conspiracy.  White Reb. Rep. ¶¶ 52-60 (Ex. 26); *Cf. In re Pressure Sensitive Labelstock Antitrust*

12   *Litig.*, No. 3:03-MDL-1556, 2007 WL 4150666, at \*20 (M.D. Pa. Nov. 19, 2007) (citing

13   numerous cases upholding use of "benchmark" time period unaffected by conspiracy to determine

14   but-for prices as acceptable method to calculate antitrust damages).[14]  Because plaintiffs' actual

15   prices were significantly higher than the "but-for" prices, Dr. White concludes that the defendants'

16   conspiracy more likely than not affected plaintiffs' prices.  White Rep. ¶¶ 157-61 (Ex. 147).

17        In reaching his conclusion, Dr. White used nearly a *dozen* different accepted methods and

18   isolated the impact of defendants' conspiracy on plaintiffs' prices by analyzing many different

19   market conditions.  White Rep. ¶¶ 5-39 (Ex. 147).[15]  Defendants have challenged only *one* of the

---

21   [14] Dr. White calculated his but-for price index based on the Named OEMs' prices because
     substantially more price data was available for the Named OEMs, which allowed Dr. White to
22   calculate the but-for index much more accurately than if he had calculated a but-for index for each
     plaintiff directly.  White Reb. Rep. ¶¶ 86-87 (Ex. 26).  Dr. White used standard econometric
23   techniques to determine the statistical relationship between the prices paid by each plaintiff and
     the Named OEMs throughout the conspiracy period, which enabled him to determine the but-for
24   prices for each plaintiff.  White Rep. ¶¶ 120-24 (Ex. 147); White Reb. Rep. ¶¶ 41-51 (Ex. 26).
     Nevertheless, in his rebuttal report, in response to complaints from defendants' experts, Dr. White
25   calculated but-for prices for each plaintiff directly and reached the same conclusions.  But this
     method would not be the method preferred by econometricians because of the data limitations.
26   White Reb. Rep. ¶¶ 84-91 (Ex. 26).

27   [15] Dr. White's methodology is set forth in more detail in Plaintiffs' Opposition to Defendants'
     Motion to Exclude the Testimony of Dr. Halbert L. White, which plaintiffs incorporate by
28   reference.

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

*eleven* different methods employed by Dr. White, each of which independently found plaintiffs'

but-for prices to be lower than the prices they actually paid, and have made no effort to rebut these

other *ten* analyses and findings.[16]  The reliability of Dr. White's but-for prices is confirmed by the

fact that they are nearly identical to *actual* prices after the conspiracy ended in June 2002,

demonstrating that Dr. White's but-for price index accurately predicts DRAM prices in a purely

competitive market.  Dr.  White's analysis is further confirmed by the evidence.  During the so-

called "Kill Hynix" period, which experienced coordinated predatory pricing, actual DRAM prices

descend toward Dr. White's predicted but-for prices, even dropping below the but-for prices in

late 2001.  White Rep., Fig. 9-14 (Ex. 147).  Once the "Kill Hynix" period ended by November

2001, actual DRAM prices begin a steep ascent above the but-for price level until the breakdown

of the conspiracy in May-June 2002 due to the announcement of the DOJ investigation.  *Id.*

Dr. White's testimony provides sufficient evidence that plaintiffs' DRAM prices more

likely than not were affected by defendants' conspiracy and therefore plaintiffs suffered an

"injury" under section 4 of the Clayton Act.  *Southwire*, 528 F. Supp. 2d at 936.  In *Southwire*, the

court denied summary judgment on the question of injury because the regression analysis

performed by the plaintiff's expert on actual price data and market conditions was sufficient for a

jury reasonably to conclude that the price of copper was affected by the defendant's

anticompetitive conduct.[17]  Like the economic evidence in *Southwire*, Dr. White's analysis

supports a finding of causation because it allows a jury to isolate the effect of defendants'

conspiracy from the other market forces that affect DRAM prices.[18]  Defendants' disagreement

---

[16] Samsung's expert, Dr. Rubinfeld, performed a regression analysis intended to rebut Dr. White's findings, but Dr. Rubinfeld's model contained a fundamental econometric error.  White Reb. Rep. ¶¶ 113-14 (Ex. 26).  Once Dr. White corrected this error, Dr. Rubinfeld's own regression model generated but-for prices that closely resembled Dr. White's and showed that the conspiracy had a significant impact on plaintiffs and the Named OEMs' prices.  *Id.* ¶¶ 118-23.

