# Exhibit 19

NIALL E. LYNCH (CSBN 157959)
NATHANAEL M. COUSINS (CSBN 177944)
MAY Y. LEE (CSBN 209366)
BRIGID S. BIERMANN (CSBN 231705)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Room 10-0101, Box 36046
San Francisco, CA 94102
Telephone: (415) 436-6660

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | Case No. |
| v. | ) | PLEA AGREEMENT |
| KUN CHUL SUH, | ) | |
| Defendant. | ) | |

**PLEA AGREEMENT**

The United States of America and Kun Chul Suh ("Defendant") hereby enter into the following Plea Agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."):

**RIGHTS OF DEFENDANT**

1.    Defendant understands that he has the right:

    (a)    to be represented by an attorney;

    (b)    to be charged by Indictment;

    (c)    to plead not guilty to any criminal charge brought against him;

    (d)    as a citizen of the Republic of Korea ("Korea") and a resident of Singapore, to decline to accept service of the Summons in this case, and to contest the jurisdiction of the United States to prosecute this case against him in the United States District Court for the Northern District of California;

PLEA AGREEMENT – SUH

(e)     to have a trial by jury, at which he would be presumed not guilty of the charge and the United States would have to prove every essential element of the charged offense beyond a reasonable doubt for him to be found guilty;

(f)     to confront and cross-examine witnesses against him and to subpoena witnesses in his defense at trial;

(g)     not to be compelled to incriminate himself;

(h)     to appeal his conviction; and

(i)     to appeal the imposition of sentence against him.

## AGREEMENT TO PLEAD GUILTY AND WAIVE CERTAIN RIGHTS

2.      Defendant knowingly and voluntarily waives the rights set out in Paragraph 1(b)-(h) above, including all jurisdictional defenses to the prosecution of this case, and agrees voluntarily to consent to the jurisdiction of the United States to prosecute this case against him in the United States District Court for the Northern District of California.  Defendant also knowingly and voluntarily waives the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2241 or 2255 that challenges the sentence imposed by the Court, if that sentence is consistent with or below the recommended sentence in Paragraph 8 of this Plea Agreement, regardless of how the sentence is determined by the Court.  This agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b)-(c).  Nothing in this paragraph, however, shall act as a bar to the Defendant perfecting any legal remedies he may otherwise have on appeal or collateral attack respecting claims of ineffective assistance of counsel.  Further, pursuant to Fed. R. Crim. P. 7(b), Defendant will waive Indictment and plead guilty at arraignment to a one-count Information to be filed in the United States District Court for the Northern District of California.  The Information will charge that beginning on or about April 1, 1999, and continuing until on or about June 15, 2002, Hynix Semiconductor Inc. ("Hynix") and co-conspirators participated in a conspiracy in the United States and elsewhere to suppress and eliminate competition by fixing the price of dynamic random access memory

PLEA AGREEMENT – SUH                          2

("DRAM") to be sold to certain original equipment manufacturers of personal computers and servers ("OEMs"), in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. The Information will further charge that Defendant, an employee of Hynix and its U.S. subsidiary, joined and participated in the charged conspiracy from on or about April 1, 2001, until on or about June 15, 2002.

3.     Defendant, pursuant to the terms of this Plea Agreement, will plead guilty to the criminal charge described in Paragraph 2 above and will make a factual admission of guilt to the Court in accordance with Fed. R. Crim. P. 11, as set forth in Paragraph 4 below.

**FACTUAL BASIS FOR OFFENSE CHARGED**

4.     Had this case gone to trial, the United States would have presented evidence to prove the following facts:

(a)     For purposes of this Plea Agreement, the "relevant period" is that period from on or about April 1, 2001, to on or about June 15, 2002. Hynix is an entity organized and existing under the laws of Korea, with its principal place of business in Korea. During the relevant period, Defendant was employed by Hynix and its U.S. subsidiary, Hynix Semiconductor America Inc. ("Hynix America"). Defendant's titles during the relevant period were Senior Manager, Memory Product Marketing, for Hynix; Vice President for Product Marketing & Operations, for Hynix America; and Vice President for Operations, for Hynix America.

(b)     DRAM is the most commonly used semiconductor memory product. DRAM provides high-speed storage and retrieval of electronic information in personal computers, servers, and other devices.

(c)     In the course of his employment during the relevant period, Defendant was engaged in the sale and marketing of DRAM in the United States. Among other responsibilities, Defendant recommended to his superiors and other employees at Hynix the prices for the sale of DRAM to be sold to certain OEMs in the United States.

(d)     During the relevant period, Defendant participated in a pre-existing conspiracy, as described below, in the United States and elsewhere among certain DRAM

PLEA AGREEMENT – SUH                              3

producers and their officers and employees, the primary purpose of which was to raise the price of DRAM sold to certain OEMs.  The conspiracy directly affected these OEMs in the United States:  Dell Inc., Hewlett-Packard Company, Compaq Computer Corporation, International Business Machines Corporation, Apple Computer Inc., and Gateway, Inc.  Defendant participated in the conspiracy by engaging in communications with representatives of other DRAM producers and sellers, during which information on pricing was exchanged between competitors with the effect of influencing the price of DRAM sold to certain OEMs.  Also during these communications understandings were reached, the effect of which was to stabilize and raise the price of DRAM sold to certain OEMs.  Defendant also participated in the conspiracy by reporting pricing information to his superiors with the knowledge that minimum pricing floors for the sale of DRAM to certain OEMs in the United States would be set based on pricing information obtained by him and other Hynix employees in communications with competitors.

(e)     In addition, during the relevant period Defendant was aware of the existence of the conspiracy among the employees of Hynix, and he knowingly consented to the participation of one or more of his subordinate employees in that conspiracy.

(f)     During the relevant period, DRAM sold by one or more of the conspirators, equipment and supplies necessary to the production and distribution of DRAM, and payments for DRAM, traveled in interstate and foreign commerce.  The business activities of Defendant and his co-conspirators in connection with the production and sale of DRAM affected by this conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

(g)     Acts in furtherance of this conspiracy were carried out within the Northern District of California. Furthermore, DRAM affected by this conspiracy was sold by one or more of the conspirators to customers in this District.

PLEA AGREEMENT – SUH                              4

## POSSIBLE MAXIMUM SENTENCE

5. Defendant understands that the statutory maximum penalty which may be imposed against him upon conviction for a violation of Section One of the Sherman Antitrust Act is:

(a) a term of imprisonment for three (3) years (15 U.S.C. § 1);

(b) a fine in an amount equal to the greatest of (1) $350,000, (2) twice the gross pecuniary gain the conspirators derived from the crime, or (3) twice the gross pecuniary loss caused to the victims of the crime by the conspirators (15 U.S.C. § 1; 18 U.S.C. § 3571(b) and (d)); and

(c) a term of supervised release of one (1) year following any term of imprisonment. If Defendant violates any condition of supervised release, Defendant could be imprisoned for the entire term of supervised release (18 U.S.C. § 3559(a)(5); 18 U.S.C. § 3583(b)(3) and (e)(3); and United States Sentencing Guideline ("U.S.S.G." or "Guidelines") § 5D1.2(a)(3)).

6. In addition, Defendant understands that:

(a) pursuant to U.S.S.G. § 5E1.1 and 18 U.S.C. § 3583(d), this Court may order him to pay restitution to the victims of the offense; and

(b) pursuant to 18 U.S.C. § 3013(a)(2)(A) and U.S.S.G. § 5E1.3, this Court is required to order Defendant to pay a $100.00 special assessment upon conviction for the charged crime.

## SENTENCING GUIDELINES

7. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a), in determining and imposing sentence. Defendant understands that the Guidelines determinations will be made by the Court by a preponderance of the evidence standard. Defendant understands that although the Court is not ultimately bound to impose a sentence within the applicable Guidelines range, its sentence must be reasonable based upon consideration of all relevant sentencing factors set forth in 18 U.S.C. § 3553(a). Pursuant

PLEA AGREEMENT – SUH                    5

to U.S.S.G. § 1B1.8, the United States agrees that self-incriminating information that Defendant provides to the United States pursuant to this Plea Agreement will not be used to increase the volume of affected commerce attributable to Defendant or in determining the Defendant's applicable Guidelines range, except to the extent provided in U.S.S.G. § 1B1.8(b). Defendant and the United States agree that the Court should consider the Guidelines in effect at the time of the offense, June 15, 2002, rather than at the time of sentencing, in accordance with U.S.S.G. § 1B1.11(b). The United States and Defendant agree that the Guidelines may be applied and, if applied, the applicable sentencing guidelines is U.S.S.G. § 2R1.1 with a base level of 10, a volume of commerce adjustment of plus 7 pursuant to U.S.S.G. § 2R1.1(b)(2)(G); no role in the offense adjustment under U.S.S.G. § 3B1.1, for a sub-total of 17; less a 3-level adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b), for a total offense level of 14. Further, the United States agrees to make a motion for downward departure pursuant to Paragraph 10 herein and U.S.S.G. § 5K1.1, recommending that Defendant be sentenced to the recommended sentence agreed to below.

### SENTENCING AGREEMENT

8.    (a)    Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and Defendant agree that the appropriate disposition of this case is, and agree to recommend jointly that the Court impose, a sentence requiring that Defendant pay to the United States a criminal fine of $250,000, payable in full before the fifteenth (15th) day after the date of judgment; a period of incarceration of six months; no order of restitution; and no period of supervised release ("the recommended sentence"). Defendant understands that this Court will order him to pay a $100 special assessment pursuant to 18 U.S.C. § 3013(a)(2)(A) in addition to any fine imposed. The parties agree that there exists no aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the U.S. Sentencing Commission in formulating the Sentencing Guidelines justifying a departure pursuant to U.S.S.G. § 5K2.0. The parties agree not to seek or support any sentence outside of the Guidelines range nor any Guidelines adjustment for any reason that is not set forth in this Plea Agreement. The parties further agree that the recommended sentence set forth in this Plea Agreement is reasonable.

PLEA AGREEMENT – SUH                6

(b) The United States will not object to Defendant's request that the Court make a recommendation to the Bureau of Prisons that the Bureau of Prisons designate that Defendant be assigned to a Federal Minimum Security Camp (and specifically to the Lompoc Prison Camp in Lompoc, California) to serve his sentence of imprisonment and that Defendant be released on his own personal recognizance following the imposition of sentence to allow him to self-surrender to the designated institution on a specified date.

9. The United States and Defendant agree that, pursuant to U.S.S.G. § 5E1.1(b), Defendant should not be ordered to pay restitution in light of the civil cases filed against Hynix, Defendant's employer, including *In re DRAM Antitrust Litigation*, No. M-02-1486-PJH, MDL No. 1486, consolidated in the United States District Court, Northern District of California, which potentially provide for a recovery of a multiple of actual damages.

10. The United States and Defendant agree that the applicable Guidelines fine and incarceration ranges exceed the fine and term of imprisonment contained in the recommended sentence set out in Paragraph 8 above. Subject to the full and continuing cooperation of Defendant, as described in Paragraph 13 of this Plea Agreement, and prior to sentencing in this case, the United States agrees that it will make a motion, pursuant to U.S.S.G. § 5K1.1, for a downward departure from the Guidelines fine and incarceration ranges in this case. The motion for downward departure is based on cooperation that has already occurred and any additional cooperation that may occur prior to sentencing. Furthermore, the United States will request that this Court impose the fine and term of imprisonment contained in the recommended sentence set out in Paragraph 8 of this Plea Agreement because of Defendant's substantial assistance in the government's investigation and prosecutions of violations of federal criminal law in the DRAM industry.

11. The United States and Defendant jointly submit that this Plea Agreement and the record that will be created by the United States and Defendant at the plea and sentencing hearing will provide sufficient information concerning Defendant, the offense charged in this case, and Defendant's role in the offense to enable the meaningful exercise of sentencing authority by this Court under 18 U.S.C. § 3553. The United States will not object to Defendant's request that

PLEA AGREEMENT – SUH 7

this Court accept Defendant's plea of guilty and impose sentence on an expedited schedule as early as the date of arraignment, based upon the record provided by Defendant and the United States, under the provisions of Rule 32(b)(1), Fed. R. Crim. P., U.S.S.G. § 6A1.1, and Criminal Local Rule 32-1(b). The Court's denial of the request to impose sentence on an expedited schedule will not void this Plea Agreement. Should the Court deny Defendant's request to impose sentence on an expedited schedule, the United States agrees that, at the initial appearance or arraignment, it will recommend the release of Defendant on his personal recognizance and without bond, under 18 U.S.C. § 3142, without restriction as to travel, pending the sentencing hearing in this case.

12.     The United States and Defendant understand that this Court retains complete discretion to accept or reject the recommended sentence provided for in Paragraph 8 of this Plea Agreement.

(a)     If this Court does not accept the recommended sentence, the United States and Defendant agree that this Plea Agreement, except for Paragraph 12(b) below, shall be rendered void. Neither party may withdraw from this Plea Agreement, however, based on the type or location of the correctional facility to which Defendant is assigned to serve his sentence.

(b)     If this Court does not accept the recommended sentence, Defendant will be free to withdraw his guilty plea (Fed. R. Crim. P. 11(c)(5) and (d)). If Defendant withdraws his plea of guilty, this Plea Agreement, the guilty plea, and any statement made in the course of any proceedings under Fed. R. Crim. P. 11 regarding the guilty plea or this Plea Agreement or made in the course of plea discussions with an attorney for the government shall not be admissible against Defendant in any criminal or civil proceeding, except as otherwise provided in Fed. R. Evid. 410. In addition, should the Court not accept the Plea Agreement and should Defendant then withdraw his guilty plea, the United States agrees that it will dismiss the Information, without prejudice to the United States' right to indict Defendant on the charge contained in the Information and any other related charges. In addition, Defendant agrees that, if he withdraws his

PLEA AGREEMENT – SUH                                8

guilty plea pursuant to this subparagraph of the Plea Agreement, the statute of limitations period for any Relevant Offense, as defined in Paragraph 13 below, will be tolled for the period between the date of the signing of the Plea Agreement and the date Defendant withdrew his guilty plea or for a period of sixty (60) days after the date of the signing of the Plea Agreement, whichever is greater. For a period of three (3) consecutive days following such a withdrawal of the guilty plea under this subparagraph, the United States shall take no action, based upon either a Relevant Offense or any actual or alleged violation of the Plea Agreement, to revoke Defendant's release on his personal recognizance, to subject Defendant to service of process, arrest, or detention, or to prevent Defendant from departing the United States.

### DEFENDANT'S COOPERATION

13.    Defendant will cooperate fully and truthfully with the United States in the prosecution of this case, the current federal investigation of violations of federal antitrust and related criminal laws involving the manufacture or sale of DRAM, any other federal investigation resulting therefrom, and any litigation or other proceedings arising or resulting from any such investigation to which the United States is a party ("Federal Proceeding"). The ongoing, full, and truthful cooperation of Defendant shall include, but not be limited to:

(a)    producing in the United States and at other mutually agreed-upon locations all non-privileged documents, including claimed personal documents, and other non-privileged materials, wherever located, in the possession, custody, or control of Defendant, requested by attorneys and agents of the United States;

(b)    making himself available for interviews in the United States and at other mutually agreed-upon locations, not at the expense of the United States, upon the request of attorneys and agents of the United States;

(c)    responding fully and truthfully to all inquiries of the United States in connection with any Federal Proceeding, without falsely implicating any person or intentionally withholding any non-privileged information, subject to the penalties of making false statements (18 U.S.C. § 1001) and obstruction of justice (18 U.S.C. §

PLEA AGREEMENT – SUH                    9

1503);

(d)  otherwise voluntarily providing the United States with any non-privileged material or information, not requested in (a) - (c) of this paragraph, that he may have that is related to any Federal Proceeding; and

(e)  when called upon to do so by the United States in connection with any Federal Proceeding, testifying in grand jury, trial, and other judicial proceedings in the United States, fully, truthfully, and under oath, subject to the penalties of perjury (18 U.S.C. § 1621), making false statements or declarations in grand jury or court proceedings (18 U.S.C. § 1623), contempt (18 U.S.C. §§ 401 - 402), and obstruction of justice (18 U.S.C. § 1503).

## GOVERNMENT'S AGREEMENT

14.  Subject to the full, truthful, and continuing cooperation of Defendant, as described in Paragraph 13 of this Plea Agreement, and upon the Court's acceptance of the guilty plea called for by this Plea Agreement and the imposition of the recommended sentence, the United States will not bring further criminal charges against Defendant for any act or offense committed before the date of this Plea Agreement that was undertaken in furtherance of an antitrust conspiracy involving the manufacture or sale of DRAM or undertaken in connection with any investigation of such a conspiracy ("Relevant Offense"). The nonprosecution terms of this paragraph do not apply to civil matters of any kind, to any violation of the federal tax or securities laws, or to any crime of violence.

15.  The United States agrees that when Defendant travels to the United States for interviews, grand jury appearances, or court appearances pursuant to this Plea Agreement, or for meetings with counsel in preparation therefor, the United States will take no action, based upon any Relevant Offense, to subject Defendant to arrest, detention, or service of process, or to prevent Defendant from departing the United States. This paragraph does not apply to Defendant's commission of perjury (18 U.S.C. § 1621), making false statements (18 U.S.C. § 1001), making false statements or declarations in grand jury or court proceedings (18 U.S.C. § 1623), obstruction of justice (18 U.S.C. § 1503), or contempt (18 U.S.C. §§ 401 - 402) in

PLEA AGREEMENT – SUH                    10

connection with any testimony or information provided or requested in any Federal Proceeding.

16. (a) Subject to the full and continuing cooperation of the Defendant, as described in Paragraph 13 of this Plea Agreement, and upon the Court's acceptance of the Defendant's guilty plea and imposition of sentence in this case, the United States agrees not to seek to remove the Defendant from the United States under Sections 238 and 240 of the Immigration and Nationality Act, 8 U.S.C. §§ 1228 and 1229a, based upon the Defendant's guilty plea and conviction in this case, should the Defendant apply for or obtain admission to the United States as a nonimmigrant (hereinafter referred to as the "agreement not to seek to remove the Defendant"). The agreement not to seek to remove the Defendant is the equivalent of an agreement not to exclude the Defendant from admission to the United States as a nonimmigrant or to deport the Defendant from the United States. (Immigration and Nationality Act § 240(e)(2), 8 U.S.C. § 1229a(e)(2)).

(b) The Antitrust Division of the United States Department of Justice has consulted with United States Immigration and Customs Enforcement ("ICE") on behalf of the United States Department of Homeland Security ("DHS"). ICE, on behalf of DHS and in consultation with the United States Department of State, has agreed to the inclusion in this Plea Agreement of this agreement not to seek to remove the Defendant. The Secretary of DHS has delegated to ICE the authority to enter this agreement on behalf of DHS.

(c) So that the Defendant will be able to obtain any nonimmigrant visa that he may need to travel to the United States, DHS and the Visa Office, United States Department of State, have concurred in the granting of a nonimmigrant waiver of the Defendant's inadmissibility. This waiver will remain in effect so long as this agreement not to seek to remove the Defendant remains in effect. While the waiver remains in effect, the Department of State will not deny the Defendant's application for a nonimmigrant visa on the basis of the Defendant's guilty plea and conviction in this case, and DHS will not deny his application for admission as a nonimmigrant on the

PLEA AGREEMENT – SUH 11

basis of his guilty plea and conviction in this case.

(d)     This agreement not to seek to remove the Defendant will remain in effect so long as the Defendant:

(i)     acts and has acted consistently with his cooperation obligations under this Plea Agreement;

(ii)     is not convicted of any felony under the laws of the United States or any state, other than the conviction resulting from the Defendant's guilty plea under this Plea Agreement or any conviction under the laws of any state resulting from conduct constituting an offense subject to this Plea Agreement; and

(iii)     does not engage in any other conduct that would warrant his removal from the United States under the Immigration and Nationality Act. The Defendant understands that should the Antitrust Division become aware that the Defendant has violated any of these conditions, the Antitrust Division will notify DHS. DHS will then determine, in consultation with the Antitrust Division, whether to rescind this agreement not to seek to remove the Defendant.

(e)     The Defendant agrees to notify the Assistant Attorney General of the Antitrust Division should the Defendant be convicted of any other felony under the laws of the United States or of any state.

(f)     Should the United States rescind this agreement not to seek to remove the Defendant because of the Defendant's violation of a condition of this Plea Agreement, the Defendant irrevocably waives his right to contest his removal from the United States under the Immigration and Nationality Act on the basis of his guilty plea and conviction in this case, but retains his right to notice of removal proceedings.

17.     Defendant understands that he may be subject to administrative action by federal, state or foreign agencies other than the United States Department of Justice, Antitrust Division, based upon the conviction resulting from this Plea Agreement, and that this Plea Agreement in no way controls whatever action, if any, other agencies may take. However, the United States

PLEA AGREEMENT – SUH                    12

agrees that, if requested, it will advise the appropriate officials of any governmental agency considering such administrative action of the fact, manner, and extent of the cooperation of Defendant as a matter for that agency to consider before determining what administrative action, if any, to take.

### REPRESENTATION BY COUNSEL

18.  Defendant has reviewed all legal and factual aspects of this case with his attorney and is fully satisfied with his attorney's legal representation.  Defendant has thoroughly reviewed this Plea Agreement with his attorney and has received satisfactory explanations from his attorney concerning each paragraph of this Plea Agreement and alternatives available to Defendant other than entering into this Plea Agreement.  After conferring with his attorney and considering all available alternatives, Defendant has made a knowing and voluntary decision to enter into this Plea Agreement.

### VOLUNTARY PLEA

19.  Defendant's decision to enter into this Plea Agreement and to tender a plea of guilty is freely and voluntarily made and is not the result of force, threats, assurances, promises, or representations other than the representations contained in this Plea Agreement.  The United States has made no promises or representations to Defendant as to whether this Court will accept or reject the recommendations contained within this Plea Agreement.

### VIOLATION OF PLEA AGREEMENT

20.  Defendant agrees that, should the United States determine in good faith, during the period that any Federal Proceeding is pending, that Defendant has failed to provide full and truthful cooperation, as described in Paragraph 13 of this Plea Agreement, or has otherwise violated any provision of this Plea Agreement, the United States will notify Defendant or his counsel in writing by personal or overnight delivery or facsimile transmission and may also notify his counsel by telephone of its intention to void any of its obligations under this Plea Agreement (except its obligations under this paragraph), and Defendant shall be subject to prosecution for any federal crime of which the United States has knowledge including, but not limited to, the substantive offenses relating to the investigation resulting in this Plea Agreement.

PLEA AGREEMENT – SUH                          13

Defendant may seek Court review of any determination made by the United States under this Paragraph to void any of its obligations under the Plea Agreement. Defendant agrees that, in the event that the United States is released from its obligations under this Plea Agreement and brings criminal charges against Defendant for any Relevant Offense, the statute of limitations period for such offense will be tolled for the period between the date of the signing of this Plea Agreement and six (6) months after the date the United States gave notice of its intent to void its obligations under this Plea Agreement.

21.     Defendant understands and agrees that in any further prosecution of him resulting from the release of the United States from its obligations under this Plea Agreement based on Defendant's violation of the Plea Agreement, any documents, statements, information, testimony, or evidence provided by him to attorneys or agents of the United States, federal grand juries, or courts, and any leads derived therefrom, may be used against him in any such further prosecution. In addition, Defendant unconditionally waives his right to challenge the use of such evidence in any such further prosecution, notwithstanding the protections of Fed. R. Evid. 410.

22.     Defendant agrees to and adopts as his own the factual statement contained in Paragraph 4 above. In the event that Defendant breaches the Plea Agreement, Defendant agrees that the Plea Agreement, including the factual statement contained in Paragraph 4 above, provides a sufficient basis for any possible future extradition request that may be made for his return to the United States to face charges either in the Information referenced in Paragraph 2 of this Plea Agreement or in any related indictment. Defendant further agrees not to oppose or contest any request for extradition by the United States to face charges either in the Information referenced in Paragraph 2 of this Plea Agreement or in any related indictment.

## ENTIRETY OF AGREEMENT

23.     This Plea Agreement constitutes the entire agreement between the United States and Defendant concerning the disposition of the criminal charge in this case. This Plea Agreement cannot be modified except in writing, signed by the United States and Defendant.

PLEA AGREEMENT – SUH                                  14

24. The undersigned attorneys for the United States have been authorized by the Attorney General of the United States to enter this Plea Agreement on behalf of the United States.

25. A facsimile signature shall be deemed an original signature for the purpose of executing this Plea Agreement. Multiple signature pages are authorized for the purpose of executing this Plea Agreement.

DATED: **Feb. 28, 2006**

Respectfully submitted,

BY:

_____

Kun Chul Suh
Defendant

Niall E. Lynch (CSBN 157959)
Nathanael M. Cousins (CSBN 177944)
May Y. Lee (CSBN 209366)
Brigid S. Biermann (CSBN 231705)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Room 10-0101, Box 36046
Tel: (415) 436-6660
Fax: (415) 436-6687

_____

Counsel for Defendant
Cristina C. Arguedas
Matti Fromson
Arguedas, Cassman & Headley LLP
803 Hearst Avenue
Berkeley, CA 94710
Tel: (510) 845-3000

PLEA AGREEMENT – SUH                    15

24.     The undersigned attorneys for the United States have been authorized by the Attorney General of the United States to enter this Plea Agreement on behalf of the United States.

25.     A facsimile signature shall be deemed an original signature for the purpose of executing this Plea Agreement. Multiple signature pages are authorized for the purpose of executing this Plea Agreement.

DATED: _01. Feb. 2006_                    Respectfully submitted,

BY: _____

Kun Chul Suh
Defendant

_____
Counsel for Defendant
Cristina C. Arguedas
Matti Fromson
Arguedas, Cassman & Headley LLP
803 Hearst Avenue
Berkeley, CA 94710
Tel: (510) 845-3000

Niall E. Lynch (CSBN 157959)
Nathanael M. Cousins (CSBN 177944)
May Y. Lee (CSBN 209366)
Brigid S. Biermann (CSBN 231705)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Room 10-0101, Box 36046
Tel: (415) 436-6660
Fax: (415) 436-6687

PLEA AGREEMENT – SUH                    15

# Exhibit 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

- - - - - - - - - - - - - - - - - -

SUN MICROSYSTEMS, INC., et al.   )   No. C-06-01665 PJH

vs.                     (Consolidated)

HYNIX SEMICONDUCTOR, INC., et al., )

UNISYS CORPORATION          )   No. C-06-02915 PJH

vs.

HYNIX SEMICONDUCTOR, INC., et al., )

JACO ELECTRONICS, INC.          )   No. C-07-01212 PJH

vs.

HYNIX SEMICONDUCTOR, INC., et al., )

EDGE ELECTRONICS, INC.          )   No. C-07-01207 PJH

vs.

HYNIX SEMICONDUCTOR, INC., et al.  )

ALL AMERICAN SEMICONDUCTOR, INC.  )   No. C-07-01200 PJH

vs.

HYNIX SEMICONDUCTOR, INC., et al.  )

DRAM CLAIMS LIQUIDATION TRUST, by )   No. C-07-01381 PJH

its Trustee Wells Fargo Bank, N.A.

vs.                    )

HYNIX SEMICONDUCTOR, INC., et al.

- - - - - - - - - - - - - - - - - -

HIGHLY CONFIDENTIAL DEPOSITION OF THOMAS TRILL

FRIDAY, NOVEMBER 30, 2007

BEHMKE REPORTING & VIDEO SERVICES

BY:  MELINDA M. IBANEZ, CSR NO. 10686, CRP

160 SPEAR STREET, SUITE 300

SAN FRANCISCO, CALIFORNIA 94105

(415) 597-5600

problems until September," end quote.

Are you aware of any -- during the time that you were at Samsung, let's stick to the 2000-2002 -- any communications between Samsung employees and Hyundai employees about pricing of DRAM for customers?

MR. BENJAMIN:  Calls for speculation.

THE WITNESS:  No, I don't believe so.

BY MR. MURPHY:

Q.   So did --

Do you know how Mr. Kang acquired the information that he's conveyed in this email about Hyundai claiming that they would keep price flat?

A.   I don't.

MR. BENJAMIN:  Asked and answered.

BY MR. MURPHY:

Q.   During the time that -- that you were at Samsung, from 2000 -- let's just stick to 2000 to 2002, did you have any conversations with any Hyundai or Hynix employees?

A.   Yes.

Q.   And who did you speak to at Hyundai or Hynix?

A.   Nick La Herran and John Havington.

(Reporter interruption.)

THE WITNESS: Nick, N-i-c-k, La Herran, L-a capital H-e-r-r-a-n, and John Havington, H-a-v-i-n-g-t-o-n.

Possibly this was later than 2002, but I can't be sure.

BY MR. MURPHY:

Q. And was Mr. La Herran your counterpart at Hynix with respect to Sun?

A. Yes.

Q. And what was Mr. Havington's role?

A. He was recently, recently at the time, recruited into Hyundai, or Hynix, from Kingston's Dublin facility in Ireland. I had a relationship with him from my time at Hitachi.

Q. And let's stick with Mr. La Herran first. You said you had conversations with him during 2000-2002 time frame.

A. I believe that was the time frame, yes.

Q. And were the conversations you had with Mr. La Herran similar to the ones you described with competitors while you were at Hitachi?

MR. BENJAMIN: Objection, vague.

THE WITNESS: The only difference was that they were specific to Sun Microsystems.

BY MR. MURPHY:

Q.  And so did you have conversations with Mr. La Herran at Hynix about pricing at Sun Microsystems during this time frame?

A.  Yes.

Q.  Approximately how many conversations did you have with him?

A.  I couldn't say.  Not too many.

Q.  More than ten?

A.  It's hard for me to say.  I -- I honestly couldn't put a number on it.

Q.  If --

Can you put a number -- a number on the frequency with which you spoke with him?

MR. BENJAMIN:  Objection, vague as to time period.

THE WITNESS:  Infrequent.

BY MR. MURPHY:

Q.  Would it be on a weekly basis?

A.  No.

Q.  On a monthly basis?

A.  No.  Less frequent.

Q.  During this -- this time frame, how -- how frequently -- and let's -- let's limit my question to prior to Sun's dynamic bidding events.

A.  Okay.

the Bay Area, and all those discussions were -- were just personal, nonbusiness related.

The next communication I had with Nick was related to a -- a Sun event, and I do not recall whether I had one, two or three discussions with him, because we then recruited Nick from Hynix to come and work for Samsung.  So most of my discussions with him thereafter were around his -- the recruitment process and the interview process.

Q.  Okay.  Who --

If you know, who replaced Mr. La Herran at Hynix after he moved to Sun?

A.  I don't recall.  I knew at the time, but I don't remember the guy's name.

Q.  Did you have conversations with -- with that person?

A.  No.

Q.  And did you have -- let's talk about your conversations with Mr. Havington.  How frequently with your -- were those conversations?

A.  Infrequent.

Q.  Along the same -- same kind of frequency as with Mr. La Herran?

A.  Possibly even less.

Q.  Okay.  And did you discuss pricing with

THE WITNESS: Specific price points, no. General direction, yes.

BY MR. MURPHY:

Q. And ranges of prices?

MR. BENJAMIN: Vague.

THE WITNESS: I can't recall.

BY MR. MURPHY:

Q. And did you --

After speaking with Mr. La Herran, did you provide the information that he conveyed to you to anyone else at Samsung?

A. I don't recall specifically, but there's a high likelihood I would have relayed that information.

Q. And who would you have relayed that information to?

A. Probably --

MR. BENJAMIN: Calls for speculation.

THE WITNESS: Highly probable is Arnold Kim, Sung Han.

(Reporter interruption.

THE WITNESS: Sung Han, S-u-n-g H-a-n. That's his Korean name.

BY MR. MURPHY:

Q. And why would you relay this information to

Arnold Kim?

A. It was a competitive input.

Q. Is this something that -- that Mr. Kim or others had asked you to acquire?

A. I don't recall if he specifically or explicitly asked me to acquire that data for him.

Q. Did you understand at the time that that was information that Mr. Kim and others wanted you to acquire?

A. Yes.

Q. How did you get that understanding?

A. It's difficult to articulate, but there was a -- I'm trying to articulate this clearly for you.

It was just modus operandi that data would -- competitive data was collected in order to, you know, triangulate or, you know, create the optimum positioning to -- to maximize our business.

Q. Okay. And the term "competitive data" included information directly from competitors, correct?

A. Yes.

Q. Now, in Exhibit 3 there's -- there's also a reference to a price that Infineon claimed they were selling. Do you know how Mr. Kang acquired that information?

MS. KEMMERLING:  Objection.

THE WITNESS:  I do not.

MS. KEMMERLING:  Calls for speculation.

BY MR. MURPHY:

Q.  Did you have any contacts with any Infineon employees during the period 2000 to 2002?

A.  Yes.

Q.  Who was that?

A.  John Bugee and Dick Costa and Julian Hawkins -- perhaps not Julian Hawkins during that specific time range.  If he was employed at Infineon at that time, then I did have contact with him at Infineon.

Q.  Now, when did you first meet Mr. Bugee?

A.  When I arrived at SSI in the summer of 2000.

Q.  So he was -- he was a Samsung employee --

A.  Correct.

Q.  -- and coworker with you?

A.  Correct.

Q.  What was his role at Samsung?

A.  I believe he was the Cisco account manager.

Q.  And approximately when did he move over to Infineon?

A.  I'd have to say early 2001, early 2001.  But I could be off.  I could be way off on that date.

Q. What role did he play at Infineon?

A. He was the Sun account manager.

Q. So your counterpart --

A. Yes -- ah -- yeah.

Q. How frequently did you have contact with Mr. Bugee while he was the Sun account manager at Infineon?

A. I would say frequently.

Q. On a weekly basis?

A. Not that frequently.

Q. Quarterly basis?

A. More frequently than that.

Q. Okay. Maybe monthly?

A. Yeah. Possibly more frequently than monthly.

Q. What were the nature of your conversations with Mr. Bugee during this time period?

A. He and I had struck a friendship, so there was a lot of personal discussion and just keeping in touch and -- and then business related specific to Sun.

Q. Okay. At some point did -- did Sun request that Samsung provide budgetary information with respect to future pricing?

A. Yes.

Q.  Do you recall about when that -- when that time frame started?

A.  Oh, it was common practice for them to ask for budgetary pricing.

Q.  And what does budgetary pricing mean?

A.  It's guidance.

Q.  And in the conversations you had with Mr. Bugee, did you discuss what Samsung's budgetary pricing to Sun was going to be?

A.  I believe so, yes.

Q.  And did you provide that budgetary pricing information to Mr. Bugee by specific DRAM product?

A.  Yes.

Q.  And is it your understanding that he -- he would -- was going to convey that information to his management?

MR. BENJAMIN:  Calls for speculation, lacks personal knowledge.

THE WITNESS:  Can you repeat the question, please.

BY MR. MURPHY:

Q.  When you were providing that budgetary pricing information to Mr. Bugee, was it your understanding that he would then provide that information to his management at Infineon?

MR. BENJAMIN:  Same objection.

THE WITNESS:  That wasn't my explicit understanding, no.

BY MR. MURPHY:

Q.  Did Mr. Bugee provide Infineon's budgetary pricing information to you in those conversations?

A.  Yes.

I'd like to also add a point that when this -- when price points were being discussed, there were occasions where it was specific and there were occasions where it was general.

Q.  Okay.  Did --

During the period of 2000 to 2002, did you provide prices that Samsung quoted to Sun to Mr. Bugee?

A.  I don't recall specifically, but I would have given him a ballpark.

Q.  Did you provide --

During this time period, did you provide pricing that Samsung intended to quote to Sun to Mr. Bugee?

A.  Again, it would have been a ballpark rather than a specific.

Could I also add?

Some of those price points were really not

what Samsung intended to quote, per se, but they were -- it was gamesmanship, if you understand my point.

Q. Okay. Did -- did you ever tell Mr. Bugee pricing information about what Samsung intended to price -- or had already priced to Sun down to the dollar level?

MR. McGINNIS: Objection, vague.

THE WITNESS: I don't recall if it was as granular as -- as what you're suggesting.

BY MR. MURPHY:

Q. So if Mr. Bugee had testified that on at least some occasions that pricing information that you had conveyed to him was down to the dollar level, would you believe him to be mistaken?

A. No.

Q. At some point did Sun request that Samsung provide a bill-of-material breakdown on any products that Samsung sold Sun?

A. I -- yeah. I'm trying to recall if it was within that time period. And I think it was. And they were very specific about that. It was related to the NG DIMM adder.

Q. Let's start with what is an NG DIMM?

A. It's a -- it's nomenclature that Sun created

to describe a portfolio of DRAM modules, and "N"

stands for next, and "G" stands for generation.

Q. And so these -- these modules contained

standard DRAM components plus an adder; is that

right?

A. They were custom modules just for Sun

Microsystems, and they had a version of the standard

DRAM component with a customized array of buffers and

so on.

Q. And that's -- the customized array of

buffers and so on is the adder; is that right?

A. Correct.

There was also an adder for the component.

Q. And at some point Sun asked -- asked you to

provide them with the cost of the adder; is that

right?

A. Yes. A bill of materials, yeah.

Q. And did you have conversations with

Mr. Bugee and -- during the period 2000-2002 and tell

him Samsung's cost of adder?

A. I had a conversation with him and told

him -- I gave him a -- an adder, but it was not

representative of the cost.

Q. You gave him the adder that you had conveyed

to Sun, right?

A.  I believe so.

Q.  And, in fact, that was actually higher than Samsung's actual cost, right?

A.  I believe so.

It was the guidance I had gotten from headquarters.

Q.  Okay.  Did --

During that conversation did Mr. Bugee also tell you what Infineon's -- the amount of adder that Infineon had relayed to Sun?

A.  Yeah, he gave me a data point.

Q.  And then you relayed that data point to Mr. Kim or others in Korea?

A.  Yes.

Q.  Did you report any other conversations with competitors to Mr. Bugee when you were speaking to him during this time frame?

A.  It's likely I did.

Q.  What other competitors were you speaking to during the 2000-to-2002 time frame?

A.  Mitsubishi.  I'm trying to recall. Obviously, Infineon, Hyundai/Hynix, Elpida.

Q.  Who did you speak to at Mitsubishi?

A.  Gary Johnson.

Q.  And was he located in San Jose too?

Mitsubishi was qualified on at Sun?

A.   So I could build a -- a profile of the competitive landscape at Sun Microsystems, with the objective of optimizing and maximizing our position at Sun.

Q.   Did you get that same kind of information from Mr. Bugee?

A.   Yes.

Q.   Did you have conversations with Mr. Bugee during 2000-2002 about Infineon's future production plans?

MR. BENJAMIN:  Objection, calls for speculation.

THE WITNESS:  I don't specifically recall.

BY MR. MURPHY:

Q.   Did you have conversations generally with competitors about supply either constraints or restrictions?

MR. BENJAMIN:  Objection, vague.

THE WITNESS:  I doubt it, in that context.

BY MR. MURPHY:

Q.   Okay.  I think you also said you had conversations with Elpida.  Who did you speak with at Elpida?

A.   Jim Sogas and my counterpart, Hassett, Bill Hassett.

Q. What was Mr. Sogas's position?

A. He was Tom Quinn's equivalent, vice president of -- I don't know what they called the organization.

Q. He's some vice president in the sales function and maybe marketing function?

MS. KEMMERLING: Objection, calls for speculation.

THE WITNESS: Also --

BY MR. MURPHY:

Q. Is that your understanding?

A. Yeah, that's my understanding, yes.

Q. And -- and Bill Hassett was responsible for the Sun account at Elpida?

A. Yes.

Q. How often did you speak to Bill Hassett?

A. More than monthly and less -- more than quarterly and less than monthly.

Q. How often did you speak to Jim Sogas?

A. Less frequently.

Q. Start with -- with Mr. Sogas. What was the nature of your conversations with him?

A. Sun Microsystems business.

Q. Did you speak about pricing?

A. Yes.

Q.   About pricing that Samsung intended to charge Sun in the future?

A.   Yes.

Q.   And did he, Mr. Sogas, relay information about what Elpida intended to charge Sun in the future?

MS. KEMMERLING:  Object to the form.

THE WITNESS:  Yes.

BY MR. MURPHY:

Q.   And what did you do with the information Mr. Sogas provided you?

A.   I included it in the competitive analysis and -- and yeah.

Q.   Would you send information to Mr. Kim and others in Korea on a regular basis?

A.   Yes.

Q.   Weekly?

A.   As I got it.

Q.   Did you do something like a weekly report or -- or some other regular report to them?

A.   No, I -- no, I didn't.

Q.   So you got the information, and you would either email or call them?

A.   Correct.

Q.   Did you have a preference one way or the

A.   And there were no BlackBerrys at that time.

Q.   So with respect to Mr. Hassett, did you have discussions with Mr. Hassett where you conveyed Samsung's -- let me start over.

Did you have conversations with Mr. Hassett during the 2000-to-2002 time frame where you informed him of prices Samsung intended to charge Sun in the future?

A.   Yes.

Q.   And did he convey that same information to you, as to prices that Elpida intended to charge Sun in the future?

MS. KEMMERLING:  Objection, vague and ambiguous.

MR. BENJAMIN:  Calls for speculation.

THE WITNESS:  Yes.  But the word "intended" is -- I'd like to say that intended -- it's a soft intention.  It was a signal.  It was a positioning.

BY MR. MURPHY:

Q.   And did these conversations generally occur before the quarterly negotiations with Sun?

A.   Not before, because you would not know what the profile of the award was.  But once that was known, then yes.

Q.   Okay.  So -- so let's back up, then.  So let's -- again, let's talk about the time before Sun

started the dynamic bidding events.

A.  Mm-hmm.

Q.  Prior to the dynamic bidding events, were there face-to-face negotiations between Samsung and Sun with respect to prices Samsung was offering Sun?

A.  Yes.

MR. BENJAMIN:  Objection, vague.

BY MR. MURPHY:

Q.  Were you involved in those discussions?

A.  Yes.

Q.  And would Sun send to you a request for a quotation or some document with a similar title?

A.  I believe so, yes.

Q.  And is that the information that -- that you were talking about that you -- you couldn't have these kinds of conversations until you knew what Sun's, I guess, forecast was?

A.  Yes.  But I'd like to clarify the fact that there -- I had no contact with competitors in the period before the dynamic bidding events started.

Q.  Okay.  So -- so approximately when did the dynamic bidding events start?

A.  Early 2001, I think.  I could be wrong.

Q.  So once you received the -- or was it called a request for quotation?

A.  Yeah, RFQ.

Q.  Once you received the RFQ from Sun in the period during the dynamic bidding events, you would then have communications with your competitors, right?

A.  Correct.

Q.  And the communications that we've been talking about with respect to pricing, did -- did those occur during that -- typically occur during that period after you had gotten a request for a quotation from Sun?

MR. BENJAMIN:  Objection, vague and ambiguous.

THE WITNESS:  For dynamic bidding events, yes.

MR. BENJAMIN:  Can you read back that question and answer, please.

(Record read as follows:

"Q.  And the communications that we've been talking about with respect to pricing, did -- did those occur during that -- typically occur during that period after you had gotten a request for a quotation from Sun?

"A.  For dynamic bidding events, yes.")

MR. BENJAMIN:  Thank you.

THE REPORTER:  Sure.

BY MR. MURPHY:

from DRAMexchange.com with data that Sun included in a formula that was used to adjust the DBE pricing.

Q.   And do you recall what that formula was?

A.   Roughly, it was the -- it was -- oh, it was something like the average spot high, average spot low and a contract high, contract low, and there was some blending that went on in the formula, and the answer was a factor.  It was one plus or one minus.

Q.   Okay.  And so was -- was the --

Did the formula also involve an adder in addition to the price of the DRAM components?

A.   Yeah, there was, there was a plus NG DIMM adder, that's right.

Q.   Did you have discussions with any of your competitors about what they planned to offer Sun with respect to what their adder would be for the NG DIMM?

A.   Yes.  It was in the context of the earlier questions, right.  In the case of this formula, I don't know if I did or not.

Q.   Okay.  At some point did Sun --

Was this formula related to an indexing for the second and third months of -- of quarters?

A.   That's right.

Q.   Okay.  Did you have discussions with competitors related to your -- your strategy or your

middle.

BY MS. KEMMERLING:

Q. Okay. How about with regard to Mr. Hassett? How specific was the information that Mr. Hassett conveyed to you regarding the pricing that Elpida intended to charge Sun?

A. Again, somewhere in the middle, but it was -- yeah, somewhere in the middle.

Q. Okay. Do you recall any instance where Mr. Sogas actually conveyed the exact price that it was intending to charge Sun for a particular DRAM product?

A. I believe so, yes.

Q. And do you recall a specific instance where Mr. Hassett told you the specific price that Elpida was intending to charge to Sun?

A. Yes.

Q. Okay. You had testified earlier regarding the March 2002 DBE. Specifically, you mentioned that both Samsung and Elpida signaled the intention that Samsung would go for 60 percent of the 1GB NG DIMM lot and that Elpida would go for 40 percent of that lot.

Do you recall that testimony?

MR. McGINNIS: Objection, his testimony speaks

BY MS. KEMMERLING:

Q. Okay. Do you recall whether you talked with Elpida at all regarding the price that they would charge for the 1 NG DIMM lot at the December 2001 auction?

A. I believe I did.

Q. Okay. And do you recall if you gave the price that Samsung was intending to bid for the 1 NG DIMM lot?

A. Again, I don't recall specifically if I gave them the exact price point or not.

Q. Do you recall if Elpida gave you the specific price point that they intended to bid?

A. I don't recall exactly, no.

MS. KEMMERLING: Okay. I have no further questions.

MR. MURPHY: Just a couple follow-up.

MR. McGINNIS: Oh, joy.

MR. MURPHY: It won't be very much.

-oOo-

FURTHER EXAMINATION

BY MR. MURPHY:

Q. Mr. Trill, you just mentioned the term ceiling price.

A. Mm-hmm.

STATE OF CALIFORNIA        )

                          )    ss

COUNTY OF SAN MATEO        )

I hereby certify that the witness in the foregoing deposition of THOMAS TRILL, was by me duly sworn to testify to the truth, the whole truth and nothing but the truth, in the within-entitled cause; that said deposition was taken at the time and place herein named; that the deposition is a true record of the witness' testimony as reported by me, a duly certified shorthand reporter and a disinterested person, and was thereafter transcribed into typewriting by computer.

I further certify that I am not interested in the outcome of the said action, nor connected with, nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of December, 2007.

- - - - - - - - - - - - - -

MELINDA M. IBANEZ, CSR #10686

STATE OF CALIFORNIA

# Exhibit 21

**From:**          Rick Biggs
**To:**            Steve Kriss
**CC:**            Clint Miller
**BCC:**
**Sent Date:**     5/22/2001 2:37:14 PM
**Received Date:** 5/21/2001 2:28:58 PM
**Subject:**       Samsung Disty pricing to All American Monday May 22,2001
**Attachments:**

FYI

8Kx16 SDRAM $3.90

16Mx16 SDRAM $9.00

It sounded kind of real when they said it to me this morning.

Regards,

Rick Biggs

HIGHLY CONFIDENTIAL
PRODUCED SUBJECT TO MDL 1486 PROTECTIVE ORDER                                          HSA00133914

# Exhibit 22

CC: Michael Lin; Hiroyuki Tsuda

From: nagamori-tatsuomi [nagamori-tatsuomi@elpida.com]
Sent: Wednesday, March 27, 2002 3:05 AM
Cc: Michael Lin; Hiroyuki Tsuda
Subject: Re: April Pricing for SGI and Juniper

 We need to get competitor's input as usual,  if we need to go below folowing
price.


```
1. 128Mb SDRAM        : $5.0???            --->  $5.25
2. 256Mb SDRAM        : $10.0              --->$11.00
3. 256Mb LP           : 10% over item 2    --->Okay
4. 256Mb DDR200       : 3% over item 2 ---> 5%
5. 256Mb DDR266       : 5% over item 2 ---> 10%
6. 512Mb DDP SDRAM    : $57                ---> Okay
7. 288Mb RDRAM(PC800) : $10                ---> $17-
8. 1GB cstm DIMM board adder: $100(down from $180)  ---> No change
```


Michael Lin wrote:

> Hello Nagamori-san,
>
> Below is a pricing request from Jun-san for both Juniper and SGI for
> April. Since Tsuda-san would not be in the office on Thursday 3/28/02
> and Jun-san needs this information by Thursday morning, can you please
> provide us your feedback on the price request below by tomorrow
> (3/27/02) U.S. time.  We really appreciate it.
>
> Thank you.
>
> Michael Lin
> Elpida Memory (USA)
> Strategic Marketing Department
> Phone: (408) 970 - 6656
>
> -----Original Message-----
> From: Jun Suzuki [mailto:jun.suzuki@us.elpida.com]
> Sent: Tuesday, March 26, 2002 3:37 PM
> To: Michael Lin; Hiroyuki Tsuda
> Subject: Re: April Pricing
>
> Hello Tsuda-san and Michael
>
> Please let me know your idea first, especially for DDR.
> My request is as follows for both SGI and Juniper.
>
> 1. 128Mb SDRAM        : $5.0
> 2. 256Mb SDRAM        : $10.0
> 3. 256Mb LP           : 10% over item 2
> 4. 256Mb DDR200       : 3% over item 2
> 5. 256Mb DDR266       : 5% over item 2

CONFIDENTIAL                                                    EMUS 744085

```
> 6. 512Mb DDP SDRAM   : $57
> 7. 288Mb RDRAM(PC800): $10
> 8. 1GB cstm DIMM board adder: $100(down from $180)
>
> I have business trip tomorrow(27th)
> and I will be on 28th to the office.
> Please get ready your idea by then.
> Actually, I have appointment with SGI from
> 10:00am on 28th to discuss April price.
>
> DDR premium and Item 8 are very key to get business allocation for Apr
> Qtr and July Qtr. If we show unreasonable price comparing with Market,
> SGI never revise the allocation with Samsung(now 100%). We suppose to
> get qualification of 1GB cstm DIMM by the end of this month or 1st
> week of April.
>
> Anyway, please let me know.
>
> Regards,
> Jun
>
> PS: Since I have fever from last night, I went back to home
>     after lunch time. Now, I am in home.
>     If you have some question, please call my home(408-255-6077).
>
> Jun Suzuki
> Elpida Memory USA Inc.
> Ph. 408-970-6670
> Fx. 408-970-6996
> jun.suzuki@elpida.com
> ----- Original Message -----
> From: "Michael Lin" <michael.lin@us.elpida.com>
> To: "Jun Suzuki" <jun.suzuki@us.elpida.com>; "Hiroyuki Tsuda"
> <hiroyuki.tsuda@us.elpida.com>
> Sent: 2002?3?26? 13:36
> Subject: April Pricing
>
> Hello Jun-san,
>
> How are you?  I am following up with you to see if we can setup a time
> to review and discuss about April pricing for the SGI and Juniper.
> Please let me know when is a good time for you.  Thank you.
>
> Regards,
>
```

CONFIDENTIAL

EMUS 744086

# Exhibit 23

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

--oOo--

SUN MICROSYSTEMS, INC., et al.    No. C-06-01665 PJH

vs.                    (Consolidated)

HYNIX SEMICONDUCTOR, INC., et al.

UNISYS CORPORATION        No. C-06-02915 PJH

vs.

HYNIX SEMICONDUCOR, INC., et al.

JACO ELECTRONICS, INC.        No. C-07-01212 PJH

vs.

HYNIX SEMICONDUCTOR, INC., et al.

EDGE ELECTRONICS, INC.        No. C-07-01207 PJH

vs.

HYNIX SEMICONDUCTOR, INC., et al.

ALL AMERICAN SEMICONDUCTOR, INC.    No. C-07-01200 PJH

vs.

HYNIX SEMICONDUCTOR, INC., et al.

DRAM CLAIMS LIQUIDATION TRUST, by    No. C-07-01381 PJH

its Trustee Wells Fargo Bank, N.A.

vs.

HYNIX SEMICONDUCTOR, INC., et al.

_____/

HIGHLY CONFIDENTIAL

DEPOSITION OF YEONGHO KANG

TUESDAY, NOVEMBER 27, 2007

Reported by:

Anrae Wimberley, CSR No. 7778

_____

ACCURATE REPORTING

366 EAST 2ND STREET        (707) 751-0500

BENICIA, CALIFORNIA 94510

Q. And so when you were working in Korea, you were involved in establishing guidelines that would apply to customers in the United States?

A. Yes.

Q. And when you worked in the United States for SSI, you were involved in distributing price guidelines for customers of memory in the United States?

A. Yes.

Q. And the price guidelines that you distributed in the United States were developed and sent to you from the Korea marketing department; is that correct?

A. Yes. But I can modify it.

Q. And who had authority to modify the guidelines besides you during the period that you were in the position with SSI in the United States?

A. If it is DRAM, then I think I was the only person who can modify pricing guideline to be utilized in the States.

Q. I'd like to show you a document that has been previously marked in this case as Plaintiffs' Exhibit 10 in the Cerrato deposition.

MR. GARCIA: Thank you, Counsel.

BY MR. McCARTHY:

Q. And at the same time, I will show you Plaintiffs' Exhibit 9 from the Cerrato deposition.

Q.  Did you have communications with the vice president of the marketing team, Mr. Il Ung Kim?

A.  Yes.

Q.  Did you have communications with people who reported to Mr. Kim on the marketing team?

A.  Yes.

Q.  Did Mr. Kim during the period of time from 1999 through 2004 have ultimate responsibility for setting the price for DRAM memory in the United States?

MR. GARCIA:  Which Mr. Kim?

MR. McCARTHY:  Il Ung Kim, I. U. Kim.

THE WITNESS:  Yes.

BY MR. McCARTHY:

Q.  So the price guidelines that you received when you were in the United States concerning DRAM memory prices were sent to you under the ultimate authority of Mr. I. U. Kim?

MR. GARCIA:  I want to hear that question back.

(Record read by reporter as follows:

"Question:  So the price guidelines that you received when you were in the United States concerning DRAM memory prices were sent to you under the ultimate authority of Mr. I. U. Kim?")

MR. GARCIA:  I'll object to "ultimate authority."

that stand for northwest; SW for southwest?

A. Yes.

Q. And to the right of them are salespeople that says, "Motorola GAM," G-A-M, "EMC/Nortel," below that "Gateway," below that "Cisco."

What were these positions? Strike the question.

The people listed to the far right, Motorola, EMC, Gateway, Cisco, were they also under the regional sales?

A. Yes.

Q. And when you gave price guidelines to regional sales, it would apply to this entire customer base?

A. Yes.

Q. Did you ever send out separate price lines -- or price guidelines for distribution sales as opposed to EMS sales or regional or geographic sales customers?

A. I don't think so.

MR. GARCIA: Object to the form of that last question. Vague and ambiguous as to "customers."

BY MR. McCARTHY:

Q. Now, the determination of price guidelines -- you issued price guidelines -- excuse me.

When you send out price guidelines, do you call that publishing a price guideline?

A. Yes.

Q. And during the time you were in the United States, you published price guidelines for regional accounts?

A. Yes.

Q. Did you at any time ever publish a price guideline for Dell?

A. Yes, I did.

Q. Did you ever publish a price guideline for HP, Hewlett-Packard?

A. Yes.

Q. Did you ever publish a price guideline for IBM?

A. I published pricing guidelines for specific accounts for Rambus DRAM.

Q. Did you ever publish pricing guidelines for any form of DRAM -- for any other -- excuse me. Strike the question.

Did you ever publish price guidelines for any form of DRAM memory for a corporate account other than Rambus?

A. Actually, I published pricing guideline for the new products for corporate accounts, which included Rambus DRAM. And sometimes it included DDR when it was a new products in the market.

Q. Did you have an understanding that the price

guidelines that were issued to the corporate accounts came out of the same marketing team headed by Mr. Kim in Korea?

A. Yes.

Q. How often were price guidelines issued for the corporate accounts?

A. You mean from Korea?

Q. Yes.

A. Every month or biweekly. It depends upon the markets changing.

Q. So for some periods of time they would be issued biweekly and other periods of time monthly?

A. I think so.

Q. And how frequently were the price negotiations conducted with the corporate accounts?

A. Mostly biweekly. It depends upon customer, customer by customer.

Q. As to the server customers that you had, how frequently would you issue price guidelines for server customers?

MR. GARCIA: Are we making a distinction between corporate customers who make servers and regional accounts who make servers? Because you got both kinds.

MR. McCARTHY: I'm trying to find that out.

BY MR. McCARTHY:

Q.  Did you have a period of time in which you typically issued price guidelines for server manufacturers, whether they were regional accounts or corporate accounts?

MR. GARCIA:  Assumes facts, vague and ambiguous, object to the form.

THE WITNESS:  Server accounts.  Customers in a regional accounts group was . . . let me see . . . SGI and Cray.  So I think I sometimes published specific price guidelines for those customers.

BY MR. McCARTHY:

Q.  If you could take a look at Exhibit -- Plaintiffs' Exhibit No. 2.  This is an e-mail chain, most recent e-mail Monday, February 11th, 2002.

It is from you to a J. W. Kim; is that correct?

MR. GARCIA:  Forgive me, Counsel, has this one been previously marked?

MR. McCARTHY:  No, we just marked it Exhibit 2.

MR. GARCIA:  I see.  So I understand.

Forgive me, you're not doing sequential.  So we're going to start a separate 1, 2 --

MR. McCARTHY:  Yes, we're using 1, 2, et cetera, in the deposition.

MR. GARCIA:  Fortunately I don't have to take responsibility for any of these numbers.  Okay.

Q. And would you issue -- or publish price guidelines for channel customers every seven days then?

A. I don't remember if I published every seven days.

Q. When you published your price guidelines, how were they communicated to you?

A. After I publishing it?

Q. Excuse me.

Before you published it in the United States, how was that price guideline communicated to you?

A. Sometimes I receive price guideline from Korea by e-mail, or sometimes I receive a phone call.

Q. And based on either the e-mails or the phone calls, you would then assemble the prices to put into the price guideline?

A. Yes.

Q. Did you have to get approval from either Mr. Deen or Mr. Quinn before you issued the price guideline?

A. No.

Q. Did you need approval from someone in Korea before you issued the price guideline?

A. No.

Q. What did -- did you do anything -- strike that.

What did you do if you wished to change a price

that was communicated to you by Korea in one of the price guidelines?

A. I have to get permission from Korea.

Q. And that would be either from Mr. Kim or someone working for Mr. Kim?

A. Yes.

Q. Are you familiar with the term "bottom selling price"?

A. Yeah, we call it BSP.

Q. And what is a BSP?

A. That's a floor price which cannot be broken.

Q. Would a BSP for a particular product be found in the price guideline?

A. Yes.

Q. Is there any distinction between a price guideline and a BSP price list?

A. It's basically a BSP guideline.

Q. So someone could sell a product for more than the BSP, but not less than a BSP; is that your understanding?

MR. GARCIA: Incomplete hypothetical. Object to --

THE WITNESS: Without permission, then yes.

BY MR. McCARTHY:

Q. And these BSPs were issued for both regional accounts and global accounts; is that correct?

A. Mostly I published for regional accounts.

Q. Did Samsung marketing issue BSP guidelines for global accounts as well?

MR. GARCIA: In addition to what he's already testified to? It's asked and answered.

Go ahead.

THE WITNESS: Yeah, our corporate accounts team has its own marketing function. And they communicated with their counterparts in Korea so that they can have pricing guideline from Korea.

BY MR. McCARTHY:

Q. And were those guidelines in similar format to the guidelines that were issued for regional accounts?

A. I didn't see it.

Q. I take it that each of the BSP guidelines were created and maintained in the normal course of Samsung's business?

MR. GARCIA: Object to the form, no foundation, invites speculation.

THE WITNESS: Could you elaborate.

BY MR. McCARTHY:

Q. Well, you're familiar with BSP guidelines?

A. Yes.

Q. They were issued out of the marketing department in Korea?

A. Yes.

Q. They were issued on regular bases for different types of customers?

A. Sometimes irregular, sometimes regular.

Q. And these BSP guidelines were documents that were created by Samsung in the normal course of its business?

MR. GARCIA: Same objections.

THE WITNESS: Sometimes you have it, sometimes you don't have it.

BY MR. McCARTHY:

Q. When you say "sometimes you have it and sometimes you don't have it," what does that mean?

A. Well, it depends upon market situation, and it depends upon the characteristics of the head of each organization.

Q. Now, the head of the organization that set prices for the regional accounts was Mr. I. U. Kim; is that correct?

A. Yes.

Q. And the head of the organization that set the prices -- the BSPs for the corporate accounts was Mr. I. U. Kim?

A. Yes.

Q. The BSP then represented the lowest price that

Q.  And did you work on price guidelines for both corporate accounts and regional accounts of Samsung?

A.  Yes.

Q.  And did you work on them at the same time?

A.  Same time?

Q.  Well, if you were working in your job say for a two-month period, did you work during that two-month period on price guidelines for both corporate accounts and regional accounts?

A.  Yes.

Q.  And was that true for the others in your marketing group?

A.  Yes.

Q.  And so it was the same group of people in Korea that would generate the price guidelines for all Samsung customers?

A.  Yes.

Q.  I'd like to show you what has been marked as Deposition Exhibit 3.  This is a document dated October 22, 2001.  It's from you to a Ben Kwon, K-w-o-n; is that correct?

A.  Yes.

Q.  And is this an example of a bottom selling price price guidelines that you had published?

MR. GARCIA:  Are we going to establish any

ambiguous as to "generally," and it lacks foundation and

invites speculation.

THE WITNESS:  My basic goal to communicate with

other competitors was to help us to formulate right

marketing strategies.

BY MR. McCARTHY:

Q.  And your particular responsibilities as you've

testified here today dealt with setting the prices for

the nonglobal accounts with respect to the broad range

of DRAM and with the global accounts as to Rambus and

new technology; is that correct?

MR. GARCIA:  Misstates prior testimony, asked and

answered.

THE WITNESS:  Yes.

BY MR. McCARTHY:

Q.  And the majority of your efforts in your job

dealt with the setting and publishing of price

guidelines and pricing strategy for the nonglobal

customers?

MR. GARCIA:  Vague and ambiguous, asked and

answered, invites speculation.

THE WITNESS:  Yes.

BY MR. McCARTHY:

Q.  And the marketing strategy that you worked on

was the marketing strategy to the memory market as a

whole?

MR. GARCIA:  Vague and ambiguous as to "market as a whole" and it invites speculation and it continually misstates his prior testimony.

THE WITNESS:  The DRAM market.

BY MR. McCARTHY:

Q.  Yes, DRAM marketing.

Your marketing strategy was to work on the DRAM marketing strategy for the entire DRAM market, not simply as to the -- I will call them guilty plea OEM company customers of Samsung?

MR. GARCIA:  Same objections.

MR. BENJAMIN:  Vague and ambiguous.

THE WITNESS:  Could you repeat that question again.

BY MR. McCARTHY:

Q.  When you worked on marketing strategies for Samsung, your goal was to effect a marketing strategy for the entire DRAM market of Samsung, not just the market of the global account customers listed in the guilty pleas?

MR. GARCIA:  Same objections.

THE WITNESS:  Yes.

BY MR. McCARTHY:

Q.  And the activities you undertook in terms of trying to develop a market strategy through

communications with competitors was to help stabilize

the entire DRAM market that you worked with, not just

the guilty plea global customers?

MR. GARCIA: Misstates prior testimony, assumes

facts.

MR. TUBACH: Vague and ambiguous.

MR. GARCIA: Vague and ambiguous, invites

speculation and fails to distinguishing between the OEM

customers --

MR. McCARTHY: Counsel, the objection is to form,

foundation, not a speaking objection.

MR. GARCIA: Right.

BY MR. McCARTHY:

Q. You may answer.

A. Marketing strategy was to increase our market

share sometimes by competing with other competitors, and

also we wanted to increase our profit. That was two

basic purpose of the marketing strategy.

Q. And in the activities that you've described

here today in terms of communications with competitors

to help stabilize prices, that was to carry out a market

strategy that affected the market that you worked in,

which was the regional accounts, as well as other

customers of Samsung; isn't that correct?

MR. GARCIA: Vague and ambiguous, misstates prior

testimony, asked and answered.

MR. BENJAMIN:  Compound.

MR. GARCIA:  Object to the form, compound.

THE WITNESS:  At certain times, we had some mutual cooperation with other competitors, but most of the times we competed each other with pricing aggressively.

BY MR. McCARTHY:

Q.  With the efforts that you've described to help stabilize the price of DRAM through communications with competitors, that was directed towards stabilizing the price of DRAM to all of the customers, including the ones that you had primary responsibility for, the regional accounts?

MR. GARCIA:  That misstates prior testimony and it's vague and ambiguous and fails to distinguish between the OEMs and any other customers he dealt with.

MR. McCARTHY:  Counsel, again, limit your objection.

THE WITNESS:  My primary focus was to stabilize the market for the regional accounts.  Because the other functions -- pricing functions for global accounts belonged to other organization.

(Plaintiffs' Exhibit 33 was marked.)

BY MR. McCARTHY:

Q.  Showing you what has been marked as Deposition Exhibit 33.  It is a document produced by Samsung

CERTIFICATE OF DEPOSITION OFFICER

I, ANRAE WIMBERLEY, CSR NO. 7778, duly authorized to administer oaths pursuant to Section 8211 of the California Code of Civil Procedure, hereby certify that the witness in the foregoing deposition was by me sworn to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me and was thereafter transcribed by me or under my direction by means of computer-aided transcription; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto subscribed by my hand this 10th day of December, 2007.

_____

ANRAE WIMBERLEY, CSR NO. 7778

# Exhibit 24

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: Dynamic Random Access Memory (DRAM) Antitrust Litigation ) | |
| THIS DOCUMENT RELATES TO: ) | |
| Sun Microsystems, Inc.<br>v.<br>Hynix Semiconductor, Inc., et al. ) | Docket No. 06-cv-1665 |
| Unisys Corporation<br>v.<br>Hynix Semiconductor, Inc., et al. ) | Docket No. 06-cv-2915 |
| All American Semiconductor, Inc.,<br>v.<br>Hynix Semiconductor, Inc., et al. ) | Docket No. 07-cv-1200 |
| Edge Electronics, Inc.,<br>v.<br>Hynix Semiconductor, Inc., et al. ) | Docket No. 07-cv-1207 |
| Jaco Electronics, Inc.,<br>v.<br>Hynix Semiconductor, Inc., et al. ) | Docket No. 07-cv-1212 |
| Dram Claims Liquidation Trust, By Its Trustee, Wells Fargo Bank, N.A.,<br>v.<br>Hynix Semiconductor, Inc., et al. ) | Docket No. 07-cv-1381 |

**REBUTTAL EXPERT REPORT OF ROBERT C. MARSHALL, PH.D.**

**May 2, 2008**

**HIGHLY CONFIDENTIAL**

The information and materials referenced in this report may be subject to court orders restricting their use and distribution. Therefore, any recipient should treat this report as strictly confidential and for litigation purposes only.

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

# Table of contents

I.     Executive summary ................................................................................................................................................1
        I.1. Introduction .............................................................................................................................................................2
        I.2. My initial report ......................................................................................................................................................2
        I.3. My new empirical analyses......................................................................................................................................6
        I.4. Rebuttal of defendants' experts' critiques...............................................................................................................10
        I.5. Summary ................................................................................................................................................................11
II.    Overview....................................................................................................................................................................12
III.   DRAM market characteristics caused named OEM and plaintiff prices to move closely together ..............................14
        III.1. Introduction ..........................................................................................................................................................15
        III.2. Market factors described in my initial report caused named OEM and plaintiff prices to move closely
                together ..............................................................................................................................................................16
        III.3. Defendants' own arguments show that named OEM and plaintiff prices move closely together ........................28
        III.4. Summary ..............................................................................................................................................................29
IV.    My statistical analyses show that named OEM and plaintiff prices move closely together ........................................31
        IV.1. Introduction...........................................................................................................................................................32
        IV.2. My statistical analyses support my opinion that the prices paid by the named OEMs move closely
                together with prices paid by the plaintiffs...........................................................................................................32
        IV.3. Price comparisons of additional DRAM products show that named OEM and plaintiff prices move
                closely together ..................................................................................................................................................34
        IV.4. Refinements to my regression analysis increase the accuracy of the predictions and provide further
                support for my conclusion...................................................................................................................................38
        IV.5. Named OEM and plaintiff prices return to their fundamental economic relationship quickly after
                disturbances .......................................................................................................................................................42
        IV.6. Dr. Murphy's analysis of DRAM price ratios paid by OEMs and plaintiffs is inconsistent with
                authorities he cites and is inconsistent with his analysis of his own model...........................................................44
        IV.7. Hypothetical examples posed by defendants' experts are not supported by the data .......................................48
        IV.8. Defendants' experts' critiques of my price analyses are without merit................................................................52
V.     Defendants' arguments are inconsistent with the realities of the DRAM market...........................................................57
        V.1. Introduction............................................................................................................................................................58
        V.2. Defendants' plea agreements are not descriptions of the economics of the DRAM market and
                defendants' incentives ........................................................................................................................................58
        V.3. Defendants' organizational hierarchy supports the fact that named OEM and plaintiff prices moved
                together ...............................................................................................................................................................61
        V.4. Defendants' cartel communications extend beyond the named OEMs.................................................................63
        V.5. Additional evidence why prices move together: the "Kill Hynix" period...............................................................65
VI.    Response to defendants' other critiques ....................................................................................................................67
        VI.1. Introduction...........................................................................................................................................................68
        VI.2. Despite Nanya's claims to the contrary, there is ample evidence that Nanya was part of the cartel..................68
        VI.3. Dr. White's results confirm my findings ..............................................................................................................74
        VI.4. Defendants' experts take individual tests out of context to reach misleading conclusions .................................75
Appendix A: Materials considered .....................................................................................................................................78
        A.1. Defendant expert reports, backup materials, and errata (as applicable) .............................................................79
        A.2. Defendant expert testimony ................................................................................................................................79
        A.3. Deposition testimony...........................................................................................................................................79
        A.4. Litigation documents ...........................................................................................................................................81
        A.5. Documents from the trial of Gary Swanson ........................................................................................................81
        A.6. Others..................................................................................................................................................................82
Appendix B: Updated data processing ..............................................................................................................................83
        B.1. Overview .............................................................................................................................................................84
        B.2. Refinement of product characteristics.................................................................................................................84
        B.3. Inclusion of product characteristics for data not previously decoded..................................................................94
        B.4. General updates to data processing ...................................................................................................................96

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

# List of figures

Figure 49: Sun and named OEM purchases of 128/256MByte FPM-EDO modules (Figure 5 in initial report)......................3
Figure 50: Average actual plaintiff prices vs. predicted plaintiff prices using named OEMs' pricing (Figure 6 from initial report)........................................................................................................................................................................5
Figure 51: Market basket price indices for plaintiffs vs. named OEMs (Figure 7 from initial report) ......................................6
Figure 52: Average actual plaintiff prices vs. predicted plaintiff prices using named OEMs' pricing ......................................8
Figure 53: Market basket price indices for plaintiffs vs. named OEMs....................................................................................9
Figure 54: Sun and named OEM purchases of 128/256MByte FPM-EDO modules (Figure 21 from my initial report)........35
Figure 55: All American and named OEM purchases of 256Mbit SDRAM chips (Figure 24 from my initial report) ............36
Figure 56: Jaco and named OEM purchases of 512MByte DDR modules (Figure 26 from my initial report) .....................37
Figure 57: Average actual plaintiff prices vs. predicted plaintiff prices using named OEMs' pricing (using updated model)39
Figure 58: Market basket price indices for plaintiffs vs. named OEMs (using updated model) ...........................................40
Figure 59: Average actual plaintiff prices vs. predicted plaintiff prices using named OEMs' pricing (using updated model and updated data)............................................................................................................................................................41
Figure 60: Market basket price indices for plaintiffs vs. named OEMs (using updated model and updated data) ..............42
Figure 61: Ratio of Dr. Murphy's Predicted and Actual Cost Measures, from Murphy Exhibit 21 .......................................46
Figure 62: Figure 3 from Dr. Klein's expert report. ...............................................................................................................49
Figure 63: Nanya vs. other defendants' prices for sales of 512 MB DDR 3.8ns DIMM modules, without error correction (compare to Cox Exhibit 11a) ..........................................................................................................................................73
Figure 64: Nanya vs. other defendants' prices for sales of 256MB 3.8ns DDR DIMM modules, without error correction (compare to Cox Exhibit 11b) ..........................................................................................................................................73

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

# I.    Executive summary

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

## I.1. Introduction

(1)     I previously submitted an expert report in this matter on December 14, 2007. I subsequently was deposed on February 29, 2008. On March 2, 2008, several economists (and two non-economists) retained by defendants submitted their respective reports. This report serves as my response to those reports.

(2)     I was asked by counsel to assume that defendants engaged in a conspiracy to fix the price of DRAM sold to the named OEMs and to undertake an economic analysis to determine whether that conspiracy had an effect on the prices paid by plaintiffs for DRAM. In my initial report, I explained my opinion that the answer to this question is affirmative. The conspiracy affected the prices paid by plaintiffs for DRAM.

(3)     Certain defendants, and their employees, have pled guilty to participating in a conspiracy to fix the price of DRAM sold to certain OEMs—namely, Dell Inc., Hewlett-Packard Company, Compaq Computer Corporation, International Business Machines Corporation, Apple Computer Inc., and Gateway, Inc. (the "named OEMs").[1] In their respective guilty pleas, these defendants admitted that (i) they reached agreements to limit the rate of price declines and to increase prices and that (ii) they actually instituted price increases on DRAM sales to the named OEMs.

(4)     After reviewing the criticisms by defendants and conducting additional analyses in response to those criticisms, my opinion remains that defendants' conspiracy caused plaintiffs to pay higher prices for DRAM than they otherwise would have absent the conspiracy.[2]

## I.2. My initial report

(5)     There are six reasons for my initial conclusion that a conspiracy to fix the price of DRAM sold to the named OEMs affected the prices paid by plaintiffs.

(6)     *Visual Price Comparisons of Eight DRAM Products Show the Conspiracy Affected Plaintiffs*. First, a simple visual comparison of a plot of OEM and plaintiff prices for a number of DRAM

---

[1]     The following defendants have pled guilty to conspiring to fix the prices of DRAM sold to the named OEMs: Samsung Electronics Company, Ltd. and Samsung Semiconductor, Inc. (collectively, "Samsung"); Infineon Technologies AG ("Infineon"); Hynix Semiconductor Inc. ("Hynix"); and Elpida Memory, Inc. ("Elpida"). An additional 15 individual employees of these defendants also have pled guilty. The fines assessed for defendants' criminal conspiracy total more than $700 million. Samsung, Hynix, and Elpida admitted that their conduct alone affected in excess of $2.4 billion is DRAM sales. Although Micron has not pled guilty to participating in the conspiracy, I understand that it was the first to admit its participation in the conspiracy in exchange for leniency from the U.S. Department of Justice.

[2]     Given the ongoing discovery in these matters, I reserve the right to supplement my opinions if additional information becomes available to me.

products shows that they moved together before, during, and after the conspiracy. Plots for these eight products are in Figure 5 and Figures 21 to 28 in my initial report. They show that the OEM prices and plaintiff prices track closely together. This suggests that defendants' conspiracy affected plaintiffs' prices as well. As an example, I reproduce Figure 5 from my initial report below:

**Figure 49: Sun and named OEM purchases of 128/256MByte FPM-EDO modules (Figure 5 in initial report)**



Source: Defendant sales data

(7)    ***Generally Accepted Statistical Tests Confirmed This***. Second, I performed a generally accepted statistical analysis to calculate what is called a "correlation coefficient" of these same prices to test the visual appearance described above. The empirical results demonstrate that the OEM and plaintiff prices for these eight products are highly correlated. This further indicates that defendants' conspiracy affected plaintiffs' prices as well.

(8)    ***Defendants Admitted It***. Third, I considered the testimony of defendants themselves as well as their documents to determine whether OEM prices would move together with non-OEM prices. When asked about OEM prices and non-OEM prices, the Executive Vice President of Micron

testified that: "There should not be a material difference."[3] This and other evidence in the record further corroborates my conclusion that defendants' conspiracy affected plaintiffs' prices as well.

(9)    ***Market Characteristics Corroborate It***. Fourth, the market characteristics for DRAM reinforce the relationship between prices paid by named OEMs and by plaintiffs. DRAM generally is acknowledged to be a standardized product, with industry standards being set by an organization known as JEDEC.[4] There are well-established sales channels with an active spot market and many online DRAM price sources (e.g., see Figure 19 in my initial report). The evidence also clearly shows that OEMs and plaintiffs both look to the spot market for price benchmarks when negotiating purchase contracts and prices with defendants.[5] These factors also support my conclusion that defendants' conspiracy affected plaintiffs' prices.

(10)    ***OEM Price Data Accurately Predicts Plaintiffs' Actual Prices***. Fifth, to further test whether OEM prices impacted plaintiff prices, I used generally accepted econometric tools to predict plaintiffs' prices using named OEM prices as the data source. I found that I can reliably predict the plaintiffs' actual prices using the named OEMs' price data. This again shows that named OEMs' prices and plaintiffs' prices move closely together. Figure 6 in my initial report, which is reproduced below, shows that the predicted plaintiffs' prices track closely with plaintiffs' actual prices.

---

[3]    June 23, 2003 hearing in U.S. International Trade Commission, DRAMs and DRAM Modules From Korea, Inv. No. 701-TA-431, 122.

[4]    See "About JEDEC," available at http://www.jedec.org/Home/about_jedec.cfm. See also testimony of Robert LeFort, then President of Infineon Technologies North America, regarding the "highly substitutable" nature of DRAM. June 23, 2003 hearing in U.S. International Trade Commission, DRAMs and DRAM Modules From Korea, Inv. No. 701-TA-431, 68–70.

[5]    See, e.g., the 30(b)(6) deposition of Peter Wilson, Sun Microsystems (November 6, 2007), 285–286, 288–289, 359; Deposition of Alain Ishiguro, SGI (November 20, 2007), 189-190; Deposition of Neil Edelbaum, Unisys (October 11, 2007), 34–35; Deposition of John Landreth, Micron (March 3, 2006), 77; Deposition of Jon Ostberg, Micron (March 14, 2006), 153; Deposition of Mark Ellesberry (November 27, 2007), 68-69; DEDR 001-003425–001-003471 at DEDR 001-003439; NECELAM 075563–64 at 63; MU 00026836–37 at 36; MCKDRAM.060.001–032, at 006.

**Figure 50: Average actual plaintiff prices vs. predicted plaintiff prices using named OEMs' pricing (Figure 6 from initial report)**



(11)   I also tested whether this apparent tracking is real by performing rigorous statistical analyses. These analyses, commonly used by economists, demonstrate that these prices are nearly perfectly correlated and that they are cointegrated. The finding of cointegration means that there is a fundamental economic relationship between named OEM and plaintiff prices. This further supports my opinion that defendants' conspiracy affected plaintiffs' prices.

(12)   ***The OEM Market Basket Price Index Aligns Nearly Perfectly With the Plaintiffs' Price Index.*** Sixth, to further test this apparent relationship between OEM and plaintiffs' prices, I used another generally accepted econometric tool by using a market basket of plaintiff products to construct price indices for the named OEMs and plaintiffs, and then compared the price indices to see if they also track together.[6] Figure 7 from my initial report, which is reproduced below shows quite clearly that they do.

---

[6]   As defined in my initial report, the "market basket" is a set of DRAM product characteristics that is held constant through time and is applied to purchases for the named OEMs and the plaintiffs. This allows me to compare prices that would have been paid by the named OEMs and the plaintiffs through time, accounting for the fact that the specific product mix purchased in any month changes through time.

**Figure 51: Market basket price indices for plaintiffs vs. named OEMs (Figure 7 from initial report)**



(13)     I checked this apparent price relationship with similar statistical analysis and found that the price indices of the OEM and the plaintiffs are also nearly perfectly correlated and are cointegrated. This reliably tells us that what I see in Figure 7 is accurate and supports my opinion that defendants' conspiracy affected plaintiffs' prices as well.

## I.3. My new empirical analyses

(14)     In response to criticisms by defendants' experts, I have conducted five additional empirical analyses to determine whether those criticisms have any merit. I find that defendants' criticisms are without merit and that my additional analyses fully corroborate my opinion that defendants' conspiracy affected plaintiffs' prices as well.

(15)     ***OEM and Plaintiff Product Prices Align Closely and the Statistical Analyses Confirm This.*** In response to the criticisms from defendants' experts,[7] I have taken steps to analyze more of the product data. One empirical analysis involved augmenting the comparisons of DRAM product purchases by OEMs and plaintiffs, as displayed in my initial Figures 21 to 28. These initial

---

[7]     See, e.g., the Expert Report of Alan Cox, 10.

figures accounted for eight common products. I have now accounted for a broader range of plaintiff purchases from 1996 to 2004. These comparisons and the statistical analyses fully corroborate my opinion that defendants' conspiracy affected plaintiffs' prices.

(16)     ***After Accounting More Directly for Product Life Cycles and Adding More Defendant Data, OEM Price Data Continues to Accurately Predict Plaintiffs' Actual Prices.*** A second empirical analysis involved adjustments to my prior regression analyses using OEM prices to predict plaintiffs' prices. First, I adjusted my analysis to more directly account for any changes in prices attributable to variations in DRAM technologies and product life cycles over time. Doing so improves the reliability of the prediction and corroborates my opinion.

(17)     I used the same statistical tools to analyze this apparent tracking of plaintiffs' predicted prices and actual prices and found them to be nearly perfectly correlated and cointegrated. As stated earlier, the finding of cointegration means that there is a fundamental economic relationship between named OEM and plaintiff prices, and if that relationship is disturbed, the two prices will change over time so as to return to that fundamental economic relationship. This provides new and further support for my opinion that defendants' conspiracy affected plaintiffs' prices.

(18)     Following this, I also applied this analysis to an enhanced data set which included more of the defendant data in response to the criticisms from defendants' experts. As shown in Figure 52 below this analysis further corroborates my opinion.

**Figure 52: Average actual plaintiff prices vs. predicted plaintiff prices using named OEMs' pricing**



(19)    I also tested this apparent tracking of prices and found them nearly perfectly correlated and cointegrated when the enhanced data are used. This further supports my opinion that defendants' conspiracy affected plaintiffs' prices.

(20)    ***After Accounting More Directly for Product Life Cycles and Adding More Defendant Data, the OEM Market Basket Price Index Continues to Align Closely With the Plaintiffs' Price Index.*** A third empirical analysis involved similar adjustments to my prior regression analyses which used a market basket of plaintiff products to construct price indices for the named OEMs and for the plaintiffs, and then compared the price indices to see if they also track together.

(21)    I tested this apparent tracking of the OEM market basket price index with plaintiffs' price index and found them to be nearly perfectly correlated and cointegrated, as was found in my initial report. This provides additional incremental support for my opinion that a conspiracy to raise OEM prices affected plaintiffs' prices as well.

(22)    I also applied this analysis to an enhanced data set which included more of the defendant data. As shown in Figure 53 below, this analysis further corroborates my opinion.

**Figure 53: Market basket price indices for plaintiffs vs. named OEMs**



(23)    I then tested this apparent tracking of price indices and found them nearly perfectly correlated and cointegrated.[8] This new analysis further supports my opinion that defendants' conspiracy affected plaintiffs' prices as well.

(24)    ***Formal Statistical Tests Show That OEM Prices Did Not Rise Relative to Plaintiffs' Prices During the Conspiracy***. Despite the absence of any empirical evidence, defendants' experts have asserted hypothetical examples suggesting that prices paid by the named OEMs increased relative to prices paid by the plaintiffs during the plea period.[9] To address this, I conducted a fourth empirical analysis using a formal statistical test to assess whether named OEM prices during the plea period increased on average relative to those of plaintiffs. In each case, the statistical tests consistently confirm that there was no increase in prices paid by the named OEMs relative to

---

[8]    As noted above, the finding of cointegration means that there is a fundamental economic relationship between named OEM and plaintiff prices, and if that relationship is disturbed, the two prices will change over time so as to return to that fundamental economic relationship.

[9]    Dr. Benjamin Klein, Elpida's expert, makes this assertion despite admitting that he did not conduct any independent analysis or study to determine whether the named OEMs ever faced elevated prices during the conduct period while plaintiffs' prices remained at non-cartel levels. See Deposition of Benjamin Klein (Rough) (April 23, 2008), 86-87. Defendants' experts do not assert that this situation actually occurred; rather, they assert it merely as a hypothetical set of facts, for which they have not identified any support in the factual record.

those paid by the plaintiffs. These results further support my conclusion that defendants' conspiracy affected plaintiffs' prices as well.

(25)    ***Plaintiff Prices Respond Quickly to an Increase in the Named OEM Prices.*** A fifth empirical analysis examines how long it takes for named OEM and plaintiff prices to return to their equilibrium pricing relationship following a disturbance. I find that the majority of the adjustment occurs within 3 or 4 months. As an example, suppose the price increased to only one set of customers (e.g., the named OEMs) creating an immediate price difference between the two sets of customers. This analysis addresses how long it would take for this price increase to be transmitted to the other set of customers (e.g., the plaintiffs). This shows that even if a conspiracy were to theoretically increase only the prices paid by named OEMs, market forces would cause this price effect to be quickly transmitted to the plaintiffs.

(26)    ***Dr. White's Analysis Further Shows the Admitted Cartel Affected Plaintiffs' Prices.*** Further, at the time I prepared my initial report, I had not studied the report and opinions of Dr. Halbert White. Having now done so, I see that his opinions provide even further corroboration of my own. He finds significant overcharges to the plaintiffs which supports my opinion that defendants' conspiracy affected plaintiffs' prices as well.

## I.4. Rebuttal of defendants' experts' critiques

(27)    Defendants' experts have made several other critiques of and comments on my work, all of which are erroneous on the facts in this record or are not probative of the question I was asked to examine.[10]

(28)    For example, certain of defendants' experts contend that I have failed to show that the increase to named OEM prices, which certain defendants admitted in their guilty pleas, caused an increase in plaintiffs' prices.[11] This argument has, at its foundation, a misstatement of my opinion. It is not my opinion that the *increases to named OEM prices* caused increases to plaintiffs' prices. Attempts to mischaracterize my opinion as such are incorrect. Rather, my opinion is that defendants' *conspiracy* to increase the prices to the named OEMs caused an increase to plaintiffs' prices because of the market forces affecting DRAM prices and the characteristics of the DRAM

---

[10]    The fact that I might not expressly respond to a point raised by any of the defendants' experts does not mean I agree with their points.

[11]    Dr. Shapiro (Micron's expert) testified that defendants' guilty pleas constitute "evidence – concession, at least, we'll say concession that they were able to achieve some price increases at certain periods of time." (Deposition of Carl Shapiro (Rough), April 22, 2008, at 141). He also testified that "There was ongoing conduct that in some cases influenced prices. And that conduct is all relevant, and I'm not arguing with you about that." (Deposition of Carl Shapiro (Rough), April 22, 2008, at 160).

market. I discussed my analyses of these market forces and characteristics at length in my initial report, and my additional analyses, discussed at length below, confirms my earlier conclusion that defendants' *conspiracy* caused plaintiffs to pay higher prices for DRAM than they otherwise would have paid absent that conspiracy.

(29)     Defendants also assert that the spot market is largely irrelevant here since Sun and SGI did not buy or sell on the spot market.[12] But this criticism misses the point that plaintiffs, the named OEMs, and even defendants consulted the spot market to obtain price benchmarks that they successfully used in their own contract price negotiations. Thus, the spot market contributed to the transparency of DRAM pricing and led prices throughout the market to move together whether or not a given buyer or seller actually bought or sold DRAM in the spot market.

(30)     In addition, one of Nanya's experts asserts that Nanya's prices are generally lower than those charged by the other defendants. This conclusion is based on incomplete and misleading data analysis that does not account for several DRAM product characteristics that influence pricing. Once these are taken into account, Nanya's prices closely track prices charged by the other defendants.

(31)     Defendants' experts' also assert that prices paid by plaintiffs are not related to those paid by the named OEMs because plaintiffs bought DRAM products with different technologies than those bought by the named OEMs. However, defendants' experts ignore documents, such as contracts, that directly link Sun's prices for asynchronous DRAM to prices of synchronous DRAM, or SDRAM. They also ignore evidence that defendants monitored the "price delta" between different technologies because defendants recognized the importance of relative prices across technologies. Thus, the specific technologies purchased by certain plaintiffs had limited, if any, impact on whether prices paid by plaintiffs were affected by defendants' conspiracy.

## I.5. Summary

(32)     As this synopsis demonstrates, I have carefully considered the factual record and implemented well-accepted empirical analyses. My opinion remains the same as in my initial report. The many independent facts in the record and my extensive empirical analyses all point clearly in one direction: defendants' conspiracy affected the prices paid by the plaintiffs.[13]

---

[12]     See, for example, the Expert Report of Benjamin Klein, 17.

[13]     While it is the basis for many of their arguments, the defendants ignore the fact that one corporate defendant (Elpida) and two individuals (D. James Sogas from Elpida, Thomas Quinn from Samsung) pled guilty to fixing prices charged to Sun, who is a plaintiff in this matter. As such, the conspiracy was not "limited" or "targeted" strictly at the six named OEMs.

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

# II.   Overview

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

(33)    The remainder of this report is organized as following.

- Section III discusses the economic features of the DRAM market, why they are relevant to my analyses, and why defendants' experts misinterpret their importance and relevance.
- Section IV discusses the statistical tests, particularly correlation and cointegration, used in my initial report and why they are highly relevant and appropriate for addressing my charge. It also contains a discussion of empirical analyses designed to directly test defendant experts' hypothesis that the DRAM cartel affected the prices paid by the named OEMs and not the plaintiffs.
- Section V describes why the arguments defendants' experts' have offered are inconsistent with the realities of the DRAM market.
- Section VI addresses defendant experts' other criticisms.

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

# III.    DRAM market characteristics caused named OEM and plaintiff prices to move closely together

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 84 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.    III. DRAM market characteristics caused named OEM
                                                        and plaintiff prices to move closely together

## III.1. Introduction

(34)    My charge in this case is to determine if defendants' admitted conspiracy had an effect on the prices paid by the plaintiffs in these cases. Defendants and their experts claim that their conspiracy was "targeted" solely at the six named OEMs and increased the prices paid only by the six named OEMs.[14] In making this argument, defendants allege that prices paid by the plaintiffs in this matter were unaffected by their conspiracy. The key question to be addressed, therefore, is whether defendants feasibly could increase prices to the named OEMs, as many of them have admitted, without plaintiffs' prices also increasing. This would be economically feasible only if the characteristics of the DRAM market were to allow the prices of the named OEMs and plaintiffs to move separately. Otherwise, defendants' conspiracy could not have affected only those prices paid by the named OEMs as defendants have claimed.

(35)    To address this question, I used empirical analyses and standard statistical tests that are well-accepted in the economic literature. As a result of my analyses, I found that the prices to the named OEMs and plaintiffs did not move separately. These empirical analyses are described at length in my initial report and further described in Section IV below.

(36)    To determine whether prices to the named OEMs and plaintiffs moved together, I analyzed the characteristics of the DRAM market. First, DRAM is a standardized product that is defined by certain well-known and commonly established product characteristics. Second, there are well-established sales channels other than purchases from defendants, and prices for sales in these channels are publicly reported. Third, DRAM prices are highly transparent, meaning that industry participants can quickly and inexpensively understand what typical DRAM prices are—what some of defendants' experts have referred to as "market prices"—and how they have changed through time. DRAM purchasers (including plaintiffs) and suppliers (including defendants) use this price information to influence the final prices for their DRAM transactions. Fourth, many DRAM buyers, including the named OEMs and at least one plaintiff in these cases, have Most Favored Customer (MFC) clauses that prevent their suppliers from charging them higher prices than other customers.

(37)    Several of defendants' experts have criticized my analyses as failing to establish that a conspiracy existed and that the conspiracy impacted the named OEMs.[15] As explained above, the existence

---

[14]    In doing so, defendants ignore the fact that one corporate defendant (Elpida) and two individuals at each company (D. James Sogas from Elpida and Thomas Quinn from Samsung) pled guilty to fixing prices charged to Sun, which is a plaintiff in these cases. Defendants' economists also generally ignore the fact that defendants' plea agreements admit that they were effective and actually raised prices and slowed price declines.

[15]    See, e.g., the Expert Report of Kevin Murphy, 22–23; the Expert Report of Benjamin Klein, 29; and the Expert Report of Alan Cox, 20.

Case 4:06-cv-01665-PJH   Document 430-3   Filed 10/02/08   Page 85 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.   III. DRAM market characteristics caused named OEM
and plaintiff prices to move closely together

of the conspiracy was taken as given as part of my charge because certain defendants have admitted to participating in the conspiracy. Similarly, the fact that the conspiracy impacted price is explicitly and unambiguously admitted in the plea agreements and the sentencing statements. Given the admitted existence of a conspiracy as well as the admission that the conspiracy actually increased prices to at least the named OEMs,[16] no incremental economic analysis was needed to establish these admissions as true.

(38)   It should also be noted that I included in Section VI of my initial report evidence of defendants' behavior that is fully consistent with their conspiracy to fix DRAM prices. This evidence included pricing communications between defendants regarding prices to be charged to the named OEMs and other purchasers (often in advance of finalizing prices for a given customer) and discussions among defendants regarding restricting supply in the market. The documents and other evidence cited spans the entirety of the plea period and includes communications as far back in time as the middle of 1998.

(39)   I have also reviewed interrogatory responses served by plaintiffs' counsel that provide substantial detail on defendants' behavior during the relevant time period. These responses contain a large amount of evidence on communications among defendants about prices to be charged to their customers in advance of pricing negotiations, their past prices to the named OEMs and other purchasers including plaintiffs, their production levels, and their fab capacities. In addition to my review of the factual record, I find the evidence cited to be fully consistent with defendants' participation in an effective price-fixing cartel, as defendants have admitted.

## III.2. Market factors described in my initial report caused named OEM and plaintiff prices to move closely together

(40)   As I described in Section VII.2 of my initial report, DRAM is a standardized product with well-established sales channels and relatively transparent pricing. These factors support my opinion that named OEM prices and plaintiff prices move together. In contrast, defendants' experts offer

---

[16]   Note again that one corporate defendant (Elpida) and two individuals (D. James Sogas from Elpida, Thomas Quinn from Samsung) pled guilty to fixing prices charged to Sun, who is a plaintiff in this matter. In fact, even Elpida's expert, Benjamin Klein, concedes that there was a conspiracy against some products bought by Sun: "I mean, clearly there was a conspiracy by...Elpida and Samsung, with regards to supplying Sun [in the two DBEs referenced in the plea agreements], and that's I think pretty unambiguous. Q. With respect to the products that Sun returned to Elpida, do you understand that they actually sent payment on Elpida for those in the first instance, though; right? A. That's my understanding, yes. Q. Do you have any understanding as to whether what they paid was artificially inflated by this conspiracy? THE WITNESS: That I don't know. It could have been." (Deposition of Benjamin Klein (Rough) (April 23, 2008), 165–166).

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 86 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.          III. DRAM market characteristics caused named OEM
and plaintiff prices to move closely together

narrow arguments of how these factors operate to impact pricing, causing them to misconstrue key points.

(41)    To see how these economic forces arise, consider a market for an industrial product[17] that is standardized across manufacturers where many of the transactions are conducted and/or reported in public view. Buyers can observe this information and rely upon it as a good measure of the current market price for the product. Clearly, buyers will use this information in their discussions with suppliers as they seek the lowest prices. If they did not use this information they would risk paying more than necessary.

(42)    If a buyer's information suggests that the market price is below what the buyer is currently paying one of its suppliers (i.e., that other purchasers are receiving a better price), the buyer can demand a lower price. If that demand is not met, the buyer has an incentive to purchase less from that supplier and more from others. Conversely, if a supplier's information suggests that the market price is above what a customer currently is paying, it can demand a higher price from its customers. If that demand is not met, it has an incentive to supply less to that buyer or terminate the relationship altogether. In this process, both buyers and suppliers have strong incentives to use intelligence about market prices to leverage the final price to their own advantage.

(43)    These economic forces also exist for buyers who have made a strategic decision to concentrate purchases into a small number of suppliers, including purchasing from a single supplier. Buyers that make the strategic decision to purchase from a limited number of suppliers still retain the threat to purchase less from one supplier over another or to switch suppliers entirely should they become dissatisfied. Even if a switch may require a time lag, the threat is still present. This threat has a disciplinary effect and ensures that the buyer receives pricing that reflects market-wide conditions, even from a limited number of suppliers.

### III.2.1. DRAM is a standardized product

(44)    As I explained in my initial report, DRAM chips and modules have certain well-defined product characteristics. For a given set of characteristics, DRAM chips and modules manufactured by one defendant are the same as the DRAM chips and modules manufactured by another.

(45)    There appears to be no disagreement that DRAM chips and most modules are standard across manufacturers. This is well supported by the record, industry compliance with the JEDEC standard, and defendant statements in this and other forums. Additionally, it is not disputed by

---

[17]    I am using the term industrial product to mean an intermediate product sold by one set of suppliers to a set of manufacturers who use this product as an input.

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 87 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.    III. DRAM market characteristics caused named OEM
and plaintiff prices to move closely together

defendants' experts. For example, Dr. Rubinfeld (Samsung's expert) testified during his deposition that he "wouldn't expect to see significant differences" between the prices paid by the named OEMs and other customers for "more commoditized chips."[18] In fact, the standard nature of DRAM chips and most modules was an important part of the numerous anti-dumping complaints filed in the DRAM industry between 1985 and 2003.[19]

### III.2.1.1. Defendants' experts' arguments based on differences in technologies are flawed

(46)    Defendants' experts claim that the fact that plaintiffs buy DRAM products with different technologies means defendants could move named OEM prices without plaintiff prices also moving.[20] At specific times, Sun and SGI purchased a relatively different mix of product technologies than the named OEMs.[21] However, defendants' assertion that this should cause prices paid by Sun and SGI not to move closely with named OEM prices is incorrect for several reasons. First, prices of different memory technologies were linked by contractual terms. Several of Sun's contracts directly tied the price of asynchronous DRAM products to the market prices of products with SDRAM technology.[22] Second, prices of different memory technologies also were

---

[18]    See the deposition of Daniel Rubinfeld (Rough) (April 25, 2008), at 141.

[19]    These complaints include an anti-dumping case against Japanese DRAM manufacturers filed in 1985, an anti-dumping case against Korean DRAM manufacturers filed in 1992, an anti-dumping case against Taiwanese DRAM manufacturers filed in 1998, and a countervailing duties case against Korean DRAM manufacturers (Hynix, in particular) filed in 2002.

The economic literature supports the strongly pro-collusive nature of anti-dumping cases (See, e.g., Staiger and Wolak (1989 and 1991)), and there is direct support for this in the DRAM industry. In particular, Micron used the threat of anti-dumping complaints to keep global DRAM prices from falling too rapidly. A Hynix email dated January 21, 1998, states "Micron has sent warnings to the Japanese suppliers that they will not file charges with the DOC so long as they keep the prices at $3.50 or higher. Japanese are trying very hard to be compliant with this." See HSA00540503-04 at 503. The use of anti-dumping complaints to facilitate the cartel's goals is not unique among cartels either, as the European Commission ("EC") has noted in recent cases involving Amino Acids and Citric Acid (See EC Amino Acids decision at ¶88, 330, and 348 and EC Citric Acid decision at ¶116, 120, 121, 122, 162, 163, 165, 166, and 281).

[20]    See, e.g., the Expert Report of Benjamin Klein, p. 12–16 and the Expert Report of Daniel Rubinfeld, p. 24–25.

[21]    Note that this critique is not relevant for four of the six plaintiffs since they bought a similar mix of technologies at the same time as the named OEMs.

[22]    For example, a contract between Sun and Micron provides a formula to calculate the prices of two DRAM products with FPM technology based on the prices of DRAM products with SDRAM technology: "With respect to the end of life procurement of the… 8Mx144 FPM DIMM, … Micron…will offer pricing which is lesser of: A) $75.00… B) 18x64M SDRAM cost plus $58.20 (64M SDRAM cost as extracted from 128M NG DIMM current price)." MIC0000233–235 at 233. Sun has a similar contract with Mitsubishi that also contains a formula for tying the price of asynchronous DRAM to the price of a DRAM product with SDRAM technology (MITSSUN00141988–89). As a third example, a Sun email shows that Sun used an external manufacturer's SDRAM price offer to negotiate with the defendants for lower FPM prices: "Celestica…stated they could build an SDRAM version of the 16v72 for the price of the 18*64Mb SDRAM plus $53.20… What we did was get our FPM supplier to agree to build FPM modules at that same cost." See SUN0029067. These three examples demonstrate that a change in SDRAM prices (either directly to Sun or market-wide) would result in a corresponding change in the FPM prices for Sun.

---

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 88 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.    III. DRAM market characteristics caused named OEM
and plaintiff prices to move closely together

linked by negotiations that reference prices of other technologies. Price differences were closely monitored by defendants, the named OEMs, and plaintiffs to ensure that price gaps were not too large. This is because customers were aware of these price differentials and would adjust their purchasing mix (and speed of adoption) accordingly if relative prices for newer technologies decreased sufficiently.[23] Third, defendants' experts' argument is also directly contradicted by documents produced in this case that show that suppliers used other customers' prices as benchmarks during the negotiations with Sun.[24] Similarly, defendants' experts' argument also is directly contradicted by the fact that Sun and SGI used publicly available prices, including prices listed on DRAMeXchange.com, and prices reported in industry publications, such as prices in de Dios' *DRAM Market Advisor,* to negotiate lower prices.[25]

### III.2.1.2. Defendants' experts' arguments based on customization are flawed

(47)   Defendants' experts also claim that plaintiffs purchase custom modules that are more expensive than standard modules and cannot be substituted with JEDEC standard modules.[26] This critique does not apply to four of the plaintiffs, which defendants ignore. It is true that Sun and SGI purchased some "custom" modules from defendants. Defendants' experts, however, misstate the

---

[23]   An internal Samsung email supports this fact: "There are multiple high level meetings occurring at HP, Compaq, and Dell addressing the 50% price delta today between the Sync and DDR. This premium is too much for them for the low end systems and retail markets, and they are considering new system releases in January to be SD vs DDR… Our strategy should be to keep the demand for the DDR by forecasting to them a lower Sync vs DDR premium in January." (SSI-0010126690)

In addition, NEC stated in November 2000 that its price for 128Mb DDR was tied to a "Premium Projection over 128Mb SDRAM: CY01/Q2: 60%, Q3: 40%, Q4: 30%." See EMUS 974072. See also EMUS 743549 (256 Mb DDR is 3% over 256 Mb SDRAM), EMUS 447233, SSI-0000371224 (strategy of forecasting lower Synch v DDR premium), and SSI-0005059112 (DDR premium over SDRAM).

[24]   An email from Samsung to Sun shows that Samsung used price increases to "other corporate accounts" to justify a price increase to Sun: "I don't understand your expectation for reductions in 64M pricing. We are near completion of negotiations with our other corporate accounts and prices will increase for the 3rd consecutive month… There is still considerable upward pressure on 64M 5V Async product, which is now over $10 at the other [corporate] accounts and as high as $12–$13 in the secondary/spot markets." (SUN0033807)

[25]   Sun's corporate testimony affirms that it was Sun's practice to use these prices as benchmarks when negotiating prices for their own products:

"Q. [H]ow did Sun determine whether it was getting what it believes to be competitive pricing from its suppliers separate and apart from the targets that it set going into negotiations. A. Same process. Independent analyst data." (30(b)(6) deposition of Peter Wilson, Sun Microsystems (November 5, 2007), 100)

"Q. [U]nder what circumstances would Sun seek downward price adjustments? A. If independent analyst data provided significant reductions in pricing compared to what occurred during a quarterly negotiation or in between quarterly negotiations?." (30(b)(6) deposition of Peter Wilson, Sun Microsystems (November 6, 2007), 288)

See also the deposition of Alain Ishiguro, SGI (November 20, 2007), 200. Ishiguro, SGI's Global Commodity Manager for DRAM from 2000-2002, testified that SGI "would always use" spot prices as a reference in pricing negotiations.

[26]   See, e.g., the Expert Report of Kevin Murphy, 76, and the Expert Report of Daniel Rubinfeld, 52.

---

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 89 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.                III. DRAM market characteristics caused named OEM
                                                                   and plaintiff prices to move closely together

facts and misconstrue the implications of these "custom" module purchases. The fact that some plaintiffs purchased "custom" modules is not meaningful.

(48)    As I mentioned in my initial report, modules (whether standard or "custom") consist of standard DRAM chips plus a printed circuit board (PCB) and other components. Hence the price of a module is based on the price of the underlying DRAM chips plus the circuit board and other components. The cost of the circuit board and other components is generally known in the industry as the module "adder."[27] The adder is generally higher for "custom" modules than for JEDEC standard modules.[28] However, purchasers of "custom" modules took into account pricing of standard DRAM chips and modules in their pricing negotiations. As I explained in paragraph 156 of my initial report, prices for "custom" modules are determined using prices for standard module components.[29] I explained that plaintiffs' witnesses testified that they tracked the prices of standard modules, chips, and components to discipline the prices they paid for their own modules. That these modules may have been assembled using slightly more expensive circuit boards or placed in a non-standard configuration is irrelevant to the issue of whether defendants could have increased prices to the named OEMs without resulting in a similar increase in plaintiffs' prices because named OEM and plaintiff module prices both were based upon the prices of standard chips.

(49)    The implication of defendants' experts' argument is that by deciding to use slightly different circuit boards in their modules, Sun and SGI chose to purchase products with prices that would not respond to market forces in the DRAM industry, whether competitive or collusive.[30] They argue that prices charged to other customers and in the spot market provide Sun and SGI no

---

[27]    30(b)(6) deposition of Peter Wilson, Sun Microsystems (November 28, 2007), 525.

[28]    Although custom adder material sometimes costs more than the adder for standard modules, it appears that SGI's non-recurring engineering fees for designing the modules were invoiced separately and would not have been included in the price of SGI's modules. See the deposition of Alain Ishiguro, SGI (November 20, 2007) at 193: "Q. What was included in the adder? A. Everything else. Every other materials that was not DRAM. So it would include PCB, resistor, capacitor, PLL, register, and that's about it. Q. Just components? Did it include any services? A. No." See also Ishiguro deposition at 129: "NRE [Non-recurrent fee] charges to being [sic] paid up front is usually something that we do because the engineering team takes the bill when it's an NRE." Samsung invoices also confirm that NREs were paid in one lump sum up front. See, e.g., SSI-0000090726, SSI-0000550864, and SSI-0002003096.

[29]    See, e.g., the deposition of Alain Ishiguro, SGI (November 20, 2007), 192-194; SSI-0000339376, and SSI-0000339330.

[30]    Dr. Rubinfeld appears to take a different position, stating that changes in market-wide prices will impact the prices of custom DRAM products as well as "commodity" DRAM products. Specifically, Dr. Rubinfeld testified that both custom and "commodity" products would be impacted because "when you put together a custom memory board, ultimately it's going to include [commodity] DRAM chips on a board." Deposition of Daniel Rubinfeld (Rough) (April 25, 2008), 228-229. The implication here is that market-wide changes in the price of standard DRAM chips would impact the price of "custom" modules, such as those Sun and SGI purchased.

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 90 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.    III. DRAM market characteristics caused named OEM
and plaintiff prices to move closely together

leverage with which to discipline their suppliers. The evidence regarding plaintiffs' purchasing practices stands in complete contrast to this assertion.

(50)    As discussed above, DRAM pricing is reported frequently through DRAMeXchange, de Dios' *DRAM Market Advisor*, and other sources. Industry participants have testified that they track these prices closely, and they therefore know whether their prices are increasing or decreasing relative to the prices reported in market sources such as those discussed above. Customers such as Sun and SGI who buy some "custom" modules reference reported prices for standard modules as a threat in their own price negotiations.[31]

### III.2.1.3. Defendants' experts' arguments based on non-price attributes are flawed

(51)    Third, defendants' experts claim that price is not the only important factor for Sun and SGI in their procurement decisions. Defendants' experts then argue that this factor might allow their conspiracy to affect the prices paid by the named OEMs but not plaintiffs.[32] It is important to note that non-price factors are important to other DRAM buyers, including several of the named OEMs, in addition to Sun and SGI.[33] But the most important flaw in this argument by defendants' experts is the implicit mischaracterization of how companies buy DRAM.

(52)    Buyers of DRAM (and many other products) are typically concerned about many factors other than price when buying inputs. For example, buying DRAM modules at a low price from a supplier that is selling low quality products and/or a supplier that does not make timely deliveries

---

[31]    Additionally, because the "module adder" for standard and "custom" modules is a small and relatively stable cost compared to the cost of the DRAM chips on a given module, DRAM customers who buy "custom" modules are able to calculate the cost of the individual chips on the module, and will demand similar prices to those being offered industry-wide. See, e.g., Deposition of Alain Ishiguro, SGI (November 20, 2007), 192-194.

[32]    See, e.g., the Expert Report of Benjamin Klein, p. 19–21, and the Expert Report of Daniel Rubinfeld, 52.

[33]    For example, Steve Appleton of Micron testified during the Swanson trial that not all of the named OEMs place the same importance on price: "[A] company like IBM, which has a lot of server applications, they don't focus that much on every dime or every nickel coming out of the pricing, as opposed to a company like Dell, which is heavily dependent on the consumer market." (Testimony of Steve Appleton in the Swanson trial, 1583)

Similarly, the DRAM procurement director at Dell testified about the importance of both price and non-price factors:

"A. The…objective of the entire procurement organization is to balance price with continuity of supply and quality. Q. And when you say "balance price with continuity of supply and quality," I take it what you mean is all three of those were important objectives to achieve? A. That's correct." (Deposition of Kevin Brown, Dell (September 12, 2006), 25)

Dr. Klein admitted during his deposition that he had no opinion as to whether the non-price factors he attributes to Sun and SGI in his report also were considered by the named OEMs in their purchase decisions: "Q. In your report you discuss what you refer to as nonprice factors considered by Sun and SGI in purchasing DRAM? A. Yes. Q Those nonprice factors you discuss are quality of the product, continuity of supply, timely delivery, and short lead times. Is that accurate? A. That's what I recall. Q Is it your opinion that those, what you call nonprice [factors], that those were not [factors] considered [by] the named OEMs in their [purchasing] decisions for DRAM? A. I don't have in that opinion on that, no." (Deposition of Benjamin Klein (Rough) (April 23, 2008), 179.)

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 91 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.    III. DRAM market characteristics caused named OEM
and plaintiff prices to move closely together

is almost surely a poor purchasing decision. However, product quality and stability/punctuality of delivery are characteristics that can be determined before requesting prices from suppliers. In fact, only those suppliers whose quality and supply chain responsiveness exceed certain thresholds are likely to be asked to submit price quotes.

(53)    Defendants' experts themselves cite quality and continuity of supply as relevant non-price factors.[34] Defendants assert that Sun and SGI are the only customers that take these non-price factors into account, but this contradicts the facts in the record. Specifically, the named OEMs also emphasized these factors in their contracts, so Sun and SGI are not any different in this regard.[35, 36]

### III.2.2. Well-established sales channels exist and DRAM pricing is relatively transparent

(54)    As I discussed in Section VII.2.2 of my initial report, an active spot market for DRAM provides many purchasers with an alternative source of supply beyond buying directly from defendants.[37] In addition, the spot market prices are publicly available through many sources including DRAMeXchange, which provides spot market price quotes three times daily.[38] An obvious benefit of the spot market is that the availability of public information on prices allows all DRAM

---

[34]    Expert Report of Kevin Murphy, 67.

[35]    For instance, a contract between IBM and Samsung dated October 26, 2000 has clauses on supply continuity and product quality:

- "Supplier will maintain the capability to supply agreed upon Products including parts of Products, for a period of months after withdrawal of such Products as specified in the relevant [Statement of Work]." (SSI-0000377747)

- "Buyer may reject entire lots of Products is such lots do not meet quality levels as specified in the relevant [Statement of Work]."(SSI-0000377748)

Similarly, Dell's director of memory procurement testified that the goal of the procurement group was to "balance price with continuity of supply and quality." See Deposition of Kevin Brown, Dell (September 9, 2006), 25.

[36]    Since the named OEMs also realize the importance of non-price factors, there would have to be a substantial change in the non-price factors during the plea period for them for defendants' admitted conduct to impact the plaintiffs differently than it did the named OEMs. I am not aware of any evidence that non-price factors changed substantially during the plea period, and defendants' experts do not cite evidence that supports their point. Therefore, defendants' experts' allegations regarding non-price factors are without foundation.

[37]    Many of the DRAM market participants purchased or sold DRAM on the spot market. For instance, as I noted in paragraph 150 of my initial report, HP purchased substantial amounts of DRAM on the spot market when spot prices were lower than their contract prices with defendants. The defendants also participated in the spot market. Infineon testified that it had a regular practice of selling on the spot market because "not participating in the spot market means that we are not [one] hundred percent on line [with] what is really happening in the market in terms of prices." (Deposition of Elmar Piesch, Infineon (November 28, 2007), 25).

[38]    DRAMeXchange: Frequently Asked Questions. Available at http://www.dramexchange.com/help.asp.

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 92 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.    III. DRAM market characteristics caused named OEM
and plaintiff prices to move closely together

customers to quickly and inexpensively understand current DRAM prices and how DRAM prices are changing through time.[39]

(55)    Publicly available pricing information is not limited to spot market prices. *The DRAM Market Advisor* (published by De Dios and Associates), The Converge Global Trading Exchange, AICE, and iSuppli are among the public sources that provide recent and detailed information on contract prices or spot market prices.

(56)    Defendants, the named OEMs, and plaintiffs all watched the spot market and other public sources for trends in pricing. The fact that they tracked spot market prices and other sources for use in negotiations with customers is prevalent in testimony from plaintiffs, defendants, and defendants' experts.[40]

(57)    In addition, a substantial volume of material flows through the DRAM spot market each week—on average, between 10 and 20% of all DRAM sold.[41] The volume of DRAM transacted in the spot market is so large that Infineon employed a management consulting firm, McKinsey, to analyze whether it would be profitable for Infineon to become directly involved in creating an

---

[39]    Nanya Expert Alan Cox agrees that DRAM pricing is relatively transparent. In addition, he testified that DRAM products are relatively standardized. (Deposition of Alan Cox (Rough) (April 22, 2008), 94.)

[40]    "Q. Isn't there testimony in this record that buyers and sellers consult the spot market to get a price signal or benchmark? A. Yeah, it's certainly the case that -- that people do refer to the spot market to assist in pricing decision[s]." (Deposition of Alan Cox (Rough) (April 22, 2008), 58–59).

"Q. So do you agree that contract customers tend to take note of movements in the spot market and expect similar reductions in their price if the spot price is falling? A. I think that that's a generally correct description of what is going on with respect to OEM contract purchasers." (Deposition of Benjamin Klein (Rough) (April 23, 2008), 282).

"Q. Did you ever learn that any of the Samsung contract purchasers referred to spot market prices in negotiating prices with Samsung? A. Yeah, that's a good indicator." (Deposition of Yeongho Kang, Samsung (November 27, 2007), 102).

"Q. Do you know whether Sun used the spot price or the contract price or both to calculate the index price? A. Both. [W]e used a simple average of the four corners, which is spot high, spot low, contract high, contract low. DRAM Exchange report[s] the four corners." (30(b)(6) deposition of Peter Wilson, Sun Microsystems (November 6, 2007), 464).

"Q. You mentioned [Unisys is] trying to get the most competitive price, and you've just stated that you used input from Web sites for suppliers. So let's start with the Web sites. What information would you get off the Web sites? A. Web sites showed the trend in the memory market. You know, where they are now and where they've been and where they expect them to go, like a forecast of what they think pricing is going to do." (Deposition of Neil Edelbaum, Unisys (October 11, 2007), 34–35).

"Q. Now, you said that based on your experience, you would give them feedback. Can you tell us what factors you considered in providing feedback regarding the prices that [SGI] got from DRAM vendors? A. I would use data that I could gather from external analysts, such as websites that would give me spot market pricing and contract pricing, and I would also review that and compare it with what I get from other vendors, and then I would give them some feedback if they are competitive or not based on that." (Deposition of Alain Ishiguro, SGI (November 20, 2007), 189-190)."

[41]    See, for example, MCKDRAM.060.001–032 at 003, MU 00779253–55 at 54, and MU 00115652–53 at 52.

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 93 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.    III. DRAM market characteristics caused named OEM
and plaintiff prices to move closely together

internet-based "commodity exchange" for DRAM.[42] The "thickness" of the spot market and its transparency means that the transaction prices reported from the spot market provided a solid and reliable benchmark that both buyers and sellers could and did use in their discussions, negotiations, and deliberations. Buyers, whether named OEMs or plaintiffs, utilized the transparent information about prices available in the market as benchmarks for their own pricing. This evidence clearly shows that spot market prices were relevant in pricing negotiations for buyers and sellers of DRAM.

(58)    In addition, it is worth noting that there is evidence in the factual record that defendants discussed and coordinated on spot market pricing.[43] Defendants appear to have attempted to elevate (or, at a minimum, maintain) the benchmark prices that the named OEMs, the plaintiffs, and other buyers used. This would have had a similar effect on prices for *all* DRAM purchasers, not just the named OEMs.

### III.2.2.1. Defendants' experts' arguments based on Sun and SGI's use of the spot market are flawed

(59)    Several of defendants' experts mischaracterize the facts to suggest that because Sun and SGI could not buy or sell certain of their "custom" modules on the spot market, spot market prices are not relevant for them. They make the related argument that price transparency is not applicable for Sun and SGI either. For instance, defendants' experts claim that "Sun's purchasing practices [show] that…it never relied on the spot market" and that I provided "no empirical evidence" that price transparency "actually affected negotiated prices" or that publicly reported prices "would be inflated by the alleged conspiracy."[44]

(60)    Defendants' experts claim that, by purchasing "custom" modules, Sun and SGI knowingly and voluntarily forfeited all ability to use market information regarding price as leverage in their negotiations with suppliers. This makes no sense. First, Sun and SGI do not need to purchase or

---

[42]    See, for example, MCKDRAM.060.001–032.

[43]    This was explained in Section VI of my initial report. Examples of this evidence include:
- November 21, 2001 internal Infineon email: "As I discussed with you and Guenter we must now take several steps to prepare for the next round of negotiations for December 1 pricing which start next week with IBM...we must drive the spot market up over the next two weeks. Any signs of softening would again dilute the message." (ITAG-00019709)
- December 3, 2001 internal Elpida email: "Hynix, Samsung, and Infineon are coorperating [sic] to raise spot price for Dec contract negotiation." (EMUS155224)
- January 30, 2002 internal Samsung email with subject "Micron Channel Update": "Micron is holding fast at $4.00 and $8.00 for 128Mb and 256Mb SDRAM… Dropping the channel price would decrease their leverage for February OEM contract price increases, which are currently underway." (SSI-0005096760)

[44]    See Expert Report of Kevin Murphy, p. 76–77, and the Expert Report of Benjamin Klein, p. 25, 27.

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 94 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.          III. DRAM market characteristics caused named OEM
                                                            and plaintiff prices to move closely together

sell DRAM on the spot market for the spot market to be relevant to their purchasing. Nor do they need to engage in "arbitrage" with the named OEMs either directly or through the spot market.[45] In fact, what is important is that Sun, SGI, the other plaintiffs, the named OEMs, and other purchasers can use publicly available information to affect the prices they pay. This was emphasized at length in depositions of Sun and SGI executives.[46] As a result of the price transparency in the DRAM market, Sun and SGI understand not only the price levels for certain DRAM products but also understand the price *movements* in these data. For example, if one of the defendants were to attempt to raise prices to Sun when Sun observes that prices for other DRAM products are decreasing, Sun would use publicly available information to resist the price increase, as described above. This is not specific to or dependent upon what Dr. Klein has called "customized products" with "customized circuit boards" or whether Sun and SGI purchased "different technologies of DRAM than the [named] OEMs."[47]

(61)    Second, the Court in these cases noted at the class certification stage of the related MDL proceedings that "the ultimate DRAM pricing paid by *all* members of the class was determined with reference to a 'benchmark' spot price—namely, defendants' own documents declaring that all pricing is dependent on the spot price, and suggesting that contract prices were also dependent on the spot price" (emphasis added).[48] Third, Nanya's expert Alan Cox's testimony during both

---

[45]   See Expert Report of Benjamin Klein, 11. Dr. Klein claims incorrectly that my opinion is based on a narrowly interpreted theory of what he refers to as "arbitrage." Dr. Klein has asserted that my opinions "require" that Sun and SGI buy or sell DRAM on the spot market, through other secondary sales channels, or to/from the named OEMs. Arbitrage in this manner would be sufficient to prevent the defendants from being able to increase prices to the named OEMs without increasing prices to plaintiffs. However, it is in no way necessary for this to occur for all of the reasons cited herein, in my initial report, and in my deposition. I have not in fact offered the argument that Dr. Klein has suggested.

[46]   Defendants' experts have chosen to ignore this information and construct arguments inconsistent with these facts. For example, a Sun 30(b)(6) witness testified:

   "Q. Do you know whether Sun used the spot price or the contract price both to calculate the index price? A. Both. [W]e used a simple average of the four corners, which is spot high, spot low, contract high, contract low. DRAM Exchange report[s] the four corners." (30(b)(6) deposition of Peter Wilson, Sun Microsystems (November 6, 2007), 464).

   "Q. [W]ould you agree that using only spot market pricing would result in a price that was not a fair base, as you said? A. No, I wouldn't agree with that." (30(b)(6) deposition of Peter Wilson, Sun Microsystems (November 28, 2007), 505-506).

   Similarly, an SGI witness testified that that SGI "would always use" spot prices as a reference in pricing negotiations (Deposition of Alain Ishiguro, SGI (November 20, 2007), 200).

   More evidence on this point from the factual record is provided in Section VII.2.3 of my initial report.

[47]   See the Expert Report of Benjamin Klein, generally, 11–16. By Dr. Klein's analysis, no pair of prices in any given market could be cointegrated if the market did not have the narrowly defined arbitrage opportunities that he describes, which stands in contrast to the cointegration literature. See, e.g., Engle and Granger (1987), Co-Integration and Error Correction: Representation, Estimation and Testing, *Econometrica*, 55, 251–276 and Engle, R. F., and Yoo, B. S. (1987), Forecasting and testing in co-integrated systems, *Journal of Econometrics*, 35:143–59.

[48]   In re Dynamic Random Access Memory (DRAM) Antitrust Litigation. "Order granting motion for class

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 95 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.                III. DRAM market characteristics caused named OEM
                                                                    and plaintiff prices to move closely together

the MDL proceedings and his deposition in these proceedings further supports my opinion and contradicts the arguments made by other defendants' experts.[49]

### III.2.3. MFC clauses limited defendants' ability to raise prices selectively to the named OEMs

(62)    Defendants' contracts with DRAM customers often include most favored customer (MFC) clauses, which stipulate that prices for a customer with an MFC clause will be at least as low as prices for other customers. These clauses effectively prevent a supplier from increasing (decreasing) the price for one customer without also increasing (decreasing) the price for other customers. Because MFC clauses are commonly included in large customers' contracts, and because defendants have testified that MFC clauses were always adhered to, these clauses limited defendants' ability to raise prices for the named OEMs without also raising prices for other customers.[50] Dr. Cox agrees that MFCs, among other factors, would lead to positive price correlations between plaintiff and named OEM prices, an indication that prices for the plaintiffs and the named OEMs move together.[51]

(63)    Defendant experts on the other hand, take a narrow view of the implications of MFC clauses. To support their point, they cite to contracts containing MFC clauses with very specific language, generally ignoring some of the contracts cited in my initial report showing the breadth of many MFC clauses.[52] Defendants' experts' opinions appear to be based on reading and interpreting

---

certification." No. M 02-1486 PJH. (D. Northern District of California. filed June 5, 2006), 14–15.

[49]    "Q. And you're familiar with the fact that from time to time, OEMs will avail themselves to the spot market as their needs require? A. Yes, that's correct. And, in fact, they might take supply that they have contracted for and also sell in to the spot market…Q. And is it your understanding...that in the negotiations for OEM contracts that from time to time references are made to the spot market price? A. I have heard that, yes." (Deposition of Alan Cox (September 28, 2006), 21–22).

"Q. Well, a few moments ago we talked about the fact that from time to time in negotiations, the OEM market looks to the spot market. Agreed? A. Yes. Q. So it's not that the spot market prices are in a vacuum relative to the OEM market, correct? A. I agree with that." (Deposition of Alan Cox (September 28, 2006), 30).

"Q. Isn't there testimony in this record that buyers and sellers consult the spot market to get a price signal or benchmark? A. Yeah, it's certainly the case that -- that people do refer to the spot market to assist in pricing decision[s]." (Deposition of Alan Cox (Rough) (April 22, 2008), 58–59).

[50]    See, e.g., the 30(b)(6) Deposition of Mizuki Yoshino, Elpida (October 23, 2007), 98. "Q. And in circumstances such as that when Elpida agreed to [an MFC] clause, was it Elpida's intent to comply with the clause? A. Yes, it was. Q. To your knowledge, has Elpida ever been informed by a customer that a customer believed Elpida had violated the MFC clause in the contract? A. No, they have not. Q. So far as you are aware during your time in Elpida, has Elpida always complied with such MFC clauses? A. Yes."

[51]    Expert Report of Alan Cox, 21.

[52]    For example, a contract between HP and NEC states that if "HP brings to the Supplier's attention, that Supplier has offered or the Supplier offers a better price, pricing formula or other terms to purchasers in the spot market, or to other purchasers for similar volumes of Products, then Supplier shall immediately upon making such offer or receiving such notice, offer such price, pricing formula or other terms to HP." See NECELAM 021016–021032 at NECELAM 021020.

---

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 96 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.    III. DRAM market characteristics caused named OEM and plaintiff prices to move closely together

language such as "substantially comparable products" and "similar volumes." In doing so, they ignore the economic importance of MFC clauses for DRAM buyers. Large DRAM customers expect to receive prices that are not greater than the prices paid by their competitors, and they wanted MFC clauses to provide guarantees that they were receiving the most favorable pricing possible from their suppliers.[53,54] Because DRAM buyers competing for the same downstream sales do not want to be at a cost disadvantage, they want MFC clauses in their contracts and expect suppliers to comply with those terms.[55,56]

(64)    Defendants themselves have testified before the International Trade Commission regarding the strength and importance of MFC clauses.[57] One defendant witness testified that MFC clauses can

---

[53]    John Cerrato of Samsung testified that MFCs are a "request from the customer" and Samsung "would rather not have a pricing clause in there." See deposition of John Cerrato, Samsung (November 2, 2007), 107.

[54]    This includes prices to Sun, and defendant testimony indicates that prices to Sun were not seen as different from prices for other large DRAM customers. As I noted in my initial report, Elmar Piesch, Infineon's account manager for Sun from 1999 to 2003, testified that Sun could have been considered to be "any other customer" at Infineon (as defined in an Infineon MFC clause) and that if Infineon had sold DRAM chips or DRAM modules to Sun at a price lower than it sold to Dell, then Infineon's MFC clause with Sun could have applied. (Deposition of Elmar Piesch, Infineon (November 28, 2007), 10, 87–88.) Similarly, Sun's contract with Samsung stipulated that Samsung would offer prices to Sun that were "as good as the best prices offered by SEC to any other similarly situated customers purchasing the same or comparable products." (SSI-0020037559–611 at 560) As Samsung's economist Daniel Rubinfeld points out, Samsung considered Sun to be a Global Account along with the named OEMs. (Gateway was not always considered a global account by Samsung during the conspiracy period. See, e.g., the deposition of Yeongho Kang, Samsung (November 27, 2007), 42). It is likely, therefore, that Samsung would have considered Sun and the named OEMs to be "similarly situated" customers.

In addition, Elpida classified Sun in the same group of "Multinational Accounts" as IBM, Dell, and HP. See the deposition of Hirohisa Ueno, Elpida (December 14, 2007), 63. Hynix classified Sun in the same group of "Strategic Accounts" as Dell, HP, Apple, and Compaq. See the deposition of Nick LaHerran, Hynix and Samsung (December 11, 2007), 100. Similarly, Infineon classified Sun in the same group of "Corporate Accounts" as IBM, Dell, HP, Apple, Compaq, and Gateway (i.e., all six of the named OEMs). See the deposition of Richard Costa, Infineon (November 13, 2007), 11–13.

[55]    As Dr. Jerry Hausman testified before the ITC: "I'd like to make two points; (1) these type of contract provisions not only exist worldwide throughout the DRAM industry but they are a common feature of any commodity-like or very many, not any, but very many commodity-like inputs and the main reason they exist is if you're a customer and you're selling computers you're Dell or you're Gateway you are in a very highly competitive business. You cannot be at a cost disadvantage compared to your competition because, you know, you've seen them advertise and it's $895 and whatever and so they're going to require these type of contracts from their input suppliers so they will not be at a cost disadvantage and I have seen this not only in the DRAM business but many, many industries I have studied as an economist 30 years at MIT." June 23, 2003 hearing in U.S. International Trade Commission, DRAMs and DRAM Modules From Korea, Inv. No. 701-TA-431, 85-86.

[56]    For example, if Dell were paying a higher price than Sun for the DRAM going into its servers, Dell would be at a relative cost disadvantage Sun in competing for downstream sales of servers. If Dell discovered that it was paying higher prices than its competitors, it would approach its supplier for lower prices regardless of the specific DRAM product at issue. See, e.g., the deposition of Jackie Gross, HP/Compaq, (August 29, 2006), 200.

[57]    For example, Robert LeFort, then President of Infineon Technologies North America, testified at length about the three major factors that impact DRAM pricing market-wide—one of those was the impact of MFC clauses. LeFort explained that, for customers with MFC clauses, "if [a supplier] lowers DRAM prices for Customer A, then Customer B, C and others with whom it has such [MFC] agreements get that lowered price as well." June 23, 2003 hearing in U.S. International Trade Commission, DRAMs and DRAM Modules From Korea, Inv. No. 701-TA-431, 68–69.

---

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 97 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.                III. DRAM market characteristics caused named OEM
                                                                  and plaintiff prices to move closely together

cause low prices offered by one single supplier to one single customer to quickly "spread through the entire DRAM market."[58] No defendant in these cases testified before the ITC that MFC clauses had the limited effectiveness described by defendants' experts.

## III.3. Defendants' own arguments show that named OEM and plaintiff prices move closely together

(65)    Defendants' experts repeatedly argue that the admitted conspiracy targeted only the named OEMs, and then raise the hypothetical possibility that it had absolutely *no* impact on any other customers.[59] In doing so, they argue that prices paid by the named OEMs and by plaintiffs are not connected through market forces. They argue that the way that plaintiff and named OEM prices track one another through time (as confirmed by correlation and cointegration) as I have demonstrated is merely a coincidence caused by similar forces of supply and demand, and does not reflect any fundamental mechanism of price transmission from one part of the market to other parts of the market.

(66)    These arguments by defendants' experts directly contradict arguments defendants previously have made in other litigation related to DRAM, where defendants themselves argued that named OEM prices and plaintiff prices move together due to DRAM market characteristics. In 2002, some of the defendants filed a countervailing duty complaint before the U.S. International Trade Commission in response to the subsidies Hynix was receiving from the South Korean government.[60] In a hearing in 2003, the executives of certain defendants testified before the ITC and argued that OEM prices and plaintiff prices moved together.

---

58    June 23, 2003 hearing in U.S. International Trade Commission, DRAMs and DRAM Modules From Korea, Inv. No. 701-TA-431, 68–69.

      The same is true when suppliers increase prices—suppliers must raise prices to all customers with whom it has MFC agreements, or customers will demand the lower prices found elsewhere in the market.

59    Again, note that one corporate defendant (Elpida) and two individuals (D. James Sogas from Elpida and Thomas Quinn from Samsung) pled guilty to fixing prices charged to Sun, which is a plaintiff in these cases.

60    Contrary to the claims made by Dr. Murphy, Micron's complaint with the ITC was not due to Hynix selling its products at "less than fair value" or "underselling its competitors." See Murphy Report at p. 43. Instead, Micron notes specifically in its petition that "the past cases before the Department have been antidumping cases and asserts that the scope from earlier antidumping cases should not be imported into a countervailing duty case based on the fundamental differences between the two types of proceedings. According to the petitioner, unlike an antidumping case where the Department is concerned with unfair pricing between private parties, a countervailing duty case involves the examination of government subsidies that benefit an entire production process." Department of Commerce, International Trade Administration, "Notice of Initiation of Countervailing Duty Investigation: Dynamic Random Access Memory Semiconductors from the Republic of Korea," Federal Register 67, no. 229 (27 November 2002): 70927–70932. Dr. Murphy's description of the ITC case against Hynix is, therefore, misleading and does not support his point.

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 98 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.                III. DRAM market characteristics caused named OEM
                                                                        and plaintiff prices to move closely together

(67)    Robert LeFort of Infineon explained that MFC provisions in contracts and reference (benchmark) pricing were two of the reasons why changes in the price for one customer would affect prices for another customer. LeFort even describes the DRAM market as "interwoven," noting the "considerable substitutability…among certain types of DRAMs and modules of different densities and end use specifications."[61]

(68)    Mike Sadler of Micron was asked about pricing to OEMs versus other customers: "Vice Chairman Hillman: Okay. Then how about the pricing across variations across, again, PC OEMs versus other OEMs versus non-OEM purchasers? Mr. Sadler: There should not be a material difference."[62]

(69)    Steve Appleton of Micron was asked about regular DRAM versus specialty DRAM: "Vice Chairman Hillman: And tell me about the competition between the two. I mean…if what you think you need is one of these specialty products, can your need be met by a regular DRAM? Or if that's what you need, that's what you need, and you're not going to buy something else no matter what the price difference is? Mr. Appleton: Yes, it can…"[63] To summarize, Micron's CEO testified in front of the ITC about the importance of relative pricing for different DRAM products.

(70)    In this case, the ITC states "Petitioner [Micron Technology, Inc.] argues that the Commission should define the domestic like product as all DRAM products, including both assembled and unassembled DRAMs, memory modules, all DRAM product applications or types, and all densities of DRAM products. Respondents agree."[64] Hynix was the respondent.

## III.4. Summary

(71)    Defendants' experts concede that common demand and cost factors affect the DRAM prices of both named OEMs and plaintiffs, but they argue that I have not provided any evidence that the admitted conspiracy would impact plaintiffs. As best I can discern, we are supposed to imagine two large customer groups buying the same product, where pricing to each customer group is influenced by identical cost and demand factors, but where a conspiracy to fix prices to one customer group would have no impact on prices for the other customer group. In this case, the

---

[61]    June 23, 2003 hearing in U.S. International Trade Commission, DRAMs and DRAM Modules From Korea, Inv. No. 701-TA-431, 68–70.

[62]    June 23, 2003 hearing in U.S. International Trade Commission, DRAMs and DRAM Modules From Korea, Inv. No. 701-TA-431, 122.

[63]    June 23, 2003 hearing in U.S. International Trade Commission, DRAMs and DRAM Modules From Korea, Inv. No. 701-TA-431, 163.

[64]    August 2003 decision in U.S. International Trade Commissionn, DRAMs and DRAM Modules From Korea, Inv. No. 701-TA-431 (Final), 5.

named OEMs and plaintiffs each buy the same DRAM chips, whether as individual chips or mounted on modules. They look to the same transparent market intelligence to understand current pricing for chips and modules. The chips for named OEMs and plaintiffs are manufactured on the same machines at the same fabs. In fact, the pricing for named OEMs and plaintiffs are tied together by the DRAM market mechanisms that were identified in my initial report. These ties were acknowledged by defendants in testimony before the ITC. In addition, defendants' experts have provided no plausible explanation for how defendants' conspiratorial conduct impacted named OEM prices without impacting the prices paid by the plaintiffs.

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

# IV.    My statistical analyses show that named OEM and plaintiff prices move closely together

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

## IV.1. Introduction

(72)    My initial report contained a number of empirical analyses that showed that the prices paid by the plaintiffs and the prices paid by the named OEMs moved closely together before, during, and after the plea period. As I noted above, I conducted additional empirical analyses in response to criticisms from defendants' experts that are probative of the question I have been asked to examine. Each of these analyses confirms the findings from my initial report.

(73)    These analyses allow me to refute the hypothetical examples offered by defendants' experts. My analyses reject the hypothesis that the prices paid by the named OEMs increased while prices paid by plaintiffs did not, and distinguish between the reality of the DRAM market during the plea period and defendants' simulations.

## IV.2. My statistical analyses support my opinion that the prices paid by the named OEMs move closely together with prices paid by the plaintiffs

(74)    To reach the opinions in my initial report, I conducted a visual inspection of prices charged by defendants to the plaintiffs and the named OEMs, and I applied two statistical analyses (correlation and cointegration) to confirm what is compelling to the naked eye—prices paid by the plaintiffs moved closely with prices paid by the named OEMs.[65] These statistical analyses are appropriate, accepted and commonly used methods in the academic literature for evaluating the extent to which prices move together.

### IV.2.1. Correlation analyses

(75)    As I described at length in my initial report, correlation is well accepted as a methodology by economists to test whether two series move together.[66] It is among the first methodologies taught

---

[65]    As noted above, I also completed a detailed review of the DRAM market characteristics as part of reaching my opinions.

[66]    As noted by this Court in its class certification opinion in the related MDL proceedings, "…correlation analysis used to compare pricing data across products and customers [has] been upheld" by courts. Correlation analysis of prices for purposes of evaluating the strength of interdependence across customers, geographies or products is common in the economics literature. For example, George J. Stigler and Robert A. Sherwin proposed using correlations to characterize the boundaries of markets. See "The Extent of the Market," *Journal of Law and Economics* vol. XXVIII, October 1985. Hayes, Shapiro and Town report high correlations between Alaskan North Slope crude oil and other world petroleum prices in support of their claim that there is no separate market for ANS crude oil. See John Hayes, Carl Shapiro and Robert Town, "Market Definition in Crude Oil: Estimating the Effects of the BP/ARCO Merger, *Antitrust Bulletin*, 2007.

---

in basic statistics and econometric textbooks. [67] As shown in Table 3 and paragraphs 213 and 220 of my initial report, prices paid by plaintiffs are highly correlated with those paid by the named OEMs, demonstrating that they closely track one another before, during, and after the period in which defendants pled guilty to fixing DRAM prices.

(76)   The correlations I presented in my initial report provide statistical confirmation of the strong similarities in the price paid by the named OEMs and plaintiffs apparent from visual inspection of the prices. They reject the possibility that prices paid by the named OEMs and plaintiffs are unrelated or move independently. They are consistent with and support my opinion that plaintiffs were harmed by defendants' conspiracy, which certain defendants admitted increased prices to at least the named OEMs during the plea period.

### IV.2.2. Cointegration analyses

(77)   As I stated in my initial report, cointegration analysis examines how the difference between two variables changes over time. Compared to correlation, cointegration is a relatively modern concept commonly used by economists to test for whether two series move together and are governed by a fundamental economic relationship. Engle and Granger[68] motivate the study of this topic through an example comparing prices in two regions, noting economic reasons why the prices cannot drift very far apart. They note that cointegrated series have a tendency to return to a fundamental economic relationship, which they call an "attractor." They find that once disturbed from the attractor:

> "[t]here will be a tendency to get back near to it. Because of uncertainties, sticky prices, contracts, etc., the mechanism may not immediately bring the points exactly to the attractor. At any particular time, shocks to the economy may take it away from the line, but there will be an overall tendency towards it. … If there is an extended period with no exogenous shocks, the economy will definitely go to the line and remain there." [69]

---

[67]   See, for example, *Econometric Models and Econometric Forecasts, Fourth Edition*, by Robert S. Pindyck and Daniel L. Rubinfeld (Irwin/McGraw-Hill, 1998) at 22–24.

[68]   Robert Engle and Clive Granger were awarded the Nobel Prize in Economics in 2003. Dr. Granger's award was "for methods of analyzing economic time series with common trends (cointegration)." See http://nobelprize.org/nobel_prizes/economics/laureates/2003/. According to the Royal Swedish Academy of Sciences, Granger showed that "models containing nonstationary stochastic variables can be constructed in such a way that the results are both statistically sound and economically meaningful." He "achieved this breakthrough by introducing the concept of cointegrated variables…" See http://nobelprize.org/nobel_prizes/economics/laureates/2003/ecoadv.pdf at 2.

[69]   See R.F. Engle and C.W.J. Granger, *Long-Run Economic Relationships: Readings in Cointegration*, 1991, Oxford

(78)    Since Nobel Laureates Engle and Granger published their seminal paper[70] on cointegration in 1987, use of this concept and related econometric procedures for studying similarity of price movements has become commonplace in the economic literature.[71]

(79)    I found that the series in Figures 31 and 32 of my initial report, which compare prices charged to the plaintiffs with those charged to the named OEMs, are cointegrated. The fact that prices paid by the named OEMs and plaintiffs are cointegrated speaks directly to my charge to determine whether defendants' conspiracy had an effect on the prices paid by plaintiffs for DRAM. The finding of cointegration indicates that there is a fundamental economic relationship between named OEM and plaintiff prices, and if that relationship is disturbed the two prices will change over time so as to return to that fundamental economic relationship. The presence of cointegration also confirms that the high correlations I found are not simply statistical artifacts due to trends in plaintiff and named OEM prices, as suggested by defendants' experts, but arise from a fundamental economic relationship. Cointegration further corroborates my opinion that defendants could not raise prices to the named OEMs without also affecting the prices paid by plaintiffs.

## IV.3. Price comparisons of additional DRAM products show that named OEM and plaintiff prices move closely together

(80)    In my initial report and in Section III of this report, I describe a number of features of the DRAM market that explain why prices paid by plaintiffs and the named OEMs for DRAM move closely together through time. This was corroborated by the visual inspection, correlation analysis, regression analysis, and cointegration analysis. What is apparent from the analysis is how closely

---

University Press: Oxford, at pp 1-2.

[70]    See Engle, R. F. and Granger, C. W. J., Co-integration and error-correction: Representation, estimation and testing, *Econometrica*, 55 (1987), 251-276.

[71]    A sample of this literature is identified below:

- The question of whether Alaskan North Slope oil is a distinct product market for antitrust purposes is investigated by John Hayes, Carl Shapiro and Robert Town in "Market Definition in Crude Oil: Estimating the Effects of the BP/ARCO Merger," *Antitrust Bulletin*, 2007.

- Frank Asche, Daniel V. Gordon, Rognvaldur Hannesson apply time-series regression methods to examine whether different whitefish markets are integrated. See, "Tests for market integration and the law of one price: the market for whitefish in France." *Marine Resource Economics*, volume 19, 195–210.

- Michael J. Doane and Daniel F. Spulber studied whether regulatory reforms led to greater regional integration of U.S. natural gas markets. See, "Open Access and the Evolution of the U.S. Spot Market for Natural Gas," *Journal of Law and Economics*, vol. XXXVII, October 1994.

- Frank Asche, Petter Osmundsen and Maria Sandsmark study the co-movement of energy prices in the U.K. See, "Is It All Oil?" CESifo Working Paper No. 1401, Category 8: Resources and Environment, February 2005, available at http://SSRN.com/abstract=667324.

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

IV. My statistical analyses show that named OEM
and plaintiff prices move closely together

the prices paid by the named OEMs and plaintiffs track one another before, during, and after the plea period. This is true across a number of dimensions, including which plaintiff is buying a given product, whether that product is asynchronous DRAM, SDRAM, or DDR, and across densities within the same technology.

(81)     This can be observed in Figures 21 to 28 in my initial report. I include Figures 21, 24, and 26 here as examples and for ease of reference.[72]

**Figure 54: Sun and named OEM purchases of 128/256MByte FPM-EDO modules (Figure 21 from my initial report)**



Source: Defendant sales data

---

[72]    Note that I adjusted the vertical scale on Figure 55 (Figure 24 from my initial report) and Figure 56 (Figure 26 from my initial report) to address the defendants' assertion that the scale in my initial figures diminished the variation in price movements in later years and highlight the similarities in the price movements.

---

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

IV. My statistical analyses show that named OEM
and plaintiff prices move closely together

**Figure 55: All American and named OEM purchases of 256Mbit SDRAM chips (Figure 24 from my initial report)**



Source: Defendant sales data

**Figure 56: Jaco and named OEM purchases of 512MByte DDR modules (Figure 26 from my initial report)**

Source: Defendant sales data

(82)    These figures clearly show the similarities in increases and decreases across plaintiff and named OEM prices. In Figure 56, four cycles of price increases and decreases are echoed in both series between November 2001 and June 2004. Both series begin increasing in October 2001, reach a peak and begin to decline in January/February 2002, increase through June/July 2002, decline again through November/December 2002, and so on through 2004. A similar example can be seen in Sun's price and the price paid by the named OEMs in Figure 54. Both series begin increasing around October 1998, both reach a peak and begin to decline in September 2000, and both have an uptick again between December 2001 and January 2002.

(83)    The similarities in price movements, however, are not limited only to the three figures reproduced here or eight figures from my initial report. In addition to these eight examples, I have compared named OEM and plaintiff prices for more than 60 of the largest products purchased by each of the plaintiffs from 1996 to 2004.[73]

---

[73]    The products selected comprised at least 1% of each plaintiff's purchases from 1996 to 2004 and had more than two years of data for the purposes of calculating the correlation.

(84)    Across products and plaintiffs, prices paid by the named OEMs and plaintiffs moved closely together through time. This is consistent throughout the DRAM market before, during, and after the plea period. As I did in my initial report, one way to measure similarities in price movements is by calculating a correlation coefficient. For the 63 products analyzed, the correlation is above 0.95 for 30 (nearly 50%) and above 0.90 for 44 (nearly 70%).

(85)    Defendants' experts, however, attempt to obfuscate this point by creating *hypothetical* price data and arguing that my analysis is not meaningful. These hypothetical price data, however, have no resemblance to actual DRAM prices paid by either the plaintiffs or the named OEMs, as defendants' experts have testified.[74] Therefore, these hypothetical examples are not probative to the core facts of this case, namely that DRAM prices paid by the named OEMs and the plaintiffs move closely together. In fact, as discussed in more detail in Section IV.7, standard statistical tests demonstrate that defendants' experts' hypotheticals are not probative of the issues in these cases.

## IV.4. Refinements to my regression analysis increase the accuracy of the predictions and provide further support for my conclusion

(86)    Sections VII.3 and VII.4 of my initial report include the results of my regression analyses that confirmed that prices for the named OEMs and plaintiffs move together to a striking degree and are cointegrated. The results in my initial report are reliable, grounded in well-accepted statistical methods, and sufficient to reach my opinion.

(87)    In response to defendants' experts' criticisms, I have further refined my regression analysis to potentially enhance its performance and bolster the accuracy of its predictions. Specifically, I modified my regression analysis to account for changes through time in the relative prices of DRAM products with different technologies. These refinements more directly capture price

---

[74]    See the deposition of Kevin Murphy (Rough) (April 24, 2008), 196:

"Q. If you could look at Exhibit 33 to your report, please. It's titled illustration of correlation effect. Do you have any evidence that the kind of shift in relative prices that you portray in this hypothetical example actually happened in the DRAM industry?

A.This was not intended to be a picture of the DRAM industry so no. This was intended to show what a correlation measure does when you have a movement in one series that's not captured by a movement in the other series even though both series are moving in the same direction over the longer term."

Similarly, Dr. Klein testified that his Exhibit 3 and 4 are "purely an illustrative hypothetical, and I wouldn't expect to see something like this" and that he "couldn't imagine more extreme hypotheticals than the ones used in his report" (Deposition of Benjamin Klein (Rough) (April 23, 2008), 222–223, 241–242).

changes over the lifecycle of each specific DRAM technology and further show that many of defendants' experts' criticisms are incorrect.[75]

(88)    I used the refined model specification to replicate the analyses from my initial report. Specifically, revised versions of my original Figures 31 and 32 are presented below as Figure 57 and Figure 58, respectively. All statistics from my original analysis were recalculated using the updated specification. As was the case before, each pair of prices is highly correlated and each pair of prices is cointegrated, indicating that the prices charged by defendants to the named OEMs move closely together with the prices defendants charged the plaintiffs. The finding of cointegration means that there is a fundamental economic relationship between named OEM and plaintiff prices.

**Figure 57: Average actual plaintiff prices vs. predicted plaintiff prices using named OEMs' pricing (using updated model)**



---

[75]    The model presented here contains marginal improvements over my initial model, which was reliable and relevant. Both approaches yield the same overall results and lead me to the same conclusions.

Rebuttal Expert Report of Robert C. Marshall, Ph.D.    IV. My statistical analyses show that named OEM and plaintiff prices move closely together

**Figure 58: Market basket price indices for plaintiffs vs. named OEMs (using updated model)**



(89)    The updated analysis leads me to the same conclusion as was obtained from my initial model—that the prices paid by the named OEMs and plaintiffs closely track each other. This is apparent from visual inspection of the figures, and confirmed by the statistical analysis. This analysis, therefore, confirms my original opinion that the cartel impacted plaintiff prices.

(90)    Since my initial report, I also have included additional sales data in the combined database used in my analysis. I have made several minor additions and enhancements to my underlying data, as described in Appendix B.[76]

(91)    I applied both of the updated regression analyses to the updated combined database. As I would expect given that I used approximately 90% of the available data at the time of my initial report, there is no material difference in the results. The results are shown in Figure 59 and Figure 60. There is no material change to the statistical tests, as both sets of prices are highly correlated and cointegrated.

---

[76]    The primary changes were to indentify additional product characteristics and include additional defendant-provided data in the combined database. See Appendix B for additional information regarding the updates to the data processing.

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

IV. My statistical analyses show that named OEM and plaintiff prices move closely together

**Figure 59: Average actual plaintiff prices vs. predicted plaintiff prices using named OEMs' pricing (using updated model and updated data)**



**Figure 60: Market basket price indices for plaintiffs vs. named OEMs (using updated model and updated data)**



(92) Some of defendants' experts suggested that I should have analyzed the data on sales to each plaintiff separately. Given the degree of price transparency in the DRAM market and other market facts, there is no more reason to expect effects of defendants' conspiracy to be limited to any one plaintiff than to the plaintiffs as a group. Nevertheless, I analyzed the relationship of actual prices paid by plaintiffs and predictions of those prices based on my regression analysis of OEM prices separately for each plaintiff. I found that the actual and predicted price series are highly correlated and cointegrated individually for each of the plaintiffs.

## IV.5. Named OEM and plaintiff prices return to their fundamental economic relationship quickly after disturbances

(93) In response to criticisms from defendants' experts, I have conducted an additional econometric analysis that measures the speed with which DRAM prices paid by the named OEMs and plaintiffs return to their fundamental economic relationship when this relationship is disturbed by some event in the market. One example of such a disturbance could be a price increase to one set of customers. My analysis shows that approximately half of any disturbance to the fundamental

relationship between named OEM and plaintiff prices typically disappears within three months, absent any additional disturbance. So even if a conspiracy were theoretically to increase only the prices paid by named OEMs in the first instance, market forces would cause this price effect to be quickly transmitted to the rest of the market.

(94)    My expanded analysis extends my regression analysis to examine in more detail the cointegration relationship between the pair of price series in Figure 57 and Figure 58. As noted by Elpida expert Dr. Klein, cointegration provides a framework for detecting whether prices have an economic relationship to which they return when disturbed. As Dr. Klein writes, "the difference between two series could deviate substantially, but move back together within some period of time."[77] Dr. Klein's report seems to imply that the time period of adjustment could potentially be long enough to allow the named OEMs to be impacted without any corresponding impact on the plaintiffs. However, this is an unsupported allegation. Dr. Klein does not analyze how long it takes for DRAM prices to "move back together" following some disturbance.[78]

(95)    My expanded analysis shows that the time for DRAM prices to "move back together" (in Dr. Klein's words) following some disturbance is quite short. Importantly, the majority of any initial disturbance to the equilibrium pricing relationship is transmitted within 3 or 4 months, and that the effects are almost completely transmitted after one year.[79] To the extent that the initial disturbance came from a shock to OEM prices caused by the conspiracy, plaintiffs would begin to feel its effect almost immediately, and the effects would be quite strong within just a few months.

(96)    It follows that defendants would have had to take extraordinary efforts to actively prevent their conspiracy from having effects across the broader market, including effects on prices paid by plaintiffs. Such efforts would result in lower profits for defendants, so defendants would not have incentives to narrowly restrict the impact of their conspiracy. Therefore, my expanded analysis confirms my earlier conclusion that defendants' conspiracy caused plaintiffs to pay higher prices for DRAM than they otherwise would have absent defendants' conspiracy.

---

[77]    Expert Report of Benjamin Klein, 36.

[78]    Related to this, Stigler and Sherwin (1985), relied on by Hynix's expert, Dr. Murphy, notes that disturbances to supply and demand "will create divergent price movements in parts of a market in the absence of perfect foresight." They note that these "divergent price movements will usually be limited in size and duration." Unlike Dr. Murphy, they recognize the possibility of temporary departures from equilibrium relationships within a single market.

[79]    This was computed using a standard statistical tool known as an "impulse response function" fit to the stationary errors from the cointegrating regressions. For details, see James D. Hamilton, *Time Series Analysis*, Princeton University Press, 1994.

## IV.6. Dr. Murphy's analysis of DRAM price ratios paid by OEMs and plaintiffs is inconsistent with authorities he cites and is inconsistent with his analysis of his own model

(97)   Dr. Murphy claims that my visual depiction of the levels of DRAM prices is misleading, and that I should have focused on price ratios to compare prices paid by the named OEMs and plaintiffs. He believes that the price ratio is "the economically relevant measure." And he cites the paper by Stigler and Sherwin (1985) to support his claim that "to the extent that relative prices fluctuate substantially, there is room for conspiracy to affect prices for one group and not the other."

(98)   Dr. Murphy does not say what he means by "room" or "substantially" and does not offer any statistical benchmark by which one might determine how much fluctuation is too much for his purposes. Nor does he offer any reasons for why a cartel that has "room" to affect prices for one group and not the other would be able to use that room, or why it would have incentives to do so. His argument that the fluctuations he observes are inconsistent with my conclusions depends on a very narrow view of markets in which prices are not allowed to depart from their fundamental relationship for any period of time. This is contrary to the view of price adjustments as described in Stigler and Sherwin (1985).

(99)   His "economically relevant" price ratio measure suppresses, and thus obscures, the most striking feature of the underlying data—the closely parallel movement in prices over time paid by named OEMs and by other customers over any period of more than a few months. Instead Dr. Murphy criticizes my analysis because relative prices fluctuate. But as I showed previously, statistical evidence shows that departures from the fundamental economic relationship of prices tend to be short-lived.

(100)  It is perfectly normal for there to be some temporary departures from perfect proportionality of prices. As noted by Stigler and Sherwin, "The relation between two prices within a single market will not be strictly constant over time: their prices will not be a constant or a constant proportion of one price." In fact, my cointegration analysis is a statistical analysis of the tendency of prices to return to their fundamental economic relationship following a temporary departure. This has direct implications for economic interpretation of the data:

> "If the prices in the two places have a measure of independence in the short run, but that independence is not large … the two are in one market. Moreover, even if pricing independence is substantial in the short run, neither significant

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 114 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.    IV. My statistical analyses show that named OEM and plaintiff prices move closely together

> monopolistic nor significant monopsonistic pricing is likely to occur in one area if large differences do not survive beyond the short run."[80]

(101) Despite this, Dr. Murphy reaches the conclusion that there is too much variation in the relative prices paid by OEMs and plaintiffs to support my conclusions. However, his own conclusion is based on no statistical analysis beyond visual inspection, and a comparison of the most extreme departures from pricing equality—the "range."[81]

(102) As further illustration of the flaws in Dr. Murphy's criticism, it is instructive to examine Dr. Murphy's own Exhibit 21. There, Dr. Murphy compares his measure of actual cost to predictions of cost he makes using his own statistical model. This is similar in spirit to what was done to construct Figures 31 and 32 of my initial report.[82] Examination of the actual and predicted costs in Dr. Murphy's exhibit shows that they share a significant downward trend. However, Dr. Murphy chose to exhibit them separately rather than converting to a ratio form as he does when criticizing my analysis of downward trending prices.[83]

(103) In Figure 61, I display the data from Dr. Murphy's Exhibit 21 in ratio form. It is clear from this graph that, in ratio form, the single month prediction errors in Dr. Murphy's Exhibit are unstable and exhibit very large swings. The predicted cost is sometimes more than twice the actual cost, and at other times drops well below the actual cost. The ratio changes by a factor of more than 3 over the range of the data, and shows a huge swing during 2001–02. Yet Dr. Murphy concludes that his model explains "much of the movements in cost over the period."[84] Dr. Murphy applies a

---

[80] Stigler and Sherwin at 561.

[81] Deposition of Kevin Murphy (Rough) (April 24, 2008), 186–187:

Q. Now, in your report, how do you measure the fluctuation of relative prices? A. Basically we did it graphically by looking at the actual movement over time in relative prices. Q. Any other way? A. I think we looked at the range of those movements, we've looked, you know, at other statistical measures but the primary one we used was graphics and range. Q. What statistical measures did you use? A. I think what we looked at was the distribution of relative prices and the percentiles of such distributions as well as the ranges of those distributions. The variance is also something you could look at. I don't recall whether we looked at that or not. Q. Where would we be able to find the statistical analysis you performed? A. I didn't rely on that for my opinion. What I relied on for my opinion were the range figures, which we do discuss in the report, and the graphical analysis that I presented in my report.

[82] There is an important distinction, however. Dr. Murphy's "predicted costs" are based on a statistical analysis of his "actual cost" data, so it is not very surprising if they tend to line up well. In contrast, whenever I compare prices for different customer groups in my report, the two price lines are based on separate sources of information about the prices paid. There is no reason arising from my methodology why my price series have to line up at all. Yet the two series move closely together.

[83] This is also true of other Exhibits in Dr. Murphy's report that he uses to justify his "simple" supply and demand model. See, for example, his Exhibits 14, 15, 16, 22, 24 and 25, none of which compare trending series in ratio form.

[84] See the Expert Report of Kevin Murphy, paragraph 108. While that paragraph claims that the predictions in his Exhibit 21 are based only on data from outside the conspiracy period, Dr. Murphy admitted in his deposition that his computer program in fact generated the predictions using the entire period of available data. Deposition of

double standard when he criticizes my price comparisons for showing similarly large swings at times. In neither case does Dr. Murphy offer any formal statistical analysis, or offer any standard for evaluating whether the ratios of "actual" and "predicted" prices or costs in his exhibits are too large or too small to support either his views or my own. His conclusions, apparently based only on visual inspection of these graphs, are subjective and inconsistent.

**Figure 61: Ratio of Dr. Murphy's Predicted and Actual Cost Measures, from Murphy Exhibit 21**



Source: Murphy Report.

(104)    Furthermore, Dr. Murphy's appeal to Stigler and Sherwin to justify his reliance on the price ratio as the relevant measure does not accurately represent their analysis. He claimed at his deposition that he is using "Stigler's measure."[85] However, despite this claim there is *not one* example in Stigler and Sherwin's paper in which those authors compare prices using a price ratio graph or statistic similar to the ones presented by Dr. Murphy in his report when he criticizes my analysis of prices. Instead *every* figure in that paper displays prices in levels, or in the logarithm of levels, as I did in my initial report, and in this report, and as is common in the economics profession.

---

Kevin Murphy (Rough) (April 24, 2008), 293-294.

[85]    Deposition of Kevin Murphy (Rough) (April 24, 2008), 185:

Q. Does Stigler's argument about relative prices of products also apply to relative prices paid by different groups of customers?

A. We're not really using Stigler's argument. We're using Stigler's measure. …

Furthermore, Stigler and Sherwin often display a set of similar prices by shifting one or more series vertically in a parallel fashion.[86] Such a shift completely obscures the price ratio, suggesting that those authors did not find a display of price ratios to be particularly instructive. Finally, Stigler and Sherwin, despite having a focus on statistical comparison of prices, do not present any statistical analysis of data using Dr. Murphy's preferred price ratio measure.

(105)    Likely this is because the focus in Stigler and Sherwin's paper, like my own in this case, is on parallel price movements, not perfectly stable price ratios: "The test of a market that we shall employ is the similarity of price movements within the market. This criterion captures the essential role of competition in dominating the price movements within each part of the market. …If we find closely parallel price movements, the loci of prices are in the same market."[87] They go on to note that "The parallel price movement test of market areas is equally applicable to competitive and monopolistic markets." [88]

(106)    Dr. Murphy claims further that, not only must the price ratio be stable, but apparently he believes that the ratio of prices displayed (in log form) in Figures 31 and 32 of my initial report should "remain close to one." When asked about this at his deposition, Dr. Murphy surprisingly claimed that he believes this is true because I have "normalized" prices so that named OEM and plaintiff prices must match perfectly at some unspecified moment in time.[89]

(107)    Dr. Murphy is mistaken. I have not applied any such normalizations, either explicitly or implicitly through my methodology. All of the prices in my Figures 31 and 32 are expressed in comparable

---

[86]    See, for example, their Figure 6, which shifts one price upward by 5 cents and another downward by 5 cents while leaving a third price unchanged. Such shifts cause the ratios of the three price series to change substantially, and to vary through time in ways that the original series do not. Apparently the authors found this acceptable for their purposes.

[87]    Stigler and Sherwin at 557.

[88]    Stigler and Sherwin at 557.

[89]    Deposition of Kevin Murphy (Rough) (April 24, 2008), 201 (following up on an initial question about using one as the benchmark at 199:10):

Q. Is it your understanding that Professor Marshall normalized prices in his work? A. In some cases where they use a price index, there is a kind of natural type of normalization that occurs. Depending on which those indices or commodity baskets are constructed, you have sort of an implicit normalization. Q. Does he say anywhere that he explicitly -- explicitly say anywhere that he normalized prices? MR. SIMMONS: Do you want to show him his report? THE WITNESS: In his report, for example, whenever you engage in a standardization exercise which is you take a bunch of products and you do like the Hedonic-type models that Professor Marshall does, there is an implied normalization based on what the reference group is in that Hedonic analysis. So whatever way in which that's done, there is going to be a normalization. You have to -- normalization in economics is nothing more than a choice of the two units in which something is measured. And there is going to be a choice in the units in which it's measured in any Hedonic model. You can make that explicit and say this or it can be implicit in the way in which you carry it out. Ultimately, the answer you come up with in terms of the movements in relative prices, though, will be invariant to that normalization. It will just change the scale, like switching from pounds to tons or something like that in the measurement of weight.

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 117 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.                    IV. My statistical analyses show that named OEM
                                                                        and plaintiff prices move closely together

units—(the log of) dollars per megabit of DRAM—without any need for normalizations to achieve comparability. If the prices paid by named OEMs for every DRAM product had been twice, or ten times, as high as they actually were, then this would have been reflected in an upward, parallel shift in the predicted price line for plaintiff transactions in my Figure 31, and in the OEM price index in my Figure 32. This is easily checked, but apparently Dr. Murphy did not do so. There is no reason why the ratio of prices paid by different customers, as measured in my analysis, must tend to exactly one at any moment in time, or even on average across time.

## IV.7. Hypothetical examples posed by defendants' experts are not supported by the data

(108)    As described above, the key question to be addressed in this case is whether defendants could increase the prices paid by the named OEMs without affecting the prices paid by plaintiffs. The analyses described in my initial report and extended herein are designed to address this exact question. My review of the characteristics of the DRAM market and my correlation and cointegration analyses show that there is a fundamental economic relationship between named OEM and plaintiff prices. This relationship ensures that plaintiff and named OEMs prices closely track one another. Moreover, the rate of adjustment analysis described in IV.5 shows that even if one of the series were to experience a disturbance (such as a price increase to only the named OEMs), the other series will be quickly impacted by such a disturbance. As a result, plaintiffs' prices would have been impacted by increases in prices charged to the named OEMs due to defendants' admitted conspiracy.

(109)    Defendants' experts, however, claim that their conspiracy was "targeted" solely at the six named OEMs and that the impact of their conspiracy was limited to only these six customers.[90] As part of their reports, several of defendants' experts have posed hypothetical examples based on data they have fabricated for purposes of their analysis. Defendants' experts use this "data" to allege that prices to one group of purchasers (representing, in their view, the named OEMs) increase by an explicit amount while prices to the other group (representing, in their view, the plaintiffs) remain at non-cartel levels.[91] One example from Dr. Klein's expert report is replicated below. Defendants' experts use my correlation and cointegration tests on their examples and claim that I cannot distinguish between different types of pricing regimes.

---

[90]    Note again that one corporate defendant (Elpida) and two individuals (D. James Sogas from Elpida, Thomas Quinn from Samsung) pled guilty to fixing prices charged to Sun, which is a plaintiff in these cases.

[91]    See, for example, Dr. Klein's Figures 3 and 4, Dr. Kalt's paragraph 155 and Figure 18, and Dr. Murphy's Exhibit 33.

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 118 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.    IV. My statistical analyses show that named OEM and plaintiff prices move closely together

**Figure 62: Figure 3 from Dr. Klein's expert report.**



Source: Expert Report of Benjamin Klein

(110)    First, as discussed above, it is important to note that these are not only just hypotheticals, but (as can be seen by comparing Figure 62 to the figures in Section IV.3) the price data defendants' experts have created for their hypotheticals have absolutely no relevance or relationship to actual DRAM prices or the similarities in the movements of prices paid by the named OEMs and plaintiffs. Drs. Murphy and Klein testified to this directly during their depositions.[92]

(111)    In fact, it is illustrative to consider why defendants' experts' would choose to use hypotheticals at all. If the prices paid by the named OEMs were impacted (as certain defendants have admitted in their guilty pleas) but the prices paid by plaintiffs were not, why do defendants' experts' not just

---

[92]    See the deposition of Kevin Murphy (Rough) (April 24, 2008), 196: "Q. If you could look at Exhibit 33 to your report, please. It's titled illustration of correlation effect. Do you have any evidence that the kind of shift in relative prices that you portray in this hypothetical example actually happened in the DRAM industry?

A. This was not intended to be a picture of the DRAM industry so no. This was intended to show what a correlation measure does when you have a movement in one series that's not captured by a movement in the other series even though both series are moving in the same direction over the longer term."

Similarly, Dr. Klein testified that his Exhibit 3 and 4 are "purely an illustrative hypothetical, and I wouldn't expect to see something like this" and that he "couldn't imagine more extreme hypotheticals than the ones used in his report" (Deposition of Benjamin Klein (Rough) (April 23, 2008), 222–223, 241–242).

use actual price data to make their point? The obvious reason is that actual prices paid for DRAM do not support their flawed arguments. Because they cannot show an elevation in one price series and not the other (or even increases in one that are not mirrored in the other), they fabricate their own data to offer an argument that supports their point, but that is unrelated to actual DRAM prices. This is misleading and has no relevance to the facts of this case.

(112)   There are standard statistical tests that are specifically tailored toward assessing the validity of defendants' hypotheticals. In all cases, these tests clearly distinguish between (a) defendants' experts' view that prices to the named OEMs increased as a result of defendants' admitted cartel prices while plaintiffs' prices did not and (b) the reality of DRAM prices during the plea period. In particular, the tests allow me to refute as irrelevant the hypothetical examples posed by defendants' experts that there was impact on the named OEMs prices and not on plaintiffs' prices.

(113)   I use a formal statistical test to assess whether named OEM prices during the plea period increased on average relative to those of plaintiffs. I take care to ensure that this test is statistically valid in the presence of cointegration among the series. To do so, I modified the regression analysis that I used to detect cointegration to include additional dynamic terms and also to allow for a shift in the average difference in price between named OEMs and plaintiffs during the plea period. The dynamic terms in this "dynamic OLS" model ensure that the test will be statistically valid in the presence of cointegration.[93] Since the regression model estimates the average change in the economic relationship between the two prices during the plea period, I can use it to conduct a standard statistical test to see if the data support defendants' experts' hypothetical scenario.[94] If the prices paid by the named OEMs did increase relative to plaintiffs' prices during the conduct period, I would expect to find a corresponding statistically significant upward shift in the relative prices paid by the named OEMs. Alternatively, if the estimated shift is not positive and/or is not statistically significant, this test would show that named OEM prices did not increase relative to plaintiffs' prices during the plea period.

(114)   The precise form of the regression equation I used is as follows:

$$P_t^{OEM} = \beta_0 + \beta_{\text{conduct}} + \theta P_t^{\text{plaintiff}} + \sum_{j=-p}^{p} \delta_j \Delta P_{t-j}^{\text{plaintiff}} + u_t \qquad (1)$$

---

[93]   Using dynamic OLS allows legitimate statistical inference to be made on the coefficients regarding average price impacts in the presence of cointegrated variables. This would not be the case with a simple OLS regression. See Section 14.4 "Cointegration," in James H. Stock and Mark W. Watson, *Introduction to Econometrics*, Addison Wesley, 2003, or chapter 19, "Cointegration," in James D. Hamilton, *Time Series Analysis*, Princeton University Press, 1994.

[94]   I am not suggesting the use of this regression model as a basis for computing damages in this case or in general.

where $P_t^{OEM}$ (the left hand side of the equation above) represents the DRAM prices paid by the named OEMs and $P_t^{Plaintiff}$ denotes DRAM prices paid by plaintiffs. The term $\beta_{\text{conduct}}$ is forced to zero outside the plea period, but is permitted to take any other constant value during the plea period. If defendants' experts' hypotheticals are correct and named OEM prices did in fact increase due to the conspiracy and plaintiffs' prices did not, I would find evidence of a positive and statistically significant value for the $\beta_{\text{conduct}}$ term during conduct period.

(115)   I tested the assumption (the null hypothesis, in statistical language) that the named OEM prices increased relative to plaintiffs' prices during the plea period using the actual and predicted plaintiff prices in Figure 57,[95] the OEM and plaintiff price indexes in Figure 58.[96] and the updated versions of these analyses as reported in Figure 59 and Figure 60. The statistical test clearly shows that the prices paid by the named OEMs during the plea period did not increase relative to the prices paid by the plaintiffs. These results provide evidence that the hypotheticals proposed by defendants' experts in no way reflect or are otherwise relevant to actual DRAM market prices.

(116)   Several defendants' experts claim that not only were plaintiffs not harmed by defendants' conspiracy, but in fact defendants' experts claims that plaintiffs *benefited* because the conspiracy "reduc[ed] the DRAM prices paid by the plaintiffs."[97] As I have described at length in this report and my initial report, there is no empirical evidence whatsoever that supports this assertion, and defendants' experts have not identified any in making their assertion. Dr. Klein measures his "percentage difference" in absolute value, so his suggested analysis would not allow him to determine whether plaintiffs' prices increased or decreased relative to named OEMs' prices. The dynamic OLS tests described above clearly show that the prices paid by the named OEMs during the plea period did not increase relative to the prices paid by the plaintiffs. This is equivalent to saying that that the prices paid by the plaintiffs did not decrease relative to the prices paid by the named OEMs. Not only is defendants' experts claim difficult to believe on its face, it is also contradicted by the evidence in these cases.

---

[95]   Predicted prices are prices plaintiffs would have paid assuming they obtained pricing on the same basis as the named OEMs, as discussed in Section VII.4.2.1 of my initial report.

[96]   Price indices reflect prices paid through time by the plaintiffs and the named OEMs for a fixed "market basket," as discussed in Section VII.4.2.2 of my initial report.

[97]   See Expert Report of Benjamin Klein at 25. See also Deposition of Benjamin Klein (Rough) (April 23, 2008), 68-69, 79-81. See also Expert Report of Joseph Kalt at 4, Expert Report of Kevin Murphy at 74, and Deposition of Kevin Murphy (Rough) (April 24, 2008), 165-166.

# IV.8. Defendants' experts' critiques of my price analyses are without merit

(117)   In their expert reports, defendants' experts make several critiques of my analysis. Each of these critiques is unfounded and misses the important issue at hand. I describe and address specific critiques below. My conclusions are based upon all of the analyses that I described in detail in my initial report. Defendants' experts' criticisms of any one specific analysis as being insufficient to reach my opinion ignores the body of evidence that led to my opinion.

### IV.8.1. Critiques related to correlations of price differences are without merit

(118)   Several of defendants' experts argue that a downward trend in DRAM prices through time makes the correlations between the named OEM and plaintiff price series artificially high and not probative. In doing so, defendants' experts take my correlation analysis out of context and miss the more important point. Based on the highly suggestive finding in the calculation of correlations, I continued with additional analyses appropriate to this type of time series data, specifically cointegration analyses. My cointegration analyses demonstrate that there is a fundamental economic relationship governing the named OEM and plaintiff price series, which supports the conclusion that conspiratorial price increases to the named OEMs affected plaintiffs' prices.

(119)   Dr. Rubinfeld (the expert for Samsung) argues that the trends in the named OEM and plaintiff price series indicate I should have focused my analysis on correlations of month-to-month changes in the prices, sometimes known as "first differences." But Dr. Rubinfeld notes in his own textbook that when series exhibit stochastic trends, "differencing may result in a loss of information about the long-run relationship between two variables."[98] He then asks

> Are there situations where one can run a regression between two variables even though both variables are random walks? There are. Sometimes two variables will follow random walks but a *linear combination* of those variables will be

---

[98]   It is well known to time-series econometricians that there are risks associated with first-differencing that go beyond mere loss of information. Differencing can introduce problems of its own in the form of poorly specified dynamic structure. See, for example, the discussion in David F. Hendry and Grayham E. Mizon, "Serial Correlation as a Convenient Simplification, Not a Nuisance: A Comment on a Study of the Demand for Money by the Bank of England," *The Economic Journal*, Vol 88, No. 351, (Sep., 1978), 549–563. Hendry and Mizon note at 552 that "over-differencing" of variables may result in "swapping one awkward problem … for another…"

---

> stationary. … If this is the case, we say that [the variables] are *co-integrated*
> …"[99] (emphasis in original)

(120)   Dr. Rubinfeld goes on to describe a statistical estimation approach, based on cointegration, that is virtually identical to what I use to analyze DRAM prices in this report, and in my first expert report. He also notes

> The theory of co-integration … is important for reasons that go beyond its
> diagnostic for linear regression. In many cases economic theory tells us that two
> variables should be cointegrated, and *a test for co-integration is then a test of the
> theory*. (emphasis added)

(121)   In suggesting the calculation of correlations of month-to-month price changes, Dr. Rubinfeld ignores features of the DRAM market and the data that make this approach problematic. For example, the named OEMs renegotiated prices as frequently as every two weeks, while the typical contract length for Sun is three months. Thus, month-to-month changes for Sun would be equal to zero for eight of every 12 observations in a given year, while each monthly observation for the named OEMs would typically be non-zero because they would reflect multiple recontracting periods. The lack of consistency in renegotiating prices should not impact whether prices move together, but it will artificially lead to lower correlations.

(122)   In addition, Dr. Rubinfeld suggests that I should focus on price changes in my correlation analysis because Dr. White used price changes for his analysis.[100] Dr. Rubinfeld mischaracterizes Dr. White's work. Dr. White's analysis is directed at a far different task than my analysis. I understand Dr. White's analysis to be a dynamic pricing equation that accounts for changes in cost and demand factors for DRAM over time, which has certain implications for how the equation should be estimated. My understanding is that Dr. White believes that some of the variables in his models are cointegrated, and he therefore uses an "error-correction" approach that involves levels of variables as well as differences. So it is simply wrong to suggest that Dr. White's methodology involve only price differences, and that they ignore the levels of the variables.[101]

---

[99]   See Section 16.4, "Co-integrated Time Series" in Robert S. Pindyck and Daniel L. Rubinfeld, Econometric Models and Economic Forecasts, Fourth Edition, Irwin/McGraw-Hill, 1998, at 513. Dr. Rubinfeld's observations are broadly applicable to co-integrated time series, whether they are "random walks" or not.

[100]   See Expert Report of Daniel Rubinfeld at 50, which questions my focus on correlations in the logarithm of prices rather than the "logarithm of price *changes*, which is the dependent variable…in Professor White's first stage analysis" (emphasis in original).

[101]   My understanding is that Dr. White models cointegrated series by taking advantage of the "Granger

### IV.8.2. Dr. Rubinfeld's correlation analysis is flawed and unreliable

(123)    In his Exhibit 31, Dr. Rubinfeld does various calculations using prices for SGI and for the named OEMs. He argues that his calculations are correlations and that they show SGI's price levels and those of the named OEMs are not highly correlated.

(124)    Despite his representations to the contrary, Dr. Rubinfeld's analysis over the "Entire Period" are not correlations. In fact, the numbers he labels as correlations are devoid of economic meaning. The description Dr. Rubinfeld provides of his procedure is vague and so hides the non-standard and inappropriate nature of his calculation.[102] Instead of simply ignoring the observations (month/year pairs) where one of the two price series is missing (as is standard practice in economics), Dr. Rubinfeld employs a non-standard and inappropriate two-step process. First, he assigns a zero to all observations where one of the two prices is missing and then he adds this large number of zeros to all observations where the data is complete. Only the latter data should be included in the calculation of the correlation.

(125)    The misleading nature of this non-standard and inappropriate analysis can be illustrated as follows. Consider 91 months of time series data for two data series where one or the other of the series is missing an observation for 58 of the months. Dr. Rubinfeld first assigns a zero to the calculation of the correlation for each of these 58 observations and then adds to these 58 zeros the calculation of a correlation for the 33 months where he has data for both price series. If the 33 observations have a correlation of 0.98 then his "Entire Period" analysis would calculate the correlation as $(0.98*33 + 0.0*58)/91 = 0.35$. This is exactly what he has done in Exhibit 31.[103] This calculation by Dr. Rubinfeld is non-standard, inappropriate, and has no probative value. Since the correlations were computed in the "Overlapping Periods" panels of Exhibit 31

Representation Theorem." This important result—part of the body of work for which Granger won the Nobel Prize—tells us that the evolution of cointegrated series cannot be modeled well using only differences of the variables in question. Rather terms known as "error-correction terms," which depend on the levels of the variables in question, must be included in an appropriate model to capture the tendency of the series to return to their fundamental relationship. This is precisely what Dr. White has done. (For a formal treatment of the error-correction representation of a co-integrated series, and for the Granger Representation Theorem, see James D. Hamilton, *Time Series Analysis*, Princeton University Press, 1994, at page 582.) In contrast, two random walks that are not cointegrated can be highly correlated in first differences, and the evolution of their first differences completely describes their behavior. But such series have no tendency to exhibit any stable economic relationship.

[102]    In the notes to Exhibit 31, Dr. Rubinfeld states "When either GAMs or SGI has a missing value in a given month, correlation is set to zero for that month." Since in this data an individual month does not have its own correlation, it is unclear from Dr. Rubinfeld's statement what procedure he used.

[103]    An alternative explanation of Dr. Rubinfeld's non-standard and inappropriate calculation is that he calculated a correlation for all observations where he had complete data (33 months in this example) and then scaled it down by the proportion of months where he had complete data (33/91 months). Again, viewed in this alternative way, the calculation is non-standard, inappropriate, and of no probative value.

Case 4:06-cv-01665-PJH   Document 430-3   Filed 10/02/08   Page 124 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.                IV. My statistical analyses show that named OEM
                                                                    and plaintiff prices move closely together

correctly, the inappropriate calculation in the "Entire Period" panels reflects a selected methodology, not computational error.

(126)   Dr. Rubinfeld's correlations over the "Overlapping Period" between SGI and the named OEMs are not substantially different than mine, and are near perfect correlations for both SDRAM and DDR over the entire data range. As previously noted, the value of Dr. Rubinfeld's calculations based on monthly price changes are limited because of a number of issues, including differences in contract lengths,[104] large changes in price levels over time, and missing data, which as Dr. Rubinfeld notes in his report (in paragraph 272) is a particular issue with SGI. In addition, one would expect correlations to be lower in differences, and Dr. Rubinfeld admits this himself.[105] My cointegration analysis captures the information included in price changes in a reliable way.

### IV.8.3. Critiques related to correlation not implying causation are without merit

(127)   It is well known among economists that, by itself, "correlation does not imply causation," and defendants' experts misconstrue the point of my analysis in this regard. My charge is (and the analyses performed to address it are) not intended to demonstrate that increases in prices paid by the named OEMs *caused* plaintiffs' prices to increase. I was not asked, nor was it necessary to ask, whether there is a causal link between prices paid by the named OEMs, on the one hand, and prices paid by plaintiffs on the other hand. Stating that this question is essential to my charge, as defendants' experts have done, suggests a fundamental misunderstanding—or mischaracterization—of my opinion and indicates an inappropriate and narrow view of how economics and statistics can be helpful in this case.

(128)   More importantly, what my analyses do show is that the prices of the named OEMs and plaintiffs track one another through time and, to the extent that there are short-run deviations they are quickly brought back to this relationship by their underlying economic forces. My analysis shows that this is a fundamental characteristic of the DRAM market that exists before, during, and after the plea period. This conclusion is supported by many factors, not simply the fact that prices are correlated with one another. This relationship between the prices supports the conclusion that prices for plaintiffs increased as prices paid by the named OEMs increased and for the same underlying reason—defendants' cartel. Because of this relationship, defendants' admitted cartel caused prices paid by plaintiffs to increase, not just the prices paid by the named OEMs.

---

[104]   If a contract length is greater than one month, price changes across months within the contract period will be zero.

[105]   See Deposition of Daniel Rubinfeld (Rough) (April 25, 2008), 163-164.

### IV.8.4. Using all of the available data is appropriate

(129)   Defendants' experts claim to provide several reasons why I should have done my statistical analyses over only the plea period and also purport to show that the correlations are not "as high" when focusing strictly on the plea period. They point to ongoing technological development of the DRAM industry and the resulting downward trend in prices which, according to defendants' experts, highly influences and/or biases the statistical analyses in my favor.

(130)   I fundamentally disagree with defendants' claims that calculating the correlations from 1996 to 2004 is misleading and that it would have been more informative to focus only on the plea period. In order to address whether defendants were able to move named OEM prices separately from plaintiff prices, it is important to understand whether prices paid by the named OEMs and the plaintiffs move together over the entire period. Limiting the correlation analysis to only the plea period ignores a substantial amount of relevant data for answering this question. When looking at prices during the plea period, it is highly relevant to know that plaintiff and named OEM prices track one another before and after the plea period.

(131)   In addition, the analysis described in Section IV.7 shows that the prices charged to the named OEMs did not increase relative to plaintiffs' prices during the plea period. As discussed above, defendants' experts were forced to resort to hypothetical prices to make their point rather than rely on actual DRAM prices because there is no evidence that the situation they described ever occurred.

(132)   Even though I do not believe it is appropriate to do so, calculating correlations on only the plea period nevertheless proves to be a trivial change and demonstrates that my results are highly robust. For example, Nanya's expert Alan Cox performed the calculations and reports (in a footnote) that over the entire 1996 to 2004 time period, the correlation between the two price indexes in Figure 31 is 0.99, and it nominally "falls" to *0.96* for the plea period only. The same is true for the price indexes in Figure 32, where the correlation for the entire time period is 0.99, and it "falls" by an even smaller amount to 0.97 for the plea period only.[106] While it is true that the correlations are lower during the plea period, the plea-only correlations are still exceptionally high relative to any objective standard of the discipline.

---

[106]   See the Expert Report of Alan Cox, p. 26, footnote 84.

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

# V.     Defendants' arguments are inconsistent with the realities of the DRAM market

## V.1. Introduction

(133)    Defendants' claim that their admitted conspiracy to fix DRAM prices affected only six particular customers is fundamentally inconsistent with the economics of the DRAM market. First, many of the individuals responsible for setting the prices for the named OEMs during the conspiracy period were also responsible for setting the prices offered to other customers, including certain of the plaintiffs. It is not credible that these individuals ignored pricing information from their co-defendants when setting prices offered to the named OEMs *and* defendants' other customers, including plaintiffs. Second, there is evidence that defendants explicitly coordinated on prices to other customers besides the named OEMs, including certain of the plaintiffs. Third, the "Kill Hynix" period provides a natural experiment that confirms that prices move together through the DRAM market, even in the rare instance when that movement is directly contrary to defendants' profit-maximizing incentives. In total, these factors show that an increase in prices paid by the named OEMs would have impacted prices throughout the market, including those paid by plaintiffs.

## V.2. Defendants' plea agreements are not descriptions of the economics of the DRAM market and defendants' incentives

(134)    Defendants in this matter have argued that their admitted illegal conduct, targeted strictly at six (and *only* six) specific computer manufacturers (IBM, Dell, Compaq, HP, Apple, and Gateway), impacted only these six specific computer manufacturers, and had *no* impact on other customers.[107,108] Defendants' experts go to great lengths to reiterate this point (despite its lack of economic content) and make several arguments about why this must (in their opinion) be the only possible impact of the conduct described in defendants' guilty pleas.[109]

(135)    Defendants' negotiated plea agreements, which were jointly accepted by the defendants, the Department of Justice, and ultimately the Court, do not constitute a description of the economics of the DRAM market. The Department of Justice may have accepted this plea for many reasons,

---

[107]    As an aside, note that the defendants generally ignore the fact that several of these computer manufacturers (i.e., Dell, HP, and IBM) also manufacture workstations and servers that compete directly with companies such as Sun in the downstream market.

[108]    Importantly, defendants' experts' all but ignore the fact that Elpida's corporate plea, plea agreement of James Sogas, Elpida's Vice President of Sales, and the plea agreement of Thomas Quinn, Samsung's Vice President of Marketing for Memory Products, all explicitly describe illegal collusive behavior targeted at Sun.

[109]    To the extent they acknowledge the pleas at all. For example, Dr. Topel states that "there is no material evidence that Plaintiffs (or anyone else) were damaged by paying higher prices during any period at issue in this case" (Expert Report of Robert Topel, 29). This is in clear contradiction to Hynix's own plea agreement.

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 128 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.          V. Defendants' arguments are inconsistent
                                                                with the realities of the DRAM market

one of which could have been that the majority of price-fixing communications between the defendants concerned the six named OEMs. Even if this were true, it does not mean that no other purchaser was adversely affected by defendants' conspiracy—nor do any of the guilty pleas so limit the impact of defendants' admitted cartel. In fact, the pleas seem to acknowledge that defendants' cartel did not affect only the named OEMs. A number of the pleas indicate that the agreement to fix prices to the named OEMs was the "*primary* purpose" of the conspiracy, which necessarily implies it was not the *only* purpose.[110] Similarly, the pleas never identify the named OEMs as the *only* victims of the conspiracy, and they indicate that the named OEMs were "*directly* affected" by the conspiracy, which implies that other purchasers may have been indirectly affected by the conspiracy. This in turn is consistent with the fact that the named OEM prices move together with the prices of other customers, including plaintiffs. As I have shown in my report, the conspiracy elevated prices to the plaintiffs as well, which is not inconsistent with the guilty pleas.

(136)    If defendants were going to work in opposition to the underlying economics of the DRAM market and attempt to limit the impact of their conspiracy exclusively to the six named OEMs, they would have had to take costly measures that would have substantially reduced the financial return to their collusive activities. There is no evidence that defendants did so. Dr. Murphy wrote an article in the March 2008 issue in *GCP* (co-authored with Dr. Topel) that criticized an analysis (in the context of a proposed merger) as being problematic because it assumes that firms would forgo profits without providing either empirical evidence or an explanation as to why. Yet this is exactly what defendants' experts implicitly claim by arguing that defendants limited the scope and, in particular, the impact of their illegal conduct exclusively to the six named OEMs. They argue that defendants would not have pursued obvious collusive gains, yet they provide no empirical evidence or explanation as to why. Dr. Klein, for instance, testified that if defendants could fix the price of all products, they would do so. He does not provide any economically reasonable explanation for why defendants would have strictly fixed prices to the named OEMs.[111] There is no reason to believe that defendants' cartel would forgo the incremental profits through such a costly and artificial restriction, especially on the volume of products purchased by large buyers such as Sun, which purchased on average nearly as much DRAM as, if not more than in some cases, the named OEMs.

---

[110]  See, e.g., plea agreement of Elpida Memory, Inc. in *United States of America v. Elpida Memory, Inc.* at 4 and plea agreement of Hynix Semiconductor Inc. in *United States of America v. Hynix Semiconductor Inc.* at 3-4

[111]  "Q. Do you have any opinion as to why the members of the conspiracy would agree to fix the price of SDRAM and DDR sold to the named OEMs but not EDO? THE WITNESS: When you say any reason, I mean if they could fix the prices of everything, they would fix the prices of everything." (Deposition of Benjamin Klein (Rough) (April 23, 2008), 169–170).

(137)   The named OEMs renegotiated DRAM prices on a biweekly or monthly basis. As a result, the named OEMs were constantly analyzing and negotiating prices for DRAM, and were among the most informed customers about DRAM prices among those customers with whom defendants interacted. Since the named OEMs frequently renegotiated prices, defendants needed to be and were in almost constant communication with one another regarding (a) what prices were being charged in the market generally and to particular customers and (b) what prices to charge to the named OEMs for future purchases in order to fix prices effectively. This is apparent in the factual record in these cases through the large number of emails among defendants discussing prices as well as through the transcripts from the Swanson trial.[112] Senior executives for defendants requested information about competitor prices, received it from either their direct contacts at competitors or through their subordinates, and then used it when making final decisions on prices.[113]

(138)   Under defendants' theory, while they were in regular communication with one another about prices to charge to the named OEMs, they either (a) ignored the possibility of raising prices to other customers, (b) never discussed how their agreements would (or did) effect market-wide prices, or (c) specifically took steps to ensure that prices to other customers did not increase. All these interpretations are inconsistent with the basic economics, and are in direct contradiction to the evidence in the record. One example noted in my initial report was an email from Yeongho Kang of Samsung (who pled guilty to fixing DRAM prices and served a prison sentence) stating: "Perhaps [as] an after effect of the sudden raising of the price yesterday, today's American market is very quiet…For the moment, [Hynix has] agreed to operate this week at the [specified prices]. M Company [Micron] also says that they would participate in raising the spot price." Of particular relevance is that Kang does not identify any particular companies or sets of companies (including the named OEMs) as a target for the "raising of price," yet discussed the "American market." In his response Il Ung Kim (who also works at Samsung and pled guilty) notes the reaction of module makers and the "channel."[114]

---

[112]   The record is in spite of the fact that defendants have admitted that a large percentage of cartel communications happened over the telephone. See, e.g., Defendants Infineon Technologies North America Corp.'s and Infineon Technologies AG's Supplemental Response to Plaintiffs' Second Set of Interrogatories at 12: "Infineon understands that these [pricing-related] communications were primarily by telephone."

[113]   See, e.g., plea agreements of Sun Woo Lee (Samsung) at 3-4, Il Ung Kim (Samsung) at 3-4, Peter Schaefer (Infineon) at 3-4. See also, e.g., testimony of Kenneth Heller of Hynix during the Swanson trial at 539-543. See also the deposition of James Elliott, Samsung (Rough) (December 4, 2007), 68-69:

"Q. Were you asked to exchange -- were you asked by your superiors at Samsung to engage in these communications with competitors regarding production and pricing? THE WITNESS: Yes."

[114]   SSI-0020038689–90. These documents were translated by a Certified Court Interpreter/Translator and are available via PACER for case 3:06-cr-00692-PJH at document 200–9.

(139)    Defendants' experts ignore the fact that the named OEMs had the ability to observe prices for different types of purchasers in almost real time. One of these potential sources is the *DRAM Market Advisor* report printed by defendants' own expert, Victor de Dios. In his deposition in the related MDL proceeding, de Dios confirmed that defendants were clients of his during the conspiracy.[115] Several defendants have testified that they subscribed to and referenced materials from de Dios and Associates as part of their business. In the *DRAM Market Advisor*, de Dios reports prices separately for many different DRAM chips and modules for "major customers," "second-tier customers," and the "spot channel."[116] The availability of these price data allowed the named OEMs to track and compare their prices to those paid by similarly situated customers (i.e., "major customers")[117] and to other customers in the market.[118] It simply is not credible to believe that the named OEMs would not have noticed that their prices were increasing relative to those paid by the "second tier" customers and those prevailing in the spot market, were this to have occurred. As defendants themselves have testified, purchasers used trends in the spot market and other publicly available prices as part of their negotiations, and defendants seem to ignore the possibility that they would do so here.

## V.3. Defendants' organizational hierarchy supports the fact that named OEM and plaintiff prices moved together

(140)    Another characteristic of the DRAM industry that suggests defendants did not raise prices only to the named OEMs is defendants' organizational hierarchy. Defendant employees with price-setting authority and individual account managers frequently oversaw pricing to both the named OEMs and to many other customers other than the named OEMs.

(141)    Defendant testimony confirms that the account managers had frequent team meetings in which pricing across customers was discussed among the staff. For instance, Samsung's Mike Bocian, Samsung's VP of Sales and Marketing for the Global Accounts, testified that Samsung executives would share information gained from co-defendants during weekly executive meetings.[119]

---

[115]    See the Deposition of Victor de Dios (October 31, 2006), 17–18, 23, 27 and Deposition of Victor de Dios (Rough) (April 29, 2008), 38.

[116]    I understand the *DRAM Market Advisor* was published monthly starting at least as early as July 1995 and switched to a biweekly publication schedule around January 2000.

[117]    As noted earlier, Samsung, Hynix, Infineon, and Elpida all classified Sun in the same group of large customers as many, if not all, of the named OEMs. See the deposition of Yeongho Kang, Samsung (November 27, 2007), 42; Deposition of Hirohisa Ueno, Elpida (December 14, 2007), 63; Deposition of Nick LaHerran (December 11, 2007), 100; and Deposition of Richard Costa, Infineon (November 13, 2007), 11–13.

[118]    During his MDL deposition, de Dios attempted to describe his price data as not entirely accurate or reliable. Regardless, the named OEMs and other purchasers could also use sources like DRAMeXchange to confirm prices.

[119]    Deposition of Michael Bocian, Samsung (December 6, 2007) at 57–59: "Q. Now, in your position when you were

---

Participants in these meetings included individuals whose primary responsibilities were for the "regional accounts," which include plaintiffs SGI and Unisys, as well as individuals responsible for the "global accounts," which included some of the named OEMs and also plaintiff Sun.[120] Bocian himself was responsible for overseeing the Apple, Sun, Cisco, IBM, HP, Compaq, Dell, Gateway, and Intel accounts.[121] Because co-defendants' pricing information was shared regularly among individuals with responsibilities across Samsung accounts, it is not reasonable to assert that pricing information gained from co-defendants would only have been used in setting prices to certain Samsung accounts. If Samsung employees were using this information from its co-defendants to internally justify and implement price increases to the named OEMs, it is not reasonable to assert that these employees would decide to maintain lower prices for a subset of the customers for which they are responsible. It also is illogical that Bocian or other Samsung executives would have used pricing obtained from their co-defendants when negotiating prices with the named OEMs, yet ignored this information when negotiating prices for Samsung's other customers.

(142)    Even if one were to assume for the sake of argument that defendants exchanged price information solely for the purpose of fixing prices to the named OEMs, it is not credible to assert that the individuals who participated in those price exchanges, or otherwise received competitors' pricing information, did not use that information when setting or negotiating prices for customers other than the named OEMs, for whom they also were responsible. The fact that these individuals were responsible for pricing for both the named OEMs and other customers, including certain plaintiffs in some instances, is consistent with my conclusion that defendants' conspiracy affected prices to plaintiffs.

(143)    Similarly, account managers with responsibility for the named OEMs and other customers used the prices being offered to the largest customers, including the named OEMs, in determining

---

at Samsung, were you aware that other representatives of Samsung were exchanging competitive information with Samsung's competitors in the DRAM market? A: Yes. Q. And how would you become aware of those communications? A. Well, from the day I started, in briefing meetings, people would stand up and give competitive reports....Q...you said that from the day you joined in these briefings, information obtained from competitors was shared at these meetings. Did that continue throughout your tenure at Samsung? A. Yes." Bocian also identified include Thomas Quinn, who pled guilty to price fixing, as one of the participants in these weekly executive meetings.

[120]    In his initial report, Samsung expert Daniel Rubinfeld writes that Samsung considered Dell, Apple, IBM, Compaq, HP, Sun, and sometimes Gateway "global accounts" (GAM). See the Expert Report of Daniel Rubinfeld, 5. Dr, Rubinfeld's errata states that Samsung only "sometimes" considered Sun to be a GAM, while Gateway was always considered a GAM. This is contradicted by internal Samsung documents. See, e.g., SSI-0005240279–81: "Global Accounts restructure: GAM's under YHPark & Mike Bocian: Apple, Compaq, Dell, HP, IBM & Sun. Cisco, Gateway, & Intel moved (or will be moving) to HM Kim's & John Park's organization of telecom & regional accounts."

[121]    Deposition of Michael Bocian, Samsung (December 6, 2007), 23–24.

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 132 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.    V. Defendants' arguments are inconsistent
with the realities of the DRAM market

prices for Sun. For instance, Nick LaHerran, who managed both the Sun and Apple accounts while he worked at Hynix, testified that Hynix considered "what other customers were paying" when they made pricing decisions for Sun.[122] He also testified that the criteria that Hynix used to determine the price to Apple was the same as the criteria that Hynix used to determined the price to Sun.[123] Apple is among the named OEMs identified in the guilty pleas as victims "directly affected" by defendants' conspiracy. Mr. LaHerran also answered "yes" when he was asked whether he suggested in an email that "Apple was a benchmarking price for [pricing] information for Sun."[124] This testimony shows how actions of the cartel to raise prices one of the named OEMs impacted Sun. Defendants' experts have ignored this and similar evidence that directly contradicts their position.

## V.4. Defendants' cartel communications extend beyond the named OEMs

(144)    There also is evidence in the record that disputes the assertion that defendants' conduct was strictly targeted at the named OEMs. For example:

- Internal Elpida emails confirm that defendants Hynix, Samsung, and Infineon were cooperating to raise spot market prices for upcoming contract negotiations.[125]
- Samsung's Yeongho Kang admitted that his "primary focus [in pricing communications with other conspirators] was to stabilize the market for the regional accounts because the other functions, pricing functions for global accounts" were not his responsibility.[126] Similarly, in a series of January 2002 emails, Samsung executives discuss shifting business between various customer groups to keep prices elevated across groups.[127]
- A Mitsubishi email from late June 2000 indicates that defendants coordinated on pricing to EMC, stating, "Samsung is raising pricing as follows:…64M EDO from $13.00 to $14.00…Further detail for you. Samsung backlog on EDO will remain at $14.00 while any

---

[122]    "Q. In addition to the price targets from customers, what other factors were considered in that discussion or those discussions [with Mr. Chung about Sun price]? A. What other customers were paying. Q. Other customers of Hynix? A. Yes. Q. Other customers of other suppliers? A. I would presume that those customers would have other suppliers." (Deposition of Nick LaHerran, (December 11, 2007), 54).

[123]    "Q. Did the criteria that you used to determine the price that Hynix would quote Apple differ from the criteria used for determining the price you would quote Sun? A. In general, it was the same criteria." (Deposition of Nick LaHerran, (December 11, 2007), 61).

[124]    Deposition of Nick LaHerran, (December 11, 2007), 169-170.

[125]    See, e.g., EMUS155223–24 at 24.

[126]    Deposition of Yeongho Kang, Samsung (November 27, 2007), 240.

[127]    SSI-0005238446–49.

Case 4:06-cv-01665-PJH    Document 430-3    Filed 10/02/08    Page 133 of 397

Rebuttal Expert Report of Robert C. Marshall, Ph.D.    V. Defendants' arguments are inconsistent
with the realities of the DRAM market

new orders will be accepted at $15.00…The pricing I provided came directly from Samsung, not EMC."[128]

- A Hynix email from April 29, 1999, indicates that defendants coordinated on pricing to plaintiff Sun and other named OEMs, stating, "Please verify our competitor's current and May 64M EDO Price of IBM, Compaq, Dell, Gateway and Sun-Mitac. We will use this informatin [sic] to decide our May EDO price."[129]

- A Hynix email from May 22, 2001, with subject "Samsung Disty pricing to All American…" indicates that defendants coordinated on pricing to plaintiff All American. The email lists prices, "8Kx16 [sic] SDRAM $3.90 16Mx16 SDRAM $9.00 It sounded kind of real when they said it to me this morning."[130]

- An Elpida email from March 27, 2002, with the subject "April Pricing for SGI and Juniper" indicates that defendants coordinated on pricing to plaintiff SGI and another customer. The email states, "We need to get competitor's input as usual, if we need to go below following [sic] price."[131]

- In its plea agreement with the U.S. Department of Justice, Elpida admitted that its "employees had discussions and reached agreements with employees of its coconspirator on how it would allocate and divide a bid offered by Sun Microsystems in an auction on or about March 26, 2002. [Elpida] and its coconspirators submitted bid proposals to Sun Microsystems for a bid on a 1 GB NG DIMM lot to achieve that result, including submitting complementary bids to ensure the success of their agreement."[132]

- Two defendant executives also pled guilty to reaching agreements related to Sun Microsystems. Thomas Quinn of Samsung pled guilty to reaching agreements to coordinate on a bid offered by Sun Microsystems in an auction on or about December 5, 2001.[133] D. James Sogas of Elpida pled guilty to having meetings and discussions and reaching agreements with his coconspirators on how they would coordinate bids offered by Sun Microsystems in auctions on or about December 5, 2001 and March 26, 2002.[134] Sogas also admitted that "[he] and his coconspirators submitted bid proposals to Sun Microsystems for bids on two separate…lots to achieve that result, including submitting complementary bids to ensure the success of their agreement."[135]

---

[128] MITSSUN00136120–23.

[129] HSA 00723030.

[130] HSA 00133914.

[131] EMUS 744085.

[132] March 22, 2006 Plea Agreement of Elpida in *United States of America v. Elpida Memory, Inc.,* at 4–5.

[133] See November 8, 2006 Plea Agreement of Thomas Quinn in *United States of America v. Thomas Quinn* at 4.

[134] See December 13, 2006 Plea Agreement of D. James Sogas in *United States of America v. D. James Sogas* at 4.

[135] See December 13, 2006 Plea Agreement of D. James Sogas in *United States of America v. D. James Sogas* at 4.

(145)    Taken together, these factors suggest that defendants' experts' proffered theory about the scope of defendants' cartel is not credible and that customers other than the named OEMs, including the plaintiffs in this matter, paid higher prices as a result of defendants' cartel.

## V.5. Additional evidence why prices move together: the "Kill Hynix" period

(146)    Defendants' experts in this case argue that the impact of defendants' conspiracy was somehow limited to the named OEMs. This implies that defendants could somehow price differently to plaintiffs SGI than they did to the named OEMs. Defendants' experts' claim, however, is contradicted by the evidence and their other arguments associated with the so-called "Kill Hynix" period. Under defendants' experts' theory, the defendants (other than Hynix) would have had strong incentives to lower prices only to their customers who were purchasing from Hynix. However, evidence shows that those suppliers did not lower prices only to customers also purchasing from Hynix because they were unable to do so.

(147)    As Hynix's expert Kevin Murphy writes, "the term 'Kill Hynix' is shorthand for a period during which there were communications among Hynix's rivals about lowering prices in order to cause Hynix financial distress."[136],[137] Defendant documents and deposition testimony confirm that this coordinated effort during this period between multiple defendants was a strategy meant to drive Hynix out of the market.[138] During this period, however, "Hynix did not sell many other products

---

[136]    See the Expert Report of Kevin Murphy, 6, footnote 9.

[137]    In the Joint Sentencing Memorandum filed by the United States and Hynix on May 11, 2005, the parties carve out October 2000 and November 2001 because "of factors unique to Hynix." This is far longer than the period identified by Dr. Liu on behalf of the class plaintiffs (April 2001 to October 2001). I note that neither Murphy nor Topel provide any specific dates. According to notes from the Department of Justice's interview with D.S. Kim of Hynix, Hynix's competitors worked together to kill Hynix from May to July 2001. See DOJ-DRAM-009512 from the records in the Swanson criminal trial (3:06-cr-00692-PJH).

[138]    Examples include: *United States v. Gary Swanson,* vol. 7, CR 06-0692. 1241–1242 (Cross examination of Micron's Mike Sadler pg. 1241–1243, "Q: And in your discussions with Mr. Schaefer of Infineon, did he and you discuss that the timing of proceeding on trade proceeding against Hynix was important because Hynix was looking for new money and that trade proceedings against Hynix might disrupt Hynix's ability for refinancing? A: I recall that… Q: Do you recall that one of the subjects that was discussed in these meetings, 2001, 2002, at a high level between Samsung and Micron was consolidation in the industry. A: Yes. Q: And consolidation in the industry…meant removing players from the market? A: …correct. Q: And the weakest player at that time was…Hynix, right? A: That was my view, correct."); 30(b)(6) deposition of Heinrich Florian, Infineon (May 9, 2006), 211: "Q: Did you attend the meeting with Mr. IU Kim and other around this time? A: Yes. Q: What did you discuss at that meeting? A: I think that was the meeting when IU Kim transferred the message on killing Hynix no more working, and this was the signal to me for the price increase."); ITAG-00018846 (Nov. 9, 2001 Infineon email, "Samsung and Micron have kept prices on an artificially low level in order to put more pressure on Hynix … As Hynix gor[sic] financial support, the strategy of Samsung/Micron might have been changed and they started to strengthen their own finance by increasing prices."); 30(b)(6) deposition of Farhad Tabrizi, Hynix (April 4, 2006), 61: "Q: What was the market situation at the time with respect to DRAM? A: It was pretty bad. And a lot

to Sun," according to Hynix's own expert.[139] In fact, Hynix's expert claims that Hynix could not even supply to Sun during this period.[140] Even if one were to *assume* for purposes of this discussion that Hynix could not supply to Sun, the question becomes why would the suppliers that coordinated to "kill Hynix" lower prices to Sun (which they did) given that Sun purportedly was not purchasing and could not purchase DRAM from Hynix? If it were true that Hynix could not sell DRAM to Sun, the cartel would have had every incentive to maintain elevated prices for Sun since Hynix could not have undercut the other defendants and take some of Sun's business. Defendants had every reason to maintain higher prices for Sun since, after all, higher prices for Sun would have resulted in increased profits.

(148)    The answer is because these assertions are *not* true, and thus the suppliers could not reduce prices to those customers purchasing from Hynix without also lowering prices to Sun and other customers in the market. Sun's prices did fall substantially during the "Kill Hynix" period, just as prices fell to the named OEMs and the other plaintiffs.[141] This is inconsistent with defendants' experts' arguments and consistent with the facts I have described—defendants were unable to maintain higher prices for one customer when they had every incentive to do so. If defendants did not maintain higher prices for Sun when it could, it is difficult to believe that defendants would maintain lower prices for Sun during periods in which they were conspiring to elevate prices other customers in the market. This reinforces the fact that prices paid by plaintiffs and the named OEMs move closely together.

---

of these companies, Samsung, Micron, Mitsubishi, they wanted to kill Hynix. There was a rumor that these companies trying to kill Hynix because if they killed somebody, then there will be less supply, then the market situation will get better."); ITAG-00016983 (Oct. 18, 2001 Infineon email with the subject "can't you guys finish this off??", "Unfortunately we cannot stop this but we are trying to show to their investors that there is no chance for Hynix to survive and them to return their money. That's all I can say in an email!!").

[139]   See the Expert Report of Robert Topel, 19, paragraph 32.

[140]   See the Expert Report of Kevin Murphy, 19–21, and the Expert Report of Robert Topel, p. 19–21. Dr. Murphy claims in his report that "Sun made it clear that it did not want Hynix as a strategic supplier" (Expert Report of Kevin Murphy, 40). While I use this assertion for purposes of the discussion, I explicitly note that, based on my review of the factual record, I do not believe nor accept that Hynix was not or could not have been a viable supplier for Sun during the "Kill Hynix" period or at any other time.

[141]   As Rubinfeld wrote in his expert report, "the impact of these price wars was not limited to commodity DRAM products. For example, over the course of one year (2001) alone, SGI found that the prices it paid for its custom memory boards fell by about 75%." See Expert Report of Daniel Rubinfeld, 22.

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

# VI.  Response to defendants' other critiques

## VI.1. Introduction

(149)   In addition to those addressed above, defendants' experts have made several other criticisms of my work. These criticisms miss the important points, are based on faulty assumptions, or ignore importance evidence that contradicts the argument. These are addressed in turn below.

## VI.2. Despite Nanya's claims to the contrary, there is ample evidence that Nanya was part of the cartel

### VI.2.1. The evidence in the factual record supports this conclusion

(150)   Defendant expert Alan Cox repeatedly claims that I do not explicitly offer an opinion regarding Nanya/Nanya USA's participation in the named OEM conspiracy, arguing that my analysis cannot form the basis for the allegation of a conspiracy.[142] This argument is flawed.

(151)   As I explain in my initial report, my charge was to assume that defendants engaged in a conspiracy to fix the price of DRAM sold to the named OEMs and to undertake an economic analysis to determine whether defendants' conspiracy had an effect on the prices of DRAM sold to the plaintiffs.[143] Because the focus of my analysis was to determine whether defendants' admitted conspiracy had an effect on the prices of DRAM sold to plaintiffs, it was not necessary for me to examine the particular circumstances of each defendant's participation in the cartel. Nevertheless, in response to Dr. Cox's misplaced criticisms, I summarize below some of the evidence in the factual record and the economic circumstances of Nanya/Nanya USA that provide substantial evidence that Nanya was, in fact, part of the cartel.

(152)   Several documents indicating Nanya's participation in the cartel were shown to Dr. Cox when he was deposed during the MDL portion of this litigation. Given that Dr. Cox reviewed these exhibits during his own deposition, it is clear that Dr. Cox himself has seen ample evidence of Nanya's involvement in the cartel. Exhibits used in Dr. Cox's earlier deposition include interrogatory responses filed by the Micron defendants, a news article titled "Nanya Raises the Prospect of Cuts in DRAM Output," and defendant documents that corroborate the view that Nanya was part of the DRAM cartel.[144] I elaborate on each of these pieces of evidence below.

---

[142]   Expert Report of Alan Cox, 6–12.

[143]   See my initial report, 19.

[144]   Elpida's expert Dr. Klein testified that the DRAM cartel would have had an incentive to include a firm like Nanya in the cartel.

Q: "In your opinion, does a cartel [has] an incentive to include a supplier that's reducing its prices during the time

(153)  Interrogatory responses from the Micron defendants state, "From February to June 2002, [Steve] Thorsen spoke with Ken Hurley, whom Micron understands was a Vice President at Nanya, by phone, approximately twice a month. Thorsen and Hurley discussed…the prices their respective companies were considering offering to Dell and Compaq, usually in terms of ranges or percentages and general direction, though occasionally they shared more specific numbers."[145] In his deposition, Dr. Cox testified that, "if they did it as frequently as this, and if these statements were true, then that would be an indicator that Nanya might have been involved in a cartel."[146]

(154)  The same Micron interrogatory response states that "[Mike] Sadler had price-related contacts with Ken Hurley…They spoke approximately five to ten times between December 2001 and May 2002. Sadler and Hurley typically spoke about pricing to Dell…they typically discussed the pricing their respective companies were considering offering to Dell, in terms of percentage change."[147] In his deposition, Dr. Cox acknowledged that, "this indicates that they were talking about, according to Micron, that they were talking about future prices."[148] When asked about the implications of such competitor communications, Dr. Cox agreed that competitor communications about future prices were more consistent with collusion than they were with competition.[149]

(155)  Defendant documents also confirm that Nanya discussed future DRAM pricing with competitors. For example, an internal Nanya email dated April 1, 2002 from David Dwyer to Ken Hurley states, "I called Samsung's Russ Griffo earlier in the day and he said they were 'around' $40."[150] An internal Elpida email from David Lin to Mike Despotes, Jim Sogas and Tatusya Ilida, dated December 20, 2001, states, "FYI. I spoke with my buddies last night and this morning, here's the latest on pricing from all suppliers: [specific dollar quotes from Infineon, Samsung, Micron,

---

of the cartel?

A. I mean, I'm not sure -- once again, you're sake it's an trick question, but obviously, if there is somebody outside the cartel and it is taking action that are going to undermine the cartel, they obviously would want to bring them into occlusive [sic] arrangement." Deposition of Benjamin Klein (Rough) (April 23, 2008), 92.

[145]  Micron's "Third Supplemental Responses to Plaintiff's Second Set of Interrogatories," September 8, 2006, 45.

[146]  Deposition of Alan Cox (October 6, 2006), 87. I understand that Micron's participation in the DOJ's Corporate Leniency program requires that it provide full and truthful cooperation in these cases, and Dr. Cox has not suggested or offered any evidence that Micron's allegations are untrue.

[147]  Micron's "Third Supplemental Responses to Plaintiff's Second Set of Interrogatories," September 8, 2006, 38–39. Contrary to Cox's claims to the contrary (see paragraph 19), that DRAM prices were increasing during the time period of Nanya executive Hurley's communications with Micron. This makes it non-credible to suggest, as some defendants have tried to, that these conversations were somehow pro-competitive and resulted in lower prices.

[148]  Deposition of Alan Cox (October 6, 2006), 83.

[149]  "Q. All things being equal, when competitors get together to discuss price that each will charge, you would agree in the absence of any special factors such as a regulated industry, that that's more consistent with collusion than it is with competition, correct? A. Yes, it's more consistent" See the deposition of Alan Cox (October 6, 2006), 93.

[150]  NTC 64-00009480.

Toshiba, Nanya and Elpida follow]…Nanya thinks about going to raise [sic] 128MB/256MB DDR pricing to \$28/\$56 for 1/5."[151] As an additional note, Jim Sogas, who was vice president of North American sales at Elpida, later pled guilty to reaching agreements to fix prices to several DRAM purchasers, including plaintiff Sun.[152]

(156)    Additionally, an October 2001 news article titled "Nanya Raises the Prospect of Cuts in DRAM Output" reports that "[Charles] Kau said that local D-Ram [sic] rivals had approached Nanya about co-ordinating [sic] output cuts, but that any moves would have to be led by producers in the US, South Korea and Japan. He said leading by example was more important than attempts to co-ordinate, and that Nanya would be "willing to cut production voluntarily, once we have got the right signal."[153]

(157)    Since the time of Dr. Cox's previous deposition, additional discovery has substantiated the evidence cited above regarding Nanya's participation in the cartel. For instance, Samsung's James Elliott acknowledged that he was asked by his superiors to collect information regarding production and pricing from Samsung's competitors, including Nanya.[154] In the course of collecting this information, Elliott testified that he called Nanya about once a week or every two weeks, and exchanged pricing information with Nanya's Mike Walsh, Brian Donahue, and David Dwyer.[155] Elliott also testified that he exchanged information with Nanya about future production and product mixes.[156]

(158)    This is corroborated by the testimony three Samsung executives who pled guilty and have served (or are currently serving) prison sentences for price-fixing. Yeongho Kang testified that he asked James Elliott to contact Nanya to obtain pricing for a specific regional customer and that Nanya's employees, in fact, provided future pricing information.[157] This point illustrates not only that Nanya was involved in the DRAM cartel, but also that the members of the DRAM cartel

---

[151]    EMUS 654450.

[152]    United States v. D. James Sogas, plea agreement, Dec 13, 2006. Note that in his position as vice president of sales to North America, Sogas oversaw sales to many different customers, including the named OEMs, some plaintiffs, and other customers. For the reasons discussed throughout my report, it is illogical that Sogas could have fixed prices only to certain OEMs but not other customers.

[153]    Daniel, Caroline. "Nanya raises the prospect of cuts in D-Ram output." Financial Times UK. October 1, 2001.

[154]    "Q. Were you asked to exchange -- were you asked by your superiors at Samsung to engage in these communications with competitors regarding production and pricing? THE WITNESS: Yes." (Deposition of James Elliott, Samsung (December 4, 2007), 68-69).

[155]    Deposition of James Elliott, Samsung (December 4, 2007), 80-85. Note that Messrs. Walsh, Donahue, and Dwyer of Nanya all invoked the Fifth Amendment privilege throughout their depositions.

[156]    Deposition of James Elliott, Samsung (December 4, 2007), 88-90.

[157]    Deposition of Yeongho Kang, Samsung (November 27, 2007), 152–154, 184–185 and SSI-0005102432.

communicated about customers besides the named OEMs, which is consistent with my understanding of the way the DRAM cartel operated.

(159)   Thomas Quinn also testified that he had direct communications with Nanya to exchange competitive information.[158] Additionally, Il Ung Kim, Samsung's Executive VP for Memory Products, testified that he met with Nanya's Charles Kau in Taiwan during a business trip, and that Mr. Kau, on behalf of Nanya Taiwan, *proposed* setting up an international cartel in the DRAM market.[159] (emphasis added) This certainly seems to contradict Dr. Cox's opinion that Nanya "had little or no incentive to join such a conspiracy."[160]

(160)   Likewise, testimony offered by defendants' experts have confirmed that the cartel had ample incentive to include Nanya in the conspiracy. For example, Dr. Klein stated that "obviously, if there is somebody outside the cartel and it is taking actions that are going to undermine the cartel, they obviously would want to bring them into the collusive arrangement."[161] Dr. Cox's assertion that the DRAM cartel would not have had the incentive to included Nanya because Nanya was a "fringe player" lacks empirical support.[162] For instance, cartel participants in the vitamins and specialty graphite cartels included firms with 1 to 14 percent market share.[163] When asked about these cartels, Dr. Cox conceded that he had not looked at market shares of other participants in other cartels. When asked if cartel participants would have an incentive to include a "little guy with a market share in the zero to 5% range," Dr. Cox replied, "They might, yes."[164] Considered with the other documentary evidence noted above, it is clear that both Nanya and the other defendants had the incentive to include Nanya in the DRAM cartel.

(161)   These facts are only examples of the body of evidence that Nanya was, in fact, involved in the cartel. Dr. Cox entirely ignores the documentary evidence and testimony in his report and pretends that Nanya is entirely innocent based on its lack of a guilty plea, despite being aware of several of the facts referenced above.[165] Although it was not part of my original charge to

---

[158]   Deposition of Thomas Quinn, Samsung (November 30, 2007), 104-105, 130-131.

[159]   Deposition of Il Ung Kim, Samsung (January 9, 2008), 60-62.

[160]   Expert report of Alan Cox, 43.

[161]   Deposition of Benjamin Klein (Rough) (April 23, 2008), 92.

[162]   Expert report of Alan Cox, 41.

[163]   See European Commission Decision (December 17, 2002) in Case COMP/E-2/37.667 – Specialty Graphite at 10 and European Commission Decision (November 21, 2001) in Case COMP/E-1/37.512 – Vitamins at L6/13.

[164]   Deposition of Alan Cox (Rough) (April 22, 2008), 69.

[165]   For example, Dr. Cox acknowledged he was not aware of the contents of the deposition of Il Ung Kim, in which Kim testified that Nanya's Charles Kau had proposed setting up at DRAM cartel. (Deposition of Alan Cox (Rough) (April 22, 2008), 34–35, 83).

examine Nanya's particular circumstances, as I have stated above, I find the evidence to be fully consistent with the view that Nanya/Nanya USA was part of the cartel.

### VI.2.2. Nanya charges prices right in line with those charged by the other defendants

(162)    In his expert report, Dr. Cox claims that Nanya's data "consistently illustrate that Nanya/Nanya USA's prices were generally lower than the prices charged" by other defendants. This is incorrect, and Dr. Cox reaches this incorrect conclusion by conducting an incomplete and misleading analysis of the data. In reality, Nanya's prices track other defendants' prices closely when one compares prices for similar DRAM products.

(163)    As I noted in my initial report, there are several characteristics that can influence the price of a DRAM chip or module.[166] Dr. Cox, on the other hand, arrives at his incorrect conclusion regarding Nanya's prices by ignoring several of these characteristics, including form factor, speed, latency, and error correction and their impact on DRAM prices. By not accounting for these, his figures are misleading and suggest that there is a broad "cloud" of prices for DRAM products and Nanya is always at the bottom. When I take these additional characteristics into account, it is clear that Nanya's prices are not "generally lower" that the other defendants' prices.

(164)    I have compared Nanya's and other defendants' prices for the modules Dr. Cox includes in his Figures 11a and 11b. These two products are Nanya's top-revenue products sold to the named OEMs during the plea period. Unlike Dr. Cox, I have accounted for additional product characteristics, namely density, technology, speed, form factor, and error correction that impact DRAM prices. By accounting for these additional characteristics, I am able to make more accurate price comparisons between Nanya's prices and other defendants' prices. Figure 63 and Figure 64 demonstrate that Nanya's prices track other defendants' prices for the same product very closely.

---

[166]    For instance, I consider each product's form factor, technology, speed, density, latency and error correction in my regression analyses. See paragraph 392 of my initial report.

Rebuttal Expert Report of Robert C. Marshall, Ph.D.                    VI. Response to defendants' other critiques

**Figure 63: Nanya vs. other defendants' prices for sales of 512 MB DDR 3.8ns DIMM modules, without error correction (compare to Cox Exhibit 11a)**



**Figure 64: Nanya vs. other defendants' prices for sales of 256MB 3.8ns DDR DIMM modules, without error correction (compare to Cox Exhibit 11b)**



(165)    Because Dr. Cox does not take these additional characteristics into account, Dr. Cox's own price comparisons are misleading, and lead him to the incorrect conclusion that Nanya's prices were

"generally lower" than prices charged by other defendants. Had he considered DRAM speed, form factor, and error correction in his price comparisons, he would see that Nanya actually charges prices similar to other defendants.

## VI.3. Dr. White's results confirm my findings

(166)   Since submitting my report, I have reviewed the expert report submitted by Dr. Halbert White on December 14, 2007 in these matters summarizing his analysis of damages. As part of his analysis, Dr. White finds that the named OEMs incurred substantial overcharges on their DRAM purchases as a result of defendants' admitted conspiracy. Consistent with defendants' admitted illegal conduct and impact,[167] his overcharge varies in magnitude throughout the conspiracy period.

(167)   Similarly, Dr. White finds substantial overcharges for plaintiffs in this matter. I would not expect the overcharges to be identical for each of the firms in each period (or overall), but the strong similarities in the overcharges for the named OEMs and plaintiffs provide strong corroboration for my results. Specifically, Dr. White's results show that plaintiffs were harmed as a result of defendants' conspiracy and he quantifies the impact. While this is not part of my explicit charge, it is fully consistent with what I would expect to observe. It fully supports the notion that the prices paid by plaintiffs moved closely together with those paid by the named OEMs, and that plaintiffs paid higher prices as a result of defendants' admitted conspiracy.

(168)   Nanya's expert Dr. Cox claims that my analysis is lacking in some way because "correlations [are] also consistent with competitive market conditions."[168] In making this argument, however, Dr. Cox ignored the guilty pleas of four corporate defendants and 15 defendant executives in this case and the hundreds of millions of dollars in fines paid that conclusively show that the DRAM market was not subject to "competitive market conditions" between at least April 1, 1999 and June 15, 2002. Dr. White's analysis shows that there were substantial damages incurred by both the named OEMs and plaintiffs as a result of this conspiracy. These facts make Dr. Cox's argument irrelevant for the issues in this case.

---

[167]   The guilty pleas for [each] of the corporate defendants that have pled guilty say something similar to the following: "at certain times during the relevant period, DRAM prices decreased significantly. Nevertheless, the Defendant and its coconspirators reached agreements to limit the rate of price declines, which were achieved with varying levels of effectiveness. At other periods, the Defendant and its coconspirators reached agreements on price increases and were able to institute price increases on DRAM sales to certain OEMs." See, e.g., guilty plea of Hynix Semiconductor Inc., filed April 20, 2005.

[168]   See the Expert Report of Alan Cox, 7.

## VI.4. Defendants' experts take individual tests out of context to reach misleading conclusions

(169)   Among the standard practices of economists and statisticians as part of any investigation and/or research project is to look at a wide range of information before reaching a conclusion or an opinion. That is what I have done. I have conducted a thorough review of the economic features of the DRAM market to determine whether I would expect that prices paid by plaintiffs would increase/decrease when prices paid by the named OEMs increased/decreased. I reviewed the actual prices paid by the named OEMs and plaintiffs, which strongly suggest that they move together. I then used standard and well-accepted methodologies to determine whether my initial findings could be corroborated statistically. The results strongly support the conclusion that plaintiffs were, in fact, harmed by defendants' conspiracy because prices paid by the plaintiffs were also affected by defendants' conspiracy.

(170)   In contrast, defendants' experts have quibbled with individual pieces of my analysis (typically doing so incorrectly) and ignored the weight of the evidence as a whole. Additionally, they reach faulty conclusions by selecting certain pieces of the economic evidence that support their point, while altogether ignoring the overwhelming evidence that conflicts with their argument.

(171)   Hynix's expert Dr. Topel reaches his conclusions without apparently considering all of the relevant evidence.[169] Dr. Topel argues that "[A]s I find no evidence that prices were increased or supply restricted during either the alleged 'conspiracy' or 'plea' periods, there is no material evidence that Plaintiffs (*or anyone else*) were damaged by paying higher prices during *any period* at issue in this case" (emphasis added).[170] This statement contradicts Hynix's own plea agreement, suggesting that Dr. Topel either is unaware of or ignored Hynix's admissions in this case, including (notably) that

> "in furtherance of the conspiracy, [Hynix], through certain officers and
> employees, engaged in discussions and attended meetings with representatives of
> certain other DRAM producers and sellers. During these discussions and
> meetings, agreements were reached to fix the price of DRAM to be sold to
> certain OEMs. At certain times during the relevant period, DRAM prices
> decreased significantly. Nevertheless, the Defendant and its coconspirators

---

[169]   The same can be said of most, if not all, defendants' experts based upon the sparse listing of materials they considered or relied upon according to the lists provided with their reports. For example, Dr. Klein considered a small fraction of the documents produced in these cases, specifically only four documents from Elpida, one from Micron, and the documents included among the limited depositions he considered.

[170]   See the Expert Report of Robert Topel, 29.

> reached agreements to limit the rate of price declines, which were achieved with varying levels of effectiveness. At other periods, the Defendant and its coconspirators reached agreements on price increases and *were able to institute price increases* on DRAM sales to certain OEMs." (emphasis added)

In addition, Dr. Topel appears to have ignored the voluminous evidence in the record detailing Hynix's conversations with its competitors regarding price and the impact these conversations had on the prices Hynix actually charged for DRAM.

(172)    By looking at only selective portions of the evidence and reviewing individual tests out of context, defendants' experts reach misleading conclusions that miss the point of the issues in this case.

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

_Robert C. Marshall_                                    May 2, 2008

Robert C. Marshall, Ph.D.                              Date

Highly confidential

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

# Appendix A: Materials considered

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

Highly confidential

## A.1. Defendant expert reports, backup materials, and errata (as applicable)

- December 14, 2007 Expert Report of Halbert L. White, Jr.
- March 7, 2008 Expert Report and backup materials of Kevin Murphy
- March 7, 2008 Expert Report and backup materials of Robert Topel
- March 7, 2008 Expert Report and backup materials of Benjamin Klein
- March 7, 2008 Expert Report and backup materials of Alan Cox
- March 7, 2008 Expert Report and backup materials of Vincent O'Brien
- March 7, 2008 Expert Report and backup materials of Joseph Kalt
- March 7, 2008 Expert Report and backup materials of Carl Shapiro
- March 7, 2008 Expert Report and backup materials of Victor de Dios
- March 7, 2008 Expert Report and backup materials of Daniel Rubinfeld
- March 10, 2008 Errata Sheet for Expert Report of Vincent O'Brien
- April 1, 2008 Errata Sheet for Expert Report of Kevin Murphy
- April 1, 2008 Errata Sheet for Expert Report of Robert Topel
- April 19, 2008 Errata Sheet Addendum for Expert Report of Robert Topel
- April 22, 2008 Errata Sheet for Expert Report of Daniel Rubinfeld

## A.2. Defendant expert testimony

- April 22, 2008 Deposition of Alan Cox (Rough)
- April 23, 2008 Deposition of Benjamin Klein (Rough)
- April 24, 2008 Deposition of Carl Shapiro (Rough)
- April 24, 2008 Deposition of Kevin Murphy (Rough)
- April 25, 2008 Deposition of Daniel Rubinfeld (Rough)
- April 25, 2008 Deposition of Joseph Kalt (Rough)
- April 25, 2008 Deposition of Robert Topel (Rough)
- April 29, 2008 Deposition of Vincent O'Brien (Rough)
- April 29, 2008 Deposition of Victor de Dios (Rough)

## A.3. Deposition testimony

- January 17, 2006 Deposition of Eric Schwab
- January 18, 2006 Deposition of Gary Paul Grabowski
- January 19, 2006 Deposition of Steven Coraluzzi
- January 19, 2006 Deposition of Daniel Clement

Rebuttal Expert Report of Robert C. Marshall, Ph.D.                                    Appendix A: Materials considered

- January 20, 2006 Deposition of Richard Saitsky
- January 20, 2006 Deposition of Kevin Irwin
- January 20, 2006 Deposition of Peter Scott Holtz
- January 20, 2006 Deposition of Stelios Valavanis
- January 20, 2006 Deposition of James A. Lawson
- January 26, 2006 Deposition of Yaacov Davidson
- August 29, 2006 Deposition of Jackie Gross
- September 12, 2006 Deposition of Kevin Maurice Brown
- September 14, 2006 Deposition of Seshu Anne
- October 30, 2006 Deposition of Keith Lefebvre
- December 10, 2007 Deposition of Christina Stratmoen
- December 11, 2007 Deposition of Nick LaHerran
- December 11, 2007 Deposition of Manuel Raposa
- December 12, 2007 Deposition of Devin Cole
- December 12, 2007 Deposition of Jae Sueng Kim
- December 12, 2007 Deposition of Juseon Kim
- December 13, 2007 Deposition of Jae Sueng Kim
- December 14, 2007 Deposition of Hirohisa Ueno
- December 17, 2007 Deposition of Robert Sharpe
- January 9, 2008 Deposition of Il Ung Kim
- January 10, 2008 Deposition of Il Ung Kim
- January 15, 2008 Deposition of Young Lee
- January 17, 2008 Deposition of Carolyn Stark
- January 18, 2008 Deposition of Bashar Elsbihi
- February 6, 2008 Deposition of Yukio Sakamoto
- February 13, 2008 Deposition of Dae Soo Kim
- February 14, 2008 Deposition of Dae Soo Kim
- March 7, 2008 Deposition of Hirohisa Ueno
- March 13, 2008 Deposition of Alwin Sulaiman
- April 8, 2008 Deposition of Dieter Mackowiak
- April 9, 2008 Deposition of Kenneth Hurley
- April 18, 2008 Deposition of YH Park

## A.4. Litigation documents

- [All Plaintiffs] Supplemental Response to Elpida Memory, Inc. and Elpida Memory (USA) Inc.'s Second Set of Interrogatories to Plaintiffs.
- [All Plaintiffs] Supplemental Response to Elpida Memory, Inc. and Elpida Memory (USA) Inc.'s Third Set of Interrogatories to Plaintiffs.
- Plaintiff Unisys Corporation, All American Semiconductor, Edge Electronics, and Jaco Electronics Supplemental Responses to Infineon Defendants' First Set of Interrogatories to All Plaintiffs
- Plaintiffs' First Joint Supplemental Response to Hynix Semiconductor Inc.'s and Hynix Semiconductor America Inc.'s First Set of Interrogatories
- Plaintiff Sun Microsystems Inc.'s Supplemental Response to Nanya Technology Corporation USA's First Set of Interrogatories
- Plaintiff Unisys Corporation's Supplemental Response to Nanya Technology Corporation USA's First Set of Interrogatories
- Plaintiff All American Semiconductor Inc.'s Supplemental Response to Nanya Technology Corporation and Nanya Technology Corporation USA's First Set of Interrogatories
- Plaintiff Jaco Electronics Inc's Supplemental Response to Nanya Technology Corporation and Nanya Technology Corporation USA's First Set of Interrogatories
- Plaintiff Edge Electronics, Inc.'s Supplemental Responses to Nanya Technology Corporation's and Nanya Technology Corporation USA's First Set of Interrogatories
- Plaintiff Jaco Electronics Inc's Supplemental Response to Defendant NEC Electronics America, Inc.'s First Set of Interrogatories
- Plaintiff All American Semiconductor Inc.'s Supplemental Response to Defendant NEC Electronics America, Inc.'s First Set of Interrogatories

## A.5. Documents from the trial of Gary Swanson

- October 22, 2007 Amended Summary of Government's Case Against Gary Swanson (Redacted)
- October 24, 2007 Declaration of Niall E. Lynch in Support of the United States' Memorandum of Law Regarding Coconspirator Statements and Pretrial Factual Proffer
- February 4, 2008 Gary Swanson Trial Transcript, Volume 1 of 12
- February 5, 2008 Gary Swanson Trial Transcript, Volume 2 of 12
- February 7, 2008 Gary Swanson Trial Transcript, Volume 3 of 12
- February 8, 2008 Gary Swanson Trial Transcript, Volume 4 of 12
- February 11, 2008 Gary Swanson Trial Transcript, Volume 5 of 12

- February 12, 2008 Gary Swanson Trial Transcript, Volume 6 of 12
- February 14, 2008 Gary Swanson Trial Transcript, Volume 7 of 12
- February 15, 2008 Gary Swanson Trial Transcript, Volume 8 of 12
- February 19, 2008 Gary Swanson Trial Transcript, Volume 9 of 12
- February 21, 2008 Gary Swanson Trial Transcript, Volume 10 of 12
- February 22, 2008 Gary Swanson Trial Transcript, Volume 11 of 12
- February 25, 2008 Gary Swanson Trial Transcript, Volume 12 of 12
- February 28, 2008 K.C. Suh (Hynix) Witness Summary
- February 28, 2008 Mike Peterson (Hynix) Witness Summary
- February 28, 2008 Keith Weinstock (Micron) Witness Summary
- February 28, 2008 Ken Heller (Hynix) Witness Summary
- February 28, 2008 Dennis Lee (Infineon) Witness Summary
- February 28, 2008 D.S. Kim (Hynix) Witness Summary
- February 28, 2008 C.K. Chung (Hynix) Witness Summary

## A.6. Others

- All documents cited in this report are hereby incorporated by reference.
- In addition, all documents cited in my initial report are also incorporated by reference.

Rebuttal Expert Report of Robert C. Marshall, Ph.D.

# Appendix B: Updated data processing

## B.1. Overview

(173)    As indicated in the initial report, data were received from a number of plaintiffs, defendants, and third-party entities involved in this matter. These data were used to create a combined purchase dataset that attempted to capture a complete picture of purchases by plaintiffs' and named OEMs global DRAM purchases from all defendants. Since the submitting the initial report and in response to the defendants' experts' criticisms, several updates have been made to the data processing. The updates can be characterized as three types, summarized below:

- Refinement of product characteristics for datasets where product characteristics were already included in the initial report
- Inclusion of product characteristics for data not previously decoded
- General updates to data processing

(174)    This appendix references the information relied upon in updating the data processing scripts and product-characteristic translation table, contained in the backup materials.

## B.2. Refinement of product characteristics

### B.2.1. Elpida

(175)    Additional product information was incorporated using the following sources:

- EMUS00375183
- EMUS00434093
- EMUS00512165

### B.2.2. Hynix

(176)    Additional product information was incorporated using the following sources:

- HSA00015036
- HSA00067465
- HSA00010707
- HSA00138383
- HSA00435981
- HSA00432054
- HSA00131418
- HSA00387020

- HSA00479708
- HSA00242201
- HSA00236108
- HSA00432055
- HSA00083186
- HSA00408915
- HSA00261215
- HSA00408900
- HSA00413608
- HSA00129387
- HSA00236108
- HSA00264724
- HSA00042630

### B.2.3. Infineon

(177)    Additional product information was incorporated using the following sources:

- ITAG-00002430
- ITAG-00007052
- ITAG-00007894
- ITAG-00008501
- ITAG-00011140
- ITAG-00013068
- ITAG-0013443
- ITAG-00031270
- ITAG-00031271
- ITAG-00033890
- ITAG-00038087
- ITAG-00041417
- ITAG-00041420
- ITAG-00042147
- ITAG-00042168
- ITAG-00042847
- ITAG-00043611
- ITAG-00058706
- ITAG-00058707
- ITAG-00059946

Rebuttal Expert Report of Robert C. Marshall, Ph.D.                Appendix B: Updated data processing

- ITAG-00060025
- ITAG-00060922
- ITAG-00063102
- ITAG-00068082
- ITAG-00074543
- ITAG-00077025
- ITAG-00083762
- ITAG-00090229
- ITAG-00122737
- ITAG-00122738
- ITAG-00123699
- ITAG-00134036
- ITAG-00169453
- ITAG-00226063
- ITAG-00272071
- ITAG-00290522
- ITAG-00351826
- ITAG-00353357
- ITAG-00354548
- ITAG-00356370
- ITAG-00359963
- ITAG-00386535
- ITAG-00387175
- ITAG-00387176
- ITAG-00387203.000
- ITAG-00387204.0001
- ITAG-00387205
- ITAG-00387206.000
- ITAG-00387212.0002
- ITAG-00388753
- ITAG-00391192
- ITAG-00493352
- ITAG-00497308
- ITAG-00497970
- ITAG-00498482
- ITAG-00569438
- ITAG-00601756

- ITAG-00667389
- ITAG-00667419
- ITAG-00667423
- ITAG-00674538.031
- ITAG-00674538.032
- ITAG-00674538.0324
- ITAG-00676502.000
- ITAG-00676502.0004
- ITAG-00676580.000
- ITAG-00676580.0004
- ITAG-00677954.000
- ITAG-00682378
- ITAG-00683584
- ITAG-00712027.005
- ITAG-00721950
- ITNA01200692 .001
- ITNA01200718 .001
- ITNA 00000369
- ITNA 00015712
- ITNA 00019811
- ITNA 00021003
- ITNA 00021045
- ITNA 00026887
- ITNA01002804
- ITNA01055365
- ITNA01055878
- ITNA01055930
- ITNA01055932
- ITNA01067137
- ITNA01075504
- ITNA01106705
- ITNA01129993
- ITNA01158459
- ITNA01158462
- ITNA01158472
- ITNA01158685
- ITNA01173286

- ITNA01178989
- ITNA01179002
- ITNA01191143
- ITNA01197884
- ITNA01197892
- ITNA01198042
- ITNA01198219
- ITNA01199020
- ITNA01199932
- ITNA01200009
- ITNA01200091
- ITNA01200123
- ITNA01200133
- ITNA01200167
- ITNA01200408
- ITNA01200441
- ITNA01200656
- ITNA01200669
- ITNA01200721
- ITNA01204368
- ITNA01208997
- ITNA01223991
- ITNA01256540
- ITNA01296599
- ITNA01317189
- ITNA01318376
- ITNA01200024 .001
- ITNA01200112 .001
- ITNA01200677 .001
- ITNA01200718 .001

### B.2.4. Micron

(178)    In the Micron data, the module depth and module density information was updated for transactions involving SGRAM.

### B.2.5. NEC

(179)    Additional product information was incorporated using the following sources:

- EMUS 101524
- EMUS 120379
- EMUS 131609
- EMUS 131610
- EMUS 131611
- EMUS 135446
- EMUS 139910
- EMUS 139915
- EMUS 140882
- EMUS 140885
- EMUS 140891
- EMUS 144602
- EMUS 300406
- EMUS 300809
- EMUS 415587
- EMUS 416184
- EMUS 558669
- EMUS 558672
- EMUS 558675
- EMUS 574513
- EMUS 58858
- EMUS 58973
- EMUS 636429
- EMUS 637810
- EMUS 65347
- EMUS 670961
- EMUS 674451
- EMUS 68025
- EMUS 701646
- EMUS 732288
- EMUS 771177
- EMUS 771186
- EMUS 771199
- EMUS 771217

- EMUS 795299
- EMUS 844093
- EMUS 865458
- EMUS 871716
- EMUS 964781
- EMUS 994572
- EMUS 994574
- EMUS 994578
- EMUS 994580
- NECELAM 020103
- NECELAM 023128
- NECELAM 02782
- NECELAM 029115
- NECELAM 040413
- NECELAM 040416
- NECELAM 040419
- NECELAM 043003
- NECELAM 045303
- NECELAM 045461
- NECELAM 046318
- NECELAM 050017
- NECELAM 052370
- NECELAM 052549
- NECELAM 056887
- NECELAM 058296
- NECELAM 061781
- NECELAM 096270
- NECELAM 102647
- NECELAM 112584
- NECELAM 117134
- NECELAM 125098
- NECELAM 134186
- NECELAM 139004
- NECELAM 147312
- NECELAM 149231
- NECELAM008909
- NECELAM008996

### B.2.6. Samsung

(180)    Additional product information was incorporated using the following sources:

- SSI-0000010402
- SSI-0000047366
- SSI-0000052838
- SSI-0000055385
- SSI-0000062907
- SSI-0000065364
- SSI-0000069979
- SSI-0000072658
- SSI-0000072660
- SSI-0000072663
- SSI-0000072664
- SSI-0000072667
- SSI-0000072669
- SSI-0000075360
- SSI-0000092275
- SSI-0000092519
- SSI-0000092529
- SSI-0000092737
- SSI-0000093144
- SSI-0000094442
- SSI-0000094798
- SSI-0000097810
- SSI-0000098719
- SSI-0000100941
- SSI-0000103287
- SSI-0000103297
- SSI-0000103355
- SSI-0000106002
- SSI-0000108845
- SSI-00001097015
- SSI-0000111294
- SSI-0000111303
- SSI-0000111312
- SSI-0000113925

- SSI-0000113971
- SSI-0000114799
- SSI-0000114905
- SSI-0000116354
- SSI-0000116633
- SSI-0000117195
- SSI-0000118963
- SSI-0000119112
- SSI-0000119908
- SSI-0000120028
- SSI-0000121802
- SSI-0000122044
- SSI-0000123403
- SSI-0000124272
- SSI-0000125711
- SSI-0000127020
- SSI-0000127059
- SSI-0000128221
- SSI-0000128280
- SSI-0000128523
- SSI-0000128629
- SSI-0000129127
- SSI-0000129789
- SSI-0000129792
- SSI-0000129900
- SSI-0000131305
- SSI-0000131477
- SSI-0000132863
- SSI-0000132995
- SSI-0000133011
- SSI-0000133095
- SSI-0000133394
- SSI-0000135705
- SSI-0000135725
- SSI-0000135970
- SSI-0000136222
- SSI-0000136235

- SSI-0000136506
- SSI-0000136748
- SSI-0000138652
- SSI-0000139036
- SSI-0000140749
- SSI-0000141718
- SSI-0000143186
- SSI-0000143755
- SSI-0000143999
- SSI-0000144932
- SSI-0000147707
- SSI-0000152526
- SSI-0000155230
- SSI-0000155500
- SSI-0000155867
- SSI-0000156346
- SSI-0000156464
- SSI-0000156961
- SSI-0000157274
- SSI-0000158484
- SSI-0000159335
- SSI-000015956
- SSI-0000160087
- SSI-0000325847
- SSI-0000325848
- SSI-0000326345
- SSI-0000326362
- SSI-0000326388
- SSI-0000327645
- SSI-0000327649
- SSI-0000327676
- SSI-0000327749
- SSI-0000328021
- SSI-0000328461
- SSI-0000331481
- SSI-0000331534
- SSI-0000354981

- SSI-0000363190
- SSI-0000363243
- SSI-0000363256
- SSI-0000363923
- SSI-0000364956
- SSI-0000366673
- SSI-0010055287
- SSI-0010055297
- SSI-0010055298
- SSI-0010055299
- SSI-0010055301
- SSI-0010055302
- SSI-0010056022
- SSI-0010056023
- SSI-0010056024
- SSI-0010056038
- SSI-0010056046
- SSI-0010056047
- SSI-0020027255
- SSI-0020029013
- SSI-0020029064
- SSI-0020029066
- SSI-0020029128
- SSI-0020029129
- SSI-0020029130

## B.3. Inclusion of product characteristics for data not previously decoded

(181)    Product information has been incorporated for: (1) defendant-provided data from Mitsubishi, Mosel Vitelic, and Nanya; (2) plaintiff-provided data from SGI and Sun; and (3) third-party data provided by Benchmark.

### B.3.1. Mitsubishi

(182)    Product information was incorporated using the following sources:

- SUN0545108–SUN0546173

### B.3.2. Mosel Vitelic

(183)   Product information was incorporated using the following sources:

- MVCORP0034977–5000
- MVCORP0036825–48
- MVCORP0037237–64
- MVCORP0038846–71
- MVCORP0034949–976
- MVCORP0037195–224
- MVCORP0038942–69
- MVCORP0034923–48
- MVCORP0037112–37
- MVCORP0038872–897
- MVCORP0034897–922
- MVCORP0036211–36
- MVCORP0037044–69
- MVCORP0037138–61
- MVCORP0037070–87
- MVCORP0034864–79
- MVCORP0037096–111
- MVCORP0037164–77
- MVCORP0034836–51
- MVCORP0037178–94
- MVCORP0034102–5

### B.3.3. Nanya

(184)   Product information was incorporated using the following sources:

- NTC-1 0038–42
- NTC 64-00000029
- NTC 64-00000650–817
- NTC 008769–74
- Part number guide (April 2000)

- Nanya Part numbering guide Y2008 Dec[1].pdf, "Brochure Part Numbering Guide Y2008," Nanya Website, http://www.nanya.com/PageEdition1.aspx?Menu_ID=23&lan=en-us&def=210&isPrint=&KeyWords=

### B.3.4. SGI

(185)   SGI provided four transactional data files in Excel that were combined in order to create a complete transaction database for SGI. Each of these files contains a description field from which product characteristics were extracted.[171]

### B.3.5. Sun

(186)   Product information was incorporated using the following sources:

- SUN0545108–SUN0546173

### B.3.6. Benchmark

(187)   Benchmark data contain only sales to Sun. There is a field in the data containing Sun part numbers that was used to identify product characteristics as described for Sun.

## B.4. General updates to data processing

### B.4.1. Infineon

(188)   Infineon data contain two revenue fields, T/O_$ and T/O_EUR. Based on the methodology used to process data for my affirmative report, the T/O_$ field was used as the primary source of revenue; however, some records contain zero or null values in the T/O_$ field. Initially, the value in the T/O_EUR field, converted to U.S. dollars, was used only when the T/O_$ field was missing a value. This methodology has been updated so that, in those instances where the T/O_$ field contains a zero, and the T/O _EUR field is not zero, the value in the T/O_EUR field is used.

---

[171]   SGI's data used in the combined database does not contain a quantity field from which unit prices can be constructed.

### B.4.2. Micron

(189)    Micron data processing was updated to account for the re-classification of some purchaser names. In particular, less than 100 transactions where purchaser had previously been classified as "OTHER," purchaser is now classified as an OEM.

### B.4.3. Reptron

(190)    Jaco only owns claims for purchases made by certain Reptron entities, which they purchased in 2003.[172] Because the purchaser fields provided in the raw defendant data files often do not provide enough information to determine whether Reptron's purchases were made by its distribution entity, it was necessary to supplement Reptron purchases in defendant data files with purchases according to data provided by Reptron in the files, "REPTRON MASTER DRAM LIST.xls," "Reptron-Receipts-010103-123103.xls," and "Consolidated-DRAMs.xls ."[173]

(191)    The files, "REPTRON MASTER DRAM LIST.xls," "Reptron-Receipts-010103-123103.xls," and "Consolidated-DRAMs.xls ," were appended together, processed, and standardized as described in the overview in my affirmative report in order to identify a standard set of information for each record.

(192)    Product characteristics were incorporated using the defendant part number variable in the Reptron purchase data. Based on these defendant part numbers, product characteristics that were translated during decoding of defendant data were applied to transactions in the Reptron data.

### B.4.4. Unisys

(193)    Unisys' purchases through module makers have been allocated to DRAM suppliers, according to information available in Unisys' bill-of-material documents. In order to more accurately allocate these purchases, several updates to the allocation methodology have been made. First, Hyundai and Hynix are no longer identified as separate entities. Second, purchases are now allocated according to a supplier's relative quarterly market share. Finally, purchases are no longer being allocated to Hitachi or NEC after March 2001 or to Mitsubishi after October 2002, in order to accurately capture these firms' departures from the DRAM market.

---

[172]    U.S. Securities and Exchange Commission, Form 8-K, SEC File 0-23426, Accession Number 1193125-3-15058, Filed on 6/30/2003

[173]    Defendant data is still used for Reptron's purchases from Elpida and Nanya.

# Exhibit 25

**From:**      Jim Sogas <jim.sogas@us.elpida.com>
**Sent:**      Tuesday, February 19, 2002 6:34 PM
**To:**        Bill Hassett
**Subject:**   RE: IBM Q2/02 Award (ESG/PCD) and Elpida Support

---

Bill
The reason we need to see IBM/Dell prices is they are representative of the
open market OEM price. Since Suns stuff is custom, there is no "market
price" for a Sun module except what the other competitors are quoting.

-----Original Message-----
From: Bill Hassett [mailto:bill.hassett@us.elpida.com]
Sent: Tuesday, February 19, 2002 7:06 AM
To: ueno-hirohisa; Scott Kirk
Cc: Jim Sogas
Subject: RE: IBM Q2/02 Award (ESG/PCD) and Elpida Support


These issues we understand. Please remind people in Japan that prior to
January, Sun had the highest price of MNA's and that they should not make
any short term decisions just because the market has made such a quick turn.
We will get our prices back in line with the market as soon as our agreement
with Sun from the previous DBE is met.

Also, please discuss with factory the best way to set new prices for Sun.
Do we always need to wait for IBM/DELL pricing before we decide on Sun's
price????

-----Original Message-----
From: ueno-hirohisa [mailto:ueno-hirohisa@elpida.com]
Sent: Monday, February 18, 2002 6:37 PM
To: bill.hassett@us.elpida.com; Scott Kirk
Subject: IBM Q2/02 Award (ESG/PCD) and Elpida Support


FYI !

Sun who has the cheapest price among major MNA customers as of now
has been highly prioritized in terms of '02/2Q share.

Let's make every effort to make Sun price to be in line with the current
price for other MNA customers. If not, Sun team will be in difficulty
asking parent company to build Sun's custom modules...


Best regards

CONFIDENTIAL                                                          EMUS 391848

**Highly Confidential Pursuant to Protective Order--MDL No. 1486**

H.Ueno

-------- Original Message --------
Subject: IBM Q2/02 Award (ESG/PCD) and Elpida Support
Date: Mon, 18 Feb 2002 17:00:11 -0500
From: "Dan Donabedian" <Dan.Donabedian@us.elpida.com>
To: "Masateru Yamada" <masateru.yamada@us.elpida.com>,"Tatsuya Iida"
<tatsuya.iida@us.elpida.com>,"Jim Sogas" <jim.sogas@us.elpida.com>,"Mike
Despotes" <mike.despotes@us.elpida.com>,"Ueno Hirohisa"
<ueno-hirohisa@elpida.com>,"Higuchi Hiroshi"
<higuchi-hiroshi@elpida.com>,"Choei Matsushima"
<matsushima-choei@elpida.com>,"Yoshino Mizuki"
<yoshino-mizuki@elpida.com>
CC: "Rick Mcclellan" <richard.mcclellan@us.elpida.com>,"Jerry Barbaro"
<jerry.barbaro@us.elpida.com>

Gentlemen,

Further update to the IBM Q2/02 award situation. As you can see by
the
below, we are at a most critical stage. See below details:

Q2/02 IBM TAM: PCD ESG Total
---- ---- -----
61.9M 25.5M 87.4M (64Mb Equiv)

Q2/02 IBM Award: PCD ESG Total
---- ---- -----
6.1M 2.9M 9.0M (64Mb Equiv)

% Elpida Share: PCD ESG Total
---- ---- -----
9.8% 11.4% 10.3%

Elpida Q2/02
Support: 758K/month (128Mb equiv)
(K units)
1.516M/month (64Mb equiv)
4.548M/quarter (64Mb equiv)

Share based upon
Elpida Support: 4.548M/87.4M = 5.2%

We are awarded 10.3% share at IBM. Elpida can only support 5.2% if IBM
procures all the support offered (not realistic). We cannot survive as
a 5%
player at IBM.

As I communicated to all earlier, Elpida needs to be a minimum 6.0-7.5%

CONFIDENTIAL

EMUS 391849

Highly Confidential Pursuant to Protective Order--MDL No. 1486

share. Ideally, 9-10%.

Best case scenerio:

- Supporting IBM PCD 62% to the award (3.8M/6.1M). Total share for the quarter 6.1%(3.8M/61.9M) at PCD.

- Supporting IBM ESG 24% to the award (.7K/2.9M). Total share for the quarter 2.7% (.7K/25.5M) at ESG.

The ramifications should not be underestimated. Elpida may not be invited
to T&Q meetings or QBR's due to such low volume.

Details have been sent by P/N.

D2

CONFIDENTIAL

**Highly Confidential Pursuant to Protective Order--MDL No. 1486**

EMUS 391850

# Exhibit 26

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: Dynamic Random Access Memory (DRAM) Antitrust Litigation ) ) ) ) ) | |
| THIS DOCUMENT RELATES TO: ) ) | |
| Sun Microsystems, Inc. ) v. ) Hynix Semiconductor, Inc., et al. ) | Docket No. 06-cv-1665 |
| Unisys Corporation ) v. ) Hynix Semiconductor, Inc., et al. ) | Docket No. 06-cv-2915 |
| All American Semiconductor, Inc., ) v. ) Hynix Semiconductor, Inc., et al. ) | Docket No. 07-cv-1200 |
| Edge Electronics, Inc., ) v. ) Hynix Semiconductor, Inc., et al. ) | Docket No. 07-cv-1207 |
| Jaco Electronics, Inc., ) v. ) Hynix Semiconductor, Inc., et al. ) | Docket No. 07-cv-1212 |
| Dram Claims Liquidation Trust, By Its Trustee, Wells Fargo Bank, N.A., ) v. ) Hynix Semiconductor, Inc., et al. ) | Docket No. 07-cv-1381 |

**REBUTTAL EXPERT REPORT OF HALBERT L. WHITE, JR., PH.D.**

**May 2, 2008**

**HIGHLY CONFIDENTIAL**

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

# Table of contents

I.    Executive summary ...................................................................................................................................................1
      I.1. Introduction .....................................................................................................................................................2
      I.2. My initial report ...............................................................................................................................................2
      I.3. In response to defendants' experts' criticisms, I have undertaken additional empirical analysis that confirms my
            initial opinion .................................................................................................................................................6
            I.3.1. A simple analysis of defendants' profit margins corroborates my damage analysis ....................................7
            I.3.2. A simplified version of my prediction equation corroborates my results......................................................10
            I.3.3. An alternative analysis of plaintiffs' prices corroborates my damages analysis ..........................................12
            I.3.4. An enhanced dataset also corroborates my damages analysis .................................................................15
            I.3.5. When corrected, defendants' experts' analyses corroborate my damages analysis...................................17
            I.3.6. Conclusion.............................................................................................................................................18
      I.4. Rebuttal of the defendants' experts' critiques................................................................................................20

II.   Overview.................................................................................................................................................................21
      II.1. Introduction...................................................................................................................................................22
      II.2. In Section III, I demonstrate that my modeling approach is the most appropriate way to answer my charge.......22
      II.3. In Section IV, I show that other approaches to computing damages generate very similar results and that my
            damage estimates are consistent with the facts.........................................................................................22
      II.4. In Sections V and VI, I address fundamental flaws in defendants' reports and respond to their misguided
            criticisms ....................................................................................................................................................23

III.  My damage analysis is based on sound economic science ......................................................................................25
      III.1. Introduction .................................................................................................................................................26
      III.2. My methods appropriately combine basic economic theory and principles, my study of the DRAM industry, and
            well-accepted econometric techniques........................................................................................................27
      III.3. My methods are well accepted in the academic literature.............................................................................29
      III.4. My methods explicitly allow me to demonstrate that the defendants' illegal conduct caused the increases in
            DRAM prices ...............................................................................................................................................32

IV.   Corroborating analyses ...........................................................................................................................................35
      IV.1. Introduction..................................................................................................................................................36
      IV.2. A simple analysis of defendants' profit margins corroborates my damage analysis.........................................36
      IV.3. A simplified version of my prediction equation corroborates my damage analysis ...........................................39
      IV.4. Properly analyzing plaintiffs' prices produces results that corroborate my initial report analysis........................45
            IV.4.1. A two-stage analysis is reliable .............................................................................................................45
            IV.4.2. Defendants' experts incorrectly analyze plaintiffs' prices.........................................................................46
      IV.5. A version of my prediction equation using an enhanced dataset confirms the conclusions from my initial report49
      IV.6. My damage estimates are consistent with the facts........................................................................................52
            IV.6.1. My damage estimates are consistent with the findings of the plea agreements.......................................52
            IV.6.2. DRAM market is far more susceptible to collusion than defendants' experts suggest .............................53
            IV.6.3. There is substantial evidence in the record supporting an August 1998 start date .................................55

V.    Defendants' experts' damage analyses are fundamentally flawed..............................................................................59
      V.1. Introduction...................................................................................................................................................60
      V.2. Dr. Rubinfeld's analysis of damages is flawed and unreliable ..........................................................................60
            V.2.1. Introduction ...........................................................................................................................................60
            V.2.2. Once I correct Dr. Rubinfeld's analysis, his damages estimates corroborate those in my initial report.....61
            V.2.3. Applying Dr. Rubinfeld's own suggestion demonstrates that my approach is reliable and less restrictive
                  than Rubinfeld's...................................................................................................................................66
            V.2.4. Dr. Rubinfeld reduces SGI's damage base using unsubstantiated assertions and a computational error 68
            V.2.5. Calculation of overcharges as percent of expenditure is appropriate .......................................................73
      V.3. Dr. Shapiro's analysis of damages is flawed and unreliable ..............................................................................74
            V.3.1. Introduction ...........................................................................................................................................74
            V.3.2. Dr. Shapiro's damage model imposes restrictions that have no support in the data, economic theory, or
                  evidence from the record.....................................................................................................................75
            V.3.3. Dr. Shapiro's model tends to significantly underestimate overcharges ....................................................81
            V.3.4. Dr. Shapiro's model includes variables that are unreliable and contaminated by the conspiracy ............84
            V.3.5. Once I correct Dr. Shapiro's restrictive and unsupported assumptions, I find substantial damages .........90
      V.4. The analysis and opinions offered by Drs. Murphy and Topel are inconsistent with good scientific principles and
            have no probative value ...............................................................................................................................92

VI.   Defendants' experts' criticisms of my methods are misguided...................................................................................97
      VI.1. Introduction..................................................................................................................................................98

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

VI.2. My prediction equations contain the correct supply and demand factors, and the defendants' experts' claims to the contrary are incorrect.................................................................................................................................98
VI.3. Defendants' experts' wrongly claim that my model produces accurate post-conduct period predictions by design and regardless of the inclusion of irrelevant variables..........................................................................................101
 VI.3.1. Introduction ..................................................................................................................................101
 VI.3.2. It is well known to economists that the use of irrelevant variables is inappropriate ................................102
 VI.3.3. Contrary to his characterization, Dr. Kalt uses both economically motivated variables and irrelevant variables; his results generate nonsense if only irrelevant variables are used ..........................................103
 VI.3.4. Dr. Rubinfeld incorrectly claims that my method to select variables makes it easy to accurately predict prices in the post-conduct period ..................................................................................................................105
VI.4. Defendants' experts' are wrong in claiming that the close match between but-for prices and actual prices after the conduct period is simply the result of including post-conduct data in my analysis.......................................107
VI.5. Despite defendants' experts' claims to the contrary, the fact that the model selects different variables for different start dates has nothing to do with its reliability ..................................................................................110
VI.6. Defendants' economists attempt to make improper ceteris paribus interpretations of my regression coefficients, demonstrating their lack of understanding of basic econometrics........................................................................112
VI.7. Exclusion of negative overcharges in my damage calculation is the proper approach to take and has a negligible impact on total damages ......................................................................................................................116
VI.8. Defendants' experts' inappropriately apply my methods to alternative data and time periods .........................117
VI.9. Defendants incorrectly claim that my second-stage analysis is biased toward finding damages ......................118
VI.10. Dr. O'Brien's analysis using a Nanya specific price index is flawed and misleading ......................................122
VI.11. Dr. Topel's but-for quantity model is misguided .................................................................................124
VI.12. Errors in Dr. O'Brien's own analysis and lack of understanding cause him to incorrectly state that I drop significant data and apply overcharges to significant purchases not included in my analysis ...........................127
 VI.12.1. Dr. O'Brien falsely exaggerates the amount of transactions dropped in the smoothing of data ...........127
 VI.12.2. O'Brien's claim that 77% of overcharges come from data that has not been included in my analysis is incorrect and is the result of a significant error in his analysis ....................................................................128
VI.13. Defendants' experts assertion that Sun and SGI were unaffected by the DRAM conspiracy is not correct ....128
 VI.13.1. Both Sun and SGI's products would have been affected by the conspiracy.........................................129
 VI.13.2. Defendants' conspiracy to raise prices would not have precluded impacts on DDR or FPM-EDO prices132
 VI.13.3. Sun and SGI's non-price considerations were not unique and they would not have reduced their exposure to the DRAM conspiracy ...............................................................................................................134
 VI.13.4. SGI was not a unique customer and would be subject to the same pricing trends as the named OEMs135
 VI.13.5. SGI's purchasing methods would not limit the harm caused by defendants........................................136
 VI.13.6. Sun's DBE procurement process would not have shielded them from the price fixing conspiracy.......137
 VI.13.7. Summary...................................................................................................................................138

Appendix A : Materials considered .............................................................................................................141
 A.1. Defendant expert reports, backup materials, and errata (as applicable) ...........................................142
 A.2. Defendant expert testimony .....................................................................................................142
 A.3. Deposition testimony...............................................................................................................142
 A.4. Litigation documents ...............................................................................................................143
 A.5. Documents from the trial of Gary Swanson ..............................................................................144
 A.6. Others...................................................................................................................................145

Appendix B : Additional bibliography ...........................................................................................................146
 B.1. White forecasting-related publications ......................................................................................147
 B.2. Counterfactual studies.............................................................................................................150
 B.3. Event studies.........................................................................................................................151
 B.4. Treatment Effects Studies.......................................................................................................154

Appendix C : Data processing ...................................................................................................................162
 C.1. Overview ..............................................................................................................................163
 C.2. Refinement of product characteristics.......................................................................................163
  C.2.1. Elpida.........................................................................................................................163
  C.2.2. Hynix..........................................................................................................................163
  C.2.3. Infineon ......................................................................................................................164
  C.2.4. Micron ........................................................................................................................167
  C.2.5. NEC ...........................................................................................................................168
  C.2.6. Samsung.....................................................................................................................170
 C.3. Inclusion of product characteristics for data not previously decoded..............................................173
  C.3.1. Mitsubishi ...................................................................................................................173
  C.3.2. Mosel Vitelic................................................................................................................174
  C.3.3. Nanya.........................................................................................................................174
  C.3.4. SGI.............................................................................................................................175

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

C.3.5. Sun..................................................................................................................................................175
C.3.6. Benchmark......................................................................................................................................175
C.4. General updates to data processing .......................................................................................................175
C.4.1. Infineon ..........................................................................................................................................175
C.4.2. Micron .............................................................................................................................................175
C.4.3. Reptron ...........................................................................................................................................176
C.4.4. Unisys .............................................................................................................................................176

Appendix D : Damage tables and figures using enhanced data.........................................................................177

Appendix E : Dr. Rubinfeld's inappropriate handling of returns.........................................................................185
E.1. Dr. Rubinfeld does not accurately match returns to purchases .........................................................186

Appendix F : The restrictions imposed by Shapiro's model are not supported by statistical tests .....................187

Appendix G : Exogenous event study................................................................................................................190
G.1. Defendants own documents and analysis shows that the factors that they claim influence pricing only during the conduct period are not relevant for this analysis .................................................................................191
G.1.1. Earthquakes....................................................................................................................................191
G.1.2. Introductions of new versions of Windows......................................................................................196
G.1.3. Increase in MB per PC....................................................................................................................199
G.1.4. Technology boom and bust .............................................................................................................202
G.1.5. Y2K .................................................................................................................................................206

# List of figures

Figure 93: Sun DRAM actual and but-for price indexes – plea period...................................................................3
Figure 94: Sun DRAM actual and but-for price indexes – conspiracy period ........................................................4
Figure 95: Jaco DRAM actual and but-for price indexes – plea period .................................................................4
Figure 96: Jaco DRAM actual and but-for price indexes – conspiracy period.......................................................5
Figure 97: Plaintiffs' total purchases, overcharge percentages, and single damages during the plea and lingering effects period .......................................................................................................................................................5
Figure 98: Plaintiffs' total purchases, overcharge percentages, and single damages during the conspiracy and lingering effects period..........................................................................................................................................6
Figure 99: Sun DRAM actual and but-for price per Mbit from margin analysis – plea period.................................8
Figure 100: Sun DRAM actual and but-for price per Mbit from margin analysis – conspiracy period ...................8
Figure 101: Jaco DRAM actual and but-for price per Mbit from margin analysis – plea period ............................9
Figure 102: Jaco DRAM actual and but-for price per Mbit from margin analysis – conspiracy period ..................9
Figure 103: Sun DRAM actual and but-for price indexes from simplified analysis – plea period ........................10
Figure 104: Sun DRAM actual and but-for price indexes from simplified analysis – conspiracy period...............11
Figure 105: Jaco DRAM actual and but-for price indexes from simplified analysis – plea period .......................11
Figure 106: Jaco DRAM actual and but-for price indexes from simplified analysis – conspiracy period.............12
Figure 107: Sun DRAM actual and but-for price indexes from alternative analysis – plea period.......................13
Figure 108: Sun DRAM actual and but-for price indexes from alternative analysis – conspiracy period ............13
Figure 109: Jaco DRAM actual and but-for price indexes from alternative analysis – plea period .....................14
Figure 110: Jaco DRAM actual and but-for price indexes from alternative analysis – conspiracy period............14
Figure 111: Sun DRAM actual and but-for price indexes using enhanced data – plea period.............................15
Figure 112: Sun DRAM actual and but-for price indexes using enhanced data – conspiracy period...................16
Figure 113: Jaco DRAM actual and but-for price indexes using enhanced data – plea period............................16
Figure 114: Jaco DRAM actual and but-for price indexes using enhanced data – conspiracy period .................17
Figure 115: Overcharge percentages and single damages based on plaintiffs' total purchases using alternative analyses ..............................................................................................................................................................19
Figure 116: Overcharge percentages and single damages based on plaintiffs' U.S. purchases using alternative analyses ..............................................................................................................................................................19
Figure 117: Sun DRAM actual and but-for price per Mbit using a margin analysis – plea period .......................37
Figure 118: Sun DRAM actual and but-for price per Mbit using a margin analysis – conspiracy period.............38
Figure 119: Jaco DRAM actual and but-for price per Mbit using a margin analysis – plea period ......................38
Figure 120: Jaco DRAM actual and but-for price per Mbit using a margin analysis – conspiracy period............39
Figure 121: Overcharge percentage and single damages based on plaintiffs' total purchases using profit margin analysis ................................................................................................................................................................39
Figure 122: Sun DRAM actual and but-for price indexes from simplified analysis – plea period ........................42
Figure 123: Sun DRAM actual and but-for price indexes from simplified analysis – conspiracy period...............42

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

Figure 124: Jaco DRAM actual and but-for price indexes from simplified analysis – plea period ......................................43
Figure 125: Jaco DRAM actual and but-for price indexes from simplified analysis – conspiracy period.............................43
Figure 126: Overcharge percentage and single damages based on plaintiffs' total purchases from simplified analysis .....44
Figure 127: Summary statistics for initial report and simplified analysis ............................................................................45
Figure 128: Sun DRAM actual and but-for price indexes from alternative analysis – plea period......................................47
Figure 129: Sun DRAM actual and but-for price from alternative analysis – conspiracy period..........................................47
Figure 130: Jaco DRAM actual and but-for price indexes from alternative analysis – plea period .....................................48
Figure 131: Jaco DRAM actual and but-for price indexes from alternative analysis – conspiracy period...........................48
Figure 132: Overcharge percentage and single damages based on plaintiffs' total purchases for alternative analysis of
    plaintiffs' prices.................................................................................................................................................49
Figure 133: Sun DRAM actual and but-for price indexes using enhanced data – plea period ...........................................50
Figure 134: Sun DRAM actual and but-for price indexes using enhanced data – conspiracy period..................................50
Figure 135: Jaco DRAM actual and but-for price indexes using enhanced data – plea period...........................................51
Figure 136: Jaco DRAM actual and but-for price indexes using enhanced data – conspiracy period ................................51
Figure 137: Overcharge percentage and single damages based on plaintiffs' total purchases using enhanced data.........52
Figure 138: But-for prices for the forecast model before and after correcting for Rubinfeld's mistake (All DRAM)..............63
Figure 139: But-for prices for the forecast model before and after correcting for Rubinfeld's mistake (SDRAM only).........63
Figure 140: Average overcharges for the forecast model during the conspiracy period (All DRAM) ..................................64
Figure 141: Average overcharges for the forecast model during the conspiracy period (SDRAM only) .............................64
Figure 142: Average overcharges for the dummy variable model during the conspiracy period based on estimated
    coefficients .......................................................................................................................................................65
Figure 143: Average overcharges for the dummy variable model during the conspiracy period (All DRAM).......................67
Figure 144: Average overcharges for the dummy variable model during the conspiracy period (SDRAM only)..................68
Figure 145: Revised Rubinfeld Exhibit 30, plea period scenario ........................................................................................70
Figure 146: Dr. Shapiro model's predictions when estimated over the conduct and non-conduct period, respectively.......76
Figure 147: Coefficients estimated over the conduct and non-conduct periods...................................................................77
Figure 148: Statistical results for the joint test...................................................................................................................77
Figure 149: Simulated prices when prices during the conduct period are 35% higher than the but-for prices in each and
    every month of the conduct period.....................................................................................................................82
Figure 150: Simulated prices when prices during the conduct period are generated by increasing but-for prices in waves83
Figure 151: Overcharge comparison for simulated scenarios .............................................................................................84
Figure 152: Joint venture cost breakout in presentation to Micron's Board of Directors ....................................................87
Figure 153: Microprocessor and digital signal processor shipments...................................................................................88
Figure 154: Comparison of microprocessor shipments depicted quarterly and monthly......................................................88
Figure 155: Comparison of DSP shipments depicted quarterly and monthly ......................................................................89
Figure 156: But-for prices when Dr. Shapiro's restrictive assumptions are corrected.........................................................91
Figure 157: But-for prices when Dr. Shapiro's restrictive and unsupported assumptions are corrected.............................92
Figure 158: Conspiracy period overcharges when Dr. Shapiro's restrictive and unsupported assumptions are corrected .92
Figure 159: Price lines used by Drs. Murphy and Topel......................................................................................................93
Figure 160: OEM but-for prices after removing economic variables...................................................................................104
Figure 161: Dr. Rubinfeld's sunspot frequency regression................................................................................................106
Figure 162: SGI but-for price based on sunspot frequency ...............................................................................................107
Figure 163: OEM DRAM actual, fitted, and but-for price indexes – conspiracy period......................................................109
Figure 164: Sun DRAM actual and but-for price indexes using conspiracy-period scenario selected variables – plea period
    ........................................................................................................................................................................111
Figure 165: Sun DRAM actual and but-for price indexes using plea-period scenario selected variables – conspiracy period
    ........................................................................................................................................................................112
Figure 166: Overcharge percentage and single damages based on plaintiffs' total purchases with different variables ....112
Figure 167: Plea period and lingering effects damage calculations ...................................................................................116
Figure 168: Conspiracy period and lingering effects damage calculations ........................................................................117
Figure 169: SUN DRAM actual and expected actual price indexes – plea period scenario and plea period relationship..119
Figure 170: SUN DRAM actual and expected actual price indexes – conspiracy period scenario and conspiracy period
    relationship......................................................................................................................................................120
Figure 171: JACO DRAM actual and expected actual price indexes – plea period scenario and plea period relationship120
Figure 172: JACO DRAM actual and expected actual price indexes – conspiracy period scenario and conspiracy period
    relationship......................................................................................................................................................121
Figure 173: Damages obtained estimating the second-stage analysis over alternative data samples ..............................122
Figure 174: O'Brien's Figure 4 (Nanya specific price index) with interpolated data shown...............................................123
Figure 175: Topel's but-for quantities – conspiracy period................................................................................................126
Figure 176: Topel's but-for quantities – plea period .........................................................................................................126
Figure 177: Plaintiffs' total purchases, overcharge percentages, and single damages by defendants during the plea and
    lingering effects period, using enhanced data .................................................................................................178
Figure 178: Plaintiffs' U.S. purchases, overcharge percentages, and single damages by defendants during the plea and
    lingering effects period, using enhanced data .................................................................................................178

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

Figure 179: Plaintiffs' total purchases, overcharge percentages, and single damages by defendants during the conspiracy and lingering effects period, using enhanced data ................................................................................................178
Figure 180: Plaintiffs' U.S. purchases, overcharge percentages, and single damages by defendants during the conspiracy and lingering effects period, using enhanced data ................................................................................................179
Figure 181: Sun DRAM actual and but-for price indexes using enhanced data – plea period ..........................................179
Figure 182: Sun DRAM actual and but-for price indexes using enhanced data – conspiracy period.................................180
Figure 183: SGI DRAM actual and but-for price indexes using enhanced data – plea period ..........................................180
Figure 184: SGI DRAM actual and but-for price indexes using enhanced data – conspiracy period.................................181
Figure 185: Jaco DRAM actual and but-for price indexes using enhanced data – plea period.........................................181
Figure 186: Jaco DRAM actual and but-for price indexes using enhanced data – conspiracy period ...............................182
Figure 187: All American DRAM actual and but-for price indexes using enhanced data – plea period .............................182
Figure 188: All American DRAM actual and but-for price indexes using enhanced data – conspiracy period...................183
Figure 189: Unisys DRAM actual and but-for price indexes using enhanced data – plea period......................................183
Figure 190: Unisys DRAM actual and but-for price indexes using enhanced data – conspiracy period ............................184
Figure 191: Test results for the joint tests.......................................................................................................................189
Figure 192: Biweekly SDRAM chip prices (July 1999 through December 1999) ...............................................................192
Figure 193: Significant earthquakes in Japan and Taiwan (1994-2007) ...........................................................................195
Figure 194: DRAM price movements following significant earthquakes in Taiwan and Japan ..........................................195
Figure 195: DRAM price movements after earthquakes in Taiwan and Japan ..................................................................196
Figure 196: Windows operating system releases and memory requirements....................................................................200
Figure 197: Recommended memory for Windows OS v. average MB per PC.....................................................................201
Figure 198: Comparison of operating system MB requirements and module sales by density..........................................202
Figure 199: U.S. Industrial Production Index for Computer and Peripheral Equipment .....................................................203
Figure 200: U.S. Industrial Production Index for Information Processing and Related Equipment ....................................204
Figure 201: German Industrial Production Index for Manufacture of Computers and Other Information Processing Equipment ...................................................................................................................................................204
Figure 202: German Price Index for Manufacture of Computers and Other Information Processing Equipment..............205
Figure 203: Comparison of demand shifters and NASDAQ Computer Index.....................................................................206

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

# I.    Executive summary

## I.1. Introduction

(1) My initial expert report was submitted on December 14, 2007. I was subsequently deposed on February 27 and 28, 2008. On March 7, 2008, several economists (and two non-economists) retained by the defendants submitted their respective reports. This rebuttal report responds to the defendants' reports.

(2) Counsel for the plaintiffs asked me to assume that the defendants engaged in a conspiracy to fix the price of DRAM sold to the named OEMs and to undertake an economic analysis to determine the extent to which plaintiffs were overcharged as a result of defendants' conspiracy. Counsel asked me to conduct my analysis over two time periods—April 1, 1999 through June 15, 2002 (the "plea period") and August 1, 1998 through June 15, 2002 (the "conspiracy period"). As I explained in my initial report, I determined that the plaintiffs were overcharged by a significant amount as a result of the defendants' conspiracy.

(3) After reviewing the defendants' reports and conducting some additional empirical analyses of my own, my opinion remains that the plaintiffs were overcharged as a result of the conspiracy by approximately 49% during the conspiracy period and approximately 39% during the plea period. This translates to single damages of approximately $1.71 billion during the conspiracy period and $1.28 billion during the plea period.[1]

## I.2. My initial report

(4) As stated in my initial report, I undertook an analysis to understand what prices would have prevailed in the marketplace but for the defendants' conspiracy. To do so, I used a method that is generally accepted in the field of economics, has been accepted by District Courts as a reliable method for predicting damages in price-fixing matters, and that I have used to advise many businesses outside of the context of litigation. Based on more than 30 years of study in economics and econometrics, I believe this is the most appropriate and reliable method for addressing the question I have been asked.

(5) My initial report contains more than 30 pages describing and summarizing my review of the key economic features of the DRAM market. This research provided the factual basis for the application of my economic training and knowledge of economic principles to select the best and most relevant candidate variables for my model. These candidate variables included 22 data series

---

[1] Given the ongoing discovery in these matters, I reserve the right to supplement my opinions if additional information becomes available to me.

relating to DRAM cost, demand, and other relevant market factors appropriate for predicting DRAM prices. With this as a starting point, I used a two-step approach that is heavily based on the economics of the DRAM industry as well as best practices from the economics literature.[2]

(6)    I first obtain a prediction equation to capture the statistical relationship between the prices paid by the named OEMs and these predictors, appropriately using only data outside the conduct period. This first step allows me to exploit the richness of information contained in the named OEM pricing data, which contains more information than would be available had I used only plaintiff purchase data, and is appropriate due to the fact that in the DRAM market named OEM prices and plaintiff prices tend to move together and are explained by common demand and supply factors. In the second step, I estimate the statistical relationship between the DRAM prices paid by each plaintiff and those paid by the named OEMs. I then apply these estimated relationships to obtain plaintiff-specific but-for prices. The results of this analysis are depicted in Figures 81 to 92 of my initial report. I have reproduced a summary of the results from my initial report in Figure 93 through Figure 98 below.

**Figure 93: Sun DRAM actual and but-for price indexes – plea period[3]**



---

[2]    In my initial report, I describe my analysis in terms of three steps for clarity. However, my analysis is fundamentally a two-stage analysis, in which I first estimate prices to named OEMs and secondly use these prices to predict prices paid by plaintiffs. See Section VI.3 of my initial report for more detail.

[3]    This is a reproduction of Figure 11 in my initial report.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.                                    I. Executive summary

**Figure 94: Sun DRAM actual and but-for price indexes – conspiracy period[4]**



**Figure 95: Jaco DRAM actual and but-for price indexes – plea period[5]**



---

[4]    This is a reproduction of Figure 12 in my initial report.

[5]    This is a reproduction of Figure 13 in my initial report.

**Figure 96: Jaco DRAM actual and but-for price indexes – conspiracy period[6]**



**Figure 97: Plaintiffs' total purchases, overcharge percentages, and single damages during the plea and lingering effects period[7]**

| Plaintiff | Purchases | Overcharge | Single damages |
|---|---|---|---|
| ALL AMERICAN | $97,925,252 | 35% | $34,307,742 |
| EDGE | $12,435,755 | 38% | $4,683,093 |
| JACO | $116,024,789 | 26% | $30,330,953 |
| SGI | $136,223,580 | 51% | $69,594,840 |
| SUN | $2,796,235,002 | 40% | $1,118,110,091 |
| UNISYS | $82,677,846 | 23% | $19,337,510 |
| Total | $3,241,522,225 | 39% | $1,276,364,229 |

---

[6]    This is a reproduction of Figure 14 in my initial report.

[7]    Since the time I submitted my initial report, it has come to my attention that Jaco is not pursuing certain Reptron purchases initially included in my damage analysis. For illustration purposes I display the purchase values for Reptron found in my initial report in this and the following table. However, revised purchase values for Reptron can be found in my enhanced data set.

**Figure 98: Plaintiffs' total purchases, overcharge percentages, and single damages during the conspiracy and lingering effects period**

| Plaintiff | Purchases | Overcharge | Single damages |
|---|---|---|---|
| ALL AMERICAN | $121,599,548 | 46% | $55,947,429 |
| EDGE | $12,400,686 | 52% | $6,447,992 |
| JACO | $121,122,224 | 34% | $40,529,515 |
| SGI | $169,776,596 | 57% | $96,816,384 |
| SUN | $2,958,064,298 | 50% | $1,476,607,439 |
| UNISYS | $94,334,030 | 40% | $37,279,733 |
| Total | $3,477,297,383 | 49% | $1,713,628,491 |

## I.3. In response to defendants' experts' criticisms, I have undertaken additional empirical analysis that confirms my initial opinion

(7)    Defendants' wrongly claim that my methods are not grounded in economics and are "purely" a statistical exercise. In this report, I provide ample evidence that my methods are grounded firmly in economics, are well accepted in the academic literature, have been accepted by judges, and have been presented to juries in previous antitrust cases. I also show that my approach is well understood in the economic literature, and that it allows me to reliably measure the effect of the conspiracy.

(8)    I firmly believe that my methods are reliable and conform to generally accepted principles. In Section III I provide my reasons more fully.

(9)    Since my initial report and in rebuttal to several criticisms posed by the defendants' experts, I have considered several alternative empirical analyses that I believe are relevant to understanding the overcharges at issue. The corroborating analyses I examined include:

- A simple analysis of defendants' profit margins
- A simplified version of my prediction equation
- An alternative analysis of plaintiffs' prices
- A version of my prediction equation using an enhanced dataset
- A version of Dr. Rubinfeld's analysis after correcting for several critical errors
- A version of Dr. Shapiro's analysis after correcting for restrictive and unsupported assumptions
- A version of Drs. Murphy's and Topel's analyses after correcting for their untested and unsupported assumptions

(10)    The results of these alternative analyses suggest substantial overcharges during the conduct period and are largely consistent with and support the reasonableness of the results obtained with my approach. Below I describe these seven corroborating analyses in more detail.

### I.3.1. A simple analysis of defendants' profit margins corroborates my damage analysis

(11)    My first corroboration makes use of defendants' profit margins to estimate overcharges.[8] This type of analysis, known as margin analysis, is a useful complement to econometric analysis because it considers specific pertinent information, namely the defendants' profit margins for DRAM during the conspiracy. This method is recognized as a legitimate method for computing overcharges in price-fixing cases, and has been used extensively for this purpose.[9] Margin analysis assumes a reasonably stable relationship between prices and production costs but for the conspiracy. It also assumes that the defendants' profit margins during the conduct period but for the conspiracy would have been similar to the profit margins they earned during the non-conduct period. Under these assumptions, an increase in the defendants' profit margin during the conduct period as compared with the non-conduct period provides a measure of overcharges. Figure 99 and Figure 102 depict the expected but-for prices based on profit margins.

---

[8]    Profit margin is defined as the difference between price and variable cost of goods sold per unit, where units are measured in Mbits, and is expressed as a percentage of price.

[9]    Margin analysis is used to corroborate findings in the Expert Report of B. Douglas Bernheim, *In Re Vitamins Antitrust Litigation*.

**Figure 99: Sun DRAM actual and but-for price per Mbit from margin analysis – plea period**



**Figure 100: Sun DRAM actual and but-for price per Mbit from margin analysis – conspiracy period**



Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.                                    I. Executive summary

**Figure 101: Jaco DRAM actual and but-for price per Mbit from margin analysis – plea period**



**Figure 102: Jaco DRAM actual and but-for price per Mbit from margin analysis – conspiracy period**



(12)    This analysis suggests substantial overcharges during the conduct period as portrayed in Figure 115 and Figure 116 below, and it is largely consistent with and supports the reasonableness of the results obtained with the method I used in my initial report described in Section I.2.

### I.3.2. A simplified version of my prediction equation corroborates my results

(13)    As a second corroboration, I constructed a simplified version of my prediction equation using only measure of primary economic drivers of DRAM prices, without all of the additional refinements present in my method, namely the prediction equation described above Section I.2. This approach considers three core supply and demand factors to provide an estimate of damages. The results are portrayed in Figure 103 through Figure 106 below.

**Figure 103: Sun DRAM actual and but-for price indexes from simplified analysis – plea period**



Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.                    I. Executive summary

**Figure 104: Sun DRAM actual and but-for price indexes from simplified analysis – conspiracy period**



**Figure 105: Jaco DRAM actual and but-for price indexes from simplified analysis – plea period**



**Figure 106: Jaco DRAM actual and but-for price indexes from simplified analysis – conspiracy period**



(14)   Here again, the vertical difference between the actual price and the predicted but-for price during the conduct period provides a measure of estimated overcharges.

(15)   This simplified analysis suggests substantial overcharges during the conduct period, as shown in Figure 115 and Figure 116 below, and it is largely consistent with and supports the reasonableness of the results obtained with the method I used in my initial report described in Section I.2.

### I.3.3. An alternative analysis of plaintiffs' prices corroborates my damages analysis

(16)   As a third corroboration, I undertook yet another analysis in response to criticisms from defendants' experts that, rather than using the two-stage method I used in my initial report, I should have predicted plaintiffs' but-for prices using the relationship between plaintiff prices and the cost, demand, and other relevant factors. Even though I do not agree with their claims and believe that the approach in my report is more reliable than the one proposed by the defendants' experts because it allows me to exploit the richness of information contained in the named OEM pricing data, I have nevertheless conducted such an analysis to show that it corroborates my analysis. The results are shown in Figure 107 through Figure 110.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.                                                   I. Executive summary

**Figure 107: Sun DRAM actual and but-for price indexes from alternative analysis – plea period**



**Figure 108: Sun DRAM actual and but-for price indexes from alternative analysis – conspiracy period**



Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.                                    I. Executive summary

**Figure 109: Jaco DRAM actual and but-for price indexes from alternative analysis – plea period**



**Figure 110: Jaco DRAM actual and but-for price indexes from alternative analysis – conspiracy period**



(17)    As shown Figure 115 and Figure 116 below, constructing the model on plaintiffs' prices using cost and demand factors yields substantial overcharges. Accordingly, this result is largely

---

consistent with and supports the reasonableness of the results obtained with the method I used in my initial report described in Section I.2.

### I.3.4. An enhanced dataset also corroborates my damages analysis

(18)    As a fourth corroboration, I have made enhancements to the data underlying the analysis in my initial report, even though the great majority of the relevant data was included in my affirmative analysis. These enhancements include additional decoding and refinements of product characteristics and are detailed in Appendix C.

(19)    I find that these enhancements to my dataset do not meaningfully change my results and conclusions from my initial report. Results are shown in Figure 111 through Figure 114.

**Figure 111: Sun DRAM actual and but-for price indexes using enhanced data – plea period**



**Figure 112: Sun DRAM actual and but-for price indexes using enhanced data – conspiracy period**



**Figure 113: Jaco DRAM actual and but-for price indexes using enhanced data – plea period**



**Figure 114: Jaco DRAM actual and but-for price indexes using enhanced data – conspiracy period**



(20)    As shown in Figure 115 and Figure 116 below, redoing the analysis I presented in my initial report on an enhanced dataset yields overcharge results that are comparable to those obtained using the same method I used in my initial report. Accordingly, this result is also largely consistent with and supports the reasonableness of the results obtained with the method I used in my initial report described in Section I.2.

### I.3.5. When corrected, defendants' experts' analyses corroborate my damages analysis

(21)    Three additional corroborations are based on the affirmative analyses that Drs. Rubinfeld, Shapiro, Murphy, and Topel offered. Once I correct for certain clear errors in their analyses, I find that these analyses too show that there are substantial damages and are largely consistent with and support the method I used in my initial report. However, even after certain corrections, I continue to have reservations on the reliability of their analyses.

### I.3.5.1. Dr. Rubinfeld's corrected analysis corroborates my damages analysis

(22)    In conducting his analysis, Dr. Rubinfeld makes several critical errors. For instance, he makes a fundamental mistake in generating his but-for prices, and compounds this by improperly interpreting the estimated coefficient on his dummy variable as the overcharge estimate without making corrections appropriate to his given model specification. Both of these are basic

econometric mistakes, but they can be easily corrected. Once I make these corrections, his results are very similar to mine as shown in Figure 115 and Figure 116 below.

### I.3.5.2. Dr. Shapiro's corrected analysis corroborate my damages analysis

(23)    In his model, Dr. Shapiro makes several restrictive and unsupported assumptions that drive his results. Dr. Rubinfeld describes several tests in his report that Dr. Shapiro should have used to test these assumptions, and all of Dr. Shapiro's assumptions fail these tests. Once these restrictive and unsupported assumptions are corrected, Dr. Shapiro's analysis suggests substantial overcharges during the conduct period, as shown in Figure 115 and Figure 116 below. These results are largely consistent with and support the reasonableness of the results obtained with the method I used in my initial report described in Section I.2.

### I.3.5.3. Drs. Murphy's and Topel's analyses corroborate my damages analysis

(24)    Drs. Murphy and Topel, experts retained by Hynix, offer highly stylized, simplistic models that they assert to be of supply and demand. Their models rely on a number of untested and unjustified assumptions. Correcting these assumptions changes their results. Also, they acknowledge that cost data they rely upon are measured with error, but they incorrectly account for it in their analysis. When this error is fixed and their assumptions are corrected, their model shows substantial overcharges during the conduct period, as shown in Figure 115 and Figure 116 below. Additionally, their ability to predict prices during the conspiracy hinges on accounting cost data that, by construction, mirror prevailing industry prices during the conspiracy. Drs. Murphy and Topel do not understand this, nor does their analysis attempt to correct for this feedback. Once I make several corrections, their results are largely consistent with and support the reasonableness of the results obtained with the method I used in my initial report described in Section I.2.

### I.3.6. Conclusion

(25)    Since my initial report, I have had the opportunity to consider seven additional alternative analyses for estimating the overcharges to plaintiffs, including corrected versions of three of the defendants' own methods. All seven analyses are largely consistent with and support the reasonableness of the results obtained with the method I used in my initial report described in Section I.2.

(26)    In my opinion, the sum of all of these similar results using a wide variety of alternative analyses produces a compelling result: the plaintiffs were overcharged and my prediction equation produces reliable estimates of the amount of the overcharge. Figure 115 and Figure 116 below summarizes the overcharge percentages and single damages using these analyses.

**Figure 115: Overcharge percentages and single damages based on plaintiffs' total purchases using alternative analyses**

| Damages analyses | Plea period | | Conspiracy period | |
|---|---|---|---|---|
| | Overcharge | Single damages (millions) | Overcharge | Single damages (millions) |
| White's initial report | 39% | $1,276 | 49% | $1,714 |
| Margin analysis | 48% | $1,558 | 43% | $1,507 |
| White's simplified analysis | 32% | $1,031 | 40% | $1,374 |
| Plaintiffs' prices direct analysis | 41% | $1,355 | 43% | $1,495 |
| White's initial report analysis with enhanced data | 44% | $1,410 | 53% | $1,803 |
| Rubinfeld's corrected analysis | 58% | $2,184 | 69% | $2,542 |
| Shapiro's corrected analysis | 12% | $380 | 53% | $1,832 |
| Topel's corrected analysis [10,11] | 58% | $1,869 | 57% | $1,994 |

**Figure 116: Overcharge percentages and single damages based on plaintiffs' U.S. purchases using alternative analyses**

| Damages analyses | Plea period | | Conspiracy period | |
|---|---|---|---|---|
| | Overcharge | Single damages (millions) | Overcharge | Single damages (millions) |
| White's initial report | 38% | $957 | 48% | $1,303 |
| Margin analysis | 48% | $1,179 | 43% | $1,143 |
| White's simplified analysis | 31% | $772 | 39% | $1,042 |
| Plaintiffs' prices direct analysis | 40% | $1,000 | 42% | $1,132 |
| White's initial report analysis with enhanced data | 43% | $1,055 | 52% | $1,368 |
| Rubinfeld's corrected analysis | 58% | $1,648 | 69% | $1,948 |
| Shapiro's corrected analysis | 12% | $294 | 52% | $1,405 |
| Topel's corrected analysis [12] | 56% | $1,381 | 56% | $1,497 |

---

[10]    Dr. Topel and Dr. Murphy rely on the same framework but use different price data. As I discuss in Section 5.4, both of them rely on unfounded and almost certain false assumptions. The label "corrected" indicates that the analysis has been adjusted to be less incorrect, although substantial flaws remain.

[11]    Dr. Murphy's analysis relies on the same sales and a highly similar price line as Dr. Topel, as I discuss in Section 5.4. Therefore the corresponding numbers from an attempt to correct Dr. Murphy's analysis are similar. The plea and conspiracy period overcharges are 64% and 64%, and single damages are $2,067 million and $2,226 million.

[12]    The corresponding numbers from an attempt to correct Dr. Murphy's analysis are similar. The plea and conspiracy period overcharges are 62% and 62%, and single damages are $1,381 million and $1,497 million.

## I.4. Rebuttal of the defendants' experts' critiques

(27) Defendants' expert work contains several additional flaws and errors. Several of the defendants' experts have made critical mistakes in attempting to implement their damage methods or in their "critiques" of my analysis. In addition to these errors, several of the other defendant experts have made errors in their analyses that call into question the accuracy and probative value of their analyses.

(28) Examples of their flaws and errors include:

- Fabricating data to fill gaps in series as part of Dr. O'Brien's statistical analysis and as a consequence using a Nanya-specific price index that has made-up data for half of the time periods
- Making a calculation error when computing transaction values by failing to multiply the price by the quantity and as a consequence assuming that the quantity is equal to a single unit
- Incorrectly applying basic Excel functions and as a consequence applying a zero overcharge to over 4,600 transactions where there should be a positive overcharge

(29) This list is only a sample of a long list of important errors made by the defendants' experts. As noted above, their prevalence casts doubt on the accuracy and veracity of their analysis, opinions, and conclusions.

(30) As this brief summary shows, I have now considered eight methodologies, including three proposed by the defendants' own experts, to determine if the plaintiffs were overcharged by the admitted DRAM price-fixing conspiracy. The results obtained with the method I used in my initial report remain the best and most reliable estimate of overcharges and damages. However, the seven alternative methodologies, in my judgment, provide strong corroboration of my estimates and further demonstrate their accuracy and reliability.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

# II.   Overview

## II.1. Introduction

(31)    I submitted my initial expert report in this matter on December 14, 2007. This rebuttal report responds to defendants' reports submitted on March 7, 2008.

(32)    As per my instructions from counsel, my analysis assumes that the defendants engaged in a conspiracy to fix the price of DRAM sold to the named OEMs and determines the extent to which plaintiffs were overcharged as a result of defendants' conspiracy. As I explained in my initial report, I determined that the plaintiffs were overcharged by a significant amount as a result of the defendants' conspiracy.

(33)    After reviewing the defendants' reports and conducting some additional empirical analyses of my own, my opinion remains that the plaintiffs were overcharged as a result of the conspiracy by approximately 49% during the conspiracy period and approximately 39% during the plea period. This translates to single damages of approximately $1.71 billion during the conspiracy period and $1.28 billion during the plea period.

(34)    The body of my report is laid out as follows.

## II.2. In Section III, I demonstrate that my modeling approach is the most appropriate way to answer my charge

(35)    In Section III, I show that my damage analysis is based on sound economic science. In doing so, I rebut defendants' experts' incorrect claims that my methods are not grounded in economics and are "purely" a statistical exercise. I provide evidence that my methods are well accepted in the academic literature, have been accepted by judges, and have been presented to juries in previous antitrust cases. I also show that my methods explicitly allow me to determine whether the defendants' illegal conduct caused the increases in DRAM prices. For all of these reasons, I conclude that my modeling approach is the most appropriate way to determine the extent to which plaintiffs were overcharged as a result of defendants' conspiracy.

## II.3. In Section IV, I show that other approaches to computing damages generate very similar results and that my damage estimates are consistent with the facts

(36)    In Section IV, in response to criticisms by defendants' experts, I consider several alternative analyses for measuring damages. By performing these alternative analyses, I am able to examine whether the results of any particular approach are sensitive to its underlying assumptions. I

discuss a number of alternative approaches and their extensions to my original analysis, all of which corroborate the reasonableness of my original results. These alternative approaches include:

- A simple analysis of defendants' profit margins
- A simplified version of my prediction equation
- An alternative analysis of plaintiffs' prices
- A version of my prediction equation using an enhanced dataset

(37)   I also discuss additional data that I have now included in my analysis. I show that supplementing the data underlying my initial analysis with more complete product information confirms the conclusions from my initial report.

(38)   Finally, I demonstrate that my damage estimates are consistent with the facts about the DRAM cartel. First, I explain why my findings are consistent with defendants' plea agreements. Second, I find that my damage estimates are realistic given the pro-collusive characteristics of the DRAM market. Third, I provide an overview of the substantial evidence that defendants were coordinating on pricing and production decisions at least as early as August 1998.

## II.4. In Sections V and VI, I address fundamental flaws in defendants' reports and respond to their misguided criticisms

(39)   In Section V, I address the fundamental flaws found in the defendants' reports. I detail the numerous mistakes and erroneous assumptions made by defendants' experts, with specific attention given to particularly serious flaws in the reports offered by Drs. Rubinfeld, Shapiro, Murphy, and Topel. Specifically, I show that:

- Dr. Rubinfeld's analysis of damages is flawed and unreliable. Once I correct Dr. Rubinfeld's analysis, his damages estimates corroborate those in my initial report. Applying Dr. Rubinfeld's own suggestion demonstrates that my approach is reliable and less restrictive than Dr. Rubinfeld's. In addition, Dr. Rubinfeld incorrectly reduces SGI's damage base using unsubstantiated assertions and a computational error.
- Dr. Shapiro's analysis of damages is flawed and unreliable. Dr. Shapiro's damage model imposes restrictions that have no support in the data, no support in economic theory, and no support in evidence from the record. In addition, Dr. Shapiro's model includes variables that are unreliable and contaminated by the conspiracy. Once I correct Dr. Shapiro's restrictive and unsupported assumptions, I find substantial damages.

- The analysis and opinions offered by Drs. Murphy and Topel are inconsistent with good scientific principles and have no probative value. Fixing key conceptual errors and correcting their unsupported assumption results in substantial overcharges that corraborate my analysis.

(40)   In Section VI, I explain why defendants' experts' criticisms of my methods are misguided, and specifically address several criticisms raised by defendants' experts. Specifically, I show that:

- My prediction equations contain the relevant supply and demand factors, and the defendants' experts claims to the contrary are incorrect
- Defendants' experts incorrectly claim that, by design, including irrelevant variables in my model produces accurate post-conduct period predictions
- Defendants' experts are wrong in their claim that my but-for prices closely match up with actual prices after the conduct period simply because I include post-period data in my analysis
- Despite defendants' experts' comments to the contrary, the fact that the model selects different variables for different start dates has no direct bearing on its reliability
- Defendants' experts attempt to make improper ceteris paribus interpretations of my regression coefficients, demonstrating their lack of understanding of basic econometrics
- Exclusion of negative overcharges in my damage calculation is the proper approach to take and has a negligible impact on total damages
- Defendants' experts inappropriately apply my methods to alternative data and time periods
- Defendants incorrectly claim that my second-stage analysis is biased toward finding damages
- Dr. O'Brien's analysis using a Nanya specific price index is flawed and misleading
- Dr. Topel's but-for quantity model is misguided
- Errors in Dr. O'Brien's own analysis and lack of understanding cause him to incorrectly state that I drop significant data and apply overcharges to significant purchases not included in my analysis
- Defendants' experts assertion that Sun and SGI were unaffected by the DRAM conspiracy is not correct

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

# III.  My damage analysis is based on sound economic science

## III.1. Introduction

(41)    In their reports, defendants' experts have claimed that my statistical methods for estimating DRAM overcharges are not grounded in economics, are non-standard in economic analysis, and do not estimate the causal effect of the conspiracy on prices.[13] Nevertheless, the defendants' experts are mistaken and their claims evidence their lack of understanding of my methods and the underlying scientific literature.

(42)    In addition to their broad acceptance in the literature, the methods that I use in this matter to determine overcharges have been used and accepted in other litigations. Event studies have been widely used in the assessment of damages and in liability cases, in particular those involving securities fraud.[14] In addition, these methods have been accepted by judges and have been presented to juries in previous antitrust price-fixing cases.[15] The methods that I use to predict but-for prices in this matter are the same methods that I employed in the case designated *In Re Linerboard Antitrust Litigation*, and they were accepted as reliable methods for estimating damages by Judge Jan DuBois in a 2007 *Daubert* ruling. In particular, he commented on the reliability of my methods to appropriately address the specific areas that are the subject of the criticisms by defendants' experts in this matter. Similarly, in the case designated In *Re Vitamins Antitrust Litigation*, Judge Thomas Hogan endorsed the reliability of the two-stage predictive approach used by Dr. B. Douglas Bernheim that is also the same as my method in this matter. Dr. Bernheim's analysis was presented to and accepted by a jury, and Judge Hogan ruled that his testimony in *Vitamins* was a "…product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case."

(43)    Below I address specific criticisms asserted by the defendants' experts in this regard. First, I explain how my methods are in fact entirely grounded in economics and are not just a statistical exercise. Second, I demonstrate that my methods are standard and well-accepted in economics and are based on decades-old economic literature. Finally, I address the defendants' experts' claim that my methods do not allow me to estimate the causal impact of the conspiracy.

---

[13]    Expert Report of Vincent O'Brien, ¶ 49-52; Expert Report of Kevin Murphy, ¶ 171; Expert Report of Robert Topel, ¶ 57, 59-60; Expert Report of Robert Topel, ¶ 57.

[14]    As I explain below, event studies employ similar methods to the ones I use in this matter. Mitchell and Netter (1994) review at least five such cases. For example, *In Re Seagate Tech. II Securities Litigation*, 843 F. Supp. 1341, 1368 (N.D. Cal. 1994); Goldkrantz v. Griffin, No. 97 Civ. 9075, 1999 WL 191540 (S.D.N.Y. 1999); *In Re Executive Telecard Ltd. Sec. Litig.*, 979 F. Supp. 1021 (S.D.N.Y. 1997); *In Re Imperial Credit Industries, Inc. Securities Litigation*, 2003 WL 1563084 (C.D. Cal.). For a review, see also Mitchell, Mark L. And Netter, Jeffry M. "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," Business Lawyer, Feb. 1994, 49(2), pp. 545–90.

[15]    See footnote 15 on page 10 my initial report.

## III.2. My methods appropriately combine basic economic theory and principles, my study of the DRAM industry, and well-accepted econometric techniques

(44)    The methods I have employed to estimate overcharges in this matter are based on careful consideration of the economics of price determination and my study of the DRAM industry. These were combined with objective statistical procedures that have been developed in the extensive and decades-old econometric literature that is specifically relevant for addressing questions like those I have addressed here. Defendants' experts, however, appear to misunderstand both the literature underlying my analysis and how to apply it.

(45)    In designing my methods and analysis, I have drawn on the wealth of experience and knowledge that I have accumulated in analyzing economic and other data, and in understanding and applying econometric methods. Over my career, I have extensively studied how econometric and statistical methods can be applied to economic data to deliver reliable economic insight, and I have extensively studied how to avoid being misled by data mining and by oversimplifying assumptions.

(46)    As I explained in my initial report, I designed my prediction equation to accurately predict prices for DRAM in the absence of the alleged conduct. As an initial step, I carefully selected a set of relevant economic variables that I considered and evaluated for inclusion in my prediction equation. I have referred to this initial set of variables as "candidate predictor variables." Contrary to defendants' experts' claims, the identification of the variables I use as candidate predictors in my analysis is based on widely accepted economic and econometric principles.[16]

(47)    Economics teaches that prices are determined by factors of supply and demand. Therefore, I began by studying the DRAM industry in order to identify the appropriate market factors related to the supply of and demand for DRAM. As a result of this process, I identified and gathered the candidate predictor variables that were described in my initial report.[17] Despite the defendants' experts' assertions to the contrary, these candidate predictor variables are entirely based on economic theory and my study of the DRAM industry. I have also applied my economic expertise and judgment to ensure that each factor considered was directly relevant to DRAM supply and

---

[16]    Expert Report of Vincent O'Brien, ¶ 55; Expert Report of Daniel Rubinfeld, ¶ 312, 375-376.

[17]    In general, given practical limitations, data series for some of the true drivers of supply and demand will not be available. I therefore also gathered available data series that are meaningful proxies for the relevant supply and demand factors that I identified in my study of the industry. Because of their close relation to the underlying true drivers of cost and demand, these proxies can be useful predictors for and thereby allow more reliable predictions of DRAM prices.

demand factors and to ensure that I did not include any factors that were not relevant or were otherwise inappropriate for my analysis.

(48)   Once I identified the appropriate candidate predictor variables, I needed to determine which of these would combine to generate the most reliable prediction equation. In order to obtain reliable predictions, one must balance several competing concerns regarding the use of predictor variables in the regression. On the one hand, it is important to use a sufficient number of predictors to ensure that one does not neglect important factors that could help predict price movements. On the other hand, it is well understood in the literature that using too many predictors runs the risk of over-fitting the data and introducing random variation into the predictions that lessens their reliability. In order to properly attain this balance, I used my expert judgment along with well-established objective statistical techniques to identify the most appropriate predictor variables from among the candidates to arrive at a final prediction equation for DRAM prices.

(49)   Defendants' experts make two incorrect claims regarding my methods' foundation in basic economic principles. They claim that the variables included in my prediction equation are (1) chosen only by a statistical algorithm and (2) not related to the underlying economic relationships.[18] These criticisms suggest that defendants' experts are confused about the purpose of my analysis and the related economic and statistical literature.

(50)   In making their first claim, defendants' experts are correct that I use objective statistical criteria as part of my method. These statistical criteria were designed in the literature to allow economists to make objective decisions that will result in reliable predictions. The use of these objective criteria allows economists to avoid potential biases that can otherwise result from decisions made on a more subjective basis. Nevertheless, statistical criteria are in no way the sole basis for my analysis, as my but-for prices explicitly take into account the demand and supply factors that I identified based on my study of the DRAM industry, economic logic, economic judgment, and my thirty-plus years of experience in teaching and practicing economics.

(51)   In making their second claim, defendants' experts assert that the estimated coefficients of my prediction equation do not make economic sense because they do not conform to their naïve expectations regarding the sign and magnitude of the coefficients. In making this assertion, defendant's economists make the error of confusing regression analyses designed to measure the specific effect of each individual explanatory variable with regression analyses designed for the accurate prediction of a particular economic series, such as price. In the latter case of prediction,

---

[18]   Expert Report of Vincent O'Brien, ¶ 55; Expert Report of Robert Topel, ¶ 57, 59-60; Expert Report of Kevin Murphy, ¶ 167; Expert Report of Joseph Kalt, ¶ 195.

it is well understood in the literature that the estimated coefficients should not be interpreted as the specific impact of each individual factor, since they are designed for a different purpose.[19] Defendants' experts themselves have recognized this difference in their publications.[20] Therefore, the defendants' experts' criticisms that the estimated coefficients do not meet their expectations are inappropriate and immaterial to evaluating the reliability of my methods.

## III.3. My methods are well accepted in the academic literature

(52)    My methods are well accepted in the economic literature. Similar methods have been developed and used for decades in several areas of economic study. In the paragraphs that follow, I will describe these areas of economic study and explain how the methods used in each of these applications is virtually the same as the methods I apply in the estimation of the DRAM overcharges.

(53)    A long recognized area of economics is known as "event studies."[21] Event studies have been especially popular in the context of financial economics but have also been applied in other areas. This literature can be traced back to Dolley (1933), with seminal contributions by Fama et al. (1969) and Ball and Brown (1968).[22] The main objective of event studies is to evaluate the effect that some given economic event has on an item of interest, such as the value of firms as represented by their stock prices. Once the economic event of interest is identified, an appropriate time window around the event is determined for use in the analysis. The "event window" is chosen as the time period during which the event may have had an impact.[23]

---

[19]    Rather than separately measuring the causal effects of each factor, regressions used to develop prediction equations are designed to allow the predictive factors to collectively work together to provide accurate predictions for the series of interest. As a result, the estimated coefficients in the prediction equation do not measure individual effects but instead indicate the weight that each factor should receive relative to the other factors in making predictions. Rather than realizing that the coefficients of my prediction equations appropriately reflect correlations useful for making predictions, defendant's economists attempt to interpret the coefficients in my prediction equations as if they were ceteris paribus effects of the associated explanatory variables, that is, as if these coefficients measure causal effects of the associated explanatory variables.

[20]    "Since my concern is with forecasting [i.e., prediction], I have omitted the discussion of the individual variables." Daniel L. Rubinfeld, *Econometrics in the Courtroom*, Columbia Law Review, Vol. 85, 1985, p. 1088.

[21]    For an overview of event studies see MacKinlay, Event Studies in Economics and Finance, *Journal of Economic Literature*, Vol XXXV, March 1997.

[22]    Dolley, James Clay, Characteristics and procedure of common stock split-ups," *Harvard Business Review*, April 1933; Fama, E., Fisher, L., Jensen, M., and Roll, R., The adjustment of stock prices to new information, *International Economic Review*, February 1969; Ball, Ray and Brown, Philip, An empirical evaluation of accounting income numbers, *Journal of Accounting Research*, Autumn 1968.

[23]    In the example of stock prices, the event window typically includes the period during which the event occurred as well as periods before and after the event, in case the effect started to be transmitted to stock prices before the news of the event was published or in case the event is publicized after the close of the stock market.

(54) In order to estimate the effect of the event in question, a prediction equation is designed such that it includes various control variables as predictors. The predictive weights or coefficients for each predictor are determined using a regression on the available data outside of the event window. The resulting prediction equation is then applied to the data during the event window, resulting in a prediction of the relevant outcome had the event in question not occurred. The estimated effect of the event is then calculated as the difference between the actual outcomes and the predicted outcomes during the event window. For example, the difference between the actual and estimated stock price would provide an estimate of the impact of the event on that stock price.

(55) A second area of economic study that applies the same well-accepted methods that I used here is the "treatment effects" literature. These methods have been developed both outside of economics[24] and within it most extensively within the field of labor economics. Research in this area has been quite active since the 1970s, especially with the increased popularity of labor market programs introduced by the U.S. government, such as maternity benefits, workers' compensation, job search assistance, and job training programs. The common practices in this area are described in articles published in a leading reference publication, the *Handbook of Labor Economics*.[25] Moreover, James Heckman, a leading academic in this literature, received the 2000 Nobel Prize in Economic Sciences for developing methods that contribute to the appropriate estimation of treatment effects.[26] The literature in this area is vast.

(56) Because of its broad scientific utility and well-accepted reliability, the applications of treatment effect methods are not restricted solely to economics but are also extensively applied in other scientific disciplines such as epidemiology, psychology, and medicine.[27] Other studies using these

---

[24] Rubin, D. (1974), "Estimating Causal Effects of Treatments in Randomized and Nonrandomized Studies," *Journal of Educational Psychology*, 66, 688-701.

[25] See Heckman, J., LaLonde, R., Smith, J. (1999), The Economics and Econometrics of Active Labor Market Programs, *Handbook of Labor Economics*, Vol 3, Chapter 31; and Angrist, J., Krueger (1999), Empirical Strategies in Labor Economics *Handbook of Labor Economics*, Vol 3, Chapter 23.

[26] The 2000 Nobel Prize in Economic Sciences was awarded to James Heckman and Daniel McFadden. In describing their work, The Royal Swedish Academy of Sciences stated that: "They [the methods developed by James Heckman and Daniel McFadden] are now standard tools, not only among economists but also among other social scientists." The Royal Swedish Academy of Sciences, Press Release, October 11, 2000. (Available at http://nobelprize.org/nobel_prizes/economics/laureates/2000/press.html, last accessed: April 18, 2008).

[27] For an example relating the estimation of treatment effects in economics and epidemiology, see Angrist, J. D., Instrumental Variables Estimation of Average Treatment Effects in Econometrics and Epidemiology, National Bureau of Economic Research, Technical Paper No. 115, 1991. For a paper comparing estimation of treatment effects in epidemiology, see: John P. A. Ioannidis, MD, Anna-Bettina Haidich, MSc, Maroudia Pappa, MSc, Nikos Pantazis, MSc, Styliani I. Kokori, MD, Maria G. Tektonidou, MD, Despina G. Contopoulos-Ioannidis, MD, Joseph Lau, MD, Comparison of Evidence of Treatment Effects in Randomized and Nonrandomized Studies, *JAMA*, August 15, 2001—Vol 286, No. 7.

methods include, for example, the estimation of the effect of terrorism on GDP and the effect of discrimination on relative unemployment rates, among others.[28]

(57)     A typical objective of the treatment effects studies in labor economics is to evaluate the effects of a given social policy or program on an outcome variable of interest. The "treatment" is often the participation in the program or policy. The main challenge in this kind of framework, as in the event studies literature, is the fact that it is not possible to observe the outcome of interest in both the treated and untreated (or "control") state for the same subject. For example, if an individual was enrolled in a training program, we can only observe their earnings with the benefit of training; we cannot observe what their earnings are in the absence of enrollment. Because enrollment represents the factual state of the individual's program participation, the outcome that would occur when the individual is not enrolled is referred to as "counterfactual."[29]

(58)     In this literature, the construction of the counterfactual outcome is based on the identification of a control or untreated group and the observed (untreated) outcomes of this group. Following the example above, the counterfactual earnings can be based on the observed earnings of a carefully selected control group of individuals who did not enroll in the training program but who are as similar as possible to the individuals that did enroll. As in the event studies literature, the effect of the treatment is the difference between the actual outcome (observed earnings in our example) and the counterfactual outcome (estimated earnings in the absence of treatment).

(59)     A third area of economic literature that uses the same approach is the category of general counterfactual studies. These are studies that are not specifically event studies as defined above and that do not address the evaluation of a social program, but that are concerned generally with estimating the effects of a given cause, requiring the estimation of a counterfactual. Some of these studies include, for example, the estimation of the effect of terrorism on GDP and the effect of discrimination on relative unemployment rates, among others.[30] Appendix B contains a sample of such articles. As these examples show, general counterfactual studies apply the same approaches

---

[28]    Abadie, Alberto and Gardeazabal, Javier, The Economic Costs of Conflict: A Case-Control Study for the Basque Country, *The American Economic Review*, Vol. 93, No. 1 (Mar., 2003), pp. 113-132, William J. Collins, Race, Roosevelt, and Wartime Production: Fair Employment in World War II Labor Markets, *The American Economic Review*, Vol. 91, No. 1. (March 2001).

[29]    "Constructing counterfactuals is the central problem in the literature on evaluating social programs." Heckman, J., LaLonde, R., Smith, J. (1999), The Economics and Econometrics of Active Labor Market Programs, *Handbook of Labor Economics*, Vol 3, Chapter 31.

[30]    Abadie, Alberto and Gardeazabal, Javier, The Economic Costs of Conflict: A Case-Control Study for the Basque Country, *The American Economic Review*, Vol. 93, No. 1 (Mar., 2003), pp. 113-132, William J. Collins, Race, Roosevelt, and Wartime Production: Fair Employment in World War II Labor Markets, *The American Economic Review*, Vol. 91, No. 1. (March 2001).

as the event studies literature and the treatment effect literature for the estimation of the effect of virtually any cause on an outcome of interest.

(60)    All of the literature described above is directly analogous to the methods I used in this matter. The treatment or event to be evaluated is the conspiracy, and the outcome of interest is the DRAM price. We observe the DRAM price over time and under different treatments: conspiracy and absence of conspiracy. In this context, the relevant control group is the same subject observed at a different time absent the treatment.[31] That is, prices in the months outside the conspiracy period play the role of the control or untreated group, whereas prices in the months during the conspiracy play the role of the treatment group. Using a prediction equation constructed with standard regression analysis, the unobserved counterfactual outcome, or in this context the but-for price, is estimated. Finally, the difference between the observed and the estimated counterfactual is the treatment effect, that is, the effect of the conspiracy.

(61)    Appendix B contains a list of relevant papers.

## III.4. My methods explicitly allow me to demonstrate that the defendants' illegal conduct caused the increases in DRAM prices

(62)    Defendants' experts also wrongly claim that my methods fail to demonstrate any causal impact of the defendants' admitted conspiracy on DRAM prices.[32] It is well understood by academics and well accepted by the courts that the causal impact of any intervention (such as a conspiracy to fix prices) is measured by the difference between the outcome under the intervention and the outcome that would be expected to occur but for the intervention. In the case of a conspiracy, this impact is measured by the difference between the prices actually observed during the operation of the conspiracy and the prices expected to prevail in its absence, but under identical market conditions. Because I have carefully accounted for all of the relevant industry factors influencing DRAM prices that were not controlled or influenced by the members of the conspiracy (e.g., capacity utilization) in arriving at my estimate of what prices would have been in the absence of the cartel, any differences between actual and but-for prices can be directly interpreted as overcharges caused by the conspiracy.

---

[31]    "In this [time series] framework, the single subject at different times plays the role of both treatment and control group…" Stock, J. H. and Watson, M. W., Introduction to Econometrics, Pearson Addison Wesley, Second Edition, 2006, p. 596.

[32]    Expert Report of Vincent O'Brien, ¶ 42-43.

(63)     As explained above, the methods I apply to estimate the DRAM overcharges follow the same process as the well-accepted literature addressing the estimation of treatment effects. It is well understood in this literature that these methods properly identify the effect caused by a treatment.[33]

(64)     This can be seen using a simple example from the treatment effects literature. In the program evaluation study example discussed above, we have data for a set of individuals, some of whom participate in a program to enhance job skills and some of whom do not. The job skills program represents the treatment. The outcome of interest in this example could be the participant's earnings. The individuals participating in the program are the "treatment group." The individuals not participating in the program are the "control group." The treatment effect in this literature "measures the average gain in the outcome for persons who choose to participate in a program compared to what they would have experienced in the base state [for e.g., no participation]."[34]

(65)     In the job skills training example, since the outcome of interest for the program evaluation (i.e., earnings) is not observable for participants when they do not participate in the program (since by definition they are participants), we need to estimate the participants' counterfactual earnings, i.e. their earnings had they chosen not to participate in the program. This is done on the basis of observable characteristics of the participants and nonparticipants, where these characteristics are such that they are not affected by the program. The observed outcome for the nonparticipants is then used as the counterfactual outcome for matching participants who share the same characteristics. Intuitively, if two individuals share the same characteristics (i.e., are virtual clones) and one of them was a program participant and the other one was not, the effect of the program on earnings can be estimated as the difference between the earnings of the participant and the earnings of the nonparticipant.[35] Any such difference would then have been caused by the program.

(66)     This is directly analogous to my analysis of DRAM prices in this matter. Using a prediction equation determined using the non-conspiracy period, the DRAM but-for price for any given month within the conspiracy was predicted, for the historically observed set of demand, supply, and other economically relevant factors. The causal effect of the conspiracy is then appropriately

---

[33]     See for example, Rubin, D. (1974), "Estimating Causal Effects of Treatments in Randomized and Nonrandomized Studies," *Journal of Educational Psychology*, 66, 688-701.

[34]     Heckman, LaLonde and Smith (1999), p. 1884.

[35]     In any given study, it is usually not possible to find individuals who exactly match one another in the treatment and control groups. Nevertheless, regression methods make it possible to obtain reliable estimates of the outcome for control group individuals with any given set of characteristics, and in particular characteristics that match those of individuals in the treatment group.

measured as the difference between the observed price during the conspiracy and the predicted but-for price. Defendants' experts' criticisms in this regard are thus unfounded, as they are contrary to a substantial body of literature directly relevant to the estimation of the causal effect of a treatment, and in particular the effect of a conspiracy, and are contrary to the findings of the courts.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

# IV.  Corroborating analyses

## IV.1. Introduction

(67) In response to criticisms by defendants' experts, I have considered alternative methods to measuring damages. This enables me to assess whether my damage methods generate reasonable results and enables me to examine whether the results of any particular analysis are sensitive to its underlying assumptions. In this section, I will discuss a number of further analyses and extensions to my original analysis, and demonstrate that my damage estimates are consistent with the facts of the DRAM conspiracy. Additionally, I will show that the further analyses I consider all confirm the reasonableness of my results obtained with my method. These alternative analyses include:

- A simple analysis of defendants' profit margins
- A simplified version of my prediction equation
- An alternative analysis of plaintiffs' prices
- A version of my prediction equation using an enhanced dataset[36]

(68) As I explained in my initial report and during my deposition, my damage estimates are reasonable and consistent with the facts of the DRAM conspiracy. Defendants' own admissions in their plea agreements provide ample evidence of defendants' price-fixing. Additionally, I have found that the characteristics of the DRAM market are supportive of collusion. I also find that there is substantial evidence in the record that defendants were coordinating on pricing and production at least as early as August 1998.

## IV.2. A simple analysis of defendants' profit margins corroborates my damage analysis

(69) A simple analysis of defendants' profit margins can be used to estimate overcharges by measuring changes in prices relative to changes in production costs. This type of analysis, known as margin analysis, assumes that (a) the relationship between prices and production costs would have been reasonably stable but for the conspiracy, and (b) the defendants' profit margins during the conduct periods but for the conspiracy would have been similar to the profit margins they earned before and after the conspiracy. As a result, an increase in the defendants' profit margin per megabit (Mbit) during the conspiracy period compared to the non-conspiracy period provides a measure of overcharges. As with my econometric analysis, the vertical difference between the actual price and the expected but-for price at any point during the conduct period provides a

---

[36] In Section V I will also illustrate that the methods of Drs. Rubinfeld, Shapiro, Murphy, and Topel are largely consistent with and support the reasonableness of my results after correcting their mistakes and relaxing several of their erroneous and implausible assumptions.

measure of overcharges. What I observe is that DRAM profit margins during the conduct period increased to levels that far exceeded profit levels outside of the conduct period. This corroborates my results and suggests they are reasonable and reliable.

(70)    Figure 117 through Figure 120 depict expected but-for prices constructed using profit margins.

**Figure 117: Sun DRAM actual and but-for price per Mbit using a margin analysis – plea period**



**Figure 118: Sun DRAM actual and but-for price per Mbit using a margin analysis – conspiracy period**



**Figure 119: Jaco DRAM actual and but-for price per Mbit using a margin analysis – plea period**



**Figure 120: Jaco DRAM actual and but-for price per Mbit using a margin analysis – conspiracy period**



(71)    The estimated overcharges and damages, as shown in Figure 121 below, are substantial and largely consistent with and support the reasonableness of the results obtained using my initial report analysis.

**Figure 121: Overcharge percentage and single damages based on plaintiffs' total purchases using profit margin analysis**

| Period | Overcharge | Single damages (millions) |
|---|---|---|
| Plea | 48% | $1,558 |
| Conspiracy | 43% | $1,506 |

## IV.3. A simplified version of my prediction equation corroborates my damage analysis

(72)    In this section, I build a simplified version of the prediction equation in my initial report. This simplified version contains only measures of the key cost and demand factors driving DRAM prices. These key measures provide the foundation for the estimation of damages in my initial report. In addition to these key measures, the analysis in my initial report included measures of additional cost and demand factors relevant to DRAM prices. Nevertheless, I show that the key

economic variables alone are sufficient to generate reliable estimates of but-for prices. These simplified estimates corroborate the opinions that I offered in my initial report.

(73)    The core economic variables that drive my but-for price predictions obey a relationship with DRAM prices that is known in the statistics and econometrics literature as cointegration. Intuitively, a set of variables that are cointegrated will always tend to their fundamental economic relationship over time. It is common in the economics literature to note that variables that are cointegrated form an equilibrium relationship. In the current context, this means that interactions between the key cost and demand factors drive equilibrium prices over time. Although prices may temporarily deviate from their equilibrium value for a limited amount of time, they will nevertheless be forced back toward their equilibrium path by the economic forces of cost and demand. I directly make use of the process through which short-term deviations from this equilibrium path are corrected in arriving at my estimates of but-for prices. Using this powerful fundamental economic relationship enables me to produce reliable but-for price predictions.[37]

(74)    Through careful study of the industry and the application of my 30 years of experience as an economist, I arrived at an understanding of the primary cost and demand factors driving DRAM prices. I then gathered the data that could best measure these key factors. I selected the *U.S. Producer Price Index for MOS Microprocessors* as a key data series that captures both DRAM industry costs, as well as demand for DRAM. I also selected the *U.S. Industrial Production Index for Computer and Peripheral Equipment* and *U.S. Industrial Production Index for Information Processing and Related Equipment* as the series are able to capture the relevant demand factors. In the paragraphs below I explain my reasoning.

(75)    The *U.S. Producer Price Index for MOS Microprocessors* ("MOSMPU") captures cost movements in the DRAM industry. Microprocessors and DRAM are produced using closely similar technology and are linked through closely similar standardization processes. As a consequence, the costs of both products move similarly through time. Both products have production processes that benefit from learning by doing, which results in continuously declining costs. Additionally, the designs for microprocessors and DRAM are subject to the standardization process of JEDEC, and generations of microprocessors and DRAM must be similar to ensure interoperability in end-use products such as computers and servers.

(76)    The *U.S. Producer Price Index for MOS Microprocessors* ("MOSMPU") also reflects demand factors impacting DRAM prices. The fundamental reason for this is that the primary use of both

---

[37]    See for example, Pindyck, R. S. and Rubinfeld, D. L., *Econometric Models and Economic Forecasts*, McGraw-Hill, Fourth Edition, 1998, 513-514 and Stock, J. H. and Watson, M. W., *Introduction to Econometrics*, Pearson Education, Second Edition, 2007, 655-658.

DRAM (memory) and microprocessors (logic) is as essential components of computers. Economics teaches that the demand for product components is what is known as a "derived demand." In the present case, the demand for DRAM and the demand for microprocessors are both derived from the demand for computers.[38] Thus, because microprocessors and DRAM are components of the very same computers, demand for one will be parallel to demand for the other. Consequently, the *U.S. Producer Price Index for MOS Microprocessors* captures both demand and cost factors driving the determination of DRAM prices.

(77)    Because the demand for DRAM is derived from demand for end-use products that contain DRAM, direct measures of the output of such products can also help capture the impact of demand factors for DRAM. The *U.S. Industrial Production Index for Computer and Peripheral Equipment* accounts for production of computers, servers, and printers, for consumers and businesses.[39] Movements in the production of these DRAM-containing products, which are reflected in this index, are movements in the demand for DRAM. The *U.S. Industrial Production Index for Information Processing and Related Equipment* also accounts for the production of end-use products that contain DRAM. This series captures demand related to the production of computers, servers, and printers for businesses, routers, hubs and switches, and printed circuit assemblies.[40]

(78)    In Figure 122 through Figure 125 below I plot but-for prices for Sun and Jaco obtained from the prediction equation containing only the essential cost and demand measures described above. These but-for prices exhibit the same general trend as the but-for prices contained in my initial report.

---

[38]    See my initial report at ¶72.

[39]    Board of Governors of the Federal Reserve System, http://www.federalreserve.gov/releases/g17/SandDesc/sdtab1.pdf.

[40]    Board of Governors of the Federal Reserve System, http://www.federalreserve.gov/releases/g17/SandDesc/sdtab1.pdf.

**Figure 122: Sun DRAM actual and but-for price indexes from simplified analysis – plea period**



**Figure 123: Sun DRAM actual and but-for price indexes from simplified analysis – conspiracy period**



**Figure 124: Jaco DRAM actual and but-for price indexes from simplified analysis – plea period**



**Figure 125: Jaco DRAM actual and but-for price indexes from simplified analysis – conspiracy period**



(79)    The estimated overcharges and damages produced by the simplified analysis, as shown in Figure 126 below, are substantial and largely consistent with and support the reasonableness of the results obtained using my initial report analysis.

**Figure 126: Overcharge percentage and single damages based on plaintiffs' total purchases from simplified analysis**

| Period | Overcharge | Single damages (millions) |
|---|---|---|
| Plea | 32% | $1,031 |
| Conspiracy | 40% | $1,374 |

(80)    This simplified analysis containing only the three cost and demand factors accounts for more than 55% of the variation in month-to-month changes in DRAM prices. This is more than 70% of the month-to-month variation that is explained in my final model. This fact underlines the dominant role played by these key cost and demand factors in the estimation of but-for prices in my expert report.

(81)    The primary role played by the core economic drivers of DRAM prices in my original analysis seems to have been lost on defendant experts. Drs. Murphy, Topel, Kalt, and Rubinfeld mistakenly contend that I cede control of the variables in my final model to a mechanical process rather than applying my economic judgment.[41] This is patently false. As just described, my careful study of the industry and the application of my 30 years experience as an economist provides an understanding of the fundamental cost and demand factors driving DRAM prices. These factors are not determined by some statistical algorithm, but by economic knowledge and economic logic. By taking account of the relation between DRAM prices and these cost and demand factors, and by utilizing the powerful forces embedded in this relationship reflected in the data, I obtain a reliable estimate of but-for prices.

(82)    A comparison of the but-for lines shown in Figure 122 and Figure 123 above shows that this simplified analysis produces but-for prices that are similar to those contained in my original expert report. Nevertheless, restricting the economic variables to just these key measures of cost and demand leads to but-for price predictions that are less reliable than those in my initial report. This is evident from the fact that my simplified prediction equation is less able to capture the month-to-month fluctuations in DRAM prices than the equation that I originally reported.

(83)    Specifically, by including measures of additional economically motivated cost and demand factors that are relevant for DRAM pricing, I was able to obtain predictions superior to those delivered by the simplified analysis reported above. The incremental benefit of adding these additional cost and demand factors is attested to by the improvement in objective criteria

---

[41]    See for example the Expert Report of Kevin Murphy, ¶ 171, the Expert Report of Robert Topel, ¶ 57, the Expert Report of Joseph Kalt, ¶ 163, and Expert Report of Daniel Rubinfeld, ¶ 312.

measuring the performance of my prediction equation. As shown in Figure 127, the improvement in predictive accuracy generated by including the additional variables in my analysis is demonstrated by the higher out-of-sample R-squared and the lower error rates measured by the cross-validated root mean squared error (CV-RMSE). The additional variables also considerably enhance my ability to accurately capture the dynamics of DRAM price changes, as evidenced by the lower residual autocorrelation.

**Figure 127: Summary statistics for initial report and simplified analysis**

| Analysis | Scenario | R-squared | Residual autocorrelation | CV-RMSE | Out-of-sample R-squared |
|---|---|---|---|---|---|
| Simplified | Plea | 0.55 | 0.13 | 0.71 | 0.49 |
| White's initial report | Plea | 0.77 | -0.03 | 0.56 | 0.68 |
| Simplified | Conspiracy | 0.54 | 0.11 | 0.71 | 0.5 |
| White's initial report | Conspiracy | 0.81 | 0.03 | 0.51 | 0.74 |

## IV.4. Properly analyzing plaintiffs' prices produces results that corroborate my initial report analysis

(84)    Defendants' experts mistakenly argue that there is no need for a two-stage approach.[42] I disagree with their claims. They misunderstand my methods and fail to recognize that a two-stage approach has the advantage of capturing demand and supply forces that drive both the named OEM prices and the plaintiff prices. Further this approach has been used in previous price-fixing cases and deemed suitable for producing reliable damages.

(85)    Below I also show that the defendants' experts improperly implement my method to directly analyze plaintiffs' prices. Once I properly predict plaintiff prices using cost, demand, and other relevant factors, I demonstrate that the resulting damages are substantial and largely consistent with those I obtained using a two-stage approach.

### IV.4.1. A two-stage analysis is reliable

(86)    As I testified, compared to a direct approach, a two-stage approach allows me to obtain more reliable predictions than otherwise I would.[43] This is due to the fact that in the DRAM market

---

[42]    In my initial report, I describe my analysis in terms of three steps for clarity. However, my analysis is fundamentally a two-stage analysis, in which I first estimate prices to the named OEMs and secondly use these prices to predict prices to plaintiffs. See Section VI.3 of my initial report for more detail.

[43]    Deposition of Halbert White (February 27, 2008), 61-63.

OEM prices and plaintiff prices tend to move together and are explained by common demand and supply factors, and this approach allows me to exploit the richness of information contained in the named OEM pricing data.

(87)    Furthermore, the use of a two-stage approach has been accepted in previous price-fixing cases.[44] In particular, Judge Thomas Hogan endorsed the reliability of the two-stage forecasting method used by Dr. B. Douglas Bernheim in the case designated *In Re Vitamins Antitrust Litigation*. Dr. Bernheim's two-stage forecasting method in the *Vitamins* litigation was nearly identical to the approach I take in the present DRAM matter. Judge Hogan ruled that Dr. Bernheim's testimony in *Vitamins* was a "…product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case."[45]

### IV.4.2. Defendants' experts incorrectly analyze plaintiffs' prices

(88)    Defendants' experts inappropriately applied the method that I used in my initial report to analyze the plaintiffs price indexes.[46] The two-stage method that I adopted in my initial analysis was the result of a careful study of the DRAM industry. In particular, my two-stage approach recognizes that OEM prices and plaintiff prices tend to move together and are driven by common demand and supply factors. By building a predictive equation where the relationship between the OEM and plaintiff price indexes is explicitly accounted for, my second-stage analysis captures this salient feature of the DRAM industry.

(89)    In applying the method that I used in my initial report to the plaintiff price indexes using cost, demand, and other relevant factors, defendants' experts have deliberately ignored the relationship between the named OEM and the plaintiff price indexes. It is inappropriate to translate the results of their poorly specified models into a critique of my two-stage analysis. Instead, what the defendants' expert models show is their inability to account for the linkages between OEM and plaintiff prices.

(90)    I re-estimated the defendants' expert models by adding the named OEM price index to the original set of candidate predictors. The inclusion of the OEM price index substantially improves the statistical properties of the defendants' experts' original models. In addition, the results from this enhanced analysis corroborate my initial findings.

---

[44]    See Judge DuBois' Daubert ruling in *In Re Linerboard Antitrust Litigation* and Judge Hogan's ruling in *In Re Vitamins Antitrust* Litigation.

[45]    From transcript of *Vitamins* Daubert hearing, March 21, 2003.

[46]    See for example the Expert Report of Carl Shapiro, 40-41, the Expert Report of Vincent O'Brien, ¶ 101-101, and the Expert Report of Joseph Kalt, ¶ 214-215.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.                    IV. Corroborating analyses

(91)    Figure 128 through Figure 131 show that more appropriately specified plaintiffs' prices analysis produces results that are very similar to my original two-stage analysis.

**Figure 128: Sun DRAM actual and but-for price indexes from alternative analysis – plea period**



**Figure 129: Sun DRAM actual and but-for price from alternative analysis – conspiracy period**



**Figure 130: Jaco DRAM actual and but-for price indexes from alternative analysis – plea period**



**Figure 131: Jaco DRAM actual and but-for price indexes from alternative analysis – conspiracy period**



(92)    Figure 132 below shows that constructing the model on plaintiffs' prices as just described yields overcharge results that are comparable to those predicted by my initial report method.

Accordingly, this result is largely consistent with and support the reasonableness of the results obtained using my initial report analysis. Nevertheless, I do not endorse this approach because I believe that a two-stage approach such as the one I used in my initial report allows me to obtain more reliable predictions than this one.

**Figure 132: Overcharge percentage and single damages based on plaintiffs' total purchases for alternative analysis of plaintiffs' prices**

| Period | Overcharge | Single damages (millions) |
|---|---|---|
| Plea | 41% | $1,355 |
| Conspiracy | 43% | $1,495 |

## IV.5. A version of my prediction equation using an enhanced dataset confirms the conclusions from my initial report

(93)    As part of my work in this matter, I have carefully analyzed the available pricing data based on defendants' DRAM sales. The original data provided by the defendants were substantially inadequate and significant time and care was taken to understand and properly prepare the data. Through this process, the great majority of the relevant data was included in my initial report analysis. All of my decisions regarding the data were consistent with best practices for economists and were carefully documented within my initial report and backup materials.

(94)    In response to the defendants' experts' unfounded criticism that I "ignored" substantial amounts of data in my initial analysis, I have processed additional data for inclusion in the analysis. I have made several minor additions and enhancements to my underlying data so that I use and rely on the most accurate possible data.[47]

(95)    As depicted below in Figure 133,through Figure 136, making these changes and incorporating the additional data does not fundamentally change my results and conclusions from my initial report.[48]

---

[47]    See Appendix C for details.

[48]    See Appendix D for a complete set of results from this analysis.

**Figure 133: Sun DRAM actual and but-for price indexes using enhanced data – plea period**



**Figure 134: Sun DRAM actual and but-for price indexes using enhanced data – conspiracy period**



**Figure 135: Jaco DRAM actual and but-for price indexes using enhanced data – plea period**



**Figure 136: Jaco DRAM actual and but-for price indexes using enhanced data – conspiracy period**



(96)    As shown in Figure 137, redoing the analysis I presented in my initial report on an enhanced dataset yields overcharge results that are comparable to those included in my initial report.

Accordingly, this result is also largely consistent with and support the reasonableness of the results obtained with my initial report analysis.

**Figure 137: Overcharge percentage and single damages based on plaintiffs' total purchases using enhanced data**

| Period | Overcharge | Single damages (millions) |
|---|---|---|
| Plea | 44% | $1,410 |
| Conspiracy | 53% | $1,803 |

## IV.6. My damage estimates are consistent with the facts

### IV.6.1. My damage estimates are consistent with the findings of the plea agreements

(97)    Four of the defendants in this matter, Samsung, Hynix, Elpida, and Infineon, pled guilty to engaging in a conspiracy to fix the prices of DRAM.[49] The fact that these defendants have been indicted and have pled guilty is consistent with the results of my analysis. As mentioned above, after controlling for all the relevant industry factors influencing DRAM prices that were not controlled or influenced by the members of the conspiracy (such as capacity utilization), I have shown that the conspiracy did indeed have an impact and can conclude that any differences between actual and but-for prices can be directly attributed as damages resulting from the conspiracy.

(98)    More specifically, Samsung, Hynix, Elpida, and Infineon have pled guilty to participating in a cartel that "reached agreements to limit the rate of price declines, which were achieved with varying levels of effectiveness."[50] This is completely consistent with the monthly variation seen in my estimated overcharges throughout the period of the conspiracy. Moreover, when calculating Hynix's corporate fine based on its U.S. sales, the DOJ carved out a 14-month period from October 2000 through November 2001, which included the period commonly referred to as the "Kill Hynix" period, from Hynix's plea period.[51] Once again, this is completely consistent with

---

[49]    Elpida's joint venture owners, NEC and Hitachi, signed Cooperation and Non-prosecution Agreements with the DOJ, and their U.S. sales were considered when determining Elpida's corporate fine.

[50]    *U.S. v. Hynix Semiconductor, Inc.,* Plea Agreement, Case No. CR 05-249 PJH, p. 4.

[51]    *U.S. v. Hynix Semiconductor, Inc.,* Joint Sentencing Memorandum, Case No. 05-249 PJH, p. 5.

my damage model where I calculate zero overcharges during the period of July 2001 through December 2001.[52]

(99)     I have also reviewed interrogatory responses served by plaintiffs' counsel that provide substantial detail on defendants' behavior during the relevant time period. These responses contain a large amount of evidence on communications among defendants about prices to be charged to their customers in advance of pricing negotiations, their past prices to the named OEMs and other purchasers including plaintiffs, their production levels, and their fab capacities. In addition to my review of the factual record, I find the evidence cited to be fully consistent with the defendants' participation in an effective price-fixing cartel, as defendants have admitted.

### IV.6.2. DRAM market is far more susceptible to collusion than defendants' experts suggest

(100)    Collusion by the DRAM suppliers is a natural outgrowth of the industry structure. The industry structure is such that suppliers see that the elimination of competition has a large payoff in terms of incremental profit. As I show below, the DRAM industry features several pro-collusive factors, including:

- Homogenous products
- High barriers to entry
- Concentrated industry
- Multi-market contact

(101)    The products in the DRAM market are standardized. DRAM generally is acknowledged to be a standardized product, with industry standards being set by an organization known as JEDEC.[53] There appears to be no disagreement that DRAM chips and most modules are standard across manufacturers. This is well supported by the record, industry compliance with the JEDEC standard, and defendant statements in this and other forums. It is well recognized that markets with standardized products are susceptible to collusion. With standardized products, competition is often largely focused on price, so the benefits to the elimination of competition are large. Also, the monitoring of cartel members conduct is simplified with standardized products versus non-standardized products.

---

[52]   This is for the OEM conspiracy period model. For the OEM plea period model the time period of zero overcharges is August 2001 through December 2001.

[53]   See "About JEDEC," available at http://www.jedec.org/Home/about_jedec.cfm. See also testimony of Robert LeFort, then President of Infineon Technologies North America, regarding the "highly substitutable" nature of DRAM. June 23, 2003 hearing in U.S. International Trade Commission, DRAMs and DRAM Modules From Korea, Inv. No. 701-TA-431, 68–70.

(102)    The DRAM market is characterized by high barriers to entry. Not only does the investment required to build and equip a fab exceed $1 billion, but it takes in excess of a year to construct a fab, and there is substantial "learning by doing" to efficiently manufacture DRAM products, which requires substantial ongoing investment in R&D.[54] All of these factors encumber new entry. As a result of high barriers to entry, elevated conspiratorial prices are unlikely to be undercut by new firms entering the market.[55]

(103)    The DRAM industry can be characterized as a relatively concentrated oligopoly. Using the market share data provided by Dr. Kalt, the co-conspirators identified by the Department of Justice together account for between 75% and 80% of the market.[56] Taken together, defendants in these cases comprise between 83% and 93% of the market for DRAM. The relatively high levels of concentration in the DRAM market can be expected to increase its susceptibility to collusion.

(104)    DRAM manufacturers have many contacts across markets. Several of the DRAM manufacturers are also the largest manufacturers of other memory products such as SRAM and Flash.[57] It is well recognized that collusion can be sustained more easily if cartel members interact in multiple markets.[58] With multi-market contact, cartel members have more at risk if they deviate from conspiratorial behavior in one of the markets, which reduces the incentive for them to cheat on the cartel agreement. In addition, contacts in multiple markets increase the frequency of interactions between suppliers, and the more frequently interactions occur, the easier it is to

---

[54]    See for example the deposition of Johann Harter, Infineon (November 20, 2007), 47–49 and 127–128.

[55]    Dr. Kalt concedes that there are high barriers to entry in the DRAM industry: "The DRAM industry is characterized by high up-front costs in production facilities, and relatively low variable or marginal costs. For example, in 2002, the cost of a modern fab using 300 mm silicon wafers is estimated to be in the range of $2.5 billion…" (Expert Report of Joseph Kalt, 13). Dr. Shapiro identifies "entry barriers" as one of the "prerequisites to successful collusion." (Louis Kaplow and Carl Shapiro, Antitrust, Chapter 15 in the *Handbook of Law and Economics*, Volume 2, edited by A. Mitchell Polinsky and Steven Shavell, Elsevier B.V., 2007, at 1103). Shapiro also lists "[c]ollective market power including entry barriers" as one of the "factors relating to market structure that affect the incentive and ability of oligopolistic suppliers to sustain a collusive outcome in repeated play." (Louis Kaplow and Carl Shapiro, Antitrust, Chapter 15 in the *Handbook of Law and Economics*, Volume 2, edited by A. Mitchell Polinsky and Steven Shavell, Elsevier B.V., 2007, at 1112 and 1115).

[56]    The co-conspirators identified by the Department of Justice include Samsung, Hynix, Micron, Infineon, and Elpida.

[57]    For example, Samsung and Hynix each produced large quantities of SRAM and flash memory during the plea period. Samsung has been the world's leading supplier of SRAM since 1995 and the largest supplier of Flash Memory since 2003. See, e.g., Hynix Annual Report 2003 at 38; "Samsung – About Us – Performance," available at http://www.samsung.com/global/business/semiconductor/aboutus/AboutUs_Performance.html.

[58]    See for example B. Douglas Bernheim and Michael Douglas (1990): "Multimarket contact and collusive behavior", RAND Journal of Economics 21: 1–26; Philip M. Parker and Lars-Hendrik Röller (1997): "Collusive conduct in duopolies: multi-market contact and cross-ownership in the mobile telephone industry," *RAND Journal of Economics* 28: 304–322; William N. Evans and Ioannis N Kesides (1994): "Living by the "golden rule": multimarket contact in the U.S. airline industry," *Quarterly Journal of Economics* 109: 341–366.

sustain collusion.[59] Contacts in other markets may also offset asymmetries among suppliers in individual markets.[60,61] Also, interaction in other markets creates opportunities for cartel members to make monetary transfers without attracting substantial attention. Thus, multi-market contact among firms in a market can increase susceptibility of the market to collusion.

### IV.6.3. There is substantial evidence in the record supporting an August 1998 start date

(105)    As I noted in my initial report, I have reviewed the factual record in this case to understand defendants' conduct during the period of the conspiracy. Since my initial report, I have conducted further review of the evidence detailing defendants' conduct. I have seen numerous additional examples of defendants' coordination on DRAM pricing and production. Furthermore, there is substantial evidence suggestive that DRAM producers were coordinating on pricing and production cuts at least as early as August 1998.

(106)    The additional evidence seen in my further review of the factual record, in combination with the evidence I cite in my initial report, shows that several defendants had extensive communications on DRAM pricing from at least as early as August 1998 through April 1999, when defendants' plea periods start. For example:

- Multiple emails show that Samsung, Micron, and Siemens (later Infineon) shared their respective companies' future prices for Dell in August and September 1998. In two separate emails in this timeframe, Paul Chew, a member of the Key Accounts marketing team at Siemens, emailed future Micron and Samsung pricing information to others at Siemens, stating "Just spoke to Samsung guys regarding Dell's pricing…Prices are as below"[62] and "the prices I got from Samsung is [sic] the same as last month's. Same goes for Micron."[63]

---

[59]    See for example Oliver E. Williamson (1965): "A dynamic theory of interfirm behavior," The Quarterly Journal of Economics. 79(4): 579–607.

[60]    As an example, let firm A be the dominant firm in the market for product X, firm B the dominant firm in the market for product Y, and both firms sell in both markets. Let firm A and firm B have a collusive agreement in both markets. Firm A may be tempted to deviate from the collusive agreement in market X, where it is dominant. However, a possible response by firm B in the market Y deters firm A from cheating in the other market. (Louis Kaplow and Carl Shapiro, Antitrust, Chapter 15 in the Handbook of Law and Economics, Volume 2, edited by A. Mitchell Polinsky and Steven Shavell, Elsevier B.V., 2007, at 1112).

[61]    Note that there is nothing that mandates that this cartel use a market share agreement or customer allocation agreement (the example of OPEC raised by Dr. Murphy provides one illustration of this). Many other mechanisms exist for the division of the ill-gotten gains, and the cartel may have chosen one of these. In the presence of multi-market contact, a complete analysis of the division of profits among cartel members would need to include multiple markets.

[62]    ITNA00025552.

[63]    ITNA00025548.

- Similarly, Samsung, Hynix, and multiple Japanese DRAM suppliers coordinated on IBM and Apple prices for September 1998. On August 17th, 1998, C.K. Chung, then a manager for Strategic Accounts at Hynix Korea, sent an email to Paul Palonsky, the IBM account manager at Hynix America, stating, "Got a telephone call from the Samsung guys. As expected Samsung will raise (or at least try to) increase the pricing across the board in September…They will coordinate with Japanese suppliers, asking them to raise, or at least not to lower from August prices."[64] On August 26, 1998, Rob Sharpe, a Hynix manager who worked on the Apple, Sun, and HP accounts, emailed Seung Lee, Gary Swanson, CK Chung and others with detailed pricing information for Apple that he obtained from Samsung.[65] In a September 17, 1998, email, C.K. Chung stated that he asked Samsung to facilitate the coordination of pricing between Samsung, Hynix, LG, NEC and other Japanese DRAM suppliers: "Talked with Samsung and LG; 1. Samsung will quote $9.50/$76 as the first pass. NEC will take almost the same position, or more precisely, Samsung will invite NEC to do that. I asked Samsung to contact Toshiba, Hitachi, Mitsubishi, etc and advertise our first pass pricing so that those Japanese guys can get some guts."[66] C.K. Chung later pleaded guilty to price-fixing.[67]

- In an email dated October 27, 1998, Hynix's Clint Miller lists DRAM pricing information from several competitors: "based on the current information it looks like Samsung, NEC, Fujitsu, Hitachi and Mitsubishi will be moving to the $73–75 range (8Mx64 PC 100). Siemens, LG and Micron will be moving to the $71–73 range. Toshiba will probably be $70–71. We will work on additional information this week. Samsung claims to have gone in first pass at $76.00." Mr. Miller then suggests that Hynix set its pricing in line with the prices of its competitors, proposing that Hynix's price for 8Mx64 PC 100 be $73.50.[68]

- A chain of emails ending December 2, 1998, between Infineon employees including Rudd Corwin, Christian Scherp, and Andreas von Zitzewitz states, "our competitors are actually showing some signs of a disciplined approach to pricing...Through our contacts we are constantly monitoring how our competition @ DELL is positioned and how they are acting/negotiating as this is absolutely key to position ourselves."[69]

- Similarly, a January 26, 1999, email from Hynix's Charles Byrd to J.K. Kim, C.K. Chung, and others, reflects a conversation he had with Micron, Siemens/Infineon, Samsung and NEC

---

[64]    HSA643663.

[65]    HSA00665598.

[66]    HSA00666551.

[67]    Plea Agreement of Dae Soo Kim in *United States of America v. Dae Soo Kim*, February 28, 2006.

[68]    HSA 00685375-76.

[69]    ITNA 01069608-11.

regarding pricing to Dell and Gateway. Mr. Byrd recommends basing Hynix's Dell quote on the competitors' prices.[70]

(107)    Similarly, evidence seen in my additional review of the factual record, in combination with the evidence I cite in my initial report, shows that defendants also implemented coordinated production shutdowns aimed at raising or stabilizing market prices at least as early as August 1998. For example:

- On June 18, 1998, an email from C.K. Chung to Gary Swanson states, "As you may know, Korean Company, possibly Japanese, are planning to cut production up to as much as 25%. With regard to this production cut, Our best interest would be to keep up the current price flat at Strategic Account (possibly increase at Dell etc. and some increase at Spt/Oct.)." [sic][71]

- In an email dated July 10, 1998, Hynix's Ken Heller told Larry Masotti of Celestica, one of Sun's external manufacturers, that the "Hyundai Production Stoppages" went into effect this week" and that "we are serious about assisting the reduction of global DRAM supply."[72]

- Hynix and Samsung indicated that Korean and Japanese production shutdowns were working in August 1998. On August 7, 1998, a Samsung official was quoted in a trade press article as stating, "[P]rices have been rising recently, depending on the item, with surplus stocks of 64M DRAMs having been drained out as a result of production cuts by the three Korean semiconductor makers, as well as Japanese makers such as NEC Corp. and Toshiba."[73]

- On August 10, 1998, Charles Byrd, the strategic account manager for Dell and Gateway at HSA, emailed Mark Ellsberry, Gary Swanson, Clint Miller and others with comments on a trade press article that had appeared in the Electronic Buyer's News. The email is titled "Its [sic] time to [t]ell everyone the shutdowns are working and inventory is low!" The article he references states, "Most of Japan's chip makers are joining their South Korean rivals in shutting down their Dynamic RAM fabs for one to two weeks of summer vacation." [74]

- C.K. Chung testified that around June 1998, Hynix's management was discussing cutting production for the purpose of stabilizing DRAM prices.[75] Similarly, Charles Byrd testified that he believed the three major Korean DRAM manufacturers had agreed to stop production for a period of time around June 1998.[76]

---

[70]    HSA 3075518-19.

[71]    HSA00655761. Note that this email was technically sent by syelee to Gary Swanson, but was electronically signed by C.K. Chung.

[72]    HSA00633988.

[73]    HSA00647813-14.

[74]    HSA00674303-05.

[75]    Deposition of Chae Kyun Chung, Hynix (July 27, 2006), 83-86.

[76]    Deposition of Charles Byrd, Hynix (April 20, 2006), 127.

(108)    While the examples above illustrate a few specific instances of defendants' communication and coordination, the extensive factual record detailing defendants' communication on pricing and production is far too voluminous to cite to each piece of evidence here.[77] What is most important to note is that as least as early as August 1998, multiple defendants were coordinating DRAM pricing and production decisions with multiple other defendants.

---

[77]    For other examples of defendant communications on prices and production between August 1998 and April 1999 see, e.g., MU0094210-14 ITAG 00612474, MU 00201199-214, HSA 3100312-16, EMUS 1028125, ITNA 01069693-94, ITAG00135561-62, ITAG 00129838, ITNA 01290164-66, NECELAM 086703, ITNA 00022895, ITAG 00184544, HSA00754700, HSA00634990-91, HSA00656276, HSA00659940, MU00205955, HSA00668687-88, HSA3016482, HSA00134659, HSA00662592-96, HSA00646477-91, HSA3116542, NECELAM 010824-28, NECELAM 143167-69, HSA 3044805-06, NECELAM 092070, NECELAM 142922-24, NECELAM 086726, HSA00649182, NECELAM 141765-67, NECELAM 010881-82, NECELAM 086885-86, and HSA 3075516-17.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

# V.   Defendants' experts' damage analyses are fundamentally flawed

## V.1. Introduction

(109)   Alternative damage calculations presented in Dr. Rubinfeld's and Dr. Shapiro's reports are flawed and unreliable. The econometric models presented by both experts are restrictive and impose implausible assumptions. I will show that these assumptions contradict economic theory and testimony of defendant's experts, and are not supported by the data.

(110)   Dr. Rubinfeld makes a number of fundamental mistakes including:

- Incorrect calculation of but-for prices
- Erroneous exclusion of a significant amount of SGI purchases from the damages base

(111)   Mistakes in Dr. Shapiro's approach include:

- A flawed functional form for the price regression that tends to underestimate overcharges
- Use of explanatory variables that are contaminated by the conspiracy

(112)   After correcting their mistakes and correcting several of their erroneous and implausible assumptions, I find that their damage estimation methods produce substantial damages. Therefore, these analyses are largely consistent with and support the reasonableness of the results obtained with the method I used in my initial report described in Section I.2.

## V.2. Dr. Rubinfeld's analysis of damages is flawed and unreliable

### V.2.1. Introduction

(113)   In his report, Dr. Rubinfeld provides two approaches to estimating damages: a dummy variable approach and a forecasting approach. He also provides suggestions for tests that should be conducted when using these approaches to ensure that the damage analysis generates reliable results.

(114)   I have examined Dr. Rubinfeld's analyses in detail, and I have found several obvious mistakes in how they were implemented. When I correct for these errors, I find that both of Dr. Rubinfeld's approaches corroborate the conclusions from my initial report and yield significant damages.

(115)   In addition, I have implemented the test that Dr. Rubinfeld suggests to determine whether one should have concerns with the reliability of his results. Dr. Rubinfeld does not provide any evidence in his report or the supporting materials that he performs this test, despite recommending that it should be performed. When I perform it, the test clearly demonstrates that the forecasting approach is the more appropriate approach to use in this matter. Dr. Rubinfeld, however, improperly concludes in his report that a dummy variable model is the preferred

method. He does not reach this conclusion based on the test he suggests should be performed, contradicting his own report. Instead, Dr. Rubinfeld bases his conclusion on unsupported assertions that are not consistent with the empirical evidence.

(116)   Finally, in calculating SGI's "damage base," the purchase value to which overcharge percentages should be applied in calculating total damages, Dr. Rubinfeld makes a number of inappropriate assertions and computational errors.

### V.2.2. Once I correct Dr. Rubinfeld's analysis, his damages estimates corroborate those in my initial report

(117)   Dr. Rubinfeld has offered two damages analyses to support his opinion. In both of these approaches, he does not appropriately account for the dynamic nature of the model he is using to estimate damages. Once I correct Dr. Rubinfeld's work for this basic econometric error, his analysis corroborates the results in my initial report.

### V.2.2.1. Errors in forecasting model

(118)   In one of his two approaches, Dr. Rubinfeld uses a forecasting model that is conceptually similar to the approach in my initial report.[78] He estimates a model in which the current price of DRAM is predicted by cost and demand factors and the previous period's DRAM price. This is generally consistent with my approach, and including the previous period's price allows Dr. Rubinfeld to account for the pricing dynamics in the market.

(119)   To compute overcharges based on a forecasting model, one must first compute but-for prices to remove the effects of the conspiracy. In order to effectively remove the impact of the conspiracy but-for prices must be constructed using variables that were not contaminated by the conspiracy itself.[79] As Dr. Rubinfeld himself notes, including any variable that was "tainted" by the conspiracy would result in biased but-for price estimates. Dr. Rubinfeld stresses the importance of this issue and suggests conducting a series of robustness tests to determine whether variables that are included in the model could have been affected by the cartel.[80]

---

[78]   Although Dr. Rubinfeld criticizes me for not attributing returns in the data, I disagree with his approach for dealing with these negative transactions. Furthermore, removing the return attribution from Dr. Rubinfeld's processing does not change the conclusions drawn from his model. See Appendix E for a detailed review of his flawed methodology for handling returns.

[79]   See the Expert Report of Daniel Rubinfeld's, ¶ 362 and ¶ 374, and the deposition of Daniel Rubinfeld (Rough) (April 25, 2008), 45-48 and 187-190.

[80]   See the Expert Report of Daniel Rubinfeld, ¶ 362 and footnote 261.

(120)    In an effective price-fixing conspiracy, the variable most directly "tainted" would be the price that was obtained during the conspiracy. Therefore, in any model where the current month's price depends in part on the previous month's price, the appropriate way to compute but-for prices is to use the previous month's but-for price to update the current but-for price. By rolling this process forward, the resulting "dynamic forecast" generates but-for prices that are not contaminated by previous months' conspiracy-impacted prices. For instance, in the first month of the conspiracy period (at time = 1), the proper way to compute the but-for price is to use the actual price in the month before the conspiracy period (i.e., the actual price at time = 0). In the second month of the conspiracy, however, the appropriate method is to use the but-for price for the first month of the conspiracy (t = 1), not the actual price.

(121)    Dr. Rubinfeld emphasizes in his forecasting textbook the special treatment that is required to appropriately update a simulated series such as a but-for price:

> "we can simulate the model by solving it over time, using actual values of the explanatory variables. (If the equation contained a lagged dependent variable, we would use the predicted value of that variable, updating it period by period, to create a dynamic simulation.)"[81]

(122)    Nevertheless, in his analysis, Dr. Rubinfeld makes the mistake of not using the predicted (but-for) price. Instead, in constructing but-for prices, Dr. Rubinfeld erroneously uses the previous month's actual conspiracy price to calculate the current period's but-for price.[82] This error ensures that his but-for prices are never far from the actual conspiracy prices and therefore leads to contaminated estimates of but-for prices and overcharges that are substantially biased.

(123)    I correct this mistake. Figure 138 and Figure 139 compare the but-for prices before and after the correction for all DRAM and SDRAM only products, respectively. Figure 140 compares the overcharges in Dr. Rubinfeld's expert report against the overcharges based on the corrections to his forecast model. These show substantial overcharges and corroborate the results presented in my initial report. In fact, correcting this error increases overcharges by more than a factor of five and makes them largely consistent with my own results. For comparison with the results reported in Dr. Rubinfeld's expert report, Figure 141 contains comparable results for forecast models estimated on SDRAM only.

---

[81]    See Pindyck and Rubinfeld (1998) "*Econometric Models and Economic Forecasting*", fourth edition, p. 210.

[82]    Exhibit 33, Panel 2, in the Expert Report of Daniel Rubinfeld identifies "1st lag of the dependent variable [price]" as a right hand side variable.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.   V. Defendants' experts' damage analyses are fundamentally flawed

**Figure 138: But-for prices for the forecast model before and after correcting for Rubinfeld's mistake (All DRAM)**



**Figure 139: But-for prices for the forecast model before and after correcting for Rubinfeld's mistake (SDRAM only)**



Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.   V. Defendants' experts' damage analyses are fundamentally flawed

**Figure 140: Average overcharges for the forecast model during the conspiracy period (All DRAM)**

| Method[83] | Overcharge (dollar-per-bits)[84] | Overcharge (percent of expenditure) |
|---|---|---|
| Rubinfeld's reported estimate using forecast model incorrectly | 10.9%[85] | 13.9%[86] |
| Corrected forecast model but-for prices | 54.1% | 77.4% |

Source: Code and data provided by Dr. Rubinfeld, corrected by Bates White staff

**Figure 141: Average overcharges for the forecast model during the conspiracy period (SDRAM only)**

| Method | Overcharge (dollar-per-bits) | Overcharge (percent of expenditure) |
|---|---|---|
| Rubinfeld's reported estimate using forecast model incorrectly | 2.5%[87] | 4.1%[88] |
| Corrected forecast model but-for prices | 28.9% | 56.5% |

Source: Code and data provided by Dr. Rubinfeld, corrected by Bates White staff

### V.2.2.2. Corrections to dummy variable approach

(124)    Dr. Rubinfeld's "preferred" specification uses a dummy variable approach to estimate the impact of the defendants' admitted conspiracy. Dr. Rubinfeld constructs but-for prices from his dummy variable model and uses these to compute overcharges. In doing so, he makes the same mistake that I described above in discussing the forecasting approach. That is, he erroneously updates but-for prices using last month's actual price rather than last month's but-for price. In addition, he makes a second error that is specific to the dummy variable model.

(125)    Dr. Rubinfeld mistakenly writes that the coefficient on the dummy variable measures "the average percentage increase in price that is not accounted for by the inclusion of other explanatory variables in the model."[89] He continues, "In these regressions, the estimated coefficient on the dummy variable is small in magnitude, which suggests that the percentage overcharge associated with the alleged conspiracy is small (this assumes that any effects not

---

[83]    Unless otherwise noted, overcharges reported for Dr. Rubinfeld's work are from his "preferred" specification in log levels.

[84]    In the exhibits to his report, Dr. Rubinfeld reports two overcharge "percentages": one on a "dollar per bit" level and one on a "percentage of expenditure" level. For ease of comparison to Rubinfeld's own report, I will report both figures throughout this section. Please refer to section V.2.5 for a detailed discussion of the two overcharge calculations.
       Note that all overcharge figures reported herein do not provide credit to Samsung in months where the overcharge is negative. As discussed in more detail below, this has a marginal impact on the overall results.

[85]    See the Expert Report of Daniel Rubinfeld, Exhibit 33, Panel 1, in row 1, column 1.

[86]    See the Expert Report of Daniel Rubinfeld, Exhibit 33, Panel 1, in row 1, column 3.

[87]    See the Expert Report of Daniel Rubinfeld, Exhibit 35, Panel 1, in row 2, column 3.

[88]    Calculated in Rubinfeld's analysis code but not presented in his report.

[89]    Expert Report of Daniel Rubinfeld, ¶ 399.

reflected in the coefficients for the other explanatory variables can be attributed to the alleged conspiracy)."[90]

(126)    While his statement would be correct for a simple dummy variable model, the statement is incorrect for a model like Dr. Rubinfeld's that includes the previous period's price on the right hand side of his estimation equation. The equation estimated by Dr. Rubinfeld is the following:

$$P_t = \alpha + \beta X_{t-i} + \rho P_{t-1} + \gamma D_t + \varepsilon ,$$

(127)    where $P_t$ is the DRAM price in month $t$. $X_{t-i}$ represents the values of the cost and demand factors over the current and recent months, $P_{t-1}$ represents the previous month's DRAM price and $D_t$ is the conduct period indicator.

(128)    The overcharges in this type of dummy variable model depends not only on the coefficient on the dummy variable ($\gamma$), but also on the coefficient of the previous month's price ($\rho$). For Dr. Rubinfeld's baseline log-level specification, the average overcharge over the period August 1998 – June 2001, (a period of 47 months), is given by the following expression:

$$\text{Average overcharge} = 1 - \frac{1}{47}\sum_{t=1}^{47}\exp(-\gamma\sum_{\tau=0}^{t-1}\rho^\tau) \qquad (0.1)$$

(129)    When I correct this conceptual error and correctly calculate the overcharge implied by the estimated coefficients of his model, I find that Dr. Rubinfeld's model produces substantial overcharges. Figure 142 contains the overcharge estimates calculated from Dr. Rubinfeld's dummy variable model before and after correcting for the error described above.

**Figure 142: Average overcharges for the dummy variable model during the conspiracy period based on estimated coefficients**

| Products | Dummy variable coefficient ($\gamma$) | Average overcharge correctly based on dummy variable coefficient ($\gamma$) and coefficient on previous month's price ($\rho$) |
|---|---|---|
| All DRAM | 5.1%[91] | 37.3% |
| SDRAM only | 5.8%[92] | 40.9% |

Source: Code and data provided by Dr. Rubinfeld, Bates White calculations.

---

[90]    Expert Report of Daniel Rubinfeld, ¶ 401.

[91]    Computed in Rubinfeld's analysis code but not presented in his report.

[92]    Computed in Rubinfeld's analysis code but not presented in his report.

### V.2.3. Applying Dr. Rubinfeld's own suggestion demonstrates that my approach is reliable and less restrictive than Rubinfeld's

(130)    Dr. Rubinfeld states that in his dummy variable model "non-conspiratorial demand and supply factors are assumed to have the same effects on price in both conspiracy and non-conspiracy periods."[93] I agree that this assumption is embedded in his model, and I note that Dr. Shapiro makes the same assumption.[94]

(131)    Economic theory teaches that cost and demand factors generally have a different impact on price during a period in which an effective price fixing conspiracy is in operation compared to a more competitive benchmark period. For example, conspiracy period prices might respond differently to changing consumer demand or to decreasing input costs as compared to prices responses in a more competitive period. In such circumstances, it is dangerous to impose the restriction of common impact of the cost and demand variables across both periods, as incorrectly imposing this restriction can easily lead to misleading estimates of but-for prices.

(132)    As Dr. Rubinfeld notes, the validity of the restriction he imposes can easily be tested. He writes in a footnote:

> "A second test would involve adding an appropriate set of interaction variables (the product of variables reflecting certain supply and demand variables and the dummy variable that reflects the period of alleged collusion). If one were to take this exercise to the extreme and estimate a model that included interactions with respect to all explanatory variables the dummy-variable method would be equivalent to estimating two different models, one for the control period and one for the collusive period."[95]

(133)    In his expert report, Dr. Rubinfeld does not reveal whether or not he conducted such a test. Had he performed this test, he would have found that the test indicates that it is not appropriate to assume that non-conspiratorial demand and supply factors have the same effects on price in both conspiracy and non-conspiracy periods.[96] This suggests that the simple dummy variable approach

---

[93]    See the Expert Report of Daniel Rubinfeld, ¶ 364.

[94]    See discussion of Dr. Shapiro's model in Section V.3.

[95]    See the Expert Report of Daniel Rubinfeld, footnote 261.

[96]    Specifically, I test the null hypothesis that the interaction variables have zero coefficients, following Dr. Rubinfeld's recommendation. For the fully interacted model in log-levels I rely on Dr. Rubinfeld's assertion that the logarithm of prices is likely to be stationary (see the Expert Report of Daniel Rubinfeld footnote 272). Applying the standard test on Rubinfeld's all DRAM price series model yields an F-statistic $F(14,77) = 2.13$, p-value = 1.8%. For the fully interacted model in log-levels estimated using Rubinfeld's SDRAM only price series, the standard test yields an F-statistic $F(14,77) = 2.14$, p-value = 1.8%. I therefore reject the hypothesis that the

is inappropriate in this context. I therefore re-estimate Dr.Rubinfeld's preferred model, removing the incorrect restrictions he imposed and allowing the coefficients on the cost and demand variables to differ between conspiracy and benchmark periods. I will refer to this more flexible model as the "fully-interacted" dummy variable model.

(134)    In Figure 143, I present overcharge computations for all DRAM products using the dummy variable model. Figure 144 illustrates the comparable results for SDRAM. I present the dummy variable coefficient together with Dr. Rubinfeld's reported overcharges corrected for Dr. Rubinfeld's neglect of the lagged dependent variable described previously. I also report the overcharge obtained from the fully interacted dummy variable model.[97] In each case, simply correcting Dr. Rubinfeld's miscalculation of but-for prices yields overcharge estimates that are comparable to those that I estimated.

**Figure 143: Average overcharges for the dummy variable model during the conspiracy period (All DRAM)**

Dummy variable coefficient: 5.1%[98]

| Method | Dollar-per-bits overcharge | Percent of expenditure overcharge |
|---|---|---|
| Rubinfeld's reported estimate using dummy model incorrectly | 4.0%[99] | 5.0% |
| Corrected dummy model but-for prices | 37.2% | 52.9% |
| Fully interacted dummy model but-for prices | 54.2% | 77.5% |

Source: Code and data provided by Dr. Rubinfeld, Bates White calculations.

---

supply and demand factors have the same impacts in the conspiracy and non-conspiracy periods. Dr. Rubinfeld's assumption is not supported by the data.

[97]    The small difference between the overcharges for the but-for prices correctly computed for forecast model reported in Figure 140 and those reported in Figure 143 for the but-for prices correctly computed for the fully interacted dummy variable model is due to an adjustment introduced by the logarithmic transformations involved here.

[98]    Computed in Rubinfeld's analysis code but not presented in his report.

[99]    Computed in Rubinfeld's analysis code but not presented in his report.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.   V. Defendants' experts' damage analyses are fundamentally flawed

**Figure 144: Average overcharges for the dummy variable model during the conspiracy period (SDRAM only)**

Dummy variable coefficient: 5.8%[100]

| Method | Dollar-per-bits overcharge | Percent of expenditure overcharge |
|---|---|---|
| Rubinfeld's reported estimate using dummy model incorrectly | 2.7%[101] | 4.8% |
| Corrected dummy model but-for prices | 26.6% | 52.1% |
| Fully interacted dummy model but-for prices | 29.0% | 56.6% |

Source: Code and data provided by Dr. Rubinfeld, Bates White calculations.

### V.2.4. Dr. Rubinfeld reduces SGI's damage base using unsubstantiated assertions and a computational error

(135)   In Exhibit 30 of his expert report, Dr. Rubinfeld summarizes his reduction of SGI's damage base from more than $169 million as presented in Figure 17 of my initial report to less than $2 million. Before even beginning his analysis, Dr. Rubinfeld excludes without explanation all purchases of DRAM by SGI from manufacturers other than Samsung and all Samsung purchases that were delivered to SGI's Swiss subsidiary. This exclusion simply ignores the joint and several liability claim asserted by SGI against Samsung. Additionally, Dr. Rubinfeld's analysis contains computational errors and unsupported assumptions that I outline and correct below.

1. First, Dr. Rubinfeld arbitrarily removes all SGI purchases of asynchronous DRAM. I have corrected his analysis by including these asynchronous DRAM purchases.

2. Second, he considers only sales to SGI that occurred during the plea period, April 1, 1999 through June 15, 2002. For the purposes of this analysis, I assume that this time period is valid: performing this calculation on the conspiracy period, August 1, 1998 through June 15, 2002, increases SGI's purchase value slightly.[102,103]

3. Third, he uses invalid assertions to exclude the value of transactions for which Samsung was SGI's sole supplier. As I discuss below, there is no justification for removing these purchases, and I corrected his analysis by including them in SGI's damage base.

4. Finally, Dr. Rubinfeld removes the value of SGI's purchases that he deems to be due to the "special premia paid by SGI (new product premium, customization premium, reliability

---

[100]   See the Expert Report of Daniel Rubinfeld, Exhibit 35, Panel 2, in row 2, column 1.

[101]   See the Expert Report of Daniel Rubinfeld, Exhibit 35, Panel 3, in row 1, column 1.

[102]   Adding the months of August 1998 through March 1999 to this analysis would add approximately $1.3 million in SGI purchases from Samsung.

[103]   For simplicity, I will exclude any lingering effects period from this analysis.

premium, engineering fees)."[104] He does so by replacing the prices SGI paid for "custom" modules with the monthly average price per megabyte paid by the OEMs for SDRAM, RDRAM, and DDR modules purchased during the same period.[105] In doing so, Dr. Rubinfeld makes a computational error that has a substantial impact on the results of his analysis. Specifically, Dr. Rubinfeld fails to multiply prices by quantities, so quantities are effectively set to one unit, regardless of the size of a given transaction. Even if I assume Dr. Rubinfeld is justified in removing "special premia" paid by SGI and I replicate his analysis having corrected for this computational error, I find that Dr. Rubinfeld significantly overstated the amount of purchases that would be removed from SGI's damage base. Further, Dr. Rubinfeld uses an all-technology average OEM price to generate the results in his Exhibit 30. Alternatively, if I use technology-specific average OEM prices to replace SGI prices instead of the all-technology average OEM price used by Dr. Rubinfeld, I find that SGI's damage base is not materially different than it is without performing any price adjustment.

(136)    Figure 145 below summarizes these four steps and the calculations made by Dr. Rubinfeld in Exhibit 30 of his expert report, and it compares his results to the results that are generated after correcting his mistakes and removing his invalid assumptions.[106]

---

[104]    Expert Report of Daniel Rubinfeld, ¶ 246.

[105]    As discussed below, and more thoroughly discussed in Section VI.13., many of Dr. Rubinfeld's characterizations of SGI being a "special" purchaser of DRAM are incorrect and unsubstantiated.

[106]    In Exhibit 30 of his Expert Report, Dr. Rubinfeld performs this calculation using two methods. In the first panel, he claims to generate an adjusted module price by replacing the price of SGI's "custom" products with the average OEM price per megabyte for 512 MB, 1024 MB SDRAM, RDRAM, and DDR modules. In the second panel, he claims to generate an adjusted module price using the average price all purchasers paid for 128 Mb and 256 Mb SDRAM, RDRAM, and DDR chips. Both analyses produce similar results. In Figure 145, I only display the results according the method used in the first panel.

**Figure 145: Revised Rubinfeld Exhibit 30, plea period scenario**

| | | | Dr. Rubinfeld's Exhibit 30 | | Dr. Rubinfeld's Exhibit 30 (Corrected) | |
|---|---|---|---|---|---|---|
| | | | Incremental damage base change | Remaining damage base dollars | Incremental damage base change | Remaining damage base dollars |
| | | SGI total purchases of Async, SDRAM, RDRAM, DDR from 1/1/1997 – 12/31/2002 | | $69,843,713 | | $69,843,713 |
| Step 1 | | Remove Async. parts | ($1,594.881) | $68,248,832 | ($0) | $69,843,713 |
| Step 2 | Time period | Samsung final plea period: 4/1/1999 – 6/15/2002 | ($20,358,726) | $47,890,106 | ($20,544,359) | $49,299,354 |
| Step 3 | Portion of purchases | Exclude parts from sole supplier | ($18,737,605) | $29,152,501 | ($0) | $49,299,354 |
| Step 4.a | Prices impacted by conspiracy | Use monthly average module price of OEM purchases of SDRAM, RDRAM, DDR[107] | ($27,234,087) | $1,918,415 | ($18,019,664) | $31,279,690 |
| Step 4.b | Prices impacted by conspiracy | Use monthly average by-technology module price of OEM purchases of SDRAM, RDRAM, DDR | N/A | N/A | $(582,676) | $48,716,679 |

(137)    I now provide a more detailed discussion of each of the four adjustments made by Dr. Rubinfeld and the basis for my corrections.

(138)    First, SGI's purchases of asynchronous DRAM products from Samsung are removed by Dr. Rubinfeld.[108] No justification is provided for this removal. In fact, asynchronous DRAM continued to be purchased in significant volume by SGI and others during the conduct period. As seen in Step 1 in Figure 145 above, I have corrected his calculation by adding these purchases back into his analysis, thus increasing SGI's damage base by $1.6 million compared to Dr. Rubinfeld's number.

(139)    Second, Dr. Rubinfeld limits his analysis to the plea period. For illustrative purposes, the corrected portion of Step 2 in Figure 145 above contains only plea period purchases. As discussed above, however, performing this analysis on the conspiracy period, August 1, 1998 through June 15, 2002, increases SGI's purchase value slightly.

(140)    Third, Dr. Rubinfeld removes the dollar value of all purchases for which Samsung was SGI's sole supplier. He justifies this by arguing that if Samsung was already charging a monopoly price on the sole sourced products, the price of these products could not be impacted by the cartel. In

---

[107]    Monthly average module price calculated using all technologies.

[108]    This amount includes $769,384 in purchases of EDO and $825,498 in purchases of FPM during 1999 and 2000.

making this argument he confuses sole supplier agreements with the situation in which a firm is the sole producer of a product.

(141) Sole supplier relationships are common in industries similar in structure to the DRAM industry. In industries where prices are relatively transparent, firms that make purchases from a single supplier use the same publicly available pricing information when determining prices as firms that make purchases from multiple suppliers. SGI had access to information about prevailing market prices and was able to use this as a credible threat to switch to other suppliers should Samsung charge prices that SGI deemed too high.[109] Further, even though SGI made the strategic decision to purchase some products in some months from Samsung only, SGI typically had at least two qualified suppliers for all of the DRAM products they purchased. Moreover, other suppliers were able to make the same products and could have become qualified.[110] The existence of multiple suppliers capable of supplying DRAM to SGI would restrain Samsung from charging a monopoly price.[111] Therefore, there is no foundation for excluding the value of the sole-sourced products from SGI's damage base. As seen in Step 3 in Figure 145 above, I have corrected his calculation by retaining these sole-sourced purchases, thus increasing SGI's damage base by $18.7 million compared to Dr. Rubinfed's number.

(142) Finally, in addition to the steps described above, Dr. Rubinfeld reduces the purchases of SGI by transforming SGI prices to alleged "OEM equivalent" prices. He claims that he is doing this to remove the "special premia" paid by SGI. Dr. Rubinfeld is not justified in making this claim. As discussed in Section 6.13, Dr. Rubinfeld's characterizations of SGI being a "special" purchaser of DRAM are incorrect and unsubstantiated.

(143) The adjustment that Dr. Rubinfeld proposes is not in accord with industry facts or economic sense. By Dr. Rubinfeld's calculations, the reduction in purchase totals indicates that the "special premia" characteristics of SGI's modules account for 93% of the modules' price, whereas less than 7% is attributable to the actual cost of the DRAM chips on the modules.[112] This is not plausible given the nature of pricing in the DRAM industry. Numerous documents suggest that the majority of the cost of DRAM products comes from the individual DRAM chips

---

[109]   Deposition of Alain Ishiguro, SGI (November 20, 2007), 80-81.

[110]   Deposition of Alain Ishiguro, SGI (November 20, 2007), 75-76, 81-83.

[111]   Dr. Rubinfeld's computation of "sole source" purchases is unreliable since it is based solely on SGI's receipt records. These records do not indicate when the modules were purchased or which suppliers provided quotes, which suppliers were considered, which suppliers were qualified, which suppliers were in the process of qualification, or which suppliers were seeking qualification at the time of purchase; the data also do not indicate Samsung's knowledge of the various options being considered by SGI at the time of purchase.

[112]   See Section VI.13 for a discussion of Dr. Rubinfeld's mischaracterization of SGI's "custom" modules and "special" circumstances.

themselves.[113] These chips are standard components used by the rest of the DRAM industry and the chips themselves are not expected to contain any "custom" cost.[114]

(144)    Even if I were to assume he is justified in performing this reduction of purchases from SGI's damage base, in implementing this step, Dr. Rubinfeld makes a calculation error. This error has a substantial effect on the outcome of his analysis. Specifically, he computes the adjusted average price per unit but forgets to multiply this by the transaction quantity in order to arrive at an adjusted transaction value. This means that for each transaction he replaces the value of many units with the value of a single unit. Because of this mistake, the portion of SGI's purchases that Dr. Rubinfeld claims had been affected by "non-conspiratorial" factors is substantially overestimated. While I do not agree with his approach in removing these "special premia," I have corrected his computational mistake in his final step to show that it has a large impact on his results. By correcting only this mistake, SGI damage base is increased by $18.7 million to more than $20 million, over 10 times the amount originally reported in Dr. Rubinfeld's Exhibit 30.[115] In total, by including SGI's purchases of asynchronous DRAM, not excluding the value of purchases for which Samsung was the sole supplier, and correcting his computational mistake, SGI's damage base increases to $31 million, over 16 times the amount reported in Dr. Rubinfeld's Exhibit 30, as illustrated in Step 4.a of Figure 145 above.

(145)    I also compare SGI prices to an average OEM price for each technology. By substituting technology-specific average OEM prices for the prices SGI paid for custom modules, SGI's total damage base decreases by about $500K relative to the damage base before any price substitution occurred, as illustrated in Step 4.b of Figure 145 above.

(146)    In fact, Dr. Rubinfeld's approach in Exhibit 30 ignores a much larger portion of SGI's total purchases, relative to those reported in Figures 15–18 of my affirmative report, than is explicitly indicated in the exhibit. In particular, Dr. Rubinfeld does not consider purchases from manufacturers other than Samsung, totaling $108.6 million.[116] There is no justification for excluding purchases from Samsung's co-conspirators, as antitrust laws provide for joint and several liability. In addition, Dr. Rubinfeld does not consider SGI's purchases that were delivered to its Swiss subsidiary. These purchases have not been excluded from SGI's claim in this matter, and therefore, should be included in any damages analysis.

---

[113]    Documents showing that the majority of the cost of a DRAM module can be attributed to the DRAM chips placed on the module board include. See, e.g., SSI-0000372228, SSI-0005073578, and MU0021680.

[114]    See the Expert Report of Robert Marshall, ¶ 138-144.

[115]    This does not take into account the increase in SGI's damage base from including SGI's purchases of Async and purchases for which Samsung was SGI's sole supplier.

[116]    See Figure 17 of my initial report.

(147) To conclude, in my original report I set forth what I believe to be the appropriate damage base for SGI in Figures 15–18 in my affirmative report. SGI's total purchases from Samsung and its co-conspirators during the conspiracy period are $169.8 million, including $61.2 million in total purchases from Samsung directly. These totals are what I believe to be SGI's damage base. None of Dr. Rubinfeld's comments or calculations in Exhibit 30 support any reduction in this damage base amount.

### V.2.5. Calculation of overcharges as percent of expenditure is appropriate

(148) Dr. Rubinfeld claims that the computation of damages should be done on a dollar-per-bit basis rather than on the basis of percentage of dollars expended.[117] My computation of damages as percent of dollars expended takes into account SGI's specific product mix, contrary to Dr. Rubinfeld's assertion. Furthermore, Dr. Rubinfeld's own econometric model implies the percentage of dollars expended as the preferred method of overcharge computation.

(149) Dr. Rubinfeld creates a price model based on Samsung sales to all customers. By creating a model in the logarithm of prices, Dr. Rubinfeld ensures that a constant percent overcharge is applicable to all purchasers. However, Dr. Rubinfeld asserts that a constant dollar overcharge should be applied to SGI's purchases for the damages calculation. This method is inconsistent with Dr. Rubinfeld's proposed model of but-for prices. In addition, this method will most likely underestimate SGI's damages.

(150) Dr. Rubinfeld uses bit-weighted average prices to all Samsung customers for the computation of the price index that constitutes the dependant variable for his model. By construction, Dr. Rubinfeld's price index is dominated by large accounts that typically have a lower price per unit. Therefore, applying a constant dollar overcharge based on Dr. Rubinfeld's price index to SGI will underestimate of SGI damages.

(151) In contrast, I calculate overcharges on the basis of an SGI-specific price index. This index takes into account the SGI product mix and its evolution through time. Overcharges obtained this way are directly applicable to SGI purchases.

(152) Dr. Rubinfeld describes his adjusted damages base in Exhibit 30 and his dummy variable overcharge analysis in Exhibits 33 through 35. He does not, however, report the results of applying the overcharge methods to his preferred damage base.[118] According to Dr. Rubinfeld, the

---

[117] Expert Report of Daniel Rubinfeld, ¶ 382.

[118] Deposition of Daniel Rubinfeld (Rough) (April 25, 2008), 90.

dollars per bit method already accounts for the alleged "premia."[119] Therefore the overcharge from the dollars per bit method should not be applied to the damage base Dr. Rubinfeld reports for SGI, which is also supposed to account for this same "premia."

(153)    If I apply Dr. Rubinfeld's corrected overcharges as a percentage of expenditure to his corrected damage base of $48.7 million, the resulting damages are $37.1 million. If I applied this same overcharge to the actual purchase amount of $169 million from Figure 17 of my initial report, damages are $113 million. This is very similar to the total damages of $96.8 million that I estimate in my initial report.

## V.3. Dr. Shapiro's analysis of damages is flawed and unreliable

### V.3.1. Introduction

(154)    Dr. Shapiro offers an alternative analysis of DRAM prices based on a dummy variable approach and the assumption that but-for prices can be modeled using an error correction model. He uses as his explanatory variables a Micron-specific cost series, microprocessor and digital signal processor shipments, and an indicator variable for the alleged conspiracy period.

(155)    I have given careful consideration to Dr. Shapiro's approach and I have found that his model imposes restrictions that are unsupported by the data and contradict economic theory, plea agreements, and the testimony of defendants' experts.

(156)    Using a standard simulation approach, I also find that Dr. Shapiro's model tends to significantly underestimate overcharges.

(157)    Furthermore, I provide evidence that Dr. Shapiro's explanatory variables are unreliable and contaminated by the conspiracy.

(158)    Finally, I find significant overcharges when I correct Dr. Shapiro's restrictive and unsupported assumptions, corroborating my findings.

---

[119]    Expert Report of Daniel Rubinfeld, ¶ 382.

### V.3.2. Dr. Shapiro's damage model imposes restrictions that have no support in the data, economic theory, or evidence from the record

(159)    In his report, Shapiro describes his econometric approach as an approach that models how the dynamics of the market affect DRAM prices.[120] However, his model hinges on restrictive assumptions on the nature of the conduct that are not supported by the data. He assumes that:

- Prices in the conduct period are greater than prices in the non-conduct period by a constant percent increase in each and every month of the conduct
- Cost and demand factors have exactly the same impact on prices across the conduct and non-conduct periods
- Prices dynamically adjust to changes in cost and demand factors in exactly the same way in the presence and in the absence of the conduct.

(160)    I will illustrate below that these assumptions are not supported by the data, economic theory, the defendants' plea agreements, or the testimony of defendant experts.

### V.3.2.1. The restrictions imposed by Shapiro's model are not supported by the data

(161)    Shapiro's model implies that the only possible change in the conduct period is that there is a constant percent price increase as of the start of the conspiracy. After the initial increase, prices during the conspiracy are assumed to change from month to month by the exact same percentage amount as they would have in the absence of the conspiracy. In other words, his model assumes that the but-for price line and the actual price line move in parallel during the conduct period.[121] This follows because Shapiro's model imposes the restriction that the coefficients (or weights) given to cost and demand factors are the same whether estimated only over the conduct period or estimated over the non-conduct period, except for a difference in the coefficient on the constant (or intercept) estimated for the two periods. This is the same restriction that Dr. Rubinfeld imposed on his model and that failed Dr. Rubinfeld's recommended test.

(162)    One way to see whether this restriction is valid for Dr. Shapiro's model is to estimate his model over the non-conduct and conduct periods separately and then plot the forecasts that are obtained from these two models. If Dr. Shapiro's assumptions were correct, these two forecasts should be at least roughly parallel to one another. Figure 146 below indicates that rather than following the same price path (with a constant distance between them) as is required by Dr. Shapiro's model,

---

[120]    Expert Report of Carl Shapiro, 26.

[121]    This statement applies when prices are expressed in terms of logarithms.

the two price lines are fundamentally different from one another, strongly suggesting that Dr. Shapiro's assumptions are not supported in the data.

**Figure 146: Dr. Shapiro model's predictions when estimated over the conduct and non-conduct period, respectively**



### V.3.2.2. The restrictions imposed by Dr. Shapiro's model are inconsistent with the estimated coefficients

(163)    As I explained above, Dr. Shapiro's assumptions imply that, except for the constant, the coefficient estimates of demand and cost factors are the same for both the conduct and non-conduct periods. Figure 147 shows a comparison of the coefficients estimated separately over these two periods. Were Dr. Shapiro's assumptions supported by the data, one would expect to see the constant (which appears in the last row of the table) to differ by an amount reflecting the impact of the conduct, with all other coefficients roughly similar across the two periods. Instead, the coefficients on the demand and cost factors are quite different. For example, the sign on the Micron cost series as well as the signs on the microprocessor (MPU) and digital signal processor (DSP) shipment variables switch when the model is estimated over the two periods separately. Also the magnitudes of many coefficients are altered between the two periods, the most dramatic being the lagged DRAM price variable which decreases by 4,117%.

**Figure 147: Coefficients estimated over the conduct and non-conduct periods**

|  | Coefficients estimated using non-conduct data only | Coefficients estimated using conduct data only |
|---|---|---|
| Lagged price | -0.01 | -0.26 |
| Micron's cost | 0.03 | -0.33 |
| MPU | -0.17 | 0.18 |
| DSP | 0.03 | -0.27 |
| Change in Micron's cost | -0.16 | -0.10 |
| Change in MPU | -0.03 | 0.19 |
| Change in DSP | 0.01 | -0.15 |
| Change in lagged price | 0.22 | 0.89 |
| Constant | 1.49 | 0.92 |

### V.3.2.3. The restrictions imposed by Dr. Shapiro's model are not supported by statistical tests

(164)   Using a procedure similar to that used in my examination of Dr. Rubinfeld's model, I can test whether the restrictions imposed by Dr. Shapiro in his econometric model are supported by the data. The technical details of this test are explained in Appendix F. The test is designed to detect whether the regression coefficients in Dr. Shapiro's model are constant across the conduct and the non-conduct periods. If Dr. Shapiro's assumption is correct, the test will not be able to reject the hypothesis that none of the regression coefficients differ across periods.

(165)   I find strong empirical evidence against Dr. Shapiro's assumptions. The test results are shown in Figure 148.

**Figure 148: Statistical results for the joint test**

| Null hypothesis | Conduct period | P-value |
|---|---|---|
| All regression coefficients in Dr. Shapiro's model are constant across conduct and non-conduct periods | Conspiracy period | 0.01 |
| | Plea period | 0.01 |

(166)   Figure 148 demonstrates that Dr. Shapiro's constant coefficient assumption is rejected statistically with a probability of wrongly rejecting the null hypothesis no greater than 1%. Had Dr. Shapiro performed this test, he would have concluded that the restriction he imposes is not valid and a more flexible fully interacted model is warranted.

(167)   A more flexible fully interacted model is consistent with the economic literature and is also supported by deposition testimony. Such a model allows the impact of cost and demand factors,

price dynamics, and the speed of adjustment toward the long-run equilibrium to differ inside and outside of the conduct period. Should the model coefficients be the same, as Dr. Shapiro assumes, a fully interacted model will produce results very similar to Dr. Shapiro's but-for prices. Using a fully interacted model thus better allows the data to speak for itself.

(168)    I estimate the fully interacted model along with Dr. Shapiro's restricted version and find that the more flexible, fully interacted model generates but-for prices that are significantly different from those produced by Dr. Shapiro. Further, I find that even this more flexible specification is not well specified, in that it is not able to capture the month-to-month movements of DRAM prices and does not meet up with the actual prices after the conspiracy. This behavior indicates that the variables used by Dr. Shapiro in his regression are insufficient or inappropriate for the purpose of capturing the evolution of DRAM prices. Overall, Dr. Shapiro's model does not provide a basis for reliable damages estimates.

### V.3.2.4. The restrictions imposed by Dr. Shapiro's model are not supported by the literature on cartel impact

(169)    Dr. Shapiro's model assumes that the cartel impact on price is the same percentage price increase throughout the operation of the cartel. However, cartels are inherently unstable, and this has implications for cartel pricing behavior. This is documented in several academic articles that describe how cartels tend to form and operate.

(170)    First, it takes some time for cartel members to establish an effective cartel. Instead of simply raising prices by some set amount, cartels tend to raise price gradually. The initial phase of the cartel in which price is elevated to its optimal and more stationary level is sometimes referred to in the economics literature as the "transition phase". Actual price paths of past cartels show that transition phase is a common feature of cartels.[122] One explanation for why an initial transition phases occurs is that cartel members attempt to "avoid creating suspicions that a cartel has formed."[123]

(171)    Second, the ability to effectively implement price increases varies over the life span of a cartel agreement due to market conditions. As economics has long recognized, fluctuations in demand and cost conditions impact the effectiveness of cartel. Two competing theories have emerged in the economics literature. According to the more widely accepted theory, cartel members sustain

---

[122]    See, e.g., Harrington J. (2006): "Behavioral Screening and the Detection of Cartels", European Competition Law Annual 2006: Enforcement of Prohibition of Cartels, Claus-Dieter Ehlermann and Isabela Atanasiu, eds., Hart Publishing, 2007.

[123]    Harrington J. and Chen J. (2006): "Cartel Pricing Dynamics with Cost Variability and Endogenous Buyer Detection", International Journal of Industrial Organization 24: 1185-1212.

the collusive outcomes as long as the market price is "sufficiently" high and initiate a punishment phase once the market price is below a certain level due to price cuts or low demand.[124] Hence, the cartel is more effective when there is high demand.

(172)   The alternative theory says that cartels are less effective during economic booms because there is more to gain from cheating.[125] On the other hand, during recessions, firms tend to collude more successfully and it is easier to sustain high collusive prices because there is less incentive to cheat.

(173)   Both these theories imply that cartels may operate with varying levels of effectiveness over their lifetime.

(174)   Third, it is has been established for some of the past cartels that their estimated average effect on price varied over time. For example, a cartel operated in the Ohio school milk markets from 1980–1991. The effect of this cartel varied from -0.3% (in 1990–1991) to 11.3% (in 1981–1982) during the cartel period.[126] Similarly, a school milk cartel in Kentucky in 1980s had varying effects on prices. [127] Another example is a bid-rigging cartel in the sale of frozen seafood to the Defense Personnel Support Center. The cartel operated from 1981 through 1989. The conspiracy elevated prices by an average of 30.4% from July 1984 through November 1986. It averaged 23.1% higher from November 1986 through July 1988. [128] A third example is the citric acid cartel from 1991–1996. The effect of the citric acid cartel gradually increased during the cartel period.

---

[124]    Green E.J. and Porter R. H. (1984): "Noncooperative Collusion under Imperfect Price Information", Econometrica 52: 87-100; Lanning S. G. (1987): "Costs of Maintaining a Cartel", The Journal of Industrial Economics 36: 157-174; Ellison G. (1994): "Theories of Cartel Stability and the Joint Executive Committee", RAND Journal of Economics 25: 37-57.

[125]    Rotemberg J.J. and Saloner G. (1986): "A Supergame Theoretical Model of Price Wars during Booms", The American Economic Review 76: 390-407; Haltiwanger J. and Harrington J. E. (1991): "The Impact of Cyclical Demand Movements on Collusive Behavior", RAND Journal of Economics 22: 89-106; Borenstein S. and Shepard A. (1996): "Dynamic Pricing in Retail Gasoline Markets", RAND Journal of Economics 27: 429-451.

[126]    Porter R. H. and Zona J. D. (1999): "Ohio School Milk Markets: an Analysis of Bidding", RAND Journal of Economics 30: 263-288.

[127]    Lanzillotti R. F. (1996): "The Great School Milk Conspiracies of the 1980s", Review of Industrial Organization 11: 413-458.

[128]    Froeb L. M., Koyak R. A., and Werden G. J. (1993): "What is the effect of bid-rigging on prices?", Economics Letters 42: 419-423.

[129] A fourth example is the lysine cartel from 1992–1995. The cartel effectively started in August 1992 and was ineffective in March–July 1993. It was effective again later in the cartel period.[130]

**V.3.2.5. The restrictions imposed by Dr. Shapiro's model are not supported by the plea agreements**

(175)    Dr. Shapiro's model assumes that a cartel has the same level of effectiveness throughout the conspiracy period. However, this assumption is generally not true. It certainly does not hold for the DRAM industry where defendants admitted in their plea agreements with the U.S. Department of Justice (DOJ) that "At certain times during the relevant period, DRAM prices decreased significantly. Nevertheless, the Defendant and its coconspirators reached agreements to limit the rate of price declines, which were achieved with varying levels of effectiveness. At other periods, the Defendant and its coconspirators reached agreements on price increases and were able to institute price increases on DRAM sales to certain OEMs."[131]

**V.3.2.6. The restrictions imposed by Dr. Shapiro's model are not supported by the testimony by defendant's experts**

(176)    Dr. Shapiro's assumption that a cartel operates at the same level of effectiveness throughout the conspiracy period is not supported by other defendant experts. For instance, Dr. Murphy refers in his report to the "kill Hynix" period, in which there was a price war in the DRAM industry.[132] The factual record and the results in my original report show that the effectiveness of the cartel during the "kill Hynix" period was very different than that during the first half of 2002.

(177)    In addition, some defendants' experts, including Dr. Shapiro himself, state that market conditions varied substantially throughout the conspiracy period.[133] As a result, the economics literature cited above suggests that the cartel would not operate at the same level of effectiveness throughout the conspiracy period.

---

[129]   Connor J. M. (1998): "What can we learn from the ADM Global Price Conspiracies?", Purdue University, Working Paper. See, also, Harrington Jr J. E. "Behavioral Screening and the Detection of Cartels," in European Competition Law Annual 2006: Enforcement of Prohibition of Cartels, Claus-Dieter Ehlermann and Isabela Atanasiu, eds., Hart Publishing, 2007.

[130]   Connor J. M. "Global Cartels Redux: The Amino Acid Lysine Antitrust Litigation" in Kwoka and White, eds., The Antitrust Revolution (4th ed. 2004). See, also, Bolotova Y., Connor J. M., and Miller D. J. (2005): "The Impact of Collusion on Price Behavior: Empirical Results from Two Recent Cases", International Industrial Organization Conference 3, Atlanta, Georgia, April 8-9.

[131]   April 20, 2005 Plea Agreement of Hynix in United States of America v. Hynix Semiconductor Inc, at 4; September 14, 2004 Plea Agreement of Infineon in United States of America v. Infineon Technologies AG, at 4.

[132]   Expert Report of Kevin Murphy, p. 41.

[133]   See for example the Expert Report of Carl Shapiro, p. 9-13, and the Expert Report of Joseph Kalt, p. 21.

### V.3.3. Dr. Shapiro's model tends to significantly underestimate overcharges

(178)   I have established in Section V.3.2.1 that the data does not support Dr. Shapiro's restrictive assumptions.

(179)   In this section, using a well accepted simulation approach, I further demonstrate that if Dr. Shapiro's assumptions do not hold then Dr. Shapiro's model will find no overcharges even when in reality these are substantial. By contrast, I show that my approach is able to accurately estimate overcharges regardless of whether Dr. Shapiro's assumptions hold or not.

(180)   I proceed as follows. First, I simulate but-for prices using Dr. Shapiro's model.[134] I then consider two scenarios.

(181)   In the first scenario I generate prices during the conduct period by increasing the logarithm of the but-for prices by 35% in each and every month of the conduct period. That is, prices during the conduct period are generated in a way that is consistent with Dr. Shapiro's assumptions. These prices imply an average overcharge of about 30%. Figure 149 depicts these simulated prices.[135]

---

[134]   I use Shapiro's estimated coefficients and generate prices by setting his indicator variable equal to zero (i.e. absence of conspiracy). I also add random noise in each month that is generated by assuming a normal distribution with zero mean and variance equal to the Shapiro's model's error variance. Simulated prices are generated a thousand times.

[135]   To be precise, Figure 149 depicts the median simulated prices in each month.



Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.   V. Defendants' experts' damage analyses are fundamentally flawed

**Figure 149: Simulated prices when prices during the conduct period are 35% higher than the but-for prices in each and every month of the conduct period**



(182)    In the second scenario I generate prices during the conduct period by increasing the but-for prices not by a constant percentage amount each month, but rather in waves to mimic the pattern observed in DRAM prices during the conspiracy period. Figure 150 depicts these simulated prices.[136]

---

[136]    To be precise, Figure 150 depicts the median simulated prices in each month.

Highly confidential

**Figure 150: Simulated prices when prices during the conduct period are generated by increasing but-for prices in waves**



(183)    In the first scenario the overcharge implied by the simulated prices is about 30%. I apply Dr. Shapiro's model to the simulated prices and I find that in this case Dr. Shapiro's model produces an overcharge of about 30%. I also apply my model to the simulated prices and I find that it produces an overcharge of about 27%. This demonstrates that both Dr. Shapiro's model and my model are able to reliably estimate overcharges when the data is consistent with Dr. Shapiro's assumptions.

(184)    However, in the second scenario, by construction, the simulated data is not consistent with Dr. Shapiro's assumptions. In this case the simulated prices imply an overcharge of 30%. When I apply Dr. Shapiro's model to the simulated prices, I find that his model generates overcharges close to zero. On the other hand, my model generates overcharges of 31%. This is a clear demonstration of the fact that Dr. Shapiro's model is biased in finding zero overcharges when his assumptions are not supported in the data. Figure 151 summarizes the results for these simulations.

**Figure 151: Overcharge comparison for simulated scenarios**

| Scenario | Overcharge implied by simulated prices | Shapiro's model overcharge | White's model overcharge |
|---|---|---|---|
| Constant percent price increase | 30% | 30% | 27% |
| Two waves of price increases | 30% | -0.1% | 31% |

## V.3.4. Dr. Shapiro's model includes variables that are unreliable and contaminated by the conspiracy

(185)    In his model, Dr. Shapiro uses a Micron cost series, series of microprocessor and digital signal processor shipments, and an indicator variable for the alleged conspiracy period. In this section I explain why the cost and demand series used by Dr. Shapiro are unreliable.

(186)    Dr. Shapiro constructed a measure of total production cost per megabit by using Micron's total cost of goods sold (COGS), subtracting inventory write-downs, and adding total selling, general, and administrative expenses (SG&A) and research & development expenses (R&D) expenses.[137] My understanding is that Dr. Shapiro's series is flawed because he includes costs unrelated to production and fixed in the short-run (e.g., SG&A and R&D), costs associated with non-DRAM products (e.g., PSRAM), and costs that are a function of market prices, making them endogenous to the defendants' conspiracy.[138] Additionally, Dr. Shapiro made a significant error when attempting to remove the effects of Micron's inventory write-downs.[139] It is my understanding that Dr. Shapiro's error in adjusting for inventory write-downs understated Micron's cost of goods sold by more than $1 billion, resulting in implausibly low costs at the time of the write-downs, which coincide with the "Kill Hynix" period.[140] In totality, the flaws in Dr. Shapiro's series make it unreliable to use as a predictor of price because it is not a true measure of economic cost and because it is tainted by prices elevated by the defendants' conspiracy.

(187)    Dr. Shapiro's cost series is contaminated by the conduct because Micron's cost of good sold includes purchases it makes from its joint venture partners in Japan and Singapore.[141] According to Micron's SEC filings, the cost of these purchases to Micron was based on "prices determined quarterly, generally based on a discount from average selling prices realized by the Company

---

[137]    Rebuttal Expert Report of Boris Steffen, ¶ 16.

[138]    Rebuttal Expert Report of Boris Steffen, ¶ 48.

[139]    Rebuttal Expert Report of Boris Steffen, ¶ 48.

[140]    Rebuttal Expert Report of Boris Steffen, ¶ 52

[141]    Rebuttal Expert Report of Boris Steffen, ¶ 44-46, 53-54.

[Micron] for the immediately preceding quarter."[142] On average, more than one-third of Micron's quarterly sales were from the joint ventures' output.[143] Therefore, if one were to use Dr. Shapiro's measure of total cost of production per Mbit to construct but-for prices and compute overcharges, the constructed estimates would be biased downward as Dr. Shapiro's series will absorb some of the impact from the conspiracy.

(188)    By removing fixed and unrelated production costs, costs associated with PSRAM, and by properly accounting for Micron's inventory write-downs, Dr. Shapiro's cost measure declines by approximately 18%.[144] By further removing the costs associated with Micron's purchases of output from its join ventures, Dr. Shapiro's cost measure would have been approximately 33% lower than the cost measure he used in his analysis.[145] It was improper for Dr. Shapiro to include the aforementioned costs in his analysis, as is made clear by Micron's own analysis of its costs and margins.

(189)    Micron clearly understood the potential impact that the costs associated with purchases from its joint ventures could have on its gross margins because it explains the impact in its SEC filings. For example, in its SEC Form 10-K for the year ended August 31, 2000, Micron explains that it achieved lower margins on its purchases from its joint ventures than it did on products it produced itself. A contributing factor for why these margins were lower was because the costs of the products purchased from the joint ventures were set using selling prices from the prior quarter, which were artificially high as a result of the cartel's activities.

> "Subject to specific terms and conditions, MTI [Micron Technology, Inc.] has agreed to purchase all of the products manufactured by two joint venture wafer fabrication facilities: TECH Semiconductor Singapore Pte. Ltd. ("TECH") and KMT Semiconductor Limited ("KMT"). TECH and KMT are collectively referred to herein as the "JVs." The JVs supplied in excess of 35% of the total megabits of memory produced by the Company in 2000. MTI purchases semiconductor memory products from the JVs at prices generally determined quarterly and based on a discount from MTI's average selling prices.… All

---

[142]    See, e.g., Micron Technology's SEC Form 8-K, September 30, 2001, 1; Micron Technology's SEC Form 10-K for the year ended August 30, 2001, 43.

[143]    Rebuttal Expert Report of Boris Steffen, ¶ 45; See, e.g., Micron Technology's SEC Form 10-Q for the quarter ended November 30, 2000, 13: "The JVs supplied in excess of 40% of the total megabits of memory produced by the Company in the first quarter of 2001."; Micron Technology's SEC Form 10-K for the year ended August 31, 2000, 5: "The JVs supplied in excess of 35% of the total megabits of memory produced by the Company in 2000."

[144]    Rebuttal Expert Report of Boris Steffen, Figure 9, 40.

[145]    Rebuttal Expert Report of Boris Steffen, Figure 9, 40.

> transactions with the JVs are recognized as part of the net cost of products purchased from the JVs. The Company realized lower gross margins on sales of JV products than for products manufactured by its wholly-owned facilities in 2000 and 1999."[146]

(190)   Additionally, Micron's internal Board presentations also break out the costs related to these joint ventures separately from costs related to its wholly owned facilities, as shown in Figure 152. This breakout suggests that it was important to Micron's Board to evaluate costs and margins excluding the effects that purchases from its joint ventures had on Micron's costs and margins. This is consistent with the statements in Micron's SEC filings that indicate that the costs related to Micron's joint ventures were not true measures of economic costs, but they were in fact based on selling prices. Therefore, the costs related to Micron's join ventures were based on prices that were artificially inflated as a result of the cartel's activities. As such, it is inappropriate to include these costs in any economic measure, and Dr. Shapiro's analysis is flawed for having used a cost measure contaminated by prices in this way.

---

[146]   Micron Technology's SEC Form 10-K for the year ended August 31, 2000, 18.

**Figure 152: Joint venture cost breakout in presentation to Micron's Board of Directors**

Source: MU00837483–530 at 493

(191)    Dr. Shapiro also includes two variables that he identifies as demand variables: microprocessor and digital signal processor shipments. It is apparent from Figure 153 that these two series exhibit regular spikes such that the shipments in the last month of each quarter are noticeably higher than the shipments in the preceding two months. As I describe below, these spikes are an artifact of the data collection process, and such artifacts can have adverse impacts on a regression analysis estimated using monthly data. Despite the fact that he conducts his analysis using monthly data, Dr. Shapiro unaccountably depicts the microprocessor and digital signal processor shipment series in Exhibit 10 of his report at a quarterly frequency. At this frequency, the artifact-induced volatility within each quarter is not apparent. Figure 154 and Figure 155 compare the quarterly and monthly series for microprocessor and DSP shipments from WSTS.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.   V. Defendants' experts' damage analyses are fundamentally flawed

**Figure 153: Microprocessor and digital signal processor shipments**



Source: WSTS

**Figure 154: Comparison of microprocessor shipments depicted quarterly and monthly**



Source: WSTS and Shapiro Exhibit 10

**Figure 155: Comparison of DSP shipments depicted quarterly and monthly**



Source: WSTS and Shapiro Exhibit 10

(192)    The WSTS data used by Dr. Shapiro contains an artifact introduced by the accounting methods used by the reporting members of WSTS. In particular, it is apparent from Figure 153 that the microprocessor and DSP series exhibit regular spikes such that the shipments in the last month of each quarter are much higher than the shipments in the preceding two months. According to a WSTS employee with whom my staff spoke, many reporting companies use a 4-4-5 week per month accounting method. This method is employed for financial reporting purposes and allocates production, sales, costs, and other data to months in a quarter by assuming there are 4 weeks in the first month, 4 weeks in the second month, and 5 weeks in the third month, independent of the number of days in that calendar month. Micron appears to use the same method in the production data it provided in this litigation.[147]

(193)    In contrast my analysis includes more appropriate demand series in my analysis that do not suffer from the artifacts exhibited by Dr. Shapiro's demand variables. Specifically, I used the following two industrial production indexes:

▪    U.S. Industrial Production Index for Computer and Peripheral Equipment[148]

---

[147]    See, e.g., MU00848413 ("Monthly Wafer Starts Jan 96- Dec 04 .xls").

[148]    The components of this series include desktops, laptops, computer storage terminals, and peripheral equipments (e.g., printers) for businesses and consumers, as well as servers for businesses (Board of Governors of the Federal Reserve System website, http://www.federalreserve.gov/releases/g17/SandDesc/sdtab1.pdf).

- U.S. Industrial Production Index for Information Processing and Related Equipment[149]

(194)   The two industrial production indexes I used in my analysis account for production of end-use products containing DRAM, including computers, servers, peripheral equipment, communications equipment, and other electronic equipment. As I discussed in my initial report, demand for DRAM is a derived demand because almost all DRAM is consumed in end-use products or as memory upgrades for these products. [150]

(195)   Whereas I have included two demand variables that account for all of the major end-uses of DRAM, Dr. Shapiro has not included any variables to account for PC and server end-uses, which accounted for more than two-thirds of DRAM consumption during the relevant period.[151] Instead, Dr. Shapiro has included two series that measure demand for two complements of DRAM, and these two series exhibit artifacts induced by accounting practices unrelated to the economics of the DRAM market.

### V.3.5. Once I correct Dr. Shapiro's restrictive and unsupported assumptions, I find substantial damages

(196)   I demonstrated above that Dr. Shapiro's restrictive assumptions on the nature of the conduct are not supported by the data. Nor are they supported by the economics literature or by the facts in this case. I therefore correct Dr. Shapiro's restrictive assumptions to allow the cost and demand variables to impact prices differently during the conduct and non-conduct periods. In a further analysis, I also correct Dr. Shapiro's use of a cost series tainted by prices (and thus tainted by the conspiracy) by replacing Micron's cost series with an adjusted Micron cost series constructed to eliminate, at least to a certain degree, the improper influence of prices. In this same analysis, I also adjust the demand variables used by Dr. Shapiro to remove the accounting-induced artifacts described above.

(197)   Figure 156 shows the but-for price obtained using just a more flexible version of Dr. Shapiro's model, but without any other modifications. Here the cost and demand variables are allowed to have different coefficients during the conduct period and the non-conduct period, respectively. This has a substantial effect on the overcharges. Rather than zero overcharges, this modified model generates 19% overcharges.

---

[149]   The components of this series include computer and peripheral equipments for businesses, communications equipment, electronic industrial equipment, and other electronic products (Board of Governors of the Federal Reserve System website, http://www.federalreserve.gov/releases/g17/SandDesc/sdtab2.pdf).

[150]   See my initial report at ¶ 71-72.

[151]   See Figure 24 of my initial report at 43.

(198)    Nevertheless, it is evident from Figure 156 that just correcting this restriction does not lead to a reliable model. One indicator of the unreliability of this model is that the but-for prices neither match nor track DRAM prices after the conspiracy.

**Figure 156: But-for prices when Dr. Shapiro's restrictive assumptions are corrected**



(199)    I take an additional step of replacing the contaminated Micron cost series with a series constructed excluding, at least to a certain degree, tainted data. Furthermore, I remove the accounting-induced spikes from the WSTS demand series.

(200)    Figure 157 shows the but-for price obtained using the flexible version of Dr. Shapiro's model, the uncontaminated Micron cost series, and the adjusted demand series. As summarized in Figure 158 below, such modifications to Dr. Shapiro's model have a substantial impact on the resulting overcharges. Instead of zero overcharges, his modified model generates 36% overcharges over the alleged conspiracy period.

(201)    Although avoiding unwarranted assumptions, tainted variables, and data artifacts is necessary for obtaining reliable but-for price predictions, there can be no guarantee that these steps alone will be enough to deliver reliable but-for price estimates using Dr. Shapiro's framework. As we see in Figure 157, even these corrections are not enough to cure the problems with Dr. Shapiro's approach. Nevertheless, the resulting but-for prices are more closely aligned with actual post-conspiracy DRAM prices than they were in the previous exercise in which the tainted cost series and the data artifacts were not adjusted.

**Figure 157: But-for prices when Dr. Shapiro's restrictive and unsupported assumptions are corrected**



**Figure 158: Conspiracy period overcharges when Dr. Shapiro's restrictive and unsupported assumptions are corrected**

|  | Overcharge |
|---|---|
| Dr. Shapiro's model | -2% |
| Restrictive assumptions are corrected | 19% |
| Restrictive and unsupported assumptions are corrected | 36% |

## V.4. The analysis and opinions offered by Drs. Murphy and Topel are inconsistent with good scientific principles and have no probative value

(202)   Drs. Murphy and Topel purport to explain DRAM prices during defendants' conspiracy as the outcome of demand and supply. Dr. Murphy states, "Prices are Explained by a Basic Supply and Demand Framework."[152] Dr. Topel likewise claims, "the behavior of DRAM prices during the conduct period is consistent with changes in market fundamentals—supply and demand."[153]

---

[152]   Expert Report of Kevin Murphy, ¶ 85.

[153]   Expert Report of Robert Topel, ¶ 6.

(203)   Both Drs. Murphy and Topel use industry-wide shipments as the quantity variable in their analyses. The main distinction between their analyses is that Dr. Murphy uses prices taken from World Semiconductor Trade Statistics (WSTS), while Dr. Topel uses prices of sales to the named OEMs, taken from the transaction data. This is the only difference in their analyses of but-for supply in Murphy Exhibits 22–26 and Topel Exhibits 3–8.[154] That they generate closely similar results is unsurprising, since their two price series are closely similar. See Figure 143.

**Figure 159: Price lines used by Drs. Murphy and Topel**



Note: Price index normalized to be equal to WSTS price in July 1998.

(204)   I understand that Dr. Michael Whinston has reviewed Dr. Murphy's and Dr. Topel's analyses in detail and has come to the conclusion that the analyses are unreliable for understanding the price movements during the conspiracy period due to conceptual errors and unsupported assumptions. I have also reviewed their analyses and agree with Dr. Whinston's findings. Below, I summarize some of Dr. Murphy's and Dr. Topel's key mistakes. I also demonstrate that if some of these errors are addressed, their model estimates considerable damages for the market as a whole, including named OEMs and plaintiffs, consistent with my finding of damages.

---

[154]   "Q. Other than relying on different price data, are there any differences between your analysis in [Topel] Exhibit 3 and Dr. Murphy's in Exhibit 23 in his report? A. Not that I recall." (Deposition of Robert Topel (ROUGH) (April 25, 2008), 81.).

(205)    Because the simplistic supply and demand analyses of Drs. Murphy and Topel are methodologically the same, they share the same very substantial flaws. Individually and in total, these flaws render their analysis unreliable and incorrect.

(206)    The DRAM industry is an oligopoly, and as such, it does not have a "supply curve." Only competitive industries have supply curves.[155] Yet Drs. Murphy and Topel's analyses are based on the presumption that an industry supply curve exists.[156] This assumes competition, even though both Drs. Murphy and Topel acknowledge that the DRAM market is "oligopolistic."[157] The assumption of competition is also contrary to the recitations in the plea agreements in this matter. On the other hand, the plea agreement recitations are consistent with collusion within an oligopoly. Consequently, Drs. Murphy and Topel's incorrect finding, that the market is competitive, is a circular argument based on a false assumption. This is unscientific.

(207)    In addition, the conclusions of Drs. Murphy and Topel rely on unfounded and almost certainly false assumptions about the shape and slope of demand and (non-existent) supply curves. Drs. Murphy and Topel present their results as though "actual demand" and "actual supply" are data, although both freely admitted in deposition that these "data" were constructed results based on their assumptions.[158, 159] Neither Drs. Murphy nor Topel report how they examine the robustness

---

[155]    Besanko, David, and Ron Braeutigam, *Microeconomics*, 2nd Ed., John Wiley and Sons, 2005, 413. Besanko and Braeutigam explain that *monopolists* do not have a supply curve. The same is true of any setting, including most oligopolies, when firms are not price-takers. As Besanko and Braeutigam explain, "The fact that the perfect competitor views price as exogenous allows us to construct the firm's supply schedule." Firms in oligopolies do not generally view price as exogenous and so do not have supply curves.

[156]    "Q. What market structure does Professor Murphy's analysis assume? A. Well, the analysis of supply and demand assumes a competitive market." (Deposition of Robert Topel (Rough) (April 25, 2008), 47-48).

"There is a complimentary economic theory of how prices are determined in markets that are less competitive. There is an economic theory of how prices could be determined in monopolistic markets. Professor Murphy's analysis is … built on how prices are determined under competition by supply and demand." (Deposition of Robert Topel (Rough) (April 25, 2008), 46).

[157]    "On the supply side, the intense competition among the DRAM manufacturers spurred the rapid introduction of new DRAM generations resulting in substantial restructuring of the industry, which caused the market to evolve from a state of almost perfect competition to an oligopolistic one…the consolidation began in 1998." (Expert Report of Kevin Murphy, Footnote 21; Expert Report of Robert Topel, Footnote 16; both quoting W. J. Kim, *et al.*, "Demand forecasting for multigenerational products combining discrete choice and dynamics of diffusion under technological trajectories," 72 *Technological Forecasting & Social Change* 825, 828 (2005)).

[158]    For example, Professor Topel says, "Exhibit 12 shows the evolution of predicted 'but for' demand during the alleged conspiracy period…and also the evolution of actual demand. Actual demand for DRAM grew rapidly from the beginning of the alleged conspiracy until August 2000…after which the actual demand for DRAM plummeted" (Expert Report of Robert Topel ¶ 69). Likewise, Professor Murphy's Exhibit 22 is titled "Actual and Predicted Supply"; Professor Topel's Exhibit 4 is titled "The Evolution of Actual and Predicted Supply of DRAM".

[159]    See the deposition of Robert Topel (Rough) (April 25, 2008), at, e.g., 101: "Q. Is it also true that the but-for demand that you calculate would be different if the elasticity of demand were minus .4 in some months and minus .6 for other months? A. The numbers would be different. Q. How do you know the elasticity of demand is not different from minus .5 at times, sometimes higher and sometimes lower? A. I don't. Q. You just assumed that it was constant? A.

of their results to alternative assumptions. Had they done so, they would have found evidence, even within their own flawed framework, of significant overcharges.

(208)    Drs. Murphy and Topel also use the same flawed Micron cost data that I describe in Section 5.3. As I explain in more detail there, the Micron cost data are tainted by their dependence on DRAM prices as a result of accounting practices associated with Micron's contractually-mandated purchases from a joint venture.[160] On average, more than one-third of Micron's quarterly sales were from the joint ventures' output.[161] Moreover, Micron was contractually obligated to buy the DRAM at a price determined by the prevailing prices *in the previous quarter*.[162] As a result, a substantial component of the so-called "cost" measure upon which Drs. Murphy and Topel rely is not a measure of cost at all but rather a measure of the average price level in the previous quarter. In the conspiracy period, the use of this tainted measure would make it appear that high prices are the result of high costs. Instead, those apparently high costs are in fact the result of the elevated prices caused by the conspiracy itself.

(209)    Drs. Murphy and Topel realize that their cost measure is flawed and attempt to correct for "measurement error" using a technique called "instrumental variables."[163] The instruments they adopt are a measure of average chip density and cumulative output. Both of these measures are affected by the conspiracy, making them invalid as instruments.

(210)    Drs. Murphy and Topel also make an econometric mistake in using their instrumental variables estimates to construct the predicted price and quantity but-for the conspiracy. As just noted, they use instrumental variables in an effort to obtain consistent estimates of their model's coefficients. They then proceed to use these estimates together with the measurement error laden cost variable

---

Yes."

See also the deposition of Kevin Murphy (Rough) (April 24, 2008), at, e.g., 101 and 93-94: "Q. Would the calculated supply be different if you used a different elasticity of supply other than 0.4? A. Yes, it would be." "Q. So would your demand calculation – the calculated demand be different if you use different demand elasticity? A. Yes. I mean, if you use a different demand elasticity, you would get a different answer… Q. The same question with respect to – if the demand curve had a different shape than the one that you assumed, would that change your results as well? A. The calculated – the approach might not change but the ultimate answer you came up with would be different if you used a different demand structure. Yeah, that's for sure."

[160]   Expert Report of Boris Steffen, ¶ 44-46, 53-54.

[161]   Expert Report of Boris Steffen, ¶ 45; See, e.g., Micron Technology's SEC Form 10-Q for the quarter ended November 30, 2000, 13: "The JVs supplied in excess of 40% of the total megabits of memory produced by the Company in the first quarter of 2001."; Micron Technology's SEC Form 10-K for the year ended August 31, 2000, 5: "The JVs supplied in excess of 35% of the total megabits of memory produced by the Company in 2000."

[162] See, e.g., Micron Technology's SEC Form 8-K, September 30, 2001, 1; Micron Technology's SEC Form 10-K for the year ended August 30, 2001, 43.

[163] See, e.g., deposition of Kevin Murphy (Rough) (April 24, 2008), at 107; Expert Report of Robert Topel ¶ 45.

---

to form their price and quantity predictions.[164] Use of coefficients estimated by instrumental variables together with the error-laden variables produces biased predictions.

(211)    A second error in Drs. Murphy and Topel's analysis is that they assume there is a constant and stable relationship between what they view as "supply" (in fact an amalgam of cost and demand factors) and Micron's flawed cost variable. It is the presumption that this relationship is stable that allows them to predict prices during the conspiracy period. Yet their own data reject the notion that "supply" and Micron's flawed cost variable have the same relationship before and after the conspiracy. Even if there were not all the other problems present in their analysis, this false assumption alone would make their structural model predictions unreliable.[165]

(212)    I attempted to mitigate the impact of these errors in Drs. Murphy and Topel's framework by (1) making predictions based on the predicted, less error-laden cost measure, and (2) allowing the pre- and post-conspiracy period data to have different structure, as Drs. Murphy and Topel's own data and specification suggest. When I do this, I find these corrections generate overcharges of 64% and 57% during the conspiracy period, and overcharges of 64% and 58% during the plea period.[166,167]

(213)    Overall, the analyses of both Drs. Murphy and Topel rest on an unscientific conceptual framework, unsupported assumptions about "demand" and "supply", tainted data, and econometric errors. Relaxing some of their assumptions causes their results to change significantly, typically in ways indicating substantial overcharges, consistent with my finding of damages. On balance, their own analyses are so flawed and unreliable that they can reveal nothing about the effects of the conspiracy.

---

[164] See deposition of Kevin Murphy (Rough) (April 24, 2008), at 302.

[165] In my framework a blend of pre-conspiracy and post-conspiracy data can be reliable, as I have adopted a reduced-form approach.

[166] For comparability, these average overcharges are calculated using the same approximation adopted by Drs. Murphy and Topel.

[167] The standard errors on the conspiracy period estimates are 6.26% and 5.72%. The standard error on the plea period estimates are 5.73% and 5.54%. All these estimates are statistically greater than zero at a 95% significance level.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

# VI. Defendants' experts' criticisms of my methods are misguided

## VI.1. Introduction

(214)   The claims that my but-for price predictions are "biased" to find damages are without merit. Among other things, these claims are based on: (a) defendants' experts' own errors; (b) misrepresentations of alternative predictions; (c) faulty demonstrations of my predictions; (d) confusions about prediction models; and (e) ignorance of dynamic forecasting methods.

## VI.2. My prediction equations contain the correct supply and demand factors, and the defendants' experts' claims to the contrary are incorrect

(215)   As explained in my initial report and at my deposition, my analysis reliably and adequately accounts for the demand, supply, and other factors relevant to pricing in the DRAM industry. I have drawn on the well-understood economics of price determination, my own economic expertise, and my study of the DRAM industry to arrive at a comprehensive and sufficient set of candidate price predictors.

(216)   The experts' claims that my analysis does not account for key demand and supply factors are incorrect. Defendants' experts point to a variety of factors that they claim I left out, but they either ignore or fail to recognize: (a) the direct roles played by the numerous demand and supply predictors in my analysis; (b) that predictors act not only by themselves but also together as appropriate proxies for all additional factors with which they may be correlated; (c) that factors that are stable across the conspiracy and non-conspiracy periods do not require explicit proxies; and (d) that many of the factors I "neglected" to "include" are properly omitted because they are controlled or influenced by members of the conspiracy (e.g., capacity utilization).

(217)   Dr. Murphy claims that I fail to account for demand and learning by doing in the DRAM industry. Unlike other defendant experts, Dr. Murphy unaccountably ignores the presence of the cost and demand variables I include in my analysis. Specifically, I include the *U.S. Industrial Production Index for Computer and Peripheral Equipment*, the *U.S. Industrial Production Index for Information Processing and Related Equipment*, and the *U.S. Producer Price Index for MOS Microprocessors* in my prediction equation. The first two variables account for the production of computers, servers, communications equipment, and other end-use products for DRAM. As demand for DRAM is derived from demand for these end-use products, these variables clearly account for DRAM demand. Moreover, the *U.S. Producer Price Index for MOS Microprocessors* series directly embodies learning by doing for a closely related technology, microprocessors, and is therefore a valid and useful proxy for DRAM learning by doing.

(218)    Additionally, several defendants' experts contend that I did not account for several events that occurred during the conspiracy period, including earthquakes, introductions of new versions of Windows operating systems, increases in the amount of memory per PC, Y2K, and the technology boom and bust, among others.[168] I have carefully considered each of these arguments and found that defendants' experts' arguments regarding these events are irrelevant to my opinions in this matter, for reasons that I detail immediately below. Furthermore, many defendants' experts' arguments regarding these events are based on conjecture rather than any understanding of how such events might have an impact on my analysis.[169] Defendants' experts neglect to mention that (a) defendants' own statements and documents indicate that any effects of these events were minor at best and, in many cases, expected; and (b) several of these events are already accounted for by the computer-related variables in my analysis. A review of each of these events leads me to conclude that they do not matter for the conclusions of my analysis. I consider arguments relevant to each of these events in brief detail below.[170]

- **Earthquakes**: Several defendants' experts criticize my analysis for not explicitly considering the September 1999 earthquake in Taiwan, although none of the defendants' experts have undertaken any analysis to determine whether this earthquake affected DRAM prices. I have examined the factual record and relevant data and concluded that the earthquake had no substantial impact on DRAM prices, which had already increased substantially in the two months prior to the earthquake, whereas prices began falling in the month after the earthquake.[171] Furthermore, focusing on this one earthquake when prices were already high is misleading and ignores the fact that there were dozens of earthquakes near DRAM fabs in Taiwan and Japan before, during, and after the conspiracy period.

- **Introductions of new Windows operating systems:** Several defendants' experts state that I should have explicitly considered the introductions of new Windows operating systems, Windows XP in particular, in my analysis. However, only one expert (Dr. Shapiro) attempted to measure the impact of the release of Windows XP on DRAM demand, and he concluded

---

[168]    I discuss these events in detail in Appendix G.

[169]    For example, Dr. O'Brien simply criticizes me for not considering "changes in hardware demand driven by Y2K concerns, the earthquakes in Taiwan in 1999 and 2002, the "dotcom" boom and bust, and the introduction of Windows XP" without doing any analysis himself to see if these events had any impact on DRAM prices that was not already captured by my model. See the Expert Report of Vincent O'Brien, 22-23. See also, for example, the Expert Report of Robert Topel, ¶ 69, the Expert Report of Daniel Rubinfeld, ¶ 300, 314-315, the Expert Report of Kevin Murphy, ¶ 174-175, the Expert Report of Carl Shapiro, 9-13, the Expert Report of Victor de Dios, ¶ 35, the Expert Report of Joseph Kalt, ¶ 178, and the Expert Report of Benjamin Klein, p. 48-58.

[170]    See Appendix G for more detail.

[171]    See Appendix G. See also, e.g., U.S. International Trade Commission, "Determination and Views of the Commission: DRAMs of one Megabit and above from Taiwan," Investigation No. 731-TA-811 (USITC Publication No. 3256, December 1999), p. 22.

that it "didn't make any difference…People knew [Windows XP] was coming…It would be anticipated both in terms of potentially [sic] production decisions, demand, inventories."[172]

- **Increases in memory per PC:** Several defendants' experts also argue that these introductions of Windows operating systems drove increases in memory per PC. While it is true that each successive Windows operating systems generally required more memory than prior versions, industry data and the factual record demonstrate that the average memory in PCs at the time of the operating systems' introduction was usually more than double the amount of memory recommended to run these new operating systems. Moreover, these increases occurred steadily through time and were widely anticipated.

- **Technology boom and bust:** Several defendants' experts have claimed that I failed to account for the impact of the "tech boom" and "tech bust," also commonly known as the "dot-com bust," on DRAM prices during the conspiracy period.[173] These experts reach this conclusion by blatantly ignoring the cointegrating variables I included in my prediction equation. The *U.S. Industrial Production Index for Computer and Peripheral Equipment* and the *U.S. Industrial Production Index for Information Processing and Related Equipment* both exhibit increases and decreases in demand for electronic products that correspond to the timing of the tech boom and bust. Therefore, defendants' experts' argument that I have not accounted for the tech boom and bust is misguided.

- **Y2K:** Additionally, several defendants' experts' have claimed that I have not accounted for increased demand stemming from concerns about Y2K. However, their claims that Y2K resulted in an unexpected increase in demand for DRAM are simply not supported by the factual record.[174] Y2K was anticipated years in advance and any increases in demand for PCs prior to January 1, 2000, are captured by the demand variables in my analysis.

(219)    Based on my review of the factual record, I have concluded that these events either had no impact on DRAM prices or I already have accounted for their impact, despite defendants' experts' claims to the contrary. Furthermore, I have selected an appropriate set of candidate predictor variables, which confirm that my prediction equations contain the correct supply and demand factors to

---

[172]    Deposition of Carl Shapiro (October 6, 2006), 87.

[173]    See for example the Expert Report of Kevin Murphy, ¶ 97 and ¶ 173, the Expert Report of Robert Topel, ¶ 69, the Expert Report of Benjamin Klein, ¶ 82, the Expert Report of Vincent O'Brien, ¶ 53, and the Expert Report of Victor de Dios, 7.

[174]    See, e.g., MU00674453-473 at 456, MU00674532-550 at 540, MU00674566-583 at 571, Bolaji Ojo, "Quarterly Financial Review: PC OEMs start 2000 on sour note," ebnonline, 11 Feb 2000, downloaded 16 Jun 2004, Jack Robertson, "DRAM prices heading south," ebnonline, 25 Feb 2000, downloaded 16 Jun 2004, "Researcher dismisses Y2K impact on DRAM pricing," SiliconStrategies (reprinted at EETimes.com), 10 Dec. 1999, <http://www.eetimes.com/showArticle.jhtml?articleID=10817522>, J. Robert Lineback, "Two good years may move up DRAM sales to peak '95 level," EETimes, 3 Jan. 2000, <http://www.eetimes.com/news/semi/showArticle.jhtml?articleID=10810926&printable=true>.

measure pricing in the DRAM industry. This set of relevant candidate predictors was sufficient in number and scope to ensure that I did not neglect any important factors that are relevant to predicting price movements; while at the same time, the set of candidate predictors was not so large that I ran the risk of introducing random variation into my predictions. I weighed these concerns carefully when considering the key demand, supply, and other factors to include in the candidate set and in applying the method of cross validation to select predictors, and I am confident that my prediction equations contain the appropriate supply and demand factors.

(220)   Nevertheless, I have conducted sensitivity analysis with additional variables proposed by the defendants' experts and confirmed that these variables have no impact. I have considered additional variables to account for life cycles (technology HHI index,[175] cumulative experience, average density,[176] time since introduction), and additional cost and demand series such as Micron cost series, DSP, and MPU,[177] after accounting adjustments. The inclusion of these variables does not affect my results in any substantial way. This provides further demonstration that in my initial report I have already accounted for the relevant demand and cost factors.

## VI.3. Defendants' experts' wrongly claim that my model produces accurate post-conduct period predictions by design and regardless of the inclusion of irrelevant variables

### VI.3.1. Introduction

(221)   One indication of the reliability of my results is that the but-for prices closely match up with actual prices after the conduct period. Defendants' experts wrongly claim that this occurs by design and regardless of what factors are included in my model. The defendants' experts claim to alter my model to include variables that are clearly unrelated to DRAM, and then claim that the resulting but-for prices still match the actual prices after the conduct period.

(222)   However, these claims are fundamentally mistaken and wrong both in principle and in practice. First, it is theoretically inappropriate to include irrelevant variables in an econometric model; nothing can be learned by their inclusion. Furthermore, the inclusion of irrelevant variables in a model does not help improve the predictive accuracy of the model.

---

[175]   Dr. Rubinfeld uses a technology HHI index for Samsung; see Expert Report of Dr. Rubinfeld, ¶ 73 (construction) and ¶ 376 (use in model estimation). Using his approach I construct a technology market-wide HHI index.

[176]   See Expert Report of Dr. Murphy, ¶ 106 and Expert Report of Dr. Topel, ¶ 45 and footnote 45.

[177]   See Expert Report of Dr. Shapiro, p. 9 and Exhibit 10.

(223)    Second, the defendants' experts' attempts at finding a set of irrelevant variables that, when applied to my model, could result in but-for prices that match actual prices at the end of the conduct period is mistaken and flawed. Each of the experts has made significant mistakes in their attempts to rebut my work. When corrected, their work demonstrates that the inclusion of irrelevant variables causes but-for prices to significantly diverge from actual prices after the conduct period. Rather than demonstrate a weakness, their examples strongly corroborate the reliability of my results.

### VI.3.2. It is well known to economists that the use of irrelevant variables is inappropriate

(224)    It is inappropriate to include irrelevant variables in an econometric model; nothing can be learned by their inclusion and their inclusion does not help improve the predictive accuracy of the model.

(225)    As stated in my article, "Time-Series Estimation of the Effects of Natural Experiments,"[178] great care must be exercised in selecting variables for an econometric model, and candidate variables must be selected in "conformity with economic theory."[179] This is the first step in the set up of any standard econometric model as evidenced in many introductory econometrics textbooks.[180]

(226)    In addition, it is well known in the economic literature that the inclusion of irrelevant variables does not improve predictive accuracy, as it increases the mean squared error, and it reduces the estimates' efficiency.[181]

---

[178]    White, H., Time-series estimation of the effects of natural experiments, *Journal of Econometrics*, 135, pp. 527-566, 2006.

[179]    "Variables invalid as predictive proxies have no place in the analysis. This applies particularly to variables not satisfying validity condition *(i)*, that is, variables not having well-justified economic links to $\ddot{Z}_t$. Economic time series are sufficiently numerous that one can often find a series with just the right pattern to absorb the effect of the natural experiment." White, H., Time-series estimation of the effects of natural experiments, *Journal of Econometrics*, 135, 2006, p. 553.

[180]    "In carrying out an empirical project, an investigator must have satisfactory answers to the following questions: 1. Does the model make economic sense?" Ramanathan, Ramu, Introductory Econometrics with Applications, Fifth edition, Harcourt, 2002, p. 13. "First, a core or base set of regressor should be chosen using a combination of expert judgment, economic theory, and knowledge of how the data were collected; the regression using this base set of regressor is sometimes referred to as a base specification. This base specification should contain the variables of primary interest and the control variables suggested by expert judgment and economic theory." Stock, James H. and Watson, Mark W., Introduction to Econometrics, Pearson Education, 2007, p. 236.

[181]    "Thus, the more variables we include in a forecasting model, the lower the sum of squared residuals will be, and therefore the lower MSE [mean squared error] will be, and the higher $R^2$ will be. …including more variables in a forecasting model won't necessarily improve its out-of-sample forecasting performance, although it will improve the model's "fit" on historical data." Diebold, Francis X., Elements of Forecasting, Fourth Edition, Thomson South-Western, 2007, p. 83.

---

### VI.3.3. Contrary to his characterization, Dr. Kalt uses both economically motivated variables and irrelevant variables; his results generate nonsense if only irrelevant variables are used

(227) Similarly to Drs. O'Brien, Shapiro, Murphy, Dr. Kalt mistakenly claims that by construction a regression that uses post-conduct data will produce a but-for price that eventually will match the post-conduct data.[182] To prove his point, Dr. Kalt presents a model which, he claims, demonstrates that the but-for prices predicted by my model will always produce predictions that closely match actual prices in the post-conduct period, even when based on a set of variables that have no particular relevance to the DRAM industry.[183]

(228) As I pointed out in Section VI.3.2 the economic literature has long recognized that nothing can be learned from such exercises and great care must be exercised in selecting variables that are motivated by economic theory. The variables I chose to include as candidate predictors were selected based on my experience as an economist after considering a careful, detailed study of the DRAM industry and the data available to me. Additionally, I was careful to ensure I only included economically relevant variables and to not include any variables that were impacted by the conduct. This is essential to ensure that my but-for price predictions are not biased.[184]

(229) Nevertheless, I will demonstrate below that Dr. Kalt's characterization of his analysis is inaccurate and the figures depicting this analysis in his expert report are misleading due to underlying mistakes.

(230) Dr. Kalt has not been accurate in portraying his analysis as one that shows that "the model using variables chosen because they were frequently downloaded from the BLS, rather than because they bear any relationship to the DRAM industry, yields results very close to Professor White's."[185] This is incorrect. While Dr. Kalt implies that he has replaced the explanatory variable in my prediction equation with the BLS variables, he buries the fact that he leaves in what he calls "trend variables" in his footnote 160.[186] In fact, these "trend variables" are more than trends; they are the three economic variables that are at the core of my analysis. Contrary to

---

[182] See for example the Expert Report of Vincent O'Brien, ¶ 61, the Expert Report of Kevin Murphy, ¶ 180-181, the Expert Report of Carl Shapiro,36-38, and the Expert Report of Joseph Kalt, ¶ 184-186.

[183] As I explained in Section VI.3.2, it is well known in the economic literature that it is inappropriate to include irrelevant variables because nothing can be learned from such exercises.

[184] See the Expert Report of Daniel Rubinfeld, ¶ 374.

[185] See the Expert Report of Joseph Kalt, ¶ 197.

[186] See the Expert Report of Joseph Kalt, footnote 160.

Dr. Kalt's characterization, these economic variables do bear an important economic relationship to the DRAM industry.

(231)    Had Dr. Kalt performed the analysis portrayed in paragraph 196 of his rebuttal report, then he should have also dropped my core economic variables from the variables used in his analysis. I find that once my main economic variables are removed from Dr. Kalt's analysis, the but-for price forecast does not track the actual prices in the post-conduct period. This result is contrary to Kalt's assertion. Figure 160 shows that if only variables that bear no relationship to the DRAM industry are included in my model, the predicted prices do not match actual prices in the post-conduct period. It is noteworthy that even if post-conduct data were used to construct this example, contrary to Kalt's faulty assertions, there is no guarantee that the "but-for price forecast must fit in the asserted post-conduct period."[187]

**Figure 160: OEM but-for prices after removing economic variables**



---

[187]    See the Expert Report of Joseph Kalt, ¶ 196.

### VI.3.4. Dr. Rubinfeld incorrectly claims that my method to select variables makes it easy to accurately predict prices in the post-conduct period

(232)    Dr. Rubinfeld claims that my variable selection method will tend to generate the predictions that are relatively close to actual prices during the post-conduct period, regardless of whether or not those variables reflect the supply and demand factors that determine DRAM prices.[188]

(233)    In reality, the variables that I chose to include as candidate predictors were selected based on careful consideration of the economics of price determination, a detailed study of the DRAM industry and the data available to me, and my experience and judgment as an economist. Additionally, I was careful to ensure that I only included economically relevant variables and did not include any variables that were impacted by the conduct. This is essential to ensure that my but-for price predictions are not biased.[189]

(234)    Dr. Rubinfeld claims that it is "not difficult" to generate a model that predicts a but-for price that closely matches the actual price during the benchmark period.[190] According to this logic, the fact that my model accurately predicts the actual price during the post-conduct period should not be considered a validation of my approach.

(235)    In an attempt to validate his criticisms, Dr. Rubinfeld proposes two examples in his exhibit 32. In one example, he first predicts DRAM prices using environmental variables completely unrelated to the economics of the DRAM industry and then uses the resulting but-for price in a second stage regression for the SGI price. In a second example, he predicts sunspot frequency using environmental variables and then uses the resulting but-for price in a second stage regression for the SGI price.

(236)    Setting aside the important fact that the economic literature has long recognized that nothing can be learned from such exercises, I will demonstrate below, using Dr. Rubinfeld's second example, that Dr. Rubinfeld's did not find what he was looking for and that, because of several underlying errors, the analysis he portrays in his exhibit 32 is misleading due to underlying mistakes.

(237)    Dr. Rubinfeld considers a two-stage model. In the first stage he considers a model in which sunspot frequency is predicted by other environmental variables, completely unrelated to the economics of the DRAM industry. The resulting predicted sunspot frequency is depicted in Figure 161. It is clear to the human eye that the prediction for sunspot frequency as constructed

---

[188]    See the Expert Report of Daniel Rubinfeld, ¶ 341.

[189]    See the Expert Report of Daniel Rubinfeld, ¶ 374.

[190]    See the Expert Report of Daniel Rubinfeld, ¶ 342.

by Dr. Rubinfeld does not produces a good fit with respect to the post-conduct data, even though post-conduct data was used to construct this example. (Note that the forecast is so poor that it cannot be meaningfully depicted on the graph with a reasonable choice of scale).

(238)   Dr. Rubinfeld's exercise offers another clear proof that Drs. O'Brien, Shapiro, Murphy, and Kalt are mistaken when they claim that by construction a regression that uses post-conduct data will produce a but-for price that eventually will match the post-conduct data.[191]

**Figure 161: Dr. Rubinfeld's sunspot frequency regression**



(239)   After constructing a prediction for sunspot frequency, Dr. Rubinfeld builds a second-stage regression that uses the sunspot frequency prediction generated in the first stage to predict the SGI price. The resulting analysis is part of Dr. Rubinfeld's exhibit 32.[192] Dr. Rubinfeld attempts to argue that even though the prediction is based on a sunspot frequency measure, it still generates a good match between the actual SGI price and the predicted SGI price in the post conduct period. Unfortunately for Dr. Rubinfeld, his conclusion is the result of a fundamental error in the computation of his SGI but-for price. Dr. Rubinfeld incorrectly computes his SGI but-for price without rolling forward the but-for value of lagged SGI prices.[193] I display the properly

---

[191]   See for example the Expert Report of Vincent O'Brien, ¶ 61, the Expert Report of Kevin Murphy, ¶ 180-181, the Expert Report of Carl Shapiro, 36-38, and the Expert Report of Joseph Kalt, ¶ 184-186.

[192]   See the Expert Report of Daniel Rubinfeld, Exhibit 32, Panel 3.

[193]   I describe the nature of this fundamental mistake more extensively in Section V.2.

computed SGI but-for price line based on Dr. Rubinfeld's model in Figure 162. This clearly shows that Dr. Rubinfeld's predicted price line does not come close to matching the actual SGI price line in the post-conduct period.

**Figure 162: SGI but-for price based on sunspot frequency**

(240)   Dr. Rubinfeld has failed to find what he was looking for by engaging in his data mining exercise. He interprets his results as conclusively damaging to my approach only because he incorrectly computed the predicted value of the SGI price, using the lagged values of SGI's actual prices instead of the lagged but-for price to generate his predictions. Once this careless error is corrected, it is evident that the only thing that Dr. Rubinfeld has proved is that nonsensical procedures generate uninformative and irrelevant results.

## VI.4. Defendants' experts' are wrong in claiming that the close match between but-for prices and actual prices after the conduct period is simply the result of including post-conduct data in my analysis

(241)   Defendants' experts contend that the close match between but-for and actual prices after the conduct period is the inevitable since I include the post-period data in my analysis. This criticism is based on a flawed and naïve understanding of my model and econometrics in general. What the defendants' experts fail to understand is that my but-for prices are not simply fitted values, but

are the result of a dynamic forecast. As such there is no guarantee that my but-for prices will match up with actual prices whether or not post-conduct data is used for the purposes of estimation.

(242)    Although it is reasonable to expect that a reliable but-for price will eventually match up with the actual price once the conspiracy comes to an end, the examples above prove that this is not something that just happens by including post-conduct data in the analysis when but-for prices are dynamically updated. On the contrary, had defendants' experts understood how but-for prices are constructed in my model, they would have understood why post-conduct matching between but-for prices and actual prices is far from being a guaranteed outcome.

(243)    In estimating the prediction equation for DRAM prices, I use pre-conduct and post-conduct data on prices and demand, supply, and industry factors. As Dr. Rubinfeld notes, use of pre- and post-conduct data is necessary if one is to capture the economics of such a technologically dynamic industry.[194]

(244)    To construct my dynamic but-for price forecast, I conduct what is known as a dynamic simulation. For this, I start at the beginning of the conduct period (either plea or conspiracy). In the first period of the conduct, I use the actual price at the end of the pre-conduct period as an input for my forecast. This is the last time that my prediction uses actual prices. As I forecast forward from month-to-month, I always use the previous period's predicted price in making my prediction for the next month, not the actual prices.[195] The fact that the dynamic but-for price predictions never rely on actual prices beyond the beginning of the conduct means that their values are determined only by the pre-conduct prices, by non-conduct price dynamics, and by market factors of supply and demand that are not under the influence or control of the conspiracy. Because the dynamic but-for predictions do not rely on actual prices post-conduct, there is no guarantee that they will match actual prices post-conduct.[196] The examples of Section VI.3. provide ample proof of this fact, well understood by the forecasting profession.

(245)    In contrast, the fitted values from my prediction equation are based on previous period's actual values of prices post-conduct, so these should match well with observed prices. This is precisely

---

[194]    Expert Report of Dr. Rubinfeld, ¶ 340.

[195]    To effectively remove the impact of the conspiracy but-for prices must be constructed using variables that were not contaminated by the conspiracy itself. Including any variable that was "tainted" by the conspiracy would result in biased but-for price estimates. Therefore, when, as in my prediction equation, the current month's price depends in part on the previous month's price, the appropriate way to compute but-for prices is to use the previous month's but-for price to update the current but-for price.

[196]    See for example, Pindyck, R. S. and Rubinfeld, D. L., Econometric Models and Economic Forecasts, McGraw-Hill, Fourth Edition, 1998.

what we see in Figure 163,[197] where the fitted values of my prediction equation track the actual values fairly closely over the entire estimation period. The only way to explain the defendants' experts' mistaken claims about post-conduct but-for prices necessarily matching actual prices is that they are profoundly confused about the distinction between fitted values and dynamically updated but-for prices resulting from my model, a fundamental distinction in forecasting.[198] The fact that the but-for prices match actual prices as well as they do is by no means guaranteed and is an effective and informative demonstration of the reliability of my but-for price estimates.

**Figure 163: OEM DRAM actual, fitted, and but-for price indexes – conspiracy period**



---

[197]    Figure 163 is identical to Figure 10 in my initial report except for the addition of the fitted values.

[198]    The distinction made clear in, for example, Pyndick, R.S. and Rubinfeld, D.L. (1998), Econometric Models and Economic Forecasts, fourth edition. New York: Irwin McGraw-Hill and Diebold, Francis X. (2007), *Elements of Forecasting,* fourth edition. Cincinnati: Thomson South-Western.

## VI.5. Despite defendants' experts' claims to the contrary, the fact that the model selects different variables for different start dates has nothing to do with its reliability

(246)   A number of defendants' experts have criticized my modeling approach because it selects different variables for the plea- and conspiracy-period prediction equations.[199] They also argued that different variables enter the second-stage model with different leads and lags.[200]

(247)   As with many of the other criticisms they have raised, this is based on a fundamental misunderstanding of the methods I have applied in this case. In what follows, I review why the methods I use to select the variables that ultimately enter my model guarantee that my predictions are reliable. I further demonstrate that even if I use the same set of variables for the plea-period prediction equation and the conspiracy-period prediction equation I obtain substantial overcharge and damage results comparable to those I originally reported.

(248)   As I explained in my initial report, my prediction equation accurately predicts prices for DRAM in the absence of the alleged conduct because it is based on a careful selection of relevant economic variables based on a detailed study of the DRAM industry. Once I identify the appropriate candidate predictor variables, I determine which of the candidate predictor variables should be included to obtain the most reliable prediction equation. The selection of the ultimate set of variables out of the candidate set is motivated by both economic theory, for example in specifying the cointegrating variables, and the fact that, as is well known in the literature, there must be a balance between (a) having a sufficient number of predictor variables to ensure that important factors are not neglected and (b) avoiding the use of too many variables because this tends to reduce the reliability of the resulting predictions.

(249)   In order to properly attain this balance, I used my expert judgment along with well-established objective statistical techniques such as cross validation to identify the most appropriate predictor variables from among the candidates to arrive at a final prediction equation for DRAM prices.

(250)   Consequently, my prediction equations are based on a common set of candidate economic variables and it is only in a second step that I may select different subsets of these economic variables for the plea-period prediction equation and the conspiracy-period prediction equation. Therefore, the fact that the final variables used to estimate the model may vary across different

---

[199]   See for example the Expert Report of Joseph Kalt, ¶ 192-194, the Expert Report of Kevin Murphy, ¶ 169, the Expert Report of Vincent O'Brien, ¶ 64-65, the Expert Report of Daniel Rubinfeld, ¶ 312-313.

[200]   See for example the Expert Report of Vincent O'Brien, ¶ 94-96.

conduct period does not call into question the reliability of my methods. To the contrary, different variables are selected to increase the reliability of my predictions.

(251)   Furthermore, the use of different variables in my final prediction equations for the plea and the conspiracy period scenarios does not affect my results in any substantial way. To prove this point I proceed as follows.

(252)   In Figure 164 I plot two but-for price indexes for Sun DRAM over the plea-period scenario. The red but-for price index is that obtained by using the predictor variables I selected in my initial report for the plea-period prediction equation and the yellow uses the predictor variables I selected for the conspiracy-period prediction equation. I repeat this exercise for the conspiracy-period scenario in Figure 122.

(253)   For each of the scenarios, the Sun DRAM but-for prices using the two different sets of selected variables are very similar to the ones that were produced in my initial report. Therefore, the use of these different predictor variables has little impact on the predicted but-for price index, and consequently my damage estimates are robust and thus reliable. This conclusion is confirmed in Figure 132 where damages for the two different sets of predictor variables are compared to those obtained using the approach I utilized in my initial report.

**Figure 164: Sun DRAM actual and but-for price indexes using conspiracy-period scenario selected variables – plea period**



**Figure 165: Sun DRAM actual and but-for price indexes using plea-period scenario selected variables – conspiracy period**



**Figure 166: Overcharge percentage and single damages based on plaintiffs' total purchases with different variables**

| Analysis | Scenario | Overcharge | Single damages (millions) |
|---|---|---|---|
| Conspiracy-period variables | Plea | 36% | $1,160 |
| White's initial report (plea-period variables) | Plea | 39% | $1,276 |
| Plea-period variables | Conspiracy | 45% | $1,568 |
| White's initial report (conspiracy period variables) | Conspiracy | 49% | $1,714 |

## VI.6. Defendants' economists attempt to make improper ceteris paribus interpretations of my regression coefficients, demonstrating their lack of understanding of basic econometrics

(254)    Several of defendants' experts' criticize my procedure for selecting what they call "explanatory variables."[201] They claim that this procedure is a "mindless" exercise in data mining and that, in my model, a change in price is "predicted" by a variety of hard-to-fathom economic

---

[201]    Kalt ¶ 195, O'Brien ¶ 55, 82-87, Topel ¶ 57, 59-60

relationships.[202] Defendants' experts' concerns are misplaced and show that they confuse the purpose of my procedures.

(255)    Defendants' experts show their lack of understanding of standard econometrics by confusing my statistically objective model selection technique, based on best predictive accuracy (cross-validated root mean squared error (CVRMSE)), with data mining. Data mining is understood in the economic literature as an algorithmic procedure to select explanatory variables in an econometric model so as to achieve the best in-sample fit to the data, so that given a sufficient number of (irrelevant) variables the algorithm will eventually find (spurious) relationships that will nevertheless provide a good fit to the in-sample data. As I show in my article "A Reality Check for Data Snooping" published in *Econometrica*, and contrary to the statements made by the defendants' experts, I am fully aware of the problems that "data snooping" or "data mining" generates.[203] The defendants' experts, however, fail to understand that cross validation, the model selection method I apply, is not a data mining exercise as it selects predictors among a narrow set of pre-specified economically relevant variables,[204] in order to minimize a measure of out-of-sample prediction error and not the in-sample goodness of fit of the econometric model, as stated by O'Brien.[205] This difference is noted even in introductory forecasting textbooks:

> "It turns out that model selection strategies such as selecting the model with highest $R^2$ [a measure of goodness of fit] do not produce good out-of-sample forecasting models… Most model selection criteria attempt to find the model with the smallest out-of-sample … prediction error."[206]

(256)    Further, it has long been recognized in the scientific literature on predictive methods that a prediction equation's estimated coefficients do not provide useful diagnostics as to the model's validity or reliability. As stated 25 years ago by Copas (1983),

---

[202]    O'Brien ¶ 55, 84

[203]    As I state in my article, "[Data mining] is like running the newsletter scam: One selects a large number of individuals to receive a free copy of a stock market newsletter; to half the group one predicts the market will go up next week; to the other, that the market will go down. The next week, one sends the free newsletter only to those who received the correct prediction; again, half are told the market will go up and half down. The process is repeated at libitum. After several months there can still be a rather large group who have received perfect predictions, and who might pay for such "good" forecasts." Halbert White, A Reality Check for Data Snooping, *Econometrica*, Vol. 68, No. 5, September 2000, p 1098.

[204]    Recall my description on carefully selected predictor candidates based on economic theory.

[205]    O'Brien ¶55.

[206]    Diebold, Elements of forecasting, Fourth Edition, Thomson South-Western, 2007, p. 82

---

> [A] method for achieving a good predict[ion] may be quite inappropriate for other questions in regression analysis such as the interpretation of individual regression coefficients or testing hypotheses about them.[207]

(257)    In claiming that my regression coefficients do not make economic sense, defendants' experts' demonstrate their ignorance of the principles of predictive methods just described. They further make the common mistake of confusing causality and correlation. The dangers of confusing correlation and causation are widely understood by scientists.[208] One evidence of defendants' experts' confusion of correlation and causation is Kalt's use of the term "explanatory variables" in referring to those variables that I have been careful to call "predictors" throughout my original report. Further, by claiming that my procedure generates estimated coefficients that are inconsistent with simple economic logic, defendants' experts' signal that they are thinking of these predictors as being causally related to prices. The sharp distinction between these concepts is made clear in an introductory undergraduate econometrics textbook:

> "While in a sense forecasting is just an application of regression analysis, forecasting is quite different from the estimation of causal effects…models that are useful for forecasting need not have a causal interpretation"[209]

(258)    Because my task is to produce reliable but-for price predictions, I require a prediction equation, not a structural model of DRAM price determination. Constructing such a structural model is a complex task of little value for the estimation of but-for prices.

(259)    For example, to make reliable predictions of DRAM prices in the absence of the conspiracy, it is not necessary to uncover the structural (causal) relationship between raw material prices and DRAM prices. Such structural relations would be important if my goal were to understand how DRAM prices would change if raw material prices had been different from their actual values. But the task of constructing estimates of the DRAM prices that would have prevailed in the absence of the conspiracy takes raw material prices at their observed historical levels, not at some other non-historical ("counterfactual") values.

---

[207]   Copas, J.B., (1983), 'Regression, Prediction and Shrinkage,' *Journal of the Royal Statistical Society, B*, 45, 3 311.

[208]   An example illustrates: suppose the citizens of one country are taller, on average, than those of another country. In this case, height is correlated with country of residence. Someone who confuses correlation and causation might think that one could become taller by moving.

"…models that are useful for forecasting need not have a causal interpretation: If you see pedestrians carrying umbrellas you might forecast rain, even though carrying an umbrella does not cause it to rain." Stock, James H. and Watson, Mark W., Introduction to Econometrics, Pearson Education, 2007P. 526

[209]   J. H. Stock and M.W.Watson (2003), "Introduction to Econometrics" (1st edition), 427–8.

(260)    The only counterfactual circumstance that is directly relevant to the task of estimating the impact of the conduct is the absence of the cartel during the conduct period. I construct DRAM price predictions using a prediction equation derived from the more competitive benchmark period (where I presume the cartel was not operative), using predictors that are not impacted by the conduct. This ensures that the difference between the actual and predicted but-for prices provides a reliable estimate of the impact of the cartel.

(261)    To construct reliable but-for price predictions, I utilize the correlations in the more competitive benchmark period that exist between the candidate predictors and the prices of DRAM. The procedure that accomplishes this is the well-accepted and standard method of multiple regression.

(262)    Not only is there correlation between the DRAM prices and the candidate predictors, there is also correlation among the candidate predictors. As a result, the candidate predictors may be interchangeable to a degree. That is, because of their mutual correlations, several candidate predictors can contain the same predictively useful information. Thus, the predictors appearing in my final prediction equation work collectively to produce reliable but-for prices.

(263)    Reliable predictions are constructed by using a subset of all the available candidate predictors that contains the information most relevant to predicting DRAM prices. The procedure that I use to arrive at the variable included in my final prediction equation, the method of cross-validation, ensures that the included predictors embody the information most relevant for predicting DRAM prices contained in the entire set of candidate predictors. In so doing, it makes use of the correlations in the benchmark period data, both between the candidate predictors and DRAM prices, and among the candidate predictors, in order to provide reliable but-for price predictions. The method of cross-validation is standard and well accepted.[210]

(264)    Defendants' experts' criticism that I have used a complicated, non-transparent variable selection procedure is also misguided. It is true that the process is computer intensive, but it is nonetheless straightforward and well accepted. By adopting this procedure, I ensure that I do not overlook predictively useful information, while at the same time avoiding inclusion of too many predictors. My procedure therefore leads to reliable forecasts. This also demonstrates the care that I have taken to arrive at reliable but-for price predictions for DRAM.

---

[210]    Stone, M. (1974), "Cross-Validatory Choice and Assessment of Statistical Predictions," JRSS Series B 36, 111–147.

Golub, G et, al (1979) "Generalized cross validation as a method for choosing a ridge parameter" in *Technometrics* Vol 21. No 2. Li, K. C. (1985), "From Steins Unbiased Risk Estimates to the Method of Generalized Cross Validation," *The Annals of Statistics*, 13 1352–1377. and Shao (1993), "Linear Model Selection by Cross Validation," *Journal of the American Statistical Association*, 88. 486–494.

## VI.7. Exclusion of negative overcharges in my damage calculation is the proper approach to take and has a negligible impact on total damages

(265)    Some defendants' experts have argued that my analysis overstates overcharges and damages because I have not netted out the negative overcharges and damages implied by my model.[211] I have computed aggregate overcharges and damages on all transactions for which the best estimate of overcharges is positive.

(266)    Defendants have additionally suggested that the exclusion of negative overcharges has created a statistical bias towards finding damages. This argument is only relevant in situations where the but-for price is above the actual price nearly as often, or at a similar magnitude, as it is below the actual price, that is, in situations where the average actual and but-for prices are similar. In the case of DRAM, my predicted but-for prices are below the actual prices for the majority of the conduct period.

(267)    Additionally, the period in which we find the majority of negative overcharges occurs in late 2001 during the "Kill Hynix" period. This was a period in which multiple suppliers coordinated in reducing prices with the intention of driving Hynix out of business. As prices during this period were driven down due to the actions of defendants and not market forces, my model predicts but-for prices above actual prices during this period. Calculating negative overcharges during this period would have the perverse effect of *rewarding* DRAM suppliers and *punishing* purchasers for the collusive actions of defendants.

(268)    Despite the reasons that it is inappropriate to include negative overcharges, I have re-run my plea and conspiracy period models while allowing for negative overcharges. As seen in Figure 167 and Figure 168, including these negative overcharges has a negligible (2 to 3%) impact on total damages.

**Figure 167: Plea period and lingering effects damage calculations**

| Region | Plea period and lingering effects | | |
|---|---|---|---|
| | Single damages | Singles damages (including negative overcharges) | Percentage difference |
| U.S. | $956,981,464 | $933,800,600 | -2% |
| Total | $1,276,364,228 | $1,249,860,391 | -2% |

---

[211]    See for example the Expert Report of Joseph Kalt, ¶ 210-213, the Expert Report of Benjamin Klein, ¶ 137, the Expert Report of Daniel Rubinfeld, ¶ 319-320, and the Expert Report of Carl Shapiro, 32-33.

**Figure 168: Conspiracy period and lingering effects damage calculations**

| Region | Conspiracy period and lingering effects | | |
| --- | --- | --- | --- |
| | Single damages | Singles damages (including negative overcharges) | Percentage difference |
| U.S. | $1,303,110,967 | $1,264,901,802 | -3% |
| Total | $1,713,628,491 | $1,668,358,708 | -3% |

## VI.8. Defendants' experts' inappropriately apply my methods to alternative data and time periods

(269)    Defendants' experts claim to demonstrate that my approach finds substantial damages in hypothetical "conduct" periods during a time period before the defendants' plea-agreement period when plaintiffs have not alleged that a conspiracy existed.[212] Nevertheless, this exercise has no bearing on the reliability of the overcharges and damages I estimate.

(270)    As I discussed in my initial report, I was asked to examine the effects on plaintiffs of a conspiracy to increase the price of DRAM to the named OEMs. I was further instructed to assume that the conduct at issue took place during two periods, the "plea" period (April 1999 through June 2002) and the "conspiracy" period (August 1998 through June 2002).

(271)    In line with these instructions, I have used the data outside these periods as "benchmark" periods, representative of whatever competitive conduct may have prevailed during these periods. Presumably, the corresponding benchmark period conduct was more competitive than the conduct during the plea period or the conspiracy period, but my analysis does not rest on the supposed absence of anti-competitive conduct during the benchmark period, nor does it rest on the assumption of some constant level of competitive conduct.

(272)    Instead, my but-for prices represent the prices one would expect to prevail under the market conditions historically observed during the conduct period (as measured by historical supply and demand factors) and under whatever average blend of more or less competitive conduct prevailed during the corresponding benchmark period. As economists have long known, competitive behavior can easily vary through time, so it should not be surprising that examining certain sub-periods of the benchmark period will find prices consistent with less competitive behavior in some periods and more competitive behavior in others, consistent with defendants' experts' apparent findings.

---

[212]    See for example Kalt ¶ 201-209 and Shapiro at p. 35.

(273)    Because my but-for prices reflect the average blend of benchmark period competitive behavior, they properly account for whatever variations in competitive conduct occur in the benchmark period. To the extent that a benchmark period represents a more competitive blend of conduct, the but-for prices will tend to be lower, with higher overcharges. To the extent that a benchmark period represents a less competitive blend of conduct, the but-for prices will tend to be higher, with lower overcharges.

(274)    In fact, this is just what we see when comparing the conspiracy period overcharges to the plea period overcharges: the lower overcharges observed for the plea period are consistent with the occurrence of a blend of less competitive behavior during the plea benchmark period than during the conspiracy benchmark period. This is direct evidence that the period by which the plea and conspiracy periods differ (August 1998 through March 1999) was one in which less competitive conduct prevailed than in the conspiracy benchmark period.

(275)    In summary, defendants' experts' claims demonstrate only that they do not understand the meaning of the benchmark period or the fact that competitive conditions can vary through time. Their claims have no bearing on the reliability of my but-for price estimates. Instead, my analysis properly reflects the average blend of competitive conduct in either the plea benchmark period or the conspiracy benchmark period.

## VI.9. Defendants incorrectly claim that my second-stage analysis is biased toward finding damages

(276)    In relating the plaintiffs' prices to the named OEM prices in the second stage of my analysis, it is necessary to strike a balance between the accommodation of possible product composition effects unrelated to the conspiracy and the effects of the conspiracy. In my initial report, I combined the conduct and non-conduct data in order to accommodate product composition effects, while at the same time recognizing that the use of conduct data could potentially taint the relationship in a direction that could lead to a lower estimate of damages than might otherwise be the case.

(277)    A possible way to limit the impact of product composition differences is to estimate the second-stage analysis separately using conduct and non-conduct data. By comparing the plaintiffs actual prices to the expected actual prices obtained by using the conduct-period price relationship after replacing the but-for OEM price index with the actual OEM price index, I find that the plaintiffs'

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.    VI. Defendants' experts' criticisms of my methods are misguided

expected actual prices closely follow the plaintiffs' actual prices, indicating that the differences identified by defendants' experts[213] are due to the pooling of conduct and non-conduct data.

(278)    In Figure 169 through Figure 172 below, I plot the plaintiffs' expected actual prices for Sun and Jaco, obtained by using the conduct-period price relationship after plugging in the actual OEM price, and the plaintiffs' actual prices.

**Figure 169: SUN DRAM actual and expected actual price indexes – plea period scenario and plea period relationship**



---

[213]    See for example the Expert Report of Joseph Kalt, ¶ 210-213, the Expert Report of Benjamin Klein, ¶ 116-118, the Expert Report of Robert Topel, ¶ 78-81, the Expert Report of Carl Shapiro, 38-39, and the Expert Report of Vincent O'Brien, ¶ 67-74.

**Figure 170: SUN DRAM actual and expected actual price indexes – conspiracy period scenario and conspiracy period relationship**



**Figure 171: JACO DRAM actual and expected actual price indexes – plea period scenario and plea period relationship**



**Figure 172: JACO DRAM actual and expected actual price indexes – conspiracy period scenario and conspiracy period relationship**



(279) By estimating the second-stage analysis separately using conduct and non-conduct data, I can further isolate the impact of product composition differences and the use of data tainted by the conduct on the damage estimates. On the one hand, using only the conduct data price relationship to construct the but-for price estimates ensures that product composition effects are fully accommodated, while the but-for prices are contaminated by the conduct. On the other hand, using only the non-conduct data to construct the but-for price estimates ensures that the conspiracy does not taint the but-for price estimates, but does not accommodate product composition effects.

(280) The approach that I follow in my initial report is a middle ground approach that allows me to account for the role of product composition effects on the but-for price index estimates, while at the same time providing a conservative estimate of damages as a result of the inclusion of data tainted by the conduct. While it is not possible to determine ex ante which of the two effects (composition or conduct) will dominate, the damage estimates resulting from the two alternative methods just described (using conduct only or non-conduct only data to estimate the expected but-for prices) can provide informative bounds.

(281) Specifically, the damage numbers that I provided in my initial report are always lower than the damages that I compute using only the non-conduct data, under both the conspiracy and plea period scenarios.

(282)    In addition, under the plea period scenario the damage numbers that I provided in my initial report are bounded between the damage numbers obtained using either conduct only or non-conduct only data to obtain the expected but-for prices. Under the conspiracy period scenario, the damage numbers that I provided in my initial report are below the estimates from either of these two alternative methods for computing the expected but-for prices.

(283)    The estimated dollar damages produced by using either the conduct only or non-conduct only data are tabulated in Figure 173 below.

**Figure 173: Damages obtained estimating the second-stage analysis over alternative data samples**

| Period | Single damages (millions) | | |
|---|---|---|---|
| | Initial report | Using conduct only data | Using non-conduct only data |
| Plea | $1,276 | $1,158 | $1,302 |
| Conspiracy | $1,714 | $1,751 | $1,739 |

## VI.10. Dr. O'Brien's analysis using a Nanya specific price index is flawed and misleading

(284)    Dr. O'Brien claims to have applied my method to his constructed Nanya specific price index and found that "Nanya USA's 'but-for' price that was above Nanya USA's actual price for every month in which Nanya sold to the named OEMs" and therefore that my "methodology would thus determine that there was no impact from Nanya's pricing conduct."[214] Dr. O'Brien argues that it is preferable to examine a Nanya specific price index rather than creating a common price index using data from all defendants. In fact, Dr. O'Brien's construction of a Nanya-specific index highlights the precise reason it is necessary and appropriate to combine defendant data to create an index.[215]

(285)    Dr. O'Brien's construction of but-for prices using a Nanya specific price index (O'Brien Figure 4) is flawed and leads to unreliable results. Although Dr. O'Brien uses the same technique I have used to create my Fisher price indices, he fails to acknowledge certain limitations caused by insufficient data. In order to create an index with prices for each month, it sometimes is necessary to estimate index values for months in which ample data are not available.[216] Dr. O'Brien's

---

[214]    See O'Brien at ¶ 107 and 117.

[215]    Other defendants' experts, specifically Shapiro, Murphy, and Topel, have also relied on a price index that combines pricing data across defendants as well as other manufacturers. Aggregating or pooling is a standard and well accepted practice in economic research and also in price fixing cases involving transaction level data.

[216]    In any one of the plaintiff-specific price indices I created in my affirmative report, my method estimates at most

Nanya-specific index contains estimated prices for *half* of the months he examines. The problems associated with such a large quantity of interpolated data are further compounded by the lengthy periods of time for which Dr. O'Brien estimates prices.[217] The clear artificiality of Dr. O'Brien's estimated prices can be seen in Figure 174 below, which is simply a replication of Dr. O'Brien's Figure 4 but which displays all of the Fisher price index, including the estimated data Dr. O'Brien decided to omit from his original figure.[218] The inadequacies and uselessness of this exercise has even been confirmed by Dr. O'Brien himself.[219]

**Figure 174: O'Brien's Figure 4 (Nanya specific price index) with interpolated data shown**



(286)    As seen in Figure 174, Dr. O'Brien's index indicates that prices would be increasing for a period of 29 months (January 1998 to May 2000), despite the fact that price increases for this length of

---

six months (out of 108 total months), and I never estimate more than two consecutive months. In fact, Dr. O'Brien agrees that, "there might have been one company he [had interpolate data for], but he didn't have significant gaps there" (Deposition of Vincent O'Brien (Rough) (April 29, 2008), 137).

217    One of the consecutive periods over which Dr. O'Brien artificially constructs price index values lasts an entire year, and there is another period that lasts nearly two and a half years. This stands in contrast to the maximum period of two consecutive months in which I have allowed index prices to be estimated.

218    Dr. O'Brien hides the majority of the made up index values in his Figure 4. However, these data points are still used in the calculation of his but-for price.

219    "Q. So how can you be sure that the index you've create here in figure 4 is an accurate reflection of where -- is an accurate application of Dr. White's methodology, given the limitations of your data set? A. I don't think you can. Q. So…can you rely on the Nanya specific but-for index you derived in figure 4 for any conclusions? A. I'd say not by itself, no." (Deposition of Vincent O'Brien (Rough) (April 29, 2008), 137).

time are unprecedented in the DRAM industry. In other words, Dr. O'Brien's constructed price index does not embody the realities of DRAM pricing.

(287)    Additionally, Dr. O'Brien writes in Footnote 21 of his report that Nanya sales made to IBM under a foundry relationship are not representative of Nanya sales to OEMs and should be excluded from any analysis of Nanya data. The foundry agreement outlines a pricing structure for IBM purchases from Nanya that suggests IBM may be purchasing at a discount when compared to other OEM purchases.[220] Although Dr. O'Brien claims to exclude these transactions from his analysis, he in fact relies on these data in the construction of his Nanya-specific price index.[221,222] It is inconsistent for Dr. O'Brien to include these sales in the construction of his index. First, it is inconsistent with the description of his analysis since he states that these transactions were to be excluded. Second, since these transactions were subject to a special, discounted pricing arrangement they could result in the construction of a price index that represents lower than "normal" pricing, thus biasing overcharges.

## VI.11. Dr. Topel's but-for quantity model is misguided

(288)    Dr. Topel claims that since "prices and quantities are jointly determined in the market," if my methods are appropriate for predicting but-for prices then "they must also be appropriate for predicting the evolution of market quantities in the 'but-for' world." He then claims to have applied my methods to "market quantities of DRAM as reported by WSTS" to estimate these but-for market quantities. He further claims that the results of this exercise demonstrate the "actual market quantities of DRAM are well above the predicted 'but for' quantities." He then appears to conclude that the results provide some evidence that defendants did not engage in a supply restriction, and also that the results indicate my "algorithm" is "missing" demand.[223] However, Dr. Topel has instead misinterpreted the nature of predictive modeling, my "algorithm," and his own results.

---

[220]    IBM and Nanya Product Purchase Agreement (November 18, 1998), 2; IBM and Nanya Product Purchase Agreement II (September 28, 2000), 1-2.

[221]    Specifically, Dr. O'Brien writes that sales to IBM under the foundry agreement "were not sales for IBM's own consumption, nor was the final price in control of Nanya, and thus I do not include them in my analysis of Nanya USA's sales to the named OEMs." See the Expert Report of Vincent O'Brien, Footnote 21.

[222]    These are the only OEM purchases from Nanya before September 2001 and occur during the period June 2000 through August 2001. These purchases, which should be excluded, are in fact driving most of the estimated data between January 1998 and September 2001.

[223]    See Topel at ¶ 62-68.

(289)   In order to evaluate Dr. Topel's claims, it is important to understand the exercise that Dr. Topel has performed. For purposes of estimating my prediction equation for DRAM prices, I have created computer code that performs various statistical calculations. One of the inputs to this computer code is a DRAM price index. Dr. Topel has modified the computer code so that it uses a DRAM quantity series in place of the DRAM price index, and he has then simply re-run the code with this as an input. The output of the computer code is plotted in his Exhibit 11 and then used for his subsequent discussion. Dr. Topel appears to be confused in at least two respects.

(290)   First, Dr. Topel appears to be asserting that once a researcher has designed a predictive analysis for a specific economic series, then the same predictive analysis can be meaningfully applied, without any modification, to another related economic series. In making this assertion, Dr. Topel is incorrect in principle and inconsistent with accepted practice within the field of economics. Appropriate predictive analyses are carefully designed with several factors in mind, such as the underlying economics, the statistical properties of the primary data series of interest, and the statistical properties of the relationship between all of the data series included in the analysis. Without investigating these factors, it is inappropriate and likely incorrect to merely assume that any differences are immaterial and that a predictive analysis can be applied without modification.

(291)   Second, Dr. Topel appears to misinterpret the method that I have used in this matter as equivalent to running a piece of computer code with no further analysis or investigation. In doing so, Dr. Topel is incorrect in principle and inconsistent with accepted practice within the field of economics. While the computer code that I have written for my analysis in this matter does perform several separate calculations regarding the objective criteria I have considered, my analysis and investigation is not complete simply when the computer code has completed its calculations. Rather, as is required for any scientific investigation, it is an important part of my method to evaluate the results based on standard accepted diagnostics as well as my econometric judgment and experience. Dr. Topel appears to have omitted any steps beyond simply executing my computer code. Despite his assertions, he has therefore not applied my methods.

(292)   The results of Dr. Topel's own exercise demonstrate that he has overlooked these considerations and that the results of his exercise are not meaningful. Dr. Topel indicates in his report that he "applied the algorithm to data from outside the conduct periods."[224] This suggests that he performed his exercise for both of the time periods that I considered in my analysis, the conspiracy period and the plea period. But for some reason, Dr. Topel has only provided in his report the results of his exercise for the conspiracy period. I have replicated these results in the figure below, and I have also provided the results of his exercise for the plea period.

---

[224]   See Topel at ¶ 64.

**Figure 175: Topel's but-for quantities – conspiracy period**



**Figure 176: Topel's but-for quantities – plea period**



(293)    If Dr. Topel's analysis were valid and if his apparent claims of the absence of a supply restriction were true, then one would expect to see similar results from both exercises. But it is immediately obvious that the results of his exercise for the plea period are markedly different from those for

the conspiracy period. In particular, when his exercise is applied to the plea period, the but-for quantity is actually substantially above the actual quantity throughout much of the plea period. Interpreted as Dr. Topel suggests, these results tell us that during the period of time for which the defendants have pled guilty to participating in an effective conspiracy, the defendants were able to substantially restrict the supply of DRAM to the market as a whole. This is in stark contrast to the discussion and conclusions of the exercise as offered by Dr. Topel in his report.

(294)    A more appropriate interpretation of the difference in results for the plea period and conspiracy period is that in conducting his exercise Dr. Topel has not exercised the care required to produce informative results. His analysis cannot meaningfully reveal the presence or absence of a supply restriction, and it has no implications for the reliability of my results.

## VI.12. Errors in Dr. O'Brien's own analysis and lack of understanding cause him to incorrectly state that I drop significant data and apply overcharges to significant purchases not included in my analysis

(295)    Dr. O'Brien claims that I exclude significant purchases from my analysis and inappropriately apply overcharges to these purchases. Dr. O'Brien misinterprets my report and makes several misleading criticisms of my analysis, casting doubt on the reliability of his opinions. Not only is Dr. O'Brien's claim that the "majority" of my calculated overcharges come from data that were not included in my statistical analysis incorrect, but it is the result of an error in his underlying calculations.

### VI.12.1. Dr. O'Brien falsely exaggerates the amount of transactions dropped in the smoothing of data

(296)    Dr. O'Brien misinterprets my report and is misleading in his criticisms of my smoothing technique. According to Dr. O'Brien I have "removed 27% of the transactions (for the six Defendants whose data [I have] not discarded in toto) before running [my] regression."[225] Dr. O'Brien cites footnote 404 of my affirmative report:

> "… This amounted to removing approximately 17% of the plaintiffs' transactions (and 10% of their purchases).[226]"

---

[225]    O'Brien report, ¶ 139.

[226]    White affirmative report, Footnote 404.

(297) This footnote states I exclude 17% of transactions by count and 10% of transactions by purchase revenue for lack of complete product information. Dr. O'Brien appears to have summed these together to get the 27% he reports. Summing these percentages is not only inaccurate, but it falsely exaggerates the amount of data removed due to incomplete product information. Furthermore, I delivered to Dr. O'Brien my backup materials and data analysis. Had Dr. O'Brien tried to replicate this percentage, he would have found that the transactions dropped because of incomplete product information were 10% of transactions by purchase revenue.

### VI.12.2. O'Brien's claim that 77% of overcharges come from data that has not been included in my analysis is incorrect and is the result of a significant error in his analysis

(298) Dr. O'Brien's claim that 77% of my overcharges come from transactions I "chose" to exclude in the regression work is incorrect and results from a serious error in his underlying calculations.[227] Having corrected this simple error I find the percent of overcharges Dr. O'Brien claims to be based on transactions not included in my regression work drops from 77% to 23% for all defendants.[228] Also, as discussed in Appendix C, I have enhanced my data processing with additional product information. Using this enhanced database, I now calculate damages using 96% of available transactions, and the results from my initial report are corroborated with the new overcharge estimates.

## VI.13. Defendants' experts assertion that Sun and SGI were unaffected by the DRAM conspiracy is not correct

(299) Defendants' experts argue that Sun and SGI were in a different market segment than the major OEMs.[229] They suggest that Sun and SGI would not have been affected by the conspiracy. However, defendants' experts never provide a plausible argument as to why Sun or SGI would be unaffected by the same price increases that caused harm to the named OEMs. Both the named OEMs and plaintiffs purchased standard DRAM chips which were affected by a conspiracy to raise prices.[230] Further, defendants' experts ignore the evidence highlighting the fact that the

---

[227] Dr. O'Brien applies my monthly overcharge percentages to the revenues I include in my regression work to find the value of damages on purchases used in the construction of my models. Dr. O'Brien makes a basic mistake, however, in one of his Excel formulas and applies an overcharge of 0% to over 4,600 transactions where there should be a positive overcharge.

[228] When limited to the largest six defendants this percentage falls from 73% to 11%.

[229] Expert Report of Daniel L. Rubinfeld, p. 23; Expert Report of Kevin Murphy, p. 59-62; Expert Report of Benjamin Klein at p. 63-71.

[230] Defendants' experts do not dispute that all DRAM chips purchased by plaintiffs were standard and thus the same

conspiracy was not limited to just the named OEMs.[231] Defendants' experts also fail to acknowledge the fact that technical differences (e.g., customization, technologies) between purchasers do not explain why one purchaser would be affected by the conspiracy while another would not. In addition to being fundamentally incorrect, there also are a number of specific flaws in the arguments that defendants' experts use to support their theories. These flaws are detailed below.

### VI.13.1. Both Sun and SGI's products would have been affected by the conspiracy

(300)    Defendants' experts claim that Sun and SGI purchased "custom" modules that were more expensive than standard modules and could not be substituted with JEDEC standard modules.[232] Defendants' experts, however, misstate the facts and misinterpret the implications of these "custom" module purchases. When properly considered, I find that the customization of certain modules purchased by Sun and SGI did not cause named OEM and plaintiffs' prices to move separately or to otherwise mitigate the impact of the defendants' conspiracy upon plaintiffs' prices.[233] To see why, one has to understand how modules are priced.

(301)    DRAM modules (whether JEDEC standard or custom) consist of DRAM chips plus a printed circuit board (PCB) and other components. Hence, the price of a module is based on the price of

---

as those purchased by the named OEMs and other customers. (Deposition of Daniel Rubinfeld (ROUGH) (April 25, 2008), 117).

[231]   For instance, Samsung's Yeongho Kang admitted that his "primary focus [in pricing communications with other conspirators] was to stabilize the market for the regional accounts because the other functions, pricing functions for global accounts" were not his responsibility (Deposition of Yeongho Kang, Samsung (November 27,2007), 240). This is particularly relevant because Samsung defined SGI as a regional account (30(b)(6) deposition of John Cerrato, Samsung (11/2/2007), 57). Additionally, a January 20, 2002 internal Samsung e-mail by Il Ung Kim states, "I talked [to] Charlie regarding our pricing strategy which is in line with TQ's [Tom Quinn's] opinion. We will try to shuffle around our volume from RA [regional accounts] to GA [global accounts] or vice versa as we need to keep our price upward" (SSI-005238446–005238449 at 446). An email from Samsung to Sun shows that Samsung used price increases to "other corporate accounts" to justify a price increase to Sun: "I don't understand your expectation for reductions in 64M pricing. We are near completion of negotiations with our other corporate accounts and prices will increase for the 3rd consecutive month… There is still considerable upward pressure on 64M 5V Async product, which is now over $10 at the other corporate accounts and as high as $12-$13 in the secondary/spot markets." (SUN0033807).

[232]   Expert Report of Daniel Rubinfeld, p. 25; Expert Report of Kevin Murphy, p. 62; Expert Report of Benjamin Klein, p. 10-11.

[233]   It should be noted that not all Sun and SGI's purchases were of "custom" modules, notwithstanding the misunderstanding of (or misstatement by) defendants' experts to the contrary, "Is it your understanding that Sun did not buy any noncustomized DRAM products between August 1 of 1998 and June 15 of 2002. A That's probably essentially -- I mean, I think they did buy a few chips, but essentially, none of the DRAM products. So, I mean, I think I would modify that, because I know that they bought a very few number of chips rather than modules, and I'm not sure whether – I don't think they're customized" (Deposition of Benjamin Klein (ROUGH) (April 23, 2008), 126-127).

---

the underlying DRAM chips plus the circuit board and other components.[234] The price of the circuit board and other components typically are aggregated into a single price called the "module adder," which is added to the price of the DRAM chips mounted on the module to calculate the overall module price.

(302)    The module adder typically is a specified, or fixed, amount that is negotiated very infrequently, whereas the prices of the DRAM chips typically change based upon market conditions – or, in this case, based upon defendants' conspiracy.[235] The module adder also generally constitutes a relatively small portion of the module price. This means that purchasers take into account the pricing of standard DRAM chips on the modules in their pricing negotiations.[236] In fact, it is reasonable to conclude that the chip prices tend to drive price negotiations for the modules because the module adder typically is a fixed amount and thus is not the subject of negotiation once fixed. Even where the negotiations do not explicitly reference chip prices, customers can determine the chip price simply by deducting the module adder from the overall module price.

(303)    That certain Sun and SGI modules may have been assembled using a non-standard PCB or placed in a non-standard configuration does not mitigate the harm to Sun or SGI from defendants' conspiracy. The fact that the chips that go onto these modules are industry standard (a fact that defendants and their experts do not dispute) means that any price increases for these chips would also increase the price of the module itself.[237] In addition, Samsung's expert, Dr. Rubinfeld, agrees that he would not expect there to be any differences in the prices for these chips between named OEMs and others.[238]

(304)    Further, not only were the prices of Sun and SGI custom modules based upon the price of standard DRAM chips purchased by the named OEMs and other customers, but they were at least in some instance directly tied to the prices of non-custom modules.[239] For example, Elpida

---

[234]    Deposition of Alain Ishiguro (Nov. 20, 2007) at 191-194. The cost of the PCB and the other non-DRAM portion of the modules (whether custom or standard) was generally less than 30% of the cost of the module. Multiple documents show that the majority of the cost of a DRAM module can be attributed to the DRAM chips placed on the module board: SSI0000378628; SSI 0000378581; SSI0005130490 – 92; SGI 1207792; SGI 1207809 – 10.

[235]    Module adders were "something that [SGI] didn't negotiate, because the PCBA, or the cost of the PCB, sorry, and resistor and capacitor varied very little compared to DRAM." (Deposition of Alain Ishiguro, SGI (November 20, 2007), 207-208).

[236]    SSI-0000339376; SSI-0000310456; SSI-0000339330.

[237]    "I would expect that most of the individual chips that were put into the modules were standardized", (Deposition of Daniel Rubinfeld (ROUGH) (April 25,2008), 117 ).

[238]    "But with respect to the -- the basic market for -- more commoditized chips, I wouldn't expect to see significant differences whether we included the OEMs or not", (Deposition of Daniel Rubinfeld (ROUGH) (April 25,2008), at 141).

[239]    A reference guide that was used by Elpida for a DBE involving Sun's NGDIMM shows that the prices for standard SDRAM chips, as publicly reported, were used to calculate the price that Elpida and Sun used as a

believed the best "metric" for determining the price of Sun's custom NGDIMM modules were the prices the named OEMs were paying for standard SDRAM modules, which were the same technology as the NGDIMM. Elpida priced the NGDIMM based upon a markup over the price of standard SDRAM modules sold to the named OEMs.[240] Thus, given that certain defendants have admitted in their guilty pleas to increasing the price of SDRAM sold to the named OEMs, it necessarily follows that Sun's price for the NGDIMM was elevated by the conspiracy.

(305)    The same arguments hold true with respect to defendants' experts' claim that both Sun and SGI had a "rigorous" qualification process and needed engineering support that would have led to increased product costs.[241] There is substantial deposition testimony indicating that neither Sun nor SGI's qualification process was particularly "rigorous."[242] Also, defendants' experts conspicuously fail to mention the fact that the named OEMs also required qualifications.[243] In addition, the non-recurring engineering fees, which Dr. Rubinfeld claims are worked into the cost of SGI's product, were actually invoiced separately.[244] Despite these facts, even if defendants' experts' claim that Sun and SGI's prices were higher, their argument still does not provide a reason that would explain why Sun's and SGI's prices were not affected by the conspiracy.

(306)    The notion that defendants' conspiracy would not affect Sun and SGI's prices simply because their prices may at times be higher than those of the named OEMs implies that defendants' experts' believe that unless the named OEMs and Sun and SGI are paying the *same* prices then

---

reference price for the auction (EMUS00564103); In an internal Elpida email dated March 5, 2002 regarding Sun's NGDIMMs Bill Hassett states, "based on the latest DRAM Exchange inputs (256Mb @ $9-$10), I expect that Sun will be expecting a price around $220" (EMUS751105); Additionally, the reference price for one of Sun's DBEs used the prices for SDRAM chips that were publicly reported to create a reference price (MU00116357); A May 14, 2000 email suggesting that Apple's price should be used as a benchmark for Sun's prices (HSA00238480-83);

[240]    EMUS751105.

[241]    Expert Report of Daniel Rubinfeld, p. 27, 34-35; Expert Report of Kevin Murphy, p. 64; Expert Report of Benjamin Klein, p. 11.

[242]    Deposition of Kelly Bement, SGI (November 30, 2007), 57-59, 64-65, 81-82, 84, 107-108; 30(b)(6) deposition of Craig Swoboda, SGI (November 29, 2007), 34-35, 43, 88, 132, 134-135; Sun used the industry standards set by JEDEC to determine reliability standards (Deposition of David Jeffrey, Sun (October 4, 2007), 63-65); Sun's reliability standards for DRAM were in line with industry standards for DRAM (Deposition of David Jeffrey, Sun (October 4, 2007),148-150); Sun's qualification process did not prevent it from taking advantage of industry standard pricing because the DRAM chips were the same across the industry (Deposition of Linda Park, Sun (December 18, 2007), 72-73).

[243]    Testimony from Jackie Gross of HP shows that HP also required suppliers to go through qualifications (30(b)(6) deposition of Jackie Gross, HP (August 29, 2006), 140-141); In addition, Dell also required qualifications (30(b)(6) deposition of Kevin Brown, Dell (September 12, 2006) , 223-225; 30(b)(6) deposition of Anne Seshu, Dell (September 14, 2006), 37-38).

[244]    SSI-00090726; SSI-000550864; SGI 209266; SGI 209267.

---

defendants' conspiracy could not have impacted Sun and SGI. There is no basis for this belief, nor do defendants' experts articulate one.

(307)     It is a fundamental principle of economics that where the prices of two products are based upon the costs of the components comprising those products, if the cost of a key component included in both products goes up, the prices of *both* products will go up in turn, regardless of whether the prices of those products are the same. Defendants' experts, as noted above, do not dispute that DRAM chips comprise a key component cost upon which module prices are based so their assertion regarding the supposed significance of the customization of Sun and SGI modules is contrary to the facts of these cases. As mentioned above, this is in large part because the modules purchased by Sun, SGI, and the named OEMs (both custom and non-custom) all contain the same industry standard DRAM chips, the prices of which are publicly reported and referenced as benchmarks in contract negotiations.[245]

### VI.13.2. Defendants' conspiracy to raise prices would not have precluded impacts on DDR or FPM-EDO prices

(308)     Defendants' experts argue that by continuing to use FPM-EDO in 2000 and 2001, Sun was a legacy purchaser, and that by adopting DDR early, SGI was a technology leader. They contend that for both Sun and SGI this means that they would have paid legacy premiums or new product premiums, which would have precluded them from experiencing the effects of defendants' conspiracy.[246] In doing so, they ignore the fact that the prices of different memory technologies were linked by negotiations referencing prices of other technologies.[247] Price differences were

---

[245]     Dr. Rubinfeld himself states that "there was some degree of price transparency" and that "information about contemporaneously prevailing market prices may have served as a general reference in price negotiations" (Expert Report of Daniel. Rubinfeld, p. 33); In her testimony, Linda Park stated that "the discretes are the same. So if the discretes are the same, you know, it's -- our negotiations and our pricing and supply/demand, it's really the same market. So we should be able to take -- I mean, we did participate in that discrete supply/demand market, and that was our consumption." (Deposition of Linda Park, Sun (December 18, 2007), 72-73). SGI's former Global Commodity Manager, Alain Ishiguro testified that he received pricing for discrete DRAM chips and that he gathered comparative data on prices from various sources that provided spot and contract market pricing information. (Deposition of Alain Ishiguro, Nov 20 ,2007), 188-191.

[246]     Expert Report of Daniel Rubinfeld, p. 24; Expert Report of Benjamin Klein, p. 64-71; Expert Report of Kevin Murphy, p. 59-61.

[247]     When referring to a price increase that Hynix and Micron discussed, Mike Sadler of Micron stated that "the significance was that, and still is, that when we negotiate – we do a DRAM price negotiation with these customers, we only negotiate the price for the highest volume, essentially the highest volume product in the portfolio, and all other products then are calculated based on that base price." (Testimony of Mike Sadler in the Swanson trial, 1127-1128); A May 30, 2002 Elpida email shows that DDR was priced relative to SDRAM (EMUS 0732402); A March 12, 2002 Elpida email shows that DDR was priced relative to SDRAM (EMUS 345627). A September 24, 1998 Samsung emails states, "Most suppliers do not have separate prices for async and sync" (SSI-0000330194). In November 2000, NEC stated that its price for 128Mb DDR was tied to a "Premium Projection over 128Mb SDRAM: CY01/Q2: 60%, Q3: 40%, Q4: 30%" (EMUS 974072). See also EMUS 743549 (256 Mb DDR is 3%

---

closely monitored by defendants, the named OEMs, and plaintiffs to ensure that price gaps were not too large. Customers were aware of these price differentials and would adjust their purchasing mix (and speed of adoption) accordingly if relative prices for newer technologies decreased sufficiently. An internal Samsung email supports this fact:

> "There are multiple high level meetings occurring at HP, Compaq, and Dell addressing the 50% price delta today between the Sync and DDR. This premium is too much for them for the low end systems and retail markets, and they are considering new system release in January to be SD vs DDR… Our strategy should be to keep the demand for the DDR by forecasting to them a lower Sync vs DDR premium in January." [248]

(309) Additionally, defendants ignore the fact that memory technologies were also linked by contractual terms.[249] Several of Sun's contracts directly tied the price of asynchronous DRAM products to the market prices of products with SDRAM technology. For example, a contract between Sun and Micron provided a formula to calculate the prices of two DRAM products with FPM technology based on the prices of DRAM products with SDRAM technology:

> "With respect to the end of life procurement of the… 8Mx144 FPM DIMM, … Micron…will offer pricing which is lesser of: A) $75.00… B) 18x64M SDRAM cost plus $58.20 (64M SDRAM cost as extracted from 128M NG DIMM current price)."[250]

(310) Sun has a similar contract with Mitsubishi that also contains a formula for tying the price of asynchronous DRAM to the price of a DRAM product with SDRAM technology.[251] As a third example, a Sun email shows that Sun used a "third-party" manufacturer's SDRAM price offer to negotiate with the defendants for lower FPM prices:

> "Celestica…stated they could build an SDRAM version of the 16v72 for the price of the 18*64Mb SDRAM plus $53.20… What we did was get our FPM supplier to agree to build FPM modules at that same cost."[252]

---

over 256 Mb SDRAM), EMUS 447233, SSI0000371224 (strategy of forecasting lower Synch v DDR premium"); SSI0005059112 (DDR premium over SDRAM).

[248] SSI-0010126690.

[249] MIC0000233—MIC0000235 at MIC0000233; SUN0029067.

[250] MIC0000233—MIC0000235 at MIC0000233.

[251] MITSSUN00141988-9.

[252] SUN0029067.

(311)   In addition, defendants' experts simply ignore the fact that both FPM-EDO and DDR were sold by defendants to many customers in the United States in 2000 and 2001 including the named OEMs. The prices that both the named OEMs and SGI paid for DDR components track one another, so there is no basis for asserting that SGI's DDR prices were not subject to the same conspiratorial pricing as the OEMs' DDR prices. This is true for Sun and FPM-EDO products as well. Further, defendants' experts mischaracterize the facts when they claim that Sun and SGI were in a different market segment than the named OEMs because of the downstream products they manufactured.[253] They fail to mention the fact that many of the named OEMs also manufactured the same types of downstream products as Sun and SGI.[254]

### VI.13.3. Sun and SGI's non-price considerations were not unique and they would not have reduced their exposure to the DRAM conspiracy

(312)   Defendants' experts make the claim that price was not the only factor for Sun or SGI in their purchasing decisions.[255] However, an important reality that defendants' experts have overlooked is that this argument applies to all purchasers, including the named OEMs.[256] For instance, a contract between IBM and Samsung dated October 26, 2000, has clauses on supply continuity and product quality:

  ▪  "Supplier will maintain the capability to supply agreed upon Products including parts of Products, for a period of months after withdrawal of such Products as specified in the relevant [Statement of Work]."[257]

---

[253]   Expert Report of Daniel Rubinfeld, p. 4, 23; Expert Report of Kevin Murphy p. 64.

[254]   For instance Compaq manufactured workstations, storage devices, and high-end servers (Compaq 2000 Annual report); HP manufactured workstations and servers (HP 2000 Annual Report); Dell manufactured network servers, high-performance workstations, and storage devices (Dell 1999 Annual Report); IBM, a major competitor in the server market, also manufactured enterprise servers and storage systems (IBM 2000 Annual Report).

[255]   Expert Report of Daniel Rubinfeld, p. 26; Expert Report of Benjamin Klein, p. 19-21; Expert Report of Kevin Murphy, p. 67-68.

[256]   At one point Dell stopped doing business with Mitsubishi, stating that they evaluate suppliers on, "cost, quality, continuity of supply, flexibility (ease of doing business) and technology" (DEDR-001-015724); Also, Steve Appleton of Micron testified during the Swanson trial that not all of the named OEMs place the same importance on price: "[A] company like IBM, which has a lot of server applications, they don't focus that much on every dime or every nickel coming out of the pricing, as opposed to a company like Dell, which is heavily dependent on the consumer market" (Testimony of Steve Appleton in the Swanson trial, 1583); In testimony Jackie Gross of HP stated, "there was a number of considerations in which partners we would do business with. Probably the most notable were the manufacturer's capability in terms of technology and manufacturing, their capability in terms of quality and reliability and price and the ability to deliver and service globally." (30(b)(6) deposition of Jackie Gross, HP (October 29, 2006), 39).

[257]   SSI-0000377747.

---

- "Buyer may reject entire lots of Products which do not meet quality levels as specified in the relevant [Statement of Work]."[258]

Defendants' experts imply that Sun and SGI are the only customers that took into account delivery and quality when purchasing DRAM.[259] But this is not the case, and it is wrong to assume that they would be unaffected by a conspiracy because they considered non-price factors just as the named OEMs did.

### VI.13.4. SGI was not a unique customer and would be subject to the same pricing trends as the named OEMs

(313) Dr. Rubinfeld argues that SGI was a credit risk and had numerous returns which led Samsung to charge them higher prices.[260] Nevertheless, once again Dr. Rubinfeld provides no support for why this would prevent SGI from being affected by the same conspiracy that affected the named OEMs – nor could he. Dr. Rubinfeld cites "Deposition of Ishiguro p. 152" to support his claim that SGI had unusually frequent returns. On examination of this deposition testimony, however, it can be seen that Mr. Ishiguro does not discuss anything regarding the subject of returns, let alone even mention the word "return." In addition, the documents that Dr. Rubinfeld cites to support his claim that SGI represented "exceptional credit risks" do not discuss credit.[261]

(314) Dr. Rubinfeld's claim that SGI was different than the named OEMs due to inventory risk and unreliable forecasts also is flawed. Dr. Rubinfeld seems to ignore the fact that forecasts are nothing more than predictions, not a promise, of how much SGI would purchase. Although, SGI's forecasted purchase volumes may not have matched its actual purchase volumes at certain points in time, this issue was not unique to SGI.[262] Even if one were to assume that SGI had unreliable forecasts, was a credit risk, and had a higher rate of returns, these factors would not prevent SGI from being harmed by defendants' conspiracy. SGI's module prices still were a function of the prices of the standard DRAM chips that were included on the module. As mentioned previously,

---

[258] SSI-0000377748 .

[259] It may be that defendants' experts are simply unaware of the significance of non-price factors in the purchasing decisions of the named OEMs because many of them did not consider the deposition testimony or documents of the named OEMs in the discovery record according to the lists of materials they considered or relied upon that was provided in their reports and their own deposition testimony.

[260] Expert Report of Daniel Rubinfeld, p. 28-29.

[261] Neither SSI-0005062488-92 nor SSI-0005065255-60 says that SGI was a credit risk, and the Deposition of Ishiguro pg. 162 mentions only a single instance of a stop ship. Dr. Rubinfeld conceded he is not aware of other documents supporting his "credit risk" contention. Depostion of Daniel Rubinfeld (Rough) (April 25, 2007) at 252.

[262] For example, Dell had inaccurate forecasts, (30(b)(6) deposition of Seshu Anne, Dell (September 14, 2006), 136-137) .

prices for these chips were highly transparent due to the multiple sources tracking their prices, and SGI as well as the named OEMs used these publicly available sources as a reference for their own prices.

(315)   An additional point that Dr. Rubinfeld tries to make is that SGI purchased smaller volumes than the named OEMs.[263] However, Dr. Rubinfeld gives no reason why this would leave SGI unaffected by the conspiracy. Dr. Rubinfeld provides no evidence of lower volumes causing higher prices, and in fact deposition testimony shows that SGI was not given lower prices for purchasing additional volume.[264] Nevertheless, even if SGI were to have paid higher prices due to lower volume purchases, the prices for the DRAM would still be referenced against the exact same prices that the named OEMs themselves reference, and thus SGI's prices likely would be affected by defendants' conspiracy just as named OEM prices were.

### VI.13.5. SGI's purchasing methods would not limit the harm caused by defendants

(316)   Dr. Rubinfeld attempts to make the claim that "SGI's dual source strategy governed its purchases," rather than defendants' conspiracy, and caused them to pay higher prices than they otherwise would have paid.[265] This argument is not only fundamentally wrong, but a number of Dr. Rubinfeld's statements are misleading. SGI did not limit itself to only two suppliers, and it was willing to change suppliers if prices became too disparate between suppliers.[266] Because of this fact, suppliers would not be able to quote prices too far above those prices that others were willing to offer, or they would risk losing SGI's business.

(317)   Additionally, Dr. Rubinfeld argues that SGI would be unaffected by defendants' conspiracy due to the terms of their contracts being somehow fundamentally different from those of the named OEMs.[267] Again, Dr. Rubinfeld provides no support for this argument. For instance, none of the evidence he uses to support the claim that SGI used long term pricing contracts actually provides proof of a long term pricing agreement.[268] There were no written agreements beyond the purchase

---

[263]   Expert Report of Daniel Rubinfeld, p. 23.

[264]   Deposition of Alain Ishiguro, SGI (November 20, 2007), 194-197.

[265]   Expert Report of Daniel Rubinfeld, p. 29, 44.

[266]   "Q. [Dual source was important to SGI] enough to pay a higher price to another supplier, to the second supplier? A. If the trend would have continued like that, we would basically decide to move to another supplier. So pricing was important for us… [SGI's] goal was to have two to three DRAM vendors [and] two to three additional module vendors." (Deposition of Alain Ishiguro, SGI (November 20, 2007), 76- 83).

[267]   Expert Report of Daniel. Rubinfeld, p. 31-33.

[268]   SGI did not have any long term written contracts during the conspiracy period. The only document (SGI 202117) Dr. Rubinfeld refers to in his footnote 162 to support his conclusion is a draft of a proposed agreement which was

orders.[269] Despite the fact that Dr. Rubinfeld fails to cite a single material difference in SGI's contract terms when compared to the OEMs' terms, there is no reason why a long term contract would protect SGI from a conspiracy that affected DRAM used throughout the industry.

(318)   Another topic that Dr. Rubinfeld raises, but fails to properly support, is the renegotiation of module adders. Dr. Rubinfeld fails to recognize that module adder renegotiations were uncommon occurrences.[270] However, as mentioned before, even if SGI were to have had different contract terms than those of the named OEMs, there is no reason why that would protect SGI from a conspiracy that affected DRAM products used throughout the industry. Even to the limited extent that module adders were renegotiated, the underlying components that make up the majority of the module would still have been the same standard chips that both the named OEMs and SGI purchased. Prices for these chips are reported publicly, allowing buyers to know the current price in the market.

### VI.13.6. Sun's DBE procurement process would not have shielded them from the price fixing conspiracy

(319)   Dr. Murphy implies that Sun's use of a dynamic bidding event (DBE) to procure some of its products beginning in 2001 would have reduced the impact of the conspiracy.[271] Nevertheless, Dr. Murphy ignores the fact that the prices that Sun paid still were based on the standard DRAM prices that were reported by a number of public sources. In fact, Sun used a simple average of the low spot price, high spot price, low contract price, and high contract price (as report by DRAMeXchange) to determine the reference chip price for their DBEs.[272] This reference chip price was then multiplied by the number of chips in the particular module and added together with the module adder to determine the starting reference point for the auction.[273] As such, any

proposed in late 2002 and which I have seen no proof of actually having ever been signed. Witnesses for SGI also do not recall an agreement being signed in this time period.

[269]   Deposition of Alain Ishiguro, SGI (November 20, 2007), 111-13.

[270]   Module adders were "something that [SGI] didn't negotiate, because the PCBA, or the cost of the PCB, sorry, and resistor and capacitor varied very little compared to DRAM." (Deposition of Alain Ishiguro, SGI (November 20, 2007), 207-208). Samsung's module price guidelines to OEM and non-OEM customers show that adder costs changed much less frequently than DRAM chip component pricing (SSI-0000378628; SSI-0000378581; SSI-0000378559; SSI0000379131; SSI0000379070).).

[271]   Expert Report of Kevin Murphy p. 62-64.

[272]   A reference guide that was used by Elpida for a DBE involving Sun's NGDIMM shows that the prices for standard SDRAM chips, as publicly reported, were used to calculate the price that Elpida and Sun used as a reference price for the auction (EMUS00564103).

[273]   In his deposition Peter Wilson states, "[Sun] used a simple average of the four corners, which is spot high, spot low, contract high, contract low. DRAM Exchange report the four corners." (30(b)(6) deposition of Peter Wilson, Sun (November 6, 2007), 464); A document titled "Reference Price Setting – NGDIMM" shows that spot and contract prices were used to create the reference price for Sun's DBE (MU00116357).

conspiracy affecting the named OEMs would in turn have affected the reference prices on which Sun's prices were based.[274] In addition, defendants' experts have ignored the fact that Compaq also utilized DBEs.[275] Nevertheless, certain defendants admitted in their guilty pleas that the cartel was able to institute increases to Compaq's prices.

(320)    Dr. Murphy's contention also remarkably ignores the explicit admission by Elpida and Samsung in the guilty pleas that the conspiracy did in fact affect the Sun DBEs—on at least two separate occasions, in fact.[276] Further, Elpida's own expert, Dr. Klein, admitted during his deposition that Sun likely was charged higher prices during the DBEs as a result of defendants' conspiracy.[277]

### VI.13.7. Summary

(321)    As I have described above, defendants' experts provide no compelling arguments as to why Sun or SGI would be unaffected by the same conspiracy that harmed the named OEMs. Many of their claims are based on misunderstandings (or perhaps ignorance) of the facts concerning the DRAM industry and the named OEMs and plaintiffs. Namely, DRAM prices are transparent (as Dr. Rubinfeld concedes) and purchasers reference these prices, as reported in a number of publicly available sources, when negotiating prices. Most importantly, *all* the modules (custom and non-custom) purchased by Sun, SGI, and the named OEMs include only standard DRAM chips. Defendants' experts fail to adequately explain why one should expect that Sun or SGI's DRAM

---

[274]    EMUS589795-807 at 803.

[275]    HSA00032152.

[276]    In particular, Elpida, in its plea agreement with the U.S. Department of Justice (DOJ), admitted, "For purposes of forming and carrying out the conspiracy charged in Count Two of the Information, Defendant's employees had discussions and reached agreements with employees of its coconspirator on how it would allocate and divide a bid offered by Sun Microsystems in an auction on or about March 26, 2002. The Defendant and its coconspirators submitted bid proposals to Sun Microsystems for a bid on a 1 GB NG DIMM lot to achieve that result, including submitting complementary bids to ensure the success of their agreement." March 22, 2006 Plea Agreement of Elpida in United States of America v. Elpida Memory, Inc., at 4-5;

In addition, two executives of the defendants pleaded guilty to reaching agreements related to Sun Microsystems. Thomas Quinn of Samsung pleaded guilty to reaching agreements to coordinate on a bid offered by Sun Microsystems in an auction on or about December 5, 2001. See November 8, 2006 Plea Agreement of Thomas Quinn in United States of America v. Thomas Quinn at 4. D. James Sogas of Elpida pleaded guilty to having meetings and discussions and reaching agreements with his coconspirators on how they would coordinate bids offered by Sun Microsystems in auctions on or about December 5, 2001 and March 26, 2002. See December 13, 2006 Plea Agreement of D. James Sogas in United States of America v. D. James Sogas at 4.

[277]    "Q. So you have no opinion as to whether Sun actually paid an inflated price in either of the DBEs referenced in the Elpida guilty pleas? THE WITNESS: I think there was a conspiracy with regards to those prices, but I don't know if they in fact paid higher prices. But as I said, probably in the first one [DBE], there may be on those particular products, there may be something there" (Deposition of Benjamin Klein (ROUGH) (April 23, 2008), 164).

---

prices would be unaffected by defendants' conduct to raise prices on the same standard DRAM that the named OEMs also purchased.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

May 2, 2008

Halbert L. White, Jr., Ph.D.                                      Date

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

# Appendix A: Materials considered

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

## A.1. Defendant expert reports, backup materials, and errata (as applicable)

- December 14, 2007 Expert Report of Robert C. Marshall
- May 2, 2008 Rebuttal Expert Report of Boris J. Steffen
- March 7, 2008 Expert Report and backup materials of Kevin Murphy
- March 7, 2008 Expert Report and backup materials of Robert Topel
- March 7, 2008 Expert Report and backup materials of Benjamin Klein
- March 7, 2008 Expert Report and backup materials of Vincent O'Brien
- March 7, 2008 Expert Report and backup materials of Joseph Kalt
- March 7, 2008 Expert Report and backup materials of Carl Shapiro
- March 7, 2008 Expert Report and backup materials of Victor de Dios
- March 7, 2008 Expert Report and backup materials of Daniel Rubinfeld
- March 10, 2008 Errata Sheet for Expert Report of Vincent O'Brien
- April 1, 2008 Errata Sheet for Expert Report of Kevin Murphy
- April 1, 2008 Errata Sheet for Expert Report of Robert Topel
- April 19, 2008 Errata Sheet Addendum for Expert Report of Robert Topel
- April 22, 2008 Errata Sheet for Expert Report of Daniel Rubinfeld

## A.2. Defendant expert testimony

- April 23, 2008 Deposition of Benjamin Klein (Rough)
- April 24, 2008 Deposition of Carl Shapiro (Rough)
- April 24, 2008 Deposition of Kevin Murphy (Rough)
- April 25, 2008 Deposition of Daniel Rubinfeld (Rough)
- April 25, 2008 Deposition of Joseph Kalt (Rough)
- April 25, 2008 Deposition of Robert Topel (Rough)
- April 29, 2008 Deposition of Vincent O'Brien (Rough)
- April 29, 2008 Deposition of Victor de Dios (Rough)

## A.3. Deposition testimony

- January 17, 2006 Deposition of Eric Schwab
- January 18, 2006 Deposition of Gary Paul Grabowski
- January 19, 2006 Deposition of Steven Coraluzzi
- January 19, 2006 Deposition of Daniel Clement
- January 20, 2006 Deposition of Richard Saitsky

- January 20, 2006 Deposition of Kevin Irwin
- January 20, 2006 Deposition of Peter Scott Holtz
- January 20, 2006 Deposition of Stelios Valavanis
- January 20, 2006 Deposition of James A. Lawson
- January 26, 2006 Deposition of Yaacov Davidson
- August 29, 2006 Deposition of Jackie Gross
- September 12, 2006 Deposition of Kevin Maurice Brown
- September 14, 2006 Deposition of Seshu Anne
- October 30, 2006 Deposition of Keith Lefebvre
- December 10, 2007 Deposition of Christina Stratmoen
- December 11, 2007 Deposition of Nick LaHerran
- December 11, 2007 Deposition of Manuel Raposa
- December 12, 2007 Deposition of Devin Cole
- December 12, 2007 Deposition of Jae Sueng Kim
- December 12, 2007 Deposition of Juseon Kim
- December 13, 2007 Deposition of Jae Sueng Kim
- December 14, 2007 Deposition of Hirohisa Ueno
- December 17, 2007 Deposition of Robert Sharpe
- January 9, 2008 Deposition of Il Ung Kim
- January 10, 2008 Deposition of Il Ung Kim
- January 15, 2008 Deposition of Young Lee
- January 17, 2008 Deposition of Carolyn Stark
- January 18, 2008 Deposition of Bashar Elsbihi
- February 6, 2008 Deposition of Yukio Sakamoto
- February 13, 2008 Deposition of Dae Soo Kim
- February 14, 2008 Deposition of Dae Soo Kim
- March 7, 2008 Deposition of Hirohisa Ueno
- March 13, 2008 Deposition of Alwin Sulaiman
- April 8, 2008 Deposition of Dieter Mackowiak
- April 9, 2008 Deposition of Kenneth Hurley
- April 18, 2008 Deposition of YH Park

## A.4. Litigation documents

- [All Plaintiffs] Supplemental Response to Elpida Memory, Inc. and Elpida Memory (USA) Inc.'s Second Set of Interrogatories to Plaintiffs.

- [All Plaintiffs] Supplemental Response to Elpida Memory, Inc. and Elpida Memory (USA) Inc.'s Third Set of Interrogatories to Plaintiffs.
- Plaintiff Unisys Corporation, All American Semiconductor, Edge Electronics, and Jaco Electronics Supplemental Responses to Infineon Defendants' First Set of Interrogatories to All Plaintiffs
- Plaintiffs' First Joint Supplemental Response to Hynix Semiconductor Inc.'s and Hynix Semiconductor America Inc.'s First Set of Interrogatories
- Plaintiff Sun Microsystems Inc.'s Supplemental Response to Nanya Technology Corporation USA's First Set of Interrogatories
- Plaintiff Unisys Corporation's Supplemental Response to Nanya Technology Corporation USA's First Set of Interrogatories
- Plaintiff All American Semiconductor Inc.'s Supplemental Response to Nanya Technology Corporation and Nanya Technology Corporation USA's First Set of Interrogatories
- Plaintiff Jaco Electronics Inc's Supplemental Response to Nanya Technology Corporation and Nanya Technology Corporation USA's First Set of Interrogatories
- Plaintiff Edge Electronics, Inc.'s Supplemental Responses to Nanya Technology Corporation's and Nanya Technology Corporation USA's First Set of Interrogatories
- Plaintiff Jaco Electronics Inc's Supplemental Response to Defendant NEC Electronics America, Inc.'s First Set of Interrogatories
- Plaintiff All American Semiconductor Inc.'s Supplemental Response to Defendant NEC Electronics America, Inc.'s First Set of Interrogatories

## A.5. Documents from the trial of Gary Swanson

- October 22, 2007 Amended Summary of Government's Case Against Gary Swanson (Redacted)
- October 24, 2007 Declaration of Niall E. Lynch in Support of the United States' Memorandum of Law Regarding Coconspirator Statements and Pretrial Factual Proffer
- February 4, 2008 Gary Swanson Trial Transcript, Volume 1 of 12
- February 5, 2008 Gary Swanson Trial Transcript, Volume 2 of 12
- February 7, 2008 Gary Swanson Trial Transcript, Volume 3 of 12
- February 8, 2008 Gary Swanson Trial Transcript, Volume 4 of 12
- February 11, 2008 Gary Swanson Trial Transcript, Volume 5 of 12
- February 12, 2008 Gary Swanson Trial Transcript, Volume 6 of 12
- February 14, 2008 Gary Swanson Trial Transcript, Volume 7 of 12
- February 15, 2008 Gary Swanson Trial Transcript, Volume 8 of 12
- February 19, 2008 Gary Swanson Trial Transcript, Volume 9 of 12

- February 21, 2008 Gary Swanson Trial Transcript, Volume 10 of 12
- February 22, 2008 Gary Swanson Trial Transcript, Volume 11 of 12
- February 25, 2008 Gary Swanson Trial Transcript, Volume 12 of 12
- February 28, 2008 K.C. Suh (Hynix) Witness Summary
- February 28, 2008 Mike Peterson (Hynix) Witness Summary
- February 28, 2008 Keith Weinstock (Micron) Witness Summary
- February 28, 2008 Ken Heller (Hynix) Witness Summary
- February 28, 2008 Dennis Lee (Infineon) Witness Summary
- February 28, 2008 D.S. Kim (Hynix) Witness Summary
- February 28, 2008 C.K. Chung (Hynix) Witness Summary

## A.6. Others

- All documents cited in this report are hereby incorporated by reference.
- In addition, all documents cited in my initial report are also incorporated by reference.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

# Appendix B: Additional bibliography

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

## B.1. White forecasting-related publications

1. H. White: *Asymptotic Theory For Econometricians*. New York: Academic Press (1984).

2. A.R. Gallant and H. White: *A Unified Theory of Estimation and Inference for Nonlinear Dynamic Models*. Oxford: Basil Blackwell (1988). Postscript files. Chapter 1 Chapter 2 Chapter 3 Chapter 4 Chapter 5 Chapter 6 Chapter 7 Chapter 8

3. H. White: *Estimation, Inference, and Specification Analysis*. New York: Cambridge University Press (1994).

4. H. White: "Model Specification: Annals," *Journal of Econometrics*, 20 (1982).

5. H. White: "Non-Nested Models: Annals," *Journal of Econometrics*, 21 (1983).

6. H. White: *Artificial Neural Networks: Approximation and Learning Theory*. Oxford: Basil Blackwell (1992).

7. H. White: *Advances in Econometric Theory: The Selected Works of Halbert White*, Cheltenham: Edward Elgar (1998).

8. A.P. Refenes and H. White: "Neural Networks and Financial Economics," *International Journal of Forecasting*, 17 (1998).

9. . R. Engle and H. White: *Cointegration, Causality, and Forecasting: A Festschrift in Honour of Clive W.J. Granger*. Oxford: Oxford University Press (1999).

10. Y.S. Abu-Mostafa, A.F. Atiya, M. Magdon-Ismail, and H. White: "Neural Networks in Financial Engineering," *IEEE Transactions on Neural Networks* 12 (2001).

11. H. White: *New Perspectives in Econometric Theory: The Selected Works of Halbert White, Volume 2*. Cheltenham: Edward Elgar, 2004.

12. H. White: "Using Least Squares to Approximate Unknown Regression Functions," International Economic Review, 21, 149–170 (1980). PDF Version

13. H. White: "Consequences and Detection of Misspecified Nonlinear Regression Models," Journal of the American Statistical Association, 76, 419–433 (1981). PDF Version

14. H. White: "Maximum Likelihood Estimation of Misspecified Models," Econometrica, 50, 1–25 (1982). PDF Version

15. C. Plosser, W. Schwert and H. White: "A Differencing As A Test of Specification," International Economic Review, 23, 535–552 (1982). PDF Version

16. I. Domowitz and H. White: "Misspecified Models with Dependent Observations," Journal of Econometrics, 20, 35–50, (1982). PDF Version

17. H. White and I. Domowitz: "Nonlinear Regression with Dependent Observations," Econometrica, 52, 143–162 (1984). PDF Version

18. H. White: "Maximum Likelihood Estimation of Misspecified Dynamic Models," in T.K. Dijkstra, ed., Misspecification Analysis. New York: Springer-Verlag, 1–19 (1984). PDF Version

19. H. White: "Specification Testing in Dynamic Models," in Truman Bewley, ed., Advances in Econometrics. New York: Cambridge University Press (1987). Also appears in French as "Test de Specification dans les Modeles Dynamiques," Annales de l'INSEE, 59/60, 125–181 (1985). PDF Version

20. H. White: "Economic Prediction Using Neural Networks: The Case of IBM Daily Stock Returns," *Proceedings of the Second Annual IEEE Conference on Neural Networks*, II:451–458. (1988).

21. C.W.J. Granger, H. White and M. Kamstra: "Interval Forecasting: An Analysis Based Upon ARCH-Quantile Estimators," Journal of Econometrics, 40, 87–96 (1989). PDF Version

22. H. White: "Some Asymptotic Results for Learning in Single Hidden Layer Feedforward Network Models," Journal of the American Statistical Association, 84, 1003–1013 (1989). PDF Version

23. H. White: "Learning in Artificial Neural Networks: A Statistical Perspective," Neural Computation, 1, 425–464 (1989). PDF Version

24. H. White: "Connectionist Nonparametric Regression: Multilayer Feedforward Networks Can Learn Arbitrary Mappings," Neural Networks, 3, 535–549 (1990). PDF Version

25. H. White and J.M.Wooldridge: "Some Results for Sieve Estimation with Dependent Observations," in W. Barnett, J. Powell and G. Tauchen, eds., Nonparametric and Semi-Parametric Methods in Econometrics and Statistics. New York: Cambridge University Press, 459–493 (1991). PDF Version

26. H. White: "Nonparametric Estimation of Conditional Quantiles Using Neural Networks," in Proceedings of the Symposium on the Interface. New York: Springer-Verlag, 190–199 (1992). PDF Version

27. T.-H. Lee, H. White and C.W.J. Granger: "Testing for Neglected Nonlinearity in Time-Series Models: A Comparison of Neural Network Methods and Standard Tests," Journal of Econometrics, 56, 269–290 (1992). PDF Version

28. A.R. Gallant and H. White: "On Learning the Derivatives of an Unknown Mapping with Multilayer Feedforward Networks," Neural Networks, 5, 129–138 (1992). PDF Version

29. C.-M. Kuan and H. White: "Artificial Neural Networks: An Econometric Perspective," Econometric Reviews, 13, 1–92 (1994). PDF Version

30. H. White: "Parametric Statistical Estimation Using Artificial Neural Networks: A Condensed Discussion," in V. Cherkassky ed., From Statistics to Neural Networks: Theory and Pattern Recognition Applications. NATO-ASI Series F. New York: Springer-Verlag, 127–146 (1994). PDF Version

31. C.W.J. Granger, M.L. King and H. White: "Comments on Testing Economic Theories and the Use of Model Selection Criteria," Journal of Econometrics, 67, 173–188 (1995). PDF Version

32. N. Swanson and H. White: "A Model Selection Approach to Assessing the Information in the Term Structure Using Linear Models and Artificial Neural Networks," Journal of Business and Economic Statistics, 13, 265–276 (1995). PDF Version

33. H. White: "Parametric Statistical Estimation Using Artifical Neural Networks," in P. Smolensky, M.C. Mozer and D.E. Rumelhart, eds., Mathematical Perspectives on Neural Networks. HillDale, NJ: L. Erlbaum Associates, 719–775 (1996). PDF Version

34. C.-Y.Sin and H. White: "Information Criteria for Selecting Possibly Misspecified Parametric Models," Journal of Econometrics, 71, 207–225 (1996). PDF Version

35. N. Swanson and H. White: "A Model Selection Approach to Real-Time Macroeconomic Forecasting Using Linear Models and Artificial Neural Networks," Review of Economics and Statistics, 79, 540–550 (1997). PDF Version

36. N. Swanson and H. White: "Forecasting Economic Time Series Using Flexible Versus Fixed and Linear Versus Nonlinear Econometric Models," International Journal of Forecasting, 13, 439–461 (1997). PDF Version

37. R. Sullivan, A. Timmermann, and H. White: "Data Snooping, Technical Trading Rule Performance, and the Bootstrap," Journal of Finance, 54, 1647–1692 (1999). PDF Version

38. H. White: "A Reality Check For Data Snooping," Econometrica, 68, 1097–1127 (2000). PDF Version

39. H. White and J. Racine: "Statistical Inference, The Bootstrap, and Neural Network Modeling With Application to Foreign Exchange Rates," IEEE Transactions on Neural Networks, 12, 1–19 (2001). PDF Version

40. R. Sullivan, A Timmermann, and H. White: "Dangers of Data Mining: The Case of Calendar Effects in Stock Returns," Journal of Econometrics, 105, 249–286 (2001). PDF Version

41. X. Chen and H. White: "Asymptotic Properties of Some Projection-Based Robbins-Monro Procedures in a Hilbert Space," Studies in Nonlinear Dynamics and Econometrics, 6, 1–53 (2002). PDF Version

42. T. Perez-Amaral, G. Gallo, and H. White; "A Flexible Tool for Model Building: The Relevant Transformation of the Inputs Network Approach (RETINA)," Oxford Bulletin of Economics and Statistics, 65, 821–838 (2003). PDF Version

43. T. Perez-Amaral, G.M. Gallo, and H. White: "A Comparison of Complementary Automatic Modeling Methods: RETINA and PcGets," Econometric Theory, 21, 262–277 (2005). PDF Version

44. H. White: "Approximate Nonlinear Forecasting Methods," in G. Elliott, C.W.J. Granger, and A. Timmermann, eds., Handbook of Economics Forecasting. New York: Elsevier, pp. 460–512 (2006). PDF Version

45. H. White: "Time Series Estimation of the Effects of Natural Experiments," Journal of Econometrics, 135, 527–566 (2006). PDF Version

46. R. Giacomini and H. White: "Tests of Conditional Predictive Ability," Econometrica 74, 1545–1578 (2006) . PDF Version

47. H. Karimabadi, T. Sipeps, H. White, M. Marinucci, A. Dmitriev, J. Chao, J. Driscoll, and N. Balac: "Data Mining in Space Physics: The Mine Tool Algorithm," Journal of Geophysical Research (forthcoming). PDF Version

48. R. Giacomini, A. Gottschling, C. Haefke, and H. White: "Mixtures of t-Distributions for Finance and Forecasting," Journal of Econometrics (forthcoming). PDF Version

49. H. White and P. Kennedy: "Retrospective Estimation of Causal Effects Through Time," in J. Castle and N. Shephard (eds.) *A Festschrift in Honour of David Hendry*. Oxford: Oxford University Press (forthcoming).

50. H. White: "White Tests of Misspecification," Encyclopedia of the Statistical Sciences, v. 9. New York: Wiley 594–596 (1988). PDF Version

51. H. White: "Neural Network Learning and Statistics," AI Expert, 4, 48–52 (1989). PDF Version

52. M. Plutowski, S. Sakata and H. White: "Cross-Validation Estimates Integrated Mean Squared Error," in J. Cowan, G. Tesauro, and J. Alspector, eds., Advances in Neural Information Processing Systems 6. San Francisco: Morgan Kaufmann, 391–398 (1994). PDF Version

53. H. White, R. Marshall, and P. Kennedy: "The Measurement of Economic Damages in Antitrust Civil Litigation," *Antitrust Law Economics Committee Newsletter*, 6, 17–22 (2006).

54. S. Schennach, K. Chalak and H. White: "Estimating Average Marginal Effects in Nonseparable Structural Systems," submitted to *Econometrica.*

## B.2. Counterfactual studies

1. Kaiji Chen, Imrohoroglu, Ayse, Imrohoroglu, Selahattin, The Japanese Saving Rate, *The American Economic Review*, Vol. 96, No. 5. (December 2006)

2. William J. Collins, Race, Roosevelt, and Wartime Production: Fair Employment in World War II Labor Markets, *The American Economic Review*, Vol. 91, No. 1. (March 2001)

3. Matthew Gentzkow, Valuing Goods in a Model with Complementarity: Online Newspapers, *The American Economic Review*, Vol. 97 No. 3. (June 2007)

4. Marco Del Negro, Obiols-Homs, Has monetary policy been so bad that it is better to get rid of it? The case of Mexico, *Journal of Money, Credit and Banking*, Vol. 33, No.2, Part 2: Global Monetary Integration. (May 2001)

5. Stefan E. Oppers, The Interest Rate Effect of Dutch Money in Eighteenth-Century Britain, *The Journal of Economic History*, Vol. 53, No. 1. (Mar., 1993), pp. 25–43.

6. David Pope; Glenn Withers, Do Migrants Rob Jobs? Lessons of Australian History, 1861–1991, *The Journal of Economic History*, Vol. 53, No. 4. (Dec., 1993), pp. 719–742.

7.  Abadie, Alberto and Gardeazabal, Javier, The Economic Costs of Conflict: A Case-Control Study for the Basque Country, *The American Economic Review*, Vol. 93, No. 1 (Mar., 2003), pp. 113–132

## B.3. Event studies

1.  Ashley, John W. "Stock Prices and Changes in Earnings and Dividends: Some Empirical Results," *J. Polit. Econ.*, Feb. 1962, *70*(1), pp. 82–85.

2.  Asquith, Paul And Mullins, David. "Equity Issues and Offering Dilution," *J. Finan. Econ.*, Jan./Feb. 1986, *15*(1/2), pp. 61–89.

3.  Ball, Clifford A. And Torous, Walter N. "Investigating Security-Price Performance in the Presence of Event-Date Uncertainty," *J. Finan. Econ.*, Oct. 1988, *22*(1), pp. 123–53.

4.  Ball, Ray And Brown, Philip. "An Empirical Evaluation of Accounting Income Numbers," *J. Acc. Res. ,* Autumn 1968, *6*(2), pp. 159–78.

5.  Barclay, Michael J. And Litzenberger, Robert H. "Announcement Effects of New Equity Issues and the Use of Intraday Price Data," *J. Finan. Econ.*, May 1988, *21*(1), pp. 71–99.

6.  Barker, C. Austin. "Effective Stock Splits," *Harvard Bus. Rev.*, Jan./Feb. 1956, *34*(1), pp. 101– 06.

7.  ———. "Stock Splits in a Bull Market," *Harvard Bus. Rev.*, May/June 1957, *35*(3), pp. 72–79.

8.  ———. "Evaluation of Stock Dividends," *Harvard Bus. Rev.*, July/Aug. 1958, *36*(4), pp. 99–114.

9.  Bernard, Victor L. "Cross-Sectional Dependence and Problems in Inference in Market-Based Accounting Research," *J. Acc. Res.*, 1987, *25*(1), pp. 1–48.

10. Blume, Marshall E. And Stambaugh, Robert F. "Biases in Computed Returns: An Application to the Size Effect," *J. Finan. Econ. ,* Nov. 1983, *12*(3), pp. 387–404.

11. Boehmer, Ekkehart; Musumeci, Jim And Poulsen, Annette B. "Event-Study Methodology under Conditions of Event-Induced Variance," *J. Finan. Econ.*, Dec. 1991, *30*(2), pp. 253–72.

12. Brown, Stephen J. And Warner, Jerold B. "Measuring Security Price Performance," *J. Finan. Econ.*, Sept. 1980, *8*(3), 205–58.

13. ———. "Using Daily Stock Returns: The Case of Event Studies," *J. Finan. Econ.*, Mar. 1985, *14*(1), pp. 3–31.

14. Brown, Stephen And Weinstein, Mark I. "Derived Factors in Event Studies," *J. Finan. Econ.*, Sept. 1985, *14*(3), pp. 491–95.

15. Campbell, Cynthia J. And Wasley, Charles E. "Measuring Security Price Performance Using Daily NASDAQ Returns," *J. Finan. Econ.*, Feb. 1993, *33*(1), pp. 73–92.

16. Dann, Larry Y. And James, Christopher M. "An Analysis of the Impact of Deposit Rate Ceilings on the Market Values of Thrift Institutions," *J. Finance*, Dec. 1982, *37*(5), pp. 1259–75.

17. Dolley, James Clay. "Characteristics and Procedure of Common Stock Split-Ups," *Harvard Bus. Rev.*, Apr. 1933, *11*, pp. 316–26.

18. Eckbo, B. Espen. "Horizontal Mergers, Collusion, and Stockholder Wealth," *J. Finan. Econ.*, Apr. 1983, *11*(1–4), pp. 241–73.

19. Eckbo, B. Espen; Maksimovic, Vojislav And Williams, Joseph. "Consistent Estimation of Cross-Sectional Models in Event Studies," *Rev.Financial Stud.*, 1990, *3*(3), pp. 343–65.

20. Fama, Eugene F. Et Al. "The Adjustment of Stock Prices to New Information," *Int. Econ. Rev.*, Feb. 1969, *10*(1), pp. 1–21.

21. Fama, Eugene F. And French, Kenneth R. "Multifactor Explanations of Asset Pricing Anomalies," *J. Finance*, Mar. 1996, *51*(1), pp. 55–84.

22. Jain, Prem. "Analyses of the Distribution of Security Market Model Prediction Errors for Daily Returns Data," *J. Acc. Res.*, Spring 1986, *24*(1), pp. 76–96.

23. Jarrell, Gregg A.; Brickley, James A. And Netter, Jeffry M. "The Market for Corporate Control: The Empirical Evidence Since 1980," *J. Econ. Perspectives*, Winter 1988, *2*(1), pp. 49–68.

24. Jarrell, Gregg And Poulsen, Annette. "The Returns to Acquiring Firms in Tender Offers: 38 *Journal of Economic Literature, Vol. XXXV* (*March 1997*) Evidence from Three Decades," *Financial Management*, Autumn 1989, *18*(3), pp. 12–19.

25. Jensen, Michael C. And Ruback, Richard S. "The Market for Corporate Control: The Scientific Evidence," *J. Finan. Econ.*, Apr. 1983, *11*(1–4), pp. 5–50.

26. Kane, Edward J. And Unal, Haluk. "Change in Market Assessments of Deposit-Institution Riskiness," *J. Finan. Services Res.*, June 1988, *1*(3), pp. 207–29.

27. Lanen, William N. And Thompson, Rex. "Stock Price Reactions as Surrogates for the Net Cash-Flow Effects of Corporate Policy Decisions," *J. Acc. Econ.*, Dec. 1988, *10*(4), pp. 311–34.

28. Lintner, John. "The Valuation of Risky Assets and the Selection of Risky Investments in Stock Portfolios and Capital Budgets," *Rev. Econ. Stat.*, Feb. 1965, *47*(1), pp. 13–37.

29. Mackinlay, A. Craig. "On Multivariate Tests of the CAPM," *J. Finan. Econ.*, June 1987, *18*(2), pp. 341–71.

30. Malatesta, Paul H. And Thompson, Rex. "Partially Anticipated Events: A Model of Stock Price Reactions with an Application to Corporate Acquisitions," *J. Finan. Econ.*, June 1985, *14*(2), pp. 237–50.

31. Manne, Henry G. "Mergers and the Market for Corporate Control," *J. Polit. Econ.*, Apr. 1965, *73*(2), pp. 110–20.

32. Mcqueen, Grant And Roley, Vance. "Stock Prices, News, and Business Conditions," *Rev. Finan. Stud.*, 1993, *6*(3), pp. 683–707.

33. Mikkelson, Wayne H. And Partch, Megan. "Valuation Effects of Security Offerings and the Issuance Process," *J. Finan. Econ.*, Jan./Feb. 1986, *15*(1/2), pp. 31–60.

34. Mitchell, Mark L. And Netter, Jeffry M. "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *Business Lawyer*, Feb. 1994, *49*(2), pp. 545–90.

35. Morse, Dale. "An Econometric Analysis of the Choice of Daily Versus Monthly Returns In Tests of Information Content," *J. Acc. Res.*, Autumn 1984, *22*(2), pp. 605–23.

36. Myers, John H. And Bakay, Archie J. "Influence of Stock Split-Ups on Market Price," *Harvard Bus. Rev.*, Mar. 1948, *26*, pp. 251–55.

37. Myers, Stewart C. And Majluf, Nicholas S. "Corporate Financing and Investment Decisions When Firms Have Information That Investors Do Not Have," *J. Finan. Econ.*, June 1984, *13*(2), pp. 187–221.

38. Patell, James M. "Corporate Forecasts of Earnings Per Share and Stock Price Behavior: Empirical Tests," *J. Acc. Res.*, Autumn 1976, *14*(2), pp. 246–76.

39. Prabhala, N. R. "Conditional Methods in Event Studies and an Equilibrium Justification for Using Standard Event Study Procedures." Working Paper. Yale U., Sept. 1995.

40. Ritter, Jay R. "Long-Run Performance of Initial Public Offerings," *J. Finance*, Mar. 1991, *46*(1), pp. 3–27.

41. Ross, Stephen A. "The Arbitrage Theory of Capital Asset Pricing," *J. Econ. Theory*, Dec. 1976, *13*(3), pp. 341–60.

42. Schipper, Katherine And Thompson, Rex. "The Impact of Merger-Related Regulations on the Shareholders of Acquiring Firms," *J. Acc. Res.*, Spring 1983, *21*(1), pp. 184– 221.

43. ———. "The Impact of Merger-Related Regulations Using Exact Distributions of Test Statistics," *J. Acc. Res.*, Spring 1985, *23*(1), pp. 408– 15.

44. Scholes, Myron And Williams, Joseph T. "Estimating Betas from Nonsynchronous Data," *J. Finan. Econ.*, Dec. 1977, *5*(3), pp. 309– 27.

45. Schwert, G. William. "Using Financial Data to Measure Effects of Regulation," *J. Law Econ.*, Apr. 1981, *24*(1), pp. 121–58.

46. Sharpe, William F. "Capital Asset Prices: A Theory of Market Equilibrium Under Conditions of Risk," *J. Finance*, Sept. 1964, *19*(3), pp. 425–42.

47. ———. *Portfolio theory and capital markets*. New York: McGraw-Hill, 1970.

48. Sharpe, William F.; Alexander, Gordon J. And Bailey, Jeffery V. *Investments*. Fifth Ed. Englewood Cliffs, NJ: Prentice-Hall, 1995.

## B.4. Treatment Effects Studies

1. Ackum, S. (1991), "Youth unemployment, labour market programs and subsequent earnings", *Scandinavian Journal of Economics* 93 (4): 531–543.

2. Anderson, K., R. Burkhauser, J. Raymond and C. Russell (1991), "Mixed signals in the Job Training Partnership Act", *Growth and Change* 22 (3): 3248.

3. Anderson, K., R. Burkhauser and J. Raymond (1993), "The effect of creaming on placement rates under the Job Training Partnership Act", *Industrial and Labor Relations Review* 46 (4): 613–624.

4. Andrews, D. and M. Schafgans (1998), "Semiparametric estimation of a sample selection model", *Review of Economic Studies* 56 (3).

5. Ashenfeltcr, O. (1978), "Estimating the effect of training programs on earnings", *Review of Economics and Statistics* 6 (1): 47–57.

6. Ashenfelter, O. and D. Card (1985), "Using the longitudinal structure of earnings to estimate the effect of training programs", *Review of Economics and Statistics* 67 (3): 648–660.

7. Balestra, P. and M. Nerlove (1966), "Pooling cross section and time series data in the estimation of a dynamic model: the demand for natural gas", *Econometrica* 34 (1): 585–612.

8. BaNe, A. and J. Pearl (1997), "Bounds on treatment effects from studies with imperfect compliance", *Journal of the American Statistical Association* 92 (439): 1171–1176.

9. Barnow, B. (1987), "The impact of CETA programs on earnings: a review of the literature", *Journal of Human Resources* 22: 157–193.

10. Barron, J., D. Black and M. Lowenstein (1989), "Job matching and on-the-job training", *Journal of Labor Economics* 7 (1): 1–19.

11. Barron, J., M. Berger and D. Black (1997), "How well do we measure training?" *Journal of Labor Economics* 15 (3): 507 528.

12. Bassi, L. (1983), "The effect of CETA on the post-program earnings of participants", *Journal of Human Resources* 18 (Fall): 539–556.

13. Bassi, L. (1984), "Estimating the effect of training programs with non-random selection", *Review of Economics and Statistics* 66 (1): 36–43.

14. Begg, I., A. Blake and B. Deakin (1991), "YTS and the labour market", British *Journal of Industrial Relations* 29 (2): 223–236.

15. Bera, A., C. Jarque and L. Lee (1984), "Testing the normality assumption in limited dependent variable models", *International Economic Review* 25 (3): 563–578.

16. Bjorklund, A. (1994), "Evaluations of Swedish labor market policy", *International Journal of Manpower* 15 (5, part 2): 16–31.

17. Bjorklund, A. and R. Moffitt (1987), "Estimation of wage gains and welfare gains in self-selection models", *Review of Economics and Statistics* 69 (1): 42–49.

18. Bloom, H. (1984), "Accounting for no-shows in experimental evaluation designs", Evaluation Review 82 (2): 225–246.

19. Bonnal, L., D. Fougere and A. Serandon (1997), "Evaluating the impact of French employment policies on individual labour market histories", *Review of Economic Studies* 64 (4): 683–713.

20. Bound, J., C. Brown, G. Duncan and W. Rodgers (1994), "Evidence on the validity of cross-sectional and longitudinal labor market data", *Journal of Labor Economics* 12 (3): 345–368.

21. Bradley, S. (1994), "The Youth Training Scheme: A critical review of the evaluation literature", *International Journal of Manpower* 16 (4): 30–56.

22. Breen, R. (1988), "The work experience program in Ireland", *International Labour Review* 127 (4): 429–444.

23. Breen, R. (1991), "Assessing the effectiveness of training and temporary employment schemes: some results from the youth labour market", *The Economic and Social Review* 22 (3): 177–198.

24. Browning, E. (1987), "On the marginal welfare cost of taxation", *American Economic Review* 77 (1): 11–23.

25. Bryant, E. and K. Rupp (1987), "Evaluating the impact of CETA on participant earnings", *Evaluation Review* 11: 473–492.

26. Burtless, G. (1995), "The case for randomized field trials in economic and policy research", *Journal of Economic Perspectives* 9 (2): 63 84.

27. Cmneron, S. and J. Heckman (1998), "Life cycle schooling and dynamic selection bias: models and evidence for five cohorts of American males", *Journal of Political Economy* 106 (2): 262 333.

28. Card D. and D. Sullivan (1988), "Measuring the effects of CETA participation on movements in and out of employment", *Econometrica* 56 (3): 497–530.

29. Chamberlain, G. (1984), "Panel data", in: Z. Griliches and M. lntfiligator, eds, *Handbook of econometrics* (North-Holland, Amsterdam) pp. 1248–1318.

30. Cooley, T., T. McGuire and E. Prescott (1979), "Earnings and employment dynamics of manpower trainees: an exploratory econometric analysis", in: R. Ehrenberg, ed., *Research in labor economics*, Vol. 4, Suppl. 2 (JAI Press, Greenwich, CT) pp. 119–147.

31. Cosslett, S. (1983), "Distribution-free maximum likelihood estimator of the binary choice model", *Econometrica* 51 (3): 765–82.

32. Couch, K. (1992), "New evidence on the long-term effects of employment and training programs", *Journal of Labor Economics* 10 (4): 380–388.

33. Davidson, C. and S. Woodbury (1993), "The displacement effect of reemployment bonus programs", *Journal of Labor Economics* l1 (4): 575–605.

34. Decker, P. and W. Corson (1995), "International trade and worker displacement: evaluation of the trade adjustment assistance program", *Industrial and Labor Relations Review* 48 (4): 758–774.

35. de Koning, J., M. Koss and A. Verkaik (1991), "A quasi-experimental evaluation of the vocational training centre for adults", *Environment and Planning C: Govermnent and Policy* 9: 143–153.

36. de Koning, J. (1993), "Measuring the placement effects of two wage subsidy schemes for the long term unemployed", *Empirical Economics* 18: 447–468.

37. Devine, T. and J. Heckman (1996), "The structure and consequences of eligibility rules for a social program", in: S. Polachek, ed., *Research in labor economics*, Vol. 15 (JAI Press, Greenwich, CT) pp. 111–170.

38. Dickinson, K., T. Johnson and R. West (1986), "An analysis of the impact of CETA on participants' earnings", *Journal of Human Resources*, 21:64 91.

39. Dickinson, K., T. Johnson and R. West (1987), "An analysis of the sensitivity of quasi-experimental net estimates of CETA programs", *Evaluation Review* 11: 452–472.

40. Dolton, P. (1993), "The economics of youth training in Britain", *Economic Journal* 103 (420): 1261–1278.

41. Dolton, P. and D. O'Neill (1996a), "Unemployment duration and the Restart effect: some experimental evidence", *Economic Journal* 106 (435): 387–400.

42. Dolton, P. and D. O'Neill (1996b), "The Restart effect and the return to full-time stable employment", *Journal of the Royal Statistical Society* Series A 159 (2): 275–288.

43. Dolton, P., G. Makepeace and J. Treble (1994a), "The Youth Training Scheme and the school-to-work transition", *Oxford Economic Papers* 46 (4): 629–657.

44. Dolton, P., G. Makepeace and J. Treble (1994b), "The wage effect of YTS: evidence from YCS", *Scottish Journal of Political Economy* 41 (4): 444–453.

45. Donohue, J. and P. Siegelman (1998), "Allocating resources among prisons and social programs in the battle against crime", *Journal of Legal Studies* 27 (1): 1–43.

46. Eberwein, C., J. Ham and R. LaLonde (1997), "The impact of classroom training on the employment histories of disadvantaged women: evidence from experimental data", *Review of Economic Studies* 64 (4): 655–682.

47. Finifter, D. (1987), "An approach to estimating the net earnings impact of federally subsidized employment and training programs", *Evaluation Review* 11 (4): 528–547.

48. Flinn, C. and J. Heckman (1982), "New methods for analyzing structural models of labor force dynamics", *Journal of Econometrics* 18 (1): 115–168.

49. Fraker, T. and R. Maynard (1987), "The adequacy of comparison group designs for evaluations of employment related programs", *Journal of Human Resources* 22 (2): 194–227.

50. Friedlander, D and P. Robbins (1995), "Evaluating program evaluations: new evidence on commonly used nonexperimental methods", *American Economic Review* 85 (4): 923–937.

51. Friedlander, D., D. Greenberg and P. Robin s (1997), "Evaluating government training programs for the economically disadvantaged", *Journal of Economic Literature* 35 (4): 1809–1855.

52. Gay, R. and M. Borns (1980), "Validating performance indicators for employment and training programs", *Journal of Human Resources* 15: 29–48.

53. Green, F., M. Hoskins and S. Montgomery (1996) "The effects of company training, further education and the youth training scheme on the earnings of young employees", *Oxford Bulletin of Economics and Statistics* 58 (3) 469~88.

54. Greenberg, D. (1997), "The leisure bias in cost-benefit analyses of employment and training programs", *Journal of Human Resources* 32 (2): 413–439.

55. Gritz, M. (1993), "The impact of training on the frequency and duration of employment", *Journal of Econometrics* 57 (1–3): 21–51.

56. Gueron, J. (1990), "Work and welfare: lessons on employment programs", *Journal of Economic Perspectives* 4 (1): 79–98.

57. Ham J. and R. LaLonde (1996), "The effect of sample selection and initial conditions in duration models: evidence from experimental data", *Econometrica* 64 (1): 175–205.

58. Harberger, A. (1971), "Three basic postulates for applied welfare economics", *Journal of Economic Literature* 9 (3): 785–797.

59. Haveman, R. and D. Saks (1985), "Transatlantic lessons for employment and training policy", *Industrial Relations* 24 (2): 20–36.

60. Heckman, J. (1978), "Dummy endogenous variables in a simultaneous equations system", *Econometrica* 46 (4): 931–959.

61. Heckman, J. (1979), "Sample selection bias as a specification error", *Econometrica* 47 (1): 153–161.

62. Heckman, J. (1990), "Varieties of selection bias", *American Economic Review* 80 (2): 313–318.

63. Heckman, J. (1996), "Randomization as an instrumental variable", *Review of Economics and Statistics* 78 (2):336–341.

64. Heckman, J. (1997), "Instrumental variables: a study of implicit behavioral assumptions in one widely used estimator", *Journal of Human Resources*, 32 (3): 441461.

65. Heckman, J. (1998a), "The economic evaluation of social programs", in: J. Heckman and E. Learner, eds., *Handbook of econometrics*, Vol. 5 (Elsevier, Amsterdam), in press.

66. Heckman, J. and G. Borjas (1980), "Does unemployment cause future unemployment? Definitions, questions and answers from a continuous time model of heterogeneity and state dependence", *Economica* 47 (187): 247–283.

67. Heckman, J. and B. Honor~ (1990), "The empirical content of the Roy model", *Econometrica* 58 (5): 1121–1149.

68. Heckman, J. and J. Hotz (1989), "Choosing among alternative methods of estimating the impact of social programs: the case of manpower training", *Journal of the American Statistical Association* 84 (408): 862–874.

69. Heckman, J. and T. MaCurdy (1986), "Labor econometrics", in: Z. Griliches and M. lntriligator, eds., *Handbook of econometrics* (North-Holland, Amsterdam) pp. 1917–1977.

70. Heckman, J. and R. Robb (1985b), "Alternative methods for evaluating the impact of interventions: an overview", *Journal of Econometrics* 30 (1,2): 239–267.

71. Heckman, J. and G. Sedlacek (1985), "Heterogeneity, aggregation and market wage functions: an empirical model of self-selection in the labor market", *Journal of Political Economy* 98 (6): 1077–1125.

72. Heckman, J. and B. Singer (1984), "A method for minimizing the impact of distributional assumptions in econometric models for duration data", *Econometrica* 52 (2): 271–320.

73. Heckman, J. and J. Smith (1995), "Assessing the case for social experiments", *Journal o1" Economic Perspectives* 9 (2): 85–100.

74. Heckman, J. and J. Smith (1999), " The Pre-programme Earnings Dip and the Determinants of Participation in a Social Programme. Implications for Simple Programme Evaluation Strategies ", *Economic Journal*, in press.

75. Heckman, J. and E. Vytlacil (1999b), "The relationship between treatment parameters within a latent variable framework", *Economics Letters*, in press.

76. Heckman, J. and K. Wolpin (1976), "Does the contract compliance program work? An analysis of Chicago data", *Industrial and Labor Relations Review* 19:415–433.

77. Heckman, J., H. Ichimura and P. Todd (1997a), "Matching as an econometric evaluation estimator: evidence from evaluating a job training program", *Review of Economic Studies* 64 (4): 605–654.

78. Heckman, J., L. Lochner, J. Smith and C. Taber (1997b), "The effects of government policies on human capital investment and wage inequality", *Chicago Policy Review* 1 (2): 1–40.

79. Heckman, J., J. Smith and N. Clements (1997c), "Making the most out of programme evaluations and social experiments: accounting for heterogeneity in programme impacts", *Review of Economic Studies* 64 (4): 487 535.

80. Heckman, J., N. Hohmmm and J. Smith with M. Khoo (1998a), "Substitution and dropout bias in social experiments: evidence from an influential social experiment", *Quarterly Journal of Economics*, in press.

81. Heckman, J., H. Ichimura, J. Smith and P. Todd (1998b), "Characterizing selection bias using experimental data", *Econometrica* 66: 1017–1098.

82. Heckman, J., H. Ichimura and P. Todd (1998c), "Matching as an econometric evaluation estimator", *Review of Economic Studies* 65 (2): 261–294.

83. Heckinan, J., L. Lochner and C. Taber (1998d), "Explaining rising wage inequality: explorations with a dynamic general equilibrium model of labor earnings with heterogeneous agents", *Review of Economic Dynamics* 1 (1): 1–64.

84. Heckman, J., L. Lochner and C. Taber (1998e), "General equilibrium treatment effects: a study of tuition policy", *American Economic Review* 88 (2): 381–386.

85. Heckman, J., J. Smith and C. Taber (1998f), "Accounting for dropouts in evaluations of social programs", *Review of Economics and Statistics* 80 (1): 1–14.

86. Holland, P. (1986), "Statistics and causal inference", *Journal of the American Statistical Association* 81 (396): 945–960.

87. Hollister, R. and D. Freedman (1988), "Special employment programmes in OECD countries", *International Labour Review* 127 (3): 317–334.

88. Hutchinson, G. and A. Church (1989), "Wages, unions, the Youth Training Scheme and the Young Workers Scheme", *Scottish Journal of Political Economy* 36 (2): 160–182.

89. Ichimu ra, H. (1993), "Semiparametric least squares (SLS) and weighted SLS estimation of single-index models ", *Journal of Econometrics* 58 (1,2): 71–120.

90. lmbens, G. and J. Angrist (1994), "Identification and estimation of local average treatment effects", *Econometrica* 62 (4): 467–476.

91. Imbens, G. and T. Lancaster (1996), "Case-control studies with contaminated controls", *Journal of Econometrics* 71 (1,2): 145–160.

92. Johnson, G. and R. Layard (1986), "The natural rate of unemployment: explanation and policy", in O. Ashenfelter and R. Layard, eds., *Handbook of labor economics*, Vol. 2 (North-Holland, Amsterdam) pp. 921–999.

93. Johnson, G. and J. Tomola (1977), "The fiscal substitution effects of" alternative approaches to public service employment", *Journal of Human Resources* 12 (1): 3–26.

94. Kane, T. (1994), "College entry by blacks since 1970: the role of college costs, family background and the return to education", *Journal of Political Economy* 102 (5): 878–912.

95. Kane, T. and C. Rouse (1993), "Labor market returns to two- and four-year college", *American Economic Review* 85 (3): 600–614.

96. LaLonde, R. (1986), "Evaluating the econometric evaluations of training programs with experimental data", *American Economic Review* 76 (4): 604–620.

97. LaLonde, R. (1995), "The promise of public sector-sponsored training programs", *Journal of Economic Perspectives* 9 (2): 149–168.

98. LaLonde, R. and R. Maynard (1987), "How precise are evaluations of employment and training programs: evidence from a field experiment", *Evaluation Review* 11: 428~451.

99. Lee, L. (1983), "Generalized econometric models with selectivity", *Econometrica* 51 (2): 507–512.

100. MaCm'dy, T. (1982), "The use of time series processes to model the error structure of earnings in a longitudinal data analysis", *Journal of Econometrics* 18 (1): 83–114.

101. Main, B. (1985), "School leaver unemployment and the Youth Opportunities Programme in Scotland", *Oxford Economic Papers* 37 (3): 426–447.

102. Main, B. (1991), "The effects of the Youth Training Scheme on employment probability", *Applied Economics* 23 (2): 367–372.

103. Main, B. and D. Raffe (1983), "Determinants of employment and unemployment among school leavers: evidence from the 1979 survey of Scottish school leavers', *Scottish Journal of Political Economy* 30 (1): 1–17.

104. Main, B. and M. Shelly (1990), "The effectiveness of the Youth Training Scheme as a manpower policy", *Economica* 57 (228): 495–514.

105. Manski C. and S. Lerman (1977), "The estimation of choice probabilities from choice-based samples", *Econometrica* 45 (8): 1977–1988.

106. Matzkin, R. (1992), "Nonparametric and distribution-free estimation of the binary threshold crossing and the binary choice models", *Econometrica* 60 (2): 239–270.

107. Matzkin, R. (1993), "Nonparametric identification and estimation of polychotomous choice models", *Journal of Econometrics* 58 (1,2): 137–168.

108. Mincer, J. (1962), "On-the-job training: costs, returns and some implications", *Journal of Political Economy* 70 (5): 50–79.

109. Neyman, J. (1935), "Statistical problems in agricultural experiments", *The Journal of the Royal Statistical Society* 2 (2) (Suppl.): 107–180.

110. O'Higgins, N. (1994), "YTS, employment and sample selection bias", *Oxford Economic Papers* 46 (4): 605–628.

111. Powell, J. (1994), "Estimation of semiparametric models", in: R. Engle and D. McFadden, eds., *Handbook of econometrics*, Vol. 4 (North-Holland, Amsterdam) pp. 2443–2521.

112. Puma, M. and N. Burstein (1994), "The national evaluation of the Food Stamp employment and training program", *Journal of Policy Analysis and Management* 13 (2): 311–330.

113. Quandt, R. (1972), "Methods for estimating switching regressions", *Journal of the American Statistical Association* 67 (338): 306–310.

114. Ridder, G. (1986), "An event history approach to the evaluation of training, recruitment and employment programmes", *Journal of Applied Econometrics* 11: 109–126.

115. Rosenbaum, P. and D. Rubin (1983), "The central role of the propensity score in observational studies for causal effects", *Biometrika* 70 (1): 41–55.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.                           Appendix B: Additional bibliography

116.    Roy, A. (1951), "Some thoughts on the distribution of earnings", *Oxford Economic Papers* 3: 135–146.

117.    Rubin, D. (1974), "Estimating causal effects of treatments in randomized and non-randomized studies", *Journal of Educational Psychology* 66: 688–701.

118.    Rnhin, D. (1978), "Bayesian inference for causal effects: the role of randomization', *Annals of Statistics* 6 (1) 34–58.

119.    Rubin, D. (1979), "Using multivariate matched sampling and regression adjustment to control bias in observationMstudies", *Journal of the American Statistical Association* 74:318–328.

120.    Smith, J. and F. Welch (1986), Closing the gap: forty years of economic progress for blacks (RAND, SantaMonica, CA).

121.    Thierry, P. and M. Sollogoub (1995), "Les politiques francaises d'emploi en faveur des jeunes. Une evaluation econometrique', *Revue-Economique* 46 (3): 549–559.

122.    Topel, R. and M. Ward (1992), "Job mobility and the careers of young men", *Quarterly Journal of Economics* 107: 439–480.

123.    Weitzman, M. (1979), "Optimal search for the best alternative", *Econometrica* 47 (3): 641–654.

124.    Whitfield, K. and C. Bourlakis (1991), "An empirical analysis of YTS, employment and earnings", *Journal of Economic Studies* 18 (1): 42–56.

125.    Zweimuller, J. and R. Winter-Ebmer (1996), "Manpower training programmes and employment stability", *Economica* 63 (249): 113–130.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

# Appendix C: Data processing

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

## C.1. Overview

(322)    As indicated in the initial report, data were received from a number of plaintiffs, defendants, and third-party entities involved in this matter. These data were used to create a combined purchase dataset that attempted to capture a complete picture of purchases by plaintiffs' and named OEMs global DRAM purchases from all defendants. Since the submitting the initial report and in response to the defendants' experts' criticisms, several updates have been made to the data processing. The updates can be characterized as three types, summarized below:

- Refinement of product characteristics for datasets where product characteristics were already included in the initial report

- Inclusion of product characteristics for data not previously decoded

- General updates to data processing

(323)    This appendix references the information relied upon in updating the data processing scripts and product-characteristic translation table, contained in the backup materials.

## C.2. Refinement of product characteristics

### C.2.1. Elpida

(324)    Additional product information was incorporated using the following sources:

- EMUS00375183
- EMUS00434093
- EMUS00512165

### C.2.2. Hynix

(325)    Additional product information was incorporated using the following sources:

- HSA00015036
- HSA00067465
- HSA00010707
- HSA00138383
- HSA00435981
- HSA00432054
- HSA00131418

- HSA00387020
- HSA00479708
- HSA00242201
- HSA00236108
- HSA00432055
- HSA00083186
- HSA00408915
- HSA00261215
- HSA00408900
- HSA00413608
- HSA00129387
- HSA00236108
- HSA00264724
- HSA00042630

### C.2.3. Infineon

(326)    Additional product information was incorporated using the following sources:

- ITAG-00002430
- ITAG-00007052
- ITAG-00007894
- ITAG-00008501
- ITAG-00011140
- ITAG-00013068
- ITAG-0013443
- ITAG-00031270
- ITAG-00031271
- ITAG-00033890
- ITAG-00038087
- ITAG-00041417
- ITAG-00041420
- ITAG-00042147
- ITAG-00042168
- ITAG-00042847
- ITAG-00043611
- ITAG-00058706
- ITAG-00058707

- ITAG-00059946
- ITAG-00060025
- ITAG-00060922
- ITAG-00063102
- ITAG-00068082
- ITAG-00074543
- ITAG-00077025
- ITAG-00083762
- ITAG-00090229
- ITAG-00122737
- ITAG-00122738
- ITAG-00123699
- ITAG-00134036
- ITAG-00169453
- ITAG-00226063
- ITAG-00272071
- ITAG-00290522
- ITAG-00351826
- ITAG-00353357
- ITAG-00354548
- ITAG-00356370
- ITAG-00359963
- ITAG-00386535
- ITAG-00387175
- ITAG-00387176
- ITAG-00387203.000
- ITAG-00387204.0001
- ITAG-00387205
- ITAG-00387206.000
- ITAG-00387212.0002
- ITAG-00388753
- ITAG-00391192
- ITAG-00493352
- ITAG-00497308
- ITAG-00497970
- ITAG-00498482
- ITAG-00569438

Highly confidential

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.                    Appendix C: Data processing

- ITAG-00601756
- ITAG-00667389
- ITAG-00667419
- ITAG-00667423
- ITAG-00674538.031
- ITAG-00674538.032
- ITAG-00674538.0324
- ITAG-00676502.000
- ITAG-00676502.0004
- ITAG-00676580.000
- ITAG-00676580.0004
- ITAG-00677954.000
- ITAG-00682378
- ITAG-00683584
- ITAG-00712027.005
- ITAG-00721950
- ITNA01200692 .001
- ITNA01200718 .001
- ITNA 00000369
- ITNA 00015712
- ITNA 00019811
- ITNA 00021003
- ITNA 00021045
- ITNA 00026887
- ITNA01002804
- ITNA01055365
- ITNA01055878
- ITNA01055930
- ITNA01055932
- ITNA01067137
- ITNA01075504
- ITNA01106705
- ITNA01129993
- ITNA01158459
- ITNA01158462
- ITNA01158472
- ITNA01158685

- ITNA01173286
- ITNA01178989
- ITNA01179002
- ITNA01191143
- ITNA01197884
- ITNA01197892
- ITNA01198042
- ITNA01198219
- ITNA01199020
- ITNA01199932
- ITNA01200009
- ITNA01200091
- ITNA01200123
- ITNA01200133
- ITNA01200167
- ITNA01200408
- ITNA01200441
- ITNA01200656
- ITNA01200669
- ITNA01200721
- ITNA01204368
- ITNA01208997
- ITNA01223991
- ITNA01256540
- ITNA01296599
- ITNA01317189
- ITNA01318376
- ITNA01200024 .001
- ITNA01200112 .001
- ITNA01200677 .001
- ITNA01200718 .001

### C.2.4. Micron

(327)    In the Micron data, the module depth and module density information was updated for transactions involving SGRAM.

### C.2.5. NEC

(328)    Additional product information was incorporated using the following sources:

- EMUS 101524
- EMUS 120379
- EMUS 131609
- EMUS 131610
- EMUS 131611
- EMUS 135446
- EMUS 139910
- EMUS 139915
- EMUS 140882
- EMUS 140885
- EMUS 140891
- EMUS 144602
- EMUS 300406
- EMUS 300809
- EMUS 415587
- EMUS 416184
- EMUS 558669
- EMUS 558672
- EMUS 558675
- EMUS 574513
- EMUS 58858
- EMUS 58973
- EMUS 636429
- EMUS 637810
- EMUS 65347
- EMUS 670961
- EMUS 674451
- EMUS 68025
- EMUS 701646
- EMUS 732288
- EMUS 771177
- EMUS 771186
- EMUS 771199
- EMUS 771217

- EMUS 795299
- EMUS 844093
- EMUS 865458
- EMUS 871716
- EMUS 964781
- EMUS 994572
- EMUS 994574
- EMUS 994578
- EMUS 994580
- NECELAM 020103
- NECELAM 023128
- NECELAM 02782
- NECELAM 029115
- NECELAM 040413
- NECELAM 040416
- NECELAM 040419
- NECELAM 043003
- NECELAM 045303
- NECELAM 045461
- NECELAM 046318
- NECELAM 050017
- NECELAM 052370
- NECELAM 052549
- NECELAM 056887
- NECELAM 058296
- NECELAM 061781
- NECELAM 096270
- NECELAM 102647
- NECELAM 112584
- NECELAM 117134
- NECELAM 125098
- NECELAM 134186
- NECELAM 139004
- NECELAM 147312
- NECELAM 149231
- NECELAM008909
- NECELAM008996

### C.2.6. Samsung

(329)    Additional product information was incorporated using the following sources:

- SSI-0000010402
- SSI-0000047366
- SSI-0000052838
- SSI-0000055385
- SSI-0000062907
- SSI-0000065364
- SSI-0000069979
- SSI-0000072658
- SSI-0000072660
- SSI-0000072663
- SSI-0000072664
- SSI-0000072667
- SSI-0000072669
- SSI-0000075360
- SSI-0000092275
- SSI-0000092519
- SSI-0000092529
- SSI-0000092737
- SSI-0000093144
- SSI-0000094442
- SSI-0000094798
- SSI-0000097810
- SSI-0000098719
- SSI-0000100941
- SSI-0000103287
- SSI-0000103297
- SSI-0000103355
- SSI-0000106002
- SSI-0000108845
- SSI-00001097015
- SSI-0000111294
- SSI-0000111303
- SSI-0000111312
- SSI-0000113925

- SSI-0000113971
- SSI-0000114799
- SSI-0000114905
- SSI-0000116354
- SSI-0000116633
- SSI-0000117195
- SSI-0000118963
- SSI-0000119112
- SSI-0000119908
- SSI-0000120028
- SSI-0000121802
- SSI-0000122044
- SSI-0000123403
- SSI-0000124272
- SSI-0000125711
- SSI-0000127020
- SSI-0000127059
- SSI-0000128221
- SSI-0000128280
- SSI-0000128523
- SSI-0000128629
- SSI-0000129127
- SSI-0000129789
- SSI-0000129792
- SSI-0000129900
- SSI-0000131305
- SSI-0000131477
- SSI-0000132863
- SSI-0000132995
- SSI-0000133011
- SSI-0000133095
- SSI-0000133394
- SSI-0000135705
- SSI-0000135725
- SSI-0000135970
- SSI-0000136222
- SSI-0000136235

- SSI-0000136506
- SSI-0000136748
- SSI-0000138652
- SSI-0000139036
- SSI-0000140749
- SSI-0000141718
- SSI-0000143186
- SSI-0000143755
- SSI-0000143999
- SSI-0000144932
- SSI-0000147707
- SSI-0000152526
- SSI-0000155230
- SSI-0000155500
- SSI-0000155867
- SSI-0000156346
- SSI-0000156464
- SSI-0000156961
- SSI-0000157274
- SSI-0000158484
- SSI-0000159335
- SSI-000015956
- SSI-0000160087
- SSI-0000325847
- SSI-0000325848
- SSI-0000326345
- SSI-0000326362
- SSI-0000326388
- SSI-0000327645
- SSI-0000327649
- SSI-0000327676
- SSI-0000327749
- SSI-0000328021
- SSI-0000328461
- SSI-0000331481
- SSI-0000331534
- SSI-0000354981

Highly confidential

- SSI-0000363190
- SSI-0000363243
- SSI-0000363256
- SSI-0000363923
- SSI-0000364956
- SSI-0000366673
- SSI-0010055287
- SSI-0010055297
- SSI-0010055298
- SSI-0010055299
- SSI-0010055301
- SSI-0010055302
- SSI-0010056022
- SSI-0010056023
- SSI-0010056024
- SSI-0010056038
- SSI-0010056046
- SSI-0010056047
- SSI-0020027255
- SSI-0020029013
- SSI-0020029064
- SSI-0020029066
- SSI-0020029128
- SSI-0020029129
- SSI-0020029130

## C.3. Inclusion of product characteristics for data not previously decoded

(330)    Product information has been incorporated for: (1) defendant-provided data from Mitsubishi, Mosel Vitelic, and Nanya; (2) plaintiff-provided data from SGI and Sun; and (3) third-party data provided by Benchmark.

### C.3.1. Mitsubishi

(331)    Product information was incorporated using the following sources:

- SUN0545108–SUN0546173

### C.3.2. Mosel Vitelic

(332)    Product information was incorporated using the following sources:

- MVCORP0034977–5000
- MVCORP0036825–48
- MVCORP0037237–64
- MVCORP0038846–71
- MVCORP0034949–976
- MVCORP0037195–224
- MVCORP0038942–69
- MVCORP0034923–48
- MVCORP0037112–37
- MVCORP0038872–897
- MVCORP0034897–922
- MVCORP0036211–36
- MVCORP0037044–69
- MVCORP0037138–61
- MVCORP0037070–87
- MVCORP0034864–79
- MVCORP0037096–111
- MVCORP0037164–77
- MVCORP0034836–51
- MVCORP0037178–94
- MVCORP0034102–5

### C.3.3. Nanya

(333)    Product information was incorporated using the following sources:

- NTC-1 0038–42
- NTC 64-00000029
- NTC 64-00000650–817
- NTC 008769–74
- Part number guide (April 2000)
- Nanya Part numbering guide Y2008 Dec[1].pdf, "Brochure Part Numbering Guide Y2008," Nanya Website, http://www.nanya.com/PageEdition1.aspx?Menu_ID=23&lan=en-us&def=210&isPrint=&KeyWords=

### C.3.4. SGI

(334)    SGI provided four transactional data files in Excel that were combined in order to create a complete transaction database for SGI. Each of these files contains a description field from which product characteristics were extracted.[278]

### C.3.5. Sun

(335)    Product information was incorporated using the following sources:

- SUN0545108 – SUN0546173

### C.3.6. Benchmark

(336)    Benchmark data contain only sales to Sun. There is a field in the data containing Sun part numbers that was used to identify product characteristics as described for Sun.

## C.4. General updates to data processing

### C.4.1. Infineon

(337)    Infineon data contain two revenue fields, T/O_$ and T/O_EUR. Based on the methodology used to process data for my affirmative report, the T/O_$ field was used as the primary source of revenue; however, some records contain zero or null values in the T/O_$ field. Initially, the value in the T/O_EUR field, converted to U.S. dollars, was used only when the T/O_$ field was missing a value. This methodology has been updated so that, in those instances where the T/O_$ field contains a zero, and the T/O _EUR field is not zero, the value in the T/O_EUR field is used.

### C.4.2. Micron

(338)    Micron data processing was updated to account for the re-classification of some purchaser names. In particular, less than 100 transactions where purchaser had previously been classified as "OTHER," purchaser is now classified as an OEM.

---

[278]    SGI's data used in the combined database does not contain a quantity field from which unit prices can be constructed.

### C.4.3. Reptron

(339) Jaco only owns claims for purchases made by certain Reptron entities, which they purchased in 2003.[279] Because the purchaser fields provided in the raw defendant data files often do not provide enough information to determine whether Reptron's purchases were made by its distribution entity, it was necessary to supplement Reptron purchases in defendant data files with purchases according to data provided by Reptron in the files, "REPTRON MASTER DRAM LIST.xls," "Reptron-Receipts-010103-123103.xls," and "Consolidated-DRAMs.xls ."[280]

(340) The files, "REPTRON MASTER DRAM LIST.xls," "Reptron-Receipts-010103-123103.xls," and "Consolidated-DRAMs.xls ," were appended together, processed, and standardized as described in the overview in my affirmative report in order to identify a standard set of information for each record.

(341) Product characteristics were incorporated using the defendant part number variable in the Reptron purchase data. Based on these defendant part numbers, product characteristics that were translated during decoding of defendant data were applied to transactions in the Reptron data.

### C.4.4. Unisys

(342) Unisys' purchases through module makers have been allocated to DRAM suppliers, according to information available in Unisys' bill-of-material documents. In order to more accurately allocate these purchases, several updates to the allocation methodology have been made. First, Hyundai and Hynix are no longer identified as separate entities. Second, purchases are now allocated according to a supplier's relative quarterly market share. Finally, purchases are no longer being allocated to Hitachi or NEC after March 2001 or to Mitsubishi after October 2002, in order to accurately capture these firms' departures from the DRAM market.

---

[279] U.S. Securities and Exchange Comission, Form 8-K, SEC File 0-23426, Accession Number 1193125-3-15058, Filed on 6/30/2003.

[280] Defendant data is still used for Reptron's purchases from Elpida and Nanya.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

# Appendix D: Damage tables and figures using enhanced data

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

**Figure 177: Plaintiffs' total purchases, overcharge percentages, and single damages by defendants during the plea and lingering effects period, using enhanced data**

| Plaintiff | Purchases | Overcharge | Single damages |
|---|---|---|---|
| ALL AMERICAN | $97,925,252 | 36% | $34,854,181 |
| EDGE | $12,216,152 | 42% | $5,181,078 |
| JACO | $66,366,720 | 37% | $24,698,415 |
| SGI | $138,365,572 | 60% | $82,590,089 |
| SUN | $2,796,112,714 | 45% | $1,246,319,232 |
| UNISYS | $82,560,221 | 20% | $16,787,997 |
| Total | $3,193,546,630 | 44% | $1,410,430,992 |

**Figure 178: Plaintiffs' U.S. purchases, overcharge percentages, and single damages by defendants during the plea and lingering effects period, using enhanced data**

| Plaintiff | Purchases | Overcharge | Single damages |
|---|---|---|---|
| ALL AMERICAN | $97,925,252 | 36% | $34,854,181 |
| EDGE | $12,216,152 | 42% | $5,181,078 |
| JACO | $66,366,720 | 37% | $24,698,415 |
| SGI | $114,461,720 | 58% | $66,164,689 |
| SUN | $2,064,262,155 | 44% | $906,863,545 |
| UNISYS | $82,560,221 | 20% | $16,787,997 |
| Total | $2,437,792,220 | 43% | $1,054,549,905 |

**Figure 179: Plaintiffs' total purchases, overcharge percentages, and single damages by defendants during the conspiracy and lingering effects period, using enhanced data**

| Plaintiff | Purchases | Overcharge | Single damages |
|---|---|---|---|
| ALL AMERICAN | $121,599,548 | 45% | $55,054,810 |
| EDGE | $12,400,686 | 55% | $6,784,746 |
| JACO | $73,422,117 | 44% | $32,083,917 |
| SGI | $171,918,588 | 64% | $109,549,196 |
| SUN | $2,957,942,010 | 53% | $1,562,958,003 |
| UNISYS | $94,216,406 | 39% | $36,576,982 |
| Total | $3,431,499,355 | 53% | $1,803,007,654 |

**Figure 180: Plaintiffs' U.S. purchases, overcharge percentages, and single damages by defendants during the conspiracy and lingering effects period, using enhanced data**

| Plaintiff | Purchases | Overcharge | Single damages |
|---|---|---|---|
| ALL AMERICAN | $121,599,548 | 45% | $55,054,810 |
| EDGE | $12,400,686 | 55% | $6,784,746 |
| JACO | $73,422,117 | 44% | $32,083,917 |
| SGI | $147,852,551 | 61% | $90,433,763 |
| SUN | $2,196,245,220 | 52% | $1,146,811,832 |
| UNISYS | $94,210,656 | 39% | $36,576,212 |
| Total | $2,645,730,778 | 52% | $1,367,745,280 |

**Figure 181: Sun DRAM actual and but-for price indexes using enhanced data – plea period**



**Figure 182: Sun DRAM actual and but-for price indexes using enhanced data – conspiracy period**



**Figure 183: SGI DRAM actual and but-for price indexes using enhanced data – plea period**



**Figure 184: SGI DRAM actual and but-for price indexes using enhanced data – conspiracy period**



**Figure 185: Jaco DRAM actual and but-for price indexes using enhanced data – plea period**



**Figure 186: Jaco DRAM actual and but-for price indexes using enhanced data – conspiracy period**



**Figure 187: All American DRAM actual and but-for price indexes using enhanced data – plea period**



**Figure 188: All American DRAM actual and but-for price indexes using enhanced data – conspiracy period**



**Figure 189: Unisys DRAM actual and but-for price indexes using enhanced data – plea period**



**Figure 190: Unisys DRAM actual and but-for price indexes using enhanced data – conspiracy period**



Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

# Appendix E: Dr. Rubinfeld's inappropriate handling of returns

## E.1. Dr. Rubinfeld does not accurately match returns to purchases

(343)    In his report, Dr. Rubinfeld criticizes me for not attempting to match and subtract returns from their original purchases. Additionally, Dr. Rubinfeld attempts to match these transactions himself.[281] Dr. Rubinfeld's methods are flawed, however, and he does not match returns and purchases in a logical manner. In fact, Dr. Rubinfeld's method only attributes 48% of potential returns, albeit incorrectly, and he drops the remaining returns. Despite my disagreement with Dr. Rubinfeld's methods, I ran his analysis using his data after having removed rebates and returns completely (instead of using his data "net" of returns as processed by him), and the resulting differences when compared with his original results and conclusions are minor.

(344)    Further, Dr. Rubinfeld's returns apportionment supports the notion that this is not a trivial task and requires guidance from the defendants on how returns and rebates should be treated. Under ideal circumstances and complete information (in the data or from the defendants), I would have apportioned rebates to the corresponding original transactions. However, I specifically asked Samsung for information regarding rebates and returns in an effort to understand the appropriate treatment of these data and received no response on the issue.[282]

(345)    While my approach does not attempt to match returns to transactions, I do not ignore the presence of rebates and returns. In the creation of my price index, I drop all negative and zero quantities and dollar amounts. Dr. Rubinfeld shows through his analysis attempting to "match" returns to transactions that even a highly imprecise analysis will have little impact. When calculating the purchases to which I apply the overcharges from my damage model, I include negative volumes and dollar amounts so as not to inflate plaintiff purchases. In this way, I account for returns using the best available information.

---

[281]    Rubinfeld Report, Paragraph 215.

[282]    Letter to Mona Solouki from David Cross (October 19, 2007); Email to David Cross from Erik Bliss (November 11, 2007).

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

# Appendix F: The restrictions imposed by Shapiro's model are not supported by statistical tests

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.    Appendix F: The restrictions imposed by Shapiro's model are not supported by statistical tests

(346)    Dr. Shapiro estimates the following model to determine the effect of the conspiracy.

$$\Delta P_t^{actual} = \alpha_0 + \gamma_0 \left( P_{t-1}^{butfor} - \beta_{01} X_{t-1} \right) + \delta_{01} \Delta P_{t-1}^{butfor} + \delta_{02} \Delta X_{t-1} + \lambda \Delta D_t - \lambda \gamma_0 D_{t-1} - \lambda \delta_{01} \Delta D_{t-1} + \varepsilon_t$$
$$= \alpha_0 + \gamma_0 \left( P_{t-1}^{butfor} - \beta_{01} X_{t-1} \right) + \delta_{01} \Delta P_{t-1}^{butfor} + \delta_{02} \Delta X_{t-1} - \lambda \gamma_0 D_t + \lambda((1 + \gamma_0) \Delta D_t - \delta_{01} \Delta D_{t-1}) + \varepsilon_t$$

(347)    Note that the above notation is equivalent to that used by Dr. Shapiro.

(348)    By using a single dummy variable to capture the effect of the conspiracy. Dr. Shapiro relies on the assumption that the alleged conspiracy does not change the relationship between prices and the underlying demand and supply factors.

(349)    A more flexible model that allows the relationship to be different inside and outside of the alleged conspiracy is a fully interacted model. This model is written in the following equation.

$$\Delta P_t^{actual} = (1 - D_t) \left[ \alpha_0 + \gamma_0 \left( P_{t-1}^{butfor} - \beta_{01} X_{t-1} \right) + \delta_{01} \Delta P_{t-1}^{butfor} + \delta_{02} \Delta X_{t-1} \right] +$$
$$+ D_t \left[ \alpha_1 + \gamma_0 \left( P_{t-1}^{butfor} - \beta_{11} X_{t-1} \right) + \delta_{11} \Delta P_{t-1}^{butfor} + \delta_{12} \Delta X_{t-1} \right] + \varepsilon_t$$
$$= \alpha_0 + \gamma_0 \left( P_{t-1}^{butfor} - \beta_{01} X_{t-1} \right) + \delta_{01} \Delta P_{t-1}^{butfor} + \delta_{02} \Delta X_{t-1}$$
$$+ (\alpha_1 - \alpha_0) D_t + (\gamma_1 - \gamma_0) D_t (P_{t-1} - \beta_{11} X_{t-1})$$
$$+ (\delta_{11} - \delta_{01}) D_t \Delta P_{t-1} + (\delta_{12} - \delta_{02}) D_t \Delta X_{t-1}$$
$$+ \gamma_0 (\beta_{01} - \beta_{11}) D_t X_{t-1} + \varepsilon_t$$

(350)    I test whether Dr. Shapiro's model is correctly specified using a test with power in the direction of the fully interacted model.

(351)    First, I estimate the cointegration relationship ($\beta_{11}$) between DRAM prices and supply and demand factors during the conspiracy. I use a standard and well established procedure introduced by Engle and Granger[283] that yields a "super-consistent" estimate ($\hat{\beta}_{11}$). The estimated relation is

$$P_t = \vartheta + \beta_{11} X_t + \varepsilon_t$$

(352)    Second, I perform the following regression:

---

[283]    Engle, Robert F., and C. W. Granger (1987) "Co-integration and Error Correction: Representation, Estimation and Testing." *Econometrica* 55:251–276.

$$\Delta P_t^{actual} = \alpha_0 + \gamma_0 \left( P_{t-1}^{butfor} - \beta_{01} X_{t-1} \right) + \delta_{01} \Delta P_{t-1}^{\ butfor} + \delta_{02} \Delta X_{t-1} - \sigma_1 \gamma_0 D_t + \sigma_1 \left( (1+\gamma_0)\Delta D_t - \delta_{01}\Delta D_{t-1} \right)$$
$$+ \mu_1 D_t \left( P_{t-1}^{butfor} - \hat{\beta}_{11} X_{t-1} - \hat{\vartheta} \right) + \varphi_{11} D_t \Delta P_{t-1}^{\ butfor} + \varphi_{12} D_t \Delta X_{t-1} + \varepsilon_t$$

(353)   Note that the first line in the equation above corresponds exactly to Dr. Shapiro's specification. It follows that the coefficients $\mu_1$, $\varphi_{11}$ and $\varphi_{12}$ take the value zero when Dr. Shapiro's specification is correct.

(354)   I perform a standard statistical test, in which I test whether the coefficients in question, i.e. $\mu_1$, $\varphi_{11}$ and $\varphi_{12}$ are jointly zero. If Dr. Shapiro's specification is correct, the test will not be able to reject the hypothesis that all of these coefficients are zero. On the other hand, if a fully interacted model is more appropriate, these coefficients will be non-zero. The test strongly rejects the null hypothesis, indicating that the relationship between the cost and demand factors, price dynamics and the speed of error correction does not remain constant inside and outside of the conduct periods. Figure 191 shows the relevant statistics.

**Figure 191: Test results for the joint tests**

| Null hypothesis | Conduct period | Chi-square statistic | P-value |
|---|---|---|---|
| $\mu_1 = \varphi_{11} = \varphi_{12} = 0$ | Conspiracy period | 15.9 | 0.01 |
| | Plea period | 15.5 | 0.01 |

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

# Appendix G: Exogenous event study

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.

## G.1. Defendants own documents and analysis shows that the factors that they claim influence pricing only during the conduct period are not relevant for this analysis

(355)    As I discussed above, defendants' experts contend that I did not account for several events that occurred during the conduct period, including earthquakes, introductions of new versions of Windows, increases in the amount of memory per PC, the technology boom and bust, and Y2K, among others. I address these events below.

### G.1.1. Earthquakes

(356)    Several of the defendants' experts have asserted that the September 21, 1999, earthquake in Taiwan should have been considered in my analysis.[284] Specifically, Dr. Shapiro claims that the earthquake contributed to DRAM price increases in the fall of 1999. However, none of the defendants' experts have undertaken any analysis to determine whether the earthquake affected DRAM prices. I have done so and have found that the earthquake had no substantial impact on DRAM prices other than a short-lived increase in spot prices.

(357)    First, I examined biweekly prices from the defendants' transaction data prior to and after the Sept 21, 1999 earthquake. I focused my analysis on defendants' prices for 16Mbit and 64Mbit SDRAM chips because these were the highest volume products being sold by Mosel Vitelic and Nanya in the second half of 1999 and were most likely to have been affected by the earthquake.[285] As can be seen in Figure 192, prices for both products had been increasing from July 1999 through mid-September, just prior to the September 21, 1999 earthquake. In fact, by September 15, 1999, 64Mbit SDRAM chip prices had already increased 135% since July 1, 1999, and 16Mbit SDRAM chip prices had increased 22%. By October 1, 1999, after the earthquake, prices for 16Mbit and 64Mbit SDRAM chips increased an additional 6% and 7%, respectively. 64Mbit SDRAM chip prices began declining by mid-October and continued to decline through the end of the year, whereas 16Mbit SDRAM chip prices increased an additional 7% through mid-November before declining. The defendants' own data clearly indicate that the September 21, 1999 was not a significant driver of increasing DRAM prices in the second half of 1999.

---

[284]    See, e.g., the March 07, 2008 Expert Reports of Carl Shapiro (p. 9-10), Victor DeDios (p. 13), Joseph Kalt (¶ 178), and Vincent O'Brien (¶ 53).

[285]    16Mbit and 64Mbit SDRAM chips accounted for 6% and 43%, respectively, of Mosel Vitelic's and Nanya's sales from July 1, 1999 through December 31, 1999.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.                          Appendix G: Exogenous event study

**Figure 192: Biweekly SDRAM chip prices (July 1999 through December 1999)**



Source: Defendant transaction data

(358) The U.S. International Trade Commission's (ITC) analysis of DRAM prices in 1999 supports my analysis that the Taiwan earthquake was not a driving force behind rising DRAM prices. The ITC concluded:

> Nor do we accept petitioner's [Micron's] claim that the recent price increases are the result of one-time events like the recent Taiwan earthquake (Sept. 21, 1999)….' In particular, although the Taiwan earthquake caused a short period of panic buying, resulting in a price spike, the record indicates that the interruption to domestic and world supply caused by the earthquake was minimal and that the market quickly recovered. After declining from the price spike that occurred immediately after the earthquake, however, prices continued on their rising trend.[286]

(359) Furthermore, the defendants' own documents and industry trade press also corroborate my opinion that the Taiwan earthquake did not have a significant impact on DRAM prices:

---

[286]   U.S. International Trade Commission, "Determination and Views of the Commission: DRAMs of one Megabit and above from Taiwan," Investigation No. 731-TA-811 (USITC Publication No. 3256, December 1999) at 22.

- A Nanya press release on September 27, 1999, bearing the title "Nanya Technology Resumes Production Within Hours After Earthquake Hits Taiwan" states that "minor wafer loss" was the only damage incurred.[287]

- An EETimes article from September 28, 1999, states, "Other Taiwanese fab companies also are reporting varying degrees of progress in returning to full production. Winbond Electronics Corp. announced that its Fab 1 is 100 percent operational and that its Fab 2 is at 90 percent. They reported that Fab 3 will be fully back online soon. Mosel Vitelic Inc. said it will be 'back online quickly.'… Analysts here think the damage is much less than first estimated. 'About 40 percent of the furnaces need new quartz tubes,' said one analyst. 'About 15 percent of the wafers in process are dead. The fabs are having to hand-load the machinery, just like in the old days. All in all, I don't see DRAM prices really being affected, though.'… One fab that has managed to stay in production is Nan Ya Technology Corp. They had their own water and electricity sources and so weren't affected by the government's power-grid blackout."[288]

- An internal Mosel email dated September 29, 1999 states, "there is no structural damage in the Hsin Chu area [where Mosel, ProMOS and Winbond fabs were located]. It is estimated that the full production can be reached in the next couple of days."[289]

- The October 8, 1999 issue of DeDios' *The DRAM Market Advisor* states, "On the supply side, we expect Taiwanese companies to recover quickly. Although the delays will reduce Taiwanese fabs' contribution to worldwide supply and their growth in Q499, the overall effect on DRAM bit supply is only 6 percent."[290] De Dios later predicts a quick recovery and points out the "tendency of the industry press to exaggerate the long-term consequences of the earthquake."[291]

- An internal Micron email dated November 1, 1999, states, "Since Taiwan is a relatively minor player in DRAM production, the Sept. 21 earthquake there had little effect on actual DRAM supply other than a short-lived spike in spot prices."[292]

(360)    In addition to considering the potential impact of the September 1999 Taiwan earthquake on DRAM prices, I have analyzed prices around the times of other earthquakes in Taiwan and Japan before, during, and after the plea period. During the period from 1994 through 2007, there have

---

[287]    NTC66-00008865–66 at 65.

[288]    Mark Carroll, "Taiwan's fabs starting to resume production," *EETimes*, 28 Jan 1999, http://www.eetimes.eu/12807564.

[289]    MVC73330.

[290]    MU00674532-550 at 533.

[291]    MU00674532-550 at 534-535.

[292]    MU00238621–28 at 24.

been 92 earthquakes in Taiwan and Japan that have been classified as "significant earthquakes" by the U.S. Geological Survey.[293] A visual inspection of the timing of these significant earthquakes shows that DRAM prices increased, remained relatively stable, or decreased following these significant earthquakes, as shown in Figure 193. I have tabulated how many times price increased by more than 5% in the month after each of these earthquakes occurred and found that price increased by more than 5% after 20 of 92 (22%) earthquakes, whereas prices decreased after 34 of 92 earthquakes, as shown in Figure 194.[294]

(361)    Based on this analysis, one could make the argument that earthquakes caused prices to decrease more frequently than they caused prices to increase. However, this conclusion would be wrong because it improperly assumes that these earthquakes caused price movements. Yet this is exactly what defendants' experts have concluded about the September 21, 1999 Taiwan earthquake.[295] As can be seen in Figure 195, the price movements I tabulated in Figure 194 are entirely in line with the existing price trends at the time of the earthquakes. For example, nearly all of the times that price decreased by more than 5% after an earthquake, DRAM prices were already declining prior to the earthquake. Likewise, in most instances when DRAM price increased by more than 5% after an earthquake, prices had already been increasing prior to the earthquake. This is exactly what was happening in mid-1999 when Defendants' experts point to the September 21, 1999 earthquake as a cause for increasing DRAM prices.

(362)    Based on all of the evidence available to me, I concluded that that the September 1999 earthquake had a minimal impact on DRAM prices. The fact that the defendants' experts point to only one or two earthquakes during the conspiracy period when earthquakes were regular occurrences in Taiwan and Japan makes it clear that the defendants are simply trying to find any excuse available to them—other than conspiracy—in an attempt to explain the elevated DRAM prices during the conspiracy period. In fact, there were two other earthquakes of similar strength (March 2001 in Japan and March 2002 in Taiwan) to the September 21, 1999 earthquake that defendants' experts (except Dr. O'Brien) ignored. These earthquakes were likely ignored because DRAM

---

[293]    "Significant Earthquakes of the World," U.S. Geological Survey website, http://earthquake.usgs.gov/eqcenter/eqarchives/significant. "Significant earthquakes" are defined by the U.S. Geological Survey as those with a magnitude 6.5 or greater or ones that caused fatalities, injuries, or substantial damage.

[294]    For earthquakes that occurred in the first half of each month (from the 1st through 15th), I calculated the change in price by dividing the current month's price by the prior month's price, and for earthquakes that occurred in the second half of each month, I calculated the change in price by dividing the following month's price by the current month's price.

[295]    Dr. O'Brien also cites a March 2002 earthquake in Taiwan as an additional significant event with the "potential to influence the price of DRAM in ways unknowable by Dr. White's methodology". See the expert report of Vincent O'Brien (March 7, 2008) at 23.

prices did not increase following these earthquakes, and this fact would have contradicted their cherry-picked story about the September 1999 earthquake in Taiwan causing prices to increase.

**Figure 193: Significant earthquakes in Japan and Taiwan (1994-2007)**



Source: WSTS; U.S. Geological Survey

**Figure 194: DRAM price movements following significant earthquakes in Taiwan and Japan**

| Year | Number of earthquakes in Taiwan and Japan | Prices went up by 5% or more within 1 month | Prices went down by 5% or more within 1 month |
|---|---|---|---|
| 1994 | 6 | 0 | 2 |
| 1995 | 6 | 1 | 0 |
| 1996 | 8 | 0 | 8 |
| 1997 | 7 | 4 | 1 |
| 1998 | 5 | 0 | 1 |
| 1999 | 4 | 3 | 1 |
| 2000 | 10 | 8 | 2 |
| 2001 | 4 | 1 | 3 |
| 2002 | 3 | 0 | 3 |
| 2003 | 7 | 2 | 1 |
| 2004 | 15 | 1 | 3 |
| 2005 | 11 | 0 | 6 |
| 2006 | 3 | 0 | 1 |
| 2007 | 3 | 0 | 2 |
| Total | 92 | 20 | 34 |

Source: WSTS, U.S. Geological Survey

**Figure 195: DRAM price movements after earthquakes in Taiwan and Japan**



Source: WSTS; U.S. Geological Survey

### G.1.2. Introductions of new versions of Windows

(363) Several of the defendants' experts have asserted that the introductions of new Windows operating systems (OS), particularly Windows XP, are important demand factors that I omitted from my analysis.[296] However, none of the defendants' experts have offered any affirmative analysis supporting their assertions. In fact, I did consider the introduction of new operating systems as a demand factor and concluded that the introductions of new Windows operating systems are already adequately accounted for in my analysis.

(364) Interestingly, Dr. Shapiro criticizes my analysis for not considering the introduction of Windows XP, yet he previously testified in the MDL phase of this DRAM litigation that he ran versions of his own econometric analysis with a variable accounting for the introduction of Windows XP. He ultimately decided not to include a Windows XP variable in his final analysis because "we ran it with that and it didn't make any difference…it's by no means clear how to do it well… there is a nonobvious tricky question about how to model it and we tried a few different things; they didn't seem to matter."[297] Dr. Shapiro correctly pointed out that "People knew [Windows XP] was

---

[296] See March 7, 2008, expert reports Carl Shapiro (p. 13), Victor DeDios (p.17), Vincent O'Brien (¶ 53), Benjamin Klein (¶ 83), Daniel Rubinfeld (¶ 300, 314-315), and Joseph Kalt (¶ 124, 144, 146, 173-177).

[297] Deposition of Carl Shapiro (October 6, 2006), at 87-88.

coming…It would be anticipated both in terms of potentially [sic] production decisions, demand, inventories."[298]

(365)    Similarly, other Windows OS releases, including Windows 98 and Windows 2000, would have been anticipated prior to their introduction. Because of the well-publicized and well-anticipated nature of the new software releases, these events would not have generated substantial unanticipated demand for DRAM, nor do they require special consideration separate from the demand variables already included in my analysis.

(366)    Although demand for computers may increase in response to the introduction of a new operating system, this demand change is already adequately accounted for in my model. Specifically, the inclusion of the "U.S. Industrial Production Index for Computer and Peripheral Equipment" and the "U.S. Industrial Production Index for Information Processing and Related Equipment" capture demand for computers and therefore also capture the derived demand for DRAM related to the introduction of a new operating system. Dr. Shapiro apparently agrees with this opinion, as he stated, "it's reasonable to think the effects might phase in as well as more computers got shipped with Windows XP and so forth."[299]

(367)    Furthermore, defendant documents and industry trade press indicate that new operating systems did not generate substantial unanticipated demand for DRAM. The following quotes from industry trade press around the times of the Windows 98, Windows 2000, and Windows XP are examples of articles discussing the potential impact of the introduction of new operating systems.

- **Windows 98**: The April 1998 issue of DeDios' *The DRAM Market Advisor* states, "Windows 98…will have only a limited effect on demand because only a small portion of PC production has less than 32 MB of base memory…Historically, a new Windows operating system would have a step-function effect on DRAM demand...We do not expect the same for Windows 98, which has a June release date. In April, 87.8 percent of desktop PC production and 74 percent of notebook PC production have 32MB of base memory or more and are capable of running Windows 98 at recommended levels…The features of Windows 98 are not compelling enough to push for a rapid upgrade rate."[300]
- **Windows 98**: An internal Hynix email dated June 15, 1998, quotes a trade press article stating, "The incentive from Windows 98 has not appeared to increase DRAM demand so far."[301]

---

[298]   Deposition of Carl Shapiro (October 6, 2006), at 87.

[299]   Deposition of Carl Shapiro (October 6, 2006), at 87.

[300]   HSA 00649753-772 at 757.

[301]   HSA 006638034-73 at HSA 006638054.

- **Windows 2000:** A November 2, 1999 news article citing Dataquest and Technology Business Research analysts reports, "Windows 2000 faces multiple problems out of the gate…including weak demand as corporations work through the Y2K technology glitch and competition from the introduction of Monterey [the Unix version of Windows] in the second half of 2000."[302]

- **Windows 2000:** The February 24, 2000 edition of DeDios' *The DRAM Market Advisor* states, "The impact of Windows 2000 will be somewhat limited in Q200 because consumer versions of the systems software will be shipped in the fall of 2000 and the commercial market takes its time in adopting a new operating system until most bugs are identified and resolved."[303]

- **Windows XP:** A June article states, "Some DRAM chip makers are hoping that the launch of Microsoft's Windows XP operation system, slated for Oct. 25, will give a boost to flagging sales. But as [Dataquest senior analyst Andrew] Norwood pointed out, that had also been the hope with the releases of Window 95, 98 and 2000, and such gains never materialized… 'In order for Windows XP to make a difference to the DRAM market, you'd have to see everyone tripling their DRAM, and that doesn't look like it's going to happen," Norwood said."[304]

- **Windows XP:** An August 29, 2001, article published in the Korean newspaper *Chosun Ilbo* states, "The sluggish demand for memory chips even after the news of production reduction by some semiconductor makers and the introduction of Windows XP by Microsoft, is responsible for the falling price of semiconductors"[305]

- **Windows XP**: An IBM presentation dated November 29, 2001, with the heading "November DRAM Market Conditions" states, "Slow penetration of Pentium 4 for Windows XP. 4Q seasonal demand not materializing. Overall 4Q demand slower than projected."[306]

- **Windows XP**: An October 11, 2001, Bloomberg news article also voiced pre-release pessimism about demand for Windows XP, stating, **"**The rollout of Windows XP won't create enough demand for personal computers to offset the negative impact of war on consumption in the biggest PC market."[307]

---

[302] Stephanie Miles, "Some may take wait-and-see approach to Windows 2000," CNET News, 2 Nov 1999, http://www.news.com/2100-1040-232331.html.

[303] MU00674607-MU00674631 at MU00674615-16.

[304] Laura Rohde, "Dataquest: DRAM market to shrink by 55 percent in 2001," InfoWorld Daily News, 21 Jun 2001, http://www.infoworld.com/articles/hn/xml/01/06/21/010621hndram.html.

[305] Hwang Sun-Hyun, "DRAM Prices Continue to Fall," *Chosun Ilbo*, 29 Aug 2001.

[306] ITAG-00355747.

[307] "XP no panacea: Chip seller" Bloomberg, 11 Oct 2001, http://www.taipeitimes.com/News/Worldbiz/archives/2001/10/106716.

- **Windows XP**: The November 2001 issue of DeDios' *The DRAM Market Advisor* states, "we expect continuous momentum in MB-per-system growth, driven by increasing penetration of Windows XP…However, poor PC box demand and profits will limit the DRAM industry's ability to raise prices too abruptly…We have heard several comments that Windows XP (WinXP) has not improved DRAM demand."[308]

### G.1.3. Increase in MB per PC

(368)    The defendants' experts also have asserted that the introductions of new Windows operating systems were a driving factor behind increases in MB per PC during the conspiracy period.[309] The defendants' experts have assumed that these new Windows operating systems spurred memory upgrades because of increased memory requirements. However, they apparently neglected to test their assumptions using the defendants' own data, as they would have noticed that the data undermine their assumptions.

(369)    While it is true that each successive Windows operating systems generally required more memory, as shown above, major PC makers were already selling PCs with more DRAM than the recommended memory needed to run the new Windows operating systems at the time they were introduced. Figure 192Figure 196 shows Windows operating system releases and memory requirements.

---

[308]    ITAG-00009282-312 at ITAG-00009283-84.

[309]    See March 7, 2008, expert reports Victor DeDios (p. 12, 17), Benjamin Klein (¶ 83), Daniel Rubinfeld (¶ 314-315), and Joseph Kalt (¶ 124, 144, 146, 174-177).

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.                              Appendix G: Exogenous event study

**Figure 196: Windows operating system releases and memory requirements**

| Operating system | System | Release date* | Minimum system memory[**] | Recommended system memory** |
|---|---|---|---|---|
| Windows 95 | PC | Aug. 1995 | 4MB | 8MB |
| Windows NT 4.0 | Workstation | Jul. 1996 | 12/16 MB | 32MB |
| Windows 98 | PC | Jun. 1998 | 16MB | 24MB |
| Windows 98SE | PC | May 1999 | 16MB | 24MB |
| Windows 2000 Professional | PC | Feb. 2000 | 32MB | 64MB |
| Windows 2000 Server | Server | Feb. 2000 | 128MB | 256MB |
| Windows ME | PC | Sep. 2000 | 32MB | 64MB |
| Windows XP | PC | Oct. 2001 | 64MB | 128MB |
| Windows Server 2003 | Server | Apr. 2003 | 128MB | 256MB |
| Windows Vista Basic | PC | Jan. 2007 | 512MB | 512MB |
| Windows Vista Premium | PC | Jan. 2007 | 1024MB | 1024MB |

\* Source: Microsoft website, http://www.microsoft.com
\*\* Source: Windows website, http://support.windows.com

(370)    As can be seen in Figure 197, the average MB per PC was greater than the total MB of DRAM recommended by Microsoft for each PC operating system.

- In 1995, the average MB per PC was 16MB, which was 200% greater than the 8MB recommended for Windows 95.
- In 1998, the average MB per PC was 64MB, which was 266% greater than the 24MB recommended for Windows 98.
- In 1999, the average MB per PC was 104MB, which was 432% greater than the 24MB recommended for Windows 98SE.
- In 2000, the average MB per PC was 152MB, which was 237% greater than the 64MB recommended for Windows 2000.
- In 2001, the average MB per PC was 217MB, which was 170% greater than the 128MB recommended for Windows XP.

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.                    Appendix G: Exogenous event study

**Figure 197: Recommended memory for Windows OS v. average MB per PC**

Source: DEDR-001-000641; Windows website

(371)    Additionally, as noted above, the introductions of new Windows operating systems and the amount of DRAM that would be required to run them would have been anticipated well in advance of their releases, and DRAM manufacturers would have accounted for these releases in terms of production decisions. In fact, the defendants do appear to have prepared for these releases and memory requirements. As can be seen in Figure 198, the most commonly sold module in each quarter that a new Windows operating systems was released had a density that was either equal to, or in most cases, greater than the recommended memory for each operating system. Moreover, more than half of all modules sold in the quarter in which a Windows operating system was introduced had a density greater than the total recommended memory for each operating system. In fact, more than 70% of all modules sold in the same quarter in which a Windows operating system was released had a density that was greater than the recommended memory. The one exception is for Windows ME, which was released when only 55% of all modules sold had a density that met or exceeded the recommended density. However, as Dr. Kalt noted, "Windows ME was notable for its lack of success in the marketplace."[310]

---

[310]    Expert Report of Joseph Kalt at ¶175.

Highly confidential

**Figure 198: Comparison of operating system MB requirements and module sales by density**

| Operating system | Recommended system memory** | Most common module density sold in quarter of OS release | Most common module density sold as a % of total module sales in quarter | Percent of modules sold in quarter with a density >= recommended system memory |
|---|---|---|---|---|
| Windows 98 | 24MB | 32MB | 49% | 79% |
| Windows 98SE | 24MB | 64MB | 45% | 70% |
| Windows 2000 Pro | 64MB | 64MB | 50% | 91% |
| Windows ME | 64MB | 128MB | 46% | 55% |
| Windows XP | 128MB | 128MB | 58% | 88% |

Source: Defendant sales data

### G.1.4. Technology boom and bust

(372)   Several defendants' experts have claimed that I failed to account for the impact of the "tech boom" and "tech bust" (also referred to as the "dot-com" bubble) and Y2K on DRAM prices during the plea period.[311] These experts reach this conclusion by ignoring the demand variables I have included in my damages analysis.

(373)   As I discussed in my initial report,[312] demand for DRAM is a derived demand, meaning that demand for DRAM is driven by demand for end-use products that include DRAM. Thus demand for DRAM is derived from the production of end-use products such as computers, servers, peripheral equipment, and telecommunications equipment, and demand for DRAM increases or decreases when production of these products increases or decreases. Because of this relationship, I have included four variables in my damage analysis to account for U.S. and German production of computers, servers, computer printers, routers, hubs, and switches, and printed circuit assemblies:[313]

- U.S. Industrial Production Index for Computer and Peripheral Equipment
- U.S. Industrial Production Index for Information Processing and Related Equipment
- German Industrial Production Index for Manufacture of Computers and Other Information Processing Equipment
- German Price Index for Manufacture of Computers and Other Information Processing Equipment

---

[311]   See, e.g., Expert Report of Kevin Murphy at ¶97 and ¶173, Expert Report of Robert Topel at ¶69, Expert Report of Benjamin Klein at ¶82, Expert Report of Vincent O'Brien at ¶53, and Expert report of Victor De Dios at 7.

[312]   Expert Report of Halbert White ¶72.

[313]   Expert Report of Halbert White at ¶301-302; Reliable data for the production of end-use equipment in other countries, such as Korea and Taiwan, were not available.

(374)    As can be seen in Figure 199 through Figure 202 below, which are identical to Figures 59-62 in my initial report, these four series all show production increases for these end-use equipment through 2000, corresponding to the "tech boom," followed by a decline in production, corresponding to the "tech bust." Including any additional variables that exhibit the same patterns would be superfluous. Nevertheless, I have analyzed the series suggested by defendants' experts and determined that they have no effect on my damages analysis.

**Figure 199: U.S. Industrial Production Index for Computer and Peripheral Equipment**



Source: FED[314]

---

[314]    Federal Reserve Board of Governors, "Industrial Production Index for Computer and Peripheral Equipment", http://www.federalreserve.gov, (accessed December 11, 2007).

Rebuttal Expert Report of Halbert L. White, Jr., Ph.D.                    Appendix G: Exogenous event study

**Figure 200: U.S. Industrial Production Index for Information Processing and Related Equipment**



Source: FED[315]

**Figure 201: German Industrial Production Index for Manufacture of Computers and Other Information Processing Equipment**



Source: EUROSTAT[316]

---

[315]    Federal Reserve Board of Governors, "Industrial Production Index for Information Processing and Related Equipment", http://www.federalreserve.gov, (accessed December 11, 2007).

**Figure 202: German Price Index for Manufacture of Computers and Other Information Processing Equipment**

Source: EUROSTAT[317]

(375)   Drs. Murphy and Topel use the NASDAQ index of the stock prices of corporations making computers and related equipment ("NASDAQ Computer Index") as a demand variable in their analysis.[318] A comparison of this NASDAQ index to the two U.S. IPI series included in my analysis, as shown in Figure 203 shows that all three series increased from 1996 through mid-2001 and then declined before increasing moderately. I believe that the demand indicators in my analysis are a more appropriate measure of demand than the NASDAQ Computer Index because the NASDAQ Computer Index is affected by factors other than demand. For example, the index is affected by interest rates, which I also have included as indicators, the overall status of the economy, and a host of non-economic factors such as the psychology of investors during a stock market bubble. My indicators account for the underlying demand increases and decreases associated with the tech boom and bust without relying on non-economic movements related to investor psychology.

---

[316]   Statistical Office of the European Communities (EUROSTAT), "Industrial Production Index for Manufacture of Computers and Other Information Processing Equipment", http://epp.eurostat.ec.europa.eu, (accessed December 11, 2007).

[317]   Statistical Office of the European Communities (EUROSTAT), "Price Index for Manufacture of Computers and Other Information Processing Equipment", http://epp.eurostat.ec.europa.eu, (accessed December 11, 2007).

[318]   Expert Report of Kevin Murphy at ¶93 and Expert Report of Robert Topel at ¶70.

**Figure 203: Comparison of demand shifters and NASDAQ Computer Index**



Source: Federal Reserve Board of Governors; Yahoo! Finance

### G.1.5. Y2K

(376)   Defendants' experts also claim I failed to account for increased demand caused by concerns about the Y2K switchover.[319,320] Nevertheless, to the extent that concern for the potential Y2K problem led to replacement of older computers and electronic equipment, I have accounted for this increased demand by including the four previously mentioned demand indicators.

(377)   Additionally, none of the defendants' experts provide any substantial evidence that suggests that Y2K accounted for increased demand for DRAM. Mr. De Dios' report contains no citations to his claims that Y2K led to increased demand for PCs in 1999, and in fact, his contemporaneous issues of *The DRAM Market Advisor* contradict the assertions he makes in his expert testimony, as I discuss below. Dr. Shapiro simply repeats the claims made by Mr. De Dios and cites his report.

---

[319]   See, e.g., Expert Report of Carl Shapiro at 10, Expert Report of Benjamin Klein at ¶82, Expert Report of Victor De Dios at 7 and 22.

[320]   The Y2K switchover was a one-time phenomenon caused by the fact that many computers stored dates using only the last two digits of the year. When the year changed from 1999 to 2000, there was mass speculation that many older computers would interpret the year as 1900 rather than 2000, leading to catastrophic system failures. This speculation purportedly led many consumers and businesses to purchase new computers in which the "Y2K bug" was fixed.

(378)    Dr. Klein cites several sources that contradict his statement that "there was a large unexpected increase in demand for PCs in the fourth quarter of 1999 which was attributed in part to concerns over Y2K."[321] These contradictions are discussed below. Moreover, Dr. Klein's assertion that Y2K caused an *unexpected* increase in demand for PCs is not plausible, given that the potential issues concerning the Y2K switchover were known years in advance.

- Dr. Klein cites an article by J. Robert Lineback, but this article quotes an industry analyst who described the claims that Y2K caused increased demand for DRAM as "too simplistic."[322] The article then refers back to an earlier article titled, "Researcher dismisses Y2K impact on DRAM pricing" in which the same analyst says, "Predictions of Y2K concerns causing a run on DRAMs are not playing out in the memory market… 'Some analysts are currently pointing to Y2K as the reason for the recent volatility in DRAM prices that they have seen. This is too simplistic.'" [323]
- He cites testimony of Il Ung Kim of Samsung.[324] Although Kim does refer to a "Y2K bubble" as Dr. Klein indicates, Kim says that projected DRAM demand relating to Y2K was much greater than actual demand, resulting in excess DRAM supply.[325]

(379)    Defendants' experts' claims that Y2K concerns resulted in increased demand for DRAM are simply not supported by the factual record. In fact, contemporaneous industry trade press indicate that demand for computers actually may have been reduced leading up to Y2K, as IT departments placed new orders on hold until the Y2K problem could be fixed. For example:

- The January 25, 1999 edition of DeDios' *The DRAM Market Advisor* stated, "demand for commercial desktop PCs weakened towards the end of the year [1998] putting into question the claims that Y2K will be the major driver of PC demand through 1H99."[326]
- The October 8, 1999 edition of DeDios' *The DRAM Market Advisor* stated, "We also expect demand for commercial desktops and servers to weaken as organizations fix their systems to establish Y2K compliance by the end of the year."[327]

---

[321]    Expert Report of Benjamin Klein at ¶82.

[322]    J. Robert Lineback, "Two good years may move up DRAM sales to peak '95 level," EETimes, 3 Jan. 2000, http://www.eetimes.com/news/semi/showArticle.jhtml?articleID=10810926&printable=true.

[323]    "Researcher dismisses Y2K impact on DRAM pricing," SiliconStrategies (reprinted at EETimes.com), 10 Dec. 1999, http://www.eetimes.com/showArticle.jhtml?articleID=10817522.

[324]    Expert Report of Benjamin Klein at ¶82.

[325]    Deposition of Il Ung Kim (Samsung), January 10, 2008 at 152: "In 2001, after the Y2K bubble was gone, the demand itself that we projected was much more than the actual projection. So there was -- there was a surplus of supply."

[326]    MU00674453-473 at 456.

[327]    MU00674532-550 at 540.

- The December 17, 1999 edition of DeDios' *The DRAM Market Advisor* stated, "It is difficult to determine the strength of PC demand and PC production in Q1 2000. As we have said, we do not subscribe to the Y2K-based argument for a strong Q1 2000."[328]

- A February 11, 2000 article stated, "Y2K purchasing lockdowns at companies reduced anticipated PC revenue at major OEMs, including Compaq Computer Corp., Gateway Inc., and IBM Corp."[329]

- A February 25, 2000 article stated, "Some contend OEMs are disposing of large excess stocks that accumulated when Y2K supply disruptions failed to materialize."[330]

(380)   Despite the above contemporaneous statements from DeDios's *The DRAM Market Advisor* indicating that Y2K may cause demand to weaken, Mr. De Dios contradicted himself in his expert report by claiming that Y2K caused increases in demand in 1999: "This but-for pricing is not reasonable considering strong demand conditions at various times from 1999 to 2001, caused by, among several other factors, increased computer and IT spending due to the Y2K issue in 1999…"[331] He also claimed that in Q4 1999, "the strength of the Y2K-driven demand for PCs caused supply shortages of PC components such as core-logic chipsets, DRAMs, passives, and LCD screens."[332] Again, this claim contradicts his contemporaneous assertion that demand for PCs was weakening in Q4 1999 because of Y2K.

(381)   Finally, note that all of the above statements relating to demand focus on PCs and other products in which DRAM is a component, as is appropriate given that demand for DRAM is a derived demand. By including the four demand measures previously mentioned, my analysis properly accounts for any Y2K effects.

---

[328]   MU00674566-583 at 571.

[329]   Bolaji Ojo, "Quarterly Financial Review: PC OEMs start 2000 on sour note," ebnonline, 11 Feb 2000, downloaded 16 Jun 2004.

[330]   Jack Robertson, "DRAM prices heading south," ebnonline, 25 Feb 2000, downloaded 16 Jun 2004.

[331]   Expert Report of Victor De Dios at 7.

[332]   Expert Report of Victor De Dios at 22.

# Exhibit 27

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Sun Microsystems, Inc., a            )
California corporation, and          )
Unisys Corporation, a Delaware       )
corporation,                         )
                                     ) CV 06-01665 PHJ
            Plaintiffs,      ) (Consolidated)
                                     )
            v.               )
                                     )
Hynix Semiconductor, Inc., a         )
Korean Corporation, et. al., and     )
DOES 1 through 5,                    )
                                     )
            Defendants.      )
_____)
                             )

DEPOSITION OF ELMAR PIESCH

MUNICH, GERMANY

NOVEMBER 28, 2007

2:00 P.M.

CARMELITA M. LEE, CSR

HIGHLY CONFIDENTIAL

spot market?

MR. BLECHMAN:  Objection as to form, and also lack of foundation.  You can answer.

THE WITNESS:  Yes.

Q.   BY MR. HOWARD:  Why did Infineon sell on the spot market?

MR. BLECHMAN:  Objection, lack of foundation. You may answer.

THE WITNESS:  Very, very simple.  First all, we cannot just rely upon a handful of big customers because they have ups and downs in their demand as well, and the other thing is, not participating in the spot market means that we are not hundred percent on line what is really happening in the market in terms of prices.

Q.   BY MR. HOWARD:  Is that because of the spot market --

A.   It is important for a manufacturer to have this information.  Without it, they cannot do their business correctly.

Q.   What information?

A.   Where the price is going, it's going upwards, downwards, staying stable, because it is a good indicator where the demand is, is the demand good?  Is it decreasing?  Is it increasing?

Q.   Was it part of your responsibility in Infineon to

make sales on the spot market?

A. No.

Q. No. But were you interested to know what was going on with the prices in the spot market?

A. Yes.

Q. Why?

MR. BLECHMAN: Objection, asked and answered.

THE WITNESS: It is hard to define.

Q. BY MR. HOWARD: Is that because spot market prices are relevant to you in making decisions about pricing to some?

MR. BLECHMAN: Objection, distorts the testimony. You can answer.

THE WITNESS: Yes.

Q. BY MR. HOWARD: And when you -- how did you consult spot market prices? What sources did you use? How did you determine those prices?

A. I cannot give you a hundred percent answer on this. We had a separate department which was dealing with such customers, and we were talking on a daily basis to those guys, and just to keep good informed, and with that information we -- we were of the tendency, we saw out of this, you know, we were doing our decisions, or based on this we were doing our decisions.

Q. Your decisions on what price to bid to Sun;

right?

MR. BLECHMAN: Objection to form, you may answer.

THE WITNESS: Not necessarily, but it was a part of it.

Q.  BY MR. HOWARD: Okay.  Did any of your competitors during this time period also sell DRAM or DRAM modules in the spot market?

MR. BLECHMAN: Objection, lack of foundation.

THE WITNESS: I don't know.

Q.  BY MR. HOWARD: All right.  Did Sun buy any DRAM or DRAM modules from the spot market?

A.  I don't know.

MR. BLECHMAN: Objection, lack of foundation. And once again, give me a chance to object, okay?

Q.  BY MR. HOWARD: Are you aware of any written contracts for the sale of DRAM or DRAM modules to any purchaser, which ever referenced the spot market price?

A.  Can you repeat that, please?

Q.  Yeah.  Are you aware of any written contracts for the sale of DRAM or DRAM modules which refer to your reference the spot market pricing?

A.  No.

Q.  Okay.  So I take it at Infineon there was a group separate from your group that dealt with sales to the spot; right?

A.   Uh-huh.

MR. BLECHMAN:  Objection as to form, and also asked and answered, and once again, give me a chance to object before you say uh-huh.

THE WITNESS:  I was just --

MR. BLECHMAN:  I understand why you are not using your full speech, but what I am saying is I need at least a second between the question and the answer to object.

THE WITNESS:  It was not an answer.  I was just --

MR. BLECHMAN:  Okay.  You were just clearing your throat.

THE WITNESS:  Yes.

MR. BLECHMAN:  Okay.

Q.   BY MR. HOWARD:  During the period you were the Sun account rep, do you know what proportion of Infineon's DRAM or DRAM module sales were made to the spot market?

A.   No.

Q.   Can you give me a rough approximation?

MR. BLECHMAN:  Objection, calls for speculation.

THE WITNESS:  I have no idea.

Q.   BY MR. HOWARD:  During that time period, do you believe that Infineon made significant sales to the spot market?

MR. BLECHMAN:  Objection as to form, vague, you

can answer.

THE WITNESS:  I cannot answer this.

Q.  BY MR. HOWARD:  Okay.

In negotiations with you, did Sun people ever reference spot market prices?

A.  Can you repeat that?

Q.  When you had communications with Sun, did the Sun people ever refer to spot prices?

A.  I don't know, I cannot remember.

Q.  During the time you were the Sun account rep, were you ever made aware of prices offered by your competitors to Sun?

A.  Yes.

Q.  Can you tell me what circumstances?

A.  Well, we had been talking to Sun directly, to the production guys, and they very often told us where the competition is, especially when we -- when our offerings were too high.

Q.  Are contracts that Sun has with your competitors, are they available to you to see?

MR. BLECHMAN:  I am missing a word, was it contacts or contracts?

THE REPORTER:  Contracts.

Q.  BY MR. HOWARD:  During the time you were the Sun account rep, who were your DRAM competitors?

is 1637.

(Recessed from 4:37 to 4:44 p.m.)

THE VIDEOGRAPHER:  We are back on the record, the time is 1644.

(Exhibit 7 marked for identification).

Q.   BY MR. HOWARD:  I'll show you what has been marked as Exhibit 7, and ask if you can tell me what it is.

A.   This is the master purchase agreement regulating the full business between Dell and Infineon.

Q.   And it is signed in two places on behalf of Infineon by Gunter Hefner; right?

MR. BLECHMAN:  Objection, document speaks for itself.  You can answer.

THE WITNESS:  Yes.

Q.   BY MR. HOWARD:  And it is dated September 11th, 2001; correct?

A.   Uh-huh.

Q.   And that date is within the time period to which Gunter Hefner pled guilty for fixing prices for DRAM; isn't that right?

MR. BLECHMAN:  Objection, lack of foundation.

THE WITNESS:  Yes.

Q.   BY MR. HOWARD:  And if you turn to the first page of Exhibit 7, directing your attention to paragraph 3.3,

it provides, and I quote: "Infineon represents and

warrants that the prices for products shall not be less

favourable than prices applicable to sales by Infineon to

any other customer outside of Germany purchasing like

quantities of substantially comparable products during

like periods of time under like terms and conditions, MFC

price"; right?

    MR. BLECHMAN:  Objection, the document speaks for

itself.

    THE WITNESS:  Yes.

    Q.  BY MR. HOWARD:  Now, the phrase "any other

customer," would that have potentially included Sun

Microsystems?

    MR. BLECHMAN:  Objection, lack of foundation.

    THE WITNESS:  Yes.

    Q.  BY MR. HOWARD:  And Sun was one of the OEM

accounts; right?

    A.  Yes.

    Q.  Was your OEM account?

    A.  Yeah.

    Q.  So if, during the period, Infineon had sold DRAM

chips or DRAM modules to Sun at a price lower than it sold

to Dell, this clause could have applied; right?

    MR. BLECHMAN:  Objection, calls for a legal

conclusion, lack of foundation.

THE WITNESS:  Yes.

Q.  BY MR. HOWARD:  Why would Infineon have agreed to a clause such as this?

A.  I don't know.

Q.  Does this refresh your recollection that Infineon in fact entered into a most favored customer or MFC promises?

A.  No.

Q.  Okay.

MR. HOWARD:  No further questions.

MR. BLECHMAN:  I have no questions.

MR. HOWARD:  Thank you for your time and cooperation.

THE VIDEOGRAPHER:  This concludes the deposition of Elmar Piesch.  The total number of tapes is two.  We are going off the record.  The time is 1649.

(The deposition concluded at 4:49 p.m.)

_____

Mr. Elmar Piesch

CERTIFICATE

I, Carmelita E. Lee, CSR, Official Court Reporter, hereby certify that pursuant to Section 733, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically recorded proceedings in the above matter.

Signed this 3rd day of December, 2007.


_____

Carmelita E. Lee, CSR

Official Court Reporter

CERTIFICATE

ERRATA PAGE

I, the undersigned, do hereby certify that I have read the foregoing transcript and that, to the best of my knowledge, said testimony is true (with the exception of the following changes listed below):

Page   Line    As Reported        As Corrected

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

DATE            SIGNATURE