Jerome A. Murphy *(pro hac vice)*
David D. Cross *(pro hac vice)*
Matthew J. McBurney *(pro hac vice)*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
Telephone:     202-624-2500
Facsimile:     202-628-5116
E-mail:        jmurphy@crowell.com
               dcross@crowell.com
               mmcburney@crowell.com

Daniel A. Sasse (CA Bar No. 236234)
Theresa Lopez (CA Bar No. 205338)
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA  92614-8505
Telephone:     949-263-8400
Facsimile:     949-263-8414
E-mail:        dsasse@crowell.com
               tlopez@crowell.com

*Counsel for Plaintiff Sun Microsystems, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| SUN MICROSYSTEMS, INC., | ) | Case No. C 06-01665 PJH |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF SUN MICROSYSTEMS, INC.'S** |
| v. | ) | **MEMORANDUM IN OPPOSITION TO** |
| | ) | **DEFENDANTS' MOTION FOR PARTIAL** |
| HYNIX SEMICONDUCTOR, INC., et al., | ) | **SUMMARY JUDGMENT AS TO** |
| | ) | **EXTERNAL MANUFACTURER** |
| Defendants. | ) | **PURCHASES** |
| | ) | |
| | ) | Hearing Date:  December 10, 2008 |
| | ) | Hearing Time:  9:00 a.m. |
| | ) | Judge:  Hon. Phyllis J. Hamilton |
| | ) | Courtroom:  3. 17th Floor |

CASE NO. C 06- 01665 PJH

## **TABLE OF CONTENTS**

I.  STATEMENT OF FACTS ...................................................................................2

    A.  The DRAM Procurement Process....................................................... 2

    B.  The Procurement Process for Products Containing DRAM. ...............................6

II.  ARGUMENT ...................................................................................................7

    C.  Summary Judgment Standard ........................................................8

    D.  As a Direct Purchaser, Sun is Entitled to Bring Suit Under the Federal Antitrust Laws to Recover Overcharges Resulting from Deliveries of DRAM to its External Manufacturers...................................................9

    E.  Even if Sun is Deemed to be an Indirect Purchaser of DRAM Delivered to Its External Manufacturers, Sun is Still Entitled to Assert Claims Based On Such Deliveries Under the Federal Antitrust Laws. .............12

        1.  Sun's Relationships with its External Manufacturers Relating to the Purchase of DRAM Satisfy the "Control Exception" to the Rule Against Indirect Purchasers Bringing Suit Under the Federal Antitrust Laws..........................................................12

        2.  Permitting Sun to Bring Suit Under the Federal Antitrust Laws Will Not Offend the Policy Concerns Behind the Rule Against Indirect Purchasers Bringing Suit Under the Federal Antitrust Laws. ..................................................................16

    F.  Summary Judgment for Defendants is Not Appropriate Here............................18

    G.  The Pass-through Defense is Not Available to Defendants................................19

III.  CONCLUSION................................................................................................19

1

# **TABLE OF AUTHORITIES**

2

3

# **CASES**

4

*Alioto v. United States,*
   593 F. Supp. 1402 (N.D. Cal. 1984)....................................................................................9, 19

5

6

*Am. Soc'y of Mech. Eng'r v. Hydrolevel Corp.,*
   456 U.S. 556 (1982)...........................................................................................................9

7

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)...........................................................................................................8

8

9

*Bowoto v. Chevron Texaco Corp.,*
   312 F. Supp. 2d 1229 (N.D. Cal. 2004).........................................................................9, 10

10

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.,*
   141 F.R.D. 144 (N.D. Cal. 1991)......................................................................................16

11

12

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)...........................................................................................................8

13

*Datagate, Inc. v. Hewlett-Packard Co.,*
   672 F. Supp. 1288 (N.D. Cal. 1987).............................................................................8, 18

14

15

*E. & J. Gallo Winery v. Encana Energy Servs., Inc.,*
   Case No. 03-cv-5412, 2008 U.S. Dist. LEXIS 46927 (E.D. Cal. May 27, 2008) ...........9, 11

16

*Illinois Brick Co. v. Illinois,*
   431 U.S. 720 (1977).....................................................................................................13, 16

17

18

*In re Brand Name Prescription Drugs Antitrust Litigation,*
   123 F.3d 599 (7th Cir. 1997) ............................................................................................15

19

*In re Coupon Clearing Service, Inc.,*
   113 F.3d 1091 (9th Cir. 1997) .....................................................................................10, 11

20

21

*In re Toilet Seat Antitrust Litigation,*
   1977-2 Trade Cas. P 61,601 (E.D. Mich. 1977) .........................................................13, 14

22

*Jewish Hospital Association of Louisville, Ky., Inc. v. Stewart*
   *Mechanical Enterprises, Inc.,* 628 F.2d 971 (6th Cir. 1980),
   *cert. denied,* 450 U.S. 966, 101 S.Ct. 1483, 67 L.Ed.2d 615 (1981)..................................13

23

24

*Labrador, Inc. v. Iams Co.,*
   1997 U.S. App. LEXIS 418 (9th Cir. Jan. 8, 1997).........................................................13

25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986)...........................................................................................................9

26

*Nat'l Football Scouting, Inc. v. Continental Assurance Co.,*
   931 F.2d 646 (10th Cir. 1991) ..........................................................................................18

27

28

*Newman v. Checkrite Cal., Inc.,*

912 F. Supp. 1354 (E.D. Cal. 1995) ....................................................9

*Qwest Commc'n Corp. v. Herakles, LLC*, Case No. 07-cv-00393-MCE-KJM, 2008
U.S. Dist. LEXIS 22154 (E.D. Cal. Mar. 20, 2008) .................................10

*Royal Printing Co. v. Kimberly-Clark Corp.*,
621 F.2d 323 (9th Cir. 1980) .........................................................18

## <u>RULES</u>

Fed. R. Civ. P. 56.....................................................................8

## <u>OTHER AUTHORITIES</u>

Restatement (Third) of Agency § 1.02 ...............................................11

PLAINTIFF SUN MICROSYSTEMS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO EXTERNAL MANUFACTURER PURCHASES

Plaintiff Sun Microsystems, Inc. ("Sun") files this memorandum in opposition to Elpida Memory, Inc., Elpida Memory (USA) Inc., Hynix Semiconductor Inc., Hynix Semiconductor America Inc., Nanya Technology Corporation, and Nanya Technology Corporation USA's July 30, 2008 motion for partial summary judgment as to external manufacturer purchases ("Motion"). The purchases at issue in this Motion amount to approximately $179 million worth of DRAM, or around 6% of Sun's total DRAM purchases.[1] The evidentiary record in this case establishes that the external manufacturers, the DRAM suppliers, and Sun all viewed Sun as the direct purchaser of the DRAM at issue here and that the external manufacturers acted as mere agents of Sun in executing Sun's instructions for purchasing DRAM for incorporation into Sun products. Because of this principal-agent relationship, Sun qualifies as a "direct purchaser" of the DRAM delivered to its external manufacturers, and therefore, has standing to bring claims based on such deliveries under the federal antitrust laws. Even if Sun is deemed to be an indirect purchaser of the DRAM delivered to its external manufacturers for incorporation into Sun products, these same facts demonstrate that Sun exercised sufficient control over its external manufacturers with respect to the procurement of DRAM (including dictating suppliers and prices) to meet the "control exception" to the rule against indirect purchasers bringing suit under the federal antitrust laws. As a result, regardless of whether Sun is categorized as a "direct" or "indirect" purchaser, Sun should be permitted to recover under the federal antitrust laws the damages it incurred as a result of defendants' illegal conduct. At a minimum, Sun has demonstrated that there are disputed issues of material fact precluding summary judgment on this issue and requiring that defendants' Motion be denied.

