1  KAYE SCHOLER LLP
   Aton Arbisser, Bar Number 150496
2  Julian Brew, Bar Number 150615
   Joshua Stambaugh, Bar Number 233834
3  1999 Avenue of the Stars, Suite 1700
   Los Angeles, California  90067
4  Telephone:  (310) 788-1000
   Facsimile:  (310) 788-1200
5
   Attorneys for Defendants Infineon Technologies
6  North America Corp. and Infineon Technologies AG
   *[Additional counsel and Defendants listed on*
7  *signature page]*

8

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11              SAN FRANCISCO DIVISION

12  SUN MICROSYSTEMS, INC.,                    Case No. C 06-01665 PJH

13               Plaintiff,

14       v.                                    **DEFENDANTS' REPLY BRIEF IN
                                               SUPPORT OF THE MOTION TO
15  HYNIX SEMICONDUCTOR, INC., ET AL.,         EXCLUDE THE TESTIMONY OF
                                               PLAINTIFFS' EXPERT WITNESS
16               Defendants.                   HALBERT WHITE PURSUANT TO
                                               FED. R. EVID. 702 ("Daubert Motion")**

17  ──────────────────────────────
                                               Hearing Date:  December 10, 2008
18  This document also filed in **related cases:**   Time:          9:00 a.m.
                                               Courtroom:     3, 17th Floor
19  *Unisys Corporation v. Hynix Semiconductor,*   Judge:         Hon. Phyllis J. Hamilton
    *Inc., et al.,* Case No. C-06-02915 PJH
20
    *All American Semiconductor, Inc. v. Hynix*
21  *Semiconductor, Inc., et al.,* Case No. C-07-
    01200 PJH
22
    *Edge Electronics, Inc. v. Hynix Semiconductor,*
23  *Inc., et al.,* Case No. C-07-01207 PJH

24  *Jaco Electronics, Inc. v. Hynix Semiconductor,*
    *Inc., et al.,* Case No., C-07-01212 PJH
25
    *DRAM Claims Liquidation Trust, by its Trustee*
26  *Wells Fargo Bank, NA v. Hynix Semiconductor,*
    *Inc., et al.,* Case No. C-07-01381 PJH
27

28

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................1

II.  ARGUMENT........................................................................................................2

    A.   White Fails To Demonstrate Comparability Between His Benchmark and Conduct Periods Or Control For Differences Between Them. ...................2

        1.   White Has Failed to Account For Significant Supply Changes......................2

        2.   White Has Failed to Account For Changes in Lawful Levels of Competitiveness in the Cyclical DRAM Market.............................................4

    B.   White Failed to Exclude the Impact of Lawful Conduct ...........................5

    C.   White's Second Step, In Which He Predicts Plaintiffs' Prices Using Target OEM Prices, Is Unreliable And Inadmissible.................................8

        1.   Plaintiffs Do Not Dispute That White's Second Step Finds Overcharges to the Plaintiffs Even When There Is No Overcharge To The Target OEMs. .................................................................................8

        2.   Plaintiffs Do Not Explain How White's Second Step Is Reliable When The Accepted Methodology Finds No Damages To Plaintiffs......................9

        3.   Plaintiffs Do Not Show That The Two Step Approach As Used By White Is Generally Accepted In The Scientific Community. .........................10

    D.   White's Alternative Analyses Do Not Render His Chosen Damages Model Admissible, and Merely Repeat the Errors of His Damages Model.........................13

    E.   White's Post Conduct Period "Fit" Does Not Cure His Model's Many Flaws. ........15

III. CONCLUSION....................................................................................................15

KAYE SCHOLER LLP

# TABLE OF AUTHORITIES

Page

**Cases**

*Baldwin Graphic Systems, Inc. v. Siebert, Inc.*,
2005 WL 1300763 (N.D. Ill. 2005) .................................................................... 14

*Cagle v. Cooper Cos. (In re Silicone Gel Breasts Implants Prods. Liab. Litig.)*,
318 F. Supp. 2d 879 (C.D. Cal. 2004) ...................................................... 8, 10, 13

*Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*,
55 F. Supp. 2d 1024 (N.D. Cal. 1999) ............................................................... 11

*City of Vernon v. Southern California Edison Co.*,
955 F.2d 1361 (1992) ............................................................................................ 5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ................................................................................ 8, 9, 11, 12

*Domingo v. T.K.*,
289 F.3d 600 (9th Cir. 2002) ............................................................................... 8

*DSU Medical Corp. v. JMS Co., Ltd.*,
296 F.Supp.2d 1140 (N.D.Cal. 2003) ............................................................. 9, 13

*Farley Trans. Co. v. Santa Fe Trail Trans. Co.*,
786 F.2d 1342 (1985) ............................................................................................ 5

*Flores-Miramontes v. INS*,
212 F.3d 1133 (9th Cir. 2000) ........................................................................... 12

*Hall v. Baxter Healthcare Corp.*,
947 F. Supp. 1387 (D. Or. 1996) ......................................................................... 9

*In re Linerboard Antitrust Litigation*,
497 F.Supp.2d 666 (E.D. Pa. 2007) ..................................................... 7, 8, 11, 12

*International Business Machines Corp. v. Fasco Industries, Inc.*,
1995 WL 115421 (N.D.Cal. 1995) ..................................................................... 14

*Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*,
526 F.2d 1196 (9th Cir. 1975) .............................................................................. 2

*William Inglis & Sons Baking Co. v. Continental Baking Company, Inc.*,
942 F.2d 1332, 1340 (9th Cir. 1991),
*vacated in part (on unrelated grounds) by, remanded by*,
970 F.2d 639 (9th Cir. 1992) ................................................................................ 2

**Other Authorities**

Areeda P., Hovenkamp H., Antitrust Law (3d ed. 2007), IIA, ¶ 395, at 386 ................................... 2, 3

KAYE SCHOLER LLP

## I.   INTRODUCTION

Plaintiffs' Opposition fails to overcome the flaws that led their damages expert Professor White to the implausible conclusion that defendants overcharged Plaintiffs by as much as 50% (totaling $1.7 billion) over a four-year period.  Plaintiffs seek to brush aside controlling Ninth Circuit authority that required White to (a) ensure that his benchmark period was comparable to his conduct period (or control for differences between them), and (b) distinguish between lawful and unlawful conduct that affected prices.

