1   KENNETH R. O'ROURKE (S.B. #120144)
    korourke@omm.com
2   PAUL B. SALVATY (S.B. #171507)
    psalvaty@omm.com
3   O'MELVENY & MYERS LLP
    400 South Hope Street
4   Los Angeles, CA  90071-2899
    Telephone:     (213) 430-6000
5   Facsimile:     (213) 430-6407

6   MICHAEL TUBACH (S.B. #145955)
    mtubach@omm.com
7   THOMAS BROWN (S.B. #182916)
    tbrown@omm.com
8   O'MELVENY & MYERS LLP
    Embarcadero Center West, 275 Battery Street
9   San Francisco, CA  94111-3305
    Telephone:     (415) 984-8700
10  Facsimile:     (415) 984-8701

11  IAN SIMMONS (admitted *pro hac vice*)
    isimmons@omm.com
12  O'MELVENY & MYERS LLP
    1625 Eye Street, NW
13  Washington, D.C.  20006-4001
    Telephone:     (202) 383-5300
14  Facsimile:     (202) 383-5414

15  Attorneys for Defendants
    HYNIX SEMICONDUCTOR INC. and
16  HYNIX SEMICONDUCTOR AMERICA INC.
    (except in the *DRAM Claims Liquidation Trust*)

17
                    UNITED STATES DISTRICT COURT
18
                    NORTHERN DISTRICT OF CALIFORNIA
19

20  *Sun Microsystems, Inc., et al. v. Hynix*      Case No.   C-06-01665 PJH (Consolidated)
    *Semiconductor, Inc., et al.*                             C-06-02915 PJH
                                                              C-07-01200 PJH
21  *Unisys Corporation v. Hynix*                             C-07-01207 PJH
    *Semiconductor, Inc., et al.*                             C-07-01212 PJH
22                                                            C-07-01381 PJH

23  *All American Semiconductor, Inc. v. Hynix*
    *Semiconductor, Inc., et al*                   **DEFENDANTS' REPLY IN SUPPORT OF
                                                   MOTION FOR SUMMARY JUDGMENT
24  *Edge Electronics, Inc. v. Hynix*             AND, IN THE ALTERNATIVE,
    *Semiconductor, Inc., et al.*                  SUMMARY ADJUDICATION ("OMNIBUS
25                                                 MOTION")**

26  *Jaco Electronics, Inc. v. Hynix*
    *Semiconductor, Inc., et al.*                  Hearing Date:      December 10, 2008
                                                   Time:              9:00 a.m.
27  *DRAM Claims Liquidation Trust, by its*       Place:             Courtroom 3, 17th Floor
    *Trustee, Wells Fargo Bank, N.A. v. Hynix*    Judge:             Hon. Phyllis J. Hamilton
28  *Semiconductor, Inc., et al.*

1

**TABLE OF CONTENTS**

2

**Page**

3
I.    PLAINTIFFS MUST OFFER A PLAUSIBLE THEORY AND FACTS THAT
      SUPPORT SUCH A THEORY. ....................................................................... 2

4
II.   PLAINTIFFS OFFER AN IMPLAUSIBLE THEORY WITHOUT ANY

5
      FACTUAL SUPPORT............................................................................................ 4

6
      A.    There Is No Evidence Of A Single Coordinated Output Reduction, Let
            Alone Four Years Of Output Reductions.................................................. 5

7
      B.    There Is No Reason To Believe That Defendants Increased Plaintiffs'
            Prices By Increasing Target OEM Prices (As Plaintiffs' Own Expert

8
            Admits)..................................................................................................... 10

9
      C.    There Is No Evidence That Plaintiffs Were Targeted And Paid 50% More
            For DRAM Over A Four Year Period. .................................................... 12

10
III.  WHITE'S MODEL DOES NOT ESTABLISH CAUSATION....................................... 14

11
IV.   MARSHALL'S "MOVING TOGETHER" ANALYSIS DOES NOT ESTABLISH
      A BROADER CONSPIRACY. .......................................................................... 15

12
V.    CONCLUSION ............................................................................................ 15

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*,
    241 F.3d 696 (9th Cir. 2001) ................................................................. 12

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982) ............................................................................. 12

*Brooke Group*,
    509 U.S. at 242 ............................................................................. 14, 15

*Callahan v. A.E.V., Inc.*,
    182 F.3d 237 (3d Cir. 1999) ................................................................. 15

*In re Aluminum Phosphide*,
    905 F. Supp. 1457 (D. Kan. 1995) ......................................................... 5

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999) ................................................................. 7

*In re Coordinated Pretrial Proceedings in Petroleum Prods.*,
    906 F.2d 432 (9th Cir. 1990) ............................................................. 2, 7

*In re Indus. Diamonds Antitrust Litig.*,
    167 F.R.D. 374 (S.D.N.Y. 1996) ........................................................... 10

*In re Linerboard Antitrust Litig.*,
    497 F. Supp. 2d 666 (E.D. Pa. 2007) ..................................................... 15

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ............................................................. 3, 4

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ......................................................................... 1, 2

*Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*,
    185 F.3d 957 (9th Cir. 1999) ................................................................. 12

*Southwire Co. v. J.P. Morgan Chase & Co.*,
    528 F. Supp. 2d 908 (W.D. Wis. 2007) ................................................. 15

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931) ............................................................................... 3

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ............................................................................... 3

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ............................................................................... 7

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) ......................................................................... 1, 3

1    Defendants seek summary judgment because Plaintiffs have failed to prove that

2    Defendants' conduct caused the injury and overcharges Plaintiffs claim they suffered.  This

3    argument is based on three key points:  (1) Plaintiffs rely exclusively on the expert testimony of

4    White and Marshall to carry their burden of proving injury and causation, Mot. at 10:1-15; (2)

5    White and Marshall theorize that Defendants caused prices for almost all DRAM purchased to be

6    inflated by 50% throughout a four-year period, *id*. at 9:15-11:1; and (3) White and Marshall base

7    their theory of causation and injury entirely on the pleas entered by some Defendants, *id*.  In their

8    Opposition, Plaintiffs do not dispute these points.

9    Having ceded these premises (and lashed themselves to a theory of injury untethered from

10   the underlying facts), Plaintiffs seek to avoid summary judgment by defining their burden

11   downward.  They insist that they do not have to prove that Defendants' conduct was capable of

12   producing the industry-wide impact that is the basis of their huge damage claim.  Opp. at 25:7-

13   26:5.  They argue that they need only produce evidence from which a jury could reasonably

14   conclude that Plaintiffs "'suffered *some* damage flowing from the conspiracy,'" interpreting

15   "some damage" to mean proof that "a single sale was affected by defendants' conspiracy."  Opp.

