JAMES G. KREISSMAN (Bar No. 206740)
jkreissman@stblaw.com
HARRISON J. FRAHN IV (Bar No. 206822)
hfrahn@stblaw.com
JASON M. BUSSEY (Bar No. 227185)
jbussey@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2550 Hanover Street
Palo Alto, California 94304
Telephone: (650) 251-5000
Facsimile: (650) 251-5002

*Counsel for Defendants*
ELPIDA MEMORY, INC. and
ELPIDA MEMORY (USA) INC.

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SUN MICROSYSTEMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HYNIX SEMICONDUCTOR, INC., *et al.*,<br><br>Defendants. | Case No. C 06-01665 PJH<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO EXTERNAL MANUFACTURER PURCHASES**<br><br>Date: December 10, 2008<br>Time: 9:00 am<br>Courtroom 3, 17th Floor<br>Hon. Phyllis J. Hamilton |

# **TABLE OF CONTENTS**

Page

INTRODUCTION ...........................................................................................................................1

ARGUMENT ...................................................................................................................................3

I. SUN IS AN INDIRECT PURCHASER ..............................................................................3

    A. Sun Was Not The "Immediate Buyer" ...................................................................3

    B. Sun's Agency Argument is Irrelevant ....................................................................5

II. SUN DOES NOT SATISFY ANY EXCEPTION TO ILLINOIS BRICK .........................7

    A. Sun Concedes it Cannot Satisfy the Cost-Plus Exception ......................................8

    B. Sun Has Not Established That The Control Exception is Available .....................8

III. The Direct Purchaser Rule Is Not a Policy Rule ...............................................................13

CONCLUSION ..............................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229 (N.D. Cal. 2004) ................................6

*Burkhalter Travel Agency v. Macfarms Int'l, Inc.*, 141 F.R.D. 144 (N.D. Cal. 1991) .................13

*California v. ARC Am. Corp.*, 490 U.S. 93 (1989) .....................................................................13

*California v. Infineon Technologies AG*, Slip Copy, 2008 WL 4155665 (N.D. Cal. September 5, 2008).................................................................................................................15

*Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008) ...................................................................................................................*passim*

*E&J Gallo Winery v. EnCana Energy Servs., Inc.*, No. CV F 03-5412 (AWI), 2008 WL 2220396 (E.D. Cal. May 27, 2008) ......................................................................................6

*Fisher v. Wattles*, 639 F. Supp. 7 (M.D. Pa. 1985) .......................................................................9

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ......................................................... 9, 12, 13, 14

*In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 606 (7th Cir. 1997)………………………………………………………………….9

*In re Toilet Seat Antitrust Litigation*, No. 75-184, 1977 WL 1453 (E.D. Mich. Aug. 24, 1977) .........................................................................................................................12, 13

*In re Western Asphalt Cases*, 487 F.2d 191 (9th Cir. 1973)..........................................................9

*Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990) .......................................................*passim*

*Mid-West Paper Prods. Co. v. Cont'l Group, Inc.*, 596 F.2d 573 (3d Cir. 1979).........................11

*Perkins v. Standard Oil Co. of California*, 395 U.S. 642 (1969) .................................................9

*Qwest Commc'ns Corp. v. Herakles, LLC*, No. 2:07-cv-00393-MCE-KJM, 2008 WL 783347 (E.D. Cal. March 20, 2008) ..............................................................................6

*Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323 n.4 (9th Cir. 1980).......................9, 14

*SDI Reading Concrete, Inc. v. Hilltop Basic Res., Inc.*, 576 F. Supp. 525 (S.D. Ohio 1983)...................................................................................................................................13

**STATE CASES**

*Clayworth v. Pfizer, Inc.*, 165 Cal. App. 4th 209 (2008) ............................................................15

**STATUTES**

Clayton Act § 4 (15 U.S.C. § 15)...............................................................................................8, 13

# **INTRODUCTION**

Despite Sun's voluminous declarations and myriad citations to the record, Defendants' motion turns on only three simple questions: First, was Sun the immediate buyer of the DRAM? Second, did Sun have pre-existing, cost-plus, fixed-quantity contracts with the EMs? And, third, were the EMs so controlled by Sun that they *could not* have been harmed by increased DRAM prices? None of the facts necessary to answer these questions is in dispute, and the undisputed answer to each is "No." Summary judgment is warranted.

*First*, it is an undisputed fact that Sun was not the immediate purchaser. Sun admits the EMs acquired the DRAM in the first instance—it admits that the *EMs* issued the purchase orders to Defendants, that the *EMs* paid for the DRAM, and that the *EMs* then accepted delivery of and took title to that DRAM. Sun also admits that at some later point, after the EMs had constructed workstations from many different components, Sun separately contracted with the EMs to purchase those DRAM-containing products. In spite of this admitted multi-step process, Sun argues that it should be deemed the immediate buyer because it "normally" told the EMs from whom, at what price, and at what percentage of business to buy the DRAM. Even if those claims are accepted, Sun's argument fails *as a matter of law*. The Ninth Circuit in *Delaware Valley* held that when identifying the immediate buyer for purposes of the direct purchaser rule, the **only** relevant consideration is who paid money to, and received title from, the defendant; special business relationships are irrelevant. Sun admits it neither paid money to nor received title from the Defendants. It therefore is not a direct purchaser.

