KENNETH R. O'ROURKE (S.B. #120144)
korourke@omm.com
PAUL B. SALVATY (S.B. #171507)
psalvaty@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:     (213) 430-6000
Facsimile:      (213) 430-6407

MICHAEL F. TUBACH (S.B. #145955)
mtubach@omm.com
THOMAS P. BROWN (S.B. #182916)
tbrown@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA  94111-3823
Telephone:     (415) 984-8700
Facsimile:      (415) 984-8701

Attorneys for Defendants
HYNIX SEMICONDUCTOR INC. and
HYNIX SEMICONDUCTOR AMERICA INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SUN MICROSYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> HYNIX SEMICONDUCTOR, INC., et al., <br><br> Defendants. | Case No. C-06-01665 PJH <br><br> **DEFENDANTS HYNIX SEMICONDUCTOR INC. AND HYNIX SEMICONDUCTOR AMERICA INC.'S NOTICE OF MOTION AND MOTION TO EXCLUDE OR LIMIT THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESS ROBERT MARSHALL PURSUANT TO FED. R. EVID. 702 & 403; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Hearing Date:  April 23, 2009 <br> Time:              9:00 a.m. <br> Place:             Courtroom 3, 17th Floor <br> Judge:            Hon. Phyllis J. Hamilton |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

I.  INTRODUCTION ................................................................. 1

II.  STATEMENT OF FACTS ................................................. 4

    A.  DOJ Investigation ..................................................... 4

    B.  Summary of Professor Marshall's Analysis and Opinions ........................ 5

III.  ARGUMENT ...................................................................... 6

    A.  Legal Standards.......................................................... 6

    B.  Professor Marshall's Testimony Is Unreliable and Irrelevant to Establish a Fact at Issue and Should Therefore Be Excluded Under Rule 702 .................................................................. 8

        1.  The Validity of Professor Marshall's Opinion Hinges on an Unproven and Flawed Assumption................................. 9

        2.  Professor Marshall Did Not Try to, and Does Not, Show Direct Impact to Sun's DRAM Prices............................ 13

    C.  Professor Marshall's Testimony Has Great Propensity to Mislead and Confuse the Jury and Should Also Be Excluded Under Rule 403 ..................................................................... 14

    D.  Professor Marshall Should Not Be Allowed to Opine as to Causation................................................................. 16

IV.  CONCLUSION ................................................................. 19

# TABLE OF AUTHORITIES

**Page**

## CASES

*Blue Dane Simmental Corp. v. Am. Simmental Ass'n,*
178 F.3d 1035 (8th Cir. 1999) ............................................................................................. 7

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993) ............................................................................................... 10, 18

*Claar v. Burlington N. R.R.,*
29 F.3d 499 (9th Cir. 1994) ................................................................................................. 7

*Cook v. United States,*
545 F. Supp. 306 (N.D. Cal. 1982) .................................................................................... 17

*Daubert v. Merrell Dow Pharm., Inc.,*
43 F.3d 1311 (9th Cir. 1995) ............................................................................................... 7

*Daubert v. Merrell Dow Pharm., Inc.,*
509 U.S. 579 (1993) ................................................................................................. *passim*

*Gen. Elec. Co. v. Joiner,*
522 U.S. 136 (1997) ............................................................................................... 7, 8, 14

*In re Aluminum Phosphide Antitrust Litig.,*
893 F. Supp. 1497 (D. Kan. 1995) ..................................................................................... 14

*In re Citric Acid Litig.,*
191 F.3d 1090 (9th Cir. 1999) ........................................................................................... 12

*Jinro Am. Inc. v. Secure Invs., Inc.,*
266 F.3d 993 (9th Cir. 2001) ........................................................................................ 8, 15

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999) .......................................................................................................... 7, 8

*McGlinchy v. Shell Chem. Co.,*
845 F.2d 802 (9th Cir. 1988) ............................................................................................. 15

*Rebel Oil Co. v. Atl. Richfield Co.,*
146 F.3d 1088 (9th Cir.), *cert. denied*, 525 U.S. 1017 (1998) ...................................... 7, 18

*United States v. Orians,*
9 F. Supp. 2d 1168 (D. Ariz. 1998) ................................................................................... 14

*United States v. Verduzco,*
373 F.3d 1022 (9th Cir. 2004) ........................................................................................... 14

*United States v. W.R. Grace,*
455 F. Supp. 2d 1181 (D. Mont. 2006) ............................................................................. 17

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3   *United States v. W.R. Grace*,
      504 F.3d 745 (9th Cir. 2007)....................................................................................... 17

4

## OTHER AUTHORITIES

5

Richard A. Posner, *Antitrust Law* (2d ed. 2001) ........................................................ 10

6

## RULES

7

Fed. R. Evid. 403 ............................................................................................. *passim*

8

Fed. R. Evid. 702 ............................................................................................. *passim*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **NOTICE OF MOTION AND MOTION**

2          PLEASE TAKE NOTICE that on April 23, 2009 at 9:00 a.m. in Courtroom 3 of the

3    above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, or as soon

4    thereafter as the matter may be heard by the above-entitled Court, Defendants Hynix

5    Semiconductor Inc. and Hynix Semiconductor America Inc. ("Hynix") will and hereby do move

6    to exclude or limit the testimony of Plaintiff Sun Microsystems, Inc.'s ("Sun") expert witness

7    Professor Robert Marshall ("Professor Marshall") in the above-entitled action on the grounds that

8    Professor Marshall's analysis does not meet the standards of admissibility set forth in Federal

9    Rules of Evidence 702 and 403.  This motion is based upon this Notice of Motion and

10   accompanying Memorandum of Points and Authorities, the complete files and records in this

11   action, oral arguments, and such other and further matters as this Court may consider.

12         **MEMORANDUM OF POINTS AND AUTHORITIES**

13   **I.    INTRODUCTION**

14         This motion seeks to exclude Sun's expert, Professor Robert Marshall, from offering any

15   opinion or testimony at trial that Hynix or any other DRAM supplier caused harm to Sun.[1]

16   Professor Marshall's opinion and testimony should be excluded because Professor Marshall bases

17   his opinion—that "[p]rices paid by the plaintiffs were affected by the defendants' admitted

18   conspiracy"[2]—on layers of unfounded, unproven assumptions that render his analysis irrelevant

19   and unreliable.  For the same reason, Professor Marshall's analysis has great potential to confuse

20   and mislead the jury regarding Sun's ability to establish causation.  Any evidence or testimony

21   relating to this opinion should therefore be excluded.  To the extent the Court decides to admit

22   Professor Marshall's testimony over Hynix's objections, Hynix respectfully requests that the

23   Court limit Professor Marshall's testimony to his statistical analyses and preclude him from

24   presenting any opinion on causation to the jury.

