**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SUN MICROSYSTEMS INC.,

        Plaintiff,

   v.

HYNIX SEMICONDUCTOR INC., et al.,

        Defendants.

_____/

No. C 06-1665 PJH

**ORDER GRANTING MOTION TO DISMISS; DENYING MOTION TO EXCLUDE; AND GRANTING SUMMARY JUDGMENT IN PART AND DENYING SUMMARY JUDGMENT IN PART**

     Defendants' motion to dismiss, motion to exclude expert testimony, and motions for summary judgment came on for hearing on December 17, 2008 and January 21, 2009 before this court. Plaintiff Sun Microsystems, Inc. ("Sun" or "plaintiff"), appeared through its counsel, Kathyryn D. Kirmayer, Jerome A. Murphy, David D. Cross, and Jeffrey Howard. Defendants[1] appeared through their counsel, Paul Salvaty, Steven H. Bergman, Kenneth O'Rourke, Michael Tubach, Tim Martin, Julian Brew, Harrison Frahn, Howard Ullman, Catherine Lui, Jonathan Swartz, Robert Pringle, Joel Sanders, Joshua Hess, and Robert E. Freitas. Having read all the papers submitted and carefully considered the relevant legal authority, the court hereby GRANTS defendants' motion to dismiss, DENIES defendants' motion to exclude, and GRANTS the motions for summary judgment in part and DENIES the motions for summary judgment in part, for the reasons stated at the hearing, and as follows.

_____

[1] Although this action was originally brought against numerous defendant entities, several of the defendants have since been dismissed, or filed withdrawals. Those defendant entities who currently remain in the case and bring the current motions are: Hynix Semiconductor, Inc., and Hynix Semiconductor America, Inc. (collectively "Hynix"); Nanya Technology Corporation, and Nanya Technology Corporation USA ("NTC" and "NTC USA," respectively).

United States District Court

For the Northern District of California

**BACKGROUND**

Plaintiff is part of the general opt-out category of cases that is related to In re Dynamic Random Access Memory (DRAM) Antitrust Litigation, Case No. M 02-1486 PJH – a multidistrict litigation ("MDL") action currently pending before the court.  Both the MDL action and the opt-out cases generally allege a horizontal price-fixing conspiracy carried out by numerous DRAM manufacturer defendants, in violation of federal and state antitrust laws.  While there are a total of six different individual cases that form a part of the opt-out category of cases, only Sun Microsystems, Inc. v. Hynix Semiconductor, et. al. is currently at issue.

A.   General Background

Sun is an original equipment manufacturer ("OEM") involved in the technology field. It is a leading maker of computer servers and workstations, among other items.  In the operative amended consolidated complaint ("ACC"), Sun alleges that from 1997 through 2002 several manufacturer defendants ("defendants") engaged in a conspiracy to control DRAM production capacity, raise DRAM prices, allocate customers, and otherwise unlawfully overcharge their DRAM customers.  See, e.g., ACC ¶¶ 21, 23, 25, 27, 29, 31, & 34 (alleging that foreign defendants "manipulated the price of DRAM charged around the globe").  As a result, plaintiff alleges that, as a large purchaser of defendants' DRAM, it suffered injury in that it paid more for DRAM than it otherwise would have in the absence of defendants' conspiracy.

To that end, Sun asserts three causes of action against defendants: (1) violation of the Sherman Act pursuant to 15 U.S.C. § 1; (2) violation of California's Cartwright Act pursuant to §§ 16700 et seq. of the Cal. Bus. & Prof. Code; and (3) violation of California's Unfair Competition Act pursuant to §§ 17200 et seq. of the Cal. Bus. & Prof. Code.  See ACC, ¶¶ 79-106.  Sun seeks damages as a result of the artificially inflated prices it allegedly paid for DRAM as a consequence of defendants' alleged price-fixing activity.

2

United States District Court

For the Northern District of California

B.     Facts Regarding Sun's DRAM Procurement

Sun manufactures and sells its servers and workstations both domestically and abroad.  To aid in this process, Sun outsources a portion of its server and workstation assembly to a network of domestic and foreign entities comprised of (1) third-party external manufacturers and (2) Sun's corporate subsidiaries.  Of particular relevance here is Sun's relationship with these two entity groups vis-a-vis a critical component of the manufacturing process – the purchase of DRAM on Sun's behalf, for incorporation into final Sun products.

1.     Third-party External Manufacturers

The ACC alleges that approximately 34% of the DRAM purchases at issue here were made by third-party external manufacturers ("EM"s).[2]  See ACC ¶ 13b.  The EMs were and are independent business entities located both domestically and abroad.  See id.  Sun does not share common ownership with any of the EMs; it does not own any controlling share of any EM, has none of the same board of directors or officers as any EM, and does not commingle funds or share corporate books and records with any EM.  See Declaration of Angela M. Moore ISO MSJ re External Manuf. Purch. ("Moore Decl. Re EMs"), Ex. 5 at 10; Bergman Decl., Ex. 2 at Response 5, Ex. 3 at Response 50, Ex. 4 at Responses 42-45.  The EMs at issue in this case include, for example, Celestica, Solectron Corporation, MiTac International Corporation, Smart Modular Technologies, Inc., Benchmark Electronics, Inc., and Expansion Electronics, Inc.  See, e.g., Declaration of Steven Bergman ISO Mot. Dismiss ("Bergman Decl."), Exs. 18-21.  Sun charged the EMs, in part, with purchasing DRAM directly from defendants and other suppliers, in order to incorporate that DRAM into the manufacture of Sun-designed and Sun-branded products

---

[2]     Notwithstanding the ACC's allegation, there is a dispute between the parties as to the actual amount and percentage of DRAM purchases made by third-party external manufacturers.  Using the 34% alleged in the complaint and plaintiff's own expert report as to damages, defendants contend that there are $1.05 billion in DRAM purchases made by external manufacturers at issue in the case.  See Def. MSJ re Ext. Manuf. Purch. at 4:8-11.  Plaintiff, however, contends in their opposition that external manufacturer purchases amount to approximately $179 million worth of DRAM purchases, or around 6% of Sun's total DRAM purchases.  See Pl. Opp. Re MSJ re Ext. Manuf. Purch. at 1:5-6.

United States District Court

For the Northern District of California

1   that were to be sold back to Sun (for retail sale by Sun).

2       Sun's relationship with the relevant EMS was formalized in Master External

3   Manufacturing Agreements ("MEMAs").  All the MEMAs at issue here have effective dates

4   that post-date 1997.  See Declaration of Jason M. Bussey ("Bussey Decl. Re. EMs"), Ex. A;

5   Moore Decl. Re EMs, Exs. 24-26; see also Bergman Decl., Exs. 18-21.  Pursuant to the

6   terms of the MEMAs, the EMs were considered "independent contractors" and were

7   expressly prohibited from "act[ing] in a manner which expresses or implies a relationship

8   other than that of independent contractor, [or] bind[s] the other party."  Moore Decl. Re

9   EMs, Exs. 24, ¶ 8.5; Ex. 25, ¶ 8.5; Ex. 26, ¶ 26.3; Bussey Decl. Re. EMs, Ex. A, ¶ 28.4.

10      Sun's relationship with its EMs was multi-tiered.  As an initial matter, once an EM

11  executed a MEMA with Sun, Sun's practice was to issue an award letter to the EM.  See

12  Moore Decl. Re EMs, Ex. 7 at 61, 76-77.  The award letter set the price at which Sun would

13  buy a particular DRAM-containing product from the EM, and identified quality standards for

14  the product.  See id.  Subsequently, Sun also communicated its supply plan to the EM,

15  informing the EM how much demand for DRAM-containing products Sun forecasted in the

16  coming quarters.  See Moore Decl. Re EMs, Ex. 7 at 76.  Notably, however, Sun's forecast

17  was fluid and was frequently updated.  Sun also did not commit to actually purchasing a set

18  quantity of DRAM-containing products in its forecasts, nor did it always end up purchasing

19  all products forecasted.  See id. at 82-83.

20      After receiving Sun's supply forecasts, EMs then purchased DRAM from suppliers in

21  order to meet the demand forecasted in the supply plan.  Id. at 76-77.  As part of this

22  process, Sun would preliminarily generally determine which DRAM suppliers were qualified

23  to sell DRAM to the EMs for use in Sun products, and would furthermore generally

24  negotiate DRAM pricing between the EMs and DRAM suppliers.  See Declaration of David

25  C. Cross ISO EM Opp. ("Cross EM Opp. Decl."), Ex. 26 at 160; Ex. 27 at 128-29; Ex. 22 at

26  82-83, 613; Ex. 28 at 62-64; Ex. 29 at 119-122, 124 (generally discussing Sun's creation of

27  an approved vendor list for use by the EMs).  Sun's global memory procurement team in

28

United States District Court

For the Northern District of California

1   California, for example, dictated a single worldwide price at which the EMs were permitted

2   to order DRAM from DRAM suppliers for incorporation into Sun products, and further

3   awarded a specific share of business to each DRAM supplier.  See Cross EM Opp. Decl.,

4   Ex 29 at 28-29, 134-35; Ex. 30 at 125-26; Ex. 28 at 71-72; Ex. 31 at 57-58.  Each EM

5   would then be told from whom, at what price, and at which percentage of business they

6   should issue purchase orders for the DRAM to be used in Sun products.  See, e.g., Cross

7   EM Opp. Decl., Ex. 32 at 45-50; Ex. 29 at 28-29, 134-45; Ex. 30 at 125-26.  In some

8   instances, Sun even required the EMs to purchase DRAM from Sun's own inventory.  See

9   Cross EM Opp. Decl., Exs. 37-39.  Either way, however, the EMs were expected to, and

10  generally did, execute purchase orders for DRAM pursuant to the directions provided by

11  Sun.  See, e.g., id. at Ex. 24 at 61; Ex. 53; Ex. 54 at 111-112.

12       Nonetheless, there is evidence that at times, some of the EMs independently

13  selected DRAM suppliers from whom to purchase DRAM, and independently negotiated

14  DRAM pricing with those DRAM suppliers.  See, e.g., Moore Decl. Re EMs, Ex. 7 at 206-09

15  (MiTac); Ex. 13 at 116-18 (Celestica); Ex. 21 (MiTac); see also Bergman Decl., Ex. 9 at

16  216-21; Ex. 21 at SUN001236; Ex. 31.

17       After DRAM pricing and suppliers were determined – either by Sun, or the EMs

18  acting independently – the EMs procured the DRAM.  The EMs did so by: issuing purchase

19  orders; receiving invoices issued by the DRAM suppliers; paying the invoices sent to them

20  by the DRAM suppliers; and taking receipt of the actual DRAM purchased from the

21  suppliers.  See Moore Decl. Re EMs, Ex. 7 at 87; Ex. 13 at 45-46; Ex. 8 at 60-62; Ex. 5 at

22  10:22-13:1.  After accepting delivery of the DRAM from the defendant suppliers, the EMs

23  took title to it.  See id. at Ex. 9 at 610-11; Ex. 8 at 66, 72; Ex. 13 at 47; Ex. 14 at 114; Ex.

24  12 at 32-33, 55-56.  The EMs generally retained title until Sun accepted an assembled

25  DRAM-containing product from the EMs.  As some of the EMs testified, as a result of taking

26  title, the EMs accepted the risk of loss and damage to the DRAM, and would bear the cost

27  of replacement for damaged DRAM.  See id. at Ex. 7 at 117; Ex. 9 at 610-11; Ex. 13 at 69-

28

United States District Court

For the Northern District of California

74, 77-78.[3]

As for the DRAM that was delivered to, but not ultimately used by the EMs (as a result of a change in Sun's forecasts or the end of life of a particular Sun product, for example), the EMs often made efforts to return the excess to DRAM suppliers or to transfer it to another of Sun's EMs at Sun's direction.  However, if these efforts were unsuccessful, Sun generally bore the cost of this DRAM and bought it back from the EMs.  See id. at Ex. 28 at 53-54; Ex. 29 at 74, 94; Ex. 65 at 38-39; Ex. 30 at 34-35, 79-80, 90-94.  The EMs were not permitted to sell excess DRAM to third parties without prior approval from Sun. Id. at Ex. 28 at 54; Ex. 29 at 76-77, 191-92.

Finally, having purchased DRAM from DRAM suppliers for use in the manufacture of DRAM-containing products on Sun's behalf, the last step of the distribution chain involved a downstream transaction in which Sun purchased the finished DRAM-containing products from the EMs.  To do so, Sun issued purchase orders for products on a quarterly or semi-quarterly basis.  Sun purchased DRAM-containing products from the EMs at cost plus a percentage markup.  See id. at Ex. 7 at 217-18; see also ACC ¶¶ 13a-b.

2.      Sun's Foreign Subsidiaries

The ACC alleges that approximately 66% of the DRAM used by Sun in its finished products was purchased by and delivered to Sun's own manufacturing facilities located in the United States and abroad.  See ACC ¶ 13a.  Sun further alleges that 25% of this DRAM was delivered to and purchased specifically by Sun's foreign manufacturing facilities located in Europe – primarily Sun Microsystems Scotland ("Sun Scotland"), which manufactures servers and workstations in Linlithgow, Scotland, and Sun Microsystems International B.V. ("Sun Netherlands"), which distributes and markets Sun servers and workstations in Europe and other foreign markets.  See id.

Sun Scotland and Sun Netherlands are indirect, wholly owned subsidiaries of Sun.

---

[3]      On many occasions, the DRAM suppliers kept track of which DRAM delivered to the EMs was intended for use in Sun products.  In these instances, the suppliers' sales records identified Sun as the end-purchaser.  See, e.g., Cross EM Opp. Decl., Exs. 1-19.

6

**United States District Court**

For the Northern District of California

The subsidiaries do not share the identical board of directors and officers with Sun, although they do have some common directors and officers. See Bergman Decl., Ex. 4 at Responses 4-5, 23-25. Nor do Sun's directors form a majority of the subsidiaries' boards of directors. See id. at Responses 6, 26.

The procurement process vis-a-vis Sun's foreign subsidiaries largely paralleled that of the third-party external manufacturers. As with the external manufacturers, for example, Sun's global procurement team based in California established a single worldwide price at which the subsidiaries were permitted to order DRAM from DRAM suppliers, for delivery in turn to Sun's subsidiaries. See generally Declaration of David C. Cross ISO FTAIA Opp. ("Cross FTAIA Opp. Decl."), Ex. 3.[4] Specifically, Sun's global procurement team utilized face-to-face negotiations, live auctions called Dynamic Bidding Events ("DBE"s), and sealed bidding events in order to establish the worldwide DRAM price and choose those DRAM suppliers from whom Sun's subsidiaries then purchased DRAM for use in manufacturing Sun products. See Cross FTAIA Opp. Decl., Ex. 5 at 21-23, 28-29, 31, 47-48, 50.

After DRAM pricing and supplier determinations had been made, and in purchasing DRAM from approved suppliers (many of whom were European entities) pursuant to the worldwide price, Sun Scotland and Sun Netherlands also issued their own purchase orders to suppliers; took delivery of DRAM from the suppliers; were directly invoiced for the DRAM; and settled and/or paid the invoices from the suppliers. See Bergman Decl., Ex. 4 at Responses 16, 35; Ex. 5 at Responses 17-19, 36-38. However, when issues arose with DRAM purchased by Sun's foreign subsidiaries or with respect to the subsidiaries' relationships with suppliers, the California-based global procurement team generally addressed those issues. See, e.g., Cross FTAIA Opp. Decl., Exs. 10-11; see also id., Ex. 3 at ¶ 8.

---

[4] The "single worldwide DRAM price" established by Sun's California-based global procurement team applied equally to Sun's foreign subsidiaries and its third-party external manufacturers. See id. at ¶ 5.

United States District Court

For the Northern District of California

1    There is evidence that the DRAM purchases made by Sun's foreign subsidiaries

2 were used in the manufacture of finished Sun products at Sun's foreign facilities, which

3 products were in turn sold to customers in Europe and elsewhere.  See, e.g., Bergman

4 Decl., Ex. 7 at 23-24 (discussing manufacture and sale of DRAM-containing Sun products

5 at Sun Scotland).

6 C.    Procedural Case History

7    To date, the court has had occasion to rule on two separate motions to dismiss in

8 this case.  First, on March 7, 2007, the court heard defendants' motion to dismiss certain

9 claims asserted in the original consolidated complaint in the Sun action, on grounds that

10 the court lacked subject matter jurisdiction.  Specifically, defendants had moved to dismiss

11 plaintiff's claims to the extent they were based on foreign DRAM purchases made by Sun's

12 external manufacturers and foreign affiliates on Sun's behalf, arguing that such claims were

13 premised on unrecoverable foreign injury only.  The court granted defendants' motion to

14 dismiss, but because of the complaint's lack of clarity with respect to the nature of any

15 claims based on foreign DRAM purchases, granted Sun leave to amend in order to set forth

16 allegations that provided greater clarity and specificity with respect to that portion of

17 plaintiffs' claims allegedly based on foreign harm, as distinct from that portion based on

18 domestic harm.

19    Plaintiff filed the amended consolidated complaint on May 4, 2007, and subsequent

20 to that filing, defendants moved a second time to dismiss plaintiff Sun's claims to the extent

21 based on foreign DRAM purchases.  On October 15, 2007, the court denied defendants'

22 motion without prejudice.  The court found that the Foreign Trade Antitrust Improvement

23 Act ("FTAIA"), which precludes application of the Sherman Act to wholly foreign conduct,

24 was applicable to defendants' foreign price-fixing conduct, as alleged.  See Order Denying

25 Two Motions to Dismiss and Deferring Ruling on One Motion to Dismiss ("Dismissal Order")

26 at 12.  Having so found, however, the court noted that the relevant question in this case

27 was not really whether the general rule excluding the Sherman Act's reach over wholly

28

United States District Court

For the Northern District of California

1   foreign conduct applies, but rather whether the foreign conduct falls within the domestic

2   injury exception to the general rule, such that subject matter jurisdiction may be properly

3   exercised under the FTAIA.  See id.  This question in turn depended upon whether

4   defendants' foreign conduct (1) had a direct, substantial and reasonably foreseeable effect

5   on domestic commerce; and (2) whether that effect gave rise to a Sherman Act claim.  Id.

