1
2
3                    UNITED STATES DISTRICT COURT
4                   NORTHERN DISTRICT OF CALIFORNIA
5
6   SUN MICROSYSTEMS INC.,
7           Plaintiff,                      No. C 06-1665 PJH
8        v.                                 **ORDER DENYING MOTIONS
                                            FOR SUMMARY JUDGMENT**
9   HYNIX SEMICONDUCTOR INC., et al.,
10          Defendants.
    _____/
11

12          Defendants' motions for summary judgment came on for hearing before this court on

13   January 21, 2009.  Plaintiff Sun Microsystems, Inc. ("Sun" or "plaintiff"), appeared through

14   its counsel, Jerome A. Murphy, and David D. Cross.  Defendants Nanya Technology

15   Corporation ("NTC") and Nanya Technology Corporation USA ("NTC USA")(collectively

16   "Nanya") appeared through their counsel, Howard Ullman, Robert E. Freitas, and Catherine

17   Lui.  Having read all the papers submitted and carefully considered the relevant legal

18   authority, the court hereby DENIES the motions for summary judgment, for the reasons

19   stated at the hearing and as follows.

20                              **BACKGROUND**

21          The instant action is part of the general opt-out category of cases related to In re

22   Dynamic Random Access Memory (DRAM) Antitrust Litigation, Case No. M 02-1486 PJH –

23   a multidistrict litigation ("MDL") action currently pending before the court.  Both the MDL

24   action and the opt-out cases generally allege a horizontal price-fixing conspiracy carried out

25   by numerous DRAM manufacturer defendants, in violation of federal and state antitrust

26   laws.  While there are a total of six different individual cases that form a part of the opt-out

27   category of cases, only Sun Microsystems, Inc. v. Hynix Semiconductor, et. al. is currently

28   at issue.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

A.     Background Allegations

Sun is an original equipment manufacturer ("OEM") involved in the technology field. It is a leading maker of computer servers and workstations, among other items.  In the operative amended consolidated complaint ("ACC"), Sun alleges that from 1997 through 2002 several manufacturer defendants ("defendants")[1] engaged in a conspiracy to control DRAM production capacity, raise DRAM prices, allocate customers, and otherwise unlawfully overcharge their DRAM customers.  See, e.g., ACC ¶¶ 21, 23, 25, 27, 29, 31, & 34 (alleging that foreign defendants "manipulated the price of DRAM charged around the globe").  The defendants allegedly did so by participating in meetings and conversations to discuss the price of DRAM; agreeing to manipulate prices and supply so as to boost sagging DRAM sales; issuing price announcements and price quotations in accordance with the agreements reached by defendants; and selling DRAM to customers in the United States at non-competitive prices.  Id. at ¶ 83.

Sun's complaint also alleges that several defendants have already admitted both the existence of an unlawful conspiracy in the DRAM industry and their participation in it as part of a criminal investigation undertaken by the Antitrust Division of the Department of Justice ("DOJ") in 2002.  The DOJ's investigation probed the existence of a conspiracy to restrict supply and raise prices for DRAM among the largest makers and sellers of DRAM globally. As a result of that investigation, four manufacturers (three of which are named defendants here) – Infineon, Hynix, Samsung, and Elpida – pled guilty to participation in a price-fixing

---

[1]     Defendants are: Infineon Technologies AG, and Infineon Technologies North America Corp. (collectively "Infineon"); Hynix Semiconductor, Inc., and Hynix Semiconductor America, Inc. (collectively "Hynix"); Mosel-Vitelic Inc., and Mosel-Vitelic Corporation (collectively "Mosel-Vitelic"); Nanya Technology Corporation, and Nanya Technology Corporation USA ("NTC" and "NTC USA," respectively); Winbond Electronics Corporation, and Winbond Electronics Corporation America (collectively "Winbond"); Elpida Memory, Inc., and Elpida Memory (USA) Inc. (collectively "Elpida"); Mitsubishi Electric Corporation, Mitsubishi Electric and Electronics USA, Inc., and Mitsubishi Electric Europe B.V. (collectively "Mitsubishi").  Since the filing of the complaint, however, several of these defendant entities have been dismissed.  Accordingly, only two sets of defendant entities remain in the case: the Hynix and Nanya entities.

United States District Court

For the Northern District of California

conspiracy in violation of federal antitrust law.  See ACC ¶¶ 71-78.  In addition, several of their employees and agents have also pled guilty to criminal antitrust violations, and have been sentenced accordingly.

As a result of the foregoing, Sun alleges that it suffered injury in that it paid more for DRAM than it otherwise would have in the absence of defendants' conspiracy.  Sun asserts three causes of action against defendants: (1) violation of the  Sherman Act pursuant to 15 U.S.C. § 1; (2) violation of California's Cartwright Act pursuant to §§ 16700 et seq. of the Cal. Bus. & Prof. Code; and (3) violation of California's Unfair Competition Act pursuant to §§ 17200 et seq. of the Cal. Bus. & Prof. Code.  See ACC, ¶¶ 79-106.  Sun seeks treble damages as a result of the artificially inflated prices it allegedly paid for DRAM.

Discovery in the case is now closed, and the Nanya defendants – NTC and NTC USA – have filed two dispositive motions for the court's resolution.[2]  First, NTC has filed a motion for summary judgment on grounds that plaintiff cannot establish a triable issue of fact as to its participation in any unlawful price-fixing or other anticompetitive activity, and therefore, as to liability.  Second, NTC USA – NTC's wholly owned subsidiary – has filed an analogous motion, similarly arguing that plaintiff's evidence fails to raise a triable issue of fact as to liability for any alleged anticompetitive conduct.

B.      Related Procedural History

Of particular relevance here are two summary judgment motions previously filed by NTC and NTC USA in the related In re DRAM MDL litigation.[3]  Their motions in the MDL proceedings, similar to their motions here, generally challenged the direct purchaser plaintiffs' ability to establish the Nanya entities' liability for unlawful conspiratorial conduct

---

[2]      There are also five additional motions filed by defendants in the Sun case, all of which are addressed via separate order filed by the court on March 31, 2009.

[3]      Several of the named defendants in this Sun action were also named as defendants in the related MDL litigation pending before the court, including the Nanya defendants.  As part of those MDL proceedings, the court had occasion to hear and decide several defendants' dispositive motions addressing issues raised by the direct purchaser plaintiffs' claims.

United States District Court

For the Northern District of California

1    under the Sherman Act, although the issues with respect to each entity were distinct.

2           1.    NTC's Previous Motion for Summary Judgment

3           Beginning first with NTC's motion, the court considered and ruled upon three distinct

4    issues in the MDL case:  (1) whether NTC could be held liable for NTC USA's allegedly

5    conspiratorial actions on the basis of its parent-subsidiary relationship with NTC USA; (2)

6    the direct evidence of NTC's independent participation in the alleged conspiracy; and (3)

7    the circumstantial evidence of NTC's independent participation in the same.  See MDL

8    Direct Purchaser Order Granting Summary Judgment in Part and Denying Summary

9    Judgment in Part ("Direct Purchaser MSJ Order") at 6.  The court answered the first

10   question in the negative, holding that plaintiff's attempt to establish NTC's liability by virtue

11   of the alter ego doctrine failed, because the evidence as a whole did not sufficiently speak

12   to NTC's actual day to day control over the operations and internal affairs of NTC USA, nor

13   did the evidence demonstrate that NTC dictates "every facet of NTC USA's business."  See

14   id. at 8.  The court also found that plaintiff could not demonstrate NTC's liability vis-a-vis

15   NTC USA based on application of the single entity doctrine.  See id. at 9.

16          As to the second issue, the court considered the direct evidence advanced in

17   support of the charge that NTC independently participated in any of:  (a) a price-fixing

18   agreement with the other defendants; (b) an output reduction in connection with the other

19   defendants; or (c) an unlawful exchange of price information with any other defendants.

