1  KENNETH R. O'ROURKE (S.B.#120144)
   korourke@omm.com
2  PAUL B. SALVATY (S.B. #171507)
   psalvaty@omm.com
3  STEVEN BERGMAN (S.B. #180542)
   sbergman@omm.com
4  O'MELVENY & MYERS LLP
   400 South Hope Street
5  Los Angeles, CA  90071-2899
   Telephone:    (213) 430-6000
6  Facsimile:    (213) 430-6407

7  MICHAEL TUBACH (S.B. #145955)
   mtubach@omm.com
8  THOMAS BROWN (S.B. # 182916)
   tbrown@omm.com
9  O'MELVENY & MYERS LLP
   Two Embarcadero Center, 28th Floor
10 San Francisco, CA  94111-3823
   Telephone:    (415) 984-8700
11 Facsimile:    (415) 984-8701

12 Attorneys for Defendants
   HYNIX SEMICONDUCTOR INC. and
13 HYNIX SEMICONDUCTOR AMERICA
   INC.

14

15

16            UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
17

18

19 SUN MICROSYSTEMS, INC., *et al.*,          Case No.   C-06-01665 PJH

20            Plaintiffs,

21       v.                                    **HYNIX'S OPPOSITION TO
                                               PLAINTIFF'S MOTION TO
22 HYNIX SEMICONDUCTOR INC., *et al.*,         EXCLUDE THE TESTIMONY OF
                                               HYNIX'S EXPERT WITNESSES
23            Defendants.                      KEVIN MURPHY AND ROBERT
                                               TOPEL**

24                                             Hearing Date:  May 7, 2009
                                               Time:          2:30 p.m.
25                                             Place:         Courtroom 3, 17th Floor
                                               Judge:         Hon. Phyllis J. Hamilton
26

27

28

1

## TABLE OF CONTENTS

2

**Page**

3  I.   INTRODUCTION ....................................................................................................... 1

II.  STATEMENT OF FACTS ......................................................................................... 3

     A.   Summary of Professor Murphy's Analysis and Opinions.................................. 3

     B.   Summary of Professor Topel's Analysis and Opinions ................................... 5

III. ARGUMENT .............................................................................................................. 6

     A.   Professor Murphy's Demand-Only Analysis Was Not the Sole Basis for
          His Conclusions that Supply Was Not Restrained and Market-wide Prices
          Were Not Impacted ........................................................................................ 8

     B.   Professors Murphy's and Topel's Use of a Time Trend Is Reliable.................... 12

     C.   Professors Murphy's and Topel's Demand Elasticity Specifications Are
          Reliable .......................................................................................................... 15

     D.   There Are No "Undisputed Facts" Which Contradict Professors Murphy's
          and Topel's Conclusions.................................................................................. 19

IV.  CONCLUSION............................................................................................................ 22

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*American Booksellers Association, Inc. v. Barnes & Noble, Inc.*,
   135 F. Supp. 2d 1031 (N.D. Cal. 2001) ................................................................ 7

5

*Bickerstaff v. Vassar College*,
   196 F.3d 435 (2d Cir. 1999) .............................................................................. 15

6

*Coward v. ADT Sec. Sys., Inc.*,
   140 F.3d 271 (D.C. Cir. 1998) ......................................................................... 15

7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) .................................................................................. passim

8

*DSU Med. Corp. v. JMS Co.*,
   296 F. Supp. 2d 1140 (N.D. Cal. 2003) .......................................................... 6, 7

9

*Frye v. United States*,
   293 F. 1013 (D.C. Cir. 1923) ............................................................................. 6

10

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ........................................................................................... 6

11

*In re Polypropylene Carpet Antitrust Litig.*,
   93 F. Supp. 2d 1348 (N.D. Ga. 2000) .............................................................. 16

12

*Kennedy v. Collagen Corp.*,
   161 F.3d 1226 (9th Cir. 1998) ........................................................................... 7

13

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ....................................................................................... 6, 7

14

*McGlinchy v. Shell Chemical Co.*,
   845 F.2d 802 (9th Cir. 1988) ............................................................................. 7

15

*Merit Motors, Inc. v. Chrysler Corp.*,
   569 F.2d 666 (D.C. Cir. 1977) .......................................................................... 7

16

*New York v. Microsoft Corp.*,
   224 F. Supp. 2d 76 (D.D.C. 2002) .................................................................. 22

17

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) ........................................................................... 7

18

*United States v. Green*,
   405 F. Supp. 2d 104 (D. Mass. 2005) ............................................................. 10

19

*United States v. Mitchell*,
   365 F.3d 215 (3rd Cir. 2004) ..................................................................... 10, 11

20

*United States v. Real Prop. Located at Section 18*,
   976 F.2d 515 (9th Cir. 1992) ........................................................................... 19

21

*Wyler Summit P'ship v. Turner Broad. Sys., Inc.*,
   235 F.3d 1184 (9th Cir. 2000) ........................................................................... 7

**RULES**

Federal Rule of Evidence 403 ................................................................................. 7

Federal Rule of Evidence 702 ........................................................................ passim

20

21

22

23

24

25

26

27

28

C-06-1665 PJH

1

**TABLE OF AUTHORITIES**
(continued)

2
**Page**

3

**TREATISES**

4
3 L. Sand *et al., Modern Federal Jury Instructions-Criminal,*
¶ 58.04, Instruction 58-44 (2008) ........................................................................................ 19

5
ABA Section of Antitrust Law,
Criminal Antitrust Litigation Handbook 415-16 (2d ed. 2006) ............................................. 19

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C-06-1665 PJH

I.     **INTRODUCTION**

Professors Murphy's and Topel's opinions are grounded in thorough economic analysis of the DRAM industry and are consistent with best scientific and economic practices. Sun's contention that Professors Murphy's and Topel's econometric analyses and the conclusions drawn there from should be excluded because they are unreliable pursuant to Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ("*Daubert*") is demonstrably wrong. None of the criticisms offered by Sun, even if accurate, would justify excluding the opinions of either Professor Murphy or Topel. Rather, all of the issues that Sun raises go to the weight of the testimony at most, not its admissibility. More fundamentally, Sun's criticisms are wrong.

In its Motion to Exclude the Testimony of Hynix's Expert Witnesses Kevin Murphy and Robert Topel ("Motion" or "Mot."), Sun first argues that two of Professor Murphy's conclusions -- namely, that market-wide DRAM supply was not restrained and that there were no market-wide overcharges -- are based on an assumption that supply was not conspiratorially restrained. This argument is based on a serious misreading of Professor Murphy's report. In making this argument, Sun ignores the entirety of the model and analysis that Professor Murphy relies on to actually reach his conclusions. Instead, Sun only looks to and criticizes an exercise that Professor Murphy described in two paragraphs of his report. This demand-only exercise was intended to illustrate certain features of the DRAM market, but was never meant to be the sole basis for Professor Murphy's conclusion that supply was not restrained and overcharges were not incurred. Clearly, Sun's misreading of Professor Murphy's opinions and analysis is not grounds to exclude any portion of Professor Murphy's report or opinions.

Next, Sun argues that the analyses that Professors Murphy and Topel actually did conduct of supply in the DRAM industry are unreliable because they included a time trend variable in their supply regression in a supposedly arbitrary manner. Sun principally relies on a paper published by Professor Murphy over thirty years ago (when he was an undergraduate) in which he criticizes the arbitrary use of time trends to fit data. But Professor Murphy (then, student

1    Murphy) made clear in the same article that the circumstances of the particular industry or model

2    might justify use of a time trend.  In other words, the use of time trends is not always subject to

3    critique, and Professor Murphy himself has used time trends in econometric analysis, including in

4    a peer reviewed and seminal academic work that has been widely cited.  In this case, Professors

5    Murphy and Topel determined that it was appropriate to include a time trend in their regression in

6    light of certain DRAM industry features.  In fact, Dr. Marshall does the same and Dr. White does

7    something equivalent in their analyses of DRAM prices.

