Exhibit 1

1  KENNETH R. O'ROURKE (S.B.#120144)
   korourke@omm.com
2  PAUL B. SALVATY (S.B. #171507)
   psalvaty@omm.com
3  STEVEN BERGMAN (S.B. #180542)
   sbergman@omm.com
4  O'MELVENY & MYERS LLP
   400 South Hope Street
5  Los Angeles, CA  90071-2899
   Telephone:    (213) 430-6000
6  Facsimile:    (213) 430-6407

7  MICHAEL F. TUBACH (S.B. #145955)
   mtubach@omm.com
8  THOMAS P. BROWN (S.B. # 182916)
   tbrown@omm.com
9  O'MELVENY & MYERS LLP
   Two Embarcadero Center, 28th Floor
10 San Francisco, CA  94111-3823
   Telephone:    (415) 984-8700
11 Facsimile:    (415) 984-8701

12
   Attorneys for Defendants
13 HYNIX SEMICONDUCTOR INC. and
   HYNIX SEMICONDUCTOR AMERICA INC.
14

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17                 SAN FRANCISCO DIVISION

18
                              |  Case No. C 06-01665 PJH
19 SUN MICROSYSTEMS, INC.,    |
                              |  **NOTICE OF MANUAL FILING OF**
20            Plaintiff,      |  **EXHIBIT UNDER SEAL**
                              |
21       v.                   |
                              |
22 HYNIX SEMICONDUCTOR INC., *et*  |  Date:    May 7, 2009
   *al.*,                     |  Time:    2:30 pm
23                            |  Place:   Courtroom 3, 17th Floor
                              |  Judge:   Hon. Phyllis J. Hamilton
24                            |
            Defendants.       |
25

26

27

28

1   Regarding:    Portions of Exhibit 1 to the Declaration of Predita C. Rostomian In Support of

2   Hynix's Opposition to Plaintiff's Motion to Exclude the Testimony of Hynix's Expert Witnesses

3   Kevin Murphy and Robert Topel.

4           This filing is in paper or physical form only, and is being maintained in the case file in the

5   Clerk's office.

6           If you are a participant on this case, this filing will be served in hard-copy shortly.  For

7   information on retrieving this filing directly from the court, please see the court's main web site at

8   http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

9           This filing was not efiled for the following reason(s):

10  [___] Voluminous Document (PDF file size larger than efiling system allowances)

11  [___] Unable to Scan Documents

12  [___] Physical Object (description): _____

13  [___] Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

14  [X] Item Under Seal

15  [___] Conformance with the Judicial Conference Privacy Policy (General Order 53).

16  [___] Other (description): _____

17

18                                          Respectfully Submitted,

19          Dated:  April 16, 2009          O'MELVENY & MYERS LLP

20

21                                          By:   / Steven Bergman /
                                                   Steven Bergman

22

23                                          Attorneys for Defendants
                                            HYNIX SEMICONDUCTOR INC. and
24                                          HYNIX SEMICONDUCTOR AMERICA
                                            INC.

25

26

27

28

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA -

## SAN FRANCISCO DIVISION

| | |
|---|---|
| *Sun Microsystems, Inc., et al. v. Hynix Semiconductor, Inc., et al.* (Consolidated) | C-06-01665 PJH    (Consolidated) |
| *Unisys Corporation v. Hynix Semiconductor, Inc., et al.* | C-06-02915 PJH |
| *Jaco Electronics, Inc. v. Hynix Semiconductor, Inc., et al.* | C-07-01200 PJH |
| *Edge Electronics, Inc. v. Hynix Semiconductor, Inc., et al.* | C-07-01207 PJH |
| *All American Semiconductor, Inc. v. Hynix Semiconductor, Inc., et al* | C-07-01212 PJH |
| *DRAM Claims Liquidation Trust, by its Trustee Wells Fargo Bank, NA v. Hynix Semiconductor, et al.* | C-07-01381 PJH |

## EXPERT REPORT OF KEVIN M. MURPHY, PH.D ON BEHALF OF HYNIX SEMICONDUCTOR, INC. AND HYNIX SEMICONDUCTOR AMERICA, INC.

**March 7, 2008**

**HIGHLY CONFIDENTIAL**

TABLE OF CONTENTS

I.      Credentials .................................................................................- 1 -

II.     Assignment ...............................................................................- 2 -

III.    Summary Of My Conclusions ........................................................- 3 -

IV.     Industry Background..................................................................- 8 -

        A.     Summary of the Litigation and Plaintiffs' Claims.................- 8 -

        B.     The DRAM Industry ......................................................- 9 -

               i.      The Product..........................................................- 11 -

               ii.     DRAM Supply .......................................................- 12 -

V.      Plaintiffs Do Not Address Or Establish Necessary Economic Premises
        Underlying Their Claims .............................................................- 22 -

VI.     Changes In Industry Structure Are Not Consistent With The Type Of
        Conspiracy Alleged By Plaintiffs ..................................................- 25 -

        A.     Market Shares were not Stable During the Period of Alleged
               Conspiracy ..................................................................- 27 -

        B.     Fringe Suppliers Exited During the Period of Alleged Conspiracy.....- 28 -

        C.     Hynix, an Alleged Conspirator, Competed for Sun's Business
               During the Period of Alleged Conspiracy............................- 29 -

        D.     Summary .....................................................................- 29 -

VII.    Economic Evidence Suggests That Defendants And Hynix In Particular
        Took No Significant Actions To Reduce Supply To Raise Price...................- 30 -

        A.     Price is Explained by Demand and Supply..........................- 32 -

        B.     Hynix's Actions and Performance during the Period of Alleged
               Conspiracy are Consistent with its Unilateral Self Interest ................- 36 -

               i.      Hynix's Production and Retooling History are Consistent
                       with its Unilateral Self Interest Rather than an Industry
                       Conspiracy ...........................................................- 36 -

               ii.     Hynix Tried, but Failed, to Become a Preferred Sun
                       Supplier ...............................................................- 40 -

               iii.    The "Kill Hynix" Effort is not Consistent with Hynix
                       Participating in an Effective Conspiracy .................- 41 -

               iv.     The ITC Investigated Korean DRAM Suppliers because of
                       a Possible Effect of their Low Prices on U.S. Suppliers..........- 42 -

               v.      Hynix was on the Verge of Bankruptcy During the Alleged
                       Conspiracy Period.................................................- 43 -

C.    Empirical Analysis Shows that Changes in OEM and Plaintiff Prices During the Period of Alleged Conspiracy can be Explained by Demand and Cost Factors Without Appealing to Conspiracy ........- 44 -

    i.    Prices are Explained by a Basic Supply and Demand Framework ...........................................................................- 46 -

    ii.    Estimated Supply and Demand for DRAMs............................- 47 -

    iii.    My Models Explain Changes in Supply and Demand of DRAMs ...................................................................................- 53 -

D.    Summary .............................................................................- 59 -

VIII.    Sun's Purchases And Purchasing Procedures Affected Its Prices ...................- 59 -

A.    Sun Purchased Custom, Non-JEDEC Standard Modules ....................- 62 -

B.    Sun Used a Non-Standard Procurement System.................................- 62 -

C.    Sun Imposed Rigorous Qualification Requirements............................- 64 -

D.    Sun Limited the Number of Qualified Suppliers ................................- 65 -

E.    Sun Had a Preference for Procuring DRAM from Samsung...............- 66 -

F.    Sun Did Not Purchase Based Only on Price .......................................- 67 -

G.    Summary ..............................................................................................- 68 -

IX.    Professor Marshall's Analysis Of Impact Is Flawed And Does Not Support Plaintiffs' Claims ..............................................................................................- 69 -

A.    Summary of Professor Marshall's Report and Findings.....................- 70 -

B.    Professor Marshall does not Show that Prices Move Together ...........- 71 -

    i.    Professor Marshall's analysis of the factual record is not informative ...........................................................................- 71 -

    ii.    Professor Marshall's analysis of "the economics of the DRAM industry," which he claims supports his finding that OEMs' and Plaintiffs' prices "move together," is uninformative about the economic issues in this litigation......- 74 -

    iii.    Professor Marshall's price correlation study does not demonstrate that, even if it affected prices to the six OEMs, the alleged conspiracy affected prices to Plaintiffs..................- 80 -

    iv.    Professor Marshall's regression analysis does not establish that the alleged conspiracy had an impact on prices of either the six OEMs or Plaintiffs ..............................................- 86 -

X.    Professor White's Analysis Of Impact And Damages Is Not Based On Economic Theory And Does Not Support His Conclusions Regarding The Impact Of The Alleged Conspiracy On Plaintiffs' Prices ...............................- 92 -

A.  Professor White's Methodology is Flawed because it is not based on an Economic Model of the DRAM Industry....................................- 92 -

B.  Professor White's Methodology does not Allow for the Impact on Demand of the Technology Boom and Bust during the Period of Alleged Conspiracy...........................................................................- 96 -

C.  Professor White Ignores the Well-Documented Effects of Technology Transitions .......................................................................- 98 -

D.  Contrary to Professor White's Claim, His Model Does Not Predict out of Sample Outcomes.....................................................................- 99 -

I.    CREDENTIALS

1.      My name is Kevin M. Murphy.  I am the George J. Stigler Distinguished

Service Professor of Economics in the Graduate School of Business and the

Department of Economics at the University of Chicago, where I have taught since

1983.

2.      I earned a doctorate degree in economics from the University of Chicago

in 1986.  I received my bachelor's degree, also in economics, from the University

of California, Los Angeles, in 1981.

3.      At the University of Chicago, I teach economics in both the Graduate

School of Business and the Department of Economics. I teach graduate level

courses in microeconomics, price theory, empirical labor economics, and the

economics of public policy issues.  I cover a wide range of topics in these courses,

including the incentives that motivate firms and individuals, the operation of

markets, and the impacts of regulation and the legal system. Most of my teaching

focuses on two things: how to use the tools of economics to understand the

behavior of individuals, firms and markets; and how to apply economic analysis

to data. My focus in both research and teaching has been on integrating

economic principles and empirical analysis.

4.      I have authored or co-authored more than fifty articles in a variety of

areas in economics. Those articles have been published in leading scholarly and

professional journals, including the American Economic Review, Journal of Law

and Economics, and the Journal of Political Economy.

5.      I am a Fellow of the Econometric Society and a member of the American Academy of Arts and Sciences. In 1997, I was awarded the John Bates Clark Medal, which the American Economic Association awards once every two years to an outstanding American economist under the age of forty.  In 2005, I was named a MacArthur Fellow, an award that provides a five-year fellowship to individuals who show exceptional merit and promise for continued and enhanced creative work.

6.      In addition to my position at the University of Chicago, I am also a Principal at Chicago Partners, LLC, a consulting firm that specializes in the application of economics to law and regulatory matters.  I have consulted on a variety of antitrust, intellectual property and other matters involving economic and legal issues such as class certification, damages, labor practices, exclusionary access, tying, mergers, price fixing, price discrimination, and joint ventures.  My CV is attached as Appendix 1 to this report.  Chicago Partners is being compensated at a rate of $850 per hour for my work on this matter.

## II.    ASSIGNMENT

7.      I have been asked by Counsel for Hynix Semiconductor Inc. and Hynix Semiconductor America Inc. ("Hynix") to undertake an economic analysis of allegations by six Plaintiffs (Sun Microsystems, Inc., Unisys Corporation, All American Semiconductor, Inc., Edge Electronics, Inc., Jaco Electronics, Inc., and DRAM Claims Liquidation Trust (holding the claims of Silicon Graphics, Inc.), collectively "Plaintiffs") that Hynix participated in a conspiracy with other

DRAM manufacturers that was effective in raising Plaintiffs' DRAM prices. In addition, I have been asked to review the reports of Plaintiffs' experts Professor Robert Marshall and Professor Halbert White, Jr. and to evaluate the arguments and evidence they offer in support of Plaintiffs' claim of an effective conspiracy. Based on my analysis, I offer my opinion on the following questions:

> A. Were Hynix's actions during the alleged conspiracy period consistent with the type of conspiracy alleged by Plaintiffs?

> B. Can Hynix's activities during the alleged conspiracy period be explained by its own unilateral business interests?

> C. Is there evidence that prices paid by Plaintiffs during the alleged conduct periods were increased as a result of the alleged price-fixing conspiracy? Put differently, have Plaintiffs offered reliable economic evidence that prices would have been lower in the absence of such a conspiracy?

I reserve the right to supplement my opinions if additional information becomes available to me.

## III.    SUMMARY OF MY CONCLUSIONS

8.    In their reports, Plaintiffs' experts claim to provide economic analysis that, they claim, shows that, during the alleged conduct periods, DRAM prices were sharply higher than would have occurred under normal, competitive conditions of the industry. To support this claim, they point to a variety of communications between Defendants' employees. They conclude that these communications, and perhaps unidentified similar communications, had a broad impact on prices paid

by OEMs.  They also conclude that the alleged conspiracy raised prices paid by Plaintiffs.[1]

9.      Economic principles show that effective price-fixing such as alleged by Plaintiffs requires a reduction in the quantity sold.[2] Yet, Plaintiffs' experts offer no evidence in their reports or during their depositions about the behavior of DRAM sales or production during the period of alleged conspiracy.  In particular, they present no empirical evidence that the allegedly noncompetitive prices were achieved through an intentional and coordinated reduction in market supply (either by reducing output or increasing inventories).[3]  If Defendants did not reduce supply through conspiracy, then there could be no conspiratorial increase in industry price.

10.      Contrary to the implication of Plaintiffs' claims, the evidence shows that, during the conduct periods identified by Plaintiffs' experts, Defendants did not reduce supply, as they would have had to do in order to raise price above the competitive level.  Rather, I find that the episodes of atypically high prices during the alleged "conspiracy period" (August 1, 1998 through June 15, 2002)

_____

[1] ███████████████████████████████████████████████████████████

PUBLICLY REDACTED

[2] *See*, HAL R. VARIAN, INTERMEDIATE MICROECONOMICS:  A MODERN APPROACH 490 (5th ed 1999) ("A cartel consists of a number of firms colluding to restrict output and to maximize industry profit.").
[3] Professor Marshall addresses the supply issue in only two paragraphs (¶¶ 123 and 124).

and the "plea period" (April 1, 1999 through June 15, 2002) were caused by normal market forces, principally by demand and costs, and not by conspiracy.

11.     Plaintiffs' experts also provide no discussion of the substantial evidence concerning the DRAM industry that appears inconsistent with an effective conspiracy of the type claimed by Plaintiffs – a conspiracy that they claim increased DRAM prices from August 1, 1998 through June 15, 2002.[4]  For example, during that period there was considerable volatility in suppliers' market shares and smaller DRAM producers left the market, which are not likely to occur if there were an effective conspiracy.

12.     Hynix's actions during the period of alleged conspiracy are not consistent with the type of conspiracy alleged by Plaintiffs.  Hynix's production decisions and sales efforts are not consistent with intent to reduce its output in support of an industry-wide conspiracy.  For example, Hynix started up its U.S. facility (in Eugene, Oregon) in the first half of 1998,[5] toward the end of a period of steadily declining prices.  In the middle of 2001, Hynix temporarily shut down the Eugene facility, which at the time "accounted for 16 percent of total Hynix chip production and 50 percent of its output of 64 D-RAM's [sic]"[6] for several months, even though most of its main competitors continued to operate all their facilities.[7]

---

[4] Various Plaintiffs and their Counsel have offered different dates for the alleged conspiracy.  The Third Amended Complaint claims the alleged conspiracy started by January 1997.  Professor White says he was told to assume that the conspiracy began August 1998.
[5] HSA: TABRIZI, F. 004251; Jae Sueng Kim Tr., 149:10-12.
[6] Don Kirk, *Hynix to Shut Chip Plant in Oregon for 6 Months,* THE NEW YORK TIMES, July 19, 2001, *available at*

13.    Hynix fought to gain additional qualification at Sun, which is not consistent with a conspiracy in which members agree not to compete for each others' customers.  Hynix also repeatedly attempted to increase sales to Sun by offering to help supply its requirements at attractive prices.

14.    There was an investigation by the Commerce Department to understand whether Hynix's (or Hyundai's and LG's before the firms merged) prices were too low during the alleged conspiracy period (and the amount they sold in the United States too large) and whether countervailing duties should be imposed on Hynix's exports to the United States.  Ultimately, countervailing duties were imposed, because the Commission found the "severity of the price declines that occurred from 2000 to 2001 and persisted through 2002" resulted, at least in part, from "significant **price underselling** by subject imports [from South Korea], and that the effect of such subject imports has depressed prices to a significant degree."[8]  And there is evidence that, far from engaging in a joint effort with its competitors to raise prices, Hynix was the intended victim of a "Kill Hynix"[9] campaign by other suppliers who were trying to depress prices in order to drive Hynix from the industry.

---

http://query.nytimes.com/gst/fullpage.html?res=950DE1DB163AF93AA25754C0A9679C8B63&sec=&spon=&pagewanted=print (visited 1/21/08).

[7] At the same time, there was word that Fujitsu was reducing production at its Gresham Oregon facility but, unlike the Hynix facility, Fujitsu planned to keep the facility open. *Id.*

[8] DRAMs and DRAM Modules from Korea, Investigation No. 701-TA-431 (Final), (USITC Publication No. 3616, August 2003) at 25.

[9] The term "Kill Hynix" is shorthand for a period during which there were communications among Hynix's rivals about lowering prices in order to cause Hynix financial distress.

15.     The economic evidence supports the view that Hynix's actions reflected its unilateral business interest.  While Hynix closed some fabs, it did so when it would have been in its unilateral self interest, because prices were low and the capacity less profitable.  Consistent with unilateral action, Hynix temporarily closed its Oregon facility to retool to become more competitive, and chose to do so at a time when industry demand was depressed and prices were unusually low. And it worked to improve its product and service quality in order to gain new customers. The consequence was that, after the industry downturn ended, Hynix gained substantial market share, now is the second largest DRAM supplier[10] and, unlike during the period of alleged conspiracy, operates profitably.

16.     Neither Professor White nor Professor Marshall claims to analyze the question of whether there is economic evidence of an effective conspiracy, or whether their conclusions about "but for" prices are consistent with conspiracy among Defendants. In addition, their empirical analysis of "but for" prices is severely flawed and does not support their claim that prices during the periods of alleged conspiracy can be explained by conspiracy, and not by demand and cost factors.

---

[10] *See, e.g.,* "DRAM Suppliers Become Casualties of Their Own Market-Share War", ɪSUPPLI, 02/04/2008, *available at* http://www.isuppli.com/news/default.asp?id=8778&m=2&y=2008.

IV.    INDUSTRY BACKGROUND

A.    **Summary of the Litigation and Plaintiffs' Claims**

17.    This litigation takes place against the background of an investigation by

the U.S. Department of Justice ("DOJ"), begun in mid-2002, of possible price

fixing by DRAM suppliers.  Since that investigation began, four DRAM suppliers

have entered guilty pleas,[11] in which they acknowledged that they engaged in

discussions with competitors about prices for DRAM sold to six specific Original

Equipment Manufacturers ("OEMs"):  Dell, Inc., Hewlett-Packard Company,

Compaq Computer Corporation, International Business Machines Corporation

("IBM"), Apple Computer, Inc., and Gateway, Inc. (which I refer to collectively

as the "six OEMs") during certain periods within the plea period.  In addition,

some individual employees of the DRAM suppliers entered their own plea

agreements regarding the alleged price-fixing activity during this period.  In

these agreements, the four DRAM suppliers and their individual employees

acknowledge specific contacts and discussions with competitors.

18.    Plaintiffs in this litigation claim in their Amended Complaints that the

alleged conspiracy began by January 1997 and continued through at least the

middle of 2002.  Their experts claim that Plaintiffs were overcharged for their

DRAM purchases throughout the period August 1, 1998 through June 15, 2002, a

period that incorporates and extends the plea period.  Plaintiffs submitted an

---

[11] Hynix, Infineon, Elpida and Samsung. *See*,
http://www.usdoj.gov/atr/public/press_releases/2007/222770.htm (visited January 23, 2007).
In addition, Micron cooperated in the DOJ investigation.

expert report by Professor Marshall, in which he claims to offer empirical analysis that shows that a conspiracy to raise OEM prices also would have increased prices to Plaintiffs, because Plaintiffs' and OEM prices allegedly "move together."  Plaintiffs also submitted a report by Professor White, in which he presents his estimates of Plaintiffs' overcharges under the two alternative conspiracy-duration assumptions that Plaintiffs' counsel asked him to make – $1.713 billion (for the alleged conspiracy period) and $1.276 billion (for the plea period).  As I discuss later in my report, the analyses presented by both Professor Marshall and Professor White are critically flawed and provide no support for Plaintiffs' claims of impact and economic damages.

**B.    The DRAM Industry**

19.    In this section, I present a brief summary of some economically relevant features of the DRAM industry.  I rely for my understanding on, among other materials, the Expert Report of Victor G. De Dios submitted in related litigation.[12]

20.    Dynamic Random Access Memory ("DRAM") integrated circuits have existed since invented by Intel in 1970.[13]  These electronic memory microchips store digital information for high-speed retrieval.[14]  Demand for DRAM is largely derived from demand for new equipment, in particular new PCs, workstations

---

[12] Expert Report of Victor G. De Dios on Behalf of Micron Technology Inc. and Micron Semiconductor Products, NC. (October 2, 2006), *In re Dynamic Random Access Memory (DRAM) Litigation*, Case No. M-02-1486 (PJH), MDL-1486.

[13] http://inventors.about.com/library/weekly/aa100898.htm (visited 1/22/2008).

[14] "Order Granting Summary Judgment in Part and Denying Summary Judgment in Part," *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, No. M 02-1486 PJH (N.D.Cal., Feb. 20, 2007).

and servers, and from the enhanced capability required for efficient operation of operating systems and other software upgrades of existing equipment.  As I explain further below, as a consequence the growth in demand for DRAM declined substantially when the technology "bubble" burst in 2000, which brought to an end the rapid growth in demand for PCs and servers that had prevailed during the tech boom.

21.     DRAM accounts for a relatively small percentage of the total cost of a PC or server: 7-9 percent of the Bill of Materials, according to one source,[15] while according to another, "[r]eportedly, DRAMs and DRAM modules account for 3 to 15 percent of the cost of a PC or laptop, and a slightly higher share of the total cost of a server."[16]  Economists refer to the demand for a product such as DRAM as a derived demand, because aggregate DRAM demand largely is "derived from" demand for complementary hardware and software products.  However, DRAM is not used in fixed proportions with associated products, because OEMs and final consumers can choose the amount of DRAM, within certain limits, based on each customers' individual memory requirements and on the price of memory.

---

[15] Prudential Equity Group, "IT Hardware," October 13, 2006 (28-29) (stating that DRAM accounts for seven percent of Bill of Materials for laptops and nine percent for desktops and servers).
[16] "DRAMs and DRAM Modules from Korea," Investigation No. 701-TA-431 (Preliminary), Determination and Views of the Commission (USITC Publication No. 3569, December 2002), at 18.

### i.    The Product

#### a.    Technology

22.    Like all integrated circuits, DRAM technology is constantly evolving. DRAM technology has progressed through several generations, with the industry typically concentrated on one or two particular standards at a given time. However, individual purchasers often lead or lag the change to the next generation of technology.  Over the past two decades, the most popular technologies, and the timing of their adoption, have been:

- Fast Page Mode ("FPM"), which was introduced in 1987.  This was followed by Extended Data Out ("EDO"), in 1995.  Both FPM and EDO are asynchronous DRAM and are frequently combined together in industry statistics.

- Synchronous DRAM ("SDRAM") was introduced in 1996-97.  It synchronized data transfer with the CPU's clock cycle, which improved efficiency.  The PC industry was converting from FPM/EDO to SDRAM by 1996, and SDRAM had become the dominant technology used in PCs by 1998.  However, as I show later in my report, FPM/EDO remained an important technology in server applications for companies such as Sun for several more years.

- Rambus DRAM ("RDRAM") was introduced in 1999.  Unlike FPM/EDO, SDRAM and subsequent DRAM generations, RDRAM was developed by a private firm, Rambus, outside the industry standard setting organization.  Intel initially supported RDRAM as the primary memory technology for PCs based on its Pentium IV

processor, but it subsequently dropped its support and chose to support DDR-SDRAM instead.[17]

• Double Data Rate ("DDR") and DDR2 SDRAM, introduced in 1999 and 2004, respectively, are evolutionary advances on SDRAM. In both technologies, data transfer occurs twice each clock cycle, compared with once in standard SDRAM.

b. Density

23. DRAM density is a measure of the chip's storage capacity, or the amount of information that it can hold. Early (1996) DRAM generations were 16 megabits ("Mbs"), while today DRAM chips with 512 Mb or 1 GB are common. Exhibit 1 shows the evolution to higher densities.

ii. DRAM Supply

a. Production Technology

24. DRAM is manufactured in production plants known as fabrication facilities, or "fabs." The basic raw material for DRAMs is silicon wafer, which many DRAM manufacturers purchase from third parties.[18] The manufacture of DRAMs from these wafers involves polishing the wafer; photolithography to transfer the circuit pattern to the wafer; etching the circuit pattern; cleaning; electroplating a conducting metal on the wafer surface; and sorting, testing and

---

[17] See, Jack Robertson, "Intel Roadmap Shows Little Rambus Support", October 20, 2004, available at www.techweb.com/wire/story/TWB20001020S0016.

[18] See, e.g., Burton Nicoson Tr., 31:9 - 32:17 (indicating that Samsung purchased wafers from third-party suppliers for all of its DRAM manufacturing facilities); Susan Huang (Backend Production Manager at ProMOS) Tr., 23:17 - 23:22 (stating that ProMos also purchased all of its raw wafers from third-party suppliers).

packaging the chips.[19]  These chips then can be sold to OEMs or distributors as chips, or they can be assembled into memory modules, either by the DRAM manufacturer or by a third-party module manufacturer.

25.     Fab improvements can occur either incrementally or through complete redesign and new construction, depending on the extent of product evolution involved.  In some cases, fab upgrades can be accomplished without reducing a facility's production rate substantially.  However, major conversion of productive capability, such as to manufacture larger wafers (*e.g.,* going from six inch to eight inch) or substantially thinner line width chips, can require a shutdown of facilities, such as occurred when Hynix temporarily shut down its U.S. facility in 2001 to move from 64MB to 256MB production.[20]

   *b.     DRAM Suppliers*

26.     Exhibit 2 shows the market shares of the largest DRAM suppliers from 1996-2005.  In 2001, Samsung was the largest supplier, with 27.1 percent of total worldwide DRAM revenue.  Micron was the second largest supplier, with a market share of 19.7 percent, followed by Hynix with a market share of 15.7 percent.

27.     Market shares of DRAM suppliers changed considerably over the period 1996 through 2005, including during the period of alleged conspiracy.

---

[19] *See, e.g.,* "Economic Impact of Measurement in the Semiconductor Industry," prepared by RTI International for National Institute of Standards and Technology, December 2007, pp. 2-3 to 2-6 (which refers to http://www.sematech.org/corporate/news/mfgproc/mfgproc.htm).
[20] Hynix shut down its Eugene fab to upgrade to thinner technology (*see* Hynix Annual Report 2002 at 7 to8 ("[w]e upgraded our Eugene, Oregon fab from 64M production at $0.22_{\mu m}$ technology to 256M production at $0.15_{\mu m}$ technology").

Samsung's share increased from 16.9 percent in 1996 to 23.6 percent in 1998, and then increased again in 2001 (to 27.1 percent) and 2002 (to 32.2 percent). Infineon's share grew steadily, from 3.4 percent in 1996 to almost 11 percent in 2001 and 15.4 percent in 2003.  There were significant changes in market shares for other DRAM suppliers as well.

28.    Neither Samsung nor Infineon made any major acquisitions during this time, so the changes in their market shares reflect only their organic growth. There was considerable consolidation among other suppliers in the industry, however.  Exhibit 3 shows the evolution of firms' market shares based on the combined sales of all the entities each had acquired by the end of 2005.  For example, sales of Hyundai Electronics and LG Semicon, which combined in 1999 under pressure from the Korean government and then became Hynix in 2001, are shown as Hynix throughout the period.  On this basis, Hynix's share, which was 16.9 percent in 1996, reached 19.3 percent in 1999 (the year Hyundai and LG merged), then declined over the next three years before beginning an upward trend in 2003.  Elpida, which was formed in 2001 through a merger of NEC and Hitachi, and which then acquired Mitsubishi in 2003, suffered a long decline in share to a low of 4.4 percent in 2003, even though its three component firms had a combined market share of 26.9 percent in 1996.

29.    There was substantial exit of suppliers during the 1996-2002 time period, and not all through acquisition. There also was a change in the geographic distribution of DRAM supply.  In 1997, the leading chipmakers in Japan – NEC,

Toshiba, Fujitsu, Hitachi and Mitsubishi Electric – collectively accounted for 36.1 percent of total DRAM revenue, compared with 34.2 percent for the three South Korean firms – Samsung, Hyundai and LG.  By 2002, Elpida (formed from NEC and Hitachi) and Mitsubishi were the only remaining Japanese DRAM suppliers, with a combined 6.4 percent share.  The two large Korean firms – Samsung and Hynix – then had a combined share of 44.9 percent.

30.     As a result of the merger activity and the exit of suppliers during the period of alleged conspiracy, there was substantial change in concentration in the DRAM industry, as shown in Exhibit 4.[21]  In 1997, the top three DRAM suppliers – Samsung, NEC and Hyundai – accounted for 38.1 percent of total industry revenue.  In 2001, the top three DRAM suppliers – Samsung, Micron and Hynix – accounted for 62.5 percent of total industry revenue.  The corresponding figures for the top four suppliers were 47.1 percent in 1997 and 73.4 percent in 2001.

>        *c.*     *Hynix*

31.     Hynix, a South Korean firm, was formed from the merger of Hyundai Electronics, which had been part of the Hyundai Group, and LG Semicon. Hyundai acquired the LG Semicon business in 1999, and the firm was renamed Hynix Semiconductor Inc. in 2001.  At the time of their merger, LG operated

---

[21] This is noted in W. J. Kim, *et al.,* "Demand forecasting for multigenerational products combining discrete choice and dynamics of diffusion under technological trajectories," 72 Technological Forecasting & Social Change 825, 828 (2005): "On the supply side, the intense competition among the DRAM manufacturers spurred the rapid introduction of new DRAM generations resulting in substantial restructuring of the industry, which caused the market to evolve from a state of almost perfect competition to an oligopolistic one . . . the consolidation began in 1998".

several fabs in Cheongju and one in Gumi (both in Korea), while Hyundai operated several fabs in Icheon, South Korea and one in Eugene, Oregon.[22]  The Hyundai-LG merger, which had been announced in September 1998, was completed in October 1999.

### 1.    Hynix's Financial History

32.    The "forced" merger of Hyundai and LG was motivated by the financial difficulties of both companies and the change in policy toward chaebols, or large industrial conglomerates, by the South Korean government acting under IMF pressure to restructure these firms.[23]  The government hired Arthur D. Little Inc. ("ADL") to recommend which partner should run the combined firm[24] and, after examining the two firms' operations, ADL favored Hyundai.[25]   LG continued to resist the acquisition, but finally agreed in January 1999:  "LG's decision came less than two weeks after it rejected a mandate by the South Korean government to merge its chip operations with Hyundai's. When LG refused to do so, the government took steps to cut off its credit lines."[26] The merger was completed about a year after it first was proposed.

---

[22] *See,* Hynix's Supplemental Response to Plaintiffs Sun Microsystems, *et. al.* at 7.
[23] *See,* Evelyn Iritani, "Big Korean 'Chaebol' agree to IMF Reforms," PITTSBURGH POST-GAZETTE, January 14, 1998.  The IMF did not explicitly call for the Hyundai-LG merger and the United States and Micron were adamantly opposed to any use of IMF money for DRAM suppliers.
[24] Jack Robertson, "Korea presses Hyundai, LG to finish deal," ELECTRONIC BUYERS' NEWS, Dec. 14, 1998.
[25] Yoo Choon-sik, "S. Korea Hyundai wins first battle for merger," REUTERS NEWS, Dec. 24, 1998.
[26] Jack Robertson, "LG Set To Leave Chip Market", Channel Web Network, Jan. 14, 1999, available at http://www.crn.com/it-channel/18806651 (visited Jan. 2, 2008).

33.     The merger did not stop financial losses at Hyundai, however.  The
acquisition added to the company's debt, which totaled about $5.7 billion in
August 2001.  In 2000, Hynix reported a loss of $1.7 billion.

34.     The company received large and frequent financial assistance over the
next two years.  As shown in Exhibit 5, in January 2001, the state-run Korea
Development Bank agreed to purchase 80 percent of the company's maturing
corporate bonds in order to prevent the firm's bankruptcy.[27]  In May 2001, Hynix
required a $4.4 billion rescue package, including debt rescheduling and short-
term financing, and its subsequent global depository receipts ("GDR") issue in
June 2001 raised $1.25 billion.[28]  In September 2001, creditors restructured
Hynix's debt again to prevent the company's bankruptcy. At the end of October
2001, Hynix creditors approved additional bailouts and swapped over $3 billion
in company debt for equity.  As I discuss later in my report, one of the ironies of
Plaintiffs' contention that Hynix's prices were inflated by conspiracy is that, for
some of the alleged conspiracy period, the U.S. government concluded that the
Korean government's subsidization of Hynix allowed it to survive and charge
low prices and thereby injure U.S. DRAM producers.[29] In early 1998, Hyundai
began producing DRAM wafers at a fab in Eugene, Oregon, which had been

---

[27] Jay Solomon, "Creditors consider converting debt to equity to help Hynix," THE ASIAN WALL
STREET JOURNAL, August 23, 2001.
[28] Hynix issued new shares on European exchanges through GDRs. *Id.*
[29] DRAMs and DRAM Modules from Korea, Investigation No. 701-TA-431 (Final), (USITC
Publication No. 3616, August 2003) at 25.

under development since 1995.[30]  After three years of manufacturing, Hynix

closed the Eugene facility in July 2001 for six months and invested about $150

million to upgrade from producing 64MB SDRAM at .22 micron technology to

256MB SDRAM at .15 micron technology.[31]  According to the company, the

shutdown and conversion were undertaken so that "the Eugene facility … will

be a much stronger and more competitive operation."[32]  During the alleged

conspiracy period, Hynix converted some DRAM capacity at older fabs to other

products, shut some old fabs, and opened a new fab.  *See* Exhibit 6.

### 2.     The "Kill Hynix" Episode

35.     As I discuss further below, an irony of Plaintiffs' claims against Hynix is

that, for much of 2001, Samsung and other DRAM suppliers were offering

unusually low prices.  Accounts of some market participants contain claims that

these manufacturers offered lower prices, hoping that Hynix would suffer

financial hardship or go bankrupt by being forced to match those prices.[33]  This

---

[30] Production was originally expected in the second half of 1997, but opening was delayed due to environmental permit issues (Integrated Circuit Engineering Corporation, Profiles 1998, 5-35, see http://smithsonianchips.si.edu/ice/cd/PROF98/ROW.PDF).

[31] Cataldo, Anthony and Paul Kallender, "Hynix, Fujitsu temporarily shutter fabs in Oregon," ELECTRONIC ENGINEERING TIMES, July 23, 2001.

[32] Hynix press release, July 19, 2001, *available at* http://www.hynix.com/gl/pr_room/news_data_readA.jsp?NEWS_DATE=2001-07-19:10:35:09&CurrentPageNo=2&SearchKind=4&SearchWord=&SELECT_DATE=2001&menuNo=02&m=01&s=01.

[33] See, for example, ITNA01012531 (an email from Abraham Lim, an Infineon employee, stating that "Samsung did have almost no price strategy until September. They were under 'Don't ask but sell' policy to pressure Hynix and us and to take market share").  In another email, another Infineon employee wrote that "it appears Samsung is quoting politically low prices . . . This is done to have competition following their prices move and to weaken the financial position with the eventual decision to cease DRAM operation. In the case of Hynix, this price move is supposed to be a sign for the investors." ITNA01012533.

Highly Confidential                    - 18 -

effort failed when Hynix's creditors agreed in September 2001, and then again in October 2001, to restructure the company's debt to keep it from bankruptcy.

36.     In late 2001, rumors began to circulate about a potential merger between Micron and Hynix.  In December, the firms confirmed that they were discussing a merger, a proposal that Hynix ultimately rejected in April 2002.[34]

### 3.     Hynix's Relationship with Sun

37.     During the period of alleged conspiracy, Hynix was not a ███ PUBLICLY ███ REDACTED to Sun.[35]  After the merger with LG, Hynix supplied Sun with DRAM products that Sun previously purchased from LG.[36]  However, Hynix did not sell many other products to Sun.  In particular, Hynix was never qualified to supply Sun with the NG-DIMM, a custom memory module that Sun began to develop in 1999 that incorporated SDRAM.[37]

38.     As shown in Exhibit 7, which is based on Defendants' combined dataset (for U.S. sales), Hynix did not directly supply Sun with DRAM in either 1998 or 2002, and in no year during the alleged conspiracy did Hynix directly supply

---

[34] See, e.g., "Hynix mulls merger with Micron," BBC News, 12/03/2001, available at http://news.bbc.co.uk/1/hi/business/1688926.stm (stating that Hynix had confirmed that it was in merger talks with Micron); Sherri Buri McDonald, "Hynix board spurns Micron bid", THE REGISTER-GUARD, 5/1/2002, available at http://www.thefreelibrary.com/Hynix+board+spurns+Micron+bid.(Business)(Merger:+The+move+ends+five...-a085561977 (describing the Hynix Board of Directors' vote to reject the Micron merger offer due to disagreements about the post-merger restructuring plan).

[35]
[36]       PUBLICLY REDACTED
[37]

more than 5.9 percent of Sun's total purchases.  Based on Defendants' combined

dataset (of U.S. sales), during the alleged conspiracy period as a whole, Hynix

supplied only about 2.5 percent of Sun's total DRAM, and virtually all of this

supply was of legacy FPM/EDO DRAM products from the LG fabs that Sun had

qualified before the merger of Hyundai and LG.[38]  Because Sun accounts for over

80 percent of total purchases by the Plaintiffs based on the Defendants' dataset,

Hynix supplied only about four percent of total purchases by Plaintiffs during

the alleged conspiracy period.  Throughout the alleged conspiracy period,

however, Hynix repeatedly attempted to become qualified on a greater number

of Sun products, including the NG DIMM, with the goal of becoming one of

Sun's tier-one suppliers.[39] However, Sun was concerned about doing business

with Hynix because of ▮▮▮REDACTED▮▮▮[40] and Sun also was concerned about

---

[38] See supra note 36.

[39] 

PUBLICLY REDACTED

See also supra notes 36 and 37.

[40]

PUBLICLY REDACTED

Highly Confidential

dumping duties imposed on Hynix.[41]  Because Sun intentionally limited the

number of authorized suppliers for each of its products to three or four,[42] it

appears to have had little interest in working with Hynix to enable it to become

an authorized Sun vendor on many products.[43]  According to one former Hynix

employee:

> At the time Sun didn't seem to have an interest in doing any business
> with Hyundai, and it was my job to just at least get in and talk to them
> about what they're doing.  And Pete [Wilson – Supply-Based
> Development Manager at Sun] would definitely entertain that for me,
> he knew that was part of my job.  He – he would always kind of say,
> you know, I feel bad, you come out, you take me to lunch.  You know,
> I'm telling you, I'm not going to give you any business. . . .  No, I don't
> think we ever got close to any price negotiations, to be honest.[44]

Sun maintained this position even though Hynix offered to work with Sun to

meet its needs and to provide it with DRAM at prices that were as good as or

better than prices offered by Sun's primary suppliers.[45]

---



[41]

PUBLICLY REDACTED

[42]

PUBLICLY REDACTED

[43]

PUBLICLY REDACTED

[44]  Robert Sharpe Tr., 21:3-18.
[45]  For example, an October 18, 1999 email from Peter Wilson reports on a meeting between Sun
and Hyundai around the time of the LG merger, about which Wilson writes ▮▮▮▮▮▮▮

## V.  PLAINTIFFS DO NOT ADDRESS OR ESTABLISH NECESSARY ECONOMIC PREMISES UNDERLYING THEIR CLAIMS

39.     From an economic perspective, proof of Plaintiffs' experts' claim that Defendants effectively conspired and injured Sun and other Plaintiffs requires a chain of economic logic and supporting empirical evidence.  Failure to establish any link in their logical chain means that Plaintiffs have not proven their claims of impact and injury.

40.     The first element of Plaintiffs' claim is that Defendants engaged in specific activities that resulted in higher OEM prices for specific transactions.  Plaintiffs' experts point to certain communications among Defendants, which typically related to desired pricing to a specific OEM customer at or during a particular time.[46]  In order to provide necessary support for their conspiracy claims, Plaintiffs must show that these discussions affected prices to those customers during the period of the alleged conspiracy.

41.     Second, if Plaintiffs succeed in supporting this first premise, they then must show that the increased prices for the individual transactions that were the subject of communications among some of the Defendants had a broader impact on OEM prices generally.  If a particular communication resulted in higher prices

PUBLICLY REDACTED

---

[46] Expert Report of Robert Marshall, footnotes 147-153.

to the OEM customer that was discussed, Plaintiffs must go further and show

that this also caused a general increase in OEM prices at the same time.

42.     Assuming Plaintiffs show that the communications resulted in higher

prices to OEMs in general, the third component of the required analysis is to

show that the higher OEM prices, or the economic forces that resulted in these

higher OEM prices, also resulted in higher prices to Plaintiffs.  It is important to

recognize that higher prices to Plaintiffs do not follow inevitably from economic

theory.  Rather, standard economic theory predicts that higher prices charged to

OEMs may reduce the prices paid by Plaintiffs. Because OEMs would respond to

higher prices by purchasing less, suppliers would have excess capacity and

inventories.  This, in turn, would put pressure on suppliers to discount prices to

Plaintiffs and other buyers in order to increase sales to customers that were not

targeted by the suppliers' communications.

43.     Fourth, as part of showing the link between an alleged conspiracy and

resulting harm to themselves, Plaintiffs must show what actions Defendants took

to cause those higher prices.  As I explain below, communications by themselves

do not result in higher prices; suppliers must restrict market supply.  To support

their claim that Defendants' anticompetitive actions caused an increase in price

to Plaintiffs, the Plaintiffs must identify which output restrictions by Defendants,

such as fab shutdowns, slowdowns or untimely technology conversions, resulted

from conspiracy and that such actions were generated by the alleged conspiracy

and were not explained by Defendants' unilateral business interests.

44.     Finally, assuming Plaintiffs can establish all of the above, they must explain the mechanism by which the Defendants coordinated the output restrictions that would have been required to raise price noncompetitively. Communications that focus only on price, but include no discussion of how Defendants will coordinate the output restrictions required to achieve higher prices, cannot by themselves demonstrate that Defendants' explicit communications caused a reduction in output and higher prices. In order to support a conspiratorial reduction in output, Defendants must have a mechanism to monitor compliance with the agreement and to punish conspirators that "cheat" (by producing more than the agreed upon amount, supplying customers that they were not supposed to serve, etc.).[47]

45.     For their case to have economic merit, and for them to show overcharges from conspiracy, Plaintiffs must address and provide evidence to establish each of these logical requirements. As I discuss in the rest of my report, Plaintiffs have (a) failed to provide the required evidence; (b) provided empirical evidence that, contrary to their assertion, fails to support their claims; and (c) failed to address and explain a substantial body of evidence that contradicts their opinions and suggests that Defendants did not engage in an effective conspiracy that resulted in higher DRAM prices to Plaintiffs.

---

[47] *See, e.g.,* George Stigler, "A Theory of Oligopoly," 72 J. POL. ECON. 44 (1964); E. J. Green and R. Porter, "NonCooperative Collusion Under Imperfect Price Information," 52 ECONOMETRICA 87 (1984); HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY, Chapter 4 (2d ed. 1999) (discussing the incentives for cheating and the methods by which cheating is detected and punished).

## VI.   CHANGES IN INDUSTRY STRUCTURE ARE NOT CONSISTENT WITH THE TYPE OF CONSPIRACY ALLEGED BY PLAINTIFFS

46.   Plaintiffs allege an industry conspiracy that affected prices to all DRAM buyers.[48]  Plaintiffs' experts claim that their empirical analyses prove that prices to the six OEMs were higher than they would have been but for the alleged conspiracy, that this resulted in similarly higher prices to the Plaintiffs, and consequently that the effect of the alleged conspiracy resulted in an industry-wide increase in prices.  Various Defendants and certain of their employees have acknowledged in plea agreements with the U.S. Department of Justice that they engaged in discussions with competitors about price and other industry matters. In the remainder of my report, I address the question of whether Plaintiffs have shown that these acknowledged communications or other similar communications were effective in raising industry prices (and prices to Sun and other Plaintiffs in particular) above the level that otherwise would have prevailed.

47.   Price-fixing conspiracies typically have certain predictable outcomes.[49] However, many of the predictable outcomes and patterns that economic theory and empirical studies show occur in industries affected by an effective conspiracy did not occur in the DRAM industry.  One predicted outcome is

---

[48] According to the Sun/Unisys Amended Consolidated Complaint (¶ 81), "Defendants and their Co-conspirators, by their unlawful conspiracy, artificially raised, inflated and maintained the market price of DRAM as herein alleged."

[49] Joseph E. Harrington Jr., "Detecting Cartels", Oct. 2005, from conference and volume entitled "Advances in the Economics of Competition Law"; Shapiro, "Theories of Oligopoly Behavior," in *Handbook of Industrial Organizatio*n, Schmalensee, R., and R. Willig, eds., Amsterdam, North Holland.

stability of market shares.[50] Effective conspiracy eliminates the jockeying for customers that can result in one firm taking sales from another by cutting price. Market share stability also can arise from a pro-rata allocation of supply reductions across competitors or agreements not to compete for the business of other sellers.[51]

48.     A second, related marker of effective conspiracy is that fringe suppliers, who may or may not participate explicitly in the communications among conspirators and who have not agreed to restrain output, grow as a group relative to the conspirators, because they take advantage of the pricing umbrella to gain sales.

49.     A third common feature of an effective conspiracy is customer allocation[52] or, at a minimum, reduced effort by each conspirator to attract other conspirators' customers, because such rivalry could upset the agreed upon allocation of market sales.

50.     These implications of an effective industry-wide conspiracy are not present in the DRAM industry during this period.  Plaintiffs' experts do not address these factors and thus do not explain inconsistencies between their claims and this evidence.

---

[50] George Stigler, "A Theory of Oligopoly," 72 No. 1 *Journal of Political Economy* 44, 46 (1964)
[51] *See* Hovenkamp, *supra* n. 47 at 150.
[52] *Id. at* 151.

**A.     Market Shares were not Stable During the Period of Alleged Conspiracy**

51.     Stability of market shares is a likely consequence of an effective market-wide conspiracy.[53]  It can reflect a pro-rata reduction in output (or sharing of the costs associated with achieving higher prices) by conspiracy members.  When market shares are transparent, as they are in the DRAM industry (a number of analysts publish market share data), stable shares also facilitate monitoring compliance with the conspiracy, because substantial increases in share can reflect cheating (discounting) by a conspiracy member.

52.     In this case, market shares varied substantially over time, even adjusting for consolidation among firms.  As shown in Exhibit 3, Samsung's share increased from 23.6 percent in 1998 to 32.2 percent in 2002, although its share was as low as 21.1 percent in 2000.  Infineon's share increased from 7.2 percent in 1998 to 12.7 percent in 2002.  Neither Samsung nor Infineon acquired other firms during the period of alleged conspiracy, so changes in their shares resulted from organic growth.

53.     The other large firms in the industry – Elpida, Hynix and Micron – made acquisitions or were formed by combining firms during the period of alleged conspiracy.  Market shares of these three firms changed as well, even taking into

---

[53]*See, e.g.,* Joseph E. Harrington Jr., *Detecting Cartels*, Oct. 2005, from conference and volume entitled "Advances in the Economics of Competition Law" at 42 (listing stable market shares as a "collusive marker" tending to indicate the existence of a cartel); *id.* at 29 (suggesting that for most cartels, market shares remain stable absent a system of side payments).  *See also,* George Stigler, "A Theory of Oligopoly," 72 J. POL. ECON. 44, 46 (1964) ("Fixing market shares is probably the most efficient of all methods of combating secret price reduction" and thus maintaining a conspiracy).

account the effect of the mergers.  The firms that combined into Elpida had an aggregate market share of 6.4 percent in 2002, only about one-quarter of the same firms' combined share of 23. 6 percent in 1998.  The combined share of Hyundai and LG (Hynix) fell from 19.3 percent in 1999 to 12.7 percent in 2002 before increasing again.  Micron (which acquired the memory operations of Texas Instruments and Toshiba) also experienced substantial changes in share.

54.     The substantial changes in DRAM suppliers' market shares during the period of alleged conspiracy suggest inter-firm rivalry inconsistent with an effective conspiracy.  If exogenous factors make market shares unstable, then monitoring compliance with a conspiracy is difficult.  If exogenous market forces do not, by themselves, create instability, then the fact that large changes in market shares occurred during the period of alleged conspiracy suggests that suppliers competed for sales and thus that there was no effective conspiracy.

**B.    Fringe Suppliers Exited During the Period of Alleged Conspiracy**

55.     In a conspiracy, fringe firms, even those that are inefficient, typically survive under the price umbrella set by the major suppliers and grow their aggregate share.  Such fringe firms gain the benefits of higher prices without the burden of having to suffer the reduced output required to support these higher prices.  Yet here, there was substantial exit of fringe suppliers and their aggregate share declined during the alleged conspiracy period.  Micron's submission to the ITC notes that, during the period January 1, 2001 through June 30, 2002, four of

eight domestic manufacturers – Fujitsu, NEC, IBM and Toshiba – exited the

industry.[54,55]

**C.    Hynix, an Alleged Conspirator, Competed for Sun's Business During the Period of Alleged Conspiracy**

56.    As described above, throughout the alleged conspiracy period, Hynix

repeatedly tried unsuccessfully to win more Sun business.  Sun accounted for a

substantial portion of industry demand, so Hynix's market share relative to the

other alleged conspirators (such as Samsung) could have changed substantially if

it had been successful.  In a conspiracy, market share stability is more likely

when conspirators avoid competing for each other's important customers.

Hynix's attempts to win business from Sun show it did not intend that

Samsung's and other suppliers' importance as suppliers to Sun would remain

unchallenged during the period of alleged conspiracy.

**D.    Summary**

57.    The evidence on market shares, the exit of smaller suppliers, and Hynix's

efforts to win Sun's business suggest that several structural factors commonly

associated with successful conspiracy are lacking here.  Instead, evidence

suggests ongoing rivalry.  Plaintiffs' experts' reports and testimony do not

---

[54] *See*, "Pre-Hearing Brief of Petitioner Micron Technology, Inc., Before the U.S. International Trade Commission (in Drams and Dram Modules from Korea Inv. No. 701-TA-431 (final)) June 19, 2003, p. 60 (noting that during the period of investigation (January 1, 2001 through June 30, 2002) Fujitsu closed its DRAM facility in Oregon; NEC ceased production in California; IBM exited production in Vermont and Toshiba exited (selling its Virginia facility).
[55] While their top-tier competitors explore their options, the smaller DRAM producers that survived the hardscrabble memory market of the mid-1990s are under intense pressure. Given the current climate, there is little doubt that more consolidation  will occur this year, according to Bill McClean, an analyst at IC Insights Inc., Scottsdale, Ariz. Jack Robertson, "Weak PC Sales Could Doom Some DRAM Makers" ELECTRONIC BUYERS' NEWS,  Jan. 22, 2001.

Case 4:06-cv-01665-PJH     Document 649-2     Filed 04/20/09     Page 37 of 290

address this issue and offer no explanation of how these factors are consistent with an effective conspiracy.

## VII. ECONOMIC EVIDENCE SUGGESTS THAT DEFENDANTS AND HYNIX IN PARTICULAR TOOK NO SIGNIFICANT ACTIONS TO REDUCE SUPPLY TO RAISE PRICE

58.     I now consider whether the evidence of industry demand and output supports Plaintiffs' claims (1) that Hynix participated with other Defendants in a conspiracy, (2) that the conspiracy was effective in increasing prices to the Plaintiffs above the level that otherwise would have prevailed, and (3) that Sun and the other Plaintiffs were harmed by the alleged conspiracy.  While firms in a concentrated industry, such as the DRAM industry increasingly became during the period of alleged conspiracy, may hope to affect prices through discussions with competitors, mere talk cannot raise market prices unless firms also reduce industry output. Despite the fundamental economic principle that firms can bring about an anticompetitive increase in industry price only if they reduce output, Plaintiffs' experts fail to offer analysis or meaningful discussion of how the alleged conspiracy and the communications among Defendants affected the supply of DRAMs to the marketplace.[56]  They offer no analysis of market quantities, and no evidence that supply was restricted in any way.  As I now explain, the facts are inconsistent with Plaintiffs' claim of a successful conspiracy.

---

[56] Professor Marshall's report contains two short paragraphs on the issue of supply.  White does not discuss supply issues, as he acknowledged during his deposition.   Halbert White Tr., 147:3 - 148:18 (stating that he had not analyzed capacity during the alleged conspiracy period, or looked at what type of supply would be required under his but-for pricing prediction).

Highly Confidential                          - 30 -

59.     In this section, I analyze the question whether the evidence offered by Plaintiffs shows that Defendants and Hynix in particular adjusted supply, capacity utilization and investment during the period of alleged conspiracy in ways that suggest a conspiracy intended to achieve an increase in industry prices.  I find that Plaintiffs' experts provide no evidence that Defendants agreed on coordinated reductions in output.  Neither do they provide evidence that actual DRAM output was lower than it would have been absent the alleged conspiracy.[57] Nor do they show that any alleged reductions in output were distributed across Defendants in a way that likely could be explained by conspiracy.  My analysis shows that demand shocks and cost changes, not anticompetitive reductions in supply, explain why, for parts of the alleged conspiracy period, prices deviated upward from trend.  My analysis also shows that Defendants' actions can be understood within the context of their unilateral business interest and are inconsistent with effective coordinated efforts to reduce DRAM output.

60.     Periodic reductions in output of particular DRAM products by individual firms are typical, both within and outside the period of alleged conspiracy, such as when inventories build up to uneconomical levels and prices are low or when

---

[57] When he was asked whether he examined quantity during the period of alleged conspiracy, Professor White responded: "My analysis is focused on obtaining estimates of what the prices would have been in the  absence of the conduct by considering both the supply factors and the demand factors.  All of those things   operate together to obtain reliable estimates of what the prices would have been.  What the quantities would  have been is a different question that I haven't been asked to answer, nor is it directly of -- . . . nor is it something that is directly related to my -- addressing my charge." Halbert White Tr., 146:16-147:1.

a fab is shut down for retooling.  In particular, as I explain below, Hynix's

capacity change decisions before and during the period of alleged conspiracy can

be explained as consistent with its own unilateral business interest, and appear

largely inconsistent with participation in an effective conspiracy.  For much of

the period of alleged conspiracy, Hynix's output (measured in total megabits)

was expanding, and it made a costly investment (in its Oregon facility) to

upgrade its technology to become more competitive.  These efforts to compete

are reflected in the ITC's evaluation of whether the South Korean government

was unfairly subsidizing Hynix, so that Hynix increased exports to the United

States, causing prices to fall below the competitive level during much of the

alleged conspiracy period.[58]

61.     The temporary reduction in Hynix's capacity in 2001, when it closed down

its Eugene, Oregon facility to retool and upgrade to 256 Mb SDRAM production,

is easily understood as in Hynix's long-run interest. This was demonstrated after

the fab came back on line, because since then Hynix has become increasingly

cost-efficient, has increased its share of DRAM supply and has become

profitable.

**A.     Price is Explained by Demand and Supply**

62.     A basic law of economics is that market price equates the quantity

supplied and the quantity demanded.  All else equal, if a group of suppliers

---

[58] DRAMs and DRAM Modules from Korea, Investigation No. 701-TA-431 (Final), (USITC
Publication No. 3616, August 2003) at 20, 25.

reduces output then price will rise.[59]  A cartel wants to reduce output from the competitive level:

> [w]orking cooperatively, the cartel members gain from the output reductions of each firm. When all firms belong to the cartel, all the gains from reducing output and raising price go to the cartel…it pays the cartel to reduce total output below the competitive level, even though it would not pay any competitive firm to reduce its output individually.[60]

63.    The modern market for crude oil provides a useful way to understand the interactions of quantity and price relevant to my analysis, because it is affected by an explicit conspiracy or cartel – the Organization of Petroleum Exporting Companies ("OPEC") – that operates legally in participants' home countries and for which internal discussions, considerations and activities are public.  OPEC controls a large percentage of the world's petroleum resources, and its members meet regularly to agree on actions of its members.

64.    Although OPEC discusses price, its members' discussions aim to reach agreement on each country's output, because it is output that is under the control of cartel members. Members do not directly set the world price of oil, but they can cause price to rise or fall through their decisions and actions regarding how much petroleum to pump and export. "The most important way that OPEC maintains [a price between $22 and $28 per barrel] is by setting production quotas so that there is never too much or too little crude oil available on the

---

[59] *See* CARLTON AND PERLOFF, MODERN INDUSTRIAL ORGANIZATION 123, n.1 ("As with a monopoly, the cartel can restrict output and let the demand curve determine price or raise price and let the demand curve determine output. The two approaches are equivalent." (3rd ed. 2000)).
[60] *Id.,* at 124.

market, which would adversely affect the market price . . . For more than 40 years, OPEC has been setting a production quota for each member country within an overall ceiling."[61]  When OPEC becomes dissatisfied with market price and wants it to change (either up or down), its members agree on how to adjust output in order to achieve the desired price.[62]  When members of OPEC "cheat" and produce more than their assigned quota, price declines.

65.      This analysis highlights the effect of output restrictions on price (all else constant) – that price rises when quantity is restricted.  But this is only part of the story, because price is co-determined by demand factors.  Assume, for example, that the United States passes a law that mandates that only vehicles that get 40 miles per gallon or more can be driven.  Such a law would reduce the amount of gasoline demanded at any given price.  As a consequence, if OPEC did not adjust output to compensate, the price of gasoline would fall – because if it did not, much of the gasoline produced would remain unsold at the old cartel price.  Similarly, exogenous changes in demand, such as caused by unusual weather, will cause prices to move.[63]

---

[61] See, for example, P. Stevens, "Oil Markets," 21 Oxford Review of Economic Policy 19 (2005), 24 ("Given this excess capacity, the function of the market controller – the IOCs [international oil companies] in the 1950s and 1960s and OPEC since 1982 – has been to prevent the excess coming to market creating downward pressure on prices. Thus OPEC must estimate the call for its crude oil and then allocate that call among the members to insure the market is managed."

[62] See, for example, Jad Mouawad,  "OPEC Finds Price Range to Live With", THE NEW YORK TIMES, Dec. 6, 2007, available at http://www.nytimes.com/2007/12/06/business/worldbusiness/06opec.html?ex=1354597200&en=542e3504e5754988&ei=5088&partner=rssnyt&emc=rss

[63] "Oil dips further due to warm US weather," AGENCE FRANCE PRESSE, Nov. 4,  2003 ("World oil prices drifted lower Monday as unusually warm weather in the United States eased market concerns over heating oil supplies.")

66.    These basic economic principles can be applied to help understand whether the observed pricing of DRAM reflects, as Plaintiffs claim, an effective conspiracy by Defendants.  First, DRAM manufacturers cannot cause market price to increase simply by engaging in discussions about the desirability of higher prices.  Yet, many communications between suppliers of the sort that were identified in the plea agreements had this character.[64]  Absent actions by the alleged conspirators to supply fewer DRAMs to the marketplace than they otherwise would, market prices will not increase.

67.    Second, variation in DRAM output, both of individual suppliers and for the industry as a whole, can occur for a variety of reasons.  Consequently, in evaluating whether the economic evidence supports Plaintiffs' claim that the suppliers collectively and as a result of their communications reduced output in order to increase price, it is important to analyze how quantity would have changed during the alleged conspiracy period if, contrary to Plaintiffs' claims, there had been no conspiracy. In other words, it is necessary to understand and take into account other possible reasons why output changed during the alleged conspiracy period, in order to determine whether Defendants took steps to reduce output that they would not have taken but for a conspiracy among them.

68.    An individual DRAM supplier's output varies over time as it increases capacity, shuts down obsolete facilities, experiences quality problems, suffers labor unrest, and for a variety of other reasons.  Thus, an analysis of whether

---

[64] See, e.g., some of the communications cited in the Marshall Report, fn. 147-153.

economic evidence is consistent with the claim that Defendants reduced output in an agreed-upon effort to raise prices requires the same type of "but-for" analysis – estimating the quantity that would have been supplied "but-for" the alleged conspiracy – that Plaintiffs' experts claim to have offered for pricing. This analysis, which I present below, focuses directly on output in addition to price and allows me to consider the interaction of a variety of demand and supply factors.

**B.    Hynix's Actions and Performance during the Period of Alleged Conspiracy are Consistent with its Unilateral Self Interest**

   ***i.    Hynix's Production and Retooling History are Consistent with its Unilateral Self Interest Rather than an Industry Conspiracy***

69.    I described Hynix's production facilities and history above in Section IV(B)(ii)(c). As shown in Exhibit 8, Hynix's total output increased steadily through the end of 1999.  Hynix's monthly output (measured in megabits) declined beginning in the middle of 2001, as it closed an old fab,[65] converted capacity at some fabs to manufacture a different semiconductor product (system IC),[66] and in July 2001, closed its Oregon facility in order to convert it to a newer

---

[65] According to J.S. Kim, Hynix's "Fab number 4 was closed because it was old fab.  So it was closed.  In August 2001." J.S. Kim Tr., 36:15-19

[66]    Prior to the alleged conspiracy, Steve Grossman, senior VP and GM of the flash division of Hyundai Electronics America (HEA), described the conversion of some fab capacity to flash as one of the ways HEA was trying to diversify away from being a commodity DRAM-only company ("Hyundai's Global Squeeze – Hyundai Electronics America – Company Financial Information", Electronic News, January 12, 1998).  In its 2002 annual report, Hynix discusses the shift of some production to System IC – "Our increased shift into System IC reflects our desire to take advantage of profit margins in non-memory areas; reduce Hynix's reliance upon DRAM as a source of income; and to insulate the Company from fluctuations in DRAM pricing." (p. 10)  It notes further than "To promote its foundry business, Hynix has converted several of its depreciated memory fabs into non-memory fabs.  During 2001, Hynix succeeded in converting

technology.[67] When the Eugene facility came back on line, total production (in Mbs) increased steadily over the following year.  By the end of 2003, the Eugene facility's output (in Mbs) was higher than it had been before the conversion.

70.    Hynix's supply decisions over the period of alleged conspiracy appear to be well in line with its unilateral interests.  In the first half of 1998, just before the alleged conspiracy began, Hynix opened a production facility in Eugene, Oregon. Adding capacity would not help facilitate a conspiracy. This facility had been under development since 1995.  Exhibit 8 shows Hynix's total production over the 1990-2003 period, along with average DRAM price (Professor White's OEM price index) during that period.  As can be seen in the exhibit, Hynix did not reduce output during the period of highest prices when Plaintiffs' experts claim that prices were artificially inflated.  Instead, as I would predict based on economic principles, Hynix reduced its DRAM output when industry prices were low and/or declining.  This is precisely the time when it would have been in its unilateral self interest to eliminate its high cost capacity and, in some cases, put it to other uses (*e.g.,* to make system IC). The timing of Hynix's decision to shutdown and re-tool its Eugene facility also is consistent with unilateral action. As illustrated in Exhibit 9, the timing of the Eugene conversion coincides with

two of its 8" DRAM fabs into Foundry fabs in a six month time period with minimal capital expenditure," (p. 22).
[67] Hynix's Supplemental Response to Plaintiffs Interrogatories at 7 (discussing Cheongju Fabs 2 and 4). The timing of the shutdown of the Eugene facility is consistent with one analyst's view that chip factories become obsolete within three years of construction, since the conversion of this facility occurred a little over three years after it opened.  See, Turley, Jim, "Future Fabs", PC Magazine, Sept. 3, 2002, available at www.pcmag.com/print_article2/0,1217,a=29460,00.asp.

very low DRAM prices and the increase in Eugene production corresponds to the increase in DRAM prices. Based on the data in Exhibit 9, it would appear that Hynix chose the timing of its Eugene facility to take advantage of low opportunity costs and not to anti-competitively raise prices.

71.    At the time of the shutdown of the Eugene facility, Hynix's CEO was quoted as saying:

> The continued deterioration in the semiconductor market and, more specifically, the DRAM market has led us to review all of the Hynix's [sic] operations . . . While deeply regrettable, this action [shutdown and conversion] is necessary and substantially reduces the average unit cost of our output . . . By the temporary suspension of production of this facility, we will be able to more quickly retool and upgrade our Eugene operations.[68]

72.    The same article quotes a Semico analyst as saying that "there's just no demand" for 64Mb DRAM, which was the product that had been produced in Eugene.[69]  According to one report, the Eugene shutdown eliminated 15 percent of Hynix's capacity, but only nine percent of its output "due to lagging technology in the fab."[70] As explained in deposition testimony by a Hynix executive:

---

[68] Mark Hachman, "Hynix Closes DRAM Fab to Help Boost Prices," ExtremeTech, July 19, 2001, *available at* http://www.extremetech.com/article2/0,1697,36092,00.asp.  The de Dios DRAM Market Advisor agreed: "DRAM companies that are motivated to cut production are those that have low cash reserves or have significant, more profitable businesses than DRAMs.  In the first cluster, Hynix's intelligent decision to stop production in its Eugene plant accomplishes several necessary needs.  The company reduces production of the unprofitable and cash depleting 64M SDRAM and diverts valuable cash resources that would otherwise go to unprofitable production of old products towards an upgrade of the fab to 0.15-micron, 256M production."  August 17, 2001 DRAM Market Advisor, MU00653712 to 744 at 718.

[69] Mark Hachman, *supra* n. 68.

[70] HSA:TABRIZI.F. 107869 to 962 at 917 (document from AMN AMRO).

> I remember at one time we shut down Eugene fab to upgrade the capacity. And at the time, when you want to upgrade a fab, you basically have to bring it down, change the equipment.  And since the market was oversupplied, we felt that's the best time to do it.  By taking the capacity out, you . . . produce less of an unprofitable product and you can upgrade and get ready for the next cycle so you can produce more product.[71]

After the upgrade of the Eugene facility, its total output (in Mbs) increased.

73.     In addition, it would not have been rational for Hynix to close its Eugene facility and eliminate a substantial amount of its capacity to further an alleged conspiracy, when other major suppliers did not reduce a substantial amount of capacity.  In July 2001, spokesmen for Samsung and Micron, the largest two DRAM suppliers, "said neither company plans to cut production in the near future."[72]  If, consistent with the logic of Plaintiffs' claims, Hynix had closed its Eugene fab to reduce output and raise price, then Samsung and Micron, both of which had almost 30 percent market shares compared with Hynix's less than 15 percent market share, would have obtained the majority of the benefit without incurring any of the cost (of the lost output).  Absent side payments (Samsung and Micron giving Hynix some form of compensation to make up for its disproportionate sales reduction, which has been neither alleged here nor shown in any of the materials I reviewed), it would not have been in Hynix's interest to close its Eugene fab to further an industry supply reduction and conspiracy that benefited others at Hynix's expense.

---

[71] Farhad Tabrizi Tr. 4/7/2006 at 253:3-11.
[72] Jeanne Graham, "Production cuts, fab closures won't stop DRAM price free fall," ELECTRONIC BUYERS' NEWS, August 13, 2001.

74.     Thus, Hynix's decision to close the Eugene facility temporarily at a time of extraordinarily low DRAM prices is consistent with its unilateral business interest.  It is not economically plausible that Hynix would reduce its capacity substantially because of an alleged conspiracy at a time when other major suppliers said they were not reducing production, but instead engaged in a price war to "kill Hynix."

### ii.     Hynix Tried, but Failed, to Become a Preferred Sun Supplier

75.     Sun accounted for about 85 percent of total Plaintiff purchases during the period of the alleged conspiracy.  Historically, Samsung was Sun's primary DRAM supplier, a relationship that, according to Sun, reflected Samsung's superior quality and its ability to rapidly increase supply to Sun if Sun's demand increased unexpectedly.[73]   Despite Sun's preference, Hynix made repeated and frequent efforts to obtain more Sun business.[74] However, Sun made it clear that it did not want Hynix as a strategic supplier;[75] in fact, Sun forecasted eliminating Hynix entirely from its DRAM supply base in 2003, after reducing the amount

---

[73]



PUBLICLY REDACTED

[74] *See supra* note 36.

[75]

PUBLICLY REDACTED

Highly Confidential

purchased from Hynix in earlier years,[76] and it did not even evaluate Hynix in its April 2002 review of suppliers.[77]

76.     If Hynix had successfully obtained business from Sun, it could have had a meaningful effect on industry market shares.  Hynix's competitive efforts to acquire Sun as a customer are not economically rational if it were participating in an industry-wide conspiracy to reduce supply, avoid competition and increase DRAM prices.

   iii.     *The "Kill Hynix" Effort is not Consistent with Hynix Participating in an Effective Conspiracy*

77.     I reviewed various documents and testimony concerning alleged efforts by Samsung, Infineon and other firms to "Kill Hynix" at the time when the DRAM industry was depressed and Hynix in particular was suffering financial difficulties.  Several documents indicate that suppliers intentionally lowered DRAM prices, hoping that Hynix's creditors and lenders and the South Korean government would be unwilling to continue providing financial assistance, Hynix would collapse, and the resulting reduction in competition would cause prices to rise.[78],[79]

---

[76] ▮▮▮▮▮ PUBLICLY REDACTED ▮▮▮▮▮
[77]

[78] For example, on May 17, 2001 Mike Ridling of Micron emailed others at Micron with the subject "Tet Offensive" and proposed that Micron price aggressively "to take some volume deals" given evidence of low prices by competitors, including Hynix.  Ridling wrote "I also think now is the time to do everything in our power to make it very difficult for Hynix to get that so badly needed cash.  If we lock up aggressive volume deals, we make it that much more difficult for them.  This also potentially weakens their position in the eyes of potential Hynix investors or bank bailout efforts."

Highly Confidential

78.     From an economic perspective, efforts to drive Hynix from the market do not fit with a simultaneous industry-wide conspiracy to raise prices. Driving Hynix from the market requires lowering prices and illustrates a lack of cooperation and coordination required to sustain higher than competitive prices. It is not economically plausible that Hynix willingly participated with competitors in efforts to cause itself financial hardships that could have forced it to exit.

### iv.     The ITC Investigated Korean DRAM Suppliers because of a Possible Effect of their Low Prices on U.S. Suppliers

79.     Beginning in the early 1990s, through 2000 and then again in 2002, the ITC investigated Hynix and other Korean DRAM suppliers because of a possible effect of their low prices on domestic firms. In 2002, Micron accused Hynix and other Korean firms of engaging in "irrational market behavior"[80] during part of the alleged conspiracy period. The ITC obtained Hynix's cost data and determined that the countervailing duty claims were valid. An economist testifying on behalf of Micron stated that:

> The effect of these [South Korean government] subsidies has allowed Hynix to price below cost for an extended period of time when it otherwise would have gone out of business or at a minimum would have been unable to expand its output as it did.[81]

---

[79] MU00128260 at 261. Another example is a November, 2001 Infineon internal email which states that "Samsung and Micron have kept prices on an artificially low level in order to put more pressure on Hynix. . . ." ITNA01012540
[80] Transcript of ITC hearing 11/22/02 (testimony of Appleton (Micron)).
[81] Testimony of Professor Jerry Hausman of MIT (Final ITC Hearing June 23, 2003).

80.     I recognize, as do many economists, that the ITC's implementation of laws against government subsidies and dumping, or foreign firms selling a product in the United States at "less than its fair value" and thereby causing a U.S. industry to be "materially injured" or "threatened with material injury,"[82] provides an opportunity for domestic firms to try to reduce competition by increasing the costs of low-cost rivals (through imposition of duties on firms found to have injured domestic firms).[83]  However, I find it economically implausible that the ITC's finding, based on its own and outside experts' evaluations of the evidence, that Hynix was underselling its competitors and that its prices were low is consistent with claims that Hynix participated with its competitors in a conspiracy to raise prices to Plaintiffs in the United States above competitive levels.

> *v.     Hynix was on the Verge of Bankruptcy During the Alleged Conspiracy Period*

81.     Hynix was on the verge of bankruptcy throughout much of the period of alleged conspiracy, and survived only through repeated financial assistance from creditors and others. (*See* Section VII(B)(v), *supra*).  Rather than making supracompetitive profits, Hynix required frequent bailouts.  A firm that believes that it has a high likelihood of going bankrupt has an incentive to cheat on any alleged conspiracy to reduce output, because it perceives a low likelihood of

---

[82] Subtitle B of title VII of the Tariff Act of 1930, as added by the Trade Agreements Act of 1979 (19 U.S.C. § 1673 et seq.).

[83] For example, Carlton and Perloff, *supra* n.59 note at page 580 that "[t]he antidumping laws are often used to protect U.S. industries from competition..."

being able to make profitable sales when prices are high (by which time it may have been forced to exit). A firm in dire financial condition instead has an incentive to expand output to take advantage of any noncompetitively high pricing. This makes conspiracy less likely in the first instance.

**C.    Empirical Analysis Shows that Changes in OEM and Plaintiff Prices During the Period of Alleged Conspiracy can be Explained by Demand and Cost Factors Without Appealing to Conspiracy**

82.    As I discussed above, in order to raise market prices, a conspiracy must reduce output. As such, the hypothesis of a conspiracy has implications for the behavior of both prices and quantities. Examining the behavior of quantities in addition to prices will help show whether factors other than conspiracy explain the observed movements in prices. The joint movement of prices and quantities, viewed through the lens of supply and demand analysis, provides important information about the source of price changes. In particular, changes in demand generate movements in prices and quantities in the same direction (*e.g.*, all else equal, greater demand implies higher prices and higher quantities while lower demand generates lower prices and lower quantities). In contrast, changes in supply push prices and quantities in opposite directions. More supply increases the quantity sold and reduces market prices while less supply leads to lower output and higher prices. The observed changes in prices and quantities thus result from a combination of the underlying changes in supply and demand.

83.    To see this, we can use the economic concept of elasticity – in particular, the elasticity of demand and the elasticity of supply – to translate the observed

changes in prices and quantities into the underlying changes in supply and demand. The elasticity of demand measures how sensitive buyers are to changes in price – the elasticity of demand tells us the percentage change in the quantity buyers will purchase for each one percent change in the price of the product. For example, if a 10 percent increase in price leads to a five percent reduction in the quantity demanded, the elasticity of demand would be -5%/10% = -0.50. Similarly, the elasticity of supply tells us the percentage change in the amount suppliers will supply to the market for each one percent change in the market price. For example, if a 10 percent increase in price induces suppliers to supply four percent more product, then we would say the elasticity of supply is 4%/10% = 0.40.

84.    In the present context, the decomposition between supply and demand will allow us to assess whether the observed changes in prices over the period of alleged conspiracy were due to shifts in supply (as might be caused by a conspiracy or other supply-side factors) or by demand-side factors that would not be due to any such conspiracy, or by a combination of the two. To the extent that price changes are accounted for by demand-side factors, it would be wrong to attribute those changes in prices to the alleged conspiracy. Importantly, even if some portion of the change in prices is due to supply changes, these supply shifts may have nothing to do with an alleged conspiracy. I will return to this point below when I discuss the impact of changes in cost.

### i. Prices are Explained by a Basic Supply and Demand Framework

85.     On the demand side, the change in quantity purchased consists of two components:  the change in demand (the change in the quantity that consumers would purchase at a given price) and the response of buyers to the change in market prices (what is often called the change in quantity demanded).  In particular, if we denote the percentage change in quantity purchased by $\Delta Q$ and the percentage change in price by $\Delta P$ then we have

$$(0.1) \quad \Delta Q = \Delta D + \varepsilon^D \Delta P \, ,$$

where $\Delta D$ is the percentage change in demand at a given price and the term $\varepsilon^D \Delta P$ measures the demand-side response to the percentage change in price.  If we rearrange terms in equation 0.1, we can determine the underlying change in the demand from observable data on quantities and prices as

$$(0.2) \quad \Delta D = \Delta Q - \varepsilon^D \Delta P \, .$$

86.     Similarly, on the supply side, the change in quantity sold consists of two components, the change in supply (the change in the quantity that suppliers would sell at a given price) and the response of sellers to the change in market prices.  In particular, if we denote the percentage change in quantity sold by $\Delta Q$ and the percentage change in price by $\Delta P$, then we have

$$(0.3) \quad \Delta Q = \Delta S + \varepsilon^S \Delta P \, ,$$

where $\Delta S$ is the percentage change in supply at a given price and $\varepsilon^S \Delta P$ measures the supply-side response to the change in price.  This equation also can be rearranged as was done above for demand to determine the underlying change in the supply from the observed data on quantities and prices as

(0.4)  $\Delta S = \Delta Q - \varepsilon^S \Delta P$ .

87.    Equations 0.2 and 0.4 can be combined to describe the determinants of the change in market prices and quantities in terms of the underlying changes in supply and demand as

(0.5)  $\Delta P = (\frac{1}{\varepsilon^S - \varepsilon^D})(\Delta D - \Delta S)$

(0.6)  $\Delta Q = (\frac{\varepsilon^S}{\varepsilon^S - \varepsilon^D})\Delta D + (\frac{-\varepsilon^D}{\varepsilon^S - \varepsilon^D})\Delta S$ .

88.    Since basic principles of economics tell us that $\varepsilon^D < 0$ (consumers demand less as the price rises) and $\varepsilon^S > 0$ (suppliers will desire to produce more as the price rises), prices in a competitive market will respond positively to increases in demand and negatively to increases in supply, while the quantity sold will respond positively to increases in either supply or demand.  Equations 0.5 and 0.6 provide the basic insight discussed above – increases in demand will increase both price and quantity while reductions in supply, such as would result from conspiracy, will increase price but will reduce quantity.  Hence, demand growth and supply reductions, both of which predict higher prices, predict fundamentally different movements in quantities, even though they will change price in the same direction.

### ii.    Estimated Supply and Demand for DRAMs

89.    In order to estimate the underlying supply and demand structure, we require estimates of the elasticity of demand and the elasticity of supply.  For purposes of my analysis, I will use the range of estimates provided in an ITC

report on the DRAM industry cited by Plaintiffs' experts.[84]  That report provides

estimates for the elasticity of demand in the range of -0.3 to -0.7 and estimates of

the elasticity of supply in the range of 0.3 to 0.5.  For most of my analysis, I will

focus on numbers in the middle of these ranges, -0.5 for demand and 0.4 for

supply.

90.     The data I use to study the DRAM industry come from WSTS, which

provides data on worldwide sales and prices for DRAM.  Since the market for

DRAM is worldwide, with substantial production and consumption spread

across the globe, worldwide sales data are required in order to measure DRAM

market equilibrium outcomes.[85]  The WSTS data I use in this analysis are

monthly and cover the period from January 1996 through December 2004.

91.     Exhibits 10 and 11 show the WSTS price and quantity series that I use in

my analysis.  For both graphs, the data I present are the natural logarithms of the

variables, rather than their arithmetic values.  The use of natural logarithms is

standard in economic analysis and is of particular use, as is the case here, where

both prices and quantities have changed dramatically over time.  The use of log

scales allows me to measure percentage changes in both prices and quantities,

since equal changes on the graph correspond to equal percentage changes in the

---

[84] DRAMs and DRAM Modules from Korea, Investigation No. 701-TA-431 (Final), (USITC Publication No. 3616, August 2003) at II-9.

[85] In its 2003 decision, the ITC acknowledged the global nature of DRAM production, stating that Micron operated fabs or packaging plants in the U.S., Italy, Japan, Singapore and Scotland, Infineon had facilities in Germany, Portugal, Malaysia, Taiwan and the U.S., and both Hynix and Samsung had U.S. fabs in addition to their Korean facilities.  DRAMs and DRAM Modules from Korea, Investigation No. 701-TA-431 (Final), (USITC Publication No. 3616, August 2003) at 18.

underlying variables.  As can be seen from the exhibits, the quantity of DRAM sold over time has increased dramatically while the price of DRAM has fallen equally dramatically.

92.     Exhibits 12 and 13 present the underlying changes in demand and supply implied by these price and quantity changes.  The estimates of demand and supply changes are based on a demand elasticity of -0.5 and a supply elasticity of 0.4.  The vertical lines in the two figures correspond to the start and end of the alleged conspiracy period.  Exhibit 12 illustrates that the alleged conspiracy period was a period of substantial shifts in the demand for DRAM.  The first half of the period (through mid 2000) was characterized by rapid growth in the demand for DRAM.  This upsurge in demand corresponded to a period, often referred to as the "tech" bubble, when there was rapid growth in the demand for PCs, servers and other products requiring DRAM.[86]  Demand then fell from mid 2000 through early 2002, the period of the so-called "tech bust," before recovering. The evolution of the supply side was considerably steadier with the overall growth in supply growth gradually slowing over the 1996 to 2004 period.

93.     The demand series shown in Exhibit 12 captures some important changes in the demand for DRAM and other computer components.  One of the key drivers of the demand for such products over the alleged conspiracy period was the technology boom (and bust).  One standard index of the tech cycle is the

---

[86] The NASDAQ market, composed largely of technology stocks, peaked at 5,048.62 on March 10, 2000.  Floyd Norris, "3 Years After Nasdaq Peak, Investors Crave Safety", NYTIMES.COM, March 10, 2003.

NASDAQ index of the stock prices of corporations making computers and related equipment.[87]  The price of computer stocks on the NASDAQ rose sharply during the tech bubble and then declined sharply with the tech bust.  Exhibit 14 shows that both demand and the NASDAQ index had a roughly coincident peak during the conspiracy period.  One of the series in that Exhibit is the demand series from Exhibit 12.  The other series is the NASDAQ index, transformed to be on the same scale and to have the same time trend as the demand variable by taking the fitted value from a time series regression of demand on the NASDAQ index and a linear time trend over the alleged conspiracy period.

94.      The technology boom also drove the demand for other related computer products.  One such group of products, digital signal processors ("DSPs"), is used for a range of data processing applications in computers, communications devices and related equipment.[88]  Exhibit 15 compares the demand series calculated above to a three-month moving average of digital signal processor sales.[89]  As can be seen from the exhibit, the two series have very similar patterns.  Both show a strong and roughly coincident effect of the tech boom and bust cycle as well as broad similarity over the longer period.

---

[87] Economist have long recognized that high stock prices motivate capital creation in the underlying businesses (*See*, Tobin, James, "A general equilibrium approach to monetary theory," *Journal of Money Credit and Banking*, 1(1), 1969: 15-29).  High stock prices for computer manufacturers encourage their management to expand their operations and purchases more DRAM, among other things.

[88] DSPs are most commonly used in analog systems to process real time data, including in communications equipment.

[89] The DSP data were obtained from the backup to the Expert Report of Carl Shapiro (Oct. 2, 2006), *In re Dynamic Random Access Memory (DRAM) Litigation*, Case No. M-02-1486 (PJH), MDL-1486.

95.     The coincident movement of the DRAM demand measured with both the tech boom, as measured by the NASDAQ computer stock inde,x and the worldwide sales of digital signal processors illustrates that the demand measures calculated above are capturing some fundamental market forces.  Importantly, this demand series shows that market demand fluctuated significantly during the alleged conspiracy period – rising rapidly until mid 2000 before declining sharply over the next year and recovering thereafter.

96.     The importance of demand fluctuations for the evolution of prices over the alleged conspiracy period can be seen by a simple exercise.  Exhibit 16 presents the results of an analysis where I eliminate all fluctuations in the supply of DRAM (conspiratorial or otherwise) during the alleged conspiracy period and predict the path of prices that would have occurred based solely on the measured changes in demand (shown in Exhibit 12) during the alleged conspiracy period and on the overall change in the supply of DRAM from the start to end of the alleged conspiracy period.  For purposes of this analysis, I assume that the supply of DRAM increased at a constant rate from its average level in the six months prior to the alleged conspiracy period to its average level in the six months immediately after the alleged conspiracy period.  The figure shows that the evolution of DRAM demand accounts for the slow decline in prices over the first half of the period, a substantial part of the rapid decline in prices from mid 2000 through late 2001 as well as a number of the shorter-term movements in price.  Thus, even if there had been no fluctuations in supply

(conspiratorial or otherwise) prices would have been well above those predicted by Professor White, and much closer to actual prices through much of the alleged conspiracy period.  As I show below, Professor White's analysis fails to account for this.

97.     Exhibit 17 compares the performance of this simple economic model with the model presented by Professor White in terms of the two models' ability to explain movements in prices.  As Exhibit 17 illustrates, while Professor White's statistical model is based on a search of more than 20 economic variables, it explains far less of the variation in prices over the same period than does the simple model based only on a single parameter, the elasticity of demand.  In particular, his model fails to account for the rapid growth in demand (and hence the slow decline in price) generated by the tech boom, the rapid decline in price associated with the tech bust or any of the higher frequency fluctuations that occurred.

98.     In fact, Professor White's model predicts that prices would fall much faster (a predicted decline of 67 percent) during the first half of the period, the period of the tech boom, than during the second half of the period, the period of the tech bust (a predicted decline of 27 percent).  In contrast, actual prices increased by about four percent during the tech boom but declined by 75 percent during the tech bust, as would be expected if demand surged early in the period and then fell sharply late in the period (as can be seen in Exhibit 12).  The economic model presented in Exhibit 17, which is based on demand only,

predicts a decline of 25 percent during the tech boom and a decline of 70 percent during the tech bust. Both are much closer to the actual changes, and also more consistent with predictions of economic theory.

### iii.    My Models Explain Changes in Supply and Demand of DRAM

99.     The results in Exhibits 12 to 17 illustrate that relatively simple models of supply and demand have the ability to explain much of the movement in prices and quantities over the alleged conspiracy period. In addition, as I show in this section, these demand changes, together with changes in supply not associated with conspiracy can explain virtually all of the movement in prices over the alleged conspiracy period.

100.    While conspiracy is one potential explanation for changes in supply (something that is not demonstrated in the Plaintiffs' expert reports), there are of course many others. In general, supply will shift as producers add or remove capacity, or production costs and production efficiency changes. In the semiconductor business, costs are determined by both the prices of productive inputs (labor, machinery and materials) and process yield. Lower input costs or higher yields will increase supply. Over the long term, supply grows with the addition of new capacity and/or increases in the amount of DRAM that can be produced from a given facility. Again, over the long term, much of the growth in quantity (measured in Terabits) shown in Exhibit 11 has been the result of increased density with more memory per DRAM chip. Of course, long-term

progress induces short-term fluctuations in market output as generations of technology overlap and transitions between technologies are made.

101.    In a competitive marketplace, fluctuations in cost will lead to fluctuations in supply and therefore fluctuations in market outcomes, measured in terms of both quantities and prices.  To estimate the effect of fluctuations in costs on DRAM prices over the 1996-2004 period, I use cost estimates for Micron as a proxy for industry level costs.[90]  The time series of Micron's costs are given in Exhibit 18.  As can be seen from the figure, costs have not declined uniformly over time.  Costs fell much more rapidly late in the alleged conspiracy period than they did earlier in that period.  In addition, costs have declined very slowly since 2002.

102.    Much of the dramatic change in costs over time shown in Exhibit 18 reflects technological progress in the production of DRAM.  This technological progress has been associated with changes in the characteristics of the products produced.  One important difference among products in the DRAM industry is their density – the amount of memory contained on each chip or memory module.  The principal densities sold by the industry during the years 1996-2004 were 16, 64, 128, and 256 Mb.  Each DRAM production line is engineered to produce only one density.[91]

---

[90] Expert Report of Carl Shapiro, Oct. 2, 2006, Exhibit 9.
[91] Hynix production reports.

103.    The DRAM industry tends to specialize in a few densities at a time.   For

example, about 86 percent of industry shipments (in Mbs) in 1997 were of the

densities 4 Mb and 16 Mb.[92]  By 2003, the top two densities were 128 Mb and 256

Mb, which comprised a combined 93 percent of industry shipments.  New

DRAM products replace the old, and the production process involves the

periodic retooling of production facilities to conform to the new production

requirements.  Exhibit 1 displays the shares of total shipments of these and other

densities commonly shipped during the years 1996-2004.

104.    Both academic research and the depositions of industry experts in this

case show that production capacity and costs are affected by the retooling

process.[93]  Some of these production costs involve "learning by doing."  For

example, immediately after retooling from 128 Mb chip production to 256 Mb

chip production, the per megabit cost of producing each 256 Mb chip may be

greater and capacity lower than they will be after experience with the 256 Mb

chip has been accumulated. This is because the manufacturer (and, likely, the

industry as a whole) has little experience producing the new chip and may

---

[92] Calculated from Carl Shapiro's backup for his Exhibits 3 and 5.
[93] Examples of learning curves and the importance of the relationship between costs and
cumulative production in the DRAM industry are discussed in Flamm, K. (1992)., Flamm, K.
(1996)., Dick, A. R. (1991), Gruenspecht, H. (1988).   More generally, learning by doing is
discussed in Chapters 8 and 11 of Carlton and Perloff (2000). Ghemawat (1985) summarizes a
large body of academic studies on the learning and experience curve.  In his deposition, Jae
Sueng Kim from Hynix discussed that when a fab ramped up to a new technology (e.g., from
64Mb to 256Mb) yield was generally low for the first few months following startup.
Additionally, some problems may not arise until the fab started producing in large quantities.

experience relatively low yield rates initially.[94]  However, manufacturers learn as they produce more of each chip, and this "learning by doing" increases yields and production capacity.[95]

105.    The economics literature has proposed a simple way to approximate learning by doing: the cumulative production experience.  I have constructed a month-by-month, industry-wide measure of this type by calculating historical units shipped for each density in the immediately preceding 48 month period and averaging historical units across densities using current shipments (in megabits) as weights.[96]  The estimated cumulative experience series is shown in Exhibit 19.  The cyclical movements in the series reflect the periodic transitions to new densities.

106.    To help measure industry transitions to new technologies, I have calculated the log of each month's average megabits per unit sold in the industry. This measure rises over time as the industry produces and sells more of the high density chips.  This measure will increase faster when the technologies being used progress faster.  The estimated density series is shown in Exhibit 20.

---

[94] Note that the cost of producing each MB of DRAM may be lower for the 256 Mb chip because it contains twice the MBs of a 128 MB chip.  Conversion to higher densities may also coincidentally involve a die shrink to a smaller production technology.  This can  provide lower costs over the longer term once higher yields have been achieved (de Dios Expert Report, pages 9-11).
[95] Irwin and Klenow, 1994.
[96]  I recognize that a density based learning curve is a generalized measure of the learning curve for the industry.  It is possible that a more refined learning curve analysis, based on cumulative volume by density, technology, and die size, for example, may provide even greater insights. Available data do not permit analyzing the DRAM learning curve at a more refined level than by density.

107.    Learning by doing and industry transitions to the production of higher density DRAM helps explain the pattern of industry costs over time.  To show this, I estimate a model to explain Micron's log costs as a function of accumulated industry experience, log industry density, and a linear time trend.  I use only data from outside the conspiracy period.

108.    Exhibit 21 compares the log of Micron's cost with the log costs predicted from that model.  The figure demonstrates that changes in industry experience, density, and the long-term trend in costs (estimated from outside the alleged conspiracy period) explain much of the movements in costs over the period as a whole and during the conspiracy period in particular.

109.    Given that costs fluctuated over time, I would expect supply to have shifted non-uniformly even in the absence of any conspiracy.  As a result, it is important to control for movements in cost in evaluating whether the data supports the view that there was an effective conspiracy that affected DRAM prices generally (as Plaintiffs claim).  Exhibit 22 presents the results of using the Micron cost variable to forecast movements in supply based on data from outside the alleged conspiracy period.  For purposes of these calculations, I have used the cumulative experience variable and density variable as instruments for cost. Exhibit 22 and associated regression results demonstrate that changes in costs have had a substantial effect on supply.  The figure shows that changes in costs track shifts in market supply that occurred over the alleged conspiracy period and outside that period very well.

110.    The results presented in Exhibit 23 can be used to forecast prices and quantities that control for both changes in costs and changes in demand.  To the extent that other factors (including but not limited to the alleged conspiracy) influenced prices over the conspiracy period, they should show up as deviations of the actual price series from the predictions of this model.  Exhibits 24 and 25 use the results from Exhibit 23 to predict DRAM prices and quantities based on fluctuations in both cost and demand.  As can be seen from the exhibits, changes in demand and cost explain virtually all of the movements in DRAM prices and quantities over the alleged conspiracy period.  On average, over both the alleged conspiracy and plea periods, actual prices track those predicted based on demand and cost variables.  The differences between actual and predicted prices are similar for the alleged conspiracy and outside the alleged conspiracy period, indicating that the model is able to explain market outcomes in both periods.  Clearly, important economic factors such as shifts in DRAM demand and shifts in the costs of producing DRAM account very well for the behavior of prices during and outside of the alleged conspiracy period.  Exhibit 26 summarizes these results in terms of the difference between actual prices and those predicted by the supply and demand model (which is based on parameters estimated entirely outside the conspiracy period).  The differences between actual and predicted prices is not statistically significant for either period identified by Plaintiffs' experts.  Thus, the economic evidence does not support the conclusion that the alleged conspiracy had a measurable impact on market prices.

**D.    Summary**

111.    My analysis shows that neither the output decisions of the industry as a whole nor those of Hynix in particular support the Plaintiffs' conspiracy claim. Supply changes can be explained largely by changes in cost, and price was affected by demand changes associated with the tech boom and bust. In order to increase price above its but-for level, Defendants would have had to reduce output. Under a theory of successful collusion this would have to have been accomplished through collective action that spread the "costs" associated with output reductions across firms. *I find no evidence, and Plaintiffs' experts present none, that this occurred.* Rather, economic factors other than conspiracy can explain total output during the period of alleged conspiracy.

112.    Hynix's actions – whether to reduce its production temporarily (at Eugene) or to increase its sales (by attempting to serve new customers, such as Sun, and selling in the United States (despite the threat of dumping duties)) – provide no evidence that it acted to further a conspiracy. As I showed in my econometric analysis, changes in DRAM prices during the period of alleged conspiracy can be explained by demand shocks and cost changes without appealing to conspiracy.

**VIII.    SUN'S PURCHASES AND PURCHASING PROCEDURES AFFECTED ITS PRICES**

113.    A variety of factors influenced pricing to Sun that may not have affected prices to other DRAM purchasers, in particular the six OEMs. Many of these factors would tend to make Sun's prices higher than those paid by some of the

six OEMs and other buyers.  These differences also make it less likely and more difficult to determine whether a conspiracy to raise prices to the six OEMs would have affected Sun's prices.[97]

114.    Unlike the six OEMs, Sun purchased a large amount of legacy DRAM products during the period of the alleged conspiracy, and this difference increased over time.[98]  In 2001, for example, only about 3.9 percent of purchases by the six OEMs from Defendants were FPM/EDO, while this technology accounted for about 93.9 percent of Sun's purchases (see Exhibit 27). In 2001, these percentages were 0.32 percent and 58.8 percent, respectively.  As a consequence, Sun accounted for about 75 percent of total purchases of FPM/EDO in those two years.[99]  As the bulk of DRAM demand moved to SDRAM and then DDR-SDRAM, and from 64M to 128M and 265M densities, Sun acknowledged that DRAM suppliers ▓▓▓▓ PUBLICLY REDACTED ▓▓▓▓

---

[97] ▓▓▓▓ PUBLICLY REDACTED ▓▓▓▓

[98] Manuel Raposa Tr., ▓▓▓▓; 67:9-69:15 ▓▓▓▓ "[T]he industry had moved toward synchronous DRAM, and Sun was still consuming primarily Fast Page Mode and EDO DRAM."); ▓▓▓▓ PUBLICLY REDACTED ▓▓▓▓

[99] Based on the combined Defendants database. *See, also,* K. Carroll Depo., 140:1-141:11 ("Sun use[d] about 80 percent of the world's supply of FPM memory."); ▓▓▓▓ PUBLICLY REDACTED ▓▓▓▓

█████ PUBLICLY REDACTED █████[100]  This meant that, on a

per-bit basis, Sun's average DRAM prices would likely be higher than those paid

by other DRAM purchasers.[101]  Moreover, technological factors (such as

accumulated industry experience) that reduced the cost of producing newer

generation products would reduce prices for the newer chips but would actually

raise competitive market prices for older chips due to the higher opportunity cost

of the capacity needed to produce them.

115.    Other aspects of Sun's purchasing behavior appear to differ from the

practices of the six OEMs. These factors could have caused Sun's prices, and the

competitive forces that affected that pricing, to differ from pricing to the six

OEMs and other customers.  These factors include:  (1) Sun's purchase of custom,

non-JEDEC standard modules; (2) Sun's use of reverse auctions (Dynamic

Bidding Events or "DBEs") starting in 2001; (3) Sun's extensive qualification



[100]

PUBLICLY REDACTED

[101]            *See also* Manuel Raposa Tr. 67:9-69:15 ("it did cost more to continue with legacy
products than it did with mainstream DRAM");

PUBLICLY REDACTED

; Kevin Carroll Tr. 137:3-12 ("there is a cost penalty associated with
Fast Page/EDO.").

Highly Confidential                    - 61 -

process; (4) Sun's use of a limited number of DRAM suppliers; (5) Sun's

preference for Samsung over other DRAM suppliers; (6) the fact that factors

other than price were important to Sun in choosing among DRAM suppliers; and

(7) the fact that Sun did not always purchase DRAM in volume.

**A.    Sun Purchased Custom, Non-JEDEC Standard Modules**

116.    In 1996, Sun began designing [PUBLICLY REDACTED] called the NG

DIMM, for which qualification began in 2000.[102]  I understand that Sun's NG

DIMM modules contained non-DRAM components, or "module adders," that

increased the price anywhere from 30 percent to 50 percent above that of

comparable non-NG DIMM modules.[103]  Sun recognized that its custom DIMM

made its prices higher (on a per MB basis).

**B.    Sun Used a Non-Standard Procurement System**

117.    Beginning in 2001, Sun procured DRAM through DBEs, which were

conducted on-line among bidders authorized by Sun to supply a particular part

number.  According to Sun, the initial DBE resulted in substantial and

unexpectedly large savings.[104]  Sun also concluded that subsequent DBEs



[102] PUBLICLY REDACTED

[103] PUBLICLY REDACTED

[104] PUBLICLY REDACTED

resulted in significant savings relative to prices that Sun would have paid if it purchased in its traditional way.[105]

118.    However, other aspects of Sun's bidding system may have increased its costs. Sun reserved the right to walk away from the results of the DBE if it was not satisfied with the results, although its suppliers had no corresponding right:



119.    Sun's lack of commitment to the results of a particular auction could have raised the costs for bidders, who had to be prepared to supply Sun if they were selected, but who could not depend on Sun honoring the auction results rather than engaging in unilateral ex post negotiations with other potential suppliers. Moreover, because almost every supplier invited to bid in a Sun DBE was

[105] PUBLICLY REDACTED

[106]

guaranteed a share of Sun's business,[107] the incentive to bid aggressively may have been lessened and Sun's pricing higher as a consequence.

## C.    Sun Imposed Rigorous Qualification Requirements

120.    It is my understanding that Sun required its suppliers to complete a more demanding and time-consuming qualification process in order to become authorized than did other OEMs.[108]  Manual Raposa, a former member of Sun's Memory Team, acknowledged that



[109] Sun justified its more demanding qualification process as necessary because its servers would remain on a customer's site much longer than would PCs, and therefore customers needed greater assurance of quality and reliability.[110]  Sun acknowledged that, as a consequence of ensuring the quality of its products, it



sometimes paid a higher price than it might have paid if it were less

demanding.[111]

**D.      Sun Limited the Number of Qualified Suppliers**

121.      Sun typically limited the number of qualified suppliers for any particular

product.[112]



Sun thereby excluded other would-be suppliers that might have been willing to

offer lower prices.

122.      Importantly, throughout most of the alleged conspiracy period, Hynix

either did not supply Sun directly (as reflected in Exhibit 7, which is based on the

combined Defendants database) or supplied only limited, legacy products.[114]

However, Hynix repeatedly attempted to become qualified for additional



[114] *See supra* ¶¶ 37-38.

products, and represented to Sun that it would be a low-cost supplier.[115]  Sun

resisted adding Hynix to its list of approved vendors.[116]  If, as a consequence,

Sun paid more than it would have paid if it had agreed to work with Hynix to

add it as an authorized supplier, this would not result from Hynix's participation

in any alleged conspiratorial communications among Sun's authorized suppliers.

### E.    Sun Had a Preference for Procuring DRAM from Samsung

123.    For at least some period of time, Sun had a preference for purchasing

DRAM from Samsung.  Samsung was Sun's  and

typically supplied more than 50 percent of Sun's DRAM requirements.[117] Sun

was                                                                  [118]  Part of Sun's concern

with being too dependent on Samsung was possible loss of competitive pricing,

because                                                                              [119]  In fact, Sun

---

[115] *See supra* ¶ 38.
[116] *Id.*



acknowledged that Samsung was not a price "leader" and could have been more

"aggressive" with its pricing.[120]

**F.      Sun Did Not Purchase Based Only on Price**

124.    Sun acknowledged that price was not its most important concern. ███████

███████████ PUBLICLY REDACTED ███████████ in the DBEs and

auctions.[121]  To Sun, the ██████ of the product and ████████████ was

as important as, or more important than, price.[122]  According to a former member

of Sun's Memory Team, █████████████████████████

███████████ PUBLICLY REDACTED ███████████

████████████████████████████[123]  and

██████████████████████ of product purchased by Sun.[124]

Suppliers may have bid less aggressively to supply Sun, knowing that price was

not its only, or even its primary, concern.

125.    Moreover, the need to demonstrate sufficient capacity to serve Sun's

unpredictable demands is a cost that could have been reflected in suppliers'

---



pricing.[125]  Sun required DRAM suppliers to bear supply risk, because Sun

guaranteed each supplier a share of its purchases each quarter, but it did not

commit to purchasing any particular, or indeed any, volume of DRAM.[126]  Thus,

in order to have capacity available to serve Sun's requirements, each chosen

supplier could not commit that capacity to serve other customers, even though it

was not guaranteed any volume of Sun business. Consequently, suppliers might

have to forgo sales to other customers, even though Sun might not buy as much

as it had forecast.  The "opportunity cost" of holding capacity that Sun had an

option, but no obligation, to use likely was compounded because much of the

capacity would be for legacy products, such as FPM, for which it might be hard

to find buyers on short notice or on the spot market.  This would be expected to

increase the prices Sun paid for DRAM.

## G.    Summary

126.    Many features of Sun's procurement approach could have caused Sun's

prices to differ from those of the six OEMs and others in the marketplace that

purchased according to more standard policies and were willing to buy from a

larger number of suppliers.  Sun's particular and demanding purchasing

practices would tend to raise its prices above those paid by other customers.

---

[125] ███████████████ PUBLICLY REDACTED ███████████████

[126] Peter Wilson Tr., 93:7-20 ("Q.  Why did Sun buy a percentage from suppliers rather than a fixed quantity? A. Our demand would fluctuate.  Our product mix would change.  So we would contract and purchase or award and purchase a percent of what our forecast of our actual requirements were.  Quantities were forecasts only.").

127.    As a matter of economic theory an effective conspiracy to raise prices to the six OEMs could cause Sun's and other Plaintiffs' prices to be lower than they otherwise would have been.  This is because, in order to be effective, the alleged conspiracy would have to reduce the amount supplied to the six OEMS in order to raise their prices, which would free up capacity at DRAM suppliers.  Each member of the conspiracy then would have an incentive to "cheat" by using its excess capacity to serve customers not explicitly targeted in the communications among the alleged conspirators.  The result could be cheating that would result in lower prices to customers who were not explicitly targeted by the suppliers' communications and agreement, such as Sun.  The reduced quantity of DRAM purchased by OEMs that would be generated by a price fixing conspiracy would also free up capacity to produce more of the legacy products for Sun.

## IX.    PROFESSOR MARSHALL'S ANALYSIS OF IMPACT IS FLAWED AND DOES NOT SUPPORT PLAINTIFFS' CLAIMS

128.    I have now explained why Plaintiffs' claim that Defendants participated in a conspiracy that raised prices of DRAM is unsupported by an analysis of industry demand and supply.  Plaintiffs' expert, Robert Marshall, claims to analyze the question "whether the defendant's conspiracy had an effect on the prices of DRAM sold to the plaintiffs,"[127] and he claims to find that it did.  However, Professor Marshall's analysis is wrong as a matter of economic theory,

---

[127] Expert Report of Robert Marshall at ¶ 119.

and his empirical evidence does not demonstrate that Plaintiffs' prices were affected by the alleged conspiracy.

**A.     Summary of Professor Marshall's Report and Findings**

129.     Professor Marshall begins by reviewing the "available factual record" in this case.  He describes a number of documents that, he claims, "substantiate that the prices across purchaser groups [OEMs and Plaintiffs] were related and were expected to move together."[128]   He then lists "certain characteristics of the DRAM industry" that explain why OEM, Plaintiff and market-wide prices purportedly moved together.  With this background, he presents two empirical analyses which he claims demonstrate that "plaintiffs were affected by the conspiracy along with the named OEMs":[129] (a) a price correlation analysis of the question "whether the DRAM prices paid by the plaintiffs moved together with the prices paid by the named OEMs;" and (b) a regression analysis to understand whether Plaintiffs' and OEMs' prices "moved together."[130]   Based on these analyses he reaches the following conclusions (among others):

- "Prices paid by the named OEMs and the plaintiffs moved closely together before, during, and after the defendants' admitted conspiracy;"

- "[I]ndustry participants understand that the named OEMs' prices, other firms' prices, and market-wide prices moved together;"

---

[128] *Id.* at ¶ 14.
[129] *Id.* at ¶ 30.
[130] *Id.* at ¶ 28.

- "Standard analytical techniques employed by economists. . . . provide strong statistical confirmation that prices paid by the plaintiffs and the named OEMs moved together;" and

- "Prices paid by the plaintiffs were affected by the defendants' admitted conspiracy."[131]

**B.    Professor Marshall does not Show that Prices Move Together**

130.    The first component of Professor Marshall's logic is that OEMs' and Plaintiffs' prices "move together" in a statistically meaningful sense.  He claims to demonstrate this with a variety of analyses. However, his comparisons of price movements are misleading.  Instead, the data show that there were substantial differences in the behavior of prices paid by the two customer groups.

*i.    Professor Marshall's analysis of the factual record is not informative*

131.    Professor Marshall's first claimed evidence of the impact on Plaintiffs' prices of the alleged conspiracy comes from his review of "communications and/or information exchanges between the defendants regarding DRAM prices."[132]  He claims to find that Defendants had "frequent and repeated discussions about pricing to OEMs" from 1998 to 2002.  However, his review and the documents he cites in his report provide no support for a conclusion that OEM prices were affected as a result, and certainly no basis to conclude that there was an impact on Plaintiffs' prices following from these communications.

---

[131] *Id.* at ¶¶ 31 to 37.
[132] *Id.* at ¶ 119.

132.    First, Professor Marshall's documentary evidence of communications is unaccompanied by analysis of whether the frequency and content of these communications was sufficient to cause price to increase to any individual customer, let alone to all six OEMs.  He presents no evidence that participants took any actions as a consequence of the communications.  In particular, he does not show that if two suppliers discussed increasing the price of a particular type of DRAM to a particular customer, the price then actually increased as they had discussed.  If evidence showed that suppliers did not affect prices of the particular transaction that they discussed, then it is economically implausible that the communication would have a broader effect on prices to other OEMs, let alone prices to the Plaintiffs.  It is well recognized that competitors that agree to set prices often speak falsely in the hope of gaining an advantage over competitors by undercutting the cartel price.[133]

133.    Second, Professor Marshall provides no analysis of the content of the communications, and how that information exchange would affect prices in a way consistent with what economic theory would predict.  Some of the communications that he cites, and that are cited in the pleadings he references, relate to historical prices.  Professor Marshall has not explained how discussions of prices charged to customers in the past will influence future prices in an industry as volatile as the DRAM industry.  Moreover, Professor Marshall never

---

[133] George Stigler, "A Theory of Oligopoly," 72 No. 1 *Journal of Political Economy* 44, 46 (1964) (a "price-cutter will certainly protest his innocence, or if this would tax credulity beyond its taxable capacity, blame a disobedient subordinate" if its failure to adhere to the price-fixing agreement is detected by rivals).

addresses the question of how participants in the alleged conspiracy monitored each others' compliance with the price terms on which they claim to agree, and whether there was a mechanism for punishing suppliers who cheated. Documents I reviewed, and that the Plaintiffs refer to as evidence of widespread communications, do not identify the mechanism by which the alleged conspiracy monitored and enforced its agreements. Economic theory implies that, without such a mechanism, a conspiracy will not be effective.[134]

134.    Third, Professor Marshall provides no analysis that the cited communications about prices were effective because they were associated with output reductions. He acknowledges that "[s]upply restrictions allow members of a cartel to increase prices for all purchasers in the market above what they otherwise would have been," and claims that documents show that the cartel members engaged in "a variety of supply restrictions" including "temporary reductions in production and the withholding of inventory from customers."[135] Although he cites to documents that he claims provide evidence of supply restrictions and demonstrate that "the Defendants and industry analysts recognized that the defendants' supply restrictions led to increases in DRAM prices,"[136] he provides no evidence that Defendants restricted supply by slowing or shutting down production in ways that were not typical for the industry

---

[134] The classic reference is George Stigler, "A Theory of Oligopoly," 72 No. 1 *Journal of Political Economy* 44, 46 (1964) (stating that an effective cartel requires mechanisms for both monitoring and punishing cheaters). *See also* Green, J., and R. Porter, "NonCooperative Price Collusion under Imperfect Information," *Econometrica* (1984).
[135] Expert Report of Robert Marshall at ¶ 123.
[136] *Id.*

during a period of downturn or that were unusual because of their timing.  He has not shown that the supply decisions of the defendants were not in their unilateral interest absent conspiracy. The evidence I presented is not consistent with the Plaintiffs' claim of conspiracy, because it shows that there was no significant supply restriction (as would be required for an effective conspiracy) during the period of alleged conspiracy.

135.    Moreover, even if there were evidence that communications resulted in "withholding of inventory from customers,"[137] this is more likely to result in lower prices for Plaintiffs than in the but-for world, not higher prices as Professor Marshall claims.  Unless production were curtailed or product destroyed, a reduction in the amount of inventory held for or on behalf of a particular OEM would result in greater available supply, and lower prices, for Plaintiffs and other customers.  Professor Marshall provides no evidence that (a) supply was reduced; (b) inventory available to the six OEMs was reduced; or (c) any reduction in available inventories to the six OEMs did not thereby increase supply to non-OEMs, such as Plaintiffs.

136.    Thus, Professor Marshall's review of the "factual record" provides no economic basis for his claim that "the conspiracy had an effect on the prices of DRAM sold to the plaintiffs."[138]

> ii.    *Professor Marshall's analysis of "the economics of the DRAM industry," which he claims supports his finding that OEMs' and*

---

[137] *Id.*
[138] *Id.* at ¶ 125.

### Plaintiffs' prices "move together," is uninformative about the economic issues in this litigation

137.    According to Professor Marshall, "industry participants widely recognized that prices moved together due to the characteristics of the DRAM industry.  This finding indicates that the plaintiffs were affected by the conspiracy along with the named OEMs."[139]  Even if true, the belief by industry participants, such as employees of the Defendants, hardly constitutes the kind of rigorous economic evidence necessary to support Plaintiffs' claims that prices to OEMs were affected by the alleged conspiracy. Even if many underlying factors might move prices for OEMs and Plaintiffs in the same direction, a conspiracy to raise prices to OEMs would not generally have that effect.  Given that the effects of a conspiracy to raise prices to OEMs would likely have a different impact on the market, general statements about market movements provide even less reason to accept Professor Marshall's claim that the industry forces resulting in OEMs being affected also caused Plaintiffs to be affected.

138.    Professor Marshall identifies several features of the DRAM industry that he claims support his conclusions about the effect of the alleged conspiracy on Plaintiffs' prices. Yet, some of his claims are not supported by facts and others are not relevant or are insufficient.

- •    "DRAM is a standardized product that is highly substitutable across manufacturers;"[140] however, my earlier discussion of Sun's purchasing practices shows that its requirements and procurement

---

[139] *Id.* at ¶¶ 129 to 130.
[140] *Id.* at ¶ 134.

activities differ greatly from those of the six OEMs and that modules Sun bought (in particular, the NG-DIMM) were unique (and proprietary) to Sun, could not be sold to other DRAM customers, and could not be replaced by JEDEC standard modules.[141] In addition, Sun's NG DIMM, which Sun began producing in commercial quantities in 2001, contained non-DRAM components or module adders,[142] which increased its price.[143] The amount of additional cost depended on DRAM prices generally, but could have been as much as 30-50 percent compared with non-NG DIMM modules.[144] In addition, even if DRAM were a completely homogeneous product a conspiracy to raise prices to some buyers will still have the effect of increasing the supply available to serve other buyers not directly subject to the conspiracy and thereby put downward pressure on their prices.

- "DRAM is regularly bought and sold in well-established channels other than purchases directly from defendants;"[145] again, my discussion of Sun's purchasing practices shows that (a) it never

---

[141] Neil Duncan Tr., 106:6-108-4 ("The NG DIMM is a Sun proprietary DIMM . . . . Q: So then the Jedec standard part would not be interchangeable with the NG-DIMM? . . . THE WITNESS: No system could interchange those parts.");

PUBLICLY REDACTED

[142]

[143]

PUBLICLY REDACTED

[144]

[145] Expert Report of Robert Marshall at ¶ 134.

relied on the spot market; (b) it recognized that its demanding qualification procedures and particular requirements could cause it to pay higher prices than other buyers; and (c) it purchased primarily legacy products or proprietary products (such as NG DIMM), for which its own demand accounted for the vast majority of sales.

- "DRAM has largely transparent prices that are widely used as references and benchmarks in pricing negotiations;"[146] to support the relevance of this claimed observation, Professor Marshall references a variety of documents that allude to customer reliance in pricing negotiations on publicly available price information, but he provides no empirical evidence that these benchmarks actually affected negotiated prices or that these prices would be inflated by the alleged conspiracy.

139.    Finally, Professor Marshall claims that most favored customer ("MFC") clauses in some OEM contracts help explain why Defendants' "ability to raise prices selectively to the named OEMs was also limited"[147] because "[t]o raise named OEMs' prices and avoid violating their MFCs, defendants would have had to increase plaintiffs' prices, too."[148]  However, my review of the record concerning implementation of these clauses and of evidence that Plaintiffs', and particularly Sun's, purchases differed substantially from those of the six OEMs shows that it is unlikely that these clauses would force suppliers to increase prices to Sun in order to permit higher prices to the six OEMs.

---

[146] *Id.*
[147] *Id.* at ¶ 157.
[148] *Id.* at ¶ 165.

140.    First, the MFC clauses typically included a price comparability provision

for purchases by buyers of substantially comparable products in similar

volumes.[149]  As I discussed earlier, Sun and the OEMs often purchased very

different types of DRAM.  For much of the alleged conspiracy period, Sun

purchased FPM/EDO DRAM and the custom Sun proprietary NG DIMM

module, while the six OEMs primarily purchased SDRAM and then DDR-

SDRAM.  To the extent that MFC price adjustments were triggered by prices of

similar or identical products sold to a supplier's other customers, the clauses in

OEM contracts would not be triggered by pricing to Sun on many of the

products it purchased.

141.    Second, a price increase to OEMs would not necessarily have triggered a

price adjustment, even to OEMs with MFCs that would force suppliers to match

any lower price charged to Sun.  To the extent that Sun's prices typically were

higher than those paid by OEMs during the period of the alleged conspiracy the

MFC clauses would not be binding, and hence OEM prices could have been

raised even further without requiring an increase in Sun's pricing.  Sun's prices

tended to be higher than those of the OEMs, and Plaintiffs provide no evidence

that in actuality the MFC clauses would have been binding, but for increases in

Sun's prices.  To the extent that MFC clauses that were in place were not binding,

---

[149] See, e.g., ITAG-00299701 to 00299722 at ITAG-00299701 ("…purchasing like quantities of
substantially comparable products during like periods of time under like conditions…").

those clauses provide no economic basis for concluding that Sun's prices were increased as the result of an OEM conspiracy.

142.     Third, it appears that audit provisions in some contracts with MFC clauses were not always effective, because customers whose contracts contained MFCs often did not request or obtain the necessary information about prices paid by a supplier's other customers.  In some contracts, OEMs were obligated to pay for any audit that they initiated.[150]  Given the low volumes of products bought by OEMs that overlap with Sun, it might not be economical for an OEM to incur the cost of an audit even if it had a suspicion that Sun was paying a lower price.

143.     Fourth, MFC clauses did not cover all products, buyers, and purchase situations.  Sun's purchases and the products it bought may have been implicitly or explicitly excluded from the OEM MFC contracts.  While some contracts contained MFC clauses triggered by a broad scope of products, other OEM contracts permitted adjustment only for SDRAM products, for example, or only based on prices offered to other OEMs.[151]  Some MFCs operated only when there was an impasse in price negotiations.[152]

144.     Thus, Professor Marshall's analysis of "industry features" does not demonstrate that "[a]long with the named OEMs, plaintiffs were affected by

---

[150] *See* NECELAM 021016-021032 at NECELAM 021021: "…either party may, at its own expense, appoint a nationally recognized auditor, to whom the other party has no reasonable objection, to audit and examine the other party's records …".
[151] There is a very limited MFC between Apple and Crucial.  It limits products to SDRAM and other customers to "other PC OEM" customers requiring similar services, MIC0000656 - 0000673 at MIC 0000668-00069.
[152] Micron applies MFC pricing to Gateway only when price negotiations fail and Micron accounts for 40% of Gateway's purchases; *see* MIC0001012-035 at MIC0001013.

defendants' conspiracy."[153]  To the extent that MFC clauses were not binding at

the actual observed prices they provide no economic basis for concluding that

prices paid by Plaintiffs were increased by an OEM conspiracy.  Professor

Marshall provides no evidence that these contracts had his hypothesized impact.

> ### iii.    Professor Marshall's price correlation study does not demonstrate that, even if it affected prices to the six OEMs, the alleged conspiracy affected prices to Plaintiffs

145.    Professor Marshall uses Defendants' data to analyze price trends and

correlations between Defendants' prices to OEMs and Plaintiffs.  He claims that

these data "allow me to assess whether the prices paid by plaintiffs … and prices

paid by the named OEMs moved together."[154]  Based on graphs comparing the

average price paid by the six OEMs for a particular category of DRAM (e.g.,

128/256 MByte FPM-EDO in his Figure 21 and 512 MByte SDRAM modules in

his Figure 22) with the price paid by individual Plaintiffs for the same product,

he concludes there is "a strong relationship between the prices paid by the

plaintiffs in this matter and the prices paid by the named OEMs."[155]  He then

claims to test the strength of this relationship by calculating "correlation

coefficients between plaintiff and named OEM prices for several products."[156]

He finds that these correlation coefficients are "consistently near +1,"[157] and that

"the prices paid by the plaintiffs and by the named OEMs for their largest

---

[153] Expert Report of Robert at ¶177.
[154] *Id.* at ¶183.
[155] *Id.* at ¶184.
[156] *Id.* at ¶194.
[157] *Id.*

products moved together almost identically."[158] However, from an economic standpoint, the key question is whether prices to Plaintiffs and the six OEMs moved closely enough together that any conspiratorial increase in prices paid by OEMs must have affected prices paid by Plaintiffs.

146.    Professor Marshall misinterprets the data and the implications of his statistical calculations in reaching his conclusions. A proper analysis of the data that he presents graphically (data that he claims show that OEM and Plaintiff prices move virtually identically) instead shows that price movements are very different. A large portion of the changes in Plaintiffs' price before, during and after the period of alleged conspiracy are unrelated to (and uncorrelated with) movements in OEM prices.  Professor Marshall reaches the wrong conclusions for several reasons, as I now explain.

        *a.    Professor Marshall's graphical depiction of price trends is misleading*

147.    In his Figures 22-28, Professor Marshall presents individual Plaintiff and average OEM price per MByte for a variety of product categories from 1996 through 2005.  These figures show that both Plaintiff and OEM prices declined by large amounts before and during the alleged conspiracy.  Since DRAM price per MByte tends to decline over time as technology advances, this is not surprising. In the post-conspiracy period, it is difficult to discern from the graph how prices

---

[158] *Id.*

changed, because the graph scale makes large percentage changes in small dollar amounts indiscernible.

148.     Given the well-documented, long-run tendency for the price of a megabit of DRAM to decline over time, the common trends in Plaintiff and named OEM prices is hardly surprising.  A more relevant question is whether the relative prices of OEMs and Plaintiffs tend to be stable, and whether the relationship changed during the period of alleged conspiracy. As noted in an article co-authored by Nobel Prize winner George Stigler, "Two products are in the same market (are close substitutes in production or consumption or both) when their **relative prices maintain a stable ratio**."[159] (emphasis added)  To the extent that relative prices fluctuate substantially, there is room for conspiracy or other factors to affect prices for one group and not the other.

149.     In Exhibits 29 and 30, I reproduce Professor Marshall's Figures 21 and 22. In Exhibits 31 and 32, I provide figures displaying the same data converted into the economically relevant measure of relative prices (Sun's average price divided by the six OEM's average price). It is clear from these figures, particularly Exhibit 32, that Professor Marshall's correlation analysis masks substantial changes during the alleged conspiracy period in Sun's price's relative to prices paid by OEMs.   The data from his Figure 22 show that the relative price's to Sun and other OEM's changed by a factor of four over a period of four months.  Such

---

[159] G. S. Stigler and R. A. Sherwin, "The Extent of the Market," 28 J. LAW AND ECON. 555, 566 (1985).

large changes in relative prices are inconsistent with a claim that the two price series move together in any meaningful economic sense. This is evidence that the changes in OEM prices are not closely related to changes in Sun's prices contrary to the claims made by Professor Marshall based on these same data.

*b.*     *Correlation in price levels cannot demonstrate causation*

150.     Professor Marshall's claim that price "correlations" of the type he provides can demonstrate a *causal* relationship between prices to two customer groups is wrong.  High correlations between price series can occur even when a conspiracy affects prices only to one customer group. The price series can be highly correlated because both are influenced by the same outside forces and manifest the same trends over time even if some changes, such as those generated by a conspiracy, were unique to one series.

151.     Exhibit 33 illustrates the misleading conclusions that can be derived from correlation analysis.  The figure contains three hypothetical price series. The values of Series 1 simply increase by one each month.  Each monthly observation in Series 2 is twice its value in series 1.  Series 3 is identical to Series 2, except that in three of the months a "conspiracy" increases prices by 5.  Thus, in month 8 the value of Series 1 is 8, the value of Series 2 is 16, and the value of Series 3 is 21. After three months, the conspiracy ends (in period 11), and again the values of Series 2 and 3 are identical.

152.     Similar to Professor Marshall, I calculate the correlation coefficients among the three price series.  Since Series 1 and 2 are identical except for a factor

of two, they move identically and have a correlation coefficient equal to +1.0 (the maximum possible).  However, the correlation between Series 2 and Series 3 is virtually as high – 0.99 – even though only Series 3 is affected by the conspiracy that increases prices by 5 for three months.  The upward trend in all three series results in a very high correlation coefficient, even though only one series deviates due to "conspiracy" for three of the twenty months. Thus, just as the correlation of 0.99 with Series 3 prices does not show that Series 1 and Series 2 are affected by conspiracy, the eight correlation coefficients that Professor Marshall presents in his Table 3 (ranging from 0.91 to 0.99, and averaging 0.97) do not prove that an alleged conspiracy that affected OEM prices also would have affected Plaintiffs' prices.  In contrast the large relative price swings shown in Exhibits 31 and 32 based on these same data show that there were economically large changes in the gap between prices paid by OEM and Plaintiffs for these products.

> c. *The correlation of OEM and Plaintiff prices is much lower than Professor Marshall claims*

153.    Professor Marshall's correlation evidence is misleading.  He calculates price correlations for the entire period for which he has Defendants' data, which makes it difficult to determine whether, even if prices were correlated before and after the period of conspiracy, price correlations remained as high during the alleged conspiracy period.  Plaintiffs' claims, and Professor Marshall's methodology, are intended to demonstrate a correlation within the period of alleged conspiracy arising from a causal connection between Defendants'

communications and illegal conduct and higher Plaintiff prices.  One way to check on the economic soundness of Professor Marshall's conclusions is to see whether correlations within the alleged conspiracy period are as high as they are outside that period.

154.    As shown in Exhibits 34 and 35, the correlation within the alleged conspiracy period, whether calculated for price levels or price differences, tends to be lower than in the years before the alleged conspiracy for the three products examined by Professor Marshall for which data are available for both periods.[160] This is inconsistent with the economics of a conspiracy; when firms conspire and effectively agree on prices to charge to customers, the correlation in prices should increase or at least not decrease compared with a period when there is no discussion and overt cooperation.

> d.    Conclusion

155.    Professor Marshall claims that "[t]he correlation between two variables is perhaps the simplest and most widely used statistical measure of the extent to which the variables move together."[161] Even if this were true, the relevant question in this litigation is not "whether two variables move together" but whether the alleged illegal conduct, which is assumed to directly affect one of the price series, also affects the other.  Correlation analysis, particularly as performed and presented by Professor Marshall, does not provide evidence relevant to this

---

[160] For four of the eight products, data are available only during the alleged conspiracy period and the period afterwards.  For one of the products, data are available only for the pre-conspiracy period.
[161] Expert Report of Robert Marshall at ¶189.

question, because two price series can "move together" even though a shock

(such as conspiracy) affects one but not the other.  My analysis of the

economically relevant measure of relative prices shows that prices for the OEMs

and Plaintiffs do not move together in any way that would allow one to conclude

that a conspiracy on prices to OEMs would have to have an effect of prices to

Plaintiffs.

> iv.    *Professor Marshall's regression analysis does not establish that the alleged conspiracy had an impact on prices of either the six OEMs or Plaintiffs*

156.    Professor Marshall presents regression analysis which he claims "allows

me to simultaneously analyze the relationship between prices paid by the named

OEMs and the plaintiffs for numerous products with a wide variety of product

characteristics."[162]  His regression analysis has two components.  I discuss each

one below.

> a.    *Professor Marshall's Predicted Prices do not Track Actual Plaintiff Prices Well*

157.    Professor Marshall estimates the relationship between DRAM

characteristics, such as density and technology, and prices to named OEMs. This

type of statistical model is referred to as a "hedonic" price regression.  He then

uses the estimated relationship between characteristics and prices paid to OEMs

to predict the prices that Plaintiffs would have paid if their prices had been

determined by the same regression relationship.  For example, if, as he finds,

error correction adds 0.0868 to the price of an OEM's DRAM (all else equal), he

---

[162] *Id.* at ¶196.

assumes that it adds the same amount to the price of Plaintiffs' DRAM, all else

equal.  He then uses

> this [OEM] regression analysis to predict the price paid for each
> plaintiff transaction.  That is, I used the [OEM] pricing model . . .
> which is based solely on named OEM purchases from the defendants,
> to predict what prices the plaintiffs would have paid if the plaintiffs
> paid the same prices as the named OEMs.  The predicted plaintiff
> prices are then compared to the actual prices paid by plaintiffs.[163]

According to his logic, if the predicted Plaintiff prices closely approximate their

actual prices, then Plaintiff prices were affected by the same conspiracy that

affected OEM prices.

158.    Again, Professor Marshall's analysis is improper and provides no basis for

his conclusion that the alleged conspiracy had an impact on Plaintiffs' prices.

His Figure 31 (reproduced as my Exhibit 36), which compares actual with

predicted Plaintiff prices, makes clear that, despite common trends, there is

considerable divergence between the actual and predicted Plaintiff prices,

particularly during the alleged conspiracy period.  This is shown more clearly in

Exhibit 37, which focuses on the period of alleged conspiracy.  While the two

series are fairly close until the middle of 1998, actual Plaintiff prices then diverge

from Professor Marshall's predicted series, remaining quite flat from the middle

of 1998 through the middle of 2000, while the predicted series rise and fall.  From

the middle of 2000, the predicted and actual series move very differently. This is

shown clearly in Exhibit 38, which shows the ratio of the actual price to Plaintiffs

to the price predicted by Professor Marshall's model for the period of the alleged

---

[163] *Id.* at ¶206.

conspiracy. If Professor Marshall were correct that the prices to Plaintiffs "moved together" with the prices paid by OEMs then we would expect this number to remain close to one. However, the measure deviates far from one with relative prices ranging from over 1.30 to less than 0.50 (a factor of over 2.5 to 1). In economic terms movements in relative prices of that magnitude illustrate that the prices paid for DRAM products by Plaintiffs are not tightly linked to the prices OEMs paid for DRAM. Thus, Professor Marshall's own data disprove his own thesis.

159.    I have done two other tests of the conclusions Professor Marshall draws from his regression analysis. My first analysis uses Professor Marshall's OEM pricing regression to predict the prices of each Plaintiff individually, rather than the Plaintiffs as a group. The results are shown in Exhibits 39a-e. The exhibits show that, during the conspiracy period, the actual price paid by Plaintiffs deviated substantially from the price predicted by Professor Marshall using the OEM price model. For Sun, the model fits the pre-conspiracy period quite well, but not the alleged conspiracy period. For SGI, the model does not fit well either outside or within the alleged conspiracy period. Once again, when I translate these to relative prices (actual prices divided by predicted prices), I find that actual and predicted prices differ substantially (see Exhibits 40a-e). For Sun the ratio of actual to predicted prices varies by a factor of about five, while for SGI the price ratio varies by a factor of about two (except for one outlier which is much larger).

160.    The second analysis I conducted was to use Professor Marshall's OEM price model to predict prices for each OEM individually.  I then compare the predicted price index for the individual OEM with the actual individual OEM price index.  If, as Plaintiffs' claim, the alleged conspiracy and/or other factors caused OEM prices to increase and the effect was common to all OEMs, I expect that each OEM's actual price would be predicted well by the OEM model that was estimated using data from all OEMs.  This is because each OEM's price would move like other OEM prices move.  As shown in Exhibits 41a-f, this is generally true for Apple, Compaq and the other OEMs; the OEM price ratios tend to be substantially closer to one than are the corresponding price ratios for the Plaintiff price series.   Since the predicted Plaintiff price index differs much more from the actual Plaintiff prices the evidence does not support Professor Marshall's claim that the OEM price model, which he claims incorporates the impact of the alleged conspiracy, explains movement in Plaintiffs' prices during the alleged conspiracy.

        *b.*    *The OEM Price Index does not Predict the Plaintiff Price Index*
           *Well Based on Relative Prices*

161.    Professor Marshall's second regression analysis uses the named OEMs' purchases to predict named OEMs' prices and uses Plaintiffs' purchases (rather than OEM purchases, as he did above) to predict. Plaintiffs' prices.  He then compares the predicted OEM and Plaintiff prices assuming both groups purchased the same set of products.  According to Professor Marshall, "[t]his

comparison allows me to compare prices that would have been paid by named OEMs and the plaintiffs for a market basket of goods, while explicitly controlling for the fact that the products each group purchased may have been different and may have changed over time."[164]

162.    This approach uses the same regression for OEMs as he used in his first regression analysis.  He then estimates the same type of regression for Plaintiffs. Whereas predicted Plaintiff prices in his first analysis assume that each characteristic affects both OEM and Plaintiff prices identically (e.g., error correction adds 0.0868 to both OEM and Plaintiff prices), this second approach allows error correction to have a different impact on OEM prices than it has on Plaintiff purchases.  In order to control for the fact that the six OEMs and the Plaintiffs purchase different "bundles" of characteristics, he predicts prices assuming that both purchase the characteristic bundle actually purchased by Plaintiffs.  This amounts to asking, in a statistical sense what OEMs would have paid for the mix of products purchased by Plaintiffs.

163.    Based on this analysis, Professor Marshall concludes that "prices paid by named OEMs… and plaintiffs…for the market basket [purchased by Plaintiffs] moved together," and he finds the two series have a correlation coefficient of 0.99.  His Figure 32 is reproduced below as my Exhibit 42.

164.    Since both price indices are affected by common trends, I calculate the ratio of the two indices to see whether relative prices were stable in a way that

---

[164] *Id.* at ¶ 217.

suggests the two indices moved closely together.  Once again, this corresponds to

looking at the economically meaningful concept of relative prices.  As shown in

Exhibit 43, the ratio of the OEM index to the Plaintiff index varied substantially

over time.  The ratio declined in the period preceding the alleged conspiracy.  It

then varied during the period of alleged conspiracy, with OEM prices higher at

times, and lower for much of the period. The movement in relative prices is not

consistent with a conspiracy that had a common impact on both OEM and

Plaintiff prices.  Relative prices move by a factor of three for the period as a

whole and by a factor of roughly two during the alleged conspiracy period.

**X.      PROFESSOR WHITE'S ANALYSIS OF IMPACT AND DAMAGES IS NOT BASED ON ECONOMIC THEORY AND DOES NOT SUPPORT HIS CONCLUSIONS REGARDING THE IMPACT OF THE ALLEGED CONSPIRACY ON PLAINTIFFS' PRICES**

165.    Professor White offers a report on behalf of Plaintiffs.  He says that he has

been "asked to determine the extent to which six direct action plaintiffs were

overcharged by the defendants on purchases of DRAM."[165]  At his deposition,

Professor White made clear that he views his finding of an overcharge as

equivalent to a finding of an impact from the alleged conspiracy.  According to

Professor White, ███████ PUBLICLY REDACTED ███████ [166]

and he explains further that:

███████ PUBLICLY REDACTED ███████

---

[165] Expert Report of Halbert White at ¶ 13.

[166] ███ PUBLICLY REDACTED ███

PUBLICLY
REDACTED [67]

166.    In this section of my report, I explain some of the errors in Professor

White's analysis of impact, and thus his lack of any basis to conclude that

Plaintiffs' prices would have been lower in the but-for world without the alleged

conspiracy.   I understand that my colleague Professor Robert Topel will address

other errors in Professor White's analysis in his report.

**A.      Professor White's Methodology is Flawed because it is not based on an
         Economic Model of the DRAM Industry**

167.    At his deposition, Professor White acknowledged that, in analyzing the

question whether the alleged conspiracy had an impact on Plaintiffs' prices, he

has not created an economic model of the DRAM industry. Rather, he has

estimated a "prediction equation" using a two-step approach in which he first

uses data from outside the period of alleged conspiracy to estimate a prediction

equation for a price index of OEM prices. He then estimates a statistical

relationship between his OEM price index and prices indexes he constructs for

each of the six Plaintiffs.   Finally, he uses this estimated relationship to predict

damages (and he claims impact) on the prices paid by each Plaintiff.  Professor

White claims that he can use his prediction equations to predict the "but-for"

prices that the six OEMs as a group, and each individual Plaintiff, would have

paid if the alleged conspiracy had not occurred (the "but-for" prices), because he

---

[67] REDACTED

has accounted for all relevant demand and supply factors that changed during the period of alleged conspiracy in making these predictions.

168.     According to Professor White, although he has included in his prediction equation all the relevant demand and cost factors, it is not proper to examine and ascribe meaning to any of the coefficients in his equation, as he stressed repeatedly in his deposition.  According to Professor White:



When he was asked to explain why he did not identify in his report the particular variables included in his prediction equation, he explained



When asked to explain why the coefficients of interest rate variables included in his equation have different signs, he explains that

> There's no reason for them to have the same sign.  Absolutely not. This is not an equation that's designed to measure the effect of German bonds on anything.  This is not an equation designed to measure the effect of the U.S. Treasury Bill rate on anything.  It's not designed to measure effects, and that's why I'm objecting to the word estimated effect here. And when I say it's not designed to measure effects, it's not designed to do anything but make a prediction.[170]

---

168
169 PUBLICLY REDACTED
170 *Id.* at 104:1-11.

169.    An examination of the variables included in Professor White's prediction model confirms that he is conducting a statistical investigation and not an analysis of economic fundamentals.  In Exhibit 44, I show the variables "selected" by Professor White's methodology when it is applied to estimation periods that begin in three different months:  January 1998, August 1998 and April 1999.  The variables "selected" in each of the three models are considerably different.

170.    Because he offers a "prediction equation," and not an economic model of industry prices, it is impossible to evaluate Professor White's claim that he has taken into account all the demand and supply factors that would have affected but-for prices during the period of alleged conspiracy.  Professor White claims to be indifferent to whether any particular variable that he says was selected because it reflected demand and/or supply is related to price in any predictable way:



PUBLICLY REDACTED

[171]

_____

[171]    PUBLICLY REDACTED

171.    However, if there is no ex ante predictable relationship between a variable such as MOS MPU (the PPI of semiconductor Machinery Manufacturing) and price, or any other demand or supply variable, there can be no way to evaluate whether the relationship between cost and demand factors has changed during the period of alleged conspiracy, or whether any important explanatory variable has been omitted.  As I discussed earlier, a proper model of but-for prices must be based on economic principles.  Professor White offers only a model based on statistical performance, devoid of economic structure or content.  Consequently, the "fit" of the model before and after the alleged conspiracy cannot show that it predicts but-for prices during the period of alleged conspiracy, and the difference between but-for and actual prices cannot be assumed to be a measure of overcharge.

**B.    Professor White's Methodology does not Allow for the Impact on Demand of the Technology Boom and Bust during the Period of Alleged Conspiracy**

172.    Professor White's methodology cannot accommodate events or trends that are not present outside the alleged conspiracy period or are reflected differentially in his explanatory variables in data from inside and outside the period of alleged conspiracy. One such important event is the unique technology cycle that occurred from the end of the 1990s through mid-2002, and thus coincided with the period of alleged conspiracy.  When the forces driving market outcomes change their relative importance over time, there is no reason to believe that prediction equations of the type used by Professor White will remain

stable.[172] To the extent that the relative importance of different drivers (say supply and demand shifts) differed between the two periods, the relationship estimated by professor White will not yield reliable predictions for the alleged conspiracy period.

173.     Economic theory says that demand factors affect market prices, especially in the short run (in the short run, it is more difficult for suppliers to accommodate changes in demand).  A valid economic analysis of market prices would include measures of all important demand factors, or show that those factors were constant during the time period in question.   As can be seen from the results in Exhibit 12, the fluctuations in demand were much greater during the conspiracy period than they were outside the conspiracy period.  In fact, the only significant downturn in demand, the downturn corresponding to the "tech bust," came during the period omitted from Professor White's data.

174.     Moreover, the technology sector boom at the end of the 1990s, its initial pullback and recovery in mid 2000, and its prolonged bust through the middle of 2002 all likely affected the demand for DRAM.  For example, as the capital market provided funding for new internet companies during the technology sector boom, those new companies would demand PCs, workstations, and network servers to build their business and serve customers on the internet.

---

[172] A simple example is to let the predicted variable be Y and the prediction variable be X where both are driven by two unmeasured variables $Z_1$ (say demand) and $Z_2$ (say supply) with $Y = Z_1 + Z_2$ and $X = Z_1 - Z_2$.  The relationship between Y and X will vary from positive to negative depending on the source of variation, $Z_1$ or $Z_2$.

Highly Confidential                    - 96 -

Additional derived DRAM demand would therefore be one consequence of the technology boom.

175.    I showed earlier in my report that the technology sector boom, bust, and recovery can be readily measured.  These events are specific in large part to the period of alleged conspiracy and so cannot be incorporated in a prediction equation estimated using data only from before August 1998 and after June 2002. This unusual cycle is part of the explanation for the pattern of prices in the DRAM industry during the period of alleged conspiracy.

**C.    Professor White Ignores the Well-Documented Effects of Technology Transitions**

176.    At his deposition, Professor White was asked whether the introduction and adoption of new technologies during the period of alleged conspiracy was taken into account in his prediction model:



Thus, he offered the opinion that the introduction of new technologies and associated life-cycle effects during the period of alleged conspiracy were not unusual and were properly taken into account when he estimated his prediction

_____

[173] PUBLICLY REDACTED

equation for the Fisher price index using data outside the period of alleged

conspiracy. Otherwise, Professor White said that the technology lifecycle is

PUBLICLY REDACTED [174]

177.    My Exhibit 1 shows how the industry accumulated experience with the 8

MB chip in 1998-9, and accumulated experience with the 16 MB chip in 2000-1.

None of Professor White's three co-integrating variables captures these

transitions. These technology transitions help to explain why prices did not

decline during 1998-2001 (the period during which Professor White finds a large

overcharge and thus a large impact) at the same rate that they did in prior years.

Technology change also explain why there was little decline in DRAM prices

over the period 2001-2004. An economically valid attempt to explain market

outcomes during the conspiracy period would include measures of technology

transitions.

178.    A valid economic basis for an opinion that the technology life cycle was

the same during the period of alleged conspiracy as it was before would include

an examination of measures of technology transition. Professor White's report

does not contain any empirical analyses of this type.

179.    Professor White does not address in a meaningful way the question

whether the technology life cycle, rather than conspiracy, might explain the

overcharge that he claims to find. A valid economic basis for an opinion that the

technology life cycle was the same during the conspiracy period as before would

[174] PUBLICLY REDACTED

include an examination of measures of technology transition. Professor White's report includes no empirical analysis of this kind.

**D.    Contrary to Professor White's Claim, His Model Does Not Predict out of Sample Outcomes.**

180.    In both his report and deposition testimony, Professor White placed a great deal of weight on the fact that his model fits the period after the alleged conspiracy ended (the "post period"). However, those predictions are not out-of-sample predictions, since the post period was used to estimate the model. As a result, his estimation procedure selected variables and model coefficients in order to "fit" the post-period data as well as the pre-period data.

181.    In order to illustrate the unreliable nature of Professor White's methodology for true out-of-sample predictions, I have used his procedure to create forecasts for the post period based on a model estimated using the pre-period data only. I have performed two versions of this analysis. The first version uses the same variables selected by his model and only re-estimates the coefficients. The second method allows his procedure to select a different set of variables as well as new coefficients. The results are presented in Exhibit 45. As can be seen from the exhibit, neither of these methods produces accurate forecasts of the post-period prices. Both series diverge substantially from the actual price series, producing prices that differ from the actual price series by a factor of 300 or more in many months of the conspiracy period. Thus, Professor

White's claim that his ability to fit the post period is evidence of the out-of-

sample reliability of his method is not supported by the evidence.

Kevin Murphy, Ph.D.                              Dated:  March 7,2008

# Appendix A

*Curriculum Vitae*

# Kevin M. Murphy

March 2008

*Business Address:*                                          *Home Address:*

University of Chicago
Graduate School of Business                    1810 Pennington Court
5807 South Woodlawn Avenue                     New Lenox, Illinois 60451
Chicago, Illinois  60637                       Phone: (815)463-4756
email: murphy@chicagogsb.edu                   Fax: (815)463-4758

**Education**
University of California, Los Angeles, A.B., Economics, 1981
University of Chicago, Ph.D., 1986
Thesis Topic: *Specialization and Human Capital*

**Honors and Awards**

October 2005: Garfield Research Prize (with Robert H. Topel)
September 2005: MacArthur Foundation Fellow
1998: Elected to the American Academy of Arts & Sciences
1997: John Bates Clark Medalist
1993: Fellow of The Econometric Society
1989 – 1991: Sloan Foundation Fellowship, University of Chicago
1983 – 1984: Earhart Foundation Fellowship, University of Chicago
1981 – 1983: Fellowship, Friedman Fund, University of Chicago
1980 – 1981: Phi Beta Kappa, University of California, Los Angeles
1980 – 1981: Earhart Foundation Fellowship, University of California, Los Angeles
1979 – 1981: Department Scholar, Department of Economics, University of California, Los Angeles

**Other Affiliations** Faculty Research Associate, National Bureau of Economic Research

**Research and Academic Positions**

July 2005 – Present: George J. Stigler Distinguished Service Professor of Economics, Department of Economics and Graduate School of Business, University of Chicago
2002: George J. Stigler Professor of Economics, Department of Economics and Graduate School of Business, University of Chicago
1993 – 2002: George Pratt Shultz Professor of Business Economics and Industrial Relations,

Highly Confidential

University of Chicago
1989 – 1993: Professor of Business Economics and Industrial Relations, University of Chicago
1988 – 1989: Associate Professor of Business Economics and Industrial Relations, University of Chicago
1986 – 1988: Assistant Professor of Business Economics and Industrial Relations, University of Chicago
1983 – 1986: Lecturer, Graduate School of Business, University of Chicago
1982 – 1983: Teaching Associate, Department of Economics, University of Chicago
1979 – 1981: Research Assistant, Unicon Research Corporation, Santa Monica, California

**Selected Publications**

**Books**

Social Economics: Market Behavior in a Social Environment with Gary S. Becker, Cambridge, MA: Harvard University Press (2000).

Measuring the Gains from Medical Research: An Economic Approach edited volume with Robert H. Topel, Chicago: University of Chicago Press (2003).

**Articles**

"Government Regulation of Cigarette Health Information," with Benjamin Klein and Lynne Schneider, 24 *Journal of Law and Economics* 575 (1981).

"Estimation and Inference in Two-Step Econometric Models," with Robert H. Topel, 3 *Journal of Business and Economic Statistics* 370 (1985).

"Unemployment, Risk, and Earnings: Testing for Equalizing Wage Differences in the Labor Market," with Robert H. Topel, in Unemployment and the Structure of Labor Markets, pp. 103-139, ed. Kevin Lang and Jonathan S. Leonard. London: Basil Blackwell (1987).

"The Evolution of Unemployment in the United States: 1968-1985," with Robert H. Topel, in NBER Macroeconomics Annual, pp. 11-58, ed. Stanley Fischer. Cambridge, MA: MIT Press (1987).

"Cohort Size and Earnings in the United States," with Mark Plant and Finis Welch, in Economics of Changing Age Distributions in Developed Countries, pp. 39-58, ed. Ronald D. Lee, W. Brian Arthur, and Gerry Rodgers. Oxford: Clarendon Press, (1988).

"The Family and the State," with Gary S. Becker, 31 *Journal of Law and Economics* 1 (1988).

"A Theory of Rational Addiction," with Gary S. Becker, 96 *Journal of Political Economy* 675 (1988).

"Vertical Restraints and Contract Enforcement," with Benjamin Klein, 31 *Journal of Law and Economics* 265 (1988).

"Income Distribution, Market Size, and Industrialization," with Andrei Shleifer and Robert W. Vishny, 104 *Quarterly Journal of Economics* 537 (1989).

"Wage Premiums for College Graduates: Recent Growth and Possible Explanations," with Finis Welch, 18 *Educational Researcher* 17 (1989).

"Industrialization and the Big Push," with Andrei Shleifer and Robert W. Vishny, 97 *Journal of Political Economy* 1003 (1989).

"Building Blocks of Market Clearing Business Cycle Models," with Andrei Shleifer and Robert W. Vishny, in NBER Macroeconomic Annual, pp. 247-87, ed. Olivier Jean Blanchard and Stanley Fischer. Cambridge, MA: MIT Press (1989).

"Efficiency Wages Reconsidered: Theory and Evidence," with Robert H. Topel, in Advances in the Theory and Measurement of Unemployment, pp. 204-240. ed. Yoram Weiss and Gideon Fishelson. London: Macmillan, (1990).

"Empirical Age-Earnings Profiles," with Finis Welch, 8 *Journal of Labor Economics* 202 (1990).

"Human Capital, Fertility, and Economic Growth," with Gary S. Becker and Robert F. Tamura, 98 *Journal of Political Economy*, S12 (1990).

"Accounting for the Slowdown in Black-White Wage Convergence," with Chinhui Juhn and Brooks Pierce, in Workers and Their Wages: Changing Patterns in the United States, pp. 107-143, ed. Marvin Kosters. Washington, D.C.: American Enterprise Institute (1991).

"The Role of International Trade in Wage Differentials," with Finis Welch, in Workers and Their Wages: Changing Patterns in the United States, pp. 39- 69, ed. Marvin Kosters. Washington, D.C.: American Enterprise Institute (1991).

"Why Has the Natural Rate of Unemployment Increased over Time?" with Robert H. Topel and Chinhui Juhn, 2 *Brookings Papers on Economic Activity* 75 (1991).

"The Allocation of Talent: Implications for Growth," with Andrei Shleifer and Robert W. Vishny, 106 *Quarterly Journal of Economics* 503 (1991).

"Rational Addiction and the Effect of Price on Consumption," with Gary S. Becker and Michael Grossman, 81 *American Economic Review* 237 (1991).

"Wages of College Graduates," in The Economics of American Higher Education, pp. 121-40, ed. William E. Becker and Darrell R. Lewis. Boston: Kluwer Academic Publishers (1992).

"Changes in Relative Wages, 1963-1987: Supply and Demand Factors," with Lawrence F. Katz, 107 *Quarterly Journal of Economics* 35 (1992).

"The Structure of Wages," with Finis Welch. 107 *Quarterly Journal of Economics* 285 (1992).

"The Transition to a Market Economy: Pitfalls of Partial Planning Reform," with Andrei Shleifer and Robert W. Vishny, 107 *Quarterly Journal of Economics* 889 (1992).

"The Division of Labor, Coordination Costs, and Knowledge," with Gary S. Becker, 107 *Quarterly Journal of Economics* 1137 (1992).

"Industrial Change and the Rising Importance of Skill" with Finis Welch, in Uneven Tides: Rising Inequality in America, pp. 101-132, ed. Peter Gottschalk and Sheldon Danziger. New York: Russell Sage Foundation Publications (1993).

"Wage Inequality and the Rise in Returns to Skill," with Chinhui Juhn and Brooks Pierce, 101 *Journal of Political Economy* 410 (1993).

"Occupational Change and the Demand for Skill, 1940-1990," with Finis Welch, 83 *American Economic Review* 122 (1993).

"Inequality and Relative Wages," with Finis Welch, 83 *American Economic Review* 104 (1993).

"Why Is Rent-Seeking So Costly to Growth?" with Andrei Shleifer and Robert W. Vishny, 83 *American Economic Review* 409 (1993).

"A Simple Theory of Advertising as a Good or Bad," with Gary S. Becker, 108 *Quarterly Journal of Economics* 941 (1993).

"Relative Wages and Skill Demand, 1940-1990," with Chinhui Juhn, in Labor Markets, Employment Policy, and Job Creation, pp. 343-60, ed. Lewis C. Solmon and Alec R. Levenson. The Milken Institute Series in Economics and Education. Boulder, CO: Westview Press, (1994).

"Cattle Cycles," with Sherwin Rosen and Jose A. Scheinkman, 102 *Journal of Political Economy* 468 (1994).

"An Empirical Analysis of Cigarette Addiction," with Gary S. Becker and Michael Grossman, 84 *American Economic Review* 396 (1994).

"Inequality in Labor Market Outcomes: Contrasting the 1980s and Earlier Decades," with Chinhui Juhn, 1 *Economic Policy Review* 26 (1995).

"Employment and the 1990-91 Minimum Wage Hike," with Donald R. Deere and Finis Welch, 85 *American Economic Review* 232 (1995).

"Examining the Evidence on Minimum Wages and Employment," with Donald R. Deere and Finis Welch, in The Effects of the Minimum Wage on Employment, pp. 26-54, ed. Marvin H. Kosters. Washington, D.C.: The AEI Press, (1996).

"Social Status, Education, and Growth," with Chaim Fershtman and Yoram Weissm, 104 *Journal of Political Economy* 108 (1996).

"Wage Inequality and Family Labor Supply," with Chinhui Juhn, 15 *Journal of Labor Economics* 72 (1997).

"Quality and Trade," with Andrei Shleifer, 53 *Journal of Development Economics* 1 (1997).

"Wage Inequality and Family Labor Supply," with Chinhui Juhn, 15 *Journal of Labor Economics* 72 (1997).

"Vertical Integration as a Self-Enforcing Contractual Arrangement," with Benjamin Klein, 87 *American Economic Review* 415 (1997).

"Unemployment and Nonemployment," with Robert H. Topel, 87 *American Economic Review* 295 (1997).

"Wages, Skills, and Technology in the United States and Canada," with W. Craig Riddell and Paul M. Romen, in General Purpose Technologies and Economic Growth, pp. 283-309, ed. Elhanan Helpman.  Cambridge, MA: M.I.T. Press, (1998).

"Perspectives on the Social Security Crisis and Proposed Solutions," with Finis Welch, 88 *American Economic Review* 142 (1998).

 "Population and Economic Growth," with Gary S. Becker and Edward Glaeser, 89 *American Economic Review* 145 (1999).

 "A Competitive Perspective on Internet Explorer," with Steven J. Davis, 90 *American Economic Review* 184 (2000).

"Industrial Change and the Demand for Skill" with Finis Welch, in The Causes and Consequences of Increasing Inequality, pp. 263-84, ed. Finis Welch.  Volume II in the Bush School Series in the Economics of Public Policy.  Chicago: University of Chicago Press, (2001).

"Wage Differentials in the 1990s: Is the Glass Half Full or Half Empty?" with Finis Welch, in *The Causes and Consequences of Increasing Inequality*, pp. 341-64, ed. Finis Welch.  Volume II in the Bush School Series in the Economics of Public Policy.  Chicago: University of Chicago Press, (2001).

"Economic Perspectives on Software Design: PC Operating Systems and Platforms," with Steven J. Davis and Jack MacCrisken, in Microsoft, Antitrust, and the New Economy: Selected Essays, pp. 361-420, ed. Davis S. Evans. Boston, MA: Kluwer, (2001).

"Current Unemployment, Historically Contemplated," with Robert H. Topel and Chinhui Juhn, 1 *Brookings Papers on Economic Activity* 79 (2002).

"The Economics of Copyright 'Fair Use' in A Networked World," with Andres Lerner and Benjamin Klein, 92 *American Economic Review* 205 (2002).

"The Economic Value of Medical Research" with Robert H. Topel, in <u>Measuring the Gains from Medical Research: An Economic Approach,</u> pp. 41-73, ed. Robert H. Topel and Kevin M. Murphy. Chicago: University of Chicago Press, (2003).

"School Performance and the Youth Labor Market," with Sam Peltzman, 22 *Journal of Labor Economics* 299 (2003).

"Entrepreneurial ability and market selection in an infant industry: evidence from the Japanese cotton spinning industry," with Atsushi Ohyama and Serguey Braguinsky, 7 *Review of Economic Dynamics* 354 (2004).

"Entry, Pricing, and Product Design in an Initially Monopolized Market," with Steven J. Davis and Robert H. Topel, 112 *Journal of Political Economy*: S188 (2004).

"Diminishing Returns: The Costs and benefits of Increased Longevity," with Robert H. Topel, 46 *Perspectives in Biology and Medicine* S108 (2004).

"Persuasion in Politics," with Andrei Shleifer, 94 *American Economic Review* 435 (May 2004).

"Black-White Differences in the Economic Value of Improving Health," with Robert H. Topel, 48 *Perspectives in Biology and Medicine* S176 (2005).

"The Equilibrium Distribution of Income and the Market for Status," with Gary S. Becker and Iván Werning, 113 *Journal of Political Economy* 282 (2005).

"The Market for Illegal Goods: The Case of Drugs," with Gary S. Becker and Michael Grossman, 114 *Journal of Political Economy* 38 (2006).

"Competition in Two Sided Markets: The Antitrust Economics of Payment Card Interchange Fees," with Benjamin Klein, Kevin Green, and Lacey Place, 73 *Antitrust Law Journal* 571 (2006).

"The Value of Health and Longevity," with Robert H. Topel, 114 *Journal of Political Economy* 871 (2006).

"Social Value and the Speed of Innovation," with Robert H. Topel, 97 *American Economic Review* 433 (2007).

"Education and Consumption: The Effects of Education in the Household Compared to the Marketplace" (w/ Gary S. Becker), *The Journal of Human Capital, (2008)*

"Why Does Human Capital Need a Journal?" (w/ Isaac Erlich), *The Journal of Human Capital, (2008)*

"Exclusive Dealing Intensifies Competition for Distribution" (w/Benjamin Klein), Antitrust Law Journal (forthcoming) (2008)

**Selected Working Papers**

"The Structure of Wages Revisited" with Finis Welch. Private Enterprise Research Center Working Paper No. 9724 (June 1997).

"Adverse Price Effects of Entry in Markets with Few Firms" with Steven J. Davis and Robert H. Topel, Graduate School of Business, Unpublished Working Paper (April 2001).

"Gauging the Economic Impact of September 11th", with Gary S. Becker, Unpublished Working Paper (October 2001).

"The Market for Illegal Goods: The Case of Drugs," with Gary S. Becker and Michael Grossman, Unpublished Working Paper (February 2006).

"War In Iraq Versus Containment: Weighing the Costs," with Steven J. Davis and Robert H. Topel, *NBER Working Paper No.12092* (March 2006).

"The Economics of Bundling Advertising in Media Markets," with Ignacio Palacios, Unpublished Working Paper (2004).

"Estimating the Effect of the Crack Epidemic," with Steve Levitt and Roland Fryer, Unpublished Working Paper (September 2006).

"The Interaction of Growth in Population and Income," with Gary S. Becker, Unpublished Working Paper (2006).

"Is the Increased Earnings Inequality Among Americans Bad?" with Gary S. Becker, Unpublished Working Paper (January 2007).

"Inequality and Relative Wages," with Finis Welch, Unpublished Working Paper (May 1993).

"Persuasion and Indoctrination" (w/ Gary Becker) 2007

"The Value of Life Near Its End and Terminal Care" (w/ Gary Becker and Tomas Philipson) 2007

"Fertility Decline, the Baby Boom and Economic Growth" (w/ Gary Becker, Curtis Simon, Robert Tamura) 2007

**Selected Comments**

Comment on "Causes of Changing Earnings Equality," by Robert Z. Lawrence. Federal Reserve Bank of Kansas City (1998).

"Comment: Asking the Right Questions in the Medicare Reform Debate," <u>Medicare Reform:</u>

Issues and Answers, pp. 175-81, ed. Andrew J. Rettenmaier and Thomas R. Saving. Chicago: University of Chicago Press (2000).

Comment on "Social Security and Demographic Uncertainty," by Henning Bohn in Risk Aspects of Investment-Based Social Security Reform, ed. John Y. Campbell and Martin Feldstein. Chicago: University of Chicago Press (2001.)

Comment on "High Technology Industries and Market Structure," by Hal R. Varian. Federal Reserve Bank of Kansas City (2001).

**Popular Press Articles**

"The Education Gap Rap," *The American Enterprise,* (March-April 1990), pp. 62.

"Rethinking Antitrust," with Gary S. Becker, *Wall Street Journal,* (February 26, 2001) pp. pA22.

"Prosperity Will Rise Out of the Ashes," with Gary S. Becker, *Wall Street Journal,* (October 29, 2001) pp. pA22.

**About Murphy**

"Higher Learning Clearly Means Higher Earning," by Carol Kleiman. *Chicago Tribune*, March 12, 1989, Jobs Section pp. 1.  Long article about "The Structure of Wages" with picture of Murphy.

"Why the Middle Class Is Anxious," by Louis S. Richman. *Fortune*, May 21, 1990, pp. 106. Extensive reference to Murphy's work on returns to education.

"Unequal Pay Widespread in U.S.," by Louis Uchitelle., *New York Times,* August 14, 1990, Business Day section pp. 1. Long piece on income inequality.

"One Study's Rags to Riches Is Another's Rut of Poverty," by Sylvia Nasar, *New York Times*, June 17, 1992, Business Section pp. 1. Long piece on the income inequality research.

"Nobels Pile Up for Chicago, but Is the Glory Gone?" by Sylvia Nasar, *New York Times* November 4, 1993, Business Section pp. 1. Long piece on Chicago School of economics. Featured a photo of five of the "brightest stars on the economics faculty" (including Murphy) and a paragraph about Murphy's research.

"This Sin Tax is Win-Win," by Christopher Farrell. *Business Week*, April 11, 1994, pp. 30. Commentary section refers to Murphy, Becker, and Grossman's work on rational addiction.

"Growing inequality and the economics of fragmentation," by David Warsh, *Boston Sunday Globe*, August 21, 1994, pp. A1. Two-page article with picture and biographical details about Murphy and his research; part of a series about "how the new generation replaced the old in economics."

"A Pay Raise's Impact," by Louis Uchitelle. *New York Times*, January 12, 1995, Business Section

pp. 1. Article about consequences of proposed increase in the minimum wage. Articles featuring Murphy's comments on the minimum wage appeared in numerous other publications, including the *Chicago Tribune*; in addition, Murphy was interviewed on CNN (January 26, 1995).

"The Undereducated American," *Wall Street Journal*, August 19, 1996, pp. A12. Changes in the rate of returns to education.

"In Honor of Kevin M. Murphy: Winner of the John Bates Clark Medal," by Finis Welch, 14 *Journal of Economic Perspectives* 193 (2000)

**Testimony, Reports, and Depositions (Last 4 Years)**

Expert Report of Kevin M. Murphy, July 14, 2003, in Daniel Gordon, Michael Stolee, Vocal Signs, Inc., David Ellingson, Kari A. Wallace, Reclaim Center, Inc., Individually and On Behalf of All Others Similarly Situated, v. Microsoft Corp., United States District Court For the State of Minnesota County of Hennepin. Case No. MC 00-005994.

Expert Report of Kevin M. Murphy, July 14, 2003, in Charles I. Friedman, P.C., an Arizona corporation, and The Power P.E.O., Inc., an Arizona Corporation, on behalf of themselves and all others similarly situated, v. Microsoft Corp., United States District Court for the State of Arizona. Case No. 2000-000722 Consolidated with No. CV2000-005872.

Deposition of Kevin M. Murphy, September 3, 2003, in Daniel Gordon, Michael Stolee, Vocal Signs, Inc., David Ellingson, Kari A. Wallace, Reclaim Center, Inc., Individually and On Behalf of All Others Similarly Situated, v. Microsoft Corp., United States District Court for the  State of Minnesota County of Hennepin Case No. MC 00-005994.

Deposition of Kevin M. Murphy, September 3, 2003, in Charles I. Friedman, P.C., an Arizona corporation, and The Power P.E.O., Inc., an Arizona Corporation, on behalf of themselves and all others similarly situated, v. Microsoft Corp., United States District Court for the State of Arizona. Case No. 2000- 000722 Consolidated with No. CV2000-005872.

Expert Supplemental Report of Kevin M. Murphy, December 3, 2003, in Microsoft Antitrust Litigation, United States District Court For The District Of Maryland. M.D.L. No. 1332.

Testimony of Kevin M. Murphy, January 29, 2005, in Wade et al v. The Kroger Co. et al, United States District Court for the Western District of Kentucky, Louisville Division. Case No. 3:01 CV-699-R.

Expert Report of Kevin M. Murphy, May 24, 2005, in Applied Medical v. Ethicon, Inc., et al., United States District Court for the Central District of California. Case No. SACV 03-1329.

Declaration of Kevin M. Murphy, July 1, 2005, in Barbara Schwab, et al. v. Philip Morris USA Inc., et al., United States District Court for the Eastern District of New York. Case No. CV-0401945.

Expert Report of Kevin M. Murphy, August 1, 2005, in Conmed Corp. v. Ethicon, Inc., et al., United States District Court for the Southern District of New York. Case No. 03-CV-8800.

Expert Report of Kevin M. Murphy, August 1, 2005, in Barbara Schwab, et al. v. Philip Morris USA Inc., et al., United States District Court for the Eastern District of New York. Case No. CV-0401945.

Initial Submission of Kevin M. Murphy, October 15, 2005, in the 2003 MSA Adjustment Proceeding.

Deposition of Kevin M. Murphy, October 18, 2005, in Conmed Corp. v. Ethicon, Inc., et al., United States District Court for the Southern District of New York. Case No. 03-CV-8800.

Deposition of Kevin M. Murphy, November 8, 2005, in Applied Medical v. Ethicon, Inc., et al., United States District Court for the Central District of California. Case No. SACV 03- 1329.

Deposition of Kevin M. Murphy, December 8, 2005, in the 2003 MSA Adjustment Proceeding.

Final Submission of Kevin M. Murphy, January 30, 2006, in the 2003 MSA Adjustment Proceeding.

Expert Rebuttal Report of Kevin M. Murphy, April 7, 2006, in High Pressure Laminates Antitrust Litigation, United States District Court for the Southern District of New York. Case No. 00-MD-1368 (CLB).

Deposition of Kevin M. Murphy, April 21, 2006, in High Pressure Laminates Antitrust Litigation, United States District Court for the Southern District of New York. Case No. 00-MD-1368 (CLB).

Trial Testimony of Kevin M. Murphy, May 16-17, 2006, in High Pressure Laminates Antitrust Litigation, United States District Court for the Southern District of New York. Case No. 00-MD-1368 (CLB).

Expert Report of Kevin M. Murphy, May 26, 2006, in Barbara Schwab, et al. v. Philip Morris USA Inc., et al., Eastern District of New York. Case No. CV-0401945.

Initial Submission of Kevin M. Murphy, August 7, 2006, in the 2004 MSA Adjustment Proceeding.

Trial Testimony of Kevin M. Murphy, August 16-17, 2006, in Applied Medical v. Ethicon, Inc., et al., United States District Court for the Central District of California. Case No. SACV 03- 1329.

Expert Report of Kevin M. Murphy, August 28, 2006, in Barbara Schwab, et al. v. Philip Morris USA Inc., et al., United States District Court for the Eastern District of New York. Case No. CV-0401945.

Final Submission of Kevin M. Murphy, December 8, 2006, in the 2004 MSA Adjustment Proceeding.

Expert Report of Kevin M. Murphy, December 11, 2006, Tucker et al. v. Walgreens, United States District Court for the Southern District of Illinois. Case No. 05-CV-440-GPM.

Expert Report of Kevin M. Murphy, June 4, 2007, in Eolas Technologies Inc. and The Regents of the University of California v. Microsoft Corporation, United States District Court for the Northern District of Illinois Eastern Division. Case No. 99-C-0626.

Expert Report of Kevin M. Murphy, July 2, 2007, in Boston Scientific Corporation, Boston Scientific Scimed, Inc., Scimed Life Systems, Inc., and Schneider (Europe) GMBH v. Johnson & Johnson and Cordis Corporation, The United States District Court for the Northern District of California San Francisco Division. Case No. C 02-790 SI.

Expert Report of Kevin M. Murphy, July 9, 2007, in FTC v. Whole Foods Market, Inc. and Wild Oats Markets, Inc., United States District Court for the District of Columbia. Case No. 1:07-CV-01021-PLF.

Rebuttal Expert Report of Kevin M. Murphy, July 13, 2007, in FTC v. Whole Foods Market, Inc. and Wild Oats Markets, Inc. United States District Court for the District of Columbia. Case No. 1:07-CV-01021.

Deposition of Kevin M. Murphy, July 17, 2007, in the Matter of FTC v. Whole Foods Market, Inc. and Wild Oats Markets, Inc., United States District Court for the District of Columbia. Case No. 1:07-CV-01021.

Affidavit of Kevin M. Murphy, July 25, 2007, in Ashley Pelman v. McDonald's, United States District Court for the Southern District of New York. Case No. 02 CIV 7821 (RWS).

Testimony of Kevin M. Murphy, July 31, 2007, in the Matter of FTC v. Whole Foods Market, Inc., et al., United States District Court for the District of Columbia. Case No. 1:07-CV-01021.

Supplemental Expert Report of Kevin M. Murphy, February 16, 2007, in Conmed Corp. v. Ethicon, Inc., et al., United States District Court for the Southern District of New York. Case No. 03-CV-8800.

Initial Submission of Kevin M. Murphy, August 1, 2007, in the 2005 MSA Adjustment Proceeding.

Deposition of Kevin M. Murphy, August 22, 2007, in Boston Scientific Corporation, Boston Scientific Scimed, Inc., Scimed Life Systems, Inc., and Schneider (Europe) GMBH v. Johnson & Johnson and Cordis Corporation, The United States District Court for the Northern District of California San Francisco Division. Case No. C 02-790 SI.

Expert Report of Kevin M. Murphy, October 26, 2007, in the Matter of New Motor Vehicles Canadian Export Antitrust Litigation on behalf of Mercedes U.S.A. LLC., The United States District Court for the District of Maine.

Expert Report of Kevin M. Murphy, October 26, 2007, in the Matter of New Motor Canadian Export Antitrust Litigation on behalf of Chrysler LLC, Chrysler Motors LLC, and Chrysler Canada Inc., The United States District Court for the District of Maine.

Expert Report of Kevin M. Murphy, October 31, 2007, in the Matter of New Motor Vehicles Canadian Export Antitrust Litigation, The United States District Court for the District of Maine.

Deposition of Kevin M. Murphy, January 15-16, 2008, in the Matter of New Motor Vehicles Canadian Export Antitrust Litigation, The United States District Court for the District of Maine.

Expert Report of Kevin M. Murphy, February 1, 2008, in the Matter of Allied Orthopedic Appliances, Inc., v. Tyco Healthcare Group L.P., The United States District Court for the Central District of California Western District.

Deposition of Kevin M. Murphy, February 28, 2008, in the Matter of Allied Orthopedic Appliances, Inc., v. Tyco Healthcare Group L.P., The United States District Court for the Central District of California Western District.

# Appendix B



Exhibit 1
Share of Total DRAM Shipments, by Density
1996–2004

Highly Confidential
Source: WSTS



Exhibit 2
Historical Market Share of Top DRAM Suppliers
in 2005

Highly Confidential

Source: Gartner (from Shapiro Backup)



Exhibit 3
Market Share of Top DRAM Suppliers
Each Firm Includes All Firms It Aquired by 2005

Highly Confidential
Source: Gartner (from Shapiro backup)



Exhibit 4
Combined Market Share of Top Three and Top Four
DRAM Suppliers by Year

Highly Confidential
Source: Gartner (from Shapiro backup)

# Exhibit 5
## Financial Events for Hynix

| Date | Event |
|------|-------|
| Jan 2001 | State-run Korea Development Bank and South Korean banks agree to purchase 80%, or 2.9 trillion won ($2.27 billion), of Hynix's maturing bonds this year[1] |
| May 2001 | State-controlled Korea Exchange Bank and South Korean banks agree to extend a $4.4 billion rescue package to Hynix[2] |
| June 2001 | Hynix and financial adviser Salomon Smith Barney raise $1.25 billion by issuing global depository receipts[3] |
| Sept 2001 | 18 creditor banks of Hynix agreed to swap three trillion won ($2.33 billion) of Hynix's debt into equity and roll over an undisclosed amount of maturing debts this year until 2004[4] |
| Oct 2001 | Creditors of South Korea's troubled Hynix Semiconductor agreed to freeze its debts for three months[5] |
| Oct 2001 | Creditors approved additional bailouts and swapped over $3 billion in company debt for equity[6] |
| Nov 2002 | Hynix defaulted on payments for bonds maturing this month[7] |
| Dec 2002 | Creditors restructure Hynix debt[8] |

---

[1] Choi, Hae Won and Jay Solomon, "Korea's Hynix Defaults on Bonds In Effort to Secure Rescue Plan," Wall Street Journal, 29 August 2001.

[2] Choi, Hae Won and Jay Solomon, "Korea's Hynix Defaults on Bonds In Effort to Secure Rescue Plan," Wall Street Journal, 29 August 2001.

[3] Choi, Hae Won and Jay Solomon, "Korea's Hynix Defaults on Bonds In Effort to Secure Rescue Plan," Wall Street Journal, 29 August 2001.

[4] Choi, Hae Won, "Hynix Creditors Clear Rescue Deal, But Not New Loans – Chip Maker Needs Capital To Stay Competitive," Asian Wall Street Journal, 17 September 2001.

[5] "Korean creditors freeze Hynix debt for three months," Reuters News, 4 October 2001.

[6] "Creditors OK Hynix Semicon Bailout Proposal," Dow Jones International News, 31 October 2001.

[7] Cherry, Judith, "The 'Big Deals' and Hynix Semiconductor: State-Business Relations in Post-Crisis Korea," Asia Pacific Business Review, Vol 10, No 2, Winter 2003, p. 188.

[8] Kirk, Don, "$4 Billion Debt Relief Plan Approved by Hynix Creditors," New York Times, 31 December 2002, available online: http://query.nytimes.com/gst/fullpage.html?res=9801EFD8143FF932A05751C1A9649C8B63 (last accessed: 29 Feb 2008).

Highly Confidential

**Exhibit 6**
**Price Based on WSTS Data**



Source: WSTS,  Hynix Supplemental Response to Plaintiffs, and Hynix Production

Highly Confidential

Exhibit 7

Percentage of Sun's Total Purchases of DRAM by Supplier

1996-2004

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|
| **Elpida** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 8.5% | 5.1% | 0.7% | 0.0% |
| **Hitachi** | 0.0% | 0.0% | 0.7% | 1.0% | 1.0% | 0.5% | 0.0% | 0.0% | 0.0% |
| **Hynix** | 6.2% | 0.0% | 0.0% | 0.8% | 5.9% | 2.9% | 0.0% | 0.0% | 0.0% |
| **Infineon** | 0.3% | 0.0% | 0.0% | 0.0% | 0.2% | 1.5% | 23.9% | 28.0% | 21.9% |
| **Micron** | 0.0% | 0.0% | 0.0% | 4.5% | 14.2% | 21.9% | 28.1% | 32.1% | 50.8% |
| **Mitsubishi** | 0.0% | 24.0% | 25.2% | 16.4% | 13.1% | 15.4% | 8.1% | 0.0% | 0.0% |
| **Mosel** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **NEC** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Samsung** | 93.5% | 76.0% | 74.0% | 77.4% | 65.6% | 49.4% | 34.7% | 39.2% | 27.3% |

Source: Combined Defendant Database as compiled by White

Highly Confidential



Exhibit 8
Hynix DRAM Monthly Die Output Compared with White's OEM Price Index
January 1999 – December 2002

Highly Confidential

Source: Hynix Production Reports (HXD006794 – HXD006903) ; White OEM Model Actual Price Index
Production reports for the following dates were missing: Oct 1998, Jan 2000, Feb 2000, Mar 2000, Apr 2000,
Sep 2000, Mar 2001, Apr 2001, Mar 2002, Apr 2002, Jul 2002, Aug 2002, and Oct 2002.



Exhibit 9
Hynix DRAM Production at Eugene Fab
January 1999 – December 2002

Highly Confidential
Source: Hynix Production Reports (HXD006794 – HXD006903)



Exhibit 10
Average Worldwide DRAM Price

Highly Confidential
Source: WSTS

Exhibit 11
## Log of Worldwide DRAM Quantity (in terabits)



Highly Confidential
Source: WSTS



Exhibit 12
Demand Based on Murphy Analysis

Source: Murphy Analysis

Highly Confidential



Exhibit 13
Supply Based on Murphy Analysis

Highly Confidential
Source: Murphy Analysis



Exhibit 14
Demand and Nasdaq

Highly Confidential



Exhibit 15
Demand and Log of Total Sales of Digital Signal Processors

Highly Confidential

# Exhibit 16

## Actual and Predicted DRAM Prices (August 1998–June 2002)
## Based on Demand Only



Highly Confidential
Source: Murphy Analysis

Exhibit 17
## White's Actual and Predicted OEM Price Index Compared with Price Index Predicted by Demand Only



Highly Confidential
Source: White data and Murphy Analysis



Exhibit 18
Micron's Average Total Cost per Mb, 1996–2004

Source: Shapiro's Report Backup
Costs included were the Cost of Goods Sold, Selling, General and Administrative Expenses, and R&D



Exhibit 19
Cummulative Experience

Highly Confidential
Source: Murphy Analysis



Exhibit 20
Average Density

Highly Confidential
Source: Murphy Analysis



Exhibit 21
Actual and Predicted Cost Measure

Highly Confidential
Source: Shapiro Report Backup and Murphy Analysis



Exhibit 22
Actual and Predicted Supply

Highly Confidential
Source: Murphy Analysis

# Exhibit 23

## Supply Model Results

| | OLS | | IV | |
|---|---|---|---|---|
| | Coefficient | t-stat | Coefficient | t-stat |
| Cost | -0.8086 | -11.51 | -0.9876 | -10.82 |
| Trend | 0.0009 | 9.63 | 0.0006 | 5.51 |
| Constant | -1.6427 | -1.38 | 1.3260 | 0.87 |
| | | | | |
| R-square | 0.99 | | 0.99 | |
| N. of Observations | 61 | | 61 | |

Sources:
WSTS M1 MOS DRAM Megabits, Micron Cost Data

Highly Confidential



Exhibit 24
Actual and Predicted DRAM Price

Highly Confidential
Source: Murphy Analysis



Exhibit 25
Actual and Predicted DRAM Quantity

Highly Confidential
Source: Murphy Analysis

# Exhibit 26

## Average Price Gap - WSTS Price, WSTS Quantity

|                       | OLS       | IV        |
|-----------------------|-----------|-----------|
|                       | Price Gap | Price Gap |
| **Conspiracy Period** | -0.0825   | 0.0061    |
| Standard Error        | (0.0675)  | (0.0671)  |
| t-stat                | -1.22     | 0.09      |
|                       |           |           |
| **Plea Period**       | -0.0201   | 0.0662    |
| Standard Error        | (0.0631)  | (0.0645)  |
| t-stat                | -0.32     | 1.03      |

Notes: Standard errors are corrected for autocorrelation, heterocedasticity and two step estimation.

Source: Murphy Analysis

Highly Confidential



Exhibit 27
Percent of EDO–FPM Megabits Purchased by Sun and OEM
(Products Included in White's Price Indices)

Source: Combined Defendant Database as compiled by White

Highly Confidential



Exhibit 28
Distribution of Sun's Purchases of DRAM, by Technology
(Products Included in White's Price Indices)

Source: Combined Defendant Database as compiled by White

Highly Confidential

**Exhibit 29**

**Marshall Report, Figure 21:
Sun and named OEM purchases of 128/256Mbytes FPM-EDO modules**



Source: Defendant sales data

**Exhibit 30**

**Marshall Report, Figure 22:**
**Sun and named OEM purchases of 512Mbytes SDRAM modules**



Source: Defendant sales data



Exhibit 31
Sun and Named OEM Purchases of 128/256MByte FPM-EDO Modules
Ratio of Sun to OEM Price

Note: Vertical Lines Represent Alleged Conspiracy Period Start and Alleged Conspiracy Period End
Source: Marshall

Highly Confidential



Exhibit 32
Relative Prices of Sun and Named OEM Purchases of 512MByte SDRAM Modules
Ratio of Sun to OEM Price

Note: Vertical Lines Represent Alleged Conspiracy Period Start and Alleged Conspiracy Period End
Source: Marshall

Highly Confidential

**Exhibit 33**
**Illustration of Correlation Effect**



|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Series 1 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| Series 2 | 2 | 4 | 6 | 8 | 10 | 12 | 14 | 16 | 18 | 20 | 22 | 24 | 26 | 28 | 30 | 32 | 34 | 36 | 38 | 40 |
| Series 3 | 2 | 4 | 6 | 8 | 10 | 12 | 14 | 21 | 23 | 25 | 22 | 24 | 26 | 28 | 30 | 32 | 34 | 36 | 38 | 40 |

Highly Confidential

# Exhibit 34

### Correlation of Price Levels in Pre-Period and Alleged Conspiracy Period

| Product | Correlation Coefficients: Levels | |
| --- | --- | --- |
| | Pre-Period | Alleged Conspiracy Period |
| SUN-OEM MODULE FPM-EDO 0128 (0128/0256) | 1.00 | 0.88 |
| SUN-OEM MODULE SDRAM 0512 | NA | |
| ALL AMERICAN-OEM MODULE FPM-EDO 0128 (0128/0256) | 0.99 | 0.86 |
| ALL AMERICAN-OEM CHIP SDRAM 0256 | NA | |
| JACO-OEM CHIP SDRAM 0256 | NA | |
| JACO-OEM MODULE DDR 0512 | NA | |
| UNISYS-OEM MODULE FPM-EDO 0032 | NA | |
| SGI-OEM MODULE SDRAM 0064 (0064/0128) | 0.96 | 0.83 |

**Source: Marshall Report and Murphy Analysis**

Highly Confidential

# Exhibit 35

**Correlation of First Differences in Prices in in Pre-Period and Alleged Conspiracy Period**

| Product | Correlation Coefficients: First Differences | |
|---|---|---|
| | Pre-Period | Alleged Conspiracy Period |
| SUN-OEM MODULE FPM-EDO 0128 (0128/0256) | 0.77 | 0.31 |
| SUN-OEM MODULE SDRAM 0512 | NA | |
| ALL AMERICAN-OEM MODULE FPM-EDO (0128/0256) | 0.65 | 0.38 |
| ALL AMERICAN-OEM CHIP SDRAM 0256 | NA | |
| JACO-OEM CHIP SDRAM 0256 | NA | |
| JACO-OEM MODULE DDR 0512 | NA | |
| UNISYS-OEM MODULE FPM-EDO 0032 | NA | |
| SGI-OEM MODULE SDRAM (0064/0128) | (0.03) | 0.31 |

**Source: Marshall Report and Murphy Analysis**

Highly Confidential

**Exhibit 36**

**Marshall Report, Figure 31:**
**Average actual plaintiff prices vs. predicted plaintiff prices using named OEMs' pricing**





Exhibit 37
Marshall Figure 31:
Alleged Conspiracy Period Only

Highly Confidential
Source: Marshall



Exhibit 38
The Ratio of Predicted to Average Actual Plaintiff Prices using OEM Pricing
(from Marshall Fig 31)

Highly Confidential
Source: Marshall



Exhibit 39a
Revised Marshall Figure 31 – ALL AMERICAN
Average Actual Plaintiff Prices vs. Predicted Plaintiff Prices
Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 39b
Revised Marshall Figure 31 – JACO
Average Actual Plaintiff Prices vs. Predicted Plaintiff Prices
Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 39c
Revised Marshall Figure 31 – SGI
Average Actual Plaintiff Prices vs. Predicted Plaintiff Prices
Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 39d
Revised Marshall Figure 31 – SUN
Average Actual Plaintiff Prices vs. Predicted Plaintiff Prices
Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 39e
Revised Marshall Figure 31 – UNISYS
Average Actual Plaintiff Prices vs. Predicted Plaintiff Prices
Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 40a
Revised Marshall Figure 31 – ALL AMERICAN
Ratio of Average Actual to Predicted Plaintiff Prices
Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 40b
Revised Marshall Figure 31 – JACO
Ratio of Average Actual to Predicted Plaintiff Prices
Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 40c
Revised Marshall Figure 31 – SGI
Ratio of Average Actual to Predicted Plaintiff Prices
Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 40d
Revised Marshall Figure 31 – SUN
Ratio of Average Actual to Predicted Plaintiff Prices
Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 40e
Revised Marshall Figure 31 – UNISYS
Ratio of Average Actual to Predicted Plaintiff Prices
Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 41a
Revised Marshall Figure 31 – APPLE
Ratio of Predicted to Actual Prices Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 41b
Revised Marshall Figure 31 – COMPAQ
Ratio of Predicted to Actual Prices Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 41c
Revised Marshall Figure 31 – DELL
Ratio of Predicted to Actual Prices Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 41d
Revised Marshall Figure 31 – GATEWAY
Ratio of Predicted to Actual Prices Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 41e
Revised Marshall Figure 31 – HP
Ratio of Predicted to Actual Prices Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential



Exhibit 41f
Revised Marshall Figure 31 – IBM
Ratio of Predicted to Actual Prices Using Named OEMs' Pricing

Note: Vertical Lines Represent Conspiracy Period Start, Plea Period Start and Conspiracy/Plea Period End
Source: Murphy Analysis

Highly Confidential

**Exhibit 42**

**Marshall Report, Figure 32:**
**Price indices for plaintiffs vs. named OEMs**





Exhibit 43
The Ratio of Named OEM and Plaintiff Price Index using Plaintiff Market Basket
(from Marshall Fig 32)

Highly Confidential
Source: Marshall

# Exhibit 44

## Variables Selected by White's Iterative Procedure

| Variable Name | Jan-98 | Aug-98 | Apr-99 |
|---|---|---|---|
| 1st Lag of 31-90 Days CP Rates in Secondary Market | | | X |
| 2nd Lag of 31-90 Days CP Rates in Secondary Market | X | X | X |
| 1st Lag of U.S. Industrial Production Index for Computer and Peripheral Equipment | | | |
| 2nd Lag of U.S. Industrial Production Index for Computer and Peripheral Equipment | | | |
| 1st Lag of Fischer Price Index | X | X | X |
| 1st Lag of U.S./Euro Foreign Exchange Rate | X | X | X |
| 2nd Lag of U.S./Euro Foreign Exchange Rate | | | X |
| 1st Lag of U.S. Producer Price Index of Electric Power Distribution: Industrial Electric Power | X | | |
| 2nd Lag of U.S. Producer Price Index of Electric Power Distribution: Industrial Electric Power | | X | X |
| 2nd Lag of Producer Price Index for Semiconductors and Related Device Mfg: MOS Microprocessors | | | |
| Jan  Feb Dummy | X | | |
| Nov Dec Dummy | | X | |
| 1st Lag of U.S. Industrial Production Index for Information Processing and Related Equipment | | | |
| 2nd Lag of U.S. Industrial Production Index for Information Processing and Related Equipment | X | | |
| 1st Lag of South Korea/U.S. Foreign Exchange Rate | | | |
| 2nd Lag of South Korea/U.S. Foreign Exchange Rate | | | X |
| 2nd Lag of German Price Index for Manufacture of Computers and Other Information Processing Equipment | X | X | X |

Highly Confidential

# Exhibit 44

### Variables Selected by White's Iterative Procedure

| Variable Name | Jan-98 | Aug-98 | Apr-99 |
|---|---|---|---|
| 2nd Lag of Intermediate Input Price Index for Electric Power Supply in Taiwan | | X | |
| 1st Lag of German Treasury Bill Rate | | X | |
| 2nd Lag of 10-Year German Government Bond Rates in Secondary Market | | | X |
| 1st Lag of Japan/U.S. Foreign Exchange Rate | | | |
| 2nd Lag of Japan/U.S. Foreign Exchange Rate | | X | |
| 2nd Lag of U.S. 10-Year Treasury Constant Maturity Rate | | | |
| 2nd Lag of U.S. 3-Month Treasury Bill: Secondary Market Rate | | | X |
| 1st Lag of Taiwan/U.S. Foreign Exchange Rate | X | | |
| 2nd Lag of Taiwan/U.S. Foreign Exchange Rate | | | X |
| 1st Lag of German Industrial Production Index for Manufacture of Computers and Other Information Processing Equipment | | X | |
| 1st Lag of U.S. Average Weekly Earnings of Production Workers: Semiconductors and Related Devices | X | X | X |

Highly Confidential



Exhibit 45
Actual and Predicted Prices using White's Selected Variables

Highly Confidential

# Appendix C

# Depositions from MDL Case

| Deponent | On Behalf Of | Date | Comments |
|---|---|---|---|
| Abed "Al" Kassak | Hynix | 21-Apr-06 | |
| Akifumi Takayasu | Elpida | 14-Jun-06 | |
| Akihiko Furusawa | Elpida | 1-Aug-06 | |
| Albert J. Boro | Hynix | 10-Feb-06 | 30(b)(6) |
| Alfred P. Censullo | Micron | 11-Apr-06 | |
| Bill Lauer | Micron | 05/17/0014 | |
| Brice J. Arave | Micron | 14-Feb-06 | 30(b)(6) |
| Chae Kyun Chung | Hynix | 27-Jul-06 | |
| Charles R. Byrd | Hynix | 20-Apr-06 | |
| Chun Yub Choi | Hynix | 20-Apr-07 | |
| Dan Morrissey | Micron | 25-Apr-06 | |
| Daniel L. Donabedian | Elpida | 27-Apr-06 | |
| David S. Lin | Elpida | 20-Jul-06 | |
| Dennis Scott | NEC | 1-Mar-06 | 30(b)(6) |
| Dimitrios James Sogas | Elpida | 25-Apr-06 | |
| Donna Hatcher | NEC | 2-Mar-06 | 30(b)(6) |
| Duk Il Shin | Hynix | 9-Feb-06 | 30(b)(6) |
| Farhad Tabrizi | Hynix | 7-Apr-06 | |
| Fred R. Waddel | Micron | 10-Mar-06 | |
| Frederick Joseph Smith | Mosel | 2-May-06 | |
| Frederick Joseph Smith | Mosel | 2-May-06 | 30(b)(6) |
| Gary J. Swanson | Hynix | 27-Apr-06 | |
| Guenter Hefner | Infineon | 10-May-06 | |
| Heeseung Cho | Hynix | 23-Feb-07 | |
| Heinrich Florian | Infineon | 9-May-06 | |
| Hyun Jun Kim | Hynix | 11-Jul-06 | |
| Hyun Jun Kim | Hynix | 8-Feb-06 | 30(b)(6) |
| I.J. Kim | Hynix | 12-Jul-06 | |
| J. G. Nam | Hynix | 11-May-06 | |
| Jackie Gross | HP-Compaq | 15-Sep-01 | |
| Jeng-Yi Wu | Winbond | 11-Jul-06 | 30(b)(6) |
| Jerome L. McBroom | Hynix | 29-Mar-06 | |
| Joe Chen | Winbond | 13-Jul-06 | 30(b)(6) |
| Joe Chen | Winbond | 14-Jul-06 | |
| John A. Eideh | Winbond | 28-Jun-06 | |
| John A. Landreth | Micron | 3-Mar-06 | |
| John Bugee | Infineon | 6-Apr-06 | |
| John Yee Woon Seto | Mosel | 18-Apr-06 | |
| Jon Ostberg | Micron | 14-Mar-06 | |
| Julie Kay Smith | Micron | 14-Feb-06 | 30(b)(6) |
| K. Michael Ramirez | Mosel | 5-May-06 | |
| Karen Buse | Elpida | 21-Mar-06 | 30(b)(6) |
| Kathy Radford | Micron | 5-Apr-06 | |
| Keith D. Weinstock | Micron | 12-May-06 | |
| Kun Chul Suh | Hynix | 25-Jul-06 | |

# Depositions from MDL Case

| Deponent | On Behalf Of | Date | Comments |
|---|---|---|---|
| Larry Gaddy | Winbond | 30-Jun-06 | |
| Lin Lee | Hynix | 9-Feb-06 | |
| Linda Turner | Micron | 14-Apr-06 | |
| Lionel Lim | Micron | 8-May-06 | |
| Margaret Guerin-Calvert | Hynix | 7-Apr-06 | |
| Martha J. Earl | Hynix | 6-Feb-06 | 30(b)(6) |
| Michael Peterson | Hynix | 5-Apr-06 | |
| Michael Pitzer | Infineon | 30-Mar-06 | |
| Michael Sadler | Micron | 7-Jul-06 | |
| Mohammad Iqbal | Mosel | 27-Apr-06 | |
| Mr Charles Kau | Nanya | 12-Jul-06 | |
| Myung Ro Lee | Hynix | 8-Feb-06 | 30(b)(6) |
| Naomi Joy Lohnes | Johnson & Jennings | 12-Sep-06 | |
| Nathan Handelsman | Mosel | 1-May-06 | |
| Pai Pei Lin | Nanya | 14-Jul-06 | |
| Pamela Chen | Nanya | 29-Mar-06 | 30(b)(6) |
| Paul Palonsky | Hynix | 9-May-06 | |
| Peter Schaefer | Infineon | 8-May-06 | |
| Phillip William Hassett | Elpida | 12-May-06 | |
| Rajit Suryavadan Shah | Mosel | 11-May-06 | |
| Roger Hawkins | Micron | 28-Feb-06 | |
| Ronald Abruzzese | Winbond | 6-Jul-06 | |
| Ronald Farrell | Mosel | 9-May-06 | |
| Roy Don Brents | Sanmica | 6-Jul-06 | |
| Stefan Schauss | Winbond | 25-Jul-06 | |
| Steve Hsu | Nanya | 29-Jun-06 | |
| Steve Thorsen | Micron | 24-Mar-06 | |
| Steve Wang | Nanya | 17-Apr-06 | |
| Steven Appleton | Micron | 9-May-06 | |
| Steven Lawrence Wahl | Infineon | 25-Apr-06 | |
| Sung S. Woo | Hynix | 6-Feb-06 | 30(b)(6) |
| T. Rudd Corwin | Infineon | 13-Apr-06 | |
| Tatsuya Iida | Elpida | 14-Jul-06 | |
| Thomas Addie | Micron | 24-May-06 | |
| Thomas C. Panacci | Elpida | 25-Apr-06 | |
| Wen C. Chu | Winbond | 14-Jun-06 | 30(b)(6) |
| Yasukazu Inoue | Elpida | 22-Jun-06 | |
| Yu Sheng Li | Mosel | 3-May-06 | 30(b)(6) |
| Ali Farahbod | Elpida | 9-May-06 | |
| Abraham Lim | Infineon | 10-Oct-06 | |
| Curt Anderson | Elpida | 20-Mar-06 | |
| Arun Aggarwal | Elpida | 20-Mar-06 | |
| Michael Despotes | Elpida | 22-May-06 | |
| Donald Steven Yamagachi | Elpida | 22-Feb-07 | |
| Wesley Swail | Infineon | 22-Feb-07 | 30(b)(6) |

## Depositions from MDL Case

| Deponent | On Behalf Of | Date | Comments |
|----------|--------------|------|----------|
| Brian Donahue | Nanya | 12-Jun-06 | |
| David Dwyer | Nanya | 14-Jun-06 | |
| Kenneth Hurley | Nanya | 16-Jun-06 | |
| Michael Walsh | Nanya | 28-Jun-06 | |
| Richard Cripps | NEC | 5-May-06 | |
| Roy Brents | NEC | 6-Jul-06 | |
| Bart Ladd | NEC | 2-Mar-07 | |
| Keith Lefebvre | HP | 30-Oct-06 | |
| Kevin Brown | Dell | 12-Sep-06 | |
| Seshu Anne | Dell | 14-Sep-06 | |

# Sun Depositions from Opt-Out Case

| Deponent | On Behalf Of | Position | Date | Comments |
|---|---|---|---|---|
| Benjamin Ma | SUN | Global Commodity Director, Memory, ASICs & Flash | 30-Nov-07 | |
| Chris Maxwell | SUN | Operations Product Manager | 9-Jan-08 | |
| Clement Fang | SUN | Senior Engineering Manager (Memory Technology Group) | 29-Nov-07 | |
| David Jeffrey | SUN | Test Engineering Manager (Memory Technology Group) | 4-Oct-07 | |
| Kevin Carroll | SUN | Vice President of Supply Management | 5-Dec-07 | |
| Kurt Doelling | SUN | Vice President of Supply Management & Operations Strategy | 23-Oct-07 | 30(b)(6) |
| Linda Park | SUN | Vice President of APAC Sun Services (held many management engineering positions at Sun before coming back to the Company this year to take on this | 18-Dec-07 | |
| Lisa Ripley | SUN | Business Process Analyst/Business Opera | 15-Nov-07 | 30(b)(6) |
| Luisa Torelli | SUN | Business Analyst, Supplier Management (Memory Group) | 5-Dec-07 | |
| Manuel Raposa | SUN | Supply Base Development Manager, Supplier Management (Memory Group) | 11-Dec-07 | |
| Neil Duncan | SUN | Engineer (Memory Technology Group) | 3-Oct-07 | 30(b)(6) |
| Peter Wilson | SUN | Supply Base Development Manager, Supplier Management (Memory Group) | 5-Nov-07 | 30(b)(6) |
| Peter Wilson | SUN | Supply Base Development Manager, Supplier Management (Memory Group) | 6-Nov-07 | 30(b)(6) |
| Peter Wilson | SUN | Supply Base Development Manager, Supplier Management (Memory Group) | 28-Nov-07 | Combination: 30(b)(6) and not 30(b)(6) |
| Richard Ellis | SUN | Global Commodity Director, Memory Products (Memory Group) | 3-Dec-07 | |
| Warren Mootrey | SUN | Product Line Director | 4-Feb-08 | rough |

# Non-Sun Depositions from Opt-Out Case

| Deponent | On Behalf Of | Date | Comments |
|---|---|---|---|
| Bashar Elsbihi | All American | 18-Jan-08 | |
| Michael Pollina | Edge | 4-Oct-07 | 30(b)(6) |
| Hirohisa Ueno | Elpida | 14-Dec-07 | |
| Mizuki Yoshino | Elpida | 23-Oct-07 | |
| Tashiaki Hagiwara | Elpida | 22-Oct-07 | |
| Jackie Gross | HP | 29-Aug-06 | 30(b)(6) |
| Dae Soo Kim | Hynix | 13-Feb-08 | |
| Dae Soo Kim | Hynix | 14-Feb-08 | |
| Jae Seung Kim | Hynix | 18-Oct-07 | 30(b)(6) |
| Jae Seung Kim | Hynix | 12-Dec-08 | |
| Jae Seung Kim | Hynix | 13-Dec-08 | |
| Juseon Kim | Hynix | 12-Dec-07 | 30(b)(6) |
| Mark Ellsberry | Hynix | 27-Nov-07 | |
| Nick LaHerran | Hynix | 11-Dec-07 | |
| Robert Sharpe | Hynix | 17-Dec-07 | |
| Johann Harter | Infineon | 20-Nov-07 | |
| Richard Costa | Infineon | 13-Nov-07 | |
| John Donza | JACO | 5-Oct-07 | 30(b)(6) Testimony, Edge v. Hynix |
| John Donza | JACO | 5-Oct-07 | 30(b)(6) Exhibits, 1-25 |
| John Donza | JACO | 5-Oct-07 | 30(b)(6) Exhibits, 26-48 |
| John Donza | JACO | 5-Oct-07 | 30(b)(6) Testimony, JACO v. Hynix |
| John Donza | JACO | 5-Oct-07 | 30(b)(6) Testimony, JACO v. Hynix |
| Susan Huang | Mosel | 29-Nov-07 | |
| Susan Huang | Mosel | 30-Nov-07 | |
| Christina Stratmoen | Nanya | 10-Dec-07 | |
| Pei Lin Pai | Nanya | 28-Nov-07 | |
| John Cerrato | Samsung | 2-Nov-07 | |
| Burton Nicoson | Samsung | 15-Nov-07 | |
| Devin Cole | Samsung | 12-Dec-07 | |
| Il Ung Kim | Samsung | 9-Jan-08 | |
| Il Ung Kim | Samsung | 10-Jan-08 | |
| James Elliot | Samsung | 4-Dec-07 | |
| Michael Bocian | Samsung | 6-Dec-07 | |
| Thomas Quinn | Samsung | 30-Nov-07 | |
| Thomas Trill | Samsung | 30-Nov-07 | |
| Yeongho Kang | Samsung | 27-Nov-07 | |
| Young Woo Lee | Samsung | 15-Jan-08 | |
| Alain Ishiguro | SGI | 20-Nov-07 | |
| Kelly Bement | SGI | 30-Nov-07 | |
| Michael Oneto | SGI | 14-Dec-07 | |
| Carolyn Stark | Unisys | 17-Jan-08 | 30(b)(6), 30(b)(1) |

## Non-Sun Depositions from Opt-Out Case

| Deponent | On Behalf Of | Date | Comments |
|---|---|---|---|
| Elizabeth Debeliso | Unisys | 10-Dec-07 | |
| Harry Brunner | Unisys | 12-Oct-07 | 30(b)(6) |
| Harry Brunner | Unisys | 17-Oct-07 | 30(b)(6) |
| James Van Hollebeke | Unisys | 16-Oct-07 | 30(b)(6) |
| Kevin Krueger | Unisys | 16-Jan-08 | 30(b)(6) |
| Mark Ross Feverston | Unisys | 11-Oct-07 | 30(b)(6) |
| Neil Edelbaum | Unisys | 11-Oct-07 | |
| Philippe Pierquin | Unisys | 12-Dec-07 | |

## Depositions of Other Experts

| Name | On Behalf of | Date |
| --- | --- | --- |
| Roger Noll | Plaintiffs | 25-Sep-06 |
| Paul Liu | Plaintiffs | 28-Sep-06 |
| Halbert L. White | Plaintiffs | 27-Feb-08 |
| Halbert L. White | Plaintiffs | 28-Feb-08 |
| Robert C. Marshall | Plaintiffs | 29-Feb-08 |

# Expert Reports

| Expert | Date |
|---|---|
| Halbert L. White | 14-Dec-07 |
| Robert C. Marshall | 14-Dec-07 |
| Alan J. Cox | 2-Oct-06 |
| Carl Shapiro | 2-Oct-06 |
| Roy Weinstein | 2-Oct-06 |
| Victor G. de Dios | 2-Oct-06 |
| Vincent E. O'Brien | 2-Oct-06 |
| Paul Liu | 28-Aug-06 |
| Roger Noll | Aug-06 |

## Discovery Documents
## Provided by Other Experts

| Date | Title |
|---|---|
| Aug-06 | Roger Noll |
| 28-Aug-06 | Paul Liu |
| 2-Oct-06 | Carl Shapiro |
| 14-Dec-07 | Halbert L. White |
| 14-Dec-07 | Robert C. Marshall |

## USITC Documents

| ITC Document Title | ITC Document Date | Public/Privileged Version |
|---|---|---|
| USITC:DRAMs and DRAM Modules From Korea: Transcript | 22-Nov-02 | n/a |
| DRAMs and DRAM Modules from Korea, USITC Pub. 3569 (Preliminary) | Dec-02 | Public |
| Jerry Hausman, The Effect of Korean Government Subsidies to Hynix on the U.S. DRAM Industry | 17-Jun-03 | Public |
| DRAMs and DRAM Modules From Korea: Pre-Hearing Brief of Petitioner Micron Technology, Inc | 19-Jun-03 | Public |
| DRAMs and DRAM Modules From Korea, No. 701-TA-431, Pub. 3616 | Aug-03 | Public |
| Federal Trade Commission v. Foster et al., No. CIV 07-352 at ¶393 (D.N.M. 2007). | 29-May-07 | Public |

# Complaints

| Title | File Date |
|---|---|
| Amended Complaint of All American Semiconductor, Inc. | 4-May-07 |
| Amended Complaint of Edge Electronics, Inc. | 4-May-07 |
| Amended Complaint of JACO Electronics, Inc. | 4-May-07 |
| Amended Complaint of DRAM Claims Liquidation Trust | 4-May-07 |
| Amended Consolidated Complaint for Damages and Injunctive Relief for Sun and Unisys | 4-May-07 |

# Letters from Counsel

| Date | Heading |
|------|---------|
| 10-Oct-07 | Letter to David Cross, from Ian Simmons, re. Sun Microsystems, Inc., et al., v. Hynix Semiconductor, Inc., et al. (Case No. C06-01665 PJH (Consolidated)); Unisys Corp. v. Hynix Semiconductor, Inc., et al. (Case No. C06-02915 PJH); All American Semiconductor, Inc. v. Hynix Semiconductor, Inc., et al. (Case No. C07-01200 PJH); Edge Electronics, Inc. v. Hynix Semiconductor, Inc., et al. (Case No. C07-01207 PJH); Jaco Electronics, Inc. v. Hynix Semiconductor, Inc., et al. (Case No. C07-01212 PJH). |
| 31-Oct-07 | Letter to Ian Simmons, from Matthew J. McBurney, re. Sun Microsystems, Inc., et al., v. Hynic Semiconductor, Inc., et al., Case No. C06-01665 PJH (Consolidated) (N.D. Cal.); Unisys Corporation v. Hynix Semiconductor, Inc., et al., Case No. C06-02915 PJH (N.D. Cal.); Jaco Electronics, Inc., v. Hynix Semiconductor, Inc., et al., Case No. C06-01212 PJH (N.D. Cal.). |
| 6-Nov-07 | Letter to All Counsel of Record, from Matthew J. McBurney, re. Unisys Corporation v. Hynix Semiconductor, Inc., et al., Case No. C06-02915 PJH (N.D., Cal.). |
| 12-Nov-07 | Letter to All Counsel of Record, from Matthew J. McBurney, re. Edge Electronics, Inc. v. Hynix Semiconductor, Inc., et al., Case No. C07-01207 |
| 12-Nov-07 | Letter to All Counsel of Record, from Matthew J. McBurney, re. Sun Microsystems, Inc., et al. v. Hynix Semiconductor, Inc., et al., Case No. C06-01665 PJH (Consolidated) (N.D. Cal.). |
| 12-Nov-07 | Letter to All Counsel of Record, from Matthew J. McBurney, re. All American Semiconductor, Inc. v. Hynix Semiconductor, Inc., et al., Case no. C07-01200 PJH (N.D. Cal.). |
| 30-Nov-07 | Letter to David Cross, from Joshua Stambaugh, re. Unisys Corporation v. Hynix Semiconductor, Inc., et al. |

# Plea Agreements

| Submitted | Affiliation | Date |
|---|---|---|
| United States of America v. Hynix Semiconductor Inc.: Case No. CR 05-249 PJH | Hynix | 11-May-05 |
| United States of America v. Elpida Memory, Inc.: Case No. CR 06-0059 (PJH) | Elpida | 22-Mar-06 |
| United States of America v. Infineon Technologies AG: Case No. 04-299 (PJH) | Infineon | 20-Oct-04 |
| United States of America v. Samsung Electronics Company, Ltd. And Samsung Semiconductor, Inc. | Samsung | 23-Nov-05 |
| United States of America v. Dae Soo Kim | Hynix | 1-Mar-06 |
| United States of America v. Chae Kyun Chung | Hynix | 1-Mar-06 |
| United States of America v. Choon Yub | Hynix | 1-Mar-06 |
| United States of America v. Kun Chul Suh | Hynix | 1-Mar-06 |
| United States of America v. T. Rudd Corwin: Case No. CR 04-0397 PJH | Infineon | 15-Dec-04 |
| United States of America v. Heinrich Florian: Case No. CR-04-0397 PJH | Infineon | 15-Dec-04 |
| United States of America v. Gunter Hefner: Case No. CR-04-0397 PJH | Infineon | 15-Dec-04 |
| United States of America v. Peter Schaefer, Case No. CR-04-0397 PJH | Infineon | 15-Dec-04 |
| United States v. Il Ung Kim: Case No. CR 06-0692 PJH | Samsung | 19-Apr-07 |
| United States of America v. Thomas Quinn: Case No. CR 06-635 PJH | Samsung | 8-Nov-06 |
| United States of America v. Sun Woo Lee: Case No. CR 06-180 (PJH) | Samsung | 29-Mar-06 |
| United States of America v. Yeongho Kang: Case No. CR 06-180 (PJH) | Samsung | 13-Oct-06 |
| United States of America v. Young Hwan Park: Case No. CR 06-819 PJH | Samsung | 8-Feb-07 |
| United States of America v. Young Woo | Samsung | 22-Aug-06 |
| United States of America v. Alfred P. Censullo: Criminal No. 03-0368 PJH | Micron | 21-Jan-04 |
| United States of America v. D. James Sogas: Plea Agreement, Case No. CR 06- | Elpida | 13-Dec-06 |
| United States and Elpida Memory, Inc.'s Joint Sentencing Memorandum | Elpida | 22-Mar-06 |

# Legal Documents Pertaining to DRAM Antitrust Litigation

| Date | Title |
|------|-------|
| 31-Jan-08 | All American Semiconductor, Inc.'s Supplemental Response to Elpida Defendants' First Set of Requests for Admission to Plaintiffs |
| 31-Jan-08 | Jaco Electronics, Inc.'s Supplemental Responses to Elpida Defendants' First Set of Requests for Admission to Plaintiffs |
| 31-Jan-08 | Jaco Electronics, Inc.'s Supplemental Responses to Elpida Memory, Inc.'s and Elpida Memory (USA) Inc.'s Second Set of Interrogatories to Plaintiffs |
| 31-Jan-08 | Plaintiff All American Semiconductor, Inc.'s Supplemental Responses to Elpida Memory, Inc.'s and Elpida Memory (USA) Inc.'s Second Set of Interrogatories to |
| 31-Jan-08 | Plaintiff All American Semiconductor, Inc.'s Supplemental Responses to Hynix Semiconductor, Inc.'s and Hynix Semiconductor America, Inc.'s First Set of |
| 31-Jan-08 | Plaintiff Edge Electronics, Inc.'s Supplemental Response to Elpida Defendants' First Set of Requests for Admission to Plaintiffs |
| 31-Jan-08 | Plaintiff Edge Electronics, Inc.'s Supplemental Response to Elpida Memory, Inc.'s and Elpida Memory (USA) Inc.'s Second Set of Interrogatories to Plaintiffs |
| 31-Jan-08 | Plaintiff Edge Electronics, Inc.'s Supplemental Response to Hynix Semiconductor America Inc.'s First Set of Interrogatories |
| 31-Jan-08 | Plaintiff Edge Electronics, Inc.'s Supplemental Response to Hynix Semiconductor Inc.'s and Hynix Semiconductor America Inc.'s Second Set of Interrogatories |
| 31-Jan-08 | Plaintiff Jaco Electronics, Inc.'s Supplemental Responses to Hynix Semiconductor Inc.'s and Hynix Semiconductor America Inc.'s First Set of Interrogatories |
| 31-Jan-08 | Plaintiff Jaco Electronics, Inc.'s Supplemental Responses to Hynix Semiconductor Inc.'s and Hynix Semiconductor America Inc.'s Second Set of Interrogatories |
| 31-Jan-08 | Plaintiff Sun Microsystems, Inc.'s Second Supplemental Response to Elpida Memory, Inc. and Elpida Memory (USA) Inc.'s Second Set of Interrogatories |
| 31-Jan-08 | Plaintiff Sun Microsystems, Inc.'s Second Supplemental Response to Hynix Semiconductor Inc.'s and Hynix Semiconductor America Inc.'s First Set of |
| 31-Jan-08 | Plaintiff Sun Microsystems, Inc.'s Supplemental Response to Defendants' First Joint Set of Interrogatories Regarding Jurisdiction and Standing |
| 31-Jan-08 | Plaintiff Sun Microsystems, Inc.'s Supplemental Response to Defendants' First Joint Set of Requests for Admission Regarding Jurisdiction and Standing |
| 31-Jan-08 | Plaintiff Sun Microsystems, Inc.'s Supplemental Response to Hynix Semiconductor Inc. and Hynix Semiconductor America Inc.'s First Set of Requests for Admission |
| 31-Jan-08 | Plaintiff Sun Microsystems, Inc.'s Supplemental Response to Hynix Semiconductor Inc. and Hynix Semiconductor America Inc.'s Second Set of Interrogatories |
| 31-Jan-08 | Plaintiff Sun Microsystems, Inc.'s Supplemental Responses to Elpida Memory, Inc.'s and Elpida Memory (USA) Inc.'s First Set of Requests for Admission to Sun |
| 31-Jan-08 | Plaintiff Sun Microsystems, Inc's Supplemental Response to Elpida Memory, Inc. and Elpida Memory (USA) Inc.'s First Set of Requests for Admission |
| 31-Jan-08 | Plaintiff Unisys Corporation's Second Supplemental Response to Hynix Semiconductor Inc. and Hynix Semiconductor America Inc.'s First Set of Interrogatories |
| 31-Jan-08 | Plaintiff Unisys Corporation's Supplemental Response to Defendants' First Joint Set of Interrogatories Regarding Jurisdiction and Standing |
| 31-Jan-08 | Plaintiff Unisys Corporation's Supplemental Response to Defendants' First Joint Set of Requests for Admission Regarding Jurisdiction and Standing |

# Legal Documents Pertaining to DRAM Antitrust Litigation

| Date | Title |
|------|-------|
| 31-Jan-08 | Plaintiff Unisys Corporation's Supplemental Response to Hynix Semiconductor Inc. and Hynix Semiconductor America Inc.'s First Set of Requests for Admission |
| 31-Jan-08 | Plaintiff Unisys Corporation's Supplemental Response to Hynix Semiconductor Inc. and Hynix Semiconductor America Inc.'s Second Set of Interrogatories |
| 30-Jan-08 | Letter Brief fo Judge Spero, Attested by David Cross |
| 30-Jan-08 | Letter to The Honorable Joseph C. Spero from David D. Cross, re. C07-01212 PJH and C07-01200 PJH |
| 18-Jan-08 | Plaintiff All American Semiconductor, Inc.'s Responses to Defendants Micron Technology, Inc. and Micron Semiconductor Products, Inc's First Set of Interrogatories |
| 18-Jan-08 | Plaintiff All American Semiconductor, Inc.'s Responses to Micron Technology, Inc. and Micron Semiconductor Products, Inc. First Set of Requests for Production |
| 18-Jan-08 | Plaintiff JACO Electronics, Inc.'s Response to Micron Technology, Inc., and Micron Semiconductor Products, Inc. First Set of Requests for Production |
| 18-Jan-08 | Plaintiff JACO Electronics, Inc.'s Responses to Defendants Micron Technology, Inc. and Micron Semiconductor Products, Inc's First Set of Interrogatories |
| 18-Jan-08 | Plaintiffs' First Joint Supplemental Response to Hynix Semiconductor Inc.'s and Hynix Semiconductor America Inc.'s First Set of Interrogatories |
| 18-Jan-08 | Plaintiffs Sun Microsystems, Inc., All American Semiconductor, Inc., Edge Electronics, Inc., and JACO Electronics, Inc.'s First Joint Supplemental Response to Elpida Memory (USA) Inc.'s Second Set of Interrogatories to Plaintiffs |
| 18-Jan-08 | Plaintiffs Sun Microsystems, Inc., All American Semiconductor, Inc., Edge Electronics, Inc., and JACO Electronics, Inc.'s Supplemental Response to Elpida Memory, Inc.'s and Elpida Memory (USA) Inc.'s Third Set of Interrogatories to Plaintiffs |
| 18-Jan-08 | Plaintiff's Supplemental Response to Defendant Nanya Technology Corporation USA's First Set of Interrogatories - Nos. 3 through 6 |
| 18-Jan-08 | Plaintiffs' Supplemental Response to Defendant Nanya Technology Corporation's First Set of Interrogatories - Nos. 3 through 6 |
| 18-Jan-08 | Plaintiffs Unisys Corp., All American Semiconductor, Inc., Edge Electronics, Inc., and JACO Electronics, Inc.'s Supplemental Responses to Infineon Defendants' First Set of Interrogatories to All Plaintiffs |
| 20-Dec-07 | Plaintiffs Sun Microsystems, Inc., All American Semiconductor, Inc., Edge Electronics, Inc., and JACO Electronics, Inc.'s Objections to Elpida Memory, Inc.'s and Elpida Memory (USA) Inc.'s Second Set of Interrogatories to Plaintiffs |
| 19-Dec-07 | Hynix's Objections and Responses to Sun Microsystems Inc.'s Second Set of Interrogatories |
| 17-Dec-07 | Plaintiff All American Semiconductor, Inc.'s Response to Hynix Semiconductor Inc. and Hynix Semiconductor Amercia Inc.'s First Set of Interrogatories |
| 17-Dec-07 | Plaintiff Edge Electronics, Inc.'s Response to Hynix Semiconductor Inc. and Hynix Semiconductor America Inc.'s First Set of Interrogatories |
| 17-Dec-07 | Plaintiff Edge Electronics, Inc.'s Response to Hynix Semiconductor Inc. and Hynix Semiconductor America Inc.'s First Set of Requests for Production |
| 17-Dec-07 | Plaintiff Edge Electronics, Inc.'s Response to Hynix Semiconductor Inc. and Hynix Semiconductor Amserica Inc.'s Second Set of Interrogatories |
| 17-Dec-07 | Plaintiff Edge Electronics, Inc.'s Response to Hynix Semiconductor Inc.'s First Set of Requests for Admission |

# Legal Documents Pertaining to DRAM Antitrust Litigation

| Date | Title |
| --- | --- |
| 17-Dec-07 | Plaintiff JACO Electronics, Inc.'s Response to Defendant NEC Electronics America, Inc.'s First Set of Interrogatories |
| 17-Dec-07 | Plaintiff JACO Electronics, Inc.'s Response to Defendants Micron Technology, Inc. and Micron Semiconductor Products, Inc's First Set of Interrogatories |
| 17-Dec-07 | Plaintiff JACO Electronics, Inc.'s Response to Hynix Semiconductor Inc. and Hynix Semiconductor America Inc.'s Second Set of Interrogatories |
| 17-Dec-07 | Plaintiff JACO Electronics, Inc.'s Response to Hynix Semiconductor Inc., and Hynix Semiconductor America Inc.'s First Set of Interrogatories |
| 17-Dec-07 | Plaintiff JACO Electronics, Inc.'s Response to Hynix Semiconductor Inc., and Hynix Semiconductor America Inc.'s First Set of Requests for Production |
| 17-Dec-07 | Plaintiff Sun Microsystems, Inc.'s Response to Defendants' First Joint Set of Interrogatories Regarding Jurisdiction and Standing |
| 17-Dec-07 | Plaintiff Sun Microsystems, Inc.'s Response to Defendants' First Joint Set of Requests for Admission Regarding Jurisdiction and Standing |
| 17-Dec-07 | Plaintiff Sun Microsystems, Inc.'s Response to Defendants' First Joint Set of Requests for Production Regarding Jurisdiction and Standing |
| 17-Dec-07 | Plaintiffs Unisys Corp., All American Semiconductor, Inc., Edge Electronics, Inc., and JACO Electronics, Inc.'s Objections to Infineon Defendants' First Set of Interrogatories to All Plaintiffs |
| 17-Dec-07 | Subpoena to Charles H. Stevenson and Proof of Service of Subpoena to Charles H. Stevenson |
| 3-Dec-07 | Defendants Samsung Semiconductor, Inc.'s and Samsung Electronics Co., Ltd.'s First Amended and Supplemental Responses to DRAM Claims Liquidation Trust's First Set of Interrogatories |
| 20-Nov-07 | Hynix's Supplemental Response to Plaintiffs Sun Microsystems, Inc.; Unisys Corporation; JACO Electronics, Inc.; Edge Electronics, Inc.; and All American Semiconductor, Inc.'s First Set of Interrogatories to All Defendants |
| 8-Jun-07 | Defendants' Joint Pre-Mediation Memorandum Regarding Claims Asserted by Unisys Corporation |
| 8-Jun-07 | Defendants' Joint Pre-Mediation Morandum Regarding Claims Asserted by Sun Microsystems |
| 8-Jun-07 | Sun Microsystems, Inc.'s and Unisys Corporation's Mediation Statement: Sun Microsystems, Inc., et al. v. Hynix Semiconductor, Inc., et al. (Consolodated); Unisys Corp. v. Hynix Semiconductor, Inc. et al. |
| 20-Feb-07 | In re DYNAMIC RANDOM ACCESS MEMORY (DRAM) ANTITRUST LITIGATION: Court's Order Granting Summary Judgment in Part and Denying Summary Judgment in Part |
| 20-Feb-07 | Order Granting Summary Judgment in Part and Denying Summary Judgment in Part |
| 2-Feb-07 | Indirect Purchaser Plaintiffs' Supplemental Responses to Certain Defendants Infineon Technologies, North America Corp., Hynix Semiconductor, Inc., Winbond Electronics Corporation, NEC Electronics America, Inc., Micron Semiconductor Products Inc., Micron Technology Inc., Samsung Semiconductor, Inc., and Elpida Memory (USA), Inc.'s First Joint Set of Interrogatories to Indirect Purchaser Plaintiffs |
| 2-Feb-07 | Indirect Purchaser Plaintiffs' Supplemental Responses to Defendant Hynix Semiconductor America Inc.'s First Set of Special Interrogatories |

# Legal Documents Pertaining to DRAM Antitrust Litigation

| Date | Title |
| --- | --- |
| 10-Jan-07 | Nanya Technology Corporation USA's Reply Brief in Support of Its Motion for Summary Judgment |
| 10-Jan-07 | Nanya Technology Corporation USA's Reply Brief in Support of its Motion for Summary Judgment |
| 10-Jan-07 | Nanya Technology Corporation's Notice of Motion and Motion for Summary Judgment; Memorandum in Support Thereof |
| 10-Jan-07 | Nanya Technology Corporation's Notice of Motion for Summary Judgment: Memorandum in Support Thereof |
| 10-Jan-07 | Plaintiffs' Memorandum in Opposition to Nanya Technology Corp. and Nanya Technology Corp. U.S.A.'s Motions for Summary Judgment |
| 10-Jan-07 | Plaintiffs' Memorandum in Opposition to Nanya Technology Corp. and Nanya Technology Corp. U.S.A.'s Motions for Summary Judgment |
| 10-Jan-07 | Reply Declaration of Na'il Benjamin in Support of Nanya Technology Corporation's and Nanya Technology Corporation USA's Motions for Summary Judgment |
| 10-Jan-07 | Reply Declaration of Na'il Benjamin in Support of Nanya Technology Corporation's and Nanya Technology Corporation USA's Motions for Summary Judgment |
| 10-Jan-07 | Reply Declaration of Vincent E. O'Brien in Support of Nanya Technology Corporation's and Nanya Technology Corporation USA's Motions for Summary Judgment |
| 10-Jan-07 | Reply Declaration of Vincent E. O'Brien in Support of Nanya Technology Corporation's and Nanya Technology Corporation USA's Motions for Summary Judgment |
| 8-Sep-06 | Third Supplemental Responses to Plaintiffs' Second Set of Interrogatories |
| 22-Mar-06 | United States of America v. Elpida Memory, Inc. |
| 23-Feb-04 | In re Rambus, Inc., Initial Decision, FTC Docket No. 9302. |

## Documents From the Trial of Gary Swanson

| Date | Title |
| --- | --- |
| 28-Feb-08 | C.K. Chung (Hynix) Witness Summary |
| 28-Feb-08 | D.S. Kim (Hynix) Witness Summary |
| 28-Feb-08 | Dennis Lee (Infineon) Witness Summary |
| 28-Feb-08 | Ken Heller (Hynix) Witness Summary |
| 28-Feb-08 | Keith Weinstock (Micron) Witness Summary |
| 28-Feb-08 | Mike Peterson (Hynix) Witness Summary |
| 28-Feb-08 | K.C. Suh (Hynix) Witness Summary |
| 25-Feb-08 | Gary Swanson Trial Transcript, Vol 12 of 12 |
| 22-Feb-08 | Gary Swanson Trial Transcript, Vol 11 of 12 |
| 21-Feb-08 | Gary Swanson Trial Transcript, Vol 10 of 12 |
| 19-Feb-08 | Gary Swanson Trial Transcript, Vol 9 of 12 |
| 15-Feb-08 | Gary Swanson Trial Transcript, Vol 8 of 12 |
| 14-Feb-08 | Gary Swanson Trial Transcript, Vol 7 of 12 |
| 12-Feb-08 | Gary Swanson Trial Transcript, Vol 6 of 12 |
| 11-Feb-08 | Gary Swanson Trial Transcript, Vol 5 of 12 |
| 8-Feb-08 | Gary Swanson Trial Transcript, Vol 4 of 12 |
| 7-Feb-08 | Gary Swanson Trial Transcript, Vol 3 of 12 |
| 5-Feb-08 | Gary Swanson Trial Transcript, Vol 2 of 12 |
| 4-Feb-08 | Gary Swanson Trial Transcript, Vol 1 of 12 |
| 22-Oct-07 | Amended Summary of Government's Case Against Gary Swanson (Redacted) |
| 22-Oct-07 | Stipulation and Order in Response to Defendant Gary Swanson's Motion for Bill of Particulars |
| 27-Feb-07 | Letter from Niall Lynch to the Honorable Phyllis J. Hamilton, re. United States v. Il Ung Kim, et al. |
| 27-Feb-07 | Stipulation and (Proposed) Order in Response to Defendant Gary Swanson's Motion for Bill of Particulars |
| 27-Feb-07 | Summary of the Government's Case Against Gary Swanson (Redacted) |
| 27-Feb-07 | Steve Thorsen (Micron) Witness Summary |
| 18-Oct-06 | United States of America v. Il Ung Kim, Young Bae Rha, and Gary Swanson: Indictment, Violation: Title 15, United States Code, Section 1 (Price Fixing) |

## De Dios Documents: Micron

| Publication Date | Title | Beginning Bates Number | End Bates Number |
|---|---|---|---|
| 3/16/1998 | DRAM Market Advisor | MU00674281 | MU00674297 |
| 4/24/1998 | DRAM Market Advisor | MU00674298 | MU00674315 |
| 5/25/1998 | DRAM Market Advisor | MU00674316 | MU00674335 |
| 8/26/1998 | DRAM Market Advisor | MU00674354 | MU00674372 |
| 10/29/1998 | DRAM Market Advisor | MU00674392 | MU00674408 |
| 11/25/1998 | DRAM Market Advisor | MU00674409 | MU00674434 |
| 12/30/1998 | DRAM Market Advisor | MU00674435 | MU00674452 |
| 1/25/1999 | DRAM Market Advisor | MU00674453 | MU00674473 |
| 1/28/1999 | DRAM Market Advisor | MU00674584 | MU00674606 |
| 6/21/1999 | DRAM Market Advisor | MU00674474 | MU00674494 |
| 7/28/1999 | DRAM Market Advisor | MU00674495 | MU00674509 |
| 8/30/1999 | DRAM Market Advisor | MU00674510 | MU00674531 |
| 10/8/1999 | DRAM Market Advisor | MU00674532 | MU00674550 |
| 11/16/1999 | DRAM Market Advisor | MU00674551 | MU00674565 |
| 12/17/1999 | DRAM Market Advisor | MU00674566 | MU00674583 |
| 2/24/2000 | DRAM Market Advisor | MU00674607 | MU00674631 |
| 4/5/2000 | DRAM Market Advisor | MU00674632 | MU00674654 |
| 5/8/2000 | DRAM Market Advisor | MU00674655 | MU00674683 |
| 6/19/2000 | DRAM Market Advisor | MU00674684 | MU00674708 |
| 8/7/2000 | DRAM Market Advisor | MU00674709 | MU00674728 |
| 9/15/2000 | DRAM Market Advisor | MU00674729 | MU00674755 |
| 10/30/2000 | DRAM Market Advisor | MU00674756 | MU00674779 |
| 11/30/2000 | DRAM Market Advisor | MU00674780 | MU00674804 |
| 12/2000 | DRAM Market Advisor | MU00674805 | MU00674815 |
| 1/1/2001 | DRAM Market Advisor | MU00674816 | MU00674839 |
| 2/1/2001 | DRAM Market Advisor | MU00674840 | MU00674864 |
| 3/1/2001 | DRAM Market Advisor | MU00674865 | MU00674888 |
| 4/1/2001 | DRAM Market Advisor | MU00674889 | MU00674898 |
| 5/1/2001 | DRAM Market Advisor | MU00674899 | MU00674923 |
| 6/8/2001 | DRAM Market Advisor | MU00674924 | MU00674955 |
| 6/27/2001 | Market Insight | MU00653681 | MU00653683 |
| 8/12/2001 | DRAM Market Advisor | MU00653712 | MU00653744 |
| 8/21/2001 | DRAM Market Advisor | MU00674956 | MU00674987 |
| 9/12/2001 | DRAM Market Advisor | MU00674988 | MU00675023 |
| 9/19/2001 | DRAM Market Advisor | MU00653781 | MU00653817 |
| 10/19/2001 | DRAM Market Advisor | MU00653822 | MU00653853 |
| 10/19/2001 | DRAM Market Advisor | MU00675024 | MU00675053 |
| 11/16/2001 | DRAM Market Advisor | MU00675054 | MU00675084 |
| 11/16/2001 | DRAM Market Advisor | MU00653860 | MU00653890 |
| 12/11/2001 | DRAM Market Advisor | MU00653897 | MU00653935 |
| 1/20/2002 | DRAM Market Advisor | MU00675085 | MU00675085 |
| 2/20/2002 | DRAM Market Advisor | MU00675114 | MU00675140 |
| 3/26/2002 | DRAM Market Advisor | MU00675141 | MU00675166 |
| 6/25/2002 | DRAM Market Advisor | MU00327200 | MU00327226 |
| 6/29/2002 | DRAM Market Advisor | MU00654262 | MU00654291 |
| 10/11/2002 | Module and DDR Tracker | MU00654303 | MU00654307 |

## De Dios Documents: Infineon

| Publication Date | Title | Beginning Bates Number | End Bates Number |
|---|---|---|---|
| 3/5/1999 | DRAM Market Advisor | ITAG-00744358 | ITAG-00744378 |
| 4/6/1999 | DRAM Market Advisor | ITAG-00744379 | ITAG-00744400 |
| 5/10/1999 | DRAM Market Advisor | ITAG-00744401 | ITAG-00744426 |
| 10/8/1999 | DRAM Market Advisor | ITAG-00744427 | ITAG-00744445 |
| 4/5/2000 | DRAM Market Advisor | ITAG-00744188 | ITAG-00744210 |
| 6/19/2000 | DRAM Market Advisor | ITAG-00744211 | ITAG-00744235 |
| 4/22/2002 | DRAM Market Advisor | ITAG-00383700 | ITAG-00383725 |
| 9/2/2002 | DRAM Market Advisor | ITAG-00744236 | ITAG-00744266 |
| 9/25/2002 | DRAM Market Advisor | ITAG-00744267 | ITAG-00744299 |
| 11/4/2002 | DRAM Market Advisor | ITAG-00744300 | ITAG-00744328 |
| 12/11/2002 | DRAM Market Advisor | ITAG-00744329 | ITAG-00744357 |
| 1/17/2003 | DRAM Market Advisor | ITAG-00743416 | ITAG-00743456 |
| 2/28/2003 | DRAM Market Advisor | ITAG-00743457 | ITAG-00743498 |
| 3/28/2003 | DRAM Market Advisor | ITAG-00743499 | ITAG-00743534 |
| 5/2/2003 | DRAM Market Advisor | ITAG-00743535 | ITAG-00743571 |
| 5/31/2003 | DRAM Market Advisor | ITAG-00743572 | ITAG-00743607 |
| 7/7/2003 | DRAM Market Advisor | ITAG-00744446 | ITAG-00744487 |
| 8/5/2003 | DRAM Market Advisor | ITAG-00744155 | ITAG-00744187 |
| 9/5/2003 | DRAM Market Advisor | ITAG-00743608 | ITAG-00743642 |
| 10/13/2003 | DRAM Market Advisor | ITAG-00743643 | ITAG-00743674 |
| 11/14/2003 | DRAM Market Advisor | ITAG-00743675 | ITAG-00743706 |
| 1/9/2004 | DRAM Market Advisor | ITAG-00743707 | ITAG-00743740 |
| 2/9/2004 | DRAM Market Advisor | ITAG-00743741 | ITAG-00743779 |
| 3/9/2004 | DRAM Market Advisor | ITAG-00743780 | ITAG-00743817 |
| 4/9/2004 | DRAM Market Advisor | ITAG-00743818 | ITAG-00743858 |
| 5/14/2004 | DRAM Market Advisor | ITAG-00743859 | ITAG-00743899 |
| 6/21/2004 | DRAM Market Advisor | ITAG-00743900 | ITAG-00743938 |
| 8/3/2004 | DRAM Market Advisor | ITAG-00743939 | ITAG-00743988 |
| 9/9/2004 | DRAM Market Advisor | ITAG-00743989 | ITAG-00744032 |
| 10/5/2004 | DRAM Market Advisor | ITAG-00744033 | ITAG-00744075 |
| 11/11/2004 | DRAM Market Advisor | ITAG-00744076 | ITAG-00744114 |
| 12/27/2004 | DRAM Market Advisor | ITAG-00744115 | ITAG-00744154 |
| 7/20/1998 | DRAM Market Advisor | ITNA 00000244 | ITNA 00000264 |

# De Dios Documents: Nanya

| Publication Date | Title | Beginning Bates Number | End Bates Number |
|---|---|---|---|
| 4/1/2000 | Nanya Sales Strategy memo and presentation | NTC 66-00012029 | NTC 66-00012032 |
| 7/15/2000 | Nanya Technology Corporation | NTC 64-00002522 | NTC 64-00002548 |
| 8/1/2000 | Market information monthly update presentation | NTC 64-00001587 | NTC 64-00001594 |
| 10/1/2000 | Presentation | NTC 64-00000413 | NTC 64-00000435 |
| 10/30/2000 | DRAM Market Advisor | NTC 010055 | NTC 010104 |
| 11/10/2000 | Presentation | NTC 64-00002331 | NTC 64-00002354 |
| 11/10/2000 | SDRAM | NTC 64-00002355 | NTC 64-00002360 |
| 11/11/2000 | HP meeting presentation | NTC 64-00000234 | NTC 64-00000267 |
| 11/27/2000 | DRAM Market Outlook | NTC 64-00003611 | NTC 64-00003613 |
| 12/1/2000 | DRAM Market Advisor | NTC 73-00031752 | NTC 73-00031762 |
| 1/1/2001 | DRAM Market Advisor | NTC 64-00000131 | NTC 64-00000154 |
| 1/1/2001 | Webpage: News and Analysis for the Strategic Decision Maker | NTC-50 0243 | NTC-50 0247 |
| 1/3/2001 | Historical PC Memory Transactions Have Broken Down | NTC 73-00031763 | NTC 73-00031764 |
| 2/1/2001 | Presentation | NTC 67-00000123 | NTC 67-00000148 |
| 2/1/2001 | DRAM Market Advisor | NTC 73-00028001 | NTC 73-00028025 |
| 8/2/2001 | Presentation | NTC 003190 | NTC 003380 |
| 1/23/2002 | DRAM Market: Changing Supply Structure | NTC 63-00003126 | NTC 63-00003126 |
| 1/23/2002 | Technology Roadmap | NTC 004146 | NTC 004161 |
| 1/23/2002 | Presentation | NTC 006978 | NTC 006995 |
| 2/6/2002 | Presentation sent via e-mail re: Dell Meeting | NTC-50 0524 | NTC-50 0556 |
| 4/9/2002 | Market Insight | NTC 63-00002010 | NTC 63-00002011 |
| 4/19/2002 | Presentation sent via e-mail re: Nanya update | NTC 73-00034812 | NTC 73-00034848 |
| 6/1/2002 | Presentation | NTC 73-00004990 | NTC 73-00005025 |
| 10/26/2002 | N/A | NTC 73-00031584 | NTC 73-00031592 |
| 10/29/2002 | Presentation: Nanya DRAM Roadmaps | NTC 73-00039908 | NTC 73-00039925 |
| N/A | Presentation: NTC USA | NTC-5 0243 | NTC-5 0263 |
| 7/15/2000 | Mid-month Report and Market Insight | NTC 73-00006913 | NTC 73-00006917 |
| N/A | Future Fab International (issue 11) | NTC 004755 | NTC 004854 |
| N/A | Future Fab International (issue 11) Section 2 | NTC 004855 | NTC 004954 |
| N/A | Future Fab International (issue 11) | NTC 004955 | NTC 005054 |
| N/A | Future Fab International (issue 11) | NTC 005055 | NTC 005144 |
| 1/1/2002 | Impact of Price Increase on PC & DRAM Industries | NTC 003529 | NTC 003529 |
| 1/1/2002 | DDR-SDR Production Mix | NTC 003531 | NTC 003533 |

# De Dios Documents: Mosel

| Publication Date | Title | Beginning Bates Number | End Bates Number |
|---|---|---|---|
| 8/1/2000 | Mosel Vitelic Product Roadmaps | MVC 17094 | MVC 17112 |
| 8/1/2000 | DRAM Pricing Projections | MVC 16728 | MVC 16732 |
| 8/1/2000 | ASP Projections MVI/ DRAM pricing Projections | MVC 14450 | MVC 14463 |
| 8/1/2000 | DRAM Pricing Projections August 2000 vs. Today | MVC 17171 | MVC 17175 |
| 8/17/2000 | Strategic Marketing | MVC 16518 | MVC 16674 |
| 9/13/2000 | IBM-Executive Management Meeting | MVC 6575 | MVC 6608 |
| 10/30/2000 | Market Insight/ DRAM Market Advisor | MVC 8123 | MVC 8268 |
| 9/1/2001 | 512Mb SDR/DDR SDRAM Marketing Plan | MVC 3546 | MVC 3567 |
| 3/12/2002 | Merrill Lynch Technology Conference Presentation | MVI0039044 | MVI0039073 |
| 3/12/2002 | Merrill Lynch Technology Conference Presentation | MVC 5256 | MVC 5349 |
| 4/30/2002 | Strategic New Product Objectives | MVC 20685 | MVC 20710 |
| N/A | DRAM Market | MVC 19725 | MVC 19779 |
| N/A | DDR SDRAM Industry Summit | MVC 22344 | MVC 22412 |
| N/A | DRAM Conference Call | MVI0038977 | MVI0038993 |
| N/A | 256Mb SDRAM Marketing Business Plan | MVC 4260 | MVC 4273 |

# De Dios Documents: Hynix

| Publication Date | Title | Beginning Bates Number | End Bates Number |
|---|---|---|---|
| N/A | Presentation | HSA: Lee, S.S. 052891 | HSA: Lee, S.S. 052913 |
| 12/1/2000 | Hyundai Electronics Update | HSA: Motz, J. 036350 | HSA: Motz, J. 036387 |
| 1/1/2001 | 2001 Biz Strategy | HSA: Tabrizi, F.003114 | HSA: Tabrizi, F.003132 |
| 1/1/2001 | DRAM Market Analyzer | HSA: Tabrizi, F.002867 | HSA: Tabrizi, F.002880 |
| 1/1/2001 | Hyundai Electronics Update | HSA: Swanson, G. 053594 | HSA: Swanson, G. 053630 |
| 4/1/2001 | DRAM Market Outlook | HSA: Tabrizi, F. 03889 | HSA: Tabrizi, F. 03918 |
| 5/1/2001 | Long Term DRAM Busines Plan (for Dedios) | HSA: Tabrizi, F. 03987 | HSA: Tabrizi, F. 03990 |
| 5/1/2001 | DRAM Products | HSA: Tabrizi, F. 004161 | HSA: Tabrizi, F. 004176 |
| 5/18/2001 | WSTS Taipei Forecast Meeting | HSA: Swanson, G. 054460 | HSA: Swanson, G. 054479 |
| 7/1/2001 | Market Outlook | HSA: Miller, c. 018041 | HSA: Miller, c. 018054 |
| 8/14/2001 | Hynix Product Marketing Weekly Newletter | HSA: Swanson, G. 063543 | HSA: Swanson, G. 063544 |
| 8/23/2001 | Micron DDR SDRAM | HSA: Lee, S.S. 052858 | HSA: Lee, S.S. 052868 |
| 9/1/2001 | Demands from Major PC OEM | HSA: Motz, J. 036962 | HSA: Motz, J. 036970 |
| 9/1/2001 | 2001 DRAM Market Conditions | HSA: Swanson, G. 063493 | HSA: Swanson, G. 063522 |
| 8/1/2001 | Market Outlook | HSA: Swanson, G. 063002 | HSA: Swanson, G. 063023 |
| 9/14/2001 | E-mail Re: Information from the Presentation | HSA: Miller, c. 019000 | HSA: Miller, c. 019007 |
| 10/1/2001 | Segment Analysis | HSA: Tabrizi, F. 006189 | HSA: Tabrizi, F. 006193 |
| 10/1/2001 | DRAM Market Outlook | HSA: Swanson, G. 079142 | HSA: Swanson, G. 079161 |
| 10/9/2001 | Market Dynamics & Hynix's Position | HSA: Suh, K.C. 049607 | HSA: Suh, K.C. 049653 |
| 11/1/2001 | DRAM Market Outlook | HSA: Tabrizi, F. 006711 | HSA: Tabrizi, F. 006725 |
| 12/4/2001 | Hynix/Dell Meeting | HSA: Nam, J.G. 081530 | HSA: Nam, J.G. 081541 |
| 12/31/2001 | PC Report | HSA: Miller, c. 023824 | HSA: Miller, c. 023847 |
| 1/20/2002 | DRAM Market Advisor | HSA: Swanson, G. 0420577 | HSA: Swanson, G. 0420605 |
| 1/31/2002 | PC Report | HSA: Miller, c. 024874 | HSA: Miller, c. 024905 |
| 2/1/2002 | Memory Sales & Market: DRAM Market Outlook | HSA: Lee, S.S. 052781 | HSA: Lee, S.S. 052809 |
| 2/1/2002 | 2002 Market Conditions | HSA: Kim, K.K. 050251 | HSA: Kim, K.K. 050272 |
| 2/25/2002 | PC Report | HSA: Miller, c. 025631 | HSA: Miller, c. 025659 |
| 3/1/2002 | Corporate Overview | HSA: Suh, K.C. 048914 | HSA: Suh, K.C. 048938 |
| 3/21/2002 | Micron Technology Conference Call (Q2-2002) | HSA: Lee, S.S. 052841 | HSA: Lee, S.S. 052844 |
| 3/1/2002 | DRAM Market Outlook | HSA: Kassak, A. 007809 | HSA: Kassak, A. 007839 |
| 3/29/2002 | PC Report | HSA: Miller, c. 026376 | HSA: Miller, c. 026429 |
| 4/1/2002 | DRAM Market Outlook | HSA: Swanson, G. 058892 | HSA: Swanson, G. 058901 |
| 4/1/2002 | Corporate Overview | HSA: Nam, J.G. 083937 | HSA: Nam, J.G. 083957 |
| 4/1/2002 | DRAM Market Trend and 256M Status | HSA: Kim, K.K. 050876 | HSA: Kim, K.K. 050897 |
| 4/10/2002 | 2Q 2002 DRAM Output Overview | HSA: Lee, S.S. 052467 | HSA: Lee, S.S. 052479 |
| 5/1/2002 | DRAM Market Outlook | HSA: Tabrizi, F. 005493 | HSA: Tabrizi, F. 005509 |
| 5/6/2002 | Dallas Area Customers | HSA: Kim,H.J. 087328 | HSA: Kim,H.J. 087352 |
| 5/6/2002 | DRAM Market Advisor | HSA: Suh, K.C. 048219 | HSA: Suh, K.C. 048244 |
| 5/6/2002 | Presentation | HSA: Lee, S.S. 381976 | HSA: Lee, S.S. 382001 |
| 5/18/2002 | Weekly Report, Southeast Area | HSA: Motz, J. 037818 | HSA: Motz, J. 037845 |
| 5/22/2002 | DDR Sales/Promotion Updates and Strategies | HSA: Suh, K.C. 047142 | HSA: Suh, K.C. 047146 |
| 2/1/2002 | DRAM Market | HSA: Nam, J.G. 085200 | HSA: Nam, J.G. 085216 |
| 7/1/2001 | Market Outlook | HSA: Kim, H.J. 090661 | HSA: Kim, H.J. 090672 |

## De Dios Documents: Samsung

| Publication Date | Title | Beginning Bates Number | End Bates Number |
|---|---|---|---|
| 7/23/2002 | DRAM Market Advisor | SSI-0005139977 | SSI-0005140008 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
|---|---|
| AAS0000002 | AAS0000002 |
| AAS0000003 | AAS0000003 |
| AAS0004394 | AAS0004397 |
| AAS0004445 | AAS0004450 |
| AAS0005096 | AAS0005100 |
| AAS0011328 | AAS0011332 |
| AAS0045724 | AAS0045724 |
| AAS0045726 | AAS0045726 |
| AAS0045727 | AAS0045727 |
| AAS0045728 | AAS0045728 |
| AAS0045820 | AAS0045954 |
| AAS0050000 | AAS0050006 |
| AAS0050813 | AAS0050816 |
| AAS0071885 | AAS0071886 |
| AAS0071887 | AAS0071894 |
| AAS0080502 | AAS0080507 |
| AAS0096833 | AAS0096854 |
| AAS0096952 | AAS0097005 |
| AAS0117119 | AAS0117570 |
| AAS0170523 | AAS0170524 |
| AAS0170525 | AAS0170527 |
| AAS0170528 | AAS0170531 |
| AAS0170618 | AAS0170621 |
| AAS0170643 | AAS0170646 |
| AAS0170713 | AAS0170714 |
| AAS0255516 | AAS0255545 |
| AAS0255708 | AAS0255709 |
| AAS0255720 | AAS0255723 |
| AAS0255724 | AAS0255727 |
| AAS0255728 | AAS0255729 |
| AAS0255730 | AAS0255733 |
| AAS0255734 | AAS0255737 |
| AAS0255738 | AAS0255739 |
| AAS0255740 | AAS0255745 |
| AAS0255746 | AAS0255749 |
| AAS0331997 | AAS0331998 |
| AAS0334718 | AAS0334726 |
| AAS0376516 | AAS0376740 |
| AAS0377439 | AAS0377445 |
| AAS0411796 | AAS0411796 |
| EMUS 383292 | EMUS 383292 |
| EMUS 414215 | EMUS 414217 |
| EMUS 427946 | EMUS 427947 |
| EMUS 599746 | EMUS 599748 |
| EMUS 604332 | EMUS 604334 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
|---|---|
| EMUS 61723 | EMUS 61723 |
| EMUS 652013 | EMUS 652022 |
| EMUS 796298 | EMUS 796301 |
| EMUS 846397 | EMUS 846400 |
| EMUS109760 | EMUS109761 |
| EMUS155224 | EMUS155224 |
| EMUS369292 | EMUS369292 |
| EMUS382990 | EMUS382990 |
| EMUS383109 | EMUS383109 |
| EMUS427946 | EMUS427947 |
| EMUS428250 | EMUS428253 |
| EMUS599746 | EMUS599748 |
| EMUS652013 | EMUS652013 |
| EMUS744085 | EMUS744085 |
| EMUS797718 | EMUS797718 |
| HR905125253 | HR905125253 |
| HSA 00633620 | HSA 00633620 |
| HSA 00643276 | HSA 00643277 |
| HSA 0754700 | HSA 0754700 |
| HSA 3001873 | HSA 3001877 |
| HSA 3015887 | HSA 3015888 |
| HSA 3016482 | HSA 3016483 |
| HSA 3016851 | HSA 3016851 |
| HSA 3116542 | HSA 3116542 |
| HSA: 3116542 | HSA: 3116542 |
| HSA:BYRD C. 008653 | HSA:BYRD C. 008654 |
| HSA:BYRD C. 129467 | HSA:BYRD C. 129467 |
| HSA:HELLER, K. 172897 | HSA:HELLER, K. 172898 |
| HSA:HELLER,K. 0414450 | HSA:HELLER,K. 0414451 |
| HSA:HELLER,K. 179580 | HSA:HELLER,K. 179589 |
| HSA:LAHERRAN,N. 0207947 | HSA:LAHERRAN,N. 0207947 |
| HSA:LEE,S.S. 052688 | HSA:LEE,S.S. 052705 |
| HSA:LEE,S.S. 052858 | HSA:LEE,S.S. 052868 |
| HSA:MCBROOM,J 0414303 | HSA:MCBROOM,J 0414303 |
| HSA:NO SOURCE 333760 | HSA:NO SOURCE 333784 |
| HSA:STEVENSON,C. 321905 | HSA:STEVENSON,C. 321906 |
| HSA:STEVENSON,C. 323739 | HSA:STEVENSON,C. 323739 |
| HSA:SUNG,J.M. 0388451 | HSA:SUNG,J.M. 0388451 |
| HSA:SWANSON,G. 059125 | HSA:SWANSON,G. 059125 |
| HSA:TABRIIZI,F 128259 | HSA:TABRIZ,F:128276 |
| HSA:TABRIZI,F. 004251 | HSA:TABRIZI,F. 004251 |
| HSA:TABRIZI,F. 106653 | HSA:TABRIZI,F. 106654 |
| HSA:TABRIZI,F. 107869 | HSA:TABRIZI,F. 107962 |
| HSA:TABRIZI,F. 127181 | HSA:TABRIZI,F. 127190 |
| HSA:TABRIZI,F. 128259 | HSA:TABRIZI,F. 128276 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
|---|---|
| HSA00004622 | HSA00004627 |
| HSA00006346 | HSA00006355 |
| HSA00008834 | HSA00008838 |
| HSA00008843 | HSA00008844 |
| HSA00010297 | HSA00010324 |
| HSA00011133 | HSA00011134 |
| HSA00013534 | HSA00013536 |
| HSA00013537 | HSA00013539 |
| HSA00014133 | HSA00014133 |
| HSA00022446 | HSA00022450 |
| HSA00026797 | HSA00026797 |
| HSA00028605 | HSA00028607 |
| HSA00032959 | HSA00032960 |
| HSA00032961 | HSA00032961 |
| HSA00035809 | HSA00035825 |
| HSA000438 | HSA000474 |
| HSA000475 | HSA000508 |
| HSA000509 | HSA000541 |
| HSA000542 | HSA000574 |
| HSA000575 | HSA000604 |
| HSA00060102 | HSA00060108 |
| HSA000605 | HSA000636 |
| HSA000637 | HSA000666 |
| HSA00064535 | HSA00064536 |
| HSA000667 | HSA000697 |
| HSA00068929 | HSA00068930 |
| HSA00068944 | HSA00068946 |
| HSA00068971 | HSA00068971 |
| HSA00069399 | HSA00069400 |
| HSA00069408 | HSA00069410 |
| HSA000698 | HSA000728 |
| HSA00070385 | HSA00070386 |
| HSA00070387 | HSA00070388 |
| HSA00070529 | HSA00070529 |
| HSA00070811 | HSA00070813 |
| HSA00071606 | HSA00071607 |
| HSA00071805 | HSA00071805 |
| HSA00071859 | HSA00071860 |
| HSA00072365 | HSA00072367 |
| HSA000729 | HSA000759 |
| HSA00074021 | HSA00074022 |
| HSA00074433 | HSA00074433 |
| HSA00074499 | HSA00074501 |
| HSA00074603 | HSA00074604 |
| HSA000760 | HSA000788 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
|---|---|
| HSA00076833 | HSA00076835 |
| HSA00077558 | HSA00077574 |
| HSA00077751 | HSA00077753 |
| HSA00078232 | HSA00078233 |
| HSA00078237 | HSA00078238 |
| HSA00078413 | HSA00078413 |
| HSA00078417 | HSA00078419 |
| HSA000789 | HSA000814 |
| HSA00079369 | HSA00079370 |
| HSA00079879 | HSA00079880 |
| HSA00080409 | HSA00080410 |
| HSA00080726 | HSA00080728 |
| HSA000815 | HSA000840 |
| HSA00081810 | HSA00081811 |
| HSA00082264 | HSA00082267 |
| HSA00083238 | HSA00083240 |
| HSA00083995 | HSA00083995 |
| HSA000841 | HSA000865 |
| HSA00084765 | HSA00084795 |
| HSA00086117 | HSA00086117 |
| HSA00086191 | HSA00086192 |
| HSA000866 | HSA000890 |
| HSA00086642 | HSA00086695 |
| HSA000891 | HSA000920 |
| HSA00089295 | HSA00089300 |
| HSA00089451 | HSA00089454 |
| HSA00090006 | HSA00090010 |
| HSA00091251 | HSA00091251 |
| HSA00091382 | HSA00091383 |
| HSA00091910 | HSA00091911 |
| HSA000921 | HSA000938 |
| HSA00093392 | HSA00093411 |
| HSA000939 | HSA000963 |
| HSA000964 | HSA000989 |
| HSA00097161 | HSA00097166 |
| HSA00097531 | HSA00097531 |
| HSA00100429 | HSA00100437 |
| HSA00105161 | HSA00105162 |
| HSA00107427 | HSA00107427 |
| HSA00113136 | HSA00113138 |
| HSA00113142 | HSA00113144 |
| HSA00116080 | HSA00116081 |
| HSA00116338 | HSA00116338 |
| HSA00118377 | HSA00118378 |
| HSA00128306 | HSA00128308 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
|---|---|
| HSA00128437 | HSA00128441 |
| HSA00128458 | HSA00128462 |
| HSA00128688 | HSA00128702 |
| HSA00128983 | HSA00128986 |
| HSA00128995 | HSA00128996 |
| HSA00130675 | HSA00130677 |
| HSA00133914 | HSA00133914 |
| HSA00134659 | HSA00134659 |
| HSA00141219 | HSA00141222 |
| HSA00143480 | HSA00143483 |
| HSA00193268 | HSA00193278 |
| HSA00237634 | HSA00237634 |
| HSA00237801 | HSA00237802 |
| HSA00238557 | HSA00238558 |
| HSA00239231 | HSA00239272 |
| HSA00250306 | HSA00250308 |
| HSA00255217 | HSA00255217 |
| HSA00271953 | HSA00271996 |
| HSA00271997 | HSA00272026 |
| HSA00340218 | HSA00013351 |
| HSA00341605 | HSA00341606 |
| HSA00342812 | HSA00342813 |
| HSA00349435 | HSA00349442 |
| HSA00353134 | HSA00353158 |
| HSA00360077 | HSA00360079 |
| HSA00365321 | HSA00365322 |
| HSA00365411 | HSA00365412 |
| HSA00368560 | HSA00368563 |
| HSA00400178 | HSA00400180 |
| HSA00400312 | HSA00400313 |
| HSA00401566 | HSA00401566 |
| HSA00413764 | HSA00413788 |
| HSA00471097 | HSA00471098 |
| HSA00493413 | HSA00493415 |
| HSA00493629 | HSA00493629 |
| HSA00495254 | HSA00495255 |
| HSA00495564 | HSA00495566 |
| HSA00495567 | HSA00495568 |
| HSA00495657 | HSA00495658 |
| HSA00495659 | HSA00495660 |
| HSA00495662 | HSA00495667 |
| HSA00495668 | HSA00495669 |
| HSA00495685 | HSA00495685 |
| HSA00495686 | HSA00495687 |
| HSA00495691 | HSA00495691 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
|---|---|
| HSA00495863 | HSA00495867 |
| HSA00501740 | HSA00501741 |
| HSA00504060 | HSA00074433 |
| HSA00505287 | HSA00505302 |
| HSA00505365 | HSA00505366 |
| HSA00509053 | HSA00509053 |
| HSA00509054 | HSA00509055 |
| HSA00509234 | HSA00509237 |
| HSA00511421 | HSA00511423 |
| HSA00514481 | HSA00514482 |
| HSA00514543 | HSA00514543 |
| HSA00514583 | HSA00514585 |
| HSA00514751 | HSA00514755 |
| HSA00516496 | HSA00516499 |
| HSA00532623 | HSA00532623 |
| HSA00538248 | HSA00538250 |
| HSA00544858 | HSA00544859 |
| HSA00544863 | HSA00544866 |
| HSA00544921 | HSA00544924 |
| HSA00592990 | HSA00592990 |
| HSA00604950 | HSA00604952 |
| HSA00608410 | HSA00608410 |
| HSA00617637 | HSA000617647 |
| HSA00633017 | HSA00633017 |
| HSA00633752 | HSA00633753 |
| HSA00634268 | HSA00634269 |
| HSA00634280 | HSA00634280 |
| HSA00634571 | HSA00634571 |
| HSA0063496 | HSA0063497 |
| HSA00634989 | HSA00634989 |
| HSA00634990 | HSA00634991 |
| HSA00635827 | HSA00635832 |
| HSA00636505 | HSA00636505 |
| HSA00636658 | HSA00636658 |
| HSA00636686 | HSA00636688 |
| HSA00637863 | HSA00637863 |
| HSA00638002 | HSA00638002 |
| HSA00638003 | HSA00638005 |
| HSA00638006 | HSA00638006 |
| HSA00638023 | HSA00638024 |
| HSA00638091 | HSA00638091 |
| HSA00638160 | HSA00638161 |
| HSA00638376 | HSA00638376 |
| HSA00641367 | HSA00641368 |
| HSA00641383 | HSA00641385 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
|---|---|
| HSA00643663 | HSA00643664 |
| HSA00643693 | HSA00643695 |
| HSA00643712 | HSA00643714 |
| HSA0064413 | HSA00664415 |
| HSA00644338 | HSA00644341 |
| HSA00644977 | HSA00644978 |
| HSA00644979 | HSA00644980 |
| HSA00645048 | HSA00645048 |
| HSA00646477 | HSA00646491 |
| HSA00646566 | HSA00646567 |
| HSA00647613 | HSA00647614 |
| HSA00647814 | HSA00647814 |
| HSA00648300 | HSA00648300 |
| HSA00648406 | HSA00648406 |
| HSA00649182 | HSA00649183 |
| HSA00649588 | HSA00649590 |
| HSA00650597 | HSA00650597 |
| HSA00654567 | HSA00654570 |
| HSA00654820 | HSA00654820 |
| HSA00654821 | HSA00654821 |
| HSA00654894 | HSA00654894 |
| HSA00654899 | HSA00654899 |
| HSA00655080 | HSA00655087 |
| HSA00655279 | HSA00655281 |
| HSA00655698 | HSA00655698 |
| HSA00655761 | HSA00655761 |
| HSA00656276 | HSA00656276 |
| HSA00656366 | HSA00656369 |
| HSA00656531 | HSA00656535 |
| HSA00656608 | HSA00656608 |
| HSA00656737 | HSA00656737 |
| HSA00657160 | HSA00657163 |
| HSA00659206 | HSA00659206 |
| HSA00659940 | HSA00659940 |
| HSA00660559 | HSA00660560 |
| HSA00662592 | HSA00662596 |
| HSA00664137 | HSA00664140 |
| HSA00664389 | HSA00664392 |
| HSA00664398 | HSA00664404 |
| HSA00664524 | HSA00664524 |
| HSA00665596 | HSA00665596 |
| HSA00665598 | HSA00665598 |
| HSA00668687 | HSA00668688 |
| HSA00671502 | HSA00671504 |
| HSA00674303 | HSA00674305 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
|---|---|
| HSA00674531 | HSA00674532 |
| HSA00674593 | HSA00674593 |
| HSA00674738 | HSA00674739 |
| HSA00677007 | HSA00677008 |
| HSA00680585 | HSA00680586 |
| HSA00680591 | HSA00680593 |
| HSA00680631 | HSA00680636 |
| HSA00680645 | HSA00680645 |
| HSA00684523 | HSA00684523 |
| HSA00685375 | HSA00685376 |
| HSA00685378 | HSA00685379 |
| HSA00691660 | HSA00691663 |
| HSA00691714 | HSA00691716 |
| HSA00692255 | HSA00692260 |
| HSA00692261 | HSA00692262 |
| HSA00693084 | HSA00693084 |
| HSA00695167 | HSA00695168 |
| HSA00696276 | HSA00696276 |
| HSA00696920 | HSA00696920 |
| HSA00696928 | HSA00696928 |
| HSA00697004 | HSA00697004 |
| HSA00697014 | HSA00697014 |
| HSA00697015 | HSA00697017 |
| HSA00699986 | HSA00699988 |
| HSA00700222 | HSA00700222 |
| HSA00703442 | HSA00703444 |
| HSA00703452 | HSA00703453 |
| HSA00703518 | HSA00703519 |
| HSA00703731 | HSA00703733 |
| HSA00703775 | HSA00703776 |
| HSA00703777 | HSA00703778 |
| HSA00703917 | HSA00703918 |
| HSA00704194 | HSA00704198 |
| HSA00704611 | HSA00704612 |
| HSA00704662 | HSA00704662 |
| HSA00705182 | HSA00705185 |
| HSA00705439 | HSA00705440 |
| HSA00705754 | HSA00705754 |
| HSA00705976 | HSA00705977 |
| HSA00705978 | HSA00705978 |
| HSA00706180 | HSA00706181 |
| HSA00707710 | HSA00707710 |
| HSA00708245 | HSA00708248 |
| HSA00709485 | HSA00709486 |
| HSA00709825 | HSA00709826 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
|---|---|
| HSA00710014 | HSA00710017 |
| HSA00710267 | HSA00710267 |
| HSA00711192 | HSA00711192 |
| HSA00711220 | HSA00711220 |
| HSA00715589 | HSA00715590 |
| HSA00715603 | HSA00715604 |
| HSA00719345 | HSA00719346 |
| HSA00719558 | HSA00719558 |
| HSA00719650 | HSA00719650 |
| HSA00719660 | HSA00719661 |
| HSA00720159 | HSA00720160 |
| HSA00723072 | HSA00723076 |
| HSA00725643 | HSA00725644 |
| HSA00725660 | HSA00725661 |
| HSA00725692 | HSA00725693 |
| HSA00727809 | HSA00727810 |
| HSA00728618 | HSA00728619 |
| HSA00729359 | HSA00729372 |
| HSA00732172 | HSA00732172 |
| HSA00732189 | HSA00732189 |
| HSA00732450 | HSA00732450 |
| HSA00734201 | HSA00734202 |
| HSA00734277 | HSA00734277 |
| HSA00736951 | HSA00736951 |
| HSA00737479 | HSA00737480 |
| HSA00739978 | HSA00739981 |
| HSA00740011 | HSA00740012 |
| HSA00740039 | HSA00740039 |
| HSA00740058 | HSA00740060 |
| HSA00745208 | HSA00745208 |
| HSA00746539 | HSA00746539 |
| HSA00746742 | HSA00746743 |
| HSA00747573 | HSA00747576 |
| HSA00747601 | HSA00747602 |
| HSA00748065 | HSA00748066 |
| HSA00748338 | HSA00748338 |
| HSA00749207 | HSA00749207 |
| HSA00754045 | HSA00754045 |
| HSA00754127 | HSA00754128 |
| HSA00754129 | HSA00754130 |
| HSA0655021 | HSA0655021 |
| HSA0754700 | HSA0754700 |
| HSA0768834 | HSA0768835 |
| HSA0768924 | HSA0768924 |
| HSA0768933 | HSA0768935 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
| --- | --- |
| HSA2:Tabnak, R. 0026755 | HSA2:Tabnak, R. 0026756 |
| HSA200036732 | HSA20036733 |
| HSA20037853 | HSA20037863 |
| HSA3036551 | HSA3036551 |
| HSA3132201 | HSA3132203 |
| ITAG-00007622 | ITAG-00007625 |
| ITAG-00019709 | ITAG-00019710 |
| ITAG-00020164 | ITAG-00020164 |
| ITAG-00231422 | ITAG-00231423 |
| ITAG-00299701 | ITAG-00299722 |
| ITAG00735076 | ITAG00735087 |
| ITNA00025548 | ITNA00025548 |
| ITNA00025552 | ITNA00025552 |
| ITNA00042113 | ITNA00042115 |
| ITNA01012531 | ITNA01012531 |
| ITNA01012532 | ITNA01012533 |
| ITNA01012540 | ITNA01012541 |
| ITNA01012545 | ITNA01012547 |
| ITNA01021494 | ITNA01021496 |
| ITNA01051804 | ITNA01051804 |
| ITNA01068606 | ITNA01068607 |
| ITNA01074225 | ITNA01074225 |
| ITNA01080903 | ITNA01080905 |
| ITNA01080904 | ITNA01080904 |
| ITNA01092465 | ITNA01092466 |
| ITNA01092467 | ITNA01092469 |
| ITNA01093580 | ITNA01093593 |
| ITNA01105587 | ITNA01105588 |
| ITNA01113074 | ITNA01113083 |
| ITNA01132918 | ITNA01132920 |
| ITNA01137387 | ITNA01137387 |
| ITNA01139114 | ITNA01139114 |
| ITNA01139440 | ITNA01139440 |
| ITNA01139755 | ITNA01139756 |
| ITNA01146005 | ITNA01146008 |
| ITNA01146016 | ITNA01146020 |
| ITNA01147895 | ITNA01147897 |
| ITNA01200094 | ITNA01200094.003 |
| ITNA01251471 | ITNA01251473 |
| ITNA01313475 | ITNA01313476 |
| JEI000205 | JEI000227 |
| MIC0000203 | MIC0000220 |
| MIC0000656 | MIC0000673 |
| MIC0000914 | MIC0000939 |
| MIC0001012 | MIC0001035 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
| --- | --- |
| MIC0001044 | MIC0001059 |
| MIC0001065 | MIC0001083 |
| MIC0001735 | MIC0001738 |
| MITSSUN00136120 | MITSSUN00136123 |
| MU00001703 | MU00001703 |
| MU00018603 | MU00018603 |
| MU00026836 | MU00026837 |
| MU00049904 | MU00049904 |
| MU00049930 | MU00049930 |
| MU00050213 | MU00050213 |
| MU00057337 | MU00057337 |
| MU00094338 | MU00094339 |
| MU00117874 | MU00117882 |
| MU00128260 | MU00128261 |
| MU00130331 | MU00130331 |
| MU00131817 | MU00131818 |
| MU00136390 | MU00136392 |
| MU00137760 | MU00137760 |
| MU00193211 | MU00193213 |
| MU00193212 | MU00193212 |
| MU00205955 | MU00205955 |
| MU00221683 | MU00221684 |
| MU00242371 | MU00242371 |
| MU00256854 | MU00256854 |
| MU00299025 | MU00299025 |
| MU00386061 | MU00386061 |
| MU00424350 | MU00424350 |
| MU00497484 | MU00497486 |
| MU00813243 | MU00813243 |
| MVC 54485 | MVC 54485 |
| MVC 73673 | MVC 73674 |
| MVC 75141 | MVC 75141 |
| MVC 76049 | MVC 76050 |
| MVC51746 | MVC51746 |
| MVC55696 | MVC55697 |
| MVC55736 | MVC55737 |
| MVCORP 0040969 | MVCORP 0040970 |
| NECELAM 021016 | NECELAM 021032 |
| NTC-TW 004410 | NTC-TW 004410 |
| SSI 0020030014 | SSI 0020030015 |
| SSI-0000192219 | SSI-0000192220 |
| SSI-0000331465 | SSI-0000331468 |
| SSI-0000343728 | SSI-0000343728 |
| SSI0000379138 | SSI0000379139 |
| SSI-0000550122 | SSI-0000550123 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
| --- | --- |
| SSI-0005096760 | SSI-0005096760 |
| SSI-0005102432 | SSI-0005102434 |
| SSI-0005275429 | SSI-0005275444 |
| SSI-0010005073 | SSI-0010005073 |
| SSI-0010005076 | SSI-0010005077 |
| SSI-0010024009 | SSI-0010024009 |
| SSI-0010024158 | SSI-0010024158 |
| SSI-0010024276 | SSI-0010024276 |
| SSI-0010024345 | SSI-0010024346 |
| SSI-0010024352 | SSI-0010024352 |
| SSI-0010045845 | SSI-0010045848 |
| SSI-0010045948 | SSI-0010045950 |
| SSI-0010094223 | SSI-0010094229 |
| SSI-0010095861 | SSI-0010095861 |
| SSI-0010121517 | SSI-0010121519 |
| SSI-0010122542 | SSI-0010122543 |
| SSI-0010154796 | SSI-0010154799 |
| SSI-001049818 | SSI-001049818 |
| SSI20037929 | SSI20037939 |
| SUN0000780 | SUN0000797 |
| SUN0001102 | SUN0001104 |
| SUN0003469 | SUN0003487 |
| SUN0003575 | SUN0003582 |
| SUN0004257 | SUN0004269 |
| SUN0004296 | SUN0004321 |
| SUN0005076 | SUN0005076 |
| SUN000524 | SUN000525 |
| SUN000591 | SUN000592 |
| SUN0006302 | SUN0006305 |
| SUN0006769 | SUN0006785 |
| SUN0006796 | SUN0006797 |
| SUN0006974 | SUN0006978 |
| SUN0007183 | SUN0007186 |
| SUN0007206 | SUN0007213 |
| SUN000776 | SUN000776 |
| SUN000780 | SUN000797 |
| SUN000798 | SUN000798 |
| SUN0008486 | SUN0008488 |
| SUN000886 | SUN000888 |
| SUN000917 | SUN000917 |
| SUN000940 | SUN000941 |
| SUN001102 | SUN001104 |
| SUN001271 | SUN001272 |
| SUN0013664 | SUN0013670 |
| SUN0014293 | SUN0014295 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
| --- | --- |
| SUN0015268 | SUN0015271 |
| SUN0015637 | SUN0015637 |
| SUN0015657 | SUN0015658 |
| SUN0015659 | SUN0015662 |
| SUN001586 | SUN001590 |
| SUN0015895 | SUN0015896 |
| SUN0015897 | SUN0015898 |
| SUN0018080 | SUN0018082 |
| SUN0018090 | SUN0018091 |
| SUN001860 | SUN001861 |
| SUN0018770 | SUN0018774 |
| SUN0019096 | SUN0019104 |
| SUN001933 | SUN001934 |
| SUN0020015 | SUN0020017 |
| SUN0020021 | SUN0020022 |
| SUN0020214 | SUN0020215 |
| SUN0020334 | SUN0020334 |
| SUN0020950 | SUN0020951 |
| SUN0020956 | SUN0020962 |
| SUN0020968 | SUN0020969 |
| SUN0020973 | SUN0020975 |
| SUN0020977 | SUN0020979 |
| SUN0020981 | SUN0020983 |
| SUN0020991 | SUN0020992 |
| SUN0021002 | SUN0021004 |
| SUN0021008 | SUN0021009 |
| SUN0021010 | SUN0021017 |
| SUN0021023 | SUN0021029 |
| SUN0021030 | SUN0021032 |
| SUN0021595 | SUN0021596 |
| SUN0021688 | SUN0021691 |
| SUN0022012 | SUN0022014 |
| SUN0022054 | SUN0022057 |
| SUN0024732 | SUN0024734 |
| SUN0024735 | SUN0024738 |
| SUN0025627 | SUN0025628 |
| SUN0025698 | SUN0025699 |
| SUN0025774 | SUN0025776 |
| SUN0026853 | SUN0026854 |
| SUN0026877 | SUN0026877 |
| SUN0026878 | SUN0026881 |
| SUN0027941 | SUN0027943 |
| SUN0027944 | SUN0027944 |
| SUN0028034 | SUN0028034 |
| SUN0028060 | SUN0028062 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
|---|---|
| SUN0028723 | SUN0028724 |
| SUN0028727 | SUN0028729 |
| SUN0028758 | SUN0028759 |
| SUN0028822 | SUN0028822 |
| SUN0028873 | SUN0028876 |
| SUN0028917 | SUN0028918 |
| SUN0029213 | SUN0029280 |
| SUN0029281 | SUN0029326 |
| SUN0029327 | SUN0029348 |
| SUN0029345 | SUN0029345 |
| SUN0029348 | SUN0029281 |
| SUN0029664 | SUN0029708 |
| SUN0029717 | SUN0029765 |
| SUN0029901 | SUN0029972 |
| SUN0030321 | SUN0030327 |
| SUN0031752 | SUN0031753 |
| SUN0033757 | SUN0033758 |
| SUN0033954 | SUN0033954 |
| SUN0033955 | SUN0033955 |
| SUN0033971 | SUN0033971 |
| SUN0033987 | SUN0033987 |
| SUN0034505 | SUN0034509 |
| SUN0034956 | SUN0034957 |
| SUN0035243 | SUN0035243 |
| SUN0036575 | SUN0036585 |
| SUN0046757 | SUN0046762 |
| SUN0048378 | SUN0048386 |
| SUN0197001 | SUN0197003 |
| SUN0200024 | SUN0200025 |
| SUN0201484 | SUN0201486 |
| SUN0201712 | SUN0201714 |
| SUN0201719 | SUN0201721 |
| SUN0202161 | SUN0202162 |
| SUN0206920 | SUN0206945 |
| SUN0215781 | SUN0215782 |
| SUN0216301 | SUN0216303 |
| SUN0218047 | SUN0218049 |
| SUN0229542 | SUN0229549 |
| SUN0229726 | SUN0229727 |
| SUN0241015 | SUN0241017 |
| SUN0245222 | SUN0245224 |
| SUN0245272 | SUN0245272 |
| SUN0245273 | SUN0245276 |
| SUN0247192 | SUN0247192 |
| SUN0257743 | SUN0257744 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
|---|---|
| SUN0258470 | SUN0258472 |
| SUN0262948 | SUN0262949 |
| SUN0266714 | SUN0266718 |
| SUN0275135 | SUN0275136 |
| SUN0277786 | SUN0277787 |
| SUN0294500 | SUN0294500 |
| SUN0301319 | SUN0301319 |
| SUN0301399 | SUN0301400 |
| SUN0301488 | SUN0301491 |
| SUN0301911 | SUN0301912 |
| SUN0303107 | SUN0303107 |
| SUN0303163 | SUN0303164 |
| SUN0303785 | SUN0303785 |
| SUN0303792 | SUN0303793 |
| SUN0304318 | SUN0304320 |
| SUN0310547 | SUN0310547 |
| SUN0310598 | SUN0310601 |
| SUN0310874 | SUN0310876 |
| SUN0311083 | SUN0311084 |
| SUN0320068 | SUN0320078 |
| SUN0322664 | SUN0322669 |
| SUN0329047 | SUN0329047 |
| SUN0334505 | SUN0334505 |
| SUN0334506 | SUN0334507 |
| SUN0334508 | SUN0334508 |
| SUN033954 | SUN033954 |
| SUN0341269 | SUN0341273 |
| SUN0341289 | SUN0341289 |
| SUN0346794 | SUN0346804 |
| SUN0354970 | SUN0354973 |
| SUN0355946 | SUN0355948 |
| SUN0356161 | SUN0356161 |
| SUN0360197 | SUN0360198 |
| SUN0360947 | SUN0360947 |
| SUN0361118 | SUN0361119 |
| SUN0364617 | SUN0364618 |
| SUN0364626 | SUN0364627 |
| SUN0364633 | SUN0364633 |
| SUN0366269 | SUN0366302 |
| SUN0366303 | SUN0366321 |
| SUN0367822 | SUN0367823 |
| SUN0369766 | SUN0369769 |
| SUN0372897 | SUN0372897 |
| SUN0390143 | SUN0390144 |
| SUN0392895 | SUN0392896 |

# Other Bates Ranges

| Beginning Bates Number | End Bates Number |
| --- | --- |
| SUN0393640 | SUN0393641 |
| SUN0396354 | SUN0396366 |
| SUN0400414 | SUN0400437 |
| SUN0403142 | SUN0403157 |
| SUN0404775 | SUN0404776 |
| SUN0407802 | SUN0407805 |
| SUN0408326 | SUN0408357 |
| SUN0408543 | SUN0408550 |
| SUN0408612 | SUN0408613 |
| SUN0409943 | SUN0409944 |
| SUN0409948 | SUN0409949 |
| SUN0410001 | SUN0410002 |
| SUN0410075 | SUN0410075 |
| SUN0429665 | SUN0429696 |
| SUN0435222 | SUN0435231 |
| SUN0477007 | SUN0477011 |
| SUN0491323 | SUN0491323 |
| SUN0492706 | SUN0492775 |
| SUN0542052 | SUN0542098 |
| SUN0542946 | SUN0543022 |
| SUN0543634 | SUN0543642 |
| UNI000002 | UNI000716 |
| UNI007967 | UNI007968 |
| WEC004445 | WEC004445 |
| WEC005757 | WEC005758 |
| WECA10717 | WECA10717 |
| WECA10766 | WECA10766 |

Hynix Production and Capacity Reports

| Beginning Bates Number | End Bates Number |
| --- | --- |
| HXD001029 | HXD001051 |
| HXD001052 | HXD001086 |
| HXD001087 | HXD001122 |
| HXD001123 | HXD001138 |
| HXD001139 | HXD001153 |
| HXD001154 | HXD001181 |
| HXD001182 | HXD001209 |
| HXD001210 | HXD001237 |
| HXD001238 | HXD001265 |
| HXD001266 | HXD001300 |
| HXD001301 | HXD001336 |
| HXD001337 | HXD001366 |
| HXD001367 | HXD001396 |
| HXD001397 | HXD001426 |
| HXD001427 | HXD001456 |
| HXD001457 | HXD001486 |
| HXD006794 | HXD006853 |
| HXD006872 | HXD006903 |

# Other Documents Considered

| Title |
| --- |
| • Brown, Peter, "Hyundai's Global Squeeze -- Hyundai Electronics America -- Company Financial Information," Electronic News, 12 January 1998. |
| • Carlton and Perloff, *Modern Industrial Organization*  (3d ed. 2000). |
| • Cataldo, Anthony, "Intel, Rambus Mull Overhaul for RDRAM," EE Times, 25 August 2000. |
| • "Chipmakers Say Prayers Answered," Taipei Times, 6 January 2001. |
| • Choonsik, Yoo, "S. Korea Hyundai Wins First Battle for Merger," Reuters News, 24 December 1998. |
| • Clendenin, Mike, "DRAM Makers Said to be Coordinating Production," EETimes, 30 January 2002. |
| • Dick, Andrew R., "Learning by Doing and Dumping in the Semiconductor Industry," J. of Law and Econ., Vol. XXXIV, April 1991. |
| • DocMemory, "Then and Now in Memory," 28 October 2002. |
| • "DRAM Price Increase Advances TAIEX," Taipei Times, 29 December 2001. |
| • "DRAM Suppliers Become Casualties of Their Own Market-Share War", iSuppli, 4 February 2008. |
| • "Economic Impact of Measurement in the Semiconductor Industry," prepared by RTI International for National Institute of Standards and Technology, December 2007, pp. 2-3 to 2-6. |
| • Flamm, Kenneth, "Semiconductor Dependency and Strategic Trade Policy," Brookings Papers: Microeconomics, 1993. |
| • Flamm, Kenneth, *Mismanaged Trade? Strategic Policy and the Semiconductor Industry* , Brookings Institution Press, Washington, D.C., 1996. |
| • Ghemawat, P., "Building Strategy on the Experience Curve," Harvard Bus. Rev., 63, March-April, 1985. |
| • Graham, Jeanne, "Production Cuts, Fab Closures Won't Stop DRAM Price Free Fall," Electronic Buyers' News, 13 August 2001. |
| • Green, E. J. and R. Porter, "NonCooperative Collusion Under Imperfect Price Information," 52 Econometrica 87, 1984. |
| • Greene, R., "Semiconductor Equipment Industy in 1996 and Beyond," Fall 2006. |
| • Greene, William H., Econometric Analysis, (5th ed., 2003). |
| • Gruenspecht, Howard K., "Dumping and Dynamic Competition," J. of Int. Econ., 25, 1998. |
| • Hachman, Mark, "Hynix Closes DRAM Fab to Help Boost Prices," ExtremeTech, July 19, 2001 |
| • Hal R. Varian, Intermediate Microeconomics:  A Modern Approach 490. (5th ed 1999) |
| • Harrington Jr., Joseph E., "Detecting Cartels," from Conference and Volume Entitled "Advances in the Economics of Competition Law," October 2005. |
| • Herbert Hovenkamp, Federal Antitrust Policy,  Chapter 4 (2d ed. 1999) |
| • Hsu, Michelle, "High-Tech Industry Performs Better Than Expected," Importers and Exporters Association of Taipei. |
| • Hung, Faith, "Tawain DRAM makers May Cut Output," 14 August 2001. |
| • Hynix Annual 10-K Report, 2002 |
| • Hynix Annual 10-K Report, 2003 |
| • Hynix Annual 10-K Report, 2004 |
| • Hynix Annual 10-K Report, 2005 |
| • Hynix Annual 10-K Report, 2006 |
| • "Hynix May Trim Production of DRAM," Taipei Times, 4 July 2001. |
| • In re Linerboard Antitrust Litigation, 497 F.Supp.2d 666 (EDPa., July 30, 2007) |
| • "Infineon's CEO Says Chip Prices Rising Over US$4," Taipei Times, 4 March 2002. |
| • Iritani, Evelyn, "Big Korean 'Chaebol' Agree to IMF Reforms," Pittsburgh Post-Gazette, 14 January 1998. |
| • Irwin, Douglas A. and Peter J. Klenow, "Learning-by-Doing Spillovers in the Semiconductor Industry," J. of Pol. Econ., 102(6), 1994. |

- Japanese Companies in the United States: Semiconductors and Computers, Japan-U.S. Business Report Japan Economic Institute of America, Vol. 199, No. 292, 1 January 1994.
- Kanellos, Michael, "Dell Trying to Sidestep Chip 'Cartel'," Cnet News.com, 30 April 2002.
- Kim, W. J., et al., "Demand Forecasting for Multigenerational Products Combining Discrete Choice and Dynamics of Diffusion Under Technological Trajectories," 72 Technological Forecasting & Social Change 825, 2005.
- Kirk, Don, "Hynix to Shut Chip Plant in Oregon for 6 Months," The New York Times, 19 July 2001.
- "Korean DRAM Chip Makers to Idle Production," The Asian Wall Street Journal, 2 July 1997.
- Kubicki, Kristopher, "At News Update: DRAM Price Fixing," Anandtech, 2, March 2004.
- Kunii, Irene, et al., "Asia's Chipmakers: The Dragons Bulk Up: An Overdue Wave of Mergers is Reshaping the Industry," 12 July 1999.
- Lammers, David, "64-Mbit DRAM Prices Said to Hit All-Time Low," EE Times, 2 July 1999.
- Lammers, David, "Production Cuts Drive Up DRAM Prices," EE Times, 3 February 1997.
- Lammers, David, and Anthony Cataldo, "DRAM Map Redrawn by Merger, Closures," EE Times, 7 September 1998.
- Landsburg, Steven E., Price Theory and Application, (7th ed. 2008).
- Mainelli, Tom, "Intel-Rambus Relationship Shows Signs of Trouble: Barrett's Dissing Shocks Memory Company and Shows a Strained Relationship," PC World, 19 October 2000.
- "Makers Hold Back Chips From Market," Taipei Times, 17 May 2002.
- "Memory-Chip Prices May Soon Drop," Taipei Times, 13 March 2002.
- Mouawad, Jad, "OPEC Finds Price Range to Live With," The New York Times, 6 December 2007.
- Norris, Floyd, "3 Years Later, Investors Crave Safety," The New York Times, 10 March 2003.
- Nystedt, Dan, "Chip Futures Hard To See," 23 April 2001.
- Nystedt, Dan, "DRAM Prices Fall on Slow Demand," Taipei Times, 6 October 2000.
- Nystedt, Dan, "Memory Chip Prices Still Falling," 21 February 2001.
- Nystedt, Dan, "Tech Recovery Remains in Doubt," Taipei Times, 14 March 2002.
- Ojo, Bolaji, "Elpida Halts DRAM Price War; Sees Strong 2nd Half Sales," EETimes Online, 22 June 2007.
- "Oil Dips Further Due to Warm US Weather," Agence France Presse, 4 November 2003.
- "Post Nuclear Blast Hitachi Re-opens DRAM Plant," The Register, 1 October 1999.
- Prudential Equity Group, "IT Hardware," (28-29), 13 October 2006.
- Quan, Margaret, and Peter Clarke, "Siemens Shuts DRAM Fab, Japanese Try Offshore Production, EE Times, 10 August 1998.
- "Rising Semiconductor Prices Bolster S Korean Stocks," Taipei Times, 3 January 2002.
- Robertson, Jack, "Intel Roadmap Shows Little Rambus Support," 30 October 2000.
- Robertson, Jack, "Intel Struggles to Explain Rambus Delay," 1 Oct 1999.
- Robertson, Jack, "Korea Presses Hyundai, LG to Finish Deal," Electronic Buyers' News, 14 December
- Robertson, Jack, "LG Set to Leave Chip Market," Channel Web Network, 14 January 1999.
- Robertson, Jack, "Weak PC Sales Could Doom Some DRAM Makers," Electronic Buyers' News, 22 January 2001.
- "Samsung and Hynix Raise Chip Prices by 10 to 20 Percent," Taipei Times, 6 December 2001.
- Shapiro, Carl, "Theories of Oligopoly Behavior," Handbook of Industrial Organization, Volume 1, Schmalensee, R., and R. Willig, eds., Elsevier Science Publishers B.V., 1989.
- Smith, Tony, "Taiwan's DRAM Producers Agree to Output Cut," The Register, 14 August 2001.
- Solomon, Jay, "Creditors Consider Converting Debt to Equity to Help Hynix," The Asian Wall Street Journal, 23 August 2001.
- Stevens, P., "Oil Markets," 21 Oxford Review of Economic Policy 19, 2005.
- Stigler, G.S. and R. A. Sherwin, "The Extent of the Market," 28 J. Law and Econ. 555, 566, 1985.
- Stigler, G.S., "A Theory of Oligopoly," 72 J. Pol. Econ. 44, 1964.
- "Stocks Follow TSMC Upward," Taipei Times, 19 Feburary 2002.

- Subtitle B of title VII of the Tariff Act of 1930, as added by the Trade Agreements Act of 1979 (19 U.S.C. § 1673 et seq.).
- Teel, B., "Intel Can Dance, No Doubt," The Inquirer, 25 April 2003.
- Tobin, James, "A General Equilibrium Approach to Monetary Theory," Journal of Money Credit and Banking, 1(1), 1969.
- Turley, Jim, "Future Fabs", PC Magazine, 3 September 2002.

# Publically-Available News Articles

| |
|---|
| **Japanese Companies in the United States: SEMICONDUCTORS AND COMPUTERS,** Japan-U.S. Business Report Japan Economic Institute of America, Vol. 199, No. 292, 1 January 1994. |
| **WILL INVEST IN SUBMICRON PRODUCTION IN TAIWAN-- Formosa Plastics in**<br>ALAN PATTERSON<br>17-Jan-94<br>Electronic Engineering Times |
| **Europe's U-turn in chips**<br>Roger Woolnough<br>17-Jan-94<br>Electronic Engineering Times |
| **Samsung, NEC Team -- Joint Development Of 256-Mbit DRAM**<br>Jonathan Casell<br>7-Mar-94<br>Electronic Buyers' News |
| **HITACHI TARGETS FLASH WITH MITSUBISHI PACT. (HITACHI AND MITSUBISHI WILL JOINTLY DEVELOP 16M-BIT AND 64M-BIT FLASH MEMORY CHIPS)**<br>24-Jan-94<br>Electronic News |
| **Micron Cans Its VRAM -- Says OEMs Will Turn To WRAMs, SDRAMs**<br>Darrell Dunn<br>28-Feb-94<br>Electronic Buyers' News |
| **FLASHY FUTURE. (TRENDS)**<br>By Christopher Barr<br>11-Jan-94<br>PC Magazine |
| **New Media Corp. ships first 32MB DRAM memory card for the IBM Thinkpad laptop computer**<br>18-Jan-94<br>Business Wire |
| **Hyundai Makes $30 Million Commitment to Megatest Genesis G-III Test Systems**<br>1-Feb-94<br>Business Wire |

# Publically-Available News Articles

---

**A PEEVED GOLDSTAR BACKS AWAY FROM U.S. DRAM MARKET. (DYNAMIC RANDOM ACCESS MEMORY DEVICE SALES FOR GOLDSTAR ELECTRONIC CO.)**

By Robert Ristelhueber

1-Feb-94

Electronic Business Buyer

---

**LOW-COST 64-BIT GRAPHICS BOARDS DEBUT. (NUMBER NINE COMPUTER CORP., ATI TECHNOLOGIES INC., AND ORCHID TECHNOLOGY INC.) (BRIEF ARTICLE)**

By Erica Schroeder

7-Feb-94

PC Week

---

**NEC, Samsung Electronics Are Near Pact on Chips**

An Asian Wall Street Journal Roundup

2-Mar-94

The Asian Wall Street Journal

---

**Japan, South Korean giants tie up for advanced chip development**

1-Mar-94

Agence France-Presse

English

(Copyright 1994)

---

**Oki Becomes Latest Rambus Convert**

Dave Webb

7-Mar-94

Electronic Buyers' News

---

**NUMBER NINE: WAGING PRICE WAR?**

Fred Gardner & Brian Gillooly

7-Mar-94

Computer Reseller News

---

**NEC Electronics Inc. Introduces 16M Hyper Page Mode DRAMs**

21-Mar-94

News Release

---

**TWO FIRMS PLAN EXPANSION OF DRAM PRODUCTION FACILITIES.**

24-Mar-94

Taiwan Economic News

---

# Publically-Available News Articles

| |
|---|
| **Reactor to aid 1-Gbit DRAM push**<br>BRIAN SANTO<br>28-Mar-94<br>Electronic Engineering Times |
| **NEC jumps on the Rambus bandwagon**<br>RON WILSON<br>28-Mar-94<br>Electronic Engineering Times |
| **DRAM Suppliers Shore Up -- Japanese Firms To Hike Spending**<br>Jack Robertson<br>18-Apr-94<br>Electronic Buyers' News |
| **MOTOROLA ANNOUNCES AVAILABILITY OF A WIDE VARIETY OF DRAM CARDS FOR THE COMPUTING ENVIRONMENT**<br>2-May-94<br>PR Newswire |
| **IBM, SIEMENS, TOSHIBA CHIP IN EARLY-SAMPLING STAGE -- Trio readies shrink version of 64-Mbit DRAM**<br>RON WILSON<br>30-May-94<br>Electronic Engineering Times |
| **Alaris launches fastest low-cost VESA local bus Windows accelerator; Alaris' $189 SkyEagle delivers fastest performance of any 1 MB DRAM-based accelerator**<br>6-Jun-94<br>Business Wire |
| **Korea - Computer News Roundup**<br>8-Jun-94<br>Newsbytes News Network Newsbytes |
| **Japan - Computer News Briefs 06/09/94**<br>9-Jun-94<br>Newsbytes News Network Newsbytes |

# Publically-Available News Articles

| |
|---|
| **Japan - Computer News Briefs 06/15/94**<br>15-Jun-94<br>Newsbytes News Network Newsbytes |
| **Fujitsu forays into 64-Mbit SDRAMs**<br>RON WILSON<br>27-Jun-94<br>Electronic Engineering Times |
| **LCD, DRAM plants planned**<br>DAVID LAMMERS<br>11-Jul-94<br>Electronic Engineering Times |
| **MOSYS AIMS DEVICE AT GRAPHICS WORLD -- Startup enters fast-DRAM fray**<br>RON WILSON ; BRIAN FULLER<br>11-Jul-94<br>Electronic Engineering Times |
| **NINTENDO TO USE SPECIALTY DRAM :Rambus gets design win**<br>Brian Fuller<br>18-Jul-94<br>Electronic Engineering Times |
| **PARTNERS BACK OUT OF 8-INCH PROJECT -- TSMC inherits DRAM fab**<br>ALAN PATTERSON<br>18-Jul-94<br>Electronic Engineering Times |
| **DIAMOND EXPANDS ITS AWARD-WINNING FAMILY OF STEALTH 64 GRAPHICS ACCELERATORS WITH STEALTH 64 DRAM**<br>22-Jul-94<br>PR Newswire |
| **Korea - Technology News Briefs 07/26/94**<br>26-Jul-94<br>Newsbytes News Network Newsbytes |

# Publically-Available News Articles

---

**TI, Hitachi plan $500M DRAM venture in U.S. (Texas Instruments and Hitachi expand their memory-chip agreement to include a joint manufacturing venture)**

Reinhardt Krause

8-Aug-94

Electronic News

---

**IBM samples DRAM stack**

15-Aug-94

Electronic Engineering Times

---

**Philips keeps up with European fab outlays. (Philips Electronics NV)**

Reinhardt Krause Jim DeTar

15-Aug-94

Electronic News

---

**NEC mulls $1B DRAM fab. (NEC Electronics Inc to choose between US and UK manufacturing sites for sub-micron DRAM fabrication)**

Anthony Cataldo

29-Aug-94

Electronic News

---

**NEC chooses Scotland over California for advanced chip plant**

21-Sep-94

Agence France-Presse

---

**Gambling On DRAMs/headline 6Mark LaPedus**

26-Sep-94

Electronic Buyers' News

---

**Rambus DRAM to become next standard for PC graphics; four suppliers announce plans for Rambus 8-Megabit DRAM**

10-Oct-94

Business Wire

---

**MASSIVE INVESTMENT PLANNED - JAPAN TRIES TO CATCH UP IN COMPUTER CHIP MARKET.**

20-Oct-94

South China Morning Post

---

# Publically-Available News Articles

---

**South Korean semiconductor makers in all-out investment race**
Lee Shin-Hyung
25-Oct-94
Agence France-Presse

---

**TI Taxes Taiwanese Chip Makers -- Demand DRAM Royalties From Five**
Mark LaPedus
31-Oct-94
Electronic Buyers' News

---

**NEC Kyushu Gearing up for Additional Production of 16 & 64 MB DRAM Chips**
15-Dec-94
NTIS Alert Foreign Technology
Vol. 94, No. 24 ISSN: 0884-7541

---

**NEC Kyushu Gearing up for Additional Production of 16 & 64 MB DRAM Chips**
15-Dec-94
NTIS Alert Foreign Technology
Vol. 94, No. 24 ISSN: 0884-7541

---

**Kobe Steel, Texas Instruments invest 500 million dollars on chip plant**
Toru Aoyama
19-Dec-94

---

**Samsung At Head Of 256-Meg Pack -- Lenghtens Lead Over Competitors**
Jonathan Cassell
19-Dec-94
Electronic Buyers' News

---

**JAPANESE VENDORS REVEAL NEW DRAM DEVELOPMENTS. (MITSUBISHI ELECTRIC, MATSUSHITA ELECTRIC, AND OKI ELECTRIC DEVELOP 256M-BIT DRAMS ON 0.25-MICRON CMOS PROCESS TECHNOLOGY)**
By Jim DeTar
28-Feb-94
Electronic News

---

**COMMISSION TO RECONSIDER TIMELINESS OF EXTENDING ANTI-DUMPING MEASURES ON DRAM ELECTRONIC SEMICONDUCTORS.**
5-Jan-95
Agence Europe

---

# Publically-Available News Articles

---

**FOUR DRAM VENDORS AND EIGHT CHIPSET SUPPLIERS ANNOUNCE MULTIPLE SOURCES AND CONTROLLER SUPPORT FOR BURST EDO DRAM**

11-Jan-95

9:30 AM

Business Wire

---

**NEC KYUSHU TOOLING UP FOR THE WORLD'S FIRST MASS-PRODUCTION OF 256 MEG DRAM CHIPS SUMMARY**

15-Jan-95

NTIS Update, Foreign Technology

Vol. 95, No. 2

---

**Samsung to provide high bandwidth 500MHz Rambus DRAMs**

23-Jan-95

2:46 PM

Business Wire

---

**PRICE FOR DRAM CHIP SOARING**

MARGARET D. WILLIAMS - Bloomberg Business News JIM BARNETT - of The Oregonian staff contributed to this report

3-Mar-95

The Oregonian

---

**Three DRAM makers set up shop in Taiwan**

David Lammers

6-Mar-95

Electronic Engineering Times

---

**NEC bares Roseville blip. (NEC Electronics' Roseville, CA, facility encounters problems that delay production of 16-Mbit DRAMs)**

Anthony Cataldo

10-Apr-95

Electronic News

Vol. 41, No. 2060, ISSN: 1061-6624

---

**NEC, Samsung sampling 64-Mbit DRAMs**

DAVID LAMMERS

17-Apr-95

Electronic Engineering Times

---

# Publically-Available News Articles

---

**Fujitsu plans big chip plant in U.S. or Britain. [corrected 03:51 gmt]**
By Aya Takada
20-Apr-95
Reuters News

---

**Semiconductors. (memory chip makers to increase dynamic random access memory chip prices)(Japan Market News)**

30-Apr-95
IDC Japan Report
Vol. 21

---

**Tight supplies, jump in spot pricing hike cost of Dram**
JOHN LONGWELL
1-May-95
Computer Reseller News
Issue: 628

---

**IBM, Ramtron sign sourcing pact. (IBM to manufacture enhanced DRAM)**
Anthony Cataldo
15-May-95
Electronic News

---

**Siemens bares more DRAM expansion. (Siemens AG invests in 4-Mb, 16-Mb plants)**
Crista Hardie
15-May-95
Electronic News
Vol. 41, No. 2065, ISSN: 1061-6624

---

**CHIPS: TOSHIBA FIRST TO MARKET WITH NEW 16MB 512K X32 DYNAMIC RAM; DRAM PROVIDES GRANULARITY PREVIOUSLY UNAVAILABLE IN 16MB ORGANIZATION**

29-May-95
Edge Work-Group Computing Report
Vol. 6, No. 261

---

**DRAM Trio Hits 256-Meg**
12-Jun-95
Electronic Buyers' News
Issue: 959

---

# Publically-Available News Articles

---

**DRAM Duo Plan Ahead -- TI Intros First S-DRAM; Siemens Expands Fabs**
Mark Hachman
24-Jul-95
Electronic Buyers' News

---

**IBM Micro expects memory share to drop. (IBM Microelectronics)**
Reinhardt Krause
31-Jul-95
Electronic News

---

**Fujitsu sets $1B Oregon fab growth. (Fujitsu Microelectronics Inc)**
Crista Hardie
31-Jul-95
Electronic News
Vol. 41, No. 2076, ISSN: 1061-6624

---

**IBM, Toshiba plan 64-Mbit DRAM fab**
Yoshiko Hara and David Lammers
14-Aug-95
Electronic Engineering Times

---

**DRAM mart tightens.(dynamic random access memory)**
17-Aug-95
Purchasing
Vol. 119, No. 2, ISSN: 0033-4448

---

**MITSUBISHI: Mitsubishi launches low power consumption 4, 8, 16 & 32 Mbyte DRAM**
15-Sep-95
M2 Presswire
English
Copyright 1995 M2 Communications

---

**CHIPS: MOTOROLA TO JOIN ALLIANCE OF IBM, SIEMENS & TOSHIBA TO DEVELOP ADVANCED MEMORY CHIPS**
30-Oct-95
Edge: Work-Group Computing Report
Vol. 6, No. 283

**Fab Moves Proliferate**
Hardie, Crista
30-Oct-95
Electronic News

---

# Publically-Available News Articles

---

**CHIPS: MOTOROLA & SIEMENS PLAN JOINT DRAM MANUFACTURING IN THE U.S.**
30-Oct-95
Edge: Work-Group Computing Report
Vol. 6, No. 283

---

**Duo fields 16-Mbit DRAM**
RonWilson
6-Nov-95
Electronic Engineering Times

---

**Samsung Elec develops 1 GB DRAM chip.**
By Kim Myong-hwan
11-Dec-95
5:51 AM
Reuters News

---

**5-Year DRAM Deals**
LaPedus, Mark
18-Dec-95
Electronic Buyers' News

---

**DRAM glut launches price slide. (dynamic random access memory)**
Akira Minamikawa
31-Dec-95
IDC Japan Report

---

**Hitachi, NEC Build Fabs Outside Japan; DRAM Suppliers Fleeing From Yen**
LaPedus, Mark
8-Jan-96
Electronic Buyers' News

---

**TI, Samsung Move Squabble To Court**
Hardie, Crista
8-Jan-96
Electronic News
Vol. 42, No. 2098

---

**Semiconductor fears hit Japan technology stocks.**
By Drew Torchia
23-Jan-96
5:12 AM
Reuters News

---

# Publically-Available News Articles

---

**Micron Melodrama Appleton Returns, But It's a Little Quiet in Lehi**
19-Feb-96
Semiconductor Industry & Business Survey
Vol. 18, No. 2

---

**Micron To Delay Fab -- DRAM Uncertainty Puts Plant On Hold**
Dunn, Darrell
4-Mar-96
Electronic Buyers' News
No. 996

---

**CHIPS: MITSUBISHI DEBUTS INDUSTRY'S FIRST MICROPROCESSOR WITH ON-CHIP DRAM; GROUNDBREAKING CHIP SOLVES DATA BANDWIDTH PROBLEMS WITH HIGH INTEGRATION**

18-Mar-96
Edge: Work-Group Computing Report

---

**S.Korean firms to boost output of powerful chips.**
By Yeom Yoon-jeong
22-Mar-96
Reuters News

---

**Mosys(TM) Develops Cache Memory Replacement Using Multibank Dram Technology For Lower Cost And 1/3rd The Power**
29-Mar-96
PR Newswire

---

**IBM Plant To Stop Making DRAMs**
Robertson, Jack
15-Apr-96
Electronic Buyers' News
No. 1002

---

**Hitachi spends $1 billion to keep up in chip race.**
By Jeff Stearns
25-Apr-96
6:05 AM
Reuters News
(c) 1996 Reuters Limited

---

# Publically-Available News Articles

---

**DRAM makers cut 4 Mb production. (shifting towards 16 Mb DRAM devices)(Electronics Purchasing)**

25-Apr-96

Purchasing

Vol. 120, No. 6, ISSN: 0033-4448

COPYRIGHT 1996 Reed Publishing USA

---

**Sun Micro Sued By Reseller Over Aborted DRAM Deal**

Hardie, Crista

29-Apr-96

Electronic News

Vol. 42, No. 2114

English

---

**Two Join DRAM Market -- Taiwan Hopefuls Set Out On Dissimilar Courses**

LaPedus, Mark

628 words

6-May-96

Electronic Buyers' News

16

No. 1005

English

---

**Mitsubishi, NEC Explore Memory-MPU Pairings**

MacLellan, Andrew

759 words

13-May-96

Electronic News

50

Vol. 42, No. 2116

---

**Fujitsu delays Durham fab**

Lammers, David

392 words

11-Mar-96

Electronic Engineering Times

20

---

**S.Korean manufacturers reduce memory chip production.**

By Yeom Yoon-jeong

556 words

31-May-96

5:37 AM

Reuters News

---

# Publically-Available News Articles

**Hitachi calls in partners to set up new chip plant.**
By Jeff Stearns
524 words
6-Jun-96
5:30 AM
Reuters News
English

**Japan chip makers scaling back production plans.**
By Yuko Inoue
565 words
10-Jun-96
5:04 AM
Reuters News

And
**Fujitsu joins others in cutback on microchip production**
456 words
10-Jun-96
Agence France-Presse
English
(Copyright 1996)

**Taiwan Strengthens Its DRAM Position -- Fujitsu, Oki Will Purchase 16-, 64-Mbits From**
Robertson, Jack
824 words
24-Jun-96
Electronic Buyers' News
2
No. 1012

**SKorea's Hyundai Electronics to scale back planned 16M DRAM output**
144 words
7-Jun-96
Agence France-Presse
English
(Copyright 1996)

# Publically-Available News Articles

---

**LG Sets New Fab Outside Asia**
Hardie, Crista
511 words
15-Jul-96
Electronic News
1
Vol. 42, No. 2125
English

---

**KOREAN CHIPMAKERS SWITCH TO 64M DRAM CHIP TO BOOST SALES**
515 words
1-Aug-96
Asia Pulse
English

---

**Samsung Names New VP Of Memory Marketing**
507 words
12-Aug-96
10:19 AM
Business Wire
English

---

**Scrambling For Margin -- Two U.S. DRAM Firms Continue 16-Meg Work**
Dunn, Darrell
810 words
19-Aug-96
Electronic Buyers' News
3
No. 1020

---

News
**DRAM Plunge Stinging Japan -- Four Cut 16-Mbit Output Even Further**
Jack Robertson
519 words
9-Sep-96
Electronic Buyers' News
3
1023
English

---

# Publically-Available News Articles

---

**Mosel, Siemens Set Up Fab**
Mark LaPedus
504 words
9-Sep-96
Electronic Buyers' News
3
1023
English

---

**NEC to DRAM startups:watch your pricing**
David Lammers
865 words
28-Oct-96
Electronic Engineering Times
16
925
English
Copyright 1996 CMP Publications Inc.

---

**Samsung claims world first in 1GB DRAM development.**
589 words
4-Nov-96
8:52 AM
Reuters News
English
(c) 1996 Reuters Limited

---

**IPO VIEW - LG Semicon's listing seen poorly timed.**
By Katherine Bruce
721 words
7-Nov-96
Reuters News
English
(c) 1996 Reuters Limited

---

**Motorola, Siemens To Build Dresden Fab -- 12-in.-Wafer Facility Second Joint Venture**
Jack Robertson
533 words
18-Nov-96
Electronic Buyers' News

---

# Publically-Available News Articles

---

**Korea Seeks Trade Deal -- Asks U.S. To Drop Chip-Dumping Case**
Jack Robertson
538 words
6-Jan-97
[Electronic Buyers' News](#)

---

**Hitachi Trims 16-Meg Production -- DRAM Tags Remain Low As Glut Continues**
Jack Robertson
551 words
20-Jan-97
[Electronic Buyers' News](#)

---

News
**Samsung Scales Back DRAM Fab Investment -- South Korean Giant Hit Hard By Glut**
Jack Robertson and Jim Evans
519 words
27-Jan-97
[Electronic Buyers' News](#)
3

---

**Fab Construction Tightrope**
Hardie, Crista^Bruner, Richard
2477 words
27-Jan-97
[Electronic News](#)
1
Vol. 43, No. 2152

---

**Korea Slashes DRAM Output -- Big Three To Cut 16-Mbit Production**
Anthony Cataldo
772 words
3-Feb-97
[Electronic Buyers' News](#)
1
1043
English

---

**Hitachi Shifting To Logic Chips**
Mark Hachman
583 words
17-Feb-97
[Electronic Buyers' News](#)
3
1045

---

# Publically-Available News Articles

---

**Toshiba Eyes Stake In Austin Fab -- Talks With Samsung About 20% Share**

Jack Robertson

591 words

24-Feb-97

Electronic Buyers' News

---

**WORLDWATCH - NEC FIRST WITH 4-GIGABIT DRAM (532).**

529 words

26-Mar-97

PC Quest

English

---

**DRAM CHIP PRICES RISE MORE THAN 60% SINCE JANUARY.**

By William Choong.

627 words

8-Apr-97

Straits Times

---

**Three more companies join embedded race -- LSI, Micron will work jointly on DRAM**

Jim Evans

753 words

9-Jun-97

Electronic Buyers' News

---

**Motorola leaving memories behind // Company will quit - making DRAM chips in wake of price drops**

Lori Hawkins

657 words

2-Jul-97

Austin American-Statesman

D1

---

**Motorola leaving DRAM market -- Chip maker shifting production to SRAMs, flash, logic devices**

Darrell Dunn and Ismini Scouras

793 words

7-Jul-97

Electronic Buyers' News

68

1065

---

# Publically-Available News Articles

---

**Toshiba plans to increase cooperative ventures -- Partners with IBM Micro in a $1.7 billion DRAM fab in Virginia**

Jack Robertson

642 words

28-Jul-97

Electronic Buyers' News

4

1068

---

**Hyundai, Toshiba revamp semiconductor operations**

Jack Robertson

631 words

25-Aug-97

Electronic Buyers' News

---

**NEC expands to make faster chips in Singapore.**

By Josephine Ng

627 words

18-Sep-97

5:29 AM

Reuters News

English

---

**Micron hits testing jam -- Company indicates in a private briefing that lack of testing facilities puts crimp in DRAM production**

Jack Robertson

518 words

15-Dec-97

Electronic Buyers' News

---

**Two Taiwan companies hit with IP lawsuits**

Mark LaPedus and Sandy Chen

618 words

9-Feb-98

Electronic Buyers' News

---

**Texas Instruments, Hitachi Shut Down Chip-Making Joint Venture**

521 words

9-Feb-98

7:16 AM

Dow Jones Online News

---

# Publically-Available News Articles

**MITSUBISHI ELECTRIC, OKI ELECTRIC CANCEL DRAM CHIP PLANS**
586 words
20-Feb-98
Asia Pulse
English
(c) 1998 Asia Pulse Pty Limited

**Toshiba Sticks With DRAMs**
McGrath, Dylan
630 words
9-Mar-98
Electronic News
1
Vol. 44, No. 2209
English

**Is TI Dumping The DRAM Business?**
Wade, Will
1185 words
9-Mar-98
Electronic News
1
Vol. 44, No. 2209

**Hitachi to phase out Japan DRAM output.**
By Yuko Inoue
605 words
17-Mar-98
Reuters News
English
(c) 1998 Reuters Limited

**Fujitsu, Hitachi say to cut European DRAM output.**
By Yuko Inoue
553 words
31-Mar-98
Reuters News
English

**Samsung ships 256Mb DRAM.**
By BILL AUSTIN.
590 words
5-May-98
The Australian

# Publically-Available News Articles

---

**HYUNDAI TO PUT DRAM CHIP PRODUCTION ON HOLD**
601 words
5-Jun-98
Computergram International
No. 3425
English
Copyright 1998 Gale Group Inc. All rights reserved.

---

**S. Koreans slowing DRAM production**
Andrew MacLellan
854 words
8-Jun-98
Electronic Buyers' News
1

---

**DRAM - Korea cuts supply, Texas Instruments in talks.**
By David Manners.
527 words
10-Jun-98
Electronics Weekly

---

**TI bails out of DRAMs — Sells assets to Micron, lays off 3,500 workers**
Andrew MacLellan
822 words
22-Jun-98
Electronic Buyers' News
1
1114

---

**Siemens Shuts U.K. Plant Siemens will close North Tyneside semiconductor plant in Northern England, laying off about 1,100 people**
855 words
3-Aug-98
Electronic News

---

**Hitachi, LG to merge semi operations**
1143 words
7-Sep-98
Electronic News
1

---

# Publically-Available News Articles

---

**Upping the DRAM ante -- Samsung resumes capacity expansion at Austin fab**
Jack Robertson
793 words
19-Oct-98
Electronic Buyers' News

---

**Hitachi shifts DRAM production: single line in Singapore will make all DRAMs in the future.(Company Business and Marketing)**
521 words
26-Oct-98
Electronic News

---

**Why Siemens is exiting the chip business -- Enough already**
Richard Richtmyer
1185 words
9-Nov-98
Electronic Buyers' News

---

**Toshiba, Fujitsu to join hands in chip development.**
501 words
3-Dec-98
4:05 AM
Reuters News

---

**IBM and Nanya map out details of DRAM licensing agreement**
Jack Robertson and Sandy Chen
670 words
7-Dec-98
Electronic Buyers' News

---

**LG won't comply; gov't fights back -- DRAM maker risks losing additional financing**
Jack Robertson
709 words
4-Jan-99
Electronic Buyers' News
82
231
English
Copyright (c) 1999 CMP Media LLC

---

# Publically-Available News Articles

---

**Fujitsu To Scale Back Production Of DRAMs To Focus On Other Products**
537 words
11-Jan-99
5:51 AM
Dow Jones Business News

---

**LG workers cut output in protest**
Jack Robertson
562 words
25-Jan-99
Electronic Buyers' News
1
1144

---

Jack Robertson
712 words
11-Feb-99
3:00 AM
CMP TechWeb

---

**Siemens Semi changes name for April spinoff**
Ismini Scouras
654 words
22-Mar-99
Electronic Buyers' News

---

**Hyundai, LG Semicon get 'Big Deal' done**
Jack Robertson
1051 words
26-Apr-99
Electronic Buyers' News

---

**FOCUS-S.Korea Samsung Elec raising DRAM investment.**
By Yoo Choon-sik
524 words
2-Jun-99
2:31 AM
Reuters News

---

# Publically-Available News Articles

**Japan's NEC, Hitachi agree to combine memory chip businesses by Kazuhiro Shimamura ATTENTION - ADDS analysis ///**

586 words

23-Jun-99

Agence France-Presse

English

Copyright (c) 1999 Bell & Howell Information and Learning Company. All rights reserved.

---

**Surge in chip prices spurs DRAM makers to step up production (606).**

600 words

26-Aug-99

China News

English

(c) 1999 Chamber World Network

---

**Hitachi Revamps DRAM Strategy**

Robert Ristelhueber

601 words

22-Sep-99

3:00 AM

CMP TechWeb

English

---

News

**NEC, Hitachi broaden DRAM agreement**

Jack Robertson

611 words

29-Nov-99

Electronic Buyers' News

6

1188

---

**NEC & Hitachi Establish Joint Venture DRAM Company.(Company Business and**

6-Dec-99

EDGE: Work-Group Computing Report

---

**Mosel-Vitelic Unveils Ambitious Expansion Plan.**

10-Apr-00

Taiwan Economic News

# Publically-Available News Articles

---

**TAIWAN: CONSTRUCTION START-UP ON PLANNED 8-INCH WAFER CHIP PLANT IS TENTATIVELY SCHEDULED TO BEGIN IN JULY 2000 TO BE FOLLOWED BY THE BUILDING OF A 12-INCH FACTORY, POWERCHIP SEMICONDUCTOR CORP. (PSC) [TAIWAN] - Order #: 065400.**

1-Jun-00
World
Volume 9; Issue 06

---

**NEC, Toshiba retooling fabs for denser memories at 0.18 micron -- Process push under way for 256-Mbit DRAM**

Anthony Cataldo
21-Aug-00
Electronic Engineering Times

---

Will lawsuits curb Rambus' royalty drive? Rambus
Electronic Buyers' News, 4 September 2000

---

**NEC Decision On Rambus: Hint Of Things To Come?**

Anthony Cataldo
13-Sep-00
CMP TechWeb

---

**Samsung to license Rambus SDRAM -- Elpida follows suit, boosting design firm's royalty revenue stream**

Jack Robertson
6-Nov-00
Electronic Buyers' News

---

**UPDATE 1-Korean chipmakers to cut 2001 investments.**

By Nam In-soo
27-Nov-00
4:19 AM
Reuters News

---

**Elpida Memory to Build 300mm Wafer Plant -- Emerges as Fully Integrated DRAM Manufacturer --**

28-Nov-00
6:06 AM
Business Wire

---

**Samsung, Intel form alliance to spur Rambus chip demand.**

By Hwang Jang-jin Staff reporter.
28-Feb-01
The Korea Herald

---

# Publically-Available News Articles

---

**UPDATE 1-NEC to shift UK plant output from DRAMs.**
By Edmund Klamann
25-Apr-01
[Reuters News](#)

---

**Jury Verdict May Crimp Rambus Royalty Model**
Jack Robertson
905 words
14-May-01
[Electronic Buyers' News](#)
1

---

**Mosel Vitelic joins list of delayed 300-mm fabs**
Mike Clendenin
621 words
21-May-01
[Electronic Engineering Times](#)
22
1167
English

---

**Hynix to suspend U.S. plant to reduce DRAM output.**
By Yang Sung-jin Staff reporter.
557 words
19-Jul-01
[The Korea Herald](#)
English
(c) 2001 The Korea Herald

---

**Hynix, Fujitsu temporarily shutter fabs in Oregon**
Anthony Cataldo and Paul Kallender
722 words
23-Jul-01
[Electronic Engineering Times](#)
6
1176

---

**Toshiba to Reduce DRAM Fab Capacity at Its Yokkaichi Manufacturing Facility**
502 words
8-Aug-01
3:03 AM
[PR Newswire](#)

---

# Publically-Available News Articles

**PowerChip, Mitsubishi Co-found A Chip House.**
By Alice Liu
547 words
28-Aug-01
Taiwan Business News
English

**MOSAID TECHNOLOGIES INC - SAMSUNG ELECTRONICS CO LTD - MOSAID Initiates Litigation Against Samsung for ...**
725 words
13-Sep-01
4:36 PM
Market News Publishing
English

**Korea Hynix to cut its DRAM output portion to 60pct.**
548 words
25-Sep-01
2:10 AM
Reuters News
English
(c) 2001 Reuters Limited

**Infineon, Toshiba near chip business merger.**
628 words
18-Oct-01
Total Telecom
English

**Hynix hangs tough after bailout**
Anthony Cataldo
578 words
5-Nov-01
Electronic Engineering Times

**Powerchip says could delay new chip plant further.**
549 words
20-Nov-01
1:13 AM
Reuters News
English
(c) 2001 Reuters Limited

# Publically-Available News Articles

NEWS
**DRAM Duelers Hynix, Micron Mull Merger**
Paul Kallender and Mike Clendenin
659 words
10-Dec-01
Electronic Engineering Times

---

**Toshiba to sell US semiconductor arm to Micron [Corrected 12/18/01]**
Shingo Ito
607 words
18-Dec-01
Agence France-Presse
English
(Copyright 2001)

---

**Toshiba Exits Commodity DRAMs.**
632 words
1-Jan-02
Electronic Materials Update
Volume 16; Issue 1
English

---

**DRAM makers look to ally, as Infineon courts Hynix**
Mike Clendenin
1094 words
4-Feb-02
Electronic Engineering Times

---

**Infineon to Cooperate with Taiwanese Winbond and Mosel Vitelic to Secure Higher Memory Chip Production Capacity**
1135 words
11-Mar-02
4:06 AM
Business Wire
English

---

**Infineon wins EU approval for German aid.**
695 words
9-Apr-02
Total Telecom
English

# Publically-Available News Articles

---

Financial Post: World
**Hot chips: Micron swallows Hynix in US$4B deal: Creates world's biggest DRAM**
Bloomberg News
505 words
23-Apr-02
National Post
National

---

**OPPOSITION IN KOREA -- Fate of Hynix, Micron deal unclear as deadline looms**
Jack Robertson
1111 words
29-Apr-02
Electronic Buyers' News
2
1310

---

**Infineon enters partnerships with Taiwan tech companies.**
By The China Post Staff.
574 words
3-May-02
China Post

---

**Hynix Mulls Survival Strategies In Wake Of Micron's Departure**
Jack Robertson
957 words
6-May-02
Electronic Buyers' News

---

**Infineon Betters Position With Nanya Deal**
Faith Hung
562 words
6-May-02
Electronic Buyers' News
6

---

Financial Post: News
**U.S. antitrust unit probes price-fixing by chipmakers: Three of top four companies confirm U.S. investigation**
Daniel Sorid and Lucas van Grinsven
Reuters, with files from Bloomberg News
701 words
20-Jun-02
National Post

---

# Publically-Available News Articles

---

**A renaissance in DRAM: Mitsubishi sells DRAM to Elpida, ties knot with Hitachi. (News).**
Alex Romanelli
519 words
7-Oct-02
Electronic News
4

---

**NEW SIEMENS SEMICONDUCTOR PLANT FOR DRAMS, LOGIC WILL COST $1.18B. (DRESDEN, GERMANY PLANT TO PRODUCE 16M-BIT AND 64M-BIT DRAMS BY THE END OF 1995)**
By Marc Ferranti
449 words
3-Jan-94
Electronic News

---

**31995D0197 - 95/197/EC: Commission Decision of 8 June 1995 suspending the definitive anti-dumping duties imposed on imports of certain types of electronic microcircuits known as DRAMs (dynamic random access memories) originating in Japan and in the Republic of**
1317 words
9-Jun-95
Celex
English

---

**31996R0399 - Council Regulation (EC) No 399/96 of 4 March 1996 extending the suspension of the definitive anti-dumping duties imposed on imports of certain types of electronic microcircuits known as DRAMs (dynamic random access memories) originating in Japan and in the Republic of Korea**
1322 words
6-Mar-96
Celex

---

News
**Europeans To Press Antidumping Case**
J. Robert Lineback
777 words
23-Dec-96
Electronic Buyers' News
3
1038
English
Copyright 1996 CM

---

# Publically-Available News Articles

---

**Japan chip makers see no major impact from EU move.**
324 words
11-Mar-97
Reuters News
English

Also:
**EU to take antidumping steps on Japanese chips**
204 words
17-Mar-97
Japan Semiconductor Scan

---

**EU/ANTI-DUMPING.**
271 words
26-Nov-97
Agence Europe
English

Sector: 3

---

**31997D0798 - 97/798/EC: Commission Decision of 10 November 1997 terminating the anti-dumping proceeding concerning imports of certain types of electronic microcircuits known as DRAMS (dynamic random access memories) originating in Japan**

1999 words
27-Nov-97
Celex

---

**31997R2335 - Council Regulation (EC) No 2335/97 of 24 November 1997 repealing Regulation (EEC) No 611/93 with respect to the imposition of a definitive anti-dumping duty on imports into the Community of certain electronic microcircuits known as DRAMs originating in the Republic of Korea**

1993 words
27-Nov-97
Celex

---

**NEW KOREAN DRAM DUMPING CHARGES FILED WITH EU**
121 words
13-Jul-98
Computergram International
No. 3450
English

---

# Publically-Available News Articles

**European chipmakers decide against targeting Japan.**
308 words
18-Nov-98
1:28 PM
Reuters News
English

**EECA told to drop dumping charges.**
173 words
23-Nov-98
Electronics Times
1

**EU to launch probe into Korean DRAM sector.**
272 words
25-Jul-02
The Korea Herald
English

**S.Korean chipmakers cutting output as prices fall.**
By Yoo Choon-sik
522 words
8-Jul-97
5:51 AM
Reuters News
English

**S. Korean Computer Chip Makers Plan To Cut Production**
299 words
2-Jun-98
3:42 AM
Dow Jones International News

**Samsung sticks with cutback plan**
Jack Robertson
960 words
29-Jun-98
Electronic Buyers' News
1
1115

# Publically-Available News Articles

**Korean Chipmakers Cut Production Again.**

129 words

15-Jul-98

Korean Industry Update

English

(c) 1998 Korea Info Tank

---

**LG Decides Not to Cut Semiconductor Output.**

257 words

4-Aug-98

The Korea Herald

English

(c) 1998 The Korea Herald

---

**South Korean chip makers to temporarily stop production again**

301 words

7-Aug-98

2:32 AM

Associated Press Newswires

English

(c) 1998. The A

---

**BUSINESS - Fujitsu to shut down computer chip plant in England.**

549 words

5-Sep-98

Asahi Shimbun/Asahi Evening News

English

---

**Siemens sues LG in DRAM patent wrangle.**

by John Walko

346 words

7-Sep-98

Electronics Times

6

English

(c) 1998 Miller Freeman

---

**Hyundai Opens New US Chip Plant**

Martyn Williams, Newsbytes

195 words

10-Sep-98

Newsbytes News Network

English

# Publically-Available News Articles

**Japan Fujitsu,S. Korea Samsung Agree On Patent Issue -Nikkei**
145 words
23-Oct-98
10:35 AM
[Dow Jones International News](#)
English

**Samsung, World's Largest Computer Chip Maker, to Cut Production**
Omar L. Gallaga
523 words
4-Sep-98
[KRTBN Knight-Ridder Tribune Business News: Austin American-Statesman](#)
English
Copyright (C) 199

**Korean chip makers will cut output in early October.**
150 words
16-Sep-98
[Korean Industry Update](#)
English
(c) 1998 Korea Info Tank

**Hyundai-LG Chip Deal Appears Set to Fall Through.**
516 words
21-Sep-98
[The Korea Herald](#)
English
(c) 1998 The Korea Herald

**S.Korean president calls for troubled chip deal to go through**
548 words
15-Dec-98
[Agence France-Presse](#)

**Hyundai Takes 70 Pct Stake in New Semiconductor Firm.**
522 words
24-Dec-98
[Korea Times](#)
English

# Publically-Available News Articles

**Korean Banks Halt Loans To LG Semicon As Merger With Hyundai Stalls**
519 words
28-Dec-98
9:26 AM
Dow Jones Business News

**FOCUS-Korea LG concedes to Hyundai-led chip merger.**
By Koo Hee-jin
578 words
6-Jan-99
9:37 AM
Reuters News

**Micron of U.S. files patent infringement charge against Mosel Vitelic.**
341 words
25-Aug-98
Taiwan Economic News
English

**Micron files broad-based dumping suit -- Names Taiwanese DRAM makers, other suppliers**
Jack Robertson
675 words
26-Oct-98
Electronic Buyers' News

**U.S. Trade Panel/Taiwan -2: Complaint Against 13 Companies**
338 words
7-Dec-98
4:10 PM
Dow Jones International News
English

**Initiation of Antidumping Duty Investigation: Dynamic Random Access Memory Semiconductors From Taiwan**
2538 words
18-Nov-98
Federal Register
64040
Vol. 63, No. 222
English

# Publically-Available News Articles

---

**Taiwan makers allege U.S. exporters dump DRAM.**
332 words
12-Apr-99
6:26 AM
Reuters News
English

---

**Taiwan initially finds U.S. makers dumping chips.**
367 words
29-May-99
5:01 AM
Reuters News
English

---

**Taiwan to impose anti-dumping tax against Micron.**
351 words
17-Sep-99
6:40 AM
Reuters News
English
(c) 1999 Reuters Limited

---

**U.S. raises punitive duty rates on Taiwan's DRAM chips.**
350 words
13-Oct-99
Taiwan Economic News
English

---

**ITC rules Taiwan-made DRAM products not less than fair value.**
320 words
21-Nov-99
Taiwan Economic News
English

---

**Taiwan rules U.S. makers not dumping DRAM.**
402 words
29-Feb-00
1:03 AM
Reuters News
English
(c) 2000 Reuters Limited

---

# Publically-Available News Articles

---

**SKorea's Hyundai Elec shareholders approve new name.**
329 words
29-Mar-01
2:20 AM
Reuters News
English

---

**Hynix Semiconductor to Spin Off Non-Core Units.**
313 words
7-Apr-01
Korea Times
English

---

**LUCKY-GOLDSTAR CHANGES NAME TO LG GROUP.**

315 words
11-Jan-95
Korea Economic Weekly

---

**U.S. Agency Probes DRAM Makers**
By MATT MOORE
AP Business Writer
394 words
18-Jun-02
AP Online
English

---

**Taiwan Hot Stocks-DRAM limit-up on merger rumours.**
230 words
22-Nov-01
10:49 PM
Reuters News
English

---

**Micron Technology in alliance talks with Hynix [Corrected 12/03/01]**
C.W. Lim
554 words
3-Dec-01
Agence France-Presse
English

---

# Publically-Available News Articles

---

**Japan Technology Newsbriefs 02/20/96**

588 words

20-Feb-96

Newsbytes News Network

English

---

**Micron's Slice of Chip Pie May Shrink After Plant Move**

Bloomberg Business News

463 words

1-Mar-96

The Omaha World-Herald

Sunrise

18

---

**Reduced demand, falling prices and revised production**

411 words

1-May-96

Integrated Circuits International

ISSN: 0263-6522

---

**Samsung Electronics Cuts 16m Dram Production In Response To Drops In World DRAM Prices; Monthly Output To Decrease From 14 Million Chips To 12 Million Chips**

368 words

30-May-96

8:00 PM

Business Wire

English

---

**TI-Acer to cut 4M DRAM output by half by year-end.**

321 words

10-May-96

Reuters News

English

(c) 1996 Reuters Limited

---

**Taiwan's TI-Acer to stop 4M DRAM production.**

232 words

3-Jun-96

Reuters News

English

(c) 1996 Reuters Limited

---

# Publically-Available News Articles

**Mitsubishi Scales Back DRAM Production Plans**
115 words
5-Jun-96
Newsbytes
English

**Hitachi to cut 16-megabit output - company official.**
172 words
6-Jun-96
Reuters News
English

**NEC Cuts Back DRAM Production As Hitachi Expands 06/06/96**
592 words
6-Jun-96
Newsbytes
English

**Fujitsu to postpone microchip production projects in US, Britain**
241 words
10-Jun-96
Agence France-Presse
English

**Toshiba cuts memory chip production plans.**
By Jeff Stearns
460 words
11-Jun-96
7:48 AM
Reuters News
English

**Taiwan TI-Acer slows construction over price fall.**
304 words
14-Jun-96
Reuters News
English

**Fujitsu to reduce 4-megabit DRAM production**
201 words
1-Jul-96
Japan Semiconductor Scan
English

# Publically-Available News Articles

**Hitachi (6501) to shut down Takasaki 16M DRAM line**
189 words
16-Jul-96
1:30 AM
NIKKEI English News
English

**Fujitsu to cut DRAM production in August.**
309 words
16-Jul-96
Reuters News
English

MARKET AND CORPORATE NEWS IN ASIA
**Powerchip Semiconductor delays production increase**
179 words
23-Oct-96
5:29 AM
NIKKEI English News
English

**Hitachi, LG Halt Plan In Malaysia**
Jack Robertson and Darrell Dunn
399 words
23-Dec-96
Electronic Buyers' News

**NEC to delay 256-megabit DRAM chip output for one year: report**
200 words
28-Dec-96
Agence France-Presse
English

**Oki Electric (6703) to step up 64-MB DRAM production**
151 words
23-Jan-97
2:46 AM
NIKKEI English News
English

# Publically-Available News Articles

---

**Samsung Scales Back DRAM Fab Investment -- South Korean Giant Hit Hard By Glut**
Jack Robertson and Jim Evans
519 words
27-Jan-97
Electronic Buyers' News

---

**Top South Korean makers to cut 16M DRAM output**
162 words
29-Jan-97
1:30 AM
NIKKEI English News
English

---

**SAMSUNG ELECTRONICS STEPS UP 64-M DRAM PRODUCTION**
246 words
30-Jan-97
Asia Pulse

.  S. KOREA'S CHIPMAKERS DENY REPORTS ON PRODUCTION CUTS
Asia Pulse, 30 January 1997,

---

**KOREA DRAM MAKERS TO HALT WORK DURING LUNAR NEW YR HOLIDAYS**
148 words
31-Jan-97
Asia Pulse
English

---

**NEC DECIDES TO SWITCH TO 64 MEGA DRAM CHIP PRODUCTION**
182 words
10-Feb-97
Asia Pulse
English

---

**Japan's Fujitsu to cut 16M DRAM output ...**
180 words
24-Feb-97
Agence France-Presse

---

**S. Korean DRAM makers still cutting output: LG Semicon official**
231 words
7-Apr-97
11:05 PM
NIKKEI English News

---

# Publically-Available News Articles

---

**IBM to stop 4-Mbit production -- First-quarter earnings solid despite weak DRAM prices**
Ismini Scouras
485 words
28-Apr-97
Electronic Buyers' News
3
1055

---

**Oki Electric to cut DRAM output due to slow demand.**
185 words
24-Dec-97
Reuters News
English

---

**2 KOREAN COS TO SUSPEND 16-M CHIP OUTPUT DURING HOLIDAYS**
147 words
29-Dec-97
Asia Pulse
English

---

**Korean DRAM Chip Makers to Idle Production**
Dow Jones Newswires
135 words
2-Jul-97
The Asian Wall Street Journal

---

**Japan's Hitachi to slash 16M DRAM output: report ...**
219 words
16-Jul-97
Agence France-Presse
English
(Copyright 1997)

---

**Mitsubishi To Close US Wafer Fabrication Plants**
Martyn Williams, Newsbytes
243 words
14-Jan-98
Newsbytes News Network
English

---

**Hitachi to cut DRAM output in February and March.**
94 words
19-Jan-98
Reuters News

---

# Publically-Available News Articles

---

**NEC to double 64M DRAM chips: report**
244 words
19-Mar-98
Agence France-Presse
English

---

**Hitachi to Slash DRAM Production in U.S.**
223 words
24-Mar-98
Jiji Press English News Service

---

**JAPAN, KOREA CHIPMAKERS FAIL TO AGREE ON PRODUCTION CUTS**
388 words
21-Apr-98
Asia Pulse
English

---

**Toshiba, Mitsubishi, Fujitsu Halt DRAM Output In Golden Wk**
230 words
29-Apr-98
9:35 AM
Dow Jones International News
English

---

**Fujitsu, Acer Chart Plans To Reduce Exposure To DRAM Chips**
581 words
26-Jun-98
11:22 AM
Dow Jones Online News

---

**DRAM makers delay expansion projects, cut production.**
283 words
2-Jul-98
Taiwan Economic News
English

---

**Siemens to cut back on DRAM production after $600m losses.**
By David Manners.
322 words
29-Jul-98
Electronics Weekly

---

# Publically-Available News Articles

---

**Nan Ya bucking trend with DRAM fab build**
Sandy Chen
273 words
3-Aug-98
Electronic Buyers' News
4

---

**NEC, Fujitsu alter DRAM plans amid falling prices**
By Rob Guth InfoWorld Electric
453 words
3-Aug-98
9:02 AM
InfoWorld Daily News
English

---

**Japan joins summer slowdown -- But Temporary DRAM Fab Shutdowns Fail To Jog Prices**
Jack Robertson
491 words
10-Aug-98
Electronic Buyers' News

---

**Toshiba To Reduce DRAM Production; Shift To Higher-End Chips**
196 words
18-Aug-98
10:11 AM
Dow Jones International News
English

---

**Japan's belt-tightening continues**
Jack Robertson
806 words
10-Aug-98
Electronic Buyers' News
3

---

**Japan Chipmakers To Cut Domestic 64M DRAM Output By 30%**
217 words
24-Sep-98
7:34 PM
Dow Jones International News

---

# Publically-Available News Articles

---

**Mosel Vitelic Halts DRAM Production in 6" Wafer Plant.**

235 words

7-Oct-98

Taiwan Business News

English

---

**Matsushita Electric To Cease Mass Production Of Memory Chips**

215 words

29-Mar-99

1:36 PM

Dow Jones Business News

---

**Toshiba cuts 64M-Bit DRAM production 90 percent**

By Cheri Paquet InfoWorld Electric

304 words

1-Apr-99

3:29 PM

InfoWorld Daily News

---

**S KOREA'S CHIPMAKERS EXPAND 128-M DRAM PRODUCTION.**

280 words

7-Apr-99

10:47 PM

Asia Pulse

English

---

**NEC ups DRAM production.**

140 words

31-May-99

Electronics Times

1

English

---

**Samsung, Hyundai to expand 128M DRAM chip output.**

246 words

24-Aug-00

The Korea Herald

---

**South Korea's major chipmakers are expanding output...**

By Nam In-soo

739 words

23-Nov-00

9:01 PM

Reuters News

---

# Publically-Available News Articles

---

**UPDATE 1-Korean chipmakers to cut 2001 investments.**
By Nam In-soo
714 words
27-Nov-00
4:19 AM
Reuters News
English

---

**Three DRAM makers switch to communication chip production.**
754 words
8-Jan-01
Taiwan Economic News
English

---

**Japan's Toshiba, NEC To Boost Rambus DRAM Output - Nikkei**
222 words
8-Feb-01
12:24 PM
Dow Jones International News
English

---

**Asia's DRAM Makers Fail to Strike Capacity-Cut Pact.**
190 words
8-Feb-01
ComputerWire News
English

---

**UPDATE 2-Toshiba, NEC eye raising Rambus DRAM output.**
483 words
9-Feb-01
1:33 AM
Reuters News
English

---

**Samsung cranks Rambus output, heats up chip battle.**
By Jason Neely
1148 words
7-Mar-01
3:28 AM
Reuters News

---

# Publically-Available News Articles

---

**NEC to halt DRAM production in U.S.**
145 words
6-Apr-01
10:55 PM
Kyodo News
English

---

**Chip Firms Divided on Production Cuts.**
180 words
4-Jul-01
Chosun Ilbo
English

---

**Nanya Technology puts off expansion of 2nd wafer plant's capacity.**
272 words
5-Jul-01
Taiwan Economic News
English

---

**Leading DRAM makers delay building 300mm wafer fabs.**
By David Manners.
214 words
11-Jul-01
Electronics Weekly
1

---

**Vanguard International Semiconductor to reduce DRAM production.**
270 words
15-Jul-01
Taiwan Economic News
English

---

**Hitachi to halt DRAM production - report.**
89 words
29-Aug-01
4:57 PM
Reuters News
English

---

**Elpida's 300mm DRAM Fab Plans Delayed Nine Months**
Jack Robertson
175 words
1-Oct-01
Electronic Buyers' News

---

# Publically-Available News Articles

**Japan's Hitachi to pull out of DRAM production.**
120 words
1-Oct-01
Channelnewsasia
English

**Leading DRAM plants to reduce production capacities.**
363 words
24-Oct-01
Taiwan Economic News
English

Nan Ya Technology to suspend 128 Mb DRAM production in Dec.
Taiwan Economic News, 26 October 2001, 284 words, (English)

**DRAM makers plan production cuts amid global glut.**
256 words
9-Nov-01
Taiwan Economic News
English

**Hitachi to Cut DRAM Plant Operating Rate in Singapore**
251 words
29-Nov-01
2:09 AM
Jiji Press English News Service
English

**Toshiba to sell US semiconductor arm to Micron [Corrected 12/18/01]**
321 words
18-Dec-01
Agence France-Presse
English

**NEC to Withdraw from DRAM Output by March 2003.**
113 words
19-Dec-02
Jiji Press English News Service
English
(c) 2002

## Internet Sources

| Web Address |
| --- |
| • http://www.usdoj.gov/atr/public/press_releases/2007/222770.htm |
| • http://inventors.about.com/library/weekly/aa100898.htm |
| • http://smithsonianchips.si.edu/ice/cd/PROF98/ROW.PDF |
| http://www.hynix.com/gl/pr_room/news_data_readA.jsp?NEWS_DATE=2001-07-19:10:35:09&CurrentPageNo=2&SearchKind=4&SearchWord=&SELECT_DATE=2001&menuNo=02&m=01&s=01 |
| • http://news.bbc.co.uk/1/hi/business/1688926.stm |
| • http://www.thefreelibrary.com/Hynix+board+spurns+Micron+bid.(Business)(Merger:+The+move+ends+five...-a085561977 |

# Raw Datasets

| Dataset Name |
| --- |
| Combined Defendant Database |
| Gartner Data (from Shapiro Backup) |
| Micron Cost Data |
| White Data |
| White OEM Model Actual Price Index |
| WSTS Data |

Highly Confidential - Errata Sheet for Expert Report of Kevin Murphy

Errata Sheet for Expert Report of Kevin Murphy, March 7, 2008
Errata Date: April 1, 2008

# TABLE OF CONTENTS

Typos on page i in numbering of pages in Table of Contents

|  | In Report | Updated |
|---|---|---|
| X. Professor White's Analysis Of Impact And Damages Is Not Based On Economic Theory And Does Not Support His Conclusions Regarding The Impact Of The Alleged Conspiracy On Plaintiffs' Prices | 92 | 91 |
| B.   Professor White's Methodology does not Allow for the Impact on Demand of the Technology Boom and Bust during the Period of Alleged Conspiracy | 96 | 95 |
| C.   Professor White Ignores the Well-Documented Effects of Technology Transitions | 98 | 97 |

# III. PRINCIPAL FINDINGS AND OPINIONS

Omission on page 5, footnote 4
- In Report:      "Professor White says he was told to assume that the conspiracy began August 1998."
- Updated:        "Professor White says he was told to assume that the conspiracy began in August 1998.  *See, e.g.*, Hal White Tr., 116:19-22."

Typo on page 5, paragraph 12, lines 5-6
- In Report:      "… in the first half of 1998,[5] toward the end of a period of steadily declining prices."
- Updated:        "… in the first half of 1998, toward the end of a period of steadily declining prices.[5] "

# IV. INDUSTRY BACKGROUND

Typo on page 9, paragraph 18, line 12
- In Report:      "… asked him to make - $1.713 billion …"
- Updated:        "… asked him to make - $1.714 billion …"

1

Highly Confidential - Errata Sheet for Expert Report of Kevin Murphy

Clarification on page 9, footnote 13
- In Report:    "http://inventors.about.com/library/weekly/aa100898.htm (visited 1/22/2008)"
- Updated:    "Mary Bellis, "Inventors of the Modern Computer," *available at* http://inventors.about.com/library/weekly/aa100898.htm. (visited 1/22/2008)"

Omission on page 9, footnote 14
- In Report:    "… (N.D.Cal., Feb. 20, 2007)."
- Updated:    "… (N.D.C.A., Feb. 20, 2007), at 1-2."

Correction on page 12, first bullet, line 1
- In Report:    "… introduced in 1999…"
- Updated:    "… introduced around 1999…"

Typo on page 12, paragraph 23, line 3
- In Report:    "… 512 Mb or 1 GB are common …"
- Updated:    "… 512 Mb or 1 Gb are common …"

Typo on page 12, footnote 17
- In Report:    "… October 20, 2004 …"
- Updated:    "… October 20, 2000 …"

Typos on page 13, paragraph 25, line 8
- In Report:    "… to move from 64MB to 256 MB production."
- Updated:    "… to move from 64Mb to 256 Mb production."

Correction on page 15, paragraph 29, lines 6-8
- In Report:    "By 2002, Elpida (formed from NEC and Hitachi) and Mitsubishi were the only remaining Japanese DRAM suppliers, with a combined 6.4 percent share."
- Updated:    "By 2002, Elpida (formed from NEC and Hitachi), Fujitsu, and Mitsubishi were the only remaining Japanese DRAM suppliers, with a combined 6.9 percent share."

Typos on page 18, paragraph 34, lines 18-19
- In Report:    "… 64MB SDRAM at .22 micron technology to 256 MB SDRAM…"
- Updated:    "… 64Mb SDRAM at .22 micron technology to 256 Mb SDRAM …"

Omission on page 18, footnote 31
- In Report:    "Cataldo, Anthony and Paul Kallender, "Hynix, Fujitsu temporarily shutter fabs in Oregon," ELECTRONIC ENGINEERING TIMES, July 23, 2001."
- Updated:    "Hynix Annual Report 2002, at 7 to 8. *See also,* Cataldo, Anthony and Paul Kallender, "Hynix, Fujitsu temporarily shutter fabs in Oregon," ELECTRONIC ENGINEERING TIMES, July 23, 2001."

Highly Confidential - Errata Sheet for Expert Report of Kevin Murphy

Correction on page 19, paragraph 38, lines 1-6
- In Report:      "As shown in Exhibit 7, which is based on the Defendants' combined dataset (for U.S. sales), Hynix did not directly supply Sun with DRAM in either 1998 or 2002, and in no year during the alleged conspiracy did Hynix directly supply more than 5.9 percent of Sun's total purchases. Based on the Defendants' combined dataset (of U.S. sales), during the alleged conspiracy period as a whole, Hynix supplied only about 2.5 percent …"
- Updated:        "As shown in Exhibit 7, which is based on Defendants' combined dataset, Hynix did not directly supply Sun with DRAM in either 1997 or 2002, and in no year during the alleged conspiracy did Hynix directly supply more than 5.9 percent of Sun's total purchases. Based on Defendants' combined dataset, during the alleged conspiracy period as a whole, Hynix supplied only about 3.8 percent …"

Clarification on page 19, footnote 35
- In Report:      "SUN0028727-29"
- Updated:        "SUN0028727 to 29 at 27"

Typos on page 20, footnote 39
- In Report:      "… and the availability that we needed.");  Peter Wilson Tr., 692:22-693:186 ("Hyundai kept coming in … "
- Updated:        "… and the availability that we needed.");  Peter Wilson Tr., 692:22-693:18 ("Hyundai kept coming in … "

Typo on page 21, paragraph 38, lines 26-27
- In Report:      "… No I don't think we ever got close to any price negotiations, to be honest.[44]"
- Updated:        "… No I don't think we ever got close to my price negotiations, to be honest.[44]"

Clarification on page 21, footnote 43
- In Report:      "SUN0029281 to 348…"
- Updated:        "SUN0029281 to 348 at 328…"

Clarification on page 21, footnote 43
- In Report:      "SUN0310598 to 601…"
- Updated:        "SUN0310598 to 601 at 599"

Typos on page 21-22, footnote 45
- In Report:      "… assurance of supply: Hyunia [sic] will guarantee to support Sun's reqirements [sic] as long as Sun demand lasts. . . . Sun is guaranteed volume support regardless of market conditions from Hyundai." SUN0028917 to 918 at 918. …"
- Updated:        "… assurance of supply:  Hyundia [sic] will guarantee to support Sun's reqirements [sic] as long as Sun demand lasts. . . .  Sun is guaranteed volume support regardless of market conditions from Hyundai."  SUN0028916 to 17 at 17. …"

Highly Confidential - Errata Sheet for Expert Report of Kevin Murphy

Clarification on page 22, footnote 45
- In Report:        "SUN0029281-348"
- Updated:          "SUN0029281 to 348 at 328"

## VI. CHANGES IN INDUSTRY STRUCTURE ARE NOT CONSISTENT WITH THE TYPE OF CONSPIRACY ALLEGED BY PLAINTIFFS

Clarification on page 25, footnote 49
- In Report:        "Shapiro, "Theories of Oligopoly Behavior," in *Handbook of Industrial Organization*, Schmalensee, R., and R. Willig, eds., Amsterdam, North Holland."
- Updated:          "Carl Shapiro, *Theories of Oligopoly Behavior*, *in* HANDBOOK OF INDUSTRIAL ORGANIZATION (R. Schmalensee and R. Willig eds., 1989)."

Correction on page 27, footnote 53
- In Report:        "…*id.* at 29 (suggesting that for most cartels, market shares remain stable absent a system of side payments).  *See also,* George Stigler,…"
- Updated:          "…*See also,* George Stigler,…"

Typos on pg. 27, footnote 53
- In Report:        "… "Fixing market shares is probably the most efficient of all methods of combating secret price reduction"…"
- Updated:          "… "Fixing market shares is probably the most efficient of all methods of combating secret price reductions"…"

Typos on pg. 29, footnote 55
- In Report:        "…While their top-tier competitors explore their options, the smaller DRAM producers that survived the hardscrabble memory market of the mid-1990s are under intense pressure. Given the current climate, there is little doubt that more consolidation  will occur this year, according to Bill McClean, an analyst at IC Insights Inc., Scottsdale, Ariz. Jack Robertson,…"
- Updated:          "… "While their top-tier competitors explore their options, the smaller DRAM producers that survived the hardscrabble memory market of the mid-1990s are under intense pressure. Given the current climate, there is little doubt that more consolidation  will occur this year, according to Bill McClean, an analyst at IC Insights Inc., Scottsdale, Ariz. Jack Robertson,"…"

## VII. Economic Evidence Suggests That Defendants And Hynix In Particular Took No Significant Actions To Reduce Supply To Raise Price

Clarification on page 33, footnote 59
- In Report:     "… MODERN INDUSTRIAL ORGANIZATION 123 …"
- Updated:       "…MODERN INDUSTRIAL ORGANIZATION at 123 …"

Omission on pg. 34, footnote 61
- In Report:     "See, for example, P. Stevens,.."
- Updated:       "Falola, T. and A. Genova. "The Politics of the Global Oil Industry: An Introduction," Praeger Publishers: 2005, pg. 66. See, for example, P. Stevens,…"

Typo on pg. 34, paragraph 64, line 8
- In Report:     "…than 40…"
- Updated:       "…than forty…"

Correction on page 34, footnote 63
- In Report:     "'Oil dips further due to warm US weather,' AGENCE FRANCE PRESSE, Nov. 4,  2003…"
- Updated:       "'Oil Price Sags as Warm Weather Blankets US,' AGENCE FRANCE PRESSE, Oct. 27, 2003…"

Correction on page 36, footnote 66
- In Report:     "… company ("Hyundai's Global Squeeze – Hyundai Electronics America – Company Financial Information", Electronic News, January 12, 1998)…"
- Updated:       "…company. Peter Brown, "Hyundai's Global Squeeze: Financial Turmoil in Asia Raises Problems for American Subsidiary," Electronic News, January 12, 1998…"

Typo on page 36, footnote 66
- In Report:     "…pricing." (p. 10)…"
- Updated:       "… pricing" (p. 11). …"

Typo on pg. 36, footnote 66
- In Report:     "…non-memory fabs…"
- Updated:       "…non-memory logic fabs…"

Typo on pg. 37, footnote 66
- In Report:     "…expenditure," (p. 22)."
- Updated:       "…expenditure," (p. 23).

Typo on pg. 38, paragraph 71, line 9
- In Report:     "…Eugene operations.[68]…"
- Updated:       "…Eugene operation.[68]"

Highly Confidential - Errata Sheet for Expert Report of Kevin Murphy

Correction on page 39, paragraph 73, lines 7-9
- In Report:    "… then Samsung and Micron, both of which had almost 30 percent market shares compared with Hynix's less than 15 percent market share, …"
- Updated:    "…then Samsung (which had about a 30 percent market share) and Micron (which had a market share above 20 percent), compared with Hynix's roughly 15 percent market share, …"

Clarification on page 40, footnote 73
- In Report:    "SUN0408543 to 50 ("Samsung…"
- Updated:    "SUN0408543 to 50 at 45 ("Samsung…"

Correction on page 40-41, paragraph 75, lines 7-10
- In Report:    "…strategic supplier;[75] in fact, Sun forecasted eliminating Hynix entirely from its DRAM supply base in 2003, after reducing the amount purchased from Hynix in earlier years,[76] and it did not even evaluate Hynix in its April 2002 review of suppliers.[77]"
- Updated:    "… strategic supplier.[75]"

Clarification on pg. 40, footnote 75
- In Report:    "…SUN0018770 to 74 ("Hyundai…"
- Updated:    "…Carroll Exhibit 9 (SUN0018770 to 74 at 72) ("Hyundai…"

*** NOTE: Footnote numbers now proceed directly from 75 to 78

Omission on page 41, footnote 78
- In Report:    "…bailout efforts.'"
- Updated:    "… bailout efforts." MU00128260 to 61."

Correction on page 42, footnote 79
- In Report:    "MU00128260 at 261. Another..."
- Updated:    "Another..."

Omission on page 42, footnote 80
- In Report:    "… (testimony of Appleton (Micron)). …"
- Updated:    "… (testimony of Appleton (Micron)) at 18."

Omission on page 42, footnote 81
- In Report:    "… (Final ITC Hearing June 23, 2003)."
- Updated:    "… (Final ITC Hearing June 23, 2003) at 51."

Correction on page 49, footnote 86
- In Report:    "…Years After Nasdaq Peak…"
- Updated:    "…Years Later…"

Highly Confidential - Errata Sheet for Expert Report of Kevin Murphy

Explanatory Note: pp. 47-58
In this section, prices were unintentionally divided by 1,000 and are therefore expressed in thousands of dollars.[1] The scales on Exhibits 10, 12-16, 22 and 24 and the coefficient on the constant in Exhibit 23 reflect this.

Typo on page 51, paragraph 95, line 2
- In Report:        "…stock inde,x…"
- Updated:        "…stock index…"

Clarification on page 52, paragraph 98, line 4
- In Report:        "…(a predicted decline of 27 percent).  In contrast…"
- Updated:        "…(a predicted decline of 27 percent.  Percent differences reported here are log approximations.).  In contrast…"

Clarification on page 54, paragraph 101, lines 7-8
- In Report:        "…Costs fell much more rapidly late in the alleged conspiracy period than they did earlier in that period…."
- Updated:        "…Costs fell much more rapidly from October 2000 to September 2001 than they did from August 1998 to September 2000…."

Typo on page 54, paragraph 102, lines 6-8
- In Report:        "…The principal densities sold by the industry during the years 1996-2004 were 16, 64, 128, and 256 Mb. Each DRAM production line is engineered to produce only one density.[91]"
- Updated:        "…The principal densities sold by the industry during the years 1996-2004 were 16, 64, 128, and 256 Mb.[91] Each DRAM production line is engineered to produce only one density."

Correction on page 54, footnote 91
- In Report:        "Hynix production reports."
- Updated:        "*See* Exhibit 1."

Clarification on page 55, footnote 93
- In Report:        "…Flamm, K. (1992)., Flamm, K. (1996)., Dick, A. R. (1991), Gruenspecht, H. (1998)…"
- Updated:        "…Flamm, K. "Semiconductor Dependency and Strategic Trade Policy," Brookings Papers: 1993; Flamm, K. Mismanaged Trade? Strategic Policy and the Semiconductor Industry, The Brookings Institute: 1996; Dick, A., "Learning by Doing and Dumping In the Semiconductor Industry," 34 Journal of Law & Economics 133 (1991); Gruenspecht, H., "Dumping and Dynamic Competition," 25 Journal of International Economics 225 (1988)…."

---

[1] This can be seen on the code Make WSTS P and Q.do

7

Highly Confidential - Errata Sheet for Expert Report of Kevin Murphy

Clarification on page 55, footnote 93
- In Report:        "…Chapters 8 and 11 of Carlton and Perloff"
- Updated:        "…Chapters 8 and 11 of Carlton and Perloff *supra* n. 59…."

Clarification on page 55, footnote 93
- In Report:        "…Ghemawat (1985)…"
- Updated:        "Ghemawat, P., "Building Strategy on the Experience Curve." Harvard Bus. Rev., 63, March-April, 1985…."

Clarification on page 55, footnote 93
- In Report:        "…in large quantities."
- Updated:        "…in large quantities." Jae Sueng Kim Tr., 139:9-141:3 and 200:2-203:5."

Typos on page 56, footnote 94
- In Report:        "…producing each MB of DRAM may be lower for the 256 Mb chip because it contains twice the MBs of a 128 MB chip…"
- Updated:        "…producing each Mb of DRAM may be lower for the 256 Mb chip because it contains twice the Mbs of a 128 Mb chip…"

Clarification on page 56, footnote 95
- In Report:        "Irwin and Klenow, 1994."
- Updated:        "Douglas Irwin and Peter Klenow, "Learning-by-Doing Spillovers in the Semiconductor Industry," 102 Journal of Political Economy 1200 (1994)."

# VIII.    Sun's Purchases And Purchasing Procedures Affected Its Prices

Typos on page 60, paragraph 114, line 3-5
- In Report:        "…In 2001, for example, only about 3.9 percent of purchases by the six OEMs from Defendants were FPM/EDO, while this technology accounted for about 93.9 percent of Sun's purchases (see Exhibit 27)…."
- Updated:        "…In 2000, for example, only about 3.9 percent of purchases by the six OEMs from Defendants were FPM/EDO, while this technology accounted for about 93.8 percent of Sun's purchases (see Exhibit 27)…."

Correction on pg 60, footnote 98
- In Report:        "…108:23-110:14; 67:9-69:15…"
- Updated:        "…108:23-110:14; 66:14-67:6…"

Clarification on pg. 60, footnote 99
- In Report:        "…Carroll Depo., 140:1-141:11 ("Sun use[d]…"
- Updated:        "…Carroll Depo., 139:25-140:8 (Carroll acknowledges that "Sun use[d]…"

Highly Confidential - Errata Sheet for Expert Report of Kevin Murphy

Clarification on pg. 60, footnote 99
- In Report:        "…SUN0004257-4269…"
- Updated:         "…Carroll Exhibit 18 (SUN0004257 to 69 at 58)…"

Typo on page 60, paragraph 114, line 9
- In Report:        "265M densities"
- Updated:         "256M densities"

Clarification on pg. 61, footnote 100
- In Report:        "…SUN0029901 to 972…"
- Updated: "…SUN0029901 to 972 at 907…"

Clarification on pg. 61, footnote 100
- In Report:        "…Manuel Raposa Tr., 81:19-83:10…"
- Updated:         "…Manuel Raposa Tr., 81:19-82:10…"

Clarification on pg. 61, footnote 100
- In Report:        "…product." "[I]n exchange for that assurance…"
- Updated:         "…product." Raposa agreed that "in exchange for that assurance…"

Clarification on pg. 61, footnote 101
- In Report:        "…SUN0400414 to 437 ("Legacy…"
- Updated:         "…SUN0400414 to 37 at 15  ("Legacy…"

Clarification on pg. 62, footnote 102
- In Report:        "See Duncan Deposition, 68:17-71:22; SUN0029281 to 348 ("1996 - Server …"
- Updated:         "SUN0029281 to 348 at 310 ("1996 – Server…"

Clarification on pg. 62, footnote 103
- In Report:        "SUN0024732 to 34 (The…"
- Updated:         "SUN0024732 to 34 at 32 (The…"

Typo on pg. 62, footnote 103
- In Report:        "…SUN uniqueness…"
- Updated:         "…SUN Uniqueness…"

Clarification on pg. 62, footnote 103
- In Report:        "… the "initial ball park figure" was "$55-$63.")."
- Updated:         "… the "initial ball park figure" was "$55-$63."). Fang, C. Tr. Exhibit 13."

Clarification on pg. 62, footnote 104
- In Report:        "Louisa Torelli Tr., 98:1018 ("the first…"
- Updated:         "Louisa Torelli Tr., 98:10-18.  (Torelli agreed that "the first…"

Highly Confidential - Errata Sheet for Expert Report of Kevin Murphy

Clarification on pg. 62, footnote 104
- In Report:    "…SUN0020991-92 ("As…"
- Updated:     "…SUN0020991 to 92 at 91 ("As…"

Typo on pg. 62, footnote 104
- In Report:    "…for the FY01, total…"
- Updated"     "…for the FY02, total…"

Clarification on pg. 63, footnote 105
- In Report:    "SUN0029664 to 708 (The April…"
- Updated:     "SUN0029664 to 708 at 666 (the April…"

Clarification on pg 64, paragraph 120, line 5
- In Report:    "…different qualification processes . . . the qualification process at the PC…"
- Updated:     "…different qualification processes" and he stated that "the qualification process at the PC…"

Clarification on pg. 64, footnote 109
- In Report:    "Manuel Raposa Tr., 108:23 - 113:3."
- Updated:     "Manuel Raposa Tr., 110:24 - 111:16."

Correction on pg. 64, footnote 110
- In Report:    "Manuel Raposa Tr., 111:21-113:3 ("As a result of the August Memory DBE we've added an additional cost reduction of $140M full year, that is on top of Q4 for the FY01, total now stands at approximately $285M. . . . DBE was a wild success for Sun and a blood bath for the supply base."); Neil Duncan Tr., 56:21-57:5…"
- Updated:       "Manuel Raposa Tr., 111:21-113:3; Neil Duncan Tr., 56:21-57:5…"

Typo on pg. 64, footnote 110
- In Report:    "…for the FY01, total…"
- Updated"     "…for the FY02, total…"

Typo on pg. 65, footnote 111
- In Report:    "…qualified.  Some companies…"
- Updated:     "…qualified…Some companies…"

Highly Confidential - Errata Sheet for Expert Report of Kevin Murphy

Typos on pg. 65, footnote 112
- In Report:    "…"[A]lthough Sun is smaller than the other large OEMs, it only buys from three suppliers for most commodities and that is an advantage.  For instance with memory . . . [w]e have a much smaller memory spend and we get to choose the three best suppliers.  We don't have to do business with everyone so we can leverage what we have through DBEs.  We appear big to those three suppliers.")
- Updated:    "…"[A]lthough Sun is smaller than the other large OEMs, it only buys from three suppliers for most commodities and that is an advantage.  'For instance with memory . . . [w]e have a much smaller memory spend and we get to choose the three best suppliers.  We don't have to do business with everyone so we can leverage what we have through DBEs.  We appear big to those three suppliers.'")

Clarification on pg. 66, footnote 117
- In Report:    "…largest DIMM supplier" during "the relevant time period."); SUN0408543 to 550 ("Samsung…"
- Updated:    "…largest DIMM supplier" during 1997 to 2002); SUN0408543 to 50 at 45 ("Samsung…"

Clarification on pg. 66, footnote 118
- In Report:    "…SUN0015659 to 60 ("Over…"
- Updated:    "…SUN0015659 to 60 at 59 ("Over…"

Clarification on pg. 67, footnote 120
- In Report:    "SUN0028723 to 724 ("But…"
- Updated:    "SUN0028723 to 24 at 23 ("But…"

Typos on pg. 67, footnote 122
- In Report:    "…Richard Ellis Tr., 87:15-89:12 "[C]ontinuity of supply was [ ] number one priority. …Price…"
- Updated:    "…Richard Ellis Tr., 88:7-89:12 "continuity of supply was my number one priority. Price…"

Clarification on pg. 68, footnote 125
- In Report:    "…Richard Ellis Tr., 87:15-89:12 ("[T]here were instances…"
- Updated:    "…Richard Ellis Tr., 87:15-89:12 (Ellis affirmed that "there were instances…"

## IX. Professor Marshall's Analysis Of Impact Is Flawed And Does Not Support Plaintiffs' Claims

Typo on pg. 71, footnote 132
- In Report:    "*Id.* at ¶ 119."
- Updated:    "*Id.* at ¶ 120."

Highly Confidential - Errata Sheet for Expert Report of Kevin Murphy

Typo on pg. 72, footnote 133
- In Report:        "…*Journal of Political Economy* 44, 46 (1964)…"
- Updated:        "…*Journal of Political Economy* 44, 47 (1964)…"

Clarification on pg. 73, footnote 136
- In Report:        "*Id.*"
- Updated:        "*Id* at ¶124.*"

Clarification on pg. 74, footnote 137
- In Report:        "*Id.*"
- Updated:        "*Id* at ¶123.*"

Correction on pg. 76, footnote 141
- In Report:        "Neil Duncan Tr., 106:6-108-4 ("The NG DIMM is a Sun proprietary DIMM . . . . Q: So then the Jedec standard part would not be interchangeable with the NG-DIMM?  . . .  THE WITNESS:  No system could interchange those parts.");…"
- Updated:        "N. Duncan Tr,. 106:6-108:11.  (Duncan is asked "did Sun consider the NG-DIMM to be a proprietary product?" and he answers "Yes, [Sun] does." He is then asked:
  "Q   If Sun was unable to get NG-DIMMs from its suppliers, could it use Jedec standard DIMMs in place of the NG-DIMM?...A.  Each product that uses NG-DIMM must have that form, fit, function of a DIMM to replace it with, which could only be NG-DIMM or asynchronous DIMM of the same type of design… Sun could not substitute a standard DIMM into an NG-DIMM system.");…"

Clarification on pg. 76, footnote 144
- In Report:        "…Certain portion of this cost is due to SUN uniqueness, but not 100% of it."  Clement Fang broke down the cost of the NG DIMM, excluding DRAM, and the "initial ball park figure" was "$55-$63.""
- Updated:        "…Certain portion of this cost is due to SUN uniqueness, but not 100% of it.")  Clement Fang broke down the cost of the NG DIMM, excluding DRAM, and the "initial ball park figure" was "$55-$63." Fang, C. Tr. Exhibit 13."

Clarification on pg. 76, footnote 144
- In Report:        "SUN0024732 to 34 (The…
- Updated:        "SUN0024732 to 34 at 32 (The…

Typo on page 79, footnote 151
- In Report:        "MIC0000656 -0000673 at MIC0000668-00069."
- Updated:        "MIC0000656 to 673 at 668 to 669."

Clarification on pg. 80, footnote 153
- In Report:        "…Report of Robert at…"
- Updated:        "…Report of Robert Marshall at…

Highly Confidential - Errata Sheet for Expert Report of Kevin Murphy

Typo on pg. 82, footnote 159
- In Report:      "…G.S. Stigler and…"
- Updated:        "…G. J. Stigler and…"

Typos on pg. 87, paragraph 158, line 10
- In Report:      "…predicted series rise and fall.  From…"
- Updated:        "…predicted series rises and falls.  From…"

## X. Professor White's Analysis Of Impact And Damages Is Not Based On Economic Theory And Does Not Support His Conclusions Regarding The Impact Of The Alleged Conspiracy On Plaintiffs' Prices

Correction on pg. 91, footnote 166
- In Report:      "Halbert White Tr., 16:10-11."
- Updated:        "Halbert White Tr., 24:2-4."

Typo on pgs. 91-92, paragraph 165, lines 9-10
- In Report:      "…actual, so by comparing the actual to the but for price I'm…"
- Updated:        "…actual. So by comparing the actual to the but-for price I'm…

Correction on pg. 92, footnote 167
- In Report:      "*Id.* at 32:8-12."
- Updated:        "*Id.* at 41:10-19."

Correction on pg. 93, footnote 169
- In Report:      "*Id.* at 81:4-7."
- Updated:        "*Id.* at 90:19-22."

Typo on pg. 97, footnote 173
- In Report:      "Halbert White Tr. 2/28/2007…"
- Updated:        "Halbert White Tr. 2/28/2008…"

Typo on pg. 98, footnote 174
- In Report:      "Halbert White Tr. 2/27/2007…"
- Updated:        "Halbert White Tr. 2/27/2008…"

Highly Confidential - Errata Sheet for Expert Report of Kevin Murphy

Correction on pg. 100, paragraph 181, line 11
- In Report:      "…Both series diverge substantially from the actual price series, producing prices that differ from the actual price series by a factor of 300 or more in many months of the conspiracy period…."
- Updated:        "…Both series diverge substantially from the actual price series, producing prices that differ from the actual price series by a factor of 300 or more in many months of the post period…."


## Appendix C: Material Relied Upon

Typo in Appendix C, header, pages 45 – 91.

- In Report:      "Publically-Available"
- Updated:        "Publicly Available"


## Appendix D: Murphy Exhibits

Correction in Appendix D, Exhibit 7, Title of Graph
- In Report:      "Percentage of Sun's Total Purchases of DRAM by Supplier"
- Updated:        "Percentage of Sun's Total Purchases by Supplier"

Typo in Exhibit 26, Notes
- In Report:      "…, heterocedasticity, …"
- Updated:        "…, heteroscedasticity, …"

14

Highly Confidential - Errata Sheet for Expert Report of Kevin Murphy

Kevin Murphy, PhD                              Dated: April 1, 2008