Exhibit 5

KENNETH R. O'ROURKE (S.B. #120144)
korourke@omm.com
PAUL B. SALVATY (S.B. #171507)
psalvaty@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:    (213) 430-6000
Facsimile:    (213) 430-6407

MICHAEL F. TUBACH (S.B. #145955)
mtubach@omm.com
THOMAS P. BROWN (S.B. #182916)
tbrown@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA  94111-3823
Telephone:    (415) 984-8700
Facsimile:    (415) 984-8701

Attorneys for Defendants
HYNIX SEMICONDUCTOR INC. and
HYNIX SEMICONDUCTOR AMERICA, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sun Microsystems, Inc., a California corporation, | Case No. C-06-01665 PJH |
| Plaintiff, | **DECLARATION OF KEVIN M. MURPHY** |
| v. | |
| Hynix Semiconductor Inc., et al., | |
| Defendants. | Hearing Date:  May 7, 2009<br>Time:  2:30 p.m.<br>Place:  Courtroom 3, 17th Floor<br>Judge:  Hon. Phyllis J. Hamilton |

**DECLARATION OF KEVIN M. MURPHY**

I, Kevin M. Murphy, declare the following:

1.      I am the George J. Stigler Distinguished Service Professor of Economics in the Booth School of Business and the Department of Economics at the University of Chicago.  In addition to my position at the University of Chicago, I am also a Principal at Chicago Partners,[1] a consulting firm that specializes in the application of economics to law and regulatory matters.  I have been retained by Counsel for Hynix Semiconductor Inc. and Hynix Semiconductor America Inc. ("Hynix") as an expert in this matter.  A more detailed list of my credentials was provided as Appendix A to a report I submitted on behalf of Hynix on March 7, 2008 ("March 2008 Report")[2].

2.      In my March 2008 Report I provided an economic analysis of allegations by a group of Plaintiffs (including Sun Microsystems ("Plaintiff")) that Hynix participated in a conspiracy that was effective in raising Plaintiffs' prices for Dynamic Random Access Memory ("DRAM").  In that report, I also offered my evaluation of whether arguments and analysis contained in expert reports submitted on behalf of Plaintiffs by Professors Halbert White and Robert Marshall supported Plaintiffs' impact and damages claims.

3.      On March 19, 2009, Plaintiff filed a motion to exclude my testimony in this matter ("Motion to Exclude").[3]  Plaintiff claims in that motion that I assumed, rather than demonstrated empirically, the conclusions I reached in part of my report, that I did not explain several critical assumptions of my analysis, and that I did no "research or empirical testing to confirm the reasonableness" of certain of my assumptions.  Plaintiff claims further that minor changes in certain of my "assumptions" change my analysis and results completely.  Also, Plaintiff claims that my opinions "run afoul of the abundant and undisputed factual record,

---

[1] Chicago Partners is a subsidiary of Navigant Consulting, Inc.

[2] Ex. 1, Expert Report of Kevin M. Murphy, Ph.D. on Behalf of Hynix Semiconductor, Inc. and Hynix Semiconductor America, Inc. March 7, 2008, ("March 2008 Report").  All Exhibit numbers in this declaration refer to the Declaration of Predita Rostomian in support of Hynix's Opposition to Plaintiff's Motion to Exclude the Testimony of Hynix's Expert Witnesses Kevin Murphy and Robert Topel, which I understand will be filed today.

[3] *Plaintiff's Memorandum of Points and Authorities in Support of their Motion to Exclude the Testimony of the Hynix Defendants' Expert Witnesses Kevin Murphy and Robert Topel Pursuant to Fed. R. Evid. 702* ("Motion to Exclude").

**DECLARATION OF KEVIN M. MURPHY**

including guilty pleas by Hynix Semiconductor Inc. and various Hynix employees."[4]

4.     The Plaintiff's criticisms in the Motion to Exclude reflect a complete misunderstanding of my assignment in this matter, the purpose of my analysis, my methodology and my conclusions.  Contrary to the Plaintiff's claims, my declaration was not intended, and did not claim, to prove that Hynix and other DRAM suppliers never engaged in communications with the intention or the effect of raising prices to certain customers on certain transactions.  I was fully aware at the time I prepared my report that Hynix and other DRAM suppliers and some of their employees had entered into plea agreements with the U.S. Department of Justice, in which they acknowledged certain communications regarding pricing to certain OEMs and Sun during certain time periods.[5]  None of my conclusions in my March 2008 Report were inconsistent with the plea agreements reached by Hynix and other DRAM suppliers.[6]

5.     However, Plaintiff in *this* case alleges that price fixing by Hynix and its competitors resulted in higher prices for DRAM sold to OEMs, and that these allegedly above-competitive prices to OEMs caused market prices and the prices Plaintiff paid for DRAM to be elevated as well.  As I explained in my report, economic theory makes clear that a conspiracy to raise price to one group of buyers, even if it were effective in doing so, would not necessarily lead to higher prices to other customers.  In fact, successful collusion against one set of customers may result in *lower* prices to other customers.[7]  The actual impact is therefore an empirical question and one I addressed in my March 2008 Report.

6.     As part of my assignment, I reviewed the White and Marshall Reports offered by Plaintiffs in support of their impact and damages claims and offered my opinion about whether they provided economic evidence that supported Plaintiffs' claim that there was an *effective* price-fixing agreement that raised prices to the market and Plaintiff.  I concluded that neither Professor Marshall nor Professor White had offered economic evidence that DRAM

---

[4] Ibid. at 1.

[5] Ex. 1, March 2008 Report at ¶17.

[6] After I submitted my March 2008 Report, I understand that some of the firms that originally were Defendants in this litigation entered into settlements with Sun and other Plaintiffs.  I do not know the terms of those settlements and therefore do not know how, if at all, they relate to my analysis.

[7] Ex. 1, March 2008 Report at ¶127.

- 3 -

**DECLARATION OF KEVIN M. MURPHY**

prices generally, or those paid by Plaintiff specifically, were raised by the alleged conspiracy during the periods at issue.

