# Exhibit 6

KENNETH R. O'ROURKE (S.B. #120144)
korourke@omm.com
PAUL B. SALVATY (S.B. #171507)
psalvaty@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:    (213) 430-6000
Facsimile:    (213) 430-6407

MICHAEL F. TUBACH (S.B. #145955)
mtubach@omm.com
THOMAS P. BROWN (S.B. #182916)
tbrown@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA  94111-3823
Telephone:    (415) 984-8700
Facsimile:    (415) 984-8701

Attorneys for Defendants
HYNIX SEMICONDUCTOR INC. and
HYNIX SEMICONDUCTOR AMERICA, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Sun Microsystems, Inc., a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>Hynix Semiconductor Inc., et al.,<br><br>Defendants. | Case No. C-06-01665 PJH<br><br>**DECLARATION OF ROBERT TOPEL**<br><br><br><br>Hearing Date:  May 7, 2009<br>Time:  2:30 p.m.<br>Place:  Courtroom 3, 17th Floor<br>Judge:  Hon. Phyllis J. Hamilton |

**DECLARATION OF ROBERT TOPEL**

I, Robert Topel, declare the following:

1.      I am Robert Topel, the Isidore and Gladys J. Brown Professor of Economics at the University of Chicago Booth School of Business, and the Director of the George J. Stigler Center for the Study of the Economy and the State, also at the University of Chicago.  I am also a Principal at Chicago Partners,[1] an economic consulting firm that specializes in the application of economic theory to a variety of legal and regulatory issues.  I have been retained by Counsel for Hynix Semiconductor Inc. and Hynix Semiconductor America Inc. ("Hynix") as an expert in this matter.  A more detailed list of my credentials was provided as Appendix A to a report I submitted on behalf of Hynix on March 7, 2008 ("March 2008 Report").

2.      In my March 2008 Report I provided an economic analysis of allegations by a group of Plaintiffs (including Sun Microsystems ("Plaintiff") that those Plaintiffs had been damaged by allegedly collusive conduct by Hynix and other producers of Dynamic Random Access Memory ("DRAM").  In that report, I also offered my evaluation of whether arguments and analysis contained in the expert report of Professor Halbert White provided a reliable framework for measuring "overcharges" due to the allegedly collusive conduct of DRAM sellers, and a reliable method for measuring damages suffered by Plaintiffs.

3.      On March 19, 2009, Plaintiff filed a motion to exclude my testimony in this matter ("Motion to Exclude").[2]  Plaintiff claims in that motion that I did not explain, or do any "research or empirical testing to confirm the reasonableness" of, certain of my assumptions.  Plaintiff claims further that minor changes in certain of my "assumptions" change my analysis and results completely.  Plaintiff also claims that my opinions regarding the behavior and determinants of DRAM prices during the relevant period "run afoul of the abundant and undisputed factual record, including guilty pleas by Hynix Semiconductor Inc. and various Hynix employees, admitting they *did*, in fact conspire to fix DRAM prices."[3]

4.      The Plaintiff's criticisms in the Motion to Exclude reflect a complete

---

[1] Chicago Partners is a subsidiary of Navigant Consulting, Inc.
[2] *Plaintiff's Memorandum of Points and Authorities in Support of their Motion to Exclude the Testimony of the Hynix Defendants' Expert Witnesses Kevin Murphy and Robert Topel Pursuant to Fed. R. Evid. 702* ("Motion to Exclude").
[3] Ibid. at 2. Emphasis in original.

**DECLARATION OF ROBERT TOPEL**

misunderstanding of my assignment in this matter, the purpose of my analysis, my methodology, and my conclusions. Contrary to the Plaintiff's claims, my declaration was not intended, and did not claim, to prove that Hynix and other DRAM suppliers never engaged in communications with the intention or the effect of raising prices to certain OEM customers on certain transactions. Rather, my assignment was to determine "whether there is reliable economic evidence that market prices for DRAM were artificially elevated during the periods in which Plaintiffs allege collusive conduct" and, in the event that reliable evidence is found, to estimate damages that might have been suffered by Plaintiffs.[4] In carrying out this assignment I was fully aware, and clearly stated, that Hynix and other DRAM suppliers and some of their employees had entered into plea agreements with the U.S. Department of Justice, in which they acknowledged certain communications regarding pricing to certain OEMs during certain time periods.[5] The issue before me in *this* case is whether there is reliable economic evidence that such conduct significantly affected market prices of DRAM, and the prices paid by Plaintiff, during the periods that Plaintiff claims were affected by the alleged conspiracy. This is an empirical question that is not resolved by the existence of the indicated plea agreements.[6]