[17] Similar to Dr. White, the expert in *Southwire* used two regression equations, an equilibrium equation and an adjustment equation.  *Southwire*, 528 F. Supp. 2d at 926; White Rep. ¶¶ 21-34, 135-56 (Ex. 147).

[18] "In price-fixing cases, 'causation of injury may be found as a matter of just and reasonable inference from proof of defendants' wrongful acts and their tendency to injure plaintiffs, and from evidence of change in prices not shown to be attributable to other causes.'"  *In re Linerboard*

(continued…)

Crowell moring

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400

1   over whether Dr. White's analysis sufficiently accounts for all factors merely creates an issue of

2   fact for the jury.  *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 258 (3d Cir. 1999).  As in *Callahan*,

3   defendants' experts admit that they have performed no analyses themselves to determine the

4   impact on prices, if any, of particular events during the conspiracy period, and thus they offer only

5   unfounded speculation, which is not sufficient for summary judgment.  V. O'Brien Dep. 108:24-

6   112:13 (Ex. 148); J. Kalt Dep. 285:4-289:5 (Ex. 145).

7       **C.    Plaintiffs Are Not Required To Prove The Mechanism By Which Defendants
             Fixed Prices, Only That They Did.**

8

9                   **1.    Plaintiffs Need Not Prove Collusive Output Controls.**

10          Defendants attempt to impose upon plaintiffs a burden that has no basis in law.  They

11   wrongly argue that plaintiffs must prove an agreement among defendants to control DRAM output

12   or supply in order to establish injury and causation.  Br. 13-16.  Defendants cite absolutely *no*

13   authority for this contention, instead citing a handful of cases and articles that stand *only* for the

14   unremarkable proposition that a cartel generally restricts output in order to increase prices.  *Id.* at

15   13-14.  None of the authorities cited by defendants states, or even intimates, that a plaintiff must

16   *prove* up this output restriction.  This is because neither the Sherman Act nor the Clayton Act

17   requires a private plaintiff to prove such an agreement, *see, e.g., In re Aluminum Phosphide*, 905

18   F. Supp. at 1467-68 (denying defendants' motion for summary judgment on question of injury

19   where plaintiffs did not present any evidence that defendants agreed to restrict supply), and

20   because both the U.S. Supreme Court and the Ninth Circuit have explicitly held that "'the

21   machinery employed by a combination for price-fixing is immaterial.'"  *Knevelbaard*, 232 F.3d at

22   990 (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)).

23          Defendants would impose a nearly impossible burden upon plaintiffs because conspirators

24   can—and do—agree to fix prices, and succeed in doing so, without ever explicitly agreeing to

25   restrict supply.  Indeed, when asked whether it was his "opinion that no cartel can ever be

26   _____

    (continued)

27   *Antitrust Litig.*, 497 F. Supp. 2d 666, 675 (E.D. Pa. 2007) (quoting *In re Indus. Silicon Antitrust
    Litig.*, 1998 WL 1031507, at *4 (W.D. Pa. Oct. 13, 1998)).

28

3 Park Plaza, 20ᵗʰ Floor
Irvine, CA  92614-8505
(949) 263-8400

crowell moring

1    effective unless they explicitly discuss and agree on output restriction," Infineon's expert, Joseph

2    Kalt, responded emphatically:  "No, I didn't say that."  J. Kalt Dep. 197:1-6 (Ex. 145).  Kalt then

3    admitted that a cartel could "be effective in achieving a cartel price" where the conspirators "only

4    talk about price" and "didn't discuss the output reduction."  *Id* 197:24-199:16.  He explained that

5    an output restriction is "a logical attribute" of the agreement to fix prices.  *Id* 199:8-16.

**2.    A Reasonable Jury Could Conclude That Defendants Restrained DRAM Supply.**

8        An agreement to reduce supply would elevate price throughout the DRAM market and

9    necessarily cause plaintiffs to suffer an injury under the Clayton Act.  *United States Gypsum Co. v.*

10   *Indiana Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003) (stating that a reduction in output elevates

11   price throughout the market).  Although plaintiffs need not prove an agreement to restrain supply,

12   there nonetheless is voluminous evidence from which a jury reasonably could conclude that

13   defendants restrained supply in furtherance of their conspiracy to fix DRAM prices.  For example,

14   Samsung's internal weekly DRAM market status update for May 2000 noted increases in DRAM

15   pricing and observed:  "In summary [sic], DRAM vendors [sic] tactics to squeeze the supply

16   volume to the *open market* seems to be working."  SSI-0005222547 (Ex. 149) (emphasis and

17   brackets added).