---

[1] This figure was calculated using: (1) data produced by defendants: Decl. of David D. Cross, Ex. 1, EMUS1100305; Ex. 2, HXD000001; Ex. 3, HXD000002; Ex. 4, HXD000003; Ex. 5, HXD000004; Ex. 6, HXD000005; Ex. 7, HXD006788; Ex. 8, HXD006789; Ex. 9, HXD006790; Ex. 10, HXD006791; Ex. 11, MU00844984; Ex. 12, MU00848408; Ex. 13, MU00864081; Ex. 14, MU00864085; Ex. 15, MU00868412; Ex. 16, MITSSUN00264594; Ex. 17, MITSSUN00264595; Ex. 18, "IFX Sales Database 10 January 2005"; Ex. 19, "Infineon 1996-1998 Sale Data"; and (2) data produced by Benchmark Electronics, Inc.: Ex. 20, BEI00000211; Ex. 21, BEI00000268. All references to exhibits are to the Declaration of David D. Cross, filed herewith.

# I.   STATEMENT OF FACTS

Sun is a California-based, global manufacturer of computer servers, workstations, and storage systems.  During the time period relevant to this litigation, Sun made the strategic business decision to begin outsourcing a portion of its server and workstation assembly to companies like MiTAC International Corporation, Celestica Inc., Benchmark Electronics, Inc., Smart Modular Technologies, Inc., Solectron Corporation, Expansion Electronics, Inc., and Synnex Corporation (collectively, the "EMs").  These EMs became "virtual Sun factories" producing products containing DRAM designed by Sun and bearing Sun's name.  Ex. 22, Wilson Dep. 302:22-303:2.

## A.   The DRAM Procurement Process.

As "extensions" of Sun's manufacturing operations, Sun maintained, with few exceptions, full control over the procurement of the DRAM – which was viewed as a "core commodity" by Sun – delivered to and incorporated into Sun products by the EMs.  Ex. 23, Maxwell Dep. 28:24-29:5, 34:17-21, 43:4-10; Ex. 24, Ellis Dep. 39:18-19; Ex. 25, SUN0019772-74; Ex. 74, Declaration of Peter Wilson dated September 22, 2008, ¶¶ 4-9.  First, Sun controlled the qualification of the DRAM suppliers and products that were used by the EMs in assembling Sun products.  Ex. 26, Raposa Dep. 90:5-91:22; 160:5-12; Ex. 27, Duncan Dep. 128:7-129:2; Ex. 22, Wilson Dep. 82:16-83:1; 613:5-12; Ex. 28, Long (Solectron) 62:9-64:21; Ex. 29, Russell (Benchmark) 119:19-122:20, 124:1-14; Ex. 74, Declaration of Peter Wilson dated September 22, 2008, ¶ 6; Ex. 77, Declaration of Robert Chen (MiTAC USA, Inc.) dated September 22, 2008, ¶ 6.  Second, Sun's global memory procurement team based in California dictated a single worldwide price at which the EMs were permitted to order DRAM from DRAM suppliers for incorporation into Sun products.  Ex. 29, Russell (Benchmark) 28:3-29:9, 134:1-135:6; Ex. 30, Rock (Celestica) Dep. 125:19-126:21; Ex. 28, Long (Solectron) Dep. 71:23-72:8; Ex. 31, Torelli Dep. 57:4 -58:23; Ex. 23, Maxwell Dep. 31:9-32:19, 178:21-179:7; Ex. 22, Wilson Dep. 328:10-25; Ex. 74, Declaration of Peter Wilson dated September 22, 2008, ¶ 5; Ex. 77, Declaration of Robert Chen (MiTAC USA, Inc.) dated September 22, 2008, ¶ 5.  This global memory procurement team at Sun also awarded a specific share of business to each DRAM

supplier that applied equally to all DRAM consumed by the EMs, as well as to Sun's domestic and foreign internal manufacturing facilities.  Ex. 74, Declaration of Peter Wilson dated September 22, 2008, ¶ 7; Ex. 24, Ellis Dep. 50:2-11.  When Sun first began to outsource production to the EMs, Sun would accept receipt of all DRAM and then send specific amounts to each EM.  Ex. 23, Maxwell Dep. 160:17-161:2.  As time went on, Sun realized that it would be far more efficient and economical to allow the EMs to accept direct delivery of DRAM and to outsource some administrative functions to the EMs (e.g., issuing purchase orders to the DRAM suppliers).  Ex. 23, Maxwell Dep. 160:20-161:7.

Soon thereafter, Sun instituted a process whereby its global memory procurement team would inform the EMs from whom, at what price, and at which percentage of business they should issue purchase orders for DRAM that was to be used in Sun products.  Ex. 32, Marten (Smart Modular) Dep. 45:7-47:8, 49:21-50:6; Ex. 29, Russell (Benchmark) "Dep." 28:3-29:9, 134:1-135:6; Ex. 30, Rock (Celestica) Dep. 125:19-126:21; Ex. 28, Long (Solectron) Dep. 69:6-13, 71:23-72:8, 72:20-73:8; Ex. 31, Torelli Dep. 57:4 -58:23; Ex. 23, Maxwell Dep. 31:9-32:19, 34:17-21, 178:21-179:7; Ex. 22, Wilson Dep. 328:10-25; Ex. 33, BEI00000009-19; Ex. 34, BEI00000030-31; Ex. 35, BEI00000447; Ex. 36 SUN0019846-49; Ex. 25, SUN0019772-74; Ex. 74, Declaration of Peter Wilson dated September 22, 2008, ¶¶ 5-7; Ex. 77, Declaration of Robert Chen (MiTAC USA, Inc.) dated September 22, 2008, ¶¶ 5-6.  At times, Sun even required the EMs to purchase DRAM from Sun's own inventory.  Ex. 37, SUN0200058; Ex. 38, SUN0200500-4; Ex. 39, SUN0200059.  Sun also provided the EMs with forecast information that indicated the quantity of DRAM they should order on behalf of Sun.  Ex. 29, Russell (Benchmark) Dep. 84:9-85:20, 106:17-107:13; Ex. 28, Long (Solectron) Dep. 30:3-7.