Plaintiffs try to side-step these requirements necessary to ensure reliability as a matter of law by claiming White "controlled" for "supply and demand determinants of price."  However, White made a fundamental error of methodology by excluding from his model the most important supply determinants -- DRAM capacity and capacity utilization.  Plaintiffs do not dispute that these supply determinants changed materially and for lawful, unilateral reasons during the time periods at issue.  White's only authority for excluding the impact of all supply decisions, a single district court decision in *Linerboard*, does not apply here, because it involved a conspiracy to restrain output.  White's approach here is fundamentally inconsistent with controlling Ninth Circuit law.

White also cannot show that his benchmark period was comparable to his conduct period because he selected a hyper-competitive benchmark period where prices declined 95%.  White concedes that using a highly competitive benchmark period with such dramatic price decreases will generate "overcharges" even if the industry merely shifts to pricing that is less competitive, but non-conspiratorial, where prices do not fall so steeply.

In addition, White's "two-step" methodology is demonstrably unreliable.  White's "second step" purportedly predicts Plaintiffs' individual prices using the Target OEM prices.  But Plaintiffs do not explain how this novel, two-step approach can be reliable when the second step generates significant damages to the Plaintiffs *even if  the target OEMs paid no overcharges whatsoever during the alleged conspiracy.*  Plaintiffs also fail to justify White's use of this two-step approach when use of his first step to directly predict Plaintiffs' prices generates no damages.  Plaintiffs fail to show that this two-step approach is generally accepted, and it is demonstrably unreliable.

White cannot save his flawed approach by claiming that "ten alternative studies" can also

1    generate damages.  White did not offer any of those alternatives as his proposed damages method;

2    they first appeared in his rebuttal report.  In any event, the fact that other methods may find damages

3    does not mean the methodology White chose is admissible under *Daubert*.  Moreover, his alternative

4    models generate drastically different results from White's chosen model, ranging from 12% to 58%

5    overcharges, and each of them is merely a variation of the original study with the same flaws.

6    **II.    ARGUMENT**

7        **A.    White Fails To Demonstrate Comparability Between His Benchmark and**

8            **Conduct Periods Or Control For Differences Between Them.**

9            **1.    White Has Failed to Account For Significant Supply Changes.**

10        Plaintiffs do not dispute that the Ninth Circuit (1) requires Plaintiffs to demonstrate the

11    comparability between alleged "benchmark" and "conduct" periods, and (2) rejects damages models

12    that fail to adjust for differences between the two periods.  *See William Inglis & Sons Baking Co. v.*

13    *Continental Baking Company, Inc.*, 942 F.2d 1332, 1340 (9th Cir. 1991), *vacated in part (on*

14    *unrelated grounds) by, remanded by*, 970 F.2d 639 (9th Cir. 1992) (rejecting damages study because

15    no witness "offered evidence that market conditions existing during the base period remained the

16    same (or even comparable after appropriate adjustments) during the liability period"); *Pacific Coast*

17    *Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975).

18        Plaintiffs cannot distinguish this authority.  In *Inglis*, as here, the expert had no economic

19    justification for his benchmark period.  White Tr. at 116:19-22.  In *Inglis*, as here, the expert offered

20    no evidence that market conditions during the base period were similar to those during the conduct

21    period.  942 F.2d at 1341.  In *Inglis*, as here, the defendants offered substantial evidence that market

22    conditions differed between the two.  *See id*; Defendants' Opening Brief ("Opening Br.") at 14:7-23

23    & 16:17-17:12.  As in *Inglis*, White's predictions are therefore "wholly speculative."  *Id.*

24        Plaintiffs cite no contrary Ninth Circuit law, but instead argue that a "multiple regression

25    analysis" can be used to "control" for differences between benchmark and conduct periods.

26    (Plaintiffs' Opposition Brief ("Opposition") at 10:1 (citing Areeda P., Hovenkamp H., Antitrust Law

27    (3d ed. 2007), IIA, ¶ 395, at 386 ("Areeda").))  This, of course, is simply a restatement of the Ninth

28    Circuit's requirement that the expert must control ("adjust") for differences between his benchmark

23256711.DOC

and conduct periods. White's model, however, does not do this. Areeda explains that a proper regression must first *identify* any factors that have changed between the two periods, and then use appropriate variables to *control for* those changes. *Id.* For example, Areeda notes that sudden shifts in market conditions "will lead to price increases even in the absence of a conspiracy . . . To the extent that [a shift] coincided with the formation of [a] cartel, the influence of the . . . shift should be taken into account when estimating the but-for prices." *Id.* at 385. White has done neither.

White admits he did *no analysis* of whether the relationships between his predictive variables and defendants' behavior were different in the benchmark and conduct periods. (White Rebuttal Tr., Ex. 21 at 141:14-23.)[1] If White did not even *examine* differences between the benchmark and conduct periods noted above, he cannot claim that he has *controlled* for them.

More importantly, White admits he did not control for important supply determinants of price that defendants have shown changed between his benchmark and conduct periods, including DRAM capacity. Areeda notes that in order to create a proper regression, an expert must "*control[] for* changes in demand *and supply determinants* of price." (Areeda at 386.) Plaintiffs do not dispute there were significant changes in capacity between the benchmark and conduct periods, including shutting down fabs when prices dropped below costs and non-defendant suppliers leaving the market, *that affected prices* in the DRAM market, but which were not accounted for in (and specifically excluded from) White's prediction equation. (Opening Br. at 14:7-23 & 16:17-17:12.)