16   at 7:16-25 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9

17   (1969)); Opp. at 20 n.12.[1]

18   This is wrong as a matter of law.  Courts have applied a lower standard to prove the

19   amount of damages, but courts distinguish the standard to prove amount of damages from that

20   necessary to prove fact-of-damage.  Causation and injury are necessary elements of a liability

21   case, and Plaintiffs must establish these elements with reasonable certainty.  As the Supreme

22   Court held in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.* and has reiterated many

23   times, an antitrust plaintiff must offer a plausible theory that connects all of the antitrust dots --

24   violation, injury-in-fact and, ultimately, damage.  475 U.S. 574, 588 (1986).  Plaintiffs and their

25   experts have not done so.  They did not even try to do so, apparently believing that injury and

26   causation could be assumed from the pleas.

---

[1] In other words, Plaintiffs reduce their case to the proposition that, as a matter of law, they are entitled to present their $1.7 billion damage claim (pre-trebling) to a jury if they come forward with evidence of a $1 overcharge on a single transaction.

1    Plaintiffs' belated attempt to build a factual foundation for their massive claim only

2    compounds the original problem.  As this Court well knows, the conspiratorial conduct admitted

3    in the pleas primarily consisted of communications between certain employees of some

4    Defendants about prices or price ranges for particular products to six Target OEMs only at certain

5    times, often different for each OEM and Defendant, during the plea period.  On some occasions,

6    understandings were reached, but on many other occasions Defendants used the information

7    obtained to gain a competitive advantage.  This conduct is insufficient to cause massive and

8    unremitting overcharges of up to 50% to the entire DRAM market for almost four years.  And the

9    emails, deposition excerpts and supporting affidavit that Plaintiffs present do not substantiate --

10   and, in many cases, directly refute -- the theory of injury proffered by their experts.

11   **I.     Plaintiffs Must Offer A Plausible Theory And Facts That Support Such A Theory.**

12   In order to survive Defendants' motion, Plaintiffs must establish that there is a genuine

13   issue of material fact as to whether the conduct they use as the sole basis for their impact theory --

14   *i.e.*, the conspiracy admitted by some Defendants in the pleas -- caused the entire market to pay

15   dramatically higher prices for almost all of the DRAM purchased between August 1998 and June

16   2002.  *Matsushita*, 475 U.S. at 586 (holding that plaintiffs "must show more than a conspiracy in

17   violation of the antitrust laws; they must show an injury to them resulting from the illegal

18   conduct").  "Antitrust law limits the range of permissible inferences from ambiguous evidence."

19   *Id.* at 588.  In *Matsushita*, the Supreme Court held that a grant of summary judgment to the

20   defendant is required "if the factual context renders respondents' claim implausible -- if the claim

21   is one that simply makes no economic sense -- respondents must come forward with more

22   persuasive evidence to support their claim than would otherwise be necessary."  *Id.* at 587.  The

23   principles set forth in *Matsushita* apply to every element of Plaintiffs' claims.  *In re Coordinated*

24   *Pretrial Proceedings in Petroleum Prods.*, 906 F.2d 432, 441 (9th Cir. 1990) ("[I]n applying

25   *Matsushita*, a court must consider the nature of the evidence that the plaintiffs have offered ***with***

26   ***respect to each element of the cause of action*.") (emphasis added).  And this specifically

27   includes injury-in-fact -- *i.e.*, injury and causation.  The implausibility of Plaintiffs' theory of

28   causation is, thus, a proper ground for summary judgment.

1    None of the cases cited by Plaintiffs suggest otherwise.  Plaintiffs claim to find in *Zenith*

2    support for the proposition that proof of damage on one transaction provides a foundation for a

3    damage theory on four-years worth of transactions.  Opp. at 7:16-25, 20 n.12.  But *Zenith* says no

4    such thing.  In *Zenith*, there was evidence that a pool of companies conspired to exclude plaintiff

5    from the Canadian market.  *Zenith*, 395 U.S. at 116.  The Supreme Court upheld the District

6    Court's decision and noted that the District Court "awarded [damages] on the assumption that

7    Zenith, absent the conspiracy, would have had 16% of the Canadian television market . . .

8    ***throughout the damage period***."  *Id.* at 116-18 (finding that "the cumulative effects of the pool's

9    campaign . . . had consequences ***lasting well into the damage period***").  In stating that a plaintiff

10   need only establish that it suffered "some damage," the Court did not relieve a plaintiff of proving

11   injury over the period for which its claim of damage flows.  Nor did the Court hold that a plaintiff

12   can avoid summary judgment by presenting evidence of injury on a single transaction but then

13   proceed to trial with a completely different theory of injury based on the claim that it suffered

14   massive damages flowing from harm to the entire market.  The Court simply observed the known

15   distinction between the proof necessary to establish the existence of an injury (reasonable

16   certainty) and the proof necessary to quantify that injury.  *Id*. at 122-25 (citing *Story Parchment*

17   *Co. v. Paterson Parchment Paper Co*., 282 U.S. 555, 562 (1931)).  None of the other district

18   court cases cited by Plaintiffs depart from this holding.

19   Plaintiffs cite just two other cases for the proposition that a plaintiff in a private antitrust

20   case need not explain how the challenged conduct caused him harm.  Opp. at 25:7-26:5 (citing

21   *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) and *Knevelbaard Dairies v. Kraft*

22   *Foods, Inc*., 232 F.3d 979 (9th Cir. 2000)).  But neither of these cases supports this proposition.