*Second*, it is an undisputed fact that Sun never entered into pre-existing, cost-plus, fixed-quantity contracts with the EMs. In particular, Sun admits that to the extent EMs passed on the cost of DRAM, they did so pursuant to informal arrangements, what Sun calls "tribal knowledge." Sun also does not dispute that it made no *pre-existing* commitment to purchase a *fixed* quantity of DRAM-containing products. Recognizing that these concessions are fatal, Sun abandons in the Opposition any argument that it satisfies any cost-plus exception.

*Third*, it is an undisputed fact that Sun exerted no structural control over the EMs. Sun admits as "*fact* that Sun and the EMs: (1) were separate companies; (2) did not have

interlocking directorates; (3) did not have overlapping officers; (4) did not own each other's stock; and (5) did not enter into loan agreements, trust agreements, or extensions of credit . . . ." Sun's argument that it satisfies the "control" exception, despite the EMs' conceded independence, again rests on the assertion that it: (i) told the EMs from whom and at what price to buy DRAM, (ii) periodically forecasted how much DRAM they should buy to meet its demands; and (iii) included DRAM costs in the price it paid for workstations. These assertions, even if accepted, are *legally insufficient* to satisfy the "control" exception. The only one that bears on the EMs' susceptibility to injury is the purported pass-on of DRAM costs. However, the Supreme Court in *Utilicorp* held that, standing alone, a cost-plus agreement does *not* supersede market forces. Absent a pre-existing commitment to buy a fixed quantity of products—which Sun admits was *not* present here—Sun could react to increased DRAM prices by decreasing the number of finished products it bought. Because that, in turn, would have reduced the EMs' profits, the EMs were susceptible to injury, and Sun cannot avail itself of any "control" exception.

The remainder of Sun's Opposition is surplusage. Sun overloads its papers with record cites on facts that are irrelevant and cannot create any dispute on the three dispositive issues. Sensing the weakness of its position, Sun urges this Court to simply disregard the direct purchaser rule because, it says, the "policy concerns" articulated by *Illinois Brick* are inapplicable. Sun's policy appeal directly contravenes *Delaware Valley*, which held that "*Illinois Brick* is **not a policy holding** but rather a case of statutory construction." Thus, "[t]he Court's firm rule does **not** provide [lower courts] the leeway to make a policy determination on a case-by-case basis . . . ." Sun's policy argument also ignores its factual concessions. It admits two EMs already sought relief in the MDL proceedings; so the first "policy concern"—multiple recoveries—undeniably is implicated by Sun's § 4 claims. It also admits facts from which it follows that the second concern—apportioning damages—is also squarely implicated by this case.

Finally, Sun's claim that Defendants' motion concerns only $179 million in EM purchases is wholly unsupported by the exhibits it cites. In fact, Sun has withdrawn nearly all of the exhibits cited in support of that assertion. Sun's assertion is in any event a distraction, as Defendants have not sought a ruling concerning the precise amount of the hundreds of millions of

1  dollars in indirect purchases, which will be subject to proof at trial.  Sun's argument as to the
2  purported unavailability of the pass-on defense is also a diversion.  Defendants did not seek relief as
3  to the applicability of that defense, and Sun cannot do so through its Opposition.  The efforts Sun
4  devotes to opposing Defendants' motion belie its insinuation that the motion, even if granted, would
5  be to no effect.  As an indirect purchaser, Sun will have to prove that EMs passed on the cost of
6  DRAM despite the absence of any contract to that effect.  To the extent Sun itself passed on price
7  increases, that will independently foreclose its claims.

8  There are no disputed facts relevant to the Court's decision.  Defendants' motion
9  should be granted.

10 **ARGUMENT**

11 **I.    SUN IS AN INDIRECT PURCHASER**

12     A.    <u>Sun Was Not The "Immediate Buyer"</u>

13 Sun's principal argument is not that it meets an exception to the direct purchaser rule
14 but rather that it *is* a "direct purchaser."  Sun, however, does not at any point define that term.
15 Sun's omission is not for want of authority.  Both the Supreme Court and the Ninth Circuit have,
16 fortunately, offered precise definitions.  A "direct purchaser" is, in the words of the Supreme Court,
17 "the ***immediate buyer***[] from the alleged antitrust violators."  *Kansas v. Utilicorp United, Inc.*, 497
18 U.S. 199, 207 (1990) (emphasis added).  The Ninth Circuit in *Delaware Valley* provided further
19 guidance by holding that a plaintiff is *not* the "immediate buyer" if someone *else* "paid [the
20 defendant] directly for its inventory and took title in the products before selling them to" the
21 plaintiff.  *Delaware Valley Surgical Supply Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1122 (9th
22 Cir. 2008) (affirming grant of partial summary judgment because plaintiff was not direct purchaser).
23 Sun fails to acknowledge these definitions because its inability to satisfy them follows from facts it
24 does not dispute.  Indeed, it is clear from the face of the Opposition that Sun is an indirect purchaser
25 under *Delaware Valley*:

26 • <u>***First***</u>, it is an undisputed fact that the EMs, not Sun, paid Defendants for the DRAM.
27 Rather than challenge Defendants' evidence on this point (*see* Mot. at 8:22–9:4), Sun
28 admits, ***"[t]he EMs** were expected to, and did, **execute purchase orders** . . . ."* (Opp. at

3:26–28), and that, "[t]he DRAM suppliers . . . reach[ed] out to Sun to force *the EMs to make payments* on time, directly negotiating with Sun the credit terms to be offered *to the EMs* . . . ." Opp. at 5:10–12.