25   _____

26   [1]    References to Professor Marshall's opinions as to Sun refer generally to his opinions as to all opt-out plaintiffs (including Sun), which he groups together for purposes of his analysis.

27   [2]    *See* December 14, 2007 Expert Report of Robert Marshall ("Marshall Report"), Ex. 1, ¶ 37. Unless otherwise noted, all references to Exhibits correspond to documents attached to the

28   Declaration of Dixie L. Noonan filed concurrently herewith.

1    As the Court well knows, some DRAM suppliers have admitted in their respective pleas to

2  conspiring to raise the contract prices of certain types of Dynamic Random Access Memory

3  ("DRAM") sold to six specific Original Equipment Manufacturers ("Target OEMs")—Apple,

4  Dell, Gateway, HP, Compaq and IBM—during "certain periods of time" between April 1, 1999

5  and June 15, 2002 and with "varying levels of effectiveness."[3]  The only mention of Sun in any of

6  the corporate pleas relates to bid rigging on a specific Sun auction lot on March 26, 2002 by

7  Elpida and a Samsung employee for the 1GB NG-DIMM product.  *See* Elpida Plea Agreement,

8  Ex. 2, ¶¶ 2, 4.  But Sun did not accept the bids given for this lot.  Instead, it renegotiated the

9  prices downward before making the actual purchase, and thus the only conduct specific to Sun in

10  Elpida's plea did not result in any injury to Sun.  *See* November 28, 2007 Deposition of Peter

11  Wilson ("Wilson Dep."), Ex. 3 at 541:12-548:18.

12    There is little other evidence to indicate that Sun was targeted and/or actually injured by

13  any anticompetitive conduct of the Defendants.  Hynix supplied only 4% of Sun's total DRAM

14  purchases during the relevant period and Sun has produced scant evidence suggesting that anyone

15  from Hynix even discussed Sun pricing with a competitor.  Sun has no evidence linking any

16  Hynix communications to any Sun transaction, let alone to any overcharge to Sun.  Similarly,

17  there is no evidence that Defendant Nanya Technology Corporation ("NTC") or Defendant Nanya

18  Technology Corporation USA ("NTC USA") targeted Sun or impacted the prices that Sun paid

19  for DRAM.  NTC and NTC USA did not sell to Sun, they were not qualified to sell to Sun, and

20  they had zero communications with any competitor about Sun.

21    Sun nonetheless attempts to bootstrap an argument from the pleas as to the OEMs that *Sun*

22  itself suffered injury by reason of the DRAM suppliers' conduct admitted therein.  One might

23  think that Sun is claiming that higher prices paid by the Target OEMs led to (or caused) Sun and

24  the other Plaintiffs' prices to be higher, but this is not Professor Marshall's theory or opinion.  *See*

25  May 2, 2008 Rebuttal Expert Report of Robert Marshall ("Marshall Rebuttal Report"), Ex. 4,

26

_____

27  [3]   Not all Defendants pleaded to violating Section 1 of the Sherman Act, and the pleas by those
that did are not admissible against the other Defendants.  The non-pleading Defendants do not
28  admit to knowledge of or participation in any conspiracy.

HYNIX'S MOTION TO EXCLUDE
TESTIMONY OF ROBERT MARSHALL
CASE NO. C-06-01665 PJH

1   ¶ 28.  Rather, Professor Marshall conducts an analysis comparing the average price paid by the

2   six Target OEMs for a particular category of DRAM with the price paid by individual Plaintiffs

3   for the same product.  He concludes simply that Sun's and the other Plaintiffs' DRAM prices

4   "moved together" with the Target OEM prices over time.

5           Since DRAM prices generally trended downward over long time periods

6   notwithstanding pricing peaks and valleys along the way, it is neither surprising nor controversial

7   that DRAM prices tend to "move together" over long periods of time.  The issue here is what

8   conclusions can properly be drawn from this observation.  Sun claims that the long-term price

9   relationship Professor Marshall observes is proof of causation—that the conduct admitted by

10  DRAM suppliers in the pleas clearly impacted all DRAM prices to all buyers at all times

11  (including months before the plea periods and months after the plea periods) because all DRAM

12  prices generally "moved together."  Sun plans to use this "prices move together" observation as a

13  cornerstone of its tenuous causation theory at trial through the testimony of Professor Marshall.

14  For the reasons set forth in this Motion, however, Professor Marshall's analysis cannot show the

15  requisite causal connection under either the *Daubert* or Federal Rule of Evidence 403 standard.

16          Professor Marshall builds to his ultimate conclusion—that the DRAM suppliers' admitted

17  conduct toward the Target OEMs **did** have an impact on Sun's prices—by taking a series of

18  inferential steps.  First, he *assumed* from the plea agreements that DRAM suppliers engaged in a

19  conspiracy to fix the price of DRAM sold to the Target OEMs.  Second, he "*took as given* the

20  impact of the defendants' . . . conduct on the pricing for the [Target] OEMs."[4]  Underlying this

21  second step is an *additional, less obvious assumption*:  that the DRAM suppliers' conduct

22  impacted the ***average*** price line of the Target OEMs.  In other words, Professor Marshall assumes

23  that the average prices paid by all Target OEMs for the entire period of time were impacted.  This

24  is a large leap from the pleas themselves.  Finally, Professor Marshall conducted a statistical

25  analysis and thereby determined that the Target OEMs' and Plaintiffs' (including Sun's) ***average***

26  price lines were correlated and moved together through time, both before, during and after the

27  _____

28  [4]   *See* February 29, 2008 Deposition of Robert Marshall ("Marshall Dep."), Ex. 5 at 54:13-15 (emphasis added).

3

1   conduct period.  From these steps – including the correlation of the ***average*** of all Target OEM

2   prices with Sun's prices – he arrives at his "causation" opinion.