6          The court found that plaintiff had sufficiently established the first of these two

7   elements, by virtue of the ACC's allegations that defendants' foreign price-fixing activity led

8   to "higher prices for DRAM in the United States, which in turn formed the predicate for

9   plaintiffs' domestic agreements to pay higher prices for DRAM."  See Dismissal Order at

10  16.  As to the second and final element, however, the court was unpersuaded.  After noting

11  that plaintiff was required to allege proximate causation in order to establish the requisite

12  nexus between domestic effect and foreign injury in order to satisfy the second domestic

13  injury exception prong, the court found plaintiff fell short of the mark by arguing that its

14  global procurement strategy (which set a single global price for DRAM) satisfied the

15  proximate cause test.

16         Instead of dismissing plaintiff's claims outright for lack of subject matter jurisdiction,

17  however, the court noted that plaintiff had made an alternative argument that warranted

18  further development.  Specifically, Sun had argued that, to the extent some of its own

19  foreign facilities, subsidiaries and affiliates had made the foreign DRAM purchases at issue,

20  such purchases were tantamount to Sun's own purchases under a "single enterprise" or

21  agency theory, and Sun stood in those subsidiaries' shoes for purposes of raising their

22  claims.  While the court was unable to determine the validity of any such theory on the

23  motion before it, the court stated that "if plaintiffs can articulate and prove a legal theory

24  that would permit the court to find that they stand in the shoes of or are the alter ego of

25  their foreign affiliates as well as a factual basis for such a claim, the court would be

26  permitted to find that proximate cause under the FTAIA is necessarily satisfied, and that

27  jurisdiction exists."  See id. at 22.  To that end, the court denied defendants' motion to

28

9

United States District Court

For the Northern District of California

1  dismiss without prejudice to defendants' ability to raise the same arguments again "after an

2  appropriate amount of discovery" had been taken to enable both sides to fully develop their

3  arguments. Id.

4  D.     The Instant Motions

5         Now several months later, discovery has closed and defendants are back before the

6  court having filed seven different motions for resolution, the majority of them dispositive:

7  (1) a motion for partial summary judgment as to Sun's claims based on purchases made by

8  Sun's external manufacturers; (2) a renewed motion to dismiss certain of Sun's claims for

9  lack of subject matter jurisdiction, to the extent based on foreign DRAM purchases; (3) a

10 motion for summary judgment as to Sun's claims based on purchases of DRAM from

11 defendant Mitsubishi entities; (4) an omnibus motion for summary judgment or in the

12 alternative, for summary adjudication; (5) a motion to exclude the expert testimony of

13 plaintiff's expert, Dr. Halbert White; (6) defendant Nanya Technology Corporation's ("NTC")

14 motion for summary judgment on the basis that plaintiff cannot establish a triable issue of

15 fact as to the entities' participation in any overarching price-fixing conspiracy; and (7)

16 defendant Nanya Technology Corporation USA's ("NTC USA") analogous motion on the

17 basis that plaintiff cannot establish a triable issue of fact as to NTC USA's participation in

18 any overarching price-fixing conspiracy.[5]   The parties have also filed numerous evidentiary

19 objections, and requests for judicial notice.

20        Each of the relevant motions is dealt with in turn below.

21                                    **DISCUSSION**

22 A.     Legal Standards

23        1.     Summary Judgment

24        As a general matter, summary judgment "shall be rendered forthwith if the pleadings,

25 depositions, answers to interrogatories, and admissions on file, together with the affidavits,

26 ───────────────────

27        [5]      The first five of these motions are addressed herein, while the latter two motions
   filed by NTC and NTC USA are addressed via separate order, to be filed by the court.
28

**United States District Court**
For the Northern District of California

1   if any, show that there is no genuine issue as to any material fact and that the moving party

2   is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317,

3   322 (1986).  The court must view the facts in the light most favorable to the non-moving

4   party and give it the benefit of all reasonable inferences to be drawn from those facts.

5   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

6       Where, as here, concerted price-fixing is alleged, the plaintiffs bear the ultimate

7   burden of presenting sufficient evidence to prove that an agreement to fix prices existed.

8   See, e.g., In re Citric Acid Litig., 191 F.3d 1090, 1093 (9th Cir. 1999)(noting that price-fixing

9   is a per se violation of section 1 of the Sherman Act).  In order for them to survive

10  defendants' motion for summary judgment, therefore, plaintiffs must establish that there is

11  a genuine issue of material fact as to whether defendants entered into an illegal conspiracy

12  that caused respondents to suffer a cognizable injury.  See Matsushita, 475 U.S. at 585-86.

13  Plaintiffs can establish a genuine issue of material fact by producing either direct evidence

14  that defendants participated in an agreement to fix prices, or circumstantial evidence from

15  which a reasonable fact finder could conclude the same.  See, e.g.,Movie 1 & 2 v. United

16  Artists Commc'ns, 909 F.2d 1245, 1251-52 (9th Cir. 1990); United States v. Gen. Motors

17  Corp., 384 U.S. 127, 142-43 (1966).

18      With respect to proof by way of circumstantial evidence in section 1 cases, special

19  rules apply.  In Matsushita Elec. Indus. Co., the Supreme Court noted that "antitrust law

20  limits the range of permissible inferences from ambiguous evidence in a [section 1] case...".

21  See 475 U.S. at 588.  In addressing plaintiff's burden in proving that an issue of material

22  fact exists on the conspiracy question, the court stated, "conduct as consistent with

23  permissible competition as with illegal conspiracy does not, standing alone, support an

24  inference of antitrust conspiracy...".  See id.  In sum, to survive a motion for summary

25  judgment, "a plaintiff seeking damages for a violation of [section] 1 must present evidence

26  'that tends to exclude the possibility' that the alleged conspirators acted independently ...."

27  Id.

28

United States District Court

For the Northern District of California

1     The Ninth Circuit has embraced Matsushita and has outlined a two-part test to be

2  applied whenever a plaintiff rests its case entirely on circumstantial evidence.  First, the

3  defendant can rebut an allegation of conspiracy by showing a plausible and justifiable

4  reason for its conduct that is consistent with proper business practice.  Second, the burden

5  then "shifts back to the plaintiff to provide specific evidence tending to show that the

6  defendant was not engaging in permissible competitive behavior."  See, e.g., In re Citric

7  Acid Litig., 191 F.3d at 1094.

8     These standards apply here, to the extent that plaintiffs seek to defeat summary

9  judgment as to liability for conspiratorial conduct on the basis of circumstantial evidence,

10  whether in whole or in part.

11     2.     Motion to Dismiss

12     In evaluating a motion to dismiss, all allegations of material fact are taken as true

13  and construed in the light most favorable to the nonmoving party.  See, e.g., Burgert v.

14  Lokelani Bernice Pauahi Bishop Trust, 200 F.3d 661, 663 (9th Cir. 2000)(citations omitted).

15  In order to survive a dismissal motion, however, a plaintiff must allege facts that are

16  enough to raise his/her right to relief "above the speculative level."  See Bell Atlantic Corp.

17  v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1964-65 (2007).   While the complaint "does

18  not need detailed factual allegations," it is nonetheless "a plaintiff's obligation to provide the

19  'grounds' of his 'entitlement to relief' [which] requires more than labels and conclusions,

20  and a formulaic recitation of the elements of a cause of action will not do."  Id.  In short, a

21  plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," not

22  just conceivable.  Twombly, 127 S. Ct. at 1974.

23     With the above collective standards in mind, the court now turns to the numerous

24  motions before it, and addresses each in turn.

25  B.     Motion for Summary Judgment re External Manufacturer Purchases

26     Generally, Sun seeks recovery for defendants' alleged Sherman Act violations

27  based not only on the DRAM it purchased and had delivered, but also based on the DRAM

28

12

**United States District Court**
For the Northern District of California

1   delivered to and purchased in the first instance by its foreign subsidiaries and third-party

2   external manufacturers.  By way of the instant motion, defendants challenge only those

3   claims based on the external manufacturers' DRAM purchases.  Defendants note that the

4   external manufacturers initially paid defendant suppliers directly for their DRAM purchases,

5   and argue that this made plaintiff an indirect purchaser of DRAM vis-a-vis those purchases.

6   Thus, plaintiff's claims for recovery, to the extent based on the external manufacturers'

7   DRAM purchases, are barred by the direct purchaser rule of <u>Illinois Brick v. Illinois</u>, 431

8   U.S. 720 (1977).

9       Sun defends its ability to assert such claims on grounds that it has established an

10  agency relationship with the external manufacturers that gives Sun direct purchaser status

11  in connection with all external manufacturer DRAM purchases, notwithstanding the external

12  manufacturers' actual payment of DRAM prices to the defendants.  Even if the court does

13  not deem Sun a direct purchaser by virtue of the agency relationship between Sun and its

14  external manufacturers, plaintiff maintains that it nonetheless satisfies the 'control'

15  exception to the direct purchaser rule recognized in <u>Illinois Brick</u>, thus warranting denial of

16  defendants' motion.

17      The issues for the court to decide are accordingly two-fold:  first, whether Sun

18  qualifies as a direct purchaser of the DRAM purchased from defendants by the external

19  manufacturers, such that its claims based on those purchases may go forward under <u>Illinois</u>

20  <u>Brick</u>.  Second, and in the event Sun does not qualify as a direct purchaser, whether Sun's

21  claims may nonetheless go forward pursuant to the 'control exception' recognized under

22  <u>Illinois Brick</u>.

23      1.   <u>Whether Sun Qualifies as a Direct Purchaser</u>

24      The direct purchaser rule is well-established.  <u>See, e.g., Illinois Brick</u>, 431 U.S. 720.

25  In <u>Illinois Brick</u>, plaintiffs were indirect purchasers who sought to convince the court that

26  they had antitrust standing to sue under federal antitrust laws because the illegal

27  overcharge that resulted from defendants' antitrust conspiracy had been passed on to the

28

United States District Court

For the Northern District of California

1   indirect purchaser plaintiffs by middlemen further upstream.  The Supreme Court, however,

2   consistent with its earlier holding in Hanover Shoe[6], held that indirect purchasers are too

3   remote to suffer true "antitrust injury," and therefore do not have standing under federal

4   antitrust law to pursue claims.  In reaching its conclusion, the court expressed concerns

5   with the complexity of proof involved in any contrary rule, the purpose of the antitrust laws,

6   and risk of multiple liability for defendants if such a rule were not adopted.  See id. at 731-

7   35.

8          Defendants' first and primary argument urges a straightforward application of the

9   direct purchaser rule to the case at bar.  They argue that, since the DRAM delivered to the

10  external manufacturers – both domestically and abroad – was paid for in the first instance

11  by the external manufacturers, even if on Sun's ultimate behalf, it is the external

12  manufacturers rather than Sun who qualify as true direct purchasers capable of asserting

13  claims premised on those purchases.  For support, they rely on the Ninth Circuit's recent

14  decision in Delaware Valley Surgical Supply Inc. v. Johnson & Johnson, asserting that it

15  firmly rejects any contrary argument.

16         Defendants' position on this point is well taken, and their reliance on Delaware

17  Valley warranted.  In Delaware Valley, the Ninth Circuit considered whether a plaintiff

18  hospital had standing to bring a Sherman Act claim against a defendant manufacturer

19  engaged in the provision of sutures and endomechanical products for use in laparoscopic

20  surgery.  See 523 F.3d 1116, 1118 (9th Cir. 2008).  The pertinent facts of the case are as

21  follows:  plaintiff was a member of a group purchasing organization ("GPO") that negotiated

22  a master agreement with defendant on plaintiff's behalf that set fixed pricing options for all

23  sutures and endomechanical products.  See id.  Plaintiff then executed its own contract

24  ────────────────────

25        [6]      In Hanover Shoe, Inc., v. United Machinery Corp., the Supreme Court generally
      held that a pass-on defense cannot be relied on by defendants who seek to prove that a direct
26    purchaser plaintiff was not actually injured by a violation of the antitrust laws, if the plaintiff has
      passed on some or all of the illegal overcharge to other subsequent purchasers.  See 392 U.S.
27    481, 491-493 (1968).  The court adhered there to the "general principle" that the victim of an
      overcharge "is damaged within the meaning of [the antitrust standing statute] to the extent of
28    the overcharge" only.  Id. at 491.

14

United States District Court

For the Northern District of California

with defendant pursuant to the terms of the master agreement, which individual contract allowed plaintiff to purchase products either directly from defendant, or else from an authorized distributor of defendant's products.  Id. at 1119.  Plaintiff chose the latter option, and entered into yet another contract with a distributor, pursuant to which plaintiff procured defendant's products under the specified terms.  Plaintiff purchased defendant's products directly from the distributor; it did not pay defendant directly for any products, nor did defendant ship any goods directly to plaintiff.  Id.

In considering the same direct purchaser rule at issue here, the Ninth Circuit there squarely rejected plaintiff's argument that it could be classified as a direct purchaser of goods from defendant, instead finding plaintiff to be an *in*direct purchaser that lacked standing to sue under the federal antitrust laws.  See Delaware Valley, 523 F.3d at 1122. The Ninth Circuit reasoned:  "It is undisputed that [the distributor] was the immediate purchaser of sutures and endo products from [defendant]. [Distributor] paid [defendant] directly for its inventory and took title in the products before selling them to [plaintiff]. [Plaintiff] directly paid [distributor], not [defendant], for its orders. [Distributor] is not an agent or subsidiary of [defendant], but rather an independently owned and managed company.  Following the clear rule set forth in Illinois Brick, [plaintiff] lacks standing because the hospital is not a direct purchaser of products from [defendant]."  See id. Although the Ninth Circuit noted that plaintiff had an independent contractual relationship with the defendant, and that the actual price that plaintiff paid for defendant's products was set by "an agreement negotiated [with defendant] by a GPO on behalf of plaintiff," it also noted that plaintiff additionally "had a contract with [the distributor], and it was that contract that ultimately effectuated the transfer of these goods."  See id.

Notably, the Ninth Circuit observed that its conclusion was dictated in part by the Supreme Court's post Illinois Brick precedent, which clarified the Court's intention to establish a "bright line rule" by means of the direct purchaser rule, and had already "closed the door on the theory that an end user who buys from an independent distributor, rather

United States District Court

For the Northern District of California

1  than the manufacturer, should have standing because it may be the most efficient enforcer

2  of antitrust laws." Id. at 1122-1123 ("Illinois Brick is not a policy holding, but rather a case

3  of statutory construction").

4      Delaware Valley is controlling.  Plaintiff does not dispute that its external

5  manufacturers initially paid for the DRAM that was delivered to them for incorporation into

6  Sun products, which products would in turn be delivered and sold to Sun at cost, plus an

7  agreed upon mark-up.  Nor does plaintiff dispute that the external manufacturers took title

8  to the DRAM initially purchased from the suppliers, or that the external manufacturers were

9  independently owned and managed corporate entities.  Thus, this case is directly in line

10  with Delaware Valley, and compels the conclusion that it is the external manufacturers, and

11  not plaintiff, who must be deemed the "immediate purchasers" of DRAM.  This is so,

12  despite the existence of an overarching independent pricing strategy maintained and

13  operated by Sun in connection with purchases of DRAM from defendants.  After all, and

14  notwithstanding plaintiff's protestations to the contrary, the same reasons articulated by the

15  Delaware Valley court in rejecting the plaintiff hospital's direct purchaser claim on the basis

16  of its independent contractual relationship with the defendant, apply here, too.

17      Plaintiff's agency argument that the external manufacturers acted as mere

18  "purchasing agents" for Sun, does not change this analysis.  As articulated by plaintiff's

19  counsel at the hearing on the instant motion, a finding that the external manufacturers

20  acted as Sun's purchasing agents would allow the external manufacturers' direct payments

21  to defendant DRAM suppliers to be legally attributed to Sun, thereby cloaking Sun with the

22  necessary authority to assert claims based on external manufacturer DRAM purchases.

23  Application of this purchasing agency theory would also allow plaintiff to proceed "outside

24  the scope of Illinois Brick," in counsel's words, thereby obviating any objections based on

25  Delaware Valley.  For support for the purchasing agency theory, plaintiff relies on In re

26  Coupon Clearing Service, Inc., 113 F.3d 1091 (9th Cir. 1997), and E.&J. Gallo Winery v.

27  Encana Energy Servs., Inc., 2008 WL 2220396 (E.D. Cal. May 27, 2008).  See Pl. Opp. Re

28

**United States District Court**
For the Northern District of California

1 | EM Purch. at 9:11-12:19.

2 |     These cases, however, are neither persuasive nor controlling.  In re Coupon

3 | Clearing Serv. is a bankruptcy decision and did not address federal antitrust law at all, let

4 | alone did it consider the availability of an agency theory as an alternative theory available in

5 | the direct/indirect purchaser context.  As for E.&J. Gallo Winery, it does address the

6 | availability of a general agency theory in the federal antitrust context.  However – and

7 | putting aside the decision's non-binding status upon this court – E.&J. Gallo Winery only

8 | considered the availability of a general agency theory to a plaintiff seeking to impose

9 | antitrust *liability* on parent-subsidiary corporations.  This is, in the court's view, a distinct

10 | question from the issue urged by plaintiff upon the court here – i.e., whether a plaintiff can

11 | invoke a purchasing agency theory as an alternative means of establishing direct purchaser

12 | standing for purposes of asserting federal antitrust claims.  In contrast to the agency theory

13 | discussed by the district court in E.&J. Gallo Winery, the present inquiry precedes the

14 | question of antitrust liability entirely, and instead deals with a plaintiff's legal ability to assert

15 | antitrust claims in the first instance.

16 |     Aside from the lack of convincing legal support for plaintiff's purchasing agency

17 | theory, moreover, the real problem with plaintiff's argument is that it requires the court to

18 | turn its back on what it views as the clear governing framework of Illinois Brick.  As the

19 | Ninth Circuit has made clear, that framework set forth a "bright line rule" that prohibits all

20 | but direct purchasers from bringing suit under the federal antitrust laws – adherence to

21 | which is required under the undisputed factual scenario advanced here.  See Delaware

22 | Valley, 523 F.3d at 1122-23.  Thus, and without clear legal authority to the contrary, no

23 | justification for departing from this well-recognized framework exists.  And while plaintiff

24 | correctly notes that Delaware Valley did not have occasion to examine the precise

25 | purchasing agency argument advanced here, the factual similarities in the case at bar to

26 | Delaware Valley persuade this court that any such argument would have been discredited

27 | by the Ninth Circuit as yet another misguided attempt to fashion a "new formulation of the

28 |

United States District Court

For the Northern District of California

1    Illinois Brick rule."  See id. at 1123, 1124 (the Supreme Court's "firm [direct purchaser] rule

2    does not provide us the leeway to make a policy determination on a case-by-case basis as

3    to whether standing should be recognized when there are special business arrangements").