20   See Direct Purchaser MSJ Order at 10.  After consideration of certain emails, Mr. Kau's

21   deposition testimony, and certain industry news and articles, the court found that plaintiffs

22   failed to present any direct evidence of NTC's independent participation in any of the

23   foregoing conspiratorial conduct.  Id. at 15.

24          As to the third and final issue – i.e., the sufficiency of the circumstantial evidence

25   regarding NTC's participation in the same three types of foregoing conduct – the court once

26   again concluded that the evidence relied on by plaintiffs failed to support an inference of

27   collusive activity on NTC's part.  See Direct Purchaser MSJ Order at 25-26.  In arriving at

28

4

United States District Court

For the Northern District of California

1    this ultimate conclusion, the court considered and disposed of (a) the economic evidence

2    (including evidence relating to the structure of the DRAM market, and evidence of NTC's

3    purportedly anticompetitive conduct); (b) evidence of NTC's "frequent, high-level

4    communications" correlated to specific collusive behavior; and (c) evidence of NTC USA

5    employees' guilty pleas in the DOJ's related criminal antitrust proceedings.  Id. at 17-25.

6             2.    NTC USA's Previous Motion for Summary Judgment

7             With respect to the related dispositive motion filed by defendant NTC USA, the court

8    came to a different conclusion and denied summary judgment.  In coming to its decision,

9    the court considered both the direct and indirect evidence of conspiracy against NTC USA,

10   as it had with NTC.  Regarding the direct evidence of conspiracy, the court found

11   insufficient evidence of NTC USA's participation in any underlying conspiracy, noting that

12   plaintiffs there were relying for the most part on the same evidence they had submitted in

13   connection with NTC – i.e., Micron emails, and news articles in which NTC's president, Mr.

14   Kau, is quoted.  See Direct Purchaser MSJ Order at 29.  The court concluded that,

15   substantively, this evidence failed for the same reasons discussed in connection with

16   NTC's motion – i.e., the inadmissibility of certain hearsay documents, and

17   mischaracterization of the evidence.  See id.  In addition, however, the court held that the

18   evidence failed because it related to the actions of NTC and NTC's President, and *not*

19   directly to NTC USA, or NTC USA's president, Kenneth Hurley.  Id.  Finally, the court noted

20   that although plaintiffs had come forward with an additional email particular to NTC USA

21   itself regarding a November 2001 meeting that had been scheduled between Mr. Kau, Mr.

22   Hurley, and Mike Sadler, the email did not constitute direct evidence of conspiratorial

23   conduct, because the email only indicated that such a meeting was scheduled, not that it

24   actually took place.  Id.

25            In analyzing the circumstantial evidence of conspiracy, the court preliminarily noted

26   that NTC USA had come forward with evidence that its participation in any alleged

27   conspiracy would be economically implausible, given its small market share; the expert

28

5

United States District Court

For the Northern District of California

testimony explaining that price collusion was not possible unless a seller involved in the

collusion represents a significant portion of the market share; and the evidence that NTC

USA was pricing aggressively during the time period in question.  See Direct Purchaser

MSJ Order at 30.  The court found this evidence sufficient to shift the burden to plaintiffs,

who were then required to come forward with evidence tending to exclude the possibility

that NTC USA was engaging in permissible competitive behavior, pursuant to Matsushita

standards.  See id.

The court then turned to plaintiffs' circumstantial evidence, which consisted of (a)

economic evidence; (b) evidence of NTC USA's "frequent, high-level communications"

correlated to specific collusive behavior; and (c) evidence of co-defendants' guilty pleas in

the DOJ's related criminal antitrust proceedings.  Id. at 30-31.  As to the economic

evidence – which included evidence relating to market share, and NTC USA's purportedly

anticompetitive conduct in Compaq actions and its pricing policies – the court found it

insufficient to support an inference of conspiracy.  Id. at 33.  With respect to the numerous

email communications, however, the court noted that the volume of this evidence was

much higher than with NTC, and demonstrated that numerous contacts and

communications took place during the relevant period between NTC USA executives –

namely, Mr. Hurley and North American Sales Director Mike Walsh – and other defendants.

Id. at 34.  The court acknowledged that some of the evidence, when viewed for its

substance, conveyed only innocent information, but noted that it was equally apparent that

some of the evidence conveyed actions taken by NTC USA executives that may, in fact, be

suggestive of collusive behavior.  Id.  Ultimately, therefore, given the volume of

communications present, the court found that plaintiffs had successfully met their burden in

arguing that the evidence, considered as a whole, might reasonably support the inference

that NTC USA conspired with the admitted conspirators in the action.  See Direct

Purchaser MSJ Order at 35.

Finally, regarding the other defendants' guilty pleas and the Fifth Amendment

6

**United States District Court**

For the Northern District of California

1  invocations of certain NTC USA employees, the court found that the guilty pleas were not

2  admissible as to NTC USA, and furthermore, that although adverse inferences based on

3  Fifth Amendment invocations are permissible in certain circumstances, plaintiffs there had

4  not made a sufficient foundational showing regarding the specific questions and facts upon

5  which they would like adverse inferences to be drawn.  See id. at 35-36.  On balance,

6  however, the evidence warranted denial of NTC USA's motion.

7                                          * * *

8          With this overview in mind, the court now turns to the two motions at issue.

9                                      **DISCUSSION**

10  A.    Summary Judgment Standard

11          Generally speaking, summary judgment "shall be rendered forthwith if the pleadings,

12  depositions, answers to interrogatories, and admissions on file, together with the affidavits,

13  if any, show that there is no genuine issue as to any material fact and that the moving party

14  is entitled to a judgment as a matter of law."  See Celotex Corp. v. Catrett, 477 U.S. 317,

15  322 (1986).  The court must view the facts in the light most favorable to the non-moving

16  party and give it the benefit of all reasonable inferences to be drawn from those facts.

17  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

18          Where, as here, concerted price-fixing is alleged, the plaintiff bears the ultimate

19  burden of presenting sufficient evidence to prove that an agreement to fix prices existed.

20  See, e.g., In re Citric Acid Litig., 191 F.3d 1090, 1093 (9th Cir. 1999)(noting that price-fixing

21  is a per se violation of section 1 of the Sherman Act).  In order for plaintiff to survive

22  defendants' motions for summary judgment, therefore, plaintiff must establish that there is

23  a genuine issue of material fact as to whether defendants entered into an illegal conspiracy

24  that caused respondents to suffer a cognizable injury.  See Matsushita, 475 U.S. at 585-86.