8         Sun also argues that Professors Murphy's and Topel's analysis of demand is unreliable

9    because Professors Murphy and Topel used a demand elasticity supposedly without justification.

10   Again, this is simply not true.  Professors Murphy and Topel investigated demand elasticities and

11   made an informed economic decision about the magnitude of demand elasticity they used in their

12   models.  Indeed, Sun's own experts agree with the reasonableness of the demand elasticity used

13   by Professors Murphy and Topel.  Given Sun's experts' opinions that the demand elasticity used

14   by Professors Murphy and Topel are reliable and accurate, it is over-reaching for Sun to claim

15   that Professors Murphy's and Topel's use of that elasticity is so flawed that they should not be

16   able to testify about certain matters in this case.

17        Sun's final and more general criticism of Professors Murphy and Topel likewise falls flat.

18   Sun argues that the Court should exclude their conclusions because they supposedly are

19   inconsistent with the plea agreements entered by Hynix in the related criminal case.  Sun claims

20   that the pleas establish the market-wide price effects on which it has based its damage claims.

21   But Sun's claim is wrong because Sun's premise is flawed.  The plea agreements establish only

22   that agreements were reached amongst certain DRAM suppliers to raise prices to certain

23   customers at certain times.  They do not establish that *market-wide* prices -- or even a broad set of

24   OEM prices -- were affected by a conspiracy.  This is the issue that Professors Murphy and Topel

25   analyze -- namely, were market-wide prices or a broad set of OEM prices impacted.

26        The expert opinions of Professors Murphy and Topel are based on sound economic

27   methodologies applied properly to the facts of this case.  As a result, they are proper expert

28   testimony under Rule 702 and *Daubert*.  Sun's motion should be denied.

II.     **STATEMENT OF FACTS**

Both Professors Murphy and Topel used a supply and demand model to predict but-for DRAM prices.  Professor Murphy conducted his analysis using DRAM pricing data from World Semiconductor Trade Statistics ("WSTS") while Professor Topel conducted his analysis using the same set of consolidated data of many DRAM suppliers' sales to the specific OEMs listed in the plea agreements which Dr. White compiled and used.  Professor Murphy's focus was the existence of "impact" whereas Professor Topel was focused on determining the extent of damages, if any.

A.     **Summary of Professor Murphy's Analysis and Opinions.**

Professor Murphy conducted "an economic analysis of allegations by" Sun and its co-plaintiffs "that Hynix participated in a conspiracy . . . that was effective in raising Plaintiffs' DRAM prices."[1]  Ex. 1, Expert Report of Kevin M. Murphy, March 7, 2008 ("Murphy Rep.") ¶ 7.[2]  Professor Murphy also evaluated the reports of Sun's experts Robert Marshall and Halbert White.  *Id.*  After an extensive review and analysis of the DRAM industry, discovery materials and various data, Professor Murphy concluded that there was insufficient economic evidence to establish that market-wide DRAM prices would have been lower in the absence of the alleged conspiracy.  Instead, he found that changes in market-wide prices during the alleged conduct period "were caused by normal market forces, principally by demand and costs, and not by conspiracy."  *Id.* at ¶ 10.  *See also* Ex. 5, Declaration of Kevin M. Murphy ("Dec. of Murphy") ¶¶ 1-64 (summarizing portions of Professor Murphy's March 7, 2008 report and analysis).

In reaching these conclusions, Professor Murphy was fully aware that Hynix and other DRAM suppliers had entered into plea agreements which stated that certain prices to certain OEMs were affected in varying degrees at certain times during the relevant period.  Ex. 2,

---

[1] Professor Murphy was not asked to and never claimed to provide "a scientific test of the existence of a conspiracy" as Sun states in its Motion.  Mot. at 4:24-26.  His assigment was to determine whether "changes in OEM and Plaintiff prices during the period of alleged conspiracy can be explained by demand and cost factors without appealing to conspiracy."  Ex. 1, Murphy Rep. page 44. *See also* Dec. of Murphy ¶ 20.

[2] All numbers reference exhibits to the Declaration of Predita C. Rostomian in support of Hynix's Opposition to Plaintiff's Motion to Exclude the Testimony of Hynix's Expert Witnesses Kevin Murphy and Robert Topel.

1    Deposition of Kevin M. Murphy, April 24, 2008 ("Murphy Tr.") at 50:9-54:14; 265:4-11; 268:18-

2    276:10; 283:7-284:7.  He used the plea agreements as a starting point and analyzed an issue that

3    the plea agreements do not address -- impact on market-wide prices -- because Sun and its experts

4    alleged that market-wide prices were impacted.  Ex. 2, Murphy Tr. at 288:10-289:2; 286:13-

5    287:5.  *See also* Dec. of Murphy ¶¶ 4-8.

6          In so doing, Professor Murphy noted that price is determined by two principle components

7    -- demand and supply.  Ex. 1, Murphy Rep. ¶¶ 62-68.  More specifically, basic economics teaches

8    that a successful price fixing cartel must restrict supply to the market to raise prices market-wide

9    (as opposed to raising prices in a single transaction or to some, but not all, customers at certain

10   times).  *Id.* ¶¶ 62-68, 82.  Ex. 2, Murphy Tr. at 116:5-119:20.  Professor Murphy, thus, created a

11   model to test the hypothesis that the behavior of prices during the relevant periods could be

12   explained by the interaction of supply and demand, without the need to appeal to conspiracy.  Ex.

13   1, Murphy Rep ¶¶ 83-84. His model was based on the fundamental economic concepts of supply

14   and demand.  *See also* Dec. of Murphy ¶¶ 13-14.

15         Professor Murphy's model, Ex. 1, Murphy Rep. ¶¶ 82-112, can be broken down into a

16   number of component parts that must, in the end, be viewed together.  Professor Murphy first

17   analyzed DRAM demand.  *Id.*  ¶¶ 92-98.  Next, Professor Murphy analyzed DRAM supply.  *Id.*

18   ¶¶ 100-109.  He then combined his analyses of DRAM demand and supply and predicted DRAM

19   but-for prices (i.e., DRAM prices in the absence of a market-wide conspiracy).  *Id.* ¶¶ 109-110.

20   Finally, he measured the difference or gap between his predicted DRAM but-for prices and actual

21   DRAM prices during the same periods.  *Id.*  Based on the ***entirety*** of this analysis he showed that

22   changes in supply and demand together explain "virtually all of the movement in prices over the

23   alleged conspiracy period" without the need to resort to conspiracy.  *Id.* ¶¶ 99, 111-112.  This

24   conclusion was not assumed, but was derived from DRAM market data and the ***entirety*** of

25   Professor Murphy's analysis.[3]  *See also* Dec. of Murphy ¶¶ 19-35.

26   _____

27   [3] Professor Murphy found no evidence that the conspiracy impacted ***market-wide prices***, since
     movements in market-wide prices could be fully explained without resort to a conspiracy.

28   Significantly, Professor Murphy did not analyze or reach any conclusions about transaction-by-
     transaction level pricing.  Ex. 2, Murphy Tr. at 286:13-287:5.

1    Professor Murphy's analysis of industry facts and market realities supports his conclusion.

2    For instance, Professor Murphy analyzed the technology boom and bust in great detail. Ex. 1,

3    Murphy Rep. ¶¶ 20, 93-95, 98, 172-175.  He also looked at a number of other facts and market

4    realities that cannot be denied and concluded that these market realities also supported his

5    conclusion that *market-wide prices* were not impacted and market-wide supply was not

6    restrained.  Some of the other market realities Professor Murphy analyzed were: (1) the shifting

7    of DRAM market shares; (2) the Kill Hynix evidence; (3) the International Trade Commission

8    investigation; (4) the exiting of fringe suppliers from the DRAM market; (5) Hynix competing for

9    Sun's business with no success; and (6) Hynix's major financial troubles. *Id.* ¶¶ 51-57, 69-81.

10   These types of inquiries corroborated the results of his supply and demand analysis -- namely, the

11   conclusion that demand and non-conspiratorial changes in supply explain most of the movement

12   in prices during the period of alleged collusion.