7.    My criticisms of the Plaintiff's claims were based on my own analysis of the DRAM market as well as a detailed review of the White and Marshall Reports. First, I showed that an economic model based on the fundamental economic concepts and economic determinants of supply and demand can broadly explain how DRAM prices changed during the alleged conduct or prediction periods.[8] My application of supply and demand to the DRAM industry took into account the importance of the technology boom and bust (i.e., the "tech bubble") and the evolution of costs, and followed previous published studies by emphasizing the industry's transitions to new generations of DRAM technology.[9] In my March 2008 Report, I explained both the economic theory underlying my methodology, as well as the basis for the assumptions used in my analysis. In sharp contrast to the narrowly statistical approach offered by Plaintiff's experts – which produced a but-for price series that did not reflect economic conditions (the tech boom and bust) during the relevant periods – my model explains the behavior of DRAM prices during the relevant periods in a simple, straightforward and transparent framework that is firmly grounded in widely accepted economics principles of price determination.

8.    Second, I offered a variety of criticisms of the analyses provided by Professors White and Marshall. I explained the flaws in the economic theory on which they based their empirical tests, the empirical methods that they used and the conclusions that they drew from those analyses. I concluded that Professor Marshall had provided no empirical support

---

[8] Professor White defines two periods over which he predicted but-for prices: his "conspiracy period" of August 1, 1998 through June 15, 2002 and his "plea period" of April 1, 1999 through June 15, 2002. Ex. 14, Expert Report of Halbert L. White, Jr., Ph.D. December 14, 2007 ("White Report") at ¶2. I refer to these as the "alleged conduct periods".

[9] As I noted in my March 2008 Report, examples of learning curves and the importance of the relationship between costs and cumulative production in the DRAM industry are discussed in Flamm, K. "Semiconductor Dependency and Strategic Trade Policy," Brookings Papers: 1993; Flamm, K. Mismanaged Trade? Strategic Policy and the Semiconductor Industry, The Brookings Institute: 1996; Dick, A., "Learning by Doing and Dumping In the Semiconductor Industry," 34 Journal of Law & Economics 133 (1991); Gruenspecht, H., "Dumping and Dynamic Competition," 25 Journal of International Economics 225 (1988). More generally, learning by doing is discussed in Chapters 8 and 11 of Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization, Addison-Wesley: Massachusetts, 3rd Edition, 2000. Ghemawat summarizes a large body of academic studies on the learning and experience curve. Ghemawat, P., "Building Strategy on the Experience Curve." Harvard Bus. Rev., 63, March-April, 1985.

**DECLARATION OF KEVIN M. MURPHY**

for Plaintiff's claim that an effective price-fixing conspiracy that increased prices to certain OEMs on certain transactions during the alleged conduct periods necessarily would have increased Plaintiff's prices during these same periods.  I concluded that there was no economic evidence that market prices were increased by the alleged conspiracy,[10] and that Professor White offered no reliable evidence that Plaintiff suffered any overcharge during the periods at issue.

9.    With this general background on the purpose and findings of my March 2008 Report, I now discuss the specific criticisms in the Plaintiff's Motion to exclude my testimony.  Plaintiff's allegations fall into three categories.

10.    First, Plaintiff claims that I assumed my conclusions, because my "Demand Only" analysis was based on (a) the assumption that (counterfactually, as I noted at the time) supply grew at a constant rate over the alleged conduct period and (b) the fact that this constant-rate supply growth closely approximated actual supply growth.  This appears to be part of a larger criticism and misunderstanding by Plaintiff of why my "Demand Only" analysis is informative.

11.    Second, Plaintiff claims that both my demand and supply models depend on unsupported, untested and invalid assumptions—assumptions about a linear time trend in the supply model and about the shape and slope of the demand function.

12.    Third, Plaintiff appears to claim that my conclusions must be wrong because there is a "proven conspiracy."  I discussed above the fallacy in this third criticism.  It is also wrong because if a conspiracy that raised prices to Plaintiff had been proven already, there would be no need for Professor Marshall's report because economic analysis of causation and impact would be superfluous.  I do not discuss this issue further in this declaration.

**I.    PLANTIFF WRONGLY ASSERTS THAT I ASSUMED MY CONCLUSIONS**

13.    A valid scientific analysis requires (a) formulation of a testable hypothesis, based on examination of relevant background facts and history, to explain an observed event or pattern and (b) development and implementation of a methodology for testing that hypothesis that allows the analyst to reject the hypothesis if the data are not consistent with the hypothesis.  This

---

[10] The fact that I find that market prices were not increased does not rule out the possibility that prices may have been increased for specific OEMs targeted by the conspiracy.  This of course would require that prices to some other buyers would have been reduced.

**DECLARATION OF KEVIN M. MURPHY**

- 5 -

is what I did in my report. I reviewed the history of the DRAM industry, the events that occurred during and outside the alleged conduct periods in this litigation and the economic structure of the industry. I then tested the hypothesis that the behavior of prices during the relevant periods could be explained by the interaction of supply and demand, without appealing to conspiracy. Specifically, I tested the hypothesis that during the alleged conduct periods supply was determined by the same factors (including suppliers' costs (proxied by Micron's average cost) and costs related to transitions to new generations of DRAM technology) as before and after those periods, and I used regression analysis to test whether this hypothesis was supported by the data.

14. An alternative explanation for movements in prices during the alleged conduct periods, and the only one that is consistent with the Plaintiff's claim that the alleged conspiracy increased prices, was that supply was reduced during the conduct periods because Defendants reduced output below the level that would have prevailed if their output were determined solely by their unilateral production decisions. I found that the data do not support this alternative explanation. Specifically, I found that the data are consistent with the hypothesis that demand changes (associated with the technology boom and bust and other factors) together with the evolution of supply unrelated to conspiracy explain the movements in prices both inside and outside the conduct periods. This conclusion was not assumed, but was derived from actual market outcomes: the price and quantity data before, during and after the alleged conduct periods.

15. Even though the methodology that I used and reported in my March 2008 Report was explained there, Plaintiff now alleges that I found "no evidence of a supply restriction, and thus no evidence of overcharges" as an "immediate and *unavoidable* consequence"[11] of "assumptions regarding but-for supply in [my] 'Demand Only' analysis."[12] For three distinct reasons, which I explain below, this misrepresents the basis for my conclusion that there was no evidence of a supply restriction, and no evidence of overcharges, during the alleged conduct periods.