        5.      My March 2008 Report included an economic analysis of the DRAM market and the determinants of the behavior of DRAM prices during the conduct period, as well as a detailed critique of Professor White's methodology and results. First, I showed that an economic model based on fundamental economic concepts and economic determinants of supply and demand can broadly explain the behavior of DRAM prices during the alleged conduct periods. My application of supply and demand to the DRAM industry took into account the importance of the technology boom and bust (i.e., the "tech bubble") and changes in costs, and

---

[4] Ex. 3, Expert Report of Robert Topel, Ph.D. on Behalf of Hynix Semiconductor, Inc. and Hynix Semiconductor America, Inc. March 7, 2008, ("March 2008 Report") at ¶4. All Exhibit numbers in this declaration refer to the Declaration of Predita Rostomian in support of Hynix's Opposition to Plaintiff's Motion to Exclude the Testimony of Hynix's Expert Witnesses Kevin Murphy and Robert Topel, which I understand will be filed today.

[5] Ex. 3, March 2008 Report at ¶12. *See,* also, Ex. 4, Deposition of Robert Topel, April 25, 2008, at 141:18-143:6.

[6] After I submitted my March 2008 Report, I understand that some of the firms that originally were Defendants in this litigation entered into settlements with Sun and other Plaintiffs. I do not know the terms of those settlements and therefore do not know how, if at all, they relate to my analysis.

- 3 -                                  **DECLARATION OF ROBERT TOPEL**

followed previous studies by emphasizing the industry's transitions to new generations of DRAM technology.[7] I explained both the economic theory underlying my methodology and the basis for the assumptions used in my analysis. I concluded that there was no statistically significant evidence that market prices were raised, or market supply reduced, during the conduct periods, and that there was no statistically significant evidence of damages to Plaintiffs or other DRAM buyers.

6. I now discuss the specific criticisms of my analysis in the Plaintiff's Motion to Exclude my testimony. Plaintiff alleges three shortcomings in my analysis.

7. First, Plaintiff claims that by including a linear time trend in a model of the evolution of DRAM supply, Professor Murphy and I have "selected a specification that yields their desired conclusion."[8] Professor Murphy addresses this criticism in his Declaration filed today, because it applies to both of our March 2008 Reports. I have reviewed his Declaration and I concur with his analysis and conclusions.[9]

8. Second, Plaintiff criticizes my (and Professor Murphy's) specification of the "shape" of the demand curve for DRAM, which uses an elasticity estimate relied upon and recommended by the U.S. International Trade Commission ("ITC"). Again, Professor Murphy addresses this criticism in his Declaration. He explains why this critique is unfounded, and he provides empirical evidence to demonstrate that Plaintiff misunderstood the impact of changing the specification. Professor Murphy and I used different price data in our analyses because of differences in our assignments, so I have confirmed his qualitative empirical results using

---

[7] As noted in Professor Murphy's March 2008 Report, examples of learning curves and the importance of the relationship between costs and cumulative production in the DRAM industry are discussed in Flamm, K. "Semiconductor Dependency and Strategic Trade Policy," Brookings Papers: 1993; Flamm, K. Mismanaged Trade? Strategic Policy and the Semiconductor Industry, The Brookings Institute: 1996; Dick, A., "Learning by Doing and Dumping In the Semiconductor Industry," 34 Journal of Law & Economics 133 (1991); Gruenspecht, H., "Dumping and Dynamic Competition," 25 Journal of International Economics 225 (1988). More generally, learning by doing is discussed in Chapters 8 and 11 of Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization, Addison-Wesley: Massachusetts, 3rd Edition, 2000. Ghemawat summarizes a large body of academic studies on the learning and experience curve. Ghemawat, P., "Building Strategy on the Experience Curve." Harvard Bus. Rev., 63, March-April, 1985. Ex. 1, Expert Report of Kevin M. Murphy, March 7, 2008 at n. 93.
[8] Motion to Exclude at 7
[9] Ex. 5, Declaration of Kevin M. Murphy, April 16, 2009.

- 4 -                                         **DECLARATION OF ROBERT TOPEL**

Professor White's price data instead of the WSTS price data used by Professor Murphy.