18       As a threshold matter, defendants cannot genuinely dispute that they did not engage in *any*

19   supply controls because the pleas admit that the conspiracy successfully stabilized and increased

20   prices to at least the Named OEMs, and defendants admit that they could not do this without

21   restricting output.  Br. 13-14.  And if defendants' own admissions were not sufficient, there is

22   much more.  Although defendants allege "that production at the DRAM fabs continued at full

23   capacity" all the time, they ignore the many other means of controlling supply available to them.

24   As Micron's expert Victor De Dios noted, "DRAM companies have different ways of adjusting

25   supply to influence price: inventory management; immediate wafer production cuts; and, reduction

26   of bit supply growth through reduced capital spending and quicker migration to new processes at

27   the expense of yields."  SSI-0002010835 (Ex. 150).  Micron's Michael Sadler admitted, for

28   example, that it was "general practice" to withdraw or withhold DRAM inventories from customer

3 Park Plaza, 20th Floor
Irvine, CA  92614-8505
(949) 263-8400

crowell moring

26

PLAINTIFFS' MEMORANDUM I/S/O THEIR OPPOSITION TO DEFENDANTS' M/S/J AND, IN THE ALTERNATIVE, SUMMARY
ADJUDICATION  CASE NOS. C06-01665; C06-02915; C07-01200; C07-01207; C07-01212; C07-01381

1   hubs before price increases were instituted in order to create the "perception" of supply shortages,

2   and these deliberate efforts to reduce inventory levels were concealed from customers in order to

3   facilitate this "perception."  Sadler Dep. 5-21-2008 95:5-98:8, 102:4-107:5, 149:19-150:7 (Ex.

4   58B); Sadler Dep. 5-20-2008 107:15-110:6 (Ex. 58A); MU00781980-82 (Ex. 151) ("At OEMs

5   Infenion [sic] did the same as Micron in reducing inventory levels at hubs.").  Rather than reduce

6   production, they would house the inventory out of sight of the customer while maintaining it

7   readily available so as to take advantage of the price increases.  MU00221291-92 (Ex. 152).  But

8   this conduct would have been contrary to each defendant's economic self-interest unless it

9   understood that its competitors would do the same thing; otherwise, it risked losing sales because

10  its customers would simply buy DRAM from its competitors, which would not appear short on

11  supply.  Moreover, defendants did not even need to talk to one another to coordinate these

12  perceived shortages at the hubs because each supplier could see how much inventory each of its

13  competitors had immediately available at the shared customer hubs simply by visiting the hubs.

14  Sadler Dep. 5-20-2008 113:22-115:3 (Ex. 58A); J. Gross Dep. 130:10-131:7, 134:13-135:7,

15  139:10-140:9 (Ex. 153).

16          Another way to control DRAM supply was by altering the mix of products being produced

17  at the fabs.  DRAM products are produced on the same lines and machines as other products, and

18  the same is true of the different types of DRAM.  J. Harter Dep. 34:6-38:6 (Ex. 154); J.S. Kim 12-

19  12-2007 Dep. 178:4-189:24 (Ex. 155).  Defendants could reduce the output of a particular type of

20  DRAM or of all DRAM types as quickly as within a few hours, and at very little cost, simply by

21  increasing production of other DRAM or non-DRAM products on the same production lines.

22  The advantage of this approach, like hiding supply from hubs, is that it achieves output controls

23  without reducing the overall production at the fabs.  Defendants would have had little trouble in

24  determining the extent to which DRAM output would need to be reduced because, as discussed

25  below, they regularly exchanged competitively sensitive production information, including fab

26  capacity, current and forecasted production levels, and product mix details.  *See infra* pp. 30-32.

27          Defendants' efforts to restrict DRAM supply was perhaps most apparent in 2001, when in

28  response to declining DRAM prices, defendants coordinated a supply reduction that successfully

3 Park Plaza, 20th Floor
Irvine, CA  92614-8505
(949) 263-8400

crowell moring

27

increased prices in late 2001 and early 2002.  In July 2001, Micron's Mike Sadler met with D.S. Kim of Hynix and discussed reducing DRAM supply in order to stabilize declining DRAM prices. D.S. Kim Dep. 93:10-101:19 (Ex. 38); M. Sadler 5-21-2008 Dep. 44:19-47:25 (Ex. 58B).  Hynix responded by shutting down its Eugene, Oregon, fab the very next day, even though Hynix had previously not yet decided to do so.  HSA00493413-15 (Ex. 156); HXD001890-905 (Ex. 157) (no mention of a planned shutdown by Hynix in the context of discussing shutdowns by competitors).