EM witnesses confirm that Sun exercised full control over DRAM pricing and supplier selection.  Ex. 77, Declaration of Robert Chen (MiTAC USA, Inc.) dated September 22, 2008, ¶¶ 5-6 ("As an External Manufacturer for Sun, MiTAC obtained DRAM for incorporation into Sun products only from specific DRAM suppliers approved by Sun.").  The EMs were expected to, and did, execute purchase orders pursuant to the directions provided by Sun.  Ex. 40, Doelling Dep. 27:24 -28:17, 29:13-30:2, 110:18-111:10; Ex. 23, Maxwell Dep. 152:3-20, 160:17-161:7;

Ex. 32, Marten (Smart Modular) Dep. 48:25-49:20; Ex. 41, SUN0020337-38, Ex. 42,

SUN0007629; Ex. 43, SUN0018775-7; Ex. 44, SUN0019071-8; Ex. 45, SUN0020015-7; Ex. 46,

SUN0018569; Ex. 47, SUN0018468-9; Ex. 48, SUN0018486-8; Ex. 49, SUN0018551; Ex. 50,

SUN0033784; Ex. 51, SUN0033765-6; Ex. 77, Declaration of Robert Chen (MiTAC USA, Inc.)

dated September 22, 2008, ¶ 5 ("MiTAC had no authority to negotiate any prices or shares of

business at which MiTAC obtained DRAM for incorporation into Sun products, nor did MiTAC

ever engage in any such negotiations.").  According to a Benchmark witness, Benchmark never

negotiated the price of any DRAM it requested for incorporation into Sun products; the company

always obtained DRAM at a price dictated by Sun.  Ex. 29, Russell (Benchmark) Dep. 51:10-

52:11, 53:21-54:1, 133:15-21.  In fact, Benchmark had no knowledge of how Sun set the price of

DRAM, because Sun was exclusively responsible for negotiating DRAM prices.  Ex. 29, Russell

Dep. 131:23-132:20.  Nor did it pay any attention to DRAM price trends or the DRAM market,

because Sun completely controlled the price of DRAM obtained by Benchmark.  Ex. 29, Russell

Dep. 198:16-199:11.  Likewise, according to a Solectron witness, Solectron never negotiated the

purchase price of DRAM for inclusion in Sun products directly with the DRAM manufacturer;

instead, the company "executed per Sun's direction," never deviating from the instructions

received from Sun.  Ex. 28, Long (Solectron) Dep. 26:15-27:1, 27:10-28:1, 61:16-19, 64:22-

65:6.  Sun also took steps to monitor the EMs' compliance, tracking DRAM consumption by the

EMs and asking DRAM suppliers whether any EMs ever sought to purchase DRAM at prices

other than the ones established by Sun.  Ex. 24, Ellis Dep. 41:11-42:5; Ex. 26, Raposa Dep.

208:12-209:7; Ex. 22, Wilson Dep. 338:23-339:12; Ex. 28, Long (Solectron) Dep. 65:7-15; Ex.

29, Russell (Benchmark) Dep. 51:10-52:11, 124:24-127:1; Ex. 52, SUN0006761-62.

 In addition, the DRAM suppliers themselves viewed Sun as the direct purchaser of the

DRAM at issue here.  Sun consistently reminded the DRAM suppliers that the business

relationship was with Sun and not the EMs.  Ex. 24, Ellis Dep. 61:15-22; Ex. 53 SUN0020335.

The DRAM suppliers accepted this fact and conducted business accordingly, refraining from

direct negotiations with the EMs and dealing directly with Sun with respect to the supply of

DRAM to the EMs.  Ex. 54, Costa Dep. 111:17-112:12 ("[Sun] told us what modules to supply

to [the EMs] and pricing, and no negotiations were allowed between us and that [EM]"); Ex. 55, SUN0012478-80; Ex. 56, SUN0172502-7; Ex. 57, SUN0033921-2; Ex. 58, SUN0019212-3; Ex. 59, SUN0019279-80; Ex. 50, SUN0033784.  At his deposition, Infineon's Richard Costa explained the situation as:

> We were given emphatic instructions not to negotiate prices with the [EMs].  Sun controlled the pricing.  We—they gave the pricing to the [EMs].  We were not allowed to quote even if the [EM] asked us for the pricing.  "What's the latest pricing?"  I'd say, "You have to go to Sun."  We were both told emphatically not to do that.

Ex. 54, Costa Dep. 148:2-13.

The DRAM suppliers also turned to Sun with respect to logistical issues associated with the supply of DRAM to the EMs, reaching out to Sun to force the EMs to make payments on time, directly negotiating with Sun the credit terms to be offered to the EMs, and directly consulting with and seeking direction from Sun regarding the status of deliveries of DRAM to the EMs.  Ex. 60, ITNA01135741-2 ("[Samsung], like us, are trying to get Sun to hammer on Benchmark to improve days to pay."); Ex. 61, SUN0408853-54; Ex. 62, SUN0033449-52. Additionally, the DRAM suppliers communicated directly with Sun regarding the levels of DRAM supply made available to the EMs.  Ex. 63, SUN0018600-01; Ex. 43, SUN0018775-77. In short, the DRAM suppliers treated Sun and each EM as a "single customer."  Ex. 64, SUN0020069-71.

Further, the DRAM suppliers' sales records identify Sun as the end-purchaser, because the DRAM suppliers kept track of which DRAM delivered to the EMs was intended for use in Sun products.  Ex. 1, EMUS1100305; Ex. 2, HXD000001; Ex. 3, HXD000002; Ex. 4, HXD000003; Ex. 5, HXD000004; Ex. 6, HXD000005; Ex. 7, HXD006788; Ex. 8, HXD006789; Ex. 9, HXD006790; Ex. 10, HXD006791; Ex. 11, MU00844984; Ex. 12, MU00848408; Ex. 13, MU00864081; Ex. 14, MU00864085; Ex. 15, MU00868412; Ex. 16, MITSSUN00264594; Ex. 17, MITSSUN00264595; Ex. 18, "IFX Sales Database 10 January 2005"; Ex. 19, "Infineon 1996-1998 Sale Data"; Ex. 32, Marten (Smart Modular) Dep. 46:13-47:8.  For example, for entries in the data showing deliveries to the EMs:  (1) the Elpida transactional data contains a

1   "Sold-to Party" field with entries like "SOLECTRON/SUN;" (2) the Micron transactional data

2   contains "end customer name" and "end customer" fields that list "Sun Microsystems, Inc.;" and

3   (3) the Infineon transactional data contains "MP customer," "Customer," and "KA Code" fields

4   that list "SUN."  Ex. 1, EMUS1100305; Ex. 11, MU00844984; Ex. 12, MU00848408; Ex. 13,

5   MU00864081; Ex. 14, MU00864085; Ex. 15, MU00868412; Ex. 18, "IFX Sales Database 10

6   January 2005"; Ex. 19, "Infineon 1996-1998 Sale Data."

7         Moreover, Sun generally bore the cost of the DRAM that was delivered to, but not used

8   by, the EMs (e.g., as a result of a change in Sun's forecasts or the end of life of a particular Sun