But White admits he *excluded* from his analysis *any decisions affecting supply*, by both defendants and non-defendants. (White Report, Ex 7 at ¶ 26; White Rebuttal Report, Ex. 8 at ¶ 216 (d); White Tr., Ex. 20 at 148:3-149:13; 240:4-14; 244:17-23; White Rebuttal Tr., Ex. 21 at 61:11-62:11.)[2] None of these are addressed *anywhere* in Plaintiffs' opposition, White's report, or even in his "alternative" analyses which looked at exogenous factors *unrelated to* these supply variables.

---

[1]   All exhibit numbers refer to exhibits attached to the original Declaration of Joshua Stambaugh submitted on July 30, 2008 with Defendants' Motion, unless otherwise noted.

[2]   Plaintiffs' choice of language is revealing on this point. Knowing White did not control for numerous supply changes, Plaintiffs sidestep the issue by saying that White has included "*cost* and demand" variables, *see* Opposition at 8:12, 11:12, 11:22-23. But cost is not the same as supply, and Areeda required White to control for *supply* determinants of price.

2325671 1.DOC

KAYE SCHOLER LLP

1   (White Rebuttal Report, Ex. 8 at ¶¶ 218-19 (exogenous study examined factors such as earthquakes,

2   Windows operating systems introductions, Y2K, etc.))  Plaintiffs cite to only one place in White's

3   report where he claims he included the "correct supply and demand factors."  (Opposition at 11:13-

4   15; White Rebuttal Report, Ex. 8 at ¶¶ 215-217.)  But this is qualified by White's specific admission

5   that he *did not include* any supply decisions or output related conduct by the defendants.  (White

6   Report, Ex. 7 at ¶ 26; White Rebuttal Report, Ex. 8 at ¶ 216 (d); White Tr., Ex. 20 at 148:3-149:13.)

7   For this reason alone, White has failed to meet his burden of demonstrating comparability.

   **2.     White Has Failed to Account For Changes in Lawful Levels of**

   **Competitiveness in the Cyclical DRAM Market.**

10          In addition to glossing over White's failure to account for important supply determinants of

11  price, Plaintiffs ignore altogether White's admission that a hyper-competitive benchmark period

12  would generate "but-for" prices that are too low and overcharges not attributable to the conspiracy:

> Q.  But the mere fact that an application of your methodology results in but-for prices
> that are less than actual prices doesn't say that that period of time was conspiratorial,
> correct?
> A.  That's right.
> Q.  It could simply be a less competitive period, right?
> A.  Yes.

17  (White Rebuttal Tr., Reply Declaration of Joshua Stambaugh ("Stambaugh Reply Dec.") Ex. 6 at

18  83:17-84:1.)  However, White assumed that every instance in which his but-for prices were below

19  competitive prices during the conduct period, that difference was attributable to unlawful conduct.[3]

20  (White Tr., Ex. 20 at 177:21-178:3 ("[B]ecause I've embodied . . . the degree of competitive

21  interaction, whatever it might have been in the DRAM industry, outside the conduct period, the but-

22  for price represents the prices that would have been observed had that same conduct prevailed but

23  through the months of the conspiracy period or the plea period.")).  This is directly contrary to

24  Plaintiffs' claim that "White did not simply assume that the two periods were comparable."

25          In fact, competitive conditions did change because Plaintiffs have conceded that the DRAM

26  ――――――――――――――――――
    [3]  As this Court is aware, the pleas do not admit that any unlawful conduct took place
27  throughout the plea period, but only at "certain times during the relevant period" and only "with
    varying levels of effectiveness."  *See, e.g.,* Hynix Plea at ¶ 4(d).  Therefore, White cannot properly
28  conclude that every difference between his predicted and actual prices was due to unlawful conduct.

4

1    industry is cyclical, with periods of increased competition and dropping prices ("bust"), followed by

2    decreased competition with stable or increasing prices and capital investments ("boom"), in turn

3    leading to overcapacity, increased competition, and dropping prices ("bust").  (Opening Br. at 12:20-

4    13:13.)  Plaintiffs' own expert testified that in a cyclical market (like here), a prediction model must

5    include multiple "boom" and "bust" cycles in the base period to accurately predict prices. (May 29,

6    2008 Deposition of Francis X. Diebold ("Diebold Tr."), Ex. 10 at 147:14-17; 145:16-151:15.)

7    Nevertheless, White failed to do this, a fatal flaw that Plaintiffs simply ignore.

8           This is significant because Plaintiffs do not dispute that, due to oversupply, White's initial

9    benchmark period was an extreme and highly competitive "bust" period unprecedented in the history

10   of the DRAM market, where prices saw unprecedented declines of 95%, while the "conduct" period

11   included booms as well as busts.  (Opening Br. at 13:21-14:6.)  Plaintiffs have no answer to the fact

12   that, because of this fundamental flaw, White's model generates massive overcharges during earlier

13   cycles even when there was no alleged conspiracy, because it cannot capture these DRAM supply

14   cycles.  (White Rebuttal Report, Ex. 8 at ¶ 272-73; Kalt Report, Ex. 3 at ¶¶ 201-209 & Fig. 25;

15   Shapiro Report, Ex. 6 at pg. 35 (identifying other earlier periods when White's methodology finds

16   "overcharges" despite the absence of any conspiracy)).

17          Plaintiffs misleadingly claim that White examined "boom/bust" cycles in the industry, *see*

18   Opposition at 11:17-23, but this refers to "technology boom and bust" during the conduct period,

19   (White Rebuttal Report at ¶ 218), not the distinct and unrelated supply cycles in the DRAM market.