23   *Socony-Vacuum* is a ***criminal*** antitrust case, not a private antitrust claim governed by Section 4 of

24   the Clayton Act, and causation and injury are ***not*** required elements of a criminal case.  Mot. at 11

25   n.9, 15:17-16:2.  *Knevelbaard* is a civil case. But plaintiff there brought a claim under

26   California's analog to the Sherman Act, and the case deals with the question of how indirect a

27   claim California law permits.  *Knevelbaard*, 232 F.3d at 984.  There, plaintiffs alleged that

28   defendants fixed the price of bulk cheese to lower the price of the milk they purchased because

- 3 -

the price of bulk cheese was used in a formula by a California state agency to determine the price of milk. *Id.* at 984-85. Defendants argued that the state's decision broke the causal chain. *Id.* at 989-90. The Ninth Circuit held that plaintiffs' allegation that the price of bulk cheese "was a ***tool*** used by the conspirators to manipulate the California milk price" was sufficient. *Id.* at 990. In stating that "the machinery employed by a combination for price-fixing is immaterial," *id.*, the Ninth Circuit was simply acknowledging that plaintiffs offered a somewhat unusual mechanism -- not that a mechanism can simply be assumed and need not be demonstrated. Unlike here, the *Knevelbaard* plaintiffs identified a specific mechanism. The Ninth Circuit did not relieve a plaintiff of the burden to prove the existence of a causal connection.

## II.     Plaintiffs Offer An Implausible Theory Without Any Factual Support.

Although Plaintiffs (wrongly) contend that they can proceed with their claim with proof of injury from a single transaction, they do not prove conduct causing an overcharge on *any* specific transaction. Instead, they offer up a smorgasbord of materials and claim that these somehow prove the conspiracy that their experts assumed. But they miss the point. Plaintiffs do not dispute that their experts failed to perform any factual analysis of Defendants' conduct. Mot. at 10:16-11:11. They built their analysis on the pleas, and the pleas do not establish the existence of the only type of conspiracy that could have caused the type of injury that these Plaintiffs claim they suffered. Mot. at 11:12-13:19. Nor do the pleas establish that the conspiracy that was directed at the Target OEMs was "successful" throughout the entire plea period.[2] *Id.* Having failed to present expert testimony that is based on underlying conduct, Plaintiffs cannot now attempt to backfill the foundation for their experts' theories with material that their experts never used. And their effort to do so reveals that they do not have evidence of the injury that their experts imagine; much of the purported evidence they offer conflicts with their experts' theory of injury either because their experts disclaim the theory that Plaintiffs now put forth, *i.e.*, the idea that Target OEM prices drove Plaintiffs' prices, or because the great majority of the evidence they cite falls into the short periods during which their experts claim little or no damages.

---

[2] Indeed, Plaintiffs principal theory uses a conspiracy start date that is almost one year before the period mentioned in the pleas.

### A.    There Is No Evidence Of A Single Coordinated Output Reduction, Let Alone Four Years Of Output Reductions.

For a conspiracy to cause the type of impact claimed by these Plaintiffs -- industry-wide impact on thousands of transactions that was almost continuous for four years and increased prices by 50% -- Defendants would have had to restrain industry-wide output to "necessarily cause plaintiffs to suffer injury under the Clayton Act."  Opp. at 26:8-11.  Courts recognize that a long-term market-wide conspiracy to raise prices cannot be successful without restricting output. Mot. at 13:22-14:8.  Defendants' authorities stand unchallenged.[3]  Defendants' experts testified that it would not be possible to sustain industry-wide price increases without an output restraint. Ex. 1,[4] Kalt at 191:25-199:24; Ex. 2, Klein at 66:3-67:3; 71:4-73:25; 75:23-78:21; Ex. 3, O'Brien at 75:25-76:22; Ex. 4, Murphy at 40:19-44:6; 60:14-63:1.[5]  And Plaintiffs do not dispute that their own experts also concede that a supply restraint is necessary.  Mot. at 14:9-16.  Even so, their experts have not analyzed the extensive production data, nor have they attempted to show that supply was in fact restrained.  *Id.* at 14:17-15:2.  And the testimony by each Defendant that it always operated at full capacity is uncontroverted.  *Id.* at 15:3-10.

Plaintiffs speculate, but do not prove, that Defendants restrained supply to the entire market in four ways:  1) moving inventory out of certain customers' hubs before a price increase was announced, 2) manipulating the mix of products produced at fabs, 3) restraining the amount of DRAM produced in 2001 and 2002, and 4) restraining the amount of DRAM produced in 1998.  Opp. at 26:6-33:3.  None of their evidence establishes that any supply decision by any

---

[3] In response, Plaintiffs cite only *In re Aluminum Phosphide*, 905 F. Supp. 1457 (D. Kan. 1995), to support the contrary view, but that case does not even address the issue.  Without restraining supply, increasing market-wide prices by so much and for so long would dramatically decrease demand and inventories would build up.  Mot. at 14:2-8.  This basic economic and legal principle is beyond rational dispute.

[4] All references to exhibits are to the Supplemental Declaration of Paul B. Salvaty filed herewith unless otherwise noted.

[5] Plaintiffs misstate Professor Kalt's testimony by quoting partial answers.  Professor Kalt stated that the only circumstance where a cartel could achieve higher prices without agreeing on an output cut is "pure bid rigging" which he described as one seller agreeing to submit a "phony bid" that is higher than the other seller's bid.  Ex. 1, Kalt at 197:7-23.  As Professor Kalt explained, this is the equivalent of a supply restraint because one of the sellers agrees not to sell to that customer.  *Id.* at 197:7-199:24.  This is a far cry from the long-term coordinated industry-wide price increases claimed here, which would massively decrease demand.

Defendant from 1998 to 2002 was the product of concerted action.  Defendants' experts analyzed various Defendants' production decisions and data and their conclusions that industry output was not restrained and that Defendants' production decisions were not the result of any agreements to restrict output remain unrebutted.  Mot. at 16:3-13.  Indeed, it is telling that Plaintiffs make no serious attempt to use Defendants' extensive production data to show any coordinated reduction in output resulting from any of the four methods they identify.[6]  Nor do Plaintiffs point to testimony from any of Defendants' production witnesses to establish that there was a supply restraint at any point in time, let alone an agreed upon restraint.[7]  And even if any one production decision can be attributed to a conspiracy, it would not support the only theory of injury offered by these Plaintiffs, which requires proof that Defendants coordinated supply restraints to raise industry-wide prices *almost continuously for four years by 50%*.