- **_Second_**, it is an undisputed fact that the EMs, not Sun, took title to the DRAM. Sun does not challenge the admissible evidence Defendants present on this point. *See* Mot. at 9:5–10 (citing, *inter alia*, Moore Decl., Ex. 13 at 47:8–47:11: ("Q: Is it your understanding that after Celestica paid for and took delivery of the DRAM that the DRAM became the property of Celestica? A: Yes.")). Instead, Sun corroborates it by admitting DRAM was delivered to the EMs; that EMs were not always reimbursed for it; and that the EMs sometimes sold it to third parties. *See* Opp. at 6:7–8 ("Sun *generally*"—but not always—"bore the cost of the DRAM that was *delivered to*, but not used by, *the EMs* . . . ."); Opp. at 6:19–20 (indicating EMs sometimes sold "excess DRAM to third parties" with Sun's knowledge and approval).

- **_Third_**, it is an undisputed fact that the EMs separately sold DRAM-containing products to Sun. Rather than dispute Defendants' evidence on this point (*see* Mot. at 9:25–10:13), Sun concedes: "the EMs delivered finished products to Sun, and would, *pursuant to agreement with Sun*, *charge for the cost of all components used in the finished product, plus some added fee* . . . ." Opp. at 7:6–8.

Thus, there is no dispute that the EMs "paid [Defendants] directly for [their] inventory and took title in the products before selling them to [Sun]." *Delaware Valley*, 523 F.3d at 1122. The unanimous panel in *Delaware Valley* held that the Ninth Circuit was "bound" under the same circumstances to affirm partial summary judgment, because those facts demonstrated the plaintiff "lack[ed] standing under § 4 of the Clayton Act to assert an antitrust violation . . . ." *Id.* at 1122;[1] *see also id.* at 1125 (emphasizing that plaintiff did not "purchase its products directly from" the defendant but "[r]ather was invoiced by, and sent payments directly to, [the middleman]."). These facts compel the same outcome in this case.

---

[1] The panel in *Delaware Valley* not only was unanimous on the merits, it "unanimously [found] th[e] case suitable for decision without oral argument." *Id.* at n.*

B.     Sun's Agency Argument is Irrelevant

Sun's claim that the EMs were "mere purchasing agents" (Opp. at 9:12–13) misses the point. As an initial matter, Sun's own description of the relationship contradicts the claim that EMs were "mere purchasing agents." Sun did not hire EMs to buy DRAM. It paid them for the "finished products" they manufactured, which happened to contain DRAM. Opp. at 7:6–8. That to manufacture those products the EMs had to procure DRAM and other component parts hardly makes them purchasing agents, let alone "mere" purchasing agents.

More important, the Ninth Circuit has expressly foreclosed Sun's agency argument. Like Sun, the plaintiff in *Delaware Valley* asked the court to look beyond "the formalities of the purchase transaction" when applying the direct purchaser rule. *Delaware Valley*, 523 F.3d at 1123. In declining that invitation, the Ninth Circuit held that courts are limited to the formalities—*i.e.*, who paid the defendant and took title from it—because the Supreme "Court's firm rule does not provide . . . leeway to make a policy determination on a case-by-case basis as to whether standing should be recognized when there are special business arrangements." *Id.* at 1124. Whatever relationship Sun intends to denote by describing the EMs as "mere purchasing agents," it does **not** assert that, as a result of that relationship, the formalities were other than as described above. *See supra* § IA. That is, Sun's "agency" argument cannot change the undisputed fact that neither title nor money ever passed directly between Sun and Defendants. The argument is therefore irrelevant. *See id.* at 1122 ("The presence of a contractual relationship between [plaintiff] and [defendant] does not change the fact that [plaintiff] also had a contract with [the middleman], and it was that contract that ultimately effectuated the transfer of goods."); *see also Utilicorp*, 497 U.S. at 207 (holding that plaintiffs were indirect purchasers because "[t]hey bought their gas from the utilities, not from the suppliers said to have conspired to fix the price of gas").

Sun makes no effort to distinguish this authority. It fails even to *cite Delaware Valley*, despite the fact that the case contains the Ninth Circuit's most recent pronouncements on this subject and is central to Defendants' motion. Equally telling, Sun fails to cite contrary authority. Sun cites three cases—all from district courts—in support of its agency argument; none even *mentions* the direct purchaser rule. In *E&J Gallo Winery v. EnCana Energy Servs., Inc.*, No.