3         Professor Marshall's causation opinion is fatally flawed because he has assumed his way

4   to the conclusion and has not done the work required to justify those assumptions.  If in fact the

5   average price that the Target OEMs paid for DRAM was *not* impacted by the conspiracy (as

6   opposed to individual prices which may or may not have been impacted at certain times, as the

7   pleas themselves suggest), then Professor Marshall's correlation and cointegration analyses are

8   simply *irrelevant* to the question of whether Sun's prices were impacted by the conspiracy.  This

9   is so because Professor Marshall's assumption that the *average* Target OEM price line was

10  impacted is indispensable to the validity of the rest of his analysis.  No statistical relationship

11  between average Target OEM and Sun prices can show that Sun's prices were impacted if the

12  basis for comparison (*i.e.*, the average Target OEM price line) is not first shown to be affected.

13  Professor Marshall assumes the average price line was impacted, but he does not support this

14  crucial assumption – that the average Target OEM price line was impacted by the conduct

15  admitted in the pleas – with any analysis or evidence, and, as discussed below, this assumption is

16  unsupportable.  Therefore, this Court should not allow his testimony to be presented to the jury.

17  At the very least, this Court should not allow Professor Marshall to give an expert opinion on

18  causation at trial.

19  **II.     STATEMENT OF FACTS**

20          **A.     DOJ Investigation**

21          Beginning in 2002, the Department of Justice ("DOJ") conducted a thorough investigation

22  of allegations of anticompetitive activity in the DRAM industry.  They reviewed millions of

23  pages of documents and interviewed dozens of cooperating witnesses.  The investigation led to

24  pleas by certain DRAM suppliers to charges of conspiring to fix prices of DRAM sold to the

25  Target OEMs "during certain periods of time" between April 1, 1999 (for Hynix, Samsung and

26  Elpida) or July 1, 1999 (for Infineon) through June 15, 2002, "with varying levels of

27  effectiveness."  *See* Infineon Plea Agreement, Ex. 6, ¶¶ 4(c)-(d); Hynix Plea Agreement, Ex. 7,

28  ¶¶ 4(c)-(d); Samsung Plea Agreement, Ex. 8, ¶¶ 4(c)-(d); Elpida Plea Agreement, Ex. 2, ¶¶ 4(c)-

HYNIX'S MOTION TO EXCLUDE
TESTIMONY OF ROBERT MARSHALL
CASE NO. C-06-01665 PJH

1    (d).[5]  Significantly, the DOJ's extensive investigation resulted in no charges or admissions of

2    agreements to restrain output or to fix prices to the "spot market."  *See id.*  In fact, Samsung's

3    plea states that the named defendants "substantially added DRAM capacity and expanded output

4    during the relevant period."  Samsung Plea Agreement, Ex. 8, ¶ 4(d).  And Samsung is the

5    world's largest DRAM supplier.

6          **B.     Summary of Professor Marshall's Analysis and Opinions**

7          Professor Marshall began his analysis with the assumption that DRAM suppliers engaged

8    in a conspiracy to fix the prices of DRAM sold to the Target OEMs throughout the conspiracy

9    periods.  Marshall Report, Ex. 1, ¶ 2.  Professor Marshall did not analyze the conspiratorial

10   conduct in which the DRAM suppliers supposedly engaged to determine whether or to what

11   extent such conduct impacted the prices Sun or other Plaintiffs paid.  *See* Marshall Dep., Ex. 5 at

12   191:8-11 ("[I]t was not necessary to reach my opinion to do any additional work in regard of

13   determining anything about the nature of the conspiracy"); *id.* at 192:14-18 ("I did not investigate

14   anything about the specific time periods for the conspiracy.  I took as given what was said in the

15   plea agreements and sentencing statements.").[6]

16         Based on his reading of the guilty pleas, Professor Marshall took as a "given" that the

17   DRAM suppliers' conduct impacted the Target OEMs.  Professor Marshall conducted no

18   independent analysis of this issue of OEM impact—he personally made no attempt to determine

19   whether or to what extent any conspiratorial conduct by Hynix, NTC, NTC USA or any other

20   DRAM supplier impacted the DRAM prices paid by the Target OEMs.  As Professor Marshall

21   explained during his deposition:

22

23   _____

[5]    The Elpida Plea Agreement also discusses one instance of anticompetitive conduct regarding

24   a single bid proposal for a single DRAM module to Plaintiff Sun on a single occasion.  Elpida
     Plea Agreement, Ex. 2, ¶ 4(e).  This is the only mention of any of the Plaintiffs in any of the

25   corporate Plea Agreements.

[6]    Professor Marshall claims to have conducted a review of the "factual record for

26   communications and/or information exchanges between defendants regarding DRAM prices."
     Marshall Report, Ex. 1, ¶¶ 119-25.  But Marshall conducted this review only for the limited

27   purpose of trying "to better understand defendants' conduct during the period of the conspiracy,"
     not for the purpose of identifying or analyzing any purported causal link between such conduct

28   and Plaintiffs' prices.

HYNIX'S MOTION TO EXCLUDE
TESTIMONY OF ROBERT MARSHALL
CASE NO. C-06-01665 PJH

Q.     But when we go back to paragraph 2 of your report and we look at your charge and your task, you assume an impact on the OEMs and then you undertake an economic analysis of whether the assumed conspiracy had an effect on the prices of DRAM sold to the plaintiffs; is that correct?

A.     Yes.

Marshall Dep., Ex. 5 at 135:22-136:3; *see id.* at 61:22-62:2 ("I took as given the fact that the— that the defendants' conduct impacted the named OEMs as a consequence of the plea agreements and settlement statements, that the price conspiracy that the coconspirators engaged in was effective as reflected in those statements.").  Similarly, Marshall offers no opinion about whether changes in Target OEM prices "caused" changes in Sun's prices or vice versa.  *See* Marshall Dep., Ex. 5 at 177:10-13 ("I'm not making a causal statement about the—about the named OEM prices causing plaintiff prices . . . or plaintiff prices causing named OEM prices.").[7]

The central analysis that Professor Marshall did perform was "to look at the relationship in price between the named OEMs and the plaintiffs" in order to "determine if those prices moved together before, during, and after the conspiracy period."  Marshall Dep., Ex. 5 at 53:10-54:1.  Based on a visual and statistical comparison of the average prices paid by the Target OEMs and Plaintiffs (including Sun), Marshall concluded that the two price lines did, in fact, "move together" before, during and after the conspiracy periods.  Marshall Report, Ex. 1, ¶¶ 12, 13, 21, 27 & 31.  In addition, Marshall purported to identify certain "market characteristics," which he claims "explain why" Target OEM prices moved together with Sun's and the other Plaintiffs' prices.  *Id.* ¶¶ 15-17.