4         In sum, therefore, fidelity to controlling precedent requires the conclusion that for all

5    claims based on DRAM purchases made by external manufacturers, it is those external

6    manufacturers and not Sun who qualify as direct purchasers capable of bringing suit,

7    pursuant to the direct purchaser rule of Illinois Brick.

8         2.    Control Exception to Illinois Brick Direct Purchaser Rule

9         Sun asserts, however, that even if the court concludes that Sun does not qualify as a

10   direct purchaser under Illinois Brick, it is nonetheless qualified to assert claims based on

11   external manufacturer DRAM purchases, by virtue of the 'control' exception recognized in

12   Illinois Brick.

13        The 'ownership' or 'control' exception permits offensive use of the pass-on theory in

14   situations where "market forces have been superseded."  One example of such a situation

15   occurs when the direct purchaser is owned or controlled by a member of an alleged

16   conspiracy.  See, e.g., Illinois Brick, 431 U.S. at 736 n.16 ("Another situation in which

17   market forces have been superseded and the pass-on defense might be permitted is where

18   the direct purchaser is owned or controlled by its customer"); cf. Perkins v. Standard Oil

19   Co., 395 U.S. 642, 648 (1969); In re Western Liquid Asphalt Cases, 487 F.2d, at 197, 199.

20   While long-recognized, however, there are few authoritative cases that clearly define the

21   legal showing required to justify application of the control exception, and no Ninth Circuit

22   authority that provides affirmative guidance on the issue.  As a general matter, the

23   ownership and control exception has been construed to encompass relationships involving

24   such functional economic or other unity between the direct purchaser and either the

25   defendant or the indirect purchaser, that there effectively has been only one sale.  See,

26   e.g., Jewish Hosp. Ass'n v. Stewart Mech. Enters., 628 F.2d 971, 975 (6th Cir. 1980); Royal

27   Printing Co. v. Kimberly-Clark Corp., 621 F.2d 323, 326-27 (9th Cir. 1980); see also, e.g., In

28

United States District Court

For the Northern District of California

1    re Mercedez-Benz Antitrust Litig., 157 F. Supp. 2d 355, 355 (D. N.J. 2001)("[T]he rationale

2    of Illinois Brick's bar to indirect purchaser suits does not apply where the supposed

3    intermediary is controlled by one or the other of the parties").  Some examples of the types

4    of facts that would satisfy the control exception have furthermore been defined as:

5    "interlocking directorates, minority stock ownership, loan agreements that subject the

6    wholesalers to the manufacturers' operating control, trust agreements, or other modes of

7    control separate from ownership of a majority of the wholesalers' common stock."  In re

8    Brand Name Prescription Drugs Antitrust Litig., 123 F.3d 599, 606 (7th Cir.1997).

9           Here, plaintiff concedes that it and the external manufacturers were separate legal

10   entities, lacked interlocking directorates and officers, did not own each other's stock, and

11   did not enter into loan agreements, trust agreements, or extensions of credit on behalf of

12   one another.  See, e.g., Pl. Opp. Br. at 15:20-26; see also, e.g., Moore Decl., Ex. 5,

13   Responses 48, 58; Ex. 8 at 68-76; Ex. 15 at ¶ 18; Ex. 13 at 50-52, 118.  Plaintiff contends,

14   however, that these facts are not determinative of the control question, since application of

15   the exception depends upon the narrower issue whether sufficient control is exercised in

16   connection with the actual procurement of DRAM for incorporation into Sun products only –

17   not whether it is exercised in connection with structural day to day control of an entity.  And

18   this, says plaintiff, it has indisputably demonstrated based on the uncontested evidence

19   showing that Sun determined from whom, at what price, and at which percentage of

20   business the external manufacturers would order DRAM; that Sun provided forecasts to

21   determine the quantities of DRAM ordered by the external manufacturers; and that Sun

22   bore the cost of the DRAM that was ordered by the external manufacturers on its behalf (by

23   paying for the DRAM at cost plus a percentage mark-up).  See, e.g., Moore Decl. Re EMs,

24   Ex. 7 at 76; see also, e.g., Cross EM Opp. Decl., Ex. 22 at 82-83, 613; Ex. 26 at 160; Ex.

25   27 at 128-29; Ex. 28 at 62-64; Ex. 29 at 28-29, 119-122, 124, 134-45;  Ex. 30 at 125-26;

26   Ex. 32 at 45-50.

27          For support of its argument that it is only control over the external manufacturers'

28

19

United States District Court

For the Northern District of California

DRAM procurement activities that counts for purposes of the control exception (rather than the presence of structural control), plaintiff relies primarily on In re Toilet Seat Antitrust Litig., 1977 WL 1453 (E.D. Mich. Aug. 24, 1977).  As plaintiff notes, In re Toilet Seat found that a plaintiff lumber company could allege class action antitrust claims against defendant manufacturers of toilet seats, notwithstanding that plaintiff did not "purchase directly from" the manufacturers but rather relied on a midstream purchasing agent to make purchases on plaintiff's behalf.  See id. at *2.  The court found that plaintiff's relationship with the purchasing agent was one of "principal and agent" rather than buyer and seller, and that the relationship fell within the control exception of Illinois Brick.  Id.  The evidence that the court relied on in coming to this conclusion demonstrated: that the middle agent with whom plaintiff dealt was a "purchasing concern;" that plaintiff engaged the agent for "a flat monthly fee;" that the fee paid to the agent "bore no relation to the quantity of goods obtained;" and that billing arrangements varied with different transactions, although in some circumstances, the agent would be billed first and in turn would bill plaintiff.  Id.

Putting aside for the moment the fact that In re Toilet Seat constitutes (as so many of the cases cited herein by the parties do) non-binding authority, it is not altogether persuasive.  In re Toilet Seat teaches that the control exception may be satisfied when the plaintiff employs an independent broker or purchasing agent as middle man whose sole function is to act as a mere conduit for the procurement of goods.  This, however, is different from the case at bar.  Here, plaintiff does not dispute that it employed external manufacturers for assistance in the actual manufacture of Sun products – *not* simply as brokers to act as conduits for the procurement of DRAM.  This broader relationship triggers additional complexities that are highlighted by the different billing arrangements evidenced in both cases.  In re Toilet Seat notes, for example, that plaintiff's purchasing agent was paid a flat monthly fee for its services that bore no relationship to the quantity of goods obtained.  Here, by contrast, Sun's payments to external manufacturers are directly proportional to the amount of Sun-finished products that Sun purchases, since all products

**United States District Court**

For the Northern District of California

1   are paid for on a cost basis, plus an additional percentage mark-up.  These differences

2   serve to highlight a larger disparity:  whereas In re Toilet Seat is characterized by facts

3   indicating that market forces have been suspended (e.g., flat fee payment that is resistant

4   to supply and demand forces), the present case is characterized by a relationship in which

5   traditional market forces remain in play.  As such, the fundamental premise upon which the

6   control exception is to be applied – i.e., in situations in which market forces are suspended

7   – is not evident here, even if evident under the facts of In re Toilet Seat.

8          This conclusion is consistent with Jewish Hosp. Ass'n, a Sixth Circuit case that both

9   sides agree is instructive.  See 628 F.2d at 975.  In listing there the "examples of situations

10  where an ownership or control relationship between an indirect purchaser and a direct

11  purchaser might make the passing-on bar inapplicable," the Sixth Circuit noted situations

12  involving parent-subsidiary relationships, or one company's stock ownership of another, as

13  the paradigmatic examples.  Id.  Significantly, however, the court also noted that, while a

14  relationship with an independent broker or purchasing agent such as that described in In re

15  Toilet Seat could also satisfy the exception, this rule only applies where market forces are

16  truly superseded.  Id.; see also Howard Hess Dental Lab. v. Dentsply Intern., 424 F.3d 363,

17  372 (3d Cir. 2005)("modes of control that might qualify for the control exception include

18  'interlocking directorates, minority stock ownership, loan agreements that subject the

19  wholesalers to the manufacturers' operating control, [or] trust agreements").

20         Since there is no evidence that plaintiff's external manufacturers were independent

21  purchasing agents of the type contemplated by In re Toilet Seat and Jewish Hosp. Ass'n,

22  application of the control exception is therefore inappropriate here, unless plaintiff can

23  demonstrate other recognized modes of control that might suggest that market forces have

24  been superseded – e.g., interlocking directorates, minority stock ownership, loan

25  agreements that subject the wholesalers to the manufacturers' operating control, etc.  As

26  noted, however, it is undisputed that this is not the case.

27          It is worth noting, furthermore, that to the extent that the external manufacturers

28

United States District Court

For the Northern District of California

1   retain, and have exercised, their right to sue defendants, this further confirms that market

2   forces have not been superseded in the traditional sense contemplated by the control

3   exception, and that the policy reasons behind the Illinois Brick decision remain intact.

4   Indeed, as defendants point out, at least two external manufacturers – Celestica and

5   Solectron – have submitted direct purchaser claim forms as part of the direct purchaser

6   MDL proceedings in the In re DRAM litigation before the court.  See Moore Decl. Re EMs,

7   Ex. 13 at 41-43; Exs. 17-19.

8           In sum, therefore, the court concludes that plaintiff has failed to introduce a material

9   dispute of fact as to whether market forces here have been superseded in the manner

10   contemplated for the control exception to apply.

11                                            * * *

12          Based on all the foregoing, the court agrees with defendants that Sun does not

13   qualify as a true direct purchaser for those claims based on DRAM purchases made by

14   external manufacturers, and has furthermore failed to established a material dispute of fact

15   as to application of the control exception to Illinois Brick.  Defendants' motion for summary

16   judgment is accordingly GRANTED.

17   C.     Motion to Dismiss Claims Based on Foreign DRAM Purchases

18          Defendants' motion to dismiss seeks a ruling that the court lacks subject matter

19   jurisdiction over plaintiff's claims, to the extent based on purchases made by Sun's foreign

20   subsidiaries.[7]  As noted, the motion is defendants' third attempt to persuade the court to

21   dismiss plaintiff's claims based on foreign DRAM purchases, and "addresses the narrow

22   jurisdictional question remaining after the court's October 2007 ruling on defendants'

23   motion to dismiss" – i.e., whether plaintiff can articulate and prove a legal theory that would

24   _____

25          [7]     Defendants' motion also targets all claims based on purchases made by Sun's
     foreign external manufacturers.  Thus, defendants seek dismissal of claims based on an
26   aggregate total purchase amount of "more than $762 million between August 1998 and June
     2002 and more than $732 million between April 1999 and June 2002."  See Cross FTAIA Opp.
27   Decl., Ex. 1 at ¶ 4.  However, in view of the court's grant of summary judgment with respect
     to all claims based on DRAM purchases made by external manufacturers – both domestic and
28   foreign – this additional ground is now moot for purposes of the instant motion to dismiss.

United States District Court

For the Northern District of California

satisfy proximate causation under the FTAIA.  According to defendants, the completion of discovery has now sufficiently developed the factual record to make clear "that Sun cannot carry its jurisdictional burden" under the statute.

As discussed ad nauseam in the court's prior dismissal orders, the court's assertion of subject matter jurisdiction over plaintiff's claims based on foreign subsidiaries' DRAM purchases – notwithstanding the general proscriptions of the FTAIA – generally requires a showing that defendants' foreign conduct (1) had a direct, substantial and reasonably foreseeable effect on domestic commerce; which (2) gave rise to a Sherman Act claim. See 15 U.S.C. § 6a.; see also F. Hoffman-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 158 (2004); In re Dynamic Random Access Memory (DRAM) Antitrust Litig., 546 F.3d 981, 987-88 (9th Cir. 2008).  Having already found that plaintiff has shown the former, the court now limits its inquiry to the latter, and examines whether plaintiff can demonstrate proximate causation between the recognized domestic effect of defendants' conduct (i.e., the setting of higher prices for DRAM in the United States) and plaintiff's foreign injury (i.e., the payment of higher DRAM prices abroad).  See discussion, supra at 8-10; Dismissal Order at 20-21; see also In re Dynamic Random Access Memory (DRAM) Antitrust Litig., 546 F.3d at 987-88.  Resolution of this inquiry depends upon resolution of plaintiff's two alternative theories:  (1) the single enterprise theory; and (2) the agency theory.[8]

Before getting to the merits of these theories, however, there are two preliminary issues raised by the parties that require resolution.[9]  First, plaintiff contends, as it has

---

[8]     It should be noted that defendants' moving papers also seek dismissal based on Sun's inability to demonstrate subject matter jurisdiction over the claims at issue pursuant to an alter ego theory.  However, as Sun states in its opposition brief and conceded at the hearing, it is not pursuing an alter ego theory in arguing for subject matter jurisdiction.  See MTD Opp. Br. at 10:15-11:3 (the "alter ego and veil piercing analyses addressed by defendants are materially different" from the single enterprise theory being argued by Sun).

[9]     Plaintiff also initially contends "[a]s a threshold matter," that defendants have stipulated that the only transactions at issue in this motion are deliveries of DRAM to Sun's foreign facilities, and not deliveries of DRAM to Sun's external manufacturers.  The court has already decided that the latter issue is moot for purposes of this motion.  Even if it had not so decided, however, the court would nonetheless find that the stipulation at issue lends no support for plaintiff's argument.  See Cross FTAIA Opp. Decl., Ex. 1.

**United States District Court**
For the Northern District of California

previously, that it is legally improper in the first instance to sever for the court's

consideration any portion of claims based on foreign DRAM purchases, since those claims

are also based on domestic DRAM purchases – the court's jurisdiction over which no one

disputes.  Second, and assuming severance of the foregoing claims for the court's

consideration is permissible, the parties dispute whether the proper legal standard to be

applied in evaluating the instant motion is that provided by Federal Rule of Civil Procedure

12(b)(1), or alternatively, Federal Rule of Civil Procedure 56.

As to the first preliminary issue, plaintiff contends that since it is undisputed that the

court has jurisdiction over Sun's claims premised on *domestic* deliveries of DRAM, the

court cannot arbitrarily carve out from these claims the portion that are based on foreign

deliveries, and dismiss them.  This argument is unpersuasive, however, for as defendants

point out, the court already considered and ruled upon the issue in its October 2007 order.

Specifically, the court there said: "as to whether plaintiffs' claims based on foreign injury are

severable from their claims based on domestic injury (which defendants have not moved to

dismiss), the court agrees with a number of courts who have employed sound analysis in

determining that such claims are severable."  Dismissal Order at 22 (citing In re Rubber

Chemicals, 2007 U. S. Dist. LEXIS 62734 at *13-22).  Plaintiff presents no compelling

reason for departure from this earlier holding.  To the extent, moreover, that plaintiff rests

its renewed argument against severance on the court's corollary statement that it "need not

decide the issue definitively" on the prior dismissal motion, the court takes the opportunity

now to definitively decide the issue in favor of severance.

As to the parties' second preliminary dispute over the proper legal standard

applicable to the present motion, the court concludes that defendants have correctly argued

in favor of application of a 12(b)(1) standard, rather than a Rule 56 standard.

Both parties rely on Thornhill Publ'g Co. v. Gen. Tel. & Elec., 594 F.2d 730 (9th Cir.

1979) in their competing approaches to this issue.  In Thornhill, the Ninth Circuit affirmed

the lower court's grant of defendant's summary judgment motion seeking dismissal of

24

**United States District Court**
For the Northern District of California

plaintiff's complaint on grounds that the complaint's alleged conduct was outside the jurisdictional reach of the Sherman Act.  The trial court had applied the Rule 56 summary judgment standards in deciding the motion, rather than the 12(b)(1) standard usually applied to motions to dismiss for lack of subject matter jurisdiction.  While noting that it need not definitively resolve the question whether the Rule 56 standard or a 12(b)(1) standard should have been applied by the district court, the <u>Thornhill</u> court made several observations about the use of these standards in the antitrust context.

The Ninth Circuit noted that where, as here, a motion attacking jurisdiction is made on the basis of facts in the record, such a motion is commonly labeled a "speaking motion," which is subject to analysis pursuant to 12(b)(1) standards, and which allows the court to resolve disputed facts in evaluating the jurisdictional claims.  <u>See</u> 594 F.2d at 733.  However, the court went on to note that, where the jurisdictional issues in an antitrust case are not separable from the merits of a case (e.g., where an element required to state a Sherman Act claim "is an element of the substantive offense as well as a jurisdictional requirement"), then a motion going to the jurisdictional issue should be accorded Rule 56 treatment.  <u>See id</u>.

The <u>Thornhill</u> court also took specific note of a prior recent case in which the Ninth Circuit considered the jurisdictional and substantive issues presented in a Sherman Act case specifically, found them to be legally distinct, and applied a 12(b)(1) legal standard.  The <u>Thornhill</u> court quoted language from that prior case as follows:  "[t]he jurisdictional issue under the Sherman Act is distinct from the substantive issue of whether a given defendant's conduct was of the kind prohibited by the Act'... Specifically, 'the jurisdictional question . . . is whether defendants' conduct had a sufficient relationship to interstate commerce to be subject to regulation by Congress... (while) the substantive issue... is whether defendants participated in anti-competitive conduct."  <u>Id</u>. at 735.  The <u>Thornhill</u> court cautioned, however, that this earlier observation had been reached in a case where the opposing party had conceded that the jurisdictional and substantive issues were

United States District Court

For the Northern District of California

separable.  To that end, and notwithstanding the reasoning of this earlier case, the
Thornhill court concluded that in a case "where the jurisdictional issue and the substantive
issues are so intermeshed that the question of jurisdiction is dependent on decision of the
merits," the Rule 56 standard still applies.  See id.

Thornhill's discussion is complicated and not altogether clear.  Nonetheless, as
applied here, Thornhill is best read as suggesting that the 12(b)(1) standard, rather than a
Rule 56 standard, is appropriate.  The jurisdictional issues in the case – while factual in
nature – do not appear to be so "enmeshed" with the substantive issues of plaintiff's
Sherman Act claim such as to require Rule 56 treatment.  As the Thornhill court
contemplated, the jurisdictional issue in Sun's Sherman Act and Cartwright Act claims
(insofar as the foreign purchase based claims are concerned) is whether defendants'
conduct had a sufficient relationship with the domestic effects of that conduct and plaintiff's
injury, so as to be subject to regulation under the FTAIA.  The substantive issues of
plaintiff's claims, however, are whether defendants participated in anti-competitive conduct
by conspiring to fix prices.  Since the two issues are distinct, analysis pursuant to 12(b)(1)
standards is appropriate.  Accordingly, the court shall consider the factual evidence
presented and resolve factual disputes as necessary to determine the existence of
jurisdiction as a matter of law.