25  Plaintiff can establish a genuine issue of material fact by producing either direct evidence

26  that defendants participated in an agreement to fix prices, or circumstantial evidence from

27  which a reasonable fact finder could conclude the same.  See, e.g.,Movie 1 & 2 v. United

28

United States District Court

For the Northern District of California

1    Artists Commc'ns, 909 F.2d 1245, 1251-52 (9th Cir. 1990); United States v. Gen. Motors

2    Corp., 384 U.S. 127, 142-43 (1966).

3         With respect to proof by way of circumstantial evidence in section 1 cases, special

4    rules apply.  In Matsushita Elec. Indus. Co., the Supreme Court noted that "antitrust law

5    limits the range of permissible inferences from ambiguous evidence in a [section 1] case...".

6    See 475 U.S. at 588.  In addressing plaintiff's burden in proving that an issue of material

7    fact exists on the conspiracy question, the court stated, "conduct as consistent with

8    permissible competition as with illegal conspiracy does not, standing alone, support an

9    inference of antitrust conspiracy...".  See id.  In sum, to survive a motion for summary

10   judgment, "a plaintiff seeking damages for a violation of [section] 1 must present evidence

11   'that tends to exclude the possibility' that the alleged conspirators acted independently ...."

12   Id.

13        The Ninth Circuit has embraced Matsushita and has outlined a two-part test to be

14   applied whenever a plaintiff rests its case entirely on circumstantial evidence.  First, the

15   defendant can rebut an allegation of conspiracy by showing a plausible and justifiable

16   reason for its conduct that is consistent with proper business practice.  Second, the burden

17   then "shifts back to the plaintiff to provide specific evidence tending to show that the

18   defendant was not engaging in permissible competitive behavior."  See, e.g., In re Citric

19   Acid Litig., 191 F.3d at 1094.

20        These standards apply here to the extent that plaintiff seeks to defeat summary

21   judgment as to section 1 liability on the basis of circumstantial evidence, whether in whole

22   or in part.

23   B.    NTC's Motion for Summary Judgment

24        NTC's motion generally targets plaintiff's ability to raise triable issues of material fact

25   as to defendant's liability for price-fixing, or for any other unlawful activity.  In service of this

26   larger point, NTC argues that it cannot preliminarily be held liable on the basis of NTC

27   USA's conduct, and furthermore, that plaintiff has insufficient evidence that NTC *itself* is

28

                                          8

United States District Court

For the Northern District of California

1   guilty of any unlawful activity, or that NTC is guilty as a passive co-conspirator by virtue of

2   its participation in other defendants' unlawful activities.  In response, plaintiff argues that an

3   agency theory allows the actions of NTC USA to be imputed to NTC, and furthermore, that

4   "new" evidence combined with already existing evidence suggests NTC's direct and/or

5   indirect participation in the alleged underlying conspiracy.

6        All told, the issues for the court's consideration can therefore be broken down into

7   two overriding issues:  (1) whether NTC may be held liable under the Sherman Act for the

8   actions of NTC USA by virtue of its parent subsidiary relationship with NTC USA; and (2)

9   whether any "new" evidence independently establishes NTC's participation in any unlawful

10   price-fixing or other anticompetitive conspiracy.

11        1.    NTC's Antitrust Liability Vis-a-Vis NTC USA

12        NTC claims that it has a separate legal existence from its wholly owned subsidiary,

13   NTC USA, and that NTC itself has not engaged in any direct sales of DRAM within the

14   United States since NTC USA's incorporation in 1998.  See Declaration of Kenneth Hurley

15   ISO NTC and NTC USA's Motions for Summary Judgment ("Hurley Decl."), Ex. A at ¶ 2.

16   Pursuant to basic principles of corporate law, defendant contends that plaintiff cannot

17   therefore introduce evidence of NTC USA's conduct in attempting to create a material

18   factual dispute with respect to NTC's antitrust liability.

19        Defendant is correct that, as a general matter, corporate law prohibits a parent

20   corporation from being held liable on the basis of its subsidiary's actions.  See, e.g., U.S. v.

21   Bestfoods, 524 U.S. 51 (1998)("It is a general principle of corporate law deeply 'ingrained in

22   our economic and legal systems' that a parent corporation (so-called because of control

23   through ownership of another corporation's stock) is not liable for the acts of its

24   subsidiaries.").  However, a parent corporation *may* be held liable for the acts of its

25   subsidiary "where stock ownership has been resorted to, not for the purpose of participating

26   in the affairs of a corporation in the normal and usual manner, but for the purpose of

27   controlling a subsidiary company so that it may be used as a mere agency or

28

9

United States District Court

For the Northern District of California

1  instrumentality of the owning company." <u>See id.</u> at 62-63.  It is this exception upon which

2  plaintiff relies here, in arguing that the imposition of vicarious liability is appropriate

3  pursuant to an agency theory.

4       Preliminarily, it should be noted that plaintiff's reliance on an agency theory with

5  respect to NTC's liability is distinct from the approach taken by the direct purchaser

6  plaintiffs in the MDL proceedings.  The direct purchaser plaintiffs in the MDL relied on the

7  alter ego theory and the single entity doctrine as a means of demonstrating NTC's liability –

8  not the agency theory.  While they also tangentially raised the agency theory argument in a

9  cursory footnote in their briefs and with a casual remark at the hearing, the court declined

10 "to find an agency theory of liability applicable to NTC on the record before it," in view of the

11 fact that plaintiffs had only raised the issue in passing and had furthermore failed to submit

12 any evidence on the issue.  <u>See</u> Direct Purchaser MSJ Order at 9, fn. 2.  The court's MDL

13 ruling presents no bar to plaintiff's presentation of the same theory here, therefore, since

14 Sun has squarely focused on the agency theory argument and has attempted to make a full

15 evidentiary showing on the issue – making the topic ripe for consideration in a way that it

16 was not previously.

17      Turning to the parties' agency arguments, plaintiff first contends that NTC may be

18 held liable for NTC USA's actions because NTC USA can be deemed NTC's agent for

19 liability purposes, under either of two applicable agency doctrines:  the representative

20 services doctrine, and/or the traditional common law doctrine of agency.  The

21 representative services doctrine, which the Ninth Circuit has acknowledged in the personal

22 jurisdiction context, asks whether the subsidiary functions as the parent corporation's

23 representative in performing services that are sufficiently important that if it did not have a

24 representative to perform them, the parent would undertake to perform similar services on

25 its own.  <u>See Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.</u>, 328 F.3d

26 1122, 1134-35 (9th Cir. 2003)(representative agency test permits the imputation of contacts

27 where the subsidiary was "either established for, or is engaged in, activities that, but for the

28

10

United States District Court

For the Northern District of California

1  existence of the subsidiary, the parent would have to undertake itself"); Doe v. Unocal, 248

2  F.3d 915, 925, 928 (9th Cir. 2000)("the question to ask is... whether, in the truest sense,

3  the subsidiaries' presence substitutes for the presence of the parent").  By contrast, the

4  traditional common law agency doctrine – for which both parties cite federal district court

5  authorities – is based on analysis of three factors: (1) manifestation by a principal that the

6  agent would act on its behalf; (2) the agent's acceptance or consent to act on the principal's

7  behalf; and (3) the understanding that the principal would be in control of the agent's

8  undertaking on its behalf.  See Bowoto v. Chevron Texaco Corp., 312 F. Supp. 2d 1229 ,

9  1241-42 (N.D. Cal. 2004);  E&J Gallo Winery v. EnCana Energy Servs., Inc., 2008 WL

10  2220396, *11 (E.D. Cal. 2008).