### B.    Summary of Professor Topel's Analysis and Opinions.

14   Professor Robert Topel was asked to determine "whether there is reliable economic

15   evidence that market prices for . . . DRAM . . . were artificially elevated" during the alleged

16   conduct period and, if so, to estimate the extent of damages suffered, if any.  Ex. 3, Expert Report

17   of Robert H. Topel, March 7, 2008 ("Topel Rep.") ¶ 4.  Professor Topel was further tasked with

18   evaluating the econometric analyses and damage calculations of Dr. White.  *Id.*  Like Professor

19   Murphy, Professor Topel concluded that changes in DRAM prices were almost entirely explained

20   by non-conspiratorial fluctuations in supply and in demand and that any "unexplained price gaps -

21   - the differences between actual and 'but for' prices -- are economically small . . . and statistically

22   indistinguishable from zero." *Id.* at ¶ 6.  In short, Professor Topel concluded that "there is no

23   compelling evidence that the challenged conduct materially affected *market* prices, or caused any

24   material damage to the Plaintiff buyers." *Id.* (emphasis added).  Finally, Professor Topel found

25   that there was insufficient evidence of the type of output restraint that would have been necessary

26   to achieve the overcharges calculated by Dr. White. *Id.* at ¶ 11. *See also* Ex. 6, Declaration of

27   Robert Topel ("Dec. of Topel") ¶¶ 1-12 (summarizing portions of Professor Topel's March 7,

28   2008 report and analysis).

HYNIX'S OPP. TO PLAINTIFF'S MOTION TO
EXCLUDE THE TESTIMONY OF KEVIN MURPHY
AND ROBERT TOPEL

1    Like Professor Murphy, Professor Topel utilized a supply and demand model -- "the most

2    basic tool of economics" -- to explain price movements in the DRAM industry.  Ex. 3, Topel Rep.

3    ¶ 34-53.  Instead of using publicly available price information for DRAM (as Professor Murphy

4    had done), Professor Topel used the price data constructed by Sun's experts and reached the same

5    conclusion as Professor Murphy that non-conspiratorial supply and demand fluctuations fully

6    explained DRAM prices.  Ex. 4, Deposition of Robert H. Topel, April 25, 2008 ("Topel Tr.") at

7    79:15-80:3; Ex. 3, Topel Rep. ¶ 47.  Professor Topel used his supply and demand model to

8    calculate the average percentage price difference between observed DRAM prices and "but-for"

9    DRAM prices predicted based on actual supply and demand, and found that the gap between

10   actual and but-for prices was not statistically significant.  Ex. 3, Topel Rep. ¶ 48.  Professor Topel

11   also tested the implications of Dr. White's but-for price calculations and offered a number of

12   criticisms of Dr. White's opinions and methods.  Ex. 3, Topel Rep. ¶¶ 54-82.

13   **III.    ARGUMENT**

14   Under Federal Rule of Evidence 702, an expert witness may offer testimony which is

15   based upon sufficient facts or data, and is the product of reliable principles and methods which

16   have been reliably applied to the facts of the case.  Following *Daubert v. Merrell Dow*

17   *Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) courts evaluating testimony under Rule 702 are

18   charged with a "gatekeeper role," and possess broad discretion to determine admissibility,

19   including the selection of criteria for establishing reliability and the application of those criteria to

20   the proffered opinions.  *See DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140, 1146-47 (N.D.

21   Cal. 2003); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999); *Gen. Elec. Co. v. Joiner*,

22   522 U.S. 136, 138-39 (1997).

23   In superseding the "general acceptance" test from *Frye v. United States*, 293 F. 1013,

24   1014 (D.C. Cir. 1923), the *Daubert* Court provided a list of non-exclusive factors to aid trial

25   judges in determining the admissibility of expert testimony.  *DSU Med. Corp*, 296 F. Supp. 2d at

26   1146.  These include "(1) whether the scientific theory or technique can be (and has been) tested;

27   (2) whether the theory or technique has been subjected to peer review and publication; (3)

28   whether there is a known or potential error rate; and (4) whether the theory or technique is

- 6 -

1    generally accepted in the relevant scientific community." *Id. See also Kumho Tire Co.*, 526 U.S.

2    at 151 (stating that the factors are meant to be "helpful, not definitive."); *Southland Sod Farms v.*

3    *Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997) (expert testimony is admissible under

4    *Daubert* even if it is based on data collected by others and has not been subjected to peer review

5    so long as it is based on the scientific method, as it is practiced by at least a minority of scientists

6    in the field).

7        While a trial court's discretion to apply the above factors is broad, the court is empowered

8    to review only an expert's methods, and not their conclusions. *DSU Med. Corp.*, 296 F. Supp. 2d

9    at 1147; *Daubert v. Merrell Dow Pharms., Inc.* 43 F.3d 1311, 1318 (9th Cir. 1995) (The test for

10   reliability "is not the correctness of an expert's conclusions but the soundness of his

11   methodology."). The final authority to evaluate conclusions and weigh the testimony of

12   competing experts rests exclusively with the jury. *See Daubert*, 509 U.S. at 596; *Kennedy v.*

13   *Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998); *Wyler Summit P'ship v. Turner Broad.*

14   *Sys., Inc.*, 235 F.3d 1184, 1192 (9th Cir. 2000) ("Weighing the credibility of conflicting expert

15   witness testimony is the province of the jury.").

16       Sun cites a number of cases and claims that they provide fodder to exclude Professors

17   Murphy's and Topel's opinions under Rule 702 and *Daubert*. Mot. at 3. But the cases they cite

18   are clearly distinguishable from the situation here. Not only are most of the decisions based on a

19   motion for summary judgment (as opposed to a motion under Rule 702), but each dealt with

20   expert opinions that were completely unlike the opinions of Professors Murphy and Topel.[4]

---

21   [4] For example, in *American Booksellers Association, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp.

22   2d 1031 (N.D. Cal. 2001), a price discrimination case, this Court granted summary judgment after
     excluding an expert's study that failed to analyze plaintiffs' transactional data, failed to account

23   for differences in costs, bargaining power, and other relevant facts, and failed to link any discount
     received by defendants to an injury suffered by plaintiffs. *Id.* at 1038-42. Similarly, in

24   *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (9th Cir. 1988), a breach of contract case, the
     court granted summary judgment after ruling that the testimony of both plaintiffs' experts was

25   more prejudicial than probative under Fed. R. Evid. 403. *Id.* at 806. One expert calculated lost
     profits without attributing any of the loss to the acts of the defendants (merely assuming that they

26   were the source of any difference in predicted and actual prices), while the other expert predicted
     but-for prices by "divining" the but-for sales level at the end of the conduct period, and then

27   working backwards to determine the rate of growth that this would entail, without basing these
     calculations on any real analysis or industry knowledge. *Id.* at 806-07. In *Merit Motors, Inc. v.*

28   *Chrysler Corp.*, 569 F.2d 666 (D.C. Cir. 1977), the court affirmed summary judgment after
     finding that plaintiffs' expert's opinions did not create a genuine issue of fact as to antitrust

1

**A.    Professor Murphy's Demand-Only Analysis Was Not the Sole Basis for His Conclusions that Supply Was Not Restrained and Market-wide Prices Were Not Impacted.**

2

3        Sun contends that Professor Murphy's econometric analysis is unreliable because he

4   assumes that supply was not impacted by a conspiracy (and market-wide overcharges were not

5   incurred as a result) rather than providing analysis to support the conclusion that supply can be

6   explained by factors not attributable to a conspiracy. Mot. at 4:24-6:17  Sun argues that Professor

7   Murphy's conclusions and results were predetermined as a result.  Sun's argument fails because it

8   is based on a serious misreading of Professor Murphy's report and because it is a demonstrable

9   point that Professor Murphy's results were not predetermined.  *See, e.g,* Ex. 5. Dec. of Murphy ¶¶

10  19-38.