16. First, my conclusions about the role of the alleged conspiracy in the

---

[11] Motion to Exclude at 6 (emphasis added).
[12] Motion to Exclude at 4 (without initial caps).

**DECLARATION OF KEVIN M. MURPHY**

- 6 -

determination of DRAM prices and supply were not based on a "Demand Only" analysis. My conclusions were based on my broader analysis, which included an analysis of both supply and demand factors.

17.     Second, even if one were to use my "Demand Only" analysis to evaluate whether there had been a restriction of supply (which I did not do and which I explained was not the intended purpose of that analysis), any conclusion reached would not have been "immediate and unavoidable," but would have been based on actual data from the DRAM marketplace. The comparison of actual and but-for prices depends directly on the actual price and quantity data.

18.     Third, the conclusions that I reached based on my combined analysis of supply and demand were thoroughly grounded in and based on evidence of historical market data and outcomes. I would have obtained different results and reached a different conclusion if market outcomes (observed prices and quantities) had been sufficiently different.

A.     **My Conclusions about Supply Restrictions and Overcharge were Not Based on a "Demand Only" Analysis**

19.     Plaintiff claims that the "assumptions" about but-for supply that I make in my "Demand Only" prediction analysis "do not constitute a scientific test of the existence of a conspiracy," and implies that I have claimed otherwise. Plaintiff misrepresents the intent of my "Demand Only" discussion (I illustrated my "Demand Only" discussion with the empirical results presented in Exhibits 16 and 17 of my March 2008 Report). Plaintiff also ignores the full scope of the evidence I provide to support my ultimate conclusion that "the economic evidence does not support the conclusion that the alleged conspiracy had a measurable impact on market prices."[13]

20.     First, I never claimed to be providing "a scientific test of the existence of a conspiracy."[14] My assignment was to evaluate the economic evidence and provide an opinion whether "changes in OEM and Plaintiff prices during the period of alleged conspiracy can be explained by demand and cost factors without appealing to conspiracy."[15] My assignment also was to evaluate whether the arguments and evidence in the White and Marshall Reports were an

---

[13] Ex. 1, March 2008 Report at ¶110.
[14] Motion to Exclude at 4 (without initial caps).
[15] Ex. 1, March 2008 Report at 44 (without initial caps).

**DECLARATION OF KEVIN M. MURPHY**

- 7 -

economically valid basis on which to conclude that there was a conspiracy that raised the market prices of DRAM and prices paid by Plaintiff during the alleged conduct periods. I did not, and did not claim to, provide any opinion about "the existence of a conspiracy" outside the bounds of these assignments.

21. Second, I *did not use* my "Demand Only" prediction analysis as the sole basis for any of my opinions, including my opinion that "the episodes of atypically high prices during the alleged 'conspiracy period' (August 1, 1998 through June 15, 2002) and the 'plea period' (April 1, 1999 through June 15, 2002) were caused by normal market forces, principally by demand and costs, and not by conspiracy."[16] This opinion was based on the totality of the evidence and analysis I offered in my March 2008 Report.

22. Third, the Plaintiff's criticism of my "Demand Only" analysis reflects a misreading of the role of that evidence as an element of my equilibrium analysis and a misunderstanding of supply and demand analysis more generally. Supply and demand analysis is one of the most widely recognized and widely used tools in economics. The power of the analysis lies in its ability to divide changes in equilibrium quantities and prices into two components – the component generated by fluctuations in demand and the component generated by fluctuations in supply. In my report, I present separate economic analyses of each component because different factors typically affect the two sides of the market. However, my ultimate conclusions about whether there is economic evidence of an effective conspiracy affecting market or Plaintiff prices rests on the interaction of supply and demand in determining prices and quantities during the alleged conduct periods, as discussed in Paragraphs 99-109 of my March 2008 Report.

23. In my March 2008 Report, I showed that my "demand series … captures some important changes in the demand for DRAM and other computer components."[17] Exhibit 14 of my March 2008 Report, which makes no assumption about but-for supply, shows how the

---

[16] Ex. 1, March 2008 Report at ¶10.
[17] Ex. 1, March 2008 Report at ¶93. My calculation of a time series for "demand," described in ¶¶85-90 and shown in Exhibits 12, 14, and 15 of my March 2008 Report, does not depend on any assumption about but-for supply.

DECLARATION OF KEVIN M. MURPHY

- 8 -

technology boom and bust (as reflected in the NASDAQ index) were correlated with DRAM demand. This exhibit illustrates that a valid analysis of but-for prices has to properly reflect the technology boom and bust, and it provides an important critique of Professor White's but-for prices series and thus the reasonableness of the prediction model that generates his but-for price series.

24. As shown in Exhibit 17 of my March 2008 Report, Professor White's but-for price series does not properly reflect the impact of the technology boom and bust. Instead, his predicted price index declined rapidly at the beginning of the alleged conduct period – a time when the technology industry was booming, the NASDAQ was rising and DRAM demand was increasing steeply – while his predicted price index declined slowly later in the period – during the period of the technology industry "bust", the sharp decline in the NASDAQ and decline in demand for DRAM. This criticism of Professor White's but-for price series is independent of any assumption about but-for supply.[18]

25. My "Demand Only" analysis is useful for highlighting how much demand-side fluctuations contributed to the observed movements in prices. It illustrates the demand-side factors that contributed to the evolution of prices over this period in order to show how prices would have changed during the conduct periods had there been no fluctuations in supply (i.e., had supply grown at a constant rate over the period). In subsequent paragraphs of my March 2008 Report, I do the corresponding analysis to highlight how much supply-side fluctuations contributed to observed movements in price, by analyzing the supply side of the market and the contribution to price movements of the key driving variables of cost and technological changes.

26. The analysis in Exhibits 16 and 17 of my March 2008 Report was not intended to, and does not, provide a full analysis of the but-for world. I did not represent in connection with that analysis or any other analysis that there were no changes in supply. I simply identified what changes on the demand-side of the market contributed to the observed fluctuations in prices. My overall conclusion that price changes during the alleged conduct period "were

---

[18] The NASDAQ is an external stock price index measured without reference to any but-for supply series or assumed linear trend for but-for supply.