9.    The table below is comparable to the table on page 23 of Professor Murphy's Declaration. My results confirm that a higher assumed demand elasticity would have resulted in point estimates closer to zero for the overcharges in my Exhibit 8, but this would not have changed my finding that the estimated impact was not statistically significant.[10] Each column displays instrumental variables results based on the demand elasticity indicated in the first row. The second column shows the results that were given in Exhibit 8 of my March 2008 Report. I then show estimates based on other values for demand elasticity. For example, the results in the first column are based on a demand elasticity of -0.3. In this case, the average alleged "conspiracy period" gap between log actual and log but-for prices is -0.0167, which means that actual prices were about 1.7 percent lower than but-for prices. The standard error on this gap is 0.0905, and the t-statistic is -0.18, which means that the gap is not statistically different from zero. For the plea period, the average gap is 0.0705 (about seven percent), which is also statistically indistinguishable from zero. A comparison across the columns in the table shows that the results are similar when the demand elasticity is -0.5, -0.7, or -1.0 and the t-statistics, which provide a test of whether the effect is statistically significantly different from zero, are identical.

---

[10] In fact, as can be seen from the exhibit, the t-statistics for the hypothesis that there is no difference on average between actual and but-for prices during the conduct periods are independent of the assumed demand elasticity.

**DECLARATION OF ROBERT TOPEL**

- 5 -

**Average Price Gap with Alternative Assumed Demand Elasticities**

| | IV | IV | IV | IV |
|---|---|---|---|---|
| **Demand Elasticity** | -0.3 | -0.5 | -0.7 | -1 |
| **Conspiracy Period** | -0.0167 | -0.0130 | -0.0107 | -0.0084 |
| Standard Error | (0.0905) | (0.0704) | (0.0576) | (0.0453) |
| t-stat | -0.18 | -0.18 | -0.18 | -0.18 |
| **Plea Period** | 0.0705 | 0.0548 | 0.0449 | 0.0353 |
| Standard Error | (0.0878) | (0.0683) | (0.0559) | (0.0439) |
| t-stat | 0.80 | 0.80 | 0.80 | 0.80 |

Notes: Standard errors are corrected for autocorrelation, heteroscedasticity and two step estimation.
Source: Topel Analysis (using WSTS Quantity Data and White Price Data).

10.    Plaintiff also criticizes my assumption of a constant demand elasticity. This assumption, which Professor Murphy explained is common in economic literature, allows me to undertake a tractable analysis of the relevant issue and is highly unlikely to affect my conclusions.  My analysis regarding the price impact of the alleged conspiracy does not depend on the elasticity of demand being constant over the entire period.  In fact, the elasticity of demand could be different in each of the three periods – the period before the alleged conduct period, the conduct period, and the period after the alleged conduct period – without affecting my conclusions, because my results depend only on the demand elasticity relevant during the alleged conduct periods.

11.    If the elasticity of demand varied systematically with the size of the gap between actual and but-for supply *within the alleged conduct periods*, then deviations from a constant elasticity of demand potentially could matter.  However, the Exhibit below (which uses Professor White's price data) shows that the gap between actual and but-for supply varies from positive to negative throughout the conduct period, and there is no obvious rationale for how or why the elasticity of demand would be systematically different when the gap is positive and

- 6 -                                    **DECLARATION OF ROBERT TOPEL**

negative in such a way that it would materially alter the conclusions in Exhibit 8 of my March 2008 Report.



Gap Between Actual and Predicted Supply - IV

Source: Topel Analysis (using WSTS Quantity Data and White Price Data).

12.    The Plaintiff's third criticism of my March 2008 Report appears to be that I must be wrong in concluding that there is no compelling economic evidence of material harm to Plaintiff because there is a "proven conspiracy." I discussed above the fallacy in this third criticism. It is wrong because there is no "proven conspiracy" that affects market prices generally. The question whether market prices moved in a way consistent with an effective conspiracy is an empirical question. I explained this in my March 2008 Report and my deposition. My analysis focused on this question and I concluded that market prices did not move in a way consistent with an effective conspiracy.

- 7 -                    **DECLARATION OF ROBERT TOPEL**

13.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed this 16th day of April, 2009, at Chicago, Illinois.

Robert Topel

- 8 -

**DECLARATION OF ROBERT TOPEL**