Then, in October 2001, Mike Sadler met with Y.W. Lee of Samsung, Sang Park, Hynix's CEO, Ulrich Schumacher, Infineon's CEO, and Charles Kau of Nanya to convince them to jointly reduce production to stabilize prices.  MU00452055 (Ex. 158); MU00452057 (Ex. 159); M. Sadler 5-21-2008 Dep. 49:11-66:6 (Ex. 58B); D. Mackowiak Dep. 52:10-55:5 (Ex. 57); ITAG000385456-59 (Ex. 160).  A few weeks later, Mike Sadler met with Charles Kau and Kenneth Hurley of Nanya.  NTC-51 0395 (Ex. 161).  After these meetings, Sadler ordered the reduction of Micron's DRAM inventories at the shared hub facilities.  M. Sadler 5-21-2008 Dep. 96:17-22, 103:3-107:11 (Ex. 58B); MU00131927 (Ex. 59).  Several days after Sadler's meeting with Ulrich Schumacher, Infineon prepared to reduce wafer starts at Infineon's "Dresden 200" fab beginning on January 1, 2002 and, like Micron, began reducing its hub inventories.  ITAG-000385456-59 (Ex. 160); ITAG-0016493 (Ex. 162); MU00781980-82 (Ex. 151).  Samsung informed Elpida's Jim Sogas and Mike Despotes a few weeks after the meeting between Sadler and Y.W. Lee in November 2001 that it too was cutting production. EMUS 63421 (Ex. 163); EMUS 497544-45 (Ex. 164).[19]

Defendants cannot dispute that these actions resulted in a coordinated reduction in DRAM supply.  Data produced by Infineon regarding the Dresden 200 fab shows a decrease in wafer starts beginning in December 2001 through February 2002.  J. Harter Dep. 228:10-232:2 (Ex. 154); Harter Dep. Ex. 4 (Wafer Starts for Turnover.xls) (Ex. 166).  Production data produced by

---

[19] MU00114155 (Ex. 165) (Email from Micron's Lionel Lim noting his understanding after speaking with "Sammy" contact that Samsung was "still planning to limit their output" of DRAM).

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

1   Micron shows a nearly identical pattern of wafer start reductions in December 2001.

2   MU008684813 (Ex. 167).  Hynix's closure of its Eugene, Oregon fab from August 2001 through

3   December 2001 resulted in shortages for its customers.  Juseon Kim Dep. 51:4-54:9 (Ex. 168); J.S.

4   Kim 12-12-2007 Dep. 156:22-158:13 (Ex. 155).  Although Elpida did not manufacture any

5   DRAM itself at this time, its parent companies, including defendant NEC, did cut back

6   production.  EMUS 499436-45 (Ex. 169) (statement by Elpida Memory USA president Michael

7   Despotes that "we have cut back production"); EMUS 318725 (Ex. 170) ("Elpida is limiting

8   wafers (like very [sic] other supplier) and trying to burn inventory (at the same time keep price

9   going up…up…up)").

10       Defendants similarly cannot dispute that these reductions in DRAM supply helped achieve

11   price increases.  A January 16, 2002 Elpida presentation states:  "Recent production cuts by all

12   DRAM vendors has finally taken effect… supply has been reduced… prices are moving up

13   quickly (up 150% since Dec.)."  EMUS662210-15 (Ex. 172).  Similarly, Elpida's Jim Sogas stated

14   on Dec. 11, 2001 regarding increasing DRAM prices that "the dynamics are pretty much unrelated

15   to true market forces.  There is no organic reason for prices to increase i.e. demand increases.  This

16   is purely supply control."  EMUS 652013-22 (Ex. 173).  A Micron document summarizing a

17   meeting with Elpida on January 24, 2002, states that Micron and Elpida "both concur that the

18   current shortage is primarily due to capacity utilization in the industry.  Although there is some

19   increased demand, it is modest compared to the capacity throttling.  The factors that led to the

20   recent shortage are most likely due to Hynix shutting down OR to re-tool, Elpida capacity

21   reduction, and Micron capacity reduction."  MU00057337 (Ex. 174).  An internal Hynix

22   presentation from January 2002 states that "production cut & Fab. shut down" are the reasons why

23   DRAM prices were increasing at that time.  HSA00267620-51 at -640 (Ex. 175).  Defendants

24   would have this Court believe that all these contemporaneous production cuts in 2001 and 2002—

25   around the same time as Sadler's worldwide effort to reduce supply—were purely coincidental.