9   product).  Ex. 65, Leung (Synnex) Dep. 38:7-39:13; Ex. 30, Rock (Celestica) Dep. 34:23-35:5,

10  79:17-80:9, 94:10-15, 96:24-98:1; Ex. 29, Russell (Benchmark) Dep. 66:15–73:22;  Ex. 28, Long

11  (Solectron) Dep. 78:6-14.  Although efforts were often made by the EMs to return excess DRAM

12  to DRAM suppliers or to transfer it to another of Sun's EMs at Sun's direction, if those efforts

13  were unsuccessful, Sun bought back the DRAM from the EM.  Ex. 29, Russell (Benchmark)

14  Dep. 74:7-75:20, 94:17-95:3; Ex. 28, Long (Solectron) Dep. 53:8-22, 54:24-55:3.  If the DRAM

15  was to be returned, Sun participated in the negotiation of the terms of return.  Ex. 29, Russell

16  (Benchmark) Dep. 78:23-80:13.  The EMs sometimes even charged Sun a carrying cost for any

17  excess DRAM held in their inventories that was earmarked for Sun products.  Ex. 29, Russell

18  (Benchmark) Dep. 66:15–73:22; Ex. 28, Long (Solectron) Dep. 84:7-18; 85:23-86:3.

19        Finally, the EMs were not permitted to sell excess DRAM to third parties without prior

20  approval from Sun.  Ex. 28, Long (Solectron) Dep. 54:7-17, 54:24-55:3; Ex. 29 Russell

21  (Benchmark) Dep. 76:22-77:10.  Conversely, even if demand for a particular Sun product

22  manufactured by an EM exceeded Sun's forecasts, the EM had to obtain prior consent from Sun

23  before obtaining additional DRAM to meet the unexpected demand.  Ex. 29, Russell

24  (Benchmark) Dep. 191:25-192:25.

25        **B.    The Procurement Process for Products Containing DRAM.**

26        Sun's general business relationship with each of its EMs was governed by a Master

27  External Manufacturer Agreement ("MEMA").  Ex. 23, Maxwell Dep. 55:2-6; Ex. 66A,

28  SUN0542161-534, SUN0542588-775; Ex. 66B, SUN0542535-87; Ex. 67, SUN0542946-3482;

6                                          CASE NO. C 06- 01665 PJH

PLAINTIFF SUN MICROSYSTEMS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO EXTERNAL MANUFACTURER PURCHASES

1   Ex. 68, SUN0543660-4.  After a MEMA was in place, Sun and each EM entered into Award

2   Letters, which outlined performance standards for assembling a particular product on behalf of

3   Sun.  Ex. 23, Maxwell Dep. 60:14-61:8; Ex. 66A, SUN0542161-534, SUN0542588-775; Ex.

4   66B, SUN0542535-87; Ex. 67, SUN0542946-3482; Ex. 68, SUN0543660-4.  Sun then placed

5   purchase orders for DRAM-containing products covered by Award Letters with the EMs.  Ex.

6   23, Maxwell Dep. 77:20-78:4.  The EMs delivered finished products to Sun, and would, pursuant

7   to agreement with Sun, charge Sun for the cost of all components used in the finished product,

8   plus some added fee based on the value added by the EM.  Ex. 23, Maxwell Dep. 80:5-81:6,

9   87:19-24, 217:12-218:18; Ex. 69, SUN0434017-8; Ex. 70, SUN0429605-7; Ex. 71,

10   SUN0395873-84; Ex. 77, Declaration of Robert Chen (MiTAC USA, Inc.) dated September 22,

11   2008, ¶ 7.  Sun paid for the components – including DRAM – at cost and paid each EM an

12   additional fee based on the valued added by the EM in assembling the finished product.  Thus,

13   100% of the DRAM costs incurred by the EMs were passed on to Sun.  Ex. 23, Maxwell Dep.

14   80:1-81:6, 87:19-24, 217:12-218:18; Ex. 30, Rock (Celestica) Dep. 123:5-125:2; Ex. 77,

15   Declaration of Robert Chen (MiTAC USA, Inc.) dated September 22, 2008, ¶ 7.  According to a

16   Benchmark witness, the understanding between Sun and Benchmark was that the purchase price

17   paid by Sun included the exact cost of the DRAM (*i.e.,* the price dictated by Sun) procured by

18   Benchmark at the direction of Sun.  Ex. 29, Russell (Benchmark) Dep. 20:12-21:21, 102:7-

19   103:15, 224:9-226:25.

20        When pricing its products containing DRAM to end-customers, Sun did so based entirely

21   on competitive pressures and market pricing of the finished products (not on increased

22   component costs), and, therefore, absorbed any increase in the cost of DRAM, rather than

23   passing it on to its end-customers.  Ex. 72, Mootrey Dep. 60:24-61:8, 62:8-63:4, 67:22-68:13,

24   68:22-69:2, 69:14-70-3.

25 **II.**    **ARGUMENT**

26        As the evidentiary record establishes, the EMs acted as purchasing agents for Sun in

27   connection with the procurement of DRAM for incorporation into Sun products, and Sun

28   exercised complete control over the procurement of DRAM by the EMs.  As a result of the

7      CASE NO. C 06- 01665 PJH

PLAINTIFF SUN MICROSYSTEMS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO EXTERNAL MANUFACTURER PURCHASES

1   principal-agent relationship between Sun and the EMs, Sun qualifies as a "direct purchaser" of

2   the DRAM delivered to its EMs, and therefore is entitled to recover any overcharges resulting

3   from such deliveries under the federal antitrust laws.  Even if Sun is deemed to be an "indirect

4   purchaser" (as defendants attempt to establish against the weight of the evidence), the facts

5   learned during discovery establish that Sun exercised a sufficient level of control over the EMs

6   to meet the "control exception" to the rule against indirect purchasers bringing suit under the

7   federal antitrust laws.  Thus, regardless of how Sun is categorized, it has standing to assert

8   federal antitrust claims based on the purchases at issue.  At a minimum, Sun's position

9   demonstrates that there are genuine issues of material fact that make a grant of summary

10  judgment in favor of defendants inappropriate here.

11        **A.      Summary Judgment Standard**

12        Defendants are entitled to summary judgment only if they "show that there is no genuine

13  issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

14  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it

15  could affect the outcome of the lawsuit under the applicable substantive law, while an issue is

16  "genuine" if the relevant evidence as to that issue could permit a jury reasonably to return a

17  verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  As the

18  party seeking summary judgment, defendants bear the burden to support their motion with

19  evidence that potentially could be admissible at trial.  Only if this requirement is satisfied, does

20  the burden shift to plaintiffs to "set out specific facts showing a genuine issue for trial."  Fed. R.

21  Civ. P. 56(e)(2).  In considering defendants' motion, the Court may not weigh the evidence or

22  make credibility determinations.  *Anderson*, 477 U.S. at 255.  The Court is tasked only with

23  determining whether the evidence is such that a reasonable jury could return a verdict for

24  plaintiffs.  *Id*. at 248; *Datagate, Inc. v. Hewlett-Packard Co.*, 672 F. Supp. 1288, 1290 (N.D. Cal.