20   White does not dispute that his initial benchmark period improperly covered only an extended "bust"

21   period and his model could not predict less competitive "booms" during the conduct period.  Thus,

22   White has failed to account for these changes in lawful competitive conduct affecting DRAM prices.

23          **B.    White Failed to Exclude the Impact of Lawful Conduct.**

24          The Ninth Circuit has long required the exclusion of damages studies that fail to distinguish

25   between the impact attributable to illegal conduct and the impact attributable to legal conduct.  *See,*

26   *e.g., City of Vernon v. Southern California Edison Co.*, 955 F.2d 1361 (1992); *Farley Trans. Co. v.*

27   *Santa Fe Trail Trans. Co.*, 786 F.2d 1342 (1985).  White's damages study fails to disaggregate as

28   mandated by the Ninth Circuit, and Plaintiffs' rationalizations do not save the study from this defect.

1  White made a fundamental error by excluding consideration of any factors subject to the

2 control of the defendants or that would ***even be affected*** by the defendants' conduct, which led him

3 to include in his "damages" the impact of lawful output decisions. (White Report, Ex. 7 at ¶ 26;

4 White Tr., Ex. 20 at 148:3-149:13; 240:4-14; 244:17-23; White Rebuttal Tr., Ex. 21 at 61:11-62:11.)

5  Plaintiffs admit that defendants' supply decisions affected prices. (*See, e.g.,* Plaintiffs'

6 Opposition to Defendants' Joint Motion for Summary Judgment at 26:4-5, 27:24-25, 29:6-7.)

7 Defense experts identified numerous unilateral supply decisions, such as closing fabs that were

8 operating below cost, and Plaintiffs have no response.  Without any evidence that ***all*** of defendants'

9 output decisions were unlawful, White nonetheless attributes the ***entire*** price impact of each of those

10 decisions to the conspiracy.  As shown in the joint Summary Judgment Motion, if ***none*** of

11 defendants' output decisions were conspiratorial, the conspiracy could not have caused the type of

12 marketwide prices increases Plaintiffs claim.  For purposes of this motion, White's damages model

13 fails if ***any*** of the defendants' decisions were legal because White's failure to disaggregate the

14 impact of lawful output decisions is precisely what the Ninth Circuit prohibits.

15  In fact, White treated as "tainted" even supply decisions by ***non-defendant manufacturers***

16 (*e.g.,* IBM's exit from the industry, Toshiba's cut in DRAM production) that affected prices during

17 the conduct period.  (White Tr., Ex. 20 at 148-49; White Rebuttal Report, Ex. 8 at 216(d) (omitting

18 altogether any consideration of changes in capacity or capacity utilization).)  Plaintiffs do not deny

19 that non-defendants made these output decisions or that they affected the price of DRAM.  More

20 importantly, Plaintiffs also do not claim these decisions were unlawful.  Thus White includes as

21 damages the impact of non-defendants' legitimate conduct.  That flaw alone renders White's study

22 unreliable and requires its exclusion.

23  That is precisely what the Ninth Circuit has repeatedly condemned.  A proper damages study

24 cannot arbitrarily treat all manufacturers' conduct as unlawful or "tainted," and must allow the jury

25 to disaggregate the impact of the lawful from the unlawful.  Plaintiffs dismiss this controlling

26 authority as "irrelevant" because the cases allegedly involved damages models different than the one

27 used by White.  But the Ninth Circuit requires disaggregation for all models based on the key legal

28 principle that Plaintiffs may recover only for the impact of defendants' illegal conduct.

KAYE SCHOLER LLP

Plaintiffs assert that White's model is different because it "controlled for the demand and supply factors that may impact price." (Opposition at 12:14-13:1.) But, as shown above, that is precisely what White did not do. White did not control for lawful supply factors affected by non-defendants or by defendants. Without taking into account and controlling for the effect of lawful output decisions, Plaintiffs cannot claim that White's "damages" are based only on illegal conduct.

The economic literature Plaintiffs' counsel cites in a footnote in their opposition does not permit White to use a damage study that violates Ninth Circuit law, by including as damages the impact of lawful conduct. (Opposition at 12, n. 17.) Those articles, by Plaintiffs' own admission, address exclusion only of "any factors that were themselves tainted by the conspiracy." (*Id.* at 12.) Plaintiffs cite no economic literature, nor any case, permitting White to exclude ***all*** conduct by nondefendants' and defendants' lawful conduct that was not "tainted by the conspiracy."

Plaintiffs cite a single district court case from Pennsylvania, *In re Linerboard Antitrust Litigation*, 497 F.Supp.2d 666 (E.D. Pa. 2007), that allowed a damages study that excluded variables under defendants' control. Plaintiffs do not deny that *Linerboard* involved a fundamentally different kind of conspiracy than the one alleged here. Unlike here, the first sentence of *Linerboard* states that the case involved a conspiracy to restrain output. *Id.* at 669 (defendants "conspired to raise the price . . . by restricting production"). Where the conspiracy's purpose is to control output, it may make sense to treat the impact of output decisions as damages, but not here, where there plainly were numerous significant, but lawful and unilateral decisions affecting output.[4]

Even then, the *Linerboard* decision noted that White had not excluded all measures of capacity, because it "properly accounted for exogenous factors such as . . . capacity constraints" and "incident downtime." 497 F.Supp.3d at 671 n.11, 676. Here, White admitted he "omit[ted] the capacity variable" entirely. (White Tr., Ex. 20 at 148:16-18). The *Linerboard* court also admitted the study only after White demonstrated that the capacity variable he omitted did not materially

---

[4]   Plaintiffs do not explain how White's model in this price information exchange case would differ from the study he would construct in a case where the conspiracy encompassed a restraint on output. Indeed, Plaintiffs have affirmatively disclaimed the need to prove an agreement among defendants "to control DRAM output or supply." (Plaintiffs' Opposition to Defendants' Joint Motion for Summary Judgment at 25:10-11.)