      *First*, the evidence related to the movement of inventory out of particular customer hubs is irrelevant to the issue of a supply restraint.  *See* Opp. at 26:27-27:15.  Absent a decision to restrain production, inventory removed from one hub must go some place.  Moving product from one location to another does not restrain supply to the entire industry.  Opp. Ex. 150, SSI-0002010825-54 at 35-36 ("However, inventory management without true production cuts does not result in a substantial change in competitive behavior and DRAM prices.").  At most, these types of actions might create episodic impact on specific customers at certain times.[8]  Plaintiffs' theory that Defendants conspired to move inventory out of certain hubs is simply not sufficient to allow a jury to plausibly infer that supply to the *entire DRAM market* was restrained for any period of time.  Moreover, Plaintiffs present no evidence that any decision about how much

---

[6] Plaintiffs argue that Defendants have admitted that they could not have successfully raised prices to Target OEMs without restraining supply.  This is not true.  Defendants argue that long-term, industry-wide price increases which resulted in a 50% overcharge would not be possible without an output restraint. The pleas do not establish that output was restrained -- in fact, Samsung's plea (world's largest producer) states that output was underlined added during the plea period. Mot. at 11:12-13:19.  Nor do the pleas establish that the conspiracy that was directed at the Target OEMs was "successful" throughout the entire plea period.  *Id*.

[7] Plaintiffs spent nine days (70 hours) deposing six 30(b)(6) production witnesses from Hynix, Mosel, Samsung, Infineon, Nanya, and Micron and cite nothing from these depositions to support their claim that there was a coordinated supply restraint.

[8] Plaintiffs cite nothing which indicates that they used hubs or that Defendants conspired to reduce inventory at any hubs they might have used.

1    inventory to stock at any hub was coordinated or conspiratorial.[9]

2         **Second**, Plaintiffs' bald assertion that it is "possible" to restrain output by shifting the

3    product mix at fabs is not evidence that Defendants ever did so.  Opp. at 27:16-26.  Notably,

4    capacity diverted from one DRAM product must go somewhere, meaning that a decrease in

5    supply in one DRAM product would increase production of another DRAM product.  Moreover,

6    Plaintiffs cite only sporadic benchmarking meetings where Defendants exchanged general,

7    limited and vague information about production.[10]  *Id.* at 30:15-33:3.  Such information

8    exchanges are not illegal *per se*.  They can become illegal only if the parties to the exchange

9    intend to use the exchange to coordinate decisions on price or output and if the exchanges, in fact,

10   have that effect.  *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *In re*

11   *Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999).[11]  Plaintiffs cite no evidence of a parallel

12   shift in product mix, let alone evidence that any of these information exchanges resulted in a

13   coordinated shift in product mix or an output restraint.  The absence of such proof is dispositive

14   of this issue.

15        Further, over the period at issue, Defendants in this case (not to mention the many other

16   DRAM producers) made a host of different types of DRAM.[12]  If Defendants conspired to

17   manipulate the product mix, there would be evidence in the discovery record, especially in the

18   _____

19   [9] Plaintiffs cite to testimony from Mike Sadler (Micron) to prove up the "hub" conspiracy.  But
     Sadler testified that reducing inventory at hubs was his idea, that he never discussed it with any of
20   his competitors, and that he did not know whether any of his competitors also used this practice.
     Ex. 5, Sadler 5/20 at 108:12-24.  Plaintiffs also cite a Micron email about Infineon reducing
21   inventory at its Compaq hub.  Opp. Ex. 151, MU00781980-82.  But the email does not indicate
     that Micron got the information about Infineon's hub reduction from Infineon and, in fact, it
22   establishes that Micron was "going after the business Infineon will lose as a result of this"
     reduction of inventory at its hub.  They cite no other evidence of coordination.
23   [10] Harter (Infineon) testified that benchmarking meetings involved only a discussion of how to
     maximize production efficiency.  Prices were not discussed, and the meetings were preceded by
24   antitrust training. Ex. 6, Harter at 336:10-338:1.
     [11] Plaintiffs' claim that *Petroleum Products* suggests otherwise.  But it is entirely consistent with
25   *Gypsum*, holding only that evidence of intent to restrain capacity coupled with evidence that
     parties exchanged capacity information ***and that such a restraint occurred*** following the
26   exchange can support an inference of a conspiracy to restrain output.  906 F.2d at 462.
     [12] Prior to 1996, there was only asynchronous DRAM - Fast Page Mode (FPM) DRAM (and its
27   upgraded form, Extended Data Out (EDO) DRAM).  *See* Ex. 7, Murphy Rep. ¶ 22.  Beginning in
     1996 and continuing until late 2002, DRAM manufacturers introduced new technologies.  *Id*.
28   These issues were largely resolved by the end of 2002, as DDR (and its successor DDR2) began
     to dominate the DRAM market.  Mot. Ex. 2, White Rep. at Fig. 22.

DEFTS' REPLY BRIEF IN SUPPORT OF DEFTS'
MOTION FOR SUMMARY JUDGMENT AND
SUMMARY ADJUDICATION

1   trove of production data and testimony that Defendants produced.  But Plaintiffs do not cite any.

2   Instead, they cite deposition testimony that is irrelevant to the issue of conspiracy.  Opp. Ex. 154,

3   Harter at 34:6-38:6; Opp. Ex. 155, J.S. Kim at 178:4-189:24; Opp. Ex. 57, Mackowiak at 96:12-

4   97:10; Opp. Ex. 193, Kau at 51:19-52:16.  They also cite documents produced by various

5   Defendants, some of which do not even evidence an exchange of information amongst

6   Defendants.[13]  Other documents indicate that meetings were held to discuss possible mergers or

7   other business dealings.[14]  Others contain general and ambiguous information and Plaintiffs do

8   not attempt to explain or cite to any testimony that explains how the information contained in the

9   documents was or could possibly have been used to implement a complex industry-wide scheme

10  to coordinate product mix shifts.[15]  And, as already shown above, they do not link *any* of the

11  communications they cite to *a single* product mix or output decision.