CV F 03-5412 (AWI), 2008 WL 2220396 (E.D. Cal. May 27, 2008), the plaintiff sought summary judgment as to whether the parent of a defendant could be held liable under an agency theory for the alleged antitrust violations of its subsidiary. *Id.* at *1. The court denied the motion because, *inter alia*, there was insufficient evidence of parental control. *Id.* at *26–27. The other two cases do not even involve antitrust claims. One, *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229 (N.D. Cal. 2004), involved an attempt to hold a U.S. parent liable for alleged human rights violations committed by its subsidiary in Nigeria. The other, *Qwest Commc'ns Corp. v. Herakles, LLC*, No. 2:07-cv-00393-MCE-KJM, 2008 WL 783347 (E.D. Cal. March 20, 2008), concerned a commercial dispute in which the plaintiff argued the defendant was its agent and thus owed it fiduciary duties. The court rejected that argument because the defendant lacked the authority to bind the plaintiff and was not subject to its control. *Id.* at *8–9.

Finally, even if the Court *did* have leeway to consider the special business relationship Sun postulates here, the outcome would be no different. Sun's assertion that the EMs were "purchasing agents" boils down to the claim that Sun told them from whom and at what price (and share of business) to procure the DRAM, then reimbursed them when buying assembled products. Opp. at 10:25–28.[2] The plaintiff in *Delaware Valley* similarly argued it was a direct purchaser because it set the price paid by the immediate buyer and reimbursed that party for its costs. *Delaware Valley,* 523 F.3d at 1122–23. However, the Ninth Circuit found nothing "extraordinary" about that arrangement, holding that, even if it *were* free to "strike out on a new path," it would not do so on those facts. *Id.* at 1123–24. Sun's relationship with the EMs is even less "extraordinary." Sun does not deny that in many instances Sun did *not* set the price of the

---

[2] Sun submits—and cites to—numerous exhibits in support of these assertions. The vast majority of those documents are inadmissible for the reasons set forth in the concurrently submitted Evidentiary Objections. For example, thirty of Sun's exhibits (Nos. 25, 36–39, 41–53, 55–59, 61–64, 69–71) are internal Sun emails and documents that constitute hearsay not covered by any exception; four (Nos. 33–35, 60) are third party documents, which have the same defect; and sixteen (Nos. 2-11, 14-17, 20-21) were withdrawn by Sun, even though it relies upon them in the Opposition. However, even if the Court were to disregard these and other evidentiary infirmities, the purported evidence would fail as a matter of law to establish Sun was injured under § 4.

1  DRAM. Mot. at 8:3–20. It merely (and lamely) calls these "experiments."[3] Opp. at 11:16–12:6.
2  Moreover, it is clear that the EMs played a crucial role, economically and technologically, in these
3  transactions by manufacturing complex workstations, warranting the quality of those products, and
4  bearing the costs of repairing defects. *See* Mot. at 9:8–19. Consequently, unlike the distributor in
5  *Delaware Valley*, the EMs were much more than just a formal, intermediate step in a distribution
6  chain. Even if the Court had authority to "strike out on a new path," Sun has presented no reason to
7  do that. *Delaware Valley,* 523 F.3d at 1123–24.

8        Sun concludes its argument by claiming Defendants have "concede[d] that deliveries
9  of DRAM to Sun's foreign affiliates qualify as direct purchases to Sun;" it then argues this
10 concession "undercuts" the argument that Sun's purchases from EMs are indirect purchases  Opp. at
11 12:8–14. Sun's assertion is wrong—Defendants ***never made*** any such concession. Moreover,
12 Defendants *have* moved to dismiss Sun's claims based on deliveries of DRAM to Sun's foreign
13 affiliates precisely because they were not direct purchases by Sun; rather, they were purchases by
14 Sun's foreign affiliates, and as Defendants demonstrate in their Motion to Dismiss Sun's Claims
15 Based on Foreign Purchases, Sun's foreign affiliates are not its alter egos or agents. In any event,
16 Sun's fictitious concession is irrelevant to the EM purchases at issue in this motion.

17 **II.   SUN DOES NOT SATISFY ANY EXCEPTION TO ILLINOIS BRICK**

18       Because Defendants have established Sun's status as an indirect purchaser, Sun's § 4
19 claims cannot survive unless Sun satisfies an exception to the rule. Sun does not deny that it bears
20 the burden of establishing an exception. *See* Mot. at 14:18–24. Sun fails to meet that burden.
21 //
22 //
23

---

[3] It calls them "experiments" even though its Rule 30(b)(6) designee on the subject testified that he didn't know "how long this [EM procurement] model was in place or which products it affected." *See* Mot. at 8:15-19 (citing Moore Decl., Ex. 7 at 164:17-166:13). Sun also does not dispute that an EM independently determined the price and share of business for "tens of thousands" of DRAM modules (Mot. at 8:9-11); its only response is that those particular modules have been excluded from its damages calculations. Opp. at 11:21-12:2. Despite making these concessions, Sun often mischaracterizes the evidence, asserting that it exercised "complete" control over DRAM sourcing. Opp. at 7:27-28; 12:25-26.