III.   ARGUMENT

A.     Legal Standards

Federal Rule of Evidence 702 provides that expert testimony may not be admitted unless "the the testimony is the product of reliable principles and methods, and . . . the witness has applied

---

[7]     Professor Marshall also made no attempt to measure the impact, if any, that any DRAM supplier's conduct may have had on the prices that Plaintiffs paid for DRAM.  *See* Marshall Dep., Ex. 5 at 57:18-22 (Q: "Have you attempted to measure the—the magnitude of the impact of defendants' conduct on the price that the plaintiffs paid for DRAM?  A: "I believe that's the focus of Dr. White's report.").

the principles and methods reliably to the facts of the case."  This rule requires the Court to

"ensure that any and all scientific testimony or evidence admitted is not only relevant, but

reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  Fed. R. Evid. 702(2)

& (3).  District courts are thus "both authorized and obligated to scrutinize carefully the reasoning

and methodology underlying" expert testimony.  *Claar v. Burlington N. R.R.*, 29 F.3d 499, 501

(9th Cir. 1994).

Courts must conduct a "preliminary assessment of whether the reasoning or methodology

underlying the testimony is scientifically valid and of whether that reasoning or methodology

properly can be applied to the facts in issue."  *Id*. at 501 (citing *Daubert*, 509 U.S. at 592-93).

"This gate-keeping function is applicable to 'technical' and other 'specialized' expert testimony,

in addition to the testimony of scientific experts."  *Blue Dane Simmental Corp. v. Am. Simmental

Ass'n*, 178 F.3d 1035, 1040 (8th Cir. 1999) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

141 (1999)).  The Ninth Circuit has recognized that "[f]ederal judges must therefore exclude

proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks

clearly and directly to an issue in dispute in the case, and that it will not mislead the jury."

*Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995).

The Supreme Court has explained that "nothing in either *Daubert* or the Federal Rules of

Evidence requires a district court to admit opinion evidence that is connected to existing data only

by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical

gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146

(1997).  The Ninth Circuit has recognized that the principles of *Joiner* apply to economic

testimony.  *See, e.g.*, *Rebel Oil Co. v. Atl. Richfield Co.*, 146 F.3d 1088, 1097 (9th Cir.), *cert.

denied*, 525 U.S. 1017 (1998).

In addition to *Daubert*, Federal Rule of Evidence 403 plays an important role in

determining the admissibility of expert testimony.  Under Rule 403, the Court may exclude

otherwise relevant expert opinion "if its probative value is substantially outweighed by the danger

of unfair prejudice, confusion of the issues, or misleading the jury . . . ."  Fed. R. Evid. 403; *see

also Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993 (9th Cir. 2001).  Expert testimony "'can be

HYNIX'S MOTION TO EXCLUDE
TESTIMONY OF ROBERT MARSHALL
CASE NO. C-06-01665 PJH

1   both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk,

2   the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises

3   more control over experts than lay witnesses.'"  *Jinro Am. Inc.*, 266 F.3d at 1005 (quoting

4   *Daubert*, 509 U.S. at 595).

5           As the proponent of Professor Marshall's testimony, Sun has the burden to establish its

6   admissibility "by a preponderance of proof."  *Daubert*, 509 U.S. at 592 n.10.  This Court has

7   broad discretion in determining admissibility, including the selection of criteria for determining

8   reliability, and application of those criteria to the opinions in this case.  *See Kumho Tire*, 526 U.S.

9   at 158; *Joiner*, 522 U.S. at 138-39.

10          **B.      Professor Marshall's Testimony Is Unreliable and Irrelevant to Establish a
                      Fact at Issue and Should Therefore Be Excluded Under Rule 702**
11

12          Professor Marshall's opinion is exactly the type of expert evidence that should be

13  excluded under Rule 702 because "there is simply too great an analytical gap," *Joiner*, 522 U.S.

14  at 146, between the underlying facts and Professor Marshall's assumptions and resulting

15  opinions.  The plea agreements do not provide a sound factual foundation for Professor

16  Marshall's sweeping assumptions about the impact of the DRAM suppliers' admitted conduct on

17  the entire DRAM industry and on the average price paid by the Target OEMs throughout the

18  relevant time period.  Nor does Professor Marshall rectify this problem by, for example,

19  conducting an analysis of the evidence to link individual communications to affected transactions,

20  or to establish an output restriction; he did no such analysis.  Professor Marshall's methodologies

21  are simply too attenuated from the facts to show that Sun's prices were impacted by the DRAM

22  suppliers' admitted conduct.  And absent a showing that the average Target OEM price line was

23  impacted by the conduct admitted in the pleas (as opposed to a mere assumption of this critical

24  fact), Professor Marshall's analysis is irrelevant to Sun's burden of establishing causation, or fact

25  of damage.  Professor Marshall's testimony is thus clearly excludable under Rule 702.

26

27

28

1. **The Validity of Professor Marshall's Opinion Hinges on an Unproven and Flawed Assumption**

Professor Marshall conducted statistical analyses that compared Plaintiff and Target OEM average prices, which showed that "[p]rices paid by the named OEMs and the plaintiffs moved closely together before, during, and after the defendants' admitted conspiracy." Marshall Report, Ex. 1, ¶ 31. Professor Marshall found significant the fact that Plaintiffs' and the Target OEMs' prices moved together through time because his starting premise was that the prices that the Target OEMs paid for DRAM were impacted by the conduct admitted in the plea agreements. Professor Marshall testified that "the impact of . . . defendants' conduct on the price paid by the named OEMs was *taken as given* based upon the plea agreements and sentencing statements as to their impact on price as being effective." Marshall Dep., Ex. 5 at 57:4-16 (emphasis added). Because the Target OEM prices were impliedly affected, and because the Plaintiffs' prices (including Sun's prices) moved together with the Target OEMs' prices through time, the theory goes, it must be that Sun's prices were impacted by the DRAM suppliers' admitted conspiracy directed at the Target OEMs.