Having disposed of the preliminary issues, the court now turns to the two theories
advanced by plaintiff.

1.      Single Enterprise Theory

Plaintiff asserts that it stands in the shoes of its wholly owned foreign subsidiaries –
and thus that those subsidiaries' DRAM purchases at artificially high levels were
proximately caused by the setting of a single inflated DRAM price in the U.S. – because it,
Sun Scotland and Sun Netherlands collectively "operated as a single enterprise with a
unified purpose in the production and sale of Sun products and the procurement of
components, such as DRAM, needed to assemble those products."  See Pl. Opp. Br. at

United States District Court

For the Northern District of California

10:2-4.  As evidence of this single enterprise theory, Sun points to the global DRAM procurement strategy instituted and managed by Sun's global memory procurement team headquartered in California.  Plaintiff also relies on several district court cases, including, primarily, Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984), and Aventis Envtl. Sci. USA LP v. Scotts Co., 383 F. Supp. 2d 488, 499-500 (S.D. N.Y. 2005).  Ultimately, however, neither plaintiff's reliance on the evidence nor its reliance on the case law withstands scrutiny.

     To begin with, plaintiff's legal authority is less than compelling.  While true that a single entity doctrine was announced in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984), that case held that parent and subsidiary corporations are to be considered a single collective entity for purposes of conspiracy liability under section 1 of the Sherman Act, and cannot be found liable for conspiracy with each other under the Act.  The doctrine therefore expressly deals with the question whether a parent and subsidiary corporation may be charged with conspiring with each other, and not, as is the case here, with the question whether those two entities may collectively be treated as a single entity for purposes of jurisdictional antitrust standing.  Nor has any other case relied on by plaintiff so extended the single entity doctrine announced in Copperweld.

     Plaintiff is closer to the mark in citing Aventis, an antitrust case allowing a US affiliate plaintiff to assert antitrust claims based on the harm done to its foreign affiliate.  See Aventis, 383 F. Supp. 2d at 499-500.  Aventis noted that plaintiffs had "proffered evidence which, if believed, would demonstrate that all three [affiliate plaintiff] entities were acting as a single enterprise and shared a complete unity of interests."  Id.  Nonetheless, Aventis is distinguishable.  First, and as defendants point out, it did not deal with the FTAIA specifically.  Putting this concern aside, however, the court finds it significant that the foreign affiliates in Aventis had assigned their antitrust claims to the plaintiff affiliate corporation.  Id.  This fact alone strongly suggests a plaintiff's entitlement to assert claims on behalf of its foreign affiliates.  Here, however, this critical fact is lacking.  Furthermore,

27

United States District Court

For the Northern District of California

the <u>Aventis</u> court provided no analysis supporting its conclusion; thus, it is impossible for

this court to meaningfully evaluate the contours of any single entity doctrine applied by that

court.  And while <u>Aventis</u> did note that two other district court cases had affirmed the

existence of the single entity doctrine, neither of those cases dealt with a similar FTAIA

context.  <u>See, e.g., In re Vitamins Antitrust Litig.</u>, 2001 WL 755852, at *3 (D.D.C. June 7,

2001) and <u>Farmland Dairies, Inc. v. New York Farm Bureau, Inc.</u>, 1996 WL 191971, at *4

(N.D.N.Y. Apr.15, 1996) (holding without meaningful discussion that a parent could bring

antitrust claims on behalf of its subsidiary when their interests were the same and they

were treated as the same entity).  In sum, therefore, plaintiff's legal authorities – the

majority of which are non-binding – have not convinced the court that the single entity

doctrine should be applied in the manner advanced by plaintiff here.

        Second, defendants correctly point out that plaintiff rests its evidence in support of

its single enterprise theory in part on a global procurement strategy that has already been

discredited.  <u>See</u> Opp. Br. at 10:2-5 (Sun and its subsidiaries "operated as a single

enterprise with a unified purpose in the production and sale of Sun products and the

procurement of components, such as DRAM, needed to assemble those products"); <u>see</u>

<u>also</u> Cross FTAIA Opp. Decl., Ex. 3 at ¶ 4.  Both this court and the Ninth Circuit have held

that, to the extent plaintiff's proximate causation theory rests on proof of a global

procurement strategy, this is not a viable legal theory.  <u>See, e.g., In re Dynamic Random</u>

<u>Access Memory (DRAM) Antitrust Litig.</u>, 546 F.3d at 989-90 (rejecting plaintiff's attempt to

argue "a direct correlation between the U.S. price and the prices abroad" and fact "that the

[d]efendants' activities resulted in the U.S. prices directly setting the worldwide price," and

noting prior rejections of "single global price" theories of proximate causation).  Thus,

plaintiff's reliance on its global procurement strategy as evidence in support of its proximate

causation argument – if made via a single enterprise theory – must be rejected.

        In sum, the court finds that plaintiff has failed to sufficiently demonstrate that

application of a single entity doctrine is appropriate in the manner urged by plaintiff here as

United States District Court

For the Northern District of California

1    to the foreign subsidiaries.

2         2.    Agency Theory

3         This leaves plaintiff with its second, and alternative, theory – that of agency.  Plaintiff

4    argues that agency principles are satisfied under one of two different, but equally applicable,

5    agency doctrines: the representative services doctrine, and the traditional common law

6    doctrine of agency.  Defendants, for their part, assert that Sun cannot satisfy either.

7         Preliminarily, an overview of the relevant agency doctrines is appropriate.  The

8    representative services doctrine, which the Ninth Circuit has acknowledged in the personal

9    jurisdiction context, asks whether the subsidiary functions as the parent corporation's

10   representative in performing services that are sufficiently important that if it did not have a

11   representative to perform them, the parent would undertake to perform similar services on

12   its own.  See Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd., 328 F.3d 1122,

13   1134-35 (9th Cir. 2003)(representative agency test permits the imputation of contacts where

14   the subsidiary was "either established for, or is engaged in, activities that, but for the

15   existence of the subsidiary, the parent would have to undertake itself"); Doe v. Unocal, 248

16   F.3d 915, 925, 928 (9th Cir. 2000)("the question to ask is... whether, in the truest sense, the

17   subsidiaries' presence substitutes for the presence of the parent").

18        The traditional common law agency doctrine – for which both parties cite federal

19   district court authorities – is based on analysis of three factors: (1) manifestation by a

20   principal that the agent would act on its behalf; (2) the agent's acceptance or consent to act

21   on the principal's behalf; and (3) the understanding that the principal would be in control of

22   the agent's undertaking on its behalf.  See Bowoto v. Chevron Texaco Corp., 312 F. Supp.

23   2d 1229 , 1241-42 (N.D. Cal. 2004);  E&J Gallo Winery v. EnCana Energy Servs., Inc., 2008

24   WL 2220396, *11 (E.D. Cal. 2008).  Whereas the representative services doctrine

25   acknowledged in Doe considers the agency question in light of the parent-subsidiary

26   relationship in the jurisdiction context, both Bowoto and E&J Gallo consider the agency

27   question in light of the parent-subsidiary relationship in the liability context.

28

29

United States District Court

For the Northern District of California

1    In determining which legal standard to apply in order to determine the existence of an

2 agency relationship for FTAIA jurisdiction purposes, the court notes that neither of the

3 alternatives presented by the parties is, strictly speaking, persuasive.  Neither the personal

4 jurisdiction context nor the liability context discussed in the cited cases, for example, is

5 directly on point with the FTAIA scenario.  Moreover, after review of the cited case law, the

6 court finds that the scope of the agency test laid out therein is less than clear.  Thus, it is not

7 immediately apparent to the court that either of the two formulations discussed by the

8 parties should be given immediate effect, their contrary arguments notwithstanding.

9    This is not to say that the cases are not helpful, however.  <u>Bowoto</u> and <u>E&J Gallo</u>, for

10 example, both correctly note that the traditional common law of agency provides the basis

11 for the guiding principles that should be given effect in this case.  And as both district courts

12 acknowledge, in the area of agency, it is federal common law that controls with respect to

13 federal claims like the Sherman Act.  <u>See Bowoto</u>, 312 F. Supp. 2d 1229; <u>E&J Gallo</u>, 2008

14 WL 2220396 at *5.  In turn, federal common law is guided by those principles set forth in the

15 Restatement of Agency.  Turning, then, to the operative Restatement Third, it lays the

16 foundation for a traditional agency test that requires a plaintiff to demonstrate:  (1) a

17 manifestation by the principal that the agent shall act for him; (2) that the agent has

18 accepted the undertaking; and (3) that there is an understanding between the parties that

19 the principal is to be in control[10] of the undertaking.  <u>See</u> Restatement (Third) of Agency, §

20 1.01; <u>see also Transamerica Leasing, Inc. v. La Republica de Venezuela</u>, 200 F.3d 843, 849

21 (D.C. Cir.2000).  This, therefore, is the test that the court employs here.

22    Applying this test here, the ultimate question is therefore whether plaintiff can point to

23 facts that establish (1) Sun's intent to have its foreign subsidiaries act on Sun's behalf in

24 purchasing DRAM; (2) that the foreign subsidiaries accepted and/or understood their role in

25 ─────────────

26    [10]    The court observes that the concept of 'control,' as employed for purposes of the traditional agency test, is distinct from the legal test for 'control' that applies in connection with

27 the well-recognized control exception to <u>Illinois Brick</u> (discussed <u>supra</u> in connection with defendants' motion challenging external manufacturer purposes).  This is so even if, as

28 defendants pointed out at the hearing, the underlying arguments going to both are similar.

United States District Court

For the Northern District of California

1  purchasing DRAM on Sun's behalf; and (3) that there is an understanding between Sun and

2  its foreign subsidiaries that Sun is to be in control of the subsidiaries' procurement of DRAM.

3  To that end, plaintiff submits the following facts:  Sun's foreign facilities purchased DRAM at

4  prices set, from vendors chosen, and amounts determined by a global memory procurement

5  team based as Sun headquarters in California; and the DRAM suppliers' own records

6  demonstrate that Sun was a single customer, without distinction between Sun and its foreign

7  subsidiaries.  See Cross FTAIA Opp. Decl., Ex. 3 at ¶¶ 4-8;[11] id. at Exs. 12-16.

8      While defendants do not dispute these facts, they point out that Sun's subsidiaries –

9  specifically, Sun Scotland and Sun Netherlands – issued their own purchase orders to

10  primarily European entities of defendant DRAM manufacturers; had their own equitable

11  ownership different than Sun's; were sufficiently capitalized to satisfy their own debts and

12  liabilities; did not maintain common funds or commingle assets with Sun; used their own

13  accounts to settle the invoices issued to them by their European DRAM suppliers; took

14  delivery of the DRAM they purchased and used that DRAM to manufacture finished

15  products; and sold those products through their own European sales offices.  See

16  Declaration of Steven Bergman ISO FTAIA Dismissal ("Bergman FTAIA Decl."), Ex. 4 at

17  Responses 2, 6-8, 10, 12, 20, 25-27, 29, 31; id., Ex. 11 at 63:16-64:17; see also Cross

18  FTAIA Opp. Decl., Ex. 1 at ¶¶ 4,6.  Based on these facts, defendants contend that the

19  subsidiaries themselves controlled their purchases of DRAM, and there is no basis for

20  concluding that they acted as Sun's agent with respect to the procurement of DRAM

21  overseas.

22      Ultimately, the court agrees with defendants.  As an initial matter, the undisputed

23  facts fairly demonstrate, as plaintiff submits, that plaintiff intended to have its foreign

24

25      [11]  Defendants have objected to the Declaration of Peter Wilson, on grounds that
26  the information contained therein constitutes "new" evidence not previously disclosed, and that
    its disclosure now violates Sun's earlier obligation to supplement all discovery responses by
27  June 30, 2008.  The court overrules this objection, however, in light of defendants' failure to
    set forth an adequate showing as to what evidence contained in the declaration is actually
28  "new."

**United States District Court**
For the Northern District of California

subsidiaries purchase DRAM under terms and conditions, and from DRAM suppliers, established by Sun's global procurement team in California; that the foreign subsidiaries did, in fact, purchase their DRAM from DRAM suppliers pursuant to Sun's global procurement strategy; and that, to the extent Sun's global procurement team established and enforced its DRAM procurement strategy – via its communications with DRAM suppliers and the foreign subsidiaries – Sun was in control of its procurement strategy.  Critically, however, and notwithstanding this showing, the undisputed facts do *not* demonstrate that Sun intended, or that the foreign subsidiaries understood, that any DRAM purchases were being made on *Sun's* behalf, as opposed to on behalf of the foreign subsidiaries.  In fact, and as defendants note, the facts demonstrate that the subsidiaries purchased DRAM from primarily European entities of defendant DRAM manufacturers, took delivery of the DRAM they purchased, and used that DRAM to manufacture finished Sun products that were sold through the subsidiaries' own European sales offices.  All of which suggests that, although Sun may have established and controlled the applicable DRAM pricing strategy pursuant to which the subsidiaries purchased DRAM, it is the subsidiaries who then took charge of their own DRAM purchases, for their own eventual use.  Significantly, plaintiff has submitted no evidence disputing these facts.

Moreover, to the extent that plaintiff seeks to transform Sun's undisputed control over its global procurement strategy into a finding that Sun's subsidiaries are but agent actors whose every move in furtherance of Sun's global strategy should be imputed to Sun, the court is mindful that some degree of control is usually, even if not necessarily, implicit in the parent subsidiary relationship.  Thus, the degree of control exercised by the parent in order for the subsidiary to qualify as an agent must therefore exceed that which is to be expected in the normal scope of any such relationship.  Furthermore, defendants' point that, having availed itself of the advantages of the parent subsidiary relationship under corporate law, Sun cannot now easily disavow itself of such to suit its purposes, is well taken.  See, e.g., Disenos Artisticos, E Industriales, S.A. v. Costco Wholesale Corp., 97 F.3d 377, 380 (9th

United States District Court

For the Northern District of California

1    Cir. 1996)(noting that a corporation is not entitled to establish and use its affiliates' separate

2    legal existence for some purposes, yet have their separate corporate existence disregarded

3    for its own benefit against third parties)("[g]enerally, the corporate veil can be pierced only

4    by an adversary of the corporation, not by the corporation itself for its own benefit").

5         In sum, the court finds that, notwithstanding Sun's acknowledged control with

6    respect to its global procurement *strategy*, the undisputed evidence demonstrates that Sun

7    Scotland and Sun Netherlands controlled, in large part, their own purchases of DRAM for

8    their own use and sale.  As such, plaintiff's effort to demonstrate that the subsidiaries were

9    acting on Sun's behalf, or that Sun maintained the requisite level of control over the

10   subsidiaries' actual purchases, fails.  The foreign subsidiaries cannot therefore be deemed

11   Sun's agents for purposes of the foreign DRAM purchases made by them.

12        Having failed to persuade the court that application of either a single enterprise or

13   agency theory is appropriate, plaintiff has exhausted the avenues available to it to show that

14   the foreign DRAM purchases made by its foreign subsidiaries should in effect be considered

15   purchases made by Sun itself.  Without a valid theory to show that it stands in the shoes of

16   its subsidiaries for purposes of those DRAM purchases, the purchases themselves must be

17   viewed as foreign transactions made by independent subsidiary entities, albeit pursuant to a

18   global pricing strategy instituted by its parent corporation, Sun.

19        Under these facts, the court cannot find jurisdiction under the FTAIA for any claims

20   premised on such purchases.  As noted time and again by this court, the FTAIA requires

21   that plaintiff demonstrate that the higher U.S. DRAM prices caused by defendants' conduct

22   proximately caused *plaintiff* to pay higher DRAM prices abroad.  However, as has just been

23   determined, it is plaintiff's subsidiaries, rather than plaintiff itself, who actually paid any

24   higher DRAM prices abroad.  To the extent Sun suffered any injury as a result of its

25   subsidiaries' higher DRAM payments, those injuries are derivative of those suffered by the

26   foreign subsidiaries.  Thus, no proximate cause link has been established.  See, e.g., In re

27   Dynamic Random Access Memory Antitrust Litig., 546 F3d at 988 ("The defendants'

28

33

United States District Court

For the Northern District of California

conspiracy may have fixed prices in the United States and abroad, and maintaining higher U.S. prices might have been necessary to sustain the higher prices globally, but [plaintiff] has not shown that the higher U.S. prices proximately caused *its* foreign injury of having to pay higher prices abroad.  Other actors or forces may have affected the foreign prices.")(emphasis added).

In so ruling, the court declines plaintiff's invitation to re-examine the boundaries of its earlier proximate cause holding.  As the court stated in its most recent dismissal order, the only question for resolution at this stage is the existence of proximate cause vis-a-vis the two theories highlighted and discussed herein.  Moreover, while plaintiff's counsel's desire to revisit the issue is understandable, the court disagrees at the outset with counsel's characterization of the court's earlier proximate cause inquiry.  Contrary to counsel's statement at the hearing that the court's earlier discussion of the issue focused on whether a higher negotiated U.S. DRAM price "cause[d] Sun to go out and purchase a lot of DRAM," the court's actual proximate cause analysis was squarely focused on whether a higher negotiated U.S. DRAM price caused "Sun to pay that price for all the DRAM that it purchased."  See Dismissal Order at 20-22.  As the court finds herein, however, the answer to this inquiry is no.  This is so, despite plaintiff's accurate observation that there is a single global price for artificially inflated DRAM that was negotiated as a result of defendants' conduct.

* * *

In sum, and for all the foregoing reasons, jurisdiction under the FTAIA is lacking over plaintiff's claims, to the extent premised on foreign DRAM purchases made by Sun's foreign subsidiaries.  The court accordingly GRANTS defendants' motion to dismiss such claims.[12]

D.      Motion for Summary Judgment Re Purchases from Mitsubishi Entities

---

[12]      To the extent defendants also seek dismissal of plaintiff's state claims in addition to the Sherman Act claim, the court declines to reach this issue based on nothing more than defendants' cursory footnote (citing two out-of-circuit district cases) suggesting that plaintiff's state law claims are subject to the same FTAIA analysis as is undertaken here.

**United States District Court**
For the Northern District of California

1    Defendants also move for summary adjudication of all plaintiff's claims, to the extent

2   based on purchases from the former defendant Mitsubishi entities[13] worth $420 million.