11         NTC initially disputes that application of the representative services doctrine to the

12  present liability context is appropriate, arguing that the Ninth Circuit has limited the doctrine

13  to the personal jurisdiction context.  NTC does not, by contrast, object to application of the

14  traditional common law agency doctrine; however, it argues that plaintiff cannot establish

15  the viability of the doctrine here, since there is no evidence of an express or implied agency

16  agreement between NTC and NTC USA, nor is there evidence that NTC USA accepted

17  appointment as an agent, or that NTC controlled NTC USA's day to day activities

18         As the parties' differing takes on the matter intimate, the initial question of which

19  agency test to apply for liability purposes in the parent-subsidiary context is not a simple

20  choice between two alternatives.  As defendant correctly observes, the representative

21  services doctrine acknowledged by the Ninth Circuit in Doe did consider the agency

22  question in light of the parent-subsidiary relationship, but only in the personal jurisdiction

23  context.  And while both Bowoto and E&J Gallo do acknowledge that the common law

24  agency test is more appropriate in light of the parent-subsidiary relationship in the liability

25  context, both cases are district court opinions that lack precedential authority.  Moreover,

26  the scope of the agency test laid out therein is less than clear.  In sum, there is no Ninth

27  Circuit authority cited by the parties, or discovered by this court, that expressly addresses

28

United States District Court

For the Northern District of California

1   the question of agency in the parent-subsidiary context for purposes of liability (let alone is

2   there a case that deals with this question in the antitrust context specifically).[4]

3        While neither the personal jurisdiction context in Doe nor the liability context

4   discussed in the parties' cited district court cases is directly on point or controlling,

5   however, this is not to say that the cases are not helpful – particularly the latter.  Bowoto

6   and E&J Gallo, for example, both correctly note that the traditional common law of agency

7   does, in fact, provide the basis for the guiding principles that should be given effect in this

8   case.  And as both district courts acknowledge, in the area of agency, it is federal common

9   law that controls with respect to federal claims like the Sherman Act.  See Bowoto, 312 F.

10  Supp. 2d 1229; E&J Gallo, 2008 WL 2220396 at *5.  Federal common law is in turn guided

11  by those principles set forth in the Restatement of Agency.  Turning, then, to the operative

12  Restatement Third, it lays the foundation for a traditional agency test that requires a plaintiff

13  to demonstrate:  (1) a manifestation by the principal that the agent shall act for him; (2) that

14  the agent has accepted the undertaking; and (3) that there is an understanding between

15  the parties that the principal is to be in control of the undertaking.  See Restatement (Third)

16  of Agency, § 1.01; see also Transamerica Leasing, Inc. v. La Republica de Venezuela, 200

17  F.3d 843, 849 (D.C. Cir.2000).  This, therefore, is the test that the court employs here.[5]

18       In applying this traditional common law agency test, the court furthermore notes that,

19  because one of the touchstones of the test is the corporation's control over the subsidiary

20

21       [4]    This absence of authority on the precise question before the court reflects the
    generally confusing state of the law on this point.  As the Supreme Court itself has noted:  "The
22  whole problem of the relation between parent and subsidiary corporations is one that is still
    enveloped in the mists of metaphor.  Metaphors in law are to be narrowly watched, for starting
23  as devices to liberate thought, they end often by enslaving it."  First Nat'l Bank v. Banco Para
    El Comercio Exterior de Cuba, 462 U.S. 611, 623 (1983)(considering analogous questions of
24  liability among differing foreign governmental entities).

25       [5]    This ruling is consistent with the conclusion reached by the court in its March 31,
    2009 order granting defendants' motion to dismiss certain of plaintiff's claims for lack of subject
26  matter jurisdiction under the FTAIA (among other motions).  Plaintiff there made the same
    agency arguments as here, but for the purpose of seeking a ruling that its third party
27  relationships supported an agency finding for purposes of jurisdiction under the FTAIA.  Here,
    as noted, plaintiff seeks an agency finding with respect to defendant's relationship with a
28  subsidiary for liability purposes.

United States District Court

For the Northern District of California

1   for purposes of a defined "undertaking," this agency test shares similar concerns with many

2   of the other tests formulated by various courts to determine agency – all of which also use

3   concepts of day to day control as a touchstone.  See, e.g., Phoenix Canada Oil Co. Ltd. v.

4   Texaco, Inc., 658 F. Supp. 1061, 1084-85 (D. Del.1987)(antitrust case holding that parent

5   is liable for acts of subsidiary under agency theory only if parent "dominates" subsidiary;

6   parent of wholly-owned subsidiary that had seats on board, took part in financing, and

7   approved major policy decisions was not liable because parent did not have day-to-day

8   control); Frank v. U.S. West, Inc., 3 F.3d 1357, 1362, fn. 2 (10th Cir. 1993)(acknowledging

9   agency theory as possible basis for holding parent corporation liable for acts of its

10  subsidiary in employment context; describing relevant agency test as whether "the parent

11  exercised a significant degree of control over the subsidiary's decision-making").  Critically,

12  however, it is to be remembered that the majority of decisions require more than mere

13  ownership of stock, and more than the supervision of finance and capital budget decisions,

14  or shared directorships, in order for a finding of agency to issue.  See, e.g., United States v.

15  Bestfoods, 524 U.S. at 72; Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 658 F. Supp. 1061,

16  1084-85 (D. Del.1987)(parent of wholly-owned subsidiary that had seats on board, took

17  part in financing, and approved major policy decisions was not liable because parent did

18  not have day-to-day control); H.J., Inc. v. International Tel. & Tel. Corp., 867 F.2d 1531,

19  1549 (8th Cir. 1989)(briefly considering alternate theory of agency in antitrust context for

20  liability purposes, and holding that any finding that subsidiary was agent of principal for

21  purposes of liability was in error, despite evidence indicating that both companies acted

22  jointly in several aspects).  The question of agency is also highly fact specific.

23      Applying the traditional agency test pursuant to these standards here, the ultimate

24  question on summary judgment is whether plaintiff can point to facts that create a triable

25  issue of fact as to: (1) NTC's intent to have NTC USA act on NTC's behalf with regard to

26  the pricing and sale of DRAM; (2) NTC USA's acceptance and/or understanding of its role

27  in DRAM pricing and sales on NTC USA's behalf; and (3) an understanding between NTC

28

United States District Court

For the Northern District of California

1    and NTC USA that NTC is to be in control of NTC USA's DRAM pricing and sales activity.

2          Arguing that all three elements are satisfied, plaintiff submits the following

3    purportedly undisputed facts:  that NTC formed NTC USA for the very purpose of acting as

4    its sales and marketing arm in the United States; that communications between NTC and

5    NTC USA were regular and extensive; that NTC set and regulated NTC USA pricing policy;

6    that the companies shared two directors; that NTC USA's employee, Ms. Chen, testified

7    that NTC USA's sole purpose was to conduct NTC's DRAM sales; that NTC's audit

8    committee performed internal audits of various functions at NTC USA; that Mr. Hurley, who

9    is an executive for NTC USA, helped negotiate NTC's strategic alliances with Dell

10   regarding DRAM, and was instructed by NTC to negotiate with IBM on NTC's behalf in

11   connection with certain DRAM payments; and that NTC designated Mr. Hurley to testify as

12   NTC's corporate representative about the authority of officers, employees and managers at

13   NTC USA.  See, e.g., Declaration of David Cross ISO MSJ Opp. ("Cross Opp. Decl."), Ex.

14   14 at 39-41, 170-72; Ex. 72 at ¶¶ 1-2; Ex. 76 at 177, 214-15; Ex. 77 at 60; Ex. 75 at 22-27;

15   Declaration of David Cross ISO Plaintiffs' Submission of Newly Discovered Evidence

16   ("Cross New Evidence Decl."), Exs. A-C.