11       To explain, Sun and its experts alleged that a conspiracy impacted prices to the entire

12  market and Sun in particular.  As Professor Murphy noted in his report, price is determined by the

13  interaction of demand and supply.  Cartels cannot, and do not, impact price by controlling

14  demand. Ex. 1, Murphy Rep. ¶¶ 62-68, 82; Ex. 2, Murphy Tr. at 116:5-119:20.  Rather, cartels

15  impact market-wide prices by restricting supply.  *Id.*  To test Sun's theory that market-wide prices

16  were impacted (or, in other words, that market-wide supply was restrained), Professor Murphy

17  created a supply and demand model to predict but-for prices which he describes in great detail in

18  paragraphs 82 to 112 of his report and corresponding exhibits.  In so doing, he set forth separate

19  economic and econometric analyses of both demand ***and supply***.  Ex. 1, Murphy Rep. ¶¶ 85-95,

20  exhs. 10-15 (analysis of demand); *Id.* ¶¶ 85-90, 99-112, exhs. 18-23 (analysis of supply).  He

21  presents his detailed analysis of supply in paragraphs 99 to 112 of his report.  There, he explains

22  how changes in cost can be used to predict supply movements, and he "forecast[s] prices and

23

24  injury.  The court did state that the expert (Staelin) made unsupported assumptions about demand
    elasticity but the court in *Merit* also found that "Staelin systematically ignored ... uncontradicted
25  evidence," and that "his opinion is based solely on speculations and hypotheses and is
    unsubstantiated by any evidence in the record." *Id.* at 672-673.  Most glaringly, after six years of
26  litigation, Staelin's opinion was just 13 pages in length. *Id.* at 673 and n. 33.  In contrast, Murphy
    and Topel's voluminous opinions, including their choice of elasticity, are consistently supported
27  by evidence in the record and are the product of economic analysis, not speculation.  Clearly,
    Professors Murphy's and Topel's opinions are in no way similar to the opinions of the experts in
28  these cases.

1    quantities that control for ***both*** changes in cost[5] and changes in demand." *Id.* ¶ 110. (emphasis

2    added). His conclusion about whether the economic evidence establishes that supply was

3    restricted and market-wide overcharges were incurred rests on the ***entirety of this analysis***. *Id.*

4    ¶¶ 99, 111-112. *See also*, Ex. 5, Dec. of Murphy ¶¶ 19-27.

5         In contrast, the arguments raised in Section B.1 of Sun's Motion relate to an exercise

6    Professor Murphy performed after he analyzed demand and ***before he analyzed supply and drew***

7    ***conclusions about the behavior of supply and overcharges***. More specifically, the arguments

8    raised in Section B.1 of Sun's motion relate only to paragraph 96 and exhibit 16 of Professor

9    Murphy's report.[6] In that section of his report, Professor Murphy conducts what he terms a

10   "demand-only" price prediction. In so doing, he assumes that supply grows at a constant rate

11   from the beginning of the conduct period to the end of the conduct period. The purpose of the

12   demand-only exercise was ***not*** to establish that supply was not restrained and overcharges were

13   not incurred. The purpose was to illustrate the extent to which fluctuations in demand affect

14   market-wide prices ***when fluctuations in supply are removed***. Ex. 1, Murphy Rep. ¶ 96. In other

15   words, Professor Murphy was simply demonstrating "[t]he importance of demand fluctuations for

16   the evolution of prices . . . by a simple exercise." *Id.* After this exercise, Professor Murphy

17   moves on to actually analyze the supply side of the DRAM market and bases his conclusion that

18   supply was not restrained on the entirety of his demand and supply analysis. *Id.* ¶¶ 99, 110-11.

19   Similarly, Professor Murphy's conclusion that market-wide overcharges were not incurred is also

20   based on the entirety of his demand and supply analysis. *Id.* ¶ 110. The demand-only price

21   prediction was not the price prediction on which Professor Murphy relied when concluding that

22   market-wide overcharges were not incurred. *Id.* ¶ 110. *See also* Ex. 5, Dec. of Murphy ¶¶ 19-27.

23        Sun's claim that Professor Murphy found no supply restriction and no overcharges

24   because he "eliminate[s] all fluctuations in the supply of DRAM (conspiratorial or otherwise),"

---

25   [5] It is well known in economics that fluctuations in cost lead to fluctuations in supply. Ex. 1,
26   Murphy Rep. ¶¶ 100-101.
     [6] Professor Murphy replicates Exhibit 16 in Exhibit 17 of his report but adds Professor White's
27   but-for price prediction in red. In paragraph 97 of his report he points out that Professor White's
     but-for price prediction does not capture demand fluctuations. Although he uses Exhibit 17 to
28   illustrate this point, it is not the basis of his criticism of Professor White's but-for price
     prediction. Ex. 2, Murphy Tr. at 146:21-153:21. *See also* Ex. 1, Murphy Rep. ¶¶ 98, 172-175.

1   Ex. 1, Murphy Rep. ¶ 96, seriously misreads Professor Murphy's report.  The conclusion that

2   Professor Murphy summarizes in paragraph 99 of his report -- "demand changes, *together with*

3   *changes in supply not associated with conspiracy*, can explain virtually all of the movement in

4   prices over the alleged conspiracy period" -- depends on his combined supply and demand

5   analysis in paragraphs 99-112, not just the exercise he describes in paragraph 96.  Ex. 1, Murphy

6   Rep. ¶ 99.[7]

7           The reliability of a scientific method can only be judged in light of the purpose for which

8   the method is offered.  *United States v. Mitchell*, 365 F.3d 215, 239 (3rd Cir. 2004) (criticisms of

9   latent fingerprint identification based on the rate of false negatives irrelevant because they are not

10  "probative of the reliability of the testimony for the purpose for which it is offered (i.e., for its

11  ability to effect a positive identification).");  *United States v. Green*, 405 F. Supp. 2d 104, 119 (D.

12  Mass. 2005) ("The question of whether the expert's technique or theory is scientifically reliable is

13  a specific one:  The issue is not whether the field in general uses a reliable methodology, but the

14  reliability of the expert's methodology in *the case at bar*, i.e. whether it is valid for the purposes

15  for which it is being offered. . . .").  Because Sun misreads the purpose of Professor Murphy's

16  demand-only analysis, its arguments do not warrant exclusion of any portion of Professor

17  Murphy's report, testimony or opinions.

18          Next, Professor Murphy's choice of constantly growing supply for purposes of the

19  demand-only exercise was not arbitrary and outcome driven.  The specific supply line used was

20  not intentionally set below calculated supply as Sun contends.[8]  Mot. at 5:8-28.  Instead, it was

21  constructed to connect two points, equal to the average supply levels shortly before and shortly

22  after the alleged conspiracy period.  Ex. 1, Murphy Rep. ¶ 96; Ex. 2, Murphy Tr. at 137:9-138:9.

23  Sun offers no legal or economic reason why Professor Murphy's choice is improper.  Sun's own

---

[7] Sun is wrong in stating that Professor Murphy "intends to argue that shifts in demand for DRAM -- that alone and nothing else -- accounts for the variation in DRAM prices." Mot. at 6. Professor Murphy clearly concludes that it is both shifts in demand for DRAM as well as non-conspiratorial shifts in supply for DRAM that account for most of the variations in DRAM prices. Ex. 1, Murphy Rep. ¶ 99.

[8] Hynix objects to the entry of Sun's chart on page five because it lacks foundation, and is irrelevant, untimely and any probative worth is far outweighed by unfair prejudice. Hynix has submitted a separate evidentiary objection responding to this submission.