**DECLARATION OF KEVIN M. MURPHY**

- 9 -

caused by normal market forces, principally by demand and costs, and not by conspiracy"[19] depended on my finding *after examining the supply side of the market* that "Defendants did not reduce supply, as they would have had to do in order to raise price above the competitive level."[20]

27.    It is the combined supply and demand analysis in paragraphs 99-112 of my March 2008 Report, and not the "Demand Only" prediction exercise in paragraph 96, that supported the opinion that I summarized in paragraph 99 that "relatively simple models of supply and demand have the ability to explain much of the movement in prices and quantities over the alleged conspiracy period."  This conclusion, which referenced the "Demand Only" prediction exercise in Exhibit 16 as well as several other exhibits in that section, was just a part of the analysis on which my ultimate opinions were based.  I explained further in paragraph 99 that the next section of my report would show that "demand changes, *together with changes in supply not associated with conspiracy*, can explain virtually all of the movement in prices over the alleged conspiracy period."[21]  I was clear that my analysis of determinants of supply was an essential input into my ultimate opinions.  Thus, my "Demand Only" analysis is an integral part, but certainly not all, of my broader analysis of both the supply and demand sides of the marketplace, and the resulting equilibrium prices, on which my overall conclusions are based.

**B.    Even if, Contrary to the Facts, I had used "Demand Only" Analysis to Measure the Extent of Overcharges, my Findings Still Would Depend on Actual Market Outcomes**

28.    In Exhibit 16 of my March 2008 Report, I predicted how prices would have changed during the alleged conduct period based only on changes in demand (i.e., assuming that "the supply of DRAM increased at a constant rate from its average level in the six months prior to the alleged conspiracy period to its average level in the six months immediately after the alleged conspiracy period"[22]).  I compared this "Demand-Only" prediction to actual prices.  If, and only if, this straight-line evolution of supply during the alleged conduct periods represented the but-for

---

[19] Ex. 1, March 2008 Report at ¶10.
[20] Ibid.  Note that by "reduce output" I do not mean that Defendants would have had to agree explicitly on how and how much each one would reduce its output, but only that it would have been necessary for supply to be smaller relative to the but-for world for any conspiracy to be effective.
[21] Ex. 1, March 2008 Report at ¶99 (emphasis added).
[22] Ex. 1, March 2008 Report at ¶96.

**DECLARATION OF KEVIN M. MURPHY**

world,[23] then one could use the "Demand Only" prediction exercise to estimate the effect of the alleged conspiracy on DRAM prices and supply.[24]  I recognized, however, that it did not, as I showed in Exhibit 13 of my March 2008 Report.

29.    Plaintiff erroneously claims that my conclusions from this comparison were independent of actual market outcomes during the alleged conduct period and based instead only on "assum[ing my] desired conclusion that the conspiracy had no effect."[25]  However, the size of the gap between actual and predicted prices in this "Demand Only" comparison was not assumed, but instead depended on historical data.  There was no guarantee that this "Demand Only" comparison would show "no effect of the conspiracy on price."[26]

30.    It is easy to show that Plaintiff's claim is wrong.  I do so by using the same methodology that underlies Exhibit 16 of my March 2008 Report but I use price data constructed to reflect an artificial conspiratorial supply restriction and increase in price.  To illustrate how such an effect would be identified by my analysis, I assume (counter to the evidence that I found) that DRAM suppliers conspired effectively and reduced supply during the alleged conduct period by an amount that was sufficient to increase prices by 0.30 log points relative to actual prices (an increase of about 35 percentage points).[27]  In other words, I reduce supply artificially as it would change if there were a conspiracy-induced supply shift during the alleged conduct period.

31.    Exhibits 16 and 16A compare the results I obtained using actual market data with the results obtained based on the data generated to add a conspiratorial price effect.  As can be seen by comparing Exhibits 16 and 16A, the results are quite different.  In Exhibit 16, predicted and actual prices are very close on average, whereas in Exhibit 16A the induced increase in price shows up as predicted prices being below "actual" prices throughout much of the period.  Thus, the size and direction of the gap between the price series shown in Exhibit 16A are

---

[23] The assumption of constant supply growth would be a proper representation of supply only if (contrary to findings that I explain in ¶¶100-109 of my report) non-conspiratorial factors did not shift supply during the prediction period.
[24] Ibid.
[25] Motion to Exclude at 5.
[26] Motion to Exclude at 5 (from the figure).
[27] Given elasticities of supply and demand, increasing price by 0.3 log points requires reducing output by $0.3*0.50 = 0.15$ log points.

**DECLARATION OF KEVIN M. MURPHY**

- 11 -

much greater than I found using actual market data.  In fact, the change in the measured price gap, relative to that in Exhibit 16, *is exactly equal to* the assumed conspiratorial increase in price of 0.30 log points.

32.    Thus, the results in Exhibit 16A show definitively that I did not assume my conclusions.  My result is derived from and dependent on the actual price and quantity data.  If the data were sufficiently different, and reflected a conspiratorial supply shift coincident with the alleged conduct period, then the "Demand Only" price gap would have been larger and my conclusions would have been different.



33.    In its Motion to Exclude, Plaintiff does not critique my "Demand Only" price series directly, but instead provides a comparison on which I never relied for any of my opinions. The figure in the Motion to Exclude compares a but-for supply line that I explicitly noted did *not* represent my opinion about how supply would have evolved but-for the alleged

- 12 -                          **DECLARATION OF KEVIN M. MURPHY**

conspiracy[28] with one based on underlying changes in supply *implied by actual price and quantity changes.* Again, it is simple to show that this comparison also would have looked very different if the actual market data were different.

34.    The exhibit below uses the same type of comparison as the Plaintiff's figure, based on the same price and quantity data used to generate Exhibit 16A. I use this hypothetical to show the type of quantity restriction that a cartel might impose in order to raise price effectively. As the figure below shows, if industry quantity had been reduced by this amount during the alleged conduct (conspiracy) period, then the Plaintiff's figure would show that supply was clearly below the linear but-for quantity line throughout most of the period. Since the conclusion of my analysis would have been different had the data on price and quantities during the conduct period been sufficiently different, it is demonstrably wrong to say that I assumed my conclusions.