26       But defendants' efforts to restrain supply began well before 2001.  Defendants' documents

27   reveal a coordinated effort to reduce production in order to fix declining prices as early as 1998.

28   HSA: Byrd, C 129467 (Ex. 176) (handwritten notes by Charles Byrd of Hynix stating that "4 day

29

3 Park Plaza, 20th Floor
Irvine, CA  92614-8505
(949) 263-8400

crowell moring

1   holiday a good time [and] logical time to have a shutdown… 3 Korean manuf. have agreed to do

2   same to reduce…"); C. Byrd Dep. 120:9-128:2 (Ex. 177); MU00193211-13 (Ex. 178);

3   SSI0020030014-15 (Ex. 179) (Samsung's Yeong Ho Kang stating in a June 10, 1998 email

4   "Samsung will shut down the DRAM production lines for a week, from 6/14 to 6/20, due to

5   continued over supply of DRAM's and drastic price declines").  In June 1998, Hynix's Mark

6   Ellsberry wrote an article about the need for the industry to reduce DRAM supply, in which he

7   stated that "all DRAM makers must play fairly for the overall good of our industry," and Infineon

8   and NEC announced production cutbacks.  HSA00656368 (Ex. 180); ITAG 00061276-77 (Ex.

9   181) (stating that Siemens/Infineon shut down its fab in North Tyneside, UK); HSA00659280-83

10  (Ex. 182) (containing NEC's announcement to press of production cutbacks).  And defendants

11  believed that their efforts at restricting production were successful.  HSA00674303-05 (Ex. 183)

12  (Hynix's Charles Byrd stating in an Aug. 10, 1998 email on an article about the fab shutdowns by

13  most of Japan's and South Korea's chip makers by stating "[i]ts time to [t]ell everyone the

14  shutdowns are working and inventory is low!"); SSI-0020030014-15 (Ex. 179).

15      The Ninth Circuit has held that exchanges of detailed production and supply forecast

16  information are evidence of a conspiracy to restrict supply.  *In re Coordinated Pretrial*

17  *Proceedings In Petroleum Prods. Antitrust Litig.*, 906 F.2d 432 (9th Cir. 1990).  The information

18  exchanged by defendants here is no different from what the Ninth Circuit found sufficient in

19  *Petroleum Products*—namely, "supply and demand forecasts and production levels."  *Id.* at 460-

20  61.  The Ninth Circuit pointed to a summary of supply and demand forecasts prepared by one

21  defendant found in another defendant's files, along with two memoranda reflecting exchanges

22  among the defendants of supply- and production-level information.  *Id.* at 461.

23      Like the defendants in *Petroleum Products*, defendants here have produced documents

24  from their files containing production and supply forecasts and capacity and product mix

25  information obtained directly from other defendants.  An Infineon email dated August 4, 2000,

26  contains a table of current production levels from Samsung and NEC that Infineon's Martin Fritz

27  claims were obtained directly from those companies.  ITAG-00261998-2000 (Ex. 185).  Similarly,

28  a Samsung email from May 2000 reports information on current production levels and product

30

mix obtained from Infineon.  SSI-0005240326 (Ex. 186); *see also* D. Mackowiak Dep. 96:12-97:10 (Ex. 57) (testifying that he exchanged product roadmaps with Infineon's Peter Schaefer).  Infineon obtained similar information from Samsung in March 2001 as well.  ITAG-00268157-63 (Ex. 187) (March 9, 2001 email to Rudd Corwin from Abraham Lim providing specific production information from Samsung for January and February 2001 and its planned production in March 2001, described as "[l]ate night spy stuff.").  Other Infineon emails contain similar current and future production and product mix information obtained from meetings with Micron and Hynix in 1999, and Elpida in 2002.  ITNA01058999-9002 (Ex. 188); ITAG-00213726-27 (Ex. 189); ITAG-00308655-56 (Ex. 190).  Similarly, Hynix obtained and produced from its own files a "Confidential" Infineon presentation on the DRAM market, which included Infineon's supply and demand forecasts.  HSA 00006346-55 (Ex. 191).  In May 2000, Samsung's Yeongho Kang circulated Infineon production and product mix forecasts as well as pricing information.  SSI-0005240326 (Ex. 186).  Micron similarly was in possession of Hynix's production roadmap.  MU 00117874-82 (Ex. 192).  Nanya's Charles Kau also testified that he shared Nanya's production roadmaps with Nanya competitors. C. Kau Dep. 51:19-52:16 (Ex. 193).