25  1987).

26        As demonstrated below, summary judgment is not appropriate here, because the evidence

27  is such that a jury reasonably could return a verdict for Sun.  *Id*.  At most, defendants' Motion

28  merely alleges factual inferences from the evidence that are contradicted by the inferences

8

CASE NO. C 06- 01665 PJH

PLAINTIFF SUN MICROSYSTEMS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO EXTERNAL MANUFACTURER PURCHASES

1   presented by Sun.  Summary judgment is not appropriate where "contradictory inferences, one of

2   which supports the non-moving party's position, can be drawn from the facts."  *Alioto v. United*

3   *States*, 593 F.Supp. 1402, 1405 (N.D. Cal. 1984).  Moreover, the evidence presented by Sun is to

4   be believed, and all justifiable inferences are to be drawn in Sun's favor.  *Matsushita Elec. Indus.*

5   *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Applying this standard to the evidence

6   here, defendants' Motion should be denied.

7        **B.      As a Direct Purchaser, Sun is Entitled to Bring Suit Under the Federal
                   Antitrust Laws to Recover Overcharges Resulting from Deliveries of DRAM
8                  to its External Manufacturers.**

9        Despite defendants' unsupported assertion to the contrary, the nature of Sun's

10  relationship with its EMs qualifies Sun as the direct purchaser of the DRAM delivered to its

11  EMs.  With respect to the transactions that are at the heart of this litigation – the procurement of

12  DRAM for incorporation into Sun products containing DRAM – Sun's EMs acted as mere

13  purchasing agents for Sun.  Thus, for antitrust purposes, Sun and each of its EMs should be

14  viewed as a single entity in connection with the procurement of DRAM; therefore, each delivery

15  of DRAM to an EM should be viewed as a transaction between Sun and the DRAM supplier.

16       Federal common law sets forth three elements of agency:  (1) manifestation by a principal

17  that an agent would act on its behalf; (2) the agent's acceptance or consent to act on the

18  principal's behalf; and (3) the understanding that the principal would be in control of the agent's

19  undertaking on its behalf.[2]  *E.&J. Gallo Winery v. Encana Energy Servs., Inc.,* Case No. 03-cv-

20  5412, 2008 U.S. Dist. LEXIS 46927, at *16 (E.D. Cal. May 27, 2008) (citing *Bowoto v. Chevron*

21  *Texaco Corp.*, 312 F. Supp. 2d 1229, 1239 (N.D. Cal. 2004).  Sun's relationships with its EMs

22

23  [2] The federal common law of agency governs the determination of agency relationships for
    claims brought under a federal statute, such as the Sherman Act and Clayton Act claims at issue
24  here.  *E. & J. Gallo*, 2008 U.S. Dist. LEXIS 46927, at *15; *Bowoto*, 312 F. Supp. 2d at 1237
    (N.D. Cal. 2004) ("Where the causes of action in the complaint are federal in nature, application
25  of federal law will better effectuate the purposes of those statutes."); *Newman v. Checkrite Cal.,*
    *Inc.*, 912 F. Supp. 1354 (E.D. Cal. 1995) (applying federal common law to determination of
26  agent's apparent authority that violated a federal statute); *Am. Soc'y of Mech. Eng'r v.*
    *Hydrolevel Corp.*, 456 U.S. 556, 566-67 (1982) (applying general rules of agency law to
27  determination of liability under apparent authority theory, noting "apparent authority theory has
    long been the settled rule in the federal system").
28

1    satisfy all three of these elements.  This is most vividly illustrated as to the third element (the

2    principal's control over the agent), which has been characterized as the key indicator of agency.

3    *See Bowoto*, 312 F. Supp. 2d at 1239 ("There is no agency relationship where the alleged

4    principal has no right of control over the alleged agent.") (citation omitted); *Qwest*

5    *Communication Corp. v. Herakles, LLC*, Case No. 07-cv-00393-MCE-KJM, 2008 U.S. Dist.

6    LEXIS 22154, *22-23 (E.D. Cal. Mar. 20, 2008).

7           During the period relevant to this litigation, Sun made a business decision to reorganize

8    its manufacturing operations in a way that would allow it to function more effectively and

9    efficiently in the globalizing economy.  *See supra*, § I.A.  This decision included enlisting the

10   services of various EMs to act as "virtual Sun factories" in manufacturing certain DRAM-

11   containing products on behalf of Sun.  *Id.*  Although Sun decided to outsource some of its

12   manufacturing to EMs, it chose to keep the decision-making aspects of the procurement of

13   DRAM – which Sun deemed to be a "core component" – under its own control.  *Id.*  Sun

14   continued to qualify and select DRAM suppliers and to negotiate the price of the DRAM that

15   would be used in Sun products.  *Id.*  A global memory procurement organization at Sun then

16   instructed Sun's EMs – as well as Sun's domestic and international manufacturing facilities – to

17   issue purchase orders for DRAM from vendors selected by Sun and at prices negotiated by Sun.

18   *Id.*  In doing so, Sun manifested its intent for the EMs to act as its agents in connection with the

19   procurement of DRAM for incorporation into Sun products.  In addition, by ordering and using

20   DRAM in Sun products pursuant to the precise directions and at the precise prices dictated by

21   Sun, the EMs consented to acting as agents on Sun's behalf for this limited purpose.  *In re*

22   *Coupon Clearing Service, Inc.*, 113 F.3d 1091, 1099 (9th Cir. 1997)  (evidence of the parties'

23   conduct can demonstrate the existence of an agency relationship).  Thus, the first two elements

24   of agency – manifestation and consent – are met.

25          With respect to the third element of agency, Sun controlled the EMs in connection with

26   the procurement of DRAM on Sun's behalf.  As discussed above, Sun directed each EM to

27   purchase DRAM from Sun-qualified and specified vendors and at Sun-specified prices for

28   incorporation into finished Sun products.  *See supra*, § I.A.  Sun also provided the EMs with

10                                          CASE NO. C 06- 01665 PJH

PLAINTIFF SUN MICROSYSTEMS, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO EXTERNAL MANUFACTURER PURCHASES

1    forecasts that alerted them to the volumes of DRAM they should order. *Id.* The EMs were

2    expected to – and did – follow Sun's instructions precisely and without deviation. *Id.* In

3    addition, DRAM suppliers, including defendants here, were well aware of this arrangement and

4    knew that the DRAM requested by the EMs on Sun's behalf was to be sold at prices and shares

5    of business determined entirely by Sun and to be used only in finished Sun products. *Id.* For

6    example, the transactional sales data produced by defendants in this litigation – the same data

7    that Sun relied on to calculate its damages based on deliveries of DRAM to its EMs – contains

8    categories of information that specifically link certain deliveries of DRAM to EM facilities to

9    Sun. *Id.* Yet, in response to an interrogatory served by Sun, defendants Hynix and Elpida failed

10   to identify even a single transaction where they "sold or delivered DRAM to Sun's External

11   Manufacturers at Prices that were not established or agreed to by Sun." Ex. 75, Hynix's

12   Response to Sun Interrogatory No. 2 dated December 19, 2007; Ex. 76, Elpida's Response to

13   Sun Interrogatory No. 2 dated December 19, 2007. As a result, this should be deemed an

14   admission by defendants that there were no such instances, and defendants should be prohibited

15   from offering any facts or evidence to the contrary, because they failed to disclose such facts or

16   evidence during discovery.