7

1   impact his estimates. Thus, he "reran a number of variables in his model . . . includ[ing] container-

2   board capacity, containerboard inventories at box plants, total containerboard inventories" and found

3   "damages estimates . . . very similar to those resulting from [his] final prediction equation." 497

4   F.Supp.2d at 680. White has made no such showing here, and Plaintiffs concede that defendants'

5   output decisions affected prices. (*See, e.g.*, Plaintiffs' Opposition to Defendants' Joint Motion for

6   Summary Judgment at 26:4-5, 27:24-25, 29:6-7.) None of the ten "alternative" analyses in White's

7   Rebuttal Report included DRAM capacity variables or anything within defendants' control. The fact

8   that the White model was allowed in *Linerboard* does not mean White's model here is admissible.

9   "[S]cientific validity for one purpose is not necessarily scientific validity for other, unrelated

10  purposes." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993).

  **C.    White's Second Step, In Which He Predicts Plaintiffs' Prices Using Target
          OEM Prices, Is Unreliable And Inadmissible.**

13          Regardless of the admissibility of White's first step, which purports to predict Target OEM

14  prices using certain "predictive variables," White must also demonstrate that his second step, in

15  which he uses the Target OEM prices to predict Plaintiffs' prices, is also reliable. *See Domingo v.*

16  *T.K.*, 289 F.3d 600, 606 (9th Cir. 2002); *Cagle v. Cooper Cos. (In re Silicone Gel Breasts Implants*

17  *Prods. Liab. Litig.)*, 318 F. Supp. 2d 879, 890 (C.D. Cal. 2004) ("any step that renders [expert's]

18  analysis unreliable . . . renders the expert's testimony inadmissible.).

  **1.    Plaintiffs Do Not Dispute That White's Second Step Finds Overcharges to
          the Plaintiffs Even When There Is No Overcharge To The Target OEMs.**

21          Plaintiffs utterly fail to justify the fact that White's second step generates huge damages to

22  Plaintiffs *even when the conspiracy had no effect on the Target OEMs' prices.* (Mot. at 24:15-26).

23  Plaintiffs do not dispute this result. (Opposition at 17, n. 24). That nonsensical result alone renders

24  his two-step approach here unreliable. Whatever merits his two-step process may have in the

25  abstract, White's failure to reliably apply it in this case renders his methodology inadmissible. *See*

26  *Cagle*, 318 F. Supp. 2d at 890 (a step in a methodology is inadmissible "whether the step completely

27  changes a reliable methodology or merely misapplies that methodology").

28          Plaintiffs ask this Court to ignore this error because White finds two other approaches that

8

generate even higher overcharges, but White does not claim either of these approaches is reliable. To the contrary, he admits each of them is also flawed.[5]  (White Rebuttal Report, Ex. 8 at ¶ 279). The fact that two other admittedly flawed approaches also generate damages does not mean the demonstrably flawed approach White uses is reliable.  *See DSU Medical Corp. v. JMS Co., Ltd.*, 296 F.Supp.2d 1140, 1147 (N.D.Cal. 2003) ("Under *Daubert*, the trial judge is limited to considering the methodologies relied upon by the expert, not the conclusions reached by the expert").  Indeed, the fact that two other flawed approaches generate similar damages undercuts his approach's reliability.

### 2.    Plaintiffs Do Not Explain How White's Second Step Is Reliable When The Accepted Methodology Finds No Damages To Plaintiffs.

As demonstrated in the opening brief, White added a second step that finds damages no matter what because the methodology he claims is so reliable in predicting Target OEM prices finds no damages when used to predict plaintiffs' prices.  Plaintiffs do not dispute that determining Plaintiffs' but-for prices directly finds no damages.  (Opposition at 16).  Plaintiffs do not dispute that such an unexplained conflict between their methodology and the generally accepted methodology is grounds for exclusion.  *See Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1391 (D. Or. 1996).[6]  Instead, Plaintiffs argue that this authority does not apply because their second step is ***also*** generally accepted and reliable.  This response, however, begs the question, because the entire purpose of this motion is to determine whether their proposed approach is reliable.

Plaintiffs next contend they can generate overcharges by applying his first step directly to Plaintiffs' prices, by ***adding as a variable his Target OEM prices***.  (Opposition at 15; White Rebuttal Report at ¶ 90 ("I re-estimated the defendants' expert models by adding the named OEM price index to the original set of candidate predictors.")).  This approach recycles the same problem. Plaintiffs do not deny that this is a different approach to the one they used to predict the Target OEM

---

[5]    In addition, White did not show in his report that either of these flawed alternate approaches accurately predicts actual plaintiff prices.  He tests only one of the other approaches on only two of the Plaintiffs, Sun and Jaco, and even those results show overcharges when actual OEM prices are used (albeit less than White's approach).  (White Rebuttal Report, Ex. 8 at ¶ 278.)

[6]    Even Plaintiffs' own expert agreed that it would "certainly be interesting" and indeed "legitimate" to apply White's model directly to predict Plaintiffs' prices and to compare those results to those generated by White's two-step approach.  (Diebold Tr., Ex. 10 at 70:10-71:19.)

prices, because it uses OEM prices as a variable. *See Cagle*, 318 F. Supp. 2d at 890 (methodology is inadmissible when it "completely changes a reliable methodology"). They also do not show that this modification of the methodology is accepted or reliable, or has ***ever before been used by White, or anyone else***. The only evidence on this score is the opinion of Plaintiffs' methodology expert Diebold that this modification violates one of his fundamental requirements of a reliable predictive model, by including a predictive variable under the defendants' control (such as Target OEM prices). (Diebold Tr. Ex. 10 at 70-75).