12       ***Third***, Plaintiffs' contention that Defendants conspired to restrain supply in July and

13  October 2001 is not supported by the facts.  Opp. at 27:27-29:25.  Plaintiffs point to a meeting

14  between D.S. Kim (Hynix) and Mike Sadler (Micron) as proof that the decision to temporarily

15  close Eugene, a fab with hundreds of employees, was made by agreement with Micron the day

16  before the closure.  But undisputed testimony establishes that Hynix decided to upgrade Eugene

17  long ***before*** that meeting.  Ex. 8, D.S. Kim at 94:1-97:24 ("We already plan to upgrade our fab in

18  Eugene, Oregon. . . . We just informed them.").  *See also* Ex. 9, J.S. Kim at 159:2-160:7

19  (decisions to upgrade would be made months in advance).  None of Plaintiffs' evidence suggests

20  otherwise.  The Eugene upgrade was not even parallel much less coordinated as it is undisputed

21  that no other Defendant reduced production at that time.  Ex. 7, Murphy Rep. ¶¶ 71-74.  And a

22  decision to upgrade a fab when outdated production technology has driven up the cost of making

23  _____

24  [13] *See, e.g.*, Opp. Ex. 191, HSA00006346-55 (Infineon roadmap in Hynix's files but no indication
    it was obtained from a competitor); Opp. Ex. 186, SSI-0005240326 (internal Samsung email

25  reporting Infineon information with no indication of its source); Opp. Ex. 192, MU00117874-82
    (Hyundai roadmap found in Micron's files but no indication it was obtained from a competitor).

26  [14] Opp. Ex. 206, ITAG-00187448; Opp. Ex. 189, ITAG-00213726-27.
    [15] *See, e.g.*, Opp. Ex. 61, ITAG-00242971-72 (describing the meeting atmosphere as "[t]o the

27  topic, no details"); Opp. Ex. 194, ITNA01117804-05; Opp. Ex. 187, ITAG-00268157-63; Opp.
    Ex. 196, ITNA01145557-59; Opp. Ex. 174, MU00057337; Opp. Ex. 190, ITAG-00308655-56.

28  This type of evidence requires explanation by an expert or one of the six production witnesses
    Plaintiffs deposed, but Plaintiffs did not broach this issue with any of these witnesses.

1   a product and prices for the product are falling makes sense from the unilateral standpoint of the

2   producer. *Id.* ¶¶ 71-74, exhibit 9.

3          The undisputed evidence also conclusively shows that Sadler's efforts to get competitors

4   to agree to cut output in October 2001 were not successful. Ex. 10, Sadler 5/21 at 49:5-66:6. The

5   government agrees there was no agreement to cut output. Mot. Ex. 50, Swanson Trial Tr., Day 10

6   at 2083-84. Nor is there evidence of coordinated production cuts. Opp. at 28:7-29:9. Plaintiffs

7   attach a spreadsheet of Infineon production data with no testimony or explanation, and baldly

8   assert that it shows output reductions. But the data shows only routine changes in the mix of

9   products at a single plant at one time, not any material reduction in overall output.[16] The

10  undisputed testimony by Infineon's witness Johann Harter shows that such variations do not

11  indicate a reduction in total production. Ex. 6, Harter at 338:2-341:16. The Micron data

12  Plaintiffs cite shows that Micron increased wafer starts between October 2001 and February

13  2002. And Plaintiffs ignore the undisputed fact that Hynix re-started production at Eugene in

14  December 2001. Ex. 7, Murphy Rep. at exhibit 9. They present no competent evidence of a

15  coordinated output reduction.[17]

16          ***Finally***, the evidence cited by Plaintiffs fails to create a triable issue as to the existence of

17  any conspiracy to cut production in 1998. Opp. at 29:26-30:14. Plaintiffs cite the fact that

18  Infineon announced that it would shut down its North Tyneside fab, but fail to mention that it was

19  shut down as prices fell below costs. Ex. 11, Kalt Rep. ¶¶ 109-110; Ex. 6, Harter at 122:15-

20  124:17. They also cite to a press article about NEC moving away from producing 16M DRAM,

21  Opp. at 30:3-6, but this was at a time when the technology was transitioning to 128mb DRAM.

22  Ex. 7, Murphy Rep. at exhibit 1. They cite no evidence that these actions were pursuant to an

23  agreement. They also cite handwritten notes by Charles Byrd (Hynix) which state that three

24  Korean manufacturers agreed to shut down ***for four days*** to support their claim ***for four years*** of

25  injury, but Byrd testified that he never agreed to reduce supply and that the notation might have

26  _____

27  [16] Plaintiffs also assert that Infineon ***evaluated*** potential ways to reduce wafer starts in late 2001,
    but they misleadingly omit undisputed testimony that none of those approaches were ever
    implemented. Ex. 6, Harter at 262:16-266:21.

28  [17] The Elpida emails about NEC's and Samsung's production decisions are inadmissible hearsay.

1   summarized a press release.  Ex. 12, Byrd at 126:7-127:13.[18]

2   **B.    There Is No Reason To Believe That Defendants Increased Plaintiffs' Prices**
    **By Increasing Target OEM Prices (As Plaintiffs' Own Expert Admits).**

3

4   Lacking evidence of agreements on prices to Plaintiffs or a market-wide output restraint,

5   Plaintiffs now claim that "increases in Named OEM prices would cause increases in prices to

6   other customers, including plaintiffs."  Opp. at 12:10-17:13.  This newly minted explanation fails

7   for two reasons.  First, it was flatly disclaimed by Plaintiffs' own expert, and second, there is no

8   factual support for this theory in the record.

9   *First*, Plaintiffs rely exclusively on their experts to establish a causal connection between

10  the conduct in the pleas and the injury allegedly suffered by the Plaintiffs.  Mot. at 10:1-15.

11  Although Plaintiffs' counsel now argues that "increases in Named OEM prices would cause

12  increases in prices to other customers, including plaintiffs," their expert denied that this was the

13  mechanism by which Plaintiffs were impacted:  "It is not my opinion that the increases to named

14  OEM prices caused increases to plaintiffs' prices. . . . Rather, my opinion is that defendants'

15  conspiracy to increase the prices to the named OEMs caused an increase to plaintiffs' prices . . . ."