### A. Sun Concedes it Cannot Satisfy the Cost-Plus Exception

Sun fails to meet its burden as to the cost-plus exception because it leaves Defendants' arguments completely unrebutted. *See* Mot. at 14:26–16:18.[4] Moreover, Sun either concedes or does not challenge the evidence for those arguments. In particular, it does not deny that its relationship with the EMs *post*-dated the start of the alleged conspiracy period (Mot. at 7:3–15); that it never made a *pre-existing* commitment to buy *fixed quantities* of workstations (Mot. at 7:25–8:2); and that it never entered into cost-plus contracts with EMs (Mot. at 7:3–8:2); *see also* Opp. at 16:21 (asserting only that arrangements "*amounted to* 'cost-plus' agreements"). Each of these omissions bars recourse to the cost-plus exception.

### B. Sun Has Not Established That The Control Exception is Available

Because Sun also concedes it did not own the EMs (Opp. at 15:21), it can pursue its § 4 claims only by showing that it meets the control exception referenced in footnote sixteen of *Illinois Brick*. As set forth below, however, Sun's attempt to meet the control exception is, at bottom, predicated on little more than the claim that it had a cost-plus arrangement with the EMs. In effect, Sun admits it cannot meet the requirements of a cost-plus contract, then tries to circumvent those limitations by construing the control exception as a less exacting version of the cost-plus exception. Sun's attempted end-run fails, however, because *both* exceptions require a suspension of market forces. Moreover, the Supreme Court has expressly held that the kind of 'control' Sun claims over the EMs does *not* supersede market forces.

Sun concedes that the control exception is limited to situations where "market forces have been superseded." Opp. at 13:3–5. However, Sun offers no explanation of what it means for market forces to be superseded or why that happened here. Once again, Sun's omission is not for lack of authority. The Supreme Court in *Utilicorp* held that market forces are superseded only where the indirect purchaser can establish that, "*by hypothesis*, the direct purchaser will *bear no portion* of the overcharge and otherwise *suffer no injury*." *Utilicorp*, 497 U.S. at 218 (emphasis added). In other words, the plaintiff not only must establish the immediate buyer "suffered no

---

[4] Although for clarity of exposition Defendants refer to the cost-plus and control exceptions herein, Defendants do not concede that either exception is viable.

injury," it must do so "by hypothesis"—*i.e.*, without requiring an "inquir[y] into the precise operation of market forces . . . ." *Id.* (declining to consider argument that because demand for gas is inelastic, indirect purchasers bought same amount despite overcharges); *see also Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977) (describing suspension of market forces as situation where "[t]he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in a general case").[5]

        Sun argues that it need only establish control over the specific transactions at issue. Opp. at 12:25–28; 14:14–15. To the contrary, it is the cost-plus exception that focuses on the terms of the specific transaction; the control exception applies when *extra*-contractual relations between the parties suspend market forces. Thus, to satisfy the control exception, courts require the indirect purchaser to demonstrate that it "exerts such significant control over [the direct purchaser] as to be virtually the same entity." *Fisher v. Wattles*, 639 F. Supp. 7, 9 (M.D. Pa. 1985); *see also Illinois Brick*, 431 U.S. at 736 n.16 (citing as examples *Perkins v. Standard Oil Co. of California*, 395 U.S. 642, 648 (1969), a case involving majority-owned subsidiaries, and *In re Western Asphalt Cases*, 487 F.2d 191, 195 (9th Cir. 1973), a case where defendant controlled customers "through acquisition of stock, or . . . through various financial arrangements"); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 606 (7th Cir. 1997) (Posner, J.) (identifying as qualifying examples of control "interlocking directorates, minority stock ownership, loan agreements that subject the [direct purchaser] to the [indirect purchaser's] operating control, trust agreements, or other modes of control separate from ownership of a majority of the [direct purchaser]'s stock"). However, regardless of whether the control must extend beyond the terms of the deal, it is clear—and Sun does not deny—that the control must result in a suspension of market

---

[5] Although the Supreme Court offered these explanations while discussing the cost-plus exception, they are equally applicable to the control exception, as both are examples of situations where market forces are superseded. *See Illinois Brick*, 431 U.S. at 736 n.16 (describing the "control" exception as "another situation in which market forces have been superseded"); *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 326 n.4 (9th Cir. 1980) (recognizing the ownership or control exception "is only illustrative of the real exception: where '(t)he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case'").

forces; Sun must demonstrate, that is, that the EMs necessarily suffered no injury from the alleged overcharges.[6]

That is a burden Sun cannot meet.  Sun disclaims all structural modes of control that might establish market forces were superseded, admitting as "*fact* that Sun and the EMs: (1) were separate companies; (2) did not have interlocking directorates; (3) did not have overlapping officers; (4) did not own each other's stock; and (5) did not enter into loan agreements, trust agreements, or extensions of credit . . . ." Opp. at 15:20–23.  Sun is therefore left only with the terms of the actual transactions in support of its assertion that "Sun, not the EMs, was injured as a result of the overcharges." Opp. at 16:2–3.  Sun makes three factual claims in support of that assertion: (i) it told the EMs from whom, at what price, and at what percentage of business to order the DRAM; (ii) it told EMs how much DRAM to buy pursuant to forecasts; and (iii) the EMs billed Sun for the cost of DRAM on a cost-plus basis.  Opp. at 14:15–23.