Professor Marshall's use of *average* price lines renders his methodology an unreliable way to establish causation. Even if it is legitimate to assume that some individual OEM prices were affected by the conspiracy, or that individual OEM price lines were affected (a point which Hynix does not concede), the same cannot be said for the average OEM price line over time. This is so because price increases to some at any given point may have been offset by lower prices to others at that point in time. This makes the average Target OEM price line an improper and unreliable basis for comparison, absent independent verification that the average Target OEM price line was impacted (an analysis which Professor Marshall failed to conduct). And absent a reliable analysis indicating that the average price line is a valid basis for comparison (because it can be shown that *average* prices were impacted by the conduct admitted in the pleas), no relevant conclusions can be drawn from Professor Marshall's observations that the Target OEM price line moved together with Sun's and other Plaintiffs' price lines through time.

HYNIX'S MOTION TO EXCLUDE
TESTIMONY OF ROBERT MARSHALL
CASE NO. C-06-01665 PJH

1   This is not to say that *individual* prices paid by some Plaintiffs were or were not impacted.

2   It is impossible to extrapolate individual prices out from an average price line.  For example, you

3   cannot divine the individual stock price movements of General Electric by studying the

4   movement of the Dow Jones Industrial Average (DJIA), because movements in the stock prices

5   of the other companies included in the DJIA may (or may not) cause it to move in a contrary

6   direction to GE's stock price during any given period.  Similarly, it is quite possible (and Sun has

7   gone to no effort to prove otherwise) that individual higher prices paid by one or more OEMs

8   were offset by lower prices that DRAM suppliers were forced to give other DRAM purchasers in

9   order to offload excess DRAM they could not sell at the artificially high price.  Professor

10  Marshall does nothing to justify his bare assumption that the Target OEM *average price line* was

11  impacted by the conspiracy.  He also fails to account for the equally if not more plausible

12  assumption that can be drawn from the plea agreements:  that DRAM suppliers only achieved

13  "varying levels" of success with respect to raising prices to the Target OEMS, and that other

14  transactions at-or-below competitive levels resulted in the average price line remaining

15  unaffected.

16  This is particularly true in the absence of a substantial and sustained output restriction in

17  the DRAM market during the relevant time period.  Courts recognize that a continuous, long-term

18  and market-wide conspiracy to raise prices cannot be successful without restricting output,

19  because price is a direct function of the quantity available.  *See Brooke Group Ltd. v. Brown &*

20  *Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993) (any successful effort to raise prices above

21  the competitive level "entails a restriction in output"); *see also* Ex. 9, Richard A. Posner, *Antitrust*

22  *Law* 66 (2d ed. 2001) (absent a cut in output, "the goods will pile up and eventually exert

23  irresistible pressure to reduce price").  Professor Marshall admits this.  He testified in his

24  deposition that "if there's going to be an effective elevation in prices, it implies that there would

25  be a supply restriction in the marketplace."  Marshall Dep., Ex. 5 at 201:18-21.  Professor

26  Marshall nonetheless went on to testify that he did not form an opinion as to the amount of supply

27  reduction that would be required to elevate prices "because it was not necessary to reach my

28  opinion in this matter."  *Id*. at 201:25-202:4.

1     Professor Marshall's failure to analyze output *does*, however, impact the reliability of his

2 assumption that the average Target OEM price line was impacted.  If Professor Marshall had

3 conducted an analysis showing a purposeful and effective restriction of supply in the DRAM

4 market, this could have gone a long way to showing that his assumption is a defensible one.  This

5 is so because of the fundamental rule, discussed above, that a substantial and sustained output

6 restriction leads to higher prices overall.  But the fundamental relationship between price and

7 quantity has another important implication for Professor Marshall's analysis.  *Absent* an effective

8 output restriction, individual prices may or may not have been impacted, but the *average price*

9 *line* most certainly would not have been, because excess supply would have led DRAM

10 manufacturers to offload the excess at lower prices in other transactions.

11     Sun may argue that Professor Marshall, though not opining as to output restriction, does

12 cite to sporadic evidence regarding DRAM suppliers' attempts to restrict output.  This does

13 nothing to rescue the utter lack of foundation for Professor Marshall's causation analysis based on

14 comparing the relationship between average Target OEM prices with Sun and other Plaintiff

15 prices during the relevant period.  Professor Marshall performs no independent analysis to

16 determine if output was in fact restricted during the relevant time period, let alone whether there

17 was such a substantial and sustained restriction necessary to drive up prices across the board for

18 several years.  He selectively cites to occasional (and largely inadmissible) news articles and

19 communications between competitors about the state of supply more generally—not evincing any

20 effective market-wide agreement to reduce production (much less effective implementation of

21 any such agreement).  Marshall Report, Ex. 1, ¶¶ 123-24.

22     In fact, Sun does not dispute that industry output increased significantly over the period.

23 Sun's counsel admitted this increase in DRAM output at the hearing on Defendants' summary

24 judgment motion: "[T]he defendants talk about supply being increased over this time, but what is

25 important for the Court to remember is that demand also increased at least at the same rate of

26 supply.  So saying that supply increased without talking about what happened to demand is

27 essentially meaningless."  *See* Transcript of December 17, 2008 hearing ("Summary Judgment

28 Hearing"), Ex. 10 at 138:21-25; *see also id*. at 142:22-24 ("So demand is going up exponentially

HYNIX'S MOTION TO EXCLUDE
TESTIMONY OF ROBERT MARSHALL
CASE NO. C-06-01665 PJH

1   during this time frame, and supply is just saying [*sic*] flat or increasing just a little bit, in

2   comparison."); Samsung Plea Agreement, Ex. 8, ¶ 4(d).  And the Ninth Circuit has held that,

3   where output is increasing, courts do not step in to second-guess the rate at which firms increase

4   their output.  *In re Citric Acid Litig.*, 191 F.3d 1090, 1101 (9th Cir. 1999) ("Faulting a company

5   for expanding too slowly where it doubled capacity in a few years would subject countless

6   strategic business decisions to second-guessing by courts. . . . [B]usiness judgments should not be

7   second-guessed even where the evidence concerning the rationality of the challenged activities

8   might be subject to reasonable dispute.").

9          Professor Marshall essentially uses one assumption to support another:  he *assumes* that

10  DRAM suppliers must have restricted output because he *assumes* that average OEM prices were

11  elevated.  Or, as he puts it, "if there's going to be an effective elevation in prices, it *implies* that

12  there would be a supply restriction in the marketplace."  Marshall Dep., Ex. 5 at 201:18-21

13  (emphasis added).  This type of circular, assumption-based reasoning is a far cry from being

14  reliable, admissible expert analysis that is "based upon sufficient facts or data" and "applied . . .