3   Defendants note that any recovery premised on these purchases first requires proof that

4   Mitsubishi is liable for participating in an anticompetitive conspiracy – something that plaintiff

5   cannot demonstrate.  See Bhan v. NME Hosp., Inc., 929 F.2d 1404, 1410 (9th Cir. 1991)(to

6   prove section 1 violation, plaintiff must prove the existence of a contract, combination, or

7   conspiracy, among other elements).  Specifically, defendants challenge plaintiff's ability to

8   prove either (1) that Mitsubishi itself is guilty of any anticompetitive activity; or (2) that the

9   remaining defendants' unlawful conspiratorial conduct should otherwise be imputed to

10  Mitsubishi.  Not only does this justify summary judgment with respect to plaintiffs federal and

11  state antitrust claims, but defendants also argue that plaintiff's inability to recover from the

12  remaining defendants those overcharges it paid to Mitsubishi, justifies summary judgment

13  with respect to plaintiff's UCL claim as well.

14    Plaintiff, naturally, resists, responding that not only is there direct evidence of a

15  conspiracy to fix prices by several of the other defendants in the case, but that the

16  circumstantial proof overwhelmingly establishes that it is more likely than not that Mitsubishi

17  participated in the price-fixing conspiracy.  Thus, the federal and state antitrust claims must

18  be allowed to proceed.  As for plaintiff's UCL claim, plaintiff contends that principles of joint

19  and several liability apply, and save the claim.

20    Preliminarily, an overview of plaintiff's allegations against defendants – and Mitsubishi

21  specifically – is appropriate.  Plaintiff's consolidated complaint alleges that the defendant

22  Mitsubishi entities, along with the other co-defendants in this case, participated in a

23  conspiracy to unreasonably restrain trade, in violation of section 1 of the Sherman Act.  See

24  ACC, ¶ 80.  Plaintiff also alleges that the conspiracy specifically "consisted of a continuing

25

26    [13]    There were originally three defendant Mitsubishi entities named as defendants
27  in the present action:  Mitsubishi Electric Corporation, Mitsubishi Electric and Electronics USA,
    Inc., and Mitsubishi Electric Europe B.V.  All, however, were dismissed from the action with
28  prejudice on November 21, 2008, pursuant to a stipulation entered by the parties.

35

United States District Court

For the Northern District of California

1   agreement, understanding and concert of action among defendants and their co-

2   conspirators, the substantial terms of which were to fix, raise maintain and stabilize the

3   prices of, and/or allocate the market for, DRAM sold throughout the world, including the

4   United States." See id. at ¶ 82.  As part of the conspiracy, plaintiff contends that defendants

5   participated in meetings and conversations to discuss the price of DRAM; agreed to

6   manipulate prices and supply so as to boost sagging DRAM sales; issued price

7   announcements and price quotations in accordance with the agreements reached by

8   defendants; and sold DRAM to customers throughout the world, including the United States,

9   at non-competitive prices.  See id. at ¶ 83.

10          Turning to the parties' arguments, the court resolves them via consideration of the

11  following: (1) an overview of the legal standards applicable to antitrust conspiracy

12  challenges on summary judgment; (2) the evidence of Mitsubishi's liability for the alleged

13  anticompetitive conduct; and (3) whether, under California's UCL, plaintiff may legally seek

14  recovery against defendants on the basis of DRAM purchases made from Mitsubishi.[14]

15          1.      Relevant Section 1 Legal Standards

16          In order to establish a section 1 violation, plaintiff must prove three elements: the

17  existence of an agreement or conspiracy among two or more separate entities; that

18  unreasonably restrains trade; and which affects commerce.  See, e.g., American Ad Mgmt.,

19  Inc. v. GTE Corp., 92 F.3d 781, 788 (9th Cir. 1996).  Plaintiff alleges that Mitsubishi

20  participated in a horizontal price-fixing conspiracy by entering into an agreement with the

21  other defendants to fix the prices and supply for DRAM.  It is well established that such an

22  agreement, if proven, is per se unreasonable.  See, e.g., United States v. Socony-Vacuum

23  ─────────────────────

24          [14]     Defendants also make the argument that, to the extent plaintiff's evidence of
        Mitsubishi's participation in the conspiracy relies on conduct committed at a time that plaintiff's
25      experts finds no damages to plaintiff, defendants cannot be liable.  This is similar to the
        argument made by the direct purchaser defendants on summary judgment, which the court
26      rejected.  For similar reasons, the court also rejects the argument here.  In sum, there is no
        support for the principle that particular activities of a conspiracy can be excluded from
27      consideration simply because they do not lead to actual damages.  Rather, the question in
        regards to the conspiracy is simply whether plaintiff suffered some damage flowing from the
28      unlawful conspiracy throughout the overall conspiracy period.

United States District Court

For the Northern District of California

1    Oil Co., 310 U.S. 150 (1940); see also In re Flat Glass Antitrust Litig., 385 F. 3d 350 (3d Cir.

2    2004).  As noted, the only issue argued by defendants on this motion is the existence of an

3    actual agreement or conspiracy to restrain trade, that includes Mitsubishi.

4         With respect to the requirement that plaintiff establish a "contract, combination, or

5    conspiracy" – also referred to as "concerted action" – the legal standards are well-

6    established.  All that is required for proof of concerted action is that the alleged parties share

7    a "commitment to a common scheme that has an anticompetitive objective or effect."  See,

8    e.g., Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 768 (1984); United States v.

9    Parke, Davis & Co., 362 U.S. 29 (1960).  The parties' motives need not be identical.  Id.

10        One way of proving concerted action is by express agreement.  However, a formal

11   contract is not *necessary* to establish collective action.  See, e.g., United States v. Gen.

12   Motors Corp., 384 U.S. 127, 142-43 (1966).  Rather, conspiracies can be shown either by

13   direct *or* circumstantial evidence.  Indeed, courts recognize that only "rarely will there be

14   direct evidence of an express agreement" in conspiracy cases.  Local Union No. 189,

15   Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 720 (1965).  Circumstantial

16   evidence as to this element of the offense is, therefor, not only admissible, but often

17   dispositive.  The Ninth Circuit has long recognized that "it is not necessary for a plaintiff to

18   show an explicit agreement among defendants in support of a Sherman Act conspiracy,"

19   and that concerted action may be inferred "from circumstantial evidence of [a] defendant's

20   conduct and course of dealings."  See, e.g.,Movie 1 & 2, 909 F.2d 1245, 1251-52 (9th Cir.

21   1990).  Here, neither party disputes that plaintiff seeks to prove Mitsubishi's conspiratorial

22   activity only through circumstantial evidence.

23        As noted, with respect to proof of conspiracy by circumstantial evidence, the

24   Supreme Court has expressly considered this issue in the summary judgment motion

25   context, specifically in the landmark antitrust case, Matsushita Electric Indus. Co., 475 U.S.

26   547.  There, the court noted that "antitrust law limits the range of permissible inferences

27   from ambiguous evidence in a [section 1] case.... [C]onduct as consistent with permissible

28

competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy ... To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of [section] 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently ..... [A plaintiff], in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [it]."  See 475 U.S. at 588.

The Matsushita court identified two separate inquiries that are relevant to the above issue on summary judgment motions: (1) whether the defendant had "any rational motive" to join the alleged conspiracy, and (2) whether the defendant's conduct "was consistent with the defendant's independent interest."  See Matsushita, 475 U.S. at 587.  The court stated that, "if [the defendants] had no rational motive to conspire, and if [their] conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."  Id. at 596-97.

The Ninth Circuit, once again, has framed this issue in terms of burdens of proof.  It has outlined a two-part test to be applied "whenever a plaintiff rests its case entirely on circumstantial evidence.  First, the defendant can 'rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice."  Second, the burden then "shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior."  See, e.g., In re Citric Acid Litig., 191 F.3d 1090, 1094 (9th Cir. 1999).

The above standards apply as follows here:  if defendants come forward with evidence supporting a lack of any agreement or conspiracy to commit unlawful activity by Mitsubishi, they shift the burden to plaintiff to introduce sufficient evidence to warrant the inference of conspiratorial conduct on Mitsubishi's part.  With respect to circumstantial evidence, however, the court must consider such evidence in light of the above two-part burden-shifting test espoused by the Ninth Circuit pursuant to Matsushita – i.e., if

38

United States District Court

For the Northern District of California

1  defendants are able to show a plausible and justifiable reason for Mitsubishi's conduct that

2  is consistent with competitive behavior, plaintiff must then provide specific evidence that

3  tends to exclude the possibility of competitive behavior.

4          2.      Evidence of Mitsubishi's Conspiratorial Conduct

5          As a general preliminary matter, the court finds that defendants' showing is sufficient

6  to shift the burden to plaintiff to introduce evidence that warrants the inference of

7  conspiratorial conduct on Mitsubishi's part.  Defendants have pointed, for example, to

8  several of the purported pricing communications in evidence, and noted that many on their

9  face suggest that Mitsubishi did not provide pricing information to any of the defendants;

10  rather, the defendants' OEM customers provided Mitsubishi pricing information – which is

11  perfectly legal.  See, e.g., Declaration of Timothy Martin ISO MSJ re Mitsubishi Purchases

12  ("Martin Decl."), Exs. 27, 39, 44.  Similarly, defendants note that plaintiff relies on several

13  emails from DRAM suppliers that allegedly include Mitsubishi pricing information, but that

14  the emails never actually state whether Mitsubishi was the source for any pricing

15  information.  See Martin Decl. at Exs. 17-21, 26, 30-33.  Plaintiff also relies on emails that

16  suggest the possibility of past or future exchanges without any indication of when, or

17  whether the past or future exchanges actually occurred.  See id. at Exs. 16, 25.  This, say

18  defendants, cannot demonstrate Mitsubishi's participation in any actual conspiracy.  Finally,

19  defendants also comment that the numerous instances of communications about generic

20  market conditions in the DRAM industry – i.e., the general "shop talk" about the industry –

21  also fail to indicate any conspiratorial conduct.  Id. at Ex. 47; Ex. 49 at 44, 69.  See In re

22  Citric Acid Antitrust Litig., 191 F.3d 1090, 1094 (9th Cir. 1999)(general shop talk not

23  actionable as conspiratorial conduct).

24          Having thus demonstrated that the evidence tends to support an inference of non-

25  conspiratorial conduct, plaintiff must now, in order to defeat summary judgment, come

26  forward with evidence that shows that Mitsubishi was not engaging in permissible

27  competitive behavior.  See In re Citric Acid, 191 F.3d at 1094.  In other words, plaintiff must

28

**United States District Court**
For the Northern District of California

1   introduce evidence that tends to overcome defendants' plausible explanation and *exclude*

2   the possibility of independent conduct by Mitsubishi, such that an inference of collusion is

3   reasonable.  See id. at 1096.  Generally, the evidence plaintiff relies on falls into two broad

4   categories of evidence: the factual evidence, and the economic evidence.

5           Unfortunately for plaintiff, however, this evidentiary showing fails before it even

6   begins.  For as defendants correctly note, plaintiff's showing suffers from a fundamental

7   flaw: its inability to distinguish between any of the Mitsubishi entities.  Despite having sued

8   three different Mitsubishi entities, for example, plaintiff fails to credit any of the evidence

9   disclosing purportedly anticompetitive communications, actions, or activity by those entities,

10  to any particular entity.  This omission is significant.  As the court pointed out with respect to

11  the Nanya defendant entities' summary judgment motions in the related In re DRAM

12  litigation (and elsewhere herein), it is generally true that a corporate entity's actions cannot

13  be imputed to another corporate entity.  Thus, although plaintiff presents circumstantial

14  evidence that may very well suggest conspiratorial activity on the Mitsubishi entities' part,

15  without knowing which to which entity the evidence refers, the court cannot fully evaluate the

16  strength of the evidence as to any particular entity.  See, e.g., Declaration of David Cross re

17  Mitsubishi MSJ Opp. ("Cross Mitsubishi Opp. Decl."), Ex. 8 at 73-74; Ex. 13

18  (communications between and among employees of admitted co-conspirators indicating

19  these defendants had direct communications with Mitsubishi employees about market share

20  and other "competitive inputs." ); Ex. 9 at 138-42 (high level employee testimony of meetings

21  with Mitsubishi representatives and other DRAM defendants to discuss general market

22  conditions); Ex. 11 (NEC employee email reporting discussion with Infineon contact, noting

23  that Infineon contact "knows production figures" for Mitsubishi); Ex. 12 (Hynix employee's

24  internal email discussion rumored meeting at which Mitsubishi and other defendants

25  "probably discussed product cut back or something related issues").  Nor, more specifically,

26  can plaintiff raise a disputed issue of fact as to any specific Mitsubishi entity's participation in

27  any allegedly anticompetitive conspiracy.

28

**United States District Court**

For the Northern District of California

1    It should be noted, furthermore, that plaintiff had ample opportunity, through

2 discovery, to legally distinguish each Mitsubishi entity from the other and develop a full

3 record of conduct pertaining to each.  Having had this rather obvious opportunity but having

4 failed to avail itself of it, the court can only suppose that plaintiff made a strategic and

5 voluntary decision to blur the corporate lines between the entities – possibly in the hopes

6 that an undifferentiated showing of purportedly actionable conduct might serve to create a

7 picture of culpability greater than the sum of each entity's individual part in the matter.

8    Whatever the reason, however, the court ultimately concludes that plaintiff cannot

9 meet its burden to defeat summary judgment, since it cannot preliminarily tell the court

10 which entity is responsible for which communication or act.  Accordingly, the court hereby

11 GRANTS defendants' motion for summary judgment on the grounds presented herein.  In

12 view of this holding, it is unnecessary for the court to consider defendants' arguments with

13 respect to plaintiff's UCL claim.

14 E.    Defendants' Omnibus Motion for Summary Judgment

15    Litigation of a successful antitrust claim requires more than proof of a defendant's

16 antitrust violation.  It requires, among other things, that a plaintiff prove what is known as

17 'injury in fact' – i.e., the fact of harm to plaintiff, caused by the defendant's conduct.  See,

18 e.g., Northwest Publ'ns, Inc. v. Crumb, 752 F.2d 473, 476 (9th Cir. 1985)("[c]ausal antitrust

19 injury is an essential element of any remedy under the Sherman Act").  To demonstrate

20 injury in fact, it is "generally sufficient to show with reasonable probability some causal

21 connection between the antitrust violation and [plaintiff's alleged injury]."  Northwest Publ'ns,

22 752 F.2d at 476.  Significantly, however, in establishing the fact of injury, the antitrust

23 violation need not be the sole cause of the injury, though it must be a material and a

24 substantial cause of the injury.  See Zenith Radio Corp. v. Hazeltine Research, 395 U.S.

25 100, 114 n.9 (1969)("It is enough that the illegality is shown to be a material cause of the

26 injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his

27 burden of proving compensable injury under § 4"); Glen Holly Entm't v. Tektronix Inc., 343

28

F.3d 1000 (9th Cir. 2003)(plaintiff, who was driven out of the market as a result of defendants' anticompetitive behavior, sufficiently alleged antitrust injury in fact). Where, as here, an antitrust plaintiff alleges a price-fixing conspiracy claim, proof of causal injury therefore requires a showing that plaintiff paid higher prices than it would have paid absent the conspiracy, and that defendants' allegedly anticompetitive conduct was a material cause of plaintiff's higher payments.

It is plaintiff's ability to make this showing that defendants challenge. Generally, plaintiff's causation theory is that certain defendants' admittedly unlawful conduct in fixing DRAM prices with respect to six individual OEMs ("Target OEMs") was not only limited to the Target OEMs, but also targeted plaintiff and/or resulted in higher DRAM prices on a market-wide basis, thus injuring plaintiff. For proof of this theory, plaintiff relies on the guilty pleas entered by several co-defendants in a separate criminal DRAM price-fixing case,[15] the expert testimonies of Drs. Marshall and White, and the factual evidence in the record. Defendants do not dispute the viability of plaintiff's causation theory per se, but contend that plaintiff's causation showing falls short of creating a genuine issue of material fact as to whether defendants' alleged conduct actually resulted in the sale of artificially inflated DRAM to plaintiff. Specifically, defendants argue: that neither the pleas nor the factual evidence establishes either that plaintiff was a target of any unlawful price-fixing conspiracy carried out by the defendants during the relevant time frame alleged, or that the conspiracy had market-wide effects; that plaintiff fails to introduce any evidence of an output restraint, the fixing of benchmark prices, or any other mechanism by which defendants' alleged conduct vis-a-vis the Target OEMs could affect market-wide prices; and that, to the extent plaintiff relies on expert testimony to establish causation, that testimony impermissibly substitutes opinion for facts, since it eschews factual analysis of the relationship between defendants'

---

[15]    Specifically, defendants Infineon, Hynix, Samsung and Elpida, as well as certain of their employees, pled guilty to participation in a DRAM price-fixing conspiracy that targeted numerous large original equipment manufacturers. See, e.g., Cross Omnibus Opp. Decl., Exs. 1-19.

United States District Court

For the Northern District of California

1  conduct and higher prices market-wide, in favor of unsupported assumptions and

2  observations regarding the DRAM market that only superficially support a finding of impact.

3  Even if plaintiff's causation showing is deemed sufficient, defendants argue that it is

4  nonetheless too remote to allow recovery.

5      The court's primary mission is relatively straightforward: to determine whether plaintiff

6  has made an adequate showing, for purposes of summary judgment, that defendants'

7  allegedly anticompetitive conduct caused plaintiff to pay artificially high prices for DRAM.

8  Answering this overarching question, however, depends upon evaluation of what the court

9  views as the parties' core underlying sub-theories and arguments: (1) plaintiff's theory that

10 certain defendants' admitted conspiracy to fix the Target OEMs' DRAM prices also directly

11 targeted and raised prices paid by plaintiff; (2) plaintiff's corresponding theory that the

12 admitted conspiracy to fix the Target OEMs' DRAM prices had a market-wide impact on all

13 direct customers' DRAM prices, including those paid by plaintiff; and (3) whether plaintiff's

14 causation arguments are nonetheless too remote to defeat summary judgment.