17          In response, defendant contends that plaintiff has distorted these facts beyond what

18   examination of the record actually supports, and that even as to their substance, the

19   evidence does not rise to the level of establishing an agency relationship.  Defendants

20   note, for example:  that the deposition testimony relied on by plaintiff as proof that NTC

21   USA is there simply to "sell and market [NTC] product" is taken out of context and ascribed

22   to a different question altogether; that the testimony by Mssrs. Hsu and Wang, relied on for

23   proof of NTC's control over NTC USA's prices, is deficient and issues from employees with

24   no actual pricing responsibility; that NTC USA had the ability to approach multinational

25   OEMs without NTC's consent; that NTC USA's submission of audit-related paper work

26   regarding new hires to NTC is not synonymous with NTC's approval over hiring and

27   salaries at NTC USA; and that any contacts between NTC and NTC USA were minimal and

28

United States District Court

For the Northern District of California

1   not substantive.  See Cross Opp. Decl., Ex. 73; Ex. 74 at 33; Ex. 82; Exs. 81-83; see also

2   Reply Declaration of Michael J. O'Hara ISO Nanya's MSJ ("O'Hara Reply Decl."), Ex. C;

3   Ex. D; Reply Declaration of Kenneth M. Hurley ISO Nanya's MSJ ("Hurley Reply Decl."), ¶

4   11.

5          On balance, the court concludes that the parties' competing positions highlight the

6   existence of materially disputed facts on the question of agency.  To be sure, some of

7   plaintiff's undisputed facts – e.g., the fact that NTC and NTC USA shared two board

8   members, or that NTC shared some supervision of finance and pricing decisions – do not

9   justify any inference of agency as a matter of law.  See, e.g., United States v. Bestfoods,

10  524 U.S. at 72; H.J., Inc., 867 F.2d at 1549.  Notwithstanding, however, there are sufficient

11  other facts introduced by plaintiff that raise a triable dispute of fact, in the court's view, as to

12  whether NTC expressed a desire that NTC USA undertake certain pricing and sales on

13  NTC's behalf, whether NTC USA agreed to do so, and whether NTC had sufficient control

14  over pricing and sales of NTC USA.  Defendant's competing view of these facts – and the

15  evidence marshaled by defendant in support thereof – only serve to confirm, rather than

16  undercut, this point.

17         In short, it is impossible for the court to conclude with certainty that all facts

18  presented here cut decisively against a finding of agency as a matter of law.  It is the trier

19  of fact who must resolve the underlying questions of fact as to the relationship existing

20  between NTC and NTC USA, so that a conclusion of law as to agency may be made.

21         In so ruling, the court is also mindful that, as defendant points out, some degree of

22  control is usually even if not necessarily implicit in the parent subsidiary relationship.  Thus,

23  the degree of control exercised by the parent in order for the subsidiary to qualify as an

24  agent must therefore exceed that which is to be expected in the normal scope of any such

25  relationship.

26         In sum, however, the court concludes that there are disputed issues of material fact

27  as to NTC's desire that NTC USA undertake DRAM pricing on NTC's behalf, that NTC USA

28

United States District Court

For the Northern District of California

1    viewed its role as such, and/or that NTC controlled NTC USA with respect to DRAM pricing,

2    such that a reasonable juror could find an agency relationship satisfied.  As such, plaintiff

3    has created a triable issue of material fact with respect to NTC's vicarious liability for the

4    overarching conspiracy alleged by plaintiff, on the basis of its relationship with NTC USA.

5    Summary judgment in defendant's favor on this issue is accordingly DENIED.

6          2.    Independent Evidence of NTC's Participation in Alleged DRAM Conspiracy

7          This brings the court to the second issue under consideration:  whether, as an

8    alternative to establishing NTC's liability via its relationship and contacts with NTC USA,

9    plaintiff has sufficient evidence to suggest that NTC independently participated in any

10   alleged DRAM conspiracy.

11         In its summary judgment order in the related MDL action, the court previously

12   considered all direct and indirect evidence of NTC's participation in a conspiracy to fix

13   DRAM prices, reduce DRAM supply, or unlawfully exchange price information, and

14   concluded that plaintiff could not raise a triable issue of fact as to NTC's participation in any

15   of the foregoing.  To the extent plaintiff would base its present case upon the identical

16   evidence, the court's reasoning and holding apply with equal force.

17         Plaintiff, however, asserts that "new" evidence demonstrates the existence of

18   sufficient facts to support an inference that NTC itself was an active participant in the

19   conspiracy: namely, the recent deposition testimonies of Il Ung Kim, senior vice president

20   at Samsung, and Mike Sadler, vice president of worldwide sales for Micron.  See generally,

21   e.g., Cross MSJ Opp. Decl., Ex. 84; Ex 36.  When considered in combination with the

22   existing evidence in the record, plaintiff continues, the evidence collectively creates a

23   triable issue of fact regarding NTC's participation in unlawful conspiratorial activity.

24   Defendant, naturally, disputes that plaintiff's new evidence supports a legitimate inference

25   of NTC's participation in any conspiracy, and further notes that to the extent plaintiff relies

26   on evidence already considered and rejected by the court, the court need not reconsider

27   such evidence here.

28

                                          16

United States District Court

For the Northern District of California

1    The court must decline, however, to pass upon the viability of plaintiff's new

2 evidence here, in view of its finding that there are disputed issues of material fact with

3 respect to agency.  As the court has stated previously, and most recently in its March 31,

4 2009 order in connection with the remaining summary judgment motions pending in the

5 current case, the court must consider the circumstantial evidence in the aggregate, in

6 determining the existence of conspiratorial conduct on the part of a defendant.  See, e.g.,

7 In re Citric Acid Antitrust Litig., 191 F.3d 1090, 1097 (9th Cir. 1999)(critical question in

8 evaluating circumstantial evidence is "whether all the evidence considered as a whole can

9 reasonably support the inference that [defendant] conspired with the admitted conspirators

10 to fix prices").  In the event that a finding of agency – and therefore, NTC's vicarious liability

11 – is ultimately deemed proper, the trier of fact will assess NTC USA's actions in addition to

12 those of NTC itself, on the question of conspiratorial conduct.

13    Since any affirmative conspiracy finding will therefore be based on the assessment

14 of all these facts in the aggregate, the present evidentiary record as to NTC is, in essence,

15 incomplete.  As such, and without knowing whether plaintiff has come forward with the sum

16 total of the evidence admissible against NTC, the court is not in a position to affirmatively

17 determine as a matter of law whether plaintiff's "new" evidence, standing on its own, is

18 sufficient to raise a triable issue of material fact as to NTC's conspiratorial conduct.  Rather,

19 the trier of fact must consider all the evidence presented at trial, determine the underlying

20 facts going to the question of agency, and based upon a corresponding finding, determine

21 whether the evidence as to NTC collectively supports a finding of conspiratorial conduct.