HYNIX'S OPP. TO PLAINTIFF'S MOTION TO
EXCLUDE THE TESTIMONY OF KEVIN MURPHY
AND ROBERT TOPEL

1   expert, Dr. Whinston, concedes that Professor Murphy's specification of supply for purposes of

2   the demand-only exercise is "plausible." Ex. 7, Rebuttal Expert Report of Michael D. Whinston,

3   May 2, 2008 ("Whinston Rep.") ¶ 51. Dr. Whinston presents his own version of Professor

4   Murphy's demand-only exercise, using dynamically changing supply growth. He refers to his

5   assumption as "*another plausible choice* Professor Murphy could have made for what supply

6   behavior would have been . . . ."[9] Ex. 7, Whinston Rep. ¶ 51 (emphasis added). Expert testimony

7   is admissible under *Daubert* if it is plausible, internally consistent, and not critically impeached.

8   *Mitchell v. United States*, 141 F.3d 8, 17 (1st Cir. 1998). The conflict between Professor

9   Murphy's approach and Dr. Whinston's approach is a battle of the experts -- a question of weight,

10  not admissibility.

11      Finally, the results of Professor Murphy's demand-only exercise were not determined by

12  his supply specification but by the DRAM pricing data itself. For instance, if one were to

13  increase actual DRAM prices during the alleged conduct period by about 35% and assume that a

14  conspiracy caused this increase, then Professor Murphy's constant supply growth line would not

15  generally fall below his actual but-for supply calculation (as Sun complains about on page five of

16  its Motion) but, instead, would largely be above that line. *See* Ex. 5, Dec. of Murphy ¶¶ 28-35.

17  This is made even clearer by comparing Professor Murphy's original Exhibit 16 to Exhibit 16A of

18  Professor Murphy's declaration in support of this opposition. *Id.* Exhibit 16 shows that Professor

19  Murphy's original demand-only price prediction (green line) is close to actual prices (blue line

20  with small squares). *Id.* Exhibit 16A shows that when one assumes that actual prices were

21  impacted by a conspiracy and 35% higher as a result during the alleged conduct period (blue line

22  with squares), then Professor Murphy's demand-only price prediction is not as close to them. *Id.*

23  This demonstrates that Professor Murphy's demand-only results are derived from the price data

24  itself and not his demand-only supply specification. In other words, if a conspiracy had impacted

25  the DRAM pricing data, then Professor Murphy's demand-only results would have been

26  [9] ███████████████████████████████████████████████████████████████
    PUBLICLY REDACTED                          Ex. 8, Errata to the Rebuttal Expert

27  Report of Michael D. Whinston, June 16, 2008. ███████████████████████████
    ████████████████████████████████████████████████████████████████████

28                                              HYNIX'S OPP. TO PLAINTIFF'S MOTION TO
                        - 11 -                  EXCLUDE THE TESTIMONY OF KEVIN MURPHY
                                                AND ROBERT TOPEL

1    different.[10]

2    **B.    Professors Murphy's and Topel's Use of a Time Trend Is Reliable.**

3    Sun argues that Professors Murphy's and Topel's use of a variable called a time trend in

4    their supply regression is "an intellectual shortcut" that "yields their desired conclusion."  Mot. at

5    6:21-8:2.  Sun is wrong.  Professors Murphy's and Topel's use of a time trend does ***not*** render

6    their model unreliable because the use of time trends is a generally accepted method which allows

7    economists to capture fundamental economic relationships.  Ex. 5, Dec. of Murphy ¶¶ 39-49; Ex.

8    6, Dec. of Topel ¶ 7.  Neither Professor Whinston's report nor the article co-authored by

9    Professor Murphy and cited by Sun (but not attached as an exhibit, interestingly) prove otherwise.

10    Moreover, the use of time trends is an integral part of Drs. Marshall's and White's own

11    analyses.[11]

12    Inclusion of a time trend does not render Professors Murphy's and Topel's models

13    unreliable.  Time trends appear in many economic models.  Ex. 5, Dec. of Murphy ¶¶ 40-43.  For

14    example, Professor Murphy and Lawrence Katz co-authored an article which presented a

15    methodology similar to the one he used in this case which also included a time trend.  Ex. 9,

16    Lawrence F. Katz and Kevin M. Murphy, *Changes in Relative Wages, 1963-1987:  Supply and*

17    *Demand Factors*, 107 Q. J. of Econ. 35, 43-44 (1992) ("[W]e regress the time series of relative

18    wages and of quantities for each of 64 groups on a constant and linear time trend.").  This article

19    was cited when Professor Murphy received the John Bates Clark Medal in 1997.  Ex. 12, *Papers*

20    *and Proceedings of the Hundred and Tenth Annual Meeting of the American Economic*

21    *Association,* 88 Am. Econ. Rev. 494 (May 1998).  The Bates medal is an honor that is only

22    "awarded biennially from 1947-2009 to that American economist under the age of forty who is

23    judged to have made the most significant contribution to economic thought and knowledge."[12]

---

24    [10] In fact, the entirety of Professor Murphy's analysis of both supply and demand depends upon
market outcomes or the DRAM pricing data itself.  Ex. 5, Dec. of Murphy ¶¶ 36-38.

25    [11] As discussed in more detail above, Professors Murphy and Topel calculate demand, then they
26    calculate supply, then they put the two together to predict but-for prices and they measure the
difference between but-for and actual prices to determine impact and overcharges.  Ex. 1, Murphy
Rep. ¶¶ 82-112; Ex. 3, Topel Rep. ¶¶ 34-53.  In their supply regression, Professors Murphy and
27    Topel incorporate costs and various other factors that affect DRAM supply as well as a variable
called a time trend.  Ex. 1, Murphy Rep. ¶¶ 107.

28    [12] *See* Ex. 11, American Economic Association, John Bates Clark Medal, available at

Other distinguished economists have used time trends in similar models and analyses as well. Ex. 10, James D. Hamilton, Time Series Analysis at 435 (1994); Ex. 5, Dec. of Murphy ¶¶ 40-41, 43. Indeed, Dr. Marshall uses a time trend in his models and Dr. White uses the equivalent of a time trend in his model as well. Ex. 13, Expert Report of Robert C. Marshall, December 14, 2007 ¶ 394; Ex. 14, Expert Report of Halbert L. White, December 14, 2007 ¶ 148; Ex. 5, Dec. of Murphy ¶ 43.

Professors Murphy and Topel determined that use of a time trend was appropriate in light of DRAM specific market realities. Their decision to use a time trend was not arbitrary, unjustified, and results oriented as Sun claims. More specifically, in his report, Professor Murphy explained that supply in the DRAM industry has an obvious trend. Ex. 1, Murphy Rep. ¶¶ 101-102, 108-109. DRAM prices and costs declined at a steady rate before, during and after the conduct period. Id. exh. 21. DRAM supply increased at a steady rate before, during and after the conduct period. Id. exh. 22. It would be improper to ignore these clearly non-conspiratorial trends and impacts on DRAM prices, costs and supply. A proper analysis of DRAM supply during the conduct period should recognize the trend in DRAM supply before and after the alleged conduct period.[13] Ex. 2, Murphy Tr. at 128:19-130:1; Ex. 10, James D. Hamilton, Time

---

http://www.vanderbilt.edu/aea/clark_medal.htm (last visited April 10, 2009); Ex. 12, *Papers and Proceedings of the Hundred and Tenth Annual Meeting of the American Economic Association,* 88 Am. Econ. Rev. 493-494 (1998) ("[Kevin Murphy] provided illuminating calculations of plausible ranges for changes in the time path of the demand for skill...."); Ex. 5, Dec. of Murphy ¶¶ 42.

[13] Sun relies on criticism offered by its expert Dr. Whinston ███████████████ ███████████████████████████. Dr. Whinston was hired in or around late March 2008 after Drs. White and Marshall submitted their opening reports and after Professors Murphy and Topel submitted their reports responding to those opening reports. Ex. 15, Deposition of Michael D. Whinston, June 17, 2008 ("Whinston Tr.") at ███████████. This means that Dr. Whinston had, at most, a little over a month to study the economics of the DRAM market and Professors Murphy's and Topel's models and formulate his opinions. ███████████████ ██████████████████████████████████████████████████████████████ Ex. 8, Whinston Rep. at ███████ *Compare* to Ex. 1, Murphy Rep. at pp. 180-272 and Ex. 3, Topel Rep. at pp. 82-174.