---

[28] March 2008 Report at ¶¶100-108. Here, I make clear that supply depends on cost and other factors and is not a straight line.

**DECLARATION OF KEVIN M. MURPHY**



Source: Murphy Analysis (WSTS data)

35.     Thus, the figure in Plaintiff's Motion to Exclude and Exhibit 16 of my March 2008 Report are based on and dependent on market outcomes (actual prices and quantities) and not, as Plaintiff claims, a result of "assuming that there was no supply restriction."[29]

**C.     My Analysis of the Possible Price Impact of the Alleged Conspiracy Depends on Market Outcomes**

36.     In Paragraphs 99-109 of my March 2008 Report, I present a detailed analysis of important determinants of DRAM supply. I explain the economic theory and empirical evidence of how changes in cost, including those resulting from "learning by doing" during transitions to new technologies, can be used to predict supply movements, and I "forecast prices and quantities that control for both changes in cost [supply] and changes in demand" (see

---

[29] Motion to Exclude at 5.

**DECLARATION OF KEVIN M. MURPHY**

Exhibits 24 and 25 of my March 2008 Report).[30]  Only then do I conclude that "changes in demand and cost explain virtually all of the movements in DRAM prices and quantities over the alleged conspiracy period."[31]  All of the empirical analysis underlying this opinion depends on actual market outcomes during the alleged conspiracy period, and all would have been different if changes in actual market prices and quantities had been sufficiently different before, during and/or after the alleged conduct period.

37.    The regression analysis in Exhibit 26 of my March 2008 Report shows that the deviations between the actual prices and the prices predicted from demand and supply (from Exhibit 24) are not statistically distinguishable from zero.  I concluded from this that, even if the alleged conspiracy caused *all* of the deviations between actual and predicted prices during the alleged conduct period, there is no evidence of a price impact of the alleged conspiracy.  It is easy to show that this conclusion, like my others, depends directly on actual market outcomes during the alleged conduct period.

38.    Exhibits 26 and 26A compare my results based on the actual data with results based on hypothetical prices that are 0.30 log points higher than actual during the conduct period, for each of the two alternative definitions of "conduct period" (alleged "conspiracy period" and "plea period") posited by Professor White. As shown in Exhibit 26A, my regression analysis would have shown a statistically significant positive price gap if there had been a conspiratorial reduction in supply (such as I assumed in the alternative Exhibit 16 above) that reduced quantity enough to increase prices (and the price gap) by 0.30 log points (or about 35 percentage points).  Because Exhibit 26A shows statistically significant price gaps, I would not have been able to conclude in this counterfactual world that the alleged conspiracy had no statistically significant impact on DRAM prices.

---

[30] Ex. 1, March 2008 Report at ¶110.
[31] Ibid.

**DECLARATION OF KEVIN M. MURPHY**

**Average Price Gap - WSTS Price, WSTS Quantity**

| | Exhibit 26 | | Exhibit 26 A | |
| | | | Imposing Supply Reduction | |
| | OLS | IV | OLS | IV |
| | Price Gap | Price Gap | Price Gap | Price Gap |
| **Conspiracy Period** | -0.0825 | 0.0061 | 0.2175 | 0.3061 |
| Standard Error | (0.0675) | (0.0671) | (0.0675) | (0.0671) |
| t-stat | -1.22 | 0.09 | 3.22 | 4.56 |
| **Plea Period** | -0.0201 | 0.0662 | 0.2799 | 0.3662 |
| Standard Error | (0.0631) | (0.0645) | (0.0631) | (0.0645) |
| t-stat | -0.32 | 1.03 | 4.44 | 5.67 |

Notes: Standard errors are corrected for autocorrelation, heteroscedasticity and two step estimation.

Source: Murphy Analysis (using WSTS data)

- 16 -

**DECLARATION OF KEVIN M. MURPHY**

## II.    USE OF A LINEAR TIME TREND IS STANDARD IN ECONOMETRIC ANALYSIS

39.    Plaintiff claims that "an intellectually rigorous pricing model" will not incorporate a linear time trend. In particular, Plaintiff criticizes Professor Topel and me for assuming a "constant rate of change" which "mirrors" the "straight-line supply assumption" that I discussed above. According to Plaintiff, a model that "makes use of correct data and methods [ ] will not need to use a linear time trend to 'fill in the gaps' of the supply curve."[32] I disagree with Plaintiff's characterization of why I use a linear time trend in my supply model and with its claim that a relevant conclusion can be drawn from reestimating my supply model after excluding that variable.

40.    Proper econometric analysis of time-series data accounts for trends in the time series. This often is done by examining the relationship between logarithms of the variables, and including a linear time trend in the model. In his econometrics textbook on time-series analysis, Professor James D. Hamilton cites the example of U.S. Gross National Product ("GNP"): "There is no doubt that [GNP] has trended upward over time, and this upward trend *should be incorporated* in any forecasts of this series."[33] He notes that a "popular" approach for "describing such trends" is "a linear function of the date."[34] Professor Hamilton explains further that "it is common to take logs of the data before attempting to describe them with the model [with a linear time trend]."[35]

41.    My supply model incorporates the methodology described by Professor Hamilton. I recognized that, like GNP, there is a clear upward trend in DRAM supply. In order to obtain meaningful results, it is necessary to account for this trend, and I did so by including the

---

[32] Motion to Exclude at 7.

[33] James D. Hamilton, <u>Time Series Analysis</u>, Princeton University Press: 1994 at 435 (emphasis added). Professor Hamilton's <u>Time Series Analysis</u> is the same textbook relied upon by Plaintiff's expert Professor Marshall, who describes it as a one of the "standard graduate econometrics texts" (Marshall Report, footnote 270).   Plaintiff expert Diebold also cited the book as one of the "leading econometric texts." (Diebold report at 52).  Thus, both experts relied upon the book as a source of standard econometric methodology.

[34] James D. Hamilton, <u>Time Series Analysis</u> ("Hamilton 1994") Princeton University Press: 1994 at 435.

[35] Ibid. at 438.