Additionally, there is evidence that defendants met regularly to exchange production, capacity, and product mix information.  For example, an Infineon memorandum indicates that by November 1999, Samsung and Hynix met 1-2 times per month to share information on these topics, as well as pricing, while NEC, Micron and "Taiwan competitors" met less frequently. ITAG-00242971-72 (Ex. 61); ITNA01058999-9002 (Ex. 188) (describing a 8/9/1999 meeting between Hynix and Infineon and stating that Hynix meets "quarterly with Samsung, the top five Japanese and top five Taiwanese vendors"); ITAG-00261998-2000 (Ex. 185); ITAG-00308655-56 (Ex. 190).  These meetings continued in 2000, 2001, and 2002.  ITNA01117804-05 (Ex. 194); ITNA01118006-08 (Ex. 195); ITNA01145557-59 (Ex. 196) (describing meeting between Hynix and Infineon on 6/28/2001 during which Hynix noted that the "[i]ndustry has to reduce wafer starts in order to come out of current oversupply situation," as well as meeting between Infineon

3 Park Plaza, 20thFloor
Irvine, CA  92614-8505
(949) 263-8400

and Samsung); MU00057337 (Ex. 174).[20]

The evidence shows that during the same time period in which defendants were exchanging production and supply forecast information, DRAM prices rose in 1999 and 2000 due to supply shortages.  For example, in August 1999, the De Dios Market Advisor reported "Spot prices jumped more than 85 percent and major-customer prices increase by more than 25 percent as of the end of August as price hikes came earlier and faster than we expected.  We believe that the cause of the price hike is the vendors' ability to control supply flow to the market as they see their inventories drop."  MU00674511 (Ex. 197).  Similarly, the June 2000 De Dios Market Advisor also discusses a shortage in DRAM supply resulting in increased DRAM prices.  MU00674684-708 (Ex. 198);  *see also* UNI007967-68 (Ex. 199) (noting expected price increases resulting from insufficient capacity).

In *Petroleum Products*, the Ninth Circuit held that a reasonable jury could infer a conspiracy to restrict supply from evidence of the exchange of production and supply information and an actual shortage, when accompanied by additional evidence showing the defendants' "intent to stabilize the market by reducing excess capacity."  *Petroleum Prods.*, 906 F.3d at 462.  Here, a reasonable jury would be more than justified in concluding that defendants exchanged production information with the intent of stabilizing and increasing prices because they were exchanging pricing information *at the same time* they were collusively stabilizing and increasing prices**.**  HSA3075516-17 (Ex. 200), HSA00706482 (Ex. 201); NECELAM 086703 (Ex. 44); NECELAM 086789 (Ex. 202); NECELAM 137448 (Ex. 203); MU00773494 (Ex. 43); ITAG00204943-46 (Ex. 204); ITAG-00231422-23 (Ex. 42); ITNA01031428 (Ex. 205).  Moreover, Hynix, Elpida, Samsung and Infineon pleaded guilty to conspiring to fix DRAM prices from at least April 1999 through June 2002, the same period when they were exchanging production and supply

---

[20] Because independent evidence of a conspiracy involving these defendants exists, and because these meetings all discuss the exchange of production forecasts, product mix and other information in connection with DRAM pricing, these documents referencing these meetings are admissible against each defendant discussed therein.  *Petroleum Prods.*, 906 F.2d at 458-59.

crowell|moring

3 Park Plaza, 20thFloor
Irvine, CA 92614-8505
(949) 263-8400

1    information and stabilized and increased prices.[21]  All this evidence, together with the extensive

2    evidence of price-fixing at the same time, creates an issue of fact as to whether defendants

3    conspired to reduce DRAM supply, assuming plaintiffs had to prove this, which they do not.