17          Moreover, defendants attempt to distract the Court's attention away from this decisive

18   principal-agent relationship between Sun and each of its EMs by pointing to facets of the

19   business relationship that are not relevant to the determination of agency[3] and to isolated and

20   inconsequential deviations from the parties' normal course of business. These distractions

21   should be ignored. In fact, defendants' assertion that one of Sun's EMs independently selected

22   the DRAM suppliers and negotiated DRAM pricing for "tens of thousands" of DRAM modules

23   relates to products that are not even at issue in this lawsuit. Defs.' Mem. at 8, 19. The product

---

24

25   [3] For instance, in support of their position, defendants point to language in the MEMA
     agreements between Sun and the EMs stating that the parties are "independent contactors."

26   Defs.' Mem. at 5-6. However, contract terms purporting to establish an independent contractor
     relationship do not control the agency determination. *E. & J. Gallo*, 2008 U.S. Dist. LEXIS

27   46927, at *19; Restatement (Third) of Agency § 1.02 ("Whether a relationship is characterized as
     agency in an agreement between parties or in the context of industry or popular usage is not

28   controlling.").

CASE NO. C 06- 01665 PJH

1   they point to, "Nordica" or "Nordica Red," is a line of central processing unit motherboards that

2   has not been included in Sun's damages calculations.   Likewise, as Sun's corporate witness on

3   external manufacturer purchases testified, Sun would sometimes experiment with new

4   outsourcing opportunities with its EMs, but that none of those experiments ever unseated the

5   normal course of business between the companies, which was for Sun to choose the vendors and

6   negotiate the prices of DRAM and for the EMs to follow Sun's DRAM procurement directives.

7   Ex. 23, Maxwell Dep. 48:9-53:6; 106:13-110:17; 160:14-161:14; 165:22-166:13.

8           Further, defendants' argument is undercut by the fact that they concede that deliveries of

9   DRAM to Sun's foreign affiliates qualify as direct purchases by Sun.  As with the EMs, Sun's

10   global memory procurement team based in California directed its foreign affiliates (as well as its

11   domestic manufacturing facilities) to issue purchase orders for DRAM at prices and shares of

12   business determined by Sun.  *Id*.  In fact, this arrangement was identical to the one between Sun

13   and the EMs.  *Id*.  Yet, defendants have not challenged that Sun is the direct purchaser of all

14   DRAM delivered to its foreign affiliates.

15          In sum, because of the principal-agent relationship between Sun and each of its EMs,

16   each delivery of DRAM to an EM was, in reality, a transaction between Sun and the DRAM

17   supplier.  In fact, all the relevant parties – Sun, the DRAM suppliers, and the EMs – treated it as

18   such.  As a result, Sun qualifies as the direct purchaser in connection with these deliveries, and is

19   therefore entitled to assert claims based on the deliveries pursuant to the federal antitrust laws.

20   **C.      Even if Sun is Deemed to be an Indirect Purchaser of DRAM Delivered to Its
              External Manufacturers, Sun is Still Entitled to Assert Claims Based On**

21   **        Such Deliveries Under the Federal Antitrust Laws.**

22   **        1.      Sun's Relationships with its External Manufacturers Relating to the
                      Purchase of DRAM Satisfy the "Control Exception" to the Rule**

23   **                Against Indirect Purchasers Bringing Suit Under the Federal
                      Antitrust Laws.**

24

25          Even if Sun is deemed to be an indirect purchaser, because Sun exercised complete

26   control over its EMs with respect to the procurement of DRAM for incorporation into Sun

27   products, Sun should be permitted to bring its antitrust claims based on deliveries of DRAM to

28   its EMs under the federal antitrust laws.

1    In *Illinois Brick Co. v. Illinois*, the Supreme Court established a general rule that only

2    direct purchasers of price-fixed products can recover under the federal antitrust laws.  431 U.S.

3    720 (1977).  The Court did, however, indicate that in certain situations, where "market forces

4    have been superseded," an indirect purchaser may assert pass-on and bring suit under the

5    Clayton Act.  One such situation is "where the direct purchaser is owned or controlled by [the

6    indirect purchaser]."  *Id.* 736 n.16.  This has been commonly referred to as the "control

7    exception" to the *Illinois Brick* direct purchaser rule.

8    As defendants note, the Sixth Circuit's formulation of the "control exception" in *Jewish*

9    *Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enters., Inc.*, 628 F.2d 971 (6th Cir. 1980),

10   *cert. denied*, 450 U.S. 966, 101 S.Ct. 1483, 67 L.Ed.2d 615 (1981), is widely accepted.  Defs.'

11   Mem. at 17.  In that case, the Sixth Circuit held that the "control exception" applies where there

12   are "relationships involving such functional economic or other unity between the direct

13   purchaser and . . . the indirect purchaser that there effectively has been only one sale*." Jewish*

14   *Hosp.*, 628 F.2d at 975 (citation omitted); *Labrador, Inc. v. Iams Co.*, Case No. 95-cv-56581,

15   1997 U.S. App. LEXIS 418 (9th Cir. Jan. 8, 1997) (citing the "functional unity" standard set

16   forth in *Jewish Hospital*).

17   In turn, the court in *Jewish Hospital* distinguished the facts before it from those in *In re*

18   *Toilet Seat Antitrust Litigation*, 1977-2 Trade Cas. P 61,601 (E.D. Mich. 1977), calling the

19   circumstances it was presented with a "far cry from situations where a purchaser employs an

20   independent broker or purchasing agent to procure a particular good or service."[4]  *Jewish Hosp.*,

21   628 F.2d at 975.  *In re Toilet Seat* involved the question of whether, in light of the Supreme

22

---

23   [4]  *Jewish Hospital* involved a hospital owner (the indirect purchaser) bringing suit under the
     Clayton Act against subcontractors for their price-fixing activities targeted at a general contractor
24   (the direct purchaser) that was building an addition to a hospital.  628 F.2d at 974-5.  The
     hospital owner argued, *inter alia*, that the "control exception" to the *Illinois Brick* direct
25   purchaser rule applied, because it used the general contractor as an agent to assemble a package
     of goods and services, including subcontracting services, on its behalf.  *Id*. at 975.  The Sixth
26   Circuit rejected the hospital owner's argument as failing to establish "functional unity," because
     the offer accepted by the hospital owner was just one of five packages put together
27   independently by five different general contractors and then offered to the hospital owner, who
     made its ultimate choice based only on lowest price.