The fact that White's demonstrably flawed second step inexplicably generates damages when his own purportedly reliable methodology finds no damages conclusively shows its unreliability.

### 3.      Plaintiffs Do Not Show That The Two Step Approach As Used By White Is Generally Accepted In The Scientific Community.

In addition to failing basic tests of reliability, White has not shown that his two-step approach enjoys widespread acceptance for determining but-for prices in this context.

***First***, whether or not this indirect, two-step approach is ***ever*** appropriate, Plaintiffs' expert on methodology testified that the limited circumstances when it may be "appropriate and reliable" are when there are "issues of data quality and quantity and availability." (Diebold Tr., Stambaugh Reply Dec. Ex. 4 at 62:8-11, 71:12-19, 76:2-22.) Plaintiffs misleadingly cite a partial answer Diebold gave that it is "certainly conceivable" that a two-step approach could be "more statistically efficient," but leave out the beginning of the sentence, in which he said that may be true only where there are "issues of data quality and quantity and availability." (*Id.* at 62:8-11.) Diebold later testified that there were no data issues that would make a two-step approach appropriate here.

> Q. So there is nothing that you know about the Plaintiffs' prices that would cause you to believe that using this predictive assessment of treatment effects methodology directly on their prices would not be an appropriate way to go.
>
> THE WITNESS:   Correct.

(Diebold Tr., Ex. 10 at 71:12-19; *see also id.*, Stambaugh Reply Dec. Ex. 4 at 76:2-22 (praising the quality of the data when asked if there were any issues of data quality, quantity or availability)).

Plaintiffs cite no testimony contradicting Diebold's testimony that plaintiffs' data had no "issues of data quality and quantity and availability" that would be needed to make the two-step

10

approach appropriate.  White does not claim there were any such data issues; in fact, he used that same data in his second step.  Plaintiffs purchased billions of dollars of DRAM in thousands of transactions covering the entire time period.  Defendants' experts had no difficulty using this data to predict Plaintiffs' prices directly.  Nor did White, though he improperly modified his methodology.  Plaintiffs have not shown that use of two steps was appropriate in this case.

**Second**, White has not shown that this indirect, two-step approach is "practiced by (at least) a recognized minority of the scientists in their field," as required by *Daubert*. *Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1035 (N.D. Cal. 1999).  Importantly, the **expert** must provide both a detailed explanation of what he did and proof of its acceptance.  *See id.*  White was required to state in his report the basis for his opinions, and he had two opportunities to do so.  His first report cited no study, article or treatise (and none of the ones Plaintiffs' counsel now cites) supporting his two-step approach.  Nor did his Rebuttal Report, which devotes two paragraphs to explaining why his two-step approach is appropriate, and attaches an Appendix listing all supporting materials, neither of which cites any study, text or other literature supporting his two-step approach. (White Rebuttal Report, Ex. 8 at ¶¶ 86-87 & App. A).  Even Diebold, who Plaintiffs retained specifically to attest to the acceptance of White's approach, did not opine that the second step was generally accepted or appropriate.  (Diebold Tr., Stambaugh Reply Dec. Ex. 4 at 34:11-25).  This was White's opportunity to meet his burden under *Daubert*, and he failed to do so.

Neither of the district court decisions Plaintiffs cite as evidence of general acceptance satisfies their burden.  Tellingly, in both *In re Linerboard* and in *In re Vitamins*, Docket No. Misc. 99-197 (D.D.C. 2003), White was either the expert or assisted in preparing the report, undermining any "general acceptance" claim.  Moreover, neither decision addressed White's second step here. Plaintiffs have not even shown that the same second step was used in either case.

White admitted that in *Linerboard*, he did not use a two-step approach, but predicted Plaintiffs' prices directly.  (White Tr., Ex. 20 at 312:18-313:21.)  Plaintiffs ignore this admission by their own expert and, instead, ask the Court to rely on a cryptic statement by a lawyer at a hearing. That statement -- "the second part of his analysis was to derive for each plaintiff the impact that results from the but-for price, the change in the market price" (Opposition at 16) -- provides no

11

1    illumination on what White *did* to "derive" the impact on each plaintiff.[7]  The decision in

2    *Linerboard* spends two pages describing what White did that was being upheld under *Daubert*, and it

3    makes no mention of two steps, only predicting prices directly using various supply and demand

4    "shifters" -- *i.e.*, White's ***first*** step.  *See Linerboard*, 497 F. Supp. 2d at 670-672.  The decision is not

5    precedent for something it did not even address.  *See Flores-Miramontes v. INS*, 212 F.3d 1133,

6    1140 (9th Cir. 2000).  Thus *Linerboard* undermines, and does not support, White's approach here.

7         Plaintiffs' reliance on *In re Vitamins* is even more suspect.  Plaintiffs do not provide the

8    Court with any actual decision, citing only three pages of the transcript of a hearing.  (*See*

9    Declaration of David Cross in Support of Plaintiffs' Opposition at Exhibit 25).  That transcript

10   makes no mention of the two-step approach used here.  Moreover, Plaintiffs have not shown that the

11   expert in *Vitamins* even used the same two-step approach in that case as he used here.  They

12   misleadingly attach only two pages of the report from that case, even though defendants requested a

13   full copy.  (*See* Declaration of David Cross in Support of Plaintiffs' Opposition at Exhibit 33.)  If

14   Plaintiffs' counsel have the report and were able to attach part of it, it cannot be confidential.  Yet,

15   they do not attach any portion describing meaningfully what was done in the "second" step.  The

16   paragraph Plaintiffs quote at page 15 of their Opposition does not appear to describe what White did

17   here, because the "model" appears to have been built with data that included Plaintiffs' purchases.