16  Mot. Ex. 24, Marshall Reb. Rep. ¶¶ 28.[19]   He stated that he was not asked to determine whether

17  Target OEM prices caused Plaintiffs' prices to be higher:  "My charge is (and the analyses

18  performed to address it are) not intended to demonstrate that increases in prices paid by the

19  named OEMs caused plaintiffs' prices to increase.  I was not asked, nor was it necessary to ask,

20  whether there is a casual link between prices paid by the named OEMs, on the one hand, and

21  prices paid by plaintiffs on the other."  Mot. Ex. 24, Marshall Reb. Rep. ¶ 127.  Marshall's

22

23  [18] None of Plaintiffs' other evidence supports a plausible inference that an agreement to restrain
    supply in 1998 was reached.  Opp. Ex. 178, MU00193211-13 (internal Micron email to many

24  employees, encouraging everyone to remain optimistic with a stray reference to Samsung); Opp.
    Ex. 179, SSI0020030014-15 (Samsung email to a customer with no reference to competitor

25  coordination or communications); Opp. Ex. 180, HSA00656366-69 (article by Hynix's Mark
    Ellsbury stating that Hynix's four day shutdown could result in its losing market share).

26  [19] Defendants' experts agree that Marshall has not shown that there was a causal relationship
    between Target OEM prices and Plaintiffs' prices.  *See, e.g.*, Ex. 14, Klein Rep. ¶¶ 45-48; Ex. 11,

27  Kalt Rep. ¶¶ 150-159; Ex. 7, Murphy Rep. ¶¶ 138, 150-155; Ex. 15, Cox Rep. ¶¶ 50-51, as
    experts in other benchmark cases have determined, *In re Indus. Diamonds Antitrust Litig.*, 167

28  F.R.D. 374, 383-84 & n.10 (S.D.N.Y. 1996) (finding that plaintiffs' expert established that an
    increase to list prices (the benchmark) caused certain plaintiffs' prices to rise).

DEFTS' REPLY BRIEF IN SUPPORT OF DEFTS'
MOTION FOR SUMMARY JUDGMENT AND
SUMMARY ADJUDICATION

1   deposition testimony is also clear in this regard.  Ex. 13, Marshall 2/29 at 177:6-17; 115:17-25;

2   306:13-20.  Plaintiffs cannot avoid summary judgment and advance to trial with a theory of injury

3   that their expert has disavowed.[20]

4        ***Second***, this new theory fails for lack of causal proof.  Much of the evidence cited by

5   Plaintiffs establishes only that the Defendants communicated about certain prices to certain

6   OEMs at certain times with varying levels of effectiveness (a point not in contention).  Opp. at

7   12:21-24; 13:7-17.  Citing two documents near the end of 1998 and a handful in early 2002,

8   Plaintiffs argue that there is a triable issue as to whether Defendants successfully used inflated

9   Target OEM prices to increase their other prices almost continuously for four years.  Opp. at

10  12:24-13:6; 13:17-25.  But this ambiguous and sporadic evidence cannot substitute for an

11  empirical analysis that Plaintiffs' experts did not conduct.  The evidence does not even establish

12  that any particular Target OEM price was fixed and caused an increase to any particular price

13  paid by a Plaintiff, much less almost all prices paid by all customers.

14       Only two of the documents cited by Plaintiffs in support of the theory that Defendants

15  used increases in Target OEM prices to increase Plaintiffs' prices pre-date Sun's DBEs.  This is

16  curious because Plaintiffs state that "[p]rior to the DBEs . . . defendants had successfully fixed

17  DRAM prices to Sun and others for at least three years by focusing their communications

18  primarily . . . on the Named OEMs, which raised the market prices for plaintiffs and others."

19  Opp. at 9:8-12.  And White's calculations show that Sun allegedly suffered 99.12% of the

20  damages it claims before the DBEs were implemented.  Mot. Ex. 2, White Rep. at Figs. 35, 36,

21  42; Ex. 16, White Sun Data; Ex. 17, White Sun Summary.

22       It follows that Plaintiffs require other evidence to support their theory that increases to

23  Target OEM prices caused increases to Plaintiffs' prices.  In an attempt to meet this burden,

24  Plaintiffs point to evidence that, they claim, establishes that they monitored market prices through

25  public sources -- De Dios Market Advisor and DRAMeXchange -- and used this information

26  when negotiating prices with Defendants.[21]  Opp. at 15:9-25.  The fact that customers generally

27  [20] Plaintiffs themselves state: "Marshall's econometric analysis revealed that ***market conditions***

28  ***cause*** plaintiffs' prices to move together with the Named OEMs' prices."  Opp. at 17:20-25.
    [21] Defendants address the deficiencies and inconsistencies of Peter Wilson's declaration fully in

1    looked to these and other sources of information about the DRAM market does not establish that

2    increases to Target OEM prices caused increases to almost all prices paid by all customers for

3    four years.[22]  This is the precise point that Marshall conceded.  Further, these sources only

4    published aggregated OEM pricing information weeks after the prices were negotiated.  Ex. 13,

5    Marshall 2/29 at 206:22-214:16; Mot. Ex. 55, Marshall 5/22 at 90:18-93:7.  Marshall

6    acknowledged that spot prices were more transparent than prices at the contractual level.  Mot.

7    Ex. 55, Marshall 5/22 at 73:11-15; 90:18-93:7.  And Plaintiffs offer nothing to counter

8    Defendants' argument that there is no evidence that the more obvious benchmark price in the

9    DRAM industry -- the price on the spot market -- was fixed.[23]

10          **C.    There Is No Evidence That Plaintiffs Were Targeted And Paid 50% More For
                     DRAM Over A Four Year Period.**

11

12          Plaintiffs seek to connect themselves to the pleas by pointing to evidence that certain

13   Defendants directed particular conduct at particular Plaintiffs at particular times.  Plaintiffs'

14   experts did not base their theory of continuous market-wide injury over a four-year period on an

15   analysis of particular facts associated with particular Plaintiffs.  Ex. 18, White 5/22 at 26:15-29:9;

16   Mot. Ex. 26, Marshall 2/29 at 191:3-22.  They disclaim any obligation to do so, relying only on

17   the pleas instead.  The actual evidence serves only to highlight the gap between White and

18   Marshall and the facts.  The evidence is insufficient to prove agreements on price to any Plaintiff

19   under *Matsushita*, let alone for any material volume of transactions or period of time.

20          Plaintiffs attempt to show that Sun was harmed by Defendants' conspiracy by citing

21   communications related to the DBE process that Sun instituted in 2001.  All of these

22   _____

     their evidentiary objections. *See* Defendants' Evidentiary Objections at Section IV.A.