Even if these claims are accepted, they cannot establish the EMs "by hypothesis . . . suffer[ed] no injury." *Utilicorp*, 497 U.S. at 218.  First, that Sun told the EMs whom to buy the DRAM from and for how much has no bearing on who bore the impact; Sun offers no explanation of why it would.  Second, although Sun claims it dictated through "forecasts" the quantity of DRAM the EMs bought, it does not claim those forecasts were issued *before* the conspiracy or that they committed Sun to buying a *fixed quantity* of products.  Nor could it.  Sun's Interrogatory responses state it was "*during* the relevant period"—not before—that Sun decided "to begin outsourcing . . . to External Manufacturers." See Mot. at 7:4–14 (citing Moore Decl., Ex. 1 at 6:26–27).  Sun's Rule 30(b)(6) designee on EM issues has also given binding testimony that Sun's forecasts covered only six quarters.  *See* Mot. at 7:23–8:2 (citing Moore Decl. Ex. 7 82:14–17)

---

[6]  Indeed, if the control is not so pervasive as to make the entities virtually the same, the more control the indirect purchaser exerts over the direct purchaser, the *greater* the harm the direct purchaser would be expected to suffer: the indirect purchaser would in that case use its control to shift injury *away* from itself and on *to* the direct purchaser.  If, on the other hand, the control makes them essentially the same company, the direct purchaser never suffers a distinct injury, and apportioning damages is unnecessary.  Consistent with this analysis, Sun *concedes* the exception is limited to "relationships involving such functional economic or other unity . . . that there effectively *has been only one sale*." Opp. at 13:12-1.

("The forecast is—a forecast or supply plan is a long-term outlook, perhaps six quarters' worth of visibility to what we expect the product needs to be."). Sun has chosen not to challenge this testimony despite Defendants' reliance on it. The same Sun witness offered binding testimony— cited by Defendants and again unchallenged by Sun—that Sun did *not* commit to buying the amounts set forth in the forecasts. *Id.* at 82:22–83:1 ("So if the orders from Sun customers don't materialize in the way that the supply plan or forecast predicts, then *the purchase order would **not** be placed* for that material."). Sun's own citations in the Opposition confirm these facts.[7] In support of its claim that "Sun, not the EMs, was injured," Sun is therefore left only with the assertion that EMs passed on DRAM charges pursuant to "what amounted to 'cost-plus' agreements." Opp. at 16:21.

As a matter of black-letter law, a cost-plus arrangement is, standing alone, insufficient to suspend market forces. Like Sun, the indirect purchasers in *Utilicorp*, customers of a utility company, claimed that the direct purchaser utilities "pass[ed] on 100 percent of their costs to their customers." *Utilicorp*, 497 U.S. at 207. However, the Supreme Court held that, even if that was true, market forces were not superseded, because "the utility customers made no commitment to purchase any particular quantity of gas, and the utility itself had no guarantee of any particular profit." *Id.* at 217; *see also*, *e.g.*, *Mid-West Paper Prods. Co. v. Cont'l Group, Inc.*, 596 F.2d 573, 580 (3d Cir. 1979) (denying relief to indirect purchaser where quantity of orders were usually based on "consumer demand during the prior week"). The Ninth Circuit made a similar point in *Delaware Valley*, a case that also involved a 100% pass-on:

//

//

---

[7] As support for the claim about forecasts, Sun cites to § IA of the Opposition, which at 3:20-22 references Exhibits 29 (Benchmark) and 28 (Solectron) to the Cross Declaration. The Benchmark witness testifies at 84:16-17 "So the *six quarter* forecast is loaded in the system . . . ." The Solectron excerpt provided by Sun includes a question about the length of the forecast, but Sun chose not to submit the answer. The excerpted testimony does, however, indicate that forecasts are not binding. Cross Ex. 29 at 30:1-2. ("My understanding would be that a purchase order would be binding, as a forecast may not."). *See also* Opp. at 6:7-9 (admitting Sun "generally"—but did not always—bear the cost of excess DRAM procured by the EMs due to "a change in Sun's forecasts").

> [T]he distributor is not a completely irrelevant economic actor in this contractual framework.  In theory, a demand curve exists for the bundle of goods and services that O&M sells. If the price of the goods is artificially inflated by the anticompetitive practices of J&J, that will affect the attractiveness of the distributor's products in the marketplace.  There is no reason to believe that market forces do not work on O&M and other distributors.

*Delaware Valley*, 523 F.3d at 1124.