15  reliably to the facts of the case."  Fed. R. Evid. 702.[8]  Professor Marshall's flawed assumption

16  that the average Target OEM price line reflects the impact of the DRAM suppliers' admitted

17  conduct renders his ultimate opinion as to causation unreliable, and his testimony therefore

18  cannot "assist the trier of fact . . . to determine a fact in issue."  *Id.*

19          Professor Marshall also improperly aggregates DRAM suppliers' data.  In doing so, he

20  masks the fact that certain of the DRAM suppliers' prices to the Target OEMs and to individual

---

[8]   During discovery, Sun's counsel was provided with reams of output data from the DRAM
suppliers' individual DRAM fabs during the relevant period showing monthly or quarterly
DRAM output.  Yet Professor Marshall has no opinion on output, *see* Marshall Dep., Ex. 5 at
200:7-21, and ignores all of this actual production data as well as the testimony of several defense
witnesses that production at the DRAM fabs continued at full capacity during the relevant time
period, and defense experts who testified there was no output restriction.  *See, e.g.*, October 18,
2007 Deposition of J.S. Kim (Hynix), Ex. 12 at 36:2-19; 62:8-20; December 12, 2007 Deposition
of J.S. Kim (Hynix), Ex. 13 at 146:13-147:9; November 29, 2007 Deposition of S. Huang
(Mosel), Ex. 14 at 96:10-17; 139:2-141:2; November 15, 2007 Deposition of B. Nicoson
(Samsung), Ex. 15 at 72:16-22; 131:16-22; 138:17-139:5; November 20, 2007 deposition of J.
Harter (Infineon), Ex. 16 at 136:5-137:7; 317:2-318:14; 338:2-7; November 28, 2007 Deposition
of P. L. Pai (Nanya), Ex. 17 at 15:4-17; 114:9-115:1; January 24, 2008 Deposition of J. Hawkins
(Micron), Ex. 18 at 73:21-74:13.  *See also* Expert Report of Kevin Murphy (Hynix), Ex. 19,
¶¶ 69-74 (Hynix production decisions inconsistent with conspiratorial output restraint).

HYNIX'S MOTION TO EXCLUDE
TESTIMONY OF ROBERT MARSHALL
CASE NO. C-06-01665 PJH

1   Plaintiffs are significantly less correlated than the average price lines Professor Marshall relies on

2   in his analysis.  For example, the price of Hynix's sale of 128-256MB FPM-EDO Modules to Sun

3   has only a 0.59 correlation with Hynix's price for the same product to the Target OEMs, *see*

4   March 7, 2008 Expert Report of Alan Cox ("Cox Report"), Ex. 11 at Exhibit 15, as opposed to

5   0.98 correlation if all suppliers are included, *see* Marshall Report, Ex. 1 at Table 3, p. 94.  *See*

6   *also* Cox Report, Ex. 11, ¶¶ 57-58 ("Dr. Marshall's use of average prices therefore masks

7   differences among defendants' prices. . . . his own analysis suggests that the pricing varies greatly

8   among the defendants.  This variation suggests that it may not be appropriate to infer from these

9   defendants' data anything about prices charged by Nanya/Nanya USA.").

### 2.   Professor Marshall Did Not Try to, and Does Not, Show Direct Impact to Sun's DRAM Prices

12   At Sun's direction, Professor Marshall did not try to establish causation (or fact of

13   damage) in a traditional, straightforward way.  The most obvious and direct way to establish

14   causation in a price-fixing case is for the plaintiff to point to the exchange of information on a

15   particular product at a particular time and show that they bought the product that was the subject

16   of the exchange of information at that time.  For example, given that the Elpida plea specifically

17   addresses bid rigging as to one lot of DRAM product in a Sun auction, one would expect Sun's

18   experts to have analyzed this auction and calculated any resulting damage.  One can assume from

19   the absence of analysis and the absence of any attribution of damages from this admitted instance

20   of bid rigging that there were no damages to Sun from this instance of bid rigging.  And in fact

21   there was no overcharge on the auction, because Sun renegotiated the bid prices downward prior

22   to its purchase of the DRAM lot.

23   Alternatively, Sun could also have tried to show that changes to prices paid by the Target

24   OEMs caused changes to prices paid by Sun.  But Professor Marshall did not pursue this line of

25   proof either.  In fact, he specifically disclaims any causal relationship between the Target OEM

26   prices and Sun prices in his rebuttal report:  "It is not my opinion that the *increases to named*

27   *OEM prices* caused increases to plaintiffs' prices."  *See* Marshall Rebuttal Report, Ex. 4, ¶ 28

28   (emphasis in original).  Again, one can assume from the absence of this analysis and the absence

HYNIX'S MOTION TO EXCLUDE
TESTIMONY OF ROBERT MARSHALL
CASE NO. C-06-01665 PJH

1    of any attribution of damages from higher Target OEM prices supposedly "causing" higher Sun

2    prices that there are no damages to Sun supposedly caused by higher OEM prices.

3          Thus, having eschewed fact-based analyses and approaches to impact, the Court should

4    exclude Marshall's assumption-based approach.  Assumptions are not substitutes for facts.  *See,*

5    *e.g.*, *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1507 (D. Kan. 1995)

6    ("Because [the expert's] opinion is based on unjustified assumptions . . . it would not assist a trier

7    of fact to determine the fact or amount of plaintiffs' damages. . . . Moreover, any minimum

8    probative value of [the expert's] opinion would be substantially outweighed by the danger of

9    unfair prejudice resulting from his unsupported assumptions."); *see also Joiner*, 522 U.S. at 146.

10   And Professor Marshall's analysis is predicated on crucial assumptions for which he offers no

11   factual support:  that average Target OEM prices were impacted, that Sun's prices were impacted,

12   and the existence of an output restraint.

13          **C.     Professor Marshall's Testimony Has Great Propensity to Mislead and
14                   Confuse the Jury and Should Also Be Excluded Under Rule 403**

15         Professor Marshall's testimony should also be excluded because it fails the balancing test

16   under Federal Rule of Evidence 403.  In addition to the restraints on admissibility of expert

17   testimony established by Rule 702 and *Daubert*, Rule 403 provides an independent ground for

18   excluding expert testimony when the evidence's "probative value is substantially outweighed by

19   the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."  Fed. R. Evid.