15     The court addresses each of the foregoing in turn.

16     1.    <u>Evidence that Defendants Directly Targeted Sun</u>

17     Plaintiff asserts that the factual evidence establishes not only the existence of a price-

18 fixing conspiracy with respect to the Target OEMs, but also that defendants more broadly

19 targeted and raised prices directed at plaintiff.  For proof, plaintiff points out among other

20 things: that the guilty pleas of Elpida and one of its high level employees, along with that of a

21 high level Samsung employee, expressly identified Sun as a target of the acknowledged

22 conspiracy to fix Target OEM prices; that Samsung (also an acknowledged co-conspirator

23 vis-a-vis the Target OEMs), identified Sun as "Public Enemy Number 1" in 2001; that

24 Samsung's account manager for Sun testified that between 2000 and 2002, he

25 communicated about pricing and price strategy with Sun account managers for Elpida,

26 Hynix and Infineon (again, all of which also pleaded guilty to price-fixing vis-a-vis the Target

27 OEMs) at least once quarterly; and that certain defendants' account managers openly

28

United States District Court

For the Northern District of California

discussed plans to boycott Sun's dynamic bidding events ("DBE"s) in December 2001, before ultimately coordinating their bids in advance of Sun's DBE.  See Declaration of David Cross re Omnibus Opp. ("Cross Omnibus Opp. Decl."), Ex. 1 at ¶¶ 2, 4(e); Ex. 16 at ¶¶ 2, 4(d); Ex. 18 at ¶¶ 2, 4(d); see also Exs. 41, 62, 64, 67-71; Ex. 120 at ¶ 11.  Plaintiff also submits evidence that the same sales representatives and managers responsible for Target OEM accounts and pricing, were also responsible for Sun pricing.  See id. at Exs. 23, 38, 51-56, 81-83.  This evidence, says plaintiff – which is also cited by the expert testimony – establishes the likelihood that a reasonable juror would find that defendants' unlawful actions vis-a-vis the Target OEMs targeted as well, and furthermore caused plaintiff to pay higher DRAM prices.

Defendants contest this conclusion, asserting that while this evidence may relate to the presence or absence of a conspiratorial agreement with respect to Sun specifically, it does nothing to actually establish a causal injury – i.e., it does not actually link defendants' conduct to the actual prices paid by plaintiff.  Moreover, defendants note that plaintiff's factual evidence all post-dates June 2001 – well after the start of the alleged conspiracy periods at issue.  Thus, the existence of any impact to plaintiff caused by defendants' allegedly anticompetitive conduct is contradicted by the testimony of plaintiff's own expert, Dr. White, who finds that plaintiff had no damages at all for the vast majority of time beginning June 2001 and ending December 2002, and only limited damages for the small amount of time in which any effect was noted.  See, e.g., Supplemental Declaration of Paul Salvaty re Def. Omnibus MSJ ("Salvaty Reply Decl."), Exs. 16-17.

On the whole, the court finds that plaintiff has come forward with sufficient evidence to establish a triable issue of material fact as to whether defendants' allegedly anticompetitive conduct was targeted directly at plaintiff, and caused plaintiff to pay higher prices for DRAM.  Defendants do not dispute, for example, that the guilty pleas in evidence by certain defendants concede both the existence of a conspiracy to fix the price of DRAM with respect to the Target OEMs, and its effectiveness in raising DRAM prices.  See, e.g.,

United States District Court

For the Northern District of California

1  Cross Omnibus Opp. Decl., Ex. 1 at ¶ 4(d) (admission that Elpida and certain other

2  defendants "reached agreements on price increases and were able to institute price

3  increases on DRAM sales to certain OEMs").  Nor do they dispute, although they seek to

4  lessen the impact of, Elpida's admission that its employees conspired with certain

5  defendants to allocate and divide a bid offered by plaintiff in an auction in March 2002, or

6  that rigged bids were in fact, submitted at plaintiff's auction.  <u>See id.</u> at ¶ 4(e).  Thus there is

7  at least some evidence of a conspiracy by certain defendants to target the price that Sun

8  was to pay for DRAM purchased from defendants during the relevant time period.

9  Furthermore, there is no dispute that some of the same sales representatives and managers

10  who pled guilty to conspiring to raise DRAM prices to Target OEM accounts were also

11  responsible for Sun pricing, and that certain defendants' employees exchanged pricing

12  information relating to DRAM sold to Sun, including the markup over cost amounts.  <u>See,</u>

13  <u>e.g., id.</u>, Ex. 20 at 83-84; Ex. 38 at 52-54.  Nor is there a dispute that Dr. White found that

14  Sun suffered at least *some* overcharges during the alleged conspiracy period.  <u>See</u> Salvaty

15  Reply Decl., Exs. 16-17.  This evidence, combined with Dr. Marshall's testimony comparing

16  and correlating the relationship between Target OEM prices and plaintiff prices (including

17  Sun), creates a plausible inference that defendants' conduct directly targeted Sun in addition

18  to conspiring against the Target OEMs, and was a material cause of higher DRAM prices

19  paid by Sun.  <u>See</u> Cross Omnibus Opp. Decl, Ex. 24 at 2-6.

20          To be sure, defendants appropriately emphasized that vagaries and ambiguity exist

21  with respect to plaintiff's evidence, as much of the factual evidence is based on

22  correspondence and deposition testimony that falls short of establishing a firm direct link

23  between defendants' conduct vis-a-vis plaintiff, and higher DRAM prices actually paid by

24  Sun as a result of a particular type of conduct.  Defendants also correctly invoke the truism

25  that correlation is not causation, fidelity to which limits the extent to which Dr. Marshall's

26  correlation analysis may, standing alone, satisfy plaintiff's burden.  However, to the extent

27  defendants contend that plaintiff's evidence of communications between the parties goes

28

45

1   only to the existence of a conspiracy and not to causation, defendants are mistaken.  It is

2   true enough that the evidence may come in as part of plaintiff's attempt to prove a

3   conspiracy.  Defendants have presented neither persuasive reasoning nor authority,

4   however, as to why this same evidence may not also be submitted to prove that any

5   underlying conspiracy also had an effect on plaintiff.

6       Moreover, it must be remembered that causation may be demonstrated with

7   circumstantial evidence just as easily as with direct evidence.  See Zenith, 395 U.S. at 125

8   (fact of injury may also be established by inference or circumstantial evidence); William

9   Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., 668 F.2d 1014, 1051 (9th Cir. 1981).  To

10  that end, the court concludes plaintiff has introduced sufficient evidence, albeit of a

11  circumstantial nature, that would allow a reasonable juror to conclude that defendants'

12  allegedly anticompetitive conduct, if proven, resulted in the payment of higher DRAM prices

13  by plaintiff.  The issue and the evidence must therefore be presented to the trier of fact.

14      2.    Evidence that Defendants' Conduct led to Market-wide Price Increases

15      In addition to arguing that defendants caused plaintiff to pay higher DRAM prices by

16  directly targeting it as part of defendants' acknowledged conspiracy to fix DRAM prices to

17  Target OEMs, plaintiff also argues that defendants caused plaintiff to pay higher DRAM

18  prices because the Target OEM conspiracy had a market-wide impact on all DRAM

19  purchasers' prices.  The foundation for plaintiff's causation arguments is rooted in the expert

20  testimony of plaintiff's causation expert Dr. Marshall, and to a lesser extent, Dr. White,

21  plaintiff's primary damages expert.  As a corollary argument, plaintiff notes, however, that

22  the factual evidence also supports Drs. Marshall and White's expert testimony.

23      The bulk of defendants' motion challenges this expert testimony.  Defendants assert

24  that, in order for plaintiff to create a genuine issue of material fact that would allow a jury to

25  determine that defendants' conduct increased DRAM prices on a market-wide basis

26  between August 1998 and June 2002, plaintiff must establish either that defendants

27  restrained DRAM production and output, or that defendants fixed benchmark prices for

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  DRAM.  Defendants point out, however, that neither Dr. Marshall's nor Dr. White's testimony

2  analyzes, let alone opines on, the existence of any DRAM output restraints or any

3  agreement to fix benchmark prices for DRAM.  Furthermore, their testimony – which

4  defendants claim improperly rests on the guilty pleas instead of any analysis of the factual

5  evidence – is based on broader assumptions than what the evidence can support, and relies

6  on correlation analysis as an improper substitute for actual causation.

7      Before turning to the sufficiency of plaintiff's evidence, however, the court notes that

8  the parties preliminarily dispute the appropriate legal standard that governs plaintiff's

9  causation showing.  Specifically, defendants contend that plaintiff's proof of an industry-wide

10 price impact is legally dependent upon proof of the mechanism through which industry-wide

11 prices can be affected – i.e., evidence of a supply restraint, or evidence that defendants

12 fixed benchmark prices for DRAM.  Plaintiff, while not disagreeing that it must link

13 defendants' conduct with an industry-wide impact on DRAM prices, contends that

14 defendants are nonetheless wrong in arguing that the precise mechanism through which

15 such industry-wide impact can be shown is a legal requirement.  Thus, while neither party

16 effectively disputes that it is plaintiff's burden to demonstrate that defendants' price-fixing

17 conspiracy actually caused plaintiff to pay higher prices, they do dispute the level of

18 particularity that plaintiff must meet in demonstrating that a causal link is present between

19 defendants' conduct and higher industry-wide DRAM prices paid by plaintiff.

20     For support of the proposition that plaintiff is legally required to establish a DRAM

21 output reduction or the fixing of benchmark prices, defendants rely on Gen. Leaseways, Inc.

22 v. Nat'l Truck Leasing Ass'n, 744 F.2d 588 (7th Cir. 1984), and Nat'l Collegiate Athletic

23 Ass'n v. Bd. of Regents, 468 U.S. 85 (1984).  None of these cases, however, stands for the

24 proposition that plaintiff must, as part of its legal burden, prove an output restriction or a

25 conspiracy to fix benchmark prices as a necessary prerequisite for demonstrating that

26 defendants' alleged conspiracy had the market-wide effect of raising DRAM prices.  Indeed,

27 one of the cases – Nat'l Collegiate Athletic Ass'n – suggests the opposite, as it expressly

28

47

**United States District Court**
For the Northern District of California

notes in dicta that: "Restrictions on price and output are the paradigmatic *examples* of restraints of trade that the Sherman Act was intended to prohibit." National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma, 468 U.S. 85, 107 (1984)(emphasis added).

This is not to say that defendants' arguments miss the mark entirely.  For, as their cited cases do show, it is the norm that a price-fixing conspiracy with industry-wide impact would be expected to employ output reductions or benchmark price manipulation as a means for carrying out the overarching conspiracy.  This reflects economic truisms, however – the proof of which may or may not help plaintiff establish causation in this case – as opposed to legal requirements.  Thus, plaintiff's burden in demonstrating causation continues to be limited to the burden thus far defined by the courts: that of establishing, "with reasonable probability some causal connection between the antitrust violation and [plaintiff's alleged injury]." Northwest Publ'ns, 752 F.2d at 476.  This is so, even though plaintiff has attempted, as discussed below, to establish defendants' output reduction and/or fixing of benchmark prices at any rate.

The court now turns to the parties' substantive arguments regarding plaintiff's showing.  As noted, plaintiff's causation showing rests primarily on the expert testimonies of Drs. Marshall and White, as well as certain factual evidence in the record.  A brief summary of both the expert testimony and the evidence is therefore in order, prior to evaluation of both.

Dr. Marshall.  Dr. Marshall was asked to assume that the defendants engaged in a conspiracy to fix the price of DRAM sold to the Target OEMs, and then to undertake an economic analysis to determine whether the defendants' conspiracy had an effect on the prices of DRAM sold to the plaintiffs. See Declaration of Paul B. Salvaty Re Omnibus MSJ ("Salvaty Omnibus Decl."), Ex. 25 at ¶ 12.  After reviewing numerous documents and deposition testimony produced in the case, Dr. Marshall opined that the prices paid by the Target OEMs and the plaintiffs moved closely together before, during, and after the

1  defendants' admitted conspiracy, and that four characteristics of the DRAM industry led the

2  Target OEMs' prices, other purchasers' prices, and market-wide prices to move together.

3  See id. at ¶¶ 31-32.  Those four characteristics are:  (a) the standardized nature of DRAM

4  products, (b) the existence of well-established sales channels outside of the defendants'

5  contractual relationships with the Target OEMs (i.e., the spot market for DRAM), (c) the

6  transparency of DRAM prices in the industry (as seen in the multiple public pricing reports

7  frequently published during the relevant time period), and (d) the presence of most favored

8  customer (MFC) clauses that prevented defendants from offering lower DRAM prices to any

9  non-Target OEMs.

10       Dr. Marshall further opines that the close relationship between the Target OEMs'

11  prices, market-wide prices, and plaintiff's prices is suggested and confirmed by:  the

12  evidence of pricing communications amongst the defendants demonstrating the participants'

13  understanding that the Target OEM prices, other firms' prices, and market-wide prices

14  moved together; visual inspection of the prices paid by the Target OEMs and plaintiff (i.e.,

15  on a graph); and standard regression analyses which tested the relationship between prices

16  paid by the Target OEMs and prices paid by plaintiff.  See id. at ¶¶ 33-35; see also generally

17  Cross Omnibus Opp. Decl., Ex. 24.  Dr. Marshall also opines that, given the foregoing

18  DRAM industry characteristics as a whole, it would have been contrary to defendants'

19  economic incentives to prevent the admitted price increases to the Target OEMs from

20  affecting the plaintiff (else, the Target OEMs could have simply bought cheaper DRAM

21  through the same mechanisms used by plaintiff to purchase DRAM).  Id. at ¶¶ 36-37.

22  Based on all this, Dr. Marshall concludes that the defendants' conspiracy affirmatively

23  affected the price of DRAM sold to plaintiff.  Id.

24       Dr. White.  Dr. White was asked to assume that the defendants engaged in a

25  conspiracy to fix the price of DRAM sold to the Target OEMs, and then to undertake an

26  economic analysis to determine the extent to which plaintiffs were overcharged as a result of

27  defendants' conspiracy during two time periods – the period April 1, 1999 through June 15,

28

United States District Court

For the Northern District of California

2002 (the "plea period") and the period August 1, 1998 through June 15, 2002 (the "conspiracy period")[16].  See Salvaty Omnibus Decl., Ex. 2 at ¶ 2.  Generally, an overcharge corresponds to the difference between the price purchasers actually paid during a conspiracy period, and the prices they would have paid but for the existence of the conspiracy (i.e., the "but for" prices).  Thus, to determine the extent of the plaintiff overcharges here, Dr. White estimated plaintiff's but for prices during the relevant conduct period, and then calculated the plaintiff's damages using the difference between the actual prices paid by plaintiff, and the but for prices that plaintiff would have paid.  See id. at ¶ 16.

To estimate plaintiff's but for prices, Dr. White performed regression analysis.  He used the before and after approach, described as follows.  Dr. White analyzed the statistical relationship between actual DRAM prices on the one hand, and real supply/demand and market factors on the other hand that were present in the DRAM industry.  Id. at ¶ 17.  The statistical data were taken from two benchmark periods before and after the conspiracy period.  Dr. White then used the statistical relationship between DRAM price and relevant market factors to estimate what the but for prices would have been during the conspiracy period, had DRAM pricing and relevant market factors followed the same relationship during the conspiracy period that they had in the benchmark periods.  Id.  By accounting for the relevant market factors during the alleged conspiracy period, Dr. White opines that any difference between the actual prices during the conspiracy period and the but for prices for the conspiracy period can be directly attributed to the effects of defendants' conduct.  Id.

Specifically, this before and after approach can be broken down into "three stages."  Salvaty Omnibus Decl., Ex. 2 at ¶ 19.  First, Dr. White had to determine the impact of the defendants' admitted conspiracy on the prices paid for DRAM chips and modules by the

---

[16]     The primary difference between Dr. Marshall's testimony and Dr. White's testimony is that, while Dr. Marshall was asked to determine *whether* defendants' unlawful conduct had an effect on plaintiff's purchase of DRAM (i.e., caused an injury to plaintiff), Dr. White was asked to determine the actual *extent* of that effect (i.e., the amount of damage). Thus, Dr. Marshall's testimony goes purely to the causation issue, while Dr. White's testimony is primarily directed at the damages issue, but is nonetheless relevant to causation to the extent it necessarily proves the fact of injury.

United States District Court

For the Northern District of California

1   Target OEMs.  Id. at ¶ 20.  To do so, Dr. White used regression analysis to obtain a

2   prediction equation – based on data from the outside benchmark periods only – for the

3   Target OEMs' but for prices during the conspiracy period.  The prediction equation allowed

4   Dr. White to arrive at a price index of the Target OEMs' but for prices.  Id.  In the second

5   stage of his analysis, Dr. White estimated the statistical relationship between the DRAM

6   prices actually paid by the plaintiff, and the DRAM prices actually paid by the Target OEMs.

7   Id. at ¶ 33.  He then used regression analysis to create a price index for the plaintiff that

8   relates the plaintiff's DRAM prices in each month to the Target OEMs' DRAM prices in the

9   same and nearby months.  Id.  Finally, in the third stage, Dr. White applied the estimated

10  statistical relationship between the Target OEMs' prices and plaintiff's prices (from stage 2)

11  to the Target OEMs' but for price index (from stage 1), in order to obtain plaintiff-specific but

12  for price indexes.  See Salvaty Omnibus Decl., Ex. 2 at ¶ 34.  The resulting difference

13  between the plaintiff's specific but for price, and the actual price paid by plaintiff during the

14  conspiracy period, is the amount of the overcharge caused by defendants' anticompetitive

15  activity (i.e., plaintiff's damage amount).  Id. at ¶ 35.

16      For Sun, the results of Dr. White's analysis indicate that Sun's total weighted average

17  overcharge percentage during the conspiracy period was 50%.  Id. at ¶ 39.  This weighted

18  average percentage takes into account the fact that Sun's purchases from the defendants

19  were relatively larger during the months with the highest overcharges.  Id.  Sun's simple

20  non-weighted average overcharge percentage during the conspiracy period was 31%.  Id.

21      As noted at the outset, defendants attack this expert testimony on three fronts,

22  arguing (1) that neither expert analyzes or even opines whether defendants actually

23  restrained output during the conspiracy period on a market-wide basis; (2) that neither

24  expert analyzes or opines whether defendants fixed benchmark prices so as to affect price

25  on a market-wide basis; and (3) that Dr. Marshall bases his testimony on unfounded

26  assumptions, fails to establish that the market characteristics he identifies actually

27  functioned the way he claims, and that even if Dr. Marshall's theory is credited, it only

28

51

United States District Court

For the Northern District of California

explains that there is a relationship between the Target OEMs' DRAM prices and plaintiff's DRAM prices – not that defendants' conduct actually caused an increase in plaintiff's DRAM prices.  See, e.g., Def. Omnibus MSJ Br. at 13:22-23; 14:9-18 (conspiracy to reduce output necessary to raise market-wide prices); id. at 17:8-15; 17:21-23 (alternatively, plaintiff's injury depends on existence of successful conspiracy to raise benchmark prices).  For the following reasons, however, the court finds that these arguments fall short of demonstrating plaintiff's inability to establish a genuine dispute of material fact as to causation.