22                                        * * *

23    In sum, and based on all the foregoing, the court hereby DENIES summary

24 judgment in NTC's favor.

25 C.    NTC USA's Motion for Summary Judgment

26    NTC USA also moves for summary judgment, making the same larger point that

27 NTC made – that there is insufficient evidence that NTC USA (as distinct from NTC)

28

United States District Court

For the Northern District of California

1   participated in any unlawful conspiracy.  Thus, the same general framework and standards

2   apply, and the question for the court remains:  whether the evidence independently

3   establishes NTC USA's participation in any conspiracy to fix prices, or other unlawful

4   collusive activity.

5          This is the same question that NTC USA raised before the court in the MDL

6   proceedings, and many of the arguments duplicate those made in the MDL proceedings.

7   As a preliminary matter, however, the court is mindful that although the nature of the

8   alleged conspiracy here is fundamentally the same as that alleged in the MDL proceedings,

9   the focus of the parties' arguments here is somewhat different than in the MDL summary

10  judgment motions.  Sun's case, for example, focuses more particularly on defendants'

11  participation in an underlying conspiracy to raise prices to the Target OEMs, which in turn

12  raised prices to plaintiff, via an industry-wide price increase.  In recognition of this shift in

13  emphasis, NTC USA therefore takes a slightly different approach than it did in the related

14  MDL case, proceeding along two different but parallel tracks: first, NTC USA argues that

15  there is insufficient evidence that it participated in a Target OEM conspiracy.  Second, NTC

16  USA argues that there is insufficient evidence that it *otherwise* participated in any other

17  type of unlawful conspiracy to fix DRAM prices or exchange price information.[6]

18         The court's inquiry, therefore, considers not only whether there is any direct or

19  circumstantial evidence of NTC USA's participation in any unlawful conspiracy generally

20  aimed at the DRAM industry (and by extension, plaintiff) but also aimed at the Target

21  OEMs.

22

_____

23         [6]      The court also notes that, as was the case in connection with the direct
    purchaser motions, NTC USA declines here to focus on any evidence of a supply reduction.
24  This makes sense, as NTC USA did not manufacture DRAM; it simply sold the DRAM
    manufactured by NTC.  It bears repeating, however, that even if NTC USA did not itself
25  engage in a reduction in DRAM output, it may nonetheless be held liable for the actions of
    other co-defendants in reducing their DRAM output, if it is proven that NTC USA otherwise
26  participated in an unlawful conspiracy with those defendants.  See, e.g., BBD Transp. Co., Inc.
    v. Southern Pac. Transp. Co., 627 F.2d 170, 173 (9th Cir. 1980)("To be liable as a co-
27  conspirator for the anticompetitive acts of [other co-conspirators], the railroads need not have
    known of or participated in those acts themselves.").
28

18

United States District Court

For the Northern District of California

1    Turning to the evidence, NTC USA has – as it did in the direct purchaser litigation –

2    initially come forward with evidence that its participation in any alleged conspiracy would be

3    economically implausible, in view of the following:  NTC USA made no sales of DRAM to

4    Sun during the damage periods identified by plaintiff's experts; NTC USA had a small

5    market share for worldwide DRAM sales, ranging from 1.4% to 5.5%, for the plea period in

6    question; Dr. Alan Cox, NTC USA's expert, has opined that price collusion is not possible

7    unless a seller involved in the collusion represents a significant portion of the market; and

8    throughout the alleged conspiracy time frame, NTC USA priced aggressively and expanded

9    its DRAM sales dramatically.  See generally Declaration of Alan Cox ISO MSJ; Declaration

10   of Kenneth Hurley ISO MSJ ("Hurley Decl."), ¶¶ 3-4, 8-9; Declaration of Na'il Benjamin ISO

11   Nanya's MSJ ("Benjamin Decl."), Ex. CC at 19:15-21:12; Ex. DD, Response No. 7.  NTC

12   USA has also relied on the factual evidence to establish NTC USA's lack of participation in

13   any underlying DRAM conspiracy: Kenneth Hurley, NTC USA's president and the senior

14   NTC USA employee responsible for all sales and pricing activities during the relevant time

15   frame, also testified that NTC USA was never aware of the existence of any industry wide

16   conspiracy, was never told that any other DRAM manufacturers were engaged in any

17   conspiracy, and did not itself engage in any such conspiracy.  See, e.g., Hurley Decl., ¶ 9.

18   All of which, combined with the lack of any direct evidence demonstrating NTC

19   USA's participation in any collusive activity, is sufficient to shift the burden to plaintiff, who

20   is required to come forward with evidence tending to exclude the possibility that NTC USA

21   was engaging in permissible competitive behavior.  See, e.g., In re Citric Acid Litig., 191

22   F.3d 1090, 1094 (9th Cir. 1999)(once defendant rebuts an allegation of conspiracy by

23   showing a "plausible and justifiable reason for its conduct that is consistent with proper

24   business practice," the burden then "shifts back to the plaintiff to provide specific evidence

25   tending to show that the defendant was not engaging in permissible competitive behavior");

26   see also Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 547, 587, 596-97

27   (1986)("if [the defendants] had no rational motive to conspire, and if [their] conduct is

28

United States District Court

For the Northern District of California

1    consistent with other, equally plausible explanations, the conduct does not give rise to an

2    inference of conspiracy").

3         To make this showing, plaintiff relies on circumstantial evidence that overlaps in

4    large part with the circumstantial evidence submitted by direct purchaser plaintiffs in the

5    MDL proceedings.  That evidence primarily consists of:  (1) email communications; and (2)

6    inferences drawn from Fifth Amendment invocations by three senior employees of NTC

7    USA.[7]

8         1.    Email Communications

9         As the direct purchaser plaintiffs did previously, plaintiff here relies on a voluminous

10   record of email correspondence in its effort to establish an inference of conspiracy.

11   Generally, this email correspondence can be broken down into two general categories:

12   communications from or to NTC USA regarding NTC USA's contacts with defendants; and

13   communications from or to non-NTC USA sources regarding NTC USA's contacts with

14   defendants.  All of these email communications contain some reference to pricing, or

15   reference different defendant competitors, or contain statements as to what some

16   defendant competitors knew of NTC USA's pricing.  According to Sun, these

17   communications prove the existence of detailed exchanges of pricing information and

18   meetings between defendants, all of which purportedly track alleged coordinated

19   production cuts and price increases, thereby demonstrating NTC USA's participation in

20   collusive conduct.

21        As noted, plaintiff first relies on communications that come "from NTC USA's own

22

23        [7]    As did the direct purchaser plaintiffs, Sun also relies on economic evidence
     relating to the structure of the DRAM market for proof that it makes economic sense for NTC
24   USA to have participated in the alleged conspiracy.  Specifically, plaintiff relies on the report
     by its expert, Dr. Robert Marshall.  See Cross MSJ Opp. Decl., Ex. 96 at 71.  However, even
25   assuming that Dr. Marshall's testimony is capable of successfully refuting defendants'
     evidence as to whether the DRAM market would be receptive to a defendant's participation in
26   the underlying conspiracy, the testimony does not opine that the market would have been
     receptive to NTC USA itself (as opposed to the defendants collectively) engaging in a
27   conspiracy, as NTC USA points out.  For that reason, this  type of economic evidence,
     standing alone, cannot support an inference of NTC USA's participation in any underlying
28   conspiracy.