PUBLICLY REDACTED

██████████████████████████████████████████████ Ex. 15, Whinston Tr. at ████████████.

████████████████████████. Ex. 8, Whinston Rep. at ████ ████ Ex. 15, Whinston Tr. at ████.

1   Series Analysis at 435 (1994); Ex. 5, Dec. of Murphy ¶ 40-41, 44. Professor Murphy and

2   Professor Topel included a time trend in their regression to control for these trends in the DRAM

3   industry so they could determine whether supply was different (i.e., restrained) during the alleged

4   conduct period as compared to before and after the alleged conduct period. Ex. 2, Murphy Tr. at

5   121:11-20; Ex. 1, Murphy Rep. ¶¶ 106-109; Ex. 5, Dec. of Murphy ¶ 40-41, 44. In other words,

6   the time trend accounts for factors that moved DRAM supply in the same way before, during and

7   after the alleged conduct period and this use of a time trend is standard and proper in econometric

8   analysis. Thus, contrary to Sun's contentions, Professor Murphy's and Topel's decisions to use a

9   time trend is appropriate, reliable and consistent with the data on DRAM prices and supply

10  outside of the conduct period.[14]

11          Sun's and Dr. Whinston's reliance on one sentence in an article co-authored by Professor

12  Murphy almost thirty years ago in the same year he received his Bachelor of Arts degree (and,

13  thus five years before he received his Ph.D.) is insufficient. The article simply criticizes the

14  *arbitrary* use of time series in order to *fit data* when doing so prevents the analyst from

15  understanding the issue he or she is investigating. Ex. 16, Lynee Schneider, Benjamin Klein,

16  Kevin M. Murphy, "Government Regulation of Cigarette Health Information," 24 J. L. & Econ.

17  575, 583 (1981). In other words, the article states that adding a time trend when it is not

18  appropriate and useful *in light of the circumstances* but only to achieve desired results is

19  inappropriate. *Id.;* Ex. 5, Dec. of Murphy ¶¶ 45-47. As already explained, that is not what

20  Professors Murphy and Topel did here. Moreover, the circumstances presented by the industry

21  discussed in the article were different than the circumstances in this case. For instance, the data

22  here covers a period of almost 10 years whereas the period discussed in the article covered about

23  50 years. Ex. 16, 24 J.L. & Econ at 577. In addition, the study discussed in the article was not an

24  attempt to compare one period (alleged conduct period) with two other periods (the pre and post

25  alleged conduct periods). Instead, the analysis discussed in the article focused on whether a

26
27
28

[14] In fact, Exhibit 23 of Professor Murphy's report illustrates that he estimates supply using only data from outside the alleged conspiracy period. Ex. 2, Murphy Tr. at 115:5-21; Ex. 1, Murphy Rep. ¶ 110; Ex. 5, Dec. of Murphy ¶ 49. The data from outside the period show an expansion of supply over time which is captured by the time trend. Ex. 1, Murphy Rep. ¶¶ 106-107; Ex. 5, Dec. of Murphy ¶ 49.

HYNIX'S OPP. TO PLAINTIFF'S MOTION TO
EXCLUDE THE TESTIMONY OF KEVIN MURPHY
AND ROBERT TOPEL

1   particular trend was due to a particular cause.  *Id.* at 576.  More structure was needed in that

2   situation than is needed here.  Ex. 5, Dec. of Murphy ¶¶ 45-47.

3          Finally, contrary to Sun's allegations, use of a time trend in no way forces the outcome

4   that Professors Murphy and Topel desire -- namely, their finding that supply was not restricted

5   during the alleged conspiracy period.  Professor Whinston purports to demonstrate an overcharge

6   by removing the time trend from Professors Murphy's and Topel's models.  Ex. 7, Whinston Rep.

7   ¶ 65.  He does not, however, offer an alternative to account for the obvious and known decline in

8   over an almost ten year period in the DRAM industry.  His critique is not valid because omitting a

9   variable that is significant and relevant in light of the circumstances specific to the DRAM

10  industry without replacing it with a good alternative leads to misleading results.  *See Bickerstaff v.*

11  *Vassar College*, 196 F.3d 435, 449 (2d Cir. 1999) (affirming decision according expert's report

12  no probative weight where expert failed to account for variables "too significant not to be

13  accounted for in the regression analysis" when "it cannot be said that these variables are not

14  quantifiable or controllable"); *Coward v. ADT Sec. Sys., Inc.*, 140 F.3d 271, 274 (D.C. Cir. 1998)

15  (Brennan, J. concurring) ("'Major factors' that a regression analysis must include depend on the

16  facts and theory of the particular case.").  *See also* Ex. 5, Dec. of Murphy ¶ 48.  At most,

17  Professor Whinston's and Sun's criticisms go to weight and not admissibility.

18      **C.    Professors Murphy's and Topel's Demand Elasticity Specifications Are**
            **Reliable.**
19

20         Sun argues that Professors Murphy and Topel present an unreliable model because (1)

21  they do not sufficiently justify their choice of demand elasticity (slope of the demand curve) and

22  (2) in their model the demand elasticity is constant (shape of the demand curve).  Sun's

23  arguments are without merit.  Professors Murphy's and Topel's models are reliable because (1)

24  Professors Murphy and Topel offer sufficient justification for their choices, (2) Sun's own experts

25  agree with Professor Murphy's and Topel's demand elasticity choices, (3) there is no proof that

26  changing this specification in Professor Murphy's and Topel's models changes their results in any

27  significant way (and, in fact, it doesn't), and (4) use of a constant demand elasticity in economic

28  models is a standard economic practice which has been employed in the DRAM industry in the

past. Ex. 5, Dec. of Murphy ¶¶ 50-61; Ex. 6, Dec. of Topel ¶¶ 8-12. It would, thus, be improper

to exclude Professors Murphy's and Topel's testimony under *Daubert* based on their demand

curve specifications. Sun's arguments go to the weight that should be given the testimony, not its

admissibility. *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357-58 (N.D.

Ga. 2000) (noting that the expert at issue said that his estimate of elasticity was only suggestive

but concluding that the inability to conclusively account for several factors goes to weight rather

than reliability).

Professors Murphy and Topel explained their choice of elasticity (which is reasonable and

reliable) contrary to Sun's accusations. Professors Murphy's and Topel's demand specification is

the midpoint of the range -0.3 to -0.7 (i.e., -0.5). Ex. 1, Murphy Rep. ¶ 89; Ex. 3, Topel Rep. ¶

70. The demand curve in their model is thus inelastic but not perfectly inelastic, so the demand

curve in their model slopes down.[15] In their opening reports, both Dr. White and Dr. Marshall

opined that demand for DRAM is inelastic and, more specifically, is between -0.3 to -0.7.[16] *See,*

*e.g.,* Ex. 14, White Rep. ¶¶ 8-9, 76-80; Ex. 13, Marshall Rep. ¶¶ 7-8, 80-85. Dr. White's

deposition testimony about this point is unyielding. Ex. 17, Deposition of Halbert L. White,

February 27, 2008 ("White 2/27 Tr.") ▓PUBLICLY REDACTED▓; Ex. 18, Deposition of Halbert L. White,

February 28, 2008 ("White 2/28 Tr.") ▓PUBLICLY REDACTED▓; Ex. 19, Deposition of Halbert L. White, May 22,

---

[15] The value assigned to the elasticity of demand expresses the relationship between changes in price and changes in the quantity demanded. Ex. 1, Murphy Rep. ¶ 83. When demand is elastic (greater than -1 (e.g., -1.5)), an increase in price will lead to a more than proportional decrease in the quantity demanded. *Id.* In other words, a 10% increase in price will lead to a decrease in the quantity demanded that is *more* than 10%. *Id.* In contrast, when demand is inelastic (elasticity between 0 and -1 (e.g., -0.5)), this means that demand will not respond as strongly to changes in price. *Id.* In other words, a 10% increase in price will lead to a decrease in the quantity demanded that is *less* than 10%. *Id.* Finally, completely or perfectly inelastic demand (elasticity equals 0) means that demand will not change when price changes. *Id.* In other words, a 10% increase in price does not decrease the quantity demanded at all. A perfectly inelastic demand curve is graphically depicted as a vertical line. Inelastic and elastic demand curves are not perfectly vertical but, instead, slope down.