**DECLARATION OF KEVIN M. MURPHY**

linear time trend variable and taking logs of the price and quantity data used to compute my supply measure.[36]

42.     In an article that I co-authored and that has been heavily cited,[37] I used a methodology, including a time trend, very similar to the one used in my March 2008 Report.  In my analysis of labor markets in that article (which was cited in the American Economic Association announcement of its award to me of the John Bates Clark Medal (an honor that is "awarded biennially from 1947-2009 to that American economist under the age of forty who is judged to have made the most significant contribution to economic thought and knowledge"[38])), I included a time trend.  The time trend in that framework was used to capture on-going technological change that affected the demand for more educated labor.

43.     In criticizing my inclusion of a time trend, Plaintiff ignores the fact that Professor Marshall includes a time trend in his analysis and that Professor White's specification incorporates the counterpart of a linear time trend.  Professor Marshall explains in his section on methodology that his price model "includes a linear time trend measured in months."[39]  Professor White does not include a time trend explicitly, but instead offers a model of DRAM price changes.[40]  The constant term in his price change model plays the same role as does a linear time trend in a model of price levels.[41]

---

[36]Kenneth Flamm also used a log-log specification with a linear time trend in his analysis of the semiconductor industry.  *See.*  Flamm, K. Mismanaged Trade? Strategic Policy and the Semiconductor Industry, The Brookings Institute: 1996 at 342.

[37] Ex. 9, Lawrence F. Katz and Kevin M. Murphy, "Changes in Relative Wages, 1963-1987: Supply and Demand Factors," *The Quarterly Journal of Economics,* 107(1), pages 35-78, February 1992.  There are two databases commonly used in academics to track citations.  According to The Social Sciences Citation Index (on March 30, 2009), this article has been cited by 693 publications. According to scholar.google.com (also on March 30, 2009), this article has been cited by 1,778 other publications.

[38] Ex. 11, http://www.vanderbilt.edu/AEA/clark_medal.htm.  According to the AEA announcement, "[Kevin Murphy] provided illuminating calculations of plausible ranges for changes in the time path of the demand for skill ("Changes in Relative Wages 1963-1987," with L. Katz, 1992, in the *Quarterly Journal of Economics* )." (Ex. 12, The American Economic Review, Vol. 88, No. 2, Papers and Proceedings of the Hundred and Tenth Annual Meeting of the American Economic Association (May, 1998), pp. 494).

[39] Ex. 13, Expert Report of Robert C. Marshall, Ph.D., December 14, 2007 ("Marshall Report") at ¶394 (at 275).

[40] Ex. 14, White Report at ¶148.

[41] Plaintiff's rebuttal expert, Professor Michael Whinston, acknowledged in his deposition that an econometric method of analyzing changes in prices is mathematically equivalent to using a linear time trend (Ex. 15, Deposition of Michael D. Whinston, June 17, 2008 at 144:20-146:6).

**DECLARATION OF KEVIN M. MURPHY**
- 18 -

44. By including a time trend, I can compare whether the evolution of supply is materially different during the alleged conduct periods than in the periods before and after the alleged conduct periods. The time trend accounts for unmeasured factors that affect the growth in supply in the same way inside and outside the alleged conduct period. This is analogous to the commonly used "differences in differences" methodology applied to treatment and control groups, which eliminates the impact of common factors affecting both groups.[42]

45. In its Motion to Exclude, Plaintiff attempts to impugn my use of a time trend in my analysis of DRAM supply by quoting from an article I co-wrote in 1981 (when I was an undergraduate) about the impact on smoking behavior of information disclosed by the government.[43] In that paper, my coauthors and I used the phrase "an explicit recognition of ignorance" to describe the use of a time trend *in that context,* a context very different from the one at issue here.

46. First, the length and nature of the two time periods are very different. The data used by both Defendant and Plaintiff economic experts in this matter cover roughly 10 years, a period over which DRAM technology has steadily progressed. The data in the earlier article covered a period of roughly 50 years during which smoking prevalence first increased and then decreased.

47. Second, my analysis in this case is focused on testing whether the evolution of prices during the alleged conduct periods is consistent with market outcomes before and after those periods. The analysis in my earlier paper focused on whether the observed change in trend was due to a particular cause – the release of new health information about smoking. In order to test whether health information rather than other changes caused the change in smoking trend, it was necessary to provide more structure on how health information disseminated through the

---

[42] Angrist, Joshua D. and Alan B. Krueger, "Empirical Strategies in Labor Economics" in O. Ashenfelter & D. Card (ed.). Handbook of Labor Economics. Volume 3. 1999: 1277-1366; and Abadie, Alberto, "Semiparametric Difference-in-Difference Estimators," Review of Economic Studies 72: 1-19 (2005). The "Differences in Differences" methodology compares the changes in the group receiving treatment with the changes in the control group (not receiving treatment) in order to discern the impact of treatment by netting out changes from other causes that affect both the control and treatment groups.
[43] Ex. 16, Lynee Schneider, Benjamin Klein, Kevin M. Murphy, "Government Regulation of Cigarette Health Information," *Journal of Law and Economics*. 24: 575-612 (1981).

**DECLARATION OF KEVIN M. MURPHY**

marketplace.  In the current context, I do not claim that the time trend reflects a particular supply-side factor, only that it reflects factors that moved DRAM supply in the same way before, during and after the alleged conduct periods. This use of a time trend is standard in econometric analysis.

48.     Professor Whinston purports to demonstrate a "significant average overcharge to plaintiffs" by removing the time trend from my model.[44]  He offers no appropriate alternative to a time trend as a proxy for variables causing an upward trend in supply in the DRAM industry.  His approach of deleting a relevant variable and showing (not surprisingly) that the results change is improper and without justification, and does not provide a valid critique of my methods or results.  Omitting important and relevant variables, as he did, without replacing them with a good alternative can provide only misleading and uninformative results.

49.     In its Motion to Exclude, Plaintiff demonstrates its misunderstanding of my methodology when it claims that I performed no "analysis to determine whether the linear time trend is consistent with the data on DRAM prices and supply outside of the conspiracy period."[45] Exhibit 23 in my March 2008 Report, which shows results from my supply model that is the object of their time trend critique, is estimated only with data outside the alleged conspiracy period.  The data from outside the alleged conspiracy period show a statistically significant expansion of supply over time which is reflected in the estimated time trend.