4    **D.    Defendants' Conspiracy Was the Proximate Cause of Plaintiffs' Injuries**

5         Nothing about the way plaintiffs were injured makes their claims too "remote" for

6    purposes of the Clayton Act.  Throughout the conspiracy period, defendants intentionally

7    communicated with each other in order to artificially inflate plaintiffs' prices, kept plaintiffs'

8    prices in line with Named OEM prices, and used Named OEM prices either to negotiate higher

9    prices to plaintiffs when Named OEM prices increased or to resist plaintiffs' attempts to secure

10   lower prices.  In a price-fixing case, a plaintiff's injury is proximately caused by a conspiracy

11   when the prices paid by the plaintiff are affected by a conspiracy, regardless of whether the

12   defendants' conduct is directed primarily at a different set of products or customers.  *Knevelbaard*

13   *Dairies*, 232 F.3d at 990.

14        In contrast to the cases cited by defendants, nothing about Dr. Marshall's analysis suggests

15   that plaintiffs' injuries were derivative of the injury suffered by the Named OEMs nor entirely

16   dependent on the pricing decisions of the Named OEMs.  *Cf. Or. Laborers-Employers Health &*

17   *Welfare Trust Fund v. Phillip Morris Inc.*, 185 F.3d 957, 963-64 (9th Cir. 1999) (finding no

18   proximate cause where plaintiffs' injury was entirely derivative of and dependent on injuries

19   suffered by third parties).  Dr. Marshall's showing that plaintiffs' and Named OEM prices moved

---

21   [21] In *Petroleum Products*, 906 F.2d at 461-62, the Ninth Circuit found evidence that defendants
     expressed concern internally about oversupply and the need for coordinated action to reduce this
22   perceived oversupply supported an inference of conspiracy from the exchange of production
     information. Here, defendants expressed such concerns *to each other* in connection with their
23   exchanges of production information. On or about April 28, 1999, shortly before defendants began
     meeting to discuss production information and sharing production data, Infineon's Jan du Preez
24   spoke with Don Baldwin of Micron and Julian Hawkins of Samsung both expressing their hope
     that Infineon avoid increasing capacity. ITAG-00187448 (Ex. 206).  Similarly, in a meeting on
25   June 28, 2001, representatives of Hynix told their counterparts at Infineon that the "Industry has to
     reduce wafer starts in order to come out of current oversupply situation."  ITNA01145557-59 (Ex.
26   196).  In October 2000, representatives of Samsung and Micron met to discuss their concern with
     anticipated oversupply as well as pricing strategy. SSI-0005069884 (Ex. 207) and
27   SSI0005142367-68 (Ex. 208); M. Sadler 5-21-2008 Dep. 285:1-288:6 (Ex. 58B); M. Bocian Dep.
     80:13-83:10 (Ex. 82).

28

3 Park Plaza, 20th Floor
Irvine, CA  92614-8505
(949) 263-8400

crowell moring

1   together reveals that defendants affected plaintiffs' prices just as they affected Named OEM

2   prices.  The empirical fact that these prices moved together along with the price transparency that

3   pervaded the DRAM market made it necessary for defendants to fix plaintiffs' prices in order to

4   have any hope of affecting prices for the Named OEMs.  The Supreme Court has held that a

5   plaintiff may recover damages for injuries that were "a necessary step in effecting the ends of the

6   alleged illegal conspiracy," even if the plaintiff was not the primary target of the conspiracy.  *Blue*

7   *Shield of Va. v. McCready*, 457 U.S. 465, 478-79 (1982).[22]

8          Plaintiffs' theory of injury in no way resembles the "umbrella" theory addressed by the

9   Ninth Circuit in *In re Petroleum Products*, 691 F.2d 1335 (9th Cir. 1982).  Unlike the plaintiffs in

10  *In re Petroleum Products*, plaintiffs here are seeking damages based only on purchases made from

11  the firms that ***knowingly participated in*** the conspiracy, not innocent third parties.  Moreover,

12  because defendants communicated with each other regarding plaintiffs' prices, and because it was

13  reasonably foreseeable to defendants that an increase in Named OEM prices would be

14  accompanied by an increase in plaintiffs' prices, defendants cannot plausibly claim that they

15  "stand in much the same position as third-party sellers or re-sellers who are not even alleged to

16  have been participants in any Target OEM conspiracy."  Br. 29-30.

17         None of the other factors identified by the Supreme Court in *Associated General*

18  *Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 545

19  (1983), bars plaintiffs' claims.  Damages based on plaintiffs' direct purchases from defendants

20  would not be speculative or difficult to ascertain, as evidenced by Dr. White's testimony.