28

CASE NO. C 06- 01665 PJH

Court's decision in *Illinois Brick*, a class plaintiff who purchased relevant product through a third-party could assert federal antitrust claims on behalf of a direct purchaser class. 1977-2 Trade Cas. P 61,601 at *1. The District Court held in the affirmative, explaining that the "control exception" to the *Illinois Brick* direct purchaser rule was met as a result of the relationship between the class plaintiff and the third party being "that of principal and agent rather than buyer and seller." *Id*. at *2. In finding that "[the third party's] actions regarding purchases made on [the class plaintiff's] behalf were controlled by [the class plaintiff]," the court looked to, *inter alia*, evidence demonstrating that the third party purchased materials for the class plaintiff "at a price approved by the [class plaintiff]" and that "[i]f [the class plaintiff] was unknown to the seller, or under other appropriate circumstances, [the third party] would be billed and, in turn, would bill [the class plaintiff]."

The relationship at issue here is at least as compelling a principal-agent relationship as that between the direct and indirect purchasers in *In re Toilet Seat*. As discussed above, as in *In re Toilet Seat*, the EMs here acted as purchasing agents for Sun and were entirely controlled by Sun in connection with all critical facets of DRAM procurement. *See supra*, § I.A. Sun determined from whom, at what price, and at which percentage of business, the EMs would order DRAM for incorporation into Sun products. *Id*. In addition, forecasts provided by Sun determined the quantities of DRAM ordered by the EMs. *Id*. Further, Sun bore the cost of the DRAM that was ordered by the EMs on its behalf, as the EMs would bill Sun for the exact amount they paid for the DRAM they incorporated into Sun products (plus a fee for the EM's added value in assembling the finished product). *See supra,* § I.B. This resulted in the costs the EMs incurred in connection with ordering DRAM for incorporation into Sun products – including any overcharges – being passed back onto Sun. *Id*. This is quite unlike the situation in *Jewish Hospital*, where the indirect purchaser had no input or insights into or role in the purchasing activities of the direct purchaser.

In addition, the relationships between Sun and the EMs are in sharp contrast to a seller-buyer relationship. In such a relationship, the seller determines the price at which it procures the goods and the price at which it will sell them to the buyer, with the seller bearing the risk of the

1   spread between those prices.  Here, the EMs bore no price risk in connection with the DRAM

2   incorporated into finished Sun products.  They requested the DRAM at prices dictated by Sun

3   and were then reimbursed at that cost by Sun, with Sun bearing the full risk (in its finished

4   product prices) of any "overcharge" for that DRAM.  This is characteristic of a principal-agent

5   relationship, not a seller-buyer relationship.

6           Further, as both *Jewish Hospital* and *In re Toilet Seat* make clear, in cases where the

7   relationship between the indirect and direct purchaser are at issue, the "control exception"

8   focuses on the degree of control the indirect purchaser has over the direct purchaser with respect

9   to the sale or purchase *of the goods at issue in the litigation*.  It does not, as defendants imply,

10  focus on the *overall* degree of corporate control exerted by one company over another.  As

11  support for their mistaken assertion, defendants cite to the Seventh Circuit's decision in *In re*

12  *Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599, 605-06 (7th Cir. 1997).

13  First, *In re Brand Name Prescription Drugs* involved application of the "control exception" in

14  the context of a relationship between a manufacturer and a direct purchaser, not an indirect

15  purchaser and a direct purchaser.[5]  Moreover the court in *In re Brand Name Prescription Drugs*

16  set forth an *illustrative*, not an exhaustive, list of examples of the type of control that can satisfy

17  the exception to the *Illinois Brick* direct purchaser rule.  In fact, in citing to *Jewish Hospital*, the

18  *In re Brand Name Prescriptions Drugs* court specifically stated that "other modes of control

19  separate from ownership of a majority of the [direct purchaser's] common stock" can satisfy the

20  "control exception."  *Id.* at 605-06.  Thus, contrary to what defendants assert, the fact that Sun

21  and the EMs:  (1) were separate companies; (2) did not have interlocking directorates; (3) did not

22  have overlapping officers; (4) did not own each other's stock; and (5) did not enter into loan

23  agreements, trust agreements, or extensions of credit is not determinative of whether Sun

24  exercised sufficient control over its EMs *in connection with the procurement of DRAM for*

25  *incorporation into Sun products* for the "control exception" to the *Illinois Brick* direct purchaser

26  rule to apply.

27  ───────────────

28  [5] In their Motion, defendants acknowledge that such "cases are inapplicable here, as there is no allegation or evidence that any defendant owned or controlled the EMs."  Defs' Mem. at 17 n. 4.

1    The facts make clear that the procurement of DRAM by Sun's EMs for inclusion in Sun

2    products was under the control of Sun and that Sun, not the EMs, was injured as a result of the

3    overcharges caused by defendants' illegal conduct.  Because Sun incurred the damages at issue

4    here, it is the proper party to bring suit.  *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141

5    F.R.D. 144, 150 (N.D. Cal. 1991) ("if there is going to be one plaintiff, it should be the party that

6    incurred the damage").

7        **2.      Permitting Sun to Bring Suit Under the Federal Antitrust Laws Will Not
                    Offend the Policy Concerns Behind the Rule Against Indirect Purchasers
8                   Bringing Suit Under the Federal Antitrust Laws.**

9        The policy concerns behind the *Illinois Brick* direct purchaser rule will not be offended

10   by permitting Sun to bring its antitrust claims based on purchases of DRAM delivered to its EMs

11   under the federal antitrust laws.  The direct purchaser rule is premised on the Supreme Court's

12   concern that permitting indirect purchasers to file suit under the Clayton Act would create:  (1)

13   "evidentiary complexities and uncertainties" in apportioning overcharges between direct and

14   indirect purchasers, *Illinois Brick*, 431 U.S. 731-33; and (2) a "risk of multiple liability for

15   defendants."  *Id*. at 730.  Contrary to what defendants claim, neither of these concerns justifies

16   preventing Sun from bringing federal antitrust claims based on deliveries of DRAM to its EMs.

17       First, a complex apportionment of overcharges is not necessary here.  As Sun has alleged,

18   and as the evidence gathered during fact discovery supports, Sun specified the purchase price of

19   DRAM, the EMs purchased DRAM on Sun's behalf for incorporation into Sun products at that

20   price, and then the EMs were required to, and did, pass on the cost of the DRAM to Sun pursuant

21   to what amounted to "cost-plus" agreements between the parties.  *See supra*, §§ I.A.-B.  Thus,

22   the overcharges incurred as a result of price-fixed DRAM being delivered to the EMs on Sun's

23   behalf for incorporation into Sun products were borne entirely by Sun.

24       Second, the Court should not allow defendants to use the risk of some potential, future,

25   multiple liability as a shield against Sun's right to bring suit under the federal antitrust laws to

26   redress the overcharges it suffered.  Defendants point to the fact that a few of Sun's EMs

27   submitted claims in connection with the direct purchaser class action as support for their

28   argument.  However, for there to be actual multiple liability here, the total combined amount

16

1  defendants would have to pay to the two EMs who submitted claims in connection with the class

2  settlements and to Sun in connection with this litigation would have to exceed treble damages on

3  the DRAM purchases at issue.  Defendants cannot make this showing at this time.  Sun should

4  not be punished in this litigation by being denied its rightful recovery of damages suffered at the

5  hands of defendants under the federal antitrust laws, just because defendants may incur potential

6  multiple liability in the future as a result of their own illegal conduct.