18   The *Vitamins* court also did not address a second step and is not precedent for this Court.

19        ***Third***, Plaintiffs cannot fill the missing gap in White's report by citing to a handful of studies

20   White did not cite and has never claimed involve the same second step he used here.  (Opposition at

21   14-15, fn. 20 & fn. 21).  As noted above, White did not cite or utilize these articles and studies, and

22   Plaintiffs' counsel are not qualified to opine that they support White's approach.  On their face, none

23   involves determining but-for prices or overcharges, let alone in an antitrust case.  In fact, they all

24   seem to involve forecasting a subset of data from an aggregated set, which is not the case here.

25        Footnote 19 cites a series of articles describing a single study by "a group of economists at

---

[7]  Even as to the first step, the challenge in that case was not to general acceptance, but to the "fit" in that case, and the court noted that its decision did "not address in detail Professor White's qualifications or the general reliability of predictive modeling." *Linerboard*, 497 F.Supp.2d at 668, n. 2.

KAYE SCHOLER LLP

the University of Chicago" to forecast international growth rates (not prices). While Plaintiffs do not describe what "two step[s]" were used in the study, the articles show that it involved using predicted *aggregate* growth rates to determine individual countries' rates. The other articles are equally off-point, involving such things as using aggregate salmon numbers to forecast numbers for individual species *within* the overall total, and similar methods to predict individual product demand, sales and earnings, all using *aggregate* data that is then broken out into its components to determine predictions for individuals within those aggregate numbers.

White did not predict aggregate market prices (or salmon runs or telephone demand) in his first step, but one set of customers' prices, that were then used to predict prices for a distinct set of customers whose data were *not* included in the aggregate set. There is a world of difference between using aggregate data that includes Plaintiffs' prices in the first step, and using one set of customers' prices (that does not include Plaintiffs' prices) to predict Plaintiffs' prices. *See Cagle*, 318 F. Supp. 2d at 890 (methodology is inadmissible when it "completely changes a reliable methodology"). In any event, Plaintiffs provide no expert testimony claiming these studies demonstrate general acceptance of White's two-step approach, especially when use of this approach generates damages when there should be none, and where the direct approach generates polar opposite results.

**D.      White's Alternative Analyses Do Not Render His Chosen Damages Model Admissible, and Merely Repeat the Errors of His Damages Model.**

Unable to defend the methodology that White used in the study he actually used to generate his damage figures, Plaintiffs claim that it is somehow "corroborated" by the results he obtained using several alternative analyses – all presented for the first time in his rebuttal report. But *Daubert* requires the methodology to be reliable, not the result. *See DSU Medical Corp.*, 296 F.Supp.2d at 1147. The fact that White may also be able to also generate other damage amounts using other methodologies does not mean the methodology he used is reliable or admissible. Moreover, the alternatives do not even corroborate White's results. Instead, they generate wildly different damages, from 12% to 58%. (Opposition at 4-6.) These figures undermine, rather than verify, the reliability of even the results of White's damages actual, chosen model.

Also, the alternatives were offered for the first time in White's rebuttal report. Rebuttal

23256711.DOC

1   testimony should be "strictly limited to poking holes in the theories of [the other side's] experts."

2   *International Business Machines Corp. v. Fasco Industries, Inc.*, 1995 WL 115421 (N.D.Cal. 1995);

3   *see also Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 2005 WL 1300763 (N.D. Ill. 2005). Judge

4   Alsup recently refused to consider new damage models submitted for the first time in a rebuttal

5   report supporting class certification, because they were procedurally improper and should have been

6   included in the opening report. 7/18/08 Order Certifying Limited Direct Purchaser Class in *In re*

7   *Graphics Processing Units Antitrust Litig*, Case No. C 06-07417 WHA, MDL No. 1826, RJN Ex. A

8   at 37-38 & n. 7; *see also* 11/07/07 Pretrial Order No. 7 in *In Re Graphics Processing Units Antitrust*

9   *Litig.*, (Docket # 247), RJN Ex. B at Para. 5 ("Reply [expert] reports must be limited to true rebuttal

10   and should be very brief. They should not add new material that should have been placed in the

11   opening report.").

12       Moreover, three of White's alternatives are revisions of alternatives done by particular

13   defendants' experts, which could be relevant only in cases where the defendants' experts testify to

14   those opinions. In fact, two of the three alternatives cannot be presented in the initial trial involving

15   Sun because the party offering the expert is not a defendant in the Sun case.

16       Even more fundamentally, Plaintiffs do not show that any of the alternatives address the

17   specific problems raised by this motion.[8] Each alternative uses the same benchmark period as

18   White's damages study, a benchmark that was not comparable to the conspiracy period because it

19   involved a sustained industry "bust." (*See* profit margin analysis (#1)--White Rebuttal Report, Ex. 8

20   at Figures 99 & 100, Rebuttal Tr., Stambaugh Reply Dec. Ex. 6 at 57:6-9; simplified prediction

21   equation (#2)--White Rebuttal Report at Figures 103 & 104; one stage (#3)--White Rebuttal Report

22   at Figures 107 & 108; enhanced data set (#4)--White Rebuttal Report at Figures 111 & 112; response

23   to Rubinfeld (#5)--White Rebuttal Report at Figures 138 & 139; response to Shapiro (#6)--White

24   Rebuttal Report at Figure 157; response to Topel (#7)--White Rebuttal Report at ¶ 212; common

25   variable study (#8)--White Rebuttal Report at figures 164 & 165; netting negative overcharges (#9)--

26

27       [8]   Study "No. 10" is White's extended examination of a few of the factors that various defense
     economists said should have been considered. (Opposition at 5:23-6:5.) It does not generate any
28   damages estimates and, therefore, cannot "corroborate" the results of his damages study.