23   [22] For example, Plaintiffs repeatedly cite one Elpida email and claim that IBM/Dell prices were
     used to determine Sun's prices, but they omit the next line: "Since Suns stuff is custom, there is

24   no "market price' for a Sun module except what other competitors are quoting."  Opp. Ex. 25,
     EMUS391848-50.

25   [23] In addition, Plaintiffs also cannot survive summary judgment based on this theory because the
     causal connection is too remote to allow for recovery.  Plaintiffs cite *Blue Shield of Va. v.*

26   *McCready*. 457 U.S. 465, 478-79 (1982), but they ignore Ninth Circuit precedent which limits
     this case.  *See, e.g.*, *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 704

27   (9th Cir. 2001) (distinguishing *McCready* because it involved a plaintiff directly harmed by the
     unlawful conduct and the damages "were not derivative of the harm the conspirators inflicted

28   upon psychologists"); *Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris*
     *Inc.*, 185 F.3d 957, 967 (9th Cir. 1999) (same).

1   communications occurred after Sun had already suffered 99.12% of its injury according to

2   Plaintiffs' own calculations.  Mot. Ex. 2, White Rep. at Figs. 35, 36, 42; Ex. 16, White Sun Data;

3   Ex. 17, White Sun Summary.  Thus, although there is some reason to believe that Samsung

4   communicated with other producers about Sun's prices beginning in the summer of 2001, there is

5   no evidence that this caused Sun to pay higher prices.  Plaintiffs maintain that the testimony of

6   Thomas Trill (Samsung) establishes that communications about Sun occurred before the summer

7   of 2001, but Trill clearly testified to the contrary.[24]  Ex. 19, Trill at 91:18-23; 95:1-15.

8           Plaintiffs' efforts to link the alleged conspiracy to the other Plaintiffs also fails.  For

9   example, they claim that Unisys (the only Plaintiff that Infineon ever sold to) was injured because

10  it was an Infineon regional account and the evidence supposedly shows that Infineon at one or

11  two points raised prices to regional accounts.  Opp. at 10:11-17.  But Plaintiffs present no

12  evidence that Unisys was ever a regional account for Infineon or that Infineon sold to Unisys

13  during the time of these communications.[25]  Plaintiffs cite one May 2001 document that refers to

14  All American, but their expert's damage calculations establish that All American was not injured

15  during this period.  Ex. 20, White AA Data; Ex. 21, White AA Summary.  They also cite one

16  document that refers to SGI, but this solitary document does not connect Defendants' conduct to

17  SGI's multi-million dollar claim which spans almost four years.  Neither Edge nor Jaco is

18  mentioned a single time in any of the evidence.

19          Nor is Plaintiffs' evidence sufficient to establish that for four years Defendants' alleged

20  conspiracy raised prices at regional accounts.  For instance, Plaintiffs cite to testimony by Jim

21  Elliott of Samsung, but Elliott clearly stated that the limited communications he had with

22  competitors began in the third quarter of 2001 and stopped in the second quarter of 2002.  Ex. 22,

23  Elliott at 73:25-74:20.  And Elliott testified that he did not know how prices to Target OEMs

24

25  _____
    [24] To the extent that this Court is unwilling to grant summary judgment in full across the entire
26  damage period, Defendants request that this Court grant an order of summary adjudication or
    partial summary judgment and find that there is no genuine issue of material fact as to whether
27  Sun suffered any injury before June 2001 and no genuine issue of material fact as to whether any
    other Plaintiff suffered injury.
    [25] In fact, Infineon sold to Unisys only twice in the spring of 2002 and none of the evidence
28  Plaintiffs cite is from that period.

DEFTS' REPLY BRIEF IN SUPPORT OF DEFTS'
MOTION FOR SUMMARY JUDGMENT AND
SUMMARY ADJUDICATION

1    actually affected regional customers' prices. *Id.* at 61:5-14.[26]

2    **III.    White's Model Does Not Establish Causation.**

3         Plaintiffs claim that the model created by their amount of damages expert -- White --

4    establishes that Defendants' conduct caused their claimed injury. "Expert testimony is useful as a

5    guide to interpreting market facts, but it is not a substitute for them." *Brooke Group Ltd. v.*

6    *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). White's opinion alone cannot

7    suffice to meet Plaintiffs' burden on causation because his opinion is not a substitute for facts.

8    Impact must be causal and, by definition, causal injury must factually connect Defendants'

9    conduct to the harm claimed. Mot. at 8:11-9:14. White attributes the difference between his so-

10   called "but for" DRAM prices and actual DRAM prices to the conspiracy based on an instruction

11   and an assumption. He took the time period for measuring the assumed impact of the conspiracy

12   from Plaintiffs' counsel and, thus, assumed that Defendants conspired to raise prices throughout

13   that period and even longer, Ex. 23, White 2/28 at 422:8-19; 445:25-447:15, and he attributes the

14   difference between the lines to the existence of the conspiracy based on an assumption that the

15   alleged conspiracy was active throughout and was the only difference between the periods not

16   otherwise accounted for by his model, Ex. 18, White 5/22 at 78:10-79:8; 83:17-84:1.

17        This does not establish that the conspiracy admitted in the pleas caused anything. White

18   admitted that the difference between his predicted and actual prices could be attributed to non-

19   conspiratorial changes in competition. Ex. 18, White 5/22 at 83:17-84:1. He did not analyze the

20   underlying conduct, and he cannot, therefore, offer an informed opinion about whether any

21   unlawful conduct actually was taking place during periods when his predicted prices depart from

22   actual prices, and therefore could have caused injury to Plaintiffs. Ex. 23, White 2/28 at 367:24-

23   368:17; Ex.18, White 5/22 at 26:15-29:9. White also used Target OEM prices to predict

24   ───────────────

[26] Recognizing that their evidence is not sufficient, Plaintiffs argue that because various sales
25   managers and executives were often responsible for Target OEM accounts as well as other
accounts, including some Plaintiffs, they must have conspired to raise Plaintiffs' prices. Opp. at
26   11:9-12:7. This is an attempt to paint ***all actions*** taken by the deponents they point to as tainted
based solely on the fact that some -- but not all -- pleaded to specific instances of price-fixing to
27   specific customers. Plaintiffs bear the burden to prove the existence of a conspiracy as to them as
well as the successful implementation of any conspiracy they allege. And none of the evidence
28   they cite in support of their hypothesis that all of the conduct by the sales managers and
executives they list was conspiratorial establishes that they conspired as to Plaintiffs.