The same rationale applies here.  Because it is undisputed that Sun made no pre-existing commitment to purchase a particular quantity of workstations, Sun was free to buy those products in smaller quantities when, due to higher DRAM prices, they became less attractive; that, in turn, would have decreased the EMs' profits, which Sun concedes were earned incrementally on each sale.  *See* Opp. at 7:6–7 ("the EMs . . . charge[d] for the cost of all the components used in the finished product, ***plus some added fee*** . . . .").  This alone establishes that Sun cannot meet its burden under *Illinois Brick*.[8]  Sun also cannot meet its burden because, as in *Utilicorp*, there is no evidence the EMs were "guarantee[d] . . . any particular profit." *Utilicorp,* 497 U.S. at 218.  That is, Sun, which has the burden of establishing an exception to the direct purchaser rule, has presented no reason to believe that it was precluded from renegotiating or decreasing the EMs' percentage markup in response to increased DRAM prices.

Against these binding authorities, Sun relies on a single district court case, *In re Toilet Seat Antitrust Litig.*, No. 75-184, 1977 WL 1453 (E.D. Mich. Aug. 24, 1977).  Sun's reliance on that case is misplaced for two reasons.  First, the immediate buyer in *Toilet Seat* acted as a true "purchasing agent" by apparently facilitating some transactions to which the plaintiff was a direct party.  *See id.* at *2 (indicating that *if* plaintiff "was unknown to the seller, or under other appropriate circumstances" the direct purchaser would be billed and would in turn bill the plaintiff)

---

[8] It is no response to say the EMs' products would have become only marginally less attractive because DRAM was one among many components.  *See Illinois Brick*, 431 U.S. at 743-44 (declining to recognize exception to direct purchaser rule where "a price-fixed good is a small but vital input into a much larger product, making the demand for the price-fixed goods highly inelastic"); *Utilicorp*, 497 U.S. at 218 ("[E]ven if the utility customers had a highly inelastic demand for natural gas . . . the need to inquire into the precise operation of market forces would negate the simplicity and certainty that could justify a cost-plus contract exception.").

(emphasis added).  Moreover, the immediate buyer in *Toilet Seat* received a *flat fee*, *independent of volume*, from the plaintiff.  *Id*.  Thus, if the arrangement was also cost-plus (which is unclear from the cursory opinion), that would ensure the direct purchaser suffered no injury.  *See*, *e.g.*, *SDI Reading Concrete, Inc. v. Hilltop Basic Res., Inc.*, 576 F. Supp. 525, 532 (S.D. Ohio 1983) (distinguishing *Toilet Seat* on ground that it involved a flat fee, creating functional unity between parties).  To the extent *In re Toilet Seat* does suggest the control exception is satisfied absent a suspension of market forces, it was incorrectly decided.  The case is non-binding and has little persuasive value given that it precedes *Utilicorp* and, at three pages, contains almost no analysis or recitation of facts.[9]

        Thus, Sun proffers *no* authority that supports its attempt to meet the control exception.  It concedes that it must establish a suspension of market forces, but the undisputed facts prove, as a matter of law, that the EMs were susceptible to injury.  Sun's § 4 claims therefore cannot survive summary judgment.

**III.   THE DIRECT PURCHASER RULE IS NOT A POLICY RULE**

        In a final attempt to avoid this outcome, Sun urges the Court to simply disregard the direct purchaser rule; doing so, it claims, would not offend "the policy concerns behind [that] . . . rule."  Opp. at 16:9–11.  Sun's policy appeal exhibits a failing common to Sun's other arguments: it ignores binding precedent.  "*Illinois Brick* **is not a policy holding,** but rather a case of statutory construction."  *Delaware Valley*, 523 F.3d at 1123 (emphasis added); *see also California v. ARC Am. Corp.*, 490 U.S. 93, 102–03 (1989) ("As we made clear in *Illinois Brick*, the issue . . . in both that case and in *Hanover Shoe* was strictly a question of statutory interpretation—what was the proper construction of § 4 of the Clayton Act.").  Thus, even if *all* of the policy factors discussed in

---

[9]  Sun also cites *Burkhalter Travel Agency v. Macfarms Int'l, Inc.*, 141 F.R.D. 144 (N.D. Cal. 1991) in passing.  That case expressly acknowledges that the control exception applies only where "there is ***no*** possibility that [the direct purchaser] will be damaged by the overcharging." *Id.* at 148 (emphasis added).  The district court held that the direct purchaser rule did not bar the plaintiff's claims because the plaintiff resold the goods at cost rather than on a cost-plus basis.  Because the plaintiff therefore made no profit from the sales regardless of quantity, the court concluded the plaintiff "incurred all the damage." *Id.* at 150.  Here, in contrast, Sun admits the EMs "charge[d] for the cost of all the components used in the finished product, ***plus some added fee*** . . . .".  Opp. at 7:6-8.

*Illinois Brick* were *entirely* in Sun's favor, which they are not, the rule would still foreclose Sun's claims. *See*, *e.g.*, *Utilicorp*, 497 U.S. at 217 ("[E]ven assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions."); *Delaware Valley*, 523 F.3d at 1123 ("The Supreme Court intended to make a bright line rule . . . . The Court has explicitly rejected attempts to create exceptions to that rule, even when the considerations in a particular market may undermine some of the reasoning . . .").