20   403; *see also Jinro Am. Inc.*, 266 F.3d at 1006-09; *United States v. Orians*, 9 F. Supp. 2d 1168,

21   1174 (D. Ariz. 1998) (concluding that polygraph evidence, even if admissible under *Daubert*,

22   should be excluded based upon a Rule 403 analysis).

23         In a Rule 403 analysis, courts "weigh the risk of prejudice and confusion against the

24   probative value of the evidence."  *United States v. Verduzco*, 373 F.3d 1022, 1033 (9th Cir.

25   2004).  Professor Marshall's testimony is not probative to a fact in issue because, as explained

26   above, the flaws in Professor Marshall's underlying assumptions render his analysis irrelevant to

27   establishing causation.  Even if the Court determines that Professor Marshall's analysis has some

28   relevance to Sun's case, however, the evidence is of such limited probative value that the

1   possibility of confusing and misleading the jury favors excluding the evidence in this case. The

2   danger of giving Professor Marshall's opinion the imprimatur of expert status can unfairly

3   mislead the jury into believing that his statistical analyses establish causation. *Jinro Am. Inc.*, 266

4   F.3d at 1005 (Expert testimony "can be both powerful and quite misleading because of the

5   difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against

6   probative force under Rule 403 . . . exercises more control over experts than lay witnesses.")

7   (quoting *Daubert*, 509 U.S. at 595).

8         In *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 807 (9th Cir. 1988), the district court

9   excluded expert opinion testimony on damages in a breach of contract and tortious interference

10   case in part because the expert relied upon a broad generalization of a decline in the plaintiff's

11   gross sales to establish losses to particular product lines in particular territories. The Ninth

12   Circuit affirmed the district court because the testimony posed "a great danger of misleading a

13   jury into believing that appellants' losses associated with a decline in gross sales were the amount

14   of damages to appellants from 'lost profits' in particular product lines and territories." *Id.*; *see

15   also id.* at 806 (concluding that expert testimony was "properly excluded because any probative

16   value was 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

17   misleading the jury.'" (citing Fed. R. Evid. 403)). Like the proposed expert testimony in

18   *McGlinchy*, Professor Marshall's analysis attempts to extrapolate specific conclusions based upon

19   "unsupported assumptions . .   crucial to arriving at a valid conclusion." *Id.* at 807. His

20   conclusion about impact on Sun's prices is based on an assumption about impact to *average*

21   Target OEM prices, which cannot account for individual differences in prices. These

22   assumptions and extrapolations pose a particular danger of misleading the jury.

23         Professor Marshall's testimony is also likely to confuse and mislead the jury in this case

24   because of its deceptive simplicity. By making unsupported and buried assumptions that do not

25   appear on the face of his analysis, Professor Marshall presents what appears to be a

26   straightforward analysis while masking the many inferential leaps necessary for a full

27   understanding of his analysis and its significant flaws. Given the intuitively attractive and

28   deceptively simple nature of Professor Marshall's analysis, the jury could be misled into

HYNIX'S MOTION TO EXCLUDE
TESTIMONY OF ROBERT MARSHALL
CASE NO. C-06-01665 PJH

believing that Professor Marshall's analysis establishes causation, and the Court should exclude his testimony to avoid misleading the jury.

Finally, admitting Professor Marshall's testimony will waste the Court's and the jury's time, as well as create significant potential for confusion, because it will require Defendants to go to great lengths to explain why his testimony is analytically unsound and therefore irrelevant. Given the great potential that Professor Marshall's testimony has to mislead the jury, its admission would be substantially more prejudicial than probative and should be excluded.

### D.   Professor Marshall Should Not Be Allowed to Opine as to Causation

Sun relies on Professor Marshall to establish a necessary component of its case—that Hynix *caused injury* to Sun.  In his initial report, Professor Marshall concludes that his "analyses demonstrate that the defendants' conspiracy affected the prices of DRAM sold to the plaintiffs." Marshall Report, Ex. 1, ¶ 12.  Professor Marshall states his opinion more forcefully in his rebuttal report:  "[M]y opinion remains that defendants' conspiracy *caused* plaintiffs to pay higher prices for DRAM than they otherwise would have absent the conspiracy."  Marshall Rebuttal Report, Ex. 4, ¶ 4 (emphasis added).  To the extent the Court declines to wholly exclude Professor Marshall's testimony based on the arguments set forth above, it should limit Professor Marshall's testimony to presenting the statistical analyses he performed.  Professor Marshall should be precluded from testifying as to his ultimate opinion on causation at trial because it is based on unfounded assumptions and is not supported by underlying evidence in the record that Sun's prices were affected by any actions taken by Hynix, NTC or NTC USA.

Professor Marshall conducted no actual analysis of the allegedly illegal conduct and made no attempt to link that underlying conduct to any impact on the DRAM prices that Sun paid.  The limited analysis that Professor Marshall did perform—which did not focus either on the nature or extent of any anticompetitive conduct or any link between such conduct and Sun's DRAM prices—is simply not probative on the question of causation.  Professor Marshall's primary opinion, namely, that Target OEM prices "moved together" with Sun's and the other Plaintiffs' prices over time, suggests at most a correlation between the prices the Target OEMs paid and the prices that Sun and other Plaintiffs paid.  Proof that these series are highly correlated does not

1    imply a causal relationship.  Nor does it establish a causal relationship between any series and

2    some other event—*e.g.*, the alleged conspiracy.  *See, e.g.*, *United States v. W.R. Grace*, 455 F.

3    Supp. 2d 1181, 1193 (D. Mont. 2006) (excluding a scientific study in part because it

4    demonstrated correlation, but not causation:  "An opinion on causation assists the jury, because

5    the jury must decide whether the charged releases placed another person in imminent danger. . . .