As to defendants' first argument, the court has already noted that plaintiff is not legally required to prove defendants' participation in a supply reduction as an element of causation.  As such, and as plaintiff points out, plaintiff's experts cannot be faulted for failing to demonstrate that a supply reduction was the actual mechanism by which industry-wide prices were raised (provided, however, that the experts demonstrate that defendants' conduct was a material cause of plaintiff's injury).  Notwithstanding this observation, however, the court finds that plaintiff has, in fact, introduced evidence in support of a supply reduction.  Dr. Marshall, for example, does actually opine that, based on his review of the documents and deposition testimony in the case, "defendants engaged in a variety of supply restrictions."  See Salvaty Omnibus Decl., Ex. 25 at ¶¶ 123-24.  Such supply restrictions "include temporary reductions in production and the withholding of inventory from customers."  Id.  In support thereof, Dr. Marshall relies on several email communications among the various defendants purportedly indicating defendants' decisions to reduce output.  See id. at fn. 155.  Furthermore, plaintiff also independently points to the factual evidence in the case, asserting that it corroborates the expert testimony.  See Cross Omnibus Opp. Decl., Ex. 180 (internal Hynix email); Ex. 176 (handwritten Hynix notes); Ex. 172 (internal Elpida presentation noting that "supply has been reduced"); Ex. 174 (Micron email acknowledging "current shortage" due primarily to "capacity utilization in the industry"); Ex. 50 (De Dios testimony noting there are "numerous different ways of adjusting supply to influence price").

United States District Court

For the Northern District of California

1    Defendants respond to plaintiff's showing by pointing out Dr. Marshall's contradictory

2    testimony stating that he did "not have an opinion regarding the existence of an output

3    restraint in the marketplace." See Salvaty Omnibus Decl., Ex. 26 at 200:14-16.  They also

4    look to the factual evidence for support, arguing that no supply reduction took place because

5    the defendants expanded output and were operating at 100% of capacity.  See id. at Exs.

6    42-43 at 147:1-4, Ex. 45 at 138:17-39:5; Ex. 46 at 136:16-18, Ex. 48 at 74:4-5; see also

7    (Samsung plea).  Their expert testimony, too, concludes that no supply restriction took

8    place.  See, e.g., id., Ex. 12 at 61-62.

9    These contrasting views and evidence constitute a disputed issue of fact as to the

10   presence of a supply restriction in the DRAM market carried out by defendants during the

11   alleged time frame.  Although defendants take issue with the nature of the documentary

12   evidence cited by Dr. Marshall in his report and point out Dr. Marshall's failure to consider all

13   "other evidence" supporting the lack of a supply restriction in the DRAM marketplace (e.g.,

14   actual production data or production decisions), see Def. Omnibus MSJ Br. at 14, n. 13,

15   these are challenges that must ultimately be decided by the trier of fact.  Notably,

16   defendants have not argued any manifest failure in Dr. Marshall's methodology, or otherwise

17   attacked the admissibility of his opinion.

18   A similar analysis also applies to defendants' second argument – i.e., that the expert

19   testimony fails to establish causation because it does not opine whether defendants fixed

20   benchmark prices so as to affect a market-wide price increase that injured plaintiff.  As a

21   preliminary matter, the court again notes that plaintiff is not, in the first instance, necessarily

22   required to prove the existence of defendants' efforts to fix benchmark prices as a legal

23   element of their claim.  However, as is the case with the supply restriction argument, plaintiff

24   nonetheless targets as much.  Specifically, Dr. Marshall opines that defendants were able to

25   institute industry-wide price increases by conspiring to raise "spot prices" as a precursor to

26   contract prices, and that combined with the observable characteristics of the DRAM industry

27   (e.g., standardized nature of DRAM, price transparency, well-established sales channels,

28

53

United States District Court
For the Northern District of California

and the use of most favored customer clauses), it would have been difficult for defendants to raise prices to one set of buyers without raising prices industry-wide – recognition of which in fact led defendants to fix industry-wide prices. See Salvaty Omnibus Decl., Ex. 25 at ¶¶ 14-15, 150; id. at ¶ 121 (defendants "discussed market-wide prices" and "recognized that they needed to increase spot market prices in order to increase contract prices, and numerous documents also indicate that the defendants coordinated on spot market pricing"); see also, e.g., id., Ex. 25 at ¶¶ 134-165 (discussing characteristics of DRAM industry allowing for spot prices and contract prices to influence industry prices); see also Cross Omnibus Opp. Decl., Ex. 120 at ¶ 6; Ex. 133. Plaintiff also argued in its opposition and at the hearing on the motion that the Target OEM prices themselves constituted a "benchmark" price from which plaintiff's prices were derived, a fact further corroborated by the factual evidence, and Dr. Marshall's analysis correlating plaintiff's prices with Target OEM prices. See, e.g., Cross Omnibus Opp. Decl., Ex. 56 at 169:23-170:1 (Hynix admission that "Apple was a benchmark price for [pricing] information for Sun"); Ex. 24 at 64 n. 129; Ex. 25 ("Let's make every effort to make Sun price to be in line with the current price for other MNA customers"); Ex. 38 (admitting that a price increase to IBM would also raise the price at Sun); Ex. 80 ("we are raising sync DRAM price per the changes in price to PC OEM customers").

Defendants respond that Dr. Marshall's testimony that defendants "could not raise the named OEMs' prices without also raising spot market prices" is based on pure conjecture, as it is unsupported by any affirmative evidence of that spot market prices were actually fixed. See, e.g., Salvaty Omnibus Decl., Ex. 25 at ¶ 150. Moreover, to the extent that Sun contends that the Target OEM prices were benchmark prices, defendants note that Dr. Marshall himself expressly disavowed this very theory in his reports. Id., Ex. 24 at ¶¶ 28, 127. As to his views on the characteristics of the DRAM market, defendants also dispute the conclusions he reaches regarding the effect those characteristics had on industry-wide prices. Salvaty Omnibus Decl., Ex. 25 at ¶ 157, Ex. 26 at 221:5-224:22. Dr. Marshall

54

**United States District Court**
For the Northern District of California

ignores, for example, the fact that most favored customer clauses only required the matching of lower prices for purchases of "like quantities of substantially comparable products." See Def. Omnibus MSJ Br. at 24:21-25:6.  Sun, however, purchased DRAM that was entirely distinct from the DRAM purchased by the Target OEMs, thereby making it impossible for plaintiff to demonstrate any link between the DRAM prices paid by the Target OEMs and those paid by plaintiff.  Salvaty Omnibus Decl., Ex. 10 at Ex. 27; Ex. 12 at ¶¶ 17-19.

As with the supply reduction issue, the court finds that the parties' contrasting arguments and evidence constitute disputed issues of material fact.  Although defendants may raise valid challenges to the nature of the evidence underlying the expert opinions regarding the existence of a conspiracy to fix benchmark prices, the jury must have the final say over the weight to be given each party's showing.  For purposes of summary judgment, plaintiff has come forward with sufficient circumstantial and expert evidence to create a triable issue of fact as to whether defendants' conduct affected benchmark prices for DRAM which in turn raised prices industry-wide.

Finally, defendants' third argument – i.e., that Dr. Marshall's testimony rests on unfounded assumptions and even if credited, only explains that there is a relationship between the Target OEMs' DRAM prices and plaintiff's DRAM prices, not that defendants' conduct actually caused an increase in plaintiff's DRAM prices – also fails.  First, to the extent defendants take issue with the experts' reliance on the conduct admitted by certain defendants in their guilty pleas in 'assuming' the existence of a price-fixing conspiracy aimed at the Target OEMs, rather than independently proving such conduct, the court finds this objection meritless.  The guilty pleas are properly in evidence, and the experts are entitled to base their opinions on the facts established therein.  To the extent defendants take issue with those facts, they are entitled to dispute them at trial.  However, the experts' reliance thereon does not render their testimony objectionable as a matter of law.

Second, defendants' argument fails because, properly read, Dr. Marshall's testimony

United States District Court

For the Northern District of California

1    *does* undertake an explanation for whether and how defendants' price-fixing conspiracy with

2    respect to the Target OEMs could have artificially raised prices on an industry-wide basis.

3    Specifically, Dr. Marshall's testimony opines:  that based on a visual understanding of the

4    relationship between DRAM pricing for Target OEMs and plaintiff, and furthermore on the

5    results of regression analyses that confirm a closely correlated relationship between Target

6    OEM pricing and plaintiff's pricing, and based further on the documents in evidence

7    demonstrating a conspiracy that extended beyond simply the Target OEMs, that DRAM

8    pricing for Target OEMs moved together with plaintiff's DRAM prices; and that, when the

9    nature of the DRAM industry is considered together in conjunction with this closely

10   correlated relationship, it would not have been economically plausible for defendants to

11   restrict their DRAM price-fixing conspiracy to the Target OEMs.  Rather, defendants'

12   conspiracy would have affected the entire industry.

13         This expert testimony warrants presentation to a jury.  While defendants correctly

14   note that correlation testimony – relied on heavily by Dr. Marshall – does not equal

15   causation, the court is not persuaded that Dr. Marshall's correlation analysis is employed as

16   a catch-all substitute for causation here.  For when taken in conjunction with the totality of all

17   the other evidence submitted by plaintiff, Dr. Marshall's causation theory is supported by

18   more than just the correlation analysis.  Defendants, of course, are entitled to cast doubt on

19   the quantity and quality of the testimony and evidence at trial.  As a matter of law, however,

20   plaintiff's showing as to causation is not so insufficient as to justify a grant of summary

21   judgment.  See, e.g., Hasbrouck v. Texaco, Inc., 842 F.2d 1034, 1042 (9th Cir. 1987)("If

22   there is sufficient evidence in the record to support an inference of causation, the ultimate

23   conclusion as to what the evidence proves is for the jury"); Perkins v. Standard Oil, 395 U.S.

24   642, 648 (1969).

25         In sum, and although defendants have made a valiant showing to the contrary, the

26   court concludes that plaintiff has come forward with a sufficiently plausible theory – by way

27   of the expert testimony and the circumstantial evidence – to create a triable issue of fact as

28

**United States District Court**

For the Northern District of California

1    to whether defendants' conduct vis-a-vis plaintiff and/or the Target OEMs could have raised

2    prices to plaintiff directly or through industry-wide effect.

3         3.    <u>Proximate Cause</u>

4         Finally, defendants contend that, even if the court finds that plaintiff has adequately

5    presented a material issue of fact as to causation, plaintiff's theory of causation (and the

6    proof going to it) should still be considered too remote, as a matter of law.  After all,

7    defendants note that courts have generally held that not just causation, but proximate

8    causation, is necessary to state a claim for antitrust damages.  <u>See, e.g., Or. Laborers-</u>

9    <u>Employers Health & Welfare Trust Fund v. Philip Morris, Inc.</u>, 185 F.3d 957, 963 (9th Cir.

10   1999).  Thus, a direct relationship between the injury and the alleged wrongdoing is

11   required.  <u>See, e.g., Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc.</u>, 241 F.3d 696,

12   701 (9th Cir. 2001).  To that end, the basic problem with plaintiff's theory, say defendants, is

13   that causation here is not based on any price-fixing activity aimed directly at plaintiff but

14   rather is based on the fact that defendants' conspiracy to fix prices to Target OEMs *in turn*

15   caused an increase to plaintiff's prices, which increase was due *in turn* to the market forces

16   affecting prices and the characteristics of the DRAM market.  <u>See</u> Def. Omnibus MSJ Br. at

17   29:18-21.  This theory depends on the operation of generic market forces rather than

18   defendants' conduct, and furthermore fails to articulate any chain of causation between

19   defendants' conspiracy and plaintiff's injury vis-a-vis these market features.  <u>See id</u>. at

20   29:22-27.

21        Plaintiff, in opposition, does not dispute the proximate causation requirement, but

22   states that proximate causation is satisfied in price-fixing cases by proof that a plaintiff's

23   prices are affected by a conspiracy, regardless whether the defendants' conduct is directed

24   primarily at a different set of products or customers.  This is the case here: plaintiff has

25   demonstrated, through its expert testimony and the evidence, that defendants intentionally

26   communicated with each other in order to artificially inflate plaintiff's prices, kept plaintiff's

27   prices in line with Target OEM prices, and used Target OEM prices either to negotiate

28

United States District Court

For the Northern District of California

1   higher prices with plaintiff when Target OEM prices increased, or to resist plaintiff's attempts

2   to secure lower prices.  Moreover, plaintiff's note that there is nothing in Dr. Marshall's

3   testimony or analysis that suggests that plaintiff's injuries were derivative of the Target

4   OEMs' injuries, or even that plaintiff's pricing was entirely dependent on the pricing

5   decisions for the Target OEMs.  Furthermore, plaintiff has submitted evidence

6   demonstrating that it *has* been individually targeted.

7         Plaintiff has the better argument here.  Preliminarily, it is true that proximate

8   causation is required for plaintiff's state antitrust claim under the Cartwright Act (even if not

9   explicitly required as such for plaintiff's Sherman Act claim).  Even if proximate causation

10  must be shown, however, plaintiff's causation theory satisfies this standard.  Dr. Marshall

11  does not opine, as defendants suggest, that plaintiff's increased price was caused by the

12  Target OEMs' increased price and generic market forces.  Rather, Dr. Marshall's testimony

13  is (as noted above) that defendants' conspiracy to raise prices to the Target OEMs actually

14  reached farther than the Target OEMs and encompassed plaintiff, and that proof of the

15  conspiracy's effect on plaintiff is corroborated by the relationship between Target OEM

16  pricing and plaintiff's DRAM pricing over time, as well as the presence of certain factors in

17  the DRAM industry that would have made it economically implausible for the defendants to

18  limit their price-fixing conspiracy solely to the Target OEMs.  While the distinction between

19  defendants' characterization of Dr. Marshall's testimony and Dr. Marshall's actual testimony

20  is a subtle one, this does not make it insignificant.  It is the difference between a theory that

21  hinges plaintiff's pricing primarily on factors outside defendants' control, and a theory that

22  properly hinges plaintiff's pricing on defendants' actual conduct.  Thus, the court views

23  plaintiff's causation theory as one that presents a sufficiently direct causal link between

24  defendants' conduct and plaintiff's injury to pass the proximate cause hurdle.

25        Furthermore, to the extent that defendants make the passing argument that plaintiff's

26  causation theory is really an impermissible umbrella theory in disguise, the court rejects this

27  contention.  The umbrella theory of liability is essentially a "consequential damages theory."

28

**United States District Court**

For the Northern District of California

1  <u>See In re Petroleum Prods. Antitrust Litig.</u>, 691 F.2d 1335, 1339 (9th Cir. 1982).  This theory

2  is implicated when a plaintiff seeks recovery from price-fixing defendants, on the basis of

3  purchases that the plaintiff made from *non-conspiring competitors* of the defendants.  In

4  essence, the plaintiff pursuing this theory contends that defendants' successful price-fixing

5  conspiracy created a "price umbrella" under which non-conspiring competitors of defendants

6  raise their prices to a level at or near the fixed price set by the conspiring defendants.  A

7  successful umbrella liability theory thus seeks to hold price-fixers liable for harm allegedly

8  flowing from their illegal conduct even though the price-fixing defendants received none of

9  the illegal gains and were uninvolved in their competitors' pricing decisions.  <u>See id</u>.

10        Many courts, including the Ninth Circuit, have rejected umbrella liability theories.

11  Indeed, in <u>In re Petroleum Prods. Antitrust Litig</u>, the Ninth Circuit held that it had "little

12  hesitance in concluding that the limitations recognized in Illinois Brick bar umbrella claims in

13  the context of the multi-tiered distribution chain alleged" in the case.  <u>Id</u>. at 1340. The court

14  explicitly reserved judgment, however, as to whether "in a situation involving a single level of

15  distribution, a single class of direct purchasers from non-conspiring competitors of the

16  defendants can assert claims for damages against price-fixing defendants under an

17  umbrella theory."  <u>See id</u>. at 1340.

18        Defendants would now have the court step into the opening created by the Ninth

19  Circuit's refusal to consider the umbrella liability theory in situations involving a single level

20  of distribution and a single class of direct purchasers (as is the scenario here), and

21  conclusively decide its legal impropriety.  However, aside from the fact that prudence

22  counsels restraint, there is also the fact that defendants' invitation presupposes that an

23  umbrella theory of liability is, in fact, actually being asserted.  Yet, as plaintiff points out, this

24  is not the case.  Plaintiff is seeking damages based on purchases made from the allegedly

25  conspiring defendants in this case only – *not* based on purchases made from any non-

26  conspiring competitors of defendants.  While true that several of the defendants named in

27  Sun's lawsuit were not named in the guilty pleas that affirmatively establish the existence of

28

**United States District Court**
For the Northern District of California

1   a price-fixing conspiracy as to the Target OEMs, this has no bearing on the instant action.

2   Plaintiff has sued *all* the named defendants here as co-conspirators who *each* participated

3   in an alleged conspiracy to fix DRAM prices, which conspiracy injured plaintiff.  It is up to

4   plaintiff to demonstrate that each defendant did, in fact, participate in such a conspiracy.

5   Nonetheless, plaintiff has not moved on this issue, and it must be reserved for trial.

6   Assuming this conspiracy among each and every named defendant, however, no umbrella

7   theory of liability is even implicated.

8         Finally, the court disposes of defendants' argument that analysis of certain <u>AGC</u>

9   factors also demonstrates that plaintiff's claims are too remote.  <u>See Associated Gen.</u>

10  <u>Contractors v. Cal. State Council of Carpenters</u>, 459 U.S. 519, 534-35 (1983)("AGC")

11  (establishing multi-factor test for use in determining antitrust standing).  While not totally

12  clear, defendants appear to imply that the <u>AGC</u> factors are equivalent to the Ninth Circuit's

13  proximate cause requirement, since they guarantee that an antitrust plaintiff's injuries may

14  not be too remote from defendants' conduct.  For reasons already discussed, however,

15  plaintiff raises a material dispute of fact regarding causation and in doing so, also raises a

16  material dispute of fact regarding the directness of plaintiff's injury.

17        Accordingly, for all the above reasons, the court rejects defendants' arguments that

18  plaintiff's theory of causation fails on remoteness grounds.