United States District Court

For the Northern District of California

1   mouth" – the majority of which involve senior NTC USA executives Kenneth Hurley

2   (President) and Mike Walsh (North American Sales Director).  See, e.g., Cross MSJ Opp.

3   Decl., Exs. 2-7, 13, 16, 19; id., Ex. 14 at 64-71, 90-91, 98-100, 111, 163.  These

4   communications establish: the fact that NTC USA sent spreadsheets to the VP of Sales at

5   Elpida, which spreadsheets contained "Nanya" price targets, including detailed information

6   about part numbers and associated pricing; that Mr. Hurley and Mr. Walsh communicated

7   with each other about "checking with [their] competitors to see where [they] were in relation

8   to their quotes;" that Mr. Walsh regularly exchanged information related to DRAM price

9   forecasts with an Elpida contact; that Mr. Hurley regularly spoke and communicated with

10  senior executives of NTC USA's competitors about the DRAM business; and that on

11  occasion, when Dell would give NTC USA "competitive feedback on pricing that major

12  suppliers had been providing to [Dell]," Mr. Hurley would contact Mr. Sadler of Micron to

13  ask him "if he had heard the same ranges of prices that Dell was providing to Nanya."  See

14  id.

15       The second group of email correspondence that plaintiff relies on includes those

16  communication exchanges that stem from other competitors' employees, and which

17  purportedly implicate NTC USA.  See, e.g., Cross MSJ Opp. Decl., Exs. 37 (Kevin Chen of

18  Mosel "directly checked with the marketing people of Nanyan [sic] who "told [him] that they

19  had stopped 128MB SD and the inventory level is very small, so they insist price at $1.75");

20  38 ("Nanaya [sic] told me their lowest price on last Friday was $2.5 but they quoted and

21  keep price $2.6 today"); 39 (Mr. Liu of Mosel knew in advance that "Nanya ... will try to

22  quote $4.0 next Monday"); id. at Exs. 41-44, 45-55.

23       As a preliminary matter, NTC USA has filed numerous objections to the admissibility

24  of this evidence on hearsay grounds, relying on the well-settled rule that "only admissible

25  evidence may be considered by the trial court in ruling on a motion for summary judgment."

26  See, e.g., Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181-82 (9th Cir. 1988).

27  As the parties undoubtedly recall, it was in service of this rule that the court previously

28

United States District Court

For the Northern District of California

1   excluded several of plaintiffs' similar exhibits containing email correspondence and industry

2   news bulletins, holding that the documents constituted inadmissible hearsay and failed to

3   qualify for the co-conspirator exception advanced by defendant.  See Direct Purchaser MSJ

4   Order at 11-12.

5          A similar ruling is not warranted here, however.  First, both the parties' arguments

6   and the showing made as to this issue here are distinct.  Defendants' objections, for

7   example, respond to each exhibit in boiler plate fashion, without distinguishing the excerpt

8   of each exhibit that purportedly constitutes hearsay.  See generally Nanya's Objections to

9   Plaintiffs' Exhibits ISO MSJ Opp. ("Nanya Objections").  This makes it difficult if not

10  impossible for the court to determine – as it was able to do in the MDL proceedings –

11  whether a given statement in an exhibit is being offered for the truth of the matter asserted

12  therein or, as plaintiff urges, as evidence of conduct from which the trier of fact is to infer

13  something else.  Only the former constitutes hearsay.  To that end, and for the same

14  reasons, the court is also hard pressed on the record of objections before it to determine

15  the viability of the various exceptions to hearsay that plaintiff asserts apply.  This evaluation

16  is a necessary component to determining admissibility of the exhibits in the event the

17  exhibits do, in fact, constitute hearsay.

18         Second, and moreover, the court is also mindful that with respect to many of the

19  exhibits that constitute communications from or to NTC USA, the content contained therein

20  would likely be authenticated and admissible at trial via the testimony of the out of court

21  declarants themselves, thus suggesting that their submission and the court's reliance

22  thereon at the summary judgment stage is proper.  See, e.g., Fraser v. Goodale, 342 F.3d

23  1032, 1036-37 (9th Cir. 2003)("At the summary judgment stage, we do not focus on the

24  admissibility of the evidence's form.  We instead focus on the admissibility of its contents");

25  Fed. Deposit Ins. Corp. v. N.H. Ins. Co., 953 F.2d 478, 485 (9th Cir.1991) ("the nonmoving

26  party need not produce evidence in a form that would be admissible at trial in order to avoid

27  summary judgment.").  Indeed, this is the same observation made by the court in the MDL

28

United States District Court

For the Northern District of California

1   proceedings with respect to similar evidence.  See Direct Purchaser MSJ Order at 34 n.7.

2   All of which compels the court to overrule defendant's inadmissibility objections to the

3   above exhibits.[8]

4        Putting aside defendant's admissibility objections, defendant more fundamentally

5   disputes the weight that should be given the substance of the above exhibits.  Defendant

6   argues, for example, that while the emails may suggest the possibility of competitor

7   contacts or meetings, they do not actually demonstrate that any such contact or meeting

8   took place.  See, e.g., Cross MSJ Opp. Decl., Ex. 2.  Similarly, they point out that some of

9   the emails do not discuss DRAM pricing at all, but rather reflect innocuous discussions and

10  meetings about generic industry information, or events like employee interviews.  See, e.g.,

11  id., Ex. 6; Ex. 7.  And still other exhibits, continues defendant, do not establish a NTC USA

12  contact at all, but merely reflect undifferentiated Nanya pricing from potentially unreliable

13  sources.  See, e.g., id., Ex. 39; Ex. 40.  Plaintiff cannot withstand its summary judgment

14  burden, asserts defendant, in light of these seemingly innocent explanations and/or

15  unreliable communications.

16       Defendant's position is not without some merit.  It seems apparent, for example, that

17  some of the communications relied upon by plaintiff convey only innocent information,

18  standing alone.  Furthermore, as the court has previously held, to the extent that some of

19  plaintiff's cited communications discuss generic pricing or industry information, there is

20  nothing inherently wrong with the exchange of such information among competitors in the

21  same industry.  See In re Citric Acid,191 F.3d at 1103, citing In re Baby Food Antitrust

22  Litig., 166 F.3d 112, 126 (3d Cir. 1999)("[C]ommunications between competitors do not

23  permit an inference of an agreement to fix prices unless 'those communications rise to the

24  level of an agreement, tacit or otherwise.'");  Rutledge v. Elec. Hose & Rubber Co., 327 F.

25  Supp. 1267, 1271 (C.D. Cal. 1971)("Absent an agreement to fix prices, there is nothing

26

27       [8]     Defendant is, of course, free to renew its hearsay objections at trial, to the extent
28  such exhibits are relied upon in the future.