[16] It is incredibly rare for any industry to have perfectly inelastic demand. Even Drs. White and Marshall concede that demand for DRAM is not completely inelastic. Marshall has stated: "I don't think there's any question that we were going to accept that the demand curve sloped downward." Ex. 20, Deposition of Robert C. Marshall, February 29, 2008 at 201:9-23.

▓White 2/27 Tr. at ██████████▓. PUBLICLY REDACTED ▓Ex. 17,

██████████. Ex. 14, White Rep. ¶¶ 76-78; Ex. 17, White 2/27 Tr. at ██████

██████.

2008 ("White 5/22 Tr.") ▮PUBLICLY REDACTED▮.  And his defense of the analysis which led to this conclusion

is just as adamant.  Ex. 17, White 2/27 Tr. at ▮PUBLICLY REDACTED▮.  Professors Murphy and Topel used

Drs. White's and Marshall's opinions as starting points.  They then reviewed the International

Trade Commission materials underlying Drs. White's and Marshall's opinions as well as industry

data and other literature to verify that their specifications were reasonable.  Ex. 1, Murphy Rep. ¶

89; Ex. 2, Murphy Tr. at 109:14-111:2; 98:11-99:9; 96:7-19; Ex. 5, Dec. of Murphy ¶¶ 50-53; Ex.

3, Topel Rep. at ¶ 40; Ex. 4, Topel Tr. 133:3-134:9; Ex. 6, Dec. of Topel ¶ 8.  They even

disregarded certain other elasticities, which would have improved their results and predicted

lower overcharges, as inconsistent with the realities of the DRAM industry.  Ex. 4, Topel Tr. at

134:1-9.

After using the mid-point of the elasticity values so adamantly endorsed by Sun to

calculate a demand line, Professors Murphy and Topel further tested their calculation.  They

compared their calculated demand line to observed movements in the NASDAQ index and sales

of digital signal processors (DSPs).  Ex. 1, Murphy Rep. ¶¶ 92-95, exhs. 12, 14, 15; Ex. 3, Topel

Rep. ¶ 70 and n. 53, exh. 13; Ex. 2, Murphy Tr. at 130:14-133:2; 134:7-137:7; Ex. 4, Topel Tr. at

118:2-12; 124:1-125:8.  Professors Murphy's and Topel's calculated demand line, like the DSP

sales index and NASDAQ, reflects the "technology boom and bust" which was the leading driver

of demand for technology products during the period at issue.  Ex. 1, Murphy Rep. ¶¶ 93-94.  The

fact that their calculated demand line resembles two data series that are *completely independent*

of the alleged conspiracy but closely related to the technology sector serves as strong evidence

that Professors Murphy's and Topel's calculations are reliable.

Thus, Sun's argument that "Drs. Murphy and Topel conducted no analysis -- adequate or

otherwise -- to confirm the viability and soundness of their assumed demand curves" is

completely wrong.  Mot. at 10.

Instead of Drs. White and Marshall -- who both agree with Professors Murphy and Topel -

- Sun relies on the testimony of Dr. Whinston in arguing that Professors Murphy's and Topel's

demand elasticity is unreliable.  Mot. at 8:17-18.  ▮PUBLICLY REDACTED▮

. Ex. 15, Whinston Tr. at

PUBLICLY REDACTED

. Ex. 15, Whinston Tr. at . Thus, Dr.

Whinston's conclusions are completely out of context.

PUBLICLY REDACTED

Sun also argues that changing Professors Murphy's and Topel's demand specifications would change their results in some significant way. But the deposition testimony cited by Sun does not establish this point. Professor Murphy was asked "if the demand curve had a different shape than the one that you assumed, would that change your results?" And he did answer "sure." Ex. 2, Murphy Tr. at 102:5-13. But this is not the same as testifying that changes in demand elasticity which are reasonable in light of the economics of the DRAM industry change his model's results in a *significant* way that would cause him to change his conclusions. The same is true for Professor Topel. Ex. 4, Topel Tr. at 108:4-6. In fact, during his deposition, Professor Murphy clearly explained that changing the demand elasticity in a reasonable way would not lead to *significant changes* in the results of his model. Ex. 2, Murphy Tr. at 96:7-19.

Nor does Dr. Whinston show that use of a different but reasonable demand elasticity change Professors Murphy's and Topel's results significantly, only that it potentially could.

PUBLICLY REDACTED

. Ex. 15, Whinston Tr. at . Moreover, Dr. Whinston offers no alternative value of demand elasticity and, as discussed above, Sun's other experts endorsed the values used by Professors Murphy and Topel. In fact, if everything about Professors Murphy's and Topel's models is kept the same except that their demand specification is changed to the most inelastic

HYNIX'S OPP. TO PLAINTIFF'S MOTION TO
EXCLUDE THE TESTIMONY OF KEVIN MURPHY
AND ROBERT TOPEL

point endorsed by Dr. White, their results do not change in any significant way.  Ex. 5, Dec. of Murphy ¶¶ 54-56; Ex. 6, Dec. of Topel ¶¶ 8-9.  And, ironically, a more elastic demand specification would have resulted in a *lower* overcharge estimate, but this changed result would not have impacted Professors Murphy's and Topel's conclusions.  Ex. 5, Dec. of Murphy ¶¶ 54-56; Ex. 6, Dec. of Topel ¶¶ 8-9.

Finally, use of a constant elasticity of demand is standard economic modeling practice that is very common. Ex. 2, Murphy Tr. at 96:20-97:17, 99:19-101:1; Ex. 5, Dec. of Murphy ¶¶ 57-61; Ex. 6, Dec. of Topel ¶¶ 10-12.  And, as discussed above, even if varying demand elasticities were used, Professors Murphy's and Topel's results would not change in any notable way.

## D.    There Are No "Undisputed Facts" Which Contradict Professors Murphy's and Topel's Conclusions.  Their Opinions Are Consistent with the Facts.

Sun argues that Professors Murphy's and Topel's testimony should be excluded because they conclude that the conspiracy admitted by some DRAM suppliers in the plea agreements did not cause the damage that Sun claims it suffered.  Sun contends that this conclusion is "contradicted by indisputable record facts" and therefore is inadmissible.  This argument is meritless.

The plea agreements do not establish that DRAM prices market-wide were impacted to any degree.  The plea agreements only establish that Section 1 of the Sherman Act was violated and impact is not an element of a Section 1 violation.[17]  *See United States v. Real Prop. Located at Section 18*, 976 F.2d 515, 519 (9th Cir. 1992) ("Although it is settled law in this circuit that a guilty plea may be used to establish issue preclusion in a subsequent civil suit, preclusion has only been allowed where ***an element of the crime to which the defendant pled guilty*** or of which he was convicted was at issue in the second suit.") (emphasis added).  Even Sun's expert, Dr. Whinston,

PUBLICLY REDACTED

---

[17] The essential elements of a violation are:  (1) the existence of a price-fixing conspiracy at or about the time alleged in the accusatory instrument; (2) defendant knowingly became a member of that conspiracy; (3) defendant joined the conspiracy with the intent to unreasonably restrain trade; and (4) the conspiracy concerned goods or services in interstate or foreign commerce. Ex. 21, 3 L. Sand *et al.*, *Modern Federal Jury Instructions-Criminal*, ¶ 58.04, Instruction 58-44 (2008).  *See also* Ex. 22, ABA Section of Antitrust Law, Criminal Antitrust Litigation Handbook 415-16 (2d ed. 2006) (including only elements (1), (2) and (4) from the above set in its list of the elements of a Sherman Act offense).