### III.   MY ASSUMPTIONS WERE REASONABLE AND EXPLAINED IN MY REPORT

#### A.   I Considered a Reasonable Range of Possible DRAM Demand Elasticities that is Consistent with Previous Economic Studies of the Industry

50.     One step in specifying my supply and demand model was to select a reasonable value for the price elasticity of DRAM demand.  I used the midpoint of "elasticity of demand in the range of -0.3 to -0.7."[46]  Plaintiff's Motion to Exclude incorrectly alleges that I did no "research or empirical testing to confirm the reasonableness" of my assumption about the magnitude of the elasticity of demand.

51.     In preparing my March 2008 Report, I reviewed previous economic studies

---

[44] Ex. 7, Expert Report of Michael D. Whinston, May 2, 2008 at ¶65.
[45] Motion to Exclude at 7 (emphasis in the original).
[46] Ex. 1, March 2008 Report at ¶89.

- 20 -                                    **DECLARATION OF KEVIN M. MURPHY**

of the DRAM industry, some of which contained estimates of the demand elasticity.[47]  I also considered a 2003 report on the DRAM market by the U.S. International Trade Commission ("ITC"), which explicitly recommended the range cited above, and which the ITC uses in its own analyses of the market.[48]  This same report was relied upon by Professors Marshall and White *for the same purpose*: to quantify the magnitude of the demand elasticity.[49]  As both Professor Marshall and Professor White put it: "*After thorough analysis* and several remands, the ITC and the U.S. Court of International Trade agreed with the characterization that DRAM demand was inelastic,"[50] and both endorsed the demand elasticity range of -0.3 to -0.7 that I used in my analysis and that was advocated by the trade agencies ("[a] demand elasticity in the range of -0.3 to -0.7 is suggested"[51]).  Professors Marshall and White emphasized in their reports that demand is inelastic and that the sources on which they and I relied are reliable.[52]

52.    I also considered estimates of demand elasticities put forward by Professor Hausman in DRAM dumping litigation.  Professor Hausman's report also was relied upon by Professors Marshall and White *for the same purpose*: to quantify the magnitude of the demand elasticity.[53]

53.    I also considered academic articles about the DRAM industry, although based on my review of the literature I found that most of these elasticity estimates pertained to the demand for specific DRAM generations (e.g., 1MB) or other subsets of DRAM products.  For example, Irwin and Klenow concluded that DRAM demand was more price elastic than the top of the range claimed by Professors Marshall and White, and Flamm reported estimates greater in

---

[47]For example, Irwin, Douglas A. and Peter J. Klenow, "Learning-by-Doing Spillovers in the Semiconductor Industry," J. of Pol. Econ., 102(6), 1994; and Flamm, Kenneth, "Mismanaged Trade? Strategic Policy and the Semiconductor Industry," Brookings Institution Press, Washington, D.C, 1996.

[48] DRAMs and DRAM Modules from Korea, Investigation No. 701-TA-431 (Final), (USITC Publication No. 3616, August 2003) at II-9.

[49] Ex. 13, Marshall Report at ¶82; Ex. 14, White Report at ¶78.

[50] Ex. 14, White Report at ¶78; Ex. 13, Marshall Report at ¶82 (emphasis added).

[51] DRAMs and DRAM Modules from Korea, Investigation No. 701-TA-431 (Final), (USITC Publication No. 3616, August 2003) at II-9.

[52] Ex. 14, White Report at ¶¶77-81, Ex. 13, Marshall Report at ¶¶81-86.

[53] Ex. 13, Marshall Report at ¶82; Ex. 14, White Report at ¶78.

**DECLARATION OF KEVIN M. MURPHY**

magnitude than -1.0, including his own estimate near -1.5.[54]  I chose to use an estimate closer to zero within the range proposed by the ITC and Professor Hausman because this is more conservative (with respect to my ultimate conclusions) as well as more recent than Irwin-Klenow's.[55]

54.      Plaintiff implies in its Motion to Exclude that my results and conclusions would have been different if I had used a different number for the demand elasticity.  Although it is true that I would have obtained different point estimates for the average overcharge with a higher or lower elasticity, it is not true that my conclusions would have changed.  In particular, a higher assumed demand elasticity would have resulted in a **lower** point estimate for the overcharge in my Exhibits 24 and 26, but this would not have changed my finding that the estimated impact was not statistically significant.[56]

55.      I illustrate this in the table below.  Each column displays instrumental variables results based on the assumed demand elasticity indicated in the first row.  The second column shows the results from Exhibit 26 of my March 2008 Report.  The other columns provide estimates using other values for demand elasticity.  For example, the results in the first column are based on a demand elasticity of -0.3.  In this case, the average alleged "conspiracy period" gap between log actual and log but-for prices is 0.0079, which means that actual prices were about 0.79 percent higher than but-for prices.  The standard error on this gap is 0.0863, and the t-statistic is 0.09, which means that the gap is not statistically different from zero.  For the plea period, the average gap is 0.0852 (about nine percent), which is also statistically indistinguishable from zero.  A comparison across the columns in the table shows that the results are similar for demand elasticities of -0.5, -0.7, or -1.0, and that the t-statistics, which provide a test of whether the effect is statistically significantly different from zero, are identical.

---

[54] Irwin, Douglas A. and Peter J. Klenow, "Learning-by-Doing Spillovers in the Semiconductor Industry," J. of Pol. Econ., 102(6), 1994 at 1214; and Flamm, K., "Mismanaged Trade? Strategic Policy and the Semiconductor Industry", Brookings Institution Press, Washington, D.C, 1996 at 341-343.
[55] Ibid. *See*, also, Ex. 2, Deposition of Kevin M. Murphy, April 24, 2008 at 98:11-99:9.
[56] In fact, as can be seen from the exhibit, the t-statistics for the hypothesis that there is no difference on average between actual and but-for prices during the conduct periods are independent of the assumed demand elasticity.

**DECLARATION OF KEVIN M. MURPHY**

- 22 -

**Average Price Gap with Alternative Assumed Demand Elasticities**

|  | IV | IV | IV | IV |
|---|---|---|---|---|
| Demand Elasticity | -0.3 | -0.5 | -0.7 | -1 |
| Conspiracy Period | 0.0079 | 0.0061 | 0.0050 | 0.0039 |
| Standard Error | (0.0863) | (0.0671) | (0.0549) | (0.0431) |
| t-stat | 0.09 | 0.09 | 0.09 | 0.09 |
| Plea Period | 0.0852 | 0.0662 | 0.0542 | 0.0426 |
| Standard Error | (0.0830) | (0.0645) | (0.0528) | (0.0415) |
| t-stat | 1.03 | 1.03 | 1.03 | 1.03 |

Notes: Standard errors are corrected for autocorrelation, heteroscedasticity and two step estimation.
Source: Murphy Analysis (using WSTS data)

56.     Thus, Plaintiff's critique of my basis for selecting a particular value for the demand elasticity, even if it were valid (which I explained above it is not), is both without merit and irrelevant to my conclusion that "the differences [sic] between actual and predicted prices is not statistically significant for either [alleged conduct] period."[57]

### B.      I Considered Shapes for DRAM Demand and Supply that are Reasonable and Consistent with Previous Economic Studies of the Industry

57.     Plaintiff's Motion to Exclude incorrectly alleges that I did no "research or empirical testing to confirm the reasonableness" of my use of models in which DRAM demand and supply are linear in the logarithms (i.e., that the log of DRAM supplied and the log of DRAM demanded are linear functions of the log of DRAM price).  Supply and demand systems that are linear in the logarithms are standard practice in economics. I used this specification in my 1992 article with Professor Katz and it is a common specification in the literature.[58]

58.     Plaintiff's Motion to Exclude appears to want to create the impression that I made "unsupported" assumptions about the shape and slope of the demand curve, including my use of a log-log specification which implicitly assumes a constant demand elasticity over the

---

[57] Ex. 1, March 2008 Report, ¶110.
[58] *See*, for example, J. A. Hausman (winner of the John Bates Clark medal), "Valuation of new goods under perfect and imperfect competition," in The Economics of New Goods, Timothy F. Bresnahan and Robert J. Gordon, eds. pg. 209-248; Flamm, Kenneth "Mismanaged Trade? Strategic Policy and the Semiconductor Industry", Brookings Institution Press, Washington, D.C, 1996 at 342.

**DECLARATION OF KEVIN M. MURPHY**

period before, during and after the alleged conspiracy. By calling this an "assumption," Plaintiff implies that my specification is imposing on the data an "unnatural" and untested relationship. This is clearly absurd, given the widespread use of log-log specifications in the economic literature that analyzes many important and well-accepted economic relationships.[59]

59.   In any empirical analysis, it is necessary to formulate a specification that limits the potential relationship among the observations. A very common assumption used in econometric analysis and the one that I use in my work is that the relationship between the variables (in this case the logarithms of price and quantity) is linear. In fact, Professors White and Marshall make this linearity assumption in their regression models. The linear specification allows a researcher to create a tractable model for explaining empirical relationships. For example, a standard regression of annual aggregate U.S. consumption on annual GNP "assumes" that consumption and GNP in year one have the same relationship as consumption and GNP in year two, three, etc., in order to estimate the coefficient that measures the amount by which consumption changes when GNP changes. If there is a reason to expect that this relationship changes – for example, during a war-time period – then the analyst can test that explicitly, but it is necessary for the analyst to assume some stability in this relationship over some period of time. If the analyst had to prove that the same relationship applied in year one as year two, and as in year two as year three, it would turn an otherwise tractable and informative analytical investigation into one that is infeasible.

60.   In this case, my assumption, common in the literature, of a constant elasticity allows me to undertake a tractable analysis of the relevant issue. The Plaintiff's critique of my use of a constant elasticity specification for DRAM demand is particularly inappropriate given that my analysis regarding the price impact of the alleged conspiracy does not depend on the elasticity of demand being constant over the entire period. In fact, the elasticity of demand could be different in each of the three periods – the period before the alleged conduct period, the alleged conduct period, and the period after the alleged conduct period – without affecting my conclusions in Exhibit 26 at all. The results depend only on the demand elasticity relevant during

---

[59] Ibid. *See,* also, Hamilton 1994 at 438.

- 24 -

**DECLARATION OF KEVIN M. MURPHY**

the alleged conduct periods.

61.    If the elasticity of demand varied systematically with the size of the gap between actual and but-for supply *within the alleged conduct periods*, deviations from a constant elasticity of demand potentially could matter.  However, economic theory provides no reason to expect such a relationship, and Plaintiff's experts provide no empirical evidence that the elasticity of demand varies in this way.  In fact, as can be seen in the Exhibit below, the gap between actual and but-for supply varies from positive to negative throughout the conduct period, and there is no obvious rationale for how or why the elasticity of demand would be systematically different when the gap is positive and negative in such a way that it would materially alter my conclusions in Exhibit 26.



Gap Between Actual and Predicted Supply - IV

Source: Murphy Analysis (WSTS data)

## IV.    SUMMARY

62.    In many ways, the Plaintiff's critique of my analysis demonstrates its

DECLARATION OF KEVIN M. MURPHY

misunderstanding of my methods and conclusions.  My method accounts for demand fluctuations in an extremely flexible and general way.  It allows for the impact in the but-for world of the full range of factors that affected demand in the actual world, and it thereby uses demand changes in the actual world to explain what would happen in the but-for world.

63.     My model is very general and flexible, particularly when compared to Professor White's model.  In contrast to my approach, Professor White's demand-side controls are limited to the specific set of factors that he uses in his prediction equation.  If factors other than those for which he explicitly controls affected demand during the alleged conduct periods, his model would mistake the impact of these factors for the effects of the alleged conspiracy.

64.     My analysis shows that observed outcomes during the alleged conduct periods are consistent with the behavior of supply and demand outside of the conduct period.  The fact that I use demand and supply parameters from the existing literature (taken from the sources cited by both of Plaintiff's experts) is a virtue of the model.  My model's ability to explain prices during the alleged conduct periods without appealing to an effective conspiracy provides strong evidence that an effective conspiracy cannot be inferred from the observed price data.

65.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed this 16th day of April, 2009, at Chicago, Illinois.

_____
Kevin M. Murphy

**DECLARATION OF KEVIN M. MURPHY**