21  Defendants admit as much when they note the reasonableness of the overcharge estimates of the

22  direct purchaser class (a class that included plaintiffs).  Br. 31 n.23.  Finally, there are no more

23  direct victims than plaintiffs.  Plaintiffs are seeking damages based on overcharges they

24  _____

25  [22] Defendants' claim that they cannot be liable for injuries that "rest on the operation of market
    forces," Br. 29, not only misconstrues Dr. Marshall's opinion but also is legally incorrect.  *Amarel*
26  *v. Connell*, 102 F.3d 1494, 1512 (9th Cir. 1996) (holding that injury to plaintiffs in one market
    caused by anticompetitive conduct in another is sufficiently direct for purposes of section 4 where
27  the markets are so closely related that conduct in one market "predictably would have impacted"
    the price in the other).

28

3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

1    *themselves* suffered as a result of direct purchases from defendants; these specific injuries were not

2    suffered by the Named OEMs or anyone else.  Thus, plaintiffs are the *only* victims that can

3    recover for these injuries.

4    **III.    Summary Judgment Is Inappropriate On Plaintiffs' California Law Claims**

5            Because the factual evidence and opinions of plaintiffs' experts are sufficient to create an

6    issue of material fact under the Clayton Act, summary judgment is not appropriate on plaintiffs'

7    claims under California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.* (2008), and

8    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*,

9    ("UCL").  Defendants acknowledge that the analysis of whether the evidence is sufficient to

10   establish injury and causation is the same under both the Clayton Act and the Cartwright Act as

11   well as the UCL, *Knevelbaard*, 232 F.3d at 987-92; *Hall v. Time Inc.*, 70 Cal. Rptr. 3d 466-67, and

12   offer no additional argument as to why plaintiffs' state law claims should be dismissed.

13   **IV.    Defendants Are Not Entitled To Summary Adjudication**

14           There is no basis for summary adjudication under Rule 56(b) on the issues of whether

15   plaintiffs suffered an injury from defendants' conspiracy to fix their prices, whether plaintiffs

16   suffered an injury from a restraint on DRAM output, or whether plaintiffs suffered an injury from

17   a fix of "benchmark" prices.  For all the reasons set forth above, these are disputed issues of

18   material fact that must be resolved by a jury.  Defendants are precluded from seeking summary

19   adjudication of any other issues in their reply brief.

20   **V.    Conclusion**

21           Plaintiffs respectfully request that this Court deny defendants' motion.

22

23

24

25

26

27

28

3 Park Plaza, 20ᵗʰFloor
Irvine, CA 92614-8505
(949) 263-8400

crowell moring

1   DATED:  October 2, 2008          CROWELL & MORING LLP

2

3                                          By:   /s/
                                                 Jerome A. Murphy
4                                                David D. Cross
                                                 Daniel A. Sasse
5                                                Theresa C. Lopez

6                                          *Counsel for Plaintiffs Sun Microsystems, Inc.,*
                                           *Unisys Corporation, Jaco Electronics, Inc.,*
7                                          *Edge Electronics, Inc., and All American*
                                           *Semiconductor, Inc.*
8

9   DATED:  October 2, 2008          LINDQUIST & VENNUM P.L.L.P.

10

11                                         By:   /s/ James P. McCarthy
                                                 James M. McCarthy *(pro hac vice)*
12                                                 jmccarthy@lindquist.com
                                                 Michael Olafson *(pro hac vice)*
13                                                 molafson@lindquist.com
                                                 James M. Lockhart *(pro hac vice)*
14                                                 jlockhart@lindquist.com
                                                 DeAnne M. Hilgers *(pro hac vice)*
15                                                 dhilgers@lindquist.com
                                                 John C. Ekman *(pro hac vice)*
16                                                 jekman@lindquist.com
                                                 LINDQUIST & VENNUM P.L.L.P.
17                                               4200 IDS Center
                                                 80 South 8th Street
18                                               Minneapolis, MN  55402
                                                 Telephone:  (612) 371-3211
19                                               Facsimile:   (612) 371-3207

20                                         *Counsel for Plaintiff, DRAM Claims Liquidation*
                                           *Trust,*
21                                         *by its Trustee, Wells Fargo Bank, N.A.*

22   DC6314317.16

23

24

25

26

27

28

crowell moring

3 Park Plaza, 20ᵗʰ Floor
Irvine, CA  92614-8505
(949) 263-8400