7        In fact, if one were to accept defendants' theory that the mere filing of a claim by a so-

8  called "direct purchaser" in connection with a class action settlement creates multiple liability

9  that prevents a so-called "indirect purchaser" from bringing suit under the federal antitrust laws,

10  then the "control" exception to the direct purchaser rule established by the Supreme Court would

11  be rendered meaningless.  Here, "control" was not taken into consideration when claims were

12  made by the two EMs in connection with the class settlements.  In fact, the EMs who submitted

13  claims were permitted to do so without any sort of "control" due diligence by the claims

14  administrator.  Therefore, regardless of the fact that Sun believed that the EMs did not have the

15  right to assert these claims and actively informed the EMs that they should not make claims for

16  purchases of DRAM made on Sun's behalf,[6] Sun had no say in the settlement claims

17  administration process, and therefore, no way to prevent the claims administrator from

18  considering and approving the EMs' claims.  Defendants now wish to use this lack of oversight

19  in the way settlement claims are administered to bar Sun from bringing claims based on

20  overcharges it incurred.  This should not be allowed.

21        At the very least, Sun should be permitted to bring claims under the federal antitrust laws

22  based on deliveries of DRAM to Benchmark and MiTAC.  Because those EMs have not brought

23  suit against defendants or filed claims in connection with the direct purchaser class settlements

24  (or at least defendants have presented no evidence of such suits or claims), if Sun is not allowed

25  to proceed with these claims, defendants will effectively escape *all* liability based on these

26

27  _____

[6] As defendants point out, Sun sent a letter to at least one EM requesting that they not file claims based on purchases belonging to Sun.  Ex. 73, Declaration of Jeffrey Woodlock (Celestica) dated

28  April 2, 2008.

CASE NO. C 06- 01665 PJH

1   purchases under the federal antitrust laws.[7]  Ex. 77, Declaration of Robert Chen (MiTAC USA,

2   Inc.) dated September 22, 2008, ¶ 8.  This is precisely what the Ninth Circuit warned against in

3   *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 (9th Cir. 1980).  In that case, the

4   Court held that the risk of multiple recovery did not outweigh the alternative risk of no recovery

5   at all, which would have "effectively immuniz[ed] the transactions . . . from private antitrust

6   liability, thus thwarting a vital part of the antitrust enforcement scheme and the expressed

7   purpose of *Illinois Brick*."  *Id.* at 326.  Like in *Royal Printing*, a blind adherence to the *Illinois*

8   *Brick* direct purchaser rule here would improperly allow defendants to escape all liability under

9   the federal antitrust laws for a portion of the purchases at issue.

10             **D.        Summary Judgment for Defendants is Not Appropriate Here.**

11             In their Motion, defendants argue that Sun did not exercise enough control over its EMs

12   to meet the "control exception" to the rule against indirect purchasers bringing suit under the

13   federal antitrust laws.  In response, Sun has set forth specific facts demonstrating:  (1) a

14   principal-agent relationship between Sun and its EMs in connection with the procurement of

15   DRAM for incorporation into Sun products that makes Sun the *direct* purchaser of the DRAM

16   delivered to its EMs; and (2) a level of control exercised by Sun over its EMs in connection with

17   the procurement of DRAM for incorporation into Sun products that, regardless of whether Sun is

18   deemed to be an indirect purchaser of DRAM delivered to its EMs, meets the "control

19   exception" to the *Illinois Brick* direct purchaser rule.  Although these facts establish that Sun has

20   standing to bring suit under the federal antitrust laws, at a minimum, Sun has demonstrated that

21   there are sufficient material facts in dispute about whether Sun controlled its EMs that granting

22   summary judgment here is not appropriate.  *Nat'l Football Scouting, Inc. v. Cont'l Assurance*

23   *Co.*, 931 F.2d 646, 649 (10th Cir. 1991) ("The question of agency . . . is ordinarily a question of

24   fact."); *Datagate*, 672 F. Supp. at 1290 (summary judgment is not appropriate "where the

25

26   ───────────────────────
     [7] The opt-out deadline in the DRAM direct purchaser MDL was October 3, 2006; the deadline
27   for submitting claims was December 31, 2007.  Thus, Benchmark and MiTAC are now barred
     both from bringing separate litigations against defendants and from filing claims in connection
28   with the class settlements.

1    evidence is such that a reasonable jury could return a verdict for the non-moving party"); *Alioto*,

2    593 F. Supp. at 1405 (summary judgment is not appropriate where "contradictory inferences, one

3    of which supports the non-moving party's position, can be drawn from the facts").

4              **E.      The Pass-Through Defense is Not Available to Defendants.**

5              Defendants attempt to justify bringing this Motion by claiming that if it is granted, they

6    will be able to assert a pass-through defense against Sun.  Defs' Mem. at 4 n.2.  However, it is

7    undisputed on the factual record in this case that Sun did not pass-on any overcharges to its end-

8    customers.  As Sun's corporate designee on this topic testified, Sun priced its products

9    containing DRAM based entirely on competitive pressures and market pricing of finished

10   products containing DRAM and would not change its prices as the result of increased component

11   costs.  Ex. 72, Mootrey Dep. 60:24-61:8, 62:8-63:4, 67:22-68:13, 68:22-69:2, 69:14-70:3.

12   According to the witness, when the cost of DRAM increased, Sun would absorb the price

13   increases rather than pass them on to customers purchasing Sun products containing DRAM.  Ex.

14   72, Mootrey Dep. 62:8-25, 69:20-23.  This testimony and the documentary evidence produced by

15   Sun are unrebutted by defendants, and fact discovery closed long ago.  Thus, the pass-through

16   defense is unavailable to defendants and their proposed justification for this Motion is

17   misguided.

18                                     **<u>CONCLUSION</u>**

19             Based on the foregoing, Sun respectfully requests that the Court deny defendants' Motion

20   for Partial Summary Judgment as to External Manufacturer Purchases.

21

22   DATED:  October  2, 2008                          CROWELL & MORING LLP

23

24                                                     /s/
                                                       _____

25                                                     Jerome A. Murphy
                                                       David D. Cross
26                                                     Matthew J. McBurney
                                                       1001 Pennsylvania Avenue, N.W.
27                                                     Washington, D.C.  20004-2595
                                                       Phone: 202-624-2578
28                                                     Fax:    202-628-5116

                                            19                    CASE NO. C 06- 01665 PJH

1
2

Daniel A. Sasse
Theresa Lopez
3 Park Plaza, 20th Floor
Irvine, CA  92614-8505
Phone: 949-263-8400
Fax:     949-263-8414

3
4
5

*Counsel for Plaintiff Sun Microsystems, Inc.*

6

DC6324315.9

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

20