KAYE SCHOLER LLP

1   White Rebuttal Report at ¶ 268.)

2       Similarly, none of the alternatives address the problem that White excludes all output

3   decisions, including non-defendants' and defendants' lawful decisions. For example, White

4   concedes his simplified predictive equation (#2) did not consider production capacity or capacity

5   utilization. (White Rebuttal Tr., Ex. 21 at 61:11-18, 62:16-19.) And each alternative uses the

6   unreliable two-step approach except  No. 3, which is discussed above. Not surprisingly, alternatives

7   infected with the same flaws as White's damages study return similarly flawed results. These

8   studies do not justify the admission of an unreliable damages study that violates the Ninth Circuit's

9   requirements for damages studies.

10   **E.   White's Post Conduct Period "Fit" Does Not Cure His Model's Many Flaws.**

11       Finally, the fact that White's methodology predicted but-for prices that were similar to actual

12   prices during the post-conspiracy period does not establish reliability. Indeed, defendants' experts

13   demonstrated that by using post conspiracy period prices to build the model itself, White's

14   methodology necessarily "fits" post-conspiracy prices. This is akin to having the answers to an

15   exam before taking the test. (*See* Murphy Report, Stambaugh Reply Dec. Ex. 2 at ¶¶ 180-81 &

16   Exhibit 45; O'Brien Report, Stambaugh Reply Dec. Ex. 3 at ¶¶ 57-62, Exhibits 6A & 6B; Kalt

17   Report, Stambaugh Reply Dec. Ex. 1 at ¶¶ 184-90.) In other words, White's model inherently forces

18   predicted post-conspiracy prices back to actual prices. (Kalt Report, Stambaugh Reply Dec. Ex. 1 at

19   ¶¶ 184-90 & Figures 21A, 21B.)  By contrast, when defendants' experts applied the established test

20   of using only data from the initial pre-conspiracy period to run White's regression (which White

21   admits he did not do), there is no similar match in the post period between actual and but-for prices,

22   and hence no evidence that the model is reliable. (*See* White Tr., Stambaugh Reply Dec. Ex. 5 at

23   297:11-21; Murphy Report, Stambaugh Reply Dec. Ex. 2 at ¶¶ 180-81 & Exhibit 45; O'Brien

24   Report, Stambaugh Reply Dec. Ex. 3 at ¶¶ 57-62, Exhibits 6A & 6B.)

25   **III.   CONCLUSION**

26       Defendants respectfully request that this Court exclude any and all testimony, references to

27   testimony or argument based upon the testimony of Professor White regarding Plaintiffs' alleged

28   damages in the above-entitled actions.

15

1

2   DATED:  October 31, 2008                     Respectfully Submitted,
                                                 KAYE SCHOLER LLP
3

4                                                By:_____/s/_____
                                                        Julian Brew
5                                                Attorneys for Defendants
                                                 INFINEON TECHNOLOGIES NORTH AMERICA
6                                                CORP. AND INFINEON TECHNOLOGIES AG
                                                 *[On behalf of all Defendants listed below]*
7

8

9   Dated: October 31, 2008                      KENNETH R. O'ROURKE
                                                 O'MELVENY & MYERS LLP
10

11                                               By:_____/s/_____
                                                        Kenneth R. O'Rourke
12

13                                               Attorneys for Defendants
                                                 HYNIX SEMICONDUCTOR INC. and
14                                               HYNIX SEMICONDUCTOR AMERICA INC.
                                                 in all but the DRAM Claims Liquidation Trust
15                                               matter

16  Dated: October 31, 2008                      ORRICK, HERRINGTON & SUTCLIFFE LLP
17

18                                               By:_____/s/_____
                                                        Howard M. Ullman
19

20                                               Attorneys for Defendants
                                                 NANYA TECHNOLOGY CORPORATION
21                                               and NANYA TECHNOLOGY
                                                 CORPORATION USA
22

23  Dated: October 31, 2008                      SIMPSON THACHER & BARTLETT LLP
24

25                                               By: _____/s/_____
                                                        Harrison J. Frahn IV
26

27                                               Attorneys for Defendants
                                                 ELPIDA MEMORY, INC. and
28                                               ELPIDA MEMORY (USA) INC.

KAYE SCHOLER LLP

16

23256711.DOC

1    Dated: October 31, 2008                    THELEN REID BROWN RAYSMAN &
                                                STEINER LLP
2

3                                               By: _____/s/_____
                                                        Robert Pringle
4

5                                               Attorneys for Defendants
                                                NEC ELECTRONICS AMERICA, INC
6

7    Dated: October 31, 2008                    SHEPPARD MULLIN RICHTER &
                                                HAMPTON LLP
8

9                                               By: _____/s/_____
                                                        David Garcia
10

11                                              Attorneys for Defendants
                                                SAMSUNG ELECTRONICS CO., LTD. and
12                                              SAMSUNG SEMICONDUCTOR, INC.

13   Dated: October 31, 2008                    GIBSON DUNN & CRUTCHER LLP

14

15                                              By: _____/s/_____
                                                        Joel Sanders
16

17                                              Attorneys for Defendants
                                                MICRON TECHNOLOGY, INC. and
18                                              MICRON SEMICONDUCTOR PRODUCTS,
                                                INC.
19

20   Dated: October 31, 2008                    THELEN REID BROWN RAYSMAN
                                                & STEINER LLP
21

22                                              By: _____/s/_____
                                                        Samuel J. Maselli
23

24                                              Attorneys for Defendants
                                                HYNIX SEMICONDUCTOR INC. and
25                                              HYNIX SEMICONDUCTOR AMERICA INC.
                                                in the DRAM Claims Liquidation Trust matter
26                                              only

27

28

                                          17

23256711.DOC

**ATTESTATION OF FILING**

Pursuant to General Order No. 45 § X (B), I hereby attest that I have obtained concurrence in the service and filing of this Motion with electronic signatures from all of the Defendants listed in the signature blocks above.

                        /s/ Joshua Stambaugh
                        Joshua Stambaugh

18

23256711.DOC