1    Plaintiffs' prices, assuming a relationship again.  In other words, White's model does not *prove*

2    impact; it *assumes* impact in order to conclude that his overcharges are attributable to the

3    conspiracy.  Plaintiffs' cited cases do not help them.  *In re Linerboard Antitrust Litig.*, 497 F.

4    Supp. 2d 666, 675 (E.D. Pa. 2007) (stating that "[t]he Court need not and does not address

5    whether Professor White's testimony, standing alone, would be sufficient to support a finding of

6    causation of damages so as to survive a motion for summary judgment"); *Callahan v. A.E.V.,*

7    *Inc.*, 182 F.3d 237, 260 (3d Cir. 1999) (summary judgment denied based on the facts of the case

8    and not the expert's opinion alone); *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d

9    908, 923-24 (W.D. Wis. 2007) (same

10   **IV.    Marshall's "Moving Together" Analysis Does Not Establish A Broader Conspiracy**.

11          Plaintiffs argue that Marshall shows that Defendants could not have successfully

12   conspired to fix the prices of the Target OEMs without fixing industry-wide prices and this

13   establishes "the existence of a broader conspiracy that affected plaintiffs."  Opp. at 18:22-25.  As

14   Defendants have shown, there is no evidence that a conspiracy existed that was broader than the

15   one admitted in the pleas.  Marshall's opinion that Target OEM prices and Plaintiffs' prices

16   generally moved together because of market characteristics cannot substitute for facts.  *Brooke*

17   *Group,* 509 U.S. at 242.  *See also* Mot. at 19:17-27:17.  Marshall concedes that the two sets of

18   prices fluctuate and only come back to moving together by 50% after three months, and he has

19   not determined whether this is because Plaintiffs' prices move up or the Target OEM prices move

20   down.  Opp. Ex. 146, Marshall 5/22 at 45:12-50:2.  He also concedes that he has not determined

21   whether Target OEM prices were impacted on a short term or long term basis as impact on the

22   Target OEMs was something he assumed based on the pleas.  Ex. 13, Marshall 2/29 at 48:12-

23   52:2; 53:5-14; 54:8-17; 56:1-14.  This alone is simply not enough to establish that Defendants'

24   conduct involved an industry wide restraint on output, the fixing of spot prices, or targeted

25   conduct directed at Plaintiffs for four years.

26   **V.     Conclusion**

27          For the reasons stated above, Defendants request that this Court grant their motion for

28   summary judgment on all of Plaintiffs' claims, or, in the alternative, summary adjudication.

1

2       Dated:  October 31, 2008          Respectfully Submitted,

3                                         O'MELVENY & MYERS LLP

4

5                                         By: */S/ Kenneth R. O'Rourke*
                                              Kenneth R. O'Rourke
6

7                                         Attorneys for Defendants
                                          HYNIX SEMICONDUCTOR INC. and
                                          HYNIX SEMICONDUCTOR AMERICA INC.
8                                         (except in the *DRAM Claims Liquidation Trust*
                                          matter)
9

10      Dated:  October 31, 2008          ORRICK, HERRINGTON & SUTCLIFFE LLP

11

12                                        By: */S/ Howard M. Ullman*
                                              Howard M. Ullman
13
                                          Attorneys for Defendants
14                                        NANYA TECHNOLOGY CORPORATION and
                                          NANYA TECHNOLOGY CORPORATION USA

15      Dated:  October 31, 2008          SIMPSON THACHER & BARTLETT LLP

16

17                                        By:*/S/ Harrison J. Frahn IV*
                                              Harrison J. Frahn IV
18

19                                        Attorneys for Defendants
                                          ELPIDA MEMORY, INC. and
20                                        ELPIDA MEMORY (USA) INC.

21      Dated:  October 31, 2008          THELEN REID BROWN RAYSMAN & STEINER
                                          LLP
22

23
                                          By: */S/ Robert Pringle*
24                                            Robert Pringle

25                                        Attorneys for Defendant
                                          NEC ELECTRONICS AMERICA, INC.
26

27

28

1  Dated:  October 31, 2008   KAYE SCHOLER LLP

2

3             By: */S/ Julian Brew*
                 Julian Brew

4
             Attorneys for Defendants
5             INFINEON TECHNOLOGIES AG and
             INFINEON TECHNOLOGIES NORTH AMERICA
6             CORP.

7  Dated:  October 31, 2008   SHEPPARD MULLIN RICHTER & HAMPTON
             LLP
8

9
             By: */S/ David Garcia*
10                David Garcia

11            Attorneys for Defendants
             SAMSUNG ELECTRONICS CO., LTD. and
12            SAMSUNG SEMICONDUCTOR, INC.

13  Dated:  October 31, 2008   GIBSON DUNN & CRUTCHER LLP

14

15            By: */S/ Joel Sanders*
                Joel Sanders
16
             Attorneys for Defendants
17            MICRON TECHNOLOGY, INC. and
             MICRON SEMICONDUCTOR PRODUCTS, INC.
18
  Dated:  October 31, 2008   THELEN REID BROWN RAYSMAN
19            & STEINER LLP

20

21            By: */S/ Samuel J. Maselli*
                Samuel J. Maselli
22
             Attorneys for Defendants
23            HYNIX SEMICONDUCTOR INC. and
             HYNIX SEMICONDUCTOR AMERICA INC.
24            in the *DRAM Claims Liquidation Trust* matter only

25

26

27

28

1

**ATTESTATION OF FILING**

2      Pursuant to General Order No. 45 § X(B), I hereby attest that I have obtained concurrence

3  in the filing of Defendants' Reply In Support of Motion For Summary Judgment and, in the

4  Alternative, Summary Adjudication from all of the Defendants listed in the signature blocks

5  above.

6

7                                    ___/S/Kenneth R. O'Rourke_____
                                           Kenneth R. O'Rourke

8
                                     Attorneys for Defendants Hynix Semiconductor
                                     Inc. and Hynix Semiconductor America Inc.
9                                    (except in the *DRAM Claims Liquidation Trust*)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFTS' REPLY BRIEF IN SUPPORT OF DEFTS'
MOTION FOR SUMMARY JUDGMENT AND
SUMMARY ADJUDICATION