In pressing this argument, Sun betrays a misunderstanding of both Defendants' own arguments and of *Illinois Brick* itself. For example, Sun urges the Court to reject "defendants' theory that the mere filing of a claim by a so-called 'direct purchaser' . . . prevents a so-called 'indirect purchaser' from bringing suit . . . ." Opp. at 17:7–9. But that is not Defendants' theory. Sun's claims are barred not because EMs filed claims but because Sun is an indirect purchaser; the EMs' claims merely establish that this is not among those cases in which the policies "underlying the Illinois Brick rule [are] disproved." *Utilicorp*, 497 U.S. at 217. Sun makes the same mistake in arguing that "the Court should not allow defendants to use the risk of . . . multiple liability as a shield" against Sun's claims. Opp. at 16:24–26. It is not the risk of multiple liability but rather the "bright-line" holding of *Illinois Brick* that deprives Sun of standing. Thus, even if some of the EMs have not filed claims, Sun cannot simply adopt them as its own. Opp. at 17:21–18:1. *See*, *e.g.*, *Illinois Brick*, 431 U.S. at 746 (adhering to direct purchaser rule even though "direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers"); *Delaware Valley*, 523 F.3d at 1121 ("[T[he *Illinois Brick* rule 'often den[ies] relief to consumers who have paid inflated prices because of their status as indirect purchasers' . . . .").[10]

Finally, Sun simply gets it wrong when it claims the economic policies discussed in *Illinois Brick* are inapplicable here because "a complex apportionment of overcharges is not

---

[10] Sun's reliance on *Royal Printing*, 621 F.2d at 326, is misplaced. For one, that case, which preceded both *Utilicorp* and *Delaware Valley,* has been superseded to the extent it suggests an exception can be made wherever the underlying rationales are absent. Second, *Royal Printing* involved a situation where the direct purchaser would never, or almost never, bring suit, because it was owned by the antitrust violator. *Id.* Here, in contrast, Sun does *not* assert Defendants owned the EMs and it is admits least two EMs *have* sought recovery.

necessary . . . ." Opp. at 16:17. As set forth above, the factual support Sun provides for the claim that EMs could not have been harmed—and that damages apportioning would be unnecessary—fails as a matter of law to support that assertion. *See* § IIB *supra.*

As for Sun's parting salvo—that none of this matters because Defendants cannot make out a pass-on defense—it is both belied by Sun's own opposition and irrelevant to the merits of Defendants' motion. Defendants did not seek summary adjudication as to the applicability of the pass-on defense, and Sun cannot do so through its Opposition. That the defense exists is undisputed. *See Clayworth v. Pfizer, Inc.*, 165 Cal. App. 4th 209, 235–36 (2008) ("[T]he language of the Cartwright Act, all relevant case law, and all relevant statutes lead us to conclude that . . . the pass-on defense is available in California"). Sun may believe the discovery record does not bear out the defense, but that does not make it so. Moreover, Sun as an indirect purchaser will have the affirmative obligation of proving at trial that the EMs passed on overcharges. *See California v. Infineon Technologies AG*, Slip Copy, 2008 WL 4155665, *6 (N.D. Cal. September 5, 2008) (Hamilton, J.) ("[W]here as here, the proposed class includes indirect purchasers, proof of impact requires . . . that the overcharge paid by the direct purchasers was 'passed on' to the indirect purchasers."). Sun has already admitted there were no contracts with EMs requiring such a pass on, and Defendants will put it to its proof to make the necessary showing at trial. If, as Defendants believe, it cannot do so, Sun will not be able to recover for any of the EM purchases.

## **CONCLUSION**

For the foregoing reasons, the undersigned respectfully request that the Court grant partial summary judgment as to Sun's inability to recover treble damages under the Clayton Act for DRAM purchases made by External Manufacturers.

//

//

//

//

Dated:  October 31, 2008                Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP


By: _____/s/_____
       Harrison J. Frahn

Attorneys for Defendants
ELPIDA MEMORY, INC. and
ELPIDA MEMORY (USA) INC.

Dated:  October 31, 2008                ORRICK, HERRINGTON & SUTCLIFFE LLP


By: _____/s/_____
       Howard Ullman

Attorneys for Defendants
NANYA TECHNOLOGY CORPORATION
and NANYA TECHNOLOGY
CORPORATION USA

Dated:  October 31, 2008                O'MELVENY & MYERS LLP


By: _____/s/_____
       Kenneth R. O'Rourke

Attorneys for Defendants
HYNIX SEMICONDUCTOR INC. and
HYNIX SEMICONDUCTOR AMERICA INC

**ECF FILER'S ATTESTATION**

I, Harrison J. Frahn IV, as the e-filing signatory, attest that concurrence in filing this document has been obtained from the signatories hereto. In accordance with General Order 45, Section X(B), I shall maintain a record of the original signatures to support this concurrence for subsequent production for the court if so ordered or for inspection upon request by a party until one year after final resolution of the action.

Dated: October 31, 2008

By  /s/ Harrison J. Frahn IV
    Harrison J. Frahn IV

REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. C 06-01665 PJH