6    The ATSDR Report and the Peipins Study do not contain opinions as to causation, but instead

7    identify a correlation or association. . . . Evidence of this correlation does not assist the trier of

8    fact.") (*aff'd by United States v. W.R. Grace*, 504 F.3d 745, 765 (9th Cir. 2007)); *Cook v. United

9    States*, 545 F. Supp. 306, 314 (N.D. Cal. 1982) (holding plaintiffs had not adequately shown

10   causation when they presented evidence of correlation without accounting for alternative

11   explanations).  Even Professor Marshall admits that his correlation analyses are only "suggestive"

12   support for his conclusions on causation.  *See* Marshall Report, Ex. 1, ¶ 195; May 22, 2008

13   Deposition of Robert Marshall ("Marshall Rebuttal Dep."), Ex. 20 at 13:9-13.[9]

14           Nor does Professor Marshall's testimony about various DRAM "market characteristics"

15   elevate his analysis into an opinion on causation.  Professor Marshall points to certain

16   "characteristics" or "mechanisms" at work in the DRAM market that "explain why" Sun's prices

17   and the Target OEMs' average prices "moved together" over time.[10]  Even assuming Professor

18   Marshall's market characteristics observations are based in fact (which they are not), they are not

19   sufficient to support a proper opinion on causation.  Professor Marshall himself describes his

20   market characteristics analysis as merely "corroborative"—it serves only to "reinforce" his

21   opinions concerning the "relationship between prices paid by named OEMs and by plaintiffs."

22   

23   [9]   Professor Marshall also admits that OEM and individual Plaintiff prices often diverged from
     one another, and that when this happened it could take a year or longer before they moved back
24   together.  *See* Marshall Rebuttal Report, Ex. 4, ¶¶ 93-96.  This reveals the fundamental inability
     of his statistical analyses to show that the same forces affected both sets of prices, or that they did
25   so in the same way.  Professor Marshall testified that, in the situation where prices moved back
     together, his statistical analysis could not determine whether this was due to one price increasing
26   or the other price decreasing.  *See* Marshall Rebuttal Dep., Ex. 20 at 49:17-50:2.

27   [10]   These market characteristics include:  (1) the standardized nature of DRAM products;
     (2) the existence of well-established sales channels outside of purchases from Defendants;
28   (3) transparency of pricing; and (4) the presence of most-favored customer clauses (MFCs) in the
     Target OEMs contracts.

HYNIX'S MOTION TO EXCLUDE
TESTIMONY OF ROBERT MARSHALL
CASE NO. C-06-1665 PJH

1  Marshall Rebuttal Report, Ex. 4, ¶ 9.  At most, Professor Marshall's market characteristics

2  discussion may bear on reasons why Sun's and the other Plaintiffs' prices and the Target OEMs'

3  prices are correlated.[11]  This explanation of a correlation is not proof of causation.  To prove

4  causation, Sun must introduce sufficient *facts* linking some wrongful conduct by Defendants to

5  Sun's purported injury.  *See, e.g.*, *Rebel Oil*, 51 F.3d at 1443-44; *see also Brooke Group*, 509

6  U.S. at 242 ("Expert testimony is useful as a guide to interpreting market facts, but it is not a

7  substitute for them.").  Sun has not done so.

8       Professor Marshall's testimony affirmatively demonstrates that he never even attempted to

9  conduct an analysis that would qualify him to opine that Sun suffered injury by reason of

10  Defendants' anticompetitive conduct, because he did not analyze Defendants' conduct—he

11  simply took it as "given."  In Professor Marshall's own words:

12       [A]gain, I am not making a determination as to any aspect of the implementation
        of the conspiracy with regard to my opinion.  I'm only looking at the co-movement
13       in prices between the plaintiffs and the named OEMs taking as given the fact that
        there is an admission of guilt with regard to the conspiracy's impact on the named
14       OEMs.  Note that these prices have moved together through time and that,
        therefore, given that the price-fixing conspiracy was effective, that it must have,
15       therefore, impacted the plaintiffs in this matter and harmed them.

16  Marshall Dep., Ex. 5 at 195:3-13.  This is not a proper opinion on causation because it does not

17  assess (or even attempt to analyze) whether or not there is a nexus between Defendants' conduct

18  and Sun's DRAM prices.  Absent any investigation into whether such a link exists, Professor

19  Marshall cannot offer a valid opinion that Defendants caused injury to Sun.  *See, e.g.*, *Rebel Oil*,

20  51 F.3d at 1443-44.

21       Finally, Professor Marshall should not be permitted to opine on causation based on his

22  reading of the guilty pleas.  As the Court knows, the guilty pleas are limited in scope and effect.

23  The fact that certain DRAM suppliers admitted a criminal violation with respect to certain Target

24  OEMs does not establish that such violation was also directed toward, or caused injury to, Sun.[12]

25  Indeed, Professor Marshall specifically acknowledges that he is ***not*** opining that movement in

26

27  [11]  He has not done the necessary analysis to link these characteristics to anything.

28  [12]  And, the guilty pleas of non-party DRAM suppliers are inadmissible against the Defendants
    in the present action.

1   Target OEM prices—whether or not affected by the conduct admitted in the pleas—somehow

2   caused Sun to pay higher prices.  *See* Marshall Rebuttal Report, Ex. 4, ¶ 28 ("It is not my opinion

3   that the *increases to named OEM prices* caused increases to plaintiffs' prices.") (emphasis in

4   original).

5          Similarly, the general admission by certain of the DRAM suppliers (for instance, by

6   Hynix but not others such as NTC or NTC USA) that their participation in an OEM conspiracy

7   had some limited—but unspecified—impact on the prices that one or more Target OEMs paid in

8   some unknown number of OEM transactions simply cannot serve as a substitute for proof by Sun

9   of some causal injury in fact.  The plea agreements do not suggest that Defendants engaged in

10  price-fixing activities that caused injury to *Sun or moved up the Target OEMs' average prices*,

11  and no amount of expert testimony can change that fact whether by interpreting the pleas to Sun's

12  liking or otherwise.  The pleas state what they state, no more.

13  **IV.    CONCLUSION**

14         Hynix respectfully requests that the Court exclude any and all testimony, references to

15  testimony or argument based upon the testimony of Professor Marshall in the above-entitled

16  action.  To the extent the Court denies this request, Hynix respectfully requests that the Court

17  preclude Professor Marshall from offering any opinion as to causation.

18
19         Dated: March 19, 2009          Respectfully submitted,

20                                         O'MELVENY & MYERS LLP

21
22                                         By: /s/ Kenneth R. O'Rourke
                                               Kenneth R. O'Rourke
23                                         Attorneys for Defendants
                                           HYNIX SEMICONDUCTOR INC. and
24                                         HYNIX SEMICONDUCTOR AMERICA INC.

25
    SF1:755815.7
26

27

28