19                                     * * *

20        In sum, defendants have failed to persuade the court that summary judgment as to

21  plaintiff's Sherman Act claim is warranted for lack of causation.  As such, defendants'

22  summary judgment motion on this ground is DENIED.  Since the analysis for injury and

23  causation is similar for plaintiff's Cartwright Act and Unfair Competition Law claims, and in

24  view of the court's conclusions regarding defendants' proximate causation arguments,

25  defendants' motion is also DENIED with respect to these additional claims.  In so ruling, the

26  court also denies defendants' alternative motion for summary adjudication as to limited

27  issues encompassed herein.

28

**United States District Court**
For the Northern District of California

F.      Motion to Exclude the Testimony of Dr. Halbert White

FRE 702 governs the admission of expert opinion testimony.  It provides that, where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert witness may be called upon to testify accordingly.  See Fed. R. Evid. 702.  Pursuant to the Supreme Court's interpretation of the rule, expert testimony must be both relevant and reliable to be admissible.  See, e.g., Daubert v. Merrell Dow Pharm., 509 U.S. 579 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).  Expert opinion testimony is relevant if the knowledge underlying it has a "valid ... connection to the pertinent inquiry," and it is reliable if the knowledge underlying it "has a reliable basis in the knowledge and experience of [the relevant] discipline."  Daubert, 509 U.S. at 592; Kumho Tire Co., 526 U.S. at 149.  Trial courts must exercise reasonable discretion in evaluating and in determining how to evaluate the relevance and reliability of expert opinion testimony.

Defendants here seek to exclude the testimony of plaintiff's damages expert, Dr. White, claiming that Dr. White's testimony falls short of the relevant standard.  They make three arguments in this regard: (1) Dr. White's analysis fails to demonstrate that market conditions were the same in the benchmark and cartel periods; (2) Dr. White improperly excludes from consideration any factors that were under defendants' control (e.g., supply and demand factors, capacity utilization); and (3) Dr. White's methodology is unreliable.

Preliminarily, a brief review of Dr. White's testimony is in order.  As noted in connection with defendants' omnibus motion for summary judgment regarding causation, Dr. White is charged by plaintiff with establishing the extent to which all the opt-out plaintiffs were overcharged as a result of defendants' conspiracy.  Generally, Dr. White opines that a market-wide conspiracy resulted in overcharges as high as 50% to plaintiffs, between August 1998 and June 2002.  To do this, he first assumes the existence of the conspiracy set forth in the plea agreements, with the exception of the conspiracy's start date, which Dr. White assumes was either April 1, 1999 or August 1, 1998.  Then he employs a three step

**United States District Court**
For the Northern District of California

process.  First, Dr. White measures the impact of the alleged conspiracy on the prices paid
for DRAM chips and modules by the Target OEMs.  To do so, Dr. White uses regression
analysis to obtain a prediction equation (based on DRAM sales and price data during the
benchmark periods) for the Target OEMs' but for prices during the conspiracy period.  The
prediction equation is what allows Dr. White to arrive at a price index of the Target OEMs'
but for prices.  Second, Dr. White estimates the statistical relationship between the DRAM
prices actually paid by the plaintiff, and the DRAM prices actually paid by the Target OEMs.
Specifically, he uses regression analysis to create a price index for the plaintiff that relates
the plaintiff's DRAM prices in each month to the Target OEMs' DRAM prices in the same
and nearby months.  Finally, Dr. White applies this estimated statistical relationship between
the Target OEMs' prices and plaintiff's prices to the Target OEMs' but for price index (from
step 1), in order to obtain plaintiff-specific but for prices.

Defendants first contend that Dr. White's analysis fails to demonstrate that market
conditions were the same in the benchmark and cartel periods.  Defendants' argument is
premised on Ninth Circuit authority, which defendants claim holds that use of a "before and
after" approach to determining damages requires "some showing that the market conditions
in the two periods were similar but for the impact of the violation."  See, e.g., Pacific Coast
Agricultural Expert Ass'n v. Sunkist Growers, Inc., 526 F.2d 1196 (9th Cir. 1975)("Plaintiffs'
method of measuring damages, known as the 'before and after' theory, may be used only
where there has been some showing that the market conditions in the two periods were
similar but for the impact of the violation"); see also Areeda & Hovenkamp, Antitrust Law at
384-85 (requiring that changes in market conditions between the benchmark and conspiracy
periods must be "taken into account in estimating the 'but for' prices during the conspiracy
period'").  In contravention of this requirement, argue defendants, Dr. White assumes rather
than proves that market conditions were comparable during the benchmark and conspiracy
periods, despite the fact that Dr. White himself concedes that the DRAM industry was more
competitive and less competitive at times.  See Declaration of Joshua Stambaugh re Motion

1   to Exclude ("Stambaugh Decl."), Ex. 8 at ¶¶ 272-73; Ex. 21 at 78-79.

2        Generally, defendants have correctly cited Ninth Circuit authority holding that, where

3   the before and after approach is undertaken, an expert must account for differences in

4   market conditions when measuring damages across benchmark and conspiracy periods.

5   See Pacific Coast, 526 F. 2d 1196.  However, plaintiff has also correctly noted that neither

6   the cases relied on by defendants, nor Areeda & Hovenkamp, stated as much in connection

7   with a "reduced form price equation" specifically – which is what Dr. White employs here

8   through use of his "prediction equation."  In a reduced form price equation, price is

9   "expressed as a function of supply and demand variables."  And as plaintiff points out,

10  where this type of multiple regression analysis is used, "plaintiff has controlled for changes

11  in demand and supply determinants of price, and the resulting prediction on price during the

12  conspiracy period takes into account influences other than the conspiracy that could serve

13  to increase the...prices."  See Areeda & Hovenkamp at 386.  Thus, to the extent Dr. White's

14  prediction equation takes supply and demand variables into account as a function of price, it

15  is acceptable.

16       More importantly, plaintiff correctly points to several examples in which Dr. White's

17  testimony does, in fact, take market conditions between the benchmark and conspiracy

18  periods into account.  Dr. White's analysis uses several production indices related to end

19  products for DRAM (e.g., end products reflect production issues), and furthermore includes

20  several variables related to the underlying costs of manufacturing DRAM.  See Stambaugh

21  Decl., Ex. 1 at ¶¶ 216-17; Ex. 2, Appendix E.  In addition, Dr. White undertook a separate

22  study of exogenous factors – e.g., boom and bust cycles, earthquakes, other production

23  influences – in his rebuttal report, precisely in order to answer defendants' criticisms on this

24  point.  Even after undertaking this alternative analysis, Dr. White found that the alternative

25  analysis verified his own initial results.  See id. at Ex. 1 at ¶ 218; Ex. 1 at Appendix G at ¶¶

26  355-81.

27       In sum, the law suggests that it is permissible for Dr. White to use a reduced form

28

63

1  price equation, which expresses price as a function of supply and demand, in order to

2  control for changes in market conditions.  And significantly, Dr. White's initial analysis and

3  the rebuttal analysis both indicate that Dr. White has actually attempted to control for certain

4  changes in market conditions.  Thus, to the extent that defendants challenge the accuracy

5  or propriety of these variables, it is an issue that goes to the weight, rather than the

6  admissibility, of Dr. White's testimony.

7      Defendants' second argument in support of exclusion centers on Dr. White's

8  purported failure to consider any factors that were under defendants' control.  According to

9  defendants, Dr. White assumes the conspiracy admitted by certain defendants, and leaps

10 from there to a model in which *all* of defendants' conduct – including unilateral decisions

11 related to output, for example – is presumed to be tainted by the conspiracy.  In doing so,

12 say defendants, Dr. White erroneously lumps together legal and illegal conduct.  See

13 Vernon v. Southern Cal. Edison Co., 955 F.2d 1361, 1371 (9th Cir. 1992)(exclusion

14 appropriate where damages study fails to distinguish between legal and illegal conduct).

15 Indeed, defendants note that their own experts and witnesses have introduced testimony

16 that numerous changes in capacity, yield and market conditions arising during the conduct

17 period were responsible for any restrictions in output – not any conspiratorial conduct.  Yet,

18 Dr. White admits that he attributes any impact or changes in output to the conspiracy, and

19 not to any other sources.  This failure to make allowance for unilateral decisions affecting

20 DRAM supply and prices, warrants exclusion.

21     Without challenging the legal principle that legal and illegal conduct should not be

22 lumped together, plaintiff responds that defendants' criticisms do not go to the admissibility

23 of Dr. White's testimony, merely the weight.  After all, the court in In re Linerboard

24 considered and rejected the very same argument that defendants are making here, and

25 admitted Dr. White's same methodology.  See In re Linerboard Antitrust Litig., 497 F. Supp.

26 2d 666 (E.D. Pa. 2007).

27     The court agrees with plaintiff on this point.  Several economic studies support the

28

United States District Court

For the Northern District of California

1   argument that, in order to generate a reliable set of plaintiff but for prices, experts should not

2   include any factors that were themselves tainted by the conspiracy.  See Pl. Opp. BR. Re

3   Dr. White's Testimony at 12:4-8.  Hence, Dr. White purported to omit the factors under the

4   conspirators' control, so as to exclude any effects of the conspiracy itself in generating

5   plaintiff's but for prices.  This seems reasonable.  It is also not the same as improperly

6   *including* both legal and illegal conduct.  Rather, Dr. White's analysis simply takes out all of

7   defendants' conduct altogether.  Moreover, while not controlling, it is at least instructive that

8   the In re Linerboard court allowed Dr. White's testimony to come in over the precise same

9   argument that defendants are making here.  And finally, while defendants may have very

10  valid points regarding the importance of outside influences – like changes in capacity and

11  market conditions – in raising prices (thereby leading to the conclusion that defendants have

12  not caused an industry-wide conspiracy at all), these are points that go to the weight, and

13  not the admissibility of Dr. White's testimony.  Accordingly, the court rejects defendants'

14  second argument in support of exclusion.

15          Finally, the court reaches the same conclusion with respect to defendants' third and

16  final argument in support of exclusion – i.e., that Dr. White's second step, in which he uses

17  the Target OEM but for prices to predict plaintiff's but for prices, is unreliable and

18  inadmissible.  Defendants' primary objection to the reliability of Dr. White's analysis seems

19  to be that Dr. White's second step generates huge damages to plaintiff even when the

20  conspiracy had no effect on the Target OEMs' prices.  This is nonsensical enough, say

21  defendants, to lead to exclusion.  Moreover, defendants note that Dr. White's second step

22  finds no support among accepted methodologies and conflicts with what Dr. White himself

23  states is the generally accepted approach.

24          Defendants' arguments are interesting, but not necessarily grounds for exclusion.

25  The gist of their argument is that Dr. White should have predicted plaintiff's but for prices

26  directly, rather than using the Target OEMs' but for prices to generate the plaintiff's but for

27  prices (based on his analysis of the relationship between Target OEM prices and plaintiff

28

United States District Court

For the Northern District of California

prices).  If Dr. White had simply repeated his first step – which *is* generally accepted – in order to directly estimate plaintiff's but for prices, defendants note that plaintiff would have ended up with huge undercharges for plaintiff, not overcharges.  Even if defendants are right, however, this is the type of criticism that goes to the weight of Dr. White's testimony.  This is because defendants do not do enough to demonstrate that Dr. White's second step is unreliable, or otherwise totally at odds with the scientific literature.  Plaintiff submits, for example, citations to several instances in which a two step forecasting method has been used, even when a single step approach was available.  According to these citations, the two step forecasting method has been used to predict international countries' growth rates, real interest rates, GDP rates, as well as other economic factors.  See Declaration of David Cross re Dr. White Opp. ("Cross Exclusion Opp. Decl."), Exs. 20-24.  Furthermore, plaintiff has also pointed to case law where similar two-step forecasting methods in the antitrust context specifically was admitted – the In re Linerboard and In re Vitamins Antitrust Litig. cases.  See id. at Exs. 25, 34.  While these cases, as noted before, are not controlling, they are instructive.

Moreover, there is the additional point that Dr. White's use of the two step method was undertaken with the specific intent and belief that this method, under the facts of this case, is "the most reliable way to obtain the but-for price estimates" for plaintiff.  See id. at Ex. 4 at 64.  Thus, Dr. White's use of the second step, far from being undertaken in some unscientific manner, is explained as a means of *increasing* reliability.  While defendants may understandably attack this method as one that decreases reliability, such an attack goes to the weight, and not the admissibility of the approach.

It should also be noted that those cases that *do* hold experts' econometrics analyses inadmissible are limited to cases in which the expert had blatant failures in methodology – e.g., they ran only simple regressions rather than complex regressions, or totally omitted to include supply and demand factors as part of the methodology.  See, e.g., In re Methionine Antitrust Litig., 2003 WL 22048232 (N.D. Cal. 2003)(expert failed to run multiple

**United States District Court**
For the Northern District of California

1    regressions).  None of these deficiencies is evident here.

2    Finally, it is also worth mentioning, as plaintiff points out, that Dr. White conducted ten

3    alternative methods of analysis, in response to defendants' criticisms of Dr. White's initial

4    analysis.  All of them corroborate Dr. White's initial analysis.  Defendants' challenges to

5    these are fairly generic, and generally are predicated upon the principle that Dr. White's

6    recourse to alternative analyses still does not demonstrate that his initial analysis is valid.

7    However, to the extent these additional analyses tend to corroborate Dr. White's initial

8    testimony, they support a finding of reliability.

9    In sum, defendants have presented no arguments that establish sufficient grounds for

10    outright exclusion of Dr. White's testimony.  While they may have raised valid criticisms and

11    concerns with respect to Dr. White's analysis, these are all criticisms and concerns that go

12    to the testimony's weight and not its admissibility.  Plaintiff, moreover, has done an

13    acceptable job of demonstrating that Dr. White's analysis is based on reliable principles and

14    methodologies.

15    Defendants' motion to exclude the expert testimony of Dr. White is accordingly

16    DENIED.

17   G.    Evidentiary Objections

18    Defendants have filed numerous evidentiary objections in connection with each

19    motion discussed herein, asserting several conceivable grounds (hearsay, lack of

20    foundation and/or authentication, relevance, etc.) for objection wherever possible.  In

21    addition, defendants filed a motion to strike in response to *plaintiff*'s response to defendants'

22    evidentiary objections regarding their motion to exclude the testimony of Dr. Halbert White.

23    In view of the sheer number of objections at issue, the court declines to review each and

24    every exhibit as a matter of course.  Rather, the court has reviewed defendants' objections –

25    and plaintiff's response thereto – in connection with those exhibits that the court has actually

26    relied upon in its analysis and decision.

27    As a preliminary matter, the court notes that many of defendants' objections are

28

United States District Court

For the Northern District of California

1   overly broad.  In particular, while having objected to a majority of exhibits on hearsay

2   grounds, defendants have largely failed to detail the actual statements that purportedly

3   qualify as hearsay.  As plaintiff points out, this is a deficiency that makes it difficult, if not

4   impossible, for the court to assess defendants' hearsay objections – and any potential

5   hearsay objections – at this stage.  To the extent that defendants have also objected to

6   plaintiff's exhibits on grounds of relevance and lack of foundation and/or authentication, the

7   court has also found the objections unpersuasive with respect to the exhibits relied on by the

8   court for the purposes of this order.

9          With this in mind, the court hereby OVERRULES defendants' objections to certain

10  exhibits, as follows:

11         (a)      defendants' objections to Exhibits 12-13, 18-19, 28, 37-39, 53, and 74 of the

12  Cross Declaration, submitted in support of Sun's opposition to defendants' motion for partial

13  summary judgment as to external manufacturer purchases, are OVERRULED;

14         (b)      defendants' objections to Exhibits 3, 5, and 10-11 of the Cross Declaration

15  submitted in support of plaintiff's opposition to the motion to dismiss certain claims for lack

16  of subject matter jurisdiction under the FTAIA, are OVERRULED;

17         (c)      defendants' objections to Exhibits 11-3 of the Cross Declaration submitted in

18  opposition to defendants' motion for summary judgment based on purchases from

19  Mitsubishi entities, are OVERRULED;

20         (d)      defendants' objections to Exhibits 1-19, 20, 23-25, 38, 41, 5-56, 62, 64, 67-71,

21  80-83,  120, 172, 174, 176, and 180 of the Cross Declaration in support of Sun's opposition

22  to defendants' motion for summary judgment and, in the alternative, summary adjudication,

23  are OVERRULED; and

24         (e)      defendants' objections to Exhibits 8-25 and 26-34 of the Cross Declaration

25  submitted in opposition to defendants' motion to exclude the testimony of Dr. Halbert White

26  are OVERRULED.

27         To the extent, however, that defendants have additionally filed a motion to strike the

28

68

United States District Court

For the Northern District of California

1  supplemental declaration of Dr. White that was submitted in connection with plaintiff's

2  response to defendants' evidentiary objections, the motion to strike is GRANTED, as the

3  filing of that supplemental declaration violates the deadline for completing expert discovery

4  that was imposed in this case.

5         Finally, as intimated above, to the extent defendants have made evidentiary

6  objections to exhibits not relied on by the court herein, the court declines to rule on the

7  admissibility of those exhibits.  The parties remain free to raise any objections thereto at

8  trial, if necessary.

9  H.    Requests for Judicial Notice

10        Both sides have filed requests for judicial notice of various unrelated court decisions.

11  See Plaintiffs' Request for Judicial Notice Regarding Case Materials from in re Vitamins and

12  In re Linerboard; see also Defendants' Request for Judicial Notice ISO Motion to Exclude

13  the Testimony of Plaintiffs' Expert Witness Halbert White.

14        The court hereby GRANTS both sides' requests for judicial notice, as it finds that the

15  documents for which each party seeks judicial notice present a proper basis for such a

16  request, pursuant to Federal Rule of Evidence 201.

17  I.    Conclusion

18        For all the foregoing reasons, the court hereby GRANTS summary judgment in part

19  and DENIES summary judgment in part, as follows:  (1) defendants' motion for partial

20  summary judgment as to Sun's claims based on purchases made by Sun's external

21  manufacturers is GRANTED; (2) defendants' motion for summary judgment as to Sun's

22  claims based on purchases of DRAM from defendant Mitsubishi entities is GRANTED; and

23  (3) defendants' omnibus motion for summary judgment or in the alternative, for summary

24  adjudication, is DENIED.  The court furthermore GRANTS defendants' renewed motion to

25  dismiss certain of Sun's claims for lack of subject matter jurisdiction, to the extent based on

26  foreign DRAM purchases, and DENIES defendants' motion to exclude the expert testimony

27

28

1   of plaintiff's expert, Dr. Halbert White.

2   **IT IS SO ORDERED.**

3   Dated: March 31, 2009

4

                                        PHYLLIS J. HAMILTON

5                                      United States District Judge

**United States District Court**
For the Northern District of California