United States District Court

For the Northern District of California

1  unlawful about competitors meeting and exchanging price information or discussing

2  problems common in their industry, or even exchanging information as to the cost of their

3  product.").[9]

4        It is in the aggregate, however, that the court must ultimately judge the relevant

5  evidence.  And taken in the aggregate, the evidence – much of which is the same as was

6  before the court in the MDL proceedings – demonstrates that numerous contact and

7  communications that took place between NTC USA executives and other defendants

8  during the relevant time period, of varying degrees and kind.  It is undisputed that at least

9  some of the discussion therein concerned DRAM pricing, even if some can be classified as

10  generic shop talk.  See, e.g., In re Citric Acid, 191 F.3d at 1103 (Specific discussions

11  between competitors regarding price may give rise to inference of conspiracy).  The court is

12  ultimately persuaded, as it was by the direct purchaser plaintiffs in the MDL proceedings,

13  that on balance, the volume of contact and communications (and considering the fact that

14  some of the defendants and individuals with whom NTC USA was communicating are

15  admitted conspirators), might reasonably support the inference that NTC USA conspired

16  with the admitted conspirators in this action to engage in collusive activity regarding the

17  industry-wide sale of DRAM at artificial prices.

18        2.    Fifth Amendment Invocations and Possibility of Adverse Inferences

19        In attempting to overcome NTC USA's initial showing that any conspiracy defies

20  plausible economic justification, plaintiff also argues that adverse inferences of conspiracy

21  should be made against three of NTC USA's employees – Mr. Walsh, Mr. Donahue, and

22  Mr. Dwyer – all of whom invoked the Fifth Amendment at their depositions in response to

23

24        [9]    The court also notes that certain of the email correspondence relied on by
plaintiff fails to distinguish between NTC and NTC USA, referring only generically to "Nanya."
25  This is problematic, since it makes it impossible for the court to determine which of the Nanya
entities the information contained therein should be deemed admissible against.  However,
26  many of these emails can readily be sourced to an NTC USA employee or origin.  Moreover,
when viewed in the aggregate with the totality of the evidence submitted by plaintiff, the
27  affected emails do not justify the court's wholesale rejection of plaintiff's evidence or
arguments.
28

United States District Court

For the Northern District of California

1    certain relevant questions.

2        The court previously denied a similar request made by the direct purchasers in the

3    MDL proceedings to draw adverse inferences.  As the court noted there, the seminal case

4    on this issue, Baxter v. Palmigiano, 425 U.S. 308 (1976), holds that adverse inferences

5    based on a party's invocation of the Fifth Amendment are permissible in certain situations.

6    Lower courts interpreting Baxter, however, have been uniform in suggesting that the key to

7    the Baxter holding is that such adverse inferences may only be drawn when independent

8    evidence exists of the fact to which the party refuses to answer.  See, e.g., LaSalle Bank

9    Lake View v. Seguban, 54 F.3d 387, 391 (7th Cir.1995); Peiffer v. Lebanon Sch. Dist., 848

10   F.2d 44, 46 (3d Cir.1988).  Thus, an adverse inference can be drawn when silence is

11   countered by independent evidence of the fact being questioned, but that same inference

12   cannot be drawn when, for example, silence is the answer to an allegation contained in a

13   complaint.  See Nat'l Acceptance Co. v. Bathalter, 705 F.2d 924, 930 (7th Cir.1983).

14       The court denied the direct purchasers' request for adverse inferences, because

15   plaintiffs there had not made a sufficient foundational showing regarding the specific

16   questions and facts upon which they were requesting that adverse inferences be drawn.

17   Here, plaintiff has sought to distinguish its attempt from the direct purchasers' previous

18   attempt by setting forth the specific grounds upon which it requests an adverse inference,

19   as well as the evidence that independently supports the answers to the questions that the

20   three deponents at issue refused to answer.

21       Specifically, plaintiff requests that the court make the following adverse inference

22   with respect to all three NTC USA witnesses at issue:  that each NTC USA employee

23   "exchanged DRAM pricing or other competitive information" with NTC USA's rivals.  See,

24   e.g., Pl. Opp. Br. at 33:5-34:2.  Plaintiff bases this request on each employee's Fifth

25   Amendment invocation taken in response to the question whether the employee had

26   exchanged pricing or other competitive information with NTC USA's competitors.  See id.

27   As independent evidence supporting the requested inference, plaintiff points to testimony

28

25

1   by employees and executives of the various competitor defendants that purportedly reveal

2   that all three NTC USA employees *did*, in fact, exchange DRAM pricing or other

3   competitive information with them.  See id.

4          The court concludes that plaintiff has laid a sufficient foundation for its request.

5   First, with respect to Mr. Walsh, plaintiff has correctly pointed out that Mr. Donabedian of

6   Elpida and Mr. Elliot of Samsung both testified that they had communications with Mr.

7   Walsh regarding DRAM pricing.  See Cross MSJ Opp Decl., Ex. 30, ¶¶ 2, 4; Ex. 31 at 78,

8   82-83, 166.  Thus, an adverse inference that Mr. Walsh exchanged DRAM pricing

9   information with Elpida and Samsung, to the extent detailed by Mssrs. Donabedian and

10  Elliot, is appropriate.  Similarly, and with respect to Mr. Donahue, plaintiff has noted that

11  Mr. Elliot also testified that he had communications with Mr. Donahue regarding "market

12  trends and general price information."  See id. at Ex. 31 at 80-81.  Thus, an inference that

13  Mr. Donahue exchanged market trend and general price information with Mr. Elliot is also

14  proper.  Finally, with respect to Mr. Dwyer, plaintiff has pointed out that Mr. Grifo of

15  Samsung testified that he had communications with Mr. Dwyer regarding DRAM pricing,

16  and furthermore, that email correspondence between Mr. Dwyer and Mr. Hurley

17  independently establishes that Mr. Dwyer had asked Mr. Grifo for Samsung's DRAM pricing

18  on at least one occasion.  Id., Ex. 34 at 17-18, Ex. 35.  Thus, an inference that Mr. Dwyer

19  exchanged DRAM pricing information, to the extent detailed by Mr. Grifo and set forth in the

20  email communication in evidence, is also appropriate.

21         In sum, to the extent plaintiff has relied on independent evidence establishing that

22  Samsung employees (plus Elpida, in the case of Mr. Walsh) had discussions with each

23  NTC USA employee regarding DRAM pricing, an adverse inference is proper.  In granting

24  plaintiff's request for such adverse inferences, however, the court notes that any adverse

25  inferences are limited to what the independent evidence actually corroborates.  Thus, the

26  court does not sanction the use of adverse inferences against the three NTC USA

27  employees to the extent plaintiff seeks inferences as to competitors whose corroborative

28

1   testimony or evidence has not been submitted.

2      Even after making these inferences, the court is mindful that, standing alone, a

3   single inference is insufficient to establish NTC USA's participation in any conspiracy to fix

4   prices, either to the Target OEMs, or within the industry at large.  Moreover, as already

5   noted, "shop talk" is not actionable.  Again, however, the question is whether the

6   inferences, together with the aggregate evidence, can support an inference of collusive

7   activity.  The court answers this question in the affirmative, for the reasons discussed

8   herein.

9                                    * * *

10     Accordingly, as it found previously in connection with the MDL proceedings, the

11  court once again concludes that plaintiff has presented disputed issues of material fact as

12  to proof of NTC USA's involvement in the overarching conspiracy alleged by plaintiff.

13  Summary judgment is therefore DENIED.

14  D.   Conclusion

15     For all the foregoing reasons, the court hereby DENIES both NTC's motion for

16  summary judgment, and NTC USA's corresponding motion for summary judgment.

17  **IT IS SO ORDERED.**

18  Dated: April 3, 2009

19  _____

20  PHYLLIS J. HAMILTON
    United States District Judge

21

22

23

24

25

26

27

28