1    [PUBLICLY REDACTED]. Ex. 15, Whinston Tr. at

2    .

3    Regardless, Sun relies on the language in the pleas that certain suppliers affected the

4    prices of certain OEMs at certain times in varying degrees to argue that Professors Murphy and

5    Topel should be precluded from testifying that a broad set of prices (i.e., market-wide prices and

6    all prices to all OEMs during almost all times) were not impacted.  But the plea agreements fail to

7    establish that all DRAM producers participated in the alleged conspiracy simultaneously (as

8    opposed to certain producers reaching bilateral agreements at certain times), that all types of

9    DRAM were impacted, or that the alleged conspiracy affected all transactions at all times during

10   the alleged conduct period.  *See, e.g.,* Ex. 23, Hynix Plea Agreement at ¶¶ 4, 16; Ex. 24, Samsung

11   Plea Agreement at ¶ 4.  There is no mention whatsoever in the pleas of an impact on market-wide

12   prices, or of the type of output restriction which, as explained by Professor Murphy, would be

13   necessary to impact market-wide DRAM prices.  Ex. 1, Murphy Rep. ¶¶ 9-10; Ex. 2, Murphy Tr.

14   42:17-49:2; 60:14-61:7.  Indeed, Samsung's plea states that it "substantially added DRAM

15   capacity and expanded output during the relevant period" and Samsung is the world's largest

16   DRAM supplier.  Ex. 24, Samsung Plea Agreement at ¶ 4(d).

17   Professors Murphy and Topel reviewed the plea agreements and used them as a starting

18   point for their analysis.  Ex. 2, Murphy Tr. at 288:10-289:2.  Ex. 3, Topel Rep. ¶ 12.  They

19   understand that the pleas admit that certain prices to certain customers at certain times were

20   affected in varying degrees.  Ex. 2, Murphy Tr. at 49:9-54:14; 283:7-284:7;  265:4-11; 268:18-

21   276:11; Ex. 4, Topel Tr. at 31:8-21; 143:7-145:7.  But they offer no opinion about transaction-by-

22   transaction level pricing.  Ex. 2, Murphy Tr. at 49:9-54:14; 180:2-181:2; 286:13-287:5.  Ex. 4,

23   Topel Tr. at 49:5-17.  Instead, their analysis focuses on whether a broader set of prices -- market

24   wide prices and all prices to all six OEMs listed as targets in the plea agreements -- were

25   impacted by the conspiracy delineated in the plea agreements.  Ex. 2, Murphy Tr. at 283:7-284:7;

26   286:13-287:5.  *See also* Ex. 5, Dec. of Murphy ¶¶ 6-12.; Ex. 6, Ex. 6, Dec. of Topel ¶¶ 2-4.  Thus,

27   a statement in the pleas that the conspiracy had some effect on certain customers at certain times

28   sheds no light on the question as to whether the conspiracy impacted market-wide prices.  Unlike

1    Sun's experts, Professors Murphy and Topel do not assume an answer to this central question. If

2    they are not permitted to show that the conspiracy did not, in fact, have an impact or result in

3    damages, then it renders the entire trial irrelevant because this will be the central issue in dispute.

4        Moreover, the facts strongly support Professors Murphy's and Topel's conclusions. For

5    instance, Professor Murphy analyzed the market shares of the major DRAM suppliers during the

6    alleged conspiracy and found that they were highly unstable; contrary to what one would expect if

7    there had been an effective market-wide conspiracy. Ex. 1, Murphy Rep. ¶¶ 51-54 and Exhibits

8    2-3. Similarly, numerous smaller suppliers left the DRAM market during the alleged conduct

9    period, instead of surviving under the advantageous price umbrella of the allegedly effective

10   market-wide conspiracy that Sun claims is an "undisputed fact." Ex. 1, Murphy Rep. ¶ 55.

11   Evidence analyzed by Professors Murphy and Topel further shows that Hynix spent much of the

12   period at issue fighting for its survival in the wake of an effort by some of those competitors to

13   <u>decrease</u> prices and force Hynix out of the DRAM market. Ex. 1, Murphy Rep. ¶¶ 77-78. Only a

14   series of bailouts from the Korean government and its creditors allowed Hynix to stave off

15   bankruptcy. Ex. 1, Murphy Rep. ¶¶ 81, 32-34 and Exhibit 5. Moreover, Hynix's own supply

16   decisions -- including its steady expansion of output and efforts to upgrade its outdated

17   technology -- were consistent with active competition and unilateral decision making. Ex. 1,

18   Murphy Rep. ¶¶ 69-74. Even more glaringly, the International Trade Commission investigated

19   the conduct of Hynix in 2000 through 2002 and concluded that Hynix received major government

20   bailout funds which lowered its cost of production and allowed it to offer DRAM at unfairly low

21   prices in the United States in 2000, 2001 and 2002. Ex.1, Murphy Rep. ¶¶ 79-80. As Professor

22   Murphy states in his report, such a finding is inconsistent with the existence of a successful

23   market-wide price-fixing conspiracy. In addition, Professor Murphy's assessment of the

24   communications between competitors is consistent with his and Professor Topel's conclusions

25   that a broad set of prices were not impacted. Ex. 2, Murphy Tr. at 50:9-54:14. Finally, the record

26   with regard to Sun reveals that Hynix actively competed for Sun's business, but was repeatedly

27   rebuffed, and was given only a small fraction of Sun's DRAM orders. Ex. 1, Murphy Rep. ¶¶ 37-

28   38, 56.

HYNIX'S OPP. TO PLAINTIFF'S MOTION TO
EXCLUDE THE TESTIMONY OF KEVIN MURPHY
AND ROBERT TOPEL

These facts, and others, reveal that, not only did Professors Murphy and Topel carefully study the DRAM industry and the record of this case, but these studies and facts significantly buttress Professors Murphy's and Topel's econometric analyses, and their conclusion that the alleged DRAM conspiracy did not substantially impact market-wide DRAM prices.  Sun's allegation that Professors Murphy and Topel have ignored the record and reached conclusions inconsistent with "undisputed facts" is therefore demonstrably false.  In fact, if Sun's argument had any merit, one would expect to have pending before this a Court a summary judgment motion arguing that there is no genuine dispute as to whether market-wide prices or a broad set of OEM prices were impacted by the conspiracy admitted by some suppliers in the plea agreements.  But no such motion has been filed.

Finally, Sun's reference to the District Court of D.C.'s decision in *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76 (D.D.C. 2002) has no bearing whatsoever on this case.  Professor Murphy's current opinion uses an entirely dissimilar model to the one he utilized in *Microsoft*, and his testimony relates to entirely different issues.  Moreover, the decision of the court in *Microsoft* is distinguishable on its face.  In that case, the court found that the experts' opinions concerned issues which had already been resolved at an earlier stage of the litigation.  *Id.* at 151. Here, Sun is arguing that this Court should bar Professor Murphy and Topel from testifying about an issue which is still very much in dispute.  This Court has not resolved the issue and the plea agreements do not resolve the issue either.  Professors Murphy's and Topel's testimony is both relevant to the matter at hand, and reliable under Rule 702 and *Daubert*.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Plaintiff's Motion.

1

2    Dated:  April 16, 2009                    Respectfully Submitted,

3                                              O'MELVENY & MYERS LLP

4                                              By: _____ /S/ Kenneth R. O'Rourke
                                                           Kenneth R. O'Rourke
5
                                              Attorneys for Defendants
6                                             HYNIX SEMICONDUCTOR INC. and HYNIX
                                              SEMICONDUCTOR AMERICA INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HYNIX'S OPP. TO PLAINTIFF'S MOTION TO
                                              EXCLUDE THE TESTIMONY OF KEVIN MURPHY
                                              AND